**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| Gregory Boyer, | |
| Plaintiff, | Case No: 3:20-cv-1123-JDP |
| v. | Judge James D. Peterson |
| Advanced Correctional Healthcare, Inc., *et al.*, | Magistrate Judge Stephen L. Crocker |
| Defendants. | |

| | |
|---|---|
| Gregory Boyer, | |
| Plaintiff, | Case No: 3:22-cv-00723-JDP |
| v. | Judge James D. Peterson |
| USA Medical & Psychological Staffing, Inc., *et al.*, | Magistrate Judge Stephen L. Crocker |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SANCTIONS AGAINST DEFENDANT ADVANCED CORRECTIONAL HEALTHCARE, INC.

Plaintiff Gregory Boyer submits this memorandum in support of his motion (ECF 176) for this Court to impose sanctions on defendant Advanced Correctional Healthcare, Inc. ("ACH") or its counsel for violating the rules of discovery.

### INTRODUCTION

Several years ago this Court noted that it "will not tolerate" "a lack of candor and diligence by . . . counsel in meeting deadlines, in responding to opposing counsel, and in complying with the Federal Rules of Civil Procedure." *Faxel v. Wilderness Hotel & Resort, Inc.*, No. 19-cv-1026, 2020 WL 2569872, at *1 (W.D. Wis. May 21, 2020) (Crocker, M.J.).  ACH and its counsel have engaged in each of these forms of misconduct, and they have done so flagrantly.

In June 2021, at the outset of Plaintiff's *Monell* discovery in this case, ACH counsel told Plaintiff that ACH had no practical way of providing information about deaths of patients under its care, because ACH does not track deaths at the facilities it serves.  Relying on this representation, Plaintiff's counsel stopped trying to gather death evidence from ACH, and instead undertook a broad search for such of public records.  That process was laborious and, even in its ideal form, it could only identify a fraction of the patients who had died in ACH facilities.

In April 2022, another ACH discovery response hinted that there might be more to the story, and that perhaps ACH *did* track deaths in some form after all.  Plaintiff promptly sought to meet and confer with ACH in order to revisit ACH counsel's June 2021 representations.  Instead of providing answers, ACH counsel found every possible means to avoid discussing the matter—unilaterally cancelling scheduled conferences, coming "unprepared" to others, and simply refusing to respond to Plaintiff's discovery correspondence, often for weeks at a time or even longer.  At one point ACH counsel even told Plaintiff and the Court itself that he required an extension to conduct a trial in another matter, after that trial had already been cancelled.

Finally in December 2023, ACH revealed that all along, it had been sitting on an enormous data set, called the "Deaths at ACH serviced facilities," spreadsheet, which tracked hundreds of deaths and other catastrophic events at correctional the facilities ACH served.  The spreadsheet was relevant to Plaintiff's *Monell* claims in its own right. What is more, had it been disclosed on time Plaintiff could have used it to conduct an orderly and thorough search for death information in ACH's own files as well as those of other entities.  That, indeed, is what ACH said it would do in December 2023 to respond to Plaintiff's discovery regarding deaths—the

same discovery that ACH counsel said in June 2021 was unanswerable because ACH did not track deaths.

Even now, ACH's production of *that* information, which it promised would come by December 30, 2023, has not occurred. Plaintiff cannot tell the Court why that is so, because ACH has cut off all communication with Plaintiff's counsel. Since December 20, 2023, Plaintiff has sent nine different emails and telephone messages asking ACH's lawyers to resume discussions about this discovery, and the spreadsheet. They have not responded to a single one.

The prejudice caused by this misconduct is considerable. ACH has left no doubt that at summary judgment and trial, it plans to argue that Plaintiff's *Monell* claims fail because he has not identified enough cases similar to Ms. Boyer's death. But ACH's misconduct has frustrated Plaintiff's efforts to gather that exact evidence. It is too late to gather that evidence now. Trial in this case is set for September 9, and dispositive motions are due on March 8. Plaintiff has already retained experts and has already provided them with the documents about cases at other ACH jails that Plaintiff has been able to gather. Plaintiff cannot remedy the prejudice caused by ACH's misconduct through the discovery process.

Plaintiff therefore seeks a sanctions remedy from the Court. Sanctions are called for here, both to prevent Plaintiff from being injured by ACH's misconduct and to deter such misconduct in the future.

## FACTUAL BACKGROUND

### A.     Plaintiff's *Monell* allegations regarding ACH's national practices.

This case arises from the death of Christine Boyer in December 2019. When Ms. Boyer was booked into the Monroe County jail, she told staff that she had congestive heart failure but did not have the medications she took for the condition. The next day she reported shortness of breath and stabbing chest pain. There was a hospital ER across the street, but instead of having

3

Ms. Boyer sent there to be evaluated, an "on call" practitioner, employed by ACH, told jail staff to give Ms. Boyer aspirin.  Ms. Boyer suffered a fatal heart attack shortly thereafter.

In addition to suing several individuals involved, Plaintiff asserted a Section 1983 claim against ACH.  Among other things Plaintiff has alleged, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that ACH has a widespread practice of providing inadequate medical care to detainees in the various jails it services.  Plaintiff charged that ACH's practices were not confined to the Monroe County Jail—rather, Plaintiff alleged, its policies and practices were "widespread within the facilities at which ACH is contracted to provide medical care," ECF 26 (First Amended Complaint) ¶ 46, "at numerous jails including Monroe County," and were "the moving force driving" the violation of Ms. Boyer's constitutional rights. *Id.* ¶ 47.

Plaintiffs asserting *Monell* claims of a widespread practice have a notoriously weighty burden of proof.  *Monell*'s evidentiary requirements impose "a high bar." *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 987 (7th Cir. 2021).  A plaintiff claiming that "an act [was] performed pursuant to a 'custom' . . . may fairly subject a municipality to liability" only if the plaintiff shows that "the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  And setting aside this bare legal threshold, when a *Monell* plaintiff seeks to prove their claims to a jury, "there can be little doubt that a practice or custom theory will be more persuasive if a plaintiff can show that the defendant . . . company treated other, similarly situated patients in similar unconstitutional ways." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 655 (7th Cir. 2021).

To identify such cases in other jails serviced by ACH, Plaintiff served the discovery that is at issue in this motion.

**B.    Plaintiff's May 2021 *Monell* discovery and ACH counsel's June 2021
representation that ACH does not track deaths at the facilities it services.**

In May 2021 Plaintiff served a set of discovery requests that included Rule 34 Request

27, which asked ACH to produce documents:

> relating to deaths from medical conditions of persons incarcerated
> at facilities serviced by ACH between January 1, 2011 through the
> present, including but not limited to medical records, death
> reviews, mortality and morbidity reports, investigative Documents,
> incident reports, and Communications.

**Ex. 1** ¶ 27.

ACH responded to Request 27 with objections that the request was unduly burdensome,

and it and made no responsive production. *See* **Ex. 2** ¶ 27.  In a subsequent Rule 37 telephone

conference regarding Request 27 and other discovery, ACH counsel (Mr. Knott) told Plaintiff's

counsel that any response to Request 27 would be prohibitively difficult because ACH did not

keep track of deaths at the facilities it serviced.  Plaintiff counsel recounted that representation in

a June 29, 2021 email to ACH counsel following up on their Rule 37 conference:

> We also discussed RFP 27 to ACH. . . . You . . . stated searching
> for responsive cases was difficult because ACH does not track the
> claims made in litigation, and it *does not track deaths or causes of
> death at facilities where it provides medical care*.

**Ex. 3** (emphasis added).

Relying on this representation, Plaintiff stopped trying to gather discovery from ACH

about deaths at other ACH facilities.  Instead, Plaintiff embarked on a broad and laborious search

for instances in which ACH or its employees were involved in adverse medical outcomes similar

to Ms. Boyer's.  But the search was hamstrung.  Plaintiff was effectively limited to a single

source of information:  public federal court filings, as local state court dockets are effectively un-

searchable in a national inquiry.  Plaintiff's search also could not detect cases in which ACH

employees were named as defendants, but ACH was not.  Plaintiff had to exclude cases filed *pro*

*se* because as a rule the complaints in those cases were inarticulate in describing medical issues and other pertinent facts. And Plaintiff's search could not detect deaths that did not result in litigation, either because a case settled before filing or because the dead person's family never sued in court. With these limitations Plaintiff was able to find a limited number of similar cases, most of which are gathered in Plaintiff's current operative complaint. *See* ECF 161 ¶¶ 40-75.

### C. Plaintiff's February 2022 *Monell* discovery and ACH's refusal to meet and confer after admitting in April 2022 that it <u>does</u> track deaths.

In February 2022 Plaintiff served Interrogatory 20, which asked ACH to:

> Describe what efforts, if any, ACH makes to track deaths that occur at the facilities ACH services (including deaths that occur offsite shortly after a critical medical incident the facility), and identify the documents or ESI ACH uses to track such deaths.

**Ex. 4** ¶ 20. Interrogatory 20 was intended as clean-up discovery, which Plaintiff served to memorialize ACH counsel's previous representation that the company did not track deaths at the facilities it served. Plaintiff expected ACH to confirm its lawyer's June 2021 representation that it did not track such deaths. Instead, ACH responded:

> ACH requests that field staff report inmate deaths. It has found the reporting is inconsistent because, among other reasons, ACH staff have limited information about medical care after an inmate leaves the facility, post-release events are not reported, and events are subject to individual interpretation. Subject to the objections, see ACH 19158-19161.

**Ex. 5** ¶ 20. The document referred to by ACH, "ACH 19158-19161," was a chart listing a total of 48 deaths. *See* **Ex. 6** (names redacted).[1] All the deaths occurred in 2021 or later, however, making them of limited value in proving Plaintiff's *Monell* claims for Ms. Boyer's 2019 death.

---

[1] Plaintiff filed an excerpt of this chart as an exhibit to his June 6, 2022 motion to compel, *see* ECF 81-13.

Even so, this response indicated that ACH counsel's June 2021 representation, that ACH did not track deaths at facilities it serviced, was incorrect.  That raised a number of questions. In particular, it suggested that ACH counsel might have been using "track" in the narrowest sense in June 2021, leaving open the possibility that ACH in fact *did* track deaths in some manner, and that there might be custodians, repositories, or keywords that could be used to identify and gather documents or information from ACH about deaths at its facilities.

After a preliminary call covering a variety of discovery topics in April, Plaintiff set about to explore these possibilities.  On May 23, 2022, Plaintiff sent a Rule 37 email to ACH asking for clarification of ACH's responses to the Rule 27 / Interrogatory 20 "death discovery." **Ex. 7**.  In the May 23, 2022 email, Plaintiff pointed out to ACH counsel that on their June 2021 call, "you stated that ACH does not track deaths," but that ACH's "response [to Interrogatory 20] concedes that ACH \*does\* ask for staff to report inmate deaths, and indeed you provide a tracking spreadsheet." *Id.*  This response, Plaintiff noted, raised a number of questions about ACH's tracking of deaths, including "how the information is stored or what information is stored," and "how long ACH has tracked deaths."  *Id.*  In that light, Plaintiff counsel wrote, ACH's response to Request 27 was incomplete.  *Id.*  Plaintiff counsel asked for a Rule 37 conference to discuss ACH's responses to both Interrogatory 20 and Request 27.  *Id.*

The conference Plaintiff requested never occurred.  The parties scheduled the Rule 37 conference for June 3, but a few minutes before it was set to start, ACH counsel emailed to cancel the call. **Ex. 8**.  In doing so, ACH counsel indicated that he was cutting off discussion of Request 27 and Interrogatory 20 entirely, saying that "We have no time to listen to your multiple hour filibuster or talk to you yet again about topics we've discussed repeatedly for over a year."

*Id.*[2]  At this point, however, Plaintiff and ACH had never held a substantive discussion about ACH's response to Interrogatory 20.  Nor had they held any sort of discussion about ACH's response to Request 27 in light of ACH's new admission that it *did* track Deaths at ACH serviced facilities.  Plaintiff counsel responded asking to hold the conference, *see* **Ex. 9**, to no avail.

### D.    Plaintiff's June 6, 2022 motion to compel and the tabling of Plaintiff's "death" discovery.

After ACH counsel cut off the parties' Rule 37 conference on June 3, 2022, Plaintiff filed a motion to compel on June 6.  ECF 81.  Plaintiff's June 6 motion to compel pointed out ACH's broad refusal to meet and confer regarding Plaintiff's discovery, including Request 27, *see* ECF 81 at 1-3, and asked the Court to order ACH simply to revisit Request 27 in light of ACH's revelation that it did track deaths.  *See* ECF 81 at 6 ("Now that ACH has confirmed that it does in fact track deaths of persons who die at the facilities it services, it should be ordered to revisit its initial response to Request No. 27 and produce documents.").

This request was ultimately tabled for a year.  While Plaintiff's June 6 motion to compel was pending, the two municipal defendants in the case (Monroe County and ACH) filed Rule 12(c) motions to dismiss Plaintiff's *Monell* claims, *see* ECF 105 & ECF 107.  ACH argued in its Rule 12(c) motion that the medical care it provided at other facilities across the country was outside the scope of an appropriate *Monell* theory.  *See* ECF 106 at 2.  Because that contention would render the death documents sought in Request 27 irrelevant to the *Monell* claims in the case, the Magistrate Judge tabled Plaintiff's motion to compel, dismissing it without prejudice

---

[2]  Plaintiff quoted from this email in his June 6, 2022 motion to compel.  *See* ECF 81 at 2.

until the Court had ruled on the Rule 12(c) motions, since that ruling would define the scope of *Monell* discovery going forward.  *See* ECF 130 at 3-4.

### E.    The Court's June 13, 2023 Rule 12(c) *Monell* decision and ACH's foot-dragging and refusal to meet and confer regarding the "death" discovery.

On June 13, 2023, the Court issued its Rule 12(c) order, rejecting the municipal defendants' Rule 12(c) motions in their entirety, and endorsing the national scope *Monell* evidence that Plaintiff had advanced in his Rule 12(c) briefing.  *See* ECF 134 at 12-15.  On June 26, 2023, with the relevance of Request 27 resolved in Plaintiff's favor, Plaintiff counsel sent a Rule 37 letter to ACH counsel, explaining that Plaintiff sought to resume discussion of the discovery at issue in Plaintiff's June 6, 2022 motion to compel.  *See* **Ex. 10**.  The June 26, 2023 letter Request 27 and Interrogatory 20 at length.  *See id.* at 2 (*heading* – "Discovery relating to deaths in facilities serviced by ACH").  Plaintiff also proposed and coordinated a Rule 37 conference with the defendants for July 13, 2023, specifically to discuss the items in the June 26 letter. *See* **Ex. 11**.

On July 13, 2023, the parties held the telephone conference as scheduled.  ACH counsel Mr. Knott and Daniel Kafka were on that call.  While the parties conferred about other discovery matters during that call, ACH counsel was not prepared to discuss the substance of the June 26 letter—the very purpose for which the parties had agreed to the Rule 37 conference. On July 14, Plaintiff counsel sent an email summarizing the July 13 call.  **Ex. 12**. In that email, Plaintiff counsel recited that the parties had agreed during the July 13 call that ACH counsel "will provide their position on 7/28" regarding the bulk of the items discussed in the June 26 letter, including

the Request 27 / Interrogatory 20 discovery.[3]  *Id.* at 1. In the same email Plaintiff told ACH

counsel their lack of preparation to discuss the June 26 letter was delaying discovery.  *Id.* at 2.

       July 28 came and went with no response from ACH.  On July 30, Plaintiff wrote to ACH

counsel to ask that ACH address the items in the June 26 letter by August 4.  **Ex. 13**.  On August

4, ACH counsel (Mr. Knott) responded and requested until August 15 to respond, to which

Plaintiff agreed.  **Ex. 14**.  On August 15, ACH (Mr. Knott) emailed a terse written response to

the June 26 letter.  **Ex. 15**.  Regarding Request 27 / Interrogatory 20, Mr. Knott's email stated:

> With respect to Interrogs No. 20 and RFP 27: Your June 26
> correspondence misstates the course of our discussion over many
> months and the basis for our objections. The request is plainly over
> broad and unduly burdensome on its face.  You continually omit
> the stated work product and atty/client privilege objections, which
> the Magistrate Judge has concluded with respect to the Boyer
> matter are valid.  As we have discussed many, many times over
> several months, ACH has no ability to identify a universe of
> "deaths related to medical conditions" in a 12 year window at more
> than 300 facilities it serves.

**Ex. 15**.  In the same email, Mr. Knott pre-emptively shut down any telephonic meet-and-confer

regarding any of the positions ACH had taken in the August 15 email.  *Id.*

       On August 16, Plaintiff counsel responded to Mr. Knott's August 15 email, again

requesting a Rule 37 conference to discuss Regarding Request 27 / Interrogatory 20.  **Ex. 16**.  In

---

[3]  ACH has claimed elsewhere that "ACH was *not* unprepared to discuss the items plaintiff
highlighted as outstanding [at the July 13 conference]. Rather, plaintiff's counsel was simply
unsatisfied with ACH Defendants' position, *i.e.*, defendants maintained their previously stated
objections."  ECF 158 at 3 (emphasis original). That claim is impossible to square with the
parties' contemporaneous communications, particularly Plaintiff counsel's July 14 email reciting
the parties' agreement that ACH counsel would "provide their position" regarding the discovery
items in the June 26 letter by July 28. **Ex. 12** at 1.  For ACH's claim to be true, it would mean
that Plaintiff counsel both fabricated this agreement *and* email the fabricated agreement to
opposing counsel one day after the July 13 conference. That is simply implausible.

particular, Plaintiff noted, there were a number of questions unanswered regarding what information about deaths might be available in ACH's files:

> [D]oes ACH track this information [*i.e.*, deaths at other facilities]? Is there a single person or department that gathers it? Is responsive information--or at least a lot of it--contained in a particular file folder? Is there some point past which gathering the documents creates particular burdens--perhaps because ACH changed the way it recorded information? You have never specified what the burdens would be, either in writing or over the phone.

**Ex. 16**. Plaintiff went on, "[w]e are happy to discuss ways to address your burden objections, in order to mitigate them . . . But we do not know what the particulars of your burden objection are." *Id*. Plaintiff again asked to resume the parties' Rule 37 conference, writing, "I reiterate: we are willing to discuss your burden objections and determine how to address them." *Id.*

> **F.** **Plaintiff's September 5, 2023 motion to compel, ACH counsel's misleading statements to enable further delay, and ACH's failure to make the "death" production it had proposed.**

Plaintiff counsel received no response to his August 16 email.[4] So on September 5, Plaintiff filed a motion to compel several discovery items raised in the June 26 letter, including Request 27. *See* ECF 148. Plaintiff noted once again ACH's conflicting representations about whether it "tracked" deaths, observing that "ACH may well be using the term in the narrowest sense," but that "Plaintiff knows little, because substantive discussions about this discovery have never actually occurred." ECF 148 at 6.

---

[4]  In a pleading with the Court, Mr. Knott later claimed he did not respond to Plaintiff's August 16 email because he was busy preparing for a trial. ECF 158 at 3. The trial in question, however, was the *Swayzer* trial, a one-week trial scheduled to being on September 18—more than a month after Plaintiff's August 16 email. *See* ECF 152 ¶¶ 1. In another pleading Mr. Knott states that he only became "heavily engaged" in preparing for the *Swayzer* trial after September 1, 2023. *See* ECF 152 ¶ 2. That means that Mr. Knott simply chose to ignore Plaintiff counsel's August 16 email for two weeks before turning to trial preparation on September 1.

On September 14, 2023, Plaintiff counsel received a telephone call from ACH counsel (Mr. Knott). This was the first communication Plaintiff counsel had received from ACH since ACH counsel's August 15 email. ACH counsel told Plaintiff that he had a trial beginning the following Monday, September 18. ACH counsel told Plaintiff that once the trial was completed, ACH could hold a meet-and-confer regarding the matters raised in Plaintiff's motion to compel, and proposed to hold the call on September 28. Plaintiff counsel protested that this delayed ACH's discovery response to the matters raised in the June 26 letter even more. With no practical means of forcing an earlier response, however, Plaintiff consented.

On September 18, with Plaintiff's reluctant agreement in hand, ACH filed a motion with the Court to extend its deadline to respond to Plaintiff's motion to compel. ECF 152. In the motion, ACH stated that ACH counsel had "been heavily engaged in trial preparation for another matter, *Swayzer v Milwaukee County et. al.*, No. 16-cv-1703, scheduled for trial September 18, 2023 through September 22, 2023," ECF 158 ¶ 2, and requested "an extension of two weeks to resume work on the response [to Plaintiff's motion to compel, ECF 148] and complete it due to other impending obligations such as trial." *Id.* ¶ 3. ACH noted that Plaintiff had agreed to hold a meet-and-confer on September 28, *id.* ¶ 7, and requested an extension to October 2 to file any response. *Id.* The Court granted ACH's motion. ECF 153.

There was no *Swayzer* trial, however: when ACH filed its motion on September 18, the *Swayzer* trial had already been cancelled. On September 15, 2023—the day after Mr. Knott had called Plaintiff counsel to request the extension—Mr. Knott had filed a notice in the *Swayzer* case, informing the district court that the parties had settled. *See* **Ex. 17** (*Swayzer v. Witkowiak et al.*, No. 16-cv-01703, ECF 684 (E.D. Wis. Sept. 15, 2023) (letter from Douglas Knott to the district court stating, "I am writing on behalf of the parties to inform the Court that the parties

12

have reached an agreement to resolve all claims and *will not need to proceed to trial* this Monday, September 18, 2023." (emphasis added)).

ACH never told Plaintiff (or the Court) that the *Swayzer* trial had been cancelled, and the parties held the conference as originally scheduled on September 28 (with continued calls on October 3 & October 6).  ACH counsel (Mr. Knott) opened the September 28 call by proposing to resolve Plaintiff's motion to compel Request 27 by examining litigation assessments performed for deaths,[5] and then providing Plaintiff with information about those deaths.[6]

Plaintiff agreed to this proposal.  But Mr. Knott said that this discovery response would be delayed as well, because he had another trial coming up, and would therefore need an extension until October 27.[7]  Plaintiff counsel protested but once again, with no practical way to force an earlier response, Plaintiff had little choice but to agree to the October 27 response date.

Meanwhile, on October 2, ACH filed a partial response to Plaintiff's motion to compel, regarding another disputed matter.  *See* ECF 158. Once again, ACH told the Court that ACH's response to Plaintiff's discovery was delayed by the *Swayzer* "trial," stating:

> The subject motion to compel [ECF 148] was served on September 5, 2023 while ACH's counsel remained fully occupied by trial preparation. ACH Defendants informed plaintiffs' counsel of that fact and a Rule 37 Conference was scheduled for Thursday, September 28, the first available date for both parties *following ACH Defendants' counsel's trial in the other matter*.

---

[5]   As the Court will recall, ACH performed a "litigation assessment" regarding Ms. Boyer's death, which has been the subject of some motion practice in this case.  *See* ECF 61; ECF 164. ACH counsel proposed to review other assessments in other cases and provide a response.

[6]   Mr. Knott represented that reviewing each litigation assessment would be burdensome and therefore asked to limit the response to January 1, 2016 going forward.

[7]   Mr. Knott has never identified the name of this other case.

ECF 158 at 3 (emphasis added). While preparing Plaintiff's reply in support of the motion to compel (*see* ECF 163, filed on October 10, 2023), Plaintiff counsel pulled up the *Swayzer* docket. It was then that Plaintiff saw that the *Swayzer* trial had never occurred.

On October 11, Plaintiff counsel emailed ACH counsel and demanded that, in light of Mr. Knott's conduct obtaining the extension for the *Swayzer* "trial," ACH should respond immediately to Request 27 / Interrogatory 20, with no extension to October 27. **Ex. 18**. ACH counsel never responded. ACH made a production of several other documents that the parties had agreed to on October 30, but produced nothing in response to Plaintiff's death discovery.

### G.    ACH's December 2023 production of the "Deaths at ACH serviced facilities" spreadsheet and ACH counsel's subsequent refusal to communicate.

After examining ACH's production and conducting a search to determine whether some additional production might have been missed, Plaintiff counsel wrote ACH counsel to inquire about the apparently missing production responsive to Request 27 / Interrogatory 20. This time Mr. Knott really was out for trial, so Plaintiff counsel was connected with the associate on the case, Daniel Kafka. Mr. Kafka agreed to supplement ACH's response to Request 27. On December 8, ACH served a supplemental written response to Request 27, *see* **Ex. 19**. The table, however, was the same table ACH had produced in April 2022, tracking deaths beginning in 2021. *Cf.* **Ex. 6**.[8] Plaintiff counsel contacted Mr. Kafka to point out this fact, and Mr. Kafka agreed to supplement ACH's response again.

ACH provided that second supplementation on December 12. The supplement included a supplemental written response to Request 27, **Ex. 20**, which directed Plaintiff to a spreadsheet.

---

[8] The table produced by ACH on December 8, 2023 is marked as confidential and Plaintiff therefore has not produced it. The undersigned counsel avers that the December 8 table is the same four-page table as produced in Exhibit 6. Though the four pages are arranged in a different order, the December 8, 2023 table does not appear to have been updated since April 2022.

ACH has marked that spreadsheet as confidential, and Plaintiff has filed it separately under seal.
(**Ex. 28**) ECF 175.  The spreadsheet is titled "**Deaths at ACH serviced facilities 1.1.16 to
7.28.23**."  The Deaths at ACH serviced facilities" spreadsheet lists deaths (along with several
other catastrophic events) at facilities that ACH services across the country going back to 2016.[9]
The spreadsheet contains columns for each patient's name and age, the date of the incident, the
name and location of the facility where the incident occurred, and a "Result Description," which
lists "death," "suicide," "attempted suicide," or "dead on arrival" for each entry.  The
spreadsheet contains **408 entries**, including **299 death** entries.  Ms. Boyer's death is among
them:

| Claim Number | Age On Occurr | Claim Date | Claimant | Gender | Incident Date | Facility Name | Facility Location City | Facility Location State | Facility Location County | Result Description |
|---|---|---|---|---|---|---|---|---|---|---|
| ACH-19-437962 | 41 | 01/16/20 | Boyer, Christin | F | 12/23/19 | Monroe County Jail | Sparta | WI | Monroe | Death |

Plaintiff counsel immediately requested a conference regarding the "Deaths at ACH
serviced facilities" spreadsheet, and a call was held with Mr. Kafka on December 12.  Plaintiff
counsel made number of initial inquiries, and the parties scheduled a follow-up call for
December 15. *See* Ex. **21**.  On the December 15 call, Mr. Kafka reported that the "Deaths at
ACH serviced facilities" spreadsheet tabulates information about catastrophic incidents
(including deaths) at ACH facilities for which ACH has sent a litigation alert to its retained third-
party claims administrator, a company called Gallagher Bassett Services, Inc.[10]  Mr. Kafka said
that ACH intended resolve Plaintiff's September 5 motion to compel by using the "Deaths at
ACH serviced facilities" spreadsheet to locate documents responsive to Request 27 /

---

[9]   Mr. Kafka explained that the spreadsheet tracked deaths before January 1, 2016, but that
ACH had cut off the spreadsheet on that date for production to Plaintiff.

[10]   The "claim number" field in the table is Gallagher Bassett's tracking number for each
event.

Interrogatory 20, and that ACH would make a production of the resulting documents / information on December 30.  Plaintiff raised several additional questions, and the parties scheduled a follow-up call for 12:00 p.m. on December 20, 2023 to address them.  Plaintiff memorialized those follow-up questions in an email. **Ex. 22**.

 December 15 was Mr. Knott's last day out of the office, and it marked the end of ACH's cooperation with Plaintiff about the "death" discovery. On December 20, Plaintiff counsel called ACH at the agreed-upon conference time of 12:00 pm.  Nobody answered, so Plaintiff counsel emailed Mr. Kafka. **Ex. 23**.  A few minutes later Mr. Kafka wrote back, responding that Mr. Knott had asked to reschedule the call to the next day.  **Ex. 24**.

 This would be the last communication Plaintiff counsel received from ACH regarding its responses to Request 27 / Interrogatory 20.  Plaintiff counsel responded via email immediately and explained to Mr. Kafka that the next day would be impossible because of a family trip but offered to meet instead at another time.  Receiving no response, Plaintiff counsel wrote back a few hours later, and then a few hours later.  No response.  Plaintiff counsel wrote on December 22, December 26, December 29 (which Plaintiff counsel accompanied with a call and voicemail to Mr. Knott), January 2, and January 11. **Ex. 25** (gathering emails).  In each of these calls and emails, Plaintiff has asked ACH counsel to resume the December 20 discovery conference that ACH had cancelled.  As of the filing of this motion, Plaintiff counsel has received no response from ACH counsel to any of these communications, in any form.  And though Mr. Kafka told Plaintiff ACH would be making a production responsive to Request 27 / Interrogatory 20 by December 30, 2023, that production has never occurred.  Plaintiff's communications to ACH have asked about this production as well; again, ACH has not responded in any form.

**H.       Current case deadlines and Plaintiff's expert reports.**

The deadline for dispositive motions in this case is March 8, 2024 and trial is set for

September 9, 2024.  *See* June 28, 2023 Text Order.  Plaintiff has retained experts and will shortly

be making Rule 26(a)(2) disclosures.  One of the experts Plaintiff has retained is reviewing

adverse medical outcomes at ACH facilities across the country to offer opinions about ACH's

national medical practices.  Given the deadlines in this case, it is now too late to provide that

expert with any eventual ACH production responsive to Request 27 or Interrogatory 20 relating

to deaths of other patients under ACH's care.  In light of these circumstances, Plaintiff has

brought the present motion for sanctions.

## ARGUMENT

**A.       ACH and its counsel violated their discovery obligations.**

The conduct of ACH and its counsel with respect to Plaintiff's discovery about Deaths at

ACH serviced facilities implicates basic obligations of parties and their counsel in conducting

litigation.  "Parties have a duty to provide true, explicit, responsive, complete, and candid

answers to discovery." *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839,

945 (N.D. Ill. 2021).  That duty requires parties and their attorneys "to act in good faith in

complying with their discovery obligations and to cooperate with and facilitate forthright

discovery. *Next Millenium Telecom Co. v. Am. Signal Corp.*, No. 20-cv-178, 2022 WL

20690797, at *2 (E.D. Wis. Sept. 14, 2022) (quotation omitted).  A party violates that duty to

cooperate "by providing evasive and incomplete" discovery responses, *Am. Rsrv. Corp. v.

Holland*, No. 80-b-04786, 1991 WL 172011, at *3 (N.D. Ill. Aug. 30, 1991), including by

making inaccurate representations about "locations and nature" of documents and information

responsive to a discovery request.  *DR Distributors, LLC*, 513 F. Supp. 3d at 945–46.

Besides being complete and accurate, discovery responses must be timely. "'[E]vidence of foot-dragging or a cavalier attitude towards . . . the discovery rules' warrants strong action by the Court." *Novelty, Inc. v. Mountain View Mktg., Inc.*, 265 F.R.D. 370, 382 (S.D. Ind. 2009) (quoting *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 335 (N.D. Ill. 2001)). Such misconduct includes delay brought about by a refusal to meet and confer. *See, e.g.*, *Gross v. PPG Indus., Inc.*, No. 07-cv-982, 2009 WL 159261, at * 1 (E.D. Wis. Jan 22, 2009) (holding that telephone and e-mail correspondence was insufficient to satisfy a party's Rule 37 conference requirements where the tone of those communications demonstrated a lack of sincere conciliatory effort). And, "it goes without saying that attorneys should make every effort to ensure that their statements to us (or any court, actually) are accurate." *Willis Corroon Corp. v. Home Ins. Co.*, 203 F.3d 449, 454 (7th Cir. 2000)).

These basic rules undergird every case litigated in a federal district court. ACH and its counsel violated them in a sustained manner in this case, and they did so during nearly all of fact discovery in this case. The "Deaths at ACH serviced facilities" spreadsheet was, as ACH's December 12, 2023 response acknowledges, responsive to Request 27. The spreadsheet, moreover, was not merely relevant to Plaintiff's *Monell* claims in its own right. Its tabulation of hundreds of deaths (and other catastrophic events) at ACH facilities provided a ready means for Plaintiff to seek *other* evidence about those events. Indeed, that is what ACH said it would do by December 30, 2023 (but has not yet done) in order to finally respond to Request 27 / Interrogatory 20.

The hundreds of entries in the "Deaths at ACH serviced facilities" spreadsheet make plain that ACH has tabulated deaths and other catastrophic events at the facilities it services for years before Ms. Boyer entered the Monroe County jail in December 2019. Yet ACH withheld

this important document when Plaintiff requested it.  ACH should have produced the "Deaths at

ACH serviced facilities" spreadsheet in June 2021 when ACH first responded to Plaintiff's

Request 27.  Instead, ACH counsel misled Plaintiff, telling him, falsely, that responding to

Request 27 would be unduly burdensome because ACH *did not keep track of deaths at facilities

that it serviced*.

The nature of this conduct bears repeating: ACH counsel said in June 2021 that

responding to Request 27 was unduly burdensome because ACH did not track deaths—thus

representing that nothing resembling the "Deaths at ACH serviced facilities" spreadsheet existed.

Yet in December 2023, two and a half years later, ACH counsel proposed ***using*** the deaths

tracked in the "Deaths at ACH serviced facilities" spreadsheet to locate and gather information to

finally respond to the exact same discovery—Request 27. (And even that promised production

has never occurred.)

**B.      Plaintiff has been prejudiced by ACH's misconduct.**

The prejudice caused by the misconduct of ACH and its counsel is concrete, specific, and

acute.  And as set forth below, ACH appears prepared to capitalize on its wrongdoing at the

summary judgment and trial phases of this case.

**1.      ACH's misconduct deprived Plaintiff of the opportunity to gather
*Monell* evidence.**

By misleading Plaintiff about whether it even tracked deaths at its facilities, ACH counsel

affirmatively misdirected Plaintiff away from ACH's own data repositories as a potential source

of information on Deaths at ACH serviced facilities.  Yet all along, the "Deaths at ACH serviced

facilities" spreadsheet contained a roadmap that Plaintiff could have used to investigate deaths at

the various jails ACH serviced.  Plaintiff could have used the spreadsheet to request additional

evidence about deaths from ACH itself—again, that is the very thing that ACH proposed to do in

December 2023 to resolve Plaintiff's September 5, 2023 motion to compel.  Or, Plaintiff could have used the spreadsheet to gather documents from the various jails where the people listed on the spreadsheet had been housed.  Or, Plaintiff could have used the spreadsheet to gather evidence from ACH's third-party claims administrator, Gallagher Basset, whose index numbers appear on the spreadsheet itself.[11]  By misleading Plaintiff about information in ACH's possession, ACH prevented any of this from occurring.  Instead, relying on ACH counsel's misrepresentation, Plaintiff counsel embarked on the costly and badly imperfect search through public records described elsewhere in this motion.

ACH might have mitigated some of this prejudice had it met and conferred with Plaintiff after conceding, in April 2022, that it *did* perform some tracking of deaths at its facilities.  Such a conference would have resulted in identification of the "Deaths at ACH serviced facilities" spreadsheet in May of 2022. But that did not occur either.  Instead, from April 2022 forward, through December 2023, ACH counsel repeatedly cut off Plaintiff counsel's attempts to conduct a Rule 37 conference to understand what sort of tracking ACH actually performed.  ACH counsel did this in a variety of ways—cancelling Rule 37 conferences at the last minute; coming to other conferences "unprepared" to discuss the death discovery; and simply ignoring Plaintiff counsel's repeated requests to hold a conference.  To enable these stalling tactics, ACH counsel

---

[11]  Third-party claims administrators like Gallagher Bassett typically investigate and gather factual information about events potentially giving rise to a claim, and while some parts of their files may fall under the work-product privilege, medical records and similar factual information gathered by such third-party administrators generally do not.  *See, e.g¸ El-Barbarawi v. Home Depot U.S.A.*, No. 19-cv-2520, 2020 WL 11269818, at *2 (N.D. Ill. Nov. 5, 2020) (factual information gathered by third-party claims administrator in investigating incident is not privileged); *Beal v. Treasure Chest Casino*, No. 98-cv-0786, 1999 WL 461970, at *4 (E.D. La. July 1, 1999) (in adjudicating claim of privilege over documents held by third-party claims administrator, "[t]o the extent that [the document] conveys factual information, that information is protected by neither the attorney-client privilege nor the work product doctrine.").

even made false representations.  ACH counsel extracted a costly extension from Plaintiff by invoking the impending *Swayzer* trial, but when that case settled the next day, ACH counsel never updated Plaintiff counsel that the reason for the extension had ceased to exist.  Instead, **after** the *Swayzer* case had settled, ACH counsel falsely told the Court—on two occasions—that the extensions and delays in responding to Plaintiff's discovery were required because of the *Swayzer* "trial."

ACH counsel (Mr. Knott) then ignored even the eleventh-hour October 27, 2023 deadline that he obtained with these representations and does not appear to have intended to respond in any form.  Only when Mr. Knott was out of the office and Plaintiff counsel was able to confer with an associate at his firm instead did ACH produce the "Deaths at ACH serviced facilities" spreadsheet, revealing that ACH had been tracking deaths at its facilities all along.

In a few words, ACH's misconduct has effectively misdirected Plaintiff away from hundreds of relevant cases that could have been used to develop evidence to support his *Monell* claims against ACH.  It is too late to obtain that evidence now.  As Plaintiff has noted, dispositive motions are due on March 8, 2024.  To meet that date Plaintiff is preparing expert reports, and he has already provided material to his expert witnesses.  Under the schedule set by this Court, it simply will not be possible to use the "Deaths at ACH serviced facilities" spreadsheet to gather additional *Monell* information and provide it to Plaintiff's expert in time.

**2.      ACH's *Monell* defense strategy capitalizes on its discovery misconduct.**

Plaintiff need not speculate about the prejudice resulting from this missing information on other deaths.  ACH has already argued that the limited number of cases Plaintiff has been able to identify (through the imperfect public record searches described *supra*) are not enough—too few in number and too dissimilar in medical condition to shed light on ACH's widespread

practices under *Monell*.  ACH has argued that "the scattershot lawsuits [identified in Plaintiff's complaint] against ACH" fail to support Plaintiff's charge that "ACH has a practice of refusing outside medical care."  ECF 119 at 9.  ACH argues that the other "arise over many years and involve diverse medical conditions, none of which is facially similar to Ms. Boyer's," ECF 106 at 11, that "[t]here are no commonalities among the [other ACH] cases" that Plaintiff had identified, ECF 70 at 5, and that the "[d]isparate 'bad acts'" Plaintiff had pointed to "are not probative of a 'pattern' or 'practice'" by ACH.  *Id.*

The thrust of this *Monell* defense strategy is plain enough: ACH plans to argue that Plaintiff has not identified a sufficient number of sufficiently similar cases to support a *Monell* widespread practice claim against it. Thus far the Court has turned these arguments away, but that is only because ACH has made them too early: as the Court explained in its June 13 Rule 12(c) opinion, "[w]hether these incidents are sufficiently similar to each other or the circumstances leading to Christine's death and are otherwise relevant to the alleged policies at issue in this case are not questions to be resolved at the pleading stage." ECF 134 at 16.  Rather, the Court held, the place for such arguments is summary judgment and trial.  *See* ECF 134 at 16 (noting that a *Monell* plaintiff must offer *evidence* of widespread practices at summary judgment and trial).  It is a sure bet that ACH will raise the same arguments at summary judgment and again at trial, and will attempt to convince the Court, and then a jury, that Plaintiff has identified too few similar incidents to establish a pattern of inadequate medical care by ACH.

In this light, the conduct of ACH and its counsel is exceptionally troubling.  ACH gives every impression of attempting first to evade discovery by misleading Plaintiff, and then by running out the discovery clock in the service of achieving a concrete litigation advantage.  It is difficult to understand any other reason for the inexplicably long periods in which ACH counsel

simply refused to engage in Rule 37 conferences, or counsel's willingness to mislead even the Court about its reasons for those delays. Such misconduct merits sanction in its own right.

### C. The purpose of discovery sanctions: to make the injured party whole and to deter future misconduct.

"A district court has broad discretion in deciding whether a violation of the rules of discovery warrants the imposition of sanctions." *Matei v. Cessna Aircraft Co.*, 35 F.3d 1142, 1147 (7th Cir. 1994). That sanctions authority arises from the Court's inherent power. *See Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015) (noting that "A district court has inherent power to sanction a party who had willfully abused the judicial process or otherwise conducted litigation in bad faith." (quotation omitted)). It also arises from Rule 26(g)(3), which provides that by signing a discovery response a party certifies that "it is complete and correct as of the time it is made," along with Rule 26(e), which requires timely supplementation of incomplete discovery responses; upon a finding that this rule has been violated, a court "must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3).

The authority to sanction also arises under Rule 37(c), which provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e)," the court may impose a variety of sanctions, including "directing that . . . designated facts be taken as established for purposes of the action, as the prevailing party claims[,]" Rule 37(b)(2)(A)(i),[12] "prohibiting the . . . party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," Rule 37(b)(2)(A)(ii), and "inform[ing] the jury of

---

[12] Sanctions enumerated in Rule 37(b)(2) may be imposed pursuant to Rule 37(c)(1)(C).

the party's failure [to provide information or identify a witness.]" Rule 37(c)(1)(B).  Monetary sanctions are available as well.  *See, e.g.*, Rule 26(g)(3); Rule 37(c)(1)(A).

Whatever its source, the sanctions imposed should accomplish two goals: they should "make [moving party] whole for the injury" caused by the offending party's misconduct, and they should be "designed to deter the type of [discovery] misconduct" at issue. *DR Distributors, LLC*, 513 F. Supp. 3d at 864 (citing *NHL v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)). Plaintiff respectfully submits that both forms of sanction are appropriate in this case.

### D.     Proposed sanctions.

Plaintiff submits that the following sanctions are called for:

***First***, ACH should be barred from seeking summary judgment on grounds that Plaintiff has failed to come forward with sufficient evidence of the widespread practices alleged in Plaintiff's complaint.  *See* ECF 161 ¶ 157.  This sanction is contemplated by Rule 37(b)(2)(A)(ii) (enumerating sanction of "prohibiting the disobedient party from supporting or opposing designated claims or defenses"), and limiting the scope of a party's summary judgment contentions is an accepted form of sanction for discovery violations.  *See, e.g.*, *Bluestein v. Cent. Wisconsin Anesthesiology, S.C.*, 296 F.R.D. 597, 602 (W.D. Wis. 2013) (barring plaintiff from relying on certain documents in response to defendant' motion for summary judgment); *Exxonmobil Glob. Servs. Co. v. Bragg Crane Serv.*, No. 4:21-CV-03008, 2023 WL 2825691, at *1 (S.D. Tex. Mar. 8, 2023) (issuing Rule 37 discovery sanction barring defendant from seeking summary judgment on certain issues because of defendant's discovery misconduct).  A widespread-practice *Monell* claim is proved through examination of other cases—precisely what ACH's discovery misconduct frustrated.  Limiting ACH's ability to reap the benefits of that misconduct at summary judgment is appropriate.

***Second***, Plaintiff must also be protected from the harm caused by ACH's misconduct if the case proceeds to trial. The Court has multiple sanctions at its disposal, including an order that ACH's widespread practices as Plaintiff has alleged be taken as established. *See* Rule 37(b)(2)(A)(i) (empowering court to issue sanctions order "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims"). Plaintiff believes that a more calibrated sanction will be adequate: an instruction from the Court informing the jury of ACH's misconduct. *See DeCastro v. Kavadia*, 309 F.R.D. 167, 180 (S.D.N.Y. 2015) (noting that Rule 37 "allows for a court to sanction a party that . . . has withheld documents it was obligated to produce by . . . . inform[ing] the jury of the nature of the party's misconduct . . . ."); *Stillman v. City of Terre Haute*, No. 2:17-cv-00394, 2019 WL 1258793, at *3 (S.D. Ind. Mar. 19, 2019) (noting that sanctions available for failing to respond to discovery include "an adverse jury instruction").

Judge Kennelly imposed such a sanction in *Young v. Cook County*, No. 06-cv-552 ECF 402 (N.D. Ill. Aug. 3 2009), in circumstances closely analogous to those at issue here. In *Young*, the defendant failed to respond to the plaintiffs' request to produce multiple grievances relating to strip searches. *Young* ECF 402 at 3. (A copy of Judge Kennelly's *Young* ruling is attached as **Ex. 26**.) After finding that the failure was not justified, *id.*, Judge Kennelly additionally found that the plaintiffs were prejudiced, since they were "deprived of the opportunity to call the grievance filers as witnesses and to conduct discovery and possibly present evidence regarding what became of these grievances," thus hindering the plaintiffs' ability to prove a widespread practice in their case. *Id.* As part of the remedy for this violation, Judge Kennelly invited the plaintiffs to propose a "jury [] instruction regarding defendants' noncompliance with discovery obligations," **Ex. 26** at 3, and issued the following instruction for trial:

25

> [D]uring the preparation of this case, the defendant was obligated
> by court rules to search for and promptly turn over to the plaintiffs'
> attorneys all detainee grievances involving intake strip searches
> during the period that is relevant to this case.  Prior to the trial, I
> determined that the defendant failed to properly search for all such
> grievances. You may infer from this that there were additional
> grievances regarding intake strip searches that the defendant failed
> to locate and failed to turn over.

**Ex. 27** at 10.   A similar instruction is appropriate in this case.  Plaintiff proposes the following

instruction, which draws on the instruction provided by Judge Kennelly:

> During the preparation of this case, ACH was obligated by court
> rules to search for and promptly turn over to Plaintiff's attorneys
> all documents and information identifying deaths of its patients in
> correctional facilities that it served. Prior to the trial, I determined
> that ACH failed to properly search for and disclose all such
> documents and information. You may infer from this that there are
> additional deaths of patients at ACH facilities that ACH failed to
> identify to Plaintiff's attorneys.

***Third***, in conjunction with the jury instruction, the Court should bar ACH from

challenging Plaintiff's *Monell* expert on grounds that the expert relied on too few medical events

to establish a pattern or practice across the facilities ACH services.

***Fourth***, ACH or its counsel should pay the reasonable attorney fees Plaintiff incurred in

drafting and filing this sanctions motion.

In addition to or in lieu of these sanctions, Plaintiff requests that the Court issue whatever

sanctions order it determines is appropriate to remedy the prejudice caused to Plaintiff by ACH's

discovery misconduct and to deter such misconduct in the future.

## CONCLUSION

For the reasons set forth in above, Plaintiff respectfully requests that the Court issue a

sanctions order against ACH or its counsel for the discovery misconduct described in this

motion.

26

Dated: January 23, 2024

Respectfully submitted,

/s/ *Stephen Weil*

*One of Plaintiff's attorneys*

Jonathan Loevy
Steven Art
Stephen H. Weil
Maria Makar
Megan Porter
Loevy + Loevy
311 N. Aberdeen Street
Chicago, IL 60607
(312) 243-5900
weil@loevy.com