LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



# KENTUCKIANA
## COURT REPORTERS

**CASE NO. 20-cv-1123**

**GREGORY BOYER, AS ADMINISTRATOR OF THE ESTATE OF CHRISTINE BOYER, AND ON HIS OWN BEHALF**

**V.**

**ADVANCED CORRECTIONAL HEALTHCARE, INC., ET AL.**

**DEPONENT:**

**FRITZ DEGNER**

**DATE:**

**October 12, 2023**



a courtroom powerhouse

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF WISCONSIN
 2
    ----------------------------------------------------
 3
    Gregory Boyer, as Administrator
 4  of the Estate of Christine Boyer,
    and on his own behalf,
 5
           Plaintiff,                  Case No. 20-cv-1123
 6
    - vs -
 7
    Advanced Correctional
 8  Healthcare, Inc., et al.

 9         Defendants.

10  ----------------------------------------------------

11

12           *      *      *      *      *      *

13         VIDEOTAPED DEPOSITION OF FRITZ DEGNER

14         TAKEN ON THE 12TH DAY OF OCTOBER, 2023

15                      3:48 P.M.

16                  REMOTELY VIA ZOOM

17           *      *      *      *      *      *

18

19

20       Taken before Michelle A. Manni, RPR

21

22

23

24

25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

          APPEARANCES

     MEGAN PORTER, ESQUIRE, and MARIA MAKAR, ESQUIRE, of
the firm of Loevy & Loevy, 311 North Aberdeen Street,
Third Floor, Chicago, Illinois 60607, appeared remotely
via Zoom on behalf of the Plaintiff.

     DOUGLAS S. KNOTT, ESQUIRE, and DANIEL A. KAFKA,
ESQUIRE, of the firm of Lieb Knott Gaynor, LLC, 219 North
Milwaukee Street, Suite 710, Milwaukee, Wisconsin 53202,
appeared remotely via Zoom on behalf of the Defendants
Advanced Correctional Healthcare, Inc., Amber Fennigkoh,
and Lisa Pisney.

     ANDREW A. JONES, ESQUIRE, of the firm of Hansen
Reynolds, LLC, 301 North Broadway Street, Suite 400,
Milwaukee, Wisconsin 53202, appeared remotely via Zoom
on behalf of the Defendants Monroe County, Wisconsin,
Stan Hendrickson, Danielle Warren, Shasta Parker, and
Fritz Degner.

     JOHN B. CASSERLY, ESQUIRE, of the firm of Geraghty,
O'Loughlin & Kenney, Wells Fargo Place, 30 Seventh
Street, Suite 2750, St. Paul, Minnesota 55101, appeared
remotely via Zoom on behalf of the Defendants USA
Medical & Psychological Staffing, S.C., Norman Johnson,

Page 3

Travis Schamber, Wesley Harmston, and Jillian Bresnahan.

     ALSO PRESENT REMOTELY:
     Sheila Jones, videographer

Page 4

               INDEX
EXAMINATION                                           PAGE
OF FRITZ DEGNER
By Ms. Porter...........................................7

              OBJECTIONS
PAGE           LINE
12             25
13             8
13             14
13             21
27             9
28             8

     EXHIBITS PREVIOUSLY MARKED FOR IDENTIFICATION
Exhibit 52..............................................5
     [Email]

Page 5

          PROCEEDINGS
     (Exhibit 52 [Email] was previously marked for
identification.)
     THE VIDEOGRAPHER:  We're now on the record.  My
name is Sheila Jones.  I'm the online video
technician, and Michelle Manni is our court reporter.
We represent Kentuckiana Court Reporters located at
730 West Main Street, Suite 101, Louisville,
Kentucky.
     Today is the 12th day of October 2023.  The time
is 3:48 p.m. Central Time.  We are convened by
videoconference to take the deposition of Fritz
Degner in the matter of Gregory Boyer, as the
administrator of the estate of Christine Boyer, and
on his own behalf vs. Advanced Correctional
Healthcare Inc., et al., pending in the United States
District Court for the Western District of Wisconsin,
Case No. 20-cv-1123.
     Will everyone, except for the witness, please
state your appearance, how you're attending, and the
location you are attending from, starting with
plaintiff's counsel.
     MS. PORTER:  Megan Porter on behalf of the
plaintiff via Zoom, Chicago, Illinois.
     MR. JONES:  Andrew Jones on behalf of the Monroe



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1  County defendants and the witness by Zoom from
2  Sparta.
3  　　　MR. KNOTT:  Doug Knott and Daniel Kafka
4  appearing on behalf of Advanced Correctional
5  Healthcare, Amber Fennigkoh, and Lisa Pisney from
6  Milwaukee.
7  　　　MR. CASSERLY:  John Casserly on behalf of USA
8  Medical and Drs. Johnson, Harmston, Schamber, and
9  Bresnahan via Zoom from St. Paul, Minnesota.
10 　　　THE VIDEOGRAPHER:  Okay.  Will the witness
11 please state your name full for the record.
12 　　　THE WITNESS:  Fritz Alfred Degner.
13 　　　THE VIDEOGRAPHER:  Thank you.
14 　　　And the parties have agreed to stipulate to the
15 identity of Mr. Degner today.  Do all parties agree
16 on the record?
17 　　　MS. PORTER:  Yes.
18 　　　MR. JONES:  Yes.
19 　　　MR. CASSERLY:  Yes.
20 　　　THE VIDEOGRAPHER:  Perfect.  Mr. Degner, will
21 you raise your right hand for our court reporter.
22 　　　　　　　　　FRITZ DEGNER,
23 having been first duly sworn, was examined and testified
24 as follows:
25

Page 7

1  　　　　　　　　　EXAMINATION
2  BY MS. PORTER:
3  　Q.　Okay.  Good afternoon, Deputy Degner.  My name
4  is Megan Porter.  I'm plaintiff's council in this case.
5  First, I'm going to lay out some quick protocols.  Have
6  you been deposed before?
7  　A.　Yes, I have.
8  　Q.　Okay.  In what case?
9  　A.　Kingsley v. Hendrickson.
10 　Q.　Okay.  And what -- what was the subject matter
11 of that case?
12 　A.　Use of force.
13 　Q.　Okay.  And was your role as a deponent in that
14 case?
15 　A.　I used the force.
16 　Q.　Okay.  And were you a party to that case?
17 　A.　Yes, I was.
18 　Q.　Okay.  And were you a defendant?
19 　A.　Yes, I was.
20 　Q.　Okay.  So because you've been deposed before,
21 you're going to be familiar with this, so I'm just going
22 to really quickly go over some quick protocols.  I'm going
23 to be asking you questions.  You're giving them under oath
24 as though you were before a judge and a jury.  So the
25 answers that you give in this deposition have the same

Page 8

1  force as if they were given in a courtroom with a judge.
2  　　　There is a court reporter who is present today
3  who's recording our conversation.  Because we're on Zoom
4  and there can sometimes be a lag in the video, we -- it's
5  really important that we try to wait until one another is
6  finished speaking.  So wait until I finished asking my
7  questions before you answer.  It just makes it easier for
8  the court reporter to transcribe.
9  　　　If you don't understand the question, you can
10 just tell me, and I'm happy to rephrase it or clarify.  If
11 you do not hear my question, just let me know, and I'll
12 repeat it.  If you proceed to answer my question, I'm
13 going to presume, unless you say otherwise, that you
14 understood it.
15 　　　Make sure you give verbal answers rather than
16 just shaking or nodding your head, because it makes it
17 easier for the transcription for the court reporter.
18 　　　And it is a little bit strange, but your lawyer
19 is going to be objecting periodically throughout this
20 deposition.  Until they instruct you not to answer, you're
21 going to proceed to answer the question, just like the
22 objection.
23 　　　You can take a break at any time, unless there
24 is a question pending.
25 　　　Do you understand these rules?

Page 9

1  　A.　Yes, I do.
2  　Q.　Okay.  Is there any reason today why you can't
3  provide complete, accurate answers to my questions?
4  　A.　No, there's not.
5  　Q.　Okay.  Where are you currently located?
6  　A.　Monroe County Courthouse, Sparta, Wisconsin.
7  　Q.　And are you alone?  Are you alone in the room
8  with you (sic)?
9  　A.　No, I'm not.  Counsel is here beside me.
10 　Q.　Okay.  And that is counsel representing you?
11 　A.　Yes, it is.
12 　Q.　Okay.  So without revealing the substance of
13 your conversations with your attorney, did you meet with
14 your attorney today prior, to prepare for today's
15 deposition?
16 　A.　Yes, I did.
17 　Q.　Okay.  So who did you meet with, exactly?
18 　A.　Attorney Andrew Jones.
19 　Q.　Okay.  And how many times?
20 　A.　Once today.
21 　Q.　Okay.  And about how long was that meeting?
22 　A.　Approximately ten minutes.
23 　Q.　Okay.  Was anybody present with Mr. Jones,
24 anybody other than him and yourself?
25 　A.　No.  There was not.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

Q. Okay. Did you review any documents to prepare for this deposition?

A. I reviewed the police report that I wrote.

Q. Okay. And how did you receive those documents? Did you search for them yourself, or did your attorney send them to you?

A. Counsel provided them.

Q. Okay. Did you look at any other documents besides the report that you authored?

A. I did not.

Q. Okay. And I should ask before you proceed, do you have any documents in front of you?

A. I do not.

Q. Okay. Did you speak with anybody else besides your attorney to prepare for today's deposition?

A. No, I didn't.

Q. Okay. Did you know Christine Boyer before you became involved in this case?

A. No, I did not.

Q. Do you know Greg Boyer?

A. I do not.

Q. Okay. So quickly, I want to talk quickly about your background. So what's your current employment?

A. I'm currently employed by the Monroe County Sheriff's Office as a deputy working in the court services

Page 11

division.

Q. Okay. And when were you hired in that position?

A. September 21st of 2020 is when I changed from my previous position.

Q. Okay. And you said "previous position." Could you quickly walk me through any other positions you've held with Monroe County?

A. I started in May of 2002 as a patrol deputy. In October of 2014, I was promoted to sergeant, and I served in that capacity until I relinquished my stripes and went to work in court system.

Q. Okay. When you say relinquish your stripes, what does that mean?

A. I -- to change the position to the court services, I was not allowed to keep my rank, so I had to relinquish that.

Q. Okay. And I apologize for having you repeat, but what positions did you hold with the Monroe County Sheriff's Department?

MR. JONES: I think -- I think you broke up. We missed part of that questions.

BY MS. PORTER:

Q. Oh, I just want to say -- I was just re-asking, for my clarification, what positions you held with the sheriff's office at Monroe County?

Page 12

A. A deputy, a sergeant, and, again, back to a deputy again.

Q. Okay. And as -- at the time of the circumstances surrounding Christine Boyer's death, what position were you in?

A. I was the night shift sergeant.

Q. Okay. And why did you move from sergeant? I guess scratch that.

For my clarification, when you moved from sergeant to deputy, is that going down in rank, or is that going up in rank?

A. That was going down in rank.

Q. Okay. And why did you go down in rank?

A. Because I had the opportunity to come and work in the courts again, and so I chose to do that.

Q. Okay. Have you ever been employed by Monroe County in any other department besides the Monroe County Sheriff's Office?

A. I was employed by the Sparta Police Department.

Q. Okay. And where were you employed by Sparta?

A. From September of 1991 through May of 2002.

Q. Okay. And as a member of the Sparta Police Department, did you ever have any civilian complaints filed against you?

MR. JONES: Objection to form.

Page 13

Go ahead.

THE WITNESS: I don't believe I did.

BY MS. PORTER:

Q. Okay. And I believe you may -- you mentioned a use of force incident earlier for the Kingsley case. As a member of the Monroe County Sheriff's Department, did you have any civilian complaints filed against you?

MR. JONES: Objection to form.

Go ahead.

THE WITNESS: I did not.

BY MS. PORTER:

Q. Just the use of force. Was there a complaint in Kingsley vs. Henderson -- Hendrickson?

MR. JONES: Object to form.

Go ahead.

THE WITNESS: Could repeat the question?

BY MS. PORTER:

Q. Yes. You mentioned that you were a defendant in the Kingsley vs. Hendrickson case. Was it a civilian complaint associated with that case?

MR. JONES: Objection to form.

Go ahead.

THE WITNESS: I do not believe so. I believe it just came from him.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1  BY MS. PORTER:
2  Q. Okay. Have you been a party to any civil case
3  besides the Kingsley case?
4  A. I have not.
5  Q. Okay. Okay. So I'm going to move to the
6  incident surrounding Christine Boyer. Did you work any
7  shifts at the Monroe County Jail on December 21st, 2019?
8  A. I did not.
9  Q. Okay. Did you work any shifts at the Monroe
10 County Jail on December 22nd, 2019?
11 A. I did not.
12 Q. Okay. And then did you work any shifts at the
13 Monroe County Jail on December 23, 2019?
14 A. I did not.
15 Q. Okay. So can you -- can you kind of walk me
16 through your independent recollection of how you became
17 involved in this case with the incident surrounding
18 Ms. Boyer?
19 A. On the night of the incident, I was working at
20 my desk, taking care of administrative duties. I received
21 a phone call from dispatch requesting help in the jail
22 with an unresponsive inmate. And so Deputy Alex Maas and
23 I responded to the jail.
24 Q. Okay. So the events in question here took place
25 on December 23rd, 2019, so were you working a shift at the

Page 15

1  sheriff's department on that date?
2  A. Yes, I was.
3  Q. Okay. Do you remember when you started your
4  shift that day?
5  A. I would have started my shift at 11:00 p.m.
6  Q. Okay. And that would have been 11:00 p.m. the
7  prior night?
8  A. Correct. The night of the -- the night of
9  December 22nd.
10 Q. Okay. Okay. And before December 23rd, 2019,
11 did you interact with the plaintiff, Christine Boyer, at
12 any time prior to being called to report to the jail on
13 the 23rd?
14 A. I did not.
15 Q. Okay. Okay. And then -- oh, what is your --
16 what is your badge number? Or, I guess, sorry. Scratch
17 that.
18    What was your badge number at the time of this
19 incident?
20 A. I believe it was 13 at that time.
21 Q. Okay. Okay. So I want to go to -- again, let's
22 talk a little bit about your own independent recollection.
23 So you mentioned that -- so I guess, walk me through how
24 you arrived at the jail. You said that you got a call.
25 Kind of proceed from there.

Page 16

1  A. Okay. So I got the call to come and assist. We
2  left our equipment that we would normally not take into
3  the jail in our -- in the respective places. I left mine
4  in my office. From there, we rang the bell to -- for
5  master control to let us into the jail. And from there,
6  they let us into the booking area.
7     When -- when I walked in, there were a number of
8  the jail staff that were outside of -- I believe it was
9  Booking 4 Cell. And when I looked in, I saw one of the
10 jailers doing CPR at that time.
11 Q. Okay. All right. So we can stop right there.
12 A couple follow-up questions. Who initially called you to
13 come to the jail?
14 A. Dispatch notified us.
15 Q. Do you know who had called the dispatch?
16 A. I do not.
17 Q. And I'm going to put up an exhibit. I believe
18 this is previously marked as Exhibit 2 in this case.
19    Okay. Do you see a map in front of you on your
20 screen?
21 A. Yes, I do.
22 Q. Okay. Are you familiar with this document?
23 A. The document itself, I'm not. But I'm familiar
24 with the layout of the booking area there.
25 Q. Okay. All right. So you recognize it as the

Page 17

1  booking area of the Monroe County Jail?
2  A. Yes, I do.
3  Q. Okay. So using -- I understand this will be a
4  little strange via Zoom, especially, but can you try to
5  help me understand, when you arrived at the booking area,
6  you know, you walk in. You describe seeing staff outside
7  of Booking Cell No. 4. Where were you positioned at this
8  time?
9  A. Probably right about between the two arrows, one
10 that points up and the one that points down, at the top
11 upper right.
12 Q. Got it. So you were positioned between these
13 two arrows, essentially?
14 A. That would be correct.
15 Q. About what time did you arrive at -- at the
16 booking area?
17 A. Well, we got the call at 1:04. It would have
18 been within a couple minutes of that.
19 Q. So it would been a few minutes after 1:04 a.m.
20 that you would have arrived at the booking area?
21 A. Correct.
22 Q. Okay. And when you walked in, you said you saw
23 staff outside number 4. What staff did you see? Who was
24 there?
25 A. The only one I specifically remember is Sergeant

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1  Warren.
2  Q. From sergeant -- can you repeat the name?
3  A. Sergeant Danielle Warren.
4  Q. Danielle Warren. Okay. So you remember seeing
5  Sergeant Danielle Warren. Where was she in relationship
6  to Booking Cell 4?
7  A. That, I don't recall.
8  Q. Okay. Do you recall seeing Ms. Boyer?
9  A. Yes. At the time I did not know it was her or
10 who it was.
11 Q. Okay. And so you said you saw the staff is, you
12 know, outside of Booking Cell No. 4. What were they
13 doing?
14 A. There was one of the -- one or two of the
15 jailers were inside the cell. One was doing CPR. I don't
16 recall what anybody else was doing.
17 Q. Did you speak to anybody on the scene when you
18 arrived?
19 A. I don't know if I spoke specifically to anybody.
20 I know -- I'm trying to think. I remember whoever was
21 doing the CPR at the time called for a switch. And at
22 that time, I said, "Move her out of the cell," so there
23 was more room to work.
24 Q. Okay. And when you say "more room to work,"
25 what do you mean?

Page 19

1  A. The area inside the booking cell is very
2  cramped, and it was very -- it would be difficult to --
3  make it easier to work.
4  Q. Okay. And I apologize we're jumping back
5  briefly, but before these events on December 23rd of 2019,
6  had you ever heard Christine Boyer's name before?
7  A. I had not.
8  Q. Okay. You hadn't spoken to anybody in the jail
9  about her?
10 A. No.
11 Q. Okay. And you had interaction with her
12 previously?
13 A. No, I haven't.
14 Q. Okay. And -- okay. So from there, you told
15 folks that were doing CPR to move her out of the small
16 area, Booking Cell No. 4. Walk me through what happened
17 from there.
18 A. Deputy Maas took over doing CPR. I asked
19 Sergeant Warren for a location of their bag -- bag belt
20 mask, assistive breathing device for giving breath to a
21 patient. After that I went over to the area by master
22 control, which is where you see where it says
23 "A-D-S-C-B-A-F-E," there.
24 Q. Okay. So you went over to master control, this
25 area where I'm highlighting down here?

Page 20

1  A. In that general area. I was looking for a med
2  bag that might have it.
3  Q. Okay. Okay. Do you know approximately how long
4  this was after you arrived at the scene?
5  A. No, I don't.
6  Q. Okay. Okay. And so from there, you went down
7  to this master control area to look for an air bag. What
8  happened from there?
9  A. I wasn't able to locate it because I was not
10 familiar with where their equipment was kept, so I was
11 going to come back to ask. And at that time, Sparta
12 ambulance paramedic crew arrived.
13 Q. Okay. And so you said you were going to come
14 back to ask. Did you go back to Booking Cell No. 4?
15 A. I did go back to that area.
16 Q. Okay. And then you said paramedics arrived.
17 How did you see paramedics arrive, or how were you
18 notified?
19 A. I saw them walk in through the door there.
20 Q. Okay.
21 A. Where you see the arrow down at the bottom
22 right, they came through this one slider door there, and
23 then they went through the next slider door, where you
24 have --
25 Q. Okay.

Page 21

1  A. -- that area right there.
2  Q. Okay. Great. So the paramedics entered from
3  this bottom right corner through those two slider doors
4  that I have highlighted?
5  A. Yes.
6  Q. And you see them coming; is that correct?
7  A. That's right.
8  Q. Okay. And so from there, keep walking me
9  through what happened.
10 A. Well, I was familiar with their kit, so I got
11 the bag mask -- bag mask out of theirs and started
12 preparing that and preparing their oxygen tank for oxygen
13 delivery.
14 Q. Okay. Okay. I apologize. I didn't hear. Did
15 you start preparing that or did paramedics?
16 A. I did.
17 Q. Okay. And did you speak with any of the
18 paramedics during this time?
19 A. I did. Spoke to Mike Huber.
20 Q. Okay. And what did you say to him?
21 A. Well, he -- it was more he spoke to me, I guess.
22 He requested that a helicopter be called.
23 Q. Okay. And what did you do from there?
24 A. I tried to reach dispatch on my radio to have
25 them call Gundersen Air. And because of the building, my



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1 radio wasn't going out, so I believe Deputy Maas had used
2 a cell phone and called from there to dispatch to have
3 them request the helicopter.
4  Q.  Okay.  So Deputy Maas called dispatch to request
5 the helicopter.  Okay.  And so the paramedic spoke to you.
6 What did you do from there?
7  A.  I began administrating rescue breathing via the
8 bag mask to Christine.
9  Q.  Okay.  And did you speak to anybody during this
10 time?
11  A.  I don't think so.  I just was pumping the bag.
12  Q.  Okay.  And were you pumping the bag by yourself?
13 Did you switch out with anybody?  What went from there?
14  A.  I did not switch out with anybody during that
15 time.
16  Q.  Okay.  Okay.  And so what happened after -- so
17 you're pumping the air bag.  What happens from there?
18  A.  The paramedics began doing their -- their thing.
19 And I know she was defibulated several times.
20  Q.  Okay.  And what happened from there?
21  A.  In between the defibrillation and the -- reading
22 the response, CPR was continued on her.  And eventually,
23 we got a pulse, and she began to breathe again.
24  Q.  Okay.  About how long was this going on?  How
25 long were you administrating air?

Page 23

1  A.  I have no clue how long it was.
2  Q.  Okay.  How long were -- how long were they
3 administrating CPR?
4  A.  I don't know.  There's -- there was no clock in
5 there.
6  Q.  Okay.  So from there, you get a pulse back.
7 What happens next?
8  A.  She was prepared for transport to an ambulance.
9  Q.  Okay.  And who prepared her for transport?
10  A.  The paramedics did.
11  Q.  Okay.  And this whole time, are you sill in
12 front of Booking Cell No. 4?
13  A.  I'm going to guess we were.  I don't know if we
14 may have moved a little farther out from the wall there.
15  Q.  Okay.  And how was she taken to the helicopter?
16  A.  Well, she was put on a backboard and then put
17 onto the ambulance cot, and they transported her to the
18 hospital where the helicopter met them.
19  Q.  And how was she taken out of the booking area?
20 What route?
21  A.  Excuse me?
22  Q.  Oh, like what route?  What did they take to get
23 to the booking area?
24  A.  The same way that they came in, where you see
25 the arrows coming back, pointing to the bottom right of

Page 24

1 the screen.
2  Q.  Got it.  So basically, this highlighted path I
3 just highlighted to get to the area?
4  A.  Yes.  The ambulance would have probably been in
5 the sally port at that time.
6  Q.  Okay.  And did you -- what were you doing at
7 this time?  Did you stay in front of the booking cell?
8 Did you follow them?
9  A.  I don't recall if I went out with them with the
10 cot until they went to the ambulance.  Once she was out to
11 the ambulance, I spoke to Sergeant Warren about whether or
12 not somebody would need to go to the hospital and
13 potentially go with the helicopter to La Crosse.
14  Q.  Okay.  And what did Sergeant Warren say?
15  A.  She said that somebody would need to go with
16 until the helicopter was in the air.
17  Q.  Okay.  And what did you do from there?
18  A.  From there, I left the jail, went back to my
19 office, put my equipment on that I had taken off, and went
20 over to the hospital.
21  Q.  Okay.  And to -- how did you leave the booking
22 area to go back to your office?
23  A.  Where you see the arrow pointing up in the upper
24 right there, where it says "holding cell."
25  Q.  Got it.

Page 25

1  A.  If you go a little higher than that, there's a
2 doorway.
3  Q.  Got it.  Okay.
4  A.  And I went through that, and then I turned to my
5 right and went back out towards our main office area.
6  Q.  Okay.  And do you know what time you get back to
7 your office?
8  A.  I do not.
9  Q.  Okay.  Do you have an estimate of about how long
10 you were in the booking area?
11  A.  I don't.
12  Q.  Okay.  And then you said you went over to the
13 hospital; is that correct?
14  A.  That is correct.
15  Q.  Okay.  And do you know what time you arrived at
16 the hospital?
17  A.  I don't.
18  Q.  Who else was at the hospital?
19  A.  As far as law enforcement?
20  Q.  Um-hmm.  Yeah.  Who else from Monroe County was
21 at the hospital?
22  A.  If I recall, it was just me.
23  Q.  Okay.  And what did you do when you arrived at
24 the hospital?
25  A.  I stood there and waited until the helicopter


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1 crew came. And they secured Christine on their stretcher
2 and took her out to the helicopter.
3   Q.  Okay. And so you went over to the -- my
4 understanding, you went over to the hospital. You were
5 waiting at the helicopter flight medevac area, and you
6 waited until they brought Christine over to that area to
7 load her into the helicopter; is that correct?
8   A.  No. I went into the emergency department.
9   Q.  Okay.
10  A.  And then I was in there until the helicopter
11 flight crew came in and loaded her up. And then I walk
12 out with them from there to -- went to where they took her
13 and put her on the helicopter.
14  Q.  Okay. Did you speak to anybody in the flight
15 crew -- for the fight crew during that time?
16  A.  I did not.
17  Q.  Okay. You didn't talk to them about logistics,
18 anything that was going on with her?
19  A.  I did not.
20  Q.  Okay. So after they loaded her into the
21 helicopter, what did you do?
22  A.  I advised dispatch that she was in the
23 helicopter and the helicopter was in the air.
24  Q.  Okay. Okay. And so after that, after you
25 advised dispatch, what did you do?

Page 27

1   A.  I went back to the office and wrote a report on
2 it, what happened.
3   Q.  You went back to the office and you said wrote a
4 report on it?
5   A.  Yes, I did.
6   Q.  Did you speak with anybody at the jail after,
7 you know, they had gotten Christine loaded and off to --
8 off to the hospital?
9       MR. JONES:  Objection to the form.
10      Go ahead.
11      THE WITNESS:  I had spoke to Sergeant Warren in
12   regards to making sure reports were written.
13 BY MS. PORTER:
14  Q.  Okay. What did you speak to -- what was, like,
15 the substance of your conversation with Sergeant Warren?
16  A.  I just said because of the type -- because of
17 the incident that reports needed to be written.
18  Q.  Okay. And when was this conversation?
19  A.  It would have been shortly after I returned back
20 to the -- returned back to the sheriff's office.
21  Q.  Okay. Did you speak with anybody else besides
22 Sergeant Warren?
23  A.  I spoke to Deputy Maas and told him he needed to
24 write a report on his involvement.
25  Q.  Okay. And in your conversation with Sergeant

Page 28

1 Warren, how did she seem emotionally?
2   A.  I guess she seemed okay.
3   Q.  Okay. And in your conversation with Deputy
4 Maas, how did he seem emotionally?
5   A.  Fine. He just said, "Okay."
6   Q.  Okay. Did you speak with anybody else at the --
7 at the jail besides those two?
8       MR. JONES:  Objection to form.
9       Go ahead.
10      THE WITNESS:  I only spoke to Sergeant Warren in
11   the jail. Deputy Maas was already back to the patrol
12   office area, where I talked to him at.
13 BY MS. PORTER:
14  Q.  Okay. And do you know about what time you spoke
15 with Sergeant Warren?
16  A.  I do not.
17  Q.  Okay. Do you know what time you spoke with
18 Deputy Maas?
19  A.  I do not.
20  Q.  And so in the -- the days following the -- this
21 incident, did you speak with anybody about Ms. Boyer, in
22 Monroe County?
23  A.  No. I don't believe I did.
24  Q.  Okay. How did you hear about Ms. Boyer's death?
25  A.  I'm not sure. I think I inquired and asked how

Page 29

1 she was doing.
2   Q.  Okay. Who did you inquire from?
3   A.  That, I don't recall.
4   Q.  Do you remember when you inquired about her
5 condition?
6   A.  It may have been a couple days later.
7   Q.  Okay. Between inquiring about how she was doing
8 and then her death and the incident itself, did you speak
9 with anybody about Ms. Boyer's condition?
10  A.  No, I didn't.
11  Q.  Okay. Did you ever have any conversations with
12 anybody at the jail about Ms. Boyer's medical condition?
13  A.  No. Not that I recall.
14  Q.  Okay. Did you have any conversations with
15 anybody at the jail about Ms. Boyer's medical treatment
16 prior to the December 23rd incident?
17  A.  No. I have no knowledge of it.
18  Q.  Okay. I want to stop showing this, or I already
19 stopped showing this. Now I want to show you -- I believe
20 this was previously marked as Exhibit 51 (sic). Let me
21 double-check that.
22      Do you see the document up in front of you?
23  A.  I do.
24  Q.  Okay. And so this is an email from Stan
25 Hendrickson.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 30

1    MS. PORTER: I believe this was marked as
2    Exhibit 51, but, Ms. Manni, please correct me if I am
3    incorrect on the numbering there.
4  BY MS. PORTER:
5    Q.  Do you recognize this?  Do you recognize this
6  document?
7    A.  I do because I see my name is in the email
8  string.
9    Q.  Okay.  And so what is this document?
10   A.  It's about a critical incident debrief available
11 on December 27th.
12   Q.  Okay.  Did you attend this debrief?
13   A.  I did not.
14   Q.  Okay.  Why did you not attend it?
15   A.  I've been doing this job for a long time, and --
16 and I worked on the ambulance crews before, and so I -- I
17 was not having any issue with what happened.
18   Q.  Okay.  What was the -- in your understanding,
19 what is the purpose of a critical incident debrief?
20   A.  That's to help for people who are maybe having
21 difficulties with the situation that occurred and to give
22 them tools to help them deal with the situation.
23   Q.  Do you know of anybody who attended this
24 debrief?
25   A.  I do not.

Page 31

1    Q.  Did you speak with anybody about their
2  attendance?
3    A.  No, I didn't.
4    Q.  Okay.  Did you speak with anybody about the
5  substance of what was discussed in the debrief?
6    A.  I did not.
7    Q.  Okay.  Did you, at any point, speak with Stan
8  Hendrickson about Christine Boyer and the circumstances
9  surrounding her death?
10   A.  No, I didn't.
11   Q.  Okay.  And I'm going to stop sharing this.
12      MR. JONES:  I was just going ask if you could
13   indicate what the Bates number on that document was
14   before you took it down.
15      MS. PORTER:  Oh, yeah.
16      MS. JONES:  I got Exhibit 51.
17      MS. PORTER:  That's okay.  It's --
18      MR. KAFKA:  It's Exhibit 52.
19      MS. PORTER:  Yeah.  Exhibit 52, then.  Yeah.
20   It's ACH 19154.
21      MR. JONES:  Yeah.  Fifty-two.
22      MS. PORTER:  Okay.  Thank you.
23      Okay.  Let's see.  I am going -- why don't we
24   take a quick five-minute break.  We can come back --
25   let's see -- 4:30.

Page 32

1    MS. JONES:  Okay.
2    MS. PORTER:  Okay.  Great.
3    THE VIDEOGRAPHER:  Okay.  The time is 4:24 p.m.
4  We're going off the record.
5    (Pause in the proceedings.)
6    THE VIDEOGRAPHER:  We're back on the record for
7  deposition of Fritz Degner being conducted by
8  videoconference.  My name is Sheila Jones.  Today is
9  October 12th, 2023, and the time is 4:31 p.m.  You
10 may proceed.
11   MS. PORTER:  Okay.  Deputy Degner, I believe
12 that's all my questions that I have.
13   THE WITNESS:  Okay.
14   MR. JONES:  Any questions, Doug or John?
15   MR. KNOTT:  No questions.
16   MR. CASSERLY:  None from Casserly.
17   MR. JONES:  I do not have any questions.
18   THE VIDEOGRAPHER:  All right.  We'll go off the
19 record.  The time is 4:32 p.m.
20   THE COURT REPORTER:  I need to get down who all
21 is ordering the transcript and, I guess, what format
22 you prefer.
23   MS. PORTER:  The plaintiff is not ordering
24 transcripts at this time.
25   MR. JONES:  I'll (inaudible).

Page 33

1    THE COURT REPORTER:  Can you repeat that,
2  Mr. Jones?
3    THE VIDEOGRAPHER:  He's on mute, it looks like.
4    MR. CASSERLY:  Well, while we have a minute,
5  Casserly will take a digital PDF with PDF exhibits,
6  please.
7    MR. KNOTT:  I'll have the same.
8    THE VIDEOGRAPHER:  Oh, go ahead.
9    MR. KNOTT:  I'll have what Casserly is having.
10   MR. JONES:  Same for Jones.
11   THE COURT REPORTER:  Okay.  Do you have any
12 specific format that you like it in.
13   MR. CASSERLY:  Searchable PDF is fine.
14   MR. KNOTT:  Yep.  That sounds good.
15   MR. JONES:  Same.
16   THE VIDEOGRAPHER:  Okay.
17   THE COURT REPORTER:  And, Ms. Porter, you said
18 you're not ordering any of the transcripts from
19 today?
20   MS. PORTER:  No.
21   THE COURT REPORTER:  And who is going to take
22 the original?
23   MR. JONES:  I guess you can charge the county
24 for that.
25   (The deposition was concluded at 4:34 p.m.)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

```
 1  STATE OF WISCONSIN  )
 2  COUNTY OF POLK      )
 3
 4       Be it known that I reported the remote deposition of
 5  FRITZ DEGNER on the 12th day of October, 2023;
 6       that I was then and there a Notary Public in and for
 7  the County of Polk, State of Wisconsin, and by the virtue
 8  thereof, I was authorized to administer an oath;
 9       that the witness, before testifying, was by me first
10  duly sworn to testify to the whole truth and nothing but
11  the truth relative to said cause;
12       that the testimony of said witness was recorded in
13  stenotype by myself and reduced to print by means of
14  computer-assisted transcription under my direction, and
15  that the deposition is a true record of the testimony
16  given by the witness to the best of my ability;
17       that I am not related to any parties hereto nor
18  interested in the outcome of the action.
19       Dated this 31st day of October, 2023.
20                  [signature: Michelle A. Manni]
21       _____
             Michelle A. Manni, RPR, Notary Public
22           State of Wisconsin At Large
             My Commission Expires June 28, 2025
23
24
25
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 52_ Fritz** 4:16 5:2 31:18,19

**1**

**101** 5:8
**11:00** 15:5,6
**12th** 5:10 32:9
**13** 15:20
**19154** 31:20
**1991** 12:21
**1:04** 17:17,19

**2**

**2** 16:18
**20-cv-1123** 5:18
**2002** 11:8 12:21
**2014** 11:9
**2019** 14:7,10, 13,25 15:10 19:5
**2020** 11:3
**2023** 5:10 32:9
**21st** 11:3 14:7
**22nd** 14:10 15:9
**23** 14:13
**23rd** 14:25 15:10,13 19:5 29:16
**27th** 30:11

**3**

**3:48** 5:11

**4**

**4** 16:9 17:7,23 18:6,12 19:16 20:14 23:12
**4:24** 32:3
**4:30** 31:25
**4:31** 32:9
**4:32** 32:19
**4:34** 33:25

**5**

**51** 29:20 30:2 31:16
**52** 5:2 31:18,19

**7**

**730** 5:8

**A**

**A-D-S-C-B-A-F-E** 19:23
**a.m.** 17:19
**accurate** 9:3
**ACH** 31:20
**administrating** 22:7,25 23:3
**administrative** 14:20
**administrator** 5:14
**Advanced** 5:15 6:4
**advised** 26:22, 25
**afternoon** 7:3
**agree** 6:15
**agreed** 6:14
**ahead** 13:1,9, 15,22 27:10
**air** 20:7 21:25 22:17,25 24:16 26:23
**Alex** 14:22
**Alfred** 6:12
**allowed** 11:15
**Amber** 6:5
**ambulance** 20:12 23:8,17 24:4,10,11 30:16
**Andrew** 5:25 9:18
**answers** 7:25 8:15 9:3
**apologize** 11:17 19:4 21:14
**appearance** 5:20
**appearing** 6:4
**approximately** 9:22 20:3
**area** 16:6,24 17:1,5,16,20 19:1,16,21,25 20:1,7,15 21:1 23:19,23 24:3, 22 25:5,10 26:5,6 28:12
**arrive** 17:15 20:17
**arrived** 15:24 17:5,20 18:18 20:4,12,16 25:15,23
**arrow** 20:21 24:23
**arrows** 17:9,13 23:25
**assist** 16:1
**assistive** 19:20
**attend** 30:12, 28:9 33:8

**14**
**attendance** 31:2
**attended** 30:23
**attending** 5:20,21
**attorney** 9:13, 14,18 10:5,15
**authored** 10:9

**B**

**back** 12:1 19:4 20:11,14,15 23:6,25 24:18, 22 25:5,6 27:1, 3,19,20 28:11 31:24 32:6
**backboard** 23:16
**background** 10:23
**badge** 15:16, 18
**bag** 19:19 20:2, 7 21:11 22:8, 11,12,17
**basically** 24:2
**Bates** 31:13
**began** 22:7,18, 23
**behalf** 5:15,23, 25 6:4,7
**bell** 16:4
**belt** 19:19
**bit** 8:18 15:22
**booking** 16:6, 9,24 17:1,5,7, 16,20 18:6,12 19:1,16 20:14 23:12,19,23 24:7,21 25:10
**bottom** 20:21 21:3 23:25
**Boyer** 5:13,14

10:17,20 14:6, 18 15:11 18:8 28:21 31:8
**Boyer's** 12:4 19:6 28:24 29:9,12,15
**break** 8:23 31:24
**breath** 19:20
**breathe** 22:23
**breathing** 19:20 22:7
**Bresnahan** 6:9
**briefly** 19:5
**broke** 11:20
**brought** 26:6
**building** 21:25

**C**

**call** 14:21 15:24 16:1 17:17 21:25
**called** 15:12 16:12,15 18:21 21:22 22:2,4
**capacity** 11:10
**care** 14:20
**case** 5:18 7:4, 8,11,14,16 10:18 13:5,19, 20 14:2,3,17 16:18
**Casserly** 6:7, 19 32:16 33:4, 5,9,13
**cell** 16:9 17:7 18:6,12,15,22 19:1,16 20:14 22:2 23:12 24:7,24
**Central** 5:11
**change** 11:14
**changed** 11:3

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

charge 33:23
Chicago 5:24
chose 12:15
Christine 5:14 10:17 12:4 14:6 15:11 19:6 22:8 26:1,6 27:7 31:8
circumstances 12:4 31:8
civil 14:2
civilian 12:23 13:7,19
clarification 11:24 12:9
clarify 8:10
clock 23:4
clue 23:1
complaint 13:12,20
complaints 12:23 13:7
complete 9:3
concluded 33:25
condition 29:5,9,12
conducted 32:7
continued 22:22
control 16:5 19:22,24 20:7
convened 5:11
conversation 8:3 27:15,18,25 28:3
conversations 9:13 29:11,14
corner 21:3
correct 15:8 17:14,21 21:6 25:13,14 26:7 30:2

Correctional 5:15 6:4
cot 23:17 24:10
council 7:4
counsel 5:22 9:9,10 10:7
county 6:1 9:6 10:24 11:7,18,25 12:17 13:6 14:7,10,13 17:1 25:20 28:22 33:23
couple 16:12 17:18 29:6
court 5:6,7,17 6:21 8:2,8,17 10:25 11:11,14 32:20 33:1,11,17,21
Courthouse 9:6
courtroom 8:1
courts 12:15
CPR 16:10 18:15,21 19:15,18 22:22 23:3
cramped 19:2
crew 20:12 26:1,11,15
crews 30:16
critical 30:10,19
Crosse 24:13
current 10:23

**D**

Daniel 6:3
Danielle 18:3,4,5
date 15:1
day 5:10 15:4
days 28:20 29:6

deal 30:22
death 12:4 28:24 29:8 31:9
debrief 30:10,12,19,24 31:5
December 14:7,10,13,25 15:9,10 19:5 29:16 30:11
defendant 7:18 13:18
defendants 6:1
defibrillation 22:21
defibulated 22:19
Degner 5:13 6:12,15,20,22 7:3 32:7,11
delivery 21:13
department 11:19 12:17,19,23 13:6 15:1 26:8
deponent 7:13
deposed 7:6,20
deposition 5:12 7:25 8:20 9:15 10:2,15 32:7 33:25
deputy 7:3 10:25 11:8 12:1,2,10 14:22 19:18 22:1,4 27:23 28:3,11,18 32:11
describe 17:6
desk 14:20
device 19:20
difficult 19:2
difficulties 30:21
digital 33:5

discussed 31:5
dispatch 14:21 16:14,15 21:24 22:2,4 26:22,25
District 5:17
division 11:1
document 16:22,23 29:22 30:6,9 31:13
documents 10:1,4,8,12
door 20:19,22,23
doors 21:3
doorway 25:2
double-check 29:21
Doug 6:3 32:14
Drs 6:8
duly 6:23
duties 14:20

**E**

earlier 13:5
easier 8:7,17 19:3
email 5:2 29:24 30:7
emergency 26:8
emotionally 28:1,4
employed 10:24 12:16,19,20
employment 10:23
enforcement 25:19
entered 21:2
equipment 16:2 20:10 24:19
essentially 17:13
estate 5:14
estimate 25:9
et al 5:16
events 14:24 19:5
eventually 22:22
EXAMINATION 7:1
examined 6:23
Excuse 23:21
exhibit 5:2 16:17,18 29:20 30:2 31:16,18,19
exhibits 33:5

**F**

familiar 7:21 16:22,23 20:10 21:10
farther 23:14
Fennigkoh 6:5
Fifty-two 31:21
fight 26:15
filed 12:24 13:7
fine 28:5 33:13
finished 8:6
five-minute 31:24
flight 26:5,11,14
folks 19:15
follow 24:8
follow-up 16:12
force 7:12,15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

8:1 13:5,12
**form** 12:25 13:8,14,21 27:9 28:8
**format** 32:21 33:12
**Fritz** 5:12 6:12,22 32:7
**front** 10:12 16:19 23:12 24:7 29:22
**full** 6:11

**G**

**general** 20:1
**give** 7:25 8:15 30:21
**giving** 7:23 19:20
**good** 7:3 33:14
**Great** 21:2 32:2
**Greg** 10:20
**Gregory** 5:13
**guess** 12:8 15:16,23 21:21 23:13 28:2 32:21 33:23
**Gundersen** 21:25

**H**

**hand** 6:21
**happened** 19:16 20:8 21:9 22:16,20 27:2 30:17
**happy** 8:10
**Harmston** 6:8
**head** 8:16
**Healthcare** 5:16 6:5
**hear** 8:11 21:14

28:24
**heard** 19:6
**held** 11:7,24
**helicopter** 21:22 22:3,5 23:15,18 24:13,16 25:25 26:2,5,7,10,13,21,23
**Henderson** 13:13
**Hendrickson** 7:9 13:13,19 29:25 31:8
**higher** 25:1
**highlighted** 21:4 24:2,3
**highlighting** 19:25
**hired** 11:2
**hold** 11:18
**holding** 24:24
**hospital** 23:18 24:12,20 25:13,16,18,21,24 26:4 27:8
**Huber** 21:19

**I**

**identification** 5:3
**identity** 6:15
**Illinois** 5:24
**important** 8:5
**inaudible** 32:25
**incident** 13:5 14:6,17,19 15:19 27:17 28:21 29:8,16 30:10,19
**incorrect** 30:3
**independent** 14:16 15:22

**initially** 16:12
**inmate** 14:22
**inquire** 29:2
**inquired** 28:25 29:4
**inquiring** 29:7
**inside** 18:15 19:1
**instruct** 8:20
**interact** 15:11
**interaction** 19:11
**involved** 10:18 14:17
**involvement** 27:24
**issue** 30:17

**J**

**jail** 14:7,10,13,21,23 15:12,24 16:3,5,8,13 17:1 19:8 24:18 27:6 28:7,11 29:12,15
**jailers** 16:10 18:15
**job** 30:15
**John** 6:7 32:14
**Johnson** 6:8
**Jones** 5:5,25 6:18 9:18,23 11:20 12:25 13:8,14,21 27:9 28:8 31:12,16,21 32:1,8,14,17,25 33:2,10,15,23
**judge** 7:24 8:1
**jumping** 19:4
**jury** 7:24

**K**

**Kafka** 6:3 31:18
**Kentuckiana** 5:7
**Kentucky** 5:9
**kind** 14:15 15:25
**Kingsley** 7:9 13:5,13,19 14:3
**kit** 21:10
**Knott** 6:3 32:15 33:7,9,14
**knowledge** 29:17

**L**

**La** 24:13
**lag** 8:4
**law** 25:19
**lawyer** 8:18
**lay** 7:5
**layout** 16:24
**leave** 24:21
**left** 16:2,3 24:18
**Lisa** 6:5
**load** 26:7
**loaded** 26:11,20 27:7
**locate** 20:9
**located** 5:7 9:5
**location** 5:21 19:19
**logistics** 26:17
**long** 9:21 20:3 22:24,25 23:1,2 25:9 30:15
**looked** 16:9

**Louisville** 5:8

**M**

**Maas** 14:22 19:18 22:1,4 27:23 28:4,11,18
**main** 5:8 25:5
**make** 8:15 19:3
**makes** 8:7,16
**making** 27:12
**Manni** 5:6 30:2
**map** 16:19
**marked** 5:2 16:18 29:20 30:1
**mask** 19:20 21:11 22:8
**master** 16:5 19:21,24 20:7
**matter** 5:13 7:10
**med** 20:1
**medevac** 26:5
**medical** 6:8 29:12,15
**meet** 9:13,17
**meeting** 9:21
**Megan** 5:23 7:4
**member** 12:22 13:6
**mentioned** 13:4,18 15:23
**met** 23:18
**Michelle** 5:6
**Mike** 21:19
**Milwaukee** 6:6
**mine** 16:3
**Minnesota** 6:9
**minute** 33:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

minutes 9:22 17:18,19
missed 11:21
Monroe 5:25 9:6 10:24 11:7, 18,25 12:16,17 13:6 14:7,9,13 17:1 25:20 28:22
move 12:7 14:5 18:22 19:15
moved 12:9 23:14
mute 33:3

**N**

needed 27:17, 23
night 12:6 14:19 15:7,8
nodding 8:16
notified 16:14 20:18
number 15:16, 18 16:7 17:23 31:13
numbering 30:3

**O**

oath 7:23
Object 13:14
objecting 8:19
objection 8:22 12:25 13:8,21 27:9 28:8
occurred 30:21
October 5:10 11:9 32:9
office 10:25 11:25 12:18 16:4 24:19,22 25:5,7 27:1,3,

20 28:12
online 5:5
opportunity 12:14
ordering 32:21,23 33:18
original 33:22
oxygen 21:12

**P**

p.m. 5:11 15:5, 6 32:3,9,19 33:25
paramedic 20:12 22:5
paramedics 20:16,17 21:2, 15,18 22:18 23:10
part 11:21
parties 6:14,15
party 7:16 14:2
path 24:2
patient 19:21
patrol 11:8 28:11
Paul 6:9
pause 32:5
PDF 33:5,13
pending 5:16 8:24
people 30:20
Perfect 6:20
periodically 8:19
phone 14:21 22:2
Pisney 6:5
place 14:24
places 16:3

plaintiff 5:24 15:11 32:23
plaintiff's 5:22 7:4
point 31:7
pointing 23:25 24:23
points 17:10
police 10:3 12:19,22
port 24:5
Porter 5:23 6:17 7:2,4 11:22 13:3,11, 17 14:1 27:13 28:13 30:1,4 31:15,17,19,22 32:2,11,23 33:17,20
position 11:2, 4,5,14 12:5
positioned 17:7,12
positions 11:6,18,24
potentially 24:13
prefer 32:22
prepare 9:14 10:1,15
prepared 23:8, 9
preparing 21:12,15
present 8:2 9:23
presume 8:13
previous 11:4, 5
previously 5:2 16:18 19:12 29:20
prior 9:14 15:7, 12 29:16

proceed 8:12, 21 10:11 15:25 32:10
proceedings 5:1 32:5
promoted 11:9
protocols 7:5, 22
provide 9:3
provided 10:7
pulse 22:23 23:6
pumping 22:11,12,17
purpose 30:19
put 16:17 23:16 24:19 26:13

**Q**

question 8:9, 11,12,21,24 13:16 14:24
questions 7:23 8:7 9:3 11:21 16:12 32:12,14,15,17
quick 7:5,22 31:24
quickly 7:22 10:22 11:6

**R**

radio 21:24 22:1
raise 6:21
rang 16:4
rank 11:15 12:10,11,12,13
re-asking 11:23
reach 21:24
reading 22:21

reason 9:2
recall 18:7,8,16 24:9 25:22 29:3,13
receive 10:4
received 14:20
recognize 16:25 30:5
recollection 14:16 15:22
record 5:4 6:11,16 32:4,6, 19
recording 8:3
relationship 18:5
relinquish 11:12,16
relinquished 11:10
remember 15:3 17:25 18:4,20 29:4
repeat 8:12 11:17 13:16 18:2 33:1
rephrase 8:10
report 10:3,9 15:12 27:1,4,24
reporter 5:6 6:21 8:2,8,17 32:20 33:1,11, 17,21
Reporters 5:7
reports 27:12, 17
represent 5:7
representing 9:10
request 22:3,4
requested 21:22
requesting 14:21

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

rescue 22:7

respective 16:3

responded 14:23

response 22:22

returned 27:19,20

revealing 9:12

review 10:1

reviewed 10:3

role 7:13

room 9:7 18:23,24

route 23:20,22

rules 8:25

**S**

sally 24:5

scene 18:17 20:4

Schamber 6:8

scratch 12:8 15:16

screen 16:20 24:1

search 10:5

Searchable 33:13

secured 26:1

send 10:6

September 11:3 12:21

sergeant 11:9 12:1,6,7,10 17:25 18:2,3,5 19:19 24:11,14 27:11,15,22,25 28:10,15

served 11:9

services 10:25 11:15

shaking 8:16

sharing 31:11

Sheila 5:5 32:8

sheriff's 10:25 11:19,25 12:18 13:6 15:1 27:20

shift 12:6 14:25 15:4,5

shifts 14:7,9,12

shortly 27:19

show 29:19

showing 29:18,19

sic 9:8 29:20

sill 23:11

situation 30:21,22

slider 20:22,23 21:3

small 19:15

sounds 33:14

Sparta 6:2 9:6 12:19,20,22 20:11

speak 10:14 18:17 21:17 22:9 26:14 27:6,14,21 28:6,21 29:8 31:1,4,7

speaking 8:6

specific 33:12

specifically 17:25 18:19

spoke 18:19 21:19,21 22:5 24:11 27:11,23 28:10,14,17

spoken 19:8

St 6:9

staff 16:8 17:6,23 18:11

Stan 29:24 31:7

start 21:15

started 11:8 15:3,5 21:11

starting 5:21

state 5:20 6:11

States 5:16

stay 24:7

stipulate 6:14

stood 25:25

stop 16:11 29:18 31:11

stopped 29:19

strange 8:18 17:4

Street 5:8

stretcher 26:1

string 30:8

stripes 11:10,12

subject 7:10

substance 9:12 27:15 31:5

Suite 5:8

surrounding 12:4 14:6,17 31:9

switch 18:21 22:13,14

sworn 6:23

system 11:11

**T**

taking 14:20

talk 10:22 15:22 26:17

talked 28:12

tank 21:12

technician 5:6

ten 9:22

testified 6:23

thing 22:18

time 5:10,11 8:23 12:3 15:12,18,20 16:10 17:8,15 18:9,21,22 20:11 21:18 22:10,15 23:11 24:5,7 25:6,15 26:15 28:14,17 30:15 32:3,9,19,24

times 9:19 22:19

today 5:10 6:15 8:2 9:2,14,20 32:8 33:19

today's 9:14 10:15

told 19:14 27:23

tools 30:22

top 17:10

transcribe 8:8

transcript 32:21

transcription 8:17

transcripts 32:24 33:18

transport 23:8,9

transported 23:17

treatment 29:15

turned 25:4

type 27:16

**U**

Um-hmm 25:20

understand 8:9,25 17:3,5

understanding 26:4 30:18

understood 8:14

United 5:16

unresponsive 14:22

upper 17:11 24:23

USA 6:7

**V**

verbal 8:15

video 5:5 8:4

videoconference 5:12 32:8

**W**

wait 8:5,6

waited 25:25 26:6

waiting 26:5

walk 11:6 14:15 15:23 17:6 19:16 20:19 26:11

walked 16:7 17:22

walking 21:8

wall 23:14

Warren 18:1,3,4,5 19:19 24:11,14 27:11,15,22 28:1,10,15



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**West** 5:8

**Western** 5:17

**Wisconsin** 5:17 9:6

**work** 11:11 12:14 14:6,9,12 18:23,24 19:3

**worked** 30:16

**working** 10:25 14:19,25

**write** 27:24

**written** 27:12, 17

**wrote** 10:3 27:1,3

---
**Z**
---

**Zoom** 5:24 6:1, 9 8:3 17:4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com