

# KENTUCKIANA
## — COURT REPORTERS —

**CASE NO. 20-CV-1123**

**GREGORY BOYER, AS ADMINSTRATOR OF THE ESTATE**

**OF CHRISTINE BOYER, AND ON HIS OWN BEHALF**

**V.**

**ADVANCED CORRECTIONAL HEALTHCARE, INC., ET AL.**

**DEPONENT:**

**DANIELLE NELSON**

**DATE:**

**FEBURARY 24, 2022**



✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

1    IN THE UNITED STATES COURT DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF WISCONSIN

3    CASE NO. 20-CV-1123

4

5

6    GREGORY BOYER, AS ADMINSTRATOR OF THE ESTATE

7    OF CHRISTINE BOYER, AND ON HIS OWN BEHALF,

8    Plaintiff

9

10    V.

11

12    ADVANCED CORRECTIONAL HEALTHCARE, INC., ET AL.,

13    Defendants

14

15

16

17

18

19

20

21

22

23    DEPONENT:  DANIELLE NELSON

24    DATE:      FEBURARY 24, 2022

25    REPORTER:  KRYSTAL M. BARNES



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
— COURT REPORTERS —

Page 2

```
1                    APPEARANCES
2
3    ON BEHALF OF THE PLAINTIFF, GREGORY BOYER, AS
4    ADMINSTRATOR OF THE ESTATE OF CHRISTINE BOYER, AND ON
5    HIS OWN BEHALF:
6    Stephen Weil, Esquire
7    Loevy & Loevy
8    311 North Aberdeen Street
9    3rd Floor
10   Chicago, Illinois 60607
11   Telephone No.: (312) 243-5900
12   E-mail: weil@loevy@com
13   (Appeared via videoconference)
14
15   ON BEHALF OF THE DEFENDANTS, DANIELLE NELSON, MONROE
16   COUNTY SHERIFF'S OFFICE, AND MONROE COUNTY DEFENDANTS:
17   John W. McCauley, Esquire
18   Hansen Reynolds LLC
19   10 East Doty Street
20   Suite 800
21   Madison, Wisconsin 53703
22   Telephone No.: (608) 841-1510
23   E-mail: jmccauley@hansenreynolds.com
24   (Appeared via videoconference)
25
```

Page 3

```
1                 APPEARANCES (CONTINUED)
2
3    ON BEHALF OF THE DEFENDANTS, ADVANCED CORRECTIONAL
4    HEALTHCARE, INC., LISA PISNEY, AND AMBER FENNIGKOH:
5    Douglas Knott, Esquire
6    Leib Knot Gynor
7    219 North Milwaukee Street
8    Suite 710
9    Milwaukee, Wisconsin 53202
10   Telephone No.: (414) 276-2102
11   E-mail: dknott@lkglaw.net
12   (Appeared via videoconference)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                        INDEX
2                                              Page
3    PROCEEDINGS                                  7
4    DIRECT EXAMINATION BY MR. WEIL               8
5    CROSS EXAMINATION BY MR. KNOTT             221
6    REDIRECT EXAMINATION BY MR. WEIL           227
7
8                       EXHIBITS
9                                              Page
10   1 - Floor Plan of Booking Area - Monroe
11       County 3147                             18
12   2 - Enlarged Floor Plan with Arrows         19
13   3 - Intake Medical Screening for Christine
14       Boyer - Monroe County 1093              30
15   4 - Monroe Booking Face Sheet for Christine
16       Boyer - Monroe County 1273-1274         32
17   5 - Larger Floor Plan - First and Second
18       Floor - Monroe County 4517              53
19   6 - Narrative Progress Note December 21,
20       2019 - Monroe County - 1095             78
21   8 - Observation Log - Monroe County
22       1103-1104                              150
23   9 - E-mail from Amber Fennigkoh to
24       Danielle Wareen - Monroe County 88     184
25
```

Page 5

```
1                  EXHIBITS (CONTINUED)
2
3    10 - E-mail from Danielle Warren to Amber
4         Fennigkoh - Monroe County 4519        189
5    11 - E-mail from Danielle Warren to Amber
6         Fennigkoh - Monroe County 6112        198
7    12 - Incident Report - Monroe County 6457
8         - 6458                                199
9    13 - E-mail Chain from Shasta Parker to
10        Danielle Warren - Monroe County 4529
11        - 4530                                203
12   14 - Narrative Progress Note - Monroe
13        County 1105                           206
14   15 - E-mail from Amber Fennigkoh to
15        Danielle Warren - Monroe County 4846  210
16   16 - List of Staff Working During
17        Christine Boyer Incident - Monroe
18        County 13680                          211
19   17 - Medication Administration Record -
20        Monroe County 1100                    215
21   18 - Medical Verification Form - Monroe
22        County 1094                           224
23
24
25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

STIPULATION

The VIDEO deposition of Danielle Warren was taken at
KENTUCKIANA COURT REPORTERS, 30 SOUTH WACKER DRIVE,
CHICAGO, ILLINOIS 60606, via videoconference in which
all participants attended remotely, on THURSDAY, the
24TH day of FEBRUARY 2022 at 10:02 a.m. CST; said VIDEO
deposition was taken pursuant to the FEDERAL Rules of
Civil Procedure. The oath in this matter was sworn
remotely pursuant to FRCP 30.

It is agreed that KRYSTAL M. BARNES, being a Notary
Public and Court Reporter, may swear the witness and
that the reading and signing of the completed transcript
by the witness is not waived.

---

Page 7

PROCEEDINGS

COURT REPORTER: Good morning. My name is
Krystal Barnes. I'm the online video technician and
court reporter today, representing Kentuckiana Court
Reporters, located at 30 South Wacker Drive, the
22nd Floor, Chicago, Illinois 60606. Today is the
24th day of February, 2022, and the time is 10:02
a.m. We are convened by videoconference to take the
deposition of Danielle Nelson in the matter of
Gregory Boyer as the Administrator of the Estate of
Christine Boyer and on his own behalf, pending in
the United States District Court for the Western
District of Wisconsin, Case number 20-cv-1123. Will
everyone but the witness please state your
appearance, how you are attending, and the location
you are attending from, starting with the
plaintiff's counsel?
MR. WEIL: Morning. My name is Steven Weil,
W-E-I-L, representing the plaintiff. I'm attending
from Chicago, Illinois.
MR. MCCAULEY: Morning. It's John McCauley of
Hansen Reynolds. I represent the deponent and the
Monroe County and the county defendants.
MR. KNOTT: And good morning. This is Doug

---

Page 8

Knott. I represent Advanced Correctional
Healthcare, Lisa Pisney, Amber Fennigkoh, and I'm in
the room with the witness.
COURT REPORTER: Okay. Ms. Nelson, will you
please state your full name for the record?
THE WITNESS: Danielle Lynn Nelson.
COURT REPORTER: All right. Do all parties
agree that the witness is, in fact, Danielle Nelson?
MR. WEIL: Yes --
MR. MCCAULEY: Yes.
MR. WEIL: -- for the plaintiff.
MR. KNOTT: Yes.
COURT REPORTER: All right. Can you raise your
right hand for me, please? Do you solemnly swear or
affirm that the testimony you are about to give will
be the truth, the whole truth, and nothing but the
truth?
THE WITNESS: I do.
COURT REPORTER: Counsel, you may begin.
DIRECT EXAMINATION
BY MR. WEIL:
Q    Good morning, Ms. Nelson. As we just
introduced myself, my name is Steve Weil. I represent
the plaintiff in this case. Have you ever been deposed
before?

---

Page 9

A    No.
Q    Have you ever testified in court?
A    Yes.
Q    Okay. This is something like a court. How
many times have you testified in court, I should ask?
A    I believe two times.
Q    Okay. And you were under oath when you
testified?
A    Yes.
Q    This is something like court testimony.
Obviously, we're not in a courtroom right now. We're
before a court reporter, and it's an informal setting.
There's a couple ground rules I want to go over, and I
imagine your counsel went over with you as well. You
understand that you're on oath today?
A    Yes.
Q    And your answers that you give, they will have
the same force as if they were in courtroom with a judge
and jury?
A    Yes.
Q    Is there anything today that would prevent you
from giving your full attention and truthful, complete
answers, whether it's an illness, medication, you're
very tired, or anything of that sort?
A    No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    If -- this is not a marathon.  It's -- well,
2  it is a marathon.  And because of that, you're welcome
3  to take breaks anytime.  It's not a test of your
4  endurance, and it's important for you to feel
5  comfortable and rest and to be able to answer the
6  questions accurately.  So anytime you want to take a
7  break, just let me know.
8    A    Okay.
9    Q    The only -- they don't tell you in advance,
10 but it's my practice to ask whether you've talked with
11 anybody during their break or whether you've looked at
12 documents.
13   A    Okay.
14   Q    And because we're in a deposition, the rules
15 of confidentiality don't necessarily apply, and I just
16 want to forewarn you of that.  The other -- does that
17 make sense?
18   A    Yes.
19   Q    Okay.  The other note is, it's fine to ask for
20 breaks anytime.  The only thing I'd ask is that you wait
21 until -- that you not ask for a break while a question
22 is pending.  So you give an answer and then you take the
23 break.  Does that make sense?
24   A    Yes.
25   Q    One of the big and important things that makes

1  a deposition much different than a normal conversation
2  is people have a tendency just to talk over each other a
3  bit, anticipate each other's answers and questions.  It's
4  important that we don't do that here because it's very
5  hard for the court reporter to take down the two of us
6  talking over each other; do you understand?
7    A    I do.
8    Q    The lawyers in the room with you may, from
9  time to time, make objections, all right?  You're still
10 obligated to answer my question unless they instruct you
11 not to do so.  Does that make sense?
12   A    Yep.
13   Q    If you don't understand a question that I'm
14 asking, I will do my best to rephrase it, to explain
15 what I'm asking about, and to give you a clear
16 understanding of what I'm getting at.  Does that make
17 sense?
18   A    Yes.
19   Q    So please don't hesitate to ask me to clarify
20 if you don't understand what I'm asking --
21   A    Okay.
22   Q    -- okay?  The corollary to that is, if you do
23 answer a question that I'm asking, I'm going to assume
24 that you understand the question I'm asking.  Does that
25 make sense?

1    A    Yes.
2    Q    We're in a Zoom setting right now, so I can't
3  see the entirety of the room, but I just ask for a
4  couple things.  One, if anybody attempts to communicate
5  with you, I'd asked that you let me know via hand
6  gesture, you know, anything of the sort, because I can't
7  see everybody in the room.  Does that make sense?
8    A    Yes.
9    Q    Okay.  Before we, sort of, dive into the
10 deposition, I just -- for technical purposes, I want to
11 put up a document and just see if you can read from
12 where you sit, given that we're in this Zoom setting.
13 So I'm going to give this my best shot here.  Now, I'm
14 sharing a screen with you, which should be -- did the
15 first document that was filed in this case, the
16 complaint.  Do you -- can you read that, Ms. Nelson?
17   A    I mean, not super clear, but if you were to
18 zoom, I would be able to.
19   Q    Okay.  So you can't -- you just can't read
20 this text, though?  You can't read a sentence out of
21 here?
22   A    It would be hard to really read.
23   Q    Okay.
24   A    I can -- I mean, I can walk up to it,
25 otherwise.

1    Q    Okay.  That's fine.  So if I -- let me just
2  try to zoom in.  Can you read it now?
3    A    Yeah.
4    Q    Okay.  I will try to make the text this big as
5  we go through.  I'm going to show you several documents
6  through this deposition.  We'll work with each other,
7  but as long as you can read this text, so you can read,
8  say, this first sentence that I'm highlighting?
9    A    Yep.
10   Q    Okay.  Great.  Then we will -- we will
11 proceed.  And I think that we'll be able to make this
12 work.  How -- when did you begin preparing for this
13 deposition, Ms. Nelson?
14   A    Oh my gosh.  Like, officially, I think I spoke
15 with them right after I started in Eau Claire, which was
16 last March.  I had spoke to them on the phone, and then
17 they called me, I think, like, between a month and two
18 months ago, and then Friday, we actually had our prep.
19   Q    So I -- you know, throughout this, I'm not
20 interested in what you -- the substance of what you said
21 to your counsel, but I do want to understand some
22 circumstances around your conversation.  Does that make
23 sense?
24   A    Yes.
25   Q    So you said that you were contacted last year,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1  last March, I think it was?
2      A    I think it was like March or April.  I don't
3  remember the exact.  But yeah, it was right after I
4  started in Eau Claire.
5      Q    Okay.  So that'd be March or April of 2021?
6      A    Yeah.  I know I met with the prior attorney
7  before he unexpectedly passed away.  I don't remember
8  exactly when that was.  But with the counsel now was,
9  I think, last March or April right after I started in
10  Eau Claire.
11      Q    Understood.  Who was with you at that meeting?
12      A    With the prior attorney or the ones now?
13      Q    Just in the March or April 2021 meeting, who
14  was at that meeting?
15      A    Well, it was over the phone, and it was just
16  me and then I was speaking to both John and Andrew.
17      Q    Okay.  So it was over the phone you said?
18      A    Yep.
19      Q    Then you mentioned the second interaction,
20  right?
21      A    Yep.
22      Q    When was that?
23      A    I believe it was, like, a month or two ago.
24      Q    Okay.
25      A    A little over a month or -- a little -- two

Page 15

1  months ago, so...
2      Q    And was that in person, or was that over the
3  phone?
4      A    That was also over the phone.
5      Q    Okay.  And then you said you had a prep
6  session on Friday?
7      A    I believe it was Friday the 18th, yeah.
8      Q    Okay.  So last week?  Did you -- have you
9  reviewed any documents to prepare for this deposition?
10      A    Yes.
11      Q    Okay.  I see you have a binder in front of
12  you.  Does that binder contain the documents that you
13  reviewed?
14      A    Yes.
15      Q    Okay.  Can you just tell me what those
16  documents are?
17      A    There was, like, the medical screening, the
18  strip search form, medical notes by the nurse, some
19  e-mails, and reports.
20      Q    So you said medical screening?
21      A    That's the one that I completed.
22      Q    Okay.  And then the search form you said?
23      A    Yeah.
24      Q    And then -- just go ahead.  The other
25  documents you reviewed?

Page 16

1      A    There were some e-mails from various people.
2  There was reports from officers, medical notes from the
3  nurse, looks like some logs from the jail, and I believe
4  reports from the hospital.
5      Q    Okay.
6      MR. WEIL:  John, it may make sense to just have
7  her -- have those available, if it's a little hard
8  to read what I put up on the screen.  Do you --
9      MR. MCCAULEY:  It may -- yeah, this is -- I
10  know it was sitting right here.  This is actually my
11  binder, so it's got annotations on the documents.
12      MR. WEIL:  Okay.
13      MR. MCCAULEY:  But I -- yeah, I have the
14  availability.  We'll get through this, you know, as
15  we go.
16      MR. WEIL:  Okay.
17      MR. MCCAULEY:  I do have the ability to pull up
18  documents on my computer if it's hard for her to
19  read.
20      MR. WEIL:  Okay.
21      MR. MCCAULEY:  So we'll cross that bridge when
22  we get to it.
23      MR. WEIL:  That's fine.  That's fine, John.
24  I didn't mean to intrude on your work product there.
25  BY MR. WEIL:

Page 17

1      Q    So Ms. Nelson, did the documents that you
2  reviewed have annotations on them?
3      A    Yes.
4      Q    Okay.  And those are the documents you
5  reviewed to prepare for your deposition today?
6      A    Those are the ones I just looked over today,
7  but the ones that I actually got via e-mail when we did
8  our -- over the video prep did not have all those
9  annotations on it.
10      Q    Okay.  And so when you say the documents you
11  looked at to prepare for today, it's a binder that's in
12  front of you right now?
13      A    Today, I looked over the binder, but on
14  Friday, it was over e-mail attachments.  They were sent
15  to me.
16      Q    Okay.  Okay.  I want to get through the
17  logistically most complicated part of the deposition
18  first, and it's complicated because we're on Zoom and it
19  involves just the floor plan of the jail and where
20  things happened.  But as by way of background, real
21  quickly, when did you start working at the Monroe County
22  Jail?
23      A    September 2016.
24      Q    Okay.  And then you left in 2021; is that
25  right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1    A    March 2021, yes.
2    Q    Okay.  And so you developed, fair to say you
3  developed a familiarity with the layout of the jail
4  during those five years?
5    A    Yeah.
6    Q    All right.  So I'm going to show you now some
7  documents.  And I have them printed out here, so I may
8  end up showing to you them in paper like this.  We'll
9  just try to work through this.  But maybe we'll start --
10 all right, Ms. Nelson.  We'll mark this as Exhibit 1,
11 and this is a document that's been Bates marked Monroe
12 County 3147.  And it's a booking floor plan.  Do -- are
13 you able to see that document and just -- I understand
14 the type's a little small, but are you able to see a
15 floor plan on the screen?
16       (EXHIBIT 1 MARKED FOR IDENTIFICATION)
17   A    Yeah.
18   Q    Okay.  And do you -- well, we can blow it up,
19 but do you recognize this floor plan as the booking area
20 of the Monroe County Jail?
21   A    Yeah.  Can you zoom in just a little bit?
22   Q    Absolutely.  How's that?  More?
23   A    That should be good.
24   Q    Okay.  Let me just -- let's see what we can do
25 here and see if we can make this work.  I have -- I can

Page 19

1  show you -- I just want to make sure I capture all the
2  events, and I'd like to do it on as few documents as
3  possible.
4    A    Okay.
5    Q    So I have this other document.  It doesn't
6  have a Bates number sent to me by counsel.  It's, sort
7  of, a zoom into this.  Does that -- is that clearer for
8  you?
9    A    Yeah.  Okay.  I see.  Yep.
10       MR. KNOTT:  Weil, can I ask, are the red arrows
11 yours or --
12       MR. WEIL:  No.  They were on the document.
13 BY MR. WEIL:
14   Q    So let me see -- this -- we'll this as --
15 floor -- so we'll mark this as Exhibit 2, and this is a
16 document that's been sent by counsel.  Well, let's just
17 get started here and see where we can go, Ms. Nelson.
18 We're looking at this Exhibit 2 here, this floor plan
19 with the arrows on it, and what does this look like to
20 you?
21       (EXHIBIT 2 MARKED FOR IDENTIFICATION)
22   A    Booking.
23   Q    Okay.
24   A    (Inaudible).
25   Q    So let -- this is where -- I'm hoping that we

Page 20

1  can do this without too much pain.  I want to, kind of,
2  go through where Christine Boyer was in the jail during
3  the short time that she was there and just try to
4  understand where -- you know, we've all looked at
5  documents that recount various things in this case.
6  I haven't been to the jail yet, so I'm just trying to
7  understand, sort of, where things transpired.  Does that
8  make sense?
9    A    Yes.
10   Q    Okay.  So as a general matter, you know,
11 Christine Boyer's arrested, and she's brought into
12 booking.  Is -- can you see on this Exhibit 2 where --
13 someone who's brought into booking, where they come in
14 from the outside world?
15   A    Yes.
16   Q    Okay.  I've got my -- the little hand here.
17 Can you see my little cursor?
18   A    Yep.
19   Q    Okay.  Just direct me to the part of the --
20 you know, up, down, left, right, where should I be
21 looking for when a person walks into the booking area?
22   A    So where that --
23   Q    -- when walking in?
24   A    -- X is, the lowest arrow on the right.
25   Q    Down here?

Page 21

1    A    Yep.  They walk in there, and I believe it
2  says pre-booking, but I think that arrow was covering
3  booking.
4    Q    Okay.
5    A    Does it say "pre" in front of that arrow?
6  Looks like it might say "pre."
7    Q    All right.  Let's -- I knew this was going to
8  be painful.  I want to -- I want to back out to -- now
9  that we have a little -- can you see the same thing here
10 at all?  And this is Exhibit 1 I'm showing you now on
11 the screen.
12   A    Yep.
13   Q    Okay.  So where should I be looking --
14   A    So to the --
15   Q    -- for this --
16   A    Sorry.  To the left where that X is in that
17 little box again, down.  Down.  Down.  Down.  To your
18 left.  Up.  To the right.  No.  Slow down.  Down.  Right
19 there where that X is.
20   Q    Right here where this X is?
21   A    That's, like, the entrance into pre-booking.
22   Q    Okay.  You know what I'm going to do?
23 Hopefully, this works out.  I'm going to try to put --
24 so I am going to try to draw -- let's see.  I'll put a
25 big O.  Is that O in the right place?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1    A    Yeah.  So that's not really pre-booking.
2 That's just, like, to walking into it --
3    Q    Right.
4    A    -- if that makes sense.  Okay.
5    Q    So I -- that's my first step.  When Christine
6 Boyer is brought in by the police, where does she come
7 in?  Where the O is?
8    A    I mean, when she's out of the squad, yes.  That
9 big, long rectangle is the garage that the officer
10 drives into, and then that circle is, like, walking into
11 the jail once they're out of the squad.
12    Q    Got it.  So this -- on the very far right of
13 -- or far left of Exhibit 1, that is where a car -- a
14 police car would come in, and the person who's been
15 arrested would be brought out of the car and then walked
16 into the jail, right?
17    A    Yes.
18    Q    And so you know what?  Just to -- for sake of
19 ordering, I'm going to call this an A.  So step A, do
20 they come in where the letter A is right there?  Is that
21 where they come in?
22    A    Like, when they walk in?  Yeah.  That looks
23 like the little cutout where the officers put their
24 weapons --
25    Q    Okay.

Page 23

1    A    -- and then wait for the sliding door.
2    Q    Okay.  All right.  So is that A in the right
3 spot, Ms. Nelson?
4    A    For when they walk in, yes.
5    Q    Okay.  What happens next?  Where do they go?
6 Do they -- from the officer just walking in --
7    A    So then B would be that -- up.  Right there,
8 like, in that little area.
9    Q    Okay.  So this -- the next area after the
10 officer comes in with whoever's being arrested, there's
11 going to be -- let's see.  They go to this room here
12 that I've marked as B; is that right?
13    A    Yep.  Which we call pre-booking.
14    Q    Okay.
15    A    That's where we did the pat-down and the
16 medical.
17    Q    Okay.  Let me ask you about that, then.  Now,
18 you -- we'll get into, sort of, all the particulars of,
19 you know, the intake process, but the night -- I'm
20 assuming for a second, just to back up, that you recall
21 -- do you recall Christine Boyer being booked on this
22 evening --
23    A    Yeah.
24    Q    -- of the December 21, 2019?
25    A    Yes.

Page 24

1    Q    That was a yes?  Okay.  And so the -- if I
2 understand you correctly, the first time you would've
3 laid eyes on her would be in this room that we've marked
4 as B; is that right?
5    A    Yes.
6    Q    Okay.  Now -- and you said this was pre-
7 booking, and I see that label right there, faintly.  But
8 you said the room marked as B is a pre-booking room; is
9 that right?
10    A    Yep.
11    Q    Okay.  Where are you -- you know, what was
12 your job that evening, the evening that Ms. Boyer was
13 booked at the jail?
14    A    I believe I was working in booking that night,
15 so I was the booking officer.
16    Q    Okay.  So -- and the booking officer, where
17 does the booking officer sit, or where are they in this
18 room?
19    A    So it looks like they, kind of, cut out where
20 the booking area is, which is that -- yeah.  Right where
21 your cursor, that angle there, that's, like, the corner
22 of the counter and then the line that goes to the left.
23 Nope.  That left fainter line that you were just up by.
24    Q    I'm sorry.  This is a little bit painful, but
25 it's over here?

Page 25

1    A    No.  Up.  Up.  Up.  Up.  To your right.  Like,
2 that area is the booking area.  Like, where the counter
3 was and behind there where we'd sit at the desk.
4    Q    Got it.  So I'll mark this with a C, and
5 you're saying that this is a counter where the booking
6 officer sits; is that right?
7    A    Yes.
8    Q    Okay.  So does the person that's being
9 arrested, do they come to this pre-booking room and then
10 you're summoned from area C to area B?
11    A    Yeah.  We would go up there to do the pat-
12 down.  Yep.
13    Q    Okay.  So someone says there has been someone
14 arrested -- someone's being brought in, you would leave
15 area C and you'd walk over to area B; is that right?
16    A    Yep.
17    Q    Okay.  And in terms of the setup of area B,
18 are there -- is there a bench that someone sits on, or
19 how is that set up?
20    A    Yep.  Like, straight above the B is where the
21 bench was.  And then, like, where it -- like, that area
22 is -- like, a desk was there, like, a computer and a
23 desk.  And then, like, right where that little diamond
24 -- yep.  Right there.  That's, kind of, where the bench
25 was, along that.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    Q    Okay.
2    A    Yep.
3    Q    So you're indicating the diamond that's, sort
4  of, the top of the room, where room B?
5    A    Yeah.  That's, like, where the wall is, where
6  the bench would be.  Yeah.
7    Q    Okay.  And so there's a desk here in room B.
8  There's a bench for the person that's been arrested to
9  sit; is that right?
10   A    Yep.
11   Q    And then you come in, and do you sit behind
12  the desk, or how does that work?
13   A    No.  So the desk was just along the wall.  So
14  basically the shape of that darker line is, like, where
15  the desk was.  We weren't behind it.  It was built
16  against the wall.
17   Q    Okay.
18   A    And you would just --
19   Q    Understood.
20   A    Yeah.
21   Q    Okay.  So you're, sort of -- the desk is
22  against the wall.  You're not behind the desk.  It's
23  just the place to rest papers and whatnot.
24   A    Yeah.  And there was a computer there as well.
25  Yeah.

Page 27

1    Q    Okay.  Got it.  Now, there's a note in --
2  there's a progress or a narrative progress note by the
3  nurse, Amber Fennigkoh.  Is that how you pronounce that?
4    A    Fennigkoh, yeah.  Fennigkoh.
5    Q    Fennigkoh.  And she talks about a PREA room?
6    A    Yep.
7    Q    Yeah.  Is that -- do you see that on this --
8  on Exhibit 1?
9    A    Yep.  Right to the right of the C where you
10  see, like, that diamond shape and the door opening.
11  Over.  To --
12   Q    Right here?
13   A    No, to the right.
14   Q    Oh, I'm sorry.  To the right.
15   A    Right there.
16   Q    Would it be here?
17   A    Yep.
18   Q    Right here?
19   A    Yep.  That room.
20   Q    Okay.  So this would be the PREA room?
21   A    Yep.
22   Q    Okay.  So I'm going to mark that as D.
23  So that's the PREA room?
24   A    Yep.
25   Q    Okay.  All right.  Walk me through again just

Page 28

1  the process for booking someone in, and you can tell me
2  if it's any different for -- if it was any different for
3  Ms. Boyer.  And what I'm just -- you know, if you'd walk
4  me through the process and then you can direct me to
5  where things happened, I'd appreciate it.
6    A    Okay.  So ultimately, every inmate that was
7  brought in had to be brought into where B is.  That's
8  where we would go out to do the pat-down and complete a
9  medical screening prior to the officer leaving.  If an
10  inmate was uncooperative or combative, that process
11  would be, kind of, taken out of there until they were
12  cooperative.  But -- so you go out there, pat them down,
13  complete the medical screening, and then some officers
14  did it differently, but you'd bring them in and either
15  book them in, or some people would put them in the PREA
16  room to watch the PREA video that all inmates had to
17  watch and then finish the booking process and then
18  change them up.
19   Q    All right.  So the officer brings them in, the
20  booking officer, and they bring them in through room A
21  or vestibule A, or whatever we're calling it, right?
22   A    Yes.
23   Q    And then they're brought into room B, correct?
24   A    Yes.
25   Q    The booking officer in the jail is typically

Page 29

1  sitting in area C that we've marked, right?
2    A    Yes.
3    Q    How are they alerted that somebody has been
4  brought into room B?
5    A    Well, before the inmates arrive, we typically
6  got a call from either dispatch or the person working in
7  master control would radio that someone was en route.
8  And then when they got there, there was a giant window
9  in the pre-booking, so you could see them coming in as
10  well.
11   Q    Is that window here where my cursor is?
12   A    Yep.
13   Q    Okay.  I'll just mark that with a --
14   A    And then you would also -- sorry.
15   Q    I'll mark it with a W real quickly.  So the
16  window to pre-booking -- let's see.  Okay.  That's where
17  the -- I've marked the window with a W; is that right?
18   A    Yes.  Like, that whole, like, darker line were
19  windows.  Yep.
20   Q    Got it.  Okay.  And so you can see into the --
21  someone in area C can see into area B through the
22  window?
23   A    Yes.
24   Q    Okay.  And then so you would walk in from C to
25  B, and this is where you'd performed the intake screen?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    A    The medical screening.  Yep.  And then the
2  pat-down.
3    Q    Okay.  So in addition to the medical screen,
4  you figure out who the person is; is that right?
5    A    Yes.  The officers brought in what they called
6  an arrest card or arrest form, which would tell us who
7  the inmate was and their charges.
8    Q    Okay.  And you -- let me see here.
9    A    I believe also, just in case, I -- it's been a
10  while, but I know we had switched programs.  I can't
11  remember.  I think we had Zuercher then.  The officers
12  had the option of doing the arrest form on the computer.
13  So if they didn't have that actual hard copy, we had
14  access to it on the computer.  So they would tell us
15  verbally, then, who it was and what they were there for.
16    Q    You would take a photo of the person being
17  arrested, right?
18    A    Yes.
19    Q    Would that happen in area B?
20    A    Not usually.
21    Q    Okay.  Well, let's keep going then.  So you
22  perform -- it sounds like you do the medical intake
23  screen in area B, right?
24    A    Yes.
25    Q    Let me pull that up.  So we'll mark this as

1  Exhibit 3.  Can you see the intake medical for Ms. Boyer
2  --
3    A    Yes.
4    Q    -- on the screen, Ms. Nelson?
5        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
6    A    Yes.
7    Q    And you reviewed this before today, right?
8    A    Yes.
9    Q    Okay.  So my question here -- and we'll talk
10  about this later, but there's, sort of, numbers 1
11  through 6, and then you see, "Officer may leave."
12  Do you see that down there at the bottom --
13    A    Yes.
14    Q    -- of Exhibit 3?
15    A    Yes.
16    Q    Okay.  Is -- going back to Exhibit 1 here that
17  we've been marking up, does part of the intake screen
18  happen in area B and then the officer -- when the
19  officer may leave, there's a further screen done in some
20  other place, or is it all done in area B?
21    A    Typically, it always got done in that
22  pre-booking room.
23    Q    Okay.  So the -- again, you've looked at that
24  intake screen form.  The whole thing would be filled out
25  in that area B place, right?

1    A    Typically.  Like I said, under certain
2  circumstances, if they're uncooperative or if we're
3  super busy, it might get finished out in booking, but
4  typically, it always got done out in pre-book.
5    Q    Okay.  To your recollection, was Ms. Boyer's
6  booking completed in B?
7    A    I believe it was, yes.
8    Q    Okay.  And once that -- so in addition to the
9  intake screen that we just looked at as Exhibit 3 -- let
10  me see.  I'll mark this as Exhibit 4.  And this is --
11  let's -- you know what?  For the record, let's just do
12  Exhibit 3.  Exhibit 3, real quickly, is produced by
13  Monroe County 1091 to 1093.  Then Exhibit 4 is produced
14  by Monroe County 1273 to 1274.  So my question is now
15  directed to Exhibit 4.  Do you recognize this type of
16  document, this form?
17        (EXHIBIT 4 MARKED FOR IDENTIFICATION)
18    A    I'm sorry, I didn't catch all of that.
19    Q    Sure.  Often there are standardized forms or
20  computer printouts.  And so, you know, sometimes a
21  person hasn't seen the particular documents in front of
22  them, but they recognize the form that the document is
23  in.  Do you recognize this form in Exhibit 4?
24    A    Yes.
25    Q    Okay.  Can you say what it is?

1    A    I think we call it, like, the booking face
2  sheet, essentially.  So after an inmate was booked in
3  and we put their file together, we would print this out
4  and put it in the file.
5    Q    Okay.  So this is obviously information that's
6  entered on a computer, right?
7    A    Yes.
8    Q    All right.  And the -- where would this
9  information be entered?  Like, it -- going back to the
10  floor plan.  Let's see.  Is it -- is the information
11  entered in that computer you talked about in Exhibit --
12  in area B, or is it somewhere else?
13    A    It could have been, but otherwise -- a lot of
14  times we did it in C.
15    Q    Okay.  So you would do the intake screen in
16  area B -- well, we'll table Exhibit 4 for a second. What
17  -- after you do the intake screen in area B, what
18  happens to the person who's been arrested?
19    A    I'm sorry, can you repeat that?
20    Q    So we're just -- I'm tabling Exhibit 4 for a
21  second, the face sheet.
22    A    Okay.
23    Q    Going back to just, sort of, the process of
24  bringing a person into the jail.  Once you've done the
25  intake screen in area B, what is the next step after



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1  that?
2      A    Like I said, some officers may have done it
3  differently, but they would either be brought to the
4  desk at C to be asked, like, their information, like,
5  their address, telephone number, personal information,
6  and then get their photo done, or they would be placed
7  in D to watch the video, or vice versa.  It, kind of,
8  depended on how the officer did it.
9      Q    Okay.  So there's, sort of, two steps that
10 occur, and they could occur in either order?
11     A    Yeah.
12     Q    One of them is gathering personal information
13 and taking the photo of the person; is that right?
14     A    And their prints, if needed, yes.
15     Q    And their fingerprints.  And then the second
16 thing -- or the other thing is -- I'm sorry.  So the
17 print, the photo, the personal information, that's
18 typically gathered in area C, right?
19     A    Yes.
20     Q    And that's, sort of, a booking desk that the
21 person in front of?
22     A    Yep.
23     Q    Okay.  And then --
24     A    Or --
25     Q    Go ahead.  I'm sorry.

Page 35

1      A    Or sit.  Sorry.
2      Q    Or sits.  Okay.
3      A    Yeah.
4      Q    And where does the person sit for their photo
5  --
6      A    So they would --
7      Q    -- or stand for their photo?
8      A    They would stand right to, like, in between
9  the C and the D, like, down a little bit.  Right about
10 there, there's a wall -- just a white wall that we used.
11     Q    Okay.  I'm going to just make a lower case --
12 so, sort of, like, right there?
13     A    Yeah.  I know --
14     Q    Where that P is?
15     A    Yep.  Sometimes officers would also take it
16 out in pre-book while they were sitting on the bench.
17 I don't know if hers was done there or where P is.
18     Q    Oh, okay.  So the photo may have been taken an
19 area B?
20     A    Yeah.  Sometimes an officer would just come
21 out with a camera and take their photo out there.
22     Q    Understood.  And then you said the other thing
23 that happens, and we're not sure of the order, is
24 they're taken into area D to watch a video; is that
25 right?

Page 36

1      A    Yep.  It was just a table with some chairs and
2  a TV with a DVD player, and they would have to watch,
3  like, a 16-minute PREA video.
4      Q    And is that -- is area D referred to as the
5  PREA room?
6      A    Yeah, I don't think it's, like, labeled as
7  that on, like, the wall or the floor plan.  It was just
8  what we called it, because that's the only thing it was
9  really used for.
10     Q    Okay.
11     A    Or for public defenders.
12     Q    For public defenders as well?
13     A    Yeah.
14     Q    So it'd be a private area where someone could
15 speak with their lawyer?
16     A    Yep.
17     Q    Okay.  And once -- so once the process is
18 complete that occurs, that the information gathered at
19 C, and the watching the video in D, what's the next step
20 that occurs for a person who's brought into the jail?
21     A    So after they complete all of the booking, and
22 if they did the prints and photo, and then watched the
23 PREA video, if they hadn't already been changed up, we
24 would take them to the change up room and change them
25 up.  And then they would be allowed their phone call.

Page 37

1      Q    Okay.  Let me -- let's take that step by step.
2  So you said you take them up and for a change-out?
3      A    Yep.
4      Q    Okay.  So you're changing out their civilian
5  clothes and putting them in a jail uniform; is that
6  right?
7      A    Yes.
8      Q    Where does that occur?  Is that on --
9      A    Yep.
10     Q    -- this exhibit?
11     A    Yep.
12     Q    Okay.
13     A    So, essentially, like, the diamond right above
14 the D, straight above that, there's that little area
15 right there.  Yep.
16     Q    Where my cursor is?
17     A    Yep.
18     Q    Okay.  And so in -- I'm going to mark this as
19 -- it's a very small room, right?
20     A    Yeah.  It's, like, a little, kind of,
21 rectangular shaped room.  And then right to the left,
22 right when you walk in, where that other diamond is, is
23 the shower.
24     Q    All right.  So I've marked this room here on
25 Exhibit 1 with an E.  Is E the place where the person's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  clothes are changed?

2      A    Yes.

3      Q    And then there's also, just I'm inferring from

4  some of the information that's on the documents, there's

5  an inventory of items that they have on them, be a cell

6  phone, wallet, money, whatever.  Where does that happen?

7      A    So when we log their inmate property, we would

8  do it in C as a part of, like, the rest of the booking.

9  We would log it then and verify with them before they

10 signed off.

11     Q    Got it.  So that would be back in the process

12 that we were discussing earlier, right?

13     A    Yeah.

14     Q    They're in their civilian clothes.  You're

15 gathering information.  And as you're doing that, you're

16 also inventorying their personal property?

17     A    Yes.

18     Q    Okay.  And then after the process -- that

19 booking process and then the PREA process in D is done,

20 then you would take them to area E to change out their

21 clothes?

22     A    Yes.

23     Q    And then you mentioned a phone call.  Where

24 does that happen?

25     A    Right below the D.  That was the wall along

Page 39

1  the PREA room.  Right --

2      Q    Where my cursor is?

3      A    Yep.  There were two phones on that wall.

4      Q    Okay.  So I'm going to put an F there.  And

5  that is -- the F -- where I placed an F, do you see it

6  there, Ms. Nelson?

7      A    Yep.  That wall right above it, yeah.

8      Q    Okay.  And the wall above the F, there's two

9  phones there?

10     A    There was, yeah.

11     Q    Okay.  That's where the -- during this time,

12 that's where the person would call out?

13     A    Yep.

14     Q    And so I think this is probably clear, but

15 just to clarify.  I'm interested in the time that

16 Christine Boyer was booked on those dates.  So if there

17 was a different process before or a different process

18 after, I'm not too interested in that.  So I'm assuming

19 that you're about the time that Ms. Boyer was booked

20 there, right?  Do you understand my question?

21     A    Like, you want to know the time frame -- like,

22 the steps of her booking?

23     Q    No, no.  I'm sorry.  You know, you were there

24 from 2016 to 2021, right?

25     A    Yeah.

Page 40

1      Q    So there may -- processes may have changed

2  during that time.  I was alerted to this just because

3  you said that there used to be phones there or something

4  like that.  So --

5      A    Sorry.  Yeah.  I said that because I no longer

6  work there.  So if there's been --

7      Q    Got it.

8      A    -- changes since -- yeah.

9      Q    Got it.  So -- okay.  Just so we're -- just so

10 we're on the same page, the process that we've been

11 discussing and putting all these letters on this

12 document, this was the process that you recall existing

13 when Christine Boyer was booked --

14     A    Yes.

15     Q    -- into the jail, right?  Okay.

16     A    Yes.

17     Q    All right.  So they're given an opportunity to

18 make a phone call on the two phones you remember being

19 right above F; is that right?

20     A    Yes.

21     Q    Okay.  After they've had that opportunity,

22 what happens after that?

23     A    So if everything was done, the booking, the

24 photo, the prints if needed, the change up, and the PREA

25 they would be placed in a housing cell.

Page 41

1      Q    Okay.  And is that housing cell always in the

2  booking area, or is it somewhere else?  Or could it be

3  somewhere else, I should say?

4      A    So I think at that time, it was just before

5  COVID and the restrictions.  If they were classified,

6  they could be brought to the back to general population.

7  But if they needed to stay up front for medical reasons

8  or if they were on a suicide watch, they would stay in

9  the booking area.

10     Q    So if I understand you correctly, your generic

11 inmate who doesn't have any special issues, they would

12 go through this process that we've been discussing, and

13 then they would say, okay, you are be moved to general

14 population.  That's off of this -- off of Exhibit 1,

15 right?  That's in another part of the jail?

16     A    Yep.  After they're classified, then they

17 could go to GP, general population, which is not on that

18 diagram.

19     Q    How does the classification occur?

20     A    So I guess I'm not quite sure exactly what you

21 want to know.

22     Q    Well, you said after they're classified.  I

23 mean, who does the classification to decide whether they

24 go to general population or stay in this booking area?

25     A    So classification was completed by conducting,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1  like, the criminal background check, and that was done
2  by the person in master control.
3      Q   Okay.  And I think over here we can mark this.
4  I have my cursor on a document that I think says master
5  control.  Am I in the right spot?
6          MR. MCCAULEY:  Steve, hold on.  I think there's
7      some technical issues.
8          MR. WEIL:  Yeah.  You know what?
9          MR. KNOTT:  Sorry, Steve.
10         MR. WEIL:  Yeah, no problem.
11         MR. MCCAULEY:  It just changed.  Okay.  So --
12     are we back?  Okay.  The video's there.  Danielle,
13     can you -- if you talk.  Steve, can you hear her?
14         THE WITNESS:  Can you hear me?
15         MR. WEIL:  I can hear you fine.
16         MR. MCCAULEY:  Okay.  For some reason the
17     speaker back changed to my computer, so we're back
18     now.
19         MR. WEIL:  Yeah, no problem.  You know, this is
20     a -- this technical glitch may be a good time for a
21     quick break.  I need to use the restroom, and I
22     think we can all just take a breather.  And I
23     appreciate your patience, Ms. Nelson, in walking
24     through this document.  So let's just take five, if
25     that's all right.

Page 43

1          MR. MCCAULEY:  Okay.
2          MR. WEIL:  Come back at 10:47.
3          MR. MCCAULEY:  Sounds good.
4          MR. WEIL:  Okay.  Great.
5          COURT REPORTER:  We are now off the record.  It
6      is 10:43 a.m.
7              (OFF THE RECORD)
8          COURT REPORTER:  We are back on the record for
9      the deposition of Danielle Nelson, being conducted
10     by videoconference.  My name is Krystal.  Today's
11     date is February 24, 2022, and the time is 10:49
12     a.m.
13 BY MR. WEIL:
14     Q   All right, Ms. Nelson.  Can you hear me okay?
15     A   Yes.
16     Q   All right.  So do you -- are you still able to
17 see this floor plan that we've been marking up on the
18 screen?
19     A   Yes.
20     Q   All right.  Just before we took a break, we
21 were talking about how someone -- how to determine where
22 someone's going to be placed in the jail, and I think
23 you said something about the decision about whether to
24 send them to general population or somewhere else is
25 made by someone in master control; is that right?

Page 44

1      A   The -- the classification was completed in
2  master, yes.
3      Q   Okay.  So that's called the classification?
4      A   That's what it's called before it, yeah, to
5  like, determine the housing.
6      Q   All right.  And is that just -- who's sitting
7  in master control who typically does that?  Like, what
8  is the role of that person?
9      A   So any officer working that night could work
10 in master control.  I know when I had worked there they
11 had hired a couple part-timers that they called master
12 control officers, but otherwise, if they weren't there,
13 any regular floor staff would work in there.  There was
14 really no specific person unless that's all they were
15 hired for was to work in there.
16     Q   All right.  So I'm going to mark the master
17 control room as G, and did I put the G in the right
18 spot?
19     A   Yes.
20     Q   Okay.  And so this -- I don't know what shape
21 that is.  It's, sort of, a square room with one wall
22 that's at an angle.  That's the master control room?
23     A   Yeah.
24     Q   And it looks like several of these walls are
25 just large windows; is that right?

Page 45

1      A   So master, yes, had a window, I think, right
2  about where your cursor is on that angle and then along
3  that wall there as well.  But they were, like, the --
4  you'd call one-way mirrors -- or two-way mirrors, where
5  they couldn't see in, but you could see out.
6      Q   Right.  Okay.  And so they would look out into
7  this booking area, the large open area?
8      A   Yes.
9      Q   All right.  And so is information being
10 relayed to a person in master control to make the
11 classification decision?
12     A   So whoever the booking officer was would
13 typically fill out the classification sheet with the
14 name and their charges and stick it in a drawer that was
15 in booking that connected to master, and then that was
16 their, essentially, cue to classify that inmate.
17     Q   All right.  And then do you understand the
18 process for classifying an inmate or someone being
19 brought in?  How that worked?
20     A   Yes.  I haven't done it since I've worked
21 there, but yes.
22     Q   Sure.  Just give me your best recollection how
23 that works, if you will.
24     A   (Clears throat.)  Sorry.  So I know that it
25 was called, I believe, the Northpointe Classification

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  system.  But we would have to do their criminal
2  background check where we would look at all their prior
3  convictions.  And based on their prior convictions, if
4  they had, like, more than five felonies, I believe it
5  was, their current charges, all of that would go into
6  consideration when classifying them.  I can't recall
7  every step on the sheet that would determine their final
8  classification, but you would use their current charges
9  and prior convictions.
10      Q    Got it.  So that sounds like you're assigning
11  them, sort of, a security level; is that right?
12      A    I'm sorry?
13      Q    You're --
14      A    What do you --
15      Q    The process you described sounds like the
16  person doing the classification is assigning them a
17  security level?  Like, minimum, maximum, that kind of
18  thing?
19      A    Yes.  Yes.
20      Q    Okay.  And then you -- I think you also
21  mentioned -- and so that would be -- that influence --
22  excuse me.  That would influence where the person went
23  within the general population; is that right?  Their
24  security level?
25      A    Yes.

1      Q    I believe you also mentioned there might be
2  other reasons, like someone with suicidal ideation or
3  medical monitoring; is that right?
4      A    That did not affect their classification, but
5  that would determine if they had to stay in booking
6  until they were cleared to go to general population.
7      Q    Got it.  The -- who would that decision about
8  -- again, setting aside the security classification --
9  but that the special needs that would keep them in
10  staging booking?
11      A    So jail staff could make the decision to put
12  them on a suicide watch based on their answers in that
13  medical screening or comments made during the booking
14  process.  Or even if they were already in GP and made
15  comments regarding suicide, we could put them on a
16  watch.  Medical watches were typically assigned by
17  medical.
18      Q    Okay.
19      A    And then we also sometimes had what we called
20  mental health watches.  So if our mental health provider
21  didn't feel that they were suicidal but, kind of, the
22  step up, just to kind of keep that extra eye on them
23  until they could go back to general population.
24      Q    And so you -- the three areas you mentioned is
25  someone who's suicidal, someone who has a medical issue,

1  and someone who just has a general mental health
2  concern, those three categories could keep somebody in
3  booking; is that right?
4      A    Yes.
5      Q    All right.  Now, I believe from the record
6  that Ms. Boyer was placed in booking 4; is that right?
7      A    Yes.
8      Q    All right.  Do you -- are you able to identify
9  booking 4 on this floor plan that we've been looking at?
10      A    I believe so.  Can you just zoom in just a
11  little bit?
12      Q    Sure.
13           MR. MCCAULEY:  Steve, if she needs to approach
14      the screen, is that okay?  So that she can get close
15      --
16           MR. WEIL:  Yeah.  Yeah.  Sure.
17           MR. MCCAULEY:  Okay.
18  BY MR. WEIL:
19      Q    Let me show you another -- this is the -- so
20  this is the -- what did we designate this document as?
21  Exhibit 2.  And this is the floor plan that counsel sent
22  over.  It's a bit zoomed up.  So I'll just say on
23  Exhibit 2, I see something called booking cell -- it
24  looks like booking cell 4.  See where my cursor is?
25      A    Yep.

1      Q    All right.  I'm going to mark that real
2  quickly.  Bear with my computer.  So I'm marking that
3  with a 4.  Just make it a bit bigger just for -- okay.
4  Am I putting the 4 in the right spot for booking 4?
5      A    Yes.
6      Q    Okay.  So I'll back out for a second.  And
7  then I just want to, if we could, transpose this onto
8  the Exhibit 1 that we've been marking up, so we can keep
9  all the information in one spot.  So keep -- bearing in
10  mind where you have the floor plan on this larger
11  document, are you able to identify booking 4 now?  I'm
12  happy to toggle back.
13      A    Yes.  No.  Yes.  I'm sorry.  I could before.
14  I was just, kind of, curious what those dash lines were.
15  That was, kind of, throwing me off, but yes, I can --
16      Q    Where should I go?  I -- should --
17      A    Up to your right.  Right there.  Oh, one more.
18  To your right.
19      Q    This one right here?
20      A    Yes.
21      Q    So I'm going to put the 4 there.  Okay.  So do
22  I have the 4 in the right spot, Ms. Nelson?
23      A    Can you zoom in?
24      Q    Sure.  I'll delete it for a second, so you can
25  look at it.  And I'm happy to go back.  Let's go back to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Zoom real quickly to help orient you. Okay. So I'll go
2  back to -- I see it as, like, catty-corner to the master
3  control.
4     A   Yes.
5     Q   To the master control. So --
6     A   That's 4.
7     Q   This one right here where my cursor is?
8     A   No, where you had the 4. Right there. I
9  think your cursor, yep, keeps, like, disappearing. Right
10  there.
11     Q   Right there?
12     A   In that rectangle. Yep.
13     Q   Okay.
14     MR. MCCAULEY: Just going to place an objection
15   to form.
16     MR. WEIL: What's the objection, John?
17     MR. MCCAULEY: Just based on the difficulty in
18   reading that document.
19  BY MR. WEIL:
20     Q   Well, Ms. Nelson, I just want you to be
21  confident. I'm just trying to gather the information I
22  can. Are -- do you think that this is booking 4, this
23  cell here?
24     A   Yes. Because coming out of pre-booking, the
25  first cell was 7, then 6, 5, 4. And 4 was connected to

1  the holding cell, which I see says "holding cell."
2     Q   Okay. What do you mean by holding? That's in
3  the corner here of this building floor plan?
4     A   Yes.
5     Q   You're saying it was connected to the holding
6  cell?
7     A   Yes.
8     Q   Okay. And --
9     A   I mean, like, they shared a wall.
10     Q   Got it. Okay. So there wasn't -- there
11  wasn't a way to walk between the two of them, but they
12  shared a wall?
13     A   Yes. Or, I mean, I think there might have
14  been a pipe trace, but I mean, essentially, yeah, it
15  was, like, the next cell over was the holding cell.
16     Q   All right. And so booking 4 was adjacent to
17  the holding cell; is that right?
18     A   Yes.
19     Q   And the documents you reviewed showed
20  Ms. Boyer in booking 4, right?
21     A   Yes.
22     Q   Are -- I understand that booking 4, from --
23  again, from the documents, that it was -- there was a
24  closed-circuit TV monitor inside of it; is that right?
25     A   All the booking cells had cameras in them.

1     Q   All the booking cells had cameras?
2     A   Yes.
3     Q   And what about in this open area in the
4  staging booking area? Were there cameras covering this
5  open area?
6     A   There were a few.
7     Q   Okay. And were there -- and I'll just say --
8  so this open booking area is H. I'll just put that
9  down. Do I have that right?
10     A   Okay. Yes.
11     Q   So there would be cameras covering area H,
12  right?
13     A   Yes.
14     Q   And also cameras covering area B, I assume?
15     A   Yes.
16     Q   Okay. From what you recall, Ms. Boyer was
17  booked directly into booking 4; is that right?
18     A   Yes.
19     Q   And that was -- from my recollection of the
20  documents, that was the only place that she was held
21  during her time at the jail; is that right?
22     A   Yes.
23     Q   Did you see documents where Shasta Parker's
24  performing a chest pain protocol for Ms. Boyer?
25     A   I did see the document, yes.

1     Q   Where would that typically happen? Would that
2  typically -- would someone go into the cell, or would
3  the person come out? How would that work?
4     A   Honestly, it varied. It could be done in
5  their cell, it could have been done in medical, or it
6  could have been done out in the booking counter.
7     Q   You said done in medical?
8     A   Yes.
9     Q   Is there --
10     MR. MCCAULEY: Objection -- hold it. That
11   misstates her testimony. She gave three
12   possibilities.
13     MR. WEIL: Yeah. Sure. That's fine.
14  BY MR. WEIL:
15     Q   So it could have been done in the cell, it
16  could have been done in medical, and it could have been
17  done where else?
18     A   At the booking counter.
19     Q   In front of area C?
20     A   Yes.
21     Q   Do you see medical on this floor plan?
22     A   No.
23     Q   Okay. Let me see. All right. So this will
24  be -- I believe we're at Exhibit 5. This is a larger
25  floor diagram, and obviously the print is very small.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1  I believe this is the second floor, and then this is the
2  first floor. I'm just reading off the -- again, Ms.
3  Nelson, I don't expect you to rec -- you know, to be
4  able to read in minute detail anything on here. I
5  can't. But as I understand it, booking in this document
6  would be -- and I'm just going to -- booking would be
7  where my cursor is; is that right?
8        (EXHIBIT 5 MARKED FOR IDENTIFICATION)
9        MR. MCCAULEY: Object to form.
10  A    Yes.
11  Q    Okay. I'm going to put a B there. And then
12  where would medical -- do you see medical on this
13  diagram or where it would be on this floor plan?
14       MR. MCCAULEY: Same objection.
15  A    I have a general idea, but it's too small.
16  Q    Sure. Sure. Again, I can't read these. Where
17  is it from booking? Like, orient me on this. Take my
18  cursor to medical.
19  A    So if you go out that door right there to the
20  left, it's down that hall.
21  Q    Okay.
22  A    (Inaudible).
23  Q    Is my cursor going in the right direction?
24  A    Yes.
25  Q    Okay. And then where does it -- where should

1  I stop?
2  A    I think you keep going.
3  Q    Okay.
4  A    I believe it's -- whoops. From what I'm, kind
5  of, gathering, I believe it's there, but I would need
6  you to zoom in for sure.
7  Q    Let's see what we can do here. I've zoomed in
8  a little. Does any of this look more familiar or
9  refresh your recollection as to where medical is?
10  A    Yes.
11  Q    Okay. You said that was a yes?
12  A    Yes.
13  Q    Okay. Where -- again, I've got my cursor
14  here. Just tell me where to go. I'm in the hallway.
15  A    So right there. That was the main entrance
16  into the medical. And then to the right was the office.
17  To the left was the med room, an exam room, and then a
18  file room.
19  Q    Okay. So in this area that I'm circling my
20  cursor, this is the medical area?
21       MR. MCCAULEY: Object to form.
22  A    Yes.
23  Q    Okay. And without going into particular
24  rooms, that's where you recall medical being? Where
25  I've placed the M?

1  A    Yes.
2  Q    Okay. Okay. And so you said -- just going
3  back to the booking floor plan -- the -- a chest pain
4  protocol might have been done in the cell itself, at the
5  booking area, which is C, or in medical, which we just
6  reviewed; is that right?
7  A    Those are areas that it could have been done,
8  yes.
9  Q    Okay. I -- save that and, hopefully, be done
10  with that for the most part in the deposition. Thank
11  you, Ms. Nelson. That went, I think, pretty painlessly.
12  I want just go to -- just discuss your employment
13  background a little. You said that you began working at
14  the Monroe County Jail in 2016; is that right?
15  A    Yes.
16  Q    What did you do before that?
17  A    I worked at Kwik Trip for, I believe, six
18  years.
19  Q    Okay.
20  A    I also did get hired at Price County for a
21  very short period of time, but it just didn't work out.
22  So I stayed with Kwik Trip.
23  Q    Okay. Kwik Trip is a convenience store gas
24  station?
25  A    Yes. The one with the K-W-I-K.

1  Q    Great. And you were -- what was your job
2  there?
3  A    I was -- when I had left, I was a guest
4  service leader.
5  Q    Okay. Was that -- were you behind the counter
6  checking folks out or something else?
7  A    It was -- it was either that or working in the
8  kitchen or stocking on the floor.
9  Q    Okay. And then you said you worked for --
10  during that time, you worked for a -- that was six
11  years, right, at Kwik Trip?
12  A    Yes. I believe it was six years.
13  Q    Then you also said you worked for another
14  county, right?
15  A    Yeah. I was hired by Price County. I believe
16  I was there for two weeks. I was training in dispatch,
17  and it just wasn't for me, so I didn't stay.
18  Q    All right. And so was that -- it's sounds
19  like you were in a law enforcement capacity in Price
20  County?
21  A    I believe they listed it as a civilian job.
22  But if you go on -- like, my background of my criminal
23  justice, like, training and stuff, but
24  Q    So the dispatcher for the sheriff's office; is
25  that right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Page 58

1    A    Yep.
2    Q    Yeah.  And when was that?
3    A    I believe I was hired there in January of, oh
4  my gosh, 2016.
5    Q    Okay.  And did you go back to Kwik Trip after
6  that?
7    A    So I never actually left Kwik Trip.  I kept
8  that job during that.  But then I went back there
9  full-time, I believe, yeah.
10   Q    And when did you start working for Monroe
11 County?
12   A    So I was hired part-time in September of 2016,
13 and I believe I was given the full-time spot in December
14 of 2016.
15   Q    Okay.  And was that a sworn position?
16   A    We were sworn jailers, not certified to work
17 the road, yes.
18   Q    Okay.  So you're a correctional officer, in
19 other words?
20   A    Yes.
21   Q    All right.  Why don't you go through your
22 rankings?  I believe at the time Ms. Boyer came to the
23 jail, you were a sergeant, right?
24   A    Yes.
25   Q    And did you start out as a sergeant?

Page 59

1    A    No.
2    Q    What did you start out as?
3    A    A correctional officer.
4    Q    Okay.  That's, sort of, a line correctional
5  officer?
6    A    Yeah.
7    Q    When did you -- how did you progress through
8  the ranks?
9    A    So I was a correctional officer until, I
10 think, November of 2018, and then I got promoted to
11 sergeant.
12   Q    Okay.
13   A    We didn't have any other ranks between that.
14   Q    Yeah.  At the time Ms. Boyer arrived at the
15 jail, you were still sergeant, right?
16   A    Yes.
17   Q    And then you -- did you have a -- I know that
18 -- you said you left the jail in Monroe County in 2021,
19 right?
20   A    March 2021, yes.
21   Q    Right.  And did you have another rank between
22 November of '18 and March '21?
23   A    No.
24   Q    So when you left you were -- when you left
25 Monroe County, you were a sergeant?

Page 60

1    A    Yes.
2    Q    All right.  Can you describe what sort of
3  training you received on coming on to the Monroe County
4  force?
5    A    I completed my criminal justice program,
6  Associate's of Applied Science, so the two years.  And
7  then I did also complete the criminal justice law
8  enforcement academy, the seven -- no, 520.  And then the
9  jail academy, which I believe was 160 hours.  So I did
10 all that prior to being hired at Monroe.  And then --
11   Q    Okay.  So just to back up, you graduated from
12 high school, right?
13   A    Yes.
14   Q    Okay.  What year was that?
15   A    2009.
16   Q    Okay.  And then you said -- I think you said
17 you got an associate's degree, right?
18   A    I have two, but one of them is the criminal
19 justice, yes.
20   Q    Okay.  When did you get that?
21   A    2014.
22   Q    And was that a prerequisite for starting with
23 the county?
24   A    No.
25   Q    Okay.  And then you mentioned there was a

Page 61

1  second training that you got.  You mentioned two other
2  trainings.  One was the jail.  Just go ahead and go
3  through the other ones real quickly.
4    A    I did the law enforcement academy.  I believe
5  at the time I did it, it was about 520 hours.  And then
6  I did the jail academy as well, which I believe was 160
7  hours.
8    Q    All right.  Were those prerequisites for
9  working at the jail?
10   A    No.  If you didn't have the jail academy, the
11 county would pay to send you.
12   Q    When did you complete the law enforcement
13 academy?
14   A    I did all of that while in the program.  They
15 had it built into the program.  So 2014.
16   Q    When you say "built into the program," you
17 mean the criminal justice associate program?
18   A    Yeah.
19   Q    Okay.  And then how about the jail academy?
20 When did you complete that?
21   A    Same.  It was all done at the same time.
22   Q    Okay.  So the law enforcement academy and the
23 jail academy, those were components of your criminal
24 justice associate's degree?
25        MR. MCCAULEY:  Object to form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    So you would do -- as long as you have the 60
2  college credits, you could do the academy.  But when I
3  went through, it was -- it was all incorporated in the
4  program as well, so I didn't have to do the academy
5  separate.
6    Q    It sounds like, then, you completed both of
7  those, all the training we've discussed so far, in 2014,
8  right?
9    A    From to 2012 to 2014, yes.
10   Q    Okay.  And once you came on with the Monroe
11 County Jail in September of 2016, was there additional
12 training at that point?
13   A    I was put through what you would consider an
14 STO program, per se.  So I had people training me on the
15 job.  I was not just working on my own right away.
16   Q    Let me back up real quick.  Between completing
17 the criminal justice associate's, the law enforcement
18 academy, and jail academy, all in 2014, did you have any
19 additional training between completing those programs
20 and starting at the jail on September 2016?
21   A    No.
22   Q    Okay.  And so starting in September 2016, you
23 were describing -- you were describing your training
24 once you were hired at the jail.
25   A    Yes.

1    Q    And can you describe that again, please?
2    A    So when you got hired, you would have officers
3  with more experience training you.  They would show you
4  the job.  You would have to be familiar with the
5  policies.  They would train you on the floor and show
6  you how to do the job.
7    Q    All right.  So if I'm understanding correctly,
8  part of your training would be reading policies; is that
9  right?
10   A    Yes.
11        MR. MCCAULEY:  Object to form.
12   Q    Okay.  And then part of your job would be, for
13 lack of a better word, shadowing senior officers as they
14 did their jobs?
15   A    Yes.
16   Q    Okay.  Do you remember reading -- like, was
17 there a set time for you to sit down and read policies
18 as part of that training?
19   A    No.  What I recall is I was instructed by one
20 of my trainers in my free time to look over policies.
21   Q    And by that, you're referring to the jail's
22 written policies?
23   A    Yes.
24   Q    Okay.  Did you watch any videos as part of
25 your training?

1    A    I do not recall watching videos.
2    Q    Okay.  And then you had -- you mentioned
3  shadowing as well?
4    A    Yes.
5    Q    Okay.  How long -- was there a period of
6  training that this happened, you know, the shadowing and
7  the looking over policies?
8    A    Yes.  I don't remember their time frame.
9  I don't remember how long they required people to train.
10 I couldn't remember.
11   Q    Okay.  What's your best estimate of how long
12 that training period lasted?
13   A    Oh my gosh.  Maybe two to three months.  I
14 honestly couldn't remember.
15   Q    Okay.  So would it be the period that you were
16 part-time?
17   A    Yes, but I was still part-time when I got off
18 training, so
19   Q    Okay.  So earlier you said you went full-time
20 in December of '16, right?
21   A    Yeah.  Yes.
22   Q    So the training would've ended at some point
23 before that?
24   A    Yes.
25   Q    All right.  So you remember reading written

1  policies, and you remember shadowing the senior
2  officers; is that right?
3        MR. MCCAULEY:  Object to form.
4    A    Yes.  There were multiple officers that I
5  trained with.
6    Q    Okay.  Were there any courses where someone
7  would come and explain to you or to you and other people
8  aspects of the job?
9    A    During the training, whoever was training
10 would essentially let you know all of those things.
11   Q    Okay.  And so there wasn't anything that
12 looked like a class where you'd be sitting there and
13 someone would be -- in a chair, what have you, someone
14 sitting there talking and lecturing on a topic?
15   A    I don't believe we did that, no.
16   Q    Okay.  And then you said you do not recall
17 watching videos, right?  As part of your training?
18   A    I do not remember, yeah.
19   Q    Besides that training at the outset, have you
20 received other training during your time at the jail?
21   A    Oh, state law requires -- and Corrections,
22 you have to -- require, I believe, 24 hours of annual
23 training every year.  So whatever sort of in-service
24 trainings we would conduct, but I believe we were
25 required every year to have a medical and mental health



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1 refresher and CPR was, I believe, every two years.

2    Q    Anything else?  Any other topics that you

3 remember?

4    A    We would do, like, fire evacuation, fire

5 safety, or fire extinguisher STBA.  Yes.  Essentially,

6 if we had any changes to how we did things, procedures

7 or policies, we would do those.  Or if we weren't

8 getting any, sort of, new equipment in the jail or

9 programs, we would do trainings.

10    Q    All right.  So I have here -- well, I won't go

11 through them, but the -- this training, this in-service

12 training and the stuff you just discussed after you had

13 started working, did it come in a particular form?  Was

14 it video?  Was it lecture?  Was it a person coming in?

15    MR. MCCAULEY:  Object to form.

16    A    Typically, we would sit in a room and have

17 somebody either instruct the class, or explain, or talk

18 about the training.

19    Q    Okay.  So something resembling a classroom, it

20 sounds like?

21    A    Essentially, yes.

22    Q    All right.  Any other forms of training

23 besides that?

24    A    POSC 00

25    MR. MCCAULEY:  Same objection.

Page 67

1    A    POSC, which is principles of subject control,

2 which is a training for jail staff or TASER training.

3    Q    Okay.  What about medical training?  What sort

4 of medical training?  You mentioned that that's one of

5 the items that you would receive training on.  What

6 would that consist of?

7    A    It typically would consist of going over

8 administering meds if we had to, completing what a --

9 they were called protocols.  They are now called illness

10 reports.  We were shown how to use an EpiPen if needed.

11 Any sort of medical changes that we needed to be aware

12 of, medical policies.

13    Q    And what form would those trainings take as

14 in, again, in person, classroom, video, written, what

15 have you?

16    A    They were done in person or in, like, a

17 training room with somebody talking or explaining these

18 things.

19    Q    Do you remember if any of the training, if you

20 know, was done by someone from ACH?

21    A    Yes.

22    Q    I'm sorry.  You know what?  I should back up.

23 Do you know what -- do you recognize the name Advanced

24 Correctional Healthcare?

25    A    Yes.

Page 68

1    Q    Okay.  And your understanding is that they're

2 a company that provided medical care at the jail; is

3 that right?

4    A    Yes.

5    Q    All right.  And so when I refer to ACH, I'm

6 referring to Advanced Correctional Healthcare.  Does

7 that make sense?

8    A    Yes.

9    Q    And so you said -- I interrupted because I

10 hadn't introduced ACH as a term.  Some of the trainings

11 were done by folks from ACH?

12    A    Typically, the nurse that worked at the jail.

13    Q    Okay.  And so she would do a training in

14 person?

15    A    Yes.

16    Q    All right.  And that would be on some topic

17 about how to provide medical care?

18    A    Yes.  And it could also be a he.  Sometimes we

19 had a male nurse, but

20    Q    Sure.  Understood.  A good point.  Would the

21 ACH nurse hand out literature to you, training

22 literature?

23    MR. MCCAULEY:  Object to form.

24    A    I believe sometimes they would hand out

25 printouts.  Yes.

Page 69

1    Q    Would -- do you recall them ever showing you

2 videos?

3    A    I do recall watching an ACH video.  Honestly,

4 I can't remember if it was done by mental health or the

5 medical staff, though.

6    Q    What do you recall about that video?

7    A    I believe it was, like, the -- it probably was

8 medical now that I think of it.  I believe it was the --

9 understanding, like, the -- the cares that inmates

10 receive in jail.

11    Q    Okay.  Do you have any memory about roughly

12 when you watched that video?

13    A    No.

14    Q    Okay.  Just sometime during your stay at the

15 jail?

16    A    Yes.

17    Q    Your work at the jail?

18    A    Yes.

19    Q    Okay.  How -- do you remember how many videos

20 like that?  How many different videos you watched like

21 that?

22    A    I do not.

23    Q    What was the setting where you watched the

24 video?  Would it be in this classroom setting that you

25 were talking about or --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1     A    The same one.  Yeah, the same one that we
2  would use for our training room.
3     Q    Okay.  And so that was a classroom setting.
4  There'd be a TV up in front and everyone, sort of, would
5  watch the video together?
6     A    Or a projector, yes.
7     Q    Okay.  As opposed to you doing it, say, on a
8  laptop or something like that, right?
9     A    Yes.
10     Q    Okay.  Do you know -- do you recall that --
11  watching videos on one occasion or multiple occasions?
12  Was it something that happened on a regular basis or
13  just something that happened once?
14     A    With medical or in general?
15     Q    ACH training videos.
16     A    I do not recall how many we've done with
17  medical because like I said, our mental health provider
18  also did videos as well, and I believe she was employed
19  through ACH.
20     Q    Okay.  And between medical and mental health,
21  would you have a ballpark of how many videos you
22  watched?
23     A    No.
24     Q    More than five or less than five?
25         MR. MCCAULEY:  Foundation.

Page 71

1     A    Maybe less than five.  I believe the mental
2  health one was usually the same one.
3     Q    Okay.  When you're saying less than five, you
4  mean less than five medical or less than five total
5  between medical and mental health?
6         MR. MCCAULEY:  Object to form.
7     A    I believe five less than total between both.
8     Q    Give me one minute.  My apologies.  I'm
9  just -- well, we can do that after the break.  Okay.
10  When Ms. Boyer was booked into the jail, do you recall
11  working a particular shift during that time?  Let me
12  back up real quick and -- well, strike that.  They're --
13  jails are typically run in shifts where folks work
14  different set times, right?
15     A    Yes.
16     Q    And what shifts did the Monroe County Jail
17  operate on while -- during the time Ms. Boyer came in?
18     A    We were on 12-hour shifts.
19     Q    Okay.  What -- and how was that divided?  What
20  hours of the day would the shifts change over?
21         MR. MCCAULEY:  Object to form.
22     A    Day shift was 6:00 A to 6:00 p.m., and night
23  was 6:00 P to 6:00 A.
24     Q    Okay.  So on the -- so 6:00 a.m. to 6:00 p.m.
25         would be day shift?

Page 72

1     A    Yes.
2     Q    And 6:00 p.m. to 6:00 a.m. is night shift?
3     A    Yes.
4     Q    How much overlap was there between the two
5  shifts?  Would people come and -- there'd obviously be
6  some overlap between the two shifts.  How much overlap
7  would there be?
8         MR. MCCAULEY:  Object to form.
9     A    There really wasn't much overlap.  I mean, if
10  somebody clocked in at, like, 5:45, maybe, but
11  typically, there wasn't much overlap.
12     Q    Okay.  So there would not be an expectation of
13  overlap, in other words?  Like, there wasn't a set
14  procedure where it'd say you had to show up 20 minutes
15  before your -- before the shift officially started or
16  stay 20 minutes after your -- that hour, the 6:00 hour
17  past?
18     A    Yeah, they --
19         MR. MCCAULEY:  Object to form.
20     A    They typically wanted us to stay in our 12
21  hours.  They didn't want us staying too long past.
22  I mean
23     Q    Well, you said, "I mean What did -- what were
24  you going to say?
25     A    Sorry.  Like, if (Inaudible) needed to be

Page 73

1  completed, somebody may have stayed five, ten minutes
2  past their shift.  But if somebody came in early enough,
3  it could have been done beforehand.
4     Q    Okay.
5     A    But there was no expectation of somebody being
6  there 20 minutes before or after their shift, no.
7     Q    Did folks clock in and clock out?  Was there a
8  timecard or something like that?
9     A    Sorry.  I have to rethink how we did it.
10  We did not clock in or clock out.  We had a computer
11  program where we would enter our hours for that day.
12     Q    How would that work?
13     A    It was done on the computer on some sort of
14  program where you would enter the time you started and
15  the time you left for each shift and then overtime if
16  necessary.
17     Q    Okay.  So you'd come in and sit down at a
18  keyboard and type in -- enter some sort of information
19  yourself about recording that you'd come in and that
20  you'd left?
21     A    Yes.
22         MR. MCCAULEY:  Objection.  Mischaracterizes.
23     Q    Did I mischaracterize how it worked,
24  Ms. Nelson?  Let me --
25     A    It could --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    Q    Did I describe it accurately or not?
2    A    So it was -- I don't know if I'm describing it
3  correctly, but you would -- each day you could enter the
4  time you started your shift and then ended your shift.
5  It was on a program, like, some sort of computer program
6  used by the county.
7    Q    Okay.  And was it, like, an Excel program, or
8  did -- if you know?
9    A    No, it was some program built into whatever
10  the county is.
11    Q    Okay.  And so if I understand you correctly,
12  you'd sit down at that program, type in that you'd, you
13  know, arrived at a particular time, right?
14    A    Yes.  Like I said, they kept us at our 12
15  hours and essentially only gave us overtime for so many
16  minutes over.  So that's when you would have to enter
17  that additional time.
18    Q    Okay.  So you would record when you entered
19  and when you left on that program; is that right?
20    A    Yes.
21    Q    Okay.  And I am inferring from the record that
22  you were working the 6:00 p.m. to 6:00 a.m. shift on the
23  days that Ms. Boyer was in the jail; is that right?
24    A    The day she got booked in, yes.
25    Q    Okay.  And then that was December 21st, right?

Page 75

1  That she was booked in the jail?
2    A    Yes.
3    Q    Okay.  And then you were working on this --
4  6:00 p.m. on the 21st to 6:00 a.m. on the 22nd, right?
5    A    Yes.
6    Q    And then you were also working 6:00 p.m. on
7  the 22nd to 6:00 a.m. on the 23rd; is that right?
8    A    Yes.
9    Q    Okay.  When you became a sergeant, would you
10  be the highest-ranking person at the jail, say, on the
11  night that -- on a typical night where you were on a
12  shift?
13    A    On night shift, if the lieutenant or captain
14  were not working, then yes.
15    Q    Okay.  And the lieutenant would be -- is that
16  Lieutenant Hallman?
17    A    Yes.
18    Q    Okay.  And then the captain is Captain
19  Hendrickson; is that right?
20    A    Yes.  At the time that I was there, yes.
21    Q    Uh-huh.  And so if one of those two officers
22  were not at the jail, you would be the highest-ranking
23  person at the jail or employee at the jail; is that
24  right?
25    A    Yes.  I mean, if there was other sergeants,

Page 76

1  depending on seniority, then they might be essentially
2  the higher sergeant, but yes.
3    Q    Okay.  What was your job as a -- how did your
4  job change when you became a sergeant versus a line
5  correctional officer?
6    A    So, essentially, I was more responsible for
7  conducting cell check audits, reviewing reports done by
8  staff, ensuring that staff were completing their duties
9  for the day, just being a person in charge.
10    Q    And would you be -- I'm sorry.  Go ahead.
11  I didn't mean to interrupt you.
12    A    There was essentially more paperwork as a
13  sergeant, like, also.  Completing release dates for
14  inmates.
15    Q    Okay.  So you're doing a lot more
16  administrative stuff; is that right?
17    A    More than a CO, yes.
18    Q    Okay.  And it -- were you performing those
19  duties mostly in that area C, that booking area that we
20  were looking at?  Is that where you'd be sitting most of
21  the time?
22        MR. MCCAULEY:  Object to form.
23    A    I could essentially complete these tasks
24  anywhere in the jail.  I could do them in booking,
25  master, or housing.  I chose to work booking that night.

Page 77

1    Q    Okay.  And would you -- it sounds like you'd
2  be doing a lot of tasks on the computer; is that right?
3    A    As a booking officer?
4    Q    Well -- sure.  Were -- you described a lot of
5  administrative tasks, like computing time.  There were
6  several other administrative tasks you described.  Those
7  would be -- you'd be doing those on a computer?
8        MR. MCCAULEY:  Object to form.
9    A    It could be done on computer or by a paper.
10  Like, we had printouts of our self-check audits that we
11  could review.
12    Q    Okay.  And then were you using e-mail as well?
13    A    All staff e-mailed, yes.
14    Q    Okay.  Would you -- I have a job where I'm
15  getting e-mail on my phone all the time.  So, you know,
16  I'm -- whether I'm in the office or not, I'm getting
17  e-mail.  Did -- was your job like that, or were you --
18  would you show up at your shift and then start reading
19  -- going through your e-mail?
20    A    I had a -- as a sergeant, we had a work cell
21  phone that we would take home.  So if e-mails or texts
22  came through, we would get them on that.  So, yeah, I
23  would see e-mails while off duty, but I'd also review
24  them when I got to work as well.
25    Q    Okay.  All right.  Ms. Nelson, I'm going to --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1  I think we're at Exhibit 6 now.  So Exhibit 6 is a
2  narrative progress note dated December 21, 2019, and
3  it's a single-page document with Monroe County Bates
4  1095.  Do you see Exhibit 5 [sic] in front of you,
5  Ms. Nelson?
6            (EXHIBIT 6 MARKED FOR IDENTIFICATION)
7      A    Can you zoom in a little bit?
8      Q    Sure.
9      A    Okay.
10     Q    All right.  So let me just ask you one thing
11  (Inaudible).  There's a -- on the lower left-hand corner
12  of Exhibit 5 [sic], there's something that looks like
13  initials.  Looks, sort of, like an M and an O with a
14  line after it.  Do you see that?
15     A    Yes.
16     Q    Do you recognize those markings as being made
17  by anybody?
18     A    No.
19     Q    Okay.  So that -- you don't recognize that as,
20  like, someone's signature or sign-off or anything like
21  that?
22     A    I don't --
23     Q    Okay.
24     A    -- recognize it.
25     Q    Okay.  This -- have you seen this document

Page 79

1  before, Ms. Nelson?
2      A    I have.
3      Q    Okay.  Did you see this document in preparing
4  for your deposition today?
5      A    Yes.
6      Q    I want to sort of -- let me ask you this: Was
7  what was written in this document in terms of the --
8  there's an entry on December 21, 2019, right?  And then
9  lower down, there's one from December 22, 2019.  Do you
10  see that?
11     A    Yes.
12     Q    Okay.  So I want to talk to you about this
13  entry that's marked as December 21, 2019.  Have you read
14  this entry before?
15     A    Yes.
16     Q    Okay.  Was it consistent with your
17  recollection of what happened that evening?  Obviously,
18  other things may have happened.  Was it -- but was this
19  consistent with your recollection of what happened?
20          MR. MCCAULEY:  Object to form.
21     A    From what I read, yes.  I don't really recall
22  that first line, though, stated by the officer.  That I
23  don't know.
24     Q    Okay.  So do you recognize the signature down
25  here at the bottom of the December 21st entry?

Page 80

1      A    Yes.
2      Q    All right.  And is that Amber Fennigkoh's
3  signature?
4      A    Yes.
5      Q    All right.  Do you recall that Amber Fennigkoh
6  was at the jail that evening?
7      A    That Christine got booked in, yes.
8      Q    Okay.  And this first line says, "Leaving
9  facility when Tomah PD officer stated, 'I hope you're
10  ready for a medical mess.'"  Do you see that?
11     A    Yes.
12          MR. MCCAULEY:  Object to form.  You might want
13     to zoom in on this end, Steve, so --
14          MR. WEIL:  Sure.
15          MR. MCCAULEY:  It's a little hard to read.
16          MR. WEIL:  Okay.  This will be helpful.
17          MR. MCCAULEY:  Yeah.
18  BY MR. WEIL:
19     Q    Ms. Nelson, can you read the whole -- can you
20  see the whole entry there?
21     A    Yes.
22     Q    Okay.  We'll keep it nice and big.  All right.
23  So you see this first line.  I think we mentioned it
24  briefly.  "I hope you're ready for a medical mess."
25  Do you see that?

Page 81

1      A    Yes.
2      Q    I think you said something about not recalling
3  that, right?
4      A    Yeah.  I don't recall the officer saying that.
5      Q    Okay.
6      A    If he said it when I was there, I don't
7  recall.
8      Q    All right.  Do you remember where -- we talked
9  about how the booking process worked, and do you recall
10  an officer bringing Ms. Boyer into that area B that --
11  and I'd be happy to go back to.  Let's look at
12  Exhibit 1 again, this area B that we were looking at.
13     A    Yes.
14     Q    Okay.  And so do you recall how Ms. Fennigkoh
15  -- did Ms. Fennigkoh end up in area B as well?
16     A    I don't believe she did.  I recall contacting
17  her, I think, as she was walking out before she walked
18  in into room B, because I was in the PREA with Christine
19  and she had come in to talk to Christine in there.
20     Q    Okay.  So why don't we go through -- we talked
21  in general about how booking worked.  Do you have any
22  recollection how the booking proceeded with Ms. Boyer in
23  particular?
24     A    Like, all the steps?
25     Q    Yeah.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1    A    I honestly don't recall, like, every step.
2 I believe I had an officer help with the booking, so he
3 may have done some of it and I did some of it.
4    Q    Okay.  Do you recall -- we discussed that you
5 -- again, we'll just go to the booking floor plan here
6 and discuss it briefly.  Do you recall -- we discussed
7 that you would -- you know, someone would -- an arrestee
8 would come in and if you were doing booking that
9 evening, you would walk from area C to area B, right?
10   A    Yes.
11   Q    Do you recall doing that with Ms. Boyer?
12   A    Yes.  I was the one that did the pat-down and
13 the medical screening.
14   Q    Okay.  And that intake screen would be the
15 document that we looked at briefly, and that would've
16 been performed in area B, right?
17   A    Yes.  Yes.
18   Q    Do you remember doing that with Ms. Boyer in
19 area B?
20   A    I do believe I did it all in B.
21   Q    Okay.  And then it's -- if I understood you
22 right -- let's see.  Well, you know what?  Let's -- here
23 we go.  So you said that you may have -- how did you
24 encounter Ms. Fennigkoh in this booking process, if you
25 recall?

Page 83

1         MR. MCCAULEY:  Object to form.
2    A    I believe she may have been walking through
3 booking, and I stopped her before she left to inform her
4 of Christine Boyer and the things she had told me
5 regarding her medical issues.
6    Q    And were those the medical issues that you
7 recorded on the intake form?
8         MR. MCCAULEY:  Object to the form of the
9    question.  Vague and overly broad.
10   A    Yeah.  What she had verbally and what I had
11 written down is what I had passed on to Amber.
12   Q    You said verbally and written down?
13   A    Yeah, so what she had told me that I had
14 written down.
15   Q    Okay.  Why don't we just turn to the intake
16 form real quick?  We looked at this earlier and --
17        MR. MCCAULEY:  Same request, Steve, if you can
18    zoom in.
19        MR. WEIL:  Yeah, of course.  I'll do that --
20        MR. MCCAULEY:  Sorry to interrupt, but I'll
21    give that reminder from time to time, so you can
22    remember.
23        MR. WEIL:  Not at all.
24 BY MR. WEIL:
25   Q    So we're looking at Exhibit 3, which is the

Page 84

1 intake medical screening report.  Can you see that,
2 Ms. Nelson?
3    A    Yes.
4    Q    Okay.  Your Star is 1292; is that right?
5    A    Badge number, yes.
6    Q    I'm sorry.  Your badge number.  And so it --
7 whose handwriting is this; do you know?
8    A    That is mine, other than the "Reviewed By"
9 with the date to the right of that.  That's not mine.
10   Q    Okay.  Understood.  So -- and that -- is that
11 true?  I'm just scrolling through Exhibit 1 [sic].  Is
12 that throughout Exhibit 1 [sic], that this is your
13 handwriting with the exception that you noted earlier?
14   A    And then that -- that last little spot there,
15 that is not mine.
16   Q    Okay.  So I'm on page 1093, and there's a
17 typewritten thing.  It says, "Revised 8-8-2018."  Do you
18 see that?
19   A    Yes.
20   Q    And you're saying that there's -- then below
21 that, there's something handwritten that begins with an
22 asterisk and it says, "Medical call," and there's some
23 writing after that.  You're saying that that's not your
24 handwriting?
25   A    That is not mine.  Correct.

Page 85

1    Q    Do you know whose handwriting that is?
2    A    Yes.
3    Q    Whose is it?
4    A    Officer Brooke Dempsey, who no longer works at
5 the jail as well.
6    Q    Officer Brooke Dempsey?
7    A    Yes.
8    Q    B-R-O-O-K-E?
9    A    Yes.
10   Q    And then how do you spell the last name?
11   A    D-E-M-P-S-E-Y.
12   Q    Okay.  All right.  Let's go back up to the top
13 of Exhibit 3, Ms. Nelson.  So, again, we discussed in
14 general how these forms are filled out.  Just taking it
15 from the top, you go into that area B on the floor plan
16 that we discussed.  Then you -- do you bring this form
17 -- this printed out form with you?
18   A    We had a stack of them on the desk out there.
19   Q    Okay.  And then you begin to fill it out by
20 asking the person questions and taking down information
21 that they provide; is that right?
22   A    You ask them those questions, yes, and then
23 write their responses.
24   Q    I'm assuming some of these questions would --
25 you wouldn't be -- well, I'm just looking at "PBT" at

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1  the top of Exhibit 3, and it says, "0.133." Do you see
2  that?
3      A    Yes.
4      Q    So this is a blood alcohol content reading;
5  is that right?
6      A    It's the breathalyzer, yes.
7      Q    Okay. Breathalyzer reading. Is that
8  something that you would perform?
9      A    Yes.
10     Q    Okay. So you would have the person being
11 arrested blow into a breathalyzer?
12     A    Yes.
13     Q    And then you'd write out the result that
14 whatever came out?
15     A    Yes.
16     Q    Okay. And then going down from there, there's
17 a bunch of numbered, sort of, question prompts; is that
18 right?
19     A    Yes.
20     Q    And so you are essentially reading from each
21 of these questions and writing down what the inmate
22 says; is that right?
23     A    Yes.
24     Q    And we'll go through them. So, number 1,
25 "Does the inmate's behavior suggest the probability of

Page 87

1  assault?" I think, in there that would not be a
2  question you ask, right, of them. You would -- that
3  would be your own observation; is that right?
4      A    Yes.
5      Q    Okay. And then number 2, "Are you sick or
6  injured in any way?" Do you see that?
7      A    Yes.
8      Q    So this would be questions that you would ask
9  the person being arrested and then they would provide
10 answers; is that right?
11     A    Yes.
12     Q    And here it appears that you are quoting
13 Ms. Boyer; is that right?
14     A    Yes.
15     Q    Okay. The first quote that I read is, "Some
16 doctors say I have a year to live." Do you see that?
17     A    Yes.
18     Q    And so that was something that Ms. Boyer told
19 you and you wrote down; is that right?
20     A    Yes.
21     Q    And then the second quote that I read is,
22 "I have a lot of medical problems." Do you see that?
23     A    Yes.
24     Q    Did I read that right?
25     A    Yes.

Page 88

1      Q    All right. So going to number 3, this is a --
2  I guess it looks like there's a question here, which is
3  -- it says, "Are you or will you be experiencing alcohol
4  or drug withdrawal?" Do you see that?
5      A    Yes.
6      Q    Is that a question that you would be asking
7  the person being arrested?
8      A    Yes.
9      Q    Okay. And then the second prompt here is,
10 "Does the inmate appear to be under the influence of
11 alcohol and/or drugs? Observed signs," and that'd be
12 for your -- that'd be based on your own observations and
13 not a question you'd ask them, right?
14     A    Yes.
15     Q    And here you put "no" for the first question.
16 "Are you or will you be experiencing alcohol or drug
17 withdrawal," right?
18     A    Yes.
19     Q    And then 4, "Does the inmate appear to be
20 under the influence of alcohol and/or drugs?" Based on
21 your own observation, you put "yes," right?
22     A    Yes.
23     Q    Okay. And what I read is your observed signs
24 are "PBT," and that -- does that refer to the 0.133 that
25 -- from the breathalyzer reading?

Page 89

1      A    Yes.
2      Q    And then, "Odor of intoxicant." Do you see
3  that?
4      A    Yes.
5      Q    Does that mean she smelled like alcohol?
6      A    Yes.
7      Q    Okay. Number 4 asks a question about whether
8  they've had psychiatric care, right?
9      A    Yes.
10     Q    And so, again, that's a question that you ask
11 them, and they just provide an answer, and you write it
12 down; is that right?
13     A    Yeah. We typically -- as you can see, it
14 says, "Where, When, Why, Who." We get as much
15 information if they were.
16     Q    Yeah. Thank you, and I appreciate your
17 patience. Lawyers end up asking a lot of questions that
18 seem really pedantic during depositions, so I appreciate
19 your patience. The same goes for 5, right? This is a
20 question that you're asking Ms. Boyer, and then you're
21 providing the answer that -- you're writing down the
22 answer that she provides, right?
23     A    Yep.
24     Q    Okay. And the same goes for 6, correct?
25     A    Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1    Q    This is a question you're asking about
2  suicidality, right?
3    A    Yes.
4    Q    Okay.  And then it says underneath 6 -- I'm
5  sorry.  It's a question you're asking that they're
6  providing answers to, right?
7    A    Yes.
8    Q    Okay.  Under 6, there's a -- in bold, there's
9  a line says, "Officer may leave."  What does that refer
10  to?
11    A    Those were questions we were required to ask
12  before the officer left in case they needed some sort of
13  clearance.  If their PBT was more than 0.3, they would
14  have to get medically cleared.  If their answers to the
15  suicidal questions required a chapter, obviously, we'd
16  have to have the officer involved, and -- can you scroll
17  up again?
18    Q    Sure.
19    A    Oh, the injured.  So if they had a head injury
20  or a severe injury that they would have to go get
21  cleared bef -- that would be the officer's
22  responsibility before we would actually take them into
23  booking and accept them as an intake.
24    Q    Okay.  You mentioned briefly PBT being a
25  certain level.  What was that level again?

Page 91

1    A    If they were a 0.3, they would have to be
2  taken to the hospital to get cleared before we would
3  accept them.
4    Q    Okay.  And if they were below a 0.3, what
5  would the policy be?
6    A    We would take them.  They would've to stay in
7  booking and just be generally observed with cell checks
8  until they were sober.
9    Q    Okay.  And then you said, "Are you sick and
10  injured in any way," number 2.  That would also
11  influence whether you book a person or not?
12    A    Yeah.  If they had a significant injury or a
13  head injury, they had to be taken over to the hospital
14  and cleared before we would take them.
15    Q    A significant injury or a head injury?
16    A    Yes.
17    Q    Okay.  And what did they mean by significant
18  injury, if you recall, or what was that -- what did that
19  mean?
20    A    Usually, if they, like, needed something --
21  had, like, -- something that required stiches or if
22  they clearly had a broken arm, any sort of severe
23  abrasions, that would need to be checked out.
24    Q    Okay.  And a head injury, what did that mean?
25    A    If they hit their head on something or had a

Page 92

1  concussion due to them hitting their head in the vehicle
2  or officers having to use force or if they're --
3    Q    Go ahead.  I'm sorry.
4    A    Sorry.  Sometimes if they were in a vehicle
5  accident prior to coming in, too.
6    Q    So injuries from accidents or events that
7  occurred out in the world, like being hit or running
8  into something or what have you, right?
9    A    Yes.
10    Q    Outside of a head injury or a physical injury
11  like that requiring stitches or a broken arm, was there
12  any other criteria that you would use to decide whether
13  take someone in or not for this -- for number 2, this
14  medical issue?
15      MR. MCCAULEY:  Object to form.
16    A    The head injury was or, like, stitches were
17  the probably two biggest ones I remember.
18    Q    Okay.  And how did you -- who told you about
19  those two criteria?  That it was a head injury, or a
20  broken arm, or stitches?
21      MR. MCCAULEY:  Object to form.
22    A    It was taught to me in training either by the
23  officers' training me and -- and/or medical staff.  I
24  know head injury was a large one reiterated by medical
25  staff.

Page 93

1    Q    I see.  So as you understood it, the training
2  was if they have a physical injury, like a broken bone
3  or stitches, you would say, "Officer, you need to take
4  them to the hospital before we can book them"; is that
5  right?
6    A    If they weren't already medically cleared,
7  yeah, or if they clearly needed stitches or had, like,
8  significant bleeding, yes.
9    Q    Sorry.  You had -- the audio just cut out for
10  a second.  Could you answer that again?
11    A    Yeah.  If they needed the medical clearance,
12  like, if they needed stitches or had heavy bleeding,
13  then yes, b if they were already cleared at the hospital
14  and received stitches and came in, then we would be able
15  to take them.
16    Q    Understood.  So if it appeared that they
17  needed stitches that they hadn't received, you would
18  say, "Officer, I can't book them.  You need to take them
19  to the hospital," right?
20    A    Yes.
21    Q    Did you ever do that?
22    A    For somebody who was -- who needed stitches?
23    Q    I'm sorry.  Let me get through -- did you ever
24  -- did you ever -- in this booking process, do you ever
25  recall telling an officer for whatever reason, I can't



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1 take this person in. They need to go to the hospital?
2    A    I have for PBTs. I believe I have once for a
3 potential head injury and somebody who needed stitches,
4 but that individual had refused medical attention, so
5    Q    Okay. And so -- and that -- if I understand
6 it, so, you know, one of the reasons you might say that
7 you can't come in is you just said PBT of 0.3 or higher,
8 right?
9    A    Yes.
10    Q    And that line of 0.3, where did -- that was
11 taught to you in training?
12    A    Yes. And it was our policy. It was in the
13 jail policy.
14    Q    Okay. So it was a written policy?
15    A    Yes.
16    Q    Okay. And then -- let's see. A significant
17 injury -- I just wrote down what you said, significant
18 injury; is that right?
19    A    Yes.
20    Q    Okay. And we've discussed what that would be.
21 A significant head injury, an injury requiring stitches
22 or an injury that appeared to be a broken bone. Are
23 those --
24    A    Yes.
25    Q    -- significant injuries; is that right?

Page 95

1    A    Typic -- typically, yes. Those are the big
2 ones that I recall.
3    Q    Okay. And did those significant injuries,
4 that was another thing that was taught to you in
5 training; is that right?
6    A    I believe -- I believe when I got hired, our
7 FTO officers were the ones that would teach these
8 things.
9    Q    Meaning the -- and that was the informal
10 shadowing process that we talked about earlier; is that
11 right?
12    A    Yes.
13    Q    I didn't mean to say informal. There was a
14 shadowing process that was part of your training, right?
15    A    Yes.
16    Q    Okay. And that is where you were told that a
17 significant injury would be a reason to refuse booking,
18 so you need to go to the hospital, right?
19    MR. MCCAULEY: Object --
20    A    Yes --
21    MR. MCCAULEY: Object to form.
22    A    Yes. Typically, yes, but we could also refer
23 to our medical staff if they were available.
24    Q    Okay. And those -- PBT and the significant
25 injury were the two reasons you were told that you

Page 96

1 should refuse booking and send someone to the hospital
2 potentially?
3    MR. MCCAULEY: Object to form.
4    Mischaracterizes.
5    A    The PBT and head injuries were the two big
6 ones.
7    Q    Okay.
8    A    And then obviously if they needed stitches or
9 an obvious medical attention, yes.
10    Q    What do you mean "obvious medical attention"?
11    A    Again, what I said. Like, they had a broken
12 bone or needed stitches.
13    Q    Okay. Anything else?
14    A    Not that I really recall.
15    MR. MCCAULEY: Object to form.
16    Q    Sorry, what was that answer again? I -- it
17 just got cut off with the objection.
18    A    Not that I recall beyond that, no.
19    Q    Okay. So in this case, you record Ms. Boyers
20 telling you -- she has a lot of medical problems; is
21 that right?
22    A    Yes.
23    Q    Okay. And did that not present a barrier to
24 booking because it was not a significant injury and the
25 PBT was under 3 -- 0.3?

Page 97

1    A    Yes.
2    Q    Okay. When you're writing this form, the
3 space for writing is, you know, a couple lines, right?
4    A    Yes.
5    Q    Okay. And so how are you selecting what
6 should go down on those lines? Were you trained about
7 how to select what goes down on each of these lines?
8    MR. MCCAULEY: Object to form.
9    A    Typically whatever they would say to us is
10 what we would note.
11    Q    I imagine sometimes you have somebody who
12 maybe doesn't ramble but goes on for quite a while
13 describing their medical problems or any of these other
14 categories in here. Does that happen?
15    A    Yeah, there's been times I've written on the
16 -- that little ledge -- or edge to the left of the
17 numbers. I've used that space. I've written smaller.
18 I've -- typically, if it was a lot of information, we'd
19 note, like, the actual medical issue that they would
20 tell us.
21    Q    Okay. And you would try to do that in this
22 booking stage before the officer is free to leave?
23    A    Yes.
24    Q    Okay. And so does -- do you recall Ms. Boyer
25 telling you -- describing her medical problems at all to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1 you --
2      A    What I --
3      Q    -- at this initial stage here before the
4 officer's free to leave?
5      A    What I recall is her telling me she could not
6 tell me exactly what the terms were, the medical issues
7 she had.  Just said she had a lot.
8      Q    Okay.  And so by that, do you mean -- she may
9 have said I have a lot of medical problems.  Would that
10 prompt you to ask more questions or --
11     A    Yeah.
12     Q    Okay.  And I don't see those questions -- any
13 elaboration on what medical problems she had here,
14 right?
15     A    Yeah, because this is why I brought in Amber
16 because she wouldn't elaborate beyond that or couldn't
17 elaborate.  She just kept saying she didn't remember all
18 the medical issues.  She just had a lot of them.
19     Q    Okay.  And so let's go back to, again, just,
20 sort of, the process and where this occurs.  So you
21 write down these -- you fill in these six fields here,
22 these six numbered fields, right?  And then the
23 officer's free to leave; is that right?
24     A    Yes.
25     Q    Okay.  You said she told you she had a lot of

Page 99

1 medical problems, but as you remember, she couldn't
2 describe what those were; is that right?
3      A    Yes.  She kept telling me she didn't remember
4 what they were.  Couldn't recall what they were.  Just
5 said she had a lot of medical issues or problems, which
6 is why I brought the nurse -- which is why I got the
7 nurse's attention to see her before she left.
8      Q    Okay.  How -- so why -- do you remember how
9 that interaction occurred?  How you got in contact with
10 Ms. Fennigkoh?  I believe you said she was leaving, but
11 do you remember how that happened?
12     A    Like I said, I believe she was walking through
13 the booking area before she got into pre-booking.  I had
14 stopped her.  I was in the PREA with Christine.
15     Q    Okay.  So if I understand you correctly, going
16 back to the booking floor plan, you took down -- you
17 filled out, I believe you said this chart, this intake
18 form.  Do you fill out the entire intake form or the
19 intake medical screening report and -- and, again, going
20 back here to Exhibit 1 -- in area B, right?
21     A    I believe I did, yes.
22     Q    Okay.  And then you took her over to the PREA;
23 is that right?  Took Ms. -- I'm sorry.  You walked --
24 let's go through the process.  Again, to the best you
25 recall.  It's not a memory test.  I'm just asking for

Page 100

1 your best recollection.  So you filled out the intake
2 screening form in area B for Ms. Boyer, to the best of
3 your recollection; is that right?
4      A    Yes.
5      Q    Okay.  And then you walk up to area C.  Well,
6 you said that area C and area D, those were the two
7 things that, sort of, one person might do it, the PREA
8 thing first, and one person might do the booking first,
9 right?
10     A    Yes.
11     Q    Do you remember how you did it?
12     A    I believe I took her to the PREA room.
13 I don't recall if I changed up first or after.  I --
14 that I don't recall.  So -- but when the nurse saw her,
15 we were in the PREA room.
16     Q    Okay.  See here.  I can -- so this is -- I'm
17 showing you right now Exhibit 4, and we discussed this
18 exhibit earlier, Ms. Nelson.  I'll blow it up here.
19 This, I believe you called this a face sheet; is that
20 right?
21     A    Yeah.  Like I said, I don't know that it
22 really had a -- its name, but that's what we referred to
23 it as a booking face sheet.
24     Q    Okay.  Booking face sheet.  All right.  And
25 this is -- if I understand correctly, this is the form

Page 101

1 that gets filled out on a computer, usually in area C,
2 that booking area, right?   And the photo's taken there?
3      A    Typically, yes.
4      Q    Okay.  Is there anything on here that would
5 tell you when this got filled out on this face sheet?
6      A    I'm sorry.  Can you repeat that?
7      Q    Is there anything on this face sheet that
8 would tell you when it was filled out?  I see for
9 instance here, Lucas Runice filled something out, but
10 just go ahead -- you tell me if you see anything that
11 would tell you when it got filled out.
12     A    Yeah, the -- booking date.  That's
13 typically the date that we would book them in and then
14 -- or they signed.
15     Q    Okay.  So --
16     MR. MCCAULEY:  Object to form.
17     Q    Sure.  This booking time -- again, this is
18 just, I'm just trying to get your best understanding
19 here, Ms. Nelson.  This booking date says 12-21-19,
20 22:41.  Do you see that?
21     A    Yes.
22     Q    So that would be December 21st at 10:41 p.m.;
23 is that right?
24     A    I'm sorry.  You cut out.
25     Q    Sure.  That would be December 21st at 10:41

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1  p.m.?
2      A    Yes.
3      Q    That's the 22:41; is that right?
4      A    Yes.
5      Q    Okay.  And then down here on the next page, do
6  you see where it says, "Charge"?
7      A    Yes.
8      Q    Okay.  And so this would -- would this have
9  been part of the booking process; is that right?  Where
10 the charges that they were being arrested for would be
11 recorded?
12     A    Yes.
13     Q    Okay.  And, again, here, there's a timestamp
14 of 22:45.  Do you see that?
15     A    Yes.
16     Q    Do you have an understanding of what -- how
17 that is created or how that's recorded?
18     A    So typically if that -- if they were brought
19 in that same day for that charge, that's the date and
20 time that was entered.  If the charge was referred
21 later, we would enter that date depending on when the
22 offense occurred.
23     Q    Understood.  So this -- given that this
24 booking date is 10:41 p.m., then down here it looks like
25 the charge is entered four minutes later; is that right?

Page 103

1  At 10:45 p.m.?
2      A    Yes.  It was one of those autofill times.
3  So when you would go to it, it would automatically fill
4  in the date and time.
5      Q    Okay.  And then down below that, it has,
6  "Scheduled Intake Court Appearance Date."  Do you see
7  that?
8      A    Yes.
9      Q    And do you know how that was created?
10     A    We would enter that.
11     Q    Okay.  And -- so let's see.  How would you --
12 so obviously this is something that was set to occur in
13 the future, right?
14     A    Yes.
15     Q    And how would you know to enter this -- how
16 would you have the information to know when -- what time
17 to and date to enter there?
18     A    Intake court was always the next business day
19 at 1:00, unless --
20     Q    Okay.
21     A    -- an officer provided a probable cause or the
22 DA requested we push them to a different date.
23     Q    All right.  So just the standard was that it's
24 Monday the 23rd at 1:00, and that's when you -- the --
25 you would know that there was going to be court at that

Page 104

1  time and that's how you were able to enter that
2  information?
3      A    Yes.
4      Q    Okay.
5          MR. MCCAULEY:  Steve, I'm going to put in a
6  plug for a break soon, if you don't mind.
7          MR. WEIL:  Yeah.  Let's -- this is a good time.
8  I mean, do we want to -- do we want to take a lunch-
9  type break?  We could break for, I don't know, 20
10 minutes, half an hour?  Or whatever you want --
11         MR. MCCAULEY:  That's up to you.
12         MR. WEIL:  -- to do.  Yeah.  It's really up to
13 you-all.  I mean, I'm -- I'll grab a little
14 something, but I'm not going to -- I don't need much
15 time.
16         MR. MCCAULEY:  Okay.  Are we off the record
17 now?
18         MR. WEIL:  We can go off the record.
19         MR. MCCAULEY:  Yeah, I don't want to --
20         COURT REPORTER:  We are now off the record at
21 12:06 p.m.
22         (OFF THE RECORD)
23         COURT REPORTER:  We are back on the record for
24 the deposition of Danielle Nelson, being conducted
25 by videoconference.  My name is Krystal.  Today's

Page 105

1  date is February 24, 2022, and the time is 1:13 p.m.
2  BY MR. WEIL:
3      Q    Hi, Ms. Nelson.  Welcome back.
4      A    Thanks.
5      Q    You know, I never asked.  Where are you
6  sitting right now?  Like, what town are you in?
7      A    Sparta, Wisconsin.
8      Q    Okay.  You're in Sparta.  Great.  But you
9  don't -- it's -- is that the -- are you in a government
10 office there?
11     A    The sheriff's department, yes.
12     Q    Okay.  Is that where you currently work, or
13 are you --
14     A    No, I work in Eau Claire County.
15     Q    Okay.  I apologize.  I'm a little, like -- I'm
16 mixing up towns and counties.  So Sparta is in Monroe
17 County, right?
18     A    Yes.  Yes.
19     Q    Okay.  All right.  Thank you.  I want to --
20 I'll pull it up here.  All right.  Ms. Nelson, I'm
21 showing you again the -- this is Exhibit 3, the intake
22 medical screening report.  Can you see that in front of
23 you right now?
24     A    Yes.
25     Q    We were talking about this when we went for a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 lunch break. To return to it, one of the things you
2 mentioned when we were talking about the first page and
3 the first six items is that you'd often -- when someone
4 mentioned something, if it would, sort of, spill out
5 over the lines that were available under a particular
6 number, you'd write it elsewhere. Do you remember that?
7    A    Yes.
8    Q    There's a "Notes" section here at the bottom.
9    A    Uh-huh.
10   Q    Do you see that on the last page of Exhibit 3?
11   A    Yes.
12   Q    Is that a place where you would note
13 information that spilled over from another item?
14   A    Either that or if, like, they maybe mentioned
15 something later on after we got to the end of the
16 screening or maybe something that didn't fit one of the
17 questions quite, but it's still worth noting.
18   Q    Sure. I think as you described it, what you
19 would do -- and, again, correct me if I'm wrong. I'm
20 just -- what I recall you saying is that you would ask a
21 question. They would provide an answer. You might have
22 a colloquy with them about that topic. You might go
23 back and forth and say, well, what do you mean and that
24 kind of thing, right? Is that right?
25   A    I'm sorry. Can you repeat that?

1    Q    Sure. It wasn't the best-asked question.
2 So we were talking about how you go through filling this
3 out. And I think one of the things that you said --
4 and, again, correct me if I'm wrong, but what I
5 understood you to say is, you know, you'd ask a
6 question, they'd provide an answer, and you might have
7 more follow-up questions that you would prompt them for
8 if you didn't understand what their answer was, right?
9         MR. MCCAULEY: Object to form.
10   A    I mean, we could ask some follow-up questions
11 if we needed clarification, yes.
12   Q    Okay. And do you recall trying to get
13 clarification of what -- you said that Ms. -- just
14 strike that. You said Ms. Boyer was, kind of, all over
15 the place when she described her medical problems or
16 something like that? Do you remember that?
17        MR. MCCAULEY: Object to form.
18   A    She basically wouldn't give me any clear
19 answers to what kind of medical issues she had
20 specifically.
21   Q    Okay.
22   A    And I would try to get more clarification, but
23 she wouldn't. She just kept stating something along the
24 lines that she didn't remember what they all were.
25 Couldn't tell me all of them.

1    Q    Okay. And going down to the "Notes" section
2 at the bottom, it say, "She states she has multiple
3 medical issues due to cancer, chemo, radiation. Also
4 states she has congestive heart failure." Do you see
5 that in the "Notes" section?
6    A    Yes.
7    Q    So would that have been Ms. Boyer elaborating
8 about what her medical conditions were, at least some of
9 them?
10   A    That may have been a little more, but other
11 than that, she wouldn't give me any more detail as to
12 what else she had for medical issues.
13   Q    So I guess in this "Notes" section, the
14 (Inaudible) question, is this something that you would
15 be trying to gather at that item number 2 stage where
16 you're asking her about what her medical issues are and
17 maybe you're filling out more in the "Notes" section
18 below?
19        MR. MCCAULEY: Foundation. Calls for
20   speculation.
21   A    I may have written that down for the fact that
22 there was more room, or it was something she mentioned
23 at the end of the medical that I noted at that point.
24 I don't recall when she said that, if it was from
25 question 2 or after.

1    Q    Okay. I'm want to turn you to -- we have this
2 down, I believe, as Exhibit 6. And this is the
3 narrative note that we've been talking about. Do you
4 see that in front of you? This is the narrative note
5 from December 21st at 22:40. Do you see that, Ms.
6 Nelson?
7    A    Yes.
8    Q    And we reviewed this a bit before. I --
9 again, as you understand it, this is Amber Fennigkoh
10 writing this, right?
11   A    Yes.
12   Q    Okay. And I just -- you know, you'd reviewed
13 it before. I wanted to, sort of, walk through what you
14 remember as being consistent with your recollection,
15 what you don't remember, what you do remember, if you
16 remember something different. Understood?
17   A    Yes.
18   Q    Okay. So we'll just go sentence by sentence.
19 I think the first sentence here, we talked about a bit.
20 It says, "Leaving facility when Tomah PD officer said
21 [sic]," "I hope you're ready for a medical mess.'"
22 Do you see that?
23   A    Yes.
24   Q    And I believe you testified earlier that you
25 didn't hear this exchange or you don't recall hearing



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 110

1 this exchange, right?
2     A    Yeah.  I don't recall or remember if he said
3 that.
4     Q    Okay.  The next line says, "RN questions
5 Sergeant Warren if she felt the PT needed medical
6 clearance and Sergeant Warren indicated no.  The [sic]
7 PT just had [sic] long history of past medical concerns
8 and is intoxicated."  Do you see that?
9     A    Yes.
10    Q    Is that consistent with your recollection?
11    A    Yes.
12    Q    Okay.  The next sentences says, "RN offered to
13 stay and assist with medical intake."  Do you see that?
14    A    Yes.
15    Q    Is that consistent with your recollection that
16 Ms. Fennigkoh offered to stay and assist with this
17 intake?
18    A    Yes.
19    Q    And is that -- okay.  Next sentence says --
20 and PT, do you understand that -- what do you understand
21 that mean as an abbreviation?
22    A    Patient.
23    Q    Okay.  So I'll read it that way.  "Patient
24 intoxicated with PBT of 1.33 [sic]."  Do you see that?
25    A    Yes.

Page 111

1     Q    And that would've -- that's consistent with
2 the breathalyzer that you took, right?
3     A    Yes.
4     Q    Okay.  I'm assuming here -- it says, "Tearful,
5 of adequate weight, skin appears appropriate for
6 ethnicity."  Do you see that?
7     A    Yes.
8     Q    Now, that's just Ms. Fennigkoh's observation.
9 It's no -- she wasn't saying these things to you, right?
10    A    Yeah, no.  I -- no.
11    Q    Okay.  It says, "Patient states, 'I only have
12 one year live.'"  Do you see that?
13    A    Yes.
14    Q    Do you recall Ms. Boyer telling Ms. Fennigkoh
15 that?
16    A    I recall her basically reiterating what I had
17 been told, but I -- I can't tell you if I recall that
18 specific sentence.
19    Q    Sure.  I'll stop you right there.  I'm just
20 trying to put this in context.  So it sounds like
21 Ms. Fennigkoh's walking out of -- just again, referring
22 to the sentences we just went over.  Ms. Fennigkoh's in
23 the process of leaving the facility, and the first
24 contact she has was with this police officer, right?
25         MR. MCCAULEY:  Object to form.

Page 112

1     A    I --
2         MR. MCCAULEY:  Foundation.
3     A    Yeah.  I don't recall the interaction between
4 her and the officer.
5     Q    And I understand.  But is -- does that refresh
6 your recollection of how Ms. Fennigkoh came to interact
7 with you in this intake?
8     A    No.  I believe that I had stopped her before
9 she left to let her know about Christine.  I don't -- I
10 don't recall her interaction with the officer.
11    Q    Okay.  So this first sentence, understanding
12 that you don't recall being here one way or the other
13 for the conversation between her and the police officer
14 --
15    A    Yeah, I don't --
16    Q    Let me ask you this:  Do you recall her
17 interacting with a police officer or being in the same
18 room as a police officer?
19    A    I mean, she may have been, being that the
20 officers sometimes stick around, but I can't remember
21 that part.
22    Q    Okay.  And -- okay.  Going back down to the
23 part down here, it says, "Patient states, 'I only have'"
24 -- well, let me back up real quick.  The next sentence
25 after the first one says, "RN questioned Sergeant

Page 113

1 Warren."  Do you see where I'm at?
2     A    Yes.
3     Q    "If she felt the patient needed medical
4 clearance and Sergeant Warren indicated no.  The [sic]
5 patient just has a long history," and it goes on.
6 Do you remember that interaction?
7     A    Yes.
8     Q    Okay.  And so do you remember Nurse Fennigkoh
9 asking you whether you thought that that patient needed
10 medical clearance?
11    A    I do, but I don't recall if it was in regards
12 to her alcohol level or just in general.  I -- yeah.
13    Q    Okay.  And you recall you telling the nurse
14 that no, you did not believe that Ms. Boyer needed
15 medical clearance?
16    A    Yes.
17    Q    Do you have an understanding of what medical
18 clearance means?
19    A    For jail, yes.
20    Q    Yeah.  What does it mean?
21    A    Ultimately, if they're at a state that they're
22 able to be accepted by the jail.  So like I said, if
23 they were to have a head injury, we wouldn't be able to
24 take them, unless they're cleared to ensure there was no
25 further issues.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1    Q    Okay.  And so here, Ms. Fennigkoh's writing
2  here -- if I understand you correctly, she's asking you
3  whether you think that Ms. Boyer needed medical
4  clearance and you're telling Ms. Fennigkoh, no, I don't
5  think she needs medical clearance, right?
6    A    Yes.
7    Q    Okay.  And then after that, Ms. Fennigkoh
8  offers to stay and assist with the medical intake; is
9  that right?
10    A    Yes.
11    Q    And what more needed to be done with the
12  medical intake?  Well, let me ask you this: Do you
13  remember that?  Ms. Fennigkoh offering to stay and
14  assist with the medical intake?
15    A    Yes.  The medical screening was completed, but
16  I had, with the fact that I did not get any clear
17  answers as to what kind of medical issues or concerns
18  that we needed to address from her, I had spoke with
19  Amber to let her know this, to see if she could get more
20  answers from Christine than I was able to, being that
21  she's medically trained and
22    Q    Okay.  So if I understand you right, just
23  going to this form, by the time you're interacting with
24  Ms. Fennigkoh, you had concluded that she was -- that
25  Ms. Boyer was cleared for medical intake, right?

Page 115

1    A    I concluded what?
2    Q    Well, you -- I'm just trying to marry these
3  two documents up.  So here in -- you know, we went over
4  this -- this is the -- I'm looking at -- sorry, Exhibit
5  3, the medical intake screening.  We went over these
6  first six items, right?  Where you're deciding whether
7  someone's cleared for intake, correct?
8    A    Yes.
9        MR. MCCAULEY:  Object to form.
10    Q    And it's after --
11        MR. MCCAULEY:  Mischaracterizes.
12    Q    It's after entering this -- these first six
13  numbers that you make a determination whether someone's
14  clear for medical intake at that point, right?
15    A    Yes.
16        MR. MCCAULEY:  Object to form.
17    Q    Okay.
18        MR. MCCAULEY:  Mischaracterizes.
19    Q    And then -- and so I'm trying to match that up
20  with what Ms. Boyer's saying here.  I'm sorry,
21  Ms. Fennigkoh's saying here.  So Ms. Fennigkoh comes --
22  approach -- says questioned you -- I'm just reading from
23  the second sentence -- to see if you felt the patient
24  needed medical clearance and you indicated that no, and
25  that it was just because she just had a long history of

Page 116

1  past medical concerns and is intoxicated, right?
2    A    Yes.
3    Q    Okay.  And if I understand you correctly, the
4  reason that you concluded that she was clear for medical
5  intake is because she didn't have one of the injuries
6  that we discussed before the lunch break, right?
7        MR. MCCAULEY:  Object to form.  Mischaracterizes
8    the testimony.
9    A    Yeah.  She didn't have a head injury.  Her PBT
10  was below the 0.3, and she didn't have any significant
11  injuries.
12    Q    Okay.  Let's continue with Exhibit 6 then,
13  this -- Ms. Fennigkoh's note.  Again, I want to ask you
14  -- I'm trying to understand what is consistent with your
15  recollection.  Well, you say, well, I wasn't there for
16  that, as in the first line and you say, well, that's not
17  consistent with my recollection.  Do you understand what
18  I'm saying?
19    A    Yes.
20    Q    Okay.  So do you recall in general, before we
21  get into each of the lines here, where this interaction
22  was happening?  I think you said it was the PREA room;
23  is that right?
24    A    Yes.  When Amber was questioning her, it was
25  Amber, Christine, and myself in the room.

Page 117

1    Q    Okay.  And that was the PREA room that we
2  looked at in that floor plan?
3    A    Yes.
4    Q    And so the three of you were in that room,
5  sort of, trying to conduct an interview; is that right?
6    A    Amber was asking her about her medical
7  history, yes.
8    Q    Were you taking notes at that point, or did
9  you have anything with you to write on?
10    A    No.
11    Q    Okay.  So at that point, had you already
12  completed this -- again, not just the first six items of
13  this medical screening report, but the remainder of the
14  report as well?
15    A    I believe I had already completed it prior to
16  talking to her and Amber, yes.
17    Q    Okay.  Well, let's do this first.  Let's go
18  through the rest of the screening report first then.  And
19  so we've talked about the first six items quite a bit,
20  and then the officer's free to leave at that point,
21  right?
22    A    Yes.
23    Q    Okay.  And so then going to item 7, "Are you
24  currently taking any prescription medications?"  Do you
25  see that?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1    A    Yes.
2    Q    And so that's a question that you're asking
3    Ms. Boyer, correct?
4    A    Yes.
5    Q    And so you're writing that her answer was just
6    yes, right?
7    A    Yes.
8    Q    And then Ms. Boyer says -- you wrote down that
9    Ms. Boyer says she took -- and I believe that's blood
10   pressure meds today; is that right?
11   A    Yes.
12   Q    And then there's a line below that says,
13   "The Medicine Shoppe - Tomah."  Do you see that?
14   A    Yes.
15   Q    And I'm assuming that is in response to the
16   prompt, "Which [sic] pharmacy do you use" --
17   A    Yes.
18   Q    -- is that right?
19   A    Yes.
20   Q    Okay.
21        MR. MCCAULEY:  Steve, can you just zoom in on
22   that document, if you wouldn't mind, please?
23        MR. WEIL:  Of course.  Can everybody see it
24   okay?
25        MR. MCCAULEY:  Yeah.

Page 119

1        MR. WEIL:  Okay.  Great.
2    BY MR. WEIL:
3    Q    Going down to item 8, it says, "Do you have
4    your medications with you or do you have anyone that can
5    drop them off at the jail?"  Do you see that?
6    A    Yes.
7    Q    Okay.  And she answers "yes" to that question,
8    correct?
9    A    That she had some of her meds, yes.
10   Q    Okay.  And that's the marginal notation you
11   make on the left-hand side?
12   A    Yes.
13   Q    Okay.  Okay.  If she had provided more
14   information to you during the intake screening process,
15   I believe you said that you would've entered it
16   somewhere; is that right?
17   A    Yes.
18   Q    Okay.  And there's no other information
19   entered here; is that right?
20   A    Number 8?
21   Q    Right.
22        MR. MCCAULEY:  Object to form.
23   A    Yeah, I don't see any.
24   Q    Is it possible that you could have entered
25   information on the backside of this form?

Page 120

1    A    No.
2    Q    Okay.  And why do you say that?
3    A    Because I don't recall ever using the
4    backside.
5    Q    Okay.  The next question is, "Have you been
6    hospitalized overnight and [sic] had surgeries in the
7    last year?"  Do you see that?
8    A    Yes.
9    Q    And that's -- again, that's the person
10   responding to you, and she tells you "no," correct?
11   A    Yes.
12   Q    Okay.  And then the next question is, "Do you
13   have a primary doctor and/or clinic preference?"  Do
14   you see that?
15   A    Yes.
16   Q    You have a "no" circled here, but then there's
17   some information provided at the same time.  Do you see
18   that?
19   A    Yes.
20   Q    Might have just been a contradiction between
21   as you're entering the form?
22   A    Or she may have said she doesn't really have a
23   primary, but at the time she was seeing that doctor or a
24   preference.  But --
25   Q    Okay.

Page 121

1    A    -- so honestly, yeah, I don't recall.
2    Q    I read that as Dr. Erdman; is that right?
3    A    Yes.
4        MR. MCCAULEY:  Object to form.
5    Q    And then the line below is Gundersen Tomah.
6    Do you see that?
7    A    Yes.
8    Q    What is Gundersen Tomah?
9    A    It's the clinic in Tomah.
10   Q    Okay.  What sort of a clinic is it?
11   A    It's a hospital.  I -- I don't know the extent
12   of what all they do there.
13   Q    Okay.  Is Gundersen a -- is Gundersen a name
14   that's familiar to you in the hospital space?
15   A    Yes.
16   Q    Okay.  Is it a regional hospital network or --
17   if you know?
18   A    I don't know how far they extend out.  I know
19   there's one in La Crosse.  I don't know beyond that.
20   I know Tomah and La Crosse.
21   Q    Okay.  So it's a network with a couple sites
22   at least?
23   A    Yeah.  I believe there's one here in Sparta,
24   too, but it's, like -- I think it's a small clinic.  But
25   like I said, I don't know the extent of each facility,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 122

1  what all they do.  I know -- that's all I really know.
2      Q    Okay.  "Are you currently taking [sic] a" --
3  going on to number 11, "Are you currently taking [sic] a
4  special diet prescribed by a doctor," and it's says
5  "no," right?
6      A    Yes.
7      Q    And then underneath, it says, "What kind of a
8  diet or [sic] who is prescribing," and it says,
9  "Whatever I can keep down."  Do you see that?
10      A    Yes.
11      Q    Okay.  So that, again, would be something that
12  she told you, correct?
13      A    Yes.
14      Q    Okay.  And then the next question's about
15  allergies.  Do you see that?
16      A    Yes.
17      Q    Okay.  And there's another -- "no," again, is
18  circled here.  Do you --
19      A    Yes.
20      Q    -- see that?
21      A    Yes.
22      Q    But then there's an entry for, "Cannot have
23  peanuts or seeds due to bowel."
24      A    Yes.
25      Q    Do you see that?  You know, this isn't quite a

Page 123

1  got-you question, but is there a reason that you'd be
2  entering "no," but then also entering information in
3  just the way you fill these things out?
4      A    Well, because it wasn't an allergy, but it was
5  something she noted, so I just wrote it down.
6      Q    Okay.  "Do you abuse alcohol or drugs?"  Again,
7  that's a question, and she answers "no," right?
8      A    Yes.
9      Q    Okay.  And number 14 is, "Do you have or are
10  you being treated for," and then it lists of variety of
11  conditions, right?
12      A    Yes.
13      Q    And what was the procedure for filling out 14?
14  How would you fill that out?
15      A    The way I typically did it was I would circle
16  whichever one they said yes to and then get a little
17  more information if needed or any other specific
18  information they wanted to give me regarding one of
19  those things that they're being treated for.
20      Q    If I read this correctly, and I think this is
21  what you're saying, number 14 lists a variety of common
22  ailments, which you might circle, and then there's space
23  below that to enter additional ailments or medical
24  conditions that might not be in that first list; is that
25  right?

Page 124

1      A    That, or like I said -- for example,
2  pregnancy.  If they said pregnancy, I would notate how
3  far along, who they're seeing for their pregnancy, stuff
4  like that if I needed to.  Or diabetes, we would list
5  type 1, type 2, if they had insulin or not, stuff like
6  that.
7      Q    Okay.  Got it.  Some of these -- there's a 14
8  A and B, and these look like -- these would be based on
9  your observations, right?
10      A    Yes.
11      Q    Okay.  Number 15 is a question you'd ask,
12  again, about physical handicaps and a variety of other
13  physical conditions, right?
14      A    Yes.
15      Q    Okay.  And then was it your practice, as with
16  14, to circle whatever items they said yes to and then
17  maybe add some more information down below --
18      A    Yes.
19      Q    -- in the space provided?
20      A    Yes.
21      Q    Okay.  Number 16 asks for religious reference,
22  right?
23      A    Yes.
24      Q    So she's -- that's just something she's
25  telling you?

Page 125

1      A    Yes.
2      Q    Okay.  And then 17, 18, and 19, those are all
3  questions that you're asking, and she's providing
4  answers; is that right?
5      A    Yes.
6      Q    Okay.  20 is the same thing.  You're asking a
7  question, and she's providing an answer, right?
8      A    Yes.
9      Q    And 20 is a question on insurance and she
10  says, "Blue Cross Blue Shield"; is that it right?
11      A    Yes.
12      Q    Okay.  There's, sort of, a closeout question
13  about whether she has any questions for 21, correct?
14      A    Yes.
15      Q    And then we already reviewed this, but you --
16  we've discussed these notes below, right?
17      A    Yes.
18      Q    And I think what you said was you couldn't
19  pinpoint when these were entered into the process in the
20  various questions you asked, right?
21      A    Yes.  I couldn't -- I can't remember if she
22  answered on number 2 or if I wrote it at the end of the
23  screening when she told me after going through the
24  questions.  I don't recall that.
25      Q    Okay.  Either one is possible?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1    A    Yes.
2    Q    Okay.  And then this is just your effort to
3 gather more information about her conditions, right?  Or
4 anything else that's important?
5    A    Yes --
6    Q    And then this is her signature, inmate's
7 signature, and jailer's signature.
8    A    That's --
9    Q    So this is Christine Boyer's signature, and
10 then you would sign it below; is that right?
11    A    Yes.
12    Q    Do you watch -- the person being booked, do
13 you watch them sign it?
14    A    Yes.
15    Q    Okay.  And then you sign it after they sign
16 it?
17    A    Yes.
18    Q    Okay.  Okay.  Let's turn back here to
19 Ms. Fennigkoh's notes, and it's Exhibit 6.  So I believe
20 we stopped with, "I only have one year to live."  And
21 what I think you said is -- correct me if I'm wrong, but
22 I think you said you're not sure whether that's
23 something you heard Christine Boyer tell Ms. Fennigkoh
24 or whether she might have told that out of earshot?
25    A    Yeah.  I don't recall that specific line being

Page 127

1 said.
2    Q    Okay.  But the one thing you do recall is that
3 Ms. Fennigkoh did conduct an interview in the PREA room
4 with you and Ms. Boyer, and it was the three of you,
5 right?
6    A    Yes.
7    Q    Okay.  Did Ms. Fennigkoh have anything she was
8 writing on?
9    A    I do not recall if she did or not.
10    Q    Okay.  The next line is, "RN further prompted
11 patient for clarification."  Do you see that?
12    A    Yes.
13    Q    Okay.  And it says, "Patient all over the
14 place with scenario stating, 'I have all my organs
15 shutting down.  Radiation back then did me in.  I don't
16 have a hip.  I pee myself and shit myself every 20
17 minutes.  I am peeing right now.'"  Do you see that?
18    A    Yes.
19    Q    Is that consistent with your recollection of
20 what Ms. Boyer told you and Ms. Fennigkoh?
21    A    I do recall her talking about her organs
22 shutting down and issues with cancer and those specific
23 lines.  I don't recall word by word, but yes.
24    Q    Okay.  So it's just generally consistent what
25 you remember Ms. Boyer telling you and Ms. Fennigkoh,

Page 128

1 right?
2    A    Yeah.  I do remember her saying she had issues
3 with urinating herself, not having control with it.
4    Q    Okay.  The next line -- sentence starts with,
5 "Patient standing in PREA room at this point."  Do you
6 see that?
7    A    Yes.
8    Q    Okay.  It says, "With no difficulties.  Legs
9 appear symmetric.  Patient wearing tight pants with no
10 urine stain or brief."  Do you see that?
11    A    Yes.
12    Q    Do you understand what "brief" means?
13    A    Like --
14         MR. MCCAULEY:  Object to form.
15    A    Like, undergarments or -- yeah.
16    Q    Okay.  Does that have -- give me your
17 recollection of this.  Does that have any meaning to
18 you?
19         MR. MCCAULEY:  Object to form.
20    A    What do you mean does it have any meaning?
21    Q    I -- in the context here, I don't quite
22 understand what it means.  Like -- she's wearing pants.
23 Why would you see her briefs or something like that?  I
24 just didn't know if there was -- if the word "brief" had
25 any meaning to you in this context --

Page 129

1    A    I --
2    Q    -- given your recollection?
3    A    I don't know.
4    Q    Okay.  The next line -- and I guess RN would
5 be Ms. Fennigkoh talking about herself, right, given
6 it's just the three of you in that room?
7    A    Yes.
8    Q    Okay.  "RN questioned if patient had active
9 cancer or was in remission."  Do you see that?
10    A    Yes.
11    Q    Did -- and then, "Patient stated, 'What's it
12 even matter to you?'"  Do you see that?
13    A    Yes.
14    Q    Is that consistent with your recollection of
15 Ms. Fennigkoh asking Ms. Boyer about cancer and
16 Ms. Boyer responding in that way?
17    A    Yes.
18    Q    Okay.  And then at this -- the next line is
19 Ms. Fennigkoh clarifying that despite the winter coat,
20 she is the nurse at the jail.  Do you see that?
21    A    Yes.
22    Q    Okay.  Do you remember that sequence of
23 events?  That after the question of the cancer,
24 Ms. Fennigkoh clarified that she was the nurse at the
25 jail?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1    A    I do recall her telling her she was the nurse.

2    Q    Okay.  The next line is, "Patient states,

3  'I have had bone cancer, blood cancer, three pelvic

4  surgeries, three bladder lifts, three abdominal

5  surgeries.  Do you want me to continue?'"  Do you see

6  that?

7    A    Yes.

8    Q    Okay.  Is that consistent with your

9  recollection about what Ms. Boyer told you-all?

10    A    I don't -- I can't be certain on everything

11  she said, but I do recall her saying it in that manner,

12  like, upset like that, "Do you want me to continue?"

13    Q    Okay.  So is -- okay.  The next sentence is,

14  "RN asked patient -- if patient taking any meds? Patient

15  indicated she had blood pressure meds and oxycodone and

16  other meds at Tomah Medicine Shoppe."  Do you see that?

17    A    Yes.

18    Q    Is that consistent with what you recall?

19    A    I mean, I recall her telling her she takes

20  meds, yes.  I don't remember specific meds.

21    Q    Okay.  Do you remember you or Ms. Fennigkoh

22  trying to gather more information from Ms. Boyer about

23  what meds she was taking?

24    A    I believe Amber did, but I don't recall her

25  specifying what meds.

Page 131

1    Q    Okay.  The next line is "Nurse asked" -- or,

2  "RN asked if patient could call husband to bring meds

3  in.  RN" -- do you remember that?

4    A    Yes.

5    Q    Okay.  And then, "RN also added that if she

6  utilizes any type of brief or pad for incontinence, her

7  husband could bring it in, too."  Do you see that?

8    A    Yes.

9    Q    Okay.  Does that refresh your recollection

10  about what "brief" means?  I just really don't

11  understand what that term means.  Is that a term for an

12  incontinence product?

13         MR. MCCAULEY:  Object to form.

14    A    I believe that's what she was referring to,

15  yes.

16    Q    Okay.  And is this consistent with your

17  recollection of Ms. Fennigkoh asking about this?

18    A    Yes.

19    Q    Okay.  "Patient" -- the next line says,

20  "Patient stated, 'My husband doesn't even know'" -- or,

21  I'm sorry, "'My husband doesn't know where it is.  I

22  hide at all from him.  He has no clue what I take.'"

23  Do you see that?

24    A    Yes.

25    Q    Do you remember Ms. Boyer saying something

Page 132

1  like that to you, too?

2    A    I do remember her telling us that she hides

3  that stuff from her husband and he wouldn't know where

4  any of it was, so --

5    Q    And by "that stuff," what do you mean?

6    A    Like, her meds and anything she would use for

7  her incontinence.

8    Q    Okay.  The next line is that, "RN further

9  explained the difficulty as her pharmacy is not open

10  Sundays, so Jail is unable to call and get her med

11  list."  Do you see that?

12    A    Yes.

13    Q    Is that consistent with your recollection what

14  Ms. Fennigkoh told Ms. Boyer?

15    A    I believe so, but I can't be 100 percent.

16  I can't recall for sure.

17    Q    Was this a common problem, in your experience,

18  on admitting folks over the weekend, that the jail --

19  that the pharmacy might not be open on --

20         MR. MCCAULEY:  Object to form.

21    Q    -- on a Sunday and that they wouldn't be able

22  to fill their meds?

23         MR. MCCAULEY:  Object to form.  Vague.

24  Foundation.

25         MR. KNOTT:  Join.

Page 133

1    A    I honestly don't recall the struggles they had

2  with getting meds because jail staff wasn't responsible

3  for calling the pharmacy or getting meds ordered.

4  BY MR. WEIL:

5    Q    Okay.  When you did intake on weekends, do you

6  recall this issue coming up at least on the intake

7  sheet?

8         MR. MCCAULEY:  Same objections.

9    A    I recall more so if inmates -- whether or not

10  they had meds on them.  If they had the meds on them,

11  then we would have to fill out a med verification sheet,

12  count their meds, and call those into the doctor, but

13  that's as far as we would take it.  If they had to have

14  any other meds that the jail had to order, that was done

15  by medical staff.

16    Q    Okay.  So return really quickly to Exhibit 3,

17  the intake screen.  There's this number 7.  Do you see

18  it?

19    A    Yes.

20    Q    Can you read that?

21    A    Yes.

22    Q    All right.  And so this is a question you

23  would ask, number 7 was a question, "Are you currently

24  taking any prescription medications?"  That was a

25  question you would ask on every intake screen, right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 134

1    A    Yes.

2    Q    Okay.  And if they told you that they were, on
3    the weekend, what would be the procedure from your
4    perspective after that?

5         MR. MCCAULEY:  Object to form.

6    A    We would determine if they had their meds on
7    them or ask if somebody could drop them off.  And,
8    again, if they had the meds, then we would count them
9    and fill out a med verification sheet and contact the
10   jail doctor.  But if they didn't have meds, this medical
11   screening would go to our medical staff when they were
12   available next to take over.

13   Q    Okay.  And on the weekends, the medical staff
14   would be available on Monday; is that right?

15        MR. MCCAULEY:  Object to form.

16   A    I believe we had a nurse on Saturday.  I don't
17   think we had one on Sundays, like, regularly.

18   Q    Right.  And do you remember whether
19   Ms. Fennigkoh was there on a special assignment?

20        MR. MCCAULEY:  Object to form.

21   Q    Was -- happened to be at the jail on a special
22   assignment?

23   A    On Saturday?

24   Q    Yeah.

25        MR. MCCAULEY:  Object to form.

Page 135

1    A    I believe it was --

2    Q    What -- I'm sorry.  Go ahead.

3    A    I believe it was just her shift.  I don't know
4    -- I just don't know of a special assignment.

5    Q    Okay.  So if someone came in late Saturday
6    night and they noted that they took meds but didn't have
7    them with them and didn't have a relative to bring them
8    in, that's something you'd refer to medical staff for
9    the next time medical staff came in?

10   A    Yes.

11   Q    And if that was Saturday night, the next time
12   they come in typically would be Monday, right?

13        MR. MCCAULEY:  Object to form.

14   A    I believe at the time I worked there, there
15   was no medical staff on Sundays.  I don't recall the
16   medical schedule entirely.  If it was an inmate that
17   stated they were diabetic and took insulin, that was
18   something we would have to call a jail doc -- the jail
19   doctor right away to make sure that they were getting
20   insulin if they weren't able to have it dropped off.

21   Q    Okay.  That was, like, an exception to the
22   rule of leaving this for staff for Monday?

23        MR. MCCAULEY:  Object.  Mischaracterizes
24   testimony.

25   A    Yes.

Page 136

1    Q    Okay.  Returning now back to Exhibit 6,
2    Ms. Nelson.  I'm trying to figure out where we left off.
3    Well, we'll start here.  "Patient indicates [sic] she
4    had high blood pressure meds and oxycodone and other
5    meds at Tomah Medical Shoppe"  We went over that.
6    My apologies.  The next line is, "RN" -- okay.  We went
7    over that, too.  Let me just get my bearings for a
8    minute here.  Okay.  We'll just go over this line here,
9    "RN further explained the difficulty as her pharmacy is
10   not open Sundays, so Jail is unable to call and get her
11   med list."  Do you see that?

12   A    Yes.

13   Q    I believe we went over that line, but is that
14   with your recollection of what Ms. Fennigkoh told Ms.
15   Boyer?

16   A    Like I said, I don't really recall her
17   specifically telling her that, but

18   Q    Fair enough.  Is your recollection
19   inconsistent with that, as in she told her something
20   else?

21   A    I just know she had an extensive conversation
22   with Christine.  I -- like I said, I can't tell you
23   verbatim what she said.

24   Q    Okay.  Fair enough.  So it sounds like you
25   don't remember her saying this, but you don't remember

Page 137

1    her -- you have no reason to think that she didn't say
2    this; is that fair?

3    A    Yeah.  I believe she would've told her that,
4    but I -- I don't remember that verbatim.

5         MR. MCCAULEY:  Objective to form.  Calls for
6    speculation.

7    Q    Okay.  The next line is, "Patient stated,
8    'There should be some loose pills in my purse.  Will
9    that help?'"  Do you see that?

10   A    Yes.

11   Q    Okay.  Do you remember Ms. Boyer saying that?

12   A    I believe she did because we did find loose
13   pills in her purse.

14   Q    Okay.  The next little line here is, "'I'll
15   call him.'"  Do you remember that?

16   A    Says she'll call her husband --

17   Q    Yeah.

18   A    -- yeah, I don't -- I don't really recall her
19   saying that.

20   Q    Okay.  You don't recall Ms. Boyer saying that
21   she would call her husband?

22   A    I don't recall her saying that.

23   Q    Okay.  The next line is, "RN assisted CO with
24   identifying loose pills."  Do you see that?

25   A    Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 138

1    Q    Okay.  So are you the -- CO is correctional
2  officer; is that right?
3    A    Yes.
4    Q    Do you remember this event, "RN assisted CO
5  with identifying loose pills"?
6    A    Yes.  I remember we were digging through her
7  purse.  It was me and another officer going through her
8  property, and Amber, and we found some loose pills.
9    Q    Okay.  So very quickly, Fennigkoh, you, and
10 another officer went through her purse; is that right?
11 Ms. Boyer's purse?
12    A    I don't recall specifically which one of us
13 was -- I know Amber wasn't the one going through her
14 purse.  It was either the other officer or myself going
15 through her bag, but I don't really remember which one
16 of us.
17    Q    Do you remember who that other officer
18 would've been?
19    A    Officer Lucas Runice.
20    Q    Okay.  Okay.  And the next sentence says,
21 "Ondansetron, aspirin, oxycodone, and broken
22 unidentified pills found."  Do you see that?
23    A    Yes.
24    Q    Do you recall you and Officer Runice
25 identifying -- or finding a bunch of pills in the purse?

Page 139

1    A    I do remember there being some loose pills,
2  yes.
3    Q    Okay.  And then I'm assuming that
4  Ms. Fennigkoh would've identified the pills that you
5  found --
6       MR. KNOTT:  Object --
7    Q    -- or tried to identify them?
8       MR. KNOTT:  Objection to form.
9    A    She may have known, based on her training
10 experience, but I believe we also used drugs.com for the
11 pill identifier.
12    Q    Got it.  So is that a recollection you had of
13 going to a website to try to figure out which pills were
14 which?
15    A    I don't remember myself doing it.  I don't
16 remember if Officer Runice was headed up, but that's
17 typically what we did.
18    Q    Understood.  Last line here is, "RN instructed
19 jail staff to alert NP of situation when able."  Do you
20 see that?
21    A    Yes.
22    Q    Do you recall Ms. Fennigkoh -- well, let me
23 ask real quickly, do you have an understanding what "NP"
24 means?
25    A    Nurse practitioner.

Page 140

1    Q    Okay.  And was that Ms. Pisney?
2    A    I believe it was at the time, yes.
3    Q    Okay.  And do you have a recollection of
4  Ms. Fennigkoh instructing jail staff to alert Lisa
5  Pisney of the situation when able?
6    A    I don't really recall that.  I know we would
7  have to call in the meds if that's what she was
8  referring to.  I -- I don't recall that.
9    Q    Was there a point where Ms. Fennigkoh was
10 still there completing this process and you had stepped
11 away and were another place where you wouldn't have
12 heard her say this?
13    A    I -- I don't recall, but there was another
14 officer, so I'm not sure if it's something she specified
15 -- specifically said to that one.  I -- I don't recall.
16    Q    Okay.
17    A    I don't remember.
18    Q    We did look at this intake sheet, and I
19 believe you said that -- and I'm referring you again to
20 Exhibit 3, this intake screen.  You said that this --
21 there's some writing below the -- on the last page below
22 the "Revised 8-8-2018."  And that's not your
23 handwriting.  It belongs to Brooke Dempsey, right?
24    A    Yes.
25    Q    Okay.  And do you have any recollection about

Page 141

1  when this was written down?  And by that I mean, was it
2  written down as you were filling this out, before you
3  signed it, or after?
4    A    It was after I completed the form.  I don't
5  know why she wrote it on there.  I don't know the
6  scenario surrounding why she wrote it down.
7    Q    Okay.  It appears -- and again -- I mean, do
8  you know that Brooke Dempsey called Lisa Pisney?
9    A    I do not know.  I don't know anything beyond
10 that.
11    Q    Okay.  So you know nothing beyond what's just
12 written down here --
13    A    I --
14       MR. MCCAULEY:  Object --
15    Q    -- on the last page of Exhibit 3?
16       MR. MCCAULEY:  Object to form.
17    A    Yes.  I don't -- I don't know the
18 circumstances surrounding that.  I don't.
19    Q    Okay.  Did you call Lisa Pisney about this
20 intake?
21    A    I don't believe I did.  I don't recall.
22    Q    Had you called Lisa Pisney before about
23 medical issues?
24    A    If it was a protocol that was completed or a
25 med verification sheet, then yes, or diabetics.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    What was the middle thing?  You said a medical
2 certification sheet?
3    A    I'm sorry.  What's that?
4    Q    Well, you said -- you said if it was a
5 protocol, you said something in the middle, and then you
6 said diabetic.  I believe you said medical certification
7 sheet.
8    A    No med verification, medical verification.
9 It was if they had --
10    Q    Medical verification --
11    A    Yeah.  So if they had meds --
12    Q    Go ahead.
13    A    If they had meds, we would count the pills and
14 fill out the form to call the doctor.
15    Q    And that would be part of the intake process?
16    A    If they had meds, typically it was done after
17 they got booked in, yes.
18    Q    Okay.  And the booking person would make that
19 call to Lisa Pisney?
20    A    Or whoever counted the meds.  It could have
21 been any officer.
22    Q    Okay.  So in this circumstance, you remember
23 finding meds, but it sounds like you don't necessarily
24 recall calling Lisa Pisney after having found the meds
25 that are indicated in Ms. Fennigkoh's notes?

1    A    I don't --
2         MR. MCCAULEY:  Object to form.
3    A    I don't recall calling her for the meds.
4    Q    Okay.  And if I'm hearing you right, you don't
5 remember this instruction from Lisa Pisney that I'm
6 looking at on -- that we're looking at on Exhibit 6,
7 "RN instructed jail staff to alert NP of situation when
8 able"; is that right?
9    A    Not --
10         MR. MCCAULEY OR KNOTT???:  Object to the form.
11    A    I don't recall that specific instruction.
12    Q    Is there some point where Lisa -- or I'm
13 sorry, where Amber Fennigkoh was still there dealing
14 with Ms. Boyer in this intake and you went off to do
15 something else where you might not have heard this, but
16 she would've said it to something -- someone else at the
17 jail?
18    A    No.  I don't recall.  Like I said, there was
19 another booking officer, so she may have said something
20 to him specifically.  I may have walked off.  I don't
21 recall.
22    Q    Okay.  After you were in the PREA room with
23 Ms. Boyer and Ms. Fennigkoh, what happened next?
24    A    I remember Amber telling us to put her on a
25 half-hour medical watch until she could get more

1 information regarding her medical issues and
2 medications.
3    Q    Let me back up real quickly here.  And we're
4 looking at Exhibit 3 again, the intake medical screening
5 report.  You mentioned this earlier.  I'm looking at the
6 first page, and it says, "Reviewed By."  And do you
7 recognize Ms. Fennigkoh's signature on that line?
8    A    I believe it looks like hers, yes.
9    Q    Okay.  Is that typically something that would
10 occur -- was this line "Reviewed By" reserved for jail
11 medical staff to review the intake screen?
12    A    I believe so.  I think they did that after
13 they collected the medical screening, so I typically
14 didn't see them sign off on those.
15    Q    Okay.  You said you did not see them sign off
16 on them?
17    A    I don't know, because I believe they did that
18 once they collected the medical screenings the next time
19 that they worked or after they were done, so
20    Q    Okay.  So to return to your interaction with
21 this recounting of the intake with Ms. Boyer, the three
22 of you, Amber Fennigkoh, you, and Christine Boyer are in
23 the PREA room, right?
24    A    Yes.
25    Q    And at some point the interview concludes; is

1 that right?
2    A    Yes.
3    Q    And what do you remember happening after that?
4    A    Again, I remember Amber telling us -- me to
5 put her on a half-hour medical watch until they could
6 get more information regarding her medical issues and
7 meds.
8    Q    Okay.  So Ms. Fennigkoh told you to put
9 Ms. Boyer on a medical watch until they could get more
10 information about what medications she was taking and
11 what medical conditions she had --
12    A    Yes.
13    Q    -- is that right?
14    A    Yes.
15    Q    Okay.  So to return to the booking floor here,
16 that would mean that Ms. Boyer would be placed somewhere
17 in booking and not somewhere in the general population
18 as we discussed earlier; is that right?
19    A    She was still in booking, yes.
20    Q    Okay.  And that's -- did you place Ms. Boyer
21 into the booking cell where she was placed?
22    A    I don't remember if I specifically picked that
23 cell or if the other booking officer did.  I don't
24 recall the reasoning for that cell.
25    Q    Was there any distinction among the cells?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 146

1  I believe you mentioned that there were a couple
2  purposes that these cells could be used for. One would
3  be a suicidal person, another would be medical, another
4  -- I believe you had a third, and I'm just -- I didn't
5  write it down. That would prevent someone from going
6  into GP, they would stay in booking. Was there any
7  distinction say between the suicide risk cells and the
8  medical watch cells in booking?
9      A    So there wasn't really any specific, like,
10 names for the cells, but 1 through 3 had bigger windows,
11 which were considered more high vis cells, high visual.
12 Typically suicide watches went in there, so you could
13 see them --
14     Q    I'm sorry to interrupt you. I'm sorry. Is 1
15 through 3 along this right hand wall on the Exhibit 1?
16     A    Yes.
17     Q    Okay. So I apologize. I just -- I wanted to
18 make sure we got that clear. After that, just go ahead
19 and any distinctions you draw between where people were
20 placed?
21     A    Those three cells just had bigger windows
22 versus the little rectangle windows. They were
23 considered high visual cells. A lot of times suicide
24 watches went into those ones.
25     Q    Okay. And so suicide watch was preferred for

Page 147

1  the cells on the right-hand wall of Exhibit 1, and then
2  other watches might be on the bottom?
3      A    If others -- if those cells were --
4      Q    Go ahead.
5      A    Sorry. If those --
6          MR. MCCAULEY:  Object to form.
7      A    If those cells were open, they could be used
8  for any of those purposes. That cell 2 also had a very
9  low bunk, which a lot of times get used for people who
10 oftentimes had seizures.
11     Q    Okay.
12         MR. WEIL:  This is probably a good time to take
13 a quick break.
14         MR. MCCAULEY:  Five minutes?
15         MR. WEIL:  Yeah. Let's take five.
16         MR. MCCAULEY:  Okay.
17         COURT REPORTER:  We are off the record at 2:03
18 p.m.
19         (OFF THE RECORD)
20         COURT REPORTER:  We are back on the record for
21 the deposition of Danielle Nelson, being conducted
22 by videoconference. My name is Krystal. Today's
23 date is February 24, 2022, and the time is 2:23 p.m.
24 BY MR. WEIL:
25     Q    Ms. Fennigkoh, I want to close out the evening

Page 148

1  here real quickly with a couple more questions. Then we
2  can move on. It sounds like you recall from your
3  testimony, that you recall two people being involved in
4  this intake (inaudible) Nurse Fennigkoh and that was
5  Brooke Dempsey, or at least Brooke Dempsey being
6  involved in having handwritten that note at the bottom
7  of the intake sheet, right?
8      A    Yeah. I don't think she was there the night
9  she got booked in, but she -- when I wrote that. So if
10 was the following day, I don't know when she wrote it.
11     Q    Okay. That's helpful. So do you remember
12 when Brooke Dempsey's shift was?
13     A    I believe she was on day shift. But sometimes
14 officers would stay until 10:00, but I don't believe she
15 was there that late.
16     Q    Okay. Okay. And then the other person you
17 remember -- well, the one other person you remember
18 being there is Lucas Runice?
19     A    Runice, yes.
20     Q    Runice. Okay. And you recall him helping you
21 go through Ms. Boyer's bag; is that right?
22     A    Yeah. Between the two of us, one of us went
23 through the bag. I do recall being behind the booking
24 counter at the time, but Yeah, he was the one that,
25 I believe, did the booking portion of it on the

Page 149

1  computer, so
2      Q    Okay. Anybody else you remember being
3  involved in bringing Ms. Boyer into the jail?
4      A    Other than Amber and Lucas, no.
5      Q    Okay. I want to get a rough timeline of what
6  happened here. I'll share these documents with you
7  again, just so we can work on figuring out what happened
8  when. So this is -- bear with me here. This is Exhibit
9  4, the booking face sheet, right? And -- do you see
10 that? I'm sorry. I did not click the share button.
11 Okay. Are you able to see the booking face sheet
12 Exhibit 4, Ms. Nelson?
13     A    Yeah, I see it.
14     Q    Okay. Can you read it, okay?
15     A    Can you zoom in just a hair?
16     Q    I will. Sure. We talked about it before.
17 And, again, I'm trying to put, sort of, a time around
18 when Ms. Boyer was brought in. We talked about the
19 entry of these timestamps. Do you see where Lucas' name
20 is there?
21     A    Yes.
22     Q    And below, it's 22:41. Do you see that?
23     A    Yes.
24     Q    So -- and if I understood your testimony
25 correctly, that's a field that's getting entered and as

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 150

1  it's being entered, it, sort of, gets timestamped who in
2  that room is entered; is that right?
3      A   I believe those were, like -- I honestly don't
4  really know.  You had to enter the time.  There was
5  shortcut to enter the current date and time, but yes.
6      Q   Do you have a recollection at all
7  approximately when the booking process started with
8  Ms. Boyer?
9      A   I know the medical screening should have a
10  time on it.  That's typically the time that they're
11  brought in.
12      Q   Right.  I'll get there.  I'm -- so
13  Ms. Fennigkoh's note here says 22:40, which would be
14  10:40 p.m., right?
15      A   Yes.
16      Q   Okay.  And then I have -- there is a -- there
17  is a time on the intake screen, as you said, and we're
18  looking at it right here on Exhibit 3, and it says
19  23:15.  Do you see that?
20      A   Yes.
21      Q   And that would be 11:15 p.m., right?
22      A   Yes.
23      Q   Okay.  I'm going to introduce Exhibit 8.  It
24  is an observation log, and it begins at Monroe County
25  1103.  It goes through Monroe County 1104.  And do you

Page 151

1  recognize this form?
2          (EXHIBIT 8 MARKED FOR IDENTIFICATION)
3      A   Yes.
4      Q   And this is an observation log for the booking
5  area; is that right?
6      A   Yes.
7      Q   Is this one of the documents -- is Exhibit 8
8  one of the documents that you reviewed in preparation
9  for your deposition today?
10      A   Yes.
11      Q   Okay.  And so I'm -- this is me just trying to
12  piece together when things happened.  You mentioned
13  Nurse Fennigkoh instructing you-all to put Christine
14  Boyer in a booking cell for medical observation, right?
15      A   Yes.
16      Q   And the purpose of the log is to track when
17  someone is observed -- when someone is monitored, and
18  there's a note about -- a short note about what the
19  monitoring entails.  Fair enough?
20      A   Right.  Where it says, "Observation Type:
21  Medical"?
22      Q   Right.  I see "time, badge, code," right?
23      A   All of them, yes.
24      Q   And so time is the time of day, correct?
25      A   Yes.

Page 152

1      Q   Badge identifies the person doing the
2  monitoring?
3      A   Yes.
4      Q   And then code is -- there's a variety of, sort
5  of, things that person might've been observed to be
6  doing, correct?
7      A   Yes.
8      Q   So 23:15 -- if I'm reading this correctly, it
9  appears that 23:15 on December 21st is the first entry
10  of when -- for this booking log; is that right?  Or this
11  observation log; is that right?
12      A   Yes.
13      Q   Okay.  Does that -- would that indicate to
14  you, having read these things, that -- or being familiar
15  with these logs, that that is when Ms. Boyer was placed
16  into booking 4?
17      A   She may not have necessarily been put in 4 at
18  the point, but that's when the watch was started, yes.
19      Q   Okay.  So she might've been put in slightly
20  before?
21      A   Or after.  Like, she may have still been out
22  getting booked in at the time this watch was started,
23  yes.
24      Q   Okay.  So it may have been at 11:15 p.m., and
25  it may have been a little before; is that -- if I

Page 153

1  understand you correctly?
2          MR. MCCAULEY:  Object to form.
3      A   The time on there should be the time that the
4  watch was actually started, yes.  Oh, you're talking
5  when she goes into her cell?
6      Q   Right.
7      A   Yeah.  She --
8      Q   And I'm just looking at the first entry here.
9      A   Yeah.  She could've been placed in a cell
10  either prior or after the watch log started, yes.
11      Q   Prior or after the watch log started.  So the
12  watch log -- do you have -- there's an entry after the
13  first line, it looks like a 1 and then a -- I don't know
14  what that is.  A 9?  There's a series of codes here.  19
15  says, "Throwing water/food."  I don't think -- you don't
16  remember Ms. Boyer doing that, right?
17      A   I believe it's 15, which is talking with the
18  nurse.
19      Q   Okay.  Got it.  Talking with the nurse, so
20  that makes sense.  So this is 15.  And this would be an
21  -- is that APRN?
22      A   I believe that's AF --
23      Q   AF -- oh, AFRN.  That'd be Ms. Fennigkoh,
24  right?
25      A   Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q   And so this would be -- this would reflect --
2  if I'm reading this log correctly, and please correct me
3  if I'm wrong, but this would indicate to you, this is
4  Ms. Boyer's been placed in the booking 4 cell at 11:15
5  p.m.  She is -- the first observation by Amber
6  Fennigkoh, and the code is talking with nurse; is that
7  right?
8    A   Again, she may not have been physically put in
9  the cell yet, but that is when the watch started.
10    Q   Okay.  Got it.  So this watch might not -- and
11  not every single observation would be her in the cell
12  itself.  She might be doing something else, but there
13  would be, sort of, just a general instruction to monitor
14  her?
15    A   Yes.
16       MR. MCCAULEY:  Object to form.
17    Q   Is that right?
18    A   Yes.  Yes.
19    Q   Okay.  So that would be consistent with
20  something like just down here real quickly, I see that a
21  shower.  Do you see that?
22    A   Yes.
23    Q   Okay.  And so there's no shower in booking 4,
24  right?
25    A   No.

1    Q   So this is an observation of Ms. Boyer outside
2  of the cell, but there's still a record of whatever she
3  happens to be doing at that time?
4    A   Yes.
5    Q   Okay.  And so here -- well, let me -- while
6  we're here on this booking sheet, some of these entries
7  have asterisks behind them.  Do you see that?
8    A   Yes.
9    Q   Does that have any meaning to you?
10    A   I don't recall if this is the updated key or
11  not, but it would indicate if they had moved positions
12  from the last time they were looked at.  Like I said, I
13  don't -- if you scroll down, I don't recall if this log
14  is --
15    Q   I didn't see anything in the --
16    A   Yeah.  I think this may -- may have been an
17  updated one but in a past form that we had used before
18  the codes got updated.  There was one just saying to
19  indicate if they had changed position with that
20  asterisk, and I think some people just continued to do
21  it on the sheet.
22    Q   Okay.  So by change position, do you mean left
23  or entered the -- like, changed position in the
24  building, or just changed their position inside of the
25  cell, or both?

1    A   Because if they're -- if they're laying down
2  then sitting up or laying down, rolled over, changed
3  position.
4    Q   Okay.  Again, I don't want to get too far into
5  this.  But, you know, here if I understand correctly, 2
6  is -- the person is -- well, strike that.  These badge
7  numbers mean the -- they indicate a different person.
8  It's the last two numbers of an officer's badge, right?
9    A   Yes.
10    Q   Okay.  So looking at the 0747 entry, that's
11  someone with badge 71, right?
12    A   Yes.
13    Q   Okay.  And do you remem -- do you know who
14  that is, off the top of your head?
15    A   I believe that is Mike Wendland.
16    Q   I'm sorry, what was that?
17    A   I believe that's --
18    Q   Say it again.
19    A   -- Mike Wendland.
20       MR. WEIL:  John, I think you are extremely
21  close to the mic, or your paper is.
22       MR. MCCAULEY:  Sorry.  I apologize.  Yeah.
23  Okay.
24       MR. WEIL:  No, not at all.  It just did
25  interfere a little with what she was saying, so

1       MR. MCCAULEY:  Yeah.
2  BY MR. WEIL:
3    Q   So you said that it was Mike.  Who was that
4  again?
5    A   Wend -- Wendland, W-E --
6    Q   Okay.
7    A   --N-D-L-A-N-D.
8    Q   Okay.  And then the next entry here is -- I
9  believe this is Shasta Parker?
10    A   Yes.
11    88.  So in this one, Shasta Parker is
12  indicating 2 with a star, right?
13    A   Yes.
14    Q   So how would she know that the person has
15  moved?
16       MR. MCCAULEY:  Object to form.
17    A   I couldn't answer that for you.  I'm not --
18  I'm not the one that made that log.
19    Q   Okay.  I was just trying to clarify your
20  recollection if there might be another reason for the
21  asterisk or not.  But, yeah, you know, here's a similar
22  one down here.  You know, it's a 2 and then a 2 plus a
23  star.
24    A   Yeah, I -- I don't know.
25    Q   Okay.  That's fine.  So going back up, I'm

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 158

1 just trying to get these times straight. There's some
2 -- if we looked at -- again this is Exhibit 4. There're
3 some entries being made 22:41, and a log is started --
4 if we look at Exhibit 8, the log is started at 23:15,
5 right?
6     A    Yeah.
7     Q    So that would be -- essentially, the booking
8 process is concluding at that point, and she's being put
9 in a cell right around -- maybe not exactly, but around
10 that time?
11     A    That doesn't necessarily mean that.  It just
12 means the watch has started again.  She may still have
13 been in the booking process at this time, but a watch
14 was started at that time.
15     Q    Okay.  So Amber Fennigkoh could have been
16 talking to her anywhere in the booking area?
17     A    Yes, and she may have been still in the
18 booking process.  I don't recall.  That doesn't always
19 mean at the start of watch.  That's when they're put in
20 the cell.  It's just when the watch was started.
21     Q    Got it, and I apologize for that belabored
22 discussion.  It's an unfortunate feature of the
23 deposition forum.  Before we took a break, you said that
24 Amber Fennigkoh was the one who instructed you to place
25 Ms. Boyer in the medical observation cell; is that

Page 159

1 right?
2     A    Just to put her on a medical watch.  No
3 specific cell, just a medical watch.
4     Q    Fair enough.  To put her on medical watch.  Did
5 she give you any other instruction besides that?  Do you
6 recall her giving you other instructions besides putting
7 her on medical watch?
8     A    I don't recall, other than if we needed to
9 call the doctor for any reason.
10     Q    Okay.  Meaning?  Can you be a bit more
11 specific in what you mean about that?
12     A    Like, if we were to have to complete a
13 protocol on her for some reason.
14     Q    Okay.  I understand that that's just standard
15 procedure, right?  That if you need to complete a
16 protocol, you call the person, the doctor or Lisa Pisney
17 or what have you; is that right?
18     A    If you complete a protocol, yes, you have to
19 call the doctor.
20     Q    Okay.  Is there a reason that Amber Fennigkoh
21 would be reiterating that instruction to you?
22         MR. MCCAULEY:  Object to form.
23     A    I don't know.  Just said --
24     Q    Okay.
25     A    -- to put her on a medical watch.

Page 160

1     Q    Okay.  Do you recall her providing -- giving
2 any other instructions to anybody there?
3     A    I don't recall, no.
4     Q    Okay.  And the two people you recall being
5 there are you, and I'm apologizing that I'm butchering
6 his name, Louis [sic] Runice?
7     A    Lucas Runice.
8     Q    Lucas Runice.  And those are the two people
9 who you recall being there besides Ms. Fennigkoh in
10 terms of staff?
11     A    In regards to who was in booking, yes.
12     Q    Okay.  Do you see -- is Lucas Runice's number
13 58?
14     A    Yes, he is.
15     Q    Okay.  And your number is 94, right?
16     A    Yes.
17     Q    Do you know -- I'm just looking -- we're
18 looking at Exhibit 8 now.  I'm on the left-hand column.
19 I see someone whose number is 90.  Do you know who that
20 would be?
21     A    I believe that was Jordan White, who no longer
22 works at the jail.
23     Q    Okay.  Do you recall -- does that refresh your
24 recollection of Jordan White being at the jail during
25 this time?

Page 161

1     A    He may have been working in housing and he
2 came up to booking, but I don't recall where he was
3 working specifically.
4     Q    Okay.  The only two people you recall being in
5 booking at the time that Ms. Boyer was booked in are you
6 and Lucas Runice, right?
7     A    Yes.
8     Q    Okay.  And then was there any organization to
9 who would do these observation rounds?  I'm asking just
10 because it seems, sort of, like, one person will do it
11 for a while and then another.  Was it an informal
12 system, or how did it work?
13     A    Essentially, whoever worked in booking would
14 be the one to do it.  But if somebody came up to help,
15 if there's multiple bookings, somebody else might take
16 over checking on somebody, or if somebody just happened
17 to come up and the timer went off, or a reminder to do a
18 cell check, they would -- they might go do it just to
19 help the booking officer out.
20     Q    Okay.  So you-all had a timer to help you just
21 as a reminder to do the cell checks?
22     A    Yes.
23     Q    Okay.  And I'm assuming that's just a little
24 alarm, right?
25     A    Yeah.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  Q   There's also a 76 here.  Do you know who that
2  is?

3  A   I believe that was Davis.  I can't think of
4  her first name.  Davis was the last name.  I can't think
5  of her first name right off the top of my head.

6  Q   It was a woman?

7  A   Yes.

8  Q   Okay.  Okay.  And then you said that your
9  shift would end at around 6:00 a.m., right?

10  A   Yes.

11  Q   I see you here at 6:42.  Do you see that on
12  Exhibit 8?

13  A   Yes.

14  Q   Was there a reason you'd stay past 6:00,
15  45 minutes past 6:00?

16  A   If we did, there could be multiple reasons.
17  Somebody got brought in just before 6:00 and you'd stay
18  to help book that person in.  I know as a sergeant, a
19  lot of times I'd stay to finish up things I might need
20  to finish up.  Yeah.

21  Q   Do you see Brooke Dempsey's number on any of
22  these?

23  A   Just on this one, I do see her number, 57.

24  Q   57?

25  A   Yeah.

1  Q   I'm looking for it right now.

2  A   It's on the third column on the list.

3  Q   Third column.

4  A   To the right, the last one.

5  Q   Ah, okay.  Right down here, you're seeing
6  14:59?

7  A   50 -- yep.

8  Q   Okay.  So 57.  Now, it sounds -- do you have
9  any knowledge of whether -- it sounded like what you
10  said before was that the standard shift would be 6:00 to
11  6:00, right?

12  A   Yes.

13  Q   And there was not a lot of overlap between
14  shifts, but here there was some overlap, evidently, if
15  you're staying until 6:42, right?

16  A   Yes.

17  Q   Do you know how Brooke Dempsey would come to
18  know that she should call Lisa Pisney?

19  A   I do not.

20  Q   Okay.  Did -- between you and Lucas Runice,
21  did one of you take on the task of alerting the next
22  shift that they should call Lisa Pisney?

23  A   I'm sorry, you were cutting out.  Can you
24  repeat that?

25  Q   Sure.  Sure.  So if I understand correctly,

1  you recall you and Lucas Runice being at the jail as
2  Ms. Boyers' intake is occurring, right?

3  A   Yes.

4  Q   Okay.  And -- well, let me ask this: Going
5  back to Ms. Fennigkoh's note, do you remember when
6  Ms. Fennigkoh left your presence and went home or left
7  the jail at least?

8  A   I don't remember the exact time she left.

9  Q   Okay.  What we do have is Ms. Fennigkoh
10  talking to -- I'm looking at Exhibit 8 in the upper
11  left-hand corner.  We see Ms. Fennigkoh talking to
12  Ms. Boyer at 11:15 p.m., right?

13  A   Yes.

14  Q   Okay.  And do you have a recollection of her
15  sticking around for a while after having this
16  interaction with Ms. Boyer?

17  A   I -- I don't recall if -- by the time the
18  watch got started, if that was after we found those
19  loose pills or before, I -- I don't remember.

20  Q   Would booking be the way to just leave the
21  jail if someone like Ms. Fennigkoh was on her way out
22  when this all transpired; is that right?

23  A   A lot of time staff took that way, yes,
24  because they'd go out the sally port garage.

25  Q   Okay.  Do you know whether that's the way

1  Ms. Fennigkoh typically left, or was there some other
2  way to --

3  A   There --

4  Q   Go ahead.

5  A   No, that's -- that's usually the way she came
6  and gone.

7  Q   Okay.  And, again, just to close this out, and
8  I don't know I've refreshed your recollection.  Do you
9  remember Ms. Fennigkoh -- you know, booking's fairly
10  small.  Do you remember saying, okay, you know, I'm --
11  we've put Ms. Boyer in her booking cell, and I can take
12  off and go home?

13  A   I don't remember that time or I don't remember
14  exactly when that was.

15  Q   Do you remember when Jordan White -- the first
16  time Jordan White came back to booking and interacted
17  with you-all there?

18  A   I -- I don't remember.  I mean, I wouldn't
19  know that in that time on that sheet.

20  Q   Okay.  It sounds as though that you do
21  remember that you and Lucas Runice were the two people
22  who were in booking at the time that Ms. Boyer was
23  booked in and Ms. Fennigkoh was there helping you book
24  her in, right?

25  A   Well, she was there regarding her medical

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1 part, but she didn't do any of the booking. But yes.

2 Q Yeah. Fair. I was just talking about who was
3 present, not sort of what they were doing. But it was
4 the three of you who were present, and that was it,
5 right?

6 A Yes.

7 Q Okay. And from -- again, just -- I'm going
8 over your testimony. Correct me if I'm wrong. You
9 don't recall Ms. Fennigkoh telling you to call
10 Ms. Pisney, right?

11 A I don't recall that --

12 MR. KNOTT: It's -- object. It's asked and
13 answered. That's me.

14 Q Go ahead, Ms. Nelson.

15 A Again, I don't recall her specifically saying
16 that. Like I said, I know it was protocol to call after
17 we counted meds when they got done, but I don't recall
18 Amber specifically stating that. I don't remember.

19 Q You said just now it was protocol to call
20 after they counted meds?

21 A Yes. Like I said, when inmates would come in
22 with meds, we would count them, and we'd have to call
23 the doctor.

24 Q Okay. Is there a reason that you wouldn't
25 call Ms. Pisney right -- that -- well, that a call to

Page 167

1 Ms. Pisney would not occur until the day shift?

2 MR. MCCAULEY: Object to form.

3 A If the meds didn't get counted until later,
4 I'm not sure. Or if they weren't urgent meds to call
5 in, we were told to wait until later in the day instead
6 of calling in the middle of the night, but I don't know
7 who or when this was called in, so

8 Q Understood. So you recall that you and Lucas
9 Runice counted the meds out, right?

10 A I don't remember specifically counting the
11 meds. I remember finding pills in her bag.

12 Q Fair enough. And then did you work -- I
13 believe you said you may have recalled working with
14 Ms. Fennigkoh to figure out which meds they were -- to
15 identify which meds they were; is that right?

16 A Yeah. Or Lucas, one of us may have had the
17 drugs.com website up. I -- again, I don't remember
18 which one of us did or if he did or I did. I don't
19 remember.

20 Q But if I understand correctly, that was
21 something you-all did while Ms. Fennigkoh was still
22 there participating in this intake process --

23 A Yes.

24 Q -- is that right?

25 A Yes.

Page 168

1 Q And then --

2 A The pills --

3 Q Go ahead. I'm sorry.

4 A The pills were identified while Amber was
5 there, yes.

6 Q Okay. And then at some point, Ms. Fennigkoh
7 left the jail, correct?

8 A Yes.

9 Q Okay. And then during the morning hour, the
10 small hours in the morning, you don't recall
11 Ms. Fennigkoh being there; is that right?

12 A I don't recall her --

13 MR. MCCAULEY: Object to form.

14 A -- being there the rest of the shift, no.

15 Q Okay. And so, again, given that you and Lucas
16 Runice identified the meds while Ms. Fennigkoh was
17 there, would the standard procedure have been to make
18 the call to the practitioner after you had identified
19 those medications?

20 MR. MCCAULEY: Object to form.

21 A Once the med verification form was filled out,
22 we would call the doctor. There may have been a time
23 frame that we didn't have to call her depending on the
24 urgency of the meds. Like, if they could wait until
25 morning, then we'd call.

Page 169

1 Q Is that something that Ms. Fennigkoh would say
2 you know, okay, this can wait or this -- you have to
3 call right now in the middle of the night?

4 MR. KNOTT: Object to the form.

5 A She could have, but I don't remember her
6 telling us to wait or not wait. I don't remember her
7 saying that.

8 Q I'm just trying to understand where you
9 identified the urgency. I believe that was the word you
10 used, so I'm just trying to understand. Did you decide
11 -- did you make the decision about whether this was
12 urgent or did somebody else?

13 A No, I believe there was a chart in booking
14 that stated if it was these meds, we had to call the
15 doctor right away.

16 Q Okay. And if it wasn't -- you said there was
17 a chart in booking?

18 A I believe there was some guide, yes. I can't
19 --

20 Q Okay.

21 A -- tell you exactly what, but we were given
22 time frames to call the doctor.

23 Q If I understand you right, there was a
24 particular chart that listed certain medications and if
25 it was one of those medications, you were to call the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1  doctor immediately?

2      A    Yes.  If they ever fell under one of the

3  categories of meds, yes.

4      Q    Okay.  And if it wasn't one of those meds,

5  when would the doctor -- on that list, when would the

6  doctor be -- or when would the practitioner be called?

7      A    I don't remember the exact time frame, but in

8  the morning sometime.  I don't remember the exact time

9  frame.

10      Q    How long were you on the night shift at the

11  jail?

12          MR. MCCAULEY:  Object to form.

13      A    I don't remember because I was on nights, then

14  I went to days, and back to nights.

15      Q    Rough -- give me a -- can you give me a

16  ballpark of roughly how much time you spent on night

17  shift?

18          MR. MCCAULEY:  Object to form.

19      A    I believe I was on second shift before we did

20  12 hours.  Then went to day shift on 12 hours.  And then

21  after I got sergeant, I went to night shift on 12 hours.

22      Q    Okay.  And that was in 2018 you got sergeant,

23  right?

24      A    November 2018, yes.

25      Q    Okay.  And then from November 2018 through

Page 171

1  December 2019 at least, you were on night shift?

2      A    Yes.

3      Q    During that time, I would expect, correct me

4  if I'm wrong, that a lot of people come in at night, get

5  arrested and come in at night; is that right?

6      A    Yes.

7      Q    Okay.  Did any of those people have -- was

8  there -- strike that.  Was there a written protocol or

9  written instructions about when the practitioner should

10  be called on the night shift and when they should be

11  called -- you know, when the call could wait for the day

12  shift?

13      A    Yes, there was, but it varied with the

14  different doctors we had.  So I can't give you exact

15  times specific.  It changed all the time.

16      Q    And how would you learn about the changes?

17      A    Usually, medical would send us an e-mail or

18  put it on a paper.

19      Q    Was there -- they would put it on a paper?

20      A    Yes.  They would write it in on a paper in

21  booking.

22      Q    Okay.  So there'd be written instructions in

23  booking about when to call the practitioner on the night

24  shift and when to leave the matter for the day shift?

25      A    Yes.

Page 172

1      Q    Okay.  And I think it -- what you said earlier

2  is you recall a list of medications for which you were

3  -- you should call the practitioner immediately and --

4      A    Yeah.

5      Q    Correct?

6      A    Yes.

7      Q    And if the medications didn't fall on that

8  list, then you didn't have to call the practitioner

9  immediately; is that right?

10      A    Yes.

11      Q    Okay.  Well, is there a way for the people who

12  came on the day shift to know that the practitioner

13  should be called on the day shift?

14      A    No, it was typically --

15      Q    Was there a way of -- I'm sorry.  Go ahead.

16      A    That was typically passed on from night shift.

17      Q    Okay.  And how would that information be

18  passed on?

19      A    Verbally.

20      Q    Okay.  And so who -- if it was typically

21  passed on verbally, was there -- we talked about an

22  overlap between the two shifts.  Again, I understand

23  what you stated here.  I'm just trying to understand the

24  -- you were here until at least 6:42 a.m.  But how would

25  -- how would the -- if there wasn't a whole lot of

Page 173

1  overlap between the two shifts, how would such

2  information get passed on?

3          MR. MCCAULEY:  Object to form.

4      A    Like I said, if somebody clocked in at 5:45 or

5  ten to or whatever, that's typically when pass on would

6  be given or if another person had to stay five, ten

7  minutes late to give the rest a pass on.  It all

8  depended on when who clocked in.

9      Q    Okay.  So it was -- there was no set

10  procedure.  It just depended on what happened that

11  morning?

12          MR. MCCAULEY:  Object to form.

13      A    Yes.

14      Q    Okay.  And so there was no -- was there a

15  written protocol -- or beyond this verbal, sort of,

16  handoff, was there any other way for the day shift to

17  know that they should call the practitioner?

18      A    If somebody sent an e-mail, maybe, but usually

19  it was verbal pass on.  They'd be given the document to

20  call the doctor.

21      Q    Was there a process at all for faxing or

22  e-mailing information to the practitioner for -- from

23  you in booking?

24      A    No.

25      Q    Did you ever e-mail the practitioner?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    A    I couldn't even tell you the e-mail for the
2  practitioner, so no.
3    Q    You were never given an e-mail for the
4  practitioner?
5    A    Only a phone number.
6    Q    Okay.  And was there a fax number for the
7  practitioner?
8    A    Not that I'm aware of.
9    Q    You were never given a fax number for the
10  practitioner?
11    A    No.
12    Q    Okay.  Did the jail have a fax machine?
13    A    Yes.
14    Q    Was it in booking?
15    A    The one in booking and housing and master
16  could all fax.
17    Q    Was there one in medical?
18    A    Yes.
19    Q    Given your understanding of the procedures in
20  this handoff, the way Amber Fennigkoh's instruction to
21  call Lisa Pisney would have been transmitted to the day
22  shift would be through either you or Lucas Runice; is
23  that right?
24        MR. MCCAULEY:  Object to form.
25    A    Yes.

1    Q    Yes?
2    A    Yes.
3    Q    Okay.  Ms. Nelson, I'm going to just return
4  you briefly to Exhibit 8, which is the jail observation
5  log.  Do you see that in front of you?
6    A    Yes.
7    Q    I'm just wondering if you recognize anybody
8  else's number here.  We've talked about 58, 88, 71.
9  Or have we talked about 71?  Do you know who 71 is?
10    A    Yeah, that was -- that was Mike Wendland.
11    Q    Mike?
12    A    Wendland.
13    Q    Okay.  We talked about 57.  Do you recognize
14  65?
15    A    I believe that was Kyle Moga.
16    Q    Okay.  There's an entry here at 16:54 in the
17  lower right-hand corner.  Do you see that?
18    A    Yes.
19    Q    It says zero percent.  Do you see that?
20    A    Yes.
21    Q    Is that -- I'm looking at 11, which is the
22  only percentage note that I see.  You know, in reading
23  these forms, does that indicate to you zero percent of a
24  meal consumed?
25        MR. MCCAULEY:  Object to foundation.

1    A    I would imagine, since two blocks above it is
2  the meal pass.
3    Q    You're referring to number 10; is that right?
4    A    Yes.
5    Q    Okay.  And so number 10 is meal pass, and that
6  means what?
7    A    That means, like, the time that we gave the
8  food out, so I assume at 4:30 it was dinnertime.
9    Q    Was -- okay.  Do you know whether that was --
10  I know this wasn't your shift.  Was that the normal time
11  for dinner, if you know?
12    A    Roughly around there, yes.
13    Q    Okay.  And so a 10 would be -- for booking
14  purposes, is that the meal being passed through a slot
15  in the tray -- or a tray -- yeah, a tray in the slot of
16  the door?
17    A    That or their door being opened, but yes.
18    Q    Okay.  And so is this -- would this be a
19  common entry, just in your experience in reading these
20  entries, where there would be -- the meal would be
21  offered, that would be a 10 code, there would be a pass,
22  and then there would be a reflection of how much the
23  person ate a couple observations later?
24    A    Yeah.  Some staff may have noted that, yes.
25    Q    Okay.  There's a record of Ms. Boyer -- there

1  are just records of her calling her husband on several
2  occasions on that Sunday.  The medical floor wouldn't
3  have a phone inside of it, right?
4        MR. MCCAULEY:  Object to form.
5    A    No.  Booking cell had a phone in it.
6    Q    Right.  And so how would it work for Ms. Boyer
7  to get out and make a phone call --
8    A    Well, booking --
9    Q    -- if you know?
10    A    Well, booking had what we call the rolling
11  phone.  It was basically a phone that was installed on a
12  dolly that you could wheel up to the cell door, or
13  officers may let them out and use the phones on the
14  wall.
15    Q    Okay.  And those were the -- those were two
16  phones on the wall that we talked about earlier this
17  morning?
18    A    Yes.
19    Q    Okay.
20        MR. MCCAULEY:  Doing okay or do you want a
21  break soon?
22        THE WITNESS:  I'm okay right now.
23        MR. MCCAULEY:  Okay.
24  BY MR. WEIL:
25    Q    This 0 on this log -- again, we're on Exhibit

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 178

8.  The last cell check I have you doing -- or we have
you doing here is 6:42 a.m., right?

    A    It appears so, yes.

    Q    Do you have any recollection of leaving late
or any reason you would've been checking at that time?

    A    I don't remember.  And then like I said, if I
did leave late, it could've been bookings came in late
that morning and we just stayed to finish up --

    Q    Okay.

    A    -- or I may have been finishing some other
stuff that I didn't get done throughout my shift.

    Q    Okay.  Above your entry, there are two entries
above that.  Do you see them?

    A    Yes.

    Q    And so one is for Shasta Parker; is that
right?  The 88?

    A    Yes.

    Q    And there's a -- it looks to me like a 58,
correct me if I'm wrong.

    A    58 for Lucas.

    Q    Okay.  That's Lucas.  Okay.  And so both you
and Lucas -- this would indicate that both you and Lucas
overlapped with Shasta Parker; is that right?

    A    Yes.

    Q    Okay.  Do you recall talking with Shasta

Page 179

Parker about Ms. Boyer?

    A    I don't recall.

    Q    When someone's placed on a medical watch like
this -- when a person who's in jail is placed on medical
watch, how does the staff know what to look for?  Like,
you're on medical watch, but what are you supposed to be
watching for?  Do you understand my question?

    A    Like, what type of behaviors or concerns are
we looking for?

    Q    Sure.  So in your case, for you and Lucas
Runice, like, both of you were with Amber Fennigkoh and
were present for her intake and the expression of the
medical issues.  When someone like Shasta Parker comes
on shift, how is she informed about the medical issues
that a particular inmate might have had?

        MR. MCCAULEY:  Objection.  Vague.

    A    She may have just been informed that she's on
a medical watch due to multiple medical issues that
we're not aware of and just waiting to get more answers
from medical.

    Q    Okay.  Was there a standard way for the person
to know?

    A    To know what?

    Q    Well, to know what the medical issues were
that we're putting that person on medical watch?

Page 180

    A    Typically, if we knew the medical issue that
caused them to be put on a medical watch, yes, but in
this case, we didn't.  So we, essentially, just were
waiting to get more answers.

    Q    Understood.  I'm just under -- I'm trying to
understand what -- how someone like Shasta Parker would
learn that, learn just whatever it is.  A, we don't
know.  This person has a fever.  This person appears to
have a cough, whatever it may be.  You know, there seems
to be a risk of seizures.  Whatever the condition is
that you're putting in them, whether you know it or
don't, is there a procedure for just saying, this is why
they're on medical watch?

    A    We would typically, again, just verbally pass
it on.  If there was more details, sometimes it would be
written on the watch log as well.

    Q    Okay.  So you'd pass -- you said it'd be
written on the watch log?

    A    Yep.  At the top where it says --

    Q    Meaning --

    A    -- "Observation."

    Q    Okay.  Meaning it'd be written on this sheet
somewhere?

    A    Where it says what type of observation log,
there may be a little note next to it saying what type

Page 181

of medical watch.

    Q    Okay.  So you may have overlapped with Shasta
Parker here, as we just reviewed, right?

    A    Yes.  And Lucas --

    Q    And -- go ahead.  I'm sorry.

    A    I said and Lucas, yes.

    Q    Right.  And you may have passed on the
information that way; is that right?

    A    Yeah.  Or Lucas.

    Q    Right.  You or Lucas may pass it on, correct?

    A    Uh-huh.

    Q    Is there -- how would this person down here,
number 71, which is Mike Wendell [sic], how would -- who
-- how would that person learn if you didn't overlap
with him?

    A    Well, being that people have to be there,
there's typically somebody clocking in as we're clocking
out.  So there's just verbal pass on.  If he showed up
after we had already clocked out, Shasta may have passed
on that information.

    Q    Okay.  So it would be -- and then down here,
number 65, same thing?  Maybe word of mouth again?

    A    Essentially, yes, unless an e-mail was sent
out by somebody.

    Q    Was there any procedure to send e-mails out



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 182

1  like that, to say what people are on medical watch for?
2      A    Not necessarily, no.
3      Q    Was there any -- there's sometime -- some
4  places have a shift muster where, you know, the shift
5  shows up and the person, kind of, marches through here
6  are the issues today.  Anything like that?
7      A    Pass on.  That's what we would tell the next
8  person coming on, what happened and stuff like this that
9  they would need to know.
10     Q    Okay.  So sometime after 6:42, your shift
11 ends, and I imagine you go home and go to sleep until
12 your next shift starts, right?  Or --
13     A    Go to sleep.  Yeah, I don't know whatever I
14 did afterwards.
15     Q    Shopping, whatever.  You're not at the jail,
16 right?
17     A    Correct.
18     Q    Okay.  And then your shift resumes, I believe
19 you said, at 6:00 the next evening?
20     A    That following night, yes.
21     Q    Okay.  Now, the first entry that I had -- so
22 we're looking now at the 22nd, right?  The evening of
23 the 22nd on Bates 1103.  Is that your read on this?
24     A    Can you scroll up a little?
25     Q    Sure.

Page 183

1      A    Yep.
2      Q    Okay.  And the first time I see you on the
3  evening of the 22nd is 11:17 p.m.  Do you see that?
4      A    Yes.
5      Q    Do you know you were doing between 6:00 and
6  11:27 -- 11:17, I'm sorry?
7          MR. MCCAULEY:  Object to form.
8      A    Between 6:00 and 10:00, I was working in
9  housing because Shasta was working in booking, and then
10 I came up front at 10:00.  And between Lucas and myself,
11 we completed the cell checks.
12     Q    Okay.  How do -- do you -- is that something
13 you just happen to recall because of the events of the
14 day, or is that something that you've seen a document to
15 refresh your recollection?
16     A    I recall being in booking -- I mean housing
17 from 6:00 to 10:00 and going up front at 10:00 after
18 Shasta -- at the end of Shasta's shift.
19     Q    Okay.  When you came on, you would've come on
20 around 6:00, right?
21     A    Yeah, but I would've been in housing.
22     Q    Understood.  Understood.  Did you -- what was
23 your process for when you came on?  I think we talked
24 about reviewing e-mails earlier.  Is that something you
25 would do when you came on or

Page 184

1          MR. MCCAULEY:  Object to form.
2      A    I mean, clock in and depending on the
3  situation of the day, yeah, either check e-mails or go
4  do a cell check or
5      Q    Okay.  And if you're the sergeant, I believe
6  if Lieutenant Hallman and Captain Hendrickson aren't
7  there, you're likely the senior officer at the jail,
8  right?
9      A    Yes.
10     Q    Is there some sort of administrative
11 obligation you have at some point to just check your
12 e-mails?
13         MR. MCCAULEY:  Object to form.
14     A    Not necessarily an obligation, but every staff
15 was required to at least check e-mails so they were
16 aware of what was going on if somebody sent out
17 pertinent information.
18     Q    Okay.  Are you able to see an e-mail -- a
19 printed out e-mail that has Stan Hendrickson at the top?
20     A    I see that, yes.
21     Q    Okay.  We'll mark this as Exhibit 9.  It
22 actually should not be a lot of pages.  I only need for
23 it to be one.  So I'll clip everything off, but it's
24 Monroe County 88.  I just want to write it down.  And
25 it's a 6:02 p.m. e-mail from Amber Fennigkoh to several

Page 185

1  people, you, Lucas Runice, Shasta Parker, and Kyle Moga.
2  Do you see that?
3          (EXHIBIT 9 MARKED FOR IDENTIFICATION)
4      A    Yes.
5      Q    So real quickly, Shasta -- did you -- first,
6  did you see this e-mail as part of your preparation of
7  your deposition today?
8      A    Yes.
9      Q    Okay.  Do you remember -- do you have an
10 independent recollection of this e-mail?
11     A    Vaguely, yes.
12     Q    What's your recollection?
13     A    Just that we were informed her husband was
14 going to be dropping off meds.
15     Q    Okay.  Do you know why Shasta -- what -- to go
16 back to the log here, Shasta Parker comes on at, it
17 looks like, quarter after 6:00 in the morning, and she's
18 still there at 6:00 p.m. and as -- you know, she stays
19 even later, right?
20     A    Sometimes staff were required to stay to fill
21 in for somebody who called in or volunteer at the time
22 to stay until 10:00.
23     Q    Okay.  Do you know whether that's why Shasta
24 was still there?
25     A    I believe she was there, so yeah, I don't know

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1 if somebody called -- I can't remember if somebody
2 called in or she picked up overtime.
3    Q    Okay.  Do you recall who was on the night
4 shift on the 22nd?
5    A    After Shasta left or while she was there?
6    Q    I guess when you showed up at 6:00, around
7 6:00.
8    A    I believe it was Lucas, Shasta, Kyle, and Jeff
9 Schwanz.
10    Q    Okay.  I guess, you know, I'm trying to figure
11 out a question you don't know the answer to, which is
12 why Amber Fennigkoh is e-mailing these particular
13 people.  I'm assuming you don't know, but do you?
14    A    Know what?
15    Q    Know why Amber Fennigkoh would be e-mailing
16 the particular people on Exhibit 9, you, Lucas Runice,
17 Shasta Parker, and Kyle Moga?
18    A    Because we were working that night.
19    Q    Okay.  And then there was another person who
20 wasn't working, right?  Or who was working who was not
21 on this e-mail.  You said it was?
22    A    Jeff Schwanz.
23    Q    Okay.  So it says, "Christine's husband, Greg,
24 called and said he was going to bring some meds in for
25 her."  Do you see that?

Page 187

1    A    Yes.
2    Q    "He also indicated he was going to stop
3 Gundersen and get a prescription list and bring it in
4 along with a potential diagnosis list."  Do you see
5 that?
6    A    Yes.
7    Q    Okay.  Was it normal for relatives of people,
8 who might have prescriptions or medical needs, to bring
9 in prescriptions and diagnosis lists for detainees at
10 the jail?
11        MR. KNOTT:  Object to form and foundation.
12    A    I recall mostly just people dropping off meds,
13 not diagnosis lists.
14    Q    Okay.  And what were your instructions when
15 folks came in with meds -- relatives or friends came in
16 with meds, what was the procedure for dealing with those
17 meds?
18    A    Again, we would count them, and fill out the
19 med verification sheet, and if needed, call the doctor
20 or pass it on to medical.
21    Q    Okay.  And so you said that you -- going back
22 to Exhibit 8 here -- you were not in booking between
23 6:00 and around, I believe you said, 10:00; is that
24 right?
25    A    Between 6:00 and 10:00, I was working in back.

Page 188

1    Q    When you came on to the night shift, do you
2 recall -- beyond Ms. Fennigkoh's e-mail here, do you
3 recall receiving any information about Christine Boyer's
4 medical condition from anybody?
5    A    Her medical condition, no.
6    Q    Yeah.  How she was doing that day?
7    A    No.
8    Q    Nobody told you anything about her having
9 experienced chest pain during the day?
10        MR. MCCAULEY:  Object to form.
11    A    No.
12    Q    And did anybody tell you about her
13 experiencing high blood pressure at any point during the
14 day?
15        MR. MCCAULEY:  Object to form.
16    A    No.
17    Q    You see here at 7 -- well, strike that.
18 We talked about you sending e-mails or receiving
19 e-mails. Where would typically do that?
20        MR. MCCAULEY:  Object to form.
21    Q    What -- you know, where are you sitting at the
22 computer typing stuff down when you're working at the
23 jail?
24    A    Would depend on what computer you were sitting
25 at.

Page 189

1    Q    Okay.  Where were the computers?  There's one
2 in booking that we talked about, right?
3    A    There's three in booking.
4    Q    Okay.
5    A    One -- one in master.  I believe three in
6 housing.
7    Q    Okay.  Sorry.  Just -- opening a document
8 here.  Okay.  So let me introduce Exhibit 10 here. Let's
9 see.  And this is a document Bates marked 4519. Ms.
10 Warren -- or Ms. Nelson, do you -- is this a document
11 that you looked at in preparation for your deposition?
12        (EXHIBIT 10 MARKED FOR IDENTIFICATION)
13    A    No.
14    Q    Okay.
15        MR. MCCAULEY:  Can you zoom in a little bit
16 more, Steve?
17        MR. WEIL:  Sure.  Absolutely.  That's about as
18 much as I can go without cutting off the screen.
19        MR. MCCAULEY:  Yeah, that's good.
20 BY MR. WEIL:
21    Q    I'm not going to get into detail in this
22 document.  It has -- this is you e-mailing at 10:50 p.m.
23 Do you see that?
24    A    Yes.
25    Q    On the evening December 22nd.  And it says,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 "Hello. Here [sic] are the reports I [sic] entered for
2 Jesse Kirk and Thomas Carpenter after completing
3 tonight's med pass." Do you see that?
4     A    Yes.
5     Q    What are the -- what are the reports -- I'm
6 assuming you don't recall these particular -- two
7 particular people, but what is a report, if you know? So
8 why would you be doing this?
9     A    I believe I'd put them on Zuercher where we
10 would enter our reports, and we would do that to note,
11 like, these inmates were potentially cheeking their
12 meds.
13     Q    Okay. And so these might be, sort of,
14 problematic interactions that you had or interactions
15 that you thought that the nurse and the jail supervisor
16 should know about?
17     A    Yes, because it --
18     Q    Okay.
19     A    -- attempting to cheek meds. That is just
20 something for them to be aware of.
21     Q    Okay. I -- Ms. Nelson, your memory's really
22 consistent with this document. So it says at 7:25 p.m.,
23 you were completing med pass on pod 2. That's roughly
24 what you just told us, that you were out in the housing
25 unit, and then it looks like you're entering this, you

1 know, several hours later at 10:50, right?
2     A    Yes.
3     Q    I'm assuming that'd be after you completed
4 your work in the pod and were back in an area where
5 you're using the computer; is that right?
6     A    Yes.
7     Q    Do you remember where -- sorry. Go ahead.
8     A    No, I just said, yes. Sorry.
9     Q    Okay. Do you remember -- do you -- given your
10 habits and the way you worked there, do you remember
11 where that would be, where you would typically be doing
12 an entry like that?
13     MR. MCCAULEY: Object to form.
14     A    I don't recall. I mean, if it was after
15 10:00, I may have been in booking or I may have been in
16 master. I don't recall where I was when I wrote that
17 e-mail.
18     Q    Understood. So you could log in from various
19 places, right?
20     A    Yes.
21     Q    And so you may have been in booking and
22 the other place you said was where?
23     A    Master control.
24     Q    Master control. Okay. And is that -- that's
25 near booking, right?

1     A    It's connected to booking, yes.
2     Q    Okay. It was the -- just to pull up real
3 quickly -- bear with me. Ms. Nelson, I can't believe
4 you're bored. We're almost done. I don't have much
5 more. So that would be -- the master control would be G
6 in Exhibit 1; is that right?
7     A    Yes.
8     Q    Okay. Anywhere else where you would typically
9 be doing an entry like that?
10     MR. MCCAULEY: Object to form.
11     A    Could have been done in housing, but I assume,
12 based on the time of the e-mail, I was not in housing.
13     Q    Okay. So you had particular tasks to perform
14 in housing and then you'd come back to the booking area?
15     A    I worked booking because Shasta was done for
16 the night. So I went back up front because somebody
17 needed to be up front.
18     Q    Understood. So when did -- do you recall when
19 Shasta ended for the night?
20     A    When she was done for the night?
21     Q    Yeah.
22     A    10:00.
23     Q    Okay. Do you -- and how did you know to come
24 back to booking to relieve her?
25     A    Because she was done at 10:00. That was just

1 the schedule --
2     Q    Okay.
3     A    That was her schedule for the day. Yeah.
4     Q    Okay. So it was outside of the normal shift
5 hours, but there -- it was outside normal shift hours,
6 but you knew that in advance, that she was going to be
7 done at 10:00, correct?
8     A    Yes.
9     Q    Okay. When she -- you and her did a pass off,
10 did she talk to you about Ms. Boyer at all?
11     A    I do recall her telling me she did a protocol
12 and that she had to recheck her blood sugar or -- I'm
13 sorry, blood pressure. And that it was normal after she
14 rechecked it, and there was no further instruction.
15     Q    Okay. Do you recall her saying that she had
16 talked to a Lisa Pisney?
17     A    Just that she did the protocol, called her,
18 and was instructed to give her whatever she had to give
19 her, and then rechecked her blood pressure after a
20 certain period of time, which she had done, and
21 everything was normal.
22     Q    And did she tell you -- were there any further
23 instructions besides that?
24     A    I don't recall. She just said she had to
25 recheck the blood pressure, and it was fine.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 194

1    Q    Okay.

2    A    That's all I remember.

3    Q    So she told you about a chest pain protocol

4    that she had done for Ms. Boyer and a blood pressure

5    issue that Ms. Boyer had had, right?

6         MR. MCCAULEY:  Object to form.

7    A    The chest pain protocol, but -- which included

8    doing the blood pressure check.

9    Q    Right.  Did she --

10   A    Yes.

11   Q    Beyond just informing you about what she had

12   done and Ms. Boyer's experience, did she leave you any

13   special instructions about Ms. Boyer besides that?

14   A    No.

15   Q    Okay.

16   A    Not I remember.

17   Q    Okay.  Just pulling back the log again.

18   So you said you came back up at 10:00; is that right?

19   A    Yes.

20   Q    Okay.  And there's -- it looks like Lucas

21   Runice comes back up as well, 58?  I'm looking at --

22   we're looking at Exhibit -- apologies, Exhibit 8.  I'm

23   looking just at the log entries; is that right?  That

24   would be Lucas Runice coming back up and making checks?

25   A    He was working in master at the time.  I don't

Page 195

1    recall if we swapped for a little bit and I worked in

2    master or if I was doing paperwork in master and then we

3    just -- he helped out doing checks.

4    Q    My notes are imperfect here.  I believe you

5    said Lucas Runice was 58, right?

6    A    Yes.

7    Q    Okay.  And so you said -- I'm sorry, he was

8    working in master?

9    A    At the start of the shift, yes.  I don't

10   recall if when I came up at 10:00, he took over in

11   booking for a little bit or if he just helped do checks

12   while I was doing paperwork in master.

13   Q    Okay.  But, again, as in the night before, it

14   was the two of you in the booking area, correct?

15   A    Yes.

16   Q    Okay.  And then it looks like Mr. Runice is

17   doing the checks for -- you know what?  Let me back up

18   real quickly.  Did Shasta Parker discuss Ms. Boyer with

19   you and Lucas Runice or just you; do you remember?

20   A    I believe it was just me, because he was

21   working in master, but she can't leave that.  Somebody

22   always has to be in there.

23   Q    Okay.  And do you recall anybody else working

24   in booking at the time?

25   A    I don't recall anybody else working in

Page 196

1    booking.

2    Q    Okay.  The -- after, I guess, your first

3    check, just looking at Exhibit 8, it's 11:15 p.m.,

4    right?

5    A    Yes.

6    Q    And you record Ms. Boyer sleeping -- well, you

7    and Lucas record Ms. Boyer sleeping through, it looks

8    like, 00:36, right?

9    A    Yes.

10   Q    Okay.  Do you recall Ms. Parker calling back

11   about Ms. Boyer?  Calling into booking about Ms. Boyer

12   after she left?

13   A    I did not know about it --

14        MR. MCCAULEY:  Object to form.

15   A    I did not about it until after the whole

16   incident, and then I was informed she had called.

17   But during the time she called, I did not know.

18   Q    Okay.  And she -- I believe you discovered

19   that Ms. Boyer was having a heart attack, correct?

20        MR. MCCAULEY:  Object to form.

21   Q    Or was having a --

22   A    I --

23   Q    Was having -- I don't -- I'm not asking your

24   opinion as a medical professional, but was in a medical

25   crisis, right?

Page 197

1        MR. MCCAULEY:  Object to form.

2    A    I saw her -- the last time I saw her prior to

3    the incident, she was sitting on her bunk, putting a

4    towel around her eyes to lay down.  And then I was

5    informed by Officer Runice, Lucas, who is in master,

6    who observed, I believe, on camera that she had rolled

7    off her bunk, and he informed me of that.  And that's

8    when I went into her cell.

9    Q    How did he inform you of that?

10   A    I believe he called me on the phone.

11   Q    Where were you?

12   A    In booking.

13   Q    Okay.  So right next door to master, but

14   separated by a wall?

15   A    Yes.

16   Q    Okay.  And who is 96 here, if you know?

17   A    That was Jeff Schwanz.

18   Q    So when Mr. Runice calls you in booking, I'm

19   assuming you rush over to Ms. Boyer's cell and go in,

20   and that's when you found her in the state she was in;

21   is that right?

22   A    Yes.

23   Q    Okay.  Now, when did Mr. Schwanz come back to

24   the booking area?

25   A    Probably within a couple minutes, if that, of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 198

1 me going into her cell and then calling for assistance.
2 Him and Kyle came up front to help.
3 　　Q　Okay. So they had not been in booking. They
4 came to booking after you put out a call for assistance?
5 　　A　Yes.
6 　　Q　Okay. And that was over a radio?
7 　　A　Yes.
8 　　Q　Okay. We're almost done here, Ms. Nelson.
9 Thank you for bearing with me. All right. This will be
10 Exhibit 11, and it's a document Bates marked 6112 Monroe
11 County. Is this one of the documents that you reviewed
12 in preparation for your deposition, Ms. Nelson?
13 　　　　(EXHIBIT 11 MARKED FOR IDENTIFICATION)
14 　　A　Yes.
15 　　Q　Okay. Do you recall writing this document,
16 this e-mail?
17 　　A　I did not write the bolded stuff, but I
18 believe that was copied and pasted from a log that Lucas
19 had done.
20 　　Q　Okay. And so Lucas wrote a log entry, and you
21 copied and pasted the log entry into an e-mail to a Ryan
22 Hallman and Stan Hendrickson; is that right?
23 　　A　Yes.
24 　　Q　Okay. Is there anything -- having reviewed
25 this in preparation for your deposition, was there

Page 199

1 anything that you thought was inaccurate in this entry?
2 　　　　MR. MCCAULEY: Object to form. Vague.
3 　　A　Can I have a minute to read it, please?
4 　　Q　Of course.
5 　　A　It appears accurate.
6 　　Q　Okay. I'll mark this next document as Exhibit
7 12. It is document Bates marked Monroe County 6457 to
8 6458. Ms. Nelson, is this a document that you reviewed
9 in preparation for your deposition today?
10 　　　　(EXHIBIT 12 MARKED FOR IDENTIFICATION)
11 　　A　Yes.
12 　　Q　I'm happy to have you review it again here,
13 but in reviewing it, was there anything inaccurate in
14 this summary?
15 　　　　MR. MCCAULEY: Object to form.
16 　　A　Was there anything inaccurate in the report?
17 　　Q　Yes.
18 　　A　No.
19 　　Q　Why did you write this report?
20 　　A　Reports are required to be written in any sort
21 of medical incident or major incident involving inmates.
22 　　Q　Is that a written procedure, or is that
23 something you just understood, or how did you know to do
24 that?
25 　　A　I believe it was a written procedure, policy,

Page 200

1 and it was just something you were -- I was taught
2 during my training at Monroe.
3 　　Q　And where would this report be sent? Who
4 would it be sent to?
5 　　A　If it --
6 　　　　MR. MCCAULEY: Object to form. Foundation.
7 　　A　If it didn't have a case number, it was just
8 saved in the jail. If it had a case number, it would be
9 sent to the sheriff's office here where whoever's in
10 charge of reports over here would handle it. And
11 depending on if somebody was receiving charges, the DA
12 would also get reports. I don't know where exactly this
13 report went to. I know that one of the detectives
14 investigated the whole thing. And so I don't know where
15 else the report went.
16 　　Q　This says, "Typed by Danielle Warren." Do you
17 see that?
18 　　A　Yes.
19 　　Q　And that's you, right?
20 　　A　Yes.
21 　　Q　Okay. And then it says, "Incident Report,"
22 and it has a case number below it, right?
23 　　A　Yes.
24 　　Q　And so that -- is that the case number that
25 you were referring to a moment ago?

Page 201

1 　　A　Yes.
2 　　Q　And how would you be informed that something
3 had a case number? How would you be told that there was
4 -- an incident had a case number attached to it?
5 　　A　If somebody was receiving charges or referral
6 of charges to the DA, we would do a case number. If we
7 attached it to a road officer's case number, we would
8 use it. This incident, specifically, I don't remember.
9 I believe, due to the significance of the incident, with
10 a medical emergency that required somebody to leave to
11 go to the hospital, a case number was created for it.
12 　　Q　Do -- I -- that all makes sense. So I guess
13 I'm asking a slightly more just basic question. How
14 would you be told that there was a case number for this
15 incident?
16 　　A　I mean, after the fact or as I'm writing it,
17 how would I be told that a case number was needed?
18 　　Q　Right. I guess the way I read this is you're
19 typing this out, and you're saying this is an incident
20 report for case number, and then it provides a case
21 number. How would you be told that, this was an
22 incident that has a case number?
23 　　A　I don't recall how we established a case
24 number for this one. I don't remember what the
25 reasoning was. I don't know if, like -- oh, I believe



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  it was because law -- law enforcement and EMS were
2  called.  So there was a case already created for this
3  due to EMS and law enforcement being called, and I think
4  we attached it to that case number.
5      Q   I got you.  Ms. Nelson, I guess I'm just
6  asking a really -- and maybe this is just a basic
7  question, that it sounds silly.  Just -- would somebody
8  say there has been a case -- would you get an e-mail
9  saying, look, this case has been opened.  There's a case
10 number?  Would a person come to you and say there's a
11 case number that's been opened for the (inaudible) a
12 report?  Just not the why, but the how, if that makes
13 sense?
14     MR. MCCAULEY:  Object to form.
15     A   I guess whoever typically started the report
16 and created the case number themselves or attached it to
17 a case number could e-mail the other staff to say this
18 is the case number for the Christine Boyer incident,
19 attach the report to that case number.
20     Q   Were you interviewed by anybody in the
21 aftermath of -- and I'm not talking about your lawyer --
22 just anybody at the jail in the aftermath of Ms. Boyer's
23 medical incident about what happened?
24     A   No.
25     Q   Did -- does Jeff -- the name Jeffrey Spencer

Page 203

1  ring a bell?
2      A   Yes.
3      Q   Did Mr. Spencer ever interview you about what
4  happened --
5      A   No.
6      Q   -- with Ms. Boyer?
7      A   No.
8      Q   No?  Okay.  And no one else did, right?
9      A   No.  Like, a proper interview, no.  No.
10     Q   What do you mean "a proper interview"?
11     A   I mean, I sat down with the captain and
12 lieutenant after the incident, but they didn't interview
13 me.  They basically just made sure I was okay and that
14 the rest of the staff were okay, but no, like, formal
15 investigation interview.
16     Q   Okay.  This will be Exhibit 13, and it's a
17 document Bates marked Monroe County 4529 through 4530.
18 Ms. Nelson, is this a document that you reviewed in
19 preparation for your deposition?
20         (EXHIBIT 13 MARKED FOR IDENTIFICATION)
21     A   Yes.
22     Q   Okay.  Ms. Parker here talks about "having
23 this weird feeling I needed to call the jail at the
24 [sic] exact moment and I wanted to see if I had done
25 everything I was supposed to do" -- or, "I was supposed

Page 204

1  to."  Do you see that?
2      A   Yes.
3      Q   Okay.  And apparently, she got in touch with
4  Lucas Runice; is that right?
5      A   Yes.
6      Q   If I understand your description of what
7  happened earlier in discovering that Ms. Boyer had a
8  medical incident, Lucas Runice alerted you.  You went to
9  the cell.  You called for support, and two other
10 officers arrived.  And it sounds like -- from this
11 e-mail, it sounds like Lucas Runice stayed in the
12 master; is that right?
13     A   That Lucas what?  I'm sorry.
14     Q   That he stayed in the master so that he could
15 receive this phone call?
16     A   Yeah, he was --
17     Q   Or he was --
18     A   He was in --
19     Q   Go ahead.  I'm sorry.
20     A   He was in master at the time of this, yes.
21     Q   Okay.  So he remained in master and happened
22 to receive this phone call because he remained in
23 master?
24     MR. MCCAULEY:  Object to form.
25     A   Yes.

Page 205

1      MR. KNOTT:  Steve, I don't know how you're
2  proceeding now.  Are you mark -- are identifying
3  these as exhibits and will they be attached to a
4  transcript, or are you just --
5      MR. WEIL:  I -- sure.  I identified this as 13.
6  And what I've done with Kentuckiana is I e-mail them
7  all the documents I identify after the deposition is
8  over.  And so that's how I'd like to proceed.  I'd
9  be happy to e-mail you courtesy copies if you like.
10     MR. KNOTT:  Please.  Thanks.
11     MR. WEIL:  Okay.
12 BY MR. WEIL:
13     Q   This -- you've read this e-mail.  So Ms.
14 Parker is describing that Kyle Moga as being upset,
15 right?
16     A   I read that he's having a tough time, yes.
17     Q   Okay.  Do you remember Mr. Moga being upset at
18 the time?
19     MR. MCCAULEY:  Object to form and foundation.
20     A   I --
21     MR. MCCAULEY:  Speculation.
22     A   I do not recall.  I did not realize Kyle was
23 having a hard time with it until Shasta told me.
24     Q   Okay.
25     MR. WEIL:  Why don't we take five minutes?  And

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1   I may be -- I'm very close to done, if not done.
2       MR. MCCAULEY: Okay. Great. Yeah. We'll see
3   you in five minutes.
4       MR. WEIL: Okay.
5       COURT REPORTER: We are off the record at 3:42
6   p.m.
7       (OFF THE RECORD)
8       COURT REPORTER: We are back on the record for
9   the deposition of Danielle Nelson, being conducted
10  by videoconference. My name is Krystal. Today's
11  date is February 24, 2022, and the time is 3:48 p.m.
12  BY MR. WEIL:
13      Q   All right, Ms. Nelson. We're almost done. I'm
14  going to pull up another document here. This is Exhibit
15  14, and this is document Bates marked Monroe County
16  1105. It's a December 23, 2019 narrative note signed by
17  -- I believe that's Amber Fennigkoh. Do you see that
18  signature down there, Ms. Nelson?
19      (EXHIBIT 14 MARKED FOR IDENTIFICATION)
20      A   Yes.
21      Q   Okay. And I think that looks like the other
22  signature of Amber Fennigkoh that we talked about today,
23  right?
24      A   Yes.
25      Q   Very quickly I had a question. Is this a

Page 207

1   document that you read in preparation for your
2   deposition today?
3       A   Yes.
4       Q   Okay. I just have a question down here on the
5   0118 entry. Can you see that?
6       A   On which one?
7       Q   0118.
8       A   Yep.
9       Q   Do you see that?
10      A   Yes.
11      Q   Okay. It says, "This RN is [sic] notified
12  about incident." Do you see that?
13      A   Yes.
14      Q   Do you recall notifying Ms. Fennigkoh about
15  this incident?
16      A   I do not.
17      Q   Okay. Do you recall communicating with
18  Ms. Fennigkoh immediately after Ms. Boyer's medical
19  incident?
20      A   I do not recall, no.
21      Q   Do you recall learning about an instruction --
22  there's a line here that says Ms. Fennigkoh "offered to
23  come in and assist in communication with hospital. Staff
24  declined." Do you see that?
25      A   Yes.

Page 208

1       Q   Do you recall anyone letting you know that
2   Ms. Fennigkoh had offered to come in and assist with
3   communication with a hospital?
4       A   I do not remember. Honestly, after the
5   incident, there was a lot. It was a whirlwind. I don't
6   remember.
7       Q   So you don't remember learning about her
8   coming in to offer with help?
9       A   No.
10      Q   Okay. The next line says, "RN instructed
11  staff to send all patient info via fax to GHS and gave
12  info via phone on how to do so." Do you see that?
13      A   Yeah, I don't recall.
14      Q   Okay.
15      A   She may have called in the master and spoke
16  with Lucas about this. I don't recall talking to her on
17  the phone.
18      Q   Okay. So it sounds like you don't recall
19  getting this instruction, right?
20      A   Yeah, no.
21      Q   And you don't -- do you recall anybody telling
22  you that -- about this instruction?
23      A   No.
24      Q   Okay. And the last line here is,
25  "RN instructed staff to call with any issues and that RN

Page 209

1   would be in prior to the [sic] shift to follow up with
2   staff." Do you see that?
3       A   Yes.
4       Q   Okay. And do you recall Ms. Fennigkoh telling
5   you anything like that?
6       A   No.
7       Q   Okay. Below it says, "Staff indicated
8   patient's husband was in the lobby as he had brought
9   meds in." Do you see that?
10      A   Yes.
11      Q   Do you recall knowing that Mr. Boyer was in
12  the lobby of the jail around the time Ms. Boyer had her
13  medical incident?
14      A   Yeah. During the incident, I do remember -- I
15  don't remember who said or how I was informed that he
16  was in the lobby, but we were dealing with Ms. Boyer at
17  the time.
18      Q   Okay. Before you learned that Ms. Boyer was
19  having a medical crisis, did you know Ms. Boyer --
20  Mr. Boyer was at the jail?
21      A   No, I believe he showed up after the medical
22  incident.
23      Q   Okay. Did you -- it says -- the next line
24  says, "Staff went to alert husband of medical emergency
25  and that he should report to Mayo La Crosse." Do you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 210

1  see that?
2      A    Yes.
3      Q    Do you know -- do you recall someone in the
4  jail staff talking to Mr. Boyer?
5      A    I recall after Boyer was taken by EMS, we were
6  instructed to go let -- like, Hendrickson, he informed
7  us we could let her husband know what had happened, and
8  I believe Jeff was the one who went and spoke to him.
9      Q    Okay.  That'd be Jeff --
10     A    Schwanz.
11     Q    -- Schwanz?
12     A    Schwanz.  Yep.
13     Q    Okay.  Okay.  This is -- we'll mark this as
14  Exhibit 15.  It's a document Bates marked Monroe County
15  4846.  Do you see that?
16         (EXHIBIT 15 MARKED FOR IDENTIFICATION)
17     A    Yes.
18     Q    Okay.  Ms. Nelson, is this a document you
19  reviewed in preparation for your deposition?
20     A    Yes.
21     Q    Was that a yes?
22     A    Yes.
23     Q    Okay.  So this is an e-mail from Ms. Fennigkoh
24  to you and several other people.  It's 3:40 a.m. on the
25  morning of the 23rd, right?

Page 211

1      A    Yes.
2      Q    Okay.  And that's just a couple hours after
3  Ms. Boyer's medical incident, right?
4      A    Yes.
5      Q    Do you remember if -- did Ms. Fennigkoh come
6  in at any point in the morning after -- on your shift
7  after Ms. Boyer's medical incident?
8      A    I do remember her coming in before the end of
9  my shift.  I didn't remember what time, but yes.
10     Q    You do remember her coming in before the end
11  of your shift?
12     A    Yes.
13     Q    Okay.  This says at the bottom, "Let me know.
14  I'll be in in the morning."  Do you see that?
15     A    Yes.
16     Q    Okay.  Would that indicate to you that she
17  hadn't come in at that time?
18     A    Yeah.  I don't believe it was that early, but
19  I know it was before I left for the day she did come in.
20     Q    Okay.  This will be Exhibit 16.  It's a
21  document Bates marked Monroe County 3 -- I'm sorry,
22  Monroe County 13680.  It's titled "Monroe County Jail
23  staff/medical staff working on" some dates "during
24  Christine Boyer's incarceration."  Do you see that?
25         (EXHIBIT 16 MARKED FOR IDENTIFICATION)

Page 212

1      A    Yes.
2      Q    I'm just -- I'm showing this to you just to
3  see if it jogs your recollection about who was in the
4  jail at any particular time.  So going to the first
5  shift that you had when Ms. Boyer came in -- so this is
6  the 21st to the 22nd, right?  So I believe that we have
7  -- on this shift we have you, Danielle Warren listed
8  here, Lucas Runice, and then I think you said -- you did
9  talk about -- well, why don't I stop there and just have
10  you see if you remember anybody else being with you on
11  that first shift, the 22nd -- the 21st to the 22nd.
12     A    I recall Lucas, Kyle, and Jordan being on my
13  shift.  I don't remember if Leslie was off training yet,
14  but the other ones -- everybody else was on day shift.
15     Q    Okay.
16     A    And Shasta was also --
17     Q    And --
18     A    Sorry.
19     Q    I'm sorry.  Go ahead.  Sorry.
20     A    And Shasta was also night shift, but I believe
21  she had picked up overtime or shift swaps.
22     Q    Are you talking about on the first shift or
23  the second shift?  I'm sorry.  So I'm mixing up terms
24  here, I know.  We'll call it day one and day two; is
25  that fair?

Page 213

1      A    I --
2      Q    So day one being 21st to 22nd.  Day two being
3  22nd to 23rd.
4      A    Okay.
5      Q    Okay.  So on day one, it's -- you recall you,
6  Lucas, Kyle, Jordan.  We've talked about Amber Fennigkoh
7  being there, right?
8      A    Yes.
9      Q    Anybody else?
10     A    On my shift that night, I don't recall anybody
11  else, no.
12     Q    Okay.  You mentioned Shasta Parker, but we've
13  talked about her being on day two, right?
14     A    (Inaudible).  I believe -- if there was
15  anybody else on the day one night, it may have been
16  James Tucker in master that night for a little bit.
17     Q    Okay.
18     A    If Lucas was out in booking with me, that may
19  be because James was also (Inaudible), but I don't
20  remember.
21     Q    Does someone have to be in master at all
22  times?
23     A    Yes.
24     Q    Okay.  So if you and Lucas were out in the --
25  assisting with Ms. Boyer's intake as we've discussed,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 214

1 then someone else would need to have been in master?

2  A  Yes.

3  Q  Okay.  All right.  Then for -- anybody else

4 for day one, Ms. Nelson?

5  A  No.  Not on my shift that I recall, no.

6  Q  Okay.  Then -- and I am just asking about your

7 shift.  For day two, the 22nd to 23rd shift, we have

8 Lucas so far.  And if you would just -- I know we've

9 discussed other folks, but I don't want to mess this up.

10 Can you just go down the list there and tell me if

11 anybody else was there?

12  A  Shasta was 6:00 to 10:00, and then Kyle and

13 Jeff Schwanz were also working.

14  Q  You said someone before Kyle, and I -- oh,

15 Shasta Parker.  Sure.

16  A  Yep.

17  Q  Okay.  Okay.  So for the second -- on day two

18 I have you, Lucas Runice, Kyle Moga, Jeff Schwanz,

19 Shasta Parker.  Anybody else?

20  A  Not that I recall.  I believe that Phil Greeno

21 came in really early on that night after the medical

22 incident.

23  Q  Okay.  So he would have been after the

24 incident occurred?

25  A  Yeah.

Page 215

1  Q  Is there anybody you recall who is not on this

2 list being on your shift on either day one or day two?

3  A  No.

4  Q  Okay.  Going back really quickly to day one

5 and James Tucker, do you recall communicating with

6 Mr. Tucker at all about Ms. Boyer?

7  A  No.  If he was working, he would only have

8 been in master control.  That was his only position he

9 could work, and he wouldn't really be involved with the

10 booking.

11  Q  Okay.  Master control, among other things, is

12 where there's monitors for CCTV; is that right?

13  A  Yep.  With all the booking cells and booking

14 and then the rest of the jail, yes.

15  Q  Okay.  So that's, sort of, a central nervous

16 system for the jail?

17  A  It's, like, the main control that basically

18 controls the exterior of the jail and then can control

19 -- ultimately take over control of the whole jail.

20  Q  All right.  This may be the last document, and

21 we'll get you out of here, Ms. Nelson.  This is a

22 document Bates marked 17.  It's Monroe County 1100.

23 Do you see this document with a grid, sort of, in front

24 of you?

25        (EXHIBIT 17 MARKED FOR IDENTIFICATION)

Page 216

1  A  Yes.

2  Q  Okay.  Is this a document you reviewed in

3 preparation for your deposition?

4  A  Yes.

5  Q  Is that a yes?

6  A  Yes.

7  Q  Okay.  Do you recognize anybody's handwriting

8 on this document?

9  A  From what I'm familiar with, the top writing

10 looks like Brooke, and then the bottom half and, kind

11 of, lighter handwriting looks like Shasta's writing.

12  Q  All right.  Where are you dividing the line

13 there between Brooke and Shasta?

14  A  Right there and up is Brooke.

15  Q  Okay.  So there's two entries for

16 "BP recheck," right?

17  A  There's also that "clonidine one-time dose."

18 That looks like that could be somebody else's writing,

19 but I don't know who.

20  Q  Okay.  So let's take it from the top here.

21 "ProAir HFA," to you that looks like Brooke's

22 handwriting?

23  A  Yeah.  Can you zoom in a little bit, please?

24  Q  Sure.  Let me get over there.

25  A  Yeah.

Page 217

1  Q  Can you see it okay?

2  A  No.  Okay.

3  Q  We'll just go down the list.  "ProAir HFA,"

4 you're saying -- if I understood you correctly, this

5 looks like Brooke Dempsey's handwriting?

6  A  Yeah, it kind of looks like Brooke's.

7        MR. MCCAULEY:  Object.  Speculation.

8  Q  How about the next entry, "Ondansetron 8

9 milligrams"?  Whose handwriting does that look like?

10        MR. MCCAULEY:  Same objection.

11  A  Those I -- I now that you zoomed in.  I guess

12 I'm not sure.

13  Q  Well, you said earlier that it looked like

14 Brooke Dempsey's handwriting, right?  That the top

15 entries looked like Brooke Dempsey's?

16  A  Yeah, but then that clonidine one looks a

17 little different, so I don't think that's hers.

18  Q  I'm asking only for your best recollection.  If

19 you're not certain, that's fine.  I don't want you to

20 guess, but I also am entitled to your best estimate even

21 if you're not sure, so --

22  A  Yeah, that's --

23        MR. MCCAULEY:  Same objection.

24  A  That third box, I don't know.  They --

25  Q  Okay.  So -- sorry, Ms. Nelson.  The first two



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  look like Brooke Dempsey's handwriting; is that right?

2  A   They look like Brooke's writing, yes.

3  Q   Okay.  And then you're saying that the third

4  one looks like someone else's handwriting possibly --

5  A   That's --

6  Q   -- the "clonidine 0.2 milligrams"?

7  A   Yes, and I don't know who.

8  Q   Okay.  And there's this first entry, "BP

9  recheck at 15:45."  Do you recognize that handwriting?

10  A   It looks similar to Brooke's as well.

11  Q   Okay.  And then there's a "BP recheck 17:00."

12  Do you recognize that handwriting?

13  A   Looks --

14  MR. MCCAULEY:  Same objection.

15  A   Looks like Shasta's.

16  Q   Okay.  And below the "17:00 BP recheck,"

17  there's an entry involving clonidine.  Do you see that?

18  A   Yes.

19  Q   Okay.  Whose handwriting does that look like

20  to you, if anybody's?

21  A   That also --

22  MR. MCCAULEY:  Same objection.

23  A   That also looks like Shasta's.

24  Q   There's -- the next entry is, "81 milligrams

25  of aspirin, one-time dose."  Do you see that?

1  A   Yes.

2  Q   Do you recognize that handwriting?

3  A   Also looks like Shasta's.

4  Q   Okay.  And then, "Vital recheck," is the last

5  entry here.  Do you recognize that handwriting?

6  A   Also looks like Shasta's.

7  MR. MCCAULEY:  Same objection.

8  Q   Okay.  A quick question about BP recheck:

9  That's a blood pressure check; is that right?

10  A   Yes.

11  Q   Did -- not in this instance, but did you have

12  occasion to perform blood pressure checks on detainees?

13  A   Yes.

14  Q   How was that done physically?  What implements

15  did you use?

16  A   We would either use what they call nurse-on-a-

17  stick with the blood pressure monitor that you could

18  wheel, or we had, like, a little handheld blood pressure

19  cuff.

20  Q   Would that -- if you know, would that

21  typically be done inside or outside of a cell?

22  A   I'm sorry, what was that?

23  Q   Would a blood pressure check typically be done

24  inside or outside of a person's cell?

25  MR. MCCAULEY:  Object to form.

1  A   Similar to the protocols, it could've been

2  done in the cell, in booking, medical, in the pod

3  dayroom.

4  Q   Okay.  Are you -- so there are MARS here with

5  numbers.  Do you see that?

6  A   Yes.

7  Q   Do you recognize -- would there be entries for

8  badge numbers in MARS?  Was that used?

9  A   Those are badge numbers, yes.

10  Q   Okay.  Okay.  I believe we said 57 was Brooke

11  Dempsey; is that right?  Is that right, Ms. Nelson?

12  A   Yes.

13  Q   And then 88 was Shasta Parker?

14  A   Yes.

15  Q   Okay.

16  MR. WEIL:  All right.  Ms. Nelson, thank you

17  very much for your patience today.  That's all the

18  questions I have for the moment.  I may have some

19  follow-up if the defense counsel have questions for

20  you, but that's all I have for the moment.

21  THE WITNESS:  Okay.

22  MR. MCCAULEY:  No questions, from me.

23  MR. KNOTT:  I want to ask just a few questions

24  in follow-up.  For the exhibits, I'm just going to

25  use paper and ask for clarification.  Steve, hang in

1  there. I think you'll recognize these documents.  If

2  you need to, we'll give you time to find them, but

3  I'm just going to start with the intake medical

4  screening report, page 1091, just very quickly.

5  This won't take a couple minutes.

6  MR. WEIL:  Go ahead.

7  CROSS EXAMINATION

8  BY MR. KNOTT:

9  Q   All right.  I just wanted to ask you about

10  your practice, Ms. Warren -- Ms. Nelson.  Where it says

11  23:15 at the top of that page, was it your practice to

12  enter that time when you began working on the intake

13  medical screening report?

14  A   Typically -- honestly, sometimes if we forgot,

15  we would write it -- an approximate time that they came

16  in if we didn't get the exact time.

17  Q   What are you trying to estimate there?  The

18  time --

19  MR. WEIL:  Object to form.

20  Q   The time that they came in, meaning came into

21  the facility or

22  A   Yes, the time that the officer brought them

23  in.

24  Q   Okay.  Does that -- is that estimating the

25  time that you are asking these questions, or is it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 222

1  estimating the time that the officer brought them in?
2        MR. WEIL:  Object to form.
3        MR. KNOTT:  What's wrong with the form?
4        MR. WEIL:  It calls for speculation.  Lacks
5  foundation.  It's calling for speculation.  She
6  doesn't know why she entered that.
7  BY MR. KNOTT:
8        Q    I'm asking about your practice.  Can you tell
9  me is it your practice to enter at the top of this form
10 the time that you're actually asking these questions or
11 the time that the officer brings the detainee in for
12 booking?
13       A    So basically both, but the time that they
14 come, which is when the officer brings them in, is when
15 we're supposed to ask these as long as they're
16 cooperative.  So the time that they come in and are
17 cooperative and able to answer these questions.
18       Q    So they should be -- typically, they would be
19 pretty close in time?
20       A    Yes.
21       Q    And --
22       MR. WEIL:  Object to form.
23       Q    And I apologize if you answered this.  Brooke
24 Dempsey, what shift did she work?
25       A    I believe she was on the same rotation just on

Page 223

1  day shift.
2        Q    And that started at what time?
3        A    6:00 a.m.
4        Q    Okay.  And the medical verification form,
5  I put a green tab on the set in front of you, and this
6  is page 1094.
7        MR. WEIL:  Give me just a sec, Doug, if you
8  would.  Is that an exhibit that I used?  I'm just --
9  I'm not tracking my Bates number.
10       THE WITNESS:  I don't recall him pulling this
11 one.
12       MR. WEIL:  Let me -- I tell you what?  If you
13 give me just one second, guys, I can pull it up.
14       MR. KNOTT:  This is a new document.  This is
15 Monroe County 1094.
16       MR. WEIL:  I'll be there in just a second.  Just
17 --
18       MR. KNOTT:  Sure.
19       MR. MCCAULEY:  I'm just going to take a look at
20 it too, Doug, for a minute.
21       MR. KNOTT:  And, Steve, if you want to call it
22 the next exhibit and --
23       MR. WEIL:  Yeah, let's do that.  Just give me
24 one minute, and I'll -- we'll get it all worked out.
25 So this will be Exhibit -- ma'am, I believe we're on

Page 224

1  18; is that right, Krystal?
2        (EXHIBIT 18 MARKED FOR IDENTIFICATION)
3        MR. MCCAULEY:  That's right.
4        MR. WEIL:  Okay.  So 18 is 1094.  I'm still
5  pulling it up.  My computer is just a little slow,
6  so please just bear with me one minute.  And only
7  that page, right, Doug?
8        MR. WEIL:  Yeah.
9        MR. WEIL:  Okay.  Sure.
10 BY MR. KNOTT:
11       Q    All right.  Ms. Nelson, the question I have is
12 the same question you've been asked about other
13 documents, which is do you recognize your own
14 handwriting on this form?
15       A    I do not.
16       Q    Do you recognize the handwriting on the -- in
17 the right-hand columns where it says, "1 tab 2 times
18 daily as needed"?
19       A    I'm not quite sure, but I know Brooke, kind
20 of, did the cursive writing, so it may have been Brooke.
21       Q    And I -- it says -- at the bottom, there's --
22 under "Nurse's/officer's name," it says, "Number 1257,
23 number 1258."  Is that -- does that 57 correspond to
24 Brooke?
25       A    Yep.

Page 225

1        Q    And 58 corresponds to Lucas?
2        A    Yes.
3        Q    Do you recognize the darker writing in the
4  rest of the page as Lucas'?
5        A    It looks similar to his.
6        Q    But you're not certain?
7        A    Yeah, I didn't see him fill this out, so...
8        Q    Okay.  Did I tab a third page?  I think I did.
9        A    This one?
10       Q    Yeah.
11       MR. KNOTT:  So, Steve, this is the jail
12 observation log, page 2.
13       MR. WEIL:  Okay.  So that would be --
14       MR. KNOTT:  I'm sorry --
15       MR. WEIL:  -- Exhibit 8.
16       MR. KNOTT:  I'm sorry.  It's page 1 of the
17 observation log, and the number I have is Monroe
18 County
19 1104.
20       MR. WEIL:  Okay.  Go ahead.  So it's Exhibit
21 8.
22 BY MR. KNOTT:
23       Q    I'm sorry, but, Ms. Nelson, could you go to
24 1103 --
25       A    Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 226

1    Q    -- which is the page 2.
2    A    Yes.
3    Q    Because --
4        MR. KNOTT:  And is that also Exhibit 8, Steve?
5        MR. WEIL:  Yeah.  It's the same exhibit.  1103
6    and 1104 comprise Exhibit 8.
7        MR. KNOTT:  Right.
8    BY MR. KNOTT:
9    Q    And my understanding, Ms. Nelson, is that you
10   did the observations at 23:17, 23:31, 23:43, and 23:57,
11   correct?
12   A    And the 23:36 and 49, yep.
13   Q    Okay.  And I'm not sure if you were asked
14   this, but do you have a recollection today of your
15   observations of Ms. Boyer that evening in these
16   observations after you came up front to relieve Shasta
17   and before the medical event?
18   A    I don't really recall a whole lot, other than
19   I do recall her walking in her cell, which may have been
20   the twos.  And then right before the incident, her
21   wrapping a towel around her eyes.  Those are the -- kind
22   of the big ones.  Or standing at her cell door, I should
23   say, not walking around her cell.  But standing at her
24   cell door and then sitting on her bunk, putting the
25   towel on.

Page 227

1    Q    And otherwise, the indications are, one, that
2    she was sleeping?
3    A    Or appeared to be sleeping, yeah.  Or laying
4    down, yeah.
5    Q    And in that cell in booking, is there light so
6    that you can see?
7    A    Yep, every cell has, like, a nightlight.  So
8    when the main lights are off, there's still a soft light
9    that you can see the inmates.
10   Q    Do you have a recollection when she was laying
11   -- sleeping that night, was her face covered?
12   A    I don't recall that.  The only time I recall
13   her covering her eyes was with the towel right before
14   she laid down.
15   Q    Is it fair to say that in these observations
16   of her that evening before the medical event, she did
17   not seem to be in any distress to you?
18   A    Yeah.  When we do the cell checks, that's what
19   we look for, is any sort of distress, or if they appear
20   to be sleeping we check for the chest rise and fall to
21   make sure they're breathing.
22       MR. KNOTT:  Okay.  That's it for me.  I'm done.
23       MR. WEIL:  Sure.  Just one moment.
24           REDIRECT EXAMINATION
25   BY MR. WEIL:

Page 228

1    Q    A quick follow-up, Ms. Nelson.  When you say
2    that she didn't appear to be in any distress, what did
3    you mean?
4        MR. MCCAULEY:  Object to form.
5    A    She appeared to be as -- what we look for,
6    somebody who is breathing, not in any sort of distress
7    or something medically wrong.  She just appeared to be
8    laying there normally, breathing or standing.  And then
9    prior to the incident, she was sitting on her bunk
10   putting a towel around her eyes.  She didn't seem to be
11   in any sort of distress.
12   Q    Okay.  And by "medically wrong," what do you
13   mean?
14   A    Like --
15   Q    Anything visibly -- well, just tell me what
16   you mean.
17   A    Just, yeah, that they're breathing normal.
18   There's nothing -- they don't appear to be sweating.
19   They don't look uncomfortable.  Just making sure that
20   they appear normal.
21       MR. WEIL:  Okay.  That's all I have.
22       MR. KNOTT:  That's it for me.
23       MR. MCCAULEY:  No questions here.
24       MR. WEIL:  Okay.  Krystal, would you put
25       your -- we can go off the record.

Page 229

1        COURT REPORTER:  Okay.  We are now off the
2    record at 4:20 p.m.
3        (DEPOSITION CONCLUDED AT 4:20 P.M. CST)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 230

1        CERTIFICATE OF REPORTER

2

3    I do hereby certify that the witness in the foregoing

4    transcript was taken on the date, and at the time and

5    place set out on the Stipulation page hereof by me after

6    first being duly sworn to testify the truth, the whole

7    truth, and nothing but the truth; and that the said

8    matter was recorded by me and then reduced to

9    typewritten form under my direction, and constitutes a

10   true record of the transcript as taken, all to the best

11   of my skills and ability. I certify that I am not a

12   relative or employee of either counsel, and that I am in

13   no way interested financially, directly or indirectly,

14   in this action.

15

16

17

18

19   

20

21

22   KRYSTAL M. BARNES,

23   COURT REPORTER/NOTARY

24   COMMISSION EXPIRES ON: 02/18/2026

25   SUBMITTED ON: 03/11/2022

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

## Exhibits

**Exhibit 1_
Nelson** 18:10,
16 21:10 22:13
27:8 31:16
37:25 41:14
49:8 81:12
84:11,12 99:20
146:15 147:1
192:6

**Exhibit 2_
Nelson** 19:15,
18,21 20:12
48:21,23

**Exhibit 3_
Nelson** 31:1,5,
14 32:9,12
83:25 85:13
86:1 105:21
106:10 115:4,5
133:16 140:20
141:15 144:4
150:18

**Exhibit 4_
Nelson** 32:10,
13,15,17,23
33:16,20
100:17 149:8,9,
12 158:2

**Exhibit 5_
Nelson** 53:24
54:8 78:4,12

**Exhibit 6_
Nelson** 78:1,6
109:2 116:12
126:19 136:1
143:6

**Exhibit 8_
Nelson** 150:23
151:2,7 158:4
160:18 162:12
164:10 175:4
177:25 178:1
187:22 194:22
196:3 225:15,
20,21 226:4,6

**Exhibit 9_
Nelson** 184:21
185:3 186:16

**Exhibit 10_
Nelson** 189:8,
12

**Exhibit 11_
Nelson** 198:10,
13

**Exhibit 12_
Nelson** 199:6,
7,10

**Exhibit 13_
Nelson** 203:16,
20

**Exhibit 14_
Nelson** 206:14,
15,19

**Exhibit 15_
Nelson** 210:14,
16

**Exhibit 16_
Nelson** 211:20,
25

**Exhibit 17_
Nelson** 215:25

**Exhibit 18_
Nelson** 224:2

---

**-**

**--N-D-L-A-N-D**
157:7

---

**0**

**0** 177:25

**0.133** 86:1
88:24

**0.2** 218:6

**0.3** 90:13 91:1,4
94:7,10 96:25
116:10

**00** 66:24

**00:36** 196:8

**0118** 207:5,7

**0747** 156:10

---

**1**

**1** 18:10,16
21:10 22:13
27:8 31:10,16
37:25 41:14
49:8 81:12
84:11,12 86:24
99:20 124:5
146:10,14,15
147:1 153:13
192:6 224:17
225:16

**1.33** 110:24

**10** 176:3,5,13,
21 189:8,12

**100** 132:15

**1091** 32:13
221:4

**1093** 32:13
84:16

**1094** 223:6,15
224:4

**1095** 78:4

**10:00** 148:14
183:8,10,17
185:22 187:23,
25 191:15
192:22,25
193:7 194:18
195:10 214:12

**10:02** 7:8

**10:40** 150:14

**10:41** 101:22,
25 102:24

**10:43** 43:6

**10:45** 103:1

**10:47** 43:2

**10:49** 43:11

**10:50** 189:22
191:1

**11** 122:3 175:21
198:10,13

**1100** 215:22

**1103** 150:25
182:23 225:24
226:5

**1104** 150:25
225:19 226:6

**1105** 206:16

**11:15** 150:21
152:24 154:4
164:12 196:3

**11:17** 183:3,6

**11:27** 183:6

**12** 72:20 74:14
170:20,21
199:7,10

**12-21-19**
101:19

**12-hour** 71:18

**1257** 224:22

**1258** 224:23

**1273** 32:14

**1274** 32:14

**1292** 84:4

**12:06** 104:21

**13** 203:16,20
205:5

**13680** 211:22

**14** 123:9,13,21
124:7,16
206:15,19

**14:59** 163:6

**15** 124:11
153:17,20
210:14,16

**15:45** 218:9

**16** 64:20 124:21
211:20,25

**16-minute**
36:3

**160** 60:9 61:6

**16:54** 175:16

**17** 125:2
215:22,25

**17:00** 218:11,
16

**18** 59:22 125:2
224:1,2,4

**18th** 15:7

**19** 125:2 153:14

**1:00** 103:19,24

**1:13** 105:1

---

**2**

**2** 19:15,18,21
20:12 48:21,23
87:5 91:10
92:13 108:15,
25 124:5
125:22 147:8
156:5 157:12,
22 190:23
224:17 225:12
226:1

**20** 72:14,16
73:6 104:9
125:6,9 127:16

**20-cv-1123**
7:14

**2009** 60:15

**2012** 62:9

**2014** 60:21
61:15 62:7,9,18

**2016** 17:23
39:24 56:14
58:4,12,14
62:11,20,22

**2018** 59:10
170:22,24,25

**2019** 23:24
78:2 79:8,9,13
171:1 206:16

**2021** 14:5,13
17:24 18:1
39:24 59:18,20

**2022** 7:8 43:11
105:1 147:23
206:11

**21** 23:24 59:22
78:2 79:8,13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

125:13

**21st** 74:25 75:4
79:25 101:22,
25 109:5 152:9
212:6,11 213:2

**22** 79:9

**22:40** 109:5
150:13

**22:41** 101:20
102:3 149:22
158:3

**22:45** 102:14

**22nd** 7:7 75:4,7
182:22,23
183:3 186:4
189:25 212:6,
11 213:2,3
214:7

**23** 206:16

**23:15** 150:19
152:8,9 158:4
221:11

**23:17** 226:10

**23:31** 226:10

**23:36** 226:12

**23:43** 226:10

**23:57** 226:10

**23rd** 75:7
103:24 210:25
213:3 214:7

**24** 43:11 65:22
105:1 147:23
206:11

**24th** 7:8

**2:03** 147:17

**2:23** 147:23

---

**3**

**3** 31:1,5,14
32:9,12 83:25
85:13 86:1 88:1
96:25 105:21
106:10 115:5
133:16 140:20
141:15 144:4

146:10,15
150:18 211:21

**30** 7:6

**3147** 18:12

**3:40** 210:24

**3:42** 206:5

**3:48** 206:11

---

**4**

**4** 32:10,13,15,
17,23 33:16,20
48:6,9,24 49:3,
4,11,21,22
50:6,8,22,25
51:16,20,22
52:17 88:19
89:7 100:17
149:9,12
152:16,17
154:4,23 158:2

**45** 162:15

**4519** 189:9

**4529** 203:17

**4530** 203:17

**4846** 210:15

**49** 226:12

**4:20** 229:2,3

**4:30** 176:8

---

**5**

**5** 50:25 53:24
54:8 78:4,12
89:19

**50** 163:7

**520** 60:8 61:5

**57** 162:23,24
163:8 175:13
220:10 224:23

**58** 160:13 175:8
178:18,20
194:21 195:5
225:1

**5:45** 72:10
173:4

---

**6**

**6** 31:11 50:25
78:1,6 89:24
90:4,8 109:2
116:12 126:19
136:1 143:6

**60** 62:1

**60606** 7:7

**6112** 198:10

**6457** 199:7

**6458** 199:8

**65** 175:14
181:22

**6:00** 71:22,23,
24 72:2,16
74:22 75:4,6,7
162:9,14,15,17
163:10,11
182:19 183:5,8,
17,20 185:17,
18 186:6,7
187:23,25
214:12 223:3

**6:02** 184:25

**6:42** 162:11
163:15 172:24
178:2 182:10

---

**7**

**7** 50:25 117:23
133:17,23
188:17

**71** 156:11
175:8,9 181:13

**76** 162:1

**7:25** 190:22

---

**8**

**8** 119:3,20
150:23 151:2,7
158:4 160:18

162:12 164:10
175:4 178:1
187:22 194:22
196:3 217:8
225:15,21
226:4,6

**8-8-2018** 84:17
140:22

**81** 218:24

**88** 157:11 175:8
178:16 184:24
220:13

---

**9**

**9** 153:14 184:21
185:3 186:16

**90** 160:19

**94** 160:15

**96** 197:16

---

**A**

**a.m.** 7:9 43:6,
12 71:24 72:2
74:22 75:4,7
162:9 172:24
178:2 210:24
223:3

**abbreviation**
110:21

**abdominal**
130:4

**ability** 16:17

**abrasions**
91:23

**Absolutely**
18:22 189:17

**abuse** 123:6

**academy** 60:8,
9 61:4,6,10,13,
19,22,23 62:2,
4,18

**accept** 90:23
91:3

**accepted**

113:22

**access** 30:14

**accident** 92:5

**accidents** 92:6

**accurate** 199:5

**accurately**
10:6 74:1

**ACH** 67:20
68:5,10,11,21
69:3 70:15,19

**active** 129:8

**actual** 30:13
97:19

**add** 124:17

**added** 131:5

**addition** 30:3
32:8

**additional**
62:11,19 74:17
123:23

**address** 34:5
114:18

**adequate**
111:5

**adjacent** 51:16

**administering**
67:8

**administrative**
76:16 77:5,6
184:10

**Administrator**
7:11

**admitting**
132:18

**advance** 10:9
193:6

**Advanced** 8:1
67:23 68:6

**AF** 153:22,23

**affect** 47:4

**affirm** 8:15

**AFRN** 153:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**aftermath**
202:21,22

**agree** 8:8

**ahead** 15:24
34:25 61:2
76:10 92:3
101:10 135:2
142:12 146:18
147:4 165:4
166:14 168:3
172:15 181:5
191:7 204:19
212:19 221:6
225:20

**ailments**
123:22,23

**alarm** 161:24

**alcohol** 86:4
88:3,11,16,20
89:5 113:12
123:6

**alert** 139:19
140:4 143:7
209:24

**alerted** 29:3
40:2 204:8

**alerting** 163:21

**allergies**
122:15

**allergy** 123:4

**allowed** 36:25

**Amber** 8:2 27:3
80:2,5 83:11
98:15 109:9
114:19 116:24,
25 117:6,16
130:24 138:8,
13 143:13,24
144:22 145:4
149:4 154:5
158:15,24
159:20 166:18
168:4 174:20
179:11 184:25
186:12,15
206:17,22
213:6

**and/or** 88:11,
20 92:23

120:13

**Andrew** 14:16

**angle** 24:21
44:22 45:2

**annotations**
16:11 17:2,9

**annual** 65:22

**answers** 9:17,
23 11:3 47:12
87:10 90:6,14
107:19 114:17,
20 119:7 123:7
125:4 179:19
180:4

**anticipate** 11:3

**anybody's**
216:7 218:20

**anytime** 10:3,
6,20

**apologies** 71:8
136:6 194:22

**apologize**
105:15 146:17
156:22 158:21
222:23

**apologizing**
160:5

**apparently**
204:3

**appearance**
7:16 103:6

**appeared**
93:16 94:22
227:3 228:5,7

**appears** 87:12
111:5 141:7
152:9 178:3
180:8 199:5

**Applied** 60:6

**apply** 10:15

**approach**
48:13 115:22

**approximate**
221:15

**approximately**

150:7

**April** 14:2,5,9,
13

**APRN** 153:21

**area** 18:19
20:21 23:8,9
24:20 25:2,10,
15,17,21 29:1,
21 30:19,23
31:18,20,25
33:12,16,17,25
34:18 35:19,24
36:4,14 37:14
38:20 41:2,9,24
45:7 52:3,4,5,8,
11,14 53:19
55:19,20 56:5
76:19 81:10,12,
15 82:9,16,19
85:15 99:13,20
100:2,5,6
101:1,2 151:5
158:16 191:4
192:14 195:14
197:24

**areas** 47:24
56:7

**arm** 91:22
92:11,20

**arrest** 30:6,12

**arrested** 20:11
22:15 23:10
25:9,14 26:8
30:17 33:18
86:11 87:9 88:7
102:10 171:5

**arrestee** 82:7

**arrive** 29:5

**arrived** 59:14
74:13 204:10

**arrow** 20:24
21:2,5

**arrows** 19:10,
19

**asks** 89:7
124:21

**aspects** 65:8

**aspirin** 138:21
218:25

**assault** 87:1

**assigned**
47:16

**assigning**
46:10,16

**assignment**
134:19,22
135:4

**assist** 110:13,
16 114:8,14
207:23 208:2

**assistance**
198:1,4

**assisted**
137:23 138:4

**assisting**
213:25

**associate**
61:17

**associate's**
60:6,17 61:24
62:17

**assume** 11:23
52:14 176:8
192:11

**assuming**
23:20 39:18
85:24 111:4
118:15 139:3
161:23 186:13
190:6 191:3
197:19

**asterisk** 84:22
155:20 157:21

**asterisks**
155:7

**ate** 176:23

**attach** 202:19

**attached**
201:4,7 202:4,
16 205:3

**attachments**
17:14

**attack** 196:19

**attempting**
190:19

**attempts** 12:4

**attending**
7:16,17,20

**attention** 9:22
94:4 96:9,10
99:7

**attorney** 14:6,
12

**audio** 93:9

**audits** 76:7
77:10

**autofill** 103:2

**automatically**
103:3

**availability**
16:14

**aware** 67:11
174:8 179:19
184:16 190:20

---

**B**

**B-R-O-O-K-E**
85:8

**back** 21:8
23:20 31:16
33:9,23 38:11
41:6 42:12,17
43:2,8 47:23
49:6,12,25 50:2
56:3 58:5,8
60:11 62:16
67:22 71:12
81:11 85:12
98:19 99:16,20
104:23 105:3
106:23 112:22,
24 126:18
127:15 136:1
144:3 147:20
157:25 164:5
165:16 170:14
185:16 187:21,
25 191:4
192:14,16,24
194:17,18,21,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

24 195:17 196:10 197:23 206:8 215:4

**background** 17:20 42:1 46:2 56:13 57:22

**backside** 119:25 120:4

**badge** 84:5,6 151:22 152:1 156:6,8,11 220:8,9

**bag** 138:15 148:21,23 167:11

**ballpark** 70:21 170:16

**Barnes** 7:4

**barrier** 96:23

**based** 46:3 47:12 50:17 88:12,20 124:8 139:9 192:12

**basic** 201:13 202:6

**basically** 26:14 107:18 111:16 177:11 203:13 215:17 222:13

**basis** 70:12

**Bates** 18:11 19:6 78:3 182:23 189:9 198:10 199:7 203:17 206:15 210:14 211:21 215:22 223:9

**bear** 49:2 149:8 192:3 224:6

**bearing** 49:9 198:9

**bearings** 136:7

**bef** 90:21

**began** 56:13 221:12

**begin** 8:19 13:12 85:19

**begins** 84:21 150:24

**behalf** 7:12

**behavior** 86:25

**behaviors** 179:8

**belabored** 158:21

**bell** 203:1

**belongs** 140:23

**bench** 25:18, 21,24 26:6,8 35:16

**best-asked** 107:1

**big** 10:25 13:4 21:25 22:9 80:22 95:1 96:5 226:22

**bigger** 49:3 146:10,21

**biggest** 92:17

**binder** 15:11, 12 16:11 17:11, 13

**bit** 11:3 18:21 24:24 35:9 48:11,22 49:3 78:7 109:8,19 117:19 159:10 189:15 195:1, 11 213:16 216:23

**bladder** 130:4

**bleeding** 93:8, 12

**blocks** 176:1

**blood** 86:4 118:9 130:3,15 136:4 188:13 193:12,13,19, 25 194:4,8

219:9,12,17,18, 23

**blow** 18:18 86:11 100:18

**Blue** 125:10

**bold** 90:8

**bolded** 198:17

**bone** 93:2 94:22 96:12 130:3

**book** 28:15 91:11 93:4,18 101:13 162:18 165:23

**booked** 23:21 24:13 33:2 39:16,19 40:13 52:17 71:10 74:24 75:1 80:7 126:12 142:17 148:9 152:22 161:5 165:23

**booking** 18:12, 19 19:22 20:12, 13,21 21:3 24:7,14,15,16, 17,20 25:2,5 28:1,17,20,25 32:3,6 33:1 34:20 36:21 38:8,19 39:22 40:23 41:2,9,24 45:7,12,15 47:5,10,13 48:3,6,9,23,24 49:4,11 50:22 51:16,20,22,25 52:1,4,8,17 53:6,18 54:5,6, 17 56:3,5 76:19,24,25 77:3 81:9,21,22 82:2,5,8,24 83:3 90:23 91:7 93:24 95:17 96:1,24 97:22 99:13,16 100:8, 23,24 101:2,12, 17,19 102:9,24 142:18 143:19 145:15,17,19, 21,23 146:6,8

148:23,25 149:9,11 150:7 151:4,14 152:10,16 154:4,23 155:6 158:7,13,16,18 160:11 161:2,5, 13,19 164:20 165:11,16,22 166:1 169:13, 17 171:21,23 173:23 174:14, 15 176:13 177:5,8,10 183:9,16 187:22 189:2,3 191:15,21,25 192:1,14,15,24 195:11,14,24 196:1,11 197:12,18,24 198:3,4 213:18 215:10,13 220:2 222:12 227:5

**booking's** 165:9

**bookings** 161:15 178:7

**bored** 192:4

**bottom** 31:12 79:25 106:8 108:2 147:2 148:6 211:13 216:10 224:21

**bowel** 122:23

**box** 21:17 217:24

**Boyer** 7:11,12 20:2 22:6 23:21 24:12 28:3 31:1 39:16,19 40:13 48:6 51:20 52:16,24 58:22 59:14 71:10,17 74:23 81:10,22 82:11,18 83:4 87:13,18 89:20 97:24 100:2 107:14 108:7 111:14 113:14 114:3,25 118:3,

8,9 126:23 127:4,20,25 129:15,16 130:9,22 131:25 132:14 136:15 137:11, 20 143:14,23 144:21,22 145:9,16,20 149:3,18 150:8 151:14 152:15 153:16 155:1 158:25 161:5 164:12,16 165:11,22 176:25 177:6 179:1 193:10 194:4,5,13 195:18 196:6,7, 11,19 202:18 203:6 204:7 209:11,12,16, 18,19,20 210:4, 5 212:5 215:24 226:15

**Boyer's** 20:11 32:5 115:20 126:9 138:11 148:21 154:4 188:3 194:12 197:19 202:22 207:18 211:3,7, 24 213:25

**Boyers** 96:19

**Boyers'** 164:2

**BP** 216:16 218:8,11,16 219:8

**break** 10:7,11, 21,23 42:21 43:20 71:9 104:6,9 106:1 116:6 147:13 158:23 177:21

**breaks** 10:3,20

**breathalyzer** 86:6,7,11 88:25 111:2

**breather** 42:22

**breathing** 227:21 228:6,8,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

17

**bridge** 16:21

**briefly** 80:24
82:6,15 90:24
175:4

**briefs** 128:23

**bring** 28:14,20
85:16 131:2,7
135:7 186:24
187:3,8

**bringing** 33:24
81:10 149:3

**brings** 28:19
222:11,14

**broad** 83:9

**broken** 91:22
92:11,20 93:2
94:22 96:11
138:21

**Brooke** 85:4,6
140:23 141:8
148:5,12
162:21 163:17
216:10,13,14
217:5,14,15
218:1 220:10
222:23 224:19,
20,24

**Brooke's**
216:21 217:6
218:2,10

**brought** 20:11,
13 22:6,15
25:14 28:7,23
29:4 30:5 34:3
36:20 41:6
45:19 98:15
99:6 102:18
149:18 150:11
162:17 209:8
221:22 222:1

**building** 51:3
155:24

**built** 26:15
61:15,16 74:9

**bunch** 86:17
138:25

**bunk** 147:9
197:3,7 226:24
228:9

**business**
103:18

**busy** 32:3

**butchering**
160:5

**button** 149:10

---

**C**

---

**call** 22:19
23:13 29:6 33:1
36:25 38:23
39:12 40:18
45:4 84:22
131:2 132:10
133:12 135:18
136:10 137:15,
16,21 140:7
141:19 142:14,
19 159:9,16,19
163:18,22
166:9,16,19,22,
25 167:4
168:18,22,23,
25 169:3,14,22,
25 171:11,23
172:3,8 173:17,
20 174:21
177:7,10
187:19 198:4
203:23 204:15,
22 208:25
212:24 219:16
223:21

**called** 13:17
30:5 36:8 44:3,
4,11 45:25
47:19 48:23
67:9 100:19
141:8,22 167:7
170:6 171:10,
11 172:13
185:21 186:1,2,
24 193:17
196:16,17
197:10 202:2,3
204:9 208:15

**calling** 28:21
133:3 142:24

143:3 167:6
177:1 196:10,
11 198:1 222:5

**calls** 108:19
137:5 197:18
222:4

**camera** 35:21
197:6

**cameras** 51:25
52:1,4,11,14

**cancer** 108:3
127:22 129:9,
15,23 130:3

**capacity** 57:19

**captain** 75:13,
18 184:6
203:11

**capture** 19:1

**car** 22:13,14,15

**card** 30:6

**care** 68:2,17
89:8

**cares** 69:9

**Carpenter**
190:2

**case** 7:14 8:24
12:15 20:5 30:9
35:11 90:12
96:19 179:10
180:3 200:7,8,
22,24 201:3,4,
6,7,11,14,17,
20,22,23 202:2,
4,8,9,11,16,17,
18,19

**catch** 32:18

**categories**
48:2 97:14
170:3

**catty-corner**
50:2

**caused** 180:2

**CCTV** 215:12

**cell** 38:5 40:25
41:1 48:23,24
50:23,25 51:1,

6,15,17 53:2,5,
15 56:4 76:7
77:20 91:7
145:21,23,24
147:8 151:14
153:5,9 154:4,
9,11 155:2,25
158:9,20,25
159:3 161:18,
21 165:11
177:5,12 178:1
183:11 184:4
197:8,19 198:1
204:9 219:21,
24 220:2
226:19,22,23,
24 227:5,7,18

**cells** 51:25
52:1 145:25
146:2,7,8,10,
11,21,23 147:1,
3,7 215:13

**central** 215:15

**certification**
142:2,6

**certified** 58:16

**chair** 65:13

**chairs** 36:1

**change** 28:18
36:24 38:20
40:24 71:20
76:4 155:22

**change-out**
37:2

**changed** 36:23
38:1 40:1
42:11,17
100:13 155:19,
23,24 156:2
171:15

**changing** 37:4

**chapter** 90:15

**charge** 76:9
102:6,19,20,25
200:10

**charges** 30:7
45:14 46:5,8
102:10 200:11
201:5,6

**chart** 99:17
169:13,17,24

**check** 42:1
46:2 76:7
161:18 178:1
184:3,4,11,15
194:8 196:3
219:9,23
227:20

**checked** 91:23

**checking** 57:6
161:16 178:5

**checks** 91:7
161:21 183:11
194:24 195:3,
11,17 219:12
227:18

**cheek** 190:19

**cheeking**
190:11

**chemo** 108:3

**chest** 52:24
56:3 188:9
194:3,7 227:20

**Chicago** 7:7,
21

**chose** 76:25

**Christine** 7:12
20:2,11 22:5
23:21 39:16
40:13 80:7
81:18,19 83:4
99:14 112:9
114:20 116:25
126:9,23
136:22 144:22
151:13 188:3
202:18 211:24

**Christine's**
186:23

**circle** 22:10
123:15,22
124:16

**circled** 120:16
122:18

**circling** 55:19

**circumstance**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

142:22

**circumstances** 13:22 32:2 141:18

**civilian** 37:4 38:14 57:21

**Claire** 13:15 14:4,10 105:14

**clarification** 107:11,13,22 127:11 220:25

**clarified** 129:24

**clarify** 11:19 39:15 157:19

**clarifying** 129:19

**class** 65:12 66:17

**classification** 41:19,23,25 44:1,3 45:11, 13,25 46:8,16 47:4,8

**classified** 41:5,16,22

**classify** 45:16

**classifying** 45:18 46:6

**classroom** 66:19 67:14 69:24 70:3

**clear** 11:15 12:17 39:14 107:18 114:16 115:14 116:4 146:18

**clearance** 90:13 93:11 110:6 113:4,10, 15,18 114:4,5 115:24

**cleared** 47:6 90:14,21 91:2, 14 93:6,13 113:24 114:25 115:7

**clearer** 19:7

**clears** 45:24

**click** 149:10

**clinic** 120:13 121:9,10,24

**clip** 184:23

**clock** 73:7,10 184:2

**clocked** 72:10 173:4,8 181:19

**clocking** 181:17

**clonidine** 216:17 217:16 218:6,17

**close** 48:14 147:25 156:21 165:7 206:1 222:19

**closed-circuit** 51:24

**closeout** 125:12

**clothes** 37:5 38:1,14,21

**clue** 131:22

**coat** 129:19

**code** 151:22 152:4 154:6 176:21

**codes** 153:14 155:18

**collected** 144:13,18

**college** 62:2

**colloquy** 106:22

**column** 160:18 163:2,3

**columns** 224:17

**combative** 28:10

**comfortable** 10:5

**comments** 47:13,15

**common** 123:21 132:17 176:19

**communicate** 12:4

**communicating** 207:17 215:5

**communication** 207:23 208:3

**company** 68:2

**complaint** 12:16

**complete** 9:22 28:8,13 36:18, 21 60:7 61:12, 20 76:23 159:12,15,18

**completed** 15:21 32:6 41:25 44:1 60:5 62:6 73:1 114:15 117:12, 15 141:4,24 183:11 191:3

**completing** 62:16,19 67:8 76:8,13 140:10 190:2,23

**complicated** 17:17,18

**components** 61:23

**comprise** 226:6

**computer** 16:18 25:22 26:24 30:12,14 32:20 33:6,11 42:17 49:2 73:10,13 74:5 77:2,7,9 101:1 149:1 188:22, 24 191:5 224:5

**computers** 189:1

**computing** 77:5

**concern** 48:2

**concerns** 110:7 114:17 116:1 179:8

**concluded** 114:24 115:1 116:4 229:3

**concludes** 144:25

**concluding** 158:8

**concussion** 92:1

**condition** 180:10 188:4,5

**conditions** 108:8 123:11, 24 124:13 126:3 145:11

**conduct** 65:24 117:5 127:3

**conducted** 43:9 104:24 147:21 206:9

**conducting** 41:25 76:7

**confident** 50:21

**confidentiality** 10:15

**congestive** 108:4

**connected** 45:15 50:25 51:5 192:1

**consideration** 46:6

**considered** 146:11,23

**consist** 67:6,7

**consistent**

79:16,19 109:14 110:10, 15 111:1 116:14,17 127:19,24 129:14 130:8, 18 131:16 132:13 154:19 190:22

**consumed** 175:24

**contact** 99:9 111:24 134:9

**contacted** 13:25

**contacting** 81:16

**content** 86:4

**context** 111:20 128:21,25

**continue** 116:12 130:12

**continue?'** 130:5

**continued** 155:20

**contradiction** 120:20

**control** 29:7 42:2,5 43:25 44:7,10,12,17, 22 45:10 50:3,5 67:1 128:3 191:23,24 192:5 215:8,11, 17,18,19

**controls** 215:18

**convened** 7:9

**convenience** 56:23

**conversation** 11:1 13:22 112:13 136:21

**convictions** 46:3,9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

cooperative 28:12 222:16, 17

copied 198:18, 21

copies 205:9

copy 30:13

corner 24:21 51:3 78:11 164:11 175:17

corollary 11:22

correct 28:23 84:25 89:24 106:19 107:4 115:7 118:3 119:8 120:10 122:12 125:13 126:21 151:24 152:6 154:2 166:8 168:7 171:3 172:5 178:19 181:10 182:17 193:7 195:14 196:19 226:11

correctional 8:1 58:18 59:3, 4,9 67:24 68:6 76:5 138:1

Corrections 65:21

correctly 24:2 41:10 63:7 74:3,11 99:15 100:25 114:2 116:3 123:20 149:25 152:8 153:1 154:2 156:5 163:25 167:20 217:4

correspond 224:23

corresponds 225:1

cough 180:9

could've 153:9 178:7 220:1

counsel 7:18 8:19 9:14 13:21 14:8 19:6,16 48:21 220:19

count 133:12 134:8 142:13 166:22 187:18

counted 142:20 166:17, 20 167:3,9

counter 24:22 25:2,5 53:6,18 57:5 148:24

counties 105:16

counting 167:10

county 7:24 17:21 18:12,20 32:13,14 56:14, 20 57:14,15,20 58:11 59:18,25 60:3,23 61:11 62:11 71:16 74:6,10 78:3 105:14,17 150:24,25 184:24 198:11 199:7 203:17 206:15 210:14 211:21,22 215:22 223:15 225:18

couple 9:13 12:4 44:11 97:3 121:21 146:1 148:1 176:23 197:25 211:2 221:5

courses 65:6

court 7:3,5,13 8:4,7,13,19 9:2, 4,5,10,12 11:5 43:5,8 103:6, 18,25 104:20, 23 147:17,20 206:5,8 229:1

courtesy 205:9

courtroom 9:11,18

covered 227:11

covering 21:2 52:4,11,14 227:13

COVID 41:5

CPR 66:1

created 102:17 103:9 201:11 202:2,16

credits 62:2

criminal 42:1 46:1 57:22 60:5,7,18 61:17,23 62:17

crisis 196:25 209:19

criteria 92:12, 19

cross 16:21 125:10 221:7

Crosse 121:19, 20 209:25

CST 229:3

cue 45:16

cuff 219:19

curious 49:14

current 46:5,8 150:5

cursive 224:20

cursor 20:17 24:21 29:11 37:16 39:2 42:4 45:2 48:24 50:7,9 54:7,18, 23 55:13,20

cut 24:19 93:9 96:17 101:24

cutout 22:23

cutting 163:23 189:18

—————

D

—————

D-E-M-P-S-E-Y 85:11

DA 103:22 200:11 201:6

daily 224:18

Danielle 7:10 8:6,8 42:12 43:9 104:24 147:21 200:16 206:9 212:7

darker 26:14 29:18 225:3

dash 49:14

date 43:11 84:9 101:12,13,19 102:19,21,24 103:4,6,17,22 105:1 147:23 150:5 206:11

dated 78:2

dates 39:16 76:13 211:23

Davis 162:3,4

day 7:8 71:20, 22,25 73:11 74:3,24 76:9 102:19 103:18 148:10,13 151:24 167:1,5 170:20 171:11, 24 172:12,13 173:16 174:21 183:14 184:3 188:6,9,14 193:3 211:19 212:14,24 213:2,5,13,15 214:4,7,17 215:2,4 223:1

dayroom 220:3

days 74:23 170:14

dealing 143:13 187:16 209:16

December 23:24 58:13 64:20 74:25 78:2 79:8,9,13, 25 101:22,25 109:5 152:9 171:1 189:25 206:16

decide 41:23 92:12 169:10

deciding 115:6

decision 43:23 45:11 47:7,11 169:11

declined 207:24

defendants 7:24

defenders 36:11,12

defense 220:19

degree 60:17 61:24

delete 49:24

Dempsey 85:4,6 140:23 141:8 148:5 163:17 220:11 222:24

Dempsey's 148:12 162:21 217:5,14,15 218:1

department 105:11

depend 188:24

depended 34:8 173:8,10

depending 76:1 102:21 168:23 184:2 200:11

deponent 7:23

deposed 8:24

deposition

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

7:10 10:14 11:1
12:10 13:6,13
15:9 17:5,17
43:9 56:10 79:4
104:24 147:21
151:9 158:23
185:7 189:11
198:12,25
199:9 203:19
205:7 206:9
207:2 210:19
216:3 229:3

**depositions**
89:18

**describe** 60:2
63:1 74:1 99:2

**describing**
62:23 74:2
97:13,25
205:14

**description**
204:6

**designate**
48:20

**desk** 25:3,22,
23 26:7,12,13,
15,21,22 34:4,
20 85:18

**detail** 54:4
108:11 189:21

**details** 180:15

**detainee**
222:11

**detainees**
187:9 219:12

**detectives**
200:13

**determination**
115:13

**determine**
43:21 44:5 46:7
47:5 134:6

**developed**
18:2,3

**diabetes** 124:4

**diabetic**
135:17 142:6

**diabetics**
141:25

**diagnosis**
187:4,9,13

**diagram** 41:18
53:25 54:13

**diamond** 25:23
26:3 27:10
37:13,22

**diet** 122:4,8

**differently**
28:14 34:3

**difficulties**
128:8

**difficulty** 50:17
132:9 136:9

**digging** 138:6

**dinner** 176:11

**dinnertime**
176:8

**direct** 8:20
20:19 28:4

**directed** 32:15

**direction**
54:23

**directly** 52:17

**disappearing**
50:9

**discovered**
196:18

**discovering**
204:7

**discuss** 56:12
82:6 195:18

**discussed**
62:7 66:12
82:4,6 85:13,16
94:20 100:17
116:6 125:16
145:18 213:25
214:9

**discussing**
38:12 40:11
41:12

**discussion**
158:22

**dispatch** 29:6
57:16

**dispatcher**
57:24

**distinction**
145:25 146:7

**distinctions**
146:19

**distress**
227:17,19
228:2,6,11

**District** 7:13,
14

**dive** 12:9

**divided** 71:19

**dividing**
216:12

**doc** 135:18

**doctor** 120:13,
23 122:4
133:12 134:10
135:19 142:14
159:9,16,19
166:23 168:22
169:15,22
170:1,5,6
173:20 187:19

**doctors** 87:16
171:14

**document**
12:11,15 18:11,
13 19:5,12,16
32:16,22 40:12
42:4,24 48:20
49:11 50:18
52:25 54:5
78:3,25 79:3,7
82:15 118:22
173:19 183:14
189:7,9,10,22
190:22 198:10,
15 199:6,7,8
203:17,18
206:14,15
207:1 210:14,
18 211:21
215:20,22,23

216:2,8 223:14

**documents**
10:12 13:5
15:9,12,16,25
16:11,18 17:1,
4,10 18:7 19:2
20:5 32:21 38:4
51:19,23 52:20,
23 115:3 149:6
151:7,8 198:11
205:7 221:1
224:13

**dolly** 177:12

**door** 23:1
27:10 54:19
176:16,17
177:12 197:13
226:22,24

**dose** 216:17
218:25

**Doug** 7:25
223:7,20 224:7

**draw** 21:24
146:19

**drawer** 45:14

**Drive** 7:6

**drives** 22:10

**drop** 119:5
134:7

**dropped**
135:20

**dropping**
185:14 187:12

**drug** 88:4,16

**drugs** 88:11,20
123:6

**drugs.com**
139:10 167:17

**due** 92:1 108:3
122:23 179:18
201:9 202:3

**duties** 76:8,19

**duty** 77:23

**DVD** 36:2

_____

**E**

_____

**e-mail** 17:7,14
77:12,15,17,19
171:17 173:18,
25 174:1,3
181:23 184:18,
19,25 185:6,10
186:21 188:2
191:17 192:12
198:16,21
202:8,17
204:11 205:6,9,
13 210:23

**e-mailed** 77:13

**e-mailing**
173:22 186:12,
15 189:22

**e-mails** 15:19
16:1 77:21,23
181:25 183:24
184:3,12,15
188:18,19

**earlier** 38:12
64:19 83:16
84:13 95:10
100:18 109:24
144:5 145:18
172:1 177:16
183:24 204:7
217:13

**early** 73:2
211:18 214:21

**earshot** 126:24

**Eau** 13:15 14:4,
10 105:14

**edge** 97:16

**effort** 126:2

**elaborate**
98:16,17

**elaborating**
108:7

**elaboration**
98:13

**else's** 175:8
216:18 218:4

**emergency**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

201:10 209:24

**employed** 70:18

**employee** 75:23

**employment** 56:12

**EMS** 202:1,3 210:5

**en** 29:7

**encounter** 82:24

**end** 18:8 80:13 81:15 89:17 106:15 108:23 125:22 162:9 183:18 211:8, 10

**ended** 64:22 74:4 192:19

**ends** 182:11

**endurance** 10:4

**enforcement** 57:19 60:8 61:4,12,22 62:17 202:1,3

**ensure** 113:24

**ensuring** 76:8

**entails** 151:19

**enter** 73:11,14, 18 74:3,16 102:21 103:10, 15,17 104:1 123:23 150:4,5 190:10 221:12 222:9

**entered** 33:6,9, 11 74:18 102:20,25 119:15,19,24 125:19 149:25 150:1,2 155:23 190:1 222:6

**entering** 115:12 120:21 123:2 190:25

**entire** 99:18

**entirety** 12:3

**entitled** 217:20

**entrance** 21:21 55:15

**entries** 155:6 158:3 176:20 178:12 194:23 216:15 217:15 220:7

**entry** 79:8,13, 14,25 80:20 122:22 149:19 152:9 153:8,12 156:10 157:8 175:16 176:19 178:12 182:21 191:12 192:9 198:20,21 199:1 207:5 217:8 218:8,17, 24 219:5

**Epipen** 67:10

**equipment** 66:8

**Erdman** 121:2

**essentially** 33:2 37:13 45:16 51:14 65:10 66:5,21 74:15 76:1,6, 12,23 86:20 158:7 161:13 180:3 181:23

**established** 201:23

**Estate** 7:11

**estimate** 64:11 217:20 221:17

**estimating** 221:24 222:1

**ethnicity** 111:6

**evacuation** 66:4

**evening** 23:22 24:12 79:17 80:6 82:9

147:25 182:19, 22 183:3 189:25 226:15 227:16

**event** 138:4 226:17 227:16

**events** 19:2 92:6 129:23 183:13

**evidently** 163:14

**exact** 14:3 164:8 170:7,8 171:14 203:24 221:16

**exam** 55:17

**EXAMINATIO N** 8:20 221:7 227:24

**Excel** 74:7

**exception** 84:13 135:21

**exchange** 109:25 110:1

**excuse** 46:22

**exhibit** 18:10, 16 19:15,18,21 20:12 21:10 22:13 27:8 31:1,5,14,16 32:9,10,12,13, 15,17,23 33:11, 16,20 37:10,25 41:14 48:21,23 49:8 53:24 54:8 78:1,4,6,12 81:12 83:25 84:11,12 85:13 86:1 99:20 100:17,18 105:21 106:10 109:2 115:4 116:12 126:19 133:16 136:1 140:20 141:15 143:6 144:4 146:15 147:1 149:8,12 150:18,23 151:2,7 158:2,4

160:18 162:12 164:10 175:4 177:25 184:21 185:3 186:16 187:22 189:8, 12 192:6 194:22 196:3 198:10,13 199:6,10 203:16,20 206:14,19 210:14,16 211:20,25 215:25 223:8, 22,25 224:2 225:15,20 226:4,5,6

**exhibits** 205:3 220:24

**existing** 40:12

**expect** 54:3 171:3

**expectation** 72:12 73:5

**experience** 63:3 132:17 139:10 176:19 194:12

**experienced** 188:9

**experiencing** 88:3,16 188:13

**explain** 11:14 65:7 66:17

**explained** 132:9 136:9

**explaining** 67:17

**expression** 179:12

**extend** 121:18

**extensive** 136:21

**extent** 121:11, 25

**exterior** 215:18

**extinguisher** 66:5

**extra** 47:22

**extremely** 156:20

**eye** 47:22

**eyes** 24:3 197:4 226:21 227:13 228:10

---

**F**

**face** 33:1,21 100:19,23,24 101:5,7 149:9, 11 227:11

**facility** 80:9 109:20 111:23 121:25 221:21

**fact** 8:8 108:21 114:16 201:16

**failure** 108:4

**fainter** 24:23

**faintly** 24:7

**fair** 18:2 136:18,24 137:2 151:19 159:4 166:2 167:12 212:25 227:15

**fairly** 165:9

**fall** 172:7 227:20

**familiar** 55:8 63:4 121:14 152:14 216:9

**familiarity** 18:3

**fax** 174:6,9,12, 16 208:11

**faxing** 173:21

**feature** 158:22

**February** 7:8 43:11 105:1 147:23 206:11

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

feel 10:4 47:21

feeling 203:23

fell 170:2

felonies 46:4

felt 110:5 113:3 115:23

Fennigkoh 8:2 27:3,4,5 80:5 81:14,15 82:24 99:10 109:9 110:16 111:14 112:6 113:8 114:4,7,13,24 115:21 126:23 127:3,7,20,25 129:5,15,19,24 130:21 131:17 132:14 134:19 136:14 138:9 139:4,22 140:4, 9 143:13,23 144:22 145:8 147:25 148:4 151:13 153:23 154:6 158:15, 24 159:20 160:9 164:6,9, 11,21 165:1,9, 23 166:9 167:14,21 168:6,11,16 169:1 179:11 184:25 186:12, 15 206:17,22 207:14,18,22 208:2 209:4 210:23 211:5 213:6

Fennigkoh's 80:2 111:8,21, 22 114:1 115:21 116:13 126:19 142:25 144:7 150:13 164:5 174:20 188:2

fever 180:8

field 149:25

fields 98:21,22

figure 30:4

136:2 139:13 167:14 186:10

figuring 149:7

file 33:3,4 55:18

filed 12:15

fill 45:13 85:19 98:21 99:18 103:3 123:3,14 132:22 133:11 134:9 142:14 185:20 187:18 225:7

filled 31:24 85:14 99:17 100:1 101:1,5, 8,9,11 168:21

filling 107:2 108:17 123:13 141:2

final 46:7

find 137:12 221:2

finding 138:25 142:23 167:11

fine 10:19 13:1 16:23 42:15 53:13 157:25 193:25 217:19

fingerprints 34:15

finish 28:17 162:19,20 178:8

finished 32:3

finishing 178:10

fire 66:4,5

fit 106:16

floor 7:7 17:19 18:12,15,19 19:15,18 33:10 36:7 43:17 44:13 48:9,21 49:10 51:3 53:21,25 54:1, 2,13 56:3 57:8

63:5 82:5 85:15 99:16 117:2 145:15 177:2

folks 57:6 68:11 71:13 73:7 132:18 187:15 214:9

follow 209:1

follow-up 107:7,10 220:19,24 228:1

food 176:8

force 9:18 60:4 92:2

forewarn 10:16

forgot 221:14

form 15:18,22 30:6,12 31:24 32:16,22,23 50:15 54:9 55:21 61:25 63:11 65:3 66:13,15 67:13 68:23 71:6,21 72:8,19 76:22 77:8 79:20 80:12 83:1,7,8, 16 85:16,17 92:15,21 95:21 96:3,15 97:2,8 99:18 100:2,25 101:16 107:9, 17 111:25 114:23 115:9, 16 116:7 119:22,25 120:21 121:4 128:14,19 131:13 132:20, 23 134:5,15,20, 25 135:13 137:5 139:8 141:4,16 142:14 143:2, 10 147:6 151:1 153:2 154:16 155:17 157:16 159:22 167:2 168:13,20,21 169:4 170:12,

18 173:3,12 174:24 177:4 183:7 184:1,13 187:11 188:10, 15,20 191:13 192:10 194:6 196:14,20 197:1 199:2,15 200:6 202:14 204:24 205:19 219:25 221:19 222:2,3,9,22 223:4 224:14 228:4

formal 203:14

forms 32:19 66:22 85:14 175:23

forum 158:23

found 138:8,22 139:5 142:24 164:18 197:20

foundation 70:25 108:19 112:2 132:24 175:25 187:11 200:6 205:19 222:5

frame 39:21 64:8 168:23 170:7,9

frames 169:22

free 63:20 97:22 98:4,23 117:20

Friday 13:18 15:6,7 17:14

friends 187:15

front 15:11 17:12 21:5 32:21 34:21 41:7 53:19 70:4 78:4 105:22 109:4 175:5 183:10,17 192:16,17 198:2 215:23 223:5 226:16

FTO 95:7

full 8:5 9:22

full-time 58:9, 13 64:19

future 103:13

_____

G

garage 22:9 164:24

gas 56:23

gather 50:21 108:15 126:3 130:22

gathered 34:18 36:18

gathering 34:12 38:15 55:5

gave 53:11 74:15 176:7 208:11

general 20:10 41:6,13,17,24 43:24 46:23 47:6,23 48:1 54:15 70:14 81:21 85:14 113:12 116:20 145:17 154:13

generally 91:7 127:24

generic 41:10

gesture 12:6

GHS 208:11

giant 29:8

give 8:15 9:17 10:22 11:15 12:13 45:22 71:8 83:21 107:18 108:11 123:18 128:16 159:5 170:15 171:14 173:7 193:18 221:2 223:7,13,23

giving 9:22 159:6 160:1



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

glitch 42:20

good 7:3,25
8:22 18:23
42:20 43:3
68:20 104:7
147:12 189:19

gosh 13:14
58:4 64:13

got-you 123:1

government
105:9

GP 41:17 47:14
146:6

grab 104:13

graduated
60:11

Great 13:10
43:4 57:1 105:8
119:1 206:2

green 223:5

Greeno 214:20

Greg 186:23

Gregory 7:11

grid 215:23

ground 9:13

guess 41:20
88:2 108:13
129:4 186:6,10
196:2 201:12,
18 202:5,15
217:11,20

guest 57:3

guide 169:18

Gundersen
121:5,8,13
187:3

guys 223:13

H

habits 191:10

hair 149:15

half 104:10
216:10

half-hour
143:25 145:5

hall 54:20

Hallman 75:16
184:6 198:22

hallway 55:14

hand 8:14 12:5
20:16 68:21,24
146:15

handheld
219:18

handicaps
124:12

handle 200:10

handoff 173:16
174:20

handwriting
84:7,13,24 85:1
140:23 216:7,
11,22 217:5,9,
14 218:1,4,9,
12,19 219:2,5
224:14,16

handwritten
84:21 148:6

hang 220:25

Hansen 7:23

happen 30:19
31:18 38:6,24
53:1 97:14
183:13

happened
17:20 28:5 64:6
70:12,13 79:17,
18,19 99:11
134:21 143:23
149:6,7 151:12
161:16 173:10
182:8 202:23
203:4 204:7,21
210:7

happening
116:22 145:3

happy 49:12,
25 81:11
199:12 205:9

hard 11:5
12:22 16:7,18
30:13 80:15
205:23

have' 112:23

head 90:19
91:13,15,24,25
92:1,10,16,19,
24 94:3,21 96:5
113:23 116:9
156:14 162:5

headed 139:16

health 47:20
48:1 65:25 69:4
70:17,20 71:2,5

Healthcare 8:2
67:24 68:6

hear 42:13,14,
15 43:14
109:25

heard 126:23
140:12 143:15

hearing 109:25
143:4

heart 108:4
196:19

heavy 93:12

held 52:20

help?' 137:9

helped 195:3,
11

helpful 80:16
148:11

helping 148:20
165:23

Hendrickson
75:19 184:6,19
198:22 210:6

hesitate 11:19

HFA 216:21
217:3

hide 131:22

hides 132:2

high 60:12
136:4 146:11,

23 188:13

higher 76:2
94:7

highest-
ranking 75:10,
22

highlighting
13:8

him.' 137:15

hip 127:16

hired 44:11,15
56:20 57:15
58:3,12 60:10
62:24 63:2 95:6

history 110:7
113:5 115:25
117:7

hit 91:25 92:7

hitting 92:1

hold 42:6 53:10

holding 51:1,2,
5,15,17

home 77:21
164:6 165:12
182:11

honestly 53:4
64:14 69:3 82:1
121:1 133:1
150:3 208:4
221:14

hope 80:9,24
109:21

hoping 19:25

hospital 16:4
91:2,13 93:4,
13,19 94:1
95:18 96:1
121:11,14,16
201:11 207:23
208:3

hospitalized
120:6

hour 72:16
104:10 168:9

hours 60:9
61:5,7 65:22

71:20 72:21
73:11 74:15
168:10 170:20,
21 191:1 193:5
211:2

housing 40:25
41:1 44:5 76:25
161:1 174:15
183:9,16,21
189:6 190:24
192:11,12,14

How's 18:22

husband
131:2,7,20,21
132:3 137:16,
21 177:1
185:13 186:23
209:8,24 210:7

I

idea 54:15

ideation 47:2

IDENTIFICATI
ON 18:16 19:21
31:5 32:17 54:8
78:6 151:2
185:3 189:12
198:13 199:10
203:20 206:19
210:16 211:25
215:25 224:2

identified
139:4 168:4,16,
18 169:9 205:5

identifier
139:11

identifies
152:1

identify 48:8
49:11 139:7
167:15 205:7

identifying
137:24 138:5,
25 205:2

Illinois 7:7,21

illness 9:23
67:9

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

imagine 9:14
97:11 176:1
182:11

immediately
170:1 172:3,9
207:18

imperfect
195:4

implements
219:14

important
10:4,25 11:4
126:4

in-service
65:23 66:11

inaccurate
199:1,13,16

inaudible
19:24 54:22
72:25 78:11
108:14 148:4
202:11 213:14,
19

incarceration
211:24

incident
196:16 197:3
199:21 200:21
201:4,8,9,15,
19,22 202:18,
23 203:12
204:8 207:12,
15,19 208:5
209:13,14,22
211:3,7 214:22,
24 226:20
228:9

included 194:7

inconsistent
136:19

incontinence
131:6,12 132:7

incorporated
62:3

independent
185:10

indicating
26:3 157:12

indications
227:1

individual 94:4

inferring 38:3
74:21

influence
46:21,22 88:10,
20 91:11

info 208:11,12

inform 83:3
197:9

informal 9:12
95:9,13 161:11

information
33:5,9,10 34:4,
5,12,17 36:18
38:4,15 45:9
49:9 50:21
73:18 85:20
89:15 97:18
103:16 104:2
106:13 119:14,
18,25 120:17
123:2,17,18
124:17 126:3
130:22 144:1
145:6,10
172:17 173:2,
22 181:8,20
184:17 188:3

informed
179:14,17
185:13 196:16
197:5,7 201:2
209:15 210:6

informing
194:11

initial 98:3

initials 78:13

injured 87:6
90:19 91:10

injuries 92:6
94:25 95:3 96:5
116:5,11

injury 90:19,20
91:12,13,15,18,
24 92:10,16,19,
24 93:2 94:3,

17,18,21,22
95:17,25 96:24
113:23 116:9

inmate 28:6,10
30:7 33:2 38:7
41:11 45:16,18
86:21 88:10,19
135:16 179:15

inmate's 86:25
126:6

inmates 28:16
29:5 69:9 76:14
133:9 166:21
190:11 199:21
227:9

inside 51:24
155:24 177:3
219:21,24

installed
177:11

instance 101:9
219:11

instruct 11:10
66:17

instructed
63:19 139:18
143:7 158:24
193:18 208:10,
25 210:6

instructing
140:4 151:13

instruction
143:5,11
154:13 159:5,
21 174:20
193:14 207:21
208:19,22

instructions
159:6 160:2
171:9,22
187:14 193:23
194:13

insulin 124:5
135:17,20

insurance
125:9

intake 23:19
29:25 30:22

31:1,17,24 32:9
33:15,17,25
82:14 83:7,15
84:1 90:23
99:17,18,19
100:1 103:6,18
105:21 110:13,
17 112:7 114:8,
12,14,25 115:5,
7,14 116:5
119:14 133:5,6,
17,25 140:18,
20 141:20
142:15 143:14
144:4,11,21
148:4,7 150:17
164:2 167:22
179:12 213:25
221:3,12

interact 112:6

interacted
165:16

interacting
112:17 114:23

interaction
14:19 99:9
112:3,10 113:6
116:21 144:20
164:16

interactions
190:14

interested
13:20 39:15,18

interfere
156:25

interrupt 76:11
83:20 146:14

interrupted
68:9

interview
117:5 127:3
144:25 203:3,9,
10,12,15

interviewed
202:20

intoxicant
89:2

intoxicated
110:8,24 116:1



introduce
150:23 189:8

introduced
8:23 68:10

intrude 16:24

inventory 38:5

inventorying
38:16

investigated
200:14

investigation
203:15

involved 90:16
148:3,6 149:3
215:9

involves 17:19

involving
199:21 218:17

issue 47:25
92:14 97:19
133:6 180:1
194:5

issues 41:11
42:7 83:5,6
98:6,18 99:5
107:19 108:3,
12,16 113:25
114:17 127:22
128:2 141:23
144:1 145:6
179:13,14,18,
24 182:6
208:25

item 106:13
108:15 117:23
119:3

items 38:5 67:5
106:3 115:6
117:12,19
124:16

---

**J**

---

jail 16:3 17:19,
22 18:3,20
20:2,6 22:11,16
24:13 28:25
33:24 36:20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

37:5 40:15
41:15 43:22
47:11 52:21
56:14 58:23
59:15,18 60:9
61:2,6,9,10,19,
23 62:11,18,20,
24 65:20 66:8
67:2 68:2,12
69:10,15,17
71:10,16 74:23
75:1,10,22,23
76:24 80:6 85:5
94:13 113:19,
22 119:5
129:20,25
132:10,18
133:2,14
134:10,21
135:18 136:10
139:19 140:4
143:7,17
144:10 149:3
160:22,24
164:1,7,21
168:7 170:11
174:12 175:4
179:4 182:15
184:7 187:10
188:23 190:15
200:8 202:22
203:23 209:12,
20 210:4
211:22 212:4
215:14,16,18,
19 225:11

jail's 63:21

jailer's 126:7

jailers 58:16

jails 71:13

James 213:16,
19 215:5

January 58:3

Jeff 186:8,22
197:17 202:25
210:8,9 214:13,
18

Jeffrey 202:25

Jesse 190:2

job 24:12 57:1,

21 58:8 62:15
63:4,6,12 65:8
76:3,4 77:14,17

jobs 63:14

jogs 212:3

John 7:22
14:16 16:6,23
50:16 156:20

Join 132:25

Jordan 160:21,
24 165:15,16
212:12 213:6

judge 9:18

jury 9:19

justice 57:23
60:5,7,19
61:17,24 62:17

———

K

———

K-W-I-K 56:25

Kentuckiana
7:5 205:6

key 155:10

keyboard
73:18

kind 20:1 24:19
25:24 28:11
34:7 37:20
46:17 47:21,22
49:14,15 55:4
106:24 107:14,
19 114:17
122:7 182:5
216:10 217:6
224:19 226:21

Kirk 190:2

kitchen 57:8

knew 21:7
180:1 193:6

Knott 7:25 8:1,
12 19:10 42:9
132:25 139:6,8
143:10 166:12
169:4 187:11
205:1,10
220:23 221:8

222:3,7 223:14,
18,21 224:8,10
225:11,14,16,
22 226:4,7,8
227:22 228:22

know' 131:20

knowing
209:11

knowledge
163:9

Krystal 7:4
43:10 104:25
147:22 206:10
224:1 228:24

Kwik 56:17,22,
23 57:11 58:5,7

Kyle 175:15
185:1 186:8,17
198:2 205:14,
22 212:12
213:6 214:12,
14,18

———

L

———

La 121:19,20
209:25

label 24:7

labeled 36:6

lack 63:13

Lacks 222:4

laid 24:3
227:14

laptop 70:8

large 44:25
45:7 92:24

larger 49:10
53:24

lasted 64:12

late 135:5
148:15 173:7
178:4,7

law 57:19 60:7
61:4,12,22
62:17 65:21
202:1,3

lawyer 36:15
202:21

lawyers 11:8
89:17

lay 197:4

laying 156:1,2
227:3,10 228:8

layout 18:3

leader 57:4

learn 171:16
180:7 181:14

learned 209:18

learning
207:21 208:7

leave 25:14
31:11,19 90:9
97:22 98:4,23
117:20 164:20
171:24 178:7
194:12 195:21
201:10

leaving 28:9
80:8 99:10
109:20 111:23
135:22 178:4

lecture 66:14

lecturing
65:14

ledge 97:16

left 17:24 20:20
21:16,18 22:13
24:22,23 37:21
54:20 55:17
57:3 58:7
59:18,24 73:15,
20 74:19 83:3
90:12 97:16
99:7 112:9
136:2 155:22
164:6,8 165:1
168:7 186:5
196:12 211:19

left-hand
78:11 119:11
160:18 164:11

Legs 128:8

Leslie 212:13

letter 22:20

letters 40:11

letting 208:1

level 46:11,17,
24 90:25
113:12

lieutenant
75:13,15,16
184:6 203:12

lifts 130:4

light 227:5,8

lighter 216:11

lights 227:8

lines 49:14
97:3,6,7 106:5
107:24 116:21
127:23

Lisa 8:2 140:4
141:8,19,22
142:19,24
143:5,12
159:16 163:18,
22 174:21
193:16

list 123:24
124:4 132:11
136:11 163:2
170:5 172:2,8
187:3,4 214:10
215:2 217:3

listed 57:21
169:24 212:7

lists 123:10,21
187:9,13

literature
68:21,22

live 87:16
126:20

live.' 111:12

lobby 209:8,
12,16

located 7:6

location 7:16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

log 38:7,9
150:24 151:4,
16 152:10,11
153:10,11,12
154:2 155:13
157:18 158:3,4
175:5 177:25
180:16,18,24
185:16 191:18
194:17,23
198:18,20,21
225:12,17

logistically
17:17

logs 16:3
152:15

long 13:7 22:9
62:1 64:5,9,11
72:21 110:7
113:5 115:25
170:10 222:15

longer 40:5
85:4 160:21

looked 10:11
17:6,11,13 20:4
31:23 32:9
65:12 82:15
83:16 117:2
155:12 158:2
189:11 217:13,
15

loose 137:8,12,
24 138:5,8
139:1 164:19

lot 33:13 76:15
77:2,4 87:22
89:17 96:20
97:18 98:7,9,
18,25 99:5
146:23 147:9
162:19 163:13
164:23 171:4
172:25 184:22
208:5 226:18

Louis 160:6

low 147:9

lower 35:11
78:11 79:9
175:17

lowest 20:24

Lucas 101:9
138:19 148:18
149:4 160:7,8,
12 161:6
163:20 164:1
165:21 167:8,
16 168:15
174:22 178:20,
21,22 179:10
181:4,6,9,10
183:10 185:1
186:8,16
194:20,24
195:5,19 196:7
197:5 198:18,
20 204:4,8,11,
13 208:16
212:8,12 213:6,
18,24 214:8,18
225:1

Lucas' 149:19
225:4

lunch 106:1
116:6

lunch- 104:8

Lynn 8:6

_____

**M**

machine
174:12

made 43:25
47:13,14 78:16
157:18 158:3
203:13

main 55:15
215:17 227:8

major 199:21

make 10:17,23
11:9,11,16,25
12:7 13:4,11,22
16:6 18:25 19:1
20:8 35:11
40:18 45:10
47:11 49:3 68:7
115:13 119:11
135:19 142:18
146:18 168:17
169:11 177:7

227:21

makes 10:25
22:4 153:20
201:12 202:12

making 194:24
228:19

male 68:19

manner 130:11

marathon
10:1,2

March 13:16
14:1,2,5,9,13
18:1 59:20,22

marches 182:5

marginal
119:10

mark 18:10
19:15 25:4
27:22 29:13,15
30:25 32:10
37:18 42:3
44:16 49:1
184:21 199:6
205:2 210:13

marked 18:11,
16 19:21 23:12
24:3,8 29:1,17
31:5 32:17
37:24 54:8 78:6
79:13 151:2
185:3 189:9,12
198:10,13
199:7,10
203:17,20
206:15,19
210:14,16
211:21,25
215:22,25
224:2

marking 31:17
43:17 49:2,8

markings
78:16

marry 115:2

MARS 220:4,8

master 29:7
42:2,4 43:25
44:2,7,10,11,

16,22 45:1,10,
15 50:2,5 76:25
174:15 189:5
191:16,23,24
192:5 194:25
195:2,8,12,21
197:5,13
204:12,14,20,
21,23 208:15
213:16,21
214:1 215:8,11

match 115:19

matter 7:10
20:10 129:12
171:24

maximum
46:17

Mayo 209:25

Mccauley 7:22
8:10 16:9,13,
17,21 42:6,11,
16 43:1,3
48:13,17 50:14,
17 53:10 54:9,
14 55:21 61:25
63:11 65:3
66:15,25 68:23
70:25 71:6,21
72:8,19 73:22
76:22 77:8
79:20 80:12,15,
17 83:1,8,17,20
92:15,21 95:19,
21 96:3,15 97:8
101:16 104:5,
11,16,19 107:9,
17 108:19
111:25 112:2
115:9,11,16,18
116:7 118:21,
25 119:22
121:4 128:14,
19 131:13
132:20,23
133:8 134:5,15,
20,25 135:13,
23 137:5
141:14,16
143:2,10 147:6,
14,16 153:2
154:16 156:22
157:1,16
159:22 167:2

168:13,20
170:12,18
173:3,12
174:24 175:25
177:4,20,23
179:16 183:7
184:1,13
188:10,15,20
189:15,19
191:13 192:10
194:6 196:14,
20 197:1 199:2,
15 200:6
202:14 204:24
205:19,21
206:2 217:7,10,
23 218:14,22
219:7,25
220:22 223:19
224:3 228:4,23

meal 175:24
176:2,5,14,20

meaning 95:9
128:17,20,25
155:9 159:10
180:20,22
221:20

means 113:18
128:12,22
131:10,11
139:24 158:12
176:6,7

med 55:17
132:10 133:11
134:9 136:11
141:25 142:8
168:21 187:19
190:3,23

medical 15:17,
18,20 16:2
23:16 28:9,13
30:1,3,22 31:1
41:7 47:3,13,
16,17,25 53:5,
7,16,21 54:12,
18 55:9,16,20,
24 56:5 65:25
67:3,4,11,12
68:2,17 69:5,8
70:14,17,20
71:4,5 80:10,24
82:13 83:5,6
84:1,22 87:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

92:14,23,24
93:11 94:4
95:23 96:9,10,
20 97:13,19,25
98:6,9,13,18
99:1,5,19
105:22 107:15,
19 108:3,8,12,
16,23 109:21
110:5,7,13
113:3,10,15,17
114:3,5,8,12,
14,15,17,25
115:5,14,24
116:1,4 117:6,
13 123:23
133:15 134:10,
11,13 135:8,9,
15,16 136:5
141:23 142:1,6,
8,10 143:25
144:1,4,11,13,
18 145:5,6,9,11
146:3,8 150:9
151:14,21
158:25 159:2,3,
4,7,25 165:25
171:17 174:17
177:2 179:3,4,
6,13,14,18,20,
24,25 180:1,2,
13 181:1 182:1
187:8,20 188:4,
5 196:24
199:21 201:10
202:23 204:8
207:18 209:13,
19,21,24 211:3,
7 214:21 220:2
221:3,13 223:4
226:17 227:16

**medically**
90:14 93:6
114:21 228:7,
12

**medication**
9:23

**medications**
117:24 119:4
133:24 144:2
145:10 168:19
169:24,25
172:2,7

**Medicine**
118:13 130:16

**meds** 67:8
118:10 119:9
130:14,15,16,
20,23,25 131:2
132:6,22 133:2,
3,10,12,14
134:6,8,10
135:6 136:4,5
140:7 142:11,
13,16,20,23,24
143:3 145:7
166:17,20,22
167:3,4,9,11,
14,15 168:16,
24 169:14
170:3,4 185:14
186:24 187:12,
15,16,17
190:12,19
209:9

**meeting** 14:11,
13,14

**memory** 69:11
99:25

**memory's**
190:21

**mental** 47:20
48:1 65:25 69:4
70:17,20 71:1,5

**mentioned**
14:19 38:23
46:21 47:1,24
60:25 61:1 64:2
67:4 80:23
90:24 106:2,4,
14 108:22
144:5 146:1
151:12 213:12

**mess** 80:24
214:9

**mess.'** 80:10
109:21

**met** 14:6

**mic** 156:21

**middle** 142:1,5
167:6 169:3

**might've**

152:5,19

**Mike** 156:15,19
157:3 175:10,
11 181:13

**milligrams**
217:9 218:6,24

**mind** 49:10
104:6 118:22

**mine** 84:8,9,15,
25

**minimum**
46:17

**minute** 54:4
71:8 136:8
199:3 223:20,
24 224:6

**minutes** 72:14,
16 73:1,6 74:16
102:25 104:10
127:17 147:14
162:15 173:7
197:25 205:25
206:3 221:5

**mirrors** 45:4

**mischaracteri
ze** 73:23

**Mischaracteriz
es** 73:22 96:4
115:11,18
116:7 135:23

**misstates**
53:11

**mixing** 105:16
212:23

**Moga** 175:15
185:1 186:17
205:14,17
214:18

**moment**
200:25 203:24
220:18,20
227:23

**Monday**
103:24 134:14
135:12,22

**money** 38:6

**monitor** 51:24
154:13 219:17

**monitored**
151:17

**monitoring**
47:3 151:19
152:2

**monitors**
215:12

**Monroe** 7:24
17:21 18:11,20
32:13,14 56:14
58:10 59:18,25
60:3,10 62:10
71:16 78:3
105:16 150:24,
25 184:24
198:10 199:7
200:2 203:17
206:15 210:14
211:21,22
215:22 223:15
225:17

**month** 13:17
14:23,25

**months** 13:18
15:1 64:13

**morning** 7:3,
19,22,25 8:22
168:9,10,25
170:8 173:11
177:17 178:8
185:17 210:25
211:6,14

**mouth** 181:22

**move** 148:2

**moved** 41:13
155:11 157:15

**multiple** 65:4
70:11 108:2
161:15 162:16
179:18

**muster** 182:4

---

**N**

**names** 146:10

**narrative** 27:2

78:2 109:3,4
206:16

**necessarily**
10:15 142:23
152:17 158:11
182:2 184:14

**needed** 34:14
40:24 41:7
67:10,11 72:25
90:12 91:20
93:7,11,12,17,
22 94:3 96:8,12
107:11 110:5
113:3,9,14
114:3,11,18
115:24 123:17
124:4 159:8
187:19 192:17
201:17 203:23
224:18

**Nelson** 7:10
8:4,6,8,22
12:16 13:13
17:1 18:10
19:17 23:3 31:4
39:6 42:23
43:9,14 49:22
50:20 54:3
56:11 73:24
77:25 78:5 79:1
80:19 84:2
85:13 100:18
101:19 104:24
105:3,20 109:6
136:2 147:21
149:12 166:14
175:3 189:10
190:21 192:3
198:8,12 199:8
202:5 203:18
206:9,13,18
210:18 214:4
215:21 217:25
220:11,16
221:10 224:11
225:23 226:9
228:1

**nervous**
215:15

**network**
121:16,21

**nice** 80:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**night** 23:19 24:14 44:9 71:22 72:2 75:11,13 76:25 135:6,11 148:8 167:6 169:3 170:10,16,21 171:1,4,5,10,23 172:16 182:20 186:3,18 188:1 192:16,19,20 195:13 212:20 213:10,15,16 214:21 227:11

**nightlight** 227:7

**nights** 170:13, 14

**normal** 11:1 176:10 187:7 193:4,5,13,21 228:17,20

**Northpointe** 45:25

**notate** 124:2

**notation** 119:10

**note** 10:19 27:1,2 78:2 97:10,19 106:12 109:3,4 116:13 148:6 150:13 151:18 164:5 175:22 180:25 190:10 206:16

**noted** 84:13 108:23 123:5 135:6 176:24

**notes** 15:18 16:2 106:8 108:1,5,13,17 117:8 125:16 126:19 142:25 195:4

**notified** 207:11

**notifying** 207:14

**noting** 106:17

**November** 59:10,22 170:24,25

**now.'** 127:17

**NP** 139:19,23 143:7

**number** 7:14 19:6 34:5 84:5, 6 86:24 87:5 88:1 89:7 91:10 92:13 106:6 108:15 119:20 122:3 123:9,21 124:11,21 125:22 133:17, 23 160:12,15, 19 162:21,23 174:5,6,9 175:8 176:3,5 181:13, 22 200:7,8,22, 24 201:3,4,6,7, 11,14,17,20,21, 22,24 202:4,10, 11,16,17,18,19 223:9 224:22, 23 225:17

**numbered** 86:17 98:22

**numbers** 31:10 97:17 115:13 156:7,8 220:5,8,9

**nurse** 15:18 16:3 27:3 68:12,19,21 99:6 100:14 113:8,13 129:20,24 130:1 131:1 134:16 139:25 148:4 151:13 153:18,19 154:6 190:15

**nurse's** 99:7

**Nurse's/ officer's** 224:22

**nurse-on-a-** 219:16

---

**O**

**oath** 9:7,15

**object** 54:9 55:21 61:25 63:11 65:3 66:15 68:23 71:6,21 72:8,19 76:22 77:8 79:20 80:12 83:1,8 92:15,21 95:19,21 96:3, 15 97:8 101:16 107:9,17 111:25 115:9, 16 116:7 119:22 121:4 128:14,19 131:13 132:20, 23 134:5,15,20, 25 135:13,23 139:6 141:14, 16 143:2,10 147:6 153:2 154:16 157:16 159:22 166:12 167:2 168:13, 20 169:4 170:12,18 173:3,12 174:24 175:25 177:4 183:7 184:1,13 187:11 188:10, 15,20 191:13 192:10 194:6 196:14,20 197:1 199:2,15 200:6 202:14 204:24 205:19 217:7 219:25 221:19 222:2, 22 228:4

**objection** 50:14,16 53:10 54:14 66:25 73:22 96:17 139:8 179:16 217:10,23 218:14,22 219:7

**objections** 11:9 133:8

**Objective** 137:5

**obligated** 11:10

**obligation** 184:11,14

**observation** 87:3 88:21 111:8 150:24 151:4,14,20 152:11 154:5, 11 155:1 158:25 161:9 175:4 180:21, 24 225:12,17

**observations** 88:12 124:9 176:23 226:10, 15,16 227:15

**observed** 88:11,23 91:7 151:17 152:5 197:6

**obvious** 96:9, 10

**occasion** 70:11 219:12

**occasions** 70:11 177:2

**occur** 34:10 37:8 41:19 103:12 144:10 167:1

**occurred** 92:7 99:9 102:22 214:24

**occurring** 164:2

**occurs** 36:18, 20 98:20

**Odor** 89:2

**offense** 102:22

**offer** 208:8

**offered** 110:12, 16 176:21 207:22 208:2

**offering** 114:13

**offers** 114:8

**office** 55:16 57:24 77:16 105:10 200:9

**officer** 22:9 23:6,10 24:15, 16,17 25:6 28:9,19,20,25 31:11,18,19 34:8 35:20 44:9 45:12 58:18 59:3,5,9 76:5 77:3 79:22 80:9 81:4,10 82:2 85:4,6 90:9,12, 16 93:3,18,25 97:22 103:21 109:20 111:24 112:4,10,13,17, 18 138:2,7,10, 14,17,19,24 139:16 140:14 142:21 143:19 145:23 161:19 184:7 197:5 221:22 222:1, 11,14

**officer's** 90:21 98:4,23 117:20 156:8 201:7

**officers** 16:2 22:23 28:13 30:5,11 34:2 35:15 44:12 63:2,13 65:2,4 75:21 92:2 95:7 112:20 148:14 177:13 204:10

**officers'** 92:23

**officially** 13:14 72:15

**oftentimes** 147:10

**Ondansetron** 138:21 217:8

**one-time** 216:17 218:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

one-way 45:4

online 7:4

open 45:7 52:3,
5,8 132:9,19
136:10 147:7

opened 176:17
202:9,11

opening 27:10
189:7

operate 71:17

opinion 196:24

opportunity
40:17,21

opposed 70:7

option 30:12

order 34:10
35:23 133:14

ordered 133:3

ordering 22:19

organization
161:8

organs 127:14,
21

orient 50:1
54:17

other's 11:3

outset 65:19

overlap 72:4,6,
9,11,13 163:13,
14 172:22
173:1 181:14

overlapped
178:23 181:2

overly 83:9

overnight
120:6

overtime
73:15 74:15
186:2 212:21

oxycodone
130:15 136:4
138:21

## P

p.m. 71:22,24
72:2 74:22
75:4,6 101:22
102:1,24 103:1
104:21 105:1
147:18,23
150:14,21
152:24 154:5
164:12 183:3
184:25 185:18
189:22 190:22
196:3 206:6,11
229:2,3

pad 131:6

pages 184:22

pain 20:1 52:24
56:3 188:9
194:3,7

painful 21:8
24:24

painlessly
56:11

pants 128:9,22

paper 18:8
77:9 156:21
171:18,19,20
220:25

papers 26:23

paperwork
76:12 195:2,12

Parker 157:9,
11 178:15,23
179:1,13 180:6
181:3 185:1,16
186:17 195:18
196:10 203:22
205:14 213:12
214:15,19
220:13

Parker's 52:23

part 17:17
20:19 31:17
38:8 41:15
56:10 63:8,12,
18,24 65:17
95:14 102:9

112:21,23
142:15 166:1
185:6

part-time
58:12 64:16,17

part-timers
44:11

participating
167:22

particulars
23:18

parties 8:7

pass 173:5,7,
19 176:2,5,21
180:14,17
181:10,18
182:7 187:20
190:3,23 193:9

passed 14:7
83:11 172:16,
18,21 173:2
176:14 181:7,
19

past 72:17,21
73:2 110:7
116:1 155:17
162:14,15

pasted 198:18,
21

pat 28:12

pat- 25:11

pat-down
23:15 28:8 30:2
82:12

patience 42:23
89:17,19
220:17

patient 110:22,
23 111:11
112:23 113:3,5,
9 115:23
127:11,13
128:5,9 129:8,
11 130:2,14
131:2,19,20
136:3 137:7
208:11

patient's 209:8

pay 61:11

PBT 85:25
88:24 90:13,24
94:7 95:24
96:5,25 110:24
116:9

PBTS 94:2

PD 80:9 109:20

peanuts
122:23

pedantic 89:18

pee 127:16

peeing 127:17

pelvic 130:3

pending 7:12
10:22

people 11:2
16:1 28:15
62:14 64:9 65:7
72:5 146:19
147:9 148:3
155:20 160:4,8
161:4 165:21
171:4,7 172:11
181:16 182:1
185:1 186:13,
16 187:7,12
190:7 210:24

percent 132:15
175:19,23

percentage
175:22

perform 30:22
86:8 192:13
219:12

performed
29:25 82:16

performing
52:24 76:18

period 56:21
64:5,12,15
193:20

person 15:2
20:21 22:14
25:8 26:8 29:6

30:4,16 32:21
33:18,24 34:13,
21 35:4 36:20
39:12 42:2
44:8,14 45:10
46:16,22 53:3
66:14 67:14,16
68:14 75:10,23
76:9 85:20
86:10 87:9 88:7
91:11 94:1
100:7,8 120:9
126:12 142:18
146:3 148:16,
17 152:1,5
156:6,7 157:14
159:16 161:10
162:18 173:6
176:23 179:4,
21,25 180:8
181:12,14
182:5,8 186:19
202:10

person's
37:25 219:24

personal 34:5,
12,17 38:16

perspective
134:4

pertinent
184:17

pharmacy
118:16 132:9,
19 133:3 136:9

Phil 214:20

phone 13:16
14:15,17 15:3,4
36:25 38:6,23
40:18 77:15,21
174:5 177:3,5,
7,11 197:10
204:15,22
208:12,17

phones 39:3,9
40:3,18 177:13,
16

photo 30:16
34:6,13,17
35:4,7,18,21
36:22 40:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

photo's 101:2

physical 92:10
93:2 124:12,13

physically
154:8 219:14

picked 145:22
186:2 212:21

piece 151:12

pill 139:11

pills 137:8,13,
24 138:5,8,22,
25 139:1,4,13
142:13 164:19
167:11 168:2,4

pinpoint
125:19

pipe 51:14

Pisney 8:2
140:1,5 141:8,
19,22 142:19,
24 143:5
159:16 163:18,
22 166:10,25
167:1 174:21
193:16

place 21:25
26:23 31:20,25
37:25 50:14
52:20 106:12
107:15 127:14
140:11 145:20
158:24 191:22

places 182:4
191:19

plaintiff 7:20
8:11,24

plaintiff's 7:18

plan 17:19
18:12,15,19
19:18 33:10
36:7 43:17
48:9,21 49:10
51:3 53:21
54:13 56:3 82:5
85:15 99:16
117:2

player 36:2

plug 104:6

pod 190:23
191:4 220:2

point 62:12
64:22 68:20
108:23 115:14
117:8,11,20
128:5 140:9
143:12 144:25
152:18 158:8
168:6 184:11
188:13 211:6

police 22:6,14
111:24 112:13,
17,18

policies 63:5,
8,17,20,22 64:7
65:1 66:7 67:12

policy 91:5
94:12,13,14
199:25

population
41:6,14,17,24
43:24 46:23
47:6,23 145:17

port 164:24

portion 148:25

POSC 66:24
67:1

position 58:15
155:19,22,23,
24 156:3 215:8

positions
155:11

possibilities
53:12

possibly 218:4

potential 94:3
187:4

potentially
96:2 190:11

practice 10:10
124:15 221:10,
11 222:8,9

practitioner
139:25 168:18
170:6 171:9,23

172:3,8,12
173:17,22,25
174:2,4,7,10

pre 21:5,6

pre- 24:6

pre-book 32:4
35:16

pre-booking
21:2,21 22:1
23:13 24:8 25:9
29:9,16 31:22
50:24 99:13

PREA 27:5,20,
23 28:15,16
36:3,5,23 38:19
39:1 40:24
81:18 99:14,22
100:7,12,15
116:22 117:1
127:3 128:5
143:22 144:23

preference
120:13,24

preferred
146:25

pregnancy
124:2,3

prep 13:18
15:5 17:8

preparation
151:8 185:6
189:11 198:12,
25 199:9
203:19 207:1
210:19 216:3

prepare 15:9
17:5,11

preparing
13:12 79:3

prerequisite
60:22

prerequisites
61:8

prescribed
122:4

prescribing
122:8

prescription
117:24 133:24
187:3

prescriptions
187:8,9

presence
164:6

present 96:23
166:3,4 179:12

pressure
118:10 130:15
136:4 188:13
193:13,19,25
194:4,8 219:9,
12,17,18,23

pretty 56:11
222:19

prevent 9:21
146:5

Price 56:20
57:15,19

primary
120:13,23

principles
67:1

print 33:3
34:17 53:25

printed 18:7
85:17 184:19

printouts
32:20 68:25
77:10

prints 34:14
36:22 40:24

prior 14:6,12
28:9 46:2,3,9
60:10 92:5
117:15 153:10,
11 197:2 209:1
228:9

private 36:14

Proair 216:21
217:3

probability
86:25

probable

103:21

problem
42:10,19
132:17

problematic
190:14

problems
87:22 96:20
97:13,25 98:9,
13 99:1,5
107:15

procedure
72:14 123:13
134:3 159:15
168:17 173:10
180:12 181:25
187:16 199:22,
25

procedures
66:6 174:19

proceed 13:11
205:8

proceeded
81:22

proceeding
205:2

PROCEEDING
S 7:1

process 23:19
28:1,4,10,17
33:23 36:17
38:11,18,19
39:17 40:10,12
41:12 45:18
46:15 47:14
81:9 82:24
93:24 95:10,14
98:20 99:24
102:9 111:23
119:14 125:19
140:10 142:15
150:7 158:8,13,
18 167:22
173:21 183:23

processes
40:1

produced
32:12,13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

product 16:24
131:12

professional
196:24

program 60:5
61:14,15,16,17
62:4,14 73:11,
14 74:5,7,9,12,
19

programs
30:10 62:19
66:9

progress 27:2
59:7 78:2

projector 70:6

promoted
59:10

prompt 88:9
98:10 107:7
118:16

prompted
127:10

prompts 86:17

pronounce
27:3

proper 203:9,
10

property 38:7,
16 138:8

protocol 52:24
56:4 141:24
142:5 159:13,
16,18 166:16,
19 171:8
173:15 193:11,
17 194:3,7

protocols 67:9
220:1

provide 68:17
85:21 87:9
89:11 106:21
107:6

provided 68:2
103:21 119:13
120:17 124:19

provider 47:20
70:17

providing
89:21 90:6
125:3,7 160:1

psychiatric
89:8

PT 110:5,7,20

public 36:11,
12

pull 16:17
30:25 105:20
192:2 206:14
223:13

pulling 194:17
223:10 224:5

purpose
151:16

purposes
12:10 146:2
147:8 176:14

purse 137:8,13
138:7,10,11,14,
25

push 103:22

put 12:11 16:8
21:23,24 22:23
28:15 33:3,4
39:4 44:17
47:11,15 49:21
52:8 54:11
62:13 88:15,21
104:5 111:20
143:24 145:5,8
149:17 151:13
152:17,19
154:8 158:8,19
159:2,4,25
165:11 171:18,
19 180:2 190:9
198:4 223:5
228:24

putting 37:5
40:11 49:4
159:6 179:25
180:11 197:3
226:24 228:10

___

Q

quarter 185:17

question 10:21
11:10,13,23,24
31:9 32:14
39:20 83:9
86:17 87:2
88:2,6,13,15
89:7,10,20
90:1,5 106:21
107:1,6 108:14,
25 118:2 119:7
120:5,12 123:1,
7 124:11 125:7,
9,12 129:23
133:22,23,25
179:7 186:11
201:13 202:7
206:25 207:4
219:8 224:11,
12

question's
122:14

questioned
112:25 115:22
129:8

questioning
116:24

questions
10:6 11:3
85:20,22,24
86:21 87:8
89:17 90:11,15
98:10,12
106:17 107:7,
10 110:4 125:3,
13,20,24 148:1
220:18,19,22,
23 221:25
222:10,17
228:23

quick 42:21
62:16 71:12
83:16 112:24
147:13 219:8
228:1

quickly 17:21
29:15 32:12
49:2 50:1 61:3
133:16 138:9
139:23 144:3
148:1 154:20
185:5 192:3
195:18 206:25
215:4 221:4

quote 87:15,21

quoting 87:12

___

R

radiation
108:3 127:15

radio 29:7
198:6

raise 8:13

ramble 97:12

rank 59:21

rankings
58:22

ranks 59:8,13

read 12:11,16,
19,20,22 13:2,7
16:8,19 54:4,16
63:17 79:13,21
80:15,19 87:15,
21,24 88:23
110:23 121:2
123:20 133:20
149:14 152:14
182:23 199:3
201:18 205:13,
16 207:1

reading 50:18
54:2 63:8,16
64:25 77:18
86:4,7,20 88:25
115:22 152:8
154:2 175:22
176:19

ready 80:10,24
109:21

real 17:20
29:15 32:12
49:1 50:1 61:3
62:16 71:12
83:16 112:24
139:23 144:3
148:1 154:20
185:5 192:2
195:18

realize 205:22

reason 42:16
93:25 95:17

116:4 123:1
137:1 157:20
159:9,13,20
162:14 166:24
178:5

reasoning
145:24 201:25

reasons 41:7
47:2 94:6 95:25
162:16

rec 54:3

recall 23:20,21
40:12 46:6
52:16 55:24
63:19 64:1
65:16 69:1,3,6
70:10,16 71:10
79:21 80:5
81:4,7,9,14,16
82:1,4,6,11,25
91:18 93:25
95:2 96:14,18
97:24 98:5
99:4,25 100:13,
14 106:20
107:12 108:24
109:25 110:2
111:14,16,17
112:3,10,12,16
113:11,13
116:20 120:3
121:1 125:24
126:25 127:2,9,
21,23 130:1,11,
18,19,24
132:16 133:1,6,
9 135:15
136:16 137:18,
20,22 138:12,
24 139:22
140:6,8,13,15
141:21 142:24
143:3,11,18,21
145:24 148:2,3,
20,23 155:10,
13 158:18
159:6,8 160:1,
3,4,9,23 161:2,
4 164:1,17
166:9,11,15,17
167:8 168:10,
12 172:2
178:25 179:2
183:13,16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

186:3 187:12
188:2,3 190:6
191:14,16
192:18 193:11,
15,24 195:1,10,
23,25 196:10
198:15 201:23
205:22 207:14,
17,20,21 208:1,
13,16,18,21
209:4,11 210:3,
5 212:12 213:5,
10 214:5,20
215:1,5 223:10
226:18,19
227:12

**recalled**
167:13

**recalling** 81:2

**receive** 67:5
69:10 204:15,
22

**received** 60:3
65:20 93:14,17

**receiving**
188:3,18
200:11 201:5

**recheck**
193:12,25
216:16 218:9,
11,16 219:4,8

**rechecked**
193:14,19

**recognize**
18:19 32:15,22,
23 67:23 78:16,
19,24 79:24
144:7 151:1
175:7,13 216:7
218:9,12 219:2,
5 220:7 221:1
224:13,16
225:3

**recollection**
32:5 45:22
52:19 55:9
79:17,19 81:22
100:1,3 109:14
110:10,15
112:6 116:15,
17 127:19

128:17 129:2,
14 130:9 131:9,
17 132:13
136:14,18
139:12 140:3,
25 150:6
157:20 160:24
164:14 165:8
178:4 183:15
185:10,12
212:3 217:18
226:14 227:10

**record** 8:5
32:11 43:5,7,8
48:5 74:18,21
96:19 104:16,
18,20,22,23
147:17,19,20
155:2 176:25
196:6,7 206:5,
7,8 228:25
229:2

**recorded** 83:7
102:11,17

**recording**
73:19

**records** 177:1

**recount** 20:5

**recounting**
144:21

**rectangle** 22:9
50:12 146:22

**rectangular**
37:21

**red** 19:10

**REDIRECT**
227:24

**refer** 68:5
88:24 90:9
95:22 135:8

**reference**
124:21

**referral** 201:5

**referred** 36:4
100:22 102:20

**referring** 63:21
68:6 111:21
131:14 140:8,

19 176:3
200:25

**reflect** 154:1

**reflection**
176:22

**refresh** 55:9
112:5 131:9
160:23 183:15

**refreshed**
165:8

**refresher** 66:1

**refuse** 95:17
96:1

**refused** 94:4

**regional**
121:16

**regular** 44:13
70:12

**regularly**
134:17

**reiterated**
92:24

**reiterating**
111:16 159:21

**relative** 135:7

**relatives**
187:7,15

**relayed** 45:10

**release** 76:13

**relieve** 192:24
226:16

**religious**
124:21

**remainder**
117:13

**remained**
204:21,22

**remem** 156:13

**remember**
14:3,7 30:11
40:18 63:16
64:8,9,10,14,25
65:1,18 66:3
67:19 69:4,19

81:8 82:18
83:22 92:17
98:17 99:1,3,8,
11 100:11
106:6 107:16,
24 109:14,15,
16 110:2
112:20 113:6,8
114:13 125:21
127:25 128:2
129:22 130:20,
21 131:3,25
132:2 134:18
136:25 137:4,
11,15 138:4,6,
15,17 139:1,15,
16 140:17
142:22 143:5,
24 145:3,4,22
148:11,17
149:2 153:16
164:5,8,19
165:9,10,13,15,
18,21 166:18
167:10,11,17,
19 169:5,6
170:7,8,13
178:6 185:9
186:1 191:7,9,
10 194:2,16
195:19 201:8,
24 205:17
208:4,6,7
209:14,15
211:5,8,9,10
212:10,13
213:20

**reminder**
83:21 161:17,
21

**remission**
129:9

**repeat** 33:19
101:6 106:25
163:24

**rephrase**
11:14

**report** 84:1
99:19 105:22
117:13,14,18
144:5 190:7
199:16,19
200:3,13,15,21

201:20 202:12,
15,19 209:25
221:4,13

**reporter** 7:3,5
8:4,7,13,19
9:12 11:5 43:5,
8 104:20,23
147:17,20
206:5,8 229:1

**Reporters** 7:6

**reports** 15:19
16:2,4 67:10
76:7 190:1,5,10
199:20 200:10,
12

**represent** 7:23
8:1,23

**representing**
7:5,20

**request** 83:17

**requested**
103:22

**require** 65:22

**required** 64:9
65:25 90:11,15
91:21 184:15
185:20 199:20
201:10

**requires** 65:21

**requiring**
92:11 94:21

**resembling**
66:19

**reserved**
144:10

**responding**
120:10 129:16

**response**
118:15

**responses**
85:23

**responsibility**
90:22

**responsible**
76:6 133:2



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

rest 10:5 26:23 38:8 117:18 168:14 173:7 203:14 215:14 225:4

restrictions 41:5

restroom 42:21

result 86:13

resumes 182:18

rethink 73:9

return 106:1 133:16 144:20 145:15 175:3

Returning 136:1

review 77:11, 23 144:11 199:12

reviewed 15:9, 13,25 17:2,5 31:7 51:19 56:6 84:8 109:8,12 125:15 144:6, 10 151:8 181:3 198:11,24 199:8 203:18 210:19 216:2

reviewing 76:7 183:24 199:13

Revised 84:17 140:22

Reynolds 7:23

right-hand 147:1 175:17 224:17

ring 203:1

rise 227:20

risk 146:7 180:10

RN 110:4,12 112:25 127:10 129:4,8 130:14 131:2,3,5 132:8 136:6,9 137:23

138:4 139:18 143:7 207:11 208:10,25

road 58:17 201:7

role 44:8

rolled 156:2 197:6

rolling 177:10

room 8:3 11:8 12:3,7 23:11 24:3,8,18 25:9 26:4,7 27:5,19, 20,23 28:16,20, 23 29:4 31:22 36:5,24 37:19, 21,24 39:1 44:17,21,22 55:17,18 66:16 67:17 70:2 81:18 100:12, 15 108:22 112:18 116:22, 25 117:1,4 127:3 128:5 129:6 143:22 144:23 150:2

rooms 55:24

rotation 222:25

rough 149:5 170:15

roughly 69:11 170:16 176:12 190:23

rounds 161:9

route 29:7

rule 135:22

rules 9:13 10:14

run 71:13

Runice 101:9 138:19,24 139:16 148:18, 19,20 160:6,7,8 161:6 163:20 164:1 165:21 167:9 168:16

174:22 179:11 185:1 186:16 194:21,24 195:5,16,19 197:5,18 204:4, 8,11 212:8 214:18

Runice's 160:12

running 92:7

rush 197:19

Ryan 198:21

— S —

safety 66:5

sake 22:18

sally 164:24

sat 203:11

Saturday 134:16,23 135:5,11

save 56:9

saved 200:8

scenario 127:14 141:6

schedule 135:16 193:1,3

Scheduled 103:6

school 60:12

Schwanz 186:9,22 197:17,23 210:10,11,12 214:13,18

Science 60:6

screen 12:14 16:8 18:15 21:11 29:25 30:3,23 31:4, 17,19,24 32:9 33:15,17,25 43:18 48:14 82:14 133:17, 25 140:20

144:11 150:17 189:18

screening 15:17,20 28:9, 13 30:1 47:13 82:13 84:1 99:19 100:2 105:22 106:16 114:15 115:5 117:13,18 119:14 125:23 134:11 144:4, 13 150:9 221:4, 13

screenings 144:18

scroll 90:16 155:13 182:24

scrolling 84:11

search 15:18, 22

sec 223:7

section 106:8 108:1,5,13,17

security 46:11, 17,24 47:8

seeds 122:23

seizures 147:10 180:10

select 97:7

selecting 97:5

self-check 77:10

send 43:24 61:11 96:1 171:17 181:25 208:11

sending 188:18

senior 63:13 65:1 184:7

seniority 76:1

sense 10:17,23 11:11,17,25 12:7 13:23 16:6

20:8 22:4 68:7 153:20 201:12 202:13

sentence 12:20 13:8 109:18,19 110:19 111:18 112:11,24 115:23 128:4 130:13 138:20

sentences 110:12 111:22

separate 62:5

separated 197:14

September 17:23 58:12 62:11,20,22

sequence 129:22

sergeant 58:23,25 59:11, 15,25 75:9 76:2,4,13 77:20 110:5,6 112:25 113:4 162:18 170:21,22 184:5

sergeants 75:25

series 153:14

service 57:4

session 15:6

set 25:19 63:17 71:14 72:13 103:12 173:9 223:5

setting 9:12 12:2,12 47:8 69:23,24 70:3

setup 25:17

severe 90:20 91:22

shadowing 63:13 64:3,6 65:1 95:10,14

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

shape 26:14
27:10 44:20

shaped 37:21

share 149:6,10

shared 51:9,12

sharing 12:14

Shasta 52:23
157:9,11
178:15,23,25
179:13 180:6
181:2,19 183:9,
18 185:1,5,15,
16,23 186:5,8,
17 192:15,19
195:18 205:23
212:16,20
213:12 214:12,
15,19 216:13
220:13 226:16

Shasta's
183:18 216:11
218:15,23
219:3,6

she'll 137:16

sheet 33:2,21
45:13 46:7
100:19,23,24
101:5,7 133:7,
11 134:9
140:18 141:25
142:2,7 148:7
149:9,11 155:6,
21 165:19
180:22 187:19

sheriff's 57:24
105:11 200:9

Shield 125:10

shift 71:11,22,
25 72:2,15
73:2,6,15 74:4,
22 75:12,13
77:18 135:3
148:12,13
162:9 163:10,
22 167:1
168:14 170:10,
17,19,20,21
171:1,10,12,24
172:12,13,16
173:16 174:22

176:10 178:11
179:14 182:4,
10,12,18
183:18 186:4
188:1 193:4,5
195:9 209:1
211:6,9,11
212:5,7,11,13,
14,20,21,22,23
213:10 214:5,7
215:2 222:24
223:1

shifts 71:13,
16,18,20 72:5,6
163:14 172:22
173:1

shit 127:16

Shoppe 118:13
130:16 136:5

Shopping
182:15

short 20:3
56:21 151:18

shortcut 150:5

shot 12:13

show 13:5 18:6
19:1 48:19
63:3,5 72:14
77:18

showed 51:19
181:18 186:6
209:21

shower 37:23
154:21,23

showing 18:8
21:10 69:1
100:17 105:21
212:2

shown 67:10

shows 182:5

shutting
127:15,22

sic 78:4,12
84:11,12
109:21 110:6,7
113:4 118:16
120:6 122:2,3,8
136:3 160:6

181:13 190:1
203:24 207:11
209:1

sic] 110:24

sick 87:5 91:9

side 119:11

sign 126:10,13,
15 144:14,15

sign-off 78:20

signature
78:20 79:24
80:3 126:6,7,9
144:7 206:18,
22

signed 38:10
101:14 141:3
206:16

significance
201:9

significant
91:12,15,17
93:8 94:16,17,
21,25 95:3,17,
24 96:24
116:10

signs 88:11,23

silly 202:7

similar 157:21
218:10 220:1
225:5

single 154:11

single-page
78:3

sit 12:12 24:17
25:3 26:9,11
35:1,4 63:17
66:16 73:17
74:12

sites 121:21

sits 25:6,18
35:2

sitting 16:10
29:1 35:16 44:6
65:12,14 76:20
105:6 156:2
188:21,24

197:3 226:24
228:9

situation
139:19 140:5
143:7 184:3

skin 111:5

sleep 182:11,
13

sleeping
196:6,7 227:2,
3,11,20

sliding 23:1

slightly 152:19
201:13

slot 176:14,15

slow 21:18
224:5

small 18:14
37:19 53:25
54:15 121:24
165:10 168:10

smaller 97:17

smelled 89:5

sober 91:8

soft 227:8

solemnly 8:14

someone's
25:14 43:22
78:20 115:7,13
179:3

sort 9:24 12:6,9
19:6 20:7 23:18
26:3,21 31:10
33:23 34:9,20
35:12 44:21
46:11 59:4 60:2
65:23 66:8
67:3,11 70:4
73:13,18 74:5
78:13 79:6
86:17 90:12
91:22 98:20
100:7 106:4
109:13 117:5
121:10 125:12
149:17 150:1
152:4 154:13

161:10 166:3
173:15 184:10
190:13 199:20
215:15,23
227:19 228:6,
11

sounded 163:9

sounds 30:22
43:3 46:10,15
57:18 62:6
66:20 77:1
111:20 136:24
142:23 148:2
163:8 165:20
202:7 204:10,
11 208:18

South 7:6

space 97:3,17
121:14 123:22
124:19

Sparta 105:7,8,
16 121:23

speak 36:15

speaker 42:17

speaking
14:16

special 41:11
47:9 122:4
134:19,21
135:4 194:13

specific 44:14
111:18 123:17
126:25 127:22
130:20 143:11
146:9 159:3,11
171:15

specifically
107:20 136:17
138:12 140:15
143:20 145:22
161:3 166:15,
18 167:10
201:8

speculation
108:20 137:6
205:21 217:7
222:4,5

spell 85:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Spencer** 202:25 203:3

**spent** 170:16

**spill** 106:4

**spilled** 106:13

**spoke** 13:14,16 114:18 208:15 210:8

**spot** 23:3 42:5 44:18 49:4,9,22 58:13 84:14

**squad** 22:8,11

**square** 44:21

**stack** 85:18

**staff** 44:13 47:11 67:2 69:5 76:8 77:13 92:23,25 95:23 133:2,15 134:11,13 135:8,9,15,22 139:19 140:4 143:7 144:11 160:10 164:23 176:24 179:5 184:14 185:20 202:17 203:14 207:23 208:11, 25 209:2,7,24 210:4 211:23

**staff/medical** 211:23

**stage** 97:22 98:3 108:15

**staging** 47:10 52:4

**stain** 128:10

**Stan** 184:19 198:22

**stand** 35:7,8

**standard** 103:23 159:14 163:10 168:17 179:21

**standardized** 32:19

**standing** 128:5 226:22,23 228:8

**star** 84:4 157:12,23

**start** 17:21 18:9 58:10,25 59:2 77:18 136:3 158:19 195:9 221:3

**started** 13:15 14:4,9 19:17 66:13 72:15 73:14 74:4 150:7 152:18, 22 153:4,10,11 154:9 158:3,4, 12,14,20 164:18 202:15 223:2

**starting** 7:17 60:22 62:20,22

**starts** 128:4 182:12

**state** 7:15 8:5 65:21 113:21 197:20

**stated** 79:22 80:9 129:11 131:20 135:17 137:7 169:14 172:23

**states** 7:13 108:2,4 111:11 112:23 130:2

**stating** 107:23 127:14 166:18

**station** 56:24

**stay** 41:7,8,24 47:5 57:17 69:14 72:16,20 91:6 110:13,16 114:8,13 146:6 148:14 162:14, 17,19 173:6 185:20,22

**stayed** 56:22 73:1 178:8 204:11,14

**staying** 72:21 163:15

**stays** 185:18

**STBA** 66:5

**step** 22:5,19 33:25 36:19 37:1 46:7 47:22 82:1

**stepped** 140:10

**steps** 34:9 39:22 81:24

**Steve** 8:23 42:6,9,13 48:13 80:13 83:17 104:5 118:21 189:16 205:1 220:25 223:21 225:11 226:4

**Steven** 7:19

**stiches** 91:21

**stick** 45:14 112:20 219:17

**sticking** 164:15

**stitches** 92:11, 16,20 93:3,7, 12,14,17,22 94:3,21 96:8,12

**STO** 62:14

**stocking** 57:8

**stop** 55:1 111:19 187:2 212:9

**stopped** 83:3 99:14 112:8 126:20

**store** 56:23

**straight** 25:20 37:14 158:1

**strike** 71:12 107:14 156:6 171:8 188:17

**strip** 15:18

**struggles**

133:1

**stuff** 57:23 66:12 76:16 124:3,5 132:3,5 178:11 182:8 188:22 198:17

**subject** 67:1

**substance** 13:20

**sugar** 193:12

**suggest** 86:25

**suicidal** 47:2, 21,25 90:15 146:3

**suicidality** 90:2

**suicide** 41:8 47:12,15 146:7, 12,23,25

**summary** 199:14

**summoned** 25:10

**Sunday** 132:21 177:2

**Sundays** 132:10 134:17 135:15 136:10

**super** 12:17 32:3

**supervisor** 190:15

**support** 204:9

**supposed** 179:6 203:25 222:15

**surgeries** 120:6 130:4,5

**surrounding** 141:6,18

**swapped** 195:1

**swaps** 212:21

**swear** 8:14

**sweating** 228:18

**switched** 30:10

**sworn** 58:15, 16

**symmetric** 128:9

**system** 46:1 161:12 215:16

--- T ---

**tab** 223:5 224:17 225:8

**table** 33:16 36:1

**tabling** 33:20

**take.'** 131:22

**takes** 130:19

**taking** 34:13 85:14,20 117:8, 24 122:2,3 130:14,23 133:24 145:10

**talk** 11:2 31:9 42:13 66:17 79:12 81:19 193:10 212:9

**talked** 10:10 33:11 81:8,20 95:10 109:19 117:19 149:16, 18 172:21 175:8,9,13 177:16 183:23 188:18 189:2 193:16 206:22 213:6,13

**talking** 11:6 43:21 65:14 67:17 69:25 105:25 106:2 107:2 109:3 117:16 127:21 129:5 153:4,17, 19 154:6 158:16 164:10, 11 166:2

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

178:25 202:21
208:16 210:4
212:22

talks 27:5
203:22

TASER 67:2

task 163:21

tasks 76:23
77:2,5,6 192:13

taught 92:22
94:11 95:4
200:1

teach 95:7

Tearful 111:4

technical
12:10 42:7,20

technician 7:4

telephone
34:5

telling 93:25
96:20 97:25
98:5 99:3
111:14 113:13
114:4 124:25
127:25 130:1,
19 132:2
136:17 143:24
145:4 166:9
169:6 193:11
208:21 209:4

tells 120:10

ten 73:1 173:5,
6

tendency 11:2

term 68:10
131:11

terms 25:17
79:7 98:6
160:10 212:23

test 10:3 99:25

testified 9:2,5,
8 109:24

testimony
8:15 9:10 53:11
116:8 135:24
148:3 149:24

166:8

text 12:20 13:4,
7

texts 77:21

that'd 14:5
88:11,12
153:23 191:3
210:9

there'd 70:4
72:5 171:22

There're 158:2

thing 10:20
21:9 31:24
34:16 35:22
36:8 46:18
78:10 84:17
95:4 100:8
106:24 125:6
127:2 142:1
181:22 200:14

things 10:25
12:4 17:20
20:5,7 28:5
65:10 66:6
67:18 79:18
83:4 95:8 100:7
106:1 107:3
111:9 123:3,19
151:12 152:5,
14 162:19
215:11

Thomas 190:2

thought 113:9
190:15 199:1

throat 45:24

throwing
49:15 153:15

tight 128:9

time 7:8 11:9
20:3 24:2
39:11,15,19,21
40:2 41:4 42:20
43:11 52:21
56:21 57:10
58:22 59:14
61:5,21 63:17,
20 64:8 65:20
71:11,17 73:14,
15 74:4,13,17

75:20 76:21
77:5,15 83:21
101:17 102:20
103:4,16 104:1,
7,15 105:1
114:23 120:17,
23 135:9,11,14
140:2 144:18
147:12,23
148:24 149:17
150:4,5,10,17
151:22,24
152:22 153:3
155:3,12
158:10,13,14
160:25 161:5
164:8,17,23
165:13,16,19,
22 168:22
169:22 170:7,8,
16 171:3,15
176:7,10 178:5
183:2 185:21
192:12 193:20
194:25 195:24
196:17 197:2
204:20 205:16,
18,23 206:11
209:12,17
211:9,17 212:4
221:2,12,15,16,
18,20,22,25
222:1,10,11,13,
16,19 223:2
227:12

timecard 73:8

timeline 149:5

timer 161:17,
20

times 9:5,6
33:14 71:14
97:15 103:2
146:23 147:9
158:1 162:19
171:15 213:22
224:17

timestamp
102:13

timestamped
150:1

timestamps
149:19

tired 9:24

titled 211:22

today 7:5,7
9:15,21 17:5,6,
11,13 31:7 79:4
118:10 151:9
182:6 185:7
199:9 206:22
207:2 220:17
226:14

Today's 43:10
104:25 147:22
206:10

toggle 49:12

told 83:4,13
87:18 92:18
95:16,25 98:25
111:17 122:12
125:23 126:24
127:20 130:9
132:14 134:2
136:14,19
137:3 145:8
167:5 188:8
190:24 194:3
201:3,14,17,21
205:23

Tomah 80:9
109:20 118:13
121:5,8,9,20
130:16 136:5

tonight's
190:3

top 26:4 85:12,
15 86:1 156:14
162:5 180:19
184:19 216:9,
20 217:14
221:11 222:9

topic 65:14
68:16 106:22

topics 66:2

total 71:4,7

touch 204:3

tough 205:16

towel 197:4
226:21,25
227:13 228:10

town 105:6

towns 105:16

trace 51:14

track 151:16

tracking 223:9

train 63:5 64:9

trained 65:5
97:6 114:21

trainers 63:20

training 57:16,
23 60:3 61:1
62:7,12,14,19,
23 63:3,8,18,25
64:6,12,18,22
65:9,17,19,20,
23 66:11,12,18,
22 67:2,3,4,5,
17,19 68:13,21
70:2,15 92:22,
23 93:1 94:11
95:5,14 139:9
200:2 212:13

trainings 61:2
65:24 66:9
67:13 68:10

transcript
205:4

transmitted
174:21

transpired
20:7 164:22

transpose
49:7

tray 176:15

treated 123:10,
19

Trip 56:17,22,
23 57:11 58:5,7

true 84:11

truth 8:16,17

truthful 9:22

Tucker 213:16
215:5,6

turn 83:15
109:1 126:18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

TV 36:2 51:24 70:4

two-way 45:4

twos 226:20

type 32:15 73:18 74:12 104:9 124:5 131:6 151:20 179:8 180:24, 25

type's 18:14

Typed 200:16

typewritten 84:17

Typic 95:1

typical 75:11

typically 28:25 29:5 31:21 32:1,4 34:18 44:7 45:13 47:16 53:1,2 66:16 67:7 68:12 71:13 72:11,20 89:13 95:1,22 97:9,18 101:3,13 102:18 123:15 135:12 139:17 142:16 144:9, 13 146:12 150:10 165:1 172:14,16,20 173:5 180:1,14 181:17 188:19 191:11 192:8 202:15 219:21, 23 221:14 222:18

typing 188:22 201:19

_____

U

Uh-huh 75:21 106:9 181:11

ultimately 28:6 113:21 215:19

unable 132:10 136:10

uncomfortable 228:19

uncooperative 28:10 32:2

undergarments 128:15

underneath 90:4 122:7

understand 9:15 11:6,13, 20,24 13:21 18:13 20:4,7 24:2 39:20 41:10 45:17 51:22 54:5 74:11 94:5 99:15 100:25 107:8 109:9 110:20 112:5 114:2,22 116:3, 14,17 128:12, 22 131:11 153:1 156:5 159:14 163:25 167:20 169:8, 10,23 172:22, 23 179:7 180:6 204:6

understanding 11:16 63:7 68:1 69:9 101:18 102:16 112:11 113:17 139:23 174:19 226:9

understood 14:11 26:19 35:22 68:20 82:21 84:10 93:1,16 102:23 107:5 109:16 139:18 149:24 167:8 180:5 183:22 191:18 192:18 199:23 217:4

unexpectedly 14:7

unfortunate 158:22

unidentified 138:22

uniform 37:5

unit 190:25

United 7:13

updated 155:10,17,18

upper 164:10

upset 130:12 205:14,17

urgency 168:24 169:9

urgent 167:4 169:12

urinating 128:3

urine 128:10

utilizes 131:6

_____

V

Vague 83:9 132:23 179:16 199:2

Vaguely 185:11

varied 53:4 171:13

variety 123:10, 21 124:12 152:4

vehicle 92:1,4

verbal 173:15, 19 181:18

verbally 30:15 83:10,12 172:19,21 180:14

verbatim 136:23 137:4

verification 133:11 134:9 141:25 142:8, 10 168:21 187:19 223:4

verify 38:9

versa 34:7

versus 76:4 146:22

vestibule 28:21

vice 34:7

video 7:4 17:8 28:16 34:7 35:24 36:3,19, 23 66:14 67:14 69:3,6,12,24 70:5

video's 42:12

videoconference 7:9 43:10 104:25 147:22 206:10

videos 63:24 64:1 65:17 69:2,19,20 70:11,15,18,21

vis 146:11

visibly 228:15

visual 146:11, 23

Vital 219:4

volunteer 185:21

_____

W

W-E 157:5

W-E-I-L 7:20

Wacker 7:6

wait 10:20 23:1 167:5 168:24 169:2,6 171:11

waiting 179:19 180:4

walk 12:24 21:1 22:22 23:4 25:15 27:25 28:3 29:24 37:22 51:11 82:9 100:5 109:13

walked 22:15 81:17 99:23 143:20

walking 20:23 22:2,10 23:6 42:23 81:17 83:2 99:12 111:21 226:19, 23

walks 20:21

wall 26:5,13,16, 22 35:10 36:7 38:25 39:3,7,8 44:21 45:3 51:9,12 146:15 147:1 177:14, 16 197:14

wallet 38:6

walls 44:24

wanted 72:20 109:13 123:18 146:17 203:24 221:9

Warren 110:5, 6 113:1,4 189:10 200:16 212:7 221:10

watch 28:16,17 34:7 35:24 36:2 41:8 47:12,16 63:24 70:5 126:12,13 143:25 145:5,9 146:8,25 152:18,22 153:4,10,11,12 154:9,10 158:12,13,19, 20 159:2,3,4,7, 25 164:18 179:3,5,6,18,25 180:2,13,16,18 181:1 182:1

watched 36:22 69:12,20,23 70:22

watches 47:16,20 146:12,24 147:2

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**watching** 36:19 64:1 65:17 69:3 70:11 179:7

**water/food** 153:15

**weapons** 22:24

**wearing** 128:9, 22

**website** 139:13 167:17

**week** 15:8

**weekend** 132:18 134:3

**weekends** 133:5 134:13

**weeks** 57:16

**weight** 111:5

**Weil** 7:19 8:9, 11,21,23 16:6, 12,16,20,23,25 19:10,12,13 42:8,10,15,19 43:2,4,13 48:16,18 50:16, 19 53:13,14 80:14,16,18 83:19,23,24 104:7,12,18 105:2 118:23 119:1,2 133:4 147:12,15,24 156:20,24 157:2 177:24 189:17,20 205:5,11,12,25 206:4,12 220:16 221:6, 19 222:2,4,22 223:7,12,16,23 224:4,9 225:13, 15,20 226:5 227:23,25 228:21,24

**weird** 203:23

**Wend** 157:5

**Wendell** 181:13

**Wendland** 156:15,19 157:5 175:10, 12

**Western** 7:13

**whatnot** 26:23

**wheel** 177:12 219:18

**whichever** 123:16

**whirlwind** 208:5

**white** 35:10 160:21,24 165:15,16

**whoever's** 23:10 200:9

**whoops** 55:4

**window** 29:8, 11,16,17,22 45:1

**windows** 29:19 44:25 146:10,21,22

**winter** 129:19

**Wisconsin** 7:14 105:7

**withdrawal** 88:4,17

**woman** 162:6

**wondering** 175:7

**word** 63:13 127:23 128:24 169:9 181:22

**words** 58:19 72:13

**work** 13:6,12 16:24 18:9,25 26:12 40:6 44:9,13,15 53:3 56:21 58:16 69:17 71:13 73:12 76:25 77:20,24 105:12,14

149:7 161:12 167:12 177:6 191:4 215:9 222:24

**worked** 44:10 45:19,20 56:17 57:9,10,13 68:12 73:23 81:9,21 135:14 144:19 161:13 191:10 192:15 195:1 223:24

**working** 17:21 24:14 29:6 44:9 56:13 57:7 58:10 61:9 62:15 66:13 71:11 74:22 75:3,6,14 161:1,3 167:13 183:8,9 186:18, 20 187:25 188:22 194:25 195:8,21,23,25 211:23 214:13 215:7 221:12

**works** 21:23 45:23 85:4 160:22

**world** 20:14 92:7

**worth** 106:17

**would've** 24:2 64:22 82:15 91:6 111:1 119:15 137:3 138:18 139:4 143:16 178:5 183:19,21

**wrapping** 226:21

**write** 85:23 86:13 89:11 98:21 106:6 117:9 146:5 171:20 184:24 198:17 199:19 221:15

**writing** 84:23 86:21 89:21 97:2,3 109:10

114:1 118:5 127:8 140:21 198:15 201:16 216:9,11,18 218:2 224:20 225:3

**written** 63:22 64:25 67:14 79:7 83:11,12, 14 94:14 97:15, 17 108:21 141:1,2,12 171:8,9,22 173:15 180:16, 18,22 199:20, 22,25

**wrong** 106:19 107:4 126:21 154:3 166:8 171:4 178:19 222:3 228:7,12

**wrote** 87:19 94:17 118:8 123:5 125:22 141:5,6 148:9, 10 191:16 198:20

---

**Y**

**year** 13:25 60:14 65:23,25 87:16 111:12 120:7 126:20

**years** 18:4 56:18 57:11,12 60:6 66:1

**you-all** 104:13 130:9 151:13 161:20 165:17 167:21

**you?'** 129:12

---

**Z**

**zoom** 12:2,12, 18 13:2 17:18 18:21 19:7 48:10 49:23 50:1 55:6 78:7 80:13 83:18

118:21 149:15 189:15 216:23

**zoomed** 48:22 55:7 217:11

**Zuercher** 30:11 190:9



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com