

LOUISVILLE  LEXINGTON  LONDON  FLORENCE  CINCINNATI  INDIANAPOLIS  ORLANDO  JACKSONVILLE  TAMPA

# KENTUCKIANA
## — COURT REPORTERS —

**CASE NO: 20-CV-1123**

**GREGORY BOYER, AS ADMINISTRATOR OF THE ESTATE OF**

**CHRISTINE BOYER, AND ON HIS OWN BEHALF**

**V.**

**ADVANCED CORRECTIONAL HEALTHCARE, INC., ET AL.**

**DEPONENT:**

**LISA PISNEY**

**DATE:**

**MARCH 3, 2022**



schedule@kentuckianareporters.com
877.808.5856  |  502.589.2273

www.kentuckianareporters.com

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WISCONSIN

3              JUDGE JAMES D. PETERSON

4          MAGISTRATE JUDGE STEPHEN L. CROCKER

5                CASE NO: 20-CV-1123

6

7

8

9      GREGORY BOYER, AS ADMINISTRATOR OF THE ESTATE OF

10        CHRISTINE BOYER, AND ON HIS OWN BEHALF,

11                  Plaintiff,

12

13                     V.

14

15      ADVANCED CORRECTIONAL HEALTHCARE, INC., ET AL.,

16                 Defendants.

17

18

19

20

21

22

23    DEPONENT:  LISA PISNEY

24    DATE:      MARCH 3, 2022

25    REPORTER:  SYDNEY LITTLE



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
1                    APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF, GREGORY BOYER, AS
4   ADMINISTRATOR OF THE ESTATE OF CHRISTINE BOYER, AND ON
5   HIS OWN BEHALF:
6   Stephen H. Weil, Esquire
7   Loevy & Loevy
8   311 North Aberdeen
9   3rd Floor
10  Chicago, Illinois 60607
11  Telephone No.: (312) 243-5900
12  E-mail: weil@loevy.com
13  (Appeared via videoconference)
14
15  ON BEHALF OF THE DEFENDANT, LISA PISNEY, AMBER
16  FENNIGKOH, ADVANCED CORRECTIONAL HEALTHCARE, INC.:
17  Douglas S. Knott, Esquire
18  Leib Knott Gaynor LLC
19  219 North Milwaukee Street
20  Suite 710
21  Milwaukee, Wisconsin 53202
22  Telephone No.: (414) 276-2109
23  E-mail: dknott@lkglaw.net
24  (Appeared via videoconference)
25
```

Page 3

```
1              APPEARANCES (CONTINUED)
2
3   ON BEHALF OF THE DEFENDANT, MONROE COUNTY, SHASTA
4   PARKER, DANIELLE WARREN, STAN HENDRICKSON:
5   John McCauley, Esquire
6   Hansen Reynolds LLC
7   10 East Doty Street
8   Suite 800
9   Madison, Wisconsin 53703
10  Telephone No.: (608) 841-1510
11  E-mail: jmccauley@hansenreynolds.com
12  (Appeared via videoconference)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                      INDEX
2                                              Page
3   PROCEEDINGS                                  6
4   DIRECT EXAMINATION BY MR. WEIL               8
5
6
7                    EXHIBITS
8   Exhibit                                     Page
9   28 - American Heart Association Common
10  Heart Attack Warning Signs                   83
11  29 - United States Department of Health
12  and Human Services Heart Attack Know
13  the Symptoms Take Action Article             94
14  30 - Healthline Blood Pressure Changes
15  During a Heart Attack Article               116
16  31 - Advanced Correctional Healthcare, Inc.
17  Orientation PowerPoint                      213
18
19
20
21
22
23
24
25
```

Page 5

```
1                    STIPULATION
2
3   The VIDEO deposition of LISA PISNEY was taken at
4   KENTUCKIANA COURT REPORTERS, 730 WEST MAIN STREET, SUITE
5   101, LOUISVILLE, KENTUCKY 40202, via videoconference in
6   which all participants attended remotely, on THURSDAY
7   the 3rd day of MARCH 2022 at 10:20 a.m.; said deposition
8   was taken pursuant to the FEDERAL Rules of Civil
9   Procedure. The oath in this matter was sworn remotely
10  pursuant to FRCP 30.
11
12  It is agreed that SYDNEY LITTLE, being a Notary Public
13  and Court Reporter, may swear the witness.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

                PROCEEDINGS

        COURT REPORTER:  On record.  My name is Sydney
Little.  I'm the online video technician and court
reporter today representing Kentuckiana Court
Reporters, located at 730 West Main Street, Suite
101, Louisville, Kentucky 40202.  Today is the 3rd
day of March 2022. The time is 10:21 a.m.  We are
convened by video conference to take the deposition
of Lisa Pisney, in the matter of Gregory Boyer as
Administrator of the Estate of Christine Boyer, and
on his own behalf versus Advanced Correctional
Healthcare, Inc., et al., pending in the United
States District Court for the Western District of
Wisconsin, case number 20-CV-1123.  Will everyone,
but the witness, please state your appearance, how
you're attending, and the location you're attending
from, starting with plaintiff's counsel?
        MR. WEIL:  Good morning.  My is Stephen Weil.
I'm with the firm Loevy & Loevy.  I represent the
plaintiff.  I'm attending via video from Chicago,
Illinois.
        MR. MCCAULEY:  Good morning.  I'm John
McCauley, with the Hansen Reynolds law firm.  I'm
appearing by video from Madison, Wisconsin.  I

Page 7

represent Monroe County and Stan Hendrickson,
Shasta Parker, and Danielle Warren.
        MR. KNOTT:  I'm Doug Knott from the law firm
of Leib Knott Gaynor in Milwaukee.  I represent
Advanced Correctional Healthcare, Ms. Pisney, and
Ms. Fennigkoh, and I'm at the Milwaukee County
Sheriff's Office in Sparta.
        THE WITNESS:  Monroe County.
        MR. KNOTT:  What?
        THE WITNESS:  You said Milwaukee.  It's Monroe
County, right?
        MR. KNOTT:  Right.  Okay.
        THE WITNESS:  All right.  Thank you very much.
        MR. KNOTT:  I don't know what I said, but
we're all here.
        COURT REPORTER:  Ms. Pisney, please state your
name for the record.
        THE WITNESS:  Lisa Pisney.
        COURT REPORTER:  Do all parties agree and
stipulate that the witness is, in fact, Lisa
Pisney?
        MR. KNOTT:  Yes.
        MR. WEIL:  Plaintiff stipulates.
        COURT REPORTER:  Thank you.  Ms. Pisney, will
you please raise your right hand?  Do you solemnly

Page 8

swear or affirm that the testimony you are about to
give will be the truth, the whole truth, and
nothing but the truth?
        THE WITNESS:  I do.
        COURT REPORTER:  Thank you.  Counsel, you may
begin.
                DIRECT EXAMINATION
BY MR. WEIL:
    Q    Ms. Pisney, good morning.  My name is Stephen
Weil.  I represent the plaintiff, as you've just heard.
Have you ever been deposed before?
    A    No.
    Q    I expect that your Counsel talked to you about
how to sit for a deposition.  There are several rules
that make this different from a normal conversation. You
understand that you're under oath today; is that right?
    A    Yes.
    Q    And your answers that you give at this
deposition will have the same effect, as if they were in
a court of law, do you understand that?
    A    Yes.  I am -- I understand.
    Q    The perhaps the most important rule of the
deposition is that, unlike normal conversations that you
have out in the world, this conversation is being taken
down by a court reporter.  That means that it's

Page 9

important for the two of us not to talk over each other.
It's natural for people to anticipate answers and
questions.  In normal conversation, that's not rude.
It's just something that happens, but a court reporter
cannot take down two people talking at the same time. I,
therefore, ask that you wait until I'm finishing with my
-- I've finished with my question before you answer it,
and I'll do my best to wait for you to finish your
answer before I ask another question, does that make
sense?
    A    Yes.
    Q    The lawyers may object from time to time in
this deposition.  That's part of preserving legal rights
in the case, but you must still answer the questions
that I ask you unless your lawyer instructs you not to,
does that make sense?
    A    Yes.
    Q    Okay.  You should keep your answers verbal and
audible.  Shakes of the head and uh-huh are hard to
record on a transcript, even though we do have a video,
does that make sense?
    A    Yes.
    Q    Okay.  You're entitled to take breaks during
this deposition.  It's not an endurance test.  I would
ask that before you take a break, you answer any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1  questions pending, does that make sense?
2      A    Yes.
3      Q    There are rules governing when you can talk to
4  your lawyers during the course of a deposition.  And I
5  reserve the right to ask you about any discussions you
6  had with your lawyer during a break, does that make
7  sense?
8      A    Yes.
9      Q    Do you have any conditions that might affect
10  your ability to provide truthful and accurate testimony
11  today?
12      A    No.
13      Q    Any conditions affecting your memory or any
14  medications that you might be on, that might affect your
15  ability to provide truthful and accurate testimony?
16      A    No.
17      Q    Where do you currently work?
18      A    I work for UnityPoint out of Waterloo and I
19  work at the John Deere Waterloo Works as their
20  occupational health nurse practitioner.
21      Q    What is UnityPoint?
22      A    It's a health conglomerate that owns a
23  hospital in multiple places.  They have --
24      Q    You said you work in -- I'm sorry.  I broke
25  the rule already.  Go ahead.

Page 11

1      A    They have multiple hospitals that they own and
2  manage.
3      Q    Which hospital did you say you worked at?
4      A    I work actually at John Deere.  I work through
5  UnityPoint at work.  And I'm a occupational health nurse
6  practitioner who resides in the Waterloo Works John
7  Deere facilities, and takes care of their occupational
8  health.
9      Q    So if I understand you correctly, you work for
10  a company called UnityPoint, but you are -- you work at
11  a John Deere plant; is that right?
12      A    Yes.  Yes.  That's correct.
13      Q    And you service -- okay.  And you service the
14  employees at the John Deere plant?
15      A    Yes.  If they're injured at work.  Yes.
16      Q    Okay.  Did Christine Boyer have a serious
17  medical condition?
18          MR. KNOTT:  Object to form of the question, to
19      the extent it calls for a legal conclusion.
20      Object, it's vague as to time and it's vague as to
21      the phrase itself.  You can answer, if you're able.
22      A    It's hard for me to know.  We didn't know her
23  full medical history.
24  BY MR. WEIL:
25      Q    Sitting here today, do you believe that

Page 12

1  Christine Boyer had a serious medical condition, while
2  she was in the jail?
3          MR. KNOTT:  Object to the form of the
4      question, vague as to time.  Object to the extent
5      it calls for legal conclusion.  It's also vague as
6      to the phrase, "Serious medical condition."
7      Counsel, could you specify a time frame?
8          MR. WEIL:  Just like I said, "While she was in
9      the jail."
10      A    Not the entire time she was in the jail, I
11  don't believe so.
12  BY MR. WEIL:
13      Q    Okay.  What -- at what time during the time
14  she was at the jail, did Christie Boyer have a serious
15  medical condition?
16          MR. KNOTT:  Same objections.
17      A    When -- when she coded.  That was a serious
18  medical condition.
19      Q    Any other time?
20          MR. KNOTT:  Same objections.
21          MR. MCCAULEY:  Joined.
22      A    Prior to that, I don't believe she -- I had
23  any indication that she had a more serious condition.
24      Q    Sitting here today, do you believe that she
25  did have a serious medical condition, before she coded?

Page 13

1          MR. KNOTT:  Counsel, could you specify a
2      period of time?
3          MR. WEIL:  During the time she was at the
4      jail.
5          MR. KNOTT:  Object to the form of the
6      question.  And same objections as stated
7      previously.
8      A    Can -- can you ask me the question again?  I'm
9  sorry.
10  BY MR. WEIL:
11      Q    During the time she was at the jail, before
12  she coded, did Christine Boyer have a serious medical
13  condition?
14          MR. KNOTT:  Same objections.  Add to it that
15      it calls for speculation.
16          MR. MCCAULEY:  Joined.
17      A    From what I knew about her, I did not think
18  she had a serious medical condition prior to that.
19  BY MR. WEIL:
20      Q    Sitting here today, what do you believe?
21          MR. KNOTT:  Same objections.
22      A    That -- that would require me to know things
23  now that I didn't know then.
24      Q    Given what you know now, what do you believe?
25          MR. MCCAULEY:  Object to form.  Foundation.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 14

1      MR. KNOTT: Yeah. Same objections as
2   previously stated.
3      A    I mean, everyone else knows more in hindsight.
4   I mean, I've gotten more information about her medical
5   condition since the -- since her entry into the jail.
6   BY MR. WEIL:
7      Q    And given the information you've received,
8   what do you believe now?
9      MR. KNOTT: Same objections. And vague as to
10   time. It's also irrelevant, but answer if you're
11   able.
12      A    I still don't have all the information about
13   her medical history. I mean, if -- it's obvious that if
14   someone codes, that they had a serious medical
15   condition.
16      Q    Do you believe that Christine Boyer received
17   adequate medical treatment at the jail in December 2019?
18      A    I do.
19      Q    Why is that?
20      MR. MCCAULEY: Object to form.
21      A    I believe that we treated her appropriately
22   with the information that we had at the time.
23      Q    When you say we, who are you referring to?
24      A    Myself, the other nurse, and the correctional
25   officers.

Page 15

1      Q    Do you have an independent memory of Christine
2   Boyer? I understand that you never -- you never met
3   Christine Boyer, right?
4      A    Right. I never met her in person. No. I do
5   remember.
6      Q    Do you have an independent -- go ahead. I'm
7   sorry.
8      MR. KNOTT: She wasn't finished.
9      A    I'm sorry. I do remember the case.
10      Q    Okay. When I say independent memory, do you
11   understand that I mean, what you can remember without
12   looking at documents?
13      A    Yes.
14      Q    So do you have an independent memory of the
15   events involving Christine Boyer at the jail in December
16   2019?
17      A    I do.
18      Q    What do you recall about those events? And I
19   would ask you just to start from -- go chronologically.
20      A    Okay. I believe I talked to Amber, the jail
21   nurse, about her intake, the fact that we were not able
22   to get her medicines. She wasn't able to give us any
23   information about the medications she took or her
24   complete medical history, that it was very vague what
25   she gave during intake. And then later in the day, I

Page 16

1   was called with an elevated blood pressure for her. We
2   treated her with medications for the elevated blood
3   pressure. I asked them to recheck her blood pressure in
4   half an hour and call me back. That was done. They
5   then -- I then asked them to recheck her again in an hour,
6   and if the blood pressure was above 160 over 100, to
7   give another medication. And then I believe they called
8   me later that day -- or that evening with some
9   complaints of chest pain. We talked about that. I gave
10   her aspirin, and asked them to recheck her blood
11   pressure in a half an hour, and call me if it was
12   elevated or if she continued to complain of chest pain.
13   And after that, I never received a call back.
14      Q    Is that all you remember from Christine
15   Boyer's time at the jail?
16      A    Yes.
17      MR. KNOTT: Object. It's vague and overly
18   broad.
19      Q    That was a yes?
20      A    That was yes. Yes.
21      Q    Okay. I want to go through events that you
22   described just now. The first thing you said was that
23   you talked to Amber, the jail nurse, do you remember
24   that?
25      A    I believe so. Yeah. I remember it as talking

Page 17

1   to Amber.
2      Q    Do you remember when that conversation
3   occurred?
4      A    I do not.
5      Q    Was it in the middle of the night or during
6   the day?
7      A    I believe it was during the day.
8      Q    You're aware that Christine Boyer was at the
9   jail -- she came into the jail on December 21st in the
10   evening, was there during the day on Sunday, December
11   22nd, and then coded shortly after midnight on Monday,
12   December 23rd?
13      A    I don't remember those specific dates, but
14   that correlates with the paperwork I've seen.
15      Q    Okay. Without remembering the dates, you
16   remember being contacted over the course of a fairly
17   short period about Christine Boyer, several times,
18   right?
19      A    Yes.
20      Q    Okay. And so, again, your first memory, the
21   first event you talked about was talking to Amber; is
22   that right?
23      A    Correct.
24      Q    And that's Amber Fennigkoh?
25      A    Correct.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1    Q    And do you remember that, that conversation
2  was during the day?
3    A    I believe so.
4    Q    Okay.  Do you remember approximately what time
5  you had that conversation?
6    A    No.  I don't have any memory of that.
7    Q    You talked -- you said later in the day -- the
8  next thing after talking to Amber, what I have in my
9  notes, is you said later in the day you received a call
10  about high blood pressure; is that right?  That's what
11  you recall?
12    A    Correct.
13    Q    So you would have spoken with the person you
14  believed to be Amber, sometime before getting the call
15  about high blood pressure?
16    A    Yes.
17    Q    Okay.  And there were -- was it two calls
18  about high blood pressure?
19    A    Yes.  I believe so.
20    Q    Okay.  Do you recall any other symptoms being
21  mentioned during those two calls?
22    A    No.  I don't.
23    Q    Okay.  And then you received -- you recall
24  receiving one call later on about chest pain?
25    A    Correct.

Page 19

1    Q    What was -- after receiving that call about
2  chest pain, what was -- the next time you heard anything
3  about Christine Boyer?
4    A    I -- the next day I did -- it was my day to
5  visit the jail on Monday and when I went in to see Amber
6  that day, I asked how she was doing.  And that's when
7  Amber told me that she had coded, and was in the
8  hospital.
9    Q    Okay.  So you physically went to the jail on
10  Monday; is that right?
11    A    Correct.
12    Q    Did you -- in the time that you recall
13  Ms. Boyer being at the jail, did you place any calls
14  relating to Ms. Boyer?
15    A    No.
16    Q    When you received the call in the -- well, to
17  back up real quick.  I want to go to the first call you
18  recall speaking with Amber.  You -- I have in my notes
19  here, you're saying two things.  One is that you were
20  not able to get the meds -- that she was not able to get
21  the meds for Ms. Boyer; is that right?
22    A    Right.  So we -- she was unable to tell Amber
23  what medication she was taking.  At some point, someone
24  must have called and ran through the medications that
25  she had on her person.  And I okayed or denied the use

Page 20

1  of those medications, according to the paperwork I --
2  I've seen.
3    Q    Is this an additional call, besides the call
4  with Amber Fennigkoh, is this is a separate call that
5  you're referring to?
6    A    I don't know if Amber discussed those with me
7  at that time, or if I received another call from one of
8  the correctional officers about okaying those
9  medications.
10    Q    Okay.  So if I understand you right, you
11  recall receiving either one or two calls in -- before a
12  call later in the day about high blood pressure; is that
13  right?
14    A    I mean, I only remember one call, but --
15    Q    Okay.
16    A    -- it could have been two.
17    Q    Okay.  It could have been -- it could have
18  been one call from Amber Fennigkoh or it could have been
19  a call from Amber Fennigkoh and somebody else -- and a
20  second call from somebody else?
21        MR. KNOTT:  Wait a minute.  I think you're
22    discussing different calls.
23        MR. WEIL:  Yeah.  I am.  I'll get there, Doug.
24    I think I can clear it up.
25  BY MR. WEIL:

Page 21

1    Q    So one call you remember is from Amber
2  Fennigkoh, and one of the things that Am -- you recall
3  Amber Fennigkoh telling you, is that she was unable to
4  get a full list of medications from Ms. Boyer; is that
5  right?
6    A    Correct.
7    Q    Okay.  Do you recall being told about any
8  medications that Amber Fennigkoh, or whoever called you
9  that morning, was able to -- that medication list that
10  she was able to get?
11    A    I don't recall that phone call, but I do see
12  on the paperwork that some of the medications were okay
13  to give and some were not.  And so I'm assuming that
14  they called me, and got the -- that okay.
15    Q    Right.  So that's fair and I do want to talk
16  to you about what's written on the documents,
17  Ms. Pisney.  Right now, I'm just trying to get your
18  independent recollection.  So setting aside the
19  documents.
20    A    Okay.
21    Q    I'm just trying to get your independent
22  recollection.  So you -- again, to return, you recall
23  receiving a phone call -- just I'm going back to this
24  phone call from Amber Fennigkoh that you recall
25  receiving.  And in my notes, I have two issues that were



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1  discussed in the call. One, was an inability to get a
2  full medication list or a prescription list. And the
3  other was an inability to get a complete medical
4  history; is that right?
5      A    That is right.
6      Q    Okay. And regarding that call, again, I just
7  want to return to what do you recall in terms of inde --
8  what independent recollection do you recall -- do you
9  have of what medications were identified -- or what
10 prescriptions were identified at that point?
11     A    I don't recall that at all.
12     Q    Okay. And regarding the medical history, do
13 you have any independent recollection of what medical
14 history you did get on that call?
15     A    I do remember that I was told that Ms. Boyer
16 had said she was -- she had some sort of cancer, and
17 that she was told she only had a month to live, and that
18 was really the only medical history that she relayed.
19     Q    Those were the two things you recall receiving
20 -- you reme -- those the two conditions that you recall?
21     A    Yeah. That -- in my independent recollection.
22 Yes.
23     Q    Okay. And then I believe you said you may
24 have received a second call -- again, I -- this is
25 before the high blood pressure calls?

Page 23

1      A    Right.
2      Q    You may have received a second call about a
3  medication list or medications that were found with
4  Ms. Boyer; is that right?
5           MR. KNOTT: Object to form.
6      Q    You can answer it.
7      A    That's correct because -- that's correct just
8  because I've seen the -- the MAR, the medical
9  administration. And there are some medications that
10 were denied and some medications that were okayed, and
11 that would have been my responsibility to do that.
12     Q    Understood. And, again, I don't want to --
13 I'm just trying to get your independent recollection.
14     A    Uh-huh.
15     Q    So setting aside what you saw in documents, in
16 preparation for the -- that you reviewed in preparation
17 for this deposition, do you have an independent
18 recollection of what was discussed on the second call
19           MR. KNOTT: Object to form.
20     A    No. No. I don't. Sorry.
21     Q    Okay. And, again, the independent
22 recollection being not what you're looking at on
23 documents. But do you have an independent recollection
24 of this call number one, call number two being two
25 separate calls or one single call?

Page 24

1      A    I don't recall.
2      Q    Okay. In other words, to the best of your
3  independent recollection, it may have been one single
4  call or it may have been two different calls; is that
5  right?
6      A    That's possible. I only remember one.
7      Q    Okay. Do you remem -- do you have an
8  independent recollection of approving or denying
9  medications?
10     A    I don't remember doing that. But, again, that
11 would have been my responsibility.
12     Q    Do you have an independent recollection of
13 learning about any medications that Ms. Boyer was found
14 with or that she told anyone about?
15     A    The medications that were on the MAR would
16 have been the medications that were found on her person.
17 And -- and I can't remember if I received that
18 information before or after I saw Amber on Monday. So
19 it's confusing in my memory, when I exactly learned
20 about it. I'm assuming I learned about the medication
21 she had on person, and approved those based on the
22 documents I've reviewed. But I don't remember that in
23 my independent memory.
24     Q    Okay. So you don't -- you are dis -- you were
25 describing a medication list that you saw, but you don't

Page 25

1  have an independent memory of reviewing or approving
2  those medications; is that right?
3      A    I do not.
4      Q    Okay. I want to go to the call that you
5  described about high blood pressure now -- and that you
6  said it was just later. Do you have a recollection of
7  what time of day you received the call?
8      A    I don't have an independent recollection, just
9  from the paperwork that I've reviewed.
10     Q    Okay. And, again, an independent recol --
11 your independent recollection. Do you have an
12 independent recollection of what conditions were
13 identified, on that first call about high blood
14 pressure?
15     A    Just the high blood pressure.
16     Q    Okay. Do you have an independent recollection
17 of anything else -- any other symptoms being described
18 for Ms. Boyer?
19     A    Not during that call. No.
20     Q    Okay. And you do have a recollection of a
21 second call about high blood pressure as well; is that
22 right?
23     A    In my independent recollection, I only
24 remember two calls. But in looking at the paperwork, it
25 did bring up a memory of that second call about the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1  blood pressure.
2      Q    When you say, that you have a memory of only
3  two calls, are you talking about over the whole course
4  of the day or two calls about blood pressure?
5      A    Two calls about symptoms that she had. One
6  about the blood pressure, and then the later call about
7  the chest pain.
8      Q    Okay. All right, it sounds like then, you
9  have an independent recollection of three calls. One
10  about -- from Amber Fennigkoh first, a second call about
11  blood pressure, and a third call about chest pain; is
12  that right?
13      MR. KNOTT: I object. I think it misstates
14      her testimony. I think she said that review of
15      documents helped her.
16      MR. WEIL: Yeah. I -- yeah. I understand.
17  BY MR. WEIL:
18      Q    I'm just trying to get your independent
19  recollection, Ms. Pisney. I understand that the
20  documents may have provided you more information. I'm
21  just trying to get your independent recollection. So is
22  that right, you have an independent recollection of
23  three calls?
24      MR. KNOTT: Object to the form of the
25      question. It misstates her testimony.

Page 27

1      Q    Was your -- well, how many calls do you
2  independently recall receiving about Ms. Boyer while she
3  was at the jail?
4      A    I do remember talking with Amber about her and
5  then the two calls from the COs about her symptoms, so
6  that --
7      Q    And -- go ahead.
8      A    -- would be three.
9      Q    Okay. And one of those calls from COs was
10  about blood pressure and the second call was about chest
11  pain; is that right?
12      A    Correct.
13      Q    Okay. Going to the third call about chest
14  pain that you have an independent recollection of, what
15  do you recall being told about Ms. Boyer's symptoms --
16  what's your independent recollection about what you were
17  told about Ms. Boyer's symptoms?
18      A    They told me that she had complaints of chest
19  pain, and I asked if she had any other symptoms such as
20  diaphoresis, any shortness of breath. They told me she
21  was not diaphoretic. She may have had some slight
22  shortness of breath, and that's all I remember.
23      Q    What is diaphoresis?
24      A    Sweating.
25      Q    So they -- you -- what you recall is they told

Page 28

1  you about chest pain. You asked about other -- you
2  asked whether Ms. Boyer had diaphoresis and -- which is
3  sweating and they -- and you were told, no, correct?
4      A    Correct.
5      Q    And, again, this is all your independent
6  recollection. I'm not going farther than that right
7  now. And then the other thing that you independently
8  recall asking, is whether Ms. Boyer had shortness of
9  breath; is that right?
10      A    Correct.
11      Q    And your recollection is that -- I don't want
12  to put words in your mouth. What was your recollection
13  of the response to your question about shortness of
14  breath?
15      A    That she may have had some slight shortness of
16  breath. They also would have -- they also gave me her
17  other vital signs besides her -- so blood pressure,
18  heart rate, oxygen saturation.
19      Q    Is that based on your independent recollection
20  about something that happened or is that based on your
21  reading of the documents?
22      A    No. That -- that would have been my
23  independent recollection.
24      Q    Okay. So you independently recall receiving
25  information about Ms. Boyer's blood pressure?

Page 29

1      A    Yes.
2      Q    You independently recall receiving information
3  about Ms. Boyer's heart rate?
4      A    Correct.
5      Q    Okay. And you independently recall
6  information about oxygen saturation?
7      A    Yes.
8      Q    Okay. Anything else -- any other information
9  you in independently recall receiving, on that call
10  about chest pain?
11      A    I do not.
12      Q    What was Ms. Boyer's blood pressure reported
13  to you as?
14      A    That I -- I couldn't independently recall. I
15  remember that it was slightly elevated, but not as
16  elevated as it had been previously in the day.
17      Q    How about her heart rate, do you have an
18  independent recollection of what that was?
19      A    I remember that being normal.
20      Q    Okay. What's normal?
21      A    In the 60 to 80 range.
22      Q    How about her oxygen saturation, what's your
23  recollection of that?
24      A    I also recall that being normal.
25      Q    Okay. Do you have -- beyond the symptoms and



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1 the vitals that we've just discussed, do you have a
2 independent recollection of anything -- other
3 information that you were provided, on the call about
4 chest pain?
5    A    I do not.
6    Q    Okay.  You mentioned having a recollection of
7 providing some instructions on that call; is that right?
8    A    Yes.
9    Q    What were the instructions that you recall
10 providing, on that third call about chest pain?
11    A    So during that call, I remember the CO saying,
12 could we give her some aspirin?  And I said, yes.  That
13 would be fine, it wouldn't hurt anything.  And that
14 after they gave her the aspirin, to recheck her blood
15 pressure again in a half an hour since it was slightly
16 elevated.  And to call me if it was elevated, and also
17 to call me if she continued to have any complaints of
18 chest pain.
19    Q    Okay.  So you -- I'm sorry, you recall -- I
20 was writing down.  You recall having them check her
21 blood pressure in half an hour -- or asking them to
22 check?
23    A    Yes.
24    Q    Okay.  Do you recall instructing the guards
25 about what measurement would constitute elevated blood

Page 31

1 pressure?
2    A    I do not.
3    Q    Okay.  Okay.  Do you recall any other
4 information or instructions that were exchanged on that
5 third chest pain call?
6    A    That third call was about chest pain, but the
7 other calls weren't about chest pain.  But, no.  I do
8 not remember any other instructions.
9    Q    Okay.  Tell me everything you did to prepare
10 for today's deposition?
11    A    I looked over the records from the care of
12 Ms. Boyer.  I got out my orientation paperwork from ACH.
13 That was -- that was it.
14    Q    You reviewed -- the orientation work; what was
15 that?
16    A    Just the training that I had at ACH, when I
17 first started with them.
18    Q    Okay.  And that was training that you received
19 in Peoria, Illinois?
20    A    Correct.
21    Q    And did you retain documents -- or, did you
22 receive documents during that training?
23    A    Yes.
24    Q    Did you retain them?
25    A    Yes.

Page 32

1    Q    And are those -- when you said you reviewed
2 the orientation paperwork, is that what you're referring
3 to -- the documents that you retained?
4    A    Yes.
5    Q    Okay.  And then in terms of the --
6         MR. KNOTT:  To be clear, Counsel, you have
7    those.
8         MR. WEIL:  Yeah.
9         MR. KNOTT:  Okay.
10 BY MR. WEIL:
11    Q    In terms of the treatment paperwork that you
12 reviewed, do you remember what -- can you describe what
13 paperwork you reviewed -- or the treatment documents you
14 reviewed about Ms. Boyer?
15         MR. KNOTT:  Counsel, I could give you the
16    Bates numbers if you'd like?
17         MR. WEIL:  Do you -- how about exhibit
18    numbers?  I guess Bates numbers, if you have stuff
19    that's not exhibits, that'd be helpful.
20         MR. KNOTT:  Yeah.
21         MR. WEIL:  Either way is fine.
22         MR. KNOTT:  Materials -- the -- yeah.  She did
23    not review anything with exhibit numbers on them,
24    but they were within the materials she did review -
25    - or some exhibits were.

Page 33

1         MR. WEIL:  Okay.
2         MR. KNOTT:  The pages she was given to review
3    were Monroe County, 50 to 110.  And Monroe County,
4    1088 to 1111.  As well as the DOC report, 197 to
5    206.
6         MR. WEIL:  Okay.  Is that all, Doug?
7         MR. KNOTT:  Yes.
8 BY MR. WEIL:
9    Q    Okay.  Beyond reviewing the documents that
10 we've just discussed, Ms. Pisney, what else did you do
11 to prepare for this deposition?
12         MR. KNOTT:  Mr. Weil, I need to pause you for
13    a second.  I think that we sent her the e-mail that
14    Shasta Parker testified about.  And it was not in
15    those materials, in the pages that I referenced.
16    It's the 6:00 p.m. e-mail from Parker to Amber and
17    others.
18         MR. WEIL:  Okay.
19         MR. KNOTT:  Yeah.
20 BY MR. WEIL:
21    Q    Okay.  Go ahead.  Ms. Pisney, besides
22 reviewing the documents that we've just gone over, what
23 else did you do to prepare for today's deposition?
24    A    Just meeting with my lawyer to talk about
25 giving testimony in a deposition.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1   Q   When did you do that?

2   A   Last night.

3   Q   Any other time besides last night?

4   A   We spoke on the phone last week.

5   Q   So you spoke with your lawyer last night and

6   last week about this deposition, right?

7   A   Correct.

8   Q   And besides speaking with your lawyer on those

9   two occasions, and reviewing the paperwork discussed,

10  did you do anything else?

11  A   No.

12  Q   Other than your attorneys, who else did you

13  speak with about your deposition here today?

14  A   No one.

15  Q   Okay.  Other than your attorneys, have you

16  spoke with anybody about Ms. Boyer?

17  A   No.  Just right after the -- the incident, I

18  spoke with Amber.

19  Q   Okay.  Anybody else?

20  A   No.

21  Q   Do you recall speaking with Travis Schamber?

22  A   Oh, yes.  Yeah.  I did talk to Dr. Schamber.

23  Correct.

24  Q   Anybody else?

25  A   I talked to Melissa Caldwell, who is the

Page 35

1   mental health provider for ACH.

2   Q   Okay.  Anyone else?

3   A   Not that I recall.

4   Q   What did you talk with Melissa Caldwell about?

5   A   Just the stress of having to give a

6   deposition.

7   Q   When did you talk with her?

8   A   I talked with her shortly after the incident,

9   and then I talked with her again last week.

10  Q   How were you put in touch with Melissa

11  Caldwell?

12  A   I called her.

13  Q   Was there a reason that you called her in

14  particular?

15      MR. KNOTT:  I think it's asked and answered.

16  Q   Okay.  I -- was there a reason you called

17  Ms. --

18      MR. KNOTT:  Oh, I'm sorry.

19      MR. WEIL:  Yeah.  Just --

20      MR. KNOTT:  I'm sorry.  I misunderstood the

21  question, Steve.  I'm sorry.

22  BY MR. WEIL:

23  Q   Was there a reason you --

24  A   Because I was -- sorry.  I was stressed about

25  the deposition.

Page 36

1   Q   Okay.  And how did you know to call

2   Ms. Caldwell -- or Dr. Caldwell?

3   A   She had -- during our orientation, we had been

4   given the information, that if we ever had any stress or

5   problems, that we could call Melissa and talk to her

6   about them.

7   Q   Do you work for ACH anymore?

8   A   I do.

9   Q   Okay.  So when you gave me my employment,

10  what you told me about your job, you said you worked for

11  UnityPoint.  In addition to that, you work for ACH as

12  well?

13  A   I do.  I -- it's a part-time job.

14  Q   Okay.  And is that essentially the same job

15  that you had at the time that -- the incident with

16  Ms. Boyer?

17  A   It is.  Except I work for different jails now.

18  Q   Okay.  So -- and we'll get into the job

19  momentarily.  But, essentially, the job is serving as a

20  nurse practitioner to a particular jail; is that right?

21  A   Yeah.  Yes.

22  Q   And that job means being on call, and then

23  paying occasional visits to the jail; is that right?

24  A   That's correct.

25  Q   Okay.  Do you serve Monroe -- the Monroe

Page 37

1   County Jail anymore?

2   A   I do not.

3   Q   Okay.  Turning back to the conversation with

4   Ms. Caldwell, what did you talk about on the call, last

5   week?

6   A   She just discussed with me her expertise in

7   giving depositions in the past, trying to reassure me

8   that there was nothing to worry about.  Nothing

9   specifically about the case.

10  Q   Okay.  What did she tell you about her

11  expertise in depositions?  How did she describe that?

12  A   She said she had been deposed before and that,

13  you know, you just tell the truth, and try not to be

14  worried about it.

15  Q   Okay.  You said that you also spoke with

16  Ms. Caldwell shortly after the incident with Ms. Boyer;

17  is that right?

18  A   Yes.  Yes.

19  Q   Were you concerned about giving a deposition

20  then, during that first conversation?

21  A   I was concerned about the fact that one of my

22  patients had passed away.  I mean, that doesn't happen

23  very often and it was stressful.

24  Q   Okay.  What did she tell you during that first

25  conversation?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1   A    I don't recollect a lot about the specifics of
2   the conversation.  She just was reassuring.
3   Q    What did you talk -- what do you recall
4   talking about with Dr. Schamber?
5   A    I talked about the case, what I had done, and
6   what he -- his impression of the care that was given.
7   Q    Was -- do you recall about when you had that
8   conversation with him?
9   A    It was probably shortly after we found out
10  that Ms. Boyer had passed away.
11  Q    Okay.  And was it a call that was -- did you
12  understand why the call occurred, in the sense of why
13  Travis Schamber would be interested in talking with you?
14  A    He was my supervising physician, and I called
15  him to get his take on the care that I gave the patient.
16  Q    Okay.  Did you -- was it a call -- it was --
17  so it was a call on the phone, right?
18  A    Yes.
19  Q    Do you remember about how long it lasted?
20  A    Not really.
21  Q    Okay.  One of the things I -- the instructions
22  I didn't give you, but I should have, is that a
23  deposition is not a memory test.  I don't -- you know,
24  we don't expect you have a perfect memory.  As we've
25  just reviewed, you remember fewer -- you have an

Page 39

1   independent recollection of fewer calls than the papers
2   indicate that you got, right?
3   A    Correct.
4   Q    Okay.  So it's not a memory test, but I am
5   entitled to your best recollection, and also your best
6   estimate.  So can you estimate roughly, how long the
7   call with Dr. Schamber may have gone?
8   MR. KNOTT:  No.  Counsel, I -- you shouldn't
9   be instructing the witness, particularly if it's
10  inaccurate.  So she answers to the best of her
11  ability.  You're not entitled to estimates, if she
12  doesn't have an independent basis for that.  so I
13  object to the form of the question.  I'm going to
14  let the witness answer to the best of her ability.
15  A    I would say no more than five or ten minutes.
16  BY MR. WEIL:
17  Q    Do you recall reviewing any documents with
18  Dr. Schamber on that call?
19  A    No.
20  Q    Okay.  Other than the call with Dr. Schamber,
21  do you remember discussing with any and I -- well, to
22  back up.  It sounds like -- we just discussed your
23  conversations with Melissa Caldwell; is that right?
24  A    Yes.
25  Q    And if I understand you correctly, you

Page 40

1   initiated those conversation -- that first conversation
2   after Christine Boyer died because you were stressed
3   about that situation.  And during your orientation, you
4   had been told that Melissa Caldwell would be a person at
5   ACH you could talk to if you were stressed; is that
6   right?
7   A    Yes.
8   Q    Okay.  And that was the reason for the call,
9   correct?
10  A    Correct.
11  Q    Okay.  The call with Dr. Schamber, did you
12  initiate that call or did he?
13  A    I believe I did.
14  Q    Okay.  And I guess initiate is a little
15  inaccurate.  I mean, it may have been, he said, hey,
16  let's set up a call, and then you call in.  But do you
17  remember how that call was set up?
18  A    I don't.  I had access to Dr. Schamber any
19  time I needed it.  So I may have called him and just
20  wanted to discuss the case.
21  Q    Okay.  Besides speaking with Dr. Schamber and
22  Melissa Caldwell, have you spoken with anybody else at
23  ACH about Christine Boyer?
24  A    No.
25  Q    Okay.  You did what -- I'll create another

Page 41

1   exception of that.  You did you -- I think you testified
2   earlier, you did speak with Amber Fennigkoh on the --
3   Monday the 23rd, right?
4   A    Yes.  Yeah.
5   Q    Okay.  So besides those three people, you
6   don't recall speaking with anybody else about Christine
7   Boyer at ACH?
8   A    No.
9   Q    Did you receive any -- did you speak with
10  anybody else, be it the county, or the department of
11  corrections, or anybody else about Christine Boyer?
12  A    No.
13  Q    Okay.  Has -- do you recall anybody asking you
14  questions, talking to you, e-mailing you in some sort of
15  formal capacity, like an investigation, about Christine
16  Boyer?
17  MR. KNOTT:  Again, you're asking for her
18  independent recollection.  She has not looked at
19  any records, as of this point in the deposition.
20  A    No.  I don't remember that.
21  BY MR. WEIL:
22  Q    Okay.  Or do -- setting aside your independent
23  recollection, did any documents you reviewed in
24  preparation for this deposition, indicate you'd spoken
25  with anybody else about Christine Boyer?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1   A   Not that I can remember.
2   Q   Okay.  Do you know who Stan Hendrickson is?
3   A   Yes.
4   Q   Did you ever speak with him about Christine
5 Boyer?
6   A   Not that I -- not that I remember.  No.
7   Q   Okay.  How about Jeffrey Spencer, do you know
8 who that is?
9   A   I do not.
10   Q   Okay.  When did you first learn about this
11 lawsuit?
12   A   It would have been some time last year.
13   Q   Okay.  And have you spoken with anybody about
14 this lawsuit, besides your lawyers?
15   A   My family.
16   Q   Who did you talk to in your family?
17   A   Just my husband and my daughter.
18   Q   What did you say to your daughter about the
19 lawsuit?
20   A   Just that I was being deposed about a case
21 from the jail.
22   Q   Have you ever been sued before?
23   A   No.
24   Q   Where did you grow up, Ms. Pisney?
25   A   Mostly in Wisconsin.

Page 43

1   Q   Where'd you go to high school?
2   A   Janesville, Wisconsin.
3   Q   Did you go to college?
4   A   Yes.
5   Q   Where was that?
6   A   Well, I went to Whitewater for a few years --
7 Whitewater, Wisconsin.  I transferred to Luther College.
8 Then I met my husband and after we were married, I
9 finished my nursing degree at the University of South
10 Carolina.  And then I did my master's program at the
11 University of Colorado at Colorado Springs.
12   Q   How did you come to be in Colorado Springs?
13   A   My husband was in the Army.
14   Q   And your -- was -- so your degree at
15 University of South Carolina was in what?  I'm sorry.
16   A   Nursing.
17   Q   Okay.  And then your degree from UCCS was --
18 what was that in?
19   A   As a nurse practitioner, my master's of
20 science in nursing.
21   Q   Okay.  Can you describe the difference between
22 a nurse and a nurse practitioner?
23   A   A nurse has a -- well, can have an associate's
24 degree or a bachelor's degree, typically works in the
25 hospital or an outpatient setting.  Nurse practitioner

Page 44

1 has a hierarchy of education and is able to assess,
2 diagnose, and prescribe medications for the treatment of
3 illnesses of patients.
4   Q   When you say -- just -- when you say assess,
5 diagnose, and prescribe, can you just tease out what you
6 mean by assess?
7   A   Evaluate, perform physical evaluations,
8 physical exams, everything you need to be able to
9 diagnose a patient.
10   Q   Okay.  How about diagnose?  What does that
11 refer to?
12   A   Putting together the symptoms that a patient's
13 having along with their physical exam to come up with a
14 possible cause for their symptoms and -- yeah, symptoms
15   Q   And then prescribe -- I think it's fairly
16 self-explanatory.  You have the privilege of prescribing
17 medication; is that right?
18   A   Correct.
19   Q   And that's different than a nurse, correct?
20   A   Correct.
21   Q   Okay.  Now, after receiving your nurse
22 practitioner degree at UCCS, what did you do after that?
23   A   Let's see.  My first job as a nurse
24 practitioner was at an independent occupational health
25 clinic in Virginia.

Page 45

1   Q   How long -- what years were you there?
2   A   2004.  I was only there for approximately six
3 months, and then I took a job with the Veteran's
4 Administration in Richmond, Virginia in
5 gastroenterology.
6   Q   I'm sorry.  It was gastro, what?
7   A   Enterology.
8   Q   Okay.  And that was in Richmond, Virginia?
9   A   Yes.
10   Q   Okay.  How long were you working at the VA in
11 Richmond, Virginia?
12   A   Approximately, five years.
13   Q   So that would have been 2004 to roughly 2009,
14 thereabouts?
15   A   Or 2010, I believe.  Yeah.
16   Q   Okay.  Then what did you do in 2010?
17   A   My husband had retired from the Army and went
18 to work for Fort McCoy in Tomah -- or Sparta, Wisconsin
19 -- Fort McCoy, Wisconsin.  And so I took a job with the
20 VA in Tomah, Wisconsin to move and be able to live with
21 him.
22   Q   How long did you work at the VA in Tomah,
23 Wisconsin?
24   A   I was there for only a short time as well,
25 about six months, before I got a job at the Mayo Clinic

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1 in Rochester, Minnesota.
2    Q    How long did you work -- what was your job at
3 the Mayo Clinic?
4    A    I, again, worked in gastroenterology and
5 hepatology with them.
6    Q    How long did you have that job?
7    A    Seven years.
8    Q    So I'm doing math here, 2000 -- I guess, we're
9 in 2010 to 2017; is that right?
10   A    That's correct.
11   Q    Okay.  What did you do after that?
12   A    I got a job at Gundersen in La Crosse, in
13 gastroenterology and hepatology.
14   Q    Okay.  And how long did you work for
15 Gundersen?
16   A    I worked there from 2017 to 2021.
17   Q    That -- I think you described your job with
18 ACH is -- I guess, as something of a part-time job; is
19 that right?
20   A    Correct.
21   Q    And so -- between 2017 and 2021, your full-
22 time job was to work at Gundersen?
23   A    Yes.
24   Q    Okay.  And what -- you said you worked in
25 gastroenterology there?

Page 47

1    A    Correct.
2    Q    And that was in La Crosse?
3    A    Yes.
4    Q    What does that job entail?
5    A    I saw patients that came to the outpatient
6 clinic with any gastroenterology or hepatology
7 complaints.
8    Q    Okay.  So you're working at an outpatient
9 clinic there?
10   A    Correct.  I also worked some inpatient
11 hospital patients.
12   Q    Okay.  And that -- there's a -- it does --
13 Gundersen is -- I'm not from this -- I'm not from
14 Wisconsin.  Is Gundersen a health network with multiple
15 physical locations?
16   A    Yes.
17   Q    Okay.  And some of those locations are
18 outpatient, I guess; is that right?
19   A    Yes.
20   Q    Okay.  And there is also a full hospital in
21 La Crosse; is that right?
22   A    That's correct.
23   Q    What hours did you work at Gundersen, what was
24 your schedule during this period?
25   A    Monday through Friday, 8:00 to 5:00.

Page 48

1    Q    Okay.  So office hours?
2    A    Yes.
3    Q    Okay.  And that was both at the outpatient and
4 at the hospital?
5    A    Yes.
6    Q    Okay.  And is it -- since 2001, you took the
7 job, were you working at the Deere plant?
8    A    2021.
9    Q    I'm sorry.  2021.  Yes.  Sorry.  And that is
10 your full-time job. as of today?
11   A    Yes.
12   Q    And then you have a part-time job with ACH,
13 right?
14   A    Correct.
15   Q    How many jails do you -- have you serviced for
16 ACH?
17   A    In total three.  But I did -- I did some
18 coverage for other providers at times.
19   Q    All right.  One jail was Monroe County.  When
20 did you service Monroe County?
21   A    I started there in 2019 to 2021.
22   Q    You started working with ACH, I believe,
23 somewhere around May 2019; is that right?
24   A    Yes.
25   Q    Okay.  And then -- so you, the ja -- is it --

Page 49

1 what are -- I'm sorry.  Just -- what other counties did
2 you work for besides Monroe County?
3    A    Well, while I was with Monroe County, it was
4 -- my job was Monroe County.  I did cover some other
5 counties, when -- when other practitioners were gone.  I
6 don't remember exactly which ones.  The ones I cover now
7 are Clayton County in -- Clayton and Crawford County.
8 One is in Wisconsin and one is in Iowa.
9    Q    Okay.  The Monroe County job was -- I'll just
10 call it, a steady position, as in you were there over an
11 extended period -- you had that job over an extended
12 period; is that right?
13   A    That's correct.
14   Q    And the Clayton and Crawford Counties, those
15 are -- you're filling in for folks?
16   A    No.  Those are my steady jobs now, too.
17 They're smaller jails and require less time.
18   Q    Okay.  And so is that job similar to the job -
19 - the manner in which the job is performed is similar to
20 the job at Monroe County, in the sense that you're on
21 call for most the time, and then there's some period
22 where you physically go to the jail?
23   A    That's correct.
24   Q    Okay.  Any other counties besides those two?
25   A    Not as my -- my main job.  No.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1    Q    Have you ever had more than one county at a
2  time?  Maybe you do now with these two, but...
3    A    I do now.  Yeah.
4    Q    Okay.  How many hours a week are you working
5  for ACH?
6    A    Currently, I am required to be at the jail one
7  hour every other week, for both the counties that I'm
8  serving.  And then I'm on call for them, whenever they
9  need me.
10    Q    How about Monroe County, how long were you
11  required to be in Monroe County Jail?
12    A    Two hours a week.
13    Q    Okay.  Why did you stop working in Monroe
14  County Jail?
15    A    I moved to Iowa.
16    Q    Okay.  And in all these jails, whether working
17  in Monroe County or these two, Clayton or Crawford
18  Counties, the on-call requirement is -- doesn't require
19  you to work any particular hours, it just requires you
20  to be available, right?
21    A    That's correct.
22    Q    Would you -- can you estimate how many calls
23  you get a week, in that on-call capacity?
24        MR. KNOTT:  Object to form.
25    A    With the two jails I'm serving now, it's --

Page 51

1  how many?  Maybe five times a week.
2    Q    Okay.  How about --
3    A    Monroe County was -- go on.
4    Q    Go ahead.
5    A    Monroe County was more often.  I received at
6  least one call a day from them.
7        MR. WEIL:  Okay.  How about we take a quick
8  break?  We can come back at 11:30?
9        MR. KNOTT:  Sure.
10        THE WITNESS:  Sure.
11        MR. WEIL:  Okay, great.
12        MR. MCCAULEY:  Sounds good.  Thank you.
13        COURT REPORTER:  We are off the record.  The
14  time is 11:25.
15        (OFF THE RECORD)
16        COURT REPORTER:  We are back on the record for
17  the deposition of Lisa Pisney being conducted by
18  video conference.  My name is Sidney Little.  Today
19  is March 3, 2022.  The time is 11:32 a.m.
20  BY MR. WEIL:
21    Q    Ms. Pisney, when we left we were talking about
22  the positions you -- the different places you worked for
23  ACH.  I want to just go back over your employment
24  history.  I -- were you -- have you had any appointments
25  to any boards or anything like that?

Page 52

1    A    I haven't been employed by boards, but I've
2  been a member of boards.  I am -- was a member of the
3  Wisconsin Nurses Association Board, the Association for
4  Nurse Practitioners in Wisconsin, and the Wisconsin
5  Board of Nursing.
6    Q    Are those governmental appointments, any of
7  them?
8    A    The nurses -- the Wisconsin Board of Nursing
9  is.
10    Q    How did you come to be appointed in that
11  position?
12    A    I applied, and was accepted, and appointed by
13  Governor Evers.
14    Q    How long did your tenure last?
15    A    I think it typically lasts four years or three
16  years, but I had to leave early because I was moving to
17  Iowa.
18    Q    Was that a competitive process to become a
19  member of that board?
20    A    Yes.
21    Q    Did you receive -- how -- was there a campaign
22  to become part of it or was it just an application, or
23  many applications, or do you know why you were selected?
24    A    Just an application and I don't know why I was
25  selected.  Just at the discretion of the governor.

Page 53

1    Q    Why did you want that job -- or that position,
2  I should say?
3    A    I -- I'm interested in advancing the rights of
4  nurses, taking care of nurses, and advancing the rights
5  of nurse practitioners in the State of Wisconsin, making
6  sure that the patients in Wisconsin are well-taken care
7  of.
8    Q    What types of things did the board do to make
9  sure that the patients in Wisconsin were well-taken care
10  of?
11    A    We review complaints against nurses, and
12  adjudicate those, and place any restrictions on nursing
13  licenses, take away nursing licenses, restrict them for
14  different things.
15    Q    Okay.  What was your involvement?  You
16  described the board as doing that.  What was your
17  involvement in adjudicating and receiving complaints for
18  the Wisconsin Board of Nursing?
19    A    I was one of the member of the board.  We
20  talked about each of the cases and agreed together,
21  based on history, how we placed restrictions on nurses.
22  It was -- it was a board decision for all of the
23  restrictions we'd place or the --
24    Q    Was -- I don't know if you're done with the
25  answer.  You paused, Ms. Pisney.  I don't know if you're

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1  done or not?
2      A    Yeah.  I'm trying to think of the word to use,
3  but discipline -- discipline.
4      Q    Okay.  Where did you conduct?  Was that done
5  in hearings, or was it all on paper, or how would that
6  work?
7      A    We met monthly and discussed the cases.  We
8  each took three months, where we were more in depth in
9  hearing the cases.  We met with the lawyers and for the
10 -- for Wisconsin, for Board of Nursing and discussed the
11 cases.  We looked over the documentation from each case
12 and made decisions.  There was usually another nurse
13 pract -- or nurse that was on those calls.  And we
14 decided together on whether we should proceed with any
15 discipline, whether no discipline was necessary.  And
16 then we brought that back to the board as a whole.
17     Q    Was this discipline oversight, was that nurses
18 and nurse practitioners?
19     A    Yes.
20     Q    Okay.  Do you ever recall receiving
21 disciplinary complaints about nurses who'd ignored chest
22 pain?
23     A    I don't recall any.
24     Q    Okay.  Do you recall receiving any complaints
25 about nurses who ignored signs of a heart attack?

Page 55

1      A    I don't have any specific recollection.
2      Q    Do you remember any cases, complaints or
3  otherwise, with the Wisconsin Board of Nursing that
4  involved heart attacks?
5      A    I do not specifically.  No.
6      Q    Okay.  Do you have a general recollection that
7  there were some?
8      A    No.
9      Q    Okay.  Did you -- once you were on the board,
10 were you involved in reviewing applications by
11 additional nurses to join the board?
12     A    No.
13     Q    Okay.  It's an impressive accomplishment, at
14 least from this outsider's view, to be on the board.
15 What were the other nurses like on the board?  What were
16 their accomplishments?
17     A    The chair of the board is a certified
18 registered nurse anesthetist, who is a professor of
19 nurse anesthetizing or whatever.  There's another
20 professor on the board at the school of nursing, I
21 believe, in perhaps Madison.  I'm unsure.  There are
22 several members that are RN representatives.  There's at
23 least one general member of the board that is not a
24 nurse.  There's an LPN representative.
25     Q    Once you're appointed to the board, were you

Page 56

1  asked to speak about nursing?  Like do you do any public
2  speaking or anything of that sort?
3      A    Not in relation to the board of nursing, but I
4  have given talks in relation to my expertise in
5  gastroenterology and hepatology.
6      Q    Okay.  And that's your specialty within your
7  LPN field?  Is that --
8      A    I'm a nurse practitioner.
9      Q    I'm sorry.  I apologize.  Your nurse
10 practitioner field?
11     A    That's what I've done most of my career in.
12 Yes.
13     Q    Where have you given talks or -- in what
14 forums?
15     A    Conferences, usually -- nursing conferences.
16 Nurse practitioner conferences.
17     Q    Okay.  Anywhere else?
18     A    No.  Not that I can remember.
19     Q    Very quickly.  Just returning to the
20 disciplinary issues that you were involved in on the
21 Wisconsin Board of Nursing.  In terms of discipline for
22 -- disciplinary issues involving nurse practitioners, do
23 you ever recall discipline for failure to diagnose?
24     A    No.
25     Q    Okay.  Going back to your schedule with ACH

Page 57

1  and I'll just direct you to your time in Monroe County.
2  I understand that you're now working somewhere else.  As
3  we discussed, you're available -- when you're working
4  from Monroe County or at Monroe County, you're available
5  during the week to receive calls, and then you go in one
6  day a week to the jail; is that right?
7      A    Yes.
8      Q    And that was -- I believe you said earlier,
9  that that day was typically Monday; is that right?
10     A    That's correct.
11     Q    Okay.  And why are you going to the jail
12 physically, one day a week?  What's the purpose of those
13 visits?
14     A    I had signed off on paperwork from the week,
15 and I also saw patients that we were having any problems
16 with or that wanted to see a provider.
17     Q    Okay.  So when you're saying you sign off on
18 paperwork, what does that refer -- what paperwork are
19 you signing off on?
20     A    The MARs for patients, the -- typically if a
21 patient wants to be seen by the nurse, they'll fill out
22 a form.  And then the nurse sometimes will call me with
23 those forms and ask my opinion, ask for any med changes,
24 anything that needs a provider.  And then I would sign
25 off on that.  So any orders or anything that I'd given



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1  during the week, sign off on those.

2      Q    Okay.  And in terms of seeing people who
3  wanted to see a nurse practitioner, how would that work?
4  Do you go to a -- sort of, logistically?

5      A    So there's a nursing office in the jail. Amber
6  typically would set patients up for me to see, ones that
7  had, you know, complications with any wounds, any
8  injuries, any questions, complaints, wanting to talk
9  about their medications.  They would be called down to
10 be seen.  Sometimes a CO would come with them, sometimes
11 not.  They would come into the nurse's office.  Amber
12 would do their vital signs and take the chief
13 complaints.  Then I would talk to them about their
14 complaints, do any assessment that was necessary, give
15 my opinion, and any plan for their care.

16     Q    Okay.  I'm assuming as these folks are coming
17 down, you're reviewing whatever medical history they
18 have?

19     A    Whatever we have.  Yes.

20     Q    Right.  And as I understand it from discovery
21 in this case, every detainee at the jail has a medical
22 file, be it just a few documents or many; is that right?
23 As best you know?

24     A    That's correct.

25     Q    Okay.  And that includes an intake sheet where

Page 59

1  that's filled out when they're they come in, right?

2      A    I don't -- I don't see those intake sheets,
3  normally.

4      Q    Are those in the medical file?

5      A    I'm not sure they are.

6      Q    Okay.  Have you ever seen one in your work at
7  the jail?

8      A    I've seen one for this case, but I'm not sure
9  I've ever seen them before.  I think that's all part of
10 the jail paperwork, and I don't typically see the jail
11 side of the -- of why they're there, their charges, all
12 that kind of stuff.

13     Q    When you're looking at a medical file of a
14 detainee, just -- literally, physically, it's a paper
15 file, like with an envelope -- like a manila envelope or
16 that kind of thing?

17     MR. MCCAULEY:  Object to form.

18     A    We have files for the patients.  Yeah.  Typic
19 -- it would include like any request for a nurse visit
20 in it.  Not sure if it includes their intake evaluation
21 or not.  It might.  I just can't remember.  If we'd have
22 any outside records, it would include that.  There is a
23 form that they fill out when they come in, that they
24 answer questions about medical history, and that --
25 that's typically filled out by the -- the inmate

Page 60

1  themselves.

2      Q    Okay.  And this is a -- just physically, it's
3  like a folder with loose paper in it, or how does that
4  work?

5      A    Yes.  Yeah.  During my time at Monroe County,
6  they did get electronic paperwork, but that was later on
7  during my time there.

8      Q    And when you say electronic paperwork, what do
9  you mean?

10     A    Or electronic medical records.  So instead of
11 physically signing off on the papers, I would still do
12 some of that, but I would sign off on things that were
13 in an electronic database.

14     Q    Okay.  I have two versions of electronic files
15 in my mind.  One is just a bunch of paper that's scanned
16 and, you know, it's something you maybe hand wrote on
17 and that just gets scanned and that's the electronic,
18 and maybe there's a bunch of like handwritten stuff or
19 typed out -- just scanned paper in a file.  Another
20 version would be like, you know, computer entry forms,
21 like access database, something you'd be familiar with
22 from like a modern hospital.  Is that a distinction that
23 makes sense to you?

24     A    Yes.

25     Q    Which version are you talking about, in terms

Page 61

1  of at Monroe County?

2      A    It would've been -- it would've been after
3  this case that we got the electronic medical record and
4  that would've been, because I put my notes in into it
5  electronically -- the nurses' notes were entered
6  electronically.  It wasn't scanned documents.

7      Q    Okay.  So this is -- you're doing computer
8  entry into -- are they sort of electronic forms like --
9  or is it a -- but what is it?

10     A    Yes.  It's an electronic form that looks very
11 similar to the paperwork I would fill out previously.

12     Q    Okay.  And roughly, when did that switch occur
13 to the electronic forms?

14     MR. MCCAULEY:  Object to form.  Foundation.

15     A    That was just shortly before I left.  It
16 wasn't -- just a few months before I left.

17     Q    Okay.  And so previously you'd been writing
18 stuff down on paper, and then it switched over to doing
19 entry on a computer?

20     A    Yes.

21     Q    Okay.  So turning away from your time when you
22 were actually physically at the jail, in terms of your
23 being on call, can you tell me how the call -- the on-
24 call call works, when you're called off-site, What the
25 procedure is?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1  A    I would just receive a call from either the
2  nurse or the correctional officer with questions about a
3  patient or -- or whatever they had an issue with.
4      Q    Is your availability something like -- I'm
5  picturing doctors with a pager or something like that.
6  Is there a procedure that you have to keep a phone on
7  you at all times?  Or are there times where you were
8  definitely available, and then other times where it
9  might be somebody else who's on call?
10     A    Unless we asked for time off, we were always
11 on call.  There was always a backup provider though, if
12 they couldn't contact us.
13     Q    Okay.  And so you then could just be doing
14 anything, you're just going about your life, and you
15 would take a call?
16     A    That's true.
17     Q    Okay.  Did you have a place at home or
18 anything of the like -- an office where you'd typically
19 sit down and take these calls when they came in?
20     A    No.
21     Q    Okay.  Did you have any medical reference
22 literature that you'd use, when you took calls from the
23 jail?
24     A    Yeah.  I had Epocrates that I use a lot for
25 making sure I'm giving the correct dose of medication

Page 63

1  for the -- for the disease processes.
2      Q    I'm sorry.  I didn't understand that word. You
3  just said Epocrates?
4      A    Epocrates.  Yeah.  It's an app on my phone.
5      Q    Okay.
6      A    It's a medical app.
7      Q    How do you spell that?
8      A    E-P-O-C-R-A-T-E-S.
9      Q    Okay.  Besides the Epocrates app, did you have
10 any other sources of literature available when you took
11 a call?
12     A    I mean, I have my own library of -- of medical
13 books for assistance.  Typically, they weren't right at
14 my hand when someone would call, and I don't remember
15 specifically picking up a book, and looking at it for
16 any particular questions.  Typically, they were
17 something that I just knew from my education and
18 experience.
19     Q    I believe as a nurse practitioner it's
20 referred to as a mid-level practitioner; is that right?
21     A    A what?
22     Q    Mid-level practitioner?
23     A    That's what some people call us.  Yes.
24     Q    Meaning, as I understand it, you know, the
25 contract between -- well, your employment agreement has

Page 64

1  been produced and several other things, without getting
2  into it.  My understanding is that you are a
3  practitioner, and then as a nurse practitioner, you
4  practice under a doctor; is that right?
5      A    In collaboration with a physician in
6  Wisconsin, we do.  It just depends on the state you work
7  in.  In Iowa, they have independent practice.
8      Q    Okay.  And how is it in Wisconsin?
9      A    Currently, we work in collaboration with the
10 physician.
11     Q    Okay.  And the collaboration physician I saw
12 in the documents was Dr. Schamber when you were at ACH,
13 at Monroe County; is that right?
14     A    It was during part of the time I was there.
15 Dr. Schamber left ACH at some time, and I had another
16 collaborating physician after him.
17     Q    When Ms. Boyer was at the jail, was your
18 collaborating physician Dr. Schamber?
19     A    Yes.
20     Q    In terms of your working relationship -- or
21 working interactions with a collaborating physician,
22 what interaction do you have on a day to day with a
23 collaborating physician, in this role at ACH?
24     A    I -- I didn't speak to him every day.  I spoke
25 to him if I had any questions.  There was regular

Page 65

1  evaluation of my notes to make sure that I was
2  following, you know, appropriate medical care of the
3  patients.
4      Q    Okay.  And when you're talking about notes,
5  where would you be recording those notes?
6      A    At the time of the Boyer case, they were
7  handwritten notes.  When I would see a patient.
8      Q    Sure.  It was a poorly phrased question. Would
9  you be recording notes only when you were visiting the
10 jail, or would you be recording them as well when you
11 took calls off-site?
12     A    No.  Only when I would visit the jail and see
13 a patient in person.
14     Q    Okay.  And so the collaborating physician is
15 reviewing your notes that you may enter, when you're in
16 the jail.  And then I believe the other thing you said,
17 is that you might contact the collaborating physician
18 for a medical question; is that right?
19     A    Yes.  If I had questions or concerns, I could
20 call them.
21     Q    So if that would -- in my mind that sounds
22 like you get a question from the jail, you say, well,
23 I'm not quite sure what the right answer is medically.
24 I'll call the collaborating physician and talk about it
25 with them; is that right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1    A    It could be. Or I could -- yeah. If I had a
2 question about how to treat a certain diagnosis, I would
3 sometimes call him and ask his opinion.
4    Q    Okay. How often do you recall having
5 conversations like that with the collaborating
6 physician?
7    A    I didn't call often. I think I maybe call
8 Dr. Schamber -- especially when I first started, I
9 called him a little more often if I was unsure. But
10 then as time went on, I had to call him less. He was
11 very familiar with treating inpatients -- or inmates.
12 So maybe once or twice a month, I'd give him a call.
13    Q    Do you recall calling anybody, a collaborating
14 physician or anybody else in Ms. Boyer's case?
15        MR. MCCAULEY: It's vague and overly broad.
16        But you can answer.
17    A    I didn't call them during the time I was
18 treating her. No.
19    Q    Okay. We talked a bit ago about the
20 difference between a nurse practitioner and a nurse. And
21 you talked about assessment, diagnosis, and
22 prescription. Can you describe how the diagnosis
23 process works?
24    A    You take into consideration the symptoms that
25 the patient is having, their physical exam. There are

Page 67

1 several differential diagnoses for symptoms and physical
2 exam findings that you take into consideration.
3    Q    You said differential diagnosis?
4    A    Correct.
5    Q    Is the purpose of differential diagnosis to
6 look for a cause of patient's signs or symptoms?
7    A    Yes. Yeah. It gives you a number of
8 different options that those signs or symptoms could be
9 indicative of.
10    Q    Okay. What do you mean by it gives you a
11 bunch of different options?
12    A    You know, certain symptoms could be indicating
13 many different diagnoses.
14    Q    Okay. And when a symptom indicates many
15 different diagnoses -- why don't we just -- let me back
16 up for a minute. Is the goal of differential diagnosis
17 to identify the cause of a patient's signs or symptoms
18 without missing something that could cause a danger to
19 the patient?
20        MR. MCCAULEY: Object to form.
21    A    There are certain things -- oh, I didn't hear.
22 There are certain things that are red flags that you
23 would want to be aware of.
24    Q    What does a red flag mean?
25    A    Something that you don't want to miss.

Page 68

1    Q    And what is something you don't want to miss?
2    A    Something that could lead to a serious medical
3 condition.
4    Q    Okay. And so just go back -- you were saying,
5 there are certain red flags that you are seeking to
6 identify in a differential diagnosis; is that right?
7    A    Sure. So for low back pain, a red flag might
8 be a person's age, their history of cancer, those sort
9 of things.
10    Q    Is differential diagnosis, is there sort of a
11 multi-step process that you go through together?
12    A    No. Differential diagnosis -- differential
13 diagnosis are, okay. I have this symptom. It can be
14 caused by this, this, this, this, or this. So making a
15 diagnosis is an art. It is some -- to me, it is like
16 solving a mystery.
17    Q    How so?
18    A    You have to look for clues, and you have to
19 fit those clues into the different diagnoses, rule out
20 certain diagnoses because of the clues, and rule some
21 in. So, much like solving a mystery.
22    Q    When you -- described -- working forward, the
23 differential diagnosis, I think you said begins when
24 someone comes and presents to you with symptoms; is that
25 right?

Page 69

1    A    Yes.
2    Q    And so the first step in a differential
3 diagnosis is to gather information about those symptoms;
4 is that right?
5    A    That's correct.
6    Q    So that would be their subjective symptoms,
7 correct? What they're telling you?
8    A    Yes. And objective. You use subjective and
9 objective data.
10    Q    Right. So subjective is, if I understand it
11 correctly, that's what someone is telling you about what
12 they're experiencing; is that right?
13    A    That's true.
14    Q    Okay. And then objective is, what you observe
15 about the person?
16    A    Yes.
17    Q    Okay.
18    A    Yes.
19    Q    And when someone presents you with symptoms,
20 part of what you're gathering is also their medical
21 history, right?
22    A    Yes. That's part of the subjective. Yes.
23    Q    And it's important to gather the medical
24 history for a person, in order to understand what might
25 be causing their symptoms; is that right?



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1    A    That's --
2         MR. KNOTT:  Vague and overly broad.  Go ahead.
3    I think she answered.
4    A    That's true.
5    Q    Okay.  Once you've gathered the symptoms, the
6    objectives, observations, the subjective observations,
7    and the history, what's the next step in the
8    differential diagnosis process?
9    A    You know, using your knowledge to put those
10   subjective and objective data together to make a
11   diagnosis.
12   Q    Are you trying to identify potential causes
13   for symptoms, given the information about their history,
14   what -- the objective and subjective observations you're
15   making?
16   A    You're trying to come up with a diagnosis for
17   the -- the bunch of symptoms and objective data that you
18   have.  And then based on that diagnosis, a plan for
19   their care.
20   Q    So let me see if I understand how this would
21   work.  I give an example of say someone who comes in
22   with a abdominal pain, right?  And you gather the
23   information from this case, they're saying, I have
24   severe abdominal pain.  And once you've gathered that
25   information -- this is a very simple case.  I'm not

Page 71

1    providing a bunch of history.  You would say, okay --
2    you said it's like solving a mystery.  The next thing --
3    the next step in the differential diagnosis would be to
4    say, well, I'm going to make a list in my mind, on
5    paper, wherever -- I'm going to make a list of all the
6    potential causes for that symptom of abdominal pain,
7    right?
8    A    That's correct.
9    Q    And that's an important step in the
10   differential diagnosis process, because you don't want
11   to miss a potential cause, right?
12        MR. KNOTT:  It's vague and overly broad.
13   A    Yeah.  And any symptom can have multiple
14   causes.  So the differential diagnosis is that list of
15   multiple causes that it could be.
16   Q    Right.  So we'll stick with my example of
17   abdominal pain.  You know, one of the causes could just
18   be gas, right?
19   A    True.
20   Q    Another could be something more serious, like
21   a tumor, right?
22   A    It's possible.
23   Q    Okay.  And then you could have something else,
24   like appendicitis that could be another potential cause
25   of abdominal pain, correct?

Page 72

1    A    That's true.
2    Q    Once you've gathered -- and you're trying to
3    make an exhaustive list of potential symptoms; is that
4    right?  Or a potential causes for symptoms?
5    A    Yeah.  That's what a differential diagnosis
6    is.  Correct.
7    Q    Okay.  Once you've identified potential causes
8    for the symptoms, the next step in the differential
9    diagnosis, if I understand it, is that you'd want to
10   prioritize symptoms within that.  So you'd want to, you
11   know, in the list, in your mind on paper, wherever,
12   you'd want to say, well, tumor is serious, but maybe not
13   emergent, right?  So that would go a slightly higher
14   priority on your list, correct?
15   A    So you try to whittle down or narrow down the
16   differential diagnosis based on the symptoms that you're
17   given and the history.
18   Q    Right.  And if a symptom has a potentially
19   very benign cause, that goes on the list, right?
20   Something like gas, in our abdominal pain example,
21   correct?
22   A    Yes.
23   Q    And then if a symptom has a potential very
24   serious cause like appendicitis or a tumor, that would
25   go on the list as well, right?

Page 73

1         MR. KNOTT:  Object to form of the question.
2    It's vague.  Overly broad.
3    A    Yes.
4    Q    Okay.  The next step, once you've made that
5    list, is that you want to rule out or treat any
6    potential cause that would pose a danger to the patient
7    before it can hurt them; is that right?
8         MR. KNOTT:  Vague.  Overly broad.
9    A    I mean, you want to rule out the serious
10   causes first --
11   Q    So --
12   A    Benign or --
13   Q    Go ahead.  I'm sorry.  Go ahead.  I didn't
14   mean to interrupt you.
15   A    The benign can take longer and not be as
16   serious, I guess.
17   Q    Okay.  And so in my abdominal pain example,
18   and we'll just have, you know, in our example, we have
19   three potential causes that we're just going to say.  I
20   suspect you're aware of many more given your specialty,
21   but we'll just say there's three potential causes.  One
22   is gas, one is a tumor, and one is appendicitis.  Are
23   you with me in our hypothetical here?
24   A    Yes.
25   Q    Okay.  And so a gas is a benign cause for



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1 abdominal pain, or at least one that doesn't need to be
2 ruled out or treated immediately, right?
3    A    True.
4    Q    A tumor is a serious cause.  But one that
5 wouldn't be necessarily emergent, where it would have to
6 be ruled out, you know, in a very short time; is that
7 right?
8    A    Depends on the tumor, I guess.
9    Q    Sure.  I guess, you know -- of course, I guess
10 we're speaking in a matter of days or hours versus a
11 matter of weeks, right?
12    A    Uh-huh.
13    Q    Okay.  So some -- fair enough.  But then
14 something like appendicitis would be a very serious
15 cause, that would have to be ruled out very quickly; is
16 that right?
17       MR. KNOTT:  Form.  Vague.  Overly broad.
18       MR. MCCAULEY:  Joined.
19    A    Appendicitis is serious and you want to make
20 sure you don't miss it.  That's true.
21    Q    And the reason you want to -- and the way you
22 don't miss it is by ruling it out or treating it,
23 correct?
24       MR. KNOTT:  Object.  Vague.  Overly broad.
25    A    Correct.

Page 75

1    Q    Okay.  And the reason you want -- it's
2 important, whatever your list of potential causes you
3 come up with, it's important to rule out or treat any
4 potential cause that can harm the patient, before it has
5 an opportunity to harm the patient, right?
6       MR. KNOTT:  Vague.  Overly broad.
7    A    I mean, in your first -- of course you don't
8 want to miss anything that could harm the patient.
9    Q    Okay.  And to make sure you don't miss it, you
10 want to rule it out; is that right?
11       MR. KNOTT:  Object to vague.  Overly broad.
12       MR. MCCAULEY:  Joined.
13    A    So you -- I mean, you can't always rule it
14 out.  There's -- I mean, many times there can be more
15 than one diagnosis that fits.
16    Q    Okay.  Is that -- you mean, there might be,
17 for -- again, in our abdominal pain case, there might be
18 multiple causes for the same condition?
19    A    For the same symptoms.  You know, you have to
20 -- and you have multiple ways of ruling things out,
21 like, you know, imaging, and lab work, and different
22 things that are not always immediately available.
23    Q    Okay.  And so if something isn't immediately
24 available to rule out a dangerous cause, it's the job of
25 the nurse practitioner to get the patient to a place

Page 76

1 where the equipment or procedures are available to rule
2 out that dangerous cause; is that right?
3       MR. KNOTT:  Object.  Vague and overly broad.
4    A    That would depend on how -- how likely you
5 feel that might be the issue.
6    Q    Is it your -- so if you feel that a
7 potentially dangerous cause is unlikely, there's no need
8 to rule it out?
9       MR. KNOTT:  Object.  Misstates the testimony.
10 Vague and overly broad.
11    A    If it's unlikely, then you may not have to
12 rule it out.  There are certain rules for when you do or
13 don't need an x-ray.  If you suspect there could be a
14 fracture, there are certain indications that the x-ray
15 is not necessarily needed.  There are many things that
16 you take into consideration, including the history, the
17 age of the patient, their family history, social
18 history.  I mean, there's a lot of things that go into
19 making that diagnosis.
20    Q    You just mentioned x-rays for fractures; is
21 that right?
22    A    That's true.
23    Q    Are you -- what were you referring to you
24 there -- what injury or suspected condition were you
25 referring to?

Page 77

1    A    Just if someone comes in with ankle pain and,
2 you know, there are -- there's these conditions called
3 Ottawa rules.  That if they don't have a pain in this
4 certain place or this certain finding, then the
5 likelihood of a fracture is low and you don't need to
6 get an x-ray.
7    Q    Okay.  Would do the Ottawa rules also cover --
8 what do they cover?
9    A    Usually fractures.
10    Q    Okay.  Anything else?  Any other conditions?
11    A    No.  Not as far as I know.
12    Q    A fracture would be different than something
13 like appendicitis, in the sense of the harm it could
14 cause to you; is that right?
15    A    It can still leave lasting damage.  I mean,
16 appendicitis undiagnosed could cause serious a medical
17 problem, too.  But an undiagnosed fracture can lead to
18 serious medical complications as well.
19    Q    Okay.  The important -- can an undiagnosed
20 fracture -- it sounded like an undiagnosed fracture of
21 an ankle was an example you gave, right?
22    A    Yes.
23    Q    Is that something that can kill you?
24    A    In certain circumstances, I suppose it could.
25 Not usually.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1   Q   Those would be pretty -- yeah.  Not usually,
2   right?  Can an undiagnosed heart attack kill you?
3           MR. MCCAULEY:  Object to form.
4           MR. KNOTT:  Join.
5   A   That -- that depends, too.
6   Q   Okay.  Is it possible for an undiagnosed heart
7   attack to kill you?
8           MR. MCCAULEY:  Objection.
9           MR. KNOTT:  Form.
10  A   It's always possible for a heart attack to
11  cause death.  Yes.
12  Q   Because it's possible for -- and an
13  undiagnosed heart attack can kill you within a matter of
14  minutes or a matter of hours, correct?
15          MR. MCCAULEY:  Objection.
16          MR. KNOTT:  Yeah.  It's vague.
17  A   There are heart attacks that can kill
18  immediately, and then there are heart attacks that lead
19  to some damage and don't necessarily bring death.
20  Q   Okay.  But many heart attacks do bring death;
21  is that right?
22          MR. MCCAULEY:  Same objection.
23  A   I don't know if I would say many.
24  Q   I'm sorry.
25  A   I said, I don't know if I would say many.  I

Page 79

1   would say some.
2   Q   Would you agree that a heart attack is an
3   extremely dangerous event for a person suffering it?
4           MR. MCCAULEY:  Same objection.
5   A   A heart attack is an emergency.  Yes.
6   Q   Okay.  And why is it an emergency?
7   A   They need to be evaluated emergently.
8   Q   Why is that?
9   A   To prevent them from further harm.
10  Q   Does that harm include death?
11  A   Yeah.  Any medical issue can include death.
12  Q   Is death from a heart attack more or less
13  likely than death from a broken ankle?
14          MR. KNOTT:  I object to the form of the
15          question.
16  A   It's -- I'm sure it would be more likely to be
17  death from a heart attack than a broken ankle.
18  Q   Okay.  And death from a heart attack can occur
19  in a short period of time, meaning minutes or hours; is
20  that correct?
21          MR. KNOTT:  Object to the form.  Asked and
22          answered.  Vague.  Overly broad.
23  A   The faster it could be diagnosed, the better.
24  Q   That wasn't my question.  My question was,
25  death from a heart attack can occur within minutes or

Page 80

1   hours; is that correct?
2           MR. MCCAULEY:  Object to form.
3           MR. KNOTT:  Vague, overly broad.  Minutes or
4           hours from what?  But -- incomplete hypothetical.
5   A   Yeah.  I'm unsure.  I mean, it doesn't
6   necessarily mean you're going to die, if you have a
7   heart attack.
8   Q   Okay.  Death from a heart attack can occur
9   within minutes or hours of the manifestation of
10  symptoms; is that correct?
11          MR. MCCAULEY:  Same objection.
12          MR. KNOTT:  Same objections.
13  A   It's possible, but not always.
14          MR. MCCAULEY:  Ms. Pisney, did you answer?
15  A   Yes.
16  Q   What was your answer?  I didn't get it.
17  A   Possible, but not always.
18  Q   Okay.  So sometimes it can kill within minutes
19  or hours and sometimes it won't; is that right?
20  A   That's true.
21          MR. KNOTT:  Object to the form of the
22          question.  It's vague.  And it's incomplete
23          hypothetical, therefore lacked foundation.  You can
24          answer.
25  A   Yes.  You can -- it can happen quickly.  It

Page 81

1   can happen slowly.  It cannot happen at all.
2   BY MR. WEIL:
3   Q   Would you agree that without knowing in
4   advance whether a heart attack will ultimately lead to
5   death, it's a possibility that you have to address when
6   you're in -- as part of the differential diagnosis
7   process?
8           MR. KNOTT:  Object.  It's vague.  Overly
9           broad.  And incomplete hypothetical, therefore
10          lacks foundation.
11  BY MR. WEIL:
12  Q   Let me strike.  Then I'll ask you a new
13  question, Ms. Pisney.  If it's possible for a heart
14  attack to kill you within minutes or hours of the
15  manifestation of symptoms, you have to rule it out or
16  treat it, before it has the opportunity to kill the
17  patient; is that right?
18          MR. MCCAULEY:  Object to form.
19  A   It would be important to make a diagnosis of a
20  heart-related condition from symptoms.  But -- I mean, I
21  -- people complaining of chest pain, complain of chest
22  pain for many different reasons.
23  Q   Is one -- okay.  Is one of those reasons, that
24  they're actually experiencing chest pain?
25  A   Any pain of the chest is chest pain.  It

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1 doesn't necessarily mean it's from the heart. It can be
2 anxiety, it can be reflux, it can be any number of
3 things.
4     Q    It can be any number of things; is that right?
5     A    That's right.
6     Q    And one of those things can be the onset of a
7 heart attack; is that right?
8         MR. MCCAULEY:  Object to form.
9         MR. KNOTT:  Join.
10    A    That is one of the symptoms.  Yes.
11    Q    That's one of the causes of chest pain; is
12 that right?
13        MR. MCCAULEY:  Object to form.
14    A    Is -- is -- cardiac related is a -- is a cause
15 of chest pain.  Yes.
16    Q    Okay.  And one of the cardiac related causes
17 of chest pain is the onset of a heart attack; is that
18 right?
19        MR. MCCAULEY:  Same objection.
20    A    It's possible.
21    Q    It's possible?
22    A    Yes.
23    Q    And in that last step of the differential
24 diagnosis, it's vital to rule out or treat a cause of a
25 symptom you're observing, that can possibly kill

1 someone; Is that right?
2         MR. KNOTT:  Object to the form of the
3     question.
4         MR. MCCAULEY:  Join.
5         MR. KNOTT:  It's vague.  Overly broad.
6     Incomplete hypothetical.
7     A    You would want to rule out the most serious
8 diagnosis first.
9 BY MR. WEIL:
10    Q    And you want to rule out the most serious
11 potential diagnosis first, in a time frame before it's
12 able to kill the patient; is that right?
13    A    Yes.  You don't want to kill the patient.
14    Q    Just bear with me, Ms. Pisney.  I'm going to
15 show you a document.
16        MR. WEIL:  I believe we are on Exhibit 28.  And
17     this is -- so we'll mark this as Exhibit 28, and
18     for the court reporter, Sydney, what we're doing
19     is, we are just continuing with the exhibits from
20     the prior depositions and using those as static
21     numbers, so...
22        (EXHIBIT 28 MARKED FOR IDENTIFICATION)
23     COURT REPOTER:  Okay.  Thank you.
24 BY MR. WEIL:
25    Q    This is an infographic provided by the

1 American Heart Association.  Are you able to read this
2 document on the screen, Ms. Pisney?
3     A    I can't read what it says under each of the
4 numbers.
5     Q    Okay.  I'll zoom in a little.  We can see the
6 -- this is the entire document.  It's one page.  And it
7 says, "Common heart attack warning signs," do you see
8 that?
9     A    I do.
10    Q    Okay.  I will zoom in a little and hopefully
11 that'll allow us to discuss this.  One of the -- the
12 first sign that's indicated is, "Pain or discomfort in
13 the chest," do you see that?
14    A    I do.
15    Q    Another sign is, "Nausea, or vomiting, or
16 lightheadedness," do you see that?
17    A    Yes.
18    Q    A third is, "Jaw, neck, or back pain," do you
19 see that?
20    A    Yes.
21    Q    A fourth sign is, "Discomfort and pain in the
22 arm or the shoulder," do you see that?
23    A    Yes.
24    Q    And this number four in the diagram is on the
25 left side of this person's body, in Exhibit 28, right?

1     A    Correct.
2     Q    When someone's exhibiting symptoms of a heart
3 attack, is it the case that -- especially indicative is
4 pain on the left side of the chest area or the shoulder?
5     A    Yes.  That would be more common, since the
6 heart is on the left.
7     Q    Okay.  And then the fifth sign here is,
8 "Shortness of breath"; is that right?
9     A    Yes.
10    Q    Would you agree that heart attack -- that
11 those signs and symptoms that we just discussed can come
12 and go, when someone is having a heart attack?
13        MR. KNOTT:  Object to vague and overly broad.
14    A    They -- they can.
15    Q    Okay.  And so the fact that the symptoms have
16 dissipated momentarily is not a sign that someone is not
17 having a heart attack; is that right?
18        MR. MCCAULEY:  Object to form.
19    Q    Let me rephrase that.  The fact that someone's
20 -- those, the signs that we were just reviewing, one of
21 more of them may have dissipated momentarily, that does
22 not rule out the possibility that someone is still
23 having a heart attack; is that right?
24    A    People can have a heart attack with no signs
25 or symptoms as well.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1    Q    Does one of the things that -- these signs,
2  however, are clues that someone is more likely to be
3  having a heart attack, right?
4          MR. MCCAULEY:  Object to form.
5    A    Clues that it's possible.
6    Q    And if someone's exhibiting one or more of
7  these signs and symptoms, it's important to rule out the
8  possibility that they're having a heart attack; is that
9  correct?
10         MR. MCCAULEY:  Same objection.
11         MR. KNOTT:  Object.  It's vague and overly
12    broad.  Incomplete hypothetical.
13   A    I wouldn't say that one symptom would be
14  indicative of a heart attack.  There's many -- I mean,
15  if someone came to me with nausea and vomiting, that's
16  not the first thing that I would think of.
17  BY MR. WEIL:
18   Q    Okay.  If someone's having chest pain, pain in
19  the shoulder, shortness of breath, nausea and vomiting,
20  would those be symptoms that someone might be
21  experiencing a heart attack?
22         MR. MCCAULEY:  Object.  Incomplete
23    hypothetical.  Vague.
24         MR. KNOTT:  Join.
25   A    It's possible.

Page 87

1  BY MR. WEIL:
2    Q    If given that it's possible, is a heart attack
3  something that it would be important to rule out if
4  you're providing medical care to that person?
5          MR. MCCAULEY:  Same objection.
6          MR. KNOTT:  Same objection.  It's asked and
7     answered.  Vague.  Overly broad.  And incomplete
8     hypothetical.
9    A    You know, every -- every patient is different.
10  Every patient has a different history.  Every symptom is
11  expressed differently.  So it's all very individual.
12  BY MR. WEIL:
13   Q    If different individuals were experiencing the
14  same symptoms that I just described to you, is there one
15  for whom you would not try to rule out heart attack?
16   A    There are certain individuals where a heart
17  attack would be extremely unlikely.  A 20-year-old is
18  unlikely to be having a heart attack.
19   Q    Okay.  And so if a 20-year-old were
20  experiencing pain or discomfort in the chest, nausea or
21  vomiting, discomfort in the shoulder or arm, in the left
22  shoulder, and shortness of breath, you would not attempt
23  to rule out a heart attack at that point?
24         MR. KNOTT:  Vague.  Overly broad.  Incomplete
25    hypothetical.

Page 88

1    A    I'd be asking a lot more questions about any
2  drugs that they might have done recently, any cardiac
3  history, any family history.
4    Q    And those questions would be designed to rule
5  out the possibility of heart attack, right?
6    A    Yes.
7    Q    Okay.  And it would be important to rule out
8  the possibility of a heart attack in someone
9  experiencing the conditions we just discussed, because
10  heart attacks can kill within hours or minutes; is that
11  right?
12         MR. KNOTT:  Object to the form of the
13    question.  It's vague.  Overly broad.  It's also
14    been asked and answered three times.
15   A    I did say that that would be one of the
16  symptoms.  But -- or -- yeah.  But I've answered it.
17         MR. KNOTT:  Stop.  Stop.  Can you ask the
18    question again?  She clearly didn't have the
19    question in mind.
20         MR. WEIL:  If you could read it back, Sydney.
21         COURT REPORTER:  Just one moment, please.
22         AUTOMATED VOICE RECORDING:  Recording in
23    progress.
24         COURT REPORTER:  Sorry.  One moment.
25         (REPORTER PLAYS BACK REQUESTED

Page 89

1          TESTIMONY)
2    A    So as I said before, it's possible that it can
3  happen quickly, happen never, happen slowly.  There are
4  many people that have heart attacks that are undiagnosed
5  at the time and they are diagnosed afterwards.
6    Q    I don't believe you answered my question,
7  Ms. Pisney, because it had to do with whether it was
8  important to rule it out because it's possible for a
9  heart attack to kill within hours or minutes?
10         MR. KNOTT:  Object to form.  Compound
11    question.  Facts not in evidence.
12   A    It's important to rule out a cardiac cause of
13  chest pain.
14   Q    Okay.  And it would be even more important to
15  rule out -- chest pain is number one on this list,
16  right?  The first heart -- that little blue heart,
17  right?
18   A    Yes.
19   Q    So even chest pain on its own, it would be
20  important to rule out a heart attack for chest pain on
21  its own, right?
22         MR. KNOTT:  Objection.  Mischaracterizes.
23   A    Not every chest pain is a heart attack.
24   Q    Right.  But it's important to rule out that
25  it's not a heart attack in the differential diagnosis;



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1 is that right?
2          MR. MCCAULEY:  Asked and answered.
3          MR. KNOTT:  Same objections.
4     Q    Ms. Pisney, there's a question pending.  Do
5 you need me to ask it again?
6     A    Yes.
7     Q    Okay.  If a person exhibited just that first,
8 the little number one blue heart, pain or discomfort in
9 the chest, you would want to rule out -- it would be
10 important to rule out a heart attack, even if they just
11 had that one symptom; is that right?
12          MR. KNOTT:  Object.  It's vague.  Overly
13     broad.  And incomplete hypothetical.
14     A    It would depend on the person.
15     Q    Okay.  What kind of a person would you not
16 feel the need to rule out heart attack, if they
17 presented with pain or discomfort in the chest?
18          MR. MCCAULEY:  The same objections.
19          MR. MCCAULEY:  Vague.
20     A    I believe I answered that previously, when we
21 had the discussion about the 20-year-old.
22     Q    Okay.  So it would be a 20-year-old where you
23 wouldn't feel the need to rule out heart attack as a
24 cause of chest pain?
25          MR. KNOTT:  Object.  Vague.  Overly broad.

Page 91

1     A    Every -- every patient that presents with
2 chest pain is not someone that is having a heart attack,
3 so many different things go into that diagnosis.  And,
4 you know, heart attack is one cause of chest pain.
5     Q    Right.  And in the list that you're making --
6 in your differential diagnosis list, it's the most
7 serious and the most emergent; is that right?
8          MR. MCCAULEY:  Object to form.
9          MR. KNOTT:  Object -- that -- completely void
10     of any context.  Vague.  Overly broad.  Incomplete
11     hypothetical.
12     A    Not necessarily.  There are other causes.
13 BY MR. WEIL:
14     Q    Other causes even more deadly and severe than
15 heart attack?
16          MR. KNOTT:  Same objections.
17          MR. MCCAULEY:  Object.
18     A    It's very -- I mean, there are so many causes
19 of chest pain.  I mean, there's aortic aneurysm is one I
20 can think of that would be maybe more emergent.
21     Q    Okay.  Is that something you would want to try
22 to rule out as well?
23          MR. KNOTT:  Same objections.
24     A    Yes.  That would be a serious thing that you
25 would want to rule out.

Page 92

1     Q    Okay.  If you ruled out aortic aneurysm, you'd
2 still want to rule out a potential second cause like
3 chest pain; is that right?
4          MR. KNOTT:  Object.  Vague.  Overly broad.  And
5     incomplete hypothetical.  Asked and answered.
6     A    I believe I answered before that chest pain is
7 a serious complaint that needs to be investigated.
8     Q    It needs to be ruled out, correct?  Or
9 treated?
10          MR. KNOTT:  This is going on -- I'm going to
11     start -- I'm going to have a real problem with the
12     asked and answered nature of this.  You've been at
13     differential diagnosis for an hour and five
14     minutes, and so, object to form --
15          MR. WEIL:  Okay.  Doug, you're making -- I
16     just want to note for the record, you're making
17     really frivolous asked and answered objections.
18     The question that you just objected to as asked and
19     answered was, if you've ruled out aortic aneurysm,
20     you'd still want to rule out chest pain?  It's the
21     first time aortic aneurysm has been mentioned in
22     this deposition.  So it's just not possible that
23     it's been asked and answered.  I'm just trying to
24     get clear answers from this witness on this topic
25     and move forward.  That's all I'm trying to do

Page 93

1 here.  Okay?
2          MR. KNOTT:  Yeah.  Don't interrupt me.  And
3     the problem is, you say you're looking for clear
4     answers.  You get the clear answer 15 or 20 times,
5     and you keep doing it, and it becomes harassment,
6     and abuse of the process.  And you think you're the
7     only one who can talk and speak during these
8     depositions, and you're wrong.  I have to protect
9     my witness from harassment.  And, Steve, I think
10     you're a nice guy.  But I think you try to beat
11     these witnesses with repeated questioning, until
12     you get exactly the words you want, and that's not
13     what this process is about.  So, you know, I'm
14     going to protect her.  You ask the questions and
15     that's how we'll go.
16          MR. WEIL:  Okay.
17     A    So heart attack would be one of the things
18 that you want to rule out.
19 BY MR. WEIL:
20     Q    Okay.  Would you agree with me, Ms. Pisney,
21 that someone having high blood pressure is a risk factor
22 for having a heart attack?
23     A    Not necessarily.
24     Q    What's that?
25     A    Not necessarily.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1  Q   Is it possible?
2      MR. MCCAULEY:  Object to form.
3  A   There are many people that have high blood
4 pressure that have never had a heart attack.  It's not a
5 risk factor for a heart attack.
6      MR. WEIL:  I'm showing you now, what we'll
7      mark as Exhibit 29.  This is a publication by the
8      US Department of Health and Human Services.  It's
9      four pages long.  I'll scroll through it with you.
10 BY MR. WEIL:
11  Q   Can you see it on the screen, Ms. Pisney?
12      (EXHIBIT 29 MARKED FOR IDENTIFICATION)
13  A   I can see it, but I can't read it.
14  Q   That's fine.  We'll get to reading it.  Do you
15 see here on the first page of Exhibit 29, it says,
16 "Major risk factors for a heart attack you can control,
17 include smoking, overweight and obesity, high blood
18 pressure, cholesterol, diabetes, an unhealthy diet, and
19 lack of physical activity," do you see that?
20  A   I do.
21  Q   Do you agree?
22  A   I think that that's --
23  Q   Go ahead.
24  A   I think that's as -- overall.  I mean, you
25 have a risk factor if you smoke, if you're overweight,

Page 95

1 if you have high cholesterol, and high blood pressure,
2 and diabetes, and an unhealthy diet, and don't exercise.
3 I mean, that's just unhealthy.
4  Q   Are you -- so maybe we should clarify
5 something.  I'm not saying that every person with high
6 blood pressure has a heart attack, but is it a risk --
7 is high blood pressure a risk factor for having a heart
8 attack?
9  A   Not on its own.
10  Q   Okay.  Are you suggesting -- are you reading
11 this passage to mean that a person must have all of
12 these conditions, in order for them to amount to a risk
13 factor for a heart attack?
14  A   No, no.  Diabetes is considered a risk factor
15 on its own.  But I wouldn't say that just high blood
16 pressure on its own would be a risk factor for a heart
17 attack.
18  Q   Okay.
19  A   I think that someone that hasn't taken their
20 blood pressure medicines have a risk for high blood
21 pressure.
22  Q   Okay.  So you don't think that high blood
23 pressure is a risk factor for a heart attack?
24  A   Not on its own.
25  Q   Okay.  What would it need to be combined with

Page 96

1 to be a risk factor for a heart attack?
2      MR. MCCAULEY:  Object to form.
3  A   Some basis, some family history, some personal
4 history, some -- I mean, just -- there are many, many
5 people that have high blood pressure.  Of those people
6 that have high blood pressure, there's a very small
7 portion of them that have a heart attack.
8  Q   If someone had high blood pressure and
9 congestive heart failure, would that put them at greater
10 risk for a heart attack?
11      MR. KNOTT:  Object to the form of the
12      question.  It's vague.  Incomplete hypothetical.
13  A   A history of congestive heart failure is
14 multifactorial as well.  You can have a history of
15 congestive heart failure from -- that resolves and is a
16 normal -- it's hypothetical and I can't answer.
17  Q   Okay.  Is a -- let me ask you a non-
18 hypothetical question, which is congestive heart failure
19 a risk factor for a heart attack?
20      MR. KNOTT:  Object to form.
21      MR. MCCAULEY:  Join.
22  A   It can be a residual of a heart attack.
23 Depends on the congestive heart failure.
24  Q   Okay.  If someone were to present to you --
25 well, strike that.  I'm sorry, Ms. Pisney.  Let me put

Page 97

1 this Exhibit 28 back up.  After the first page that we
2 were just looking at, you see what is a heart attack and
3 who is at risk, right?  Do you see that, Ms. Pisney?
4  A   Yes.
5  Q   Okay.  The next page of Exhibit 28 says, "Know
6 the symptoms of a heart attack," do you see that?
7  A   Yes.
8  Q   And it describes -- I'm going to zoom in here.
9 If you want to read more of the document, that's fine.
10 Just let me know.  You see on the left hand column, it
11 says, "Know the symptoms of a heart attack," do you see
12 that?
13  A   Yes.
14  Q   Okay.  The first symptom of a heart attack is
15 chest pain or discomfort, do you see that?
16  A   Yes.
17      MR. KNOTT:  Object to the form of the
18      question.
19  Q   Do you agree that chest pain or discomfort is
20 a symptom of a heart attack?
21  A   It can be.
22  Q   A symptom -- and just so we're clear, a
23 symptom doesn't mean you definitely have something or
24 you definitely don't.  It means it's a symptom, as in, a
25 possible cause of a symptom is the underlying condition,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1  which in this case we're talking about a heart attack,
2  right?
3       A    It can be a symptom of a heart attack.  Yes.
4       Q    Okay.  So that's -- one of the symptoms of
5  heart attack is chest pain or discomfort; is that right?
6       A    Correct.
7       Q    Okay.  The next sentence, it says, "Most heart
8  attacks involve discomfort on the center or left side of
9  the chest."  Would you agree with that?
10      A    It would -- it just depends on the person, but
11 I guess, that's a common symptom.
12      Q    Okay.  The next sentence says, "The discomfort
13 usually lasts for more than a few minutes or goes away
14 and comes back," do you see that?
15      A    I do.
16      Q    Would you agree with that?
17      A    Yes.  Very fleeting episodes of chest pain
18 usually are not cardiac in nature.
19      Q    Okay.  If someone has chest pain and it goes
20 away, does that mean that -- at a particular time, does
21 that mean that they're no longer at risk for heart
22 attack?
23           MR. KNOT:  Object.  Vague.  Overly broad.
24      Incomplete hypothetical.
25      Q    Let me ask a different question, Ms. Pisney.

Page 99

1  Given the chest pain or discomfort associated with a
2  heart attack can go away or come back.  If a person is
3  experiencing chest pain and then at a particular point
4  in time, thereafter, they're not.  Does that mean that
5  they are no longer at risk for heart attack?
6           MR. KNOTT:  Object to form.
7           MR. MCCAULEY:  Join.  Incomplete hypothetical.
8       A    It could mean that it wasn't a symptom of a
9  heart attack or it -- if it comes back, then it would be
10 more serious.  But if it goes away for hours at a time
11 and doesn't come back, then I'd be less likely to
12 suspect a heart attack.
13      Q    Okay.  You need to know that it was -- had
14 gone away for hours at a time; is that right?
15      A    I mean, if it's -- it's unknowable.
16      Q    What do you mean by that, Ms. Pisney?
17      A    I don't -- I mean, if someone has chest pain
18 and it goes away, that could be they had gas.  And if it
19 never comes back, then it's unlikely to be cardiac.
20      Q    Okay.  You mean, "It never comes back," any
21 point, thereafter, right?
22      A    I don't know if -- I mean, chest pain
23 separated by years wouldn't necessarily lead me to think
24 that people were having a heart attack.
25      Q    How about chest pain separated by a few hours?

Page 100

1           MR. KNOTT:  Object to form.
2       A    Again, we're -- that's hypothetical.  This
3  case, she had chest pain once.
4       Q    If -- okay.  Another symptom of chest pain
5  listed here is, "Upper body discomfort," do you see
6  that?
7       A    That's a symptom of a heart attack that they
8  list.
9       Q    Okay.  And one of the symptoms is, "Pain in
10 the shoulders," do you see that?
11      A    Yes.
12      Q    Would you agree with that, as a symptom of a
13 heart attack?
14      A    Sometimes chest pain radiates to the shoulder,
15 as a symptom of a heart attack.
16      Q    Okay.  Another symptom that this publication
17 identifies is, "Shortness of breath," do you see that?
18      A    I do.
19      Q    Okay.  And it says that, "This may occur" --
20 referring to shortness of breath as a symptom of a heart
21 attack.  "This may occur, be your only symptom, or it
22 may occur before or along with chest pain or
23 discomfort," do you see that?
24      A    Yes.
25      Q    Would you agree that shortness of breath that

Page 101

1  occurs before or along with chest pain or discomfort, is
2  a symptom of a heart attack?
3       A    It could be.
4       Q    Meaning that it's a symptom of a heart attack,
5  that as a potential -- that's a symptom indicating that
6  it's a potential cause the -- strike that.  When you say
7  it could be, you mean that's a cause of that symptom
8  that you would need to rule out because it's a potential
9  heart attack causing the symptom; is that right?
10      A    I -- if someone presented to me with shortness
11 of breath, that's not the first thing that I would think
12 about.  No.
13      Q    How about if -- okay.  So just -- if it was
14 shortness of breath that occurs before chest pain, is
15 that, to you, a symptom of a heart attack that would
16 want -- cause you to want to rule out heart attack, as a
17 cause for those symptoms?
18      A    In a person with asthma?  No.  I'd be more
19 likely to -- to think it's related to the asthma, could
20 also be related to anxiety, panic attack.
21      Q    Okay.  That'd be a possibility, right?
22      A    Yes.
23      Q    And would that be something you'd want to rule
24 out?
25      A    The panic attack or the asthma?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1    Q    Sure.  Well, let me put it this way.  If
2  someone has asthma, that's potential shortness of breath
3  followed by chest pain.  Are you saying that -- are you
4  -- let me back up.  We're referring just here to
5  shortness of breath, right?  So if you're saying -- if I
6  understand you correctly, you're saying that shortness
7  of breath could just be a sign of asthma, right?
8    A    Could be, in a -- especially in a person that
9  has asthma.
10    Q    Okay.  And if there's shortness of breath,
11  that's followed by chest pain, is that a symptom of
12  asthma?
13    A    It depends.  I mean, they -- albuterol can
14  cause you to have racing heart.  If you've taken
15  albuterol for your shortness of breath, that could be
16  associated with some chest pain, I suppose.
17    Q    Would another cause of shortness of breath
18  followed by chest pain, be a heart attack?
19    A    It's possible.
20    Q    Is that a possibility that you would want to
21  rule out in your differential diagnosis?
22        MR. KNOTT:  Vague.  Overly broad.  Incomplete
23    hypothetical.
24    A    There are -- it's -- I -- you know that you
25  can't just throw some symptoms at me, and have me make a

Page 103

1  diagnosis based on those, without a specific patient and
2  the -- everything that goes along with that patient.
3    Q    If a patient presented to you with shortness
4  of breath, followed by a heart attack, would you want to
5  rule out -- or -- I'm sorry, strike that.  If a patient
6  presented to you with shortness of breath followed by
7  chest pain, and that was their medical history, would
8  you run to rule out heart attack, as a potential cause
9  for those symptoms?
10    A    Those are symptoms of a heart attack.  They
11  could also be other -- symptoms of something else.
12    Q    Okay.  And if they are symptoms of a heart
13  attack, you would want to ensure that you had ruled it
14  out, correct?
15        MR. MCCAULEY:  Object to the form of the
16    questions.  Vague.  Overly broad.  And incomplete
17    hypothetical.
18    A    You can't always rule everything out
19  immediately.
20  BY MR. WEIL:
21    Q    Okay.  Would you want to attempt to rule it
22  out?
23        MR. MCCAULEY:  Vague.  Overly broad.
24    Incomplete hypothetical.
25    A    Again, it depends on situation that you're in.

Page 104

1    Q    What do you mean by that?
2    A    There are so many options for these symptoms
3  to show up in and in dealing with patients, you have to
4  take each patient individually, give the information
5  that you have at that time, and then make a decision.
6    Q    If you received a call saying, this patient
7  has chest pain be -- well, this chest patient has chest
8  pain, before that they had shortness of breath and
9  that's the call you received.  What else would you want
10  to know, in order to rule out the possibility of heart
11  attack?
12    A    I would want to know how old they were, when
13  the chest pain occurred, were they at rest, were they in
14  activity, did they have any other symptoms, what were
15  their vital signs, what medications were they on?
16    Q    Would any of the things that you just listed
17  rule out the possibility of heart attack?
18    A    Usually chest pain at rest is not a cardiac in
19  nature.
20    Q    Is it possible that it's cardiac in nature, if
21  someone's having a heart attack?
22    A    Be less likely.
23    Q    Can people at rest have a heart attack?
24    A    I suppose they could.
25    Q    Okay.  So the fact that a person was at rest

Page 105

1  -- and experiencing the symptoms of shortness of breath
2  followed by chest pain, the fact that they were at rest
3  would not rule out a heart attack; is that right?
4        MR. KNOTT:  Object to form.
5    A    I would be less likely to think of heart
6  attack as a potential, if it happened at rest.
7    Q    Okay.  Is it one of the conditions that you
8  would make to sure you'd want to rule out, though?
9        MR. KNOTT:  Object to form.
10    A    When -- I've answered this previously, the
11  chest pain is a symptom of heart attack, and you'd want
12  to rule out a heart attack.
13    Q    Sure.  We're talking here, you said, if
14  someone was at rest and experiencing these symptoms, you
15  think a heart attack would be more likely, so I'm asking
16  about that.  So if someone's at rest --
17    A    Less likely.
18    Q    Less likely-
19        MR. KNOTT:  Did you hear her?
20    Q    Yes.  All right.  If I understand you
21  correctly, if someone's at rest, and you are alerted
22  that they have shortness of breath followed by chest
23  pain.  If I understand you correctly, you think it would
24  be less likely that they would have a heart attack than
25  if they'd been active; is that right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1    A    Yes.
2    Q    Okay. Nevertheless, is heart attack a cause
3  of those symptoms that you would want to rule out in
4  your differential diagnosis?
5         MR. KNOTT: Vague. Overly broad. Incomplete
6  hypothetical. Go ahead.
7    A    I answered that previously.
8    Q    Do you remember the rule to be laid out at the
9  beginning of this deposition. Which is if, unless your
10 lawyer instructs you not to answer a question, you're
11 obligated to answer it. I'm asking you to please answer
12 that question.
13        MR. KNOTT: And --
14   A    And I said --
15        MR. KNOTT: Mr. Weil, I'm going lay out a rule
16 too. Which is please don't instruct my clients on
17 how to answer questions. So she's entitled to
18 stand by her prior answer to that. And if she'd
19 like to do that, she can answer the question again.
20   A    As I said previously that I stand by that
21 answer. I mean, I've answered this question multiple
22 times.
23 BY MR. WEIL:
24   Q    Ma'am, I don't believe you have. We have not
25 -- but are you refusing to answer this question?

Page 107

1         MR. KNOTT: She's answered it.
2         MR. MCCAULEY: Object to form.
3  Mischaracterizes.
4  BY MR. WEIL:
5    Q    Okay. Let me ask it again. Just so we're
6  clear on the record. You stated that if someone
7  presented to you with shortness of breath followed by
8  chest pain and they had been at rest. It would be less
9  likely that they were experiencing a heart attack in
10 your mind, correct?
11        MR. KNOTT: Object to form.
12        MR. MCCAULEY: Vague. Speculative.
13   A    That is what I said. Correct.
14   Q    Okay. And my question to you was,
15 nevertheless, would you want to rule out heart attack as
16 a potential cause of the -- those two symptoms of
17 someone who you learned was at rest?
18        MR. MCCAULEY: Same objection.
19        MR. KNOTT: Same objections. Asked and
20 answered, multiple times.
21   A    As I said, shortness of breath and chest pain
22 symptoms of a heart attack and you would want to rule
23 out a heart attack. I've said that many times.
24 BY MR. WEIL:
25   Q    Even for someone at rest, who you believed --

Page 108

1  for whom you believed a heart attack was less likely,
2  correct?
3         MR. MCCAULEY: Object to form.
4         MR. KNOTT: Can I -- asked and answered,
5  multiple times.
6    A    You have to take everything into consideration
7  when you're deciding, and chest pain at rest is less
8  likely to be cardiac in nature.
9  BY MR. WEIL:
10   Q    Does that mean that you would not rule out
11 heart attack for someone who is at rest?
12        MR. KNOTT: Object to form.
13        MR. MCCAULEY: Object to the form of the
14 question. Vague. Incomplete hypothetical.
15   A    I'd have to take other things into
16 consideration.
17 BY MR. WEIL:
18   Q    What else would you take into consideration?
19   A    Any other symptoms that they were having, any
20 history, any family history, any previous diagnoses, any
21 medications.
22   Q    If someone -- so which of those things would
23 rule out heart attack, as a cause for the symptoms of
24 someone who's experiencing shortness of breath, followed
25 by chest pain, who's at rest?

Page 109

1    A    They have a prior diagnosis of heartburn. If
2  they have no family history or personal history of heart
3  attack. If they are not on any medications for heart
4  medications. If they're young and healthy.
5    Q    It would be critical --
6         MR. KNOTT: Counsel, we've been at it an hour-
7  and-a-half. And we need to take a short break or a
8  little more extended break, but I'd like to have a
9  break fairly soon. We've been at it a long time.
10        MR. WEIL: Sure. We can take a break right
11 now. Would we like to do lunch?
12        MR. KNOTT: Let me talk to the witness
13 briefly.
14        MR. WEIL: Okay.
15        THE WITNESS: Like a half hour.
16        MR. KNOTT: Yeah. I think like 20 minutes to
17 a half hour would be good.
18        MR. WEIL: Let's let's come back at 1:30.
19        MR. KNOTT: Okay.
20        MR. MCCAULEY: All right.
21        MR. KNOTT: Sounds good.
22        MR. WEIL: Okay.
23        COURT REPORTER: We're off the record. The
24 time is 1:00 p.m.
25        (OFF THE RECORD)

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 110

1     COURT REPORTER:  We are back on the record for
2  the deposition of Lisa Pisney being conducted by
3  video conference.  My name is Sydney Little.  Today
4  is March 3, 2022.  And the time is 1:38 p.m.
5     MR. WEIL:  Good afternoon, Ms. Pisney, were
6  you able to get lunch?
7     THE WITNESS:  Yeah.  Thank you.
8     MR. WEIL:  Great.  I hope you're rested and
9  ready for some more questions.  I'll try to move
10  this along as fast as I can.
11 BY MR. WEIL:
12    Q    I want to refer you back to Exhibit 29, which
13 we were discussing before lunch.  Do you recall that we
14 spent quite a bit of time on this bullet here.  Can you
15 see it in front of you, Ms. Pisney?
16    A    Yes.
17    Q    Okay.  We spent quite a bit of time on this
18 bullet, shortness of breath.  You see below that the
19 shortness of breath bullet, it says, "Other possible
20 symptoms of a heart attack."  Do you see that?
21    A    Yes.
22    Q    Okay.  So nausea is another possible symptom
23 of a heart attack; is that right?  According to this
24 document?
25    A    Yes.

Page 111

1     Q    Would you agree that you should pay attention
2  to nausea as another possible symptom of a heart of a
3  heart attack?
4     A    Yes.  But also symptom of many other things.
5     Q    Okay.  One of those things could be a heart
6  attack, correct?
7     A    Yes.
8     Q    Especially if it were combined with other
9  symptoms like chest pain, or discomfort, or shortness of
10 breath; is that right?
11    A    It's one of the possibilities.
12    Q    And in the differential diagnosis, that would
13 be all the more reason to exclude heart attack as a
14 cause of such a symptom?
15    MR. KNOTT:  Object to the form of the
16 question.  Vague.  Overly broad.  Lacks foundation.
17 Incomplete hypothetical.
18    MR. MCCAULEY:  Answered.
19    A    It would be part of the things that I would
20 take into consideration.
21 BY MR. WEIL:
22    Q    You see below nausea, it says,
23 "Lightheadedness or sudden dizziness," do you see that?
24    A    Yes.
25    Q    And that's another -- you would agree that

Page 112

1  that's another possible symptom of a heart attack?
2     A    Yes.
3     Q    Okay.  If we go the right hand column of the
4  second page of Exhibit 29, I'll start you at the top and
5  scroll down -- I'm sorry.  You see it says here, "Heart
6  attacks don't always cause common symptoms," do you see
7  that?
8     A    Yes.
9     Q    And there's a paragraph, take as long as you
10 like to read it.  I'm interested in the first bullet
11 underneath that paragraph.
12    A    Yes.  I've read it.
13    Q    Let me know when you're ready.  Okay.  It says
14 there that, "Heart attacks can start slowly and cause
15 only mild pain or discomfort," right?  Do you see that?
16    A    It says that, they don't always begin with a
17 sudden crushing chest pain.
18    Q    Where are you, Ms. Pisney?
19    A    The beginning of the --
20    Q    Sure.  Go ahead.  I'm sorry.
21    A    At the beginning of the paragraph.
22    Q    Okay.  You're up here with, "Not all heart
23 attacks," up here?
24    A    Right.  And then -- I see where you're talking
25 about the first bullet.

Page 113

1     Q    Right.  I'm talking about this first bullet.
2  So it says in the first bullet, "Heart attacks can start
3  slowly and cause only mild pain or discomfort," do you
4  see that?
5     A    Yes.
6     Q    Would you agree with that?
7     A    It's possible.
8     Q    It's possible you agree, or it's possible that
9  that is a course of symptoms of a heart attack?
10    A    It's possible that that might be a symptom of
11 a heart attack.
12    Q    Okay.  The second sentence says, "Symptoms can
13 be mild or more intense and sudden," do you see that?
14    A    Yes.
15    Q    Would you agree that sometimes, heart attack
16 symptoms can be mild or more intense and sudden?
17    A    Yes.
18    Q    Okay.  And the last sentence in that first
19 bullet says, "Symptoms also may come and go over several
20 hours."  Would you agree that symptoms of a heart attack
21 may come and go over several hours?
22    A    That's possible.
23    Q    Okay.  Do you -- by that, do you mean it's
24 possible that you agree or possible that symptoms of a
25 heart attack may come and go over several hours?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1    A    It's possible that symptoms may come and go
2 over several hours.
3    Q    Turning you to the third page of Exhibit 29.
4 You see this column on the left says, "Quick action can
5 save your life.  Call 911"?
6    A    Yes.
7    Q    I'm interested in the third bullet down where
8 it begins, "The 911 operator," do you see that?
9    A    I see something, but I can't read it.
10    Q    Okay.  I'll zoom it in.  Does that help you?
11    A    No.
12    Q    Can you read it now?
13    A    Pull it out a little bit.  Yep.
14    Q    Okay.  Says -- just take a look at this
15 bullet, and then I have a question about the last
16 sentence
17    A    I read it.
18    Q    Okay.  It says, "Aspirin taken during a heart
19 attack can limit the damage to your heart and save your
20 life," do you see that?
21    A    Yes.
22    Q    Okay.  And the next bullet is in bold, where
23 it says, "Every minute matters," do you see that?
24    A    Yes.
25    Q    Okay.  To back up real quick, would you agree

Page 115

1 that aspirin taken during a heart attack can limit the
2 damage to your heart?
3    A    It can help.
4    Q    Okay.  In the next bullet down it says, "Every
5 minute matters.  Never delay calling 911, to take
6 aspirin, or do anything else you think might help," do
7 you see that?
8    A    Yes.
9    Q    Would you agree that one should never delay
10 calling 911, to take aspirin, or do anything else that
11 they think might help, when they're experiencing the
12 symptoms of a heart attack?
13         MR. KNOTT:  Object to vague.  Overly broad.
14    And incomplete hypothetical.
15    A    That would be, if you knew you were having a
16 heart attack.
17    Q    Okay.  If you believed that -- well, if
18 someone was exhibiting the symptoms of a heart attack,
19 would aspirin be a way to treat those symptoms and --
20 therefore, in the differential diagnosis?
21    A    You can use aspirin to help with the -- slow
22 the blood clotting and that would help in a heart
23 attack.  But you can also use aspirin as an anti-
24 inflammatory for -- for musculoskeletal pain, anti-
25 inflammatory for other types of pain.

Page 116

1    Q    Is aspirin a way of treating a heart attack?
2    A    It's one of the medications given.
3    Q    Is it an effective means to treat a heart
4 attack?
5         MR. MCCAULEY:  Object to form.
6    A    It wouldn't be the only treatment.
7    Q    Okay.  So aspirin alone would not be
8 sufficient to treat a heart attack; is that correct?
9         MR. KNOTT:  Object to form of the questions.
10    Vague.  Overly broad.  And incomplete hypothetical.
11    A    You would need to do more, if you were having
12 a heart attack.
13    Q    Going to show you now a document we'll mark as
14 Exhibit 30.  This is a publication by Healthline and
15 I'll page through it real quickly for you, Ms. Pisney.
16 It's five pages long it's titled, "Blood Pressure
17 Changes During a Heart Attack."  I'm interested in the
18 line here, in the second paragraph.  Can you read it
19 Ms. Pisney or should I zoom in a little?
20         (EXHIBIT 30 MARKED FOR IDENTIFICATION)
21         MR. KNOTT:  I think you need to zoom in.
22    A    Zoom in.
23    Q    Okay.  Is that any better?
24    A    Yes.
25    Q    Okay.  It says, "Any blood pressure changes

Page 117

1 that may occur during a heart attack are unpredictable,
2 so doctors generally don't use them as a sign of a heart
3 attack," do you see that?
4    A    Yes, I do.
5    Q    Would you agree that blood pressure changes
6 during a heart attack are unpredictable?
7    A    I would.
8    Q    Would you agree that blood pressure changes
9 shouldn't be used to rule in or rule out a heart attack?
10         MR. MCCAULEY:  Object to form.
11    A    That's true.  That's what I've said
12 previously, that not everybody with high blood pressure
13 has a risk for heart attack.  Some people with heart
14 attacks will have low blood pressure.
15    Q    Right.  And so this -- this -- do you read
16 this sentence as referring to, blood pressure changes
17 during a heart attack?
18    A    That's what it says.  Yes.
19    Q    Okay.  And so a doc -- you agree that during
20 -- while someone's experiencing symptoms that are --
21 that may be a heart attack, you would not rule out a
22 heart attack by using blood pressure measurements?
23         MR. MCCAULEY:  Object to form -- sorry.  Object
24    to form.
25         MR. KNOTT:  Join.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    A    Yeah.  I -- blood pressure wouldn't play a
2  indicator in my judgment of that.  No.
3  BY MR. WEIL:
4    Q    I want -- we talked about your independent
5  memory of the time that Christine Boyer was in the jail.
6  I want to ask you a few questions by directing you to
7  documents this time.  And just --
8    A    Okay.
9    Q    -- go over the course of events there.  So do
10  you -- well, we'll get there.  I was going to ask your
11  lawyer to show you some documents -- or if he has any,
12  but we'll wait.  We've done that in the last deposition,
13  but we don't need to yet.  The first document I want to
14  show you, Ms. Pisney, is Exhibit 3, and it's the intake
15  medical screening report.  I believe it's a document
16  that you reviewed in preparation for your deposition.
17  I'm going to pull it up on the screen right now, and you
18  tell me if you've seen it before.  So can you see a
19  document in front of you?
20      MR. KNOTT:  I'm going to give her a paper
21      copy, if she wants to refer to that.
22      MR. WEIL:  That'd be great.  Thank you, Doug.
23    A    Yes.  I see it.
24  BY MR. WEIL:
25    Q    And is this a document you referred to, in

1  preparation for your deposition today -- or reviewed?
2    A    I did.  I did -- I did review it.  Yes.
3    Q    Okay.  I want to direct you to the first call
4  that you remember receiving about Ms. Boyer.  And I
5  believe you said it was before there were the calls
6  about high blood pressure.  Okay?
7    A    Yes.
8    Q    You -- I believe you told me, that you
9  received a call about someone with medical issues and --
10  sorry.  I'm just looking back at my notes here.  It said
11  she was -- the call was that she was unable to tell
12  Amber Fennigkoh what all the meds she was on, and it --
13  she was unable to provide a reliable medical history.  Do
14  you remember that from this morning?
15    A    Correct.  Yes.
16    Q    Okay.  When -- would your practice have been
17  to gather all the information that you could at that
18  point, about the person?
19    A    Yes.
20    Q    Okay.  Do you remember asking -- or would you
21  have -- let me ask you this, that you also recall being
22  called either during that call or possibly in a separate
23  call about medications that she might be on?
24    A    I must have.  Although, I don't remember that.
25    Q    Okay.  I'm looking down here at the bottom of

1  Exhibit 3, on page 1093.  You see there's an asterisk
2  right at the bottom, on the last page of-
3    A    Yes.
4    Q    -- the exhibit?  And it says, "Medical call
5  Medicine Shoppe Monday to get med list, plus get her
6  records from hospital, per Pisney," do you see that?
7    A    Yes.
8    Q    Does that refresh your recollection at all, as
9  to any conversation you might have had about Ms. Boyer,
10  in that first set of calls before -- call or calls
11  before the high blood pressure call?
12      MR. MCCAULEY:  Object to form.
13    A    That would've been --
14      MR. MCCAULEY:  Yeah.
15    A    That would've been my instructions to them, to
16  get more information.  We weren't able to get her
17  medicines from the pharmacy because they were closed,
18  and we didn't have any reliable medical history.  So I
19  had instructed them to get her medical records, so we
20  could get that.
21    Q    Okay.  And in your practice, would you have
22  asked the person who called you to read off any
23  documents, reporting whatever medical history that she
24  did have?
25      MR. MCCAULEY:  Object to form.

1    A    They wouldn't read -- they wouldn't have read
2  this in verbatim to me.  No.
3    Q    Would -- when you say verbatim, what do you
4  mean?
5    A    They don't go through every one of these
6  questions and tell me what she answered.
7    Q    Okay.  I want to take you to the first page of
8  Exhibit 3.
9    A    Uh-huh.
10    Q    It said -- you recall someone reporting that
11  Ms. Boyer said she had a month to live, do you remember
12  that?
13    A    Yes.
14    Q    Do you see number two here -- item two, "Are
15  you sick or injured in any way?"  And this document
16  says, "Some doctors say I have a year to live," do you
17  see that?
18    A    Yes.
19    Q    Is that what you might have been told is
20  report -- what might have been reported to you?
21      MR. MCCAULEY:  Object to form.  Calls for
22  speculation.
23    A    I --
24      MR. KNOTT:  Object to form.  Foundation.
25  Speculation.  And the question's vague, as to time.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1    Q    Sure.  I'm talking about this first call that
2  you got, before the calls about high blood pressure.
3    A    I seem to remember someone telling me that she
4  had said a month to live, but...
5    Q    Okay.  When you get a call like that, what is
6  your practice, in terms of trying to gather information
7  from the caller?
8         MR. MCCAULEY:  Object to form.
9    Well, you get calls all the time from people
10  -- well, I think you said multiple times per week for
11  Monroe County, correct?
12        MR. MCCAULEY:  Object to form.
13   A    Sure.
14   Q    And I believe it was -- I had one call per
15  day, roughly, from Monroe County Jail, right?
16   A    At least one call per day.
17   Q    And you're getting those calls -- typically
18  those calls would be coming from correctional officers.
19  Is that right?
20   A    No.  Most of the calls I got were from the
21  nurse.
22   Q    Okay.
23   A    And then occasionally, the nighttime calls
24  would've been from correctional officers.
25   Q    Okay.  And the weekend calls as well?

Page 123

1    A    Yes.
2    Q    Okay.  And when you got calls from
3  correctional officers, they may have had -- to your
4  knowledge, they would've had some medical training, but
5  maybe not as much as a nurse?
6    A    Yes.
7    Q    Okay.  Did you have a technique to elicit
8  relevant medical information from officers as they
9  called?
10   A    Yeah.  I asked them questions about any
11  symptoms, or the patient that they were calling me
12  about.
13   Q    Do you typically ask the person who's calling
14  you to read off any notes about the person's medical
15  history or medical conditions?
16   A    I sometimes will ask that.  But not always.
17   Q    Okay.  Would you want to know anything
18  important that had been written down about a person?
19   A    Yes.  But I don't always know what they deem
20  important.
21   Q    Yeah.  That was a vague question.  I'm sorry.
22  Anything important medically -- would you want to know
23  anything important medically, that's been written down
24  about a patient?
25   A    I would.  But I can't be sure that I always

Page 124

1  get it.
2    Q    Okay.  And so what -- given that you can't be
3  sure that you're always getting what's medically
4  important.  What's your technique in terms of asking
5  guards to report medical information, that's been
6  written down about a patient?
7    A    Usually, I just ask them questions that I want
8  to know in making a judgment.
9    Q    Would you start with a question, is there
10  anything written down about the patient?
11   A    No.
12   Q    Okay.  So you wouldn't -- would you ask them,
13  do you have a medical history for this patient?
14   A    For this patient in particular, I wouldn't
15  have.  Because I've been told previously that we didn't
16  have her medical history.
17   Q    Do you have any idea why you were called about
18  a patient who had no medical history?
19   A    They called to let me know that she'd been
20  admitted.  And that this call must have been asking me
21  about her medications that she had on person.
22   Q    Okay.
23   A    And then they told me that they did not have a
24  medical history and they did not know her medications.
25  And I that's when I told them to get that information.

Page 125

1  So we were in the process of trying to get that
2  information.
3    Q    Okay.  What you recall her -- them telling
4  you, is that she reported she had a month to live?
5    A    Yes.
6    Q    Would that prompt you to try to gather as much
7  medical information you could about this person?
8    A    It made me skeptical about the reality of that
9  statement.  But I didn't have any information to base it
10  on.
11   Q    When someone expresses that they're very ill
12  or sick, do you -- are you -- do you have a way of
13  ruling out that they're malingering or exaggerating
14  their symptoms?
15   A    That's why I ask them certain things about,
16  you know, when the symptoms started, any other symptoms
17  that go along with it, to see if it makes sense
18  medically.
19   Q    And when you are remote and it's a guard
20  calling, you're typically not able to ask the patient
21  themselves, right?
22   A    No.  I don't speak with the patient.
23   Q    Okay.  So do you try to gather as much
24  information like that, about their symptoms and their
25  history from the guard?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1    A    I do.

2    Q    Okay.  And so when you're trying to gather
3  that information, do you ask the guard if there's
4  anything written down about the person or symptoms?

5    A    No.  I'm just assuming they're telling me
6  everything there is to know.

7    Q    Okay.  So you don't say when some -- when a
8  guard reports that someone says something like, I have a
9  month live, you would ask -- do you know -- it'd be your
10  practice to say, well, do you know anything else about
11  this person, right?

12    A    I probably would've said, why -- why did she
13  say that -- why?  Did she give a reason?

14    Q    Okay.  And would you also want to say, just
15  tell me what you know about this person's medical
16  history -- or what she said about her medical history?

17    A    They've already told me that they didn't know
18  her medical history.  She wasn't able to give a clear
19  medical history.

20    Q    Would someone with this form who'd written
21  down exhibit -- you went over Exhibit 3 in preparation
22  for this deposition, right?

23    A    I did.

24    Q    Okay.  Would someone on this form -- look at,
25  if you would, at page 3, which I have up on the form

Page 127

1  here, under the notes.  It says, "She states she has
2  multiple medical issues due to cancer," do you see that?

3    A    Yes.

4    Q    So that's a medical condition, however vaguely
5  described, that someone who had this form would know
6  Ms. Boyer expressed, right?

7    A    Yes.  I do remember them saying that she said
8  she had cancer.

9    Q    Okay.  And right after, it says she's on chemo
10  -- or it says, "Chemo/radiation," right?

11    A    Yes.

12    Q    So that would be another piece of medical
13  information that the person who had this form would
14  have?

15    A    I'm assuming.  Yes.

16    Q    And the next line says, "Also states she has
17  congestive heart failure," do you see that?

18    A    I do see it.

19    Q    So that's another piece of information that
20  this person would have, right?

21    A    It's written.

22    Q    Okay.  And I guess, again, do you have any
23  reason to think that when you got a call, the person who
24  called you didn't provide you this information?

25    A    I don't remember ever getting information that

Page 128

1  she had congestive heart failure.

2    Q    Okay.  Do you have any reason to think that a
3  person calling you about Ms. Boyer's medical history
4  would not have provided you with that information?

5    MR. KNOTT:  She just answered that question.
6    She told you her recollection.

7    Q    I -- that wasn't what my question asked.

8    A    As I said, they don't read that verbatim to
9  me.  They tell me what they think is important, and what
10  the high points are, but they don't go through
11  everything verbatim.

12    Q    Do you think any person reading this form
13  would not think the congestive heart failure is
14  important to let you know about?

15    MR. MCCAULEY:  Object to form.

16    MR. KNOTT:  Foundation and speculation --
17    foundation and speculation.

18    A    I -- I don't recall them ever telling me she
19  had congestive heart failure.

20  BY MR. WEIL:

21    Q    My question was different.  Do you think any
22  person who read you this form, and was trying to provide
23  you medical information about Ms. Boyer's medical
24  history, would not think the congestive heart failure
25  was something important to tell you?

Page 129

1    MR. KNOTT:  Foundation.  Speculation about the
2    frame of mind of specific correctional officers.

3    A    I don't -- I mean, I have no idea why they
4  wouldn't tell me, but I don't remember them telling me
5  that.

6    Q    You don't remember one way or the other,
7  right?

8    A    I don't --

9    MR. KNOTT:  She's answered the question.

10    A    I specifically don't remember them saying that
11  she had congest heart failure.

12    Q    Do you remember, one way or the other, whether
13  they told you that?

14    A    I remember them telling me that she said she
15  had a month to live, that she'd had cancer, but I don't
16  remember anything about congestive heart failure.

17    Q    Okay.  Ms. Pisney, I'm going to showing you
18  another document.  I'm going to try to make it a bit
19  more manageable.  This is Exhibit 18.  Do you recognize
20  this document as something you reviewed in preparation
21  for this deposition?

22    A    Yes.

23    MR. KNOTT:  Take a second to get her a paper
24    -- paper copy.

25    MR. WEIL:  Sure.  That'd be great, Doug.  Thank

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1  you.
2      A    I have it.
3  BY MR. WEIL:
4      Q    Okay.  Let me -- just real quickly, Ms.
5  Pisney, I want to close out Exhibit 3, just a couple
6  more questions.  We talked about congestive heart
7  failure.  So we're looking at Exhibit 3 again.  The --
8  on page 2 of Exhibit 3, you see line 14.  It also says
9  -- it lists a bunch of conditions.  One of them is high
10  blood pressure, and one of them is asthma?
11      A    Yes.
12      Q    You see that?
13      A    Yes.
14      Q    Do you have any reason to think that a guard
15  calling you to report on Ms. Boyer's medical history,
16  would not have reported that Ms. Boyer had been treated
17  for high pressure and asthma?
18      MR. KNOTT:  Object to form.
19      A    I don't remember them telling me those,
20  either.
21      Q    Okay.  And again, I think you said when you
22  heard that Ms. Boyer reported that some people had said
23  she had a month to live, your practice would be to try
24  to gather as much information as possible from the
25  person calling, right?

Page 131

1      A    That's why I asked them to get her medical
2  records and her prescriptions.
3      Q    Would you ask -- and I think you also said
4  that one of the things you would do, is ask the person
5  to provide any medical information that they were aware
6  of at the time that was written down; is that right?
7      A    No.  I never specifically asked that.  I
8  assumed that when they're calling me, that they're going
9  to give me the information that they have.
10      Q    So if someone -- if a guard calls and reports
11  that this patient who's come and says, I have a month to
12  live.  Would you the guard, did the patient say why?
13  Would that be a question you'd ask?
14      MR. MCCAULEY:  Object to form.
15      A    That's possible.  I likely did that.  Yes.
16      Q    Okay.  And is it also likely that you would've
17  said, well, did the patient identify any medical
18  problems they have?  Is that something you would've
19  asked or, you know, something along those lines?
20      A    They're calling me with their medical problems
21  and they're telling me that they did not get a clear
22  medical history from her.  She did not know her
23  medications.  She said she had a month to live and that
24  she'd had cancer.  And that's really all I remember from
25  that conversation.

Page 132

1      Q    Again, do you have any reason to think that a
2  person calling you, if they were reading from this form,
3  would not have informed you about these reports of high
4  blood pressure and asthma?
5      MR. MCCAULEY:  Object to form.
6      MR. KNOTT:  Object to the form -- object to
7      the form of the question.  She's told you her
8      recollection.
9      A    I don't know if they were reading from this
10  form or not.
11  BY MR. WEIL:
12      Q    Okay.  But if they were, do you think they
13  would've told you these things that were circled?
14      MR. KNOTT:  Foundation.  Speculation.
15      MR. MCCAULEY:  Join.
16      A    All I can say is what I remember, and I don't
17  remember being told that.
18      Q    Okay.  Turning you back to Exhibit 18, I
19  believe you have in front of you.  I'm looking at the
20  top line, which is for, Oxycodone.  Do you see that?
21      A    Yes.
22      Q    And the medication instructions are in the
23  second column of the sheet, correct?
24      A    Yes.
25      Q    Okay.  And it says, "One tab, four times daily

Page 133

1  for pain," do you see that?
2      A    I do.
3      Q    Does that indicate to you that -- I understand
4  that there's a, "Not approved," sign here, do you see
5  that?
6      A    Yes.
7      Q    For the oxycodone.  Does this indicate to you,
8  however, that there was at least a written prescription
9  for the oxycodone that was found with her?
10      A    There -- yes.  I believe so, because otherwise
11  they wouldn't have known how she was prescribed it.
12      Q    Okay.  The second line is a drug -- I'm going
13  to call it Zofran.  I tried several times to pronounce
14  it yesterday.  But what's this drug here, Ms. Pisney?
15  It's on line two.
16      A    Ondansetron.
17      Q    Ondansetron?  And that's commonly referred to as
18  Zofran; is that right?
19      A    Yes.
20      Q    Okay.  And here in this column, it says, "As
21  needed for nausea from chemo/radiation," do you see
22  that?
23      A    Yes.
24      Q    Again, I'm assuming just as these things are
25  read, that would indicate to you that was a written



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 134

1  prescription for this Zofran drug; is that right?
2      A    I would assume so, since there's an indication
3  or an instruction for their taking of it.
4      Q    When -- you said that you recall earlier being
5  called about the medications that had been found with
6  Ms. Boyer; is that right?
7      A    I -- I don't remember being called about the
8  medications, but I must have been.
9      Q    Okay.  And is that -- are you saying you must
10 have been, because part of your role at the jail was to
11 -- as the provider, would be to approve medications like
12 this?
13     A    Yes.
14     Q    Okay.  And so -- and this would be -- this
15 medication list would be medications that you were
16 called about, that Ms. Boyer had on her person, right?
17     A    Yes.
18     Q    Okay.  And so among other things, in approving
19 this list, you would've learned that she'd been
20 prescribed Zofran for nausea from chemo; is that right?
21     A    Yes.
22     Q    Or radiation, correct?
23     A    Yes.
24     Q    Chemo and radiation are treatments that are
25 typical provided for a person suffering from cancer; is

Page 135

1  that correct?
2      A    Yes.
3      Q    Okay.  So, would that indicate to you that
4  Ms. Boyer had this prescription because she was
5  suffering from cancer?
6      A    It's possible.  I don't know how old that
7  prescription was.
8      Q    You approved this medication; is that right?
9      A    I did.
10     Q    Would that indicate to you that when this
11 prescription was communicated to you, that it was
12 current?
13         MR. KNOTT:  Foundation.  Speculation.
14     A    No.  Not necessarily.  These were the
15 medications found on her person.
16     Q    Would you have approved an out of date
17 medication, like Zofran?
18     A    Zofran is as needed for nausea.  So if she had
19 nausea, then we could use it.
20     Q    Okay.
21     A    So I don't -- I have no way of knowing what
22 date it was.  They usually tell me if they have a
23 prescription bottle, what date it was filled, though.
24     Q    Would that be over here, in this little line
25 right here (indicating), on to the left of exhibit -- or

Page 136

1  line two?
2      A    Yeah.  Yes.
3      Q    Can you tell me what that means, that that
4  65862391 --
5      A    I do not.
6      Q    -- and a 10.  You don't know?
7      A    No.
8      Q    Would this indicate to you it was possible
9  that Ms. -- this line from the Zofran, would that
10 indicate that it was possible that Ms. Boyer was
11 suffering from cancer, at the time she was booked into
12 the jail?
13     A    It's possible.
14     Q    Okay.
15     A    She did -- I mean, that's one of the things
16 that she said, that I was understanding, that she said
17 she had cancer.
18     Q    So this prescription would corroborate her
19 statement that she had cancer; is that right?
20     A    If that was a current prescription.  I don't
21 -- in looking at her medical records from the hospital,
22 I don't see any indication that she was being treated
23 currently for cancer, but an old history of cancer.  But
24 that's -- I found that out afterwards.
25     Q    Okay.  At the time that you would've been

Page 137

1  called about this prescription here, the prescription
2  for nausea, for chemo and radiation, would've
3  corroborated Ms. Boyer's statement that she was
4  suffering from cancer in your mind; is that right?
5      A    Yes.  If it was a current prescription.
6      Q    Okay.  And are you saying that you couldn't --
7  you can't tell from this line, whether or not it was a
8  current prescription?
9      A    I cannot.
10     Q    So it was possible that it was a current
11 prescription?
12         MR. KNOTT:  Foundation.  Speculation.
13     A    Possible it was, possible it wasn't.
14     Q    Okay.  The next exhibit I'm showing you is
15 Exhibit 20.
16         MR. WEIL:  Doug, I don't know if you want to
17 get this document for Ms. Pisney or not.
18         MR. KNOTT:  Actually, I think that was marked
19 first, yesterday.  And I'm on the road, so I don't
20 have paper copies of that.
21         MR. WEIL:  Okay.  Doug, are you referring to
22 -- there's two versions of this, right?  There's
23 one that, like, was entered at an earlier time.  I
24 can use that one if you have that document
25 document.  It's --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1      MR. KNOTT:  Right.  Exhibit 7 is the one that

2  has the Eastern Time Zone.

3      MR. WEIL:  Okay.  Well, I'll just -- I'll pull

4  up Exhibit 7.

5  BY MR. WEIL:

6   Q   Okay.  Ms. Pisney, do you have in front of you

7  a document -- the same document that's up on the screen

8  now, Exhibit 7?

9   A   Yes.

10   Q   Okay.  Is this a document that you reviewed in

11  preparation for your deposition today?

12   A   I did see this.  Yes.

13   Q   Okay.  This is an e-mail from Shasta Parker.

14  Do you know who that is?

15   A   Yes.

16   Q   Who is that?

17   A   She's one of the CO's in the jail.

18   Q   Is Shasta Parker a CO who you spoke with from

19  time to time, in fulfilling your job as the on call

20  practitioner?

21      MR. MCCAULEY:  Object to form.

22   A   Yes.

23   Q   Okay.

24      MR. KNOTT:  Can we pause for just -- can we

25  pause just for a second.  I know you want to use

1  Exhibit 7 to accommodate us, and I appreciate that.

2  I think we should inform the witness, that to the

3  best of our knowledge, this is actually a 6:26 p.m.

4  Central Time, just so we're straight on that.

5  BY MR. WEIL:

6   Q   Sure.  So, Ms. Pisney, what he's -- what your

7  lawyer's talking about, is this is one of the features

8  of electronically stored information.  You see this line

9  up here that says, "December 22nd, 7:26 p.m."?

10   A   Yes.

11   Q   Okay.  And then it says, "EST," afterwards?

12   A   Yes.

13   Q   We are figuring it out.  But what we believe

14  is that refers to Eastern Standard Time.  And

15  Wisconsin's Central Time, right?

16   A   Correct.

17   Q   And so there's another document that is

18  identical in terms of its text, but it refers to

19  6:27 p.m.  So an hour before.  So I think we believe

20  that this was written at 6:27 p.m.

21   A   Okay.

22   Q   Okay.

23      MR. KNOTT:  Thank you.

24   Q   Okay.  So, I'll refer to Exhibit 7, just so

25  we're all looking at the same document, with that

1  understanding.  And again -- I'm sorry, I'm going to

2  violate Doug's rule and repeat the question.  You do

3  recall reviewing this document before your deposition

4  today, correct?

5   A   I did see this before.

6   Q   Okay.  So it begins, "Hello.  Christine Boyer,

7  as you know, has a number of medical issues," do you see

8  that?

9   A   Yes.

10   Q   Okay.  And it says, "This afternoon, she

11  started complaining of feeling hot and sweaty and not

12  being able to breathe," do you see that?

13   A   Yes.

14   Q   Okay.  "She asked to take -- to have her blood

15  pressure taken and it was 177 over," and it says, "I

16  can't remember this bottom one at the moment, but it is

17  on the MAR.  It was really high.  And we called Lisa,"

18  do you see that?

19   A   Yes.

20   Q   Is it consistent with your memory -- earlier

21  today we discussed you receiving this call -- or one or

22  two calls in the morning about Ms. Boyer's medical

23  history and prescriptions, right?

24   A   Yes.

25   Q   And then you received a subsequent call -- you

1  recall receiving a subsequent call about Ms. Boyer

2  having high blood pressure?

3   A   Yes.

4   Q   Okay.  Is the information here about this

5  first call consistent with your recollection about

6  receiving a call about Ms. Boyer having extremely high

7  blood pressure?

8   A   I do remember them calling me about the high

9  blood pressure.  I don't remember them telling me that

10  she had complained of being hot, and sweaty, and not

11  being able to breathe.

12   Q   Okay.  You don't remember one way or the

13  other?

14   A   I don't remember them telling me that.  I just

15  remember about the blood pressure.

16   Q   Okay.  Any reason to think they wouldn't have

17  told you that?

18   A   No.  I just don't remember them saying it.

19   Q   Okay.  The next line after, "We called Lisa,"

20  says, "She said, give one dose of 0.2 milligrams of

21  clonidine, and then do a blood pressure check at 3:45

22  p.m.," do you see that?

23   A   Yes.

24   Q   Is that consistent with your recollection of

25  this first call about high blood pressure?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 142

1    A    Yes.  I gave -- I told them to give her 0.2 of
2  clonidine and recheck her blood pressure in half an
3  hour.
4    Q    Okay.  The next line says, "The recheck was
5  196/106, and Lisa said to recheck it again," do you see
6  that?
7    A    Yes.
8    Q    Okay.  And so I'm assuming this means that
9  there was a second call that was made to you, to recheck
10  it again.  Is that how you read that?
11    A    Yeah.  So they called me at 3:45 to tell me
12  the recheck, and it was coming down, so I wanted them to
13  check it again in an hour before we did anything else,
14  so we didn't drop it too much.  And then if it was above
15  the 160 over 100, to give her another dose of clonidine.
16    Q    Let me slow you down and take that in some
17  pieces.  So -- is what you just testified, is that your
18  independent recollection or is that what you're
19  inferring from this document?
20    A    No.  That's my recollection.  I do -- I do
21  remember them calling me about her blood pressure.  I
22  always thought it was one call, but obviously, from the
23  paperwork and this e-mail, it was two calls, actually.
24    Q    Okay.  And so your practice here was when you
25  reported high blood pressure, give some medication, call

Page 143

1  back in a half hour, if it's still high, right?
2    A    Yes.
3    Q    Okay.  And So there's a call at 3:45 p.m.  And
4  it's 169 over 106, right?
5    A    Yes.
6    Q    Okay.  And then the next line is, "Lisa said,
7  recheck it in an hour.  And if the bottom number is
8  still over 100, or a blood pressure reading such as
9  169/100, then go ahead and give her another
10  0.1 milligram of clonidine," do you see that?
11    A    Yes.
12    Q    Okay.  Okay.  Did you provide any further
13  instructions after that, about what to do after an hour?
14    A    Well, I told them if it was over that -- that
15  amount, then give her another 0.1 Of clonidine.
16    Q    Right.
17    A    But no.  Other than that, no.
18    Q    Is there a reason that you didn't instruct
19  them to see if that last 0.1 milligram of clonidine --
20  so just to back up.  After instructing them to say, give
21  them that one last 0.1 milligram of clonidine, you
22  didn't instruct them to check her blood pressure again,
23  to see if that quantity had been successful in reducing
24  her blood pressure?
25    A    No.  The 0.2 clonidine was working, so another

Page 144

1  0.1 was likely to work.  I didn't instruct them to
2  recheck our blood pressure.  No.
3    Q    Is there any reason you would not want them to
4  check and confirm, that last 0.1 milligrams of clonidine
5  was successful in actually reducing her blood pressure?
6    A    I didn't -- I didn't instruct them.  It's
7  typical that it looked like it was working.  So another
8  0.1 would make it drop even further.  And I think that
9  would've been in the normal zone.  So I didn't instruct
10  them to check, but if she'd had symptoms, they would've
11  rechecked her.
12    Q    What are the symptoms of high blood pressure,
13  besides high blood pressure?
14    A    Well, she was complaining and feeling hot, and
15  sweaty, and not feeling right, or being able to breathe
16  when she asked it for it to be checked, originally.  So
17  she had a symptom, and she asked that her blood pressure
18  be checked.
19    Q    Was there any protocol for someone complaining
20  of high blood pressure and having -- being hot, and
21  sweaty, or not being able to breathe at the jail?
22    A    No.
23    Q    Okay.  So were you -- why -- it sounds like
24  you assumed that the guards would know when to identify
25  concerning symptoms, after this 0.1 milligram of

Page 145

1  clonidine?
2    A    I mean, typically, we're not doing vital signs
3  on every inmate at any certain time.
4    Q    Is -- was there any reason not to just ask the
5  guards to check again, and see if that last 0.1
6  milligrams of clonidine and had been successful in
7  actually lowering her blood pressure?
8        MR. KNOTT:  That's been answered.
9    A    I -- doesn't -- it doesn't appear that I asked
10  them to recheck.  I don't -- it was working, and I
11  assumed that the next dose would drop it even further,
12  and get it her into the normal zone.
13    Q    And you weren't asking the guards to confirm
14  your assumption?
15    A    I was not.
16    Q    Why not?
17        MR. KNOTT:  Asked and answered.
18    A    I didn't judge it to be necessary.
19    Q    Why not?
20    A    It was my judgment.
21    Q    Well, how did you reach that judgment?
22        MR. KNOTT:  It's been asked and answered.
23    A    As I said, the -- the first dose helped and
24  the second dose, I assumed, would help as well.
25    Q    Were you positive?



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 146

1      MR. MCCAULEY:  Form.
2   A   No one's ever positive.
3   Q   Okay.  Do you remember what you were doing on
4   Sunday, the 22nd of December?
5   A   I was home.
6   Q   You were home all day?
7   A   Yes.
8   Q   Were you getting ready for Christmas?
9   A   I could have been.  I don't remember exactly
10  what I was doing, but I know I was home all day.
11  Q   Okay.  Do you attend church services in the
12  morning -- is it your habit to attend church services in
13  the morning?
14  A   No.
15  Q   Okay.  Do you recall having any plans around
16  the Christmas season, that you might have been doing on
17  the 22nd of December?
18  A   No.
19  Q   Were you having any family over, on the
20  evening of the 22nd of December?
21  A   I don't remember.
22  Q   Could we look at -- if you did, who would that
23  be?
24  A   I -- it could have been my family, my
25  husband's family.  I don't know.

Page 147

1   Q   Was it your habit to celebrate around the
2   Christmas season with family?
3   A   Yes.
4   Q   Your habit to have them over to your house,
5   maybe for dinner?
6   A   Sometimes.  But --
7   Q   Is there a -- go ahead, I'm sorry.
8   A   We sometimes go to other family members'
9   houses.
10  Q   Is it possible that on the 22nd of December,
11  you were over at someone else's house?
12  A   No.  I was home.
13  Q   Okay.  Do you remember anybody who was home
14  with you that day?
15  A   I'm sure my husband was.
16  Q   You mentioned you have a daughter as well?
17  A   Yes.
18  Q   Does she live at home with you?
19  A   No.
20  Q   Okay.  Any other children?
21  A   No.  My children are grown.
22  Q   Okay.  Would anybody have been -- any of your
23  children have been visiting you on that weekend before
24  Christmas?
25  A   I don't believe so.

Page 148

1   Q   Is there a way we could -- were you taking off
2   work that week?
3   A   I can't remember.
4   Q   Okay.  Your day job, at that point, would've -
5   - your full-time job would've been at Gundersen Health;
6   is that right?
7   A   Yes.
8   Q   Is there a way you could go back and identify
9   whether you were taking that week off?
10  A   No.  I no longer work at Gundersen so -- I
11  mean, Sunday I wasn't at work.  Monday was the 20 -- no.
12  It would've been the 23rd.  I don't know if I worked
13  that day beforehand.  I probably did, before I went into
14  the jail that night -- that evening.  I usually work
15  that day and then that evening, went into the jail.
16      MR. KNOTT:  Referring to the 23rd?
17      THE WITNESS:  Yes.
18  Q   Okay.  Again, I may have asked this and I
19  apologize if I have.  Where -- do your adult children
20  live close by, where they might be coming over for
21  dinner on the weekend during Christmas time?
22  A   No.  My daughter lives in Iowa and my son
23  lives in Virginia.
24  Q   Okay.  Do you recall anybody coming in to
25  visit you that weekend -- or you and your husband that

Page 149

1   weekend for Christmas?
2   A   I don't remember.  I don't know if we had
3   family over or not.
4   Q   Is there a way we could tell?  Do you
5   typically e-mail with family, we might be able to tell
6   who was coming over, if anybody?
7   A   No.  We don't e-mail.
8   Q   If someone was --
9   A   Not that anybody remembers two years ago.
10  Q   If someone was coming in from out of town --
11  would you have possibly exchanged e-mails to set that up
12  or just arrange things?
13  A   No.
14  Q   Do you keep a personal calendar at all,
15  Ms. Pisney?
16  A   No.  Not really.  I have a calendar on my
17  phone, but I don't put personal things in it, other
18  than, like, hair appointments and things like that.
19  Q   Is that -- how long have you had your phone?
20  A   Several years.
21  Q   Okay.  Would you -- do you have the same phone
22  you had in December 2019?
23  A   I think so.
24  Q   Okay.  Do you have it with you?
25      MR. KNOTT:  No.  We're not going there.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1    MR. WEIL:  Okay.
2    MR. KNOTT:  We're not going there.  That's not
3  a requirement for a deposition.  A deposition is
4  question and answer.  If you want to do discovery,
5  we can talk about it, but we're not going down that
6  road.
7  BY MR. WEIL:
8    Q    Okay.  Is there anything -- beyond your
9  lawyer's instructions, is there anything to stop you
10  from just picking up your phone, and looking if you had
11  anything scheduled on December 22, 2019?
12    A    No.
13    MR. WEIL:  Okay.  Doug, are you instructing
14  the witness not to -- we can just take a break --
15    MR. KNOTT:  No.  I'm instructing her --
16    MR. WEIL:  -- for 20 minutes and just have
17  her --
18    MR. KNOTT:  I'm instructing you to -- well,
19  I'll talk to her at the next break.  But I'm
20  instructing you, that we're going to follow the
21  rules of civil procedure and you can ask questions.
22  But we don't perform tracks, and we don't do
23  research during a deposition for you.
24    MR. WEIL:  Okay.  How about we just take a
25  quick break and you can talk to your client about

Page 151

1  it. And we can come back and at 2:40?
2    MR. KNOTT:  What is your question?
3    MR. WEIL:  I want to -- I'm trying to figure
4  out what she had scheduled on December 22, 2019.
5  The reason being, that -- well, that's -- I'm
6  trying to figure out what she had scheduled, if
7  anything.
8    MR. KNOT:  Bearing in mind -- bearing in mind,
9  that she testified that she was home all day.
10    MR. WEIL:  I believe she doesn't exactly --
11    MR. KNOTT:  (inaudible)
12    MR. WEIL:  Sure.  She doesn't exactly recall
13  if -- her phone may be a blank and there be may be
14  no answer one way or another.  I'm just asking for
15  her to just take a minute, and look at her
16  calendar, and just tell me.  If there's anything on
17  there, there's something on there.  If there's not,
18  there's not. That's all I'm asking.
19    MR. KNOTT:  We'll take a break.
20    MR. WEIL:  Okay.  Let's go back at 2:40,
21  thanks.
22    COURT REPORTER:  We're off the record.  The
23  time is 2:35.
24    (OFF THE RECORD)
25    COURT REPORTER:  We are back on the record for

Page 152

1  the deposition of Lisa Pisney being conducted by
2  video conference.  My name is Sydney Little.  Today
3  is March 3, 2022.  And the time is 2:41 p.m.
4  BY MR. WEIL:
5    Q    Ms. Pisney, did you have a chance to look at
6  your phone?
7    A    I did.  There's nothing on my calendar that
8  day.
9    Q    Okay.  That day you're referring to is 22nd of
10  December 2019, right?
11    A    Yes.
12    Q    Okay.  Did you happen to see any indication of
13  whether you were otherwise on vacation that week,
14  understanding that you went into the Monroe County jail?
15    A    No.  No indication.
16    Q    No indication one way or the other?
17    A    Correct.
18    Q    Okay.
19    MR. KNOTT:  And for the record, her calendar
20  -- her visual calendar showed to 2019.  Her
21  appointments don't go back to 2019.
22    A    The -- there was no dot on that day, but it
23  wouldn't show me anything for on 2019.  It only went to
24  2020.
25  BY MR. WEIL:

Page 153

1    Q    Okay.  So a dot would indicate some sort of an
2  appointment, even if you couldn't tell what it was?
3    A    Correct.
4    Q    Okay.  There were dots in December 2019 or
5  thereabouts, but just none on the 22nd?
6    A    Yes.
7    Q    Okay.  I won't belabor this much longer.  Does
8  your family typically -- do you celebrate Christmas?  Is
9  that a festive time for your family?  I know all
10  families are different.
11    A    Yes.
12    Q    Okay.  And do you typically celebrate it with
13  -- I believe it was your -- you have adult children?  Do
14  you celebrate it with them, typically?
15    A    Sometimes.  My daughter's a nurse, so she has
16  to work holidays occasionally.  And my son is in
17  Virginia, so we don't get together with him very often.
18    Q    Okay.  I believe you said that you and your
19  husband had family around where you live?
20    A    They live in Iowa.  So it would be unusual for
21  us to have a people over on a Sunday because most people
22  work on Monday.
23    Q    What town did you live in, during the events
24  in this case?
25    A    Onalaska.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 154

1    Q    Onalaska.  That's in Wisconsin?

2    A    Yes.

3    Q    Okay.  I am going to show you now, what's been

4  marked as Exhibit 19 in this case, Ms. Pisney.  I think

5  -- I'm sure you've reviewed it.  This is the -- it's

6  called a illness report, I believe.  Do you have a copy

7  of that handy?

8    A    Yes.

9         MR. KNOTT:  I'll get it.

10   Q    Now, before we start talking about this

11 particular document, Exhibit 19.  You -- often, when you

12 were called -- wait, let me back up a second.  ACH

13 produces a number of -- they're referred to as protocols

14 or illness reports, it's a standardized form with

15 various prompts for a guard to fill in information; is

16 that right?

17   A    Yes.

18   Q    Are -- a lot of the calls that you get after

19 hours.  I understand nurses call you, but when a guard

20 is calling you after hours or on the weekend, is it

21 often in conjunction with them having filled out a form

22 for a particular patient at the jail?

23   A    Sometimes they do.  I don't know if they do

24 all of the time.

25   Q    Okay.  Referring you to Exhibit 19, which you

Page 155

1  have in front of you, is this a document that you saw

2  before preparing for your deposition in this case?

3    A    I did.

4    Q    When did you see it?

5    A    Just when it was given to me by the lawyers.

6    Q    Okay.  But contemporaneously with all this

7  occurring, this is not something that you received, say,

8  on the evening of December 22, 2019?

9    A    No.

10   Q    Okay.  Was there -- when you were on call, was

11 there a way to e-mail you or fax you medical documents?

12   A    No.

13   Q    Was that ever done?

14   A    No.

15   Q    Is it done now at the other ACH jails that you

16 service and having -- having left Monroe County Jail?

17   A    No.

18   Q    Okay.  When -- you testified this morning,

19 that you recall receiving another call in the evening of

20 the 22nd about Ms. Boyer experiencing chest pain; is

21 that right?

22   A    Yes.

23   Q    Is it your practice to gather -- when you

24 receive information like that, is it your practice to

25 gather as much information from the guard who's calling

Page 156

1  you about the symptoms and the history of the patient

2  who's experiencing chest pain?

3    A    As best I can.

4         MR. KNOTT:  (coughs) Excuse me.

5    Q    Do you find the form -- the various prompts on

6  Exhibit 19 to be helpful, in gathering relevant

7  information for your assess of a patient with chest

8  pain?

9    A    I don't have this form with me usually, when I

10 talk -- talk to the jail.

11   Q    Sure.  I understand.  Maybe I can clear this

12 up.  In terms of the subject matters that this form

13 prompts the guard to fill out, is that -- are these

14 subject matters and the information that's gathered

15 through this form, is this helpful for you to -- is this

16 helpful information for you to assess a patient's

17 complaint of chest pain?

18   A    It would be if -- if it was all relayed to me.

19   Q    Okay.  When a guard calls you and says, I have

20 a patient here who's complaining of chest pain, is it

21 your practice to ask the guard whether they filled out

22 this chest pain form?

23   A    No.

24   Q    Okay.  You don't ask the guard, one way or the

25 other, whether they filled out the chest pain form?

Page 157

1    A    No.  I do not.

2    Q    Okay.  Do you ask the guard to describe the

3  information that they have available to them on the

4  chest pain form?

5    A    No.  I typically would ask them some

6  questions.

7    Q    Is there any reason that you would not be

8  given -- I believe, you said -- let's go through this.

9  The first question asks the detainee history of -- then

10 it goes into this -- I'll back up, I'm sorry.  The first

11 section is S, right?

12   A    Yes.

13   Q    Do you have an understanding of what S means

14 in the context of this form?

15   A    Subjective.

16   Q    Subjective is what the patient is telling a

17 care provider about the symptoms they're experiencing;

18 is that right?

19   A    Yes.

20   Q    Is that important information for you to

21 gather, in the event of someone who says they're

22 experiencing chest pain?

23   A    Yes.

24   Q    Okay.  Are the topics listed on S, on

25 Exhibit 19, important pieces of information for you to

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 158

1 understand for someone who's experiencing chest pain?
2     A    Yes.  They're -- they're typically things we'd
3 like to know.
4     Q    Okay.  It's important for you to understand
5 the history of the disease, whether you have elevated
6 blood pressure, and whether you're on any medications;
7 is that right?
8     A    Yes.
9     Q    It's important for you to know -- this
10 information is important for you to be able to perform
11 the differential diagnosis that we were discussing
12 earlier; is that right?
13    A    Yes.
14        MR. MCCAULEY:  Form.  Vague.  Overly broad.
15    Q    So it's important for the differential
16 diagnosis to understand the history -- the detainee's
17 medical history, to the extent they can give it, right?
18    A    It is.
19    Q    Okay.  It's important -- so if a detainee gave
20 a history of having a history of heart disease, that'd
21 be very important for you to know, correct?
22        MR. KNOTT:  Form.
23    A    It would be.
24    Q    Okay.  Do you remember whether the -- do you
25 remember -- do you have an independent recollection of

Page 159

1 what you were told by the guard, when you were called
2 about this chest bank complaint, on the evening of
3 Sunday the 22nd?
4     A    The things I remember are that she was
5 complaining of chest pain, that she was at rest, that
6 there was no diaphoresis or sweating, and that she had
7 some shortness of breath.  I don't recall all of this
8 information being relayed to me.
9     Q    Do you have any reason to doubt -- do you have
10 any recollection one way or another?
11        MR. KNOTT:  She just answered that.
12        MR. WEIL:  No.
13    A    I said I don't recall them telling me this --
14 all this information.
15    Q    Okay.  Do you mean -- okay.  Do you recall
16 whether or not the guard who called you, related that
17 Christine had told the guard that she had a history of
18 congestive heart failure?
19    A    I don't remember them telling me that.  No.
20    Q    Would you have asked the guard, did this
21 patient who claims to be suffering from chest pain, did
22 they tell you anything about their medical history?  Is
23 that question you would have asked?
24    A    Since we had discussed the same patient
25 multiple times during the day, I don't believe I

Page 160

1 would've.  No.  Because I --
2     Q    You would not have -- okay.  I'm sorry.  Go
3 ahead.
4     A    I -- I understood that we did not know her
5 medical history, that we did not have the specifics of
6 her medical history, nor any of her medication that she
7 normally took.
8     Q    Okay.  So you didn't say, has the -- you did
9 not attempt or ask, whether this person had provided any
10 additional medical history in the 24 hours since they'd
11 arrived at the jail?
12        MR. KNOTT:  Misstates her testimony.
13    A    I -- I did not ask if there was new
14 information about her medical history.  No.
15    Q    Okay.  One of the first step in performing a
16 differential day is to gather as much information as you
17 can; is that right?
18    A    That is correct.
19    Q    So would you have attempted to gather any
20 information that you could?
21        MR. KNOTT:  Object.  It's vague.  Are we
22        talking about this call?  Are we talking about a
23        generality?  Vague -- vague time --
24 BY MR. WEIL:
25    Q    When presented with a call from someone

Page 161

1 telling you that they had chest pain?
2     A    As I said, that this person we had talked
3 about multiple times during the day, and they had been
4 -- they had told me that we did not know her full
5 medical history.  She was unable to give it, and we did
6 not know her medication.  So I did not ask again, have
7 we found out anything new?  Because it was Sunday, and
8 we weren't able to get any new information.
9     Q    That was a person who told you, that the night
10 before Christine Boyer had come in, she was not able to
11 give a complete medical; is that right?
12    A    I don't know if it was the same person talking
13 to me.  No.
14    Q    Well, was it Amber Fennigkoh who was talking
15 to you this evening?
16    A    No.
17    Q    Okay.  Evidently, Ms. Boyer was able to report
18 that she was suffering from chest pain; is that right?
19    A    That's why they called me.  Yes.
20    Q    Right.  That's just -- that's something that
21 somebody has to say, right?  It's a symptom that they
22 have to report?
23    A    Correct.
24    Q    Okay.  Did you understand that Ms. Boyer had
25 come in intoxicated the night before?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 162

1  A   I don't remember them telling me that, either.
2  Q   Okay. Did you see no reason to check and try
3  to determine whether Ms. Boyer might know something else
4  or have remembered something else about her medical
5  history, given that she was experiencing chest pain?
6  A   I had talked to them twice before with her
7  high blood pressure, and they didn't relay any
8  additional information at that time.
9  Q   You didn't -- you told me, that you didn't ask
10 for any additional information; is that right?
11 A   I -- I rely on the officers to tell me the
12 pertinent information.
13 Q   Okay. You don't -- a guard -- the guards
14 typically don't have medical degrees, right?
15 A   No.
16 Q   In gathering information, since you're not
17 there, you have to rely on the guards to gather
18 information for you, right?
19 A   That is correct.
20 Q   And often you have to direct the guard in
21 gathering information because you do have medical
22 training, whereas they do not; is that correct?
23 A   ask them specific questions. Yes.
24 Q   Okay. In performing a differential diagnosis
25 -- the first step in performing a differential

Page 163

1  diagnosis, when someone presents with a symptom like
2  chest pain, is to attempt to gather any information you
3  can about their medical history; is that right?
4  MR. KNOTT: It's been asked and answered, at
5  least five times.
6  A   I did ask them questions --
7  Q   Okay. Did you ask --
8  A   -- in relation to her chest.
9  Q   Okay. Would you have -- Ms. Boyer was able to
10 relay the day before that she had cancer, right?
11 A   That is one of the things she said. Yes.
12 Q   And that was corroborated by the prescriptions
13 that she had in her bag; is that right?
14 MR. KNOTT: Asked and answered. Argumentative.
15 Misstates her testimony.
16 A   The only thing that corroborated that was an
17 order ondansetron from -- I don't know when, so...
18 Q   Right. Ondansetron for someone who's
19 experiencing chemotherapy, right?
20 MR. KNOTT: Asked and answered.
21 A   That's what it said, but I don't know that --
22 that's a fact. I mean, people are given ondansetron for
23 other reasons.
24 Q   But what we talked about was that a
25 prescription and bottle would have said, that was the

Page 164

1  reason she was being given ondansetron, right?
2  MR. KNOTT: Foundation. Speculation.
3  A   Yeah. I would assume that was written on
4  there because that was written on the MAR, but I don't
5  know that for sure.
6  Q   So all that would indicate to you, sitting
7  here at 8:09 p.m., that Ms. Boyer did have some
8  knowledge about her medical conditions, right?
9  A   No.
10 Q   Okay.
11 A   I mean, other than -- no.
12 Q   You recall that the prescription list that
13 Ms. Boyer had, that we went over earlier, also had
14 aspirin on it; is that right?
15 A   Yes.
16 Q   Is aspirin something that people with heart
17 disease or high blood pressure take as a form of
18 treatment?
19 MR. KNOTT: Asked and answered.
20 A   It can be. But it can be taken for other
21 things as well.
22 Q   Okay.
23 A   I don't -- that one I think was not a
24 prescription.
25 Q   Right. Aspirin is not prescribed, right --

Page 165

1  typically?
2  A   Well, it can be.
3  Q   Sure. But if someone's told to take aspirin
4  by their doctor for high blood pressure or for a heart
5  problem, they can just go and get aspirin and take it,
6  right?
7  A   They can. And people can take it just because
8  they think it's good for them, too.
9  Q   Right. One of the reasons that people might
10 be taking aspirin, is because they've been told that
11 it's important for high blood pressure or for a heart
12 condition; is that right?
13 MR. KNOTT: Foundation. Speculation. Overly
14 broad.
15 A   That could be one of the reasons they're told
16 to take it. They could also take it for headaches, body
17 aches, all kinds of things.
18 Q   So a possible indication of taking aspirin is
19 that someone as a heart problem; is that right?
20 MR. KNOTT: Asked and answered.
21 A   Along with all the other indications.
22 Q   Okay. In performing the differential
23 diagnosis that we talked earlier, that's one of the
24 points of medical history that you would want to put as
25 a possible indication that a person had a heart problem,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1 right?

2    A    Just because they were taking aspirin wouldn't
3 necessarily tell me that they had a heart problem.

4    Q    Right.  It's a possibility, right?

5    A    Along with a multitude of possibilities.  Yes.

6    Q    So when you were called by this person saying
7 that Ms. Boyer is complaining of chest pain, your
8 testimony is that you did not ask any questions about
9 Ms. Boyer's any -- whether Ms. Boyer told the guard
10 anything about her medical history; is that right?

11        MR. KNOTT:  Misstates the testimony.

12    A    Yeah.  I -- I've said many times that I
13 didn't, because I had talked to them multiple times
14 about that same patient, that same day.

15    Q    Okay.  When Ms. Boyer reported the symptom of
16 chest pain, did you ask the guard whether she had
17 reported how long the chest pain was there?  I'm looking
18 at the first line here, the first star, under S.  Did
19 you ask the guard that?

20    A    No.  Usually, they call me when she complains
21 of chest pain.  So if she complained of chest pain, then
22 they call me.

23    Q    You have -- this is just not a question you
24 ask, you don't ask the guard to report to you how long
25 the person has said they had chest pain?

Page 167

1    A    Usually, if someone has chest pain, they will
2 report it.  I -- and the -- and the jailer would call me
3 with the complaint of chest pain.

4    Q    Okay.  So if I understand you correctly, you
5 don't attempt to figure out how long they have chest
6 pain because you assume that they would've reported it
7 immediately?

8    A    If they were having a heart attack and were
9 having chest pain, then, yes.  I would assume they'd
10 report that immediately.

11    Q    If they were having a heart attack and having
12 chest pain, you assume that they would report it
13 immediately?

14    A    You said that chest pain is the only reason
15 people -- only reason people have chest pain is because
16 of a heart attack, and that that's their symptom, and
17 that you should rule it out right away.  So -- yes.  I
18 would assume that if someone had chest pain, they would
19 report that right away.

20    Q    Okay.  When someone -- when a guard calls in
21 with chest pain, you don't attempt to determine how long
22 the person has had chest pain?

23    A    No.  I'm assuming that they call me when the
24 person complains of the chest pain.

25    Q    Right.  And that person may have complained --

Page 168

1 it's possible that the person had the chest pain a
2 while, then decided there must be a problem, and told
3 the guard after they'd been experiencing it for a while;
4 is that right?

5    A    I would -- I would assume that that wouldn't
6 be hours at a time, only minutes.

7    Q    Is it a possibility you want to exclude that
8 the person had been experiencing chest pain for some
9 time, and had decided to report it?

10    A    I think I've answered that multiple times,
11 too.

12    Q    I don't -- can you just answer the question,
13 please?

14    A    When they call me with the complaint of chest
15 pain, I assume that they've just complained to the
16 officer of the chest pain, and that's why I'm being
17 called.  So I don't assume they've been having chest
18 pain all day, and then just suddenly decided, you know
19 what, maybe I'll report this now.  So -- no.  I assume
20 that's a pretty recent complaint.

21    Q    Okay.  So do you think this how long has it
22 been there is a completely superfluous question on this
23 chest pain chart?

24        MR. MCCAULEY:  Form.

25    A    For other types of pain, I would think that

Page 169

1 would be pertinent.  But for chest pain, that's usually
2 something that people would report right away.

3    Q    Okay.  So if you were editing this chest pain
4 chart, you would strike this line, "How long has it been
5 there"?

6        MR. KNOTT:  Form.  Hypothetical.

7    A    These are the typical questions you ask
8 anybody with any complaints of pain.  But that's --

9    Q    Well, any complaints of -- go ahead.  I'm
10 sorry.

11    A    Any complaints of pain, it's a pain -- pain
12 questionnaire, basically.

13    Q    Well, this isn't just a questionnaire about
14 how are you feeling.  This is a questionnaire that's
15 designed to help a practitioner detect whether someone's
16 having a heart attack; is that right?

17    A    That's what it's meant to do.  But they're --
18 I mean, these are questions I would ask someone if they
19 had a pain in their toe.  I mean, it's not -- chest pain
20 is usually something that people would report right
21 away.

22    Q    If you were editing --

23    A    I'm assuming that --

24    Q    Go ahead.

25    A    I'm assuming that when they complain of the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 170

1 chest pain, it's a recent development, and the officer's
2 calling me with that recent development of chest pain.
3 Q Okay. So if you were editing this chest pain
4 chart, you would strike that question as irrelevant and
5 not helpful; is that right?
6 MR. KNOTT: She's answered that question
7 A Protocols -- or these forms are -- they're not
8 individualized. So it depends on the individual. It
9 depends on what I want to get at, but that's not
10 something that I ask them.
11 Q My question was, if you were editing this form
12 to help a practitioner detect chest pain -- detect heart
13 attack as a result of chest pain, is, "How long has the
14 chest pain been there," a line that you would delete
15 because it's just not helpful in assessing whether
16 someone is suffering from a heart attack? I would like
17 you to answer that question.
18 MR. KNOTT: It's been asked and answered.
19 MR. WEIL: No. It has not been answered,
20 Doug.
21 MR. KNOTT: It's been asked and --
22 MR. WEIL: Doug, it has not been answered.
23 MR. KNOTT: It's been asked and answered,
24 three times.
25 MR. WEIL: No. It has not.

Page 171

1 MR. KNOTT: Don't interrupt me. It's been
2 asked and answered -- it's been asked and answered.
3 MR. WEIL: Are you going to instruct the
4 witness not to answer this question. Because
5 otherwise, I'd just like to get an answer from her?
6 MR. KNOTT: She's answered it three times. You
7 get one more shot at it, then we're moving on.
8 A I don't write these forms. So I wouldn't edit
9 it.
10 BY MR. WEIL:
11 Q If -- the question is, if you were editing it,
12 ma'am. If you were editing this form, is this a line
13 that you would strike from it?
14 MR. KNOTT: Okay. You've asked it five times.
15 This is it. Steve, we're not doing this all day.
16 A The -- So I talked to this -- about this
17 person multiple times during the day. None of those
18 times did she complain of chest pain previously, even
19 though on this form she says that -- or they say, that
20 she had it on and off all day. She did not complain to
21 anyone about chest pain on and off all day. It is not
22 one of the questions I asked. So I didn't feel it
23 pertinent and I did not ask about it.
24 Q My question is about you editing this form.
25 Okay? If you had control of this form, and what you

Page 172

1 think is useful in determining and helping you conduct a
2 differential diagnosis of chest pain, would you strike
3 this line from the form because it's not useful?
4 MR. KNOTT: Ms. Pisney, you may answer again,
5 or you may stand by your prior answers
6 A In this case, I didn't find it useful.
7 Q Ms. Pisney, I'm asking you about what you
8 would do if you were editing this form. Would you
9 strike it?
10 A That's a hypothetical question and I -- that's
11 a hypothetical question and I don't feel I can answer
12 it.
13 Q It is a hypothetical question. Why can't you
14 answer it? If you were controlling -- if you were
15 editing this form, I'm asking what you would do, if you
16 were editing a chest pain form to help a practitioner --
17 MR. WEIL: Doug, if we're going to do this --
18 MR. KNOTT: This has --
19 MR. WEIL: -- we're going to mark the
20 transcript and I'll just move to compel. Okay? So
21 it's your choice.
22 MR. KNOTT: This has reached the point -- this
23 has reached the point of harassment. You're --
24 MR. WEIL: Okay.
25 MR. KNOTT: You -- this is well past the point

Page 173

1 of harassment, so I'll protect her. I'm not going
2 to let you keep brow beating her and harassing the
3 witness over --
4 MR. WEIL: Okay.
5 MR. KNOTT: And what pertinence does it have,
6 if she was -- all -- she was editing a security
7 document?
8 MR. WEIL: Doug, don't coach the witness, A.
9 B, this isn't a security document, right? This is
10 created by ACH.
11 MR. KNOTT: Yeah. I don't know.
12 MR. WEIL: Okay. Well, listen. Doug, I'm
13 going to ask the question, and then you can make
14 your record --
15 MR. KNOTT: Get to it.
16 MR. WEIL: -- and we'll mark this part of the
17 transcript. Okay?
18 BY MR. WEIL:
19 Q Ms. Pisney, we've been talking about this
20 line. How long has the chest pain been there, right?
21 A Correct.
22 Q Your testimony is, that it's not your practice
23 to inquire into that matter because you assume that any
24 chest pain has been reported immediately; is that right?
25 A Or within a short amount of time. Correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 174

1    Q    Okay.  And so if you were editing this chest
2  pain form, you would -- would you strike that line from
3  the chest pain form as useless, in performing a
4  differential diagnosis?
5        MR. KNOTT:  Object to the form of the
6    question.  Asked and answer.  Ms. Pisney, you may
7    answer again or you may stand by your prior
8    responses.
9    A    I didn't find it pertinent, at the time.
10 BY MR. WEIL:
11   Q    Okay.  And my --
12   A    My -- so I can --
13   Q    Okay.
14   A    As -- in my professional judgment, I can
15 decide if something is pertinent or not, and ask that
16 question.  I didn't find it pertinent, so I did not ask
17 that question.  There are many questions I could ask,
18 but I did not find it pertinent, at this time, to ask
19 that question.
20   Q    Okay.  And I believe that you said when Ms.
21 Boyer had reported high blood pressure earlier, and she
22 had prompted the guard to take her blood pressure, you
23 also didn't ask whether she had any other symptoms; is
24 that right?  That was your testimony, right?
25   A    No other symptoms were reported to me.

Page 175

1    Q    And you didn't ask if she had any other
2  symptoms, did you?
3    A    Lord.
4        MR. KNOTT:  Object to the extent, it misstates
5    prior testimony.
6    A    I didn't recall.
7    Q    Okay.  If those symptoms had been reported to
8  you before, you would have learned that around 3:00
9  p.m., Ms. Boyer had -- felt like she could not breathe,
10 and had a blood pressure of 177 over something very
11 high, right?
12   A    Yes.
13   Q    And you agree that shortness of breath
14 followed by chest pain is a sign of a heart attack; is
15 that right?
16   A    That was five hours previous.  So I wouldn't
17 have considered those to be in the same realm, at all.
18   Q    Okay.
19   A    I -- I didn't -- they were not associated.
20   Q    Do you agree that the symptoms of chest pain
21 can go on and on for hours?
22       MR. KNOTT:  Asked and answered.
23   A    Yeah.  We did talk about that previously.  It
24 can be minutes or hours.
25   Q    Right.  Right.

Page 176

1    A    Did not specifically complain of chest pain at
2  that time, though.
3    Q    Okay.  She just complained that she could not
4  breathe?
5        MR. KNOTT:  Asked and answered.
6    A    Her oxygen saturation was normal.
7    Q    Did you take an oxygen saturation measurement
8  in the afternoon --
9    A    I --
10   Q    -- when she said she could not breathe?
11   A    I believe they did, but I'm -- can't be
12 certain.
13   Q    Did you -- do you have any -- did you see any
14 document preparing for this deposition, indicating in
15 the afternoon when there was a call about Ms. Boyer
16 having extremely high blood pressure and not being able
17 to breathe, that any sort of oxygen saturation test was
18 done?
19   A    I -- I thought there was, but perhaps they
20 didn't.
21   Q    Okay.
22   A    I don't know.  Did she ever receive her -- her
23 inhaler?
24   Q    Do you -- the next line is, "What caused
25 pain," do you see that?

Page 177

1    A    Yes.
2    Q    Is that a question you'd want to know the
3  answer to?
4    A    I don't think that the patient would be able
5  to answer that.
6    Q    Okay.  Well, a patient who might say something
7  like, well, I bumped into something and I'm having chest
8  pain after having bumped into something.  That would
9  help you exclude the possibility or reduce the
10 likelihood, that this -- the pain that they were
11 experiencing was caused by a heart attack; is that
12 right?
13   A    I believe that the jailer would've relayed
14 that information to me.
15   Q    So you wouldn't ask that information?
16   A    God.  If the jailer called me and said, this
17 person fell into a chair and now they're having chest
18 pain --
19   Q    Okay.
20   A    I -- they tell me those things.
21   Q    Would -- the next line is, "Any similar
22 symptoms before," do you see that?
23   A    Yes.
24   Q    Is that a question that you would want to ask
25 the patient who's coming to you with chest pain?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 178

1   A   Yes.

2   Q   Okay.  And is that a question that you would

3   ask the guard, to relay any information about?

4   A   I -- I didn't specifically ask that question.

5   Q   You didn't ask that question, either?

6   A   I did not.

7   Q   Okay.  "Does the pain come and go," do you see

8   that question?  The last star under S.

9   A   I do.

10  Q   Is that an important question to ask a person,

11  who's complaining of chest pain?

12  A   It could be.

13  Q   Okay.  Is that a question that you would've

14  asked the guard to relay any information about to you,

15  if you'd gotten it?

16  A   I don't have this questionnaire memorized.  I

17  asked what I feel is pertinent at the time, in my

18  judgment, and in knowing the -- the information about

19  the patient.

20  Q   What information do you attempt --

21  A   Every --

22  Q   Okay.  Go.  I'm sorry.  Go ahead.

23  A   Every patient is different.  I had talked to

24  them multiple times about this patient, so I felt that I

25  had an understanding of what we knew about the patient.

Page 179

1   They had called me before and told me she had chest --

2   or she had high blood pressure.  We were treating her

3   high blood pressure, that was improving.  They called me

4   many, many hours later and said she'd had a complaint of

5   chest pain.  We talked about that.  Her blood pressure

6   was still a little elevated, so I thought perhaps the

7   blood pressure could be leading to some of the chest

8   pain.  We gave her aspirin because I didn't think that

9   could hurt anything.  And then I asked them to recheck

10  her blood pressure in half an hour, and call me if it

11  was elevated, and also to let me know if she continued

12  to have chest pain.  They never called me back, so I

13  assumed that she -- her blood pressure was fine, her

14  chest pain resolved, and she was resting comfortably.

15  Q   When you say, "They called me with chest

16  pain," I wrote down you said, "We talked about that"; is

17  that right?

18  A   We did.  I asked --

19  Q   Okay.

20  A   -- were there any other symptoms associated

21  with the chest pain?  Was the chest pain at rest?  Was

22  she diaphoretic?  Did she have shortness of breath?

23  Those are --

24  Q   Did you --

25  A   -- the typical questions --

Page 180

1   Q   Okay.

2   A   -- I would ask.

3   MR. KNOTT:  Don't interrupt.

4   Q   Okay.  You said diaphoretic?

5   A   Yes.

6   Q   And shortness of breath?

7   A   Yes.

8   Q   You didn't attempt to gather any information

9   about her medical history?

10  A   No.

11  Q   You didn't attempt to gather any information

12  about whether she'd been experiencing chest pain

13  throughout the day?

14  MR. KNOTT:  Asked and answered.

15  I did not at that time.  No.

16  Q   You didn't attempt to gather any information

17  about whether the pain came and went; is that right?

18  MR. KNOTT:  Asked and answered -- asked and

19  answered.

20  A   I did not.

21  Q   Did you ask her -- did you ask the guard to

22  inform you what the chest pain felt like?

23  A   I may have asked them that.

24  Q   Okay.  And would you expect the guard to have

25  reported that it was, achy, stabbing, and "I'm not

Page 181

1   right"?

2   A   I do not remember them ever saying, that she

3   said, I'm not right.

4   Q   Given that that's written down on the form, is

5   there any reason you think that the guard would not tell

6   you that?

7   MR. KNOTT:  She just -- that's -- she just

8   answered that.

9   MR. WEIL:  No.  She didn't.

10  A   I don't --

11  MR. KNOTT:  Yes.  She did.  She just -- she

12  told you what her recollection is and you keep

13  asking is there any reason when she just told you

14  the reason.

15  MR. WEIL:  Yeah.  I know.

16  BY MR. WEIL:

17  Q   I'm just asking if there's -- you have any

18  reason to think that they didn't also tell you, "I'm not

19  right," as -- since she reported that symptom.

20  MR. KNOTT:  She just answered it.

21  A   I don't recall them telling me that.

22  Q   Okay.  Do you -- would you have asked about

23  whether she had nausea or vomiting?

24  A   I would not.  That's not something I typically

25  think about as a -- as a symptom of chest pain.  But, as

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 182

1  we've gone through the American Heart Association's
2  typical symptoms, that's what they did give. I did not
3  ask about nausea and vomiting.
4      Q.  Okay. And you didn't ask whether she was
5  dizzy?
6      A.  No.
7      Q.  Okay. And you said that you asked whether she
8  was short of breath, right?
9      A.  Yes.
10     Q.  Okay. And she reported that she was -- that's
11  what the guard reported?
12     A.  As some shortness of breath.
13     Q.  Okay. So she had some shortness of breath,
14  along with chest pain?
15     A.  Yes.
16     Q.  Did you ask the guard whether Ms. Boyer
17  reported being on any medications at all?
18     A.  No. Because I was under the understanding
19  that we did not know her medications.
20     Q.  And that's based on a conversation that
21  Ms. Boyer had on intake that --
22     A.  Earlier that day.
23     Q.  Well, the day before, right?
24     A.  It was my conversation, earlier that same day.
25     Q.  You understood that Ms. Boyer had been brought

Page 183

1  in the night before?
2      A.  Yes. I -- I don't know that I knew that in
3  particular, but I can't -- it's not in my recollection,
4  but --
5      Q.  Okay.
6      A.  -- now I know she had been brought in the
7  night before.
8      Q.  However long the time that elapsed, would you
9  want to exclude the possibility that she might have more
10  information about her medical condition or her medical
11  history, in the time that had elapsed since she'd been
12  brought in?
13     A.  I would've thought that if she was on other
14  medications for her blood pressure, when she -- they
15  called to tell me she had high blood pressure, they
16  would've told me that.
17     Q.  My question was different, Ms. Pisney. I'm
18  asking, if you would've wanted to exclude the
19  possibility that she might have recalled more about her
20  medical condition, given that she was complaining about
21  chest pain? Is that something you would've wanted to
22  make sure you could explore any information that you
23  could gather about that?
24         MR. KNOTT:  Form.
25     A.  I had talked to them multiple times during the

Page 184

1  day and no new information was given to me.
2      Q.  And I think, as we've talked about today, on
3  all those times, you told me that you did not ask
4  whether she had any other symptoms beside high blood
5  pressure, right?
6         MR. KNOTT:  Object. Misstates the testimony.
7      A.  The -- the officers typically will tell me the
8  symptoms that the patients are complaining of.
9      Q.  So in other words, they would have told you
10  before that she was complaining that she couldn't
11  breathe before, right?
12         MR. KNOTT:  Foundation. Speculation. All
13     right. Yeah.
14     A.  I -- my testimony isn't going to change. I
15  just -- I just told you what I recalled.
16     Q.  Yeah. Okay. If the officers typically tell
17  you the symptoms that someone's complaining of, they
18  typically would've told you about all the symptoms that
19  are listed here under S; is that right?
20         MR. KNOTT:  Well, that's -- that's
21     speculation. Foundation. And she's testified to
22     her memory of the calls. I -- this -- this
23     constant asking what the officers would do after
24     she tells you her memory of it is I think --
25         MR. WEIL:  Doug, she just described her --

Page 185

1  what --
2         MR. KNOTT:  I think is not --
3         MR. WEIL:  -- officers typically do. I'm just
4      off -- asking what officers typically do. Okay?
5      So if someone --
6      A.  They typically do not read this verbatim to
7  me, and I've never had an officer give me this much
8  detail about a patient, ever.
9  BY MR. WEIL:
10     Q.  The line under, "Location of chest" --
11         MR. KNOTT:  It's in exhibit -- just -- I just
12     need, when she said this, it's referencing Exhibit
13     19.
14         MR. WEIL:  Yeah.
15         MR. KNOTT:  Right?
16         THE WITNESS:  Yes. Correct.
17         MR. KNOTT:  Yeah.
18  BY MR. WEIL:
19     Q.  So regardless of whether it's read verbatim,
20  what about -- would you expect that officers would
21  typically read in substance the conditions that someone
22  -- that a patient had complained about?
23     A.  They tell me that she's having chest pain.
24  They answer any questions that I have. They typically
25  tell me their vital signs. If something that I ask

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1  hasn't been answered by the patient, then sometimes they
2  will go back to the patient and ask them that question.
3      Q    Okay.
4      A    But --
5      Q    So I've -- down here under neck -- pain in
6  neck, shoulder, arm, would you ask -- would it be your
7  practice to ask the guard, to tell you what the patient
8  has told you about what the location of the pain is --
9  the chest pain?
10     A    I do typically ask about where they're --
11 where in the chest they're having pain.
12     Q    Okay.  And this says, "Underneath the left
13 shoulder," do you see that?
14     A    Yes.  I do.
15     Q    And that's a sign that is consistent with a
16 heart attack; is that right?
17     A    It was on the AHA sheets that you showed me.
18     Q    And you agreed that -- you agreed with -- that
19 it was consistent with heart attack, right?
20     A    It can be.
21     Q    Okay.  It makes it more likely; is that right?
22     A    Also makes shoulder pain more likely, so...
23     Q    Okay.  And given -- in the differential
24 diagnosis, you would -- if you learned that someone has
25 chest pain and they have pain underneath their left

Page 187

1  shoulder, you would want to exclude, absolutely, the
2  possibility that they have a heart attack; is that
3  right?
4          MR. KNOTT:  Foundation.  Incomplete
5      hypothetical.  Vague.  Overly broad.
6      A    This -- this lady was 41 years old, which is
7  typically not a postmenopausal woman.  I didn't know
8  that she had any history of heart disease.  Typically, a
9  premenopausal woman is not likely to have a heart
10 attack.  Many times in the jail, they're complaining of
11 chest pain, shortness of breath, when they're anxious.
12 This is the first time she's ever been in the jail.
13 Anxiety was a more likely diagnosis than cardiac, in my
14 judgment.
15     Q    So anxiety would be a relatively benign
16 diagnosis of a chest pain condition, right?
17     A    It -- yes.
18     Q    Another diagnosis -- another possible cause of
19 chest pain, particularly pain under the left shoulder,
20 is heart attack; is that right?
21         MR. KNOTT:  It's been asked and answered, many
22     times.
23     A    In a 41-year-old woman with no known history
24 of heart disease, as far as I knew, it's unlikely to be
25 cardiac in nature.

Page 188

1      Q    Okay.  Is --
2      A    In my judgment --
3      Q    Go ahead.
4      A    In my medical judgment, it was not high on the
5  differential, that this was cardiac.
6      Q    By high on the differential, you mean the list
7  that you make in your mind of possible causes of the
8  symptoms that's being reported?
9      A    The likelihood of those being the cause.
10     Q    So even a lower likelihood cause -- I'm sorry.
11 I didn't mean to interrupt you.  Go ahead, Ms. Pisney.
12     A    So in my judgment, in my experience in
13 treating patients in the jail -- in my professional
14 judgment, I didn't feel that cardiac was high on the
15 list of differential.  We had been treating her blood
16 pressure and having good responses to the medications.
17 Clonidine is also helpful in use -- in helping with
18 anxiety, and withdrawal, and her blood pressure was
19 improving.  It was up a little bit when they called me
20 with the chest pain, so that's why I wanted them to
21 check again in a half an hour, and also to let me know
22 if she'd had any continued chest pain.  From the
23 observations that the officers made after that time,
24 they rechecked her blood pressure.  It was not elevated.
25 She did not continue to complain of chest pain, and she

Page 189

1  was resting comfortably throughout the night.
2      Q    When you say it's not high on your list, in
3  your judgment, you're not free to just knock potentially
4  deadly causes of a symptom off your list, right?  You
5  have -- in the differential diagnosis, you must rule out
6  or treat a deadly symptom that could kill a person
7  within hours; is that right?  A deadly cause --
8          MR. KNOTT:  Foundation --
9      Q    -- of a symptom that could kill a person
10 within hours?
11         MR. KNOTT:  Foundation.  Vague.  Overly broad.
12     A    Yeah.  That's -- I -- there's no, you have to
13 do this, you have to do this, you have to do this.
14 There's there's none of that.  People complain of
15 headaches and it can be an aneurysm, but you don't get
16 an MRI on everybody that has a headache.
17     Q    If someone's complaining of chest pain,
18 they're nauseous or -- and they're complaining of chest
19 pain under the left shoulder, your judgment is that
20 heart attack does not have to go very high on the list
21 of potential causes of those symptoms?
22     A    There's a whole list of things that you take
23 into -- into making a diagnosis.  Again, I talk about
24 this 20-year-old male that comes to you with chest pain
25 and left shoulder pain.  He's more likely to have a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 190

1  rotator cuff tear than he is to be having a heart
2  attack.  So a 41-year-old, premenopausal woman, with no
3  heart history, as far as I know, who's in the jail, not
4  happy to be in jail, anxious about being in jail, is
5  more likely to be having an anxiety attack than to be
6  having a heart attack.  In my professional judgment, I
7  didn't feel that she was having a cardiac event, and
8  that anything else needed to be done besides what I was
9  doing.  I was treating her.  I was monitoring her, and
10  she did not have any further symptoms.
11      Q   What question did I ask you that you were
12  answering?
13      A   You said that -- you asked me if I was able to
14  take chest pain off the list of the differential
15  diagnosis.  And I was telling you how I was using my
16  professional judgment to decide what to do in the plan
17  of care for this patient.
18          MR. KNOTT:  Counsel.
19          MR. WEIL:  So --
20          MR. KNOTT:  I could use a comfort break soon.
21      And when you're asking her what question you asked
22      her, I think we're at a point where maybe that
23      would be good.
24          MR. WEIL:  Well, yeah.  We can take a break.
25      That's fine.  Come back in five minutes, 3:37?

Page 191

1          MR. KNOTT:  Yep.
2          MR. WEIL:  Okay.
3          COURT REPORTER:  We're off the record.  The
4      time is 3:32 p.m.
5              (OFF THE RECORD)
6          COURT REPORTER:  We are back on the record for
7      the deposition of Lisa Pisney being conducted by
8      video conference.  My name is Sydney Little.  Today
9      is March 3, 2022.  And the time is 3:50 p.m.
10  BY MR. WEIL:
11      Q   Ms. Pisney, when we got off the record, before
12  we took a break, I -- really quickly, the symptoms that
13  you talked about were -- you asked the guard to report
14  whether Ms. Boyer had experienced any similar symptoms
15  before; is that right?
16      A   No.  I did not.
17      Q   Okay.  You did not.  And you didn't ask her
18  whether -- about the -- whether the pain comes and goes,
19  right?
20      A   Correct.
21      Q   Did you ask whether Ms. Boyer was experiencing
22  nausea or vomiting?
23      A   I did not.
24      Q   Okay.  Did you ask whether Ms. Boyer was
25  experiencing dizziness?

Page 192

1      A   I did not.
2      Q   Did you ask -- I believe you did ask, where
3  Ms. Boyer was experiencing the pain -- where on her
4  body?
5      A   Correct.
6      Q   Okay.  And --
7      A   That's my memory, anyway.
8      Q   Okay.  And what -- it says on this form, on
9  Exhibit 19, "Underneath left shoulder," are you looking
10  at 19?
11      A   Yes.
12      Q   Okay.  Is that consistent with the
13  recollection about what you were told in response to
14  that question?
15      A   I don't remember specifically.
16      Q   Okay.  Is there any reason to think -- given
17  that that's what's written on this form, is there any
18  reason to think you would've been told something
19  different?
20      A   No.
21      Q   Okay.  The next prompt is that, "Have detainee
22  pinpoint area of pain."  Would you have asked the guard
23  to have Ms. Boyer pinpoint the area of pain?
24      A   No.
25      Q   Okay.  And you asked about shortness of

Page 193

1  breath, I believe you said, right?
2      A   Correct.
3      Q   So of all the questions I have on this first
4  page, under S and O, the two questions that you recall
5  asking -- or that you believe you asked are, "Is the
6  pain in the neck, shoulder or arm," and, "Is there any
7  shortness of breath"; is that right?
8      A   I asked -- I likely asked whether she was
9  having any shortness of breath, any diaphoresis, any
10  other symptoms besides the chest pain.
11      Q   Any other symptoms beside the chest pain?
12      A   Correct.
13      Q   Okay.  And so, would you have asked about
14  dizziness then?
15      A   I didn't specifically ask that but --
16      Q   Okay.
17      A   -- I did ask for any other symptoms, and I
18  don't remember them relaying any other symptoms.
19      Q   Okay.  Given that dizziness is written on
20  here, would you expect that the -- if you'd asked for
21  any other symptoms, that the guard would have told you
22  that Ms. Boyer was also feel dizzy?
23      A   I --
24          MR. KNOTT:  Form of the -- form of the
25      question.  Foundation.  Speculation.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 194

1    A    I don't remember them telling me that.
2    Q    Any reason to think that they would not have
3  told you that, if you asked whether there are any
4  additional symptoms?
5         MR. KNOTT:  She just answered that question,
6         based on her recollection.  So I think that's an
7         improper question.  Asked and answered.
8  BY MR. WEIL:
9    Q    Can you answer my question, please,
10  Ms. Pisney?
11   A    I just don't remember them ever telling me
12  that.
13   Q    Okay.  But my question is, given that it's on
14  this form, do you have any reason to think that they
15  wouldn't have told you that, if you asked for any
16  additional symptoms?
17   A    I --
18        MR. KNOTT:  She can only testify --
19        foundation.  Speculation.  Asked and answered.
20   Q    Okay.  If you ask for any additional --
21   A    I can't --
22   Q    Okay, go ahead.  I'm sorry.
23   A    I can't -- I can't tell you why they wouldn't
24  have told me or why they would have told me.  I just
25  asked for any other symptoms, and I don't remember them

Page 195

1  telling me that.
2    Q    Okay.  Another symptom listed on this form is,
3  nausea or vomiting, do you see that?
4    A    Correct.
5    Q    If you asked for any other symptoms, would you
6  expect the guards to have told you that she'd answered
7  yes, to the question of nausea or vomiting?
8    A    It would be another --
9         MR. KNOTT:  Same objection -- same objections.
10   A    Yeah.  It would be another symptom but I don't
11  remember them telling me that.
12   Q    Any reason to think that they would not have
13  told you that she had answered yes to the question,
14  nausea or vomiting, if you asked whether she was
15  experiencing any other symptoms?
16        MR. KNOTT:  Same objections.  Asked and
17        answered.
18   A    I have no reason why they would not tell me or
19  would tell me.  I -- I asked for other symptoms.  I
20  always ask for other symptoms.
21   Q    Okay.  The other thing that it says on here
22  above dull, aching or sharp pressure is, "I'm not
23  right," do you see that?
24   A    Yes.
25   Q    And that's in quotes.  Would you agree it

Page 196

1  appears that the guard is recounting something that
2  Ms. Boyer said?
3    A    That appears to be so on the sheet.  But I
4  don't remember them telling me her -- describing that to
5  me.
6    Q    Okay.  If you asked the guards to describe any
7  other symptoms, given that, "I'm not right," is written
8  on the sheet.  Do you have any reason to think that the
9  guard would not tell you that Ms. Boyer reported, "I'm
10  not right"?
11        MR. KNOTT:  Same objections.  Asked and
12        answered.
13   A    I can only tell you what I remember and I
14  don't remember that being recalled.
15   Q    Okay.  But you have no reason to think it
16  wasn't told to you, right?
17        MR. KNOTT:  Same objections.  She's already
18        testified.  Asked and answered.
19   A    They -- I don't know what that -- I just don't
20  recall them ever saying that to me.
21   Q    Okay.  And you never asked whether she'd
22  experienced similar symptoms before?
23   A    No.
24        MR. KNOTT:  Asked and answered.
25   Q    Okay.  When we went -- before we went on

Page 197

1  break, I believe you said that -- something to the
2  effect of, and I -- correct me if I'm wrong.  People who
3  are in jail often experience anxiety, and it was your
4  judgment that Ms. Boyer was likely experiencing anxiety;
5  is that right?
6    A    That it was -- I thought it was more likely
7  than -- a more likely explanation for her symptoms than
8  chest -- than cardiac.
9    Q    Okay.  So it's more likely she was
10  experiencing anxiety than a heart attack.  Is that --
11  that was your assessment, in your judgment?
12   A    With -- with the information I had at the
13  time, yes.
14   Q    And in performing a differential diagnosis,
15  anxiety would be low on the terms of when you're listing
16  causes and trying to make sure that you rule out or
17  treat causes, anxiety would be low on that list, right?
18   A    It would be a more benign cause.
19   Q    Okay.  And a more -- the -- not withstanding
20  your judgment, that this caused -- that the symptoms
21  that we've gone over -- or that were reported to you
22  were caused by anxiety, another potential cause of those
23  symptoms was heart attack; is that correct?
24   A    That's a possible diagnosis.
25   Q    And it's critical when conducting a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1 differential diagnosis, that you rule out and treat a
2 much more dangerous possible cause of those symptoms,
3 such as heart attack; is that right?
4      MR. KNOTT:  It's covered, easily for an hour
5   this morning.  Asked and answered.  Please don't
6   retread that ground.
7      A    The -- you have to take everything into
8 consideration, when making a judgment about what you
9 think could potentially be the cause.  And in taking
10 everything together, I thought the more likely diagnosis
11 was anxiety than cardiac.
12 BY MR. WEIL:
13      Q    The more serious and deadly potential cause of
14 the condition was heart attack, though.  Given the
15 symptoms that we've just gone over today, right?  They -
16 - just going over that you think that you -- were
17 reported to you on this chest pain call, on the evening
18 of Sunday, the 22nd; is that right?
19      MR. KNOTT:  Object to the form of the
20   question.
21      A    Knowing nothing else besides the symptoms that
22 could -- that would be, of course, more serious.  But I
23 -- you have to take everything into consideration when
24 you make a diagnosis and a judgment.
25      Q    The differential diagnosis requires you to

Page 199

1 rule out more serious symptoms, though, right?  Most --
2      MR. KNOTT:  Been asked and --
3      Q    More serious potential causes.
4      MR. KNOTT:  Asked and answered, multiple
5   times.  It's argumentative.
6      A    It's not a cookbook.  You can't just say,
7 check, check, check.  There's -- that's not how it's
8 done.
9      Q    Okay.  So you're presented with someone -- and
10 we've gone through this list of what you believe you
11 recall being told.  And so we talked about differential
12 diagnosis in the abstract this morning.  Now I'm trying
13 to deal with the information that you were provided
14 with.  Okay?  What you were provided with, according to
15 your memory, is that you were told that this person had
16 chest pain, correct?
17      A    Yes.
18      Q    And that the chest pain was underneath the
19 left shoulder, correct?
20      A    Yes.
21      Q    And that they had some shortness of breath --
22      A    Yes.
23      Q    -- correct?  Given those three conditions that
24 you recall being told, one possible cause of those
25 conditions, if I understand you correctly, is that

Page 200

1 Ms. Boyer was simply anxious; is that right?
2      A    Correct.
3      Q    And another possible cause of those three
4 symptoms is that Ms. Boyer was experiencing a heart
5 attack; is that correct?
6      A    It's a possible cause.
7      Q    And it would be -- and a heart attack is
8 exponentially more serious than anxiety, when you're
9 performing differential diagnosis; is that right?
10      MR. KNOTT:  Asked and answered, multiple
11   times.  Argumentative.
12      A    It is a more serious diagnosis but I thought
13 it was less likely --
14      Q    Okay.
15      A    -- because of her age, and sex, and other
16 diagnoses that I was not aware of.
17      Q    Another diagnosis, meaning that she had
18 cancer, right?
19      A    Yeah.  Cancer doesn't necessarily make you at
20 a higher risk of heart disease.
21      Q    Okay.  Given the -- you believed it was less
22 likely, given that heart attack was a possible cause of
23 those symptoms, it's important to put that at the top of
24 the differential diagnosis list, in order to rule it out
25 before it's able to kill the patient; is that right?

Page 201

1      MR. KNOTT:  Asked and answered, at least ten
2   times.
3      A    In this case, I didn't feel that it was high
4 on the list of the differential.  Things were more
5 likely to be causing her chest pain than cardiac cause,
6 because her age, her sex.
7      Q    Did you feel --
8      A    I just thought it was unlikely.
9      Q    Okay.  So you chose not to rule out cardiac
10 because you thought other things were more likely?
11      A    I chose not to go further down the cardiac
12 path because I thought other diagnoses were more likely.
13 Yes.
14      Q    And it's your testimony, that that's an
15 acceptable practice when performing the differential
16 diagnosis?
17      A    In the situation that I was in, and the
18 information I had.  Yes.
19      Q    Your -- turning to the second page of
20 Exhibit 19, so it's the back page.  Your prescription
21 was to give Ms. Boyer 81 milligrams of aspirin -- your
22 instruction was to give her 81 milligrams of aspirin; is
23 that right?
24      A    Yes.
25      Q    Okay.  And then to call -- to check her vital



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 signs and call back in half an hour; is that right?

2    A    Yes.  If it was elevated, and she had any more

3 chest pain.

4    Q    Okay.  And the one vital sign that I see

5 changing is that her -- I believe her diastolic pressure

6 moved from 102 to 92; is that right?

7    A    Yes.

8    Q    There is no other change in her vital signs;

9 is that correct?

10    A    That is correct.

11    Q    Okay.  And did you tell the guard what vital

12 signs would be abnormal in these circumstances, and what

13 would not be?

14    A    They know the normal vital signs.

15    Q    Okay.  And the other instruction you gave, is

16 to call back if she was still complaining of chest pain?

17    A    Yes.

18    Q    Given that you had concluded that Ms. Boyer's

19 chest pain was likely caused by anxiety, why would it

20 matter to you if she was still complaining of chest pain

21 a half an hour later?

22    A    That either she was anxious or she was having

23 -- it could be more cardiac related.

24    Q    Okay.  So if she was complaining of chest pain

25 an hour later --

1    A    If it didn't go away --

2    Q    -- it could be cardiac?

3    A    If the chest pain didn't go away, it would be

4 higher risk that there could be something cardiac going

5 on, that's why I wanted to know.  I was following up and

6 making sure that she improved.

7    Q    What sort of -- do you give any medication for

8 anxiety, in your practice?

9    A    Sometimes.  I had given her clonidine

10 previously, that also helped with her blood pressure and

11 with anxiety.

12    Q    Okay.  Does aspirin help with anxiety?

13    A    No.

14    Q    Okay.  If you thought she had anxiety, why

15 didn't you prescribe something for it?

16    A    I'd given her clonidine earlier, and I wasn't

17 sure I wanted to give more clonidine.  And the officer

18 asked me about giving her aspirin, and I didn't think

19 that it would hurt anything to give her some aspirin.

20    Q    So you didn't -- it was not your idea to give

21 aspirin, it was the guard's?

22    A    They mentioned it to me.  It's not something I

23 would typically do.

24    Q    What had been your planned -- having gone

25 through the sheet, what had been your planned course of

1 treatment, before the guards suggested that you provide

2 aspirin?

3    A    I was still thinking about it.

4    Q    Yeah.  We noted a while ago that -- when we

5 were reviewing the symptoms of heart attack, that chest

6 pain pay -- a heart attack may be occurring, but chest

7 pain comes and goes; is that right?

8    A    That's correct.

9    Q    So the fact that Ms. Boyer might not have

10 chest pain one half hour after you provided her with

11 aspirin, would not exclude the possibility that she --

12 that the chest pain she was experiencing was caused by

13 heart attack; is that right?

14    A    I would expect the officers to call me, if she

15 had chest pain at any other time.

16    Q    Okay.  The question I had was, the fact that

17 Ms. Boyer was not -- would -- might not be experiencing

18 chest pain one half hour after you gave -- ordered this

19 81 milligrams of aspirin, would not exclude the

20 possibility that she had a heart attack; is that right?

21    A    No.  But they would have called me, if she had

22 chest pain at any time.

23    Q    Did you leave an instruction to call, if

24 Ms. Boyer had chest pain any other time?

25    A    I said if she had any further chest pain to

1 call.

2    Q    This is a -- okay.  And if chest pain goes in

3 and out over the course of hours, why do you think that

4 that would exclude the possibility of heart attack?

5    A    She never complained of chest pain again.  She

6 complained once, and that was all.

7    Q    Okay.  If chest pain goes in and out over the

8 course of hours, why do you think that that would -- why

9 does a complaint later of chest pain -- or checking

10 about chest pain, exclude the possibility of heart

11 attack?

12    A    There was only one complaint of chest pain, so

13 it -- it wasn't going in and out, as far as I knew.

14    Q    Okay.  And would the question of whether it

15 was going in and out be important when you're deciding

16 that a further complaint of chest pain is going to be

17 enough to indicate to you -- just to rule out heart pain

18 -- or heart attack later on?

19    A    If she continued to complain of chest pain,

20 then that would have led to more discussion.

21    Q    Do you have any idea where Ms. Boyer was

22 housed in the jail?

23    A    In the jail -- I believe she was in the

24 booking area.

25    Q    Okay.  If Ms. Boyer had difficulty describing



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1  her symptoms or her medical history to someone, would
2  there -- would you be concerned that she might not be
3  able to describe a history of chest pain, over the
4  course of the day?
5      A    She had complained of her blood pressure being
6  elevated previously, she'd asked for her blood pressure
7  to be checked, she complained about the shortness of
8  breath that you talked about, she complained about the
9  chest pain.  So she didn't seem to have any problem
10  telling the officers when she had a complaint.
11      Q    Okay.  And not withstanding that you assumed
12  that she would be unable to account -- recount any
13  medical history about chest pain; is that right?
14      A    When I was called earlier in the day, there
15  was no information, we did not have her medical
16  information, and I was not given any information that
17  that had changed.
18      Q    Do you really think it's likely that Shasta
19  Parker, who placed this call and filled out this form,
20  called you that Ms. -- told you that Ms. Boyer was
21  experiencing chest pain, but did not bother to tell you
22  that she had reported to Shasta that she had congestive
23  heart failure?
24          MR. KNOTT:  Object to the form of the
25      question.  It's argumentative.  Lacks foundation.

Page 207

1      Calls for speculation.
2      A    I just -- I never remember hearing anything
3  about a heart history on this patient.
4  BY MR. WEIL:
5      Q    Given that it's written down here, do you
6  think it's likely that Shasta -- more likely than not,
7  that Shasta Parker, who filled out this form, called you
8  and reported that among -- in addition to having chest
9  pain, Ms. Boyer had reported a history of congestive
10  heart failure?
11          MR. KNOTT:  Asked and answered.
12      A    Again, I don't recall being told that.
13      Q    I'm asking, do you think it's more likely than
14  not?
15          MR. KNOTT:  Calls for speculation.  Foundation.
16      Asked and answered.
17      A    I -- there were other things on this form that
18  I don't recall being told as well, so it's possible that
19  that wasn't relayed to me.
20      Q    Possible it was?
21          MR. KNOTT:  Same -- same objections.
22      A    I don't recall.
23      Q    Okay.  Did you review a -- an e-mail where
24  there's a conversation reported between you and Travis
25  Schamber?

Page 208

1      A    No.  I don't remember that.
2      Q    Okay.  We talked about that briefly this
3  morning, that you talked with Travis Schamber before --
4  or after this incident with Ms. Boyer?
5      A    Yes.
6      Q    Did -- did -- do you recall -- I believe you
7  said you don't recall Travis Schamber looking at any
8  documents or going over any documents with Dr. Schamber,
9  as he was recounting the history of what happened -- or
10  you were recounting the history of what happened?
11      A    I think eventually he got the documents, but I
12  don't know if he had them at the time we had our
13  conversation.
14      Q    Okay.  You don't recall him referring to any
15  documents about Ms. Boyer's medical history, or medical
16  condition, or anything like that?
17      A    I don't know if he -- when we discussed, if
18  he'd had information about the -- her hospitalization
19  afterwards.  That's possible.
20      Q    Do you recall whether Ms. Fennigkoh was on
21  that call as well?
22      A    No.  We did not talk to them together, as far
23  as I know.
24      Q    Okay.  So it was just you and Travis Schamber
25  on that call?

Page 209

1      A    I believe so.
2      Q    Okay.  Do you recall Travis Schamber saying
3  that -- what had happened, that everything was kosher,
4  regarding your care of Ms. Boyer?
5      A    He reassured me that he didn't think I did
6  anything wrong, that there was nothing wrong with the
7  care I gave the patient.
8      Q    Did Travis Schamber ask you whether you
9  attempted to perform a differential diagnosis of
10  Ms. Boyer's chest pain?
11      A    No.  We talked about the calls that were made
12  to me, the information that was relayed to me, the
13  decisions I made with that information, and he didn't
14  find that there was anything wrong with that.
15      Q    And were you looking at any documents, when
16  you told him what information was relayed to you?
17      A    No.  It was just my memory.
18      Q    Okay.
19      A    But it was clear memory, since it was recent.
20      Q    This is -- I'm showing you now what's been
21  marked as Exhibit -- I'm sorry.  I apologize, I'm going
22  to have to get the -- the exhibit number.  I'm sorry,
23  hold on.  Okay.  So, Ms. Pisney, I'm showing you what's
24  been marked as Exhibit 24.  It's a December 24, 2019 e-
25  mail from Amber Fennigkoh to Stan Hendrickson and Ryan

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1 Hallman (phonetic), do you see that document?

2     A   Yes.

3     Q   Is this the document -- is this a document you

4 reviewed in preparation for your deposition?

5     A   I'm not sure if that was included, but I -- I

6 think I've seen it before.

7     Q   Can you read it real quick to refresh yourself

8 on it?

9     MR. KNOTT:  Is it -- can you read it?

10     THE WITNESS:  Uh-huh.

11     MR. KNOTT:  All right.

12     A   Okay. I've read it.

13 BY MR. WEIL:

14     Q   Okay. Does this -- does Exhibit 24 refresh

15 your recollection at all about the substance of the call

16 with Dr. Schamber, or who participated in that call?

17     A   I still think that I just spoke with -- by

18 myself to Dr. Schamber, but I'm sure Amber had spoken

19 with him as well, at maybe a different time.

20     Q   Okay. In this e-mail, it appears that

21 Ms. Fennigkoh is saying that she reviewed -- wait, okay.

22 I'm sorry. Do you recall Dr. Schamber saying to you

23 that everything was kosher, in terms of the care that

24 was provided to Ms. Boyer?

25     A   I don't think that he probably used that

1 particular term. But like I said, he told me that he

2 didn't think I had done anything wrong.

3     Q   Okay. And you recounted to him, I'm assuming

4 in much shorter form and substance, what you recounted

5 to me today? In terms of what information you got, what

6 information you requested about Ms. Boyer over the --

7 over the calls that you had?

8     A   I'm sure, maybe in better detail then, because

9 it was just right afterwards.

10     Q   Okay. Do you recall Dr. Schamber telling you

11 -- I'm looking at the last line here, "Dr. Schamber also

12 told Lisa he wouldn't be surprised if she didn't make

13 it," do you see that?

14     A   I do. I don't specifically recall him saying

15 that, but he -- he may have.

16     Q   Okay.

17     A   I've seen her hospital records, and I

18 understand what he was talking about.

19     Q   The way this e-mail reads, I'm -- I'm reading

20 it without much context. It reads as though Dr.

21 Schamber reported something to you, and then you

22 reported something to Ms. Fennigkoh. Is that -- is that

23 how you read it?

24     A   Either that, or -- or Amber spoke with Dr.

25 Schamber as well.

1     Q   Okay. Does this refresh any -- your memory

2 about anything else that was discussed in your call with

3 Dr. Schamber?

4     A   I think he was the one that told me that the

5 electrolytes -- because I don't think I saw the hospital

6 records, at that point. He said her potassium was quite

7 low, and that was likely the cause of her arrest. And

8 that was something that you are not able to tell without

9 a lab value, so it wouldn't be something that you could

10 know.

11     Q   The only way you could know something like,

12 that is if you'd sent Ms. Boyer out to the hospital,

13 right?

14     A   If she'd had a blood test done.

15     Q   You went to the Monroe County Jail multiple

16 times, every week, while you worked for ACH at the

17 Monroe County Jail, right?

18     A   Correct.

19     Q   You were aware that there was an emergency

20 room and a hospital across the street from the jail; is

21 that right?

22     A   I was.

23     Q   Okay. So during the -- okay. Let me strike

24 it. During all these calls regarding Ms. Boyer on the

25 22nd, you knew that an emergency room was yards away

1 from the jail; is that right?

2     MR. KNOTT:  Object to form.

3     A   Yes.

4     Q   I'm almost done here, Ms. Pisney. All right.

5 When -- when you were hired on at ACH, you attended a

6 multi-day course in Peoria, Illinois; is that right?

7     A   Yes.

8     Q   And that was something of an orientation for

9 new hires to ACH?

10     A   Yes.

11     Q   Was part of the way it was billed to you, to

12 train you in how to function in correctional medicine,

13 as opposed to medicine in the community?

14     A   Yes.

15     MR. WEIL:  Okay. I'm going to introduce --

16 this would be -- are we on Exhibit 31, Sydney?

17     COURT REPORTER:  Yes.

18     MR. WEIL:  Okay. So I'm introducing what's

19 been marked as Exhibit 31. This was part of a

20 larger production by ACH, that begins ACH Bates

21 18914, and it ends ACH Bates 18929. I'm going to

22 write that down for my own notes here and then

23 we'll get going.

24 BY MR. WEIL:

25     Q   As I understand it from your lawyer,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 214

1  Ms. Pisney, this was among a deck of documents that you
2  kept with you from that training, that you had when you
3  began working at -- before you began working at ACH; is
4  that right?
5              (EXHIBIT 31 MARKED FOR IDENTIFICATION)
6      A   I assume.  Yes.
7      Q   Okay.  Do you recognize -- here I'm going to
8  blow it up.  I'll take off the marginal lines.  Do you
9  recognize this document?
10     A   It was in a bind -- a very large binder of
11 information that we went through.
12     Q   Okay.  And this -- this particular PowerPoint
13 says, "Introduction to Correctional Healthcare."  Do you
14 see that?
15     A   Yes.
16     Q   When this training was performed, do you
17 recall how it was performed?  Was this something that
18 was handed to you, or was this done in conjunction with
19 some sort of in-person presentation?
20     A   Some of it was -- we didn't go through
21 specifically, and some of it we did.  I can't remember
22 if this was one we particularly had an in-person
23 presentation, but there were multiple presentations in
24 those days -- those two days, I think it was.
25     Q   There -- I saw in the production, I don't have

Page 215

1  it handy to pull up, but sort of an itinerary for those
2  two days; is that right?
3      A   Okay.
4      Q   And when --
5      A   That's possible.  Yes.
6      Q   Is that consistent with your recollection?
7      A   Yes.
8      Q   Okay.  And when I -- the itinerary indicated a
9  lot of presentations that would have the same title as
10 what -- what's on various different PowerPoint slide
11 decks?  Is it --
12     A   Yes.
13     Q   Okay.  Is it consistent in your recollection
14 that those slide decks that -- whose titles also appear
15 in the itinerary, were in-person presentations?
16     A   I believe so.
17     Q   Okay.  Do you recall Travis Schamber
18 presenting any topics?
19     A   Yes.  He presented many.
20     Q   Okay.  Was there any illustration, or visual
21 media, or anything like that presented in addition to
22 this PowerPoint, as part of these presentations?
23     A   I don't believe so.
24     Q   Okay.  And so it would be -- you would have
25 this PowerPoint with you, in the binder, right?

Page 216

1      A   Yes.
2      Q   And then there'd be -- I'm assuming there'd be
3  -- you'd be in a room with other folks, and Dr. Schamber
4  is maybe up in front, and he's got the same slides
5  pulled up on some sort of a projector for everybody to
6  see; is that right?
7      A   Yes.
8      Q   Okay.  Do you know whether any of those
9  meetings -- did it look to you like they were being
10 recorded at all?
11     A   I don't think so.
12     Q   Okay.  I went to -- I --
13         MR. KNOTT:  I'm sorry.  What exhibit is this?
14         MR. WEIL:  This is 31.
15         MR. KNOTT:  In terms of number.
16         MR. WEIL:  31, Doug.
17         MR. KNOTT:  Thank you.
18 BY MR. WEIL:
19     Q   Do you see this, "Why do you go to the
20 doctor?"
21     A   Yes.
22     Q   Okay.  And one of the reasons you go to the
23 doctor is to be healthy, right?  That's what you were
24 told?
25     A   I guess.

Page 217

1      Q   Okay.  Were you informed that inmates go to
2  the doctor for different reasons than people in the free
3  world?
4      A   They have different motivations, at times.
5      Q   Okay.  Were you told that these --
6         MR. KNOTT:  Could you give me the Bates
7     number?
8         MR. WEIL:  Sure, sure, sure.
9         MR. KNOTT:  I'm just trying to catch up here.
10        MR. WEIL:  Absolutely.  Again, it's -- the
11    starting Bates of Exhibit 31 is 18914, and the
12    ending Bates is 18929.
13        MR. KNOTT:  Okay.  Thanks.
14 BY MR. WEIL:
15     Q   Okay.  So were you told that inmates go to
16 doctors for different reasons than people in the free
17 world?
18     A   When they're in jail, they may see the doctor
19 or have different motivations for seeking care than when
20 they're on the outside.
21     Q   Okay.  And were you told that health is not
22 the goal of an inmate who seeks medical attention in the
23 jail?
24        MR. KNOTT:  Object to form.
25     A   I mean, they're not there for primary care, I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 guess, would be my understanding of what that -- what's
2 meant by that, I guess.
3     Q    Meaning that, ACH was training you that
4 inmates don't go to see doctors for primary care
5 purposes, but instead go for the purposes listed on this
6 bullet point -- or this slide that says, "Why does the
7 inmate seek medical attention?"
8         MR. KNOTT: Object. I think it misstates the
9 document. Foundation for her personal knowledge.
10     A    I don't specifically remember them discussing
11 this, but this -- what I think is, this could be some of
12 the motivations of a -- of an inmate seeking care,
13 but...
14     Q    Do you see -- here, I'm going to make this a
15 little bigger here. On the next page it says, "What is
16 your doctor's goal when he sees you in the office," do
17 you see that?
18     A    Yes.
19     Q    And it says, "The doctor wants to understand
20 what you want," do you see that?
21     A    Yes.
22     Q    Is that how you practice medicine, Ms. Pisney?
23     A    Usually I ask the patient, what brings you to
24 see me today? So that is kind of what they want.
25     Q    Okay. Do you order -- the next line says, the

1 -- if a patient says, "Well I want you to figure out
2 what's wrong with me," is that what you try to do?
3     A    Yes.
4     Q    Do you think you should approach patients
5 differently in the jail, if a patient comes to you and
6 says, "I want you to figure out what's wrong with me?"
7     A    No. I treat my -- the -- or the -- I treat
8 patients and inmates the same. I would -- I think that
9 sometimes their motivations are not always clear in
10 jail, as they're not always clear on the outside either,
11 so...
12     Q    Okay. This is a "Remember, you want to be
13 healthy," do you see that?
14     A    Yes.
15     Q    And "the inmate wants to be comfortable,"
16 right?
17     A    Yes.
18     Q    Do you believe that inmates just want to be
19 comfortable, when they come to a doctor in the jail?
20         MR. KNOTT: Overly broad. Foundation.
21 Speculation.
22     A    I think that's one of the reasons they might
23 see me.
24     Q    Why -- why is that the only reason listed --
25 why do you think that's the only reason listed on this

1 PowerPoint?
2         MR. KNOTT: Foundation. Speculation.
3         MR. MCCAULEY: Joined.
4     A    The -- the -- you know, these PowerPoints were
5 not the only things that were said in the orientation.
6     Q    What was --
7     A    There was more discussion going on.
8     Q    Okay. Was -- do you remember anybody saying
9 anything to say, this PowerPoint is actually wrong?
10     A    I -- there may have been more further
11 clarification. I don't know that they said the
12 PowerPoint was wrong, but there was probably more
13 discussion.
14     Q    If you present with chest pain to a doctor, do
15 you want the doctor to focus on what you want, or what's
16 wrong with you?
17     A    Usually, if I go with pain, I want the pain to
18 go away, so that's a want. I want them to figure out
19 why I'm having chest pain, and to do something about it.
20     Q    Do you think a person who's in jail might want
21 those exact same things?
22         MR. MCCAULEY: Object to form.
23         MR. KNOTT: Argumentative. Speculative.
24 Overly broad. Answer, if you're able.
25     A    Yes.

1 BY MR. WEIL:
2     Q    Do you think Ms. Boyer wanted to be
3 comfortable, or do you think she wanted to be healthy,
4 when she came complaining of chest pain?
5         MR. KNOTT: Foundation. Speculation.
6     A    I -- I think she wanted someone to pay
7 attention to her complaint, and I think we did.
8     Q    Why do you think she wanted someone to pay
9 attention to her complaint? Because she was
10 uncomfortable, or because she was worried that she was
11 sick?
12         MR. KNOTT: How is this not speculative?
13 Foundation. Speculation.
14     A    She was comfortable because that -- she was
15 complaining of pain.
16     Q    Okay. Do you think that her concern was that
17 she was uncomfortable or that she might be having a
18 serious medical issue?
19         MR. KNOTT: Foundation. Speculation.
20     A    Again, that's hard to know.
21     Q    Did ACH instruct you that it's okay to treat
22 patients on the outside different than patients in a
23 jail?
24         MR. KNOTT: Argumentative.
25     A    There are certain things in the jail that we

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 222

1  would not treat, that you might treat on the outside.
2  Something like hepatitis C is not treated when patients
3  are in jail, but often they are treated when they're in
4  prison.  So there are different treatment goals in jail
5  than there are in the outside.  Basically, the -- you
6  want to keep the person as healthy as they were when
7  they came in.
8      Q   You were told by ACH, that ACH does not treat
9  hepatitis C in jail?
10         MR. KNOTT:  Foundation.  Speculation.  Vague.
11     Overly broad.
12     A   We wouldn't start treatment for hepatitis C
13  inside jail.
14     Q   I've just asked, did ACH -- did -- you said
15  that -- did ACH tell you, that ACH does not treat
16  Hepatitis C in jail?
17     A   It's not something that -- that we would start
18  treatment for in jail.
19     Q   I'm asking what --
20     A   It's a --
21     Q   Okay.
22     A   It's a long term chronic illness that can be
23  treated on the outside, and it doesn't need to be
24  emergently treated while they're in jail.
25     Q   Ms. Pisney, I'm just asking what ACH told you.

Page 223

1  Did ACH tell you that they don't treat hepatitis C in
2  jail?
3      A   There are no strict protocols for treatment
4  given out by ACH, each case is individual.
5      Q   Okay.  Did ACH ever tell you that they don't
6  treat Hepatitis C in jail, regardless of what's in
7  protocols?
8          MR. MCCAULEY:  Did Ms. Boyer have hepatitis C?
9      I don't remember that, so...
10         MR. WEIL:  You can -- we've made a Monell
11     claim about how ACH treats people in jail.
12  BY MR. WEIL:
13     Q   Can you answer the question, Ms. Boyer?
14     A   I'm Ms. Pisney.
15     Q   Or Ms. Pisney, I'm sorry.  I'm sorry.
16     A   No.  No one specifically told me that, but
17  it's -- there are things that are not treated in jail
18  because it's a short term incarceration.
19     Q   You've encountered multiple people with
20  hepatitis C in jail, and the practice has been not to
21  treat them for hepatitis C while they're in jail; is
22  that right?
23         MR. KNOTT:  Object to form of the question.
24     Assumes facts not in evidence.  Misstates her
25     testimony. Argumentative.

Page 224

1      A   It's not relevant to this case.
2          MR. KNOTT:  Yeah.
3  BY MR. WEIL:
4      Q   I'm asking you to -- can you answer my
5  question, Ms. Boyer?  Or Ms. Pisney, I'm sorry.
6          MR. KNOTT:  It's -- it's multiple.
7      A   What is the question?
8      Q   Have you encountered -- you've encountered
9  multiple people in jail presenting with hepatitis C; is
10  that right?
11     A   There are inmates that I've seen in jail that
12  have hepatitis C.  Correct.
13     Q   And the practice, as you understand it, of
14  ACH, is not to treat those inmates with hepatitis C
15  because they're not there for very long; is that right?
16         MR. MCCAULEY:  Foundation.  Speculation.
17     Vague.  And overly broad.
18     A   If they were currently on treatment, when they
19  came into the jail, that would likely be continued.  But
20  I doubt that we would start treatment while they were
21  there.
22     Q   Is that -- is that statement that you doubt
23  you'd start treatment, based on your experience treating
24  detainees in jails over the last several years?
25     A   That's my understanding of how the short-term

Page 225

1  correctional care is taken care of.  If they were
2  transferred to prison, they would be treated in prison.
3      Q   And that's -- your understanding is based on
4  encountering multiple people with hepatitis C in jail,
5  and seeing the treatment that they're given for that
6  disease; is that right?
7          MR. KNOTT:  It's asked and answered.  And you
8      just brought it around to argue with her.
9      A   It depends on what treatment you're
10  discussing.  Are they having a complication from their
11  hepatitis C, or are we talking about curing them of
12  their hepatitis C?  Because if they have a complication,
13  I would treat them for that complication.
14     Q   Okay.  And if it's curing for hepatitis C?
15     A   That's -- they had it when they came in, and
16  it's not the jail's responsibility to treat them for
17  hepatitis C -- for a cure.
18     Q   Okay.  And so your understanding based on the
19  -- you told me, I'm just trying to understand where the
20  basis of your statement that, we don't treat hepatitis C
21  in jail, or words to that effect.  I don't want to put
22  words in your mouth, but that hepatitis C -- treatment
23  for hepatitis C is not provided in jail.  I'm just
24  trying to understand the basis of that statement.
25     A   There are certain things that you would not

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 226

1 treat in jail. There are certain things that are not
2 emergent, not urgent, that don't need to be taken care
3 of when a patient is in jail. And hepatitis C would be
4 one of those.
5    Q   Have you been told by ACH, that Hepatitis C is
6 not treated in jail?
7        MR. KNOTT: Asked and answered. Overly broad
8    -- multiple.
9    A   It depends on what you mean by treated.
10   Q   Okay. And you said that it depends -- if I
11 understand you correctly, if there's an emergent
12 complication from hepatitis C, that would be treated.
13 But hepatitis C itself would not; is that correct?
14       MR. KNOTT: Asked and answered. Vague. Overly
15   broad. Foundation for her knowledge.
16   A   I said that if they were on treatment when
17 they came into jail, that treatment would continue. That
18 if there was a complication they had from their
19 hepatitis C, that would be treated. But we would not
20 likely start treatment for a cure, while they were in
21 jail.
22   Q   What is the foundation for that statement
23 that, "We would not likely start treatment for a cure
24 while they were in jail"? Is that based on something
25 you've been told? Is it based on what you've observed

Page 227

1 for prisoners, or jail inmates? Or is it based on any
2 -- something else?
3    A   It's based on my understanding, of what we
4 treat when patients are in jail.
5    Q   What is the basis of your understanding?
6 That's what I'm asking.
7    A   That's a chronic, long-term medical condition
8 that they came in with. It's not -- it's not going to
9 cause any urgent problem while they're in jail, and they
10 will be released, and can be treated on the outside for
11 their hepatitis C.
12   Q   I understand the reasoning, but whether
13 they're treated or not, as I understand it, you're
14 saying, that they are not treated. And that's your
15 experience; is that right?
16       MR. KNOTT: Argumentative. Multiple times,
17   asked and answered.
18       MR. WEIL: I'm -- so --
19       MR. KNOTT: I know you want the sound bite,
20   but you can't just keep asking the same question.
21 BY MR. WEIL:
22   Q   I'm just trying to understand where she got
23 this information from. That's all. She said that we
24 don't treat hepatitis C in jail, she's identified two
25 exceptions to that, whether treatment's ongoing or

Page 228

1 whether there's a complication. For the remainder, she
2 said, there's no treatment. I'm just trying to
3 understand the basis for that statement.
4    A   It's just from my experience --
5    Q   Okay. How many --
6    A   -- in providing care.
7    Q   Okay. How many -- since you started working
8 for ACH, how many jail detains have you encountered, who
9 have hepatitis C?
10   A   I couldn't say how many.
11   Q   Can you provide me an estimate?
12   A   Maybe 20? I don't know. I have no idea.
13   Q   Is your statement based on your experience
14 with those 20 patients?
15       MR. KNOTT: What statement? Vague. Overly
16   broad.
17   A   I have multiple -- I have great experience
18 treating hepatitis C on the outside. But -- and again,
19 if I have a patient that is being currently treated with
20 the medications to cure hepatitis C, and they have those
21 medications, they continue on those medications. But
22 it's not a medication I would start in jail.
23   Q   And -- okay.
24   A   Because I couldn't continue to follow them,
25 once they're released from jail.

Page 229

1    Q   Okay. Oh, I'm sorry. I still have this
2 Exhibit 31 up. Do you see the next slide says, "What do
3 we do when we hire a doctor?"
4        COURT REPORTER: You took it down.
5    Q   Oh, I'm sorry. Did I take it down? Oh, here.
6 You know what? There's two steps you need to do to
7 share. Do you see that next slide, Ms. Pisney?
8    A   Yes.
9    Q   And, "Train the doctor in correctional
10 healthcare," do you see that?
11   A   Yes.
12   Q   Did you receive training in correctional
13 healthcare, outside of these two days in Peoria that
14 we've been discussing?
15   A   In discussions with Dr. Schamber, he oriented
16 me to the Monroe County Jail. He provided any questions
17 -- or any answers to questions that I had. So the
18 ongoing conversations I had with him.
19   Q   Okay. So you've had ongoing conversations
20 with Dr. Schamber since that initial training?
21   A   Yes.
22   Q   But the training that you received when you
23 get hired, when you got hired, was this two day
24 orientation in Peoria; is that right?
25       MR. KNOTT: Form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 230

1    A    In relation to correctional healthcare, I had
2   my experience, and training, and education as a nurse
3   practitioner prior to that.
4        Q    Here's another slide.  It says, "Why the
5   difference?"  And I believe, it's like, what do we do
6   when we hire a doctor?  We train them in correctional
7   healthcare.  The next slide says, "Why the difference,"
8   do you see that?
9        A    Yes.
10       Q    Okay.  And it says, "They want to get
11  comfortable."  Is that referring to detainees?
12       A    That's my inference.  Yes.
13       Q    And that's to be distinguished from people in
14  the free world; is that right?
15            MR. KNOTT:  Foundation.  Speculation.
16       A    Sure.  I'm asking what you were trained.  Were
17  you told that detainees are different than people in the
18  free world, because they want to get comfortable, as
19  distinguished of people in the free world?
20       A    I -- I think the gist of what I got from the
21  training, was that sometimes their motivations for
22  seeking care is not straightforward.
23       Q    Okay.  That's like anybody, right?
24       A    Yes.  That -- anybody --
25       Q    Whether they're in jail or not, correct?

Page 231

1        A    That's true.
2        Q    So what difference was ACH identifying with
3   people in jail versus people in the free world?
4            MR. KNOTT:  Foundation.  Speculation.
5        A    You have to be more alert for misuse of
6   medication, or misuse of drugs in jail than you would on
7   the outside, necessarily.
8        Q    Do you -- okay.  Did you ever get an
9   indication that Ms. Boyer was seeking some sort of drug
10  or other, when she came to you with healthcare
11  complaints?
12       A    I did not.  I knew she was taking oxycodone in
13  large amounts on the outside, but...
14       Q    And that had been prescribed for her on the
15  outside, right?
16       A    Yes.
17       Q    That's the information you had?
18       A    Yes.
19       Q    And you were trained that jail detainees want
20  medications to handle anxiety; is that right?
21       A    They sometimes do.  Yes.
22       Q    Okay.  And is -- should that training -- this
23  difference between jail detainees and others, were you
24  instructed that should affect the way you perform a
25  differential diagnosis?

Page 232

1        A    No.
2        Q    Okay.  I'm trying to understand, did they
3   explain why this difference was relevant, if your job is
4   to perform a differential diagnosis?
5        A    My -- my job is to care for the patient that's
6   in front of me.  And I treat the detainees as I would
7   any other patient.
8        Q    Meaning, any other patient on the outside,
9   right?
10       A    Yes.  Correct.
11       Q    So you're not trying to figure out what the
12  patient wants.  You're trying to figure out what's wrong
13  with them, right?
14       A    Correct.
15       Q    And that's what a differential diagnosis is?
16       A    That's part of it.
17       Q    Okay.  Do you have any understanding then, why
18  they would -- why ACH should be describing a difference
19  between detainees and people on the outside?
20            MR. KNOTT:  Foundation.  Speculation.
21       A    There are some differences in correctional
22  healthcare, than there is on the outside --
23       Q    I -- right.  I'm sorry.  Go ahead.
24       A    I think that -- like I said, the motivation
25  can sometimes be different.  But my practice was to

Page 233

1   treat all of my patients as the same.
2        Q    I understand that as you were describing,
3   detainees are in the jail for a short amount of time.
4        A    Correct.
5        Q    And I believe you said, that changes some of
6   the ways you provide care for them, right?
7        A    Yes.
8        Q    But this difference isn't -- this, "Why the
9   difference," slide is not describing detainees being in
10  jail for a short amount of time.  It's describing other
11  attributes of detainees; is that right?
12            MR. KNOTT:  Foundation.  Speculation.
13       A    Yeah.  I can't say what motivated them to make
14  this slide.
15       Q    Okay.  Fair to say that it sounds like ACH is
16  just trying to tell you that detainees are different
17  than people on the outside, in terms of what they seek
18  healthcare for?
19            MR. KNOTT:  Argumentative.  Foundation.  Asked
20            and answered.
21       A    Again, I -- I don't know their motivation for
22  this particular slide.
23       Q    Well, is that -- do you have any recollection
24  of this instruction -- this orientation and what you
25  were told?

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 234

1    A    Not this specific one.  No.  But I know that
2  anytime you go into a talk, there are going to be more
3  discussion than what's just strictly on the slide.  They
4  could be saying that this may be what the normal person
5  thinks about inmates, but it's different.  So I don't --
6  I don't remember.
7    Q    If a normal person thought these things about
8  inmates that are on this, "Why the difference," slide,
9  do you think that would be fair to the detainees?
10        MR. KNOTT:  Foundation.  Vague.  Overly broad.
11        MR. MCCAULEY:  Object to form.
12        MR. KNOTT:  Calls for speculation.
13    A    I think everybody that goes into healthcare
14  wants to take good care of patients, and make them
15  comfortable, make them better, and treat them with
16  respect.  And that's what I do.
17  BY MR. WEIL:
18    Q    Let's see, I may be close to done here,
19  Ms. Pisney.  You mentioned a moment ago that you recall
20  seeing about 20 detainees who had hepatitis C; is that
21  right?
22    A    Maybe.  I don't know that I always even knew
23  if they had hepatitis C or not.
24    Q    Right.  You're reviewing -- when you treat
25  detainees, you would often review their medical history;

Page 235

1  is that right?
2    A    What they knew of their medical history.
3    Q    Okay.  And is the, your estimate that you saw
4  somewhere around 20 detainees with hepatitis C, based on
5  those encounters that you'd have with detainees, when
6  you came to the jail and would interview them?
7    A    Yes.
8    Q    Okay.
9    A    Yes.  I -- I didn't see every detainee, and I
10  saw maybe three or four detainees, every time I came.
11    Q    Okay.  And so, could it have been more than
12  20 detainees or less than 20 detainees that had
13  hepatitis C, that you encountered in your time at the
14  jail?
15    A    Yes.  Very possible.  I really don't have any
16  idea how many.
17    Q    Do people suffering from hepatitis C often
18  suffer, have complications from hepatitis C, as a result
19  of that condition?
20    A    Nope.  Most of them never even know they have
21  it.
22    Q    Okay.  But some do, correct?  Because they're
23  experiencing symptoms with hepatitis C?
24    A    Perhaps.  If it's been there for many years,
25  they can develop cirrhosis of the liver and liver

Page 236

1  cancer.  But that's after having had hepatitis C for
2  several years.
3    Q    For detainees who had developed cirrhosis of
4  the liver, was it still the case that they would not be
5  provided with care for hepatitis C, while they're at the
6  jail?
7        MR. MCCAULEY:  Object to form.
8    A    I didn't know -- yeah.  I didn't know if they
9  had cirrhosis or not.  We didn't have blood work on most
10  patients that came to the hospital.  There was nobody
11  that I saw that was ever jaundiced.  So I don't think
12  anybody had severe liver disease, when I saw them in the
13  jail.
14    Q    Do you have an estimate of about how long a
15  detainee is typically at the jail -- the jails you
16  serve?
17    A    It ran the gamut from, you know, some of the
18  longest ones may have been there for a year or two.  And
19  some can be there for a day.
20    Q    Hepatitis C can now be treated with a fairly
21  short course of medication; is that right?
22    A    That's correct.
23    Q    Okay.  And it lasts about -- I think about a
24  month; is that right?
25    A    Eight weeks.

Page 237

1    Q    So, two months?
2    A    Correct.
3    Q    Okay.  Notwithstanding that shorter time frame
4  that's now available, you -- ACH didn't treat detainees
5  with hepatitis C in jail; is that right?
6        MR. KNOTT:  Willful misstatement of the
7        record.  Willful misstatement of what she said
8        multiple times.
9    A    I don't know that there's any clear
10  instructions given us, not to treat people for hepatitis
11  C.  But again, it's a chronic illness that many people
12  don't have any symptoms of, that takes many years to
13  develop cirrhosis, and that patients can be treated on
14  the outside.  And when they are incarcerated for longer,
15  they're given that option of treatment as well.
16  BY MR. WEIL:
17    Q    And the reasons you've just provided, those
18  are the reasons that ACH doesn't provide treatments for
19  Hepatitis C in jail?
20        MR. KNOTT:  Willful misstatement of testimony.
21    A    Again, I never received specific instructions
22  to not treat hepatitis C in the jail.
23    Q    Okay.  You just gave me a list of reasons or
24  factors, why were you giving me that list of -- they're
25  not there for a long time, it takes a while --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 238

1    A    I didn't -- again, I never started treatment
2 for anybody for hepatitis C while they were in jail.
3 It's something that if they're released from jail, they
4 need to continue on treatment.  And I don't have the
5 ability to follow them when they're released from jail.
6 So I couldn't start someone on treatment, that I wasn't
7 going to follow.
8        MR. WEIL:  Okay.  Okay.  Why don't we just
9    take a beat here, two minutes, and then I may be
10    done.
11        MR. MCCAULEY:  Let's take five, if you don't
12    mind.
13        MR. WEIL:  Absolutely, that's no problem.
14        COURT REPORTER:  We are off the record.  The
15    time is 4:58.
16            (OFF THE RECORD)
17        COURT REPORTER:  We are back on the record for
18    the deposition of Lisa Pisney, being conducted by
19    video conference.  My name is Sydney Little.  Today
20    is March 3, 2022.  And the time is 5:05pm.
21 BY MR. WEIL:
22    Q    Ms. Pisney, I just have a couple more
23 questions and I'll be done.  Turning you to Exhibit 19,
24 which we've been going over, this chest pain protocol.
25 If you had been provided the information that's written

Page 239

1 in this protocol, under the S and the O letters, would
2 you have sent Ms. Boyer to the emergency room?
3        MR. KNOTT:  Foundation.  Speculation.
4    A    It's hard to know how that might have changed
5 my thinking.  There are a few things on here, like her
6 medications, but they're mostly dealing with high blood
7 pressure.  And I already knew she had some issues with
8 high blood pressure.  The heart history may have changed
9 my thinking, but I may have waited and done the same
10 thing as I did.  Say, you know, If it continues, let me
11 know, and we'll go from there.  So it's hard to know.
12    Q    So, if you'd been provided the rest of this
13 information at around 8:09 p.m., when the -- you see
14 8:09 p.m.'s written on the form there, up on the top?
15    A    Yeah.  Yes.
16    Q    Assuming this, you recall this information was
17 provided to you around 8:09 p.m., or thereabouts, if
18 you'd been provided all the information that's under the
19 S and the O on this form, you would not have attempted
20 to rule out heart attack at that time, under the
21 differential diagnosis; is that right?
22        MR. KNOTT:  Foundation.  Speculation.
23    A    I think the thing that would be most
24 concerning to me was her complaint of, "I'm not right."
25 And specifically, I don't remember hearing that, but I

Page 240

1 do take complaints like that serious.  And -- but again,
2 you know, someone might say that if they're having a
3 panic attack as well.  So it's hard to know what you
4 would do in retrospect.  I could tell you what I would
5 like to have done in retrospect, but with the
6 information I had at the time, I do believe that I
7 provided good care.
8    Q    When -- we discussed hepatitis C for a bit,
9 when someone has been ordered medication and you believe
10 -- or have learned that they're leaving the jail soon,
11 do you withhold ordering that prescription, if they're
12 leaving soon?
13    A    No.
14    Q    Okay.  I'm going to show you Exhibit 26, which
15 is an e-mail from Amber Fennigkoh to a woman named Sarah
16 Malloy (phonetic).  Do you see that in front of you?
17    A    I see it.  But I can't read it.
18    Q    Sure.  I'm going to make it a little -- I'm
19 just interested, this looks like somewhat -- the -- I'll
20 say that the blackout lines on the left hand side, I
21 understand are the name of different patients.  Okay?
22    A    Okay.
23    Q    And they're redacted for privacy purposes.
24 There's a patient here that says, "Saw Lisa, she
25 ordered," and said one, continue to take -- oh, I'm

Page 241

1 sorry.  I'm on the wrong one.  This up here, "Diabetic,
2 four times per day.  Not very compliant.  All orders are
3 in.  I reviewed with Lisa.  Did not send any sheet to
4 pharm, is hoping he gets out," do you see that?
5    A    Yes.
6    Q    Is it -- is that a familiar practice to you in
7 terms of not ordering certain medications, because it
8 appears that the detainee is going to be released or get
9 out soon?
10        MR. KNOTT:  Object.  It misstates the prior
11    testimony.  And calls for speculation, as to this
12    particular patient.  And there's no evidence that
13    there's a practice.
14    A    Yeah.  I don't even know what that means.  I
15 have no idea.  I mean, I don't know what, "Diabetic,
16 four times a day," means, "All orders are in," it says,
17 so I don't -- I have no idea what that means.
18 BY MR. WEIL:
19    Q    So this, if Ms. Fennigkoh is indicating here
20 that medication was ordered for a person, but it was not
21 sent to be filled at the pharmacy, as there was a hope
22 that the person might get out.  That would be a real
23 departure from practice, as far as you know; is that
24 right?
25        MR. KNOTT:  Misstates the prior testimony.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 242

1    Lacks foundation.
2        A    It could mean that they have enough on hand
3    that we don't need anymore.  Sometimes we renew their
4    prescriptions, and if we know he is going to get out,
5    and he has enough to last until he gets out, then we
6    might not renew it.
7        Q    Okay.  If it meant something else, that it
8    simply wasn't ordered because he was hoping to get out -
9    - I don't know what this means.  I'm asking you.  If
10   that's what it meant, would that be inappropriate?
11       MR. KNOTT:  You do know what it meant.  Because
12   the witness talked to you about it yesterday, she
13   wrote it.
14       MR. WEIL:  Doug, you don't need to coach --
15   you don't need to coach your witness.  Okay?  I --
16       MR. KNOTT:  No.  I'm astounded that you
17   misrepresent what's happening here.
18       MR. WEIL:  I'm asking a question.  I don't --
19   you know --
20       MR. KNOTT:  You --
21       MR. WEIL:  Doug, come on -- come on.  Okay?
22       A    We would not stop a medication just because we
23   knew that the patient was getting out.  No.
24   BY MR. WEIL:
25       Q    Okay.  And if you did stop a medication

Page 243

1    because a patient was getting out, that would be
2    inappropriate, right?
3        A    It wouldn't be something that we would do.
4        MR. WEIL:  Okay.  That is all I have right
5    now, Ms. Pisney.  Thanks very much for your time
6    today.
7        THE WITNESS:  Thank you.
8        MR. MCCAULEY:  Give me about five minutes.  I
9    don't know if I'm going to have any questions.  If
10   I do, it'll be very short.  So give me just a
11   minute.
12       COURT REPORTER:  Going off the record?
13       MR. MCCAULEY:  Maybe five minutes, sorry.  But
14   I won't keep you long.
15       MR. KNOTT:  Yeah.  You know, it's 15 after
16   five.  We just had five minutes.  All right.
17       COURT REPORTER:  Are we going off the record?
18   Or would you like to stay on?
19       MR. MCCAULEY:  Yeah, we're off the record.
20       COURT REPORTER:  Off the record, okay.  Thank
21   you.  Off the record at 5:12 p.m.
22           (DEPOSITION CONCLUDED AT 5:12 P.M.)
23
24
25

Page 244

1                    CERTIFICATE OF REPORTER
2
3
4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page here of by me after
7    first being duly sworn to testify the truth, the whole
8    truth, and nothing but the truth; and that the said
9    matter was recorded stenographically and mechanically by
10   me and then reduced to typewritten form under my
11   direction, and constitutes a true record of the
12   transcript as taken, all to the best of my skill and
13   ability.  I certify that I am not a relative or employee
14   of either counsel, and that I am in no way interested
15   financially, directly or indirectly, in this action.
16
17
18
19
20
21
22   SYDNEY LITTLE,
23   COURT REPORTER/NOTARY
24   COMMISSION EXPIRES:  12/09/2029
25   SUBMITTED ON:  03/31/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Exhibits

**EXHIBIT 28_ PISNEY** 83:16, 17,22 84:25 97:1,5

**EXHIBIT 29_ PISNEY** 94:7, 12,15 110:12 112:4 114:3

**EXHIBIT 30_ PISNEY** 116:14,20

**EXHIBIT 31_ PISNEY** 213:16,19 214:5 217:11 229:2

---

## 0

**0.1** 143:10,15, 19,21 144:1,4, 8,25 145:5

**0.2** 141:20 142:1 143:25

---

## 1

**10** 136:6

**100** 16:6 142:15 143:8

**101** 6:7

**102** 202:6

**106** 143:4

**1088** 33:4

**1093** 120:1

**10:21** 6:8

**110** 33:3

**1111** 33:4

**11:25** 51:14

**11:30** 51:8

**11:32** 51:19

**14** 130:8

**15** 93:4 243:15

**160** 16:6 142:15

**169** 143:4

**169/100** 143:9

**177** 140:15 175:10

**18** 129:19 132:18

**18914** 213:21 217:11

**18929** 213:21 217:12

**19** 154:4,11,25 156:6 157:25 185:13 192:9, 10 201:20 238:23

**196/106** 142:5

**197** 33:4

**1:00** 109:24

**1:30** 109:18

**1:38** 110:4

---

## 2

**2** 130:8

**20** 93:4 109:16 137:15 148:11 150:16 228:12, 14 234:20 235:4,12

**20-CV-1123** 6:15

**20-year-old** 87:17,19 90:21, 22 189:24

**2000** 46:8

**2001** 48:6

**2004** 45:2,13

**2009** 45:13

**2010** 45:15,16

**46**:9

**2017** 46:9,16, 21

**2019** 14:17 15:16 48:21,23 149:22 150:11 151:4 152:10, 20,21,23 153:4 155:8 209:24

**2020** 152:24

**2021** 46:16,21 48:8,9,21

**2022** 6:8 51:19 110:4 152:3 191:9 238:20

**206** 33:5

**21st** 17:9

**22** 150:11 151:4 155:8

**22nd** 17:11 139:9 146:4,17, 20 147:10 152:9 153:5 155:20 159:3 198:18 212:25

**23rd** 17:12 41:3 148:12,16

**24** 160:10 209:24 210:14

**26** 240:14

**28** 83:16,17,22 84:25 97:1,5

**29** 94:7,12,15 110:12 112:4 114:3

**2:35** 151:23

**2:40** 151:1,20

**2:41** 152:3

---

## 3

**3** 51:19 110:4 118:14 120:1 121:8 126:21, 25 130:5,7,8 152:3 191:9

**238**:20

**30** 116:14,20

**31** 213:16,19 214:5 216:14, 16 217:11 229:2

**3:00** 175:8

**3:32** 191:4

**3:37** 190:25

**3:45** 141:21 142:11 143:3

**3:50** 191:9

**3rd** 6:7

---

## 4

**40202** 6:7

**41** 187:6

**41-year-old** 187:23 190:2

**4:58** 238:15

---

## 5

**50** 33:3

**5:00** 47:25

**5:05pm** 238:20

**5:12** 243:21,22

---

## 6

**60** 29:21

**65862391** 136:4

**6:00** 33:16

**6:26** 139:3

**6:27** 139:19,20

---

## 7

**7** 138:1,4,8 139:1,24

**730** 6:6

**7:26** 139:9

---

## 8

**80** 29:21

**81** 201:21,22 204:19

**8:00** 47:25

**8:09** 164:7 239:13,14,17

---

## 9

**911** 114:5,8 115:5,10

**92** 202:6

---

## A

**a.m.** 6:8 51:19

**abdominal** 70:22,24 71:6, 17,25 72:20 73:17 74:1 75:17

**ability** 10:10,15 39:11,14 238:5

**abnormal** 202:12

**absolutely** 187:1 217:10 238:13

**abstract** 199:12

**abuse** 93:6

**acceptable** 201:15

**accepted** 52:12

**access** 40:18 60:21

**accommodate** 139:1

---



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

accomplishment 55:13

accomplishments 55:16

account 206:12

accurate 10:10,15

ACH 31:12,16 35:1 36:7,11 40:5,23 41:7 46:18 48:12,16, 22 50:5 51:23 56:25 64:12,15, 23 154:12 155:15 173:10 212:16 213:5,9, 20,21 214:3 218:3 221:21 222:8,14,15,25 223:1,4,5,11 224:14 226:5 228:8 231:2 232:18 233:15 237:4,18

aches 165:17

aching 195:22

achy 180:25

action 114:4

active 105:25

activity 94:19 104:14

Add 13:14

addition 36:11 207:8 215:21

additional 20:3 55:11 160:10 162:8, 10 194:4,16,20

address 81:5

adequate 14:17

adjudicate 53:12

adjudicating 53:17

administration 23:9 45:4

Administrator 6:11

admitted 124:20

adult 148:19 153:13

advance 81:4

Advanced 6:12 7:5

advancing 53:3,4

affect 10:9,14 231:24

affecting 10:13

affirm 8:1

afternoon 110:5 140:10 176:8,15

age 68:8 76:17 200:15 201:6

agree 7:19 79:2 81:3 85:10 93:20 94:21 97:19 98:9,16 100:12,25 111:1,25 113:6, 8,15,20,24 114:25 115:9 117:5,8,19 175:13,20 195:25

agreed 53:20 186:18

agreement 63:25

AHA 186:17

ahead 10:25 15:6 27:7 33:21 51:4 70:2 73:13 94:23 106:6 112:20 143:9 147:7 160:3 169:9,24 178:22 188:3, 11 194:22

232:23

albuterol 102:13,15

alert 231:5

alerted 105:21

Amber 15:20 16:23 17:1,21, 24 18:8,14 19:5,7,18,22 20:4,6,18,19 21:1,3,8,24 24:18 26:10 27:4 33:16 34:18 41:2 58:5,11 119:12 161:14 209:25 210:18 211:24 240:15

American 84:1 182:1

amount 95:12 143:15 173:25 233:3,10

amounts 231:13

and-a-half 109:7

anesthetist 55:18

anesthetizing 55:19

aneurysm 91:19 92:1,19, 21 189:15

ankle 77:1,21 79:13,17

answering 190:12

answers 8:18 9:2,18 39:10 92:24 93:4 172:5 229:17

anti- 115:23,24

anticipate 9:2

anxiety 82:2 101:20 187:13, 15 188:18

190:5 197:3,4, 10,15,17,22 198:11 200:8 202:19 203:8, 11,12,14 231:20

anxious 187:11 190:4 200:1 202:22

anymore 36:7 37:1 242:3

anytime 234:2

aortic 91:19 92:1,19,21

apologize 56:9 148:19 209:21

app 63:4,6,9

appearance 6:16

appearing 6:25

appears 196:1, 3 210:20 241:8

appendicitis 71:24 72:24 73:22 74:14,19 77:13,16

application 52:22,24

applications 52:23 55:10

applied 52:12

appointed 52:10,12 55:25

appointment 153:2

appointments 51:24 52:6 149:18 152:21

approach 219:4

appropriately 14:21

approve 134:11

approved 24:21 133:4 135:8,16

approving 24:8 25:1 134:18

approximately 18:4 45:2,12

area 85:4 192:22,23 205:24

argue 225:8

argumentative 163:14 199:5 200:11 206:25 220:23 221:24 223:25 227:16 233:19

arm 84:22 87:21 186:6 193:6

Army 43:13 45:17

arrange 149:12

arrest 212:7

arrived 160:11

art 68:15

asks 157:9

aspirin 16:10 30:12,14 114:18 115:1,6, 10,19,21,23 116:1,7 164:14, 16,25 165:3,5, 10,18 166:2 179:8 201:21, 22 203:12,18, 19,21 204:2,11, 19

assess 44:1,4, 6 156:7,16

assessing 170:15

assessment 58:14 66:21 197:11

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

assistance 63:13

associate's 43:23

Association 52:3 84:1

Association's 182:1

assume 134:2 164:3 167:6,9, 12,18 168:5,15, 17,19 173:23 214:6

assumed 131:8 144:24 145:11,24 179:13 206:11

Assumes 223:24

assuming 21:13 24:20 58:16 126:5 127:15 133:24 142:8 167:23 169:23,25 211:3 216:2 239:16

assumption 145:14

asterisk 120:1

asthma 101:18,19,25 102:2,7,9,12 130:10,17 132:4

astounded 242:16

attack 54:25 78:2,7,10,13 79:2,5,12,17, 18,25 80:7,8 81:4,14 82:7,17 84:7 85:3,10, 12,17,23,24 86:3,8,14,21 87:2,15,17,18, 23 88:5,8 89:9, 20,23,25 90:10, 16,23 91:2,4,15

93:17,22 94:4, 5,16 95:6,8,13, 17,23 96:1,7, 10,19,22 97:2, 6,11,14,20 98:1,3,5,22 99:2,5,9,12,24 100:7,13,15,21 101:2,4,9,15, 16,20,25 102:18 103:4,8, 10,13 104:11, 17,21,23 105:3, 6,11,12,15,24 106:2 107:9,15, 22,23 108:1,11, 23 109:3 110:20,23 111:3,6,13 112:1 113:9,11, 15,20,25 114:19 115:1, 12,16,18,23 116:1,4,8,12,17 117:1,3,6,9,13, 17,21,22 167:8, 11,16 169:16 170:13,16 175:14 177:11 186:16,19 187:2,10,20 189:20 190:2,5, 6 197:10,23 198:3,14 200:5, 7,22 204:5,6, 13,20 205:4,11, 18 239:20 240:3

attacks 55:4 78:17,18,20 88:10 89:4 98:8 112:6,14,23 113:2 117:14

attempt 87:22 103:21 160:9 163:2 167:5,21 178:20 180:8, 11,16

attempted 160:19 209:9 239:19

attend 146:11, 12

attended 213:5

attending 6:17,21

attention 111:1 217:22 218:7 221:7,9

attorneys 34:12,15

attributes 233:11

audible 9:19

AUTOMATED 88:22

availability 62:4

aware 17:8 67:23 73:20 131:5 200:16 212:19

---

## B

bachelor's 43:24

back 16:4,13 19:17 21:23 37:3 39:22 51:8,16,23 54:16 56:25 67:15 68:4,7 84:18 88:20,25 97:1 98:14 99:2,9,11,19,20 102:4 109:18 110:1,12 114:25 119:10 132:18 143:1, 20 148:8 151:1, 20,25 152:21 154:12 157:10 179:12 186:2 190:25 191:6 201:20 202:1, 16 238:17

backup 62:11

bag 163:13

bank 159:2

base 125:9

based 24:21 28:19,20 53:21 70:18 72:16 103:1 182:20 194:6 224:23 225:3,18 226:24,25 227:1,3 228:13 235:4

basically 169:12 222:5

basis 39:12 96:3 225:20,24 227:5 228:3

Bates 32:16,18 213:20,21 217:6,11,12

bear 83:14

bearing 151:8

beat 93:10 238:9

beating 173:2

began 214:3

begin 8:6 112:16

beginning 106:9 112:19, 21

begins 68:23 114:8 140:6 213:20

behalf 6:12

belabor 153:7

believed 18:14 107:25 108:1 115:17 200:21

benign 72:19 73:12,15,25 187:15 197:18

bigger 218:15

billed 213:11

bind 214:10

binder 214:10 215:25

bit 66:19

110:14,17 114:13 129:18 188:19 240:8

bite 227:19

blackout 240:20

blank 151:13

blood 16:1,2,3, 6,10 18:10,15, 18 20:12 22:25 25:5,13,15,21 26:1,4,6,11 27:10 28:17,25 29:12 30:14,21, 25 93:21 94:3, 17 95:1,6,7,15, 20,22 96:5,6,8 115:22 116:16, 25 117:5,8,12, 14,16,22 118:1 119:6 120:11 122:2 130:10 132:4 140:14 141:2,7,9,15, 21,25 142:2,21, 25 143:8,22,24 144:2,5,12,13, 17,20 145:7 158:6 162:7 164:17 165:4, 11 174:21,22 175:10 176:16 179:2,3,5,7,10, 13 183:14,15 184:4 188:15, 18,24 203:10 206:5,6 212:14 236:9 239:6,8

blow 214:8

blue 89:16 90:8

board 52:3,5,8, 19 53:8,16,18, 19,22 54:10,16 55:3,9,11,14, 15,17,20,23,25 56:3,21

boards 51:25 52:1,2

body 84:25 100:5 165:16 192:4

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**bold** 114:22

**book** 63:15

**booked** 136:11

**booking** 205:24

**books** 63:13

**bother** 206:21

**bottle** 135:23 163:25

**bottom** 119:25 120:2 140:16 143:7

**Boyer** 6:10,11 11:16 12:1,14 13:12 14:16 15:2,3,15 17:8, 17 19:3,13,14, 21 21:4 22:15 23:4 24:13 25:18 27:2 28:2,8 31:12 32:14 34:16 36:16 37:16 38:10 40:2,23 41:7,11,16,25 42:5 64:17 65:6 118:5 119:4 120:9 121:11 127:6 130:16, 22 134:6,16 135:4 136:10 140:6 141:1,6 155:20 161:10, 17,24 162:3 163:9 164:7,13 166:7,9,15 174:21 175:9 176:15 182:16, 21,25 191:14, 21,24 192:3,23 193:22 196:2,9 197:4 200:1,4 201:21 204:9, 17,24 205:21, 25 206:20 207:9 208:4 209:4 210:24 211:6 212:12, 24 221:2 223:8, 13 224:5 231:9 239:2

**Boyer's** 16:15 27:15,17 28:25 29:3,12 66:14 128:3,23 130:15 137:3 140:22 166:9 202:18 208:15 209:10

**break** 9:25 10:6 51:8 109:7,8,9,10 150:14,19,25 151:19 190:20, 24 191:12 197:1

**breaks** 9:23

**breath** 27:20, 22 28:9,14,16 85:8 86:19 87:22 100:17, 20,25 101:11, 14 102:2,5,7, 10,15,17 103:4, 6 104:8 105:1, 22 107:7,21 108:24 110:18, 19 111:10 159:7 175:13 179:22 180:6 182:8,12,13 187:11 193:1,7, 9 199:21 206:8

**breathe** 140:12 141:11 144:15, 21 175:9 176:4, 10,17 184:11

**briefly** 109:13 208:2

**bring** 25:25 78:19,20

**brings** 218:23

**broad** 16:18 66:15 70:2 71:12 73:2,8 74:17,24 75:6, 11 76:3,10 79:22 80:3 81:9 83:5 85:13 86:12 87:7,24 88:13 90:13,25 91:10 92:4 98:23 102:22

103:16,23 106:5 111:16 115:13 116:10 158:14 165:14 187:5 189:11 219:20 220:24 222:11 224:17 226:7,15 228:16 234:10

**broke** 10:24

**broken** 79:13, 17

**brought** 54:16 182:25 183:6, 12 225:8

**brow** 173:2

**bullet** 110:14, 18,19 112:10, 25 113:1,2,19 114:7,15,22 115:4 218:6

**bumped** 177:7, 8

**bunch** 60:15, 18 67:11 70:17 71:1 130:9

---

**C**

---

**Caldwell** 34:25 35:4,11 36:2 37:4,16 39:23 40:4,22

**calendar** 149:14,16 151:16 152:7, 19,20

**call** 16:4,11,13 18:9,14,24 19:1,16,17 20:3,4,7,12,14, 18,19,20 21:1, 11,23,24 22:1, 6,14,24 23:2, 18,24,25 24:4 25:4,7,13,19, 21,25 26:6,10, 11 27:10,13 29:9 30:3,7,10, 11,16,17 31:5,6

36:1,5,22 37:4 38:11,12,16,17 39:7,18,20 40:8,11,12,16, 17 49:10,21 50:8 51:6 57:22 61:23,24 62:1, 9,11,15 63:11, 14,23 65:20,24 66:3,7,10,12,17 104:6,9 114:5 119:3,9,11,22, 23 120:4,10,11 122:1,5,14,16 124:20 127:23 133:13 138:19 140:21,25 141:1,5,6,25 142:9,22,25 143:3 154:19 155:10,19 160:22,25 166:20,22 167:2,23 168:14 176:15 179:10 198:17 201:25 202:1, 16 204:14,23 205:1 206:19 208:21,25 210:15,16 212:2

**called** 11:10 16:1,7 19:24 21:8,14 35:12, 13,16 38:14 40:19 58:9 61:24 66:9 77:2 119:22 120:22 123:9 124:17, 19 127:24 134:5,7,16 137:1 140:17 141:19 142:11 154:6,12 159:1, 16 161:19 166:6 168:17 177:16 179:1,3, 12,15 183:15 188:19 204:21 206:14,20 207:7

**caller** 122:7

**calling** 66:13

115:5,10 123:11,13 125:20 128:3 130:15,25 131:8,20 132:2 141:8 142:21 154:20 155:25 170:2

**calls** 11:19 12:5 13:15 18:17,21 19:13 20:11,22 22:25 23:25 24:4 25:24 26:3,4,5, 9,23 27:1,5,9 31:7 39:1 50:22 54:13 57:5 62:19,22 65:11 119:5 120:10 121:21 122:2,9, 17,18,20,23,25 123:2 131:10 140:22 142:23 154:18 156:19 167:20 184:22 207:1,15 209:11 211:7 212:24 234:12 241:11

**campaign** 52:21

**cancer** 22:16 68:8 127:2,8 129:15 131:24 134:25 135:5 136:11,17,19, 23 137:4 163:10 200:18, 19 236:1

**capacity** 41:15 50:23

**cardiac** 82:14, 16 88:2 89:12 98:18 99:19 104:18,20 108:8 187:13, 25 188:5,14 190:7 197:8 198:11 201:5,9, 11 202:23 203:2,4

**care** 11:7 31:11 38:6,15 53:4,6,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

9 58:15 65:2 70:19 87:4 157:17 190:17 209:4,7 210:23 217:19,25 218:4,12 225:1 226:2 228:6 230:22 232:5 233:6 234:14 236:5 240:7

**career** 56:11

**Carolina** 43:10,15

**case** 6:15 9:14 15:9 37:9 38:5 40:20 42:20 54:11 58:21 59:8 61:3 65:6 66:14 70:23,25 75:17 85:3 98:1 100:3 153:24 154:4 155:2 172:6 201:3 223:4 224:1 236:4

**cases** 53:20 54:7,9,11 55:2

**catch** 217:9

**caused** 68:14 176:24 177:11 197:20,22 202:19 204:12

**causing** 69:25 101:9 201:5

**celebrate** 147:1 153:8,12, 14

**center** 98:8

**Central** 139:4, 15

**certified** 55:17

**chair** 55:17 177:17

**chance** 152:5

**change** 184:14 202:8

**changed** 206:17 239:4,8

**changing** 202:5

**charges** 59:11

**chart** 168:23 169:4 170:4

**check** 30:20,22 141:21 142:13 143:22 144:4, 10 145:5 162:2 188:21 199:7 201:25

**checked** 144:16,18 206:7

**checking** 205:9

**chemo** 127:9 134:20,24 137:2

**chemo/ radiation** 127:10 133:21

**chemotherapy** 163:19

**chest** 16:9,12 18:24 19:2 26:7,11 27:10, 13,18 28:1 29:10 30:4,10, 18 31:5,6,7 54:21 81:21,24, 25 82:11,15,17 84:13 85:4 86:18 87:20 89:13,15,19,20, 23 90:9,17,24 91:2,4,19 92:3, 6,20 97:15,19 98:5,9,17,19 99:1,3,17,22,25 100:3,4,14,22 101:1,14 102:3, 11,16,18 103:7 104:7,13,18 105:2,11,22 107:8,21 108:7, 25 111:9 112:17 155:20 156:2,7,17,20, 22,25 157:4,22 158:1 159:2,5,

21 161:1,18 162:5 163:2,8 166:7,16,17,21, 25 167:1,3,5,9, 12,14,15,18,21, 22,24 168:1,8, 14,16,17,23 169:1,3,19 170:1,2,3,12, 13,14 171:18, 21 172:2,16 173:20,24 174:1,3 175:14, 20 176:1 177:7, 17,25 178:11 179:1,5,7,12, 14,15,21 180:12,22 181:25 182:14 183:21 185:10, 23 186:9,11,25 187:11,16,19 188:20,22,25 189:17,18,24 190:14 193:10, 11 197:8 198:17 199:16, 18 201:5 202:3, 16,19,20,24 203:3 204:5,6, 10,12,15,18,22, 24,25 205:2,5, 7,9,10,12,16,19 206:3,9,13,21 207:8 209:10 220:14,19 221:4 238:24

**Chicago** 6:21

**chief** 58:12

**children** 147:20,21,23 148:19 153:13

**choice** 172:21

**cholesterol** 94:18 95:1

**chose** 201:9,11

**Christie** 12:14

**Christine** 6:11 11:16 12:1 13:12 14:16 15:1,3,15 16:14 17:8,17 19:3

40:2,23 41:6, 11,15,25 42:4 118:5 140:6 159:17 161:10

**Christmas** 146:8,16 147:2, 24 148:21 149:1 153:8

**chronic** 222:22 227:7 237:11

**chronologicall y** 15:19

**church** 146:11, 12

**circled** 132:13

**circumstance s** 77:24 202:12

**cirrhosis** 235:25 236:3,9 237:13

**civil** 150:21

**claim** 223:11

**claims** 159:21

**clarification** 220:11

**clarify** 95:4

**Clayton** 49:7, 14 50:17

**clear** 20:24 32:6 92:24 93:3,4 97:22 107:6 126:18 131:21 156:11 209:19 219:9, 10 237:9

**client** 150:25

**clients** 106:16

**clinic** 44:25 45:25 46:3 47:6,9

**clonidine** 141:21 142:2, 15 143:10,15, 19,21,25 144:4 145:1,6 188:17 203:9,16,17

**close** 130:5 148:20 234:18

**closed** 120:17

**clotting** 115:22

**clues** 68:18,19, 20 86:2,5

**CO's** 138:17

**coach** 173:8 242:14,15

**coded** 12:17, 25 13:12 17:11 19:7

**codes** 14:14

**collaborating** 64:16,18,21,23 65:14,17,24 66:5,13

**collaboration** 64:5,9,11

**college** 43:3,7

**Colorado** 43:11,12

**column** 97:10 112:3 114:4 132:23 133:20

**combined** 95:25 111:8

**comfort** 190:20

**comfortable** 219:15,19 221:3,14 230:11,18 234:15

**comfortably** 179:14 189:1

**common** 84:7 85:5 98:11 112:6

**commonly** 133:17

**communicate d** 135:11

**community** 213:13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

company
11:10

compel 172:20

competitive
52:18

complain
16:12 81:21
169:25 171:18,
20 176:1
188:25 189:14
205:19

complained
141:10 166:21
167:25 168:15
176:3 185:22
205:5,6 206:5,
7,8

complaining
81:21 140:11
144:14,19
156:20 159:5
166:7 178:11
183:20 184:8,
10,17 187:10
189:17,18
202:16,20,24
221:4,15

complains
166:20 167:24

complaint
92:7 156:17
159:2 167:3
168:14,20
179:4 205:9,12,
16 206:10
221:7,9 239:24

complaints
16:9 27:18
30:17 47:7
53:11,17 54:21,
24 55:2 58:8,
13,14 169:8,9,
11 231:11
240:1

complete
15:24 22:3
161:11

completely
91:9 168:22

compliant
241:2

complication
225:10,12,13
226:12,18
228:1

complications
58:7 77:18
235:18

Compound
89:10

computer
60:20 61:7,19

concern
221:16

concerned
37:19,21 206:2

concerns
65:19

concluded
202:18 243:22

conclusion
11:19 12:5

condition
11:17 12:1,6,
15,18,23,25
13:13,18 14:5,
15 68:3 75:18
76:24 81:20
97:25 127:4
165:12 183:10,
20 187:16
198:14 208:16
227:7 235:19

conditions
10:9,13 22:20
25:12 77:2,10
88:9 95:12
105:7 123:15
130:9 164:8
185:21 199:23,
25

conduct 54:4
172:1

conducted
51:17 110:2
152:1 191:7
238:18

conducting
197:25

conference
6:9 51:18 110:3
152:2 191:8
238:19

conferences
56:15,16

confirm 144:4
145:13

confusing
24:19

congest
129:11

congestive
96:9,13,15,18,
23 127:17
128:1,13,19,24
129:16 130:6
159:18 206:22
207:9

conglomerate
10:22

conjunction
154:21 214:18

consideration
66:24 67:2
76:16 108:6,16,
18 111:20
198:8,23

considered
95:14 175:17

consistent
140:20 141:5,
24 186:15,19
192:12 215:6,
13

constant
184:23

constitute
30:25

contact 62:12
65:17

contacted
17:16

contemporane
ously 155:6

context 91:10
157:14 211:20

continue
188:25 226:17
228:21,24
238:4 240:25

continued
16:12 30:17
179:11 188:22
205:19 224:19

continues
239:10

continuing
83:19

contract 63:25

control 94:16
171:25

controlling
172:14

convened 6:9

conversation
8:15,24 9:3
17:2 18:1,5
37:3,20,25
38:2,8 40:1
120:9 131:25
182:20,24
207:24 208:13

conversations
8:23 39:23 66:5
229:18,19

cookbook
199:6

copies 137:20

copy 118:21
129:24 154:6

correct 11:12
17:23,25 18:12,
25 19:11 21:6
23:7 27:12
28:3,4,10 29:4
31:20 34:7,23
36:24 39:3
40:9,10 44:18,
19,20 46:10,20
47:1,10,22
48:14 49:13,23
50:21 57:10

58:24 62:25
67:4 69:5,7
71:8,25 72:6,
14,21 74:23,25
78:14 79:20
80:1,10 85:1
86:9 92:8 98:6
103:14 107:10,
13 108:2 111:6
116:8 119:15
122:11 132:23
134:22 135:1
139:16 140:4
152:17 153:3
158:21 160:18
161:23 162:19,
22 173:21,25
185:16 191:20
192:5 193:2,12
195:4 197:2,23
199:16,19,23
200:2,5 202:9,
10 204:8
212:18 224:12
226:13 230:25
232:10,14
233:4 235:22
236:22 237:2

correctional
6:12 7:5 14:24
20:8 62:2
122:18,24
123:3 129:2
213:12 214:13
225:1 229:9,12
230:1,6 232:21

corrections
41:11

correctly 11:9
39:25 69:11
102:6 105:21,
23 167:4
199:25 226:11

correlates
17:14

corroborate
136:18

corroborated
137:3 163:12,
16

COS 27:5,9



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

coughs 156:4

counsel 6:18
8:5,13 12:7
13:1 32:6,15
39:8 109:6
190:18

counties 49:1,
5,14,24 50:7,18

county 7:1,6,8,
11 33:3 37:1
41:10 48:19,20
49:2,3,4,7,9,20
50:1,10,11,14,
17 51:3,5 57:1,
4 60:5 61:1
64:13 122:11,
15 152:14
155:16 212:15,
17 229:16

couple 130:5
238:22

court 6:3,4,5,
14 7:16,19,24
8:5,20,25 9:4
51:13,16 83:18,
23 88:21,24
109:23 110:1
151:22,25
191:3,6 213:17
229:4 238:14,
17 243:12,17,
20

cover 49:4,6
77:7,8

coverage
48:18

covered 198:4

Crawford 49:7,
14 50:17

create 40:25

created 173:10

critical 109:5
197:25

Crosse 46:12
47:2,21

crushing
112:17

cuff 190:1

cure 225:17
226:20,23
228:20

curing 225:11,
14

current 135:12
136:20 137:5,8,
10

**D**

daily 132:25

damage 77:15
78:19 114:19
115:2

danger 67:18
73:6

dangerous
75:24 76:2,7
79:3 198:2

Danielle 7:2

data 69:9
70:10,17

database
60:13,21

date 135:16,22,
23

dates 17:13,15

daughter
42:17,18
147:16 148:22

daughter's
153:15

day 6:8 15:25
16:8 17:6,7,10
18:2,7,9 19:4,6
20:12 25:7 26:4
29:16 51:6
57:6,9,12
64:22,24
122:15,16
146:6,10
147:14 148:4,
13,15 151:9
152:8,9,22
159:25 160:16
161:3 163:10

166:14 168:18
171:15,17,20,
21 180:13
182:22,23,24
184:1 206:4,14
229:23 236:19
241:2,16

days 74:10
214:24 215:2
229:13

deadly 91:14
189:4,6,7
198:13

deal 199:13

dealing 104:3
239:6

death 78:11,
19,20 79:10,11,
12,13,17,18,25
80:8 81:5

December
14:17 15:15
17:9,10,12
139:9 146:4,17,
20 147:10
149:22 150:11
151:4 152:10
153:4 155:8
209:24

decide 174:15
190:16

decided 54:14
168:2,9,18

deciding 108:7
205:15

decision 53:22
104:5

decisions
54:12 209:13

deck 214:1

decks 215:11,
14

deem 123:19

Deere 10:19
11:4,7,11,14
48:7

degree 43:9,

14,17,24 44:22

degrees
162:14

delay 115:5,9

delete 170:14

denied 19:25
23:10

denying 24:8

department
41:10 94:8

departure
241:23

depend 76:4
90:14

depends 64:6
74:8 78:5 96:23
98:10 102:13
103:25 170:8,9
225:9 226:9,10

deposed 8:11
37:12 42:20

deposition 6:9
8:14,19,23
9:13,24 10:4
23:17 31:10
33:11,23,25
34:6,13 35:6,25
37:19 38:23
41:19,24 51:17
92:22 106:9
110:2 118:12,
16 119:1
126:22 129:21
138:11 140:3
150:3,23 152:1
155:2 176:14
191:7 210:4
238:18 243:22

depositions
37:7,11 83:20
93:8

depth 54:8

describe 32:12
37:11 43:21
66:22 157:2
196:6 206:3

describes
97:8

14,17,24 44:22

degrees
162:14

delay 115:5,9

delete 170:14

denied 19:25
23:10

denying 24:8

department
41:10 94:8

departure
241:23

depend 76:4
90:14

describing
24:25 196:4
205:25 232:18
233:2,9,10

designed 88:4
169:15

detail 185:8
211:8

detainee 58:21
59:14 157:9
158:19 192:21
235:9 236:15
241:8

detainee's
158:16

detainees
224:24 230:11,
17 231:19,23
232:6,19 233:3,
9,11,16 234:9,
20,25 235:4,5,
10,12 236:3
237:4

detains 228:8

detect 169:15
170:12

determine
162:3 167:21

determining
172:1

develop
235:25 237:13

developed
236:3

development
170:1,2

diabetes 94:18
95:2,14

Diabetic 241:1,
15

diagnose 44:2,
5,9,10 56:23

diagnosed
79:23 89:5

diagnoses
67:1,13,15
68:19,20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

108:20 200:16
201:12

**diagnosis**
66:2,21,22
67:3,5,16 68:6,
10,12,13,15,23
69:3 70:8,11,
16,18 71:3,10,
14 72:5,9,16
75:15 76:19
81:6,19 82:24
83:8,11 89:25
91:3,6 92:13
102:21 103:1
106:4 109:1
111:12 115:20
158:11,16
162:24 163:1
165:23 172:2
174:4 186:24
187:13,16,18
189:5,23
190:15 197:14,
24 198:1,10,24,
25 199:12
200:9,12,17,24
201:16 209:9
231:25 232:4,
15 239:21

**diagram** 84:24

**diaphoresis**
27:20,23 28:2
159:6 193:9

**diaphoretic**
27:21 179:22
180:4

**diastolic** 202:5

**die** 80:6

**died** 40:2

**diet** 94:18 95:2

**difference**
43:21 66:20
230:5,7 231:2,
23 232:3,18
233:8,9 234:8

**differences**
232:21

**differential**
67:1,3,5,16
68:6,10,12,23

69:2 70:8 71:3,
10,14 72:5,8,16
81:6 82:23
89:25 91:6
92:13 102:21
106:4 111:12
115:20 158:11,
15 160:16
162:24,25
165:22 172:2
174:4 186:23
188:5,6,15
189:5 190:14
197:14 198:1,
25 199:11
200:9,24 201:4,
15 209:9
231:25 232:4,
15 239:21

**differently**
87:11 219:5

**difficulty**
205:25

**dinner** 147:5
148:21

**direct** 8:7 57:1
119:3 162:20

**directing**
118:6

**dis** 24:24

**disciplinary**
54:21 56:20,22

**discipline**
54:3,15,17
56:21,23

**discomfort**
84:12,21 87:20,
21 90:8,17
97:15,19 98:5,
8,12 99:1
100:5,23 101:1
111:9 112:15
113:3

**discovery**
58:20 150:4

**discretion**
52:25

**discuss** 40:20
84:11

**discussed**
20:6 22:1 23:18
30:1 33:10 34:9
37:6 39:22
54:7,10 57:3
85:11 88:9
140:21 159:24
208:17 212:2
240:8

**discussing**
20:22 39:21
110:13 158:11
218:10 225:10
229:14

**discussion**
90:21 205:20
220:7,13 234:3

**discussions**
10:5 229:15

**disease** 63:1
158:5,20
164:17 187:8,
24 200:20
225:6 236:12

**dissipated**
85:16,21

**distinction**
60:22

**distinguished**
230:13,19

**District** 6:14

**dizziness**
111:23 191:25
193:14,19

**dizzy** 182:5
193:22

**doc** 33:4
117:19

**doctor** 64:4
165:4 216:20,
23 217:2,18
218:19 219:19
220:14,15
229:3,9 230:6

**doctor's**
218:16

**doctors** 62:5
117:2 121:16

217:16 218:4

**document**
83:15 84:2,6
97:9 110:24
116:13 118:13,
15,19,25
121:15 129:18,
20 137:17,24,
25 138:7,10
139:17,25
140:3 142:19
154:11 155:1
173:7,9 176:14
210:1,3 214:9
218:9

**documentatio
n** 54:11

**documents**
15:12 21:16,19
23:15,23 24:22
26:15,20 28:21
31:21,22 32:3,
13 33:9,22
39:17 41:23
58:22 61:6
64:12 118:7,11
120:23 155:11
208:8,11,15
209:15 214:1

**dose** 62:25
141:20 142:15
145:11,23,24

**dot** 152:22
153:1

**dots** 153:4

**doubt** 159:9
224:20,22

**Doug** 7:3 20:23
33:6 92:15
118:22 129:25
137:16,21
150:13 170:20,
22 172:17
173:8,12
184:25 216:16
242:14,21

**Doug's** 140:2

**drop** 142:14
144:8 145:11

**drug** 133:12,14
134:1 231:9

**drugs** 88:2
231:6

**due** 127:2

**dull** 195:22

—— E ——

**e-** 209:24

**e-mail** 33:13,16
138:13 142:23
149:5,7 155:11
207:23 210:20
211:19 240:15

**e-mailing**
41:14

**e-mails** 149:11

**E-P-O-C-R-A-
T-E-S** 63:8

**earlier** 41:2
57:8 134:4
137:23 140:20
158:12 164:13
165:23 174:21
182:22,24
203:16 206:14

**early** 52:16

**easily** 198:4

**Eastern** 138:2
139:14

**edit** 171:8

**editing** 169:3,
22 170:3,11
171:11,12,24
172:8,15,16
173:6 174:1

**education**
44:1 63:17
230:2

**effect** 8:19
197:2 225:21

**effective** 116:3

**elapsed** 183:8,
11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

electrolytes
212:5

electronic
60:6,8,10,13,
14,17 61:3,8,
10,13

electronically
61:5,6 139:8

elevated 16:1,
2,12 29:15,16
30:16,25 158:5
179:6,11
188:24 202:2
206:6

elicit 123:7

else's 147:11

emergency
79:5,6 212:19,
25 239:2

emergent
72:13 74:5
91:7,20 226:2,
11

emergently
79:7 222:24

employed 52:1

employees
11:14

employment
36:9 51:23
63:25

encountered
223:19 224:8
228:8 235:13

encountering
225:4

encounters
235:5

ending 217:12

ends 213:21

endurance
9:24

ensure 103:13

entail 47:4

enter 65:15

entered 61:5
137:23

Enterology
45:7

entire 12:10
84:6

entitled 9:23
39:5,11 106:17

entry 14:5
60:20 61:8,19

envelope
59:15

episodes
98:17

Epocrates
62:24 63:3,4,9

equipment
76:1

essentially
36:14,19

EST 139:11

Estate 6:11

estimate 39:6
50:22 228:11
235:3 236:14

estimates
39:11

et al 6:13

Evaluate 44:7

evaluated 79:7

evaluation
59:20 65:1

evaluations
44:7

evening 16:8
17:10 146:20
148:14,15
155:8,19 159:2
161:15 198:17

event 17:21
79:3 157:21
190:7

events 15:15,
18 16:21 118:9
153:23

eventually
208:11

Evers 52:13

evidence
89:11 223:24
241:12

Evidently
161:17

exact 220:21

exaggerating
125:13

exam 44:13
66:25 67:2

EXAMINATIO
N 8:7

exams 44:8

exception 41:1

exceptions
227:25

exchanged
31:4 149:11

exclude
111:13 168:7
177:9 183:9,18
187:1 204:11,
19 205:4,10

Excuse 156:4

exercise 95:2

exhaustive
72:3

exhibit 32:17,
23 83:16,17,22
84:25 94:7,12,
15 97:1,5
110:12 112:4
114:3 116:14,
20 118:14
120:1,4 121:8
126:21 129:19
130:5,7,8
132:18 135:25
137:14,15
138:1,4,8
139:1,24 154:4,
11,25 156:6
157:25 185:11,
12 192:9

201:20 209:21,
22,24 210:14
213:16,19
214:5 216:13
217:11 229:2
238:23 240:14

exhibited 90:7

exhibiting
85:2 86:6
115:18

exhibits 32:19,
25 83:19

expect 8:13
38:24 180:24
185:20 193:20
195:6 204:14

experience
63:18 188:12
197:3 224:23
227:15 228:4,
13,17 230:2

experienced
191:14 196:22

experiencing
69:12 81:24
86:21 87:13,20
88:9 99:3
105:1,14 107:9
108:24 115:11
117:20 155:20
156:2 157:17,
22 158:1 162:5
163:19 168:3,8
177:11 180:12
191:21,25
192:3 195:15
197:4,10 200:4
204:12,17
206:21 235:23

expertise 37:6,
11 56:4

explain 232:3

explanation
197:7

explore 183:22

exponentially
200:8

expressed
87:11 127:6

expresses
125:11

extended
49:11 109:8

extent 11:19
12:4 158:17
175:4

extremely
79:3 87:17
141:6 176:16

F

facilities 11:7

fact 7:20 15:21
37:21 85:15,19
104:25 105:2
163:22 204:9,
16

factor 93:21
94:5,25 95:7,
13,14,16,23
96:1,19

factors 94:16
237:24

facts 89:11
223:24

failure 56:23
96:9,13,15,18,
23 127:17
128:1,13,19,24
129:11,16
130:7 159:18
206:23 207:10

fair 21:15 74:13
233:15 234:9

fairly 17:16
44:15 109:9
236:20

familiar 60:21
66:11 241:6

families
153:10

family 42:15,16
76:17 88:3 96:3
108:20 109:2
146:19,24,25
147:2,8 149:3,5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

153:8,9,19

**farther** 28:6

**fast** 110:10

**faster** 79:23

**fax** 155:11

**features** 139:7

**feel** 76:5,6
90:16,23
171:22 172:11
178:17 188:14
190:7 193:22
201:3,7

**feeling** 140:11
144:14,15
169:14

**fell** 177:17

**felt** 175:9
178:24 180:22

**Fennigkoh** 7:6
17:24 20:4,18,
19 21:2,3,8,24
26:10 41:2
119:12 161:14
208:20 209:25
210:21 211:22
240:15 241:19

**festive** 153:9

**fewer** 38:25
39:1

**field** 56:7,10

**figure** 151:3,6
167:5 219:1,6
220:18 232:11,
12

**figuring**
139:13

**file** 58:22 59:4,
13,15 60:19

**files** 59:18
60:14

**fill** 57:21 59:23
61:11 154:15
156:13

**filled** 59:1,25
135:23 154:21
156:21,25

206:19 207:7
241:21

**filling** 49:15

**find** 156:5
172:6 174:9,16,
18 209:14

**finding** 77:4

**findings** 67:2

**fine** 30:13
32:21 94:14
97:9 179:13
190:25

**finish** 9:8

**finished** 9:7
15:8 43:9

**finishing** 9:6

**firm** 6:20,24 7:3

**fit** 68:19

**fits** 75:15

**flag** 67:24 68:7

**flags** 67:22
68:5

**fleeting** 98:17

**focus** 220:15

**folder** 60:3

**folks** 49:15
58:16 216:3

**follow** 150:20
228:24 238:5,7

**form** 11:18
12:3 13:5,25
14:20 23:5,19
26:24 39:13
50:24 57:22
59:17,23 61:10,
14 67:20 73:1
74:17 78:3,9
79:14,21 80:2,
21 81:18 82:8,
13 83:2 85:18
86:4 88:12
89:10 91:8
92:14 94:2
96:2,11,20
97:17 99:6
100:1 103:15

105:4,9 107:2,
11 108:3,12,13
111:15 116:5,9
117:10,23,24
120:12,25
121:21,24
122:8,12
126:20,24,25
127:5,13
128:12,15,22
130:18 131:14
132:2,5,6,7,10
138:21 146:1
154:14,21
156:5,9,12,15,
22,25 157:4,14
158:14,22
164:17 168:24
169:6 170:11
171:12,19,24,
25 172:3,8,15,
16 174:2,3,5
181:4 183:24
192:8,17
193:24 194:14
195:2 198:19
206:19,24
207:7,17 211:4
213:2 217:24
220:22 223:23
229:25 234:11
236:7 239:14,
19

**formal** 41:15

**forms** 57:23
60:20 61:8,13
170:7 171:8

**Fort** 45:18,19

**forums** 56:14

**forward** 68:22
92:25

**found** 23:3
24:13,16 38:9
133:9 134:5
135:15 136:24
161:7

**foundation**
13:25 61:14
80:23 81:10
111:16 121:24
128:16,17
129:1 132:14

135:13 137:12
164:2 165:13
184:12,21
187:4 189:8,11
193:25 194:19
206:25 207:15
218:9 219:20
220:2 221:5,13,
19 222:10
224:16 226:15,
22 230:15
231:4 232:20
233:12,19
234:10 239:3,
22 242:1

**fourth** 84:21

**fracture** 76:14
77:5,12,17,20

**fractures**
76:20 77:9

**frame** 12:7
83:11 129:2
237:3

**free** 189:3
217:2,16
230:14,18,19
231:3

**Friday** 47:25

**frivolous**
92:17

**front** 110:15
118:19 132:19
138:6 155:1
216:4 232:6
240:16

**fulfilling**
138:19

**full** 11:23 21:4
22:2 47:20
161:4

**full-** 46:21

**full-time** 48:10
148:5

**function**
213:12

**G**

**gamut** 236:17

**gas** 71:18
72:20 73:22,25
99:18

**gastro** 45:6

**gastroenterol
ogy** 45:5 46:4,
13,25 47:6 56:5

**gather** 69:3,23
70:22 119:17
122:6 125:6,23
126:2 130:24
155:23,25
157:21 160:16,
19 162:17
163:2 180:8,11,
16 183:23

**gathered** 70:5,
24 72:2 156:14

**gathering**
69:20 156:6
162:16,21

**gave** 15:25
16:9 28:16
30:14 36:9
38:15 77:21
142:1 158:19
179:8 202:15
204:18 209:7
237:23

**Gaynor** 7:4

**general** 55:6,
23

**generality**
160:23

**generally**
117:2

**gist** 230:20

**give** 8:2,18
15:22 16:7
21:13 30:12
32:15 35:5
38:22 58:14
66:12 70:21
104:4 118:20
126:13,18



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

131:9 141:20
142:1,15,25
143:9,15,20
158:17 161:5,
11 182:2 185:7
201:21,22
203:7,17,19,20
217:6 243:8,10

**giving** 33:25
37:7,19 62:25
203:18 237:24

**goal** 67:16
217:22 218:16

**goals** 222:4

**God** 177:16

**good** 6:19,23
8:9 51:12
109:17,21
110:5 165:8
188:16 190:23
234:14 240:7

**governing**
10:3

**governmental**
52:6

**governor**
52:13,25

**great** 51:11
110:8 118:22
129:25 228:17

**greater** 96:9

**Gregory** 6:10

**ground** 198:6

**grow** 42:24

**grown** 147:21

**guard** 125:19,
25 126:3,8
130:14 131:10,
12 154:15,19
155:25 156:13,
19,21,24 157:2
159:1,16,17,20
162:13,20
166:9,16,19,24
167:20 168:3
174:22 178:3,
14 180:21,24
181:5 182:11,

16 186:7
191:13 192:22
193:21 196:1,9
202:11

**guard's** 203:21

**guards** 30:24
124:5 144:24
145:5,13
162:13,17
195:6 196:6
204:1

**guess** 32:18
40:14 46:8,18
47:18 73:16
74:8,9 98:11
127:22 216:25
218:1,2

**Gundersen**
46:12,15,22
47:13,14,23
148:5,10

**guy** 93:10

———

**H**

**habit** 146:12
147:1,4

**hair** 149:18

**half** 16:4,11
30:15,21
109:15,17
142:2 143:1
179:10 188:21
202:1,21
204:10,18

**Hallman** 210:1

**hand** 7:25
60:16 63:14
97:10 112:3
240:20 242:2

**handed** 214:18

**handle** 231:20

**handwritten**
60:18 65:7

**handy** 154:7
215:1

**Hansen** 6:24

**happen** 37:22
80:25 81:1 89:3
152:12

**happened**
28:20 105:6
208:9,10 209:3

**happening**
242:17

**happy** 190:4

**harassing**
173:2

**harassment**
93:5,9 172:23
173:1

**hard** 9:19
11:22 221:20
239:4,11 240:3

**harm** 75:4,5,8
77:13 79:9,10

**head** 9:19

**headache**
189:16

**headaches**
165:16 189:15

**health** 10:20,
22 11:5,8 35:1
44:24 47:14
94:8 148:5
217:21

**healthcare**
6:13 7:5 214:13
229:10,13
230:1,7 231:10
232:22 233:18
234:13

**Healthline**
116:14

**healthy** 109:4
216:23 219:13
221:3 222:6

**hear** 67:21
105:19

**heard** 8:10
19:2 130:22

**hearing** 54:9
207:2 239:25

**hearings** 54:5

**heart** 28:18
29:3,17 54:25
55:4 78:2,6,10,
13,17,18,20
79:2,5,12,17,
18,25 80:7,8
81:4,13 82:1,7,
17 84:1,7 85:2,
6,10,12,17,23,
24 86:3,8,14,21
87:2,15,16,18,
23 88:5,8,10
89:4,9,16,20,
23,25 90:8,10,
16,23 91:2,4,15
93:17,22 94:4,
5,16 95:6,7,13,
16,23 96:1,7,9,
10,13,15,18,19,
22,23 97:2,6,
11,14,20 98:1,
3,5,7,21 99:2,5,
9,12,24 100:7,
13,15,20 101:2,
4,9,15,16
102:14,18
103:4,8,10,12
104:10,17,21,
23 105:3,5,11,
12,15,24 106:2
107:9,15,22,23
108:1,11,23
109:2,3 110:20,
23 111:2,3,5,13
112:1,5,14,22
113:2,9,11,15,
20,25 114:18,
19 115:1,2,12,
16,18,22 116:1,
3,8,12,17
117:1,2,6,9,13,
17,21,22
127:17 128:1,
13,19,24
129:11,16
130:6 158:20
159:18 164:16
165:4,11,19,25
166:3 167:8,11,
16 169:16
170:12,16
175:14 177:11
182:1 186:16,
19 187:2,8,9,

20,24 189:20
190:1,3,6
197:10,23
198:3,14 200:4,
7,20,22 204:5,
6,13,20 205:4,
10,17,18
206:23 207:3,
10 239:8,20

**heart-related**
81:20

**heartburn**
109:1

**helped** 26:15
145:23 203:10

**helpful** 32:19
156:6,15,16
170:5,15
188:17

**helping** 172:1
188:17

**Hendrickson**
7:1 42:2 209:25

**hepatitis**
222:2,9,12,16
223:1,6,8,20,21
224:9,12,14
225:4,11,12,14,
17,20,22,23
226:3,5,12,13,
19 227:11,24
228:9,18,20
234:20,23
235:4,13,17,18,
23 236:1,5,20
237:5,10,19,22
238:2 240:8

**hepatology**
46:5,13 47:6
56:5

**hey** 40:15

**hierarchy** 44:1

**high** 18:10,15,
18 20:12 22:25
25:5,13,15,21
43:1 93:21
94:3,17 95:1,5,
7,15,20,22
96:5,6,8 117:12
119:6 120:11

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

122:2 128:10
130:9,17 132:3
140:17 141:2,6,
8,25 142:25
143:1 144:12,
13,20 162:7
164:17 165:4,
11 174:21
175:11 176:16
179:2,3 183:15
184:4 188:4,6,
14 189:2,20
201:3 239:6,8

**higher** 72:13
200:20 203:4

**hindsight** 14:3

**hire** 229:3
230:6

**hired** 213:5
229:23

**hires** 213:9

**history** 11:23
14:13 15:24
22:4,12,14,18
51:24 53:21
58:17 59:24
68:8 69:21,24
70:7,13 71:1
72:17 76:16,17,
18 87:10 88:3
96:3,4,13,14
103:7 108:20
109:2 119:13
120:18,23
123:15 124:13,
16,18,24
125:25 126:16,
18,19 128:3,24
130:15 131:22
136:23 140:23
156:1 157:9
158:5,16,17,20
159:17,22
160:5,6,10,14
161:5 162:5
163:3 165:24
166:10 180:9
183:11 187:8,
23 190:3 206:1,
3,13 207:3,9
208:9,10,15
234:25 235:2
239:8

**hold** 209:23

**holidays**
153:16

**home** 62:17
146:5,6,10
147:12,13,18
151:9

**hope** 110:8
241:21

**hoping** 241:4
242:8

**hospital** 10:23
11:3 19:8 43:25
47:11,20 48:4
60:22 120:6
136:21 211:17
212:5,12,20
236:10

**hospitalizatio
n** 208:18

**hospitals** 11:1

**hot** 140:11
141:10 144:14,
20

**hour** 16:4,5,11
30:15,21 50:7
92:13 109:15,
17 139:19
142:3,13 143:1,
7,13 179:10
188:21 198:4
202:1,21,25
204:10,18

**hour-** 109:6

**hours** 47:23
48:1 50:4,12,19
74:10 78:14
79:19 80:1,4,9,
19 81:14 88:10
89:9 99:10,14,
25 113:20,21,
25 114:2
154:19,20
160:10 168:6
175:16,21,24
179:4 189:7,10
205:3,8

**house** 147:4,
11

**housed** 205:22

**houses** 147:9

**Human** 94:8

**hurt** 30:13 73:7
179:9 203:19

**husband** 42:17
43:8,13 45:17
147:15 148:25
153:19

**husband's**
146:25

**hypothetical**
73:23 80:4,23
81:9 83:6
86:12,23 87:8,
25 90:13 91:11
92:5 96:12,16,
18 98:24 99:7
100:2 102:23
103:17,24
106:6 108:14
111:17 115:14
116:10 169:6
172:10,11,13
187:5

---

**I**

**idea** 124:17
129:3 203:20
205:21 228:12
235:16 241:15,
17

**identical**
139:18

**IDENTIFICATI
ON** 83:22 94:12
116:20 214:5

**identified**
22:9,10 25:13
72:7 227:24

**identifies**
100:17

**identify** 67:17
68:6 70:12
131:17 144:24
148:8

**identifying**
231:2

**ill** 125:11

**Illinois** 6:22
31:19 213:6

**illness** 154:6,
14 222:22
237:11

**illnesses** 44:3

**illustration**
215:20

**imaging** 75:21

**immediately**
74:2 75:22,23
78:18 103:19
167:7,10,13
173:24

**important** 8:22
9:1 69:23 71:9
75:2,3 77:19
81:19 86:7 87:3
88:7 89:8,12,
14,20,24 90:10
123:18,20,22,
23 124:4 128:9,
14,25 157:20,
25 158:4,9,10,
15,19,21
165:11 178:10
200:23 205:15

**impression**
38:6

**impressive**
55:13

**improper**
194:7

**improved**
203:6

**improving**
179:3 188:19

**in-person**
214:19,22
215:15

**inability** 22:1,3

**inaccurate**
39:10 40:15

**inappropriate**
242:10 243:2

**inaudible**
151:11

**incarcerated**
237:14

**incarceration**
223:18

**incident** 34:17
35:8 36:15
37:16 208:4

**include** 59:19,
22 79:10,11
94:17

**included** 210:5

**includes** 58:25
59:20

**including**
76:16

**incomplete**
80:4,22 81:9
83:6 86:12,22
87:7,24 90:13
91:10 92:5
96:12 98:24
99:7 102:22
103:16,24
106:5 108:14
111:17 115:14
116:10 187:4

**inde** 22:7

**independent**
15:1,6,10,14
21:18,21 22:8,
13,21 23:13,17,
21,23 24:3,8,
12,23 25:1,8,
10,11,12,16,23
26:9,18,21,22
27:14,16 28:5,
19,23 29:18
30:2 39:1,12
41:18,22 44:24
64:7 118:4
142:18 158:25

**independently**
27:2 28:7,24
29:2,5,9,14

**indicating**
67:12 101:5
135:25 176:14

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

241:19

**indication**
12:23 134:2
136:22 152:12,
15,16 165:18,
25 231:9

**indications**
76:14 165:21

**indicative** 67:9
85:3 86:14

**indicator**
118:2

**individual**
87:11 170:8
223:4

**individualized**
170:8

**individually**
104:4

**individuals**
87:13,16

**inference**
230:12

**inferring**
142:19

**inflammatory**
115:24,25

**infographic**
83:25

**inform** 139:2
180:22

**information**
14:4,7,12,22
15:23 24:18
26:20 28:25
29:2,6,8 30:3
31:4 36:4 69:3
70:13,23,25
104:4 119:17
120:16 122:6
123:8 124:5,25
125:2,7,9,24
126:3 127:13,
19,24,25 128:4,
23 130:24
131:5,9 139:8
141:4 154:15
155:24,25

156:7,14,16
157:3,20,25
158:10 159:8,
14 160:14,16,
20 161:8 162:8,
10,12,16,18,21
163:2 177:14,
15 178:3,14,18,
20 180:8,11,16
183:10,22
184:1 197:12
199:13 201:18
206:15,16
208:18 209:12,
13,16 211:5,6
214:11 227:23
231:17 238:25
239:13,16,18
240:6

**informed**
132:3 217:1

**inhaler** 176:23

**initial** 229:20

**initiate** 40:12,
14

**initiated** 40:1

**injured** 11:15
121:15

**injuries** 58:8

**injury** 76:24

**inmate** 59:25
145:3 217:22
218:7,12
219:15

**inmates** 66:11
217:1,15 218:4
219:8,18
224:11,14
227:1 234:5,8

**inpatient** 47:10

**inpatients**
66:11

**inquire** 173:23

**inside** 222:13

**instruct** 106:16
143:18,22
144:1,6,9 171:3
221:21

**instructed**
120:19 231:24

**instructing**
30:24 39:9
143:20 150:13,
15,18,20

**instruction**
134:3 201:22
202:15 204:23
233:24

**instructions**
30:7,9 31:4,8
38:21 120:15
132:22 143:13
150:9 237:10,
21

**instructs** 9:15
106:10

**intake** 15:21,25
58:25 59:2,20
118:14 182:21

**intense**
113:13,16

**interaction**
64:22

**interactions**
64:21

**interested**
38:13 53:3
112:10 114:7
116:17 240:19

**interrupt** 73:14
93:2 171:1
180:3 188:11

**interview**
235:6

**intoxicated**
161:25

**introduce**
213:15

**introducing**
213:18

**Introduction**
214:13

**investigated**
92:7

**investigation**
41:15

**involve** 98:8

**involved** 55:4,
10 56:20

**involvement**
53:15,17

**involving**
15:15 56:22

**Iowa** 49:8
50:15 52:17
64:7 148:22
153:20

**irrelevant**
14:10 170:4

**issue** 62:3 76:5
79:11 221:18

**issues** 21:25
56:20,22 119:9
127:2 140:7
239:7

**item** 121:14

**itinerary**
215:1,8,15

--- J ---

**ja** 48:25

**jail** 12:2,9,10,14
13:4,11 14:5,17
15:15,20 16:15,
23 17:9 19:5,9,
13 27:3 36:20,
23 37:1 42:21
48:19 49:22
50:6,11,14
57:6,11 58:5,21
59:7,10 61:22
62:23 64:17
65:10,12,16,22
118:5 122:15
134:10 136:12
138:17 144:21
148:14,15
152:14 154:22
155:16 156:10
160:11 187:10,
12 188:13
190:3,4 197:3

205:22,23
212:15,17,20
213:1 217:18,
23 219:5,10,19
220:20 221:23,
25 222:3,4,9,
13,16,18,24
223:2,6,11,17,
20,21 224:9,11,
19 225:4,21,23
226:1,3,6,17,
21,24 227:1,4,
9,24 228:8,22,
25 229:16
230:25 231:3,6,
19,23 233:3,10
235:6,14 236:6,
13,15 237:5,19,
22 238:2,3,5
240:10

**jail's** 225:16

**jailer** 167:2
177:13,16

**jails** 36:17
48:15 49:17
50:16,25
155:15 224:24
236:15

**Janesville**
43:2

**jaundiced**
236:11

**Jaw** 84:18

**Jeffrey** 42:7

**job** 36:10,13,
14,18,19,22
44:23 45:3,19,
25 46:2,6,12,
17,18,22 47:4
48:7,10,12
49:4,9,11,18,
19,20,25 53:1
75:24 138:19
148:4,5 232:3,5

**jobs** 49:16

**John** 6:23
10:19 11:4,6,
11,14

**join** 55:11 78:4
82:9 83:4 86:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

96:21 99:7
117:25 132:15

**Joined** 12:21
13:16 74:18
75:12 220:3

**judge** 145:18

**judgment**
118:2 124:8
145:20,21
174:14 178:18
187:14 188:2,4,
12,14 189:3,19
190:6,16 197:4,
11,20 198:8,24

———

K

**Kentuckiana**
6:5

**Kentucky** 6:7

**kill** 77:23 78:2,
7,13,17 80:18
81:14,16 82:25
83:12,13 88:10
89:9 189:6,9
200:25

**kind** 59:12,16
90:15 218:24

**kinds** 165:17

**knew** 13:17
63:17 115:15
178:25 183:2
187:24 205:13
212:25 231:12
234:22 235:2
239:7 242:23

**knock** 189:3

**KNOT** 98:23
151:8

**Knott** 7:3,4,9,
12,14,22 11:18
12:3,16,20
13:1,5,14,21
14:1,9 15:8
16:17 20:21
23:5,19 26:13,
24 32:6,9,15,
20,22 33:2,7,
12,19 35:15,18,

20 39:8 41:17
50:24 51:9 70:2
71:12 73:1,8
74:17,24 75:6,
11 76:3,9 78:4,
9,16 79:14,21
80:3,12,21 81:8
82:9 83:2,5
85:13 86:11,24
87:6,24 88:12,
17 89:10,22
90:3,12,18,25
91:9,16,23
92:4,10 93:2
96:11,20 97:17
99:6 100:1
102:22 105:4,9,
19 106:5,13,15
107:1,11,19
108:4,12 109:6,
12,16,19,21
111:15 115:13
116:9,21
117:25 118:20
121:24 128:5,
16 129:1,9,23
130:18 132:6,
14 135:13
137:12,18
138:1,24
139:23 145:8,
17,22 148:16
149:25 150:2,
15,18 151:2,11,
19 152:19
154:9 156:4
158:22 159:11
160:12,21
163:4,14,20
164:2,19
165:13,20
166:11 169:6
170:6,18,21,23
171:1,6,14
172:4,18,22,25
173:5,11,15
174:5 175:4,22
176:5 180:3,14,
18 181:7,11,20
183:24 184:6,
12,20 185:2,11,
15,17 187:4,21
189:8,11
190:18,20
191:1 193:24
194:5,18 195:9,

16 196:11,17,
24 198:4,19
199:2,4 200:10
201:1 206:24
207:11,15,21
210:9,11 213:2
216:13,15,17
217:6,9,13,24
218:8 219:20
220:2,23 221:5,
12,19,24
222:10 223:23
224:2,6 225:7
226:7,14
227:16,19
228:15 229:25
230:15 231:4
232:20 233:12,
19 234:10,12
237:6,20 239:3,
22 241:10,25
242:11,16,20
243:15

**knowing** 81:3
135:21 178:18
198:21

**knowledge**
70:9 123:4
139:3 164:8
218:9 226:15

**kosher** 209:3
210:23

———

L

**La** 46:12 47:2,
21

**lab** 75:21 212:9

**lack** 94:19

**lacked** 80:23

**lacks** 81:10
111:16 206:25
242:1

**lady** 187:6

**laid** 106:8

**large** 214:10
231:13

**larger** 213:20

**lasted** 38:19

**lasting** 77:15

**lasts** 52:15
98:13 236:23

**law** 6:24 7:3
8:20

**lawsuit** 42:11,
14,19

**lawyer** 9:15
10:6 33:24
34:5,8 106:10
118:11 213:25

**lawyer's** 139:7
150:9

**lawyers** 9:12
10:4 42:14 54:9
155:5

**lay** 106:15

**lead** 68:2 77:17
78:18 81:4
99:23

**leading** 179:7

**learn** 42:10

**learned** 24:19,
20 107:17
134:19 175:8
186:24 240:10

**learning** 24:13

**leave** 52:16
77:15 204:23

**leaving**
240:10,12

**led** 205:20

**left** 51:21
61:15,16 64:15
84:25 85:4,6
87:21 97:10
98:8 114:4
135:25 155:16
186:12,25
187:19 189:19,
25 192:9
199:19 240:20

**legal** 9:13
11:19 12:5

**Leib** 7:4

**letters** 239:1

**library** 63:12

**licenses** 53:13

**life** 62:14
114:5,20

**lightheadedne
ss** 84:16 111:23

**likelihood** 77:5
177:10 188:9,
10

**likely-** 105:18

**limit** 114:19
115:1

**lines** 131:19
214:8 240:20

**Lisa** 6:10 7:18,
20 51:17 110:2
140:17 141:19
142:5 143:6
152:1 191:7
211:12 238:18
240:24 241:3

**list** 21:4,9 22:2
23:3 24:25
71:4,5,14 72:3,
11,14,19,25
73:5 75:2 89:15
91:5,6 100:8
120:5 134:15,
19 164:12
188:6,15 189:2,
4,20,22 190:14
197:17 199:10
200:24 201:4
237:23,24

**listed** 100:5
104:16 157:24
184:19 195:2
218:5 219:24,
25

**listen** 173:12

**listing** 197:15

**lists** 130:9

**literally** 59:14

**literature**
62:22 63:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**live** 22:17
45:20 121:11,
16 122:4 125:4
126:9 129:15
130:23 131:12,
23 147:18
148:20 153:19,
20,23

**liver** 235:25
236:4,12

**lives** 148:22,23

**located** 6:6

**location** 6:17
185:10 186:8

**locations**
47:15,17

**Loevy** 6:20

**logistically**
58:4

**long** 38:19 39:6
45:1,10,22
46:2,6,14 50:10
52:14 94:9
109:9 112:9
116:16 149:19
166:17,24
167:5,21
168:21 169:4
170:13 173:20
183:8 222:22
224:15 236:14
237:25 243:14

**long-term**
227:7

**longer** 73:15
98:21 99:5
148:10 153:7
237:14

**longest** 236:18

**looked** 31:11
41:18 54:11
144:7

**loose** 60:3

**Lord** 175:3

**lot** 38:1 62:24
76:18 88:1
154:18 215:9

**Louisville** 6:7

**low** 68:7 77:5
117:14 197:15,
17 212:7

**lower** 188:10

**lowering** 145:7

**LPN** 55:24 56:7

**lunch** 109:11
110:6,13

**Luther** 43:7

———————

**M**

**made** 54:12
73:4 125:8
142:9 188:23
209:11,13
223:10

**Madison** 6:25
55:21

**mail** 209:25

**main** 6:6 49:25

**Major** 94:16

**make** 8:15 9:9,
16,21 10:1,6
53:8 65:1 70:10
71:4,5 72:3
74:19 75:9
81:19 102:25
104:5 105:8
129:18 144:8
173:13 183:22
188:7 197:16
198:24 200:19
211:12 218:14
233:13 234:14,
15 240:18

**makes** 60:23
125:17 186:21,
22

**making** 53:5
62:25 68:14
70:15 76:19
91:5 92:15,16
124:8 189:23
198:8 203:6

**male** 189:24

**malingering**
125:13

**Malloy** 240:16

**manage** 11:2

**manageable**
129:19

**manifestation**
80:9 81:15

**manila** 59:15

**manner** 49:19

**MAR** 23:8
24:15 140:17
164:4

**March** 6:8
51:19 110:4
152:3 191:9
238:20

**marginal**
214:8

**mark** 83:17
94:7 116:13
172:19 173:16

**marked** 83:22
94:12 116:20
137:18 154:4
209:21,24
213:19 214:5

**married** 43:8

**MARS** 57:20

**master's**
43:10,19

**materials**
32:22,24 33:15

**math** 46:8

**matter** 6:10
74:10,11 78:13,
14 173:23
202:20

**matters** 114:23
115:5 156:12,
14

**Mayo** 45:25
46:3

**Mccauley**
6:23,24 12:21

13:16,25 14:20
51:12 59:17
61:14 66:15
67:20 74:18
75:12 78:3,8,
15,22 79:4
80:2,11,14
81:18 82:8,13,
19 83:4 85:18
86:4,10,22 87:5
90:2,19 91:8,17
94:2 96:2,21
99:7 103:15,23
107:2,12,18
108:3,13
109:20 111:18
116:5 117:10,
23 120:12,14,
25 121:21
122:8,12
128:15 131:14
132:5,15
138:21 146:1
158:14 168:24
220:3,22 223:8
224:16 234:11
236:7 238:11
243:8,13,19

**Mccoy** 45:18,
19

**meaning** 63:24
79:19 101:4
200:17 218:3
232:8

**means** 8:25
36:22 97:24
116:3 136:3
142:8 157:13
241:14,16,17
242:9

**meant** 169:17
218:2 242:7,10,
11

**measurement**
30:25 176:7

**measurement
s** 117:22

**med** 57:23
120:5

**media** 215:21

**medical** 11:17,
23 12:1,6,15,
18,25 13:12,18
14:4,13,14,17
15:24 22:3,12,
13,18 23:8
58:17,21 59:4,
13,24 60:10
61:3 62:21
63:6,12 65:2,18
68:2 69:20,23
77:16,18 79:11
87:4 103:7
118:15 119:9,
13 120:4,18,19,
23 123:4,8,14,
15 124:5,13,16,
18,24 125:7
126:15,16,18,
19 127:2,4,12
128:3,23
130:15 131:1,5,
17,20,22
136:21 140:7,
22 155:11
158:17 159:22
160:5,6,10,14
161:5,11 162:4,
14,21 163:3
164:8 165:24
166:10 180:9
183:10,20
188:4 206:1,13,
15 208:15
217:22 218:7
221:18 227:7
234:25 235:2

**medically**
65:23 123:22,
23 124:3
125:18

**medication**
16:7 19:23 21:9
22:2 23:3
24:20,25 44:17
62:25 132:22
134:15 135:8,
17 142:25
160:6 161:6
203:7 228:22
231:6 236:21
240:9 241:20
242:22,25

**medications**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

10:14 15:23
16:2 19:24
20:1,9 21:4,8,
12 22:9 23:3,9,
10 24:9,13,15,
16 25:2 44:2
58:9 104:15
108:21 109:3,4
116:2 119:23
124:21,24
131:23 134:5,8,
11,15 135:15
158:6 182:17,
19 183:14
188:16 228:20,
21 231:20
239:6 241:7

**medicine**
120:5 213:12,
13 218:22

**medicines**
15:22 95:20
120:17

**meds** 19:20,21
119:12

**meeting** 33:24

**meetings**
216:9

**Melissa** 34:25
35:4,10 36:5
39:23 40:4,22

**member** 52:2,
19 53:19 55:23

**members**
55:22

**members'**
147:8

**memorized**
178:16

**memory** 10:13
15:1,10,14
17:20 18:6
24:19,23 25:1,
25 26:2 38:23,
24 39:4 118:5
140:20 184:22,
24 192:7
199:15 209:17,
19 212:1

**mental** 35:1

**mentioned**
18:21 30:6
76:20 92:21
147:16 203:22
234:19

**met** 15:2,4 43:8
54:7,9

**mid-level**
63:20,22

**middle** 17:5

**midnight**
17:11

**mild** 112:15
113:3,13,16

**milligram**
143:10,19,21
144:25

**milligrams**
141:20 144:4
145:6 201:21,
22 204:19

**Milwaukee**
7:4,6,10

**mind** 60:15
65:21 71:4
72:11 88:19
107:10 129:2
137:4 151:8
188:7 238:12

**Minnesota**
46:1

**minute** 20:21
67:16 114:23
115:5 151:15
243:11

**minutes** 39:15
78:14 79:19,25
80:3,9,18 81:14
88:10 89:9
92:14 98:13
109:16 150:16
168:6 175:24
190:25 238:9
243:8,13,16

**Mischaracteriz
es** 89:22 107:3

**misrepresent**
242:17

**missing** 67:18

**misstatement**
237:6,7,20

**misstates**
26:13,25 76:9
160:12 163:15
166:11 175:4
184:6 218:8
223:24 241:10,
25

**misunderstoo
d** 35:20

**misuse** 231:5,
6

**modern** 60:22

**moment** 88:21,
24 140:16
234:19

**momentarily**
36:19 85:16,21

**Monday** 17:11
19:5,10 24:18
41:3 47:25 57:9
120:5 148:11
153:22

**Monell** 223:10

**monitoring**
190:9

**Monroe** 7:1,8,
10 33:3 36:25
48:19,20 49:2,
3,4,9,20 50:10,
11,13,17 51:3,5
57:1,4 60:5
61:1 64:13
122:11,15
152:14 155:16
212:15,17
229:16

**month** 22:17
66:12 121:11
122:4 125:4
126:9 129:15
130:23 131:11,
23 236:24

**monthly** 54:7

**months** 45:3,
25 54:8 61:16
237:1

**morning** 6:19,
23 8:9 21:9
119:14 140:22
146:12,13
155:18 198:5
199:12 208:3

**motivated**
233:13

**motivation**
232:24 233:21

**motivations**
217:4,19
218:12 219:9
230:21

**mouth** 28:12
225:22

**move** 45:20
92:25 110:9
172:20

**moved** 50:15
202:6

**moving** 52:16
171:7

**MRI** 189:16

**multi-day**
213:6

**multi-step**
68:11

**multifactorial**
96:14

**multiple** 10:23
11:1 47:14
71:13,15 75:18,
20 106:21
107:20 108:5
122:10 127:2
159:25 161:3
166:13 168:10
171:17 178:24
183:25 199:4
200:10 212:15
214:23 223:19
224:6,9 225:4
226:8 227:16
228:17 237:8

**multitude**
166:5

**musculoskelet
al** 115:24

**mystery** 68:16,
21 71:2

___

**N**

**named** 240:15

**narrow** 72:15

**natural** 9:2

**nature** 92:12
98:18 104:19,
20 108:8
187:25

**nausea** 84:15
86:15,19 87:20
110:22 111:2,
22 133:21
134:20 135:18,
19 137:2
181:23 182:3
191:22 195:3,7,
14

**nauseous**
189:18

**necessarily**
74:5 76:15
78:19 80:6 82:1
91:12 93:23,25
99:23 135:14
166:3 200:19
231:7

**neck** 84:18
186:5,6 193:6

**needed** 40:19
76:15 133:21
135:18 190:8

**network** 47:14

**nice** 93:10

**night** 17:5
34:2,3,5 148:14
161:9,25 183:1,
7 189:1

**nighttime**
122:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

non- 96:17

normal 8:15,23
9:3 29:19,20,24
96:16 144:9
145:12 176:6
202:14 234:4,7

note 92:16

noted 204:4

notes 18:9
19:18 21:25
61:4,5 65:1,4,5,
7,9,15 119:10
123:14 127:1
213:22

Notwithstandi
ng 237:3

number 6:15
23:24 67:7
82:2,4 84:24
89:15 90:8
121:14 140:7
143:7 154:13
209:22 216:15
217:7

numbers
32:16,18,23
83:21 84:4

nurse 10:20
11:5 14:24
15:21 16:23
36:20 43:19,22,
23,25 44:19,21,
23 52:4 53:5
54:12,13,18
55:18,19,24
56:8,9,16,22
57:21,22 58:3
59:19 62:2
63:19 64:3
66:20 75:25
122:21 123:5
153:15 230:2

nurse's 58:11

nurses 52:3,8
53:4,11,21
54:17,21,25
55:11,15
154:19

nurses' 61:5

nursing 43:9,
16,20 52:5,8
53:12,13,18
54:10 55:3,20
56:1,3,15,21
58:5

---

O

oath 8:16

obesity 94:17

object 9:12
11:18,20 12:3,4
13:5,25 14:20
16:17 23:5,19
26:13,24 39:13
50:24 59:17
61:14 67:20
73:1 74:24
75:11 76:3,9
78:3 79:14,21
80:2,21 81:8,18
82:8,13 83:2
85:13,18 86:4,
11,22 88:12
89:10 90:12,25
91:8,9,17 92:4,
14 94:2 96:2,
11,20 97:17
98:23 99:6
100:1 103:15
105:4,9 107:2,
11 108:3,12,13
111:15 115:13
116:5,9 117:10,
23 120:12,25
121:21,24
122:8,12
128:15 130:18
131:14 132:5,6
138:21 160:21
174:5 175:4
184:6 198:19
206:24 213:2
217:24 218:8
220:22 223:23
234:11 236:7
241:10

objected 92:18

objection
78:8,15,22 79:4
80:11 82:19
86:10 87:5,6

89:22 107:18
195:9

objections
12:16,20 13:6,
14,21 14:1,9
80:12 90:3,18
91:16,23 92:17
107:19 195:9,
16 196:11,17
207:21

objective 69:8,
9,14 70:10,14,
17

objectives
70:6

obligated
106:11

observations
70:6,14 188:23

observe 69:14

observed
226:25

observing
82:25

obvious 14:13

occasional
36:23

occasionally
122:23 153:16

occasions
34:9

occupational
10:20 11:5,7
44:24

occur 61:12
79:18,25 80:8
100:19,21,22
117:1

occurred 17:3
38:12 104:13

occurring
155:7 204:6

occurs 101:1,
14

of- 120:2

off-site 61:24
65:11

office 7:7 48:1
58:5,11 62:18
218:16

officer 62:2
168:16 185:7
203:17

officer's 170:1

officers 14:25
20:8 122:18,24
123:3,8 129:2
162:11 184:7,
16,23 185:3,4,
20 188:23
204:14 206:10

okayed 19:25
23:10

okaying 20:8

on- 61:23

on-call 50:18,
23

Onalaska
153:25 154:1

ondansetron
133:16,17
163:17,18,22
164:1

one's 146:2

ongoing
227:25 229:18,
19

online 6:4

onset 82:6,17

operator 114:8

opinion 57:23
58:15 66:3

opportunity
75:5 81:16

opposed
213:13

option 237:15

options 67:8,
11 104:2

order 69:24
95:12 104:10
163:17 200:24
218:25

ordered
204:18 240:9,
25 241:20
242:8

ordering
240:11 241:7

orders 57:25
241:2,16

orientation
31:12,14 32:2
36:3 40:3 213:8
220:5 229:24
233:24

oriented
229:15

originally
144:16

Ottawa 77:3,7

outpatient
43:25 47:5,8,18
48:3

outsider's
55:14

overly 16:17
66:15 70:2
71:12 73:2,8
74:17,24 75:6,
11 76:3,10
79:22 80:3 81:8
83:5 85:13
86:11 87:7,24
88:13 90:12,25
91:10 92:4
98:23 102:22
103:16,23
106:5 111:16
115:13 116:10
158:14 165:13
187:5 189:11
219:20 220:24
222:11 224:17
226:7,14
228:15 234:10

oversight
54:17



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

overweight 94:17,25

owns 10:22

oxycodone 132:20 133:7,9 231:12

oxygen 28:18 29:6,22 176:6, 7,17

**P**

p.m 141:22

p.m. 33:16 109:24 110:4 139:3,9,19,20 143:3 152:3 164:7 175:9 191:4,9 239:13, 17 243:21,22

p.m.'s 239:14

pager 62:5

pages 33:2,15 94:9 116:16

pain 16:9,12 18:24 19:2 26:7,11 27:11, 14,19 28:1 29:10 30:4,10, 18 31:5,6,7 54:22 68:7 70:22,24 71:6, 17,25 72:20 73:17 74:1 75:17 77:1,3 81:21,22,24,25 82:11,15,17 84:12,18,21 85:4 86:18 87:20 89:13,15, 19,20,23 90:8, 17,24 91:2,4,19 92:3,6,20 97:15,19 98:5, 17,19 99:1,3, 17,22,25 100:3, 4,9,14,22 101:1,14 102:3, 11,16,18 103:7 104:7,8,13,18 105:2,11,23

107:8,21 108:7, 25 111:9 112:15,17 113:3 115:24, 25 133:1 155:20 156:2,8, 17,20,22,25 157:4,22 158:1 159:5,21 161:1, 18 162:5 163:2 166:7,16,17,21, 25 167:1,3,6,9, 12,14,15,18,21, 22,24 168:1,8, 15,16,18,23,25 169:1,3,8,11,19 170:1,2,3,12, 13,14 171:18, 21 172:2,16 173:20,24 174:2,3 175:14, 20 176:1,25 177:8,10,18,25 178:7,11 179:5, 8,12,14,16,21 180:12,17,22 181:25 182:14 183:21 185:23 186:5,8,9,11, 22,25 187:11, 16,19 188:20, 22,25 189:17, 19,24,25 190:14 191:18 192:3,22,23 193:6,10,11 198:17 199:16, 18 201:5 202:3, 16,19,20,24 203:3 204:6,7, 10,12,15,18,22, 24,25 205:2,5, 7,9,10,12,16, 17,19 206:3,9, 13,21 207:9 209:10 220:14, 17,19 221:4,15 238:24

panic 101:20, 25 240:3

paper 54:5 59:14 60:3,15, 19 61:18 71:5 72:11 118:20 129:23,24

137:20

papers 39:1 60:11

paperwork 17:14 20:1 21:12 25:9,24 31:12 32:2,11, 13 34:9 57:14, 18 59:10 60:6,8 61:11 142:23

paragraph 112:9,11,21 116:18

Parker 7:2 33:14,16 138:13,18 206:19 207:7

part 9:13 52:22 59:9 64:14 69:20,22 81:6 111:19 134:10 173:16 213:11, 19 215:22 232:16

part-time 36:13 46:18 48:12

participated 210:16

parties 7:19

passage 95:11

passed 37:22 38:10

past 37:7 172:25

path 201:12

patient 38:15 44:9 57:21 62:3 65:7,13 66:25 67:19 73:6 75:4,5,8,25 76:17 81:17 83:12,13 87:9, 10 91:1 103:1, 2,3,5 104:4,6,7 123:11,24 124:6,10,13,14, 18 125:20,22 131:11,12,17

154:22 156:1,7, 20 157:16 159:21,24 166:14 177:4,6, 25 178:19,23, 24,25 185:8,22 186:1,2,7 190:17 200:25 207:3 209:7 218:23 219:1,5 226:3 228:19 232:5,7,8,12 240:24 241:12 242:23 243:1

patient's 44:12 67:6,17 156:16

patients 37:22 44:3 47:5,11 53:6,9 57:15,20 58:6 59:18 65:3 104:3 184:8 188:13 219:4,8 221:22 222:2 227:4 228:14 233:1 234:14 236:10 237:13 240:21

pause 33:12 138:24,25

paused 53:25

pay 111:1 204:6 221:6,8

paying 36:23

pending 6:13 10:1 90:4

people 9:2,5 41:5 58:2 63:23 81:21 85:24 89:4 94:3 96:5 99:24 104:23 117:13 122:9 130:22 153:21 163:22 164:16 165:7,9 167:15 169:2,20 189:14 197:2 217:2,16 223:11,19 224:9 225:4 230:13,17,19 231:3 232:19 233:17 235:17

237:10,11

Peoria 31:19 213:6 229:13, 24

perfect 38:24

perform 44:7 150:22 158:10 209:9 231:24 232:4

performed 49:19 214:16, 17

performing 160:15 162:24, 25 165:22 174:3 197:14 200:9 201:15

period 13:2 17:17 47:24 49:11,12,21 79:19

person 15:4 18:13 19:25 24:16,21 40:4 65:13 69:15,24 79:3 87:4 90:7, 14,15 95:5,11 98:10 99:2 101:18 102:8 104:25 119:18 120:22 123:13, 18 124:21 125:7 126:4,11 127:13,20,23 128:3,12,22 130:25 131:4 132:2 134:16, 25 135:15 160:9 161:2,9, 12 165:25 166:6,25 167:22,24,25 168:1,8 171:17 177:17 178:10 189:6,9 199:15 220:20 222:6 234:4,7 241:20, 22

person's 68:8 84:25 123:14 126:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

personal 96:3
109:2 149:14,
17 218:9

pertinence
173:5

pertinent
162:12 169:1
171:23 174:9,
15,16,18
178:17

pharm 241:4

pharmacy
120:17 241:21

phone 21:11,
23,24 34:4
38:17 62:6 63:4
149:17,19,21
150:10 151:13
152:6

phonetic 210:1
240:16

phrase 11:21
12:6

phrased 65:8

physical 44:7,
8,13 47:15
66:25 67:1
94:19

physically
19:9 49:22
57:12 59:14
60:2,11 61:22

physician
38:14 64:5,10,
11,16,18,21,23
65:14,17,24
66:6,14

picking 63:15
150:10

picturing 62:5

piece 127:12,
19

pieces 142:17
157:25

pinpoint
192:22,23

Pisney 6:10
7:5,16,18,21,24
8:9 21:17 26:19
33:10,21 42:24
51:17,21 53:25
80:14 81:13
83:14 84:2 89:7
90:4 93:20
94:11 96:25
97:3 98:25
99:16 110:2,5,
15 112:18
116:15,19
118:14 120:6
129:17 130:5
133:14 137:17
138:6 139:6
149:15 152:1,5
154:4 172:4,7
173:19 174:6
183:17 188:11
191:7,11
194:10 209:23
213:4 214:1
218:22 222:25
223:14,15
224:5 229:7
234:19 238:18,
22 243:5

place 19:13
53:12,23 62:17
75:25 77:4

places 10:23
51:22

plaintiff 6:21
7:23 8:10

plaintiff's 6:18

plan 58:15
70:18 190:16

planned
203:24,25

plans 146:15

plant 11:11,14
48:7

play 118:1

PLAYS 88:25

point 19:23
22:10 41:19
87:23 99:3,21
119:18 148:4

172:22,23,25
190:22 212:6
218:6

points 128:10
165:24

poorly 65:8

portion 96:7

pose 73:6

position 49:10
52:11 53:1

positions
51:22

positive
145:25 146:2

possibilities
111:11 166:5

possibility
81:5 85:22 86:8
88:5,8 101:21
102:20 104:10,
17 166:4 168:7
177:9 183:9,19
187:2 204:11,
20 205:4,10

possibly 82:25
119:22 149:11

postmenopau
sal 187:7

potassium
212:6

potential 70:12
71:6,11,24
72:3,4,7,23
73:6,19,21
75:2,4 83:11
92:2 101:5,6,8
102:2 103:8
105:6 107:16
189:21 197:22
198:13 199:3

potentially
72:18 76:7
189:3 198:9

Powerpoint
214:12 215:10,
22,25 220:1,9,
12

Powerpoints
220:4

pract 54:13

practice 64:4,7
119:16 120:21
122:6 126:10
130:23 142:24
155:23,24
156:21 173:22
186:7 201:15
203:8 218:22
223:20 224:13
232:25 241:6,
13,23

practitioner
10:20 11:6
36:20 43:19,22,
25 44:22,24
56:8,10,16 58:3
63:19,20,22
64:3 66:20
75:25 138:20
169:15 170:12
172:16 230:3

practitioners
49:5 52:4 53:5
54:18 56:22

premenopaus
al 187:9 190:2

preparation
23:16 41:24
118:16 119:1
126:21 129:20
138:11 210:4

prepare 31:9
33:11,23

preparing
155:2 176:14

prescribe
44:2,5,15
203:15

prescribed
133:11 134:20
164:25 231:14

prescribing
44:16

prescription
22:2 66:22
133:8 134:1

135:4,7,11,23
136:18,20
137:1,5,8,11
163:25 164:12,
24 201:20
240:11

prescriptions
22:10 131:2
140:23 163:12
242:4

present 96:24
220:14

presentation
214:19,23

presentations
214:23 215:9,
15,22

presented
90:17 101:10
103:3,6 107:7
160:25 199:9
215:19,21

presenting
215:18 224:9

presents
68:24 69:19
91:1 163:1

preserving
9:13

pressure 16:1,
3,6,11 18:10,
15,18 20:12
22:25 25:5,14,
15,21 26:1,4,6,
11 27:10 28:17,
25 29:12 30:15,
21 31:1 93:21
94:4,18 95:1,6,
7,16,20,21,23
96:5,6,8
117:5,8,12,14,
16,22 118:1
119:6 120:11
122:2 130:10,
17 132:4
140:15 141:2,7,
9,15,21,25
142:2,21,25
143:8,22,24
144:2,5,12,13,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

17,20 145:7
158:6 162:7
164:17 165:4,
11 174:21,22
175:10 176:16
179:2,3,5,7,10,
13 183:14,15
184:5 188:16,
18,24 195:22
202:5 203:10
206:5,6 239:7,8

**pretty** 78:1
168:20

**prevent** 79:9

**previous**
108:20 175:16

**previously**
13:7 14:2 29:16
61:11,17 90:20
105:10 106:7,
20 117:12
124:15 171:18
175:23 203:10
206:6

**primary**
217:25 218:4

**prior** 12:22
13:18 83:20
106:18 109:1
172:5 174:7
175:5 230:3
241:10,25

**prioritize**
72:10

**priority** 72:14

**prison** 222:4
225:2

**prisoners**
227:1

**privacy** 240:23

**privilege** 44:16

**problem** 77:17
92:11 93:3
165:5,19,25
166:3 168:2
206:9 227:9
238:13

**problems** 36:5

57:15 131:18,
20

**procedure**
61:25 62:6
150:21

**procedures**
76:1

**proceed** 54:14

**PROCEEDINGS**
6:1

**process** 52:18
66:23 68:11
70:8 71:10 81:7
93:6,13 125:1

**processes**
63:1

**produced** 64:1

**produces**
154:13

**production**
213:20 214:25

**professional**
174:14 188:13
190:6,16

**professor**
55:18,20

**program** 43:10

**progress**
88:23

**projector**
216:5

**prompt** 125:6
192:21

**prompted**
174:22

**prompts**
154:15 156:5,
13

**pronounce**
133:13

**protect** 93:8,14
173:1

**protocol**
144:19 238:24
239:1

**protocols**
154:13 170:7
223:3,7

**provide** 10:10,
15 119:13
127:24 128:22
131:5 143:12
204:1 228:11
233:6 237:18

**provided**
26:20 30:3
83:25 128:4
134:25 160:9
199:13,14
204:10 210:24
225:23 229:16
236:5 237:17
238:25 239:12,
17,18 240:7

**provider** 35:1
57:16,24 62:11
134:11 157:17

**providers**
48:18

**providing**
30:7,10 71:1
87:4 228:6

**public** 56:1

**publication**
94:7 100:16
116:14

**pull** 114:13
118:17 138:3
215:1

**pulled** 216:5

**purpose** 57:12
67:5

**purposes**
218:5 240:23

**put** 28:12 35:10
61:4 70:9 96:9,
25 102:1
149:17 165:24
200:23 225:21

**Putting** 44:12

___

**Q**

**quantity**
143:23

**question** 9:7,9
11:18 12:4
13:6,8 26:25
28:13 35:21
39:13 65:8,18,
22 66:2 73:1
79:15,24 80:22
81:13 83:3
88:13,18,19
89:6,11 90:4
92:18 96:12,18
97:18 98:25
106:10,12,19,
21,25 107:14
108:14 111:16
114:15 123:21
124:9 128:5,7,
21 129:9
131:13 132:7
140:2 150:4
151:2 157:9
159:23 166:23
168:12,22
170:4,6,11,17
171:4,11,24
172:10,11,13
173:13 174:6,
16,17,19 177:2,
24 178:2,4,5,8,
10,13 183:17
186:2 190:11,
21 192:14
193:25 194:5,7,
9,13 195:7,13
198:20 204:16
205:14 206:25
223:13,23
224:5,7 227:20
242:18

**question's**
121:25

**questioning**
93:11

**questionnaire**
169:12,13,14
178:16

**questions** 9:3,
14 10:1 41:14

58:8 59:24 62:2
63:16 64:25
65:19 88:1,4
93:14 103:16
106:17 110:9
116:9 118:6
121:6 123:10
124:7 130:6
150:21 157:6
162:23 163:6
166:8 169:7,18
171:22 174:17
179:25 185:24
193:3,4 229:16,
17 238:23
243:9

**quick** 19:17
51:7 114:4,25
150:25 210:7

**quickly** 56:19
74:15 80:25
89:3 116:15
130:4 191:12

**quotes** 195:25

___

**R**

**racing** 102:14

**radiates**
100:14

**radiation**
134:22,24
137:2

**raise** 7:25

**ran** 19:24
236:17

**range** 29:21

**rate** 28:18 29:3,
17

**reach** 145:21

**reached**
172:22,23

**read** 84:1,3
88:20 94:13
97:9 112:10,12
114:9,12,17
116:18 117:15
120:22 121:1
123:14 128:8,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

22 133:25
142:10 185:6,
19,21 210:7,9,
12 211:23
240:17

**reading** 28:21
94:14 95:10
128:12 132:2,9
143:8 211:19

**reads** 211:19,
20

**ready** 110:9
112:13 146:8

**real** 19:17
92:11 114:25
116:15 130:4
210:7 241:22

**reality** 125:8

**realm** 175:17

**reason** 35:13,
16,23 40:8
74:21 75:1
111:13 126:13
127:23 128:2
130:14 132:1
141:16 143:18
144:3 145:4
151:5 157:7
159:9 162:2
164:1 167:14,
15 181:5,13,14,
18 192:16,18
194:2,14
195:12,18
196:8,15
219:24,25

**reasoning**
227:12

**reasons** 81:22,
23 163:23
165:9,15
216:22 217:2,
16 219:22
237:17,18,23

**reassure** 37:7

**reassured**
209:5

**reassuring**
38:2

**recall** 15:18
18:11,20,23
19:12,18 20:11
21:2,7,11,22,24
22:7,8,11,19,20
24:1 27:2,15,25
28:8,24 29:2,5,
9,14,24 30:9,
19,20,24 31:3
34:21 35:3
38:3,7 39:17
41:6,13 54:20,
23,24 56:23
66:4,13 110:13
119:21 121:10
125:3 128:18
134:4 140:3
141:1 146:15
148:24 151:12
155:19 159:7,
13,15 164:12
175:6 181:21
193:4 196:20
199:11,24
207:12,18,22
208:6,7,14,20
209:2 210:22
211:10,14
214:17 215:17
234:19 239:16

**recalled**
183:19 184:15
196:14

**receive** 31:22
41:9 52:21 57:5
62:1 155:24
176:22 229:12

**received** 14:7,
16 16:13 18:9,
23 19:16 20:7
22:24 23:2
24:17 25:7
31:18 51:5
104:6,9 119:9
140:25 155:7
229:22 237:21

**receiving**
18:24 19:1
20:11 21:23,25
22:19 27:2
28:24 29:2,9
44:21 53:17
54:20,24 119:4
140:21 141:1,6

155:19

**recent** 168:20
170:1,2 209:19

**recently** 88:2

**recheck** 16:3,
5,10 30:14
142:2,4,5,9,12
143:7 144:2
145:10 179:9

**rechecked**
144:11 188:24

**recognize**
129:19 214:7,9

**recol** 25:10

**recollect** 38:1

**recollection**
21:18,22 22:8,
13,21 23:13,18,
22,23 24:3,8,12
25:6,8,11,12,
16,20,23 26:9,
19,21,22 27:14,
16 28:6,11,12,
19,23 29:18,23
30:2,6 39:1,5
41:18,23 55:1,6
120:8 128:6
132:8 141:5,24
142:18,20
158:25 159:10
181:12 183:3
192:13 194:6
210:15 215:6,
13 233:23

**record** 6:3 7:17
9:20 51:13,15,
16 61:3 92:16
107:6 109:23,
25 110:1
151:22,24,25
152:19 173:14
191:3,5,6,11
237:7 238:14,
16,17 243:12,
17,19,20,21

**recorded**
216:10

**recording**
65:5,9,10 88:22

**records** 31:11
41:19 59:22
60:10 120:6,19
131:2 136:21
211:17 212:6

**recount** 206:12

**recounted**
211:3,4

**recounting**
196:1 208:9,10

**red** 67:22,24
68:5,7

**redacted**
240:23

**reduce** 177:9

**reducing**
143:23 144:5

**refer** 44:11
57:18 110:12
118:21 139:24

**reference**
62:21

**referenced**
33:15

**referencing**
185:12

**referred** 63:20
118:25 133:17
154:13

**referring** 14:23
20:5 32:2
76:23,25
100:20 102:4
117:16 137:21
148:16 152:9
154:25 208:14
230:11

**refers** 139:14,
18

**reflux** 82:2

**refresh** 120:8
210:7,14 212:1

**refusing**
106:25

**registered**
55:18

**regular** 64:25

**related** 82:14,
16 101:19,20
159:16 202:23

**relating** 19:14

**relation** 56:3,4
163:8 230:1

**relationship**
64:20

**relay** 162:7
163:10 178:3,
14

**relayed** 22:18
156:18 159:8
177:13 207:19
209:12,16

**relaying**
193:18

**released**
227:10 228:25
238:3,5 241:8

**relevant** 123:8
156:6 224:1
232:3

**reliable** 119:13
120:18

**rely** 162:11,17

**remainder**
228:1

**reme** 22:20

**remem** 24:7

**remember**
15:5,9,11
16:14,23,25
17:2,13,16
18:1,4 20:14
21:1 22:15
24:6,10,17,22
25:24 27:4,22
29:15,19 30:11
31:8 32:12
38:19,25 39:21
40:17 41:20
42:1,6 49:6
55:2 56:18
59:21 63:14
106:8 119:4,14,
20,24 121:11



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

122:3 127:7,25
129:4,6,10,12,
14,16 130:19
131:24 132:16,
17 134:7
140:16 141:8,9,
12,14,15,18
142:21 146:3,9,
21 147:13
148:3 149:2
158:24,25
159:4,19 162:1
181:2 192:15
193:18 194:1,
11,25 195:11
196:4,13,14
207:2 208:1
214:21 218:10
219:12 220:8
223:9 234:6
239:25

**remembered**
162:4

**remembering**
17:15

**remembers**
149:9

**remote** 125:19

**renew** 242:3,6

**repeat** 140:2

**repeated**
93:11

**rephrase**
85:19

**report** 33:4
118:15 121:20
124:5 130:15
154:6 161:17,
22 166:24
167:2,10,12,19
168:9,19 169:2,
20 191:13

**reported** 29:12
121:20 125:4
130:16,22
142:25 166:15,
17 167:6
173:24 174:21,
25 175:7
180:25 181:19

182:10,11,17
188:8 196:9
197:21 198:17
206:22 207:8,9,
24 211:21,22

**reporter** 6:3,5
7:16,19,24 8:5,
25 9:4 51:13,16
83:18 88:21,24,
25 109:23
110:1 151:22,
25 191:3,6
213:17 229:4
238:14,17
243:12,17,20

**Reporters** 6:6

**reporting**
120:23 121:10

**reports** 126:8
131:10 132:3
154:14

**REPOTER**
83:23

**represent** 6:20
7:1,4 8:10

**representative**
55:24

**representatives** 55:22

**representing**
6:5

**request** 59:19

**requested**
88:25 211:6

**require** 13:22
49:17 50:18

**required** 50:6,
11

**requirement**
50:18 150:3

**requires** 50:19
198:25

**research**
150:23

**reserve** 10:5

**resides** 11:6

**residual** 96:22

**resolved**
179:14

**resolves** 96:15

**respect** 234:16

**response**
28:13 192:13

**responses**
174:8 188:16

**responsibility**
23:11 24:11
225:16

**rest** 104:13,18,
23,25 105:2,6,
14,16,21 107:8,
17,25 108:7,11,
25 159:5
179:21 239:12

**rested** 110:8

**resting** 179:14
189:1

**restrict** 53:13

**restrictions**
53:12,21,23

**result** 170:13
235:18

**retain** 31:21,24

**retained** 32:3

**retired** 45:17

**retread** 198:6

**retrospect**
240:4,5

**return** 21:22
22:7

**returning**
56:19

**review** 26:14
32:23,24 33:2
53:11 119:2
207:23 234:25

**reviewed**
23:16 24:22
25:9 31:14
32:1,12,13,14
38:25 41:23

118:16 119:1
129:20 138:10
154:5 210:4,21
241:3

**reviewing** 25:1
33:9,22 34:9
39:17 55:10
58:17 65:15
85:20 140:3
204:5 234:24

**Reynolds** 6:24

**Richmond**
45:4,8,11

**rights** 9:13
53:3,4

**risk** 93:21 94:5,
16,25 95:6,7,
12,14,16,20,23
96:1,10,19 97:3
98:21 99:5
117:13 200:20
203:4

**RN** 55:22

**road** 137:19
150:6

**Rochester**
46:1

**role** 64:23
134:10

**room** 212:20,
25 216:3 239:2

**rotator** 190:1

**roughly** 39:6
45:13 61:12
122:15

**rude** 9:3

**rule** 8:22 10:25
68:19,20 73:5,9
75:3,10,13,24
76:1,8,12 81:15
82:24 83:7,10
85:22 86:7
87:3,15,23
88:4,7 89:8,12,
15,20,24 90:9,
10,16,23 91:22,
25 92:2,20
93:18 101:8,16,

23 102:21
103:5,8,18,21
104:10,17
105:3,8,12
106:3,8,15
107:15,22
108:10,23
117:9,21 140:2
167:17 189:5
197:16 198:1
199:1 200:24
201:9 205:17
239:20

**ruled** 74:2,6,15
92:1,8,19
103:13

**rules** 8:14 10:3
76:12 77:3,7
150:21

**ruling** 74:22
75:20 125:13

**run** 103:8

**Ryan** 209:25

---

**S**

**Sarah** 240:15

**saturation**
28:18 29:6,22
176:6,7,17

**save** 114:5,19

**scanned**
60:15,17,19
61:6

**Schamber**
34:21,22 38:4,
13 39:7,18,20
40:11,18,21
64:12,15,18
66:8 207:25
208:3,7,8,24
209:2,8 210:16,
18,22 211:10,
11,21,25 212:3
215:17 216:3
229:15,20

**schedule**
47:24 56:25

**scheduled**



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

150:11 151:4,6

**school** 43:1
55:20

**science** 43:20

**screen** 84:2
94:11 118:17
138:7

**screening**
118:15

**scroll** 94:9
112:5

**season** 146:16
147:2

**section** 157:11

**security** 173:6,
9

**seek** 218:7
233:17

**seeking** 68:5
217:19 218:12
230:22 231:9

**seeks** 217:22

**sees** 218:16

**selected**
52:23,25

**self-
explanatory**
44:16

**send** 241:3

**sense** 9:10,16,
21 10:1,7 38:12
49:20 60:23
77:13 125:17

**sentence** 98:7,
12 113:12,18
114:16 117:16

**separate** 20:4
23:25 119:22

**separated**
99:23,25

**serve** 36:25
236:16

**service** 11:13
48:20 155:16

**serviced** 48:15

**services** 94:8
146:11,12

**serving** 36:19
50:8,25

**set** 40:16,17
58:6 120:10
149:11

**setting** 21:18
23:15 41:22
43:25

**severe** 70:24
91:14 236:12

**sex** 200:15
201:6

**Shakes** 9:19

**share** 229:7

**sharp** 195:22

**Shasta** 7:2
33:14 138:13,
18 206:18,22
207:6,7

**she'd** 106:18
124:19 129:15
131:24 134:19
144:10 179:4
180:12 183:11
188:22 195:6
196:21 206:6
212:14

**sheet** 58:25
132:23 196:3,8
203:25 241:3

**sheets** 59:2
186:17

**Sheriff's** 7:7

**Shoppe** 120:5

**short** 17:17
45:24 74:6
79:19 109:7
173:25 182:8
223:18 233:3,
10 236:21
243:10

**short-term**
224:25

**shorter** 211:4
237:3

**shortly** 17:11
35:8 37:16 38:9
61:15

**shortness**
27:20,22 28:8,
13,15 85:8
86:19 87:22
100:17,20,25
101:10,14
102:2,5,6,10,
15,17 103:3,6
104:8 105:1,22
107:7,21
108:24 110:18,
19 111:9 159:7
175:13 179:22
180:6 182:12,
13 187:11
192:25 193:7,9
199:21 206:7

**shot** 171:7

**shoulder**
84:22 85:4
86:19 87:21,22
100:14 186:6,
13,22 187:1,19
189:19,25
192:9 193:6
199:19

**shoulders**
100:10

**show** 83:15
104:3 116:13
118:11,14
152:23 154:3
240:14

**showed**
152:20 186:17

**showing** 94:6
129:17 137:14
209:20,23

**sick** 121:15
125:12 221:11

**side** 59:11
84:25 85:4 98:8
240:20

**Sidney** 51:18

**sign** 57:17,24
58:1 60:12
84:12,15,21
85:7,16 102:7
117:2 133:4
175:14 186:15
202:4

**signed** 57:14

**signing** 57:19
60:11

**signs** 28:17
54:25 58:12
67:6,8,17 84:7
85:11,20,24
86:1,7 104:15
145:2 185:25
202:1,8,12,14

**similar** 49:18,
19 61:11
177:21 191:14
196:22

**simple** 70:25

**simply** 200:1
242:8

**single** 23:25
24:3

**sit** 8:14 62:19

**sitting** 11:25
12:24 13:20
164:6

**situation** 40:3
103:25 201:17

**skeptical**
125:8

**slide** 215:10,14
218:6 229:2,7
230:4,7 233:9,
14,22 234:3,8

**slides** 216:4

**slight** 27:21
28:15

**slightly** 29:15
30:15 72:13

**slow** 115:21
142:16

**slowly** 81:1
89:3 112:14

113:3

**small** 96:6

**smaller** 49:17

**smoke** 94:25

**smoking** 94:17

**social** 76:17

**solemnly** 7:25

**solving** 68:16,
21 71:2

**someone's**
85:2,19 86:6,18
104:21 105:16,
21 117:20
165:3 169:15
184:17 189:17

**son** 148:22
153:16

**sort** 22:16
41:14 56:2 58:4
61:8 68:8,10
153:1 176:17
203:7 214:19
215:1 216:5
231:9

**sound** 227:19

**sounded** 77:20

**sounds** 26:8
39:22 51:12
65:21 109:21
144:23 233:15

**sources** 63:10

**South** 43:9,15

**Sparta** 7:7
45:18

**speak** 34:13
41:2,9 42:4
56:1 64:24 93:7
125:22

**speaking**
19:18 34:8,21
40:21 41:6 56:2
74:10

**specialty** 56:6
73:20

**specific** 17:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

55:1 103:1
129:2 162:23
234:1 237:21

**specifically**
37:9 55:5 63:15
129:10 131:7
176:1 178:4
192:15 193:15
211:14 214:21
218:10 223:16
239:25

**specifics** 38:1
160:5

**speculation**
13:15 121:22,
25 128:16,17
129:1 132:14
135:13 137:12
164:2 165:13
184:12,21
193:25 194:19
207:1,15
219:21 220:2
221:5,13,19
222:10 224:16
230:15 231:4
232:20 233:12
234:12 239:3,
22 241:11

**speculative**
107:12 220:23
221:12

**spell** 63:7

**Spencer** 42:7

**spent** 110:14,
17

**spoke** 34:4,5,
16,18 37:15
64:24 138:18
210:17 211:24

**spoken** 18:13
40:22 41:24
42:13 210:18

**Springs** 43:11,
12

**stabbing**
180:25

**Stan** 7:1 42:2
209:25

**stand** 106:18,
20 172:5 174:7

**Standard**
139:14

**standardized**
154:14

**star** 166:18
178:8

**start** 15:19
92:11 112:4,14
113:2 124:9
154:10 222:12,
17 224:20,23
226:20,23
228:22 238:6

**started** 31:17
48:21,22 66:8
125:16 140:11
228:7 238:1

**starting** 6:18
217:11

**state** 6:16 7:16
53:5 64:6

**stated** 13:6
14:2 107:6

**statement**
125:9 136:19
137:3 224:22
225:20,24
226:22 228:3,
13,15

**states** 6:14
127:1,16

**static** 83:20

**stay** 243:18

**steady** 49:10,
16

**step** 69:2 70:7
71:3,9 72:8
73:4 82:23
160:15 162:25

**Stephen** 6:19
8:9

**steps** 229:6

**Steve** 35:21
93:9 171:15

**stick** 71:16

**stipulate** 7:20

**stipulates** 7:23

**stop** 50:13
88:17 150:9
242:22,25

**stored** 139:8

**straight** 139:4

**straightforwar
d** 230:22

**street** 6:6
212:20

**stress** 35:5
36:4

**stressed** 35:24
40:2,5

**stressful**
37:23

**strict** 223:3

**strictly** 234:3

**strike** 81:12
96:25 101:6
103:5 169:4
170:4 171:13
172:2,9 174:2
212:23

**stuff** 32:18
59:12 60:18
61:18

**subject**
156:12,14

**subjective**
69:6,8,10,22
70:6,10,14
157:15,16

**subsequent**
140:25 141:1

**substance**
185:21 210:15
211:4

**successful**
143:23 144:5
145:6

**sudden** 111:23
112:17 113:13,

16

**suddenly**
168:18

**sued** 42:22

**suffer** 235:18

**suffering** 79:3
134:25 135:5
136:11 137:4
159:21 161:18
170:16 235:17

**sufficient**
116:8

**suggested**
204:1

**suggesting**
95:10

**Suite** 6:6

**Sunday** 17:10
146:4 148:11
153:21 159:3
161:7 198:18

**superfluous**
168:22

**supervising**
38:14

**suppose** 77:24
102:16 104:24

**surprised**
211:12

**suspect** 73:20
76:13 99:12

**suspected**
76:24

**swear** 8:1

**sweating**
27:24 28:3
159:6

**sweaty** 140:11
141:10 144:15,
21

**switch** 61:12

**switched**
61:18

**Sydney** 6:3
83:18 88:20

110:3 152:2
191:8 213:16
238:19

**symptom**
67:14 68:13
71:6,13 72:18,
23 82:25 86:13
87:10 90:11
97:14,20,22,23,
24,25 98:3,11
99:8 100:4,7,
12,15,16,20,21
101:2,4,5,7,9,
15 102:11
105:11 110:22
111:2,4,14
112:1 113:10
144:17 161:21
163:1 166:15
167:16 181:19,
25 189:4,6,9
195:2,10

**symptoms**
18:20 25:17
26:5 27:5,15,
17,19 29:25
44:12,14 66:24
67:1,6,8,12,17
68:24 69:3,6,
19,25 70:5,13,
17 72:3,4,8,10,
16 75:19 80:10
81:15,20 82:10
85:2,11,15,25
86:7,20 87:14
88:16 97:6,11
98:4 100:9
101:17 102:25
103:9,10,11,12
104:2,14 105:1,
14 106:3
107:16,22
108:19,23
110:20 111:9
112:6 113:9,12,
16,19,20,24
114:1 115:12,
18,19 117:20
123:11 125:14,
16,24 126:4
144:10,12,25
156:1 157:17
174:23,25
175:2,7,20
177:22 179:20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

182:2 184:4,8,
17,18 188:8
189:21 190:10
191:12,14
193:10,11,17,
18,21 194:4,16,
25 195:5,15,19,
20 196:7,22
197:7,20,23
198:2,15,21
199:1 200:4,23
204:5 206:1
235:23 237:12

---

**T**

**tab** 132:25

**takes** 11:7
237:12,25

**taking** 19:23
53:4 134:3
148:1,9 165:10,
18 166:2 198:9
231:12

**talk** 9:1 10:3
21:15 33:24
34:22 35:4,7
36:5 37:4 38:3
40:5 42:16
58:8,13 65:24
93:7 109:12
150:5,19,25
156:10 175:23
189:23 208:22
234:2

**talked** 8:13
15:20 16:9,23
17:21 18:7
34:25 35:8,9
38:5 53:20
66:19,21 118:4
130:6 161:2
162:6 163:24
165:23 166:13
171:16 178:23
179:5,16
183:25 184:2
191:13 199:11
206:8 208:2,3
209:11 242:12

**talking** 9:5
16:25 17:21

18:8 26:3 27:4
38:4,13 41:14
51:21 60:25
65:4 98:1
105:13 112:24
113:1 122:1
139:7 154:10
160:22 161:12,
14 173:19
211:18 225:11

**talks** 56:4,13

**tear** 190:1

**tease** 44:5

**technician** 6:4

**technique**
123:7 124:4

**telling** 21:3
69:7,11 122:3
125:3 126:5
128:18 129:4,
14 130:19
131:21 141:9,
14 157:16
159:13,19
161:1 162:1
181:21 190:15
194:1,11 195:1,
11 196:4
206:10 211:10

**tells** 184:24

**ten** 39:15 201:1

**tenure** 52:14

**term** 211:1
222:22 223:18

**terms** 22:7
32:5,11 56:21
58:2 60:25
61:22 64:20
122:6 124:4
139:18 156:12
197:15 210:23
211:5 216:15
233:17 241:7

**test** 9:24 38:23
39:4 176:17
212:14

**testified** 33:14
41:1 142:17
151:9 155:18

184:21 196:18

**testify** 194:18

**testimony** 8:1
10:10,15 26:14,
25 33:25 76:9
89:1 160:12
163:15 166:8,
11 173:22
174:24 175:5
184:6,14
201:14 223:25
237:20 241:11,
25

**text** 139:18

**that'd** 32:19
101:21 118:22
129:25 158:20

**that'll** 84:11

**there'd** 216:2

**thereabouts**
45:14 153:5
239:17

**thing** 16:22
18:8 28:7 59:16
65:16 71:2
86:16 91:24
101:11 163:16
195:21 239:10,
23

**things** 13:22
19:19 21:2
22:19 38:21
53:8,14 60:12
64:1 67:21,22
68:9 75:20,22
76:15,18 82:3,
4,6 86:1 91:3
93:17 104:16
108:15,22
111:4,5,19
125:15 131:4
132:13 133:24
134:18 136:15
149:12,17,18
158:2 159:4
163:11 164:21
165:17 177:20
189:22 201:4,
10 207:17
220:5,21
221:25 223:17

225:25 226:1
234:7 239:5

**thinking** 204:3
239:5,9

**thinks** 234:5

**thought**
142:22 176:19
179:6 183:13
197:6 198:10
200:12 201:8,
10,12 203:14
234:7

**throw** 102:25

**time** 6:8 9:5,12
11:20 12:4,7,
10,13,19 13:2,
3,11 14:10,22
16:15 18:4
19:2,12 20:7
25:7 34:3 36:15
40:19 42:12
45:24 46:22
49:17,21 50:2
51:14,19 57:1
60:5,7 61:21
62:10 64:14,15
65:6 66:10,17
74:6 79:19
83:11 89:5
92:21 98:20
99:4,10,14
104:5 109:9,24
110:4,14,17
118:5,7 121:25
122:9 131:6
136:11,25
137:23 138:2,
19 139:4,14,15
145:3 148:21
151:23 152:3
153:9 154:24
160:23 162:8
168:6,9 173:25
174:9,18 176:2
178:17 180:15
183:8,11
187:12 188:23
191:4,9 197:13
204:15,22,24
208:12 210:19
233:3,10
235:10,13
237:3,25

238:15,20
239:20 240:6
243:5

**times** 17:17
48:18 51:1
62:7,8 75:14
88:14 93:4
106:22 107:20,
23 108:5
122:10 132:25
133:13 159:25
161:3 163:5
166:12,13
168:10 170:24
171:6,14,17,18
178:24 183:25
184:3 187:10,
22 199:5
200:11 201:2
212:16 217:4
227:16 237:8
241:2,16

**title** 215:9

**titled** 116:16

**titles** 215:14

**today** 6:5,7
8:16 10:11
11:25 12:24
13:20 34:13
48:10 51:18
110:3 119:1
138:11 140:4,
21 152:2 184:2
191:8 198:15
211:5 218:24
238:19 243:6

**today's** 31:10
33:23

**toe** 169:19

**told** 19:7 21:7
22:15,17 24:14
27:15,17,18,20,
25 28:3 36:10
40:4 119:8
121:19 124:15,
23,25 126:17
128:6 129:13
132:7,13,17
141:17 142:1
143:14 159:1,
17 161:4,9
162:9 165:3,10,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

15 166:9 168:2
179:1 181:12,
13 183:16
184:3,9,15,18
186:8 192:13,
18 193:21
194:3,15,24
195:6,13
196:16 199:11,
15,24 206:20
207:12,18
209:16 211:1,
12 212:4
216:24 217:5,
15,21 222:8,25
223:16 225:19
226:5,25
230:17 233:25

**Tomah** 45:18,
20,22

**top** 112:4
132:20 200:23
239:14

**topic** 92:24

**topics** 157:24
215:18

**total** 48:17

**touch** 35:10

**town** 149:10
153:23

**tracks** 150:22

**train** 213:12
229:9 230:6

**trained** 230:16
231:19

**training** 31:16,
18,22 123:4
162:22 214:2,
16 218:3
229:12,20,22
230:2,21
231:22

**transcript** 9:20
172:20 173:17

**transferred**
43:7 225:2

**Travis** 34:21
38:13 207:24

**treat** 66:2 73:5
75:3 81:16
82:24 115:19
116:3,8 189:6
197:17 198:1
219:7 221:21
222:1,8,15
223:1,6,21
224:14 225:13,
16,20 226:1
227:4,24 232:6
233:1 234:15,
24 237:4,10,22

**treated** 14:21
16:2 74:2 92:9
130:16 136:22
222:2,3,23,24
223:17 225:2
226:6,9,12,19
227:10,13,14
228:19 236:20
237:13

**treating** 66:11,
18 74:22 116:1
179:2 188:13,
15 190:9
224:23 228:18

**treatment**
14:17 32:11,13
44:2 116:6
164:18 204:1
222:4,12,18
223:3 224:18,
20,23 225:5,9,
22 226:16,17,
20,23 228:2
237:15 238:1,4,
6

**treatment's**
227:25

**treatments**
134:24 237:18

**treats** 223:11

**true** 62:16
69:13 70:4
71:19 72:1
74:3,20 76:22
80:20 117:11
231:1

**truth** 8:2,3
37:13

**truthful** 10:10,
15

**tumor** 71:21
72:12,24 73:22
74:4,8

**turning** 37:3
61:21 114:3
132:18 201:19
238:23

**typed** 60:19

**types** 53:8
115:25 168:25

**Typic** 59:18

**typical** 134:25
144:7 169:7
179:25 182:2

**typically** 43:24
52:15 57:9,20
58:6 59:10,25
62:18 63:13,16
122:17 123:13
125:20 145:2
149:5 153:8,12,
14 157:5 158:2
162:14 165:1
181:24 184:7,
16,18 185:3,4,
6,21,24 186:10
187:7,8 203:23
236:15

———

**U**

**UCCS** 43:17
44:22

**uh-huh** 9:19
23:14 74:12
121:9 210:10

**ultimately** 81:4

**unable** 19:22
21:3 119:11,13
161:5 206:12

**uncomfortable**
221:10,17

**underlying**
97:25

**underneath**
112:11 186:12,
25 192:9
199:18

**understand**
8:16,20,21 11:9
15:2,11 20:10
26:16,19 38:12
39:25 57:2
58:20 63:2,24
69:10,24 70:20
72:9 102:6
105:20,23
133:3 154:19
156:11 158:1,4,
16 161:24
167:4 199:25
211:18 213:25
218:19 224:13
225:19,24
226:11 227:12,
13,22 228:3
232:2 233:2
240:21

**understanding**
64:2 136:16
140:1 152:14
157:13 178:25
182:18 218:1
224:25 225:3,
18 227:3,5
232:17

**understood**
23:12 160:4
182:25

**undiagnosed**
77:16,17,19,20
78:2,6,13 89:4

**unhealthy**
94:18 95:2,3

**United** 6:13

**Unitypoint**
10:18,21 11:5,
10 36:11

**University**
43:9,11,15

**unknowable**
99:15

**unlike** 8:23

**underneath**

**unpredictable**
117:1,6

**unsure** 55:21
66:9 80:5

**unusual**
153:20

**Upper** 100:5

**urgent** 226:2
227:9

**useless** 174:3

———

**V**

**VA** 45:10,20,22

**vacation**
152:13

**vague** 11:20
12:4,5 14:9
15:24 16:17
66:15 70:2
71:12 73:2,8
74:17,24 75:6,
11 76:3,10
78:16 79:22
80:3,22 81:8
83:5 85:13
86:11,23 87:7,
24 88:13 90:12,
19,25 91:10
92:4 96:12
98:23 102:22
103:16,23
106:5 107:12
108:14 111:16
115:13 116:10
121:25 123:21
158:14 160:21,
23 187:5
189:11 222:10
224:17 226:14
228:15 234:10

**vaguely** 127:4

**verbal** 9:18

**verbatim**
121:2,3 128:8,
11 185:6,19

**version** 60:20,
25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

versions 60:14
137:22

versus 6:12
74:10 231:3

Veteran's 45:3

video 6:4,9,21,
25 9:20 51:18
110:3 152:2
191:8 238:19

view 55:14

violate 140:2

Virginia 44:25
45:4,8,11
148:23 153:17

visit 19:5 59:19
65:12 148:25

visiting 65:9
147:23

visits 36:23
57:13

visual 152:20
215:20

vital 28:17
58:12 82:24
104:15 145:2
185:25 201:25
202:4,8,11,14

vitals 30:1

VOICE 88:22

void 91:9

vomiting 84:15
86:15,19 87:21
181:23 182:3
191:22 195:3,7,
14

_____

W

wait 9:6,8
20:21 118:12
154:12 210:21

waited 239:9

wanted 40:20
57:16 58:3
142:12 183:18,
21 188:20

203:5,17 221:2,
3,6,8

wanting 58:8

warning 84:7

Warren 7:2

Waterloo
10:18,19 11:6

ways 75:20
233:6

week 34:4,6
35:9 37:5 50:4,
7,12,23 51:1
57:5,6,12,14
58:1 122:10
148:2,9 152:13
212:16

weekend
122:25 147:23
148:21,25
149:1 154:20

weeks 74:11
236:25

Weil 6:19 7:23
8:8,10 11:24
12:8,12 13:3,
10,19 14:6
20:23,25 26:16,
17 32:8,10,17,
21 33:1,6,8,12,
18,20 35:19,22
39:16 41:21
51:7,11,20
81:2,11 83:9,
16,24 86:17
87:1,12 88:20
91:13 92:15
93:16,19 94:6,
10 103:20
106:15,23
107:4,24 108:9,
17 109:10,14,
18,22 110:5,8,
11 111:21
118:3,22,24
128:20 129:25
130:3 132:11
137:16,21
138:3,5 139:5
150:1,7,13,16,
24 151:3,10,12,
20 152:4,25

159:12 160:24
170:19,22,25
171:3,10
172:17,19,24
173:4,8,12,16,
18 174:10
181:9,15,16
184:25 185:3,9,
14,18 190:19,
24 191:2,10
194:8 198:12
207:4 210:13
213:15,18,24
216:14,16,18
217:8,10,14
221:1 223:10,
12 224:3
227:18,21
234:17 237:16
238:8,13,21
241:18 242:14,
18,21,24 243:4

well-taken
53:6,9

West 6:6

Western 6:14

Where'd 43:1

Whitewater
43:6,7

whittle 72:15

who'd 54:21
126:20

Willful 237:6,7,
20

Wisconsin
6:15,25 42:25
43:2,7 45:18,
19,20,23 47:14
49:8 52:3,4,8
53:5,6,9,18
54:10 55:3
56:21 64:6,8
154:1

Wisconsin's
139:15

withdrawal
188:18

withhold
240:11

withstanding
197:19 206:11

witnesses
93:11

woman 187:7,
9,23 190:2
240:15

word 54:2 63:2

words 24:2
28:12 93:12
184:9 225:21,
22

work 10:17,18,
19,24 11:4,5,9,
10,15 31:14
36:7,11,17
45:18,22 46:2,
14,22 47:23
49:2 50:19 54:6
58:3 59:6 60:4
64:6,9 70:21
75:21 144:1
148:2,10,11,14
153:16,22
236:9

worked 11:3
36:10 46:4,16,
24 47:10 51:22
148:12 212:16

working 45:10
47:8 48:7,22
50:4,13,16
57:2,3 64:20,21
68:22 143:25
144:7 145:10
214:3 228:7

works 10:19
11:6 43:24
61:24 66:23

world 8:24
217:3,17
230:14,18,19
231:3

worried 37:14
221:10

worry 37:8

would've 61:2,
4 120:13,15
122:24 123:4

126:12 131:16,
18 132:13
134:19 136:25
137:2 144:9,10
148:4,5,12
160:1 167:6
177:13 178:13
183:13,16,18,
21 184:18
192:18

wounds 58:7

write 171:8
213:22

writing 30:20
61:17

written 21:16
123:18,23
124:6,10 126:4,
20 127:21
131:6 133:8,25
139:20 164:3,4
181:4 192:17
193:19 196:7
207:5 238:25
239:14

wrong 93:8
197:2 209:6,14
211:2 219:2,6
220:9,12,16
232:12 241:1

wrote 60:16
179:16 242:13

_____

X

x-ray 76:13,14
77:6

x-rays 76:20

_____

Y

yards 212:25

year 42:12
121:16 236:18

years 43:6
45:1,12 46:7
52:15,16 99:23
149:9,20 187:6
224:24 235:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

236:2 237:12

**yesterday**
133:14 137:19
242:12

**young** 109:4

---

**Z**

---

**Zofran** 133:13,
18 134:1,20
135:17,18
136:9

**zone** 138:2
144:9 145:12

**zoom** 84:5,10
97:8 114:10
116:19,21,22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com