

# CASE NO. 20-CV-1123

## GREGORY BOYER, AS ADMINISTRATOR OF THE ESTATE

## OF CHRISTINE BOYER, AND ON HIS OWN BEHALF

VS

## ADVANCED CORRECTIONAL HEALTHCARE, INC., ET AL.

### DEPONENT:

### LUCAS RUNICE

### DATE:

### April 18, 2022



1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF WISCONSIN

3            JUDGE JAMES D. PETERSON

4        MAGISTRATE JUDGE STEPHEN L. CROCKER

5            CASE NO: 20-CV-1123

6

7     GREGORY BOYER, AS ADMINISTRATOR OF THE ESTATE

8      OF CHRISTINE BOYER, AND ON HIS OWN BEHALF,

9                Plaintiff,

10

11                    V.

12

13     ADVANCED CORRECTIONAL HEALTHCARE, INC., ET

14                    AL.,

15                Defendants

16

17

18

19

20

21

22

23   DEPONENT:  LUCAS RUNICE

24   DATE:      APRIL 18, 2022

25   REPORTER:  KRYSTAL M. BARNES



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 2

```
                        APPEARANCES
 1
 2
 3   ON BEHALF OF THE PLAINTIFF, GREGORY BOYER, AS
 4   ADMINISTRATOR OF THE ESTATE OF CHRISTINE BOYER, AND ON
 5   HIS OWN BEHALF:
 6   Stephen Weil, Esquire
 7   Loevy & Loevy
 8   311 North Aberdeen Street
 9   Third Floor
10   Chicago, Illinois 60607
11   Telephone No.: (312) 243-5900
12   E-mail: weil@loevy.com
13   (Appeared via videoconference)
14
15   ON BEHALF OF THE DEFENDANTS, MONROE COUNTY JAIL:
16   John W. McCauley, Esquire
17   Hansen Reynolds LLC
18   10 East Doty Street
19   Suite 800
20   Madison, Wisconsin 53703
21   Telephone No.: (608) 841-1510
22   E-mail: jmccauley@hansenreynolds.com
23   (Appeared via videoconference)
24
25
```

Page 3

```
                   APPEARANCES (CONTINUED)
 1
 2
 3   ON BEHALF OF THE DEFENDANTS, ADVANCED CORRECTIONAL
 4   HEALTHCARE, AMBER FENNIGKOH, AND LISA PISNEY:
 5   Douglas Knott, Esquire
 6   Leib, Knott, Gaynor
 7   219 North Milwaukee Street
 8   Suite 710
 9   Milwaukee, Wisconsin 53202
10   Telephone No.: (414) 276-2109
11   E-mail: dknott@lkglaw.net
12   (Appeared via videoconference)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
                          INDEX
 1
 2                                                   Page
 3   PROCEEDINGS                                        6
 4   DIRECT EXAMINATION BY MR. WEIL                     7
 5   CROSS EXAMINATION BY MR. KNOTT                    84
 6   REDIRECT EXAMINATION BY MR. WEIL                  95
 7
 8                         EXHIBITS
 9   Exhibit                                          Page
10   1 - Booking Floorplan 1                           23
11   2 - Booking Floorplan 2                           21
12   3 - Intake Medical Screening                      32
13   4 - Monroe County Sheriff's Office Face Sheet of
14       Christine Boyer                               28
15   6 - Narrative Progress Note                       36
16   8 - Monroe County Jail Observation Log            15
17   9 - Email                                         94
18   16 - List of Jail/Medical Staff Working 12-21-19
19        through 12-23-19                             23
20   18 - Medication Verification Form                 15
21   40 - Pages from Monroe County Jail Log, Monroe
22        County, 000082 - 000087                      68
23   41 - Case Narrative, Monroe County, 5264 - 5271   80
24
25
```

Page 5

```
                       STIPULATION
 1
 2
 3   The VIDEO deposition of LUCAS RUNICE was taken at
 4   KENTUCKIANA COURT REPORTERS 730 WEST MAIN STREET, SUITE
 5   101, LOUISVILLE, KENTUCKY 40202 via videoconference in
 6   which all participants attended remotely, on MONDAY the
 7   18TH day of APRIL 2022 at 9:11a.m.; said deposition was
 8   taken pursuant to the FEDERAL Rules of Civil Procedure.
 9   The above-referenced notarial act involved the use of
10   communication technology. Specifically, the court
11   reporter appeared by videoconference pursuant to KRS
12   423.455 and complied with all statutory requirements.
13
14   It is agreed that KRYSTAL M BARNES, being a Notary
15   Public and Court Reporter, may swear the witness and
16   that the reading and signing of the completed transcript
17   by the witness is not waived.
18
19
20
21
22
23
24
25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

```
 1              PROCEEDINGS
 2        COURT REPORTER:  My name is Krystal Barnes. I'm
 3  the online video technician and court reporter today
 4  representing Kentuckiana Court Reporters, located at
 5  730 West Main Street, Suite 101, Louisville,
 6  Kentucky 40202. Today is the 18th day of April 2022,
 7  and the time is 10:12 a.m.  We are convened by video
 8  conference to take the deposition of Lucas Runice in
 9  the matter of Gregory Boyer as administrator of the
10  estate of Christine Boyer and on his own behalf
11  versus Advanced Correctional Healthcare, Inc., et
12  al., pending in the United States District Court for
13  the Western District of Wisconsin, Case Number
14  20-CV-1123.  Will everyone but the witness, please
15  state your appearance, how you are attending, and
16  the location you are attending from, starting with
17  the plaintiff's counsel.
18        MR. WEIL:  Good morning.  My name is Stephen
19  Weil, W-E-I-L.  I represent the plaintiff.  I work
20  for the law firm of Loevy & Loevy.  I am attending
21  this deposition via video from Chicago, Illinois.
22        MR. MCCAULEY:  And this is -- go ahead, Doug.
23        MR. KNOTT:  Yeah.  This is Doug Knott appearing
24  for the ACH Defendants who are Advanced Correctional
25  Healthcare, Amber Fennigkoh, Lisa Pisney, appearing
```

Page 7

```
 1  from my office in Milwaukee, Wisconsin.
 2        MR. MCCAULEY:  And it's John McCauley, Hansen
 3  Reynolds law firm.  I'm in the room with the witness
 4  at the jail in Sparta, Wisconsin, and I represent
 5  Monroe County and the county defendants.
 6        COURT REPORTER:  All right, Mr. Runice, will
 7  you please state your full name for the record?
 8        THE WITNESS:  Lucas Runice.
 9        COURT REPORTER:  All right.  And do all parties
10  agree that the witness is, in fact, Mr. Runice?
11        MR. WEIL:  Plaintiff agrees.
12        MR. KNOTT:  Yes.
13        COURT REPORTER:  All right.  Will you raise
14  your right hand for me please, sir?  Do you solemnly
15  swear or affirm that the testimony you are about to
16  give will be the truth, the whole truth, and nothing
17  but the truth?
18        THE WITNESS:  Yes.
19        COURT REPORTER:  Counsel may begin.
20              DIRECT EXAMINATION
21  BY MR. WEIL:
22     Q    Good morning, Mr. Runice.
23     A    Morning.
24     Q    My name's Steve Weil, as you just heard.  I
25  represent the plaintiff in this case.  Have you ever
```

Page 8

```
 1  been deposed before?
 2     A    Not that I recall.  I've --
 3     Q    Have you ever -- go ahead.
 4     A    I've had other -- I don't know if they're
 5  called affidavits or something like that, but nothing
 6  like this.
 7     Q    Have you testified in a court before?
 8     A    Yes.
 9     Q    How many times?
10     A    I believe, twice.
11     Q    Okay.  Did both of those times you testify
12  have -- were you offering testimony, having to do with
13  your job as a correctional officer?
14     A    Yes.
15     Q    Okay.  And besides testifying in court, have
16  you testified under oath in any form, or in a room with
17  a court reporter in it?
18     A    Yes.
19     Q    Okay.  Can you explain what other testimony
20  you've given, besides testimony in court?
21     A    I guess, I can't.
22     Q    Okay.  You mentioned -- go ahead, I'm sorry.
23     A    Like I was saying, I've just been in court
24  twice.
25     Q    Okay.  Besides those two times -- when you
```

Page 9

```
 1  said, you thought you'd offered other testimony under
 2  oath with a court reporter present, what did you have in
 3  mind when you said yes?
 4     A    I had -- I don't know if they're called
 5  affidavits or something of that sort, where you just
 6  give -- it's like a couple questions, and then you give
 7  brief answers to it.
 8     Q    Okay.  I'll go over a couple rules.  Well, let
 9  me ask you, when was the last time you testified in
10  court?
11     A    If I had to estimate, it'd be around 2014.
12     Q    So about eight years ago was the last time?
13     A    Correct.
14     Q    Okay.  And then in terms of testifying with
15  affidavits, were you sitting in a room when you did that
16  with people present?
17     A    I believe, there was only one person in there.
18     Q    And that person was asking you questions?
19     A    The questions were typed out, and I had to
20  write my own statements for each one.
21     Q    Okay.  How many times did you do that?
22     A    I believe, twice.
23     Q    Okay.  Did both of those times -- were you
24  offering the affidavits as part of your job, as a
25  correctional officer?
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1 A Correct.

2 Q When was the last time you offered affidavits

3 like that -- an affidavit like that?

4 A If I had to estimate, I'd say 2013, 2014.

5 Q I'm going to go over a few rules about

6 depositions to hopefully just make things run smoothly

7 for us today. I expect that you were told a bit about

8 this process before you sat down today. But essentially

9 we're in a room -- in this case, we're remote, but

10 there's a court reporter here. There are two lawyers,

11 besides myself, present. I'm going to be asking

12 questions, and the court reporter is going to take down

13 my questions, your answers. Does that make sense?

14 A Yes.

15 Q You can't see what the court reporter's doing,

16 but she has a little machine that she's typing on, to

17 try to get down what I ask and what you answer. And in

18 normal conversation, it often happens, that people talk

19 over each other. It's not rude, it's just the way

20 everyone talks. We have to suspend that during a

21 deposition as much as we can, because it's very hard for

22 the court reporter to take down two people talking at

23 the same time. Does that make sense?

24 A Yes.

25 Q So I'm going to do the best I can to let you

1 finish your answer, before I ask another question. And

2 the flip side is, please let me finish my question

3 before you answer, to make it easy for the court

4 reporter. Does that make sense?

5 A Yes.

6 Q Okay. The lawyers may have objections today.

7 Do you understand that you're being represented by an

8 attorney today at this deposition?

9 A Yes.

10 Q Okay. And who's that?

11 A John.

12 Q Okay. Unless your lawyer instructs you not to

13 answer a question, even if there's an objection made,

14 you're still obligated to answer. Does that make sense?

15 A Yes.

16 Q I don't think this deposition's going to go

17 too long today, but in all events, it's not an endurance

18 contest. If you need a bathroom break, you need to

19 stretch your legs, you're free to do so. The only thing

20 that I would ask is that you -- if there's a question

21 that I've asked pending, that you answer the question

22 before taking the break. Does that make sense?

23 A Yes.

24 Q I -- you may have spoken with your attorney

25 before this deposition about what this is all about or

1 what have you. I'm not interested in what you spoke

2 about. During the deposition though, and while you're

3 under oath, there are rules governing whether you can

4 speak with your attorney about this deposition, and the

5 questions I'm asking. And so, if we take a break and

6 you speak with your attorney, I reserve my right to ask

7 you about what you said and what you spoke about. Does

8 that make sense?

9 A Yes.

10 Q Are you under any medication, or any lack of

11 sleep, or anything that would prevent you from providing

12 full and complete answers today?

13 A No.

14 Q Okay. This is my one chance to ask you

15 questions before the trial in this case. So it's not a

16 test of your memory, but I am entitled to your best

17 recollection and your best estimate. Does that make

18 sense?

19 A Yes.

20 Q Did you do anything to prepare for this

21 deposition?

22 A Yes.

23 Q What did you do?

24 A I met with my attorneys.

25 Q I don't want you to tell me what you spoke

1 about with your attorneys. But can you say -- when you

2 say you met with your attorneys, can you say who those

3 people were?

4 A John and Andrew (phonetic).

5 Q Okay. When did you meet with them?

6 A I believe, it was on the 12th.

7 Q Okay. Besides meeting with your attorneys on

8 the 12th, did you do anything else?

9 A No.

10 Q Did you review any documents to prepare for

11 your deposition today?

12 A Yes.

13 Q How many documents would you estimate that you

14 reviewed?

15 A Approximately four to five.

16 Q Do you have any memory of what those documents

17 were?

18 A Yes.

19 Q Why don't you list them out, as best you can

20 remember?

21 A One was a med verification sheet, one was the

22 medical watch log, and the other one was a shift log.

23 Q Anything else?

24 A No.

25 Q Do you remember authoring -- do you -- so you



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  said four to five. I got three there. Is that --
2      A    The watch log and the shift log had more than
3  one page.
4      Q    Okay. So you -- when you're referring to
5  documents, you're referring to how many pages you
6  reviewed?
7      A    Correct.
8      Q    Okay. Do you remember -- did you write -- let
9  me ask you this, do you remember reviewing any sort of
10 report that you made about the incident involving
11 Ms. Boyer?
12     A    I don't recall going over it.
13     Q    Okay. When did you review the documents that
14 you just described to me?
15     A    I believe they were e-mailed to me on either
16 the 12th or the 13th.
17     Q    How long did you spend talking with your
18 lawyers on April 12th to prepare for this -- your
19 deposition today?
20         MR. MCCAULEY: Object to form.
21     A    I would say, approximately two hours.
22     Q    I'm going to show you a document, and in the -
23 - we've taken depositions in this room with you in the
24 past, so it's been working, but tell me if you have any
25 trouble recognizing this document. All right. Do you

1  have a document on the screen in front of you now,
2  Mr. Runice?
3      A    Yes.
4      Q    This is -- what I'm showing for the record is
5  Exhibit 18, "Medication Verification Form." Is this one
6  of the documents that you reviewed to prepare for your
7  deposition?
8         (EXHIBIT 18 MARKED FOR IDENTIFICATION)
9      A    Yes.
10     Q    All right. I'm showing you another document
11 that for the record has been marked as Exhibit 8 in this
12 case. Is this -- do you recognize this document,
13 Mr. Runice?
14         (EXHIBIT 8 MARKED FOR IDENTIFICATION)
15     A    Yes.
16     Q    Okay. Is this one of the documents that you
17 reviewed to prepare for your deposition today?
18     A    Yes.
19     Q    Okay. When you say that you reviewed a shift
20 log, can you describe for me what that is?
21     A    Shift log is in our Zuercher program. And
22 it's basically -- we log basically anything that goes on
23 throughout the day, whether it's meal passes or head
24 counts.
25     Q    This is a program in which you're typing

1  information into a computer, not handwriting it; is that
2  right?
3      A    Correct.
4      Q    Okay. And did that -- in reviewing that, did
5  that contain an entry regarding Ms. Boyer?
6      A    Correct.
7      Q    Okay. Was that an entry that you recall
8  making?
9      A    Correct.
10     Q    Do you have any -- let me ask you just to back
11 up real quickly. Where do you work right now?
12     A    Monroe County Sheriff's department.
13     Q    All right. Can you give me a bit of
14 background about your employment history, starting when
15 you graduated from high school?
16     A    I graduated from Westby High, 2010. 2011, I
17 joined the Wisconsin Department of Corrections. I
18 worked for them until the beginning of, I believe it was
19 January of 2018, where I was then employed by Monroe
20 County Sheriff's department.
21     Q    And you've been at the Monroe County Sheriff's
22 department continuously, since January 2018?
23     A    Correct.
24     Q    What has your position been during that time
25 at the Monroe County Sheriff's department?

1      A    A correctional officer.
2      Q    That's been the entire time?
3      A    Correct.
4      Q    Do you have any recollection of Christine
5  Boyer?
6      A    Yes.
7      Q    I'm going to ask you questions about your
8  independent record. And that means, your recollection
9  without having reviewed any of the documents to prepare
10 for this deposition. Do you understand what I'm saying?
11 In terms -- independent versus reviewing a document and
12 seeing what's on a document?
13     A    Yes.
14         MR. MCCAULEY: Object -- object to form.
15     Q    Okay. Independently of the documents reviewed
16 to prepare for this deposition, can you tell me what you
17 recall about Christine Boyer?
18     A    She was brought into the jail one night, and I
19 booked her into the jail.
20     Q    Anything else you recall?
21     A    I remember she had a lot of unique items on
22 her.
23     Q    What do you mean by, "Items"?
24     A    She had several pairs of brass knuckles. She
25 had several loose medications in her purse. She had a

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1   large amount of cash on her.
2       Q    Anything else you recall?
3       A    Not that I can recall.
4       Q    Do you recall -- after booking her in, do you
5   recall anything else about that first night with
6   Ms. Boyer?
7       A    I recall her being seen by medical.
8       Q    What do you mean by -- when you say, "Seen by
9   medical," what do you mean?
10      A    After Danielle had done the medical screening
11  on her, Amber, the jail nurse at the time, was notified
12  that she had medical concerns, and Amber had spoke to
13  Christine.
14      Q    And after Amber spoke to Christine -- well,
15  let me back up, do -- were you present when Amber spoke
16  to Christine?
17      A    I was in the general area.
18      Q    Okay.  Do you have any recollection of what
19  was said, when they spoke together?
20      A    No.  I don't.
21      Q    After Amber spoke to Christine, do you have
22  any recollection about what happened after that?
23      A    Christine was placed on a 30-minute medical
24  watch.
25      Q    Any recollection of after that?

Page 19

1       A    No.
2       Q    The -- do you have any -- besides what you're
3   describing during the booking process, do you have any
4   other recollections about Christine Boyer?
5       A    No.
6       Q    Do you recall Christine Boyer having a medical
7   emergency at any point, during her stay at the Monroe
8   County Jail?
9       A    Yes.
10      Q    Okay.  And that happened the next day; is that
11  correct?
12      A    Correct.
13      Q    Let me strike that.  During your next shift;
14  is that right?
15      A    Correct.
16      Q    What can you tell me about what you remember
17  about what happened on the next shift with Christine
18  Boyer?
19      A    I recall I was working in master control, and
20  I looked at the cameras on the monitor, and seen
21  Christine laying on the floor of the cell.
22      Q    Anything else that you recall?
23      A    I notified Danielle, who was working in
24  booking, to go check on her.  And when Danielle entered
25  the cell, she called for -- she wanted EMS.  And I

Page 20

1   called dispatch, and informed them that we needed EMS
2   and possibly some extra officers to the jail.
3       Q    Anything else you remember?
4       A    Yeah.  I remember that we were short staffed
5   that night.  So in master control, I'd control all the
6   doors in the entire jail.  And I let Kyle and Jeff, the
7   two officers that were working in housing, out of
8   housing.  And they came up to the jail, and started to
9   assist with the medical emergency and Christine.
10      Q    What happened after that; if you remember?
11      A    They were working on -- they were assisting
12  Christine, and I was trying to open doors to let the
13  other officers through the sheriff's side of the jail.
14  And EMS was arriving, so I was also opening those doors.
15  I was also attempting to contact the appropriate people
16  on the telephone, to inform them of what was going on.
17      Q    Do you recall anything else about that shift
18  with Christine Boyer?
19      A    No.
20      Q    Do you recall contacting a service for -- to
21  dispatch a helicopter for Christine Boyer?
22      A    No.
23      Q    Okay.  Do you recall that Christine Boyer was
24  transported from the jail in a helicopter?
25           MR. MCCAULEY:  Object to form.  Hey, Steve, you

Page 21

1   just broke up there.  So we got about half your
2   question.
3   BY MR. WEIL:
4       Q    Do you recall Christine Boyer being
5   transported away from the jail in a helicopter?
6       A    I was informed of that after -- after the
7   incident.
8       Q    Okay.  Do you recall speaking with anybody at
9   the jail about the events surrounding Christine Boyer?
10      A    Are you saying during the incident?
11      Q    We'll get to that, but afterwards.
12      A    Yeah.  I mean, I'm sure it was brought up at
13  some point.
14      Q    Okay.  I'm going show you an exhibit that's
15  been more marked as Exhibit 2.  Can you see a document
16  that looks kind of like a floor layout in front of you,
17  Mr. Runice?
18           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
19      A    Correct.
20      Q    All right.  Do you recognize this floor layout
21  at all?
22      A    Yes.
23      Q    Okay.  What is this a layout of?
24           MR. MCCAULEY:  I'm just going to interrupt and
25  say, if you want to approach the screen -- if you

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 22

1    need to, feel free to do that.
2       A    Okay.  It's a map of the booking area.
3    BY MR. WEIL:
4       Q    I want to -- we've gone over your independent
5    recollection about Christine Boyer.  And I want to just
6    backtrack a little, and talk about the two shifts that
7    you were on.  You were on the night shift in December of
8    2019; is that right?
9       A    Correct.
10      Q    Okay.  And from reviewing the documents in
11   preparation for this deposition, you're aware that
12   Christine Boyer was brought in on the evening of
13   December 21, 2019; is that right?
14      A    Correct.
15      Q    On that evening, were you working in
16   booking; if you remember?
17      A    Correct.
18      Q    Okay.  Where is booking?  If you're working in
19   booking, is that -- are you sitting somewhere in this
20   floor plan?
21      A    Correct.
22      Q    Okay.  Where are you stationed in the floor
23   plan?
24      A    It doesn't have a -- where it says -- I think
25   it says, "Bonds area," and then there's like a wall that

Page 23

1    separates -- if you go to your right.
2       Q    Where my cursor is here, it says, "Bonds"?
3       A    Yeah.  Yeah.  If you go to the right to that
4    wall, right above, "A," where it says -- yeah.  Correct.
5       Q    Okay.  Right above the AED, you're saying
6    that's the booking area?
7       A    Correct.
8       Q    Let me show you Exhibit 1 real quickly.  So
9    you're looking out Exhibit 1.  Do you recognize this
10   diagram at all?
11          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
12      A    Yes.
13      Q    Okay.  Do you see the booking area in Exhibit
14   1?
15      A    I believe, it's the one that's labeled, "C."
16      Q    Okay.  And is that where you remember being
17   stationed on the night of December 21, 2019?
18      A    Correct.
19      Q    Okay.  I'm going to show you now a document
20   that's been marked as Exhibit 16 in this case.  This was
21   a list provided to us of the -- purported list of the
22   persons working at the jail, during Christine Boyer's
23   stay at the jail from December 21st to December 23rd,
24   2019.  Do you -- can you read the names on that list,
25   Mr. Runice?

Page 24

1          (EXHIBIT 16 MARKED FOR IDENTIFICATION)
2       A    Yes.
3       Q    Okay.  As best you can remember, do you
4    remember who was working with you at the jail, on the
5    night shift, on December 21st?
6       A    It would be Sergeant Danielle Warren,
7    Corrections Officer Kyle Moga, and Corrections Officer
8    Jeff Schwanz.
9       Q    Anyone else that you recognize from this list,
10   as working with you on that shift?
11      A    I believe the on-call James Tucker was there,
12   also at the beginning of shift.
13      Q    What does, "On-call," mean; if you know?
14      A    He's a part-time employee.
15      Q    Okay.  Does that mean he would not have been
16   there the whole shift, but would've been there for part
17   of it?
18      A    Correct.
19      Q    Now the night shift is 6:00 p.m. to 6:00 a.m.;
20   is that right?
21      A    Correct.
22      Q    Okay.  And is it the case, that some people
23   working on any shift are stationed in the booking area,
24   and then others are in the -- stationed in the other
25   parts of the jail; is that right?

Page 25

1       A    Correct.
2       Q    Do you remember who was stationed in booking,
3    on the night of December 21st?
4       A    I believe, Danielle was.
5       Q    And you were, correct?
6       A    Correct.
7       Q    Okay.  How many employees would typically be
8    on a shift during this time, at the jail, total?
9       A    Typically, it's five.  Unless we have a
10   part-time officer working and then there can be up to
11   six.
12      Q    Okay.  Is it typically two people in booking
13   and then -- in the booking area, and then the others are
14   in the other parts of the jail?
15      A    Correct.  If it's busy in booking, they'll
16   have two, or the second booking officer will float
17   around where help is needed.
18      Q    Okay.  So there's always one person in master
19   control; is that right?
20      A    Correct.
21      Q    Okay.  And then there would be a person, say,
22   in your role on December 21st, who's at the booking desk
23   and taking people in on booking?
24      A    Correct.
25      Q    Do you remember who was in master control on



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 26

1  the night of December 21st?

2      A    I don't recall.

3      Q    Okay.  If you were in booking and we -- so

4  we've taken the deposition of Danielle Warren in this

5  case, and we understand from that deposition that she

6  did the intake with Ms. Boyer, as Ms. Boyer came into

7  the jail.  Would that indicate to you that she wasn't in

8  booking, given your understanding of how the booking

9  area operates -- or I'm sorry that she was not in master

10 control?

11     A    Sorry.  I'm kind of --

12     Q    You're not following me?  That's fair.  That's

13 fair.

14     A    No --

15     Q    Go ahead.

16     A    No.  I was just going to ask if you could ask

17 the question over again.

18     Q    Sure, sure.  I'm trying to -- I'm trying to

19 get your recollection of who would've been in booking on

20 the night of -- on that night shift of December 21st. So

21 again, we've taken the deposition of Danielle Warren,

22 this case.  And our understanding from that deposition

23 is that she conducted the intake of Ms. Boyer, as Ms.

24 Boyer came into the jail.  My understanding is a person

25 conducting intake would not be in the main control area,

Page 27

1  is that -- is that how things operate?

2      A    Correct.  She would not have been a master

3  control.

4      Q    And if you were in booking and did the booking

5  Ms. Boyer, would that mean that you were not in master

6  control either?

7      A    Correct.

8      Q    Okay.  And so would that indicate to you a

9  third person in the booking area that night?

10          MR. MCCAULEY:  Object to form.

11     A    There would've been one in master control.

12     Q    Okay.  And to your recollection, that would

13 not have been Kyle Moga or Jeff Schwanz, right?

14     A    I don't recall who was in master control.

15     Q    Okay.  In light of that conversation we just

16 had, is there anybody else on this list, who you believe

17 might have been in the booking area, specifically master

18 control, on the evening of December 21st?

19     A    If somebody would've been staying on overtime

20 from first shift?  Again, I -- I don't recall who

21 would've stayed or who did stay, but...

22     Q    So Mr. Runice, directing you again to Exhibit

23 1, you said that you were in -- you would've been in

24 booking, which is area C, right?  On the evening of

25 December 21st?

Page 28

1      A    Correct.

2      Q    And I believe you said, that you recalled

3  Ms. Fennigkoh and Ms. Boyer having a conversation on the

4  evening of December 21st?

5      A    Correct.

6      Q    Can you identify about where you believe that

7  conversation occurred on, on this layout map?

8      A    It was near C.

9      Q    Okay.  So near the booking area C?

10     A    Correct.

11     Q    Any more -- anything more specific that you

12 can recall about where it would've occurred?

13     A    No.

14     Q    Okay.  I'm showing you now, what's been marked

15 as Exhibit 4 in this case, and I'm going to scroll

16 through it really quickly, Mr. Runice.  And you just

17 tell me if you can recognize it at all.  Is this a

18 document --

19          (EXHIBIT 4 MARKED FOR IDENTIFICATION)

20     A    Yes.

21     Q    Okay.  You can recognize it?

22     A    Correct.

23     Q    Is this a document that you reviewed in

24 preparation for your deposition today?

25     A    No.

Page 29

1      Q    Okay.  Do you -- can you tell me what this

2  document is?

3      A    It's called the face (phonetic) sheet.

4      Q    Okay.  And how is this document prepared; if

5  you know?

6          MR. MCCAULEY:  Object to form.

7      A    When you book somebody in, it gives different

8  levels in the program.  So like the first level will ask

9  personal information, such as date of birth, age,

10 height, weight, and basically you'll enter all that info

11 in.  And once you go to print, it'll come out as that

12 sheet.

13     Q    Okay.  Is this a document with the entry --

14 the data entry you're describing just now, is that

15 something that's done by the booking officer?

16     A    Correct.

17     Q    Okay.  Do you see your name here?  It says,

18 "Booked by"?

19     A    Correct.

20     Q    Okay.  Does that indicate to you, that you

21 enter the information that's described in this sheet?

22     A    Yes.

23     Q    Okay.  And that information that you're

24 describing is the demographic information that's next to

25 Ms. Boyer's photo; is that right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  A  Correct.

2  Q  Okay.  I believe that you said -- so you enter

3  information, like sex, date of birth, age height, that

4  sort of information?

5  A  Correct.

6  Q  Is some of this information automatically

7  generated?  As in, when you printed out it's not

8  something you entered, but it's generated by the

9  program?

10  A  No.

11  Q  Okay.

12  A  The JCA number would be the only thing that's

13  automatically generated.

14  Q  The JCA number is this number, "201900787"; is

15  that right?

16  A  Correct.

17  Q  Okay.  The other information on the sheet

18  would be entered by the booking officer; is that right?

19  A  Correct.

20  Q  There's -- on the second page, do you see

21  where it says, "Charge"?

22  A  Yes.

23  Q  Okay.  And below that, it says -- a couple

24  lines down, it says, "Scheduled intake court appearance,

25  date," do you see that?

1  A  Yes.

2  Q  Is that information that you would've have

3  entered as a booking officer?  The court appearance date

4  and the time?

5  MR. MCCAULEY:  Object to form.

6  A  Yes.

7  Q  Okay.  And do you know how you knew to enter

8  this date and time?  It says Monday -- or it doesn't say

9  Monday.  It says, "December 23, 2019, 13:00," hours is

10  the scheduled intake court appearance date, do You see

11  that?

12  A  Yes.

13  Q  How would you -- how did you enter -- how did

14  you know to enter that information in the intake sheet -

15  - the face sheet?

16  MR. MCCAULEY:  Object to form.

17  A  It would've been the following business day.

18  Q  And how did you know there was a court date on

19  the following business day?

20  A  Cause we typically have bond court on the --

21  on Mondays.

22  Q  Okay.  So this would be a bond court date?

23  A  Correct.

24  Q  Can you tell me what, "Bond court," is?

25  A  Bond court is when the individual goes and

1  sits in front of a judge, and typically they're -- they

2  have the public defender there for them, and the DA is

3  also there.  And a bond is set for them, so they can be

4  released from the jail.  And it typically has bond

5  conditions on it.

6  Q  And your understanding is that's what's done

7  on this bond court date, that you entered here?

8  A  Correct.

9  Q  There's a signature down here at the bottom,

10  do you see that?

11  A  Yes.

12  Q  It -- how is that a signature -- it looks like

13  Ms. Boyer's signature; is that right?

14  A  Correct.

15  Q  Okay.  How is -- how does the detainee go

16  about signing this form?

17  A  It's signed on a -- on a electronical pad.

18  Q  Once the detainee signs the form, is it

19  printed out, and provided to them?

20  A  They do not get a copy of that document.

21  Q  Is the detainee given information about their

22  bond court date, during the booking process?

23  A  We typically inform them of when they will be

24  going.

25  Q  I am showing you now what's been marked as

1  Exhibit 3 in this case.  I'm going to scroll through it

2  real quickly with you, Mr. Runice.  My first question

3  is, did you get a chance to look at it?

4  (EXHIBIT 3 MARKED FOR IDENTIFICATION)

5  A  Yes.

6  Q  Okay.  Without referring to the specific

7  information that's handwritten in here, do you recognize

8  this form?

9  A  Yes.

10  Q  What is it?

11  MR. MCCAULEY:  Just object to form.  Just going

12  to share, the -- only a portion of the document is

13  up, at this point.

14  BY MR. WEIL:

15  Q  Cool (phonetic).  So I've scrolled through

16  this document, Mr. Runice.  So I'm asking you, it's a

17  three-page document, right?

18  A  Correct.

19  Q  And it's handwritten information on a form,

20  right?

21  A  Correct.

22  Q  Okay.  Without referring to the handwritten

23  information that's written in here, can you just

24  describe what this form is?

25  A  It's an, "Intake Medical Screening Report."

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 Q Okay. And is this a report that's prepared,
2 as a person is being taken into the jail during the
3 booking process?
4 A Correct.
5 Q And my understanding from deposing other
6 witnesses in this case is that this form is typically
7 filled out before a person is moved over to booking, in
8 the sequence of them be brought into the jail; is that
9 right?
10 A Correct.
11 Q When the form is filled out and it -- the
12 person's brought over to booking, do you know what
13 happens to the form itself? And again, I'm referring
14 generally here, your understanding of the process. Do
15 you understand what happens with the form, as it --
16 after it's been filled out on the intake process, and
17 the person's brought over to booking?
18 A Yes.
19 Q What happens to the form?
20 A It'll get a face sheet stapled to it, and it
21 goes to medical.
22 Q Okay. My understanding from other depositions
23 taken in this case, is that there's something of an
24 intake box or a wire basket at the booking station, and
25 the -- this form is placed in that wire basket; is that

1 right?
2 MR. MCCAULEY: Object to form.
3 A Correct.
4 Q Okay. And did you say this -- this was --
5 this would be stapled to the face sheet, that we just
6 reviewed?
7 A Correct.
8 Q And so the persons brought over to booking
9 with this intake medical screening report, the booking
10 process is completed. The face sheet is printed out.
11 Those two documents are stapled together, and they're
12 placed in the wire basket at the booking station; is
13 that right?
14 A Correct.
15 Q Okay. Turning you to this -- the actual
16 handwriting in Exhibit 3, have you seen Exhibit 3
17 before, in preparation for your deposition today?
18 A No.
19 Q Do you recognize this document at all?
20 A Yes.
21 Q Okay. Tell me what do you recognize it as?
22 MR. MCCAULEY: Object to form.
23 A An, "Intake Medical Screening Report."
24 Q Okay. So, Mr. Runice, just referring to your
25 memory again, of that evening, you said that you

1 recalled Ms. Boyer having a conversation with
2 Ms. Fennighoh, right?
3 A Correct.
4 Q And I think you said, you weren't able to hear
5 what was said during that conversation; is that right?
6 A Correct.
7 Q I am going to show you now, what's been marked
8 as Exhibit 6. This is a, "Narrative Progress Note,"
9 created by Amber Fennighoh. And why don't you just take
10 a minute to read this entry that's dated
11 December 21, 2019, 22:40. Can you read it okay? I'm
12 going to blow it up a little here, Mr. Runice for you.
13 Let's see if we can make it a little bigger. Can you
14 read it okay there?
15 (EXHIBIT 6 MARKED FOR IDENTIFICATION)
16 A Yes.
17 Q Okay. Great. Just take a minute to read it.
18 And then I have a couple questions. Just let me know
19 when you're done, Mr. Runice, and I can ask the
20 questions.
21 A I'm completed.
22 Q Okay. So Ms. Fennighoh testified, this was a
23 summary that she wrote up after the intake process. and
24 I'm interested in the last line here, "RN instructed
25 jail staff to alert NP of situation when able." Do you

1 recall having a conversation with Ms. Fennighoh about
2 Ms. Boyer, after -- as the intake process was being
3 completed?
4 A No.
5 Q Okay.
6 MR. KNOTT: I'm sorry. Could I have that
7 question again? I had something interrupt me here.
8 MR. WEIL: Go ahead. I -- does the court
9 reporter want to ask the -- to read it back or...?
10 COURT REPORTER: Yeah.
11 MR. WEIL: Well, I can just -- I can just do it
12 real quickly.
13 BY MR. WEIL:
14 Q But -- so do you recall having a conversation
15 with Ms. Fennighoh, Mr. Runice, after the intake process
16 was being completed?
17 A No.
18 MR. KNOTT: Okay. Thank you.
19 Q Do you remember talking with anybody about
20 alerting Lisa, the nurse practitioner, about Ms. Boyer?
21 MR. MCCAULEY: Object to form.
22 A No.
23 Q Do you remember being told -- you testified a
24 bit ago that Ms. Boyer was placed on a medic --
25 30-minute medical watch, right?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    A    Correct.

2    Q    Do you remember being told why Ms. Boyer was
3  being placed on a medical watch?

4    A    No.

5    Q    Okay.  I am now showing you what's been marked
6  as Exhibit 8, Mr. Runice, and we saw this at the
7  beginning of your deposition.  This is one of the
8  documents you reviewed in preparation of your deposition
9  today, correct?

10   A    Correct.

11   Q    Okay.  Now, your -- this is a, "Monroe County
12 Jail Observation Log," right?

13   A    Correct.

14   Q    And the purpose of this log is to record
15 observations about folks who are being observed for
16 medical purposes; is that right?

17   A    Correct.

18   Q    You are -- the way this works in terms of
19 recording information, is that a badge number is
20 recorded, so it can be determined later who made the
21 medical observation; is that right?

22   A    Correct.

23   Q    And your badge ends in 58; is that true?

24   A    Correct.

25   Q    And so this has you doing observations -- I'm

Page 39

1  looking at the second page of Exhibit 8, this records
2  you making observations that -- looks like 11:32 and
3  then 11:46 p.m. on December 21st; is that right?

4    A    Correct.

5    Q    Do you remember being told, or asking what you
6  should be looking for, or what you should be observing
7  Ms. Boyer for?

8    A    No.

9    Q    Okay.  This -- again, Mr. Runice, is Exhibit
10 18.  And this is one of the documents you've reviewed,
11 in preparation for your deposition today; is that right?

12   A    Correct.

13   Q    Okay.  And your badge number is down here in
14 the right hand corner, "1258"; is that right?

15   A    Correct.

16   Q    Do you recognize your handwriting anywhere in
17 this document?

18   A    On the top two columns, I would call them.

19   Q    Okay.

20   A    And -- and that information above appears to
21 be mine.

22   Q    Okay.  So, this information on the "Date,
23 time, detainee name, ID number, age, and date of birth"?

24   A    Correct.

25   Q    Is that -- okay.  You recognize it as your

Page 40

1  handwriting?

2    A    Correct.

3    Q    Okay.  And then, I believe you said, the -- in
4  turning to the form itself, I believe you said, you
5  recognized that the first two -- the number one and
6  number two medical entries as -- or entries, as your
7  handwriting as well?

8         MR. MCCAULEY:  Objection to form.

9    A    Correct.

10   Q    Okay.  Is the third entry -- does you
11 recognize -- is that your handwriting?  I can blow it up
12 a little here.

13   A    It doesn't appear to be my handwriting.

14   Q    Okay.  And the fourth and fifth entries, do
15 those appear to be your handwriting?

16   A    I don't believe so.

17   Q    Okay.  So we've gone over the first column,
18 the second column, the medication -- so this is the --
19 sorry.  For one and two, there's sort of -- there's a
20 column here that has sort of a bunch of sub columns, "RX
21 filled, number of pills in bottle, medication name, and
22 medication dose," right?

23   A    Right.

24   Q    And so when you're saying that you recognize
25 your handwriting is filling these out, you're referring

Page 41

1  to that first column, with all those sub columns that
2  are just listed for the first two?

3         MR. MCCAULEY:  Object to form.

4    A    Correct.

5    Q    Okay.  Turning you to the second large column,
6  "Medication instructions," do you see that?

7    A    Yes.

8    Q    Okay.  The first line for, "Oxycodone," is
9  that your -- in the medication instructions column, is
10 that your handwriting there?

11   A    Yes.

12   Q    And then this next line for number two,
13 "Ondansetron."  Is that -- it says, "As needed for
14 nausea from chemo radiation," do you see that?

15   A    Yes.

16   Q    Is that your handwriting there?

17   A    No.

18   Q    Do you know whose handwriting that is?

19   A    No.

20   Q    Do you recall filling out any part of this
21 form?

22   A    I'm sorry.  You cut out.

23   Q    I'm sorry.  Do you recall filling out any part
24 of this form, Exhibit 18?

25   A    Just the portions that we just discussed.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    Do you remember why you were filling out this
2 form?
3    A    I don't.  I just remember that the oxycodone
4 is a narc, and I wanted to make sure that all the pills
5 were accounted for.
6    Q    Is it -- is it part of the job of the booking
7 officer to fill out forms like this, as part of the
8 booking process, when somebody comes in with medication?
9    A    Yes.
10    Q    Okay.  And in term -- there's a -- sort of, a
11 third column here in Exhibit 18 that says, "Approved,"
12 do you see that?
13    A    Yes.
14    Q    Do you understand -- I'm not referring to this
15 document specifically, but do you understand how the --
16 this column, the, "Approved," column gets filled out
17 ultimately?
18    A    Yes.
19    Q    How's -- how's that filled out?
20    A    You have to call the provider, and inform them
21 of all the information beforehand, and they will either
22 approve it or deny it.
23    Q    On the night shift, when somebody comes in
24 shortly before, like, midnight, like Christine Boyer
25 did, would it -- was there a practice, in terms of

1 calling the provider to get an approval for the
2 administration of medication?
3        MR. MCCAULEY:  Object to form.
4    A    I would say, it'd depend on what the
5 medication was.
6    Q    Do you have any indication of whether you
7 would've called the -- well, let -- let's just go to
8 this first one.  I'm sorry, just to back up.  In this --
9 in the second column for entry two, "As needed for
10 nausea from chemo radiation," do you see that?
11    A    Yes.
12    Q    You said that was not your handwriting, right?
13    A    Correct.
14    Q    And I may have missed it.  There's -- there's
15 another officer here.  "1257," do you see that?
16    A    Yes.
17    Q    Do you recognize that as Brooke Dempsey's
18 badge number?
19    A    Correct.
20    Q    Do you recognize any handwriting on this form,
21 as Brooke Dempsey's handwriting?
22    A    I can't recall her handwriting looks like.
23    Q    Okay.  Brooke Dempsey was on the day shift; is
24 that right?
25        MR. MCCAULEY:  Object to form.

1    A    Correct.
2    Q    Do you have any recollection of calling Ms.
3 Pisney the night Ms. Boyer was taken in on an intake,
4 about the medications that she'd received?
5    A    No.
6    Q    In terms of the entry in the, medication
7 instructions, how would you go about making an entry?
8 I'm looking at the first row, "One tab, 4X daily for
9 pain," do you see that?
10    A    Yes.
11    Q    Okay.  The fact that there's a medication
12 instruction entry here, would that indicate to you that
13 you called Ms. Pisney?
14    A    No.
15        MR. KNOTT:  Object to the form.
16    Q    No?  Did he say, "No"?
17    A    No.
18    Q    Okay.  Where would this medication instruction
19 entry come from if -- if you hadn't called Ms. Pisney?
20        MR. MCCAULEY:  Object to form.
21    A    From the bottle or the prescription bottle.
22    Q    Okay.  So you would record what the
23 prescription bottle said, in terms of the medication
24 instructions on the bottle?
25    A    Correct.

1    Q    Okay.
2        MR. WEIL:  Sorry, Mr. Runice.  There we go.  You
3 know, how about we take a quick restroom break, just
4 five minutes.  We can come back at 10:20.
5        COURT REPORTER:  We are off the record.  It is
6 --
7        MR. KNOTT:  Can I get 10 minutes, Steve?
8        MR. WEIL:  Sure.  No problem.  Let's -- we'll
9 come back at --
10        MR. KNOTT:  I need to make a phone call.
11        MR. WEIL:  10:25.
12        COURT REPORTER:  10:25.  We are off the record.
13 It is 10:14 a.m.
14        (OFF THE RECORD)
15        COURT REPORTER:  We are back on the record.  The
16 time is 10:28 a.m.
17 BY MR. WEIL:
18    Q    Runice -- Mr. Runice, just directing you again
19 to the medication verification.
20        AUTOMATED VOICE RECORDING:  Unknown caller.
21        MR. WEIL:  I'm sorry.  Just one minute.
22        MR. MCCAULEY:  Make sure that that's shut, real
23 quick.
24        THE WITNESS:  Yeah.
25        MR. MCCAULEY:  Thanks, Lucas.  I should have

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  done that.
2      THE WITNESS:  No.  You're all right.
3      MR. WEIL:  Apologies.
4      MR. MCCAULEY:  That's okay.
5  BY MR. WEIL:
6      Q    Okay.  Directing you to the medication
7  verification form that we've been talking about.  When
8  you completed that, what would you do with a form like
9  that, once you completed it?
10     A    If all the medication was verified, then you
11 would call it into the -- to the doctor, and inform them
12 of the medications, and everything else.  And then they
13 would approve it or not approve it.
14     Q    Okay.  I guess, I meant with the piece -- say
15 in the booking process, what would you do with the form
16 itself, the piece of paper?
17     A    The -- the medication form?
18     Q    Here.  I'll pull it back up, so --
19     A    Okay.
20     Q    So, this.  Can you see Exhibit 18, Mr. Runice?
21     A    Yes.
22     Q    Okay.  Just -- this piece of paper, once you
23 filled it out, where would that go?  What would happen
24 with the piece of paper?
25     A    It would go to medical.

Page 47

1      Q    Okay.  In the case where -- it was -- when you
2  say it goes to medical, would it be included with a face
3  sheet and the intake sheet, and placed in that wire
4  basket?
5      MR. MCCAULEY:  Form.
6      A    No.
7      Q    What would happen with it?
8      MR. MCCAULEY:  Form.
9      A    I personally put it in a Ziploc baggie with
10 the face sheet and also the medications.  And it's
11 placed in a secure area inside medical.
12     Q    Okay.  When we spoke a few minutes ago -- I
13 believe you just said, you'd place it in a Ziploc
14 baggie, with a face sheet and a medication sheet; is
15 that right?
16     MR. MCCAULEY:  Object to form.
17     A    Correct.
18     Q    We spoke a few minutes ago about what you
19 would do with a face sheet and the intake sheet.  And my
20 understanding it, from what you told me was, that those
21 two sheets would be placed on a -- in a basket at the
22 booking station; is that right?
23     MR. MCCAULEY:  Object to the form of the
24 question.  Go ahead.
25     THE WITNESS:  Sorry (phonetic).

Page 48

1      MR. KNOTT:  Join.
2      A    The -- the intake one is placed in a basket,
3  behind booking.
4  BY MR. WEIL:
5      Q    Okay.  And that's the intake Exhibit 3 here --
6  the intake medical screening report, right?
7      A    Correct.
8      Q    Okay.  And as I understood your testimony
9  earlier, the intake medical screening report would be
10 attached to, or stapled to, or paper clipped with the
11 face sheet -- the booking face sheet, that you filled
12 out on the computer; is that right?
13     A    Correct.
14     Q    Okay.  You -- and I understand you're
15 describing a different process for the medication
16 verification form; is that right?
17     A    Correct.
18     Q    Okay.  And so can you describe again the
19 process for what you would do with a medication
20 verification form, once you filled it out?
21     A    I take -- I take the -- the verification form,
22 along with a face sheet, and put it in a Ziploc baggie,
23 along with the medications that go along with the --
24 with the verification form.  And it's placed in the
25 office of medical, in a secured area.

Page 49

1      Q    And why is that done?
2      A    So that they can be either called in or
3  medical can order the -- order more of the medications,
4  whatever medical needs to do to follow up with it.
5      Q    In Ms. Boyer's case here, we've been talking
6  about three documents that were created when she came
7  in.  One is the face sheet, correct?
8      A    Correct.
9      Q    Okay.  One is the intake medical screening
10 report, right?
11     A    Correct.
12     Q    And the third is the medication verification
13 form, right?
14     A    Correct.
15     Q    Okay.  My understanding from the testimony
16 earlier -- I'm not trying to put words in your mouth,
17 I'm just trying to understand what's happening.  My
18 understanding from your testimony earlier, that the face
19 sheet and the intake medical screening report would be
20 appended to each other, and placed in a basket in
21 booking --
22     MR. MCCAULEY:  Form.
23     Q    -- is that correct?
24     A    Correct.
25     Q    Okay.  And so that's the first two documents.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 50

1  It -- you're saying that something different happens to
2  this third document, the medication verification form?
3      A    Correct.
4      Q    Okay.  And so the medication verification form
5  is not placed in the basket in booking; is that right?
6      A    Typically not, if there's medications along
7  with it?  No.
8      Q    Okay.
9      A    They shouldn't be left out.
10     Q    Okay.  And so that medication verification
11  form, is it separated from the first two forms, where
12  the first two forms go into the basket, and this third
13  medication verification form goes into a secure area in
14  medical?
15         MR. MCCAULEY:  Object to the form.  It's asked
16     and answered.  Go ahead.  Sorry.
17     A    Correct.  They are separate.
18     Q    Okay.  In Ms. Boyer's case, do you recall that
19  procedure where the face sheet and the -- again, Exhibit
20  3, the intake medical screening report, those were
21  placed in the basket.  And then the medication
22  verification form was separated and placed somewhere in
23  medical?
24         MR. MCCAULEY:  Object to form.
25         MR. KNOTT:  Join.

Page 51

1      A    I don't recall that process being done.
2      Q    Would that have been your standard process,
3  for a detainee who comes in with medications?
4         MR. MCCAULEY:  Same objection.
5      A    She had loose medications in her purse that
6  the pills could not be ID'ed.  So therefore, we wouldn't
7  have called them in or did anything with them because we
8  didn't have the prescription, they were loose pills.  But
9  I believe the pills were taken to medical, and placed in
10  a secured area.
11     Q    Okay.  Sir, is that based on your
12  recollection, or are you describing a standard process?
13     A    Sorry.  Can you ask the question again?
14     Q    Sure.  I'm asking what -- so I'm asking -- I'm
15  trying to understand what you recall about Ms. Boyer's
16  intake.  And it sounds like you say you recall that she
17  had loose pills; is that right?
18     A    Correct.
19     Q    What is that recollection based on?
20     A    I found pills -- smaller pills in the bottom
21  of her purse and they were all --
22     Q    I guess --
23     A    I can't --
24     Q    Go ahead.
25     A    I don't recall exactly how many different ones

Page 52

1  there were, but I remember that there was a couple
2  different pills, not -- not in any sort of packaging or
3  container
4      Q    As part of the booking process then, do you --
5  you -- it sounds like you're testifying, that you recall
6  examining Ms. Boyer's purse?
7      A    Correct.
8      Q    And you recall locating pills in the purse?
9      A    Correct.
10     Q    And you recall that some of those pills were
11  loose, and some were in a prescription bottle; is that
12  right?
13     A    I believe, only the oxycodone was in a
14  prescription bottle.
15     Q    And -- okay.  And so, again, turning to -- do
16  you -- based on that recollection, do you remember what
17  you did with the medication verification form, after
18  filling it out?
19     A    I don't recall.
20     Q    Okay.  And so when you were describing placing
21  the medication verification form in a Ziploc baggie, are
22  you describing your standard process or something you
23  recall doing for Ms. Boyer?
24     A    That's something that I typically do.
25     Q    Okay.  Do you have any recollection of doing

Page 53

1  that with Ms. Boyer?
2         MR. MCCAULEY:  Object to form.  Asked and
3     answered.
4      A    I don't recall because we were trying to
5  identify the medications that were found in the purse.
6      Q    You mean, you recall trying to identify the
7  medications, but you don't recall what you did with the
8  medication verification form; is that correct?
9      A    Correct.  I would -- I'm assuming that the
10  medication verification form was along with the pills
11  that were found.
12     Q    I'm not quite understanding that answer.  So
13  what -- what do you mean by it, "Was along with the
14  pills that were found"?
15     A    So the medication that was found would have
16  went to medical, along with that form.
17     Q    All right.  So if I understand correctly, you
18  under -- you do recall trying to identify the pills that
19  were found in Ms. Boyer's purse; is that right?
20     A    I don't believe I personally was trying to do
21  it, but I remember informing Amber that there was loose
22  medications in there.
23     Q    Okay.  Do you remember when you informed Amber
24  there was loose medications in there?
25     A    When she was in booking, talking to Christine.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1    Q    Okay.  And so as part of the booking process,
2  you examined Ms. Boyer's purse; is that right?
3    A    Correct.
4    Q    And you were cataloging the property that was
5  in that purse, such as the knuckles you described and
6  the cash?
7    MR. MCCAULEY:  Object to form.
8    A    Correct.  I was going through her purse, and
9  logging the property.
10    Q    Okay.  And that's when you discovered the
11  prescription bottle and the additional pills?
12    A    Correct.
13    Q    All right.  So turning again, to the
14  medication verification form.  I'm just trying to
15  understand -- make sure I understand what happened with
16  this form, to the best of your recollection.  You recall
17  identifying pills, as part of the booking process.  And
18  then you all recall filling this form out; is that
19  correct?
20    A    I recall filling out the portions that we
21  spoke about.  Yes.
22    Q    Okay.  And then, is it correct that you --
23  some of these pills, when you filled them out, hadn't
24  been identified yet?
25    A    Correct.

1    Q    All right.  And so did you leave these pills
2  for later identification for -- for someone else to
3  continue trying to identify them?
4    MR. KNOTT:  Form.
5    A    Correct.
6    Q    And again, do you remember where you left the
7  pills, to have the identification process continue
8  later?
9    A    I don't recall exactly.  But I'm assuming that
10  they were placed in medical.
11    Q    Okay.  And is that assumption based on the
12  standard process for identifying medications, that you
13  haven't been able to identify yet?
14    A    Correct.  We don't leave just loose pills
15  laying out in booking.
16    Q    All right.  And so if I understand correctly,
17  the -- as you recall it -- turning back to the three
18  forms we've been talking about, the face sheet and the
19  intake screening report would be left in booking, in
20  that wire basket.  And this medication verification form
21  would go to medical; is that right?
22    MR. KNOTT:  Form.
23    MR. MCCAULEY:  Object to form.
24    A    Correct.
25    Q    I want to show you again, this is the

1  observation log, Exhibit 8 that we've been discussing.
2  You -- your -- the night shift is 6:00 to 6:00; is that
3  right?
4    A    Correct.
5    Q    All right.  I see your last entry here is,
6  "6:29 a.m.," do you see that?
7    A    Yes.
8    Q    Do you recall staying past your shift on
9  December 22nd? -- in the morning of December 22nd.
10    A    Yes.
11    Q    I'm sorry.
12    A    Yes.
13    Q    I broke the rule.  Let me -- let me get that
14  out, so we're -- we're -- the court reporter doesn't
15  have a headache.  On the morning of December 22nd, this
16  indicates that you stayed at least until, "6:29 a.m.,"
17  do you see that?
18    A    Yes.
19    Q    And do you recall staying -- that was past
20  your shift, correct?
21    A    Correct.
22    Q    Do you recall staying past your shift on the
23  morning of December 22nd?
24    A    Yes.
25    Q    Do you recall why you stayed past your shift

1  on the morning of December 22nd?
2    A    Yes.
3    Q    And why was that?
4    A    We had a large amount of inmates being brought
5  in to the jail at one time.
6    Q    Okay.  And why did that cause you to stay past
7  your normal shift hour?
8    A    I was helping trying to book people into the
9  jail.
10    Q    Do you recall how late you stayed on the
11  morning of December 22nd?
12    A    I don't recall.
13    My understanding from deposing -- we deposed
14  Ms. Parker and Danielle Warren in this case, and my
15  understanding of -- from deposing them, is that there is
16  -- as shifts change over, that there is some interaction
17  between the officers discussing the people who may be in
18  booking.  Is that consistent with your recollection?
19    A    Yes.
20    Q    Okay.  Would you -- would it be the process
21  that you typically discuss with the incoming shift, any
22  special issues involving detainees who were -- had been
23  booked into booking?
24    A    Yes.
25    Q    And would that include medical issues?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1    A    Yes.
2    Q    Would it involve issues such as, any
3  prescriptions they were on or prescriptions that they
4  might need?
5    A    Yes.
6    Q    Do you recall speaking with anybody on that
7  shift change about Ms. Boyer?
8    A    I don't recall personally doing it, but I know
9  that they were informed that she was up there on a
10  medical watch.
11    Q    How do you know that?
12    A    Because they were completing the medical watch
13  and filling out the form, so they were informed of it.
14    Q    When you say, "Completing the medical watch
15  and filling out the form," what are you referring to?
16    A    Filling out the observation.
17    Q    Okay.  And that's the Exhibit 8, that we're
18  looking at on the screen here?
19    A    Correct.
20    Q    And so what this form would have, is just the
21  fact that someone's on medical watch, right?
22    A    Correct.
23    Q    Okay.  Would any additional information be
24  transferred over, besides just the simple fact that this
25  person was on medical watch?

Page 59

1        MR. MCCAULEY:  Object to form.
2    A    There typically is, but I don't recall being
3  the one doing it.
4    Q    Do you not recall one way or the other you may
5  have, or you may not have, or...?
6    A    I would've assumed that I would've informed
7  them of a medical watch.
8    Q    Okay.  And you would've informed them of the
9  reason the person was on medical watch?
10        MR. MCCAULEY:  Object to form.
11    A    Correct.
12    Q    Okay.  Do you recall informing anybody that
13  Ms. Pisney should be called about Ms. Boyer?
14    A    I don't recall that.
15    Q    Okay.  Do you recall informing anybody that
16  there was a medication verification form in the medical
17  unit for Ms. Boyer?
18    A    I don't recall that.
19    Q    Was there any rule about what information you
20  had to pass on about a detainee's medical condition,
21  from one shift to the other?
22        MR. MCCAULEY:  Object to form.
23    A    Not that I'm aware of.
24    Q    Was there any expectation about -- or a
25  process about what information was typically passed on,

Page 60

1  about an inmate's medical condition, from one shift to
2  the other?
3        MR. MCCAULEY:  Object to form.
4    A    Not that I'm aware of.
5    Q    Okay.  When you begin a shift, do you ever
6  learn about -- beyond the fact that someone may be on a
7  medical watch, do you ever learn any information about
8  why they're on a medical watch?
9        MR. MCCAULEY:  Object to form.
10        MR. KNOTT:  Join.
11    A    Yes.
12    Q    Okay.  And how do you learn that information?
13        MR. MCCAULEY:  Same objection.
14    A    Whether it's verbal pass on or in an e-mail.
15    Q    Okay.  So can you describe what, "Verbal pass
16  on," is?
17    A    Verbal would be one -- who's ever working in
18  one area, telling the oncoming shift what's going on.
19    Q    Were there any expectations that verbal pass
20  on, would relay important medical information about a
21  detainee --
22        MR. MCCAULEY:  Object to form.
23    Q    -- from one shift to the next?
24        MR. MCCAULEY:  Object to form.
25    A    Sorry.  Can you repeat that again?

Page 61

1    Q    Were you ever instructed about how to perform
2  a verbal pass on from one shift to the next, about
3  medical issues involving the detainee?
4    A    Not that I can recall.
5    Q    Were there any rules about what information
6  would be contained in a verbal pass on from one shift to
7  another, about medical issues concerning the detainee?
8        MR. MCCAULEY:  Object to form.
9    A    Not that I know of.
10    Q    Okay.  When you began a shift, how would you
11  be assured that you had the relevant information about
12  the detainees medical issues, who you were overseeing
13  that shift.  From a verbal pass on or some other way?
14        MR. MCCAULEY:  Object to form.
15    A    Typically, you just try to give them the most
16  info that you can about the -- whatever sort of
17  situation's going on.
18    Q    Is that what you try to do in verbal pass on?
19    A    Correct.
20    Q    Okay.  And so, returning to Ms. Boyer, do you
21  remember whether or not you performed a verbal pass on
22  to whomever was coming in?
23        MR. MCCAULEY:  Object to form.  Asked and
24    answered.
25    A    I don't recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1    Q    Okay.  If you had performed a verbal pass on,
2  would you have made an effort to describe all the
3  important medical information about Ms. Boyer that you
4  were aware of?
5         MR. MCCAULEY:  Object to form.
6    A    Yes.
7    Q    Do you recall performing a verbal pass on with
8  anybody, on the morning of December 22nd?
9    A    I don't recall a specific one.  But I just
10  know that we had a large amount of inmates in, so there
11  was a lot of information being passed around.
12    Q    Okay.  I want to turn you now to the -- well,
13  let me ask real quick, and I think these questions will
14  be fairly simple.  After you ended your shift, what do
15  you do?
16         MR. MCCAULEY:  Object to form.
17    Q    I'm assuming you go home and sleep; is that
18  right?
19    A    Correct.  Or I go to the gym.
20    Q    Okay.  And then you had another shift
21  beginning at 6:00 p.m. on the evening of the 22nd; is
22  that right?
23    A    Correct.
24    Q    Okay.  Do you remember when that shift began?
25    A    I would assume 6:00 -- sorry, 6:00 p.m.

Page 63

1    Q    And do you remember being assigned to any
2  particular part of the jail on that shift, on the
3  evening of the 22nd?
4    A    I believe, I was in housing.
5    Q    Okay.  Were you in master control at any
6  point, on the night shift of December 22nd to the 23rd?
7         MR. MCCAULEY:  Object to form.  Asked and
8  answered.
9    A    I believe, I was in there around 11:00,
10  possibly a little bit after that.
11    Q    So from 6:00 to 11:00, or thereabouts, you
12  were assigned to housing, on the evening of the 22nd?
13    A    Correct.
14    Q    Okay.  And then you transferred into master
15  control; is that right?
16    A    Correct.
17    Q    When you're assigned to housing, and you begin
18  a shift, is there any pass on for people who are in
19  booking?
20         MR. MCCAULEY:  Object to form.
21    A    No.
22    Q    Okay.  How do you learn about any medical
23  issues of people who were in booking, if you begin your
24  shift in housing?
25    A    I would not have.

Page 64

1    Q    Okay.  Do you recall -- there was a medical
2  incident involving Ms. Boyer, which we'll talk about,
3  but before that medical incident, do you recall having
4  any information from anybody, about any medical issues
5  Ms. Boyer experienced during the day shift on December
6  22nd?
7    A    No.
8    Q    Okay.  We've seen a few e-mails with your name
9  on them, as a recipient.  Do you -- when you begin a
10  shift, is part of the practice to check e-mail, when you
11  come in to a shift?
12    A    Correct.
13    Q    Okay.  And is that wherever you are, whether
14  you're in housing, or booking, or main control, part of
15  the process at the beginning of a shift is to check your
16  e-mail?
17    A    Yes.  At some point in your shift.
18    Q    At some point on your shift?
19    A    Correct.  Whenever you're available to look at
20  it.
21    Q    Okay.  If you're in housing, do you have any
22  access to e-mail, if you're just beginning your shift in
23  housing?
24    A    I mean, not until you log into a computer back
25  there.

Page 65

1    Q    Okay.  So there would be computers where you
2  could log on to check your e-mail, if you're assigned to
3  housing?
4    A    Correct.
5    Q    But there's no sort of procedure, at the
6  beginning of your shift, just to check in -- all e-mails
7  that have come in, over the course of the previous
8  shift?
9         MR. MCCAULEY:  Object to form.
10    A    I mean, it's not like I just sit down, and go
11  right into my e-mails right away.  There's typically
12  other things going on or getting pass on about housing -
13  - what's going on in housing.  But at some point, yeah,
14  you should log in, and check your e-mail.
15    Q    When you're changing assignments within the
16  jail, say, from housing to booking, or booking to
17  housing, is there a pass-on process that occurs there?
18    A    Correct.
19    Q    Okay.  And how does that work?
20    A    It's typically verbal.
21    Q    Okay.  Do you remember why your shift --
22  during that shift, your assignment changed from housing
23  to booking, on the night of December 22nd?
24         MR. MCCAULEY:  Object to form.
25  Mischaracterizes.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 66

1    A    Can you repeat that?

2    Q    Sure.  I believe you testified earlier, that
3  you began -- on the night of the night shift of December
4  22nd, you began the shift in housing, but somewhere
5  around 11:00 p.m., you transferred over to booking; is
6  that right?

7         MR. MCCAULEY:  Same objection.

8    A    I believe, I went into master control.

9    Q    Okay.  That's -- is that part of booking?

10   A    It's in booking.  Correct.  But --

11   Q    Fair enough.  Do you remember why you
12 transferred that evening from housing to master control?

13   A    I believe, we had a part-timer in there, and
14 they were going to be going home at 11:00 -- around
15 11:00.

16   Q    Do you receive any pass off, when you go from
17 a place like housing to master control?

18   A    If there's anything to pass on, they should
19 pass it on.

20   Q    Okay.  And what sort of things should you pass
21 on to someone in master control?

22   A    A lot of the times, we'll get -- they're
23 called teletypes from other counties, asking about
24 inmates, or transfers, or things like that.  That's
25 typically what your pass on is in master control.

Page 67

1    Q    When you're going into master control, do you
2  typically get pass on about the medical issues that
3  detainees might be having in booking?

4    A    No.

5    Q    At the beginning of your shift -- I believe
6  you said, you don't recall talking with anybody about
7  Ms. Boyer at the beginning of your shift on December
8  22nd; is that right?

9    A    Correct.

10   Q    Okay.  Up to the medical incident that
11 involved Ms. Boyer around 1:00 a.m., do you recall
12 having a conversation with anybody about Ms. Boyer's
13 medical condition?

14   A    No.

15   Q    Do you recall interacting with Shasta Parker
16 at all, on the evening of December 22nd?

17   A    She called the jail.

18   Q    In master control, you -- you look out onto
19 the booking area through a glass window; is that right?

20   A    Correct.

21   Q    Do you recall before Ms. Parker -- Shasta
22 Parker called the jail, do you recall having any
23 conversations with her or anybody else about Ms. Boyer,
24 over the course of the evening of December 22nd?

25   A    No.

Page 68

1    Q    Okay.  Mr. Runice, I'm going to introduce an
2  exhibit -- and I believe we're at Exhibit 40 now.  And
3  this is a document beginning on Bates Monroe County
4  000082 and going to 87.  I'm going to scroll through
5  this document real quickly, Mr. Runice, and just ask --
6  if you recognize it?

7         (EXHIBIT 40 MARKED FOR IDENTIFICATION)

8    A    I recognize it.

9    Q    Okay.  Was this one of the documents -- well,
10 let me get to the bottom here.  Was this one of the
11 documents you reviewed in preparation for your
12 deposition today?

13   A    Correct.

14   Q    Okay.  And the entry at 12-23-19 at 5:49 a.m.,
15 it says, "Runice, Lucas, late entry."  Do you see that?

16   A    Yes.

17   Q    And then, I'll just start reading the event,
18 "At approximately 00:57, inmate Christine Boyer was
19 seen," and then it goes on.  Is this -- did you prepare
20 this paragraph entry?

21   A    Yes.

22   Q    It's noted as a late entry.  Why was it this -
23 - why was it late?

24   A    I had several other things going on, trying to
25 contact people.  And I was the only one that was able to

Page 69

1  open any of the doors to the jail.

2    Q    So you were kind of dealing with the aftermath
3  of this incident for a while, and that's the reason the
4  entry was made later; is that right?

5    A    Correct.

6    Q    Okay.  Does this document -- having reviewed
7  it, does it refresh your recollection at all about the
8  events involving Ms. Boyer's medical emergency?

9    A    Yes.

10   Q    Okay.  When you say, "At approximately 00:57,
11 Christine Boyer was seen on camera laying on the floor
12 in booking cell 4," do you see that?

13   A    Yes.

14   Q    That would've been you who saw her?

15   A    Correct.

16   Q    So I'm assuming main control has a lot of
17 cameras looking at a bunch of different parts of the
18 jail; is that right?

19   A    Correct.

20   Q    And part of the job of main control -- the
21 person in there is to be monitoring those various
22 cameras; is that right?

23   A    Correct.

24   Q    And so, at some point, when your eyes reached
25 the camera that was on Ms. Boyer's cell, you noticed



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1  that she was lying on the floor; is that right?
2      A    Correct.
3      Q    Okay.  It says, "Christine is on a medical
4  watch due to her health issues," do you see that?
5      A    Correct.
6      Q    When you saw her lying on the floor, did you
7  understand what health issues she was on medical watch
8  for?
9          MR. MCCAULEY:  Object to form.
10     A    I don't believe so.  No.
11     Q    Okay.  The next line says, "Sergeant Danielle
12 Warren was informed of the situation and immediately
13 reported to her cell," do you see that?
14     A    Yes.
15     Q    Okay.  And was that you who informed
16 Ms. Warren of the situation?
17     A    Yes.
18     Q    Okay.  How did you do that; if you recall?
19     A    I believe, the telephone.
20     Q    Okay.  And do you remember where Ms. Warren
21 was when you informed her?
22     A    I could not see her in the booking area.
23 That's why I used the phone.
24     Q    Okay.  So she -- you couldn't see her in the
25 booking area, you said?

Page 71

1      A    Correct.  I didn't see her sitting at one of
2  the stations.  So I called -- I knew she was in booking,
3  but I couldn't see her at the counter, but I called the
4  phone, so that she would come out to that area to answer
5  the phone.
6      Q    Okay.  So at that point, Ms. Boyer -- I mean -
7  - I'm sorry, Ms. Warren was stationed at booking and --
8  but you just -- you didn't have a line of sight to her;
9  is that right?
10     A    Correct.
11     Q    Did she pick up the phone, within a few
12 seconds of you calling?
13     A    Yes.
14     Q    Okay.  And what did she do, after she picked
15 up the phone?
16     A    I informed her what was going on and she said,
17 okay, I'm going to go check on her.  And she went over
18 there immediately.
19     Q    Okay.  Meaning, she hung up the phone and
20 walked right over to the cell?
21     A    Correct.
22     Q    Okay.  And did you open it for her in master
23 control?
24     A    Correct.
25     Q    Okay.  The -- the next line is, "Christine

Page 72

1  was," lying, "On the floor, motionless, and gasping for
2  air," do you see that?
3      A    Correct.
4      Q    Are you reporting what you're seeing on the
5  video screen?
6      A    And I had the intercom in the cell on.
7      Q    Okay.  So there's an audio feed from the cell
8  as well?
9      A    There's an emergency intercom that the inmates
10 can push, if they're having a medical emergency.  And
11 I'm able to click on that intercom and listen.
12     Q    Okay.  And so what you're describing here is -
13 - in this late entry, is what you're seeing on the
14 video, and hearing through the intercom; is that right?
15     A    Correct.
16     Q    Okay.  And so when you're saying, "Sergeant
17 Warren attempted to get Christine's attention and for
18 Christine to respond to her," that's something that
19 you're seeing and hearing through the intercom and video
20 feed, right?
21     A    Correct.
22     Q    Okay.  "Christine did not respond to Sergeant
23 Warren and continued gasping for air," do you see that?
24     A    Correct.
25     Q    Okay.  That's again, something you're seeing

Page 73

1  and hearing, through the audio and video feeds from that
2  cell, right?
3      A    Correct.
4      Q    The next line is, "Sergeant Warren radioed for
5  jail staff to report to booking and call EMS"; you see
6  that?
7      A    Yes.
8      Q    Okay.  So that is an instruction.  Did -- did
9  -- does Ms. Warren have a handheld radio with her?
10     A    Yes.
11     Q    Okay.  And that's how she performed that
12 function?
13     A    Correct.
14     Q    Okay.  And the, "Call EMS," was that an
15 instruction that you understood to be directed to you?
16     A    Yes.
17     Q    Okay.  And did you call EMS immediately?
18     A    Yes.
19     Q    Okay.  It says, "Dispatch was contacted and
20 informed the jail needed EMS for a non-responsive
21 female, and that more officers would be needed."  What
22 does, "Dispatch," mean in this sentence?
23     A    Dispatch is a department in the jail -- or
24 sorry, a department in the sheriff's office.
25     Q    Okay.  So there -- the sheriff's office isn't



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1  just the jail! So when you're -- when you contact EMS,
2  what you're doing is contacting dispatch -- the dispatch
3  function at the sheriff's office, to let them know that
4  EMS needs to be contacted?
5      A   Correct.
6      Q   Okay. Let's see. And then, the next sentence
7  begins, "Officer Kyle Moga performed at sternum rub on
8  Christine's chest, which appeared to have no effect," do
9  you see that?
10     A   Yes.
11     Q   Okay. And Mr. Moga was elsewhere in the jail
12 when this emergency started; is that right?
13     A   Correct.
14     Q   Okay. So the next line is, "Approximately,
15 01:02, Officer Kyle Moga began giving Christine chest
16 compressions, while Sergeant Warren reported to master
17 control to retrieve the AED," do you see that?
18     A   Yes.
19     Q   And that's -- this sentence is you seeing what
20 you're seeing on the camera, and then, obviously,
21 Ms. Warren comes into your office for the AED; is that
22 right?
23     A   That's correct.
24     Q   Okay. All right. The next line is,
25 "Approximately, 01:05, the AED was placed on Christine

Page 75

1  and shock was delivered to her body." Again, that's
2  something you're seeing through the camera; is that
3  right?
4      A   Correct.
5      Q   Okay. The next line says, "Jail staff slid
6  Christine out of the cell and continued CPR on her,
7  outside the cell"; you see that?
8      A   Yes.
9      Q   Okay. And that's, again, something you're
10 watching on the camera?
11     A   Correct.
12     Q   Okay. The next line is, "Christine was given
13 a total of two shocks with the AED before EMS had
14 arrived," do you see that?
15     A   Yes.
16     Q   That's also something you're watching on the
17 camera?
18     A   Correct.
19     Q   Okay. The next line says, "Approximately,
20 01:07, EMS arrive and began CPR on Christine, outside of
21 the cell." That's again, something that you are
22 watching on the camera; is that right?
23     A   Correct.
24     Q   Okay. And then, "Christine was placed on a
25 gurney and placed in the ambulance, at approximately

Page 76

1  01:30," do you see that?
2      A   Yes.
3      Q   That would've been also something you watched
4  through the main control cameras?
5      A   Correct.
6      Q   Okay. The last line is, "Christine was
7  forwarded by med flight to," is that, "Gundersen
8  Lutheran La Crosse"?
9      A   Correct.
10     Q   "And is currently in the ICU," do you see
11 that?
12     A   Yes.
13     Q   So this last sentence, these are not things
14 that you would've seen, it's things that would've been
15 relayed to you; is that right?
16     A   Correct.
17     Q   Given that you're writing this at 5:49 a.m.,
18 and you're identifying these very precise times, are --
19 when you're preparing this summary, are you going back
20 over the video to provide an accurate summary of when
21 things happened?
22     A   Correct. I used video to build some sort of
23 timeline of when everything happened.
24     Q   Okay. So you're able to go back over video
25 that's already been taken, and go through it again to

Page 77

1  see exactly when things happened?
2      A   Correct.
3      Q   Did you ever leave the master control during
4  this emergency?
5      A   Not that I recall.
6      Q   Okay. Do you recall Shasta Parker calling in
7  at some point, in the evening -- or on the shift?
8      A   Yes.
9      Q   Do you recall when she called you -- or when
10 she called in? I'm sorry.
11     A   I don't recall the exact time, but it was
12 during this incident.
13     Q   During the emergency?
14     A   Correct.
15     Q   This is just a, kind of, a mechanical
16 question, how would she reach you in master control, if
17 she called in from outside of the jail?
18     A   The master control center is basically -- if
19 you ever called the jail, there's a main phone and
20 master control answers that phone. So she must have
21 called from the outside in.
22     Q   Okay. So she can call the jail number, and
23 because you're in master control, it's going to come to
24 you; is that right?
25     A   Correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1     Q    Do you remember what Ms. Parker said when she
2 called in?
3     A    I believe, she asked to speak to Kyle.
4     Q    Okay.  And that's Kyle Moga?
5     A    Correct.
6     Q    Do you recall her saying anything else?
7     A    I don't remember the exact conversation of how
8 it all went on.
9     Q    Do you recall her asking about Ms. Boyer at
10 all?
11     A    I recall me telling her that we were in the
12 middle of an incident with Ms. Boyer, and that Kyle was
13 unavailable to talk at the moment.
14     Q    When you told her that, do you recall how
15 Ms. Parker reacted?
16         MR. MCCAULEY:  Object to form.
17     A    I -- I don't recall exactly how.  She -- she
18 basically ended the conversation, and that was the end
19 of it.
20     Q    You say you don't recall exactly, is there --
21 is there anything you recall at all about that -- about
22 how she reacted?
23         MR. MCCAULEY:  Same objection.
24     A    I mean, she sounded, I guess, excited in a --
25 in a sense, but I'm -- I'm assuming that I kind of

1 sounded excited, and that's why -- maybe that's what
2 excited her is because we had a medical emergency going
3 on, and I wasn't able to talk on the phone.
4     Q    Now, when you say, she was, "Excited," what do
5 you -- what do you mean?
6     A    As in, in a hurry.  We like -- we ended the
7 phone call quickly.
8     Q    Okay.  Obviously, you don't mean that she was
9 excited, in the sense that she was happy?
10     A    No.  Just -- she started speaking a lot
11 faster.
12     Q    Okay.  What did she say, when she started
13 speaking quickly?
14     A    She said, okay, I'll let you go.  Or something
15 along those lines, of -- we ended the call.
16         MR. WEIL:  Okay.  All right.  Mr. Runice, if
17     you give me a minute, I may have nothing more.
18     Let's just go off the record for -- for five
19     minutes, and then that may be it.
20         COURT REPORTER:  We are off the record.  The
21     time is 11:17 a.m.
22         (OFF THE RECORD)
23         COURT REPORTER:  We are back on the record.  The
24     time is 11:22 a.m.
25 BY MR. WEIL:

1     Q    All right.  Mr. Runice, I just have a few more
2 questions for you.  The first thing I'm going to do is
3 introduce another exhibit, it's Exhibit 41.  It is Bates
4 number Monroe County 5264 through 5271.  And I'm going
5 to scroll through real quickly, Mr. Runice, and just ask
6 whether you've seen this before?  Have you -- were you
7 able to --
8         (EXHIBIT 41 MARKED FOR IDENTIFICATION)
9     A    Yes.
10     Q    Okay.  When you say, "Yes," have you seen this
11 document before?
12     A    Correct.
13     Q    Is this a document you reviewed, in
14 preparation for your deposition today?
15     A    No.
16     Q    Okay.  Do you recognize this document?
17     A    Not -- not that one.  My -- my own, I would
18 recognize.
19     Q    Okay.  So, we're on page 5266.  And it's the -
20 - up at the top, it says, "Supplemental Report By Lucas
21 Runice," do you see that?
22     A    Yes.
23     Q    Do you -- so you do recognize this document?
24     A    Correct.
25     Q    It says, "Typed by Lucas Runice," do you see

1 that?
2     A    Yes.
3     Q    Is this a document you typed?
4     A    Yes.
5     Q    It says, "Supplemental Report By Lucas
6 Runice."  Do you understand what, "Supplemental," means?
7     A    Yes.
8     Q    What does it mean?
9     A    It means that it is just another -- basically,
10 it's -- it was a person that was involved in the
11 situation, but not the main person involved in it.  It
12 accompanies another report.
13     Q    At the top do you see, "Primary Report By
14 Danielle Warren"?
15     A    Correct.
16     Q    I'm trying to understand the process for
17 creating these reports.  It -- is the primary report
18 written, and the supplemental reports are designed to
19 supplement what's in the primary report?
20     A    Correct.
21     Q    Do the persons who are creating supplemental
22 reports, do they read the primary report before entering
23 the supplemental reports?
24     A    No.
25     Q    So would you have read this report by

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  Ms. Warren, before creating your supplemental report?
2     A    No.
3     Q    I may have asked my next question, but I just
4  want to make sure.  The -- so we're looking at Exhibit
5  3, the intake medical screen report.  Do you see that in
6  front of you, Mr. Runice?
7     A    Yes.
8     Q    We've talked about this document some.  And
9  you testified that this would be something that you
10 would append to the face sheet, and then place in the
11 box, in the wire basket in booking, right
12    A    Correct.
13    Q    Okay.  Would you read the intake medical
14 screening report as it was being attached -- as you
15 attached it to the face sheet, before putting it in the
16 wire box?
17       MR. MCCAULEY:  Object to form.
18    A    Not if I was the one who -- no.  No.
19    Q    When you were saying, "If," what did you --
20 what was the condition that you were thinking of?
21    A    If I -- if it was sitting out, as in, it
22 wasn't put together into a packet, I would scan over it.
23    Q    Okay.  And if you're the person in booking,
24 would you be the person who would be putting it together
25 into a packet?

Page 83

1     A    No.  Not necessarily.
2     Q    Who else would do that?
3     A    The person who did the medical screening
4  report.
5     Q    In the pass on between the p.m. shift -- on
6  the night shift on December 21st to 22nd, passing on to
7  the day shift on December 22nd, do you recall anybody
8  doing pass on from the night shift to the day shift,
9  about Ms. Boyer?
10    A    I don't remember.
11    Q    Okay.  All right.  I'm showing you what's been
12 marked as Exhibit 8, Mr. Runice, and we've gone over
13 this.  This is the observation log for Ms. Boyer.  Do
14 you see your entry at, "5:15 a.m.," for -- the code is,
15 "10"?
16    A    Yes.
17    Q    Okay.  And that's a meal code; is that right?
18    A    I believe, it's meal accepted.
19    Q    Okay.  You -- that's down here at the bottom,
20 "Meal Offered (Accepted)"; is that right?
21    A    Correct.
22    Q    Okay.  Is it your practice to record if
23 somebody doesn't eat their meal?
24    A    Correct.
25    Q    Okay.  And so -- is -- do you see any record

Page 84

1  here of Ms. Boyer not eating her meal?
2     A    No.
3     Q    Okay.  Does that indicate to you that
4  Ms. Boyer ate her meal that you offered to her at 5:15
5  a.m.?
6     A    Correct.
7        MR. WEIL:  Okay.  Thank you, Mr. Runice.  I
8     appreciate your time today.  That -- those are all
9     the questions I have.
10       MR. MCCAULEY:  Thank you.
11       MR. KNOTT:  I have some quick follow-ups if I
12    could.
13           CROSS EXAMINATION
14 BY MR. KNOTT:
15    Q    Mr. Runice, do you understand I represent
16 Amber Fennigkoh, Lisa Pisney, and the Advanced
17 Correctional Defendants.
18       MR. MCCAULEY:  Go ahead.
19    A    Yeah.
20    Q    And you can hear me?
21    A    Yep.
22    Q    Okay.  I wanted to ask you about that -- at
23 the time of intake you said, did you say, she had
24 several sets of brass knuckles with her?
25    A    That's correct.

Page 85

1     Q    How many; if you remember?
2     A    I don't remember an exact number off hand.
3     Q    Are the contents of the purse inventoried?
4     A    Sorry.  Can you repeat that?
5     Q    Are the contents of the purse inventoried --
6  is that, as a routine practice, is that usually
7  inventoried?
8     A    Yes.
9     Q    And do you know, if you did that in this case?
10    A    The brass?  Yes.
11    Q    Okay.
12    A    Yep.
13    Q    And you said -- well, first of all, did you
14 ask her why she had brass knuckles; do you remember?
15    A    I don't recall asking her about them.
16    Q    Okay.  And she had, you said a lot of cash.  Do
17 you know how much cash she had?
18    A    I don't remember the exact number, but it was
19 in the thousands.
20    Q    Okay.  Did you ask her, if you recall, why she
21 had so much cash?
22    A    I don't recall asking about the cash.
23    Q    You said, that Amber Fennigkoh was present
24 during that intake process.  That's not a normal
25 process, is it?  Where -- to have the nurse involved in

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1  the intake medical screening?
2      A    No.
3      Q    So that was an unusual thing that happened on
4  this day that Amber happened to be there, right?
5          MR. WEIL:  Object to form.
6      A    Correct.
7      Q    And my understanding is that you didn't do any
8  documentation on the intake medical screening, right?
9          MR. WEIL:  Object to form.
10     A    Correct.
11     Q    So would you be in a position to know whether
12 the intake medical screening was completed before or
13 after Amber's interview with Ms. Boyer?
14     A    I'm sorry.  Can you repeat the question again?
15     Q    Would you be in a position to know today -- to
16 have a recollection of whether the intake medical
17 screening form was completed before or after Amber did
18 her interview with Ms. Boyer?
19     A    I don't know.
20     Q    Okay.  I wanted to ask you quickly about
21 Amber's note.  If I share that screen, can you read it?
22     A    Yes.
23     Q    Okay.  This is Exhibit 6.  My question, sir,
24 is Amber wrote, "RN instructed jail staff to alert NP of
25 situation when able," and you said you don't recall

Page 87

1  that, is that an accurate reciting of your testimony?
2      A    Correct.
3      Q    And is it fair to say, that it may have
4  happened that Amber instructed the jail staff to alert
5  the nurse practitioner of the situation, you just don't
6  have a recollection of it today?
7          MR. WEIL:  Object to form.
8          COURT REPORTER:  I'm sorry.  Who just said,
9      "Object to form?"
10         MR. WEIL:  Plaintiff.
11         COURT REPORTER:  Okay.
12 BY MR. KNOTT:
13     A    She may have said it, but it wasn't -- I don't
14 believe it was to me.
15     Q    Okay.  You believe it was to Parker -- I'm --
16 I'm not -- I mean Warren?
17     A    I -- I don't know if she did or not.  I don't
18 know.
19     Q    Okay.  All right.  Is it your habit, and
20 custom, and routine to notify the nurse practitioner, if
21 there are any meds to verify?
22         MR. WEIL:  Object to form.
23     A    Correct.  If -- if medical is not on, and they
24 need medications, we call them in.
25     Q    So I just want to make sure I understand that.

Page 88

1  So if you're working with an inmate at intake, and you
2  complete a medication verification form, it's the normal
3  practice that you would contact the provider to talk
4  about those medications, isn't it?
5          MR. WEIL:  Object to form.
6      A    If -- if they needed the medications
7  immediately.  If -- if -- if it was in the middle of the
8  night, and they needed them immediately?  Then, yes, you
9  would call, and make sure that they can have that
10 medication.
11     Q    Okay.  It may be sooner, or it may be later,
12 depending on what the need is, but the normal routine is
13 that one of the COs would contact the provider, true?
14         MR. WEIL:  Object to form.
15     A    Correct.
16     Q    And I'm -- I just wanted to ask you a few
17 things about this medication verification form.  Can you
18 read that on your screen?
19     A    Yes.
20     Q    It's Exhibit 18.  And this time, 00:10, what
21 does that time signify?
22         MR. WEIL:  Doug, I'm sorry.  Where are you
23     looking?  Where are you seeing 00:10?
24         MR. KNOTT:  At the time at the top left.
25         MR. WEIL:  Okay.  Got it.  Sorry.  Apologies.

Page 89

1      Go ahead.
2  BY MR. KNOTT:
3      A    I guess, I'm not sure.
4      Q    Typically, when you would complete a
5  medication verification form, what time would you put in
6  there?  I mean, you know what I'm getting at, but does
7  it mean you're starting the form then, does it mean that
8  you're making a call then, anything else?
9      A    It -- it would mean the time that you're
10 starting the form.
11     Q    Okay.  And the oxycodone prescription, you
12 count the number of pills in the bottle, correct?
13         MR. WEIL:  Object to form.
14     A    Correct.
15     Q    And do you perform a calculation on whether
16 it's the right amount of pills in the bottle for the
17 date of the prescription?  Is that something you, as a
18 CO, do?
19     A    No.
20     Q    Okay.  And I wasn't sure from the prior
21 testimony whether you have a recollection of actually
22 calling the provider about these medications, did you?
23     A    I did not contact them.
24     Q    Okay.  So there's another officer's number
25 down here.  Do you believe that it was that officer,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 90

1  that contacted the provider?
2        MR. WEIL:  Object to form.
3     A   I'm guessing so since I'm, I'm guessing so.  I
4  don't know for sure.
5     Q   All right.
6        MR. WEIL:  Doug, to be clear, when you're
7     referring to provider, are you talking about
8     Medicine Shoppe or something else?
9        MR. KNOTT:  I was talking about Lisa Pisney,
10    the nurse provider.  Did you have that
11    understanding? I'll move on.
12 BY MR. KNOTT:
13    Q   Mr. Runice, what is, what did you write here?
14 It says, "TW8," what does that signify?
15    A   I'm not sure what the TW is, but the -- but
16 the eight would be the number of pill -- or the number
17 of -- of the -- whatever sort of pill it is.
18    Q   Okay.  And does that say, "Disintegrating"?
19    A   I believe so.
20    Q   Do you know what that meant?
21    A   I don't.
22    Q   Yeah.  It's fair.  It's been a long time.  If
23 it had a pharmacy name and phone number on the bottle,
24 would you have put that on the medication verification
25 form?

Page 91

1     A   Yes.
2        MR. WEIL:  Object to form.
3     Q   And then this next medication is, "Aspirin,"
4  and under the number of pills in the bottle, can you
5  tell me what that says?
6     A   It looks -- I just see a three and a two.
7  Looks like three -- it looks like three and I don't
8  know.  I guess, I can't.  I -- I don't know.
9     Q   Okay.  And do you know what this symbol here?
10 It looks like an, "L," next to aspirin?
11    A   Correct.
12    Q   Did you write that?
13    A   No.
14    Q   Okay.  Do you know what it is?
15    A   No.
16    Q   And this handwriting for aspirin looks, like,
17 a little bit on the lighter side, which, when you were
18 asked before, I think with respect to this language up
19 here near the ondansetron, I think you said was not your
20 writing.  Let me ask you first, am I correct that the
21 writing that I'm pointing to now next to a ondansetron
22 that says, "As needed for nausea for chemo/radiation,"
23 did you write that?
24    A   No.
25    Q   Okay.  And do you believe that you wrote,

Page 92

1  "Aspirin"?
2     A   No.
3     Q   And the same with respect to, "Unknown," is
4  that your handwriting?
5     A   No.
6     Q   And this language about the albuterol inhaler,
7  did you write that language?
8     A   I don't believe so.
9     Q   Okay.  Why do you think that's not yours, just
10 the handwriting or for some other reason?
11    A   The handwriting.  I guess, I think it looks
12 different.
13    Q   So you said that you put the medication
14 verification form together with the medications in a
15 baggie, and you put that in medical.  Is that
16 retrievable by the correctional staff, after you put it
17 in medical?
18       MR. MCCAULEY:  Object to form.
19    A   If I -- if I do that -- yeah.  I -- I
20 typically set it in the nurse's office, which is
21 available to other staff.
22    Q   Okay.  So it doesn't go on a slot or
23 something, where you can't retrieve it, right?
24    A   Correct.
25    Q   And just one more.  Bear with me, sir.  Sir,

Page 93

1  I'm showing you an e-mail that Amber Fennigkoh has sent
2  on Sunday -- says that Amber sent it on Sunday, December
3  22, at 6:02 p.m.  And it's addressed to Warren, Runice,
4  Parker, and Moga.  Do you have a recollection of getting
5  this e-mail?
6     A   Yes.
7     Q   What do you remember about that?
8     A   That I got the e-mail, and that he was
9  supposed to be dropping off the meds that night.
10    Q   If -- do you have a recollection of Greg Boyer
11 arriving at the jail?
12    A   Yes.
13    Q   Do you recall when he arrived?
14    A   It was during the medical emergency, when he
15 showed up.
16    Q   And did you have any discussions with
17 Mr. Boyer that night?
18    A   No.  I did not.  Other than he rang up on the
19 public entrance intercom, and said that he was here to
20 drop off meds.  And I told him to please wait outside,
21 because I was in the middle of the medical emergency.
22    Q   Okay.  Did -- so he stayed outside the
23 building?
24    A   I believe, he waited outside, or he may -- I
25 may have opened the door to let him wait inside the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 94

1    lobby -- inside the public lobby.
2        Q    Did you ever indicate to him, that the medical
3    emergency had to do with his wife?
4        A    No.
5        Q    And do you know, was he eventually admitted to
6    the jail?
7        A    Sorry, can you repeat that question?
8        Q    Was he eventually admitted into the -- some
9    part of the jail?
10       A    I know -- yeah.  He was in the public lobby.
11       Q    And do you know, if anybody went to talk to
12   him there?
13       A    I believe, Officer Schwanz did -- Jeff
14   Schwanz.
15       Q    Okay.  Did Schwanz tell you what Mr. Boyer had
16   said to him?
17       A    No.
18       Q    Do you have any other basis for knowing what
19   Mr. Boyer told anybody that night?
20       A    No.
21            MR. KNOTT:  Okay.  Those are the questions I
22       have.  So, thank you, sir.
23            MR. MCCAULEY:  Doug -- Hey, Doug, is this, is
24       this e-mail an exhibit?
25            MR. KNOTT:  Yeah.  It's -- I have it as Exhibit

Page 95

1    9.
2            (EXHIBIT 9 MARKED FOR IDENTIFICATION)
3            MR. WEIL:  Yeah.
4            MR. MCCAULEY:  Okay.
5            MR. WEIL:  It's Exhibit 9.
6            MR. MCCAULEY:  Okay.  Great.
7            MR. WEIL:  John, do you have any questions?
8            MR. MCCAULEY:  I have no questions.
9            MR. WEIL:  Okay.  I just a couple, based on Mr.
10       Knott's questions.  Let me --
11            MR. MCCAULEY:  Sure.
12            REDIRECT EXAMINATION
13   BY MR. WEIL:
14       Q    Mr. Runice, I'm showing you Exhibit 6, which
15   Mr. Knott just reviewed to you -- with you, and I want
16   to direct you to the bottom of Ms. Fennigkoh's entry.  It
17   talks about, "RN further explained the difficulty as our
18   pharmacy's not open on Sunday, so jail's unable to call
19   to get a med list"; you see that?
20       A    Yes.
21       Q    Do you recall hearing Ms. Fennigkoh say that
22   to Ms. Boyer?
23       A    No.
24       Q    Okay.  It says a little lower at, "PT," which
25   I believe, stands for patient, "Patient said that there

Page 96

1    should be some loose pills in my purse.  Will that
2    help?"; you see that?
3        A    Yes.
4        Q    Do you recall Ms. Boyer making that statement?
5        A    No.
6        Q    Do you recall someone informing you that
7    Ms. Boyer had said that there might be some loose pills
8    in her purse?
9        A    No.
10       Q    Okay.  Do you recall someone saying, that
11   there might be some loose pills in Ms. Boyer's purse?
12       A    No.
13       Q    The next line says, "RN assisted CO with
14   identifying loose pills," do you see that?
15       A    Yes.
16       Q    Do you recall working with Ms. Fennigkoh to
17   identify the loose pills that you found?
18       A    No.
19       Q    Do you recall working with anybody, to try to
20   identify the loose pills?
21       A    I don't recall.  No.
22       Q    Do you recall trying to identify the loose
23   pills yourself?
24       A    No.
25       Q    Do you recall somebody else working with

Page 97

1    Ms. Fennigkoh to try to identify the loose pills?
2        A    No.  I don't know.
3        Q    Was Ms. Warren around the booking area, around
4    the time that you identified the loose pills in
5    Ms. Boyer's purse?
6        A    Yes.  She was there when I found the pills.
7        Q    Do you recall Ms. Warren trying to identify
8    the loose pills?
9        A    I don't recall.
10       Q    Okay.  Do you recall her conferring at all
11   with Ms. Fennigkoh, maybe you don't know about what, but
12   conferring with her about, around this time?
13       A    I -- I don't remember.
14       Q    When you say you remember that Ms. Warren was
15   around, where, where was she during this time of when
16   you identified the loose pills?
17       A    Sorry.  Can you repeat that question?
18       Q    Sure.  You said a moment ago, that you
19   remember Ms. Warren being around the booking area,
20   around the time that you identified the loose pills.  So
21   I'm just trying to place her about where she would've
22   been during that time.  And so that's -- I'm just asking
23   your recollection about that.
24       A    She was standing near the booking -- by the
25   booking counter, while I was going through the property,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1  logging the property.

2      Q    Between the time that you identified the loose

3  pills, placed them in the baggie, and placing them in

4  the med office, did anybody -- do you remember anybody

5  looking at those pills and trying to identify them?

6          MR. WEIL:  Object to form.  Mischaracterizes.

7      A    I don't remember.

8          MR. KNOTT:  I'm sorry -- I'm sorry to

9  interrupt.  I join the objection.  Sorry.

10     Q    You don't remember?

11     A    I don't -- I don't remember.

12     Q    Okay.  Do you remember placing the pills in a

13  baggie along with the medication verification form, and

14  walking them to the medical office?  Or is that just a

15  procedure that you usually performed?

16         MR. MCCAULEY:  Object to form.  Asked and

17  answered.

18     A    That's just a -- that's just something that I

19  do when -- that I personally do, when people come in

20  with medications.

21     Q    Okay.  Do you have a specific memory in

22  Ms. Boyer's case of doing that?

23         MR. MCCAULEY:  Same objection.

24     A    I don't recall doing it.

25         MR. WEIL:  Okay.  That's all I have.  Thank

Page 99

1  you, Mr. Runice.

2          THE WITNESS:  Thank you.

3          MR. MCCAULEY:  I have no more.  Thank you, sir.

4          MR. WEIL:  Thank you very much, Mr. Runice.

5  Appreciate your time.

6          COURT REPORTER:  Okay.

7          MR. WEIL:  Thank you, guys.

8          COURT REPORTER:  One second.  Before you go, I

9  will get us off of the record.

10         (DEPOSITION CONCLUDED AT 11:54 A.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 100

1          CERTIFICATE OF REPORTER

2

3

4      I do hereby certify that the witness in the foregoing

5  transcript was taken on the date, and at the time and

6  place set out on the Title page hereof, by me after

7  first being duly sworn to testify the truth, the whole

8  truth, and nothing but the truth; and that the said

9  matter was recorded digitally by me and then reduced to

10  typewritten form under my direction, and constitutes a

11  true record of the transcript as taken, all to the best

12  of my skill and ability. I certify that I am not a

13  relative or employee of either counsel and that I am in

14  no way interested financially, directly or indirectly,

15  in this action.

16

17

18

19

20

21

22  KRYSTAL BARNES,

23  COURT REPORTER/NOTARY

24  MY COMMISSION EXPIRES: 02/18/2026

25  SUBMITTED ON:  04/28/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 1_**
**Runice** 23:8,9,
11,13,14 27:22,
23

**Exhibit 2_**
**Runice** 21:15,
18

**Exhibit 3_**
**Runice** 33:1,4
35:16 48:5
50:19,20 82:4,5

**Exhibit 4_**
**Runice** 28:15,
19

**Exhibit 6_**
**Runice** 36:8,15
86:23 95:14

**Exhibit 8_**
**Runice** 15:11,
14 38:6 39:1
56:1 58:17
83:12

**Exhibit 9_**
**Runice** 94:25
95:1,2,5

**Exhibit 16_**
**Runice** 23:20
24:1

**Exhibit 18_**
**Runice** 15:5,8
39:9,10 41:24
42:11 46:20
88:20

**Exhibit 40_**
**Runice** 68:2,7

**Exhibit 41_**
**Runice** 80:3,8

**0**

**000082** 68:4

**00:10** 88:20,23

**00:57** 68:18
69:10

**01:02** 74:15

**01:05** 74:25

**01:07** 75:20

**01:30** 76:1

**1**

**1** 23:8,9,11,14
27:23

**10** 45:7 83:15

**101** 6:5

**10:12** 6:7

**10:14** 45:13

**10:20** 45:4

**10:25** 45:11,12

**10:28** 45:16

**11:00** 63:9,11
66:5,14,15

**11:17** 79:21

**11:22** 79:24

**11:32** 39:2

**11:46** 39:3

**11:54** 99:10

**12-23-19** 68:14

**1257** 43:15

**1258** 39:14

**12th** 13:6,8
14:16,18

**13:00** 31:9

**13th** 14:16

**16** 23:20 24:1

**18** 15:5,8 39:10
41:24 42:11
46:20 88:20

**18th** 6:6

**1:00** 67:11

**2**

**2** 21:15,18

**20-CV-1123**
6:14

**2010** 16:16

**2011** 16:16

**2013** 10:4

**2014** 9:11 10:4

**2018** 16:19,22

**2019** 22:8,13
23:17,24 31:9
36:11

**201900787**
30:14

**2022** 6:6

**21** 22:13 23:17
36:11

**21st** 23:23 24:5
25:3,22 26:1,20
27:18,25 28:4
39:3 83:6

**22** 93:3

**22:40** 36:11

**22nd** 56:9,15,
23 57:1,11
62:8,21 63:3,6,
12 64:6 65:23
66:4 67:8,16,24
83:6,7

**23** 31:9

**23rd** 23:23 63:6

**3**

**3** 33:1,4 35:16
48:5 50:20 82:5

**30-minute**
18:23 37:25

**4**

**4** 28:15,19
69:12

**40** 68:2,7

**40202** 6:6

**41** 80:3,8

**4X** 44:8

**5**

**5264** 80:4

**5266** 80:19

**5271** 80:4

**58** 38:23

**5:15** 83:14 84:4

**5:49** 68:14
76:17

**6**

**6** 36:8,15 86:23
95:14

**6:00** 24:19 56:2
62:21,25 63:11

**6:02** 93:3

**6:29** 56:6,16

**7**

**730** 6:5

**8**

**8** 15:11,14 38:6
39:1 56:1 58:17
83:12

**87** 68:4

**9**

**9** 95:1,2,5

**A**

**a.m** 56:6,16
83:14

**a.m.** 6:7 24:19
45:13,16 67:11
68:14 76:17
79:21,24 84:5
99:10

**accepted**
83:18,20

**access** 64:22

**accompanies**
81:12

**accounted**
42:5

**accurate** 76:20
87:1

**ACH** 6:24

**actual** 35:15

**additional**
54:11 58:23

**addressed**
93:3

**administration**
43:2

**administrator**
6:9

**admitted** 94:5,
8

**Advanced**
6:11,24 84:16

**AED** 23:5
74:17,21,25
75:13

**affidavit** 10:3

**affidavits** 8:5
9:5,15,24 10:2

**affirm** 7:15

**aftermath** 69:2

**age** 29:9 30:3
39:23

**agree** 7:10

**agrees** 7:11

**ahead** 6:22 8:3,
22 26:15 37:8
47:24 50:16
51:24 84:18
89:1

**air** 72:2,23

**albuterol** 92:6

**alert** 36:25



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

86:24 87:4

**alerting** 37:20

**Amber** 6:25
18:11,12,14,15,
21 36:9 53:21,
23 84:16 85:23
86:4,17,24 87:4
93:1,2

**Amber's**
86:13,21

**ambulance**
75:25

**amount** 18:1
57:4 62:10
89:16

**Andrew** 13:4

**answers** 9:7
10:13 12:12
77:20

**Apologies**
46:3 88:25

**appearance**
6:15 30:24
31:3,10

**appeared** 74:8

**appearing**
6:23,25

**appears** 39:20

**append** 82:10

**appended**
49:20

**approach**
21:25

**approval** 43:1

**approve** 42:22
46:13

**Approved**
42:11,16

**approximately**
13:15 14:21
68:18 69:10
74:14,25 75:19,
25

**April** 6:6 14:18

**area** 18:17
22:2,25 23:6,13
24:23 25:13
26:9,25 27:9,
17,24 28:9
47:11 48:25
50:13 51:10
60:18 67:19
70:22,25 71:4
97:3,19

**arrive** 75:20

**arrived** 75:14
93:13

**arriving** 20:14
93:11

**aspirin** 91:3,
10,16 92:1

**assigned** 63:1,
12,17 65:2

**assignment**
65:22

**assignments**
65:15

**assist** 20:9

**assisted** 96:13

**assisting**
20:11

**assume** 62:25

**assumed** 59:6

**assuming** 53:9
55:9 62:17
69:16 78:25

**assumption**
55:11

**assured** 61:11

**ate** 84:4

**attached** 48:10
82:14,15

**attempted**
72:17

**attempting**
20:15

**attending**
6:15,16,20

**attention**
72:17

**attorney** 11:8,
24 12:4,6

**attorneys**
12:24 13:1,2,7

**audio** 72:7
73:1

**authoring**
13:25

**AUTOMATED**
45:20

**automatically**
30:6,13

**aware** 22:11
59:23 60:4 62:4

———————

**B**

**back** 16:10
18:15 37:9 43:8
45:4,9,15 46:18
55:17,21 64:24
76:19,24 79:23

**background**
16:14

**backtrack**
22:6

**badge** 38:19,
23 39:13 43:18

**baggie** 47:9,14
48:22 52:21
92:15 98:3,13

**Barnes** 6:2

**based** 51:11,19
52:16 55:11
95:9

**basically**
15:22 29:10
77:18 78:18
81:9

**basis** 94:18

**basket** 34:24,
25 35:12 47:4,
21 48:2 49:20
50:5,12,21
55:20 82:11

**Bates** 68:3
80:3

**bathroom**
11:18

**Bear** 92:25

**began** 61:10
62:24 66:3,4
74:15 75:20

**begin** 7:19
60:5 63:17,23
64:9

**beginning**
16:18 24:12
38:7 62:21
64:15,22 65:6
67:5,7 68:3

**begins** 74:7

**behalf** 6:10

**bigger** 36:13

**birth** 29:9 30:3
39:23

**bit** 10:7 16:13
37:24 63:10
91:17

**blow** 36:12
40:11

**body** 75:1

**bond** 31:20,22,
24,25 32:3,4,7,
22

**Bonds** 22:25
23:2

**book** 29:7 57:8

**booked** 17:19
29:18 57:23

**booking** 18:4
19:3,24 22:2,
16,18,19 23:6,
13 24:23 25:2,
12,13,15,16,22,
23 26:3,8,19
27:4,9,17,24
28:9 29:15
30:18 31:3
32:22 34:3,7,
12,17,24 35:8,
9,12 42:6,8

**Bates** 68:3
80:3

46:15 47:22
48:3,11 49:21
50:5 52:4 53:25
54:1,17 55:15,
19 57:18,23
63:19,23 64:14
65:16,23 66:5,
9,10 67:3,19
69:12 70:22,25
71:2,7 73:5
82:11,23 97:3,
19,24,25

**bottle** 40:21
44:21,23,24
52:11,14 54:11
89:12,16 90:23
91:4

**bottom** 32:9
51:20 68:10
83:19 95:16

**box** 34:24
82:11,16

**Boyer** 6:9,10
14:11 16:5
17:5,17 18:6
19:4,6,18
20:18,21,23
21:4,9 22:5,12
26:6,23,24 27:5
28:3 36:1 37:2,
20,24 38:2 39:7
42:24 44:3
52:23 53:1 58:7
59:13,17 61:20
62:3 64:2,5
67:7,11,23
68:18 69:11
71:6 78:9,12
83:9,13 84:1,4
86:13,18 93:10,
17 94:15,19
95:22 96:4,7

**Boyer's** 23:22
29:25 32:13
49:5 50:18
51:15 52:6
53:19 54:2
67:12 69:8,25
96:11 97:5
98:22

**brass** 17:24
84:24 85:10,14

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**break** 11:18,22 12:5 45:3

**broke** 21:1 56:13

**Brooke** 43:17, 21,23

**brought** 17:18 21:12 22:12 34:8,12,17 35:8 57:4

**build** 76:22

**building** 93:23

**bunch** 40:20 69:17

**business** 31:17,19

**busy** 25:15

———

**C**

**calculation** 89:15

**call** 39:18 42:20 45:10 46:11 73:5,14, 17 77:22 79:7, 15 87:24 88:9 89:8 95:18

**called** 8:5 9:4 19:25 20:1 29:3 43:7 44:13,19 49:2 51:7 59:13 66:23 67:17,22 71:2,3 77:9,10, 17,19,21 78:2

**caller** 45:20

**calling** 43:1 44:2 71:12 77:6 89:22

**camera** 69:11, 25 74:20 75:2, 10,17,22

**cameras** 19:20 69:17,22 76:4

**case** 6:13 7:25 10:9 12:15 15:12 23:20

**24:22** 26:5,22 28:15 33:1 34:6,23 47:1 49:5 50:18 57:14 85:9 98:22

**cash** 18:1 54:6 85:16,17,21,22

**cataloging** 54:4

**cell** 19:21,25 69:12,25 70:13 71:20 72:6,7 73:2 75:6,7,21

**center** 77:18

**chance** 12:14 33:3

**change** 57:16 58:7

**changed** 65:22

**changing** 65:15

**Charge** 30:21

**check** 19:24 64:10,15 65:2, 6,14 71:17

**chemo** 41:14 43:10

**chemo/ radiation** 91:22

**chest** 74:8,15

**Chicago** 6:21

**Christine** 6:10 17:4,17 18:13, 14,16,21,23 19:4,6,17,21 20:9,12,18,21, 23 21:4,9 22:5, 12 23:22 42:24 53:25 68:18 69:11 70:3 71:25 72:18,22 74:15,25 75:6, 12,20,24 76:6

**Christine's** 72:17 74:8

**clear** 90:6

**click** 72:11

**clipped** 48:10

**code** 83:14,17

**column** 40:17, 18,20 41:1,5,9 42:11,16 43:9

**columns** 39:18 40:20 41:1

**complete** 12:12 88:2 89:4

**completed** 35:10 36:21 37:3,16 46:8,9 86:12,17

**completing** 58:12,14

**compressions** 74:16

**computer** 16:1 48:12 64:24

**computers** 65:1

**concerns** 18:12

**CONCLUDED** 99:10

**condition** 59:20 60:1 67:13 82:20

**conditions** 32:5

**conducted** 26:23

**conducting** 26:25

**conference** 6:8

**conferring** 97:10,12

**consistent** 57:18

**contact** 20:15 68:25 74:1 88:3,13 89:23

**contacted** 73:19 74:4 90:1

**contacting** 20:20 74:2

**contained** 61:6

**container** 52:3

**contents** 85:3, 5

**contest** 11:18

**continue** 55:3, 7

**continued** 72:23 75:6

**continuously** 16:22

**control** 19:19 20:5 25:19,25 26:10,25 27:3, 6,11,14,18 63:5,15 64:14 66:8,12,17,21, 25 67:1,18 69:16,20 71:23 74:17 76:4 77:3,16,18,20, 23

**convened** 6:7

**conversation** 10:18 27:15 28:3,7 36:1,5 37:1,14 67:12 78:7,18

**conversations** 67:23

**Cool** 33:15

**copy** 32:20

**corner** 39:14

**correct** 9:13 10:1 14:7 16:3, 6,9,23 17:3 19:11,12,15 21:19 22:9,14, 17,21 23:4,7,18 24:18,21 25:1, 5,6,15,20,24 27:2,7 28:1,5,

10,22 29:16,19 30:1,5,16,19 31:23 32:8,14 33:18,21 34:4, 10 35:3,7,14 36:3,6 38:1,9, 10,13,17,22,24 39:4,12,15,24 40:2,9 41:4 43:13,19 44:1, 25 47:17 48:7, 13,17 49:7,8, 11,14,23,24 50:3,17 51:18 52:7,9 53:8,9 54:3,8,12,19, 22,25 55:5,14, 24 56:4,20,21 58:19,22 59:11 61:19 62:19,23 63:13,16 64:12, 19 65:4,18 66:10 67:9,20 68:13 69:5,15, 19,23 70:2,5 71:1,10,21,24 72:3,15,21,24 73:3,13 74:5, 13,23 75:4,11, 18,23 76:5,9, 16,22 77:2,14, 25 78:5 80:12, 24 81:15,20 82:12 83:21,24 84:6,25 86:6,10 87:2,23 88:15 89:12,14 91:11, 20 92:24

**correctional** 6:11,24 8:13 9:25 17:1 84:17 92:16

**Corrections** 16:17 24:7

**correctly** 53:17 55:16

**COS** 88:13

**counsel** 6:17 7:19

**count** 89:12

**counter** 71:3 97:25

———



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

counties 66:23

counts 15:24

county 7:5
16:12,20,21,25
19:8 38:11 68:3
80:4

couple 9:6,8
30:23 36:18
52:1 95:9

court 6:2,3,4,
12 7:6,9,13,19
8:7,15,17,20,23
9:2,10 10:10,
12,15,22 11:3
30:24 31:3,10,
18,20,22,24,25
32:7,22 37:8,10
45:5,12,15
56:14 79:20,23
87:8,11 99:6,8

CPR 75:6,20

created 36:9
49:6

creating 81:17,
21 82:1

CROSS 84:13

Crosse 76:8

cursor 23:2

custom 87:20

cut 41:22

**D**

DA 32:2

daily 44:8

Danielle 18:10
19:23,24 24:6
25:4 26:4,21
57:14 70:11
81:14

data 29:14

date 29:9 30:3,
25 31:3,8,10,
18,22 32:7,22
39:22,23 89:17

dated 36:10

day 6:6 15:23
19:10 31:17,19
43:23 64:5
83:7,8 86:4

dealing 69:2

December
22:7,13 23:17,
23 24:5 25:3,22
26:1,20 27:18,
25 28:4 31:9
36:11 39:3
56:9,15,23
57:1,11 62:8
63:6 64:5 65:23
66:3 67:7,16,24
83:6,7 93:2

defendants
6:24 7:5 84:17

defender 32:2

delivered 75:1

demographic
29:24

Dempsey
43:23

Dempsey's
43:17,21

deny 42:22

department
16:12,17,20,22,
25 73:23,24

depend 43:4

depending
88:12

deposed 8:1
57:13

deposing 34:5
57:13,15

deposition
6:8,21 10:21
11:8,25 12:2,4,
21 13:11 14:19
15:7,17 17:10,
16 22:11 26:4,
5,21,22 28:24
35:17 38:7,8
39:11 68:12
80:14 99:10

deposition's
11:16

depositions
10:6 14:23
34:22

describe 15:20
33:24 48:18
60:15 62:2

describing
19:3 29:14,24
48:15 51:12
52:20,22 72:12

designed
81:18

desk 25:22

detainee
32:15,18,21
39:23 51:3
60:21 61:3,7

detainee's
59:20

detainees
57:22 61:12
67:3

determined
38:20

diagram 23:10

difficulty 95:17

direct 7:20
95:16

directed 73:15

directing
27:22 45:18
46:6

discovered
54:10

discuss 57:21

discussed
41:25

discussing
56:1 57:17

discussions
93:16

Disintegrating
90:18

dispatch 20:1,
21 73:19,22,23
74:2

District 6:12,
13

doctor 46:11

document
14:22,25 15:1,
10,12 17:11,12
21:15 23:19
28:18,23 29:2,
4,13 32:20
33:12,16,17
35:19 39:17
42:15 50:2
68:3,5 69:6
80:11,13,16,23
81:3 82:8

documentatio
n 86:8

documents
13:10,13,16
14:5,13 15:6,16
17:9,15 22:10
35:11 38:8
39:10 49:6,25
68:9,11

door 93:25

doors 20:6,12,
14 69:1

dose 40:22

Doug 6:22,23
88:22 90:6
94:23

drop 93:20

dropping 93:9

due 70:4

**E**

e-mail 60:14
64:10,16,22
65:2,14 93:1,5,
8 94:24

e-mailed 14:15

e-mails 64:8
65:6,11

earlier 48:9
49:16,18 66:2

easy 11:3

eat 83:23

eating 84:1

effect 74:8

effort 62:2

electronical
32:17

emergency
19:7 20:9 69:8
72:9,10 74:12
77:4,13 79:2
93:14,21 94:3

employed
16:19

employee
24:14

employees
25:7

employment
16:14

EMS 19:25
20:1,14 73:5,
14,17,20 74:1,4
75:13,20

end 78:18

ended 62:14
78:18 79:6,15

ends 38:23

endurance
11:17

enter 29:10,21
30:2 31:7,13,14

entered 19:24
30:8,18 31:3
32:7

entering 81:22

entire 17:2
20:6

entitled 12:16

entrance
93:19

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

entries 40:6,14

entry 16:5,7
29:13,14 36:10
40:10 43:9
44:6,7,12,19
56:5 68:14,15,
20,22 69:4
72:13 83:14
95:16

essentially
10:8

estate 6:10

estimate 9:11
10:4 12:17
13:13

evening 22:12,
15 27:18,24
28:4 35:25
62:21 63:3,12
66:12 67:16,24
77:7

event 68:17

events 11:17
21:9 69:8

eventually
94:5,8

exact 77:11
78:7 85:2,18

EXAMINATIO
N 7:20 84:13
95:12

examined 54:2

examining
52:6

excited 78:24
79:1,2,4,9

exhibit 15:5,8,
11,14 21:14,15,
18 23:8,9,11,
13,20 24:1
27:22 28:15,19
33:1,4 35:16
36:8,15 38:6
39:1,9 41:24
42:11 46:20
48:5 50:19 56:1
58:17 68:2,7
80:3,8 82:4

83:12 86:23
88:20 94:24,25
95:2,5,14

expect 10:7

expectation
59:24

expectations
60:19

experienced
64:5

explain 8:19

explained
95:17

extra 20:2

eyes 69:24

_____

F

face 29:3 31:15
34:20 35:5,10
47:2,10,14,19
48:11,22 49:7,
18 50:19 55:18
82:10,15

fact 7:10 44:11
58:21,24 60:6

fair 26:12,13
66:11 87:3
90:22

fairly 62:14

faster 79:11

feed 72:7,20

feeds 73:1

feel 22:1

female 73:21

Fennigkoh
6:25 28:3 36:2,
9,22 37:1,15
84:16 85:23
93:1 95:21
96:16 97:1,11

Fennigkoh's
95:16

fill 42:7

filled 34:7,11,
16 40:21 42:16,
19 46:23 48:11,
20 54:23

filling 40:25
41:20,23 42:1
52:18 54:18,20
58:13,15,16

finish 11:1,2

firm 6:20 7:3

flight 76:7

flip 11:2

float 25:16

floor 19:21
21:16,20 22:20,
22 69:11 70:1,6
72:1

folks 38:15

follow 49:4

follow-ups
84:11

form 8:16
14:20 15:5
17:14 20:25
27:10 29:6
31:5,16 32:16,
18 33:8,11,19,
24 34:6,11,13,
15,19,25 35:2,
22 37:21 40:4,8
41:3,21,24 42:2
43:3,20,25
44:15,20 46:7,
8,15,17 47:5,8,
16,23 48:16,20,
21,24 49:13,22
50:2,4,11,13,
15,22,24 52:17,
21 53:2,8,10,16
54:7,14,16,18
55:4,20,22,23
58:13,15,20
59:1,10,16,22
60:3,9,22,24
61:8,14,23
62:5,16 63:7,20
65:9,24 70:9
78:16 82:17
86:5,9,17 87:7,
9,22 88:2,5,14,

17 89:5,7,10,13
90:2,25 91:2
92:14,18 98:6,
13,16

forms 42:7
50:11,12 55:18

forwarded
76:7

found 51:20
53:5,11,14,15,
19 96:17 97:6

fourth 40:14

free 11:19 22:1

front 15:1
21:16 32:1 82:6

full 7:7 12:12

function 73:12
74:3

_____

G

gasping 72:1,
23

general 18:17

generally
34:14

generated
30:7,8,13

give 7:16 9:6
16:13 61:15
79:17

giving 74:15

glass 67:19

Good 6:18 7:22

governing
12:3

graduated
16:15,16

Great 36:17
95:6

Greg 93:10

Gregory 6:9

guess 8:21
46:14 51:22

78:24 89:3 91:8
92:11

guessing 90:3

Gundersen
76:7

gurney 75:25

guys 99:7

gym 62:19

_____

H

habit 87:19

half 21:1

hand 7:14
39:14 85:2

handheld 73:9

handwriting
16:1 35:16
39:16 40:1,7,
11,13,15,25
41:10,16,18
43:12,20,21,22
91:16 92:4,10,
11

handwritten
33:7,19,22

Hansen 7:2

happen 46:23
47:7

happened
18:22 19:10,17
20:10 54:15
76:21,23 77:1
86:3,4 87:4

happening
49:17

happy 79:9

hard 10:21

head 15:23

headache
56:15

health 70:4,7

Healthcare
6:11,25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

hear 36:4 84:20

heard 7:24

hearing 72:14, 19 73:1 95:21

height 29:10 30:3

helicopter 20:21,24 21:5

helping 57:8

Hey 20:25 94:23

high 16:15,16

history 16:14

home 62:17 66:14

hour 57:7

hours 14:21 31:9

housing 20:7,8 63:4,12,17,24 64:14,21,23 65:3,12,13,16, 17,22 66:4,12, 17

how's 42:19

hung 71:19

hurry 79:6

_____

**I**

ICU 76:10

ID 39:23

ID'ED 51:6

identification 15:8,14 21:18 23:11 24:1 28:19 33:4 36:15 55:2,7 68:7 80:8 95:2

identified 54:24 97:4,16, 20 98:2

identify 28:6 53:5,6,18 55:3,

13 96:17,20,22 97:1,7 98:5

identifying 54:17 55:12 76:18 96:14

Illinois 6:21

immediately 70:12 71:18 73:17 88:7,8

important 60:20 62:3

incident 14:10 21:7,10 64:2,3 67:10 69:3 77:12 78:12

include 57:25

included 47:2

incoming 57:21

independent 17:8,11 22:4

Independently 17:15

indication 43:6

individual 31:25

info 29:10 61:16

inform 20:16 32:23 42:20 46:11

information 16:1 29:9,21, 23,24 30:3,4,6, 17 31:2,14 32:21 33:7,19, 23 38:19 39:20, 22 42:21 58:23 59:19,25 60:7, 12,20 61:5,11 62:3,11 64:4

informed 20:1 21:6 53:23 58:9,13 59:6,8 70:12,15,21 71:16 73:20

informing 53:21 59:12,15 96:6

inhaler 92:6

inmate 68:18 88:1

inmate's 60:1

inmates 57:4 62:10 66:24 72:9

inside 47:11 93:25 94:1

instructed 36:24 61:1 86:24 87:4

instruction 44:12,18 73:8, 15

instructions 41:6,9 44:7,24

instructs 11:12

intake 26:6,23, 25 30:24 31:10, 14 33:25 34:16, 24 35:9,23 36:23 37:2,15 44:3 47:3,19 48:2,5,6,9 49:9, 19 50:20 51:16 55:19 82:5,13 84:23 85:24 86:1,8,12,16 88:1

interacting 67:15

interaction 57:16

intercom 72:6, 9,11,14,19 93:19

interested 12:1 36:24

interrupt 21:24 37:7 98:9

interview 86:13,18

introduce 68:1 80:3

inventoried 85:3,5,7

involve 58:2

involved 67:11 81:10,11 85:25

involving 14:10 57:22 61:3 64:2 69:8

issues 57:22, 25 58:2 61:3,7, 12 63:23 64:4 67:2 70:4,7

items 17:21,23

_____

**J**

jail 7:4 17:18,19 18:11 19:8 20:2,6,8,13,24 21:5,9 23:22,23 24:4,25 25:8,14 26:7,24 32:4 34:2,8 36:25 38:12 57:5,9 63:2 65:16 67:17,22 69:1, 18 73:5,20,23 74:1,11 75:5 77:17,19,22 86:24 87:4 93:11 94:6,9

jail's 95:18

James 24:11

January 16:19, 22

JCA 30:12,14

Jeff 20:6 24:8 27:13 94:13

job 8:13 9:24 42:6 69:20

John 7:2 11:11 13:4 95:7

join 48:1 50:25 60:10 98:9

joined 16:17

judge 32:1

_____

**K**

Kentuckiana 6:4

Kentucky 6:6

kind 21:16 26:11 69:2 77:15 78:25

knew 31:7 71:2

Knott 6:23 7:12 37:6,18 44:15 45:7,10 48:1 50:25 55:4,22 60:10 84:11,14 87:12 88:24 89:2 90:9,12 94:21,25 95:15 98:8

Knott's 95:10

knowing 94:18

knuckles 17:24 54:5 84:24 85:14

Krystal 6:2

Kyle 20:6 24:7 27:13 74:7,15 78:3,4,12

_____

**L**

La 76:8

labeled 23:15

lack 12:10

language 91:18 92:6,7

large 18:1 41:5 57:4 62:10

late 57:10 68:15,22,23 72:13

law 6:20 7:3

lawyer 11:12

lawyers 10:10

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

11:6 14:18

**laying** 19:21
55:15 69:11

**layout** 21:16,
20,23 28:7

**learn** 60:6,7,12
63:22

**leave** 55:1,14
77:3

**left** 50:9 55:6,
19 88:24

**legs** 11:19

**level** 29:8

**levels** 29:8

**light** 27:15

**lighter** 91:17

**lines** 30:24
79:15

**Lisa** 6:25 37:20
84:16 90:9

**list** 13:19
23:21,24 24:9
27:16 95:19

**listed** 41:2

**listen** 72:11

**lobby** 94:1,10

**located** 6:4

**locating** 52:8

**location** 6:16

**Loevy** 6:20

**log** 13:22 14:2
15:20,21,22
38:12,14 56:1
64:24 65:2,14
83:13

**logging** 54:9
98:1

**long** 11:17
14:17 90:22

**looked** 19:20

**loose** 17:25
51:5,8,17 52:11
53:21,24 55:14

96:1,7,11,14,
17,20,22 97:1,
4,8,16,20 98:2

**lot** 17:21 62:11
66:22 69:16
79:10 85:16

**Louisville** 6:5

**lower** 95:24

**Lucas** 6:8 7:8
45:25 68:15
80:20,25 81:5

**Lutheran** 76:8

**lying** 70:1,6
72:1

———

**M**

**machine** 10:16

**made** 11:13
14:10 38:20
62:2 69:4

**main** 6:5 26:25
64:14 69:16,20
76:4 77:19
81:11

**make** 10:6,13,
23 11:3,4,14,22
12:8,17 36:13
42:4 45:10,22
54:15 82:4
87:25 88:9

**making** 16:8
39:2 44:7 89:8
96:4

**map** 22:2 28:7

**marked** 15:8,
11,14 21:15,18
23:11,20 24:1
28:14,19 32:25
33:4 36:7,15
38:5 68:7 80:8
83:12 95:2

**master** 19:19
20:5 25:18,25
26:9 27:2,5,11,
14,17 63:5,14
66:8,12,17,21,
25 67:1,18

71:22 74:16
77:3,16,18,20,
23

**matter** 6:9

**Mccauley** 6:22
7:2 14:20 17:14
20:25 21:24
27:10 29:6
31:5,16 33:11
35:2,22 37:21
40:8 41:3 43:3,
25 44:20 45:22,
25 46:4 47:5,8,
16,23 49:22
50:15,24 51:4
53:2 54:7 55:23
59:1,10,22
60:3,9,13,22,24
61:8,14,23
62:5,16 63:7,20
65:9,24 66:7
70:9 78:16,23
82:17 84:10,18
92:18 94:23
95:4,6,8,11
98:16,23 99:3

**meal** 15:23
83:17,18,20,23
84:1,4

**Meaning** 71:19

**means** 17:8
81:6,9

**meant** 46:14
90:20

**mechanical**
77:15

**med** 13:21 76:7
95:19 98:4

**medic** 37:24

**medical** 13:22
18:7,9,10,12,23
19:6 20:9 33:25
34:21 35:9,23
37:25 38:3,16,
21 40:6 46:25
47:2,11 48:6,9,
25 49:3,4,9,19
50:14,20,23
51:9 53:16
55:10,21 57:25

58:10,12,14,21,
25 59:7,9,16,20
60:1,7,8,20
61:3,7,12 62:3
63:22 64:1,3,4
67:2,10,13 69:8
70:3,7 72:10
79:2 82:5,13
83:3 86:1,8,12,
16 87:23 92:15,
17 93:14,21
94:2 98:14

**medication**
12:10 15:5
40:18,21,22
41:6,9 42:8
43:2,5 44:6,11,
18,23 45:19
46:6,10,17
47:14 48:15,19
49:12 50:2,4,
10,13,21 52:17,
21 53:8,10,15
54:14 55:20
59:16 88:2,10,
17 89:5 90:24
91:3 92:13
98:13

**medications**
17:25 44:4
46:12 47:10
48:23 49:3 50:6
51:3,5 53:5,7,
22,24 55:12
87:24 88:4,6
89:22 92:14
98:20

**Medicine** 90:8

**meds** 87:21
93:9,20

**meet** 13:5

**meeting** 13:7

**memory** 12:16
13:16 35:25
98:21

**mentioned**
8:22

**met** 12:24 13:2

**middle** 78:12
88:7 93:21

**midnight**
42:24

**Milwaukee** 7:1

**mind** 9:3

**mine** 39:21

**minute** 36:10,
17 45:21 79:17

**minutes** 45:4,7
47:12,18 79:19

**Mischaracteriz
es** 65:25 98:6

**missed** 43:14

**Moga** 24:7
27:13 74:7,11,
15 78:4 93:4

**moment** 78:13
97:18

**Monday** 31:8,9

**Mondays**
31:21

**monitor** 19:20

**monitoring**
69:21

**Monroe** 7:5
16:12,19,21,25
19:7 38:11 68:3
80:4

**morning** 6:18
7:22,23 56:9,
15,23 57:1,11
62:8

**motionless**
72:1

**mouth** 49:16

**move** 90:11

**moved** 34:7

———

**N**

**name's** 7:24

**names** 23:24

**narc** 42:4

**Narrative** 36:8



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

nausea 41:14 43:10 91:22

necessarily 83:1

needed 20:1 25:17 41:13 43:9 73:20,21 88:6,8 91:22

night 17:18 18:5 20:5 22:7 23:17 24:5,19 25:3 26:1,20 27:9 42:23 44:3 56:2 63:6 65:23 66:3 83:6,8 88:8 93:9,17 94:19

non-responsive 73:20

normal 10:18 57:7 85:24 88:2,12

note 36:8 86:21

noted 68:22

noticed 69:25

notified 18:11 19:23

notify 87:20

NP 36:25 86:24

number 6:13 30:12,14 38:19 39:13,23 40:5, 6,21 41:12 43:18 77:22 80:4 85:2,18 89:12,24 90:16, 23 91:4

nurse 18:11 37:20 85:25 87:5,20 90:10

nurse's 92:20

### O

oath 8:16 9:2 12:3

object 14:20 17:14 20:25 27:10 29:6 31:5,16 33:11 35:2,22 37:21 41:3 43:3,25 44:15,20 47:16, 23 50:15,24 53:2 54:7 55:23 59:1,10,22 60:3,9,22,24 61:8,14,23 62:5,16 63:7,20 65:9,24 70:9 78:16 82:17 86:5,9 87:7,9, 22 88:5,14 89:13 90:2 91:2 92:18 98:6,16

objection 11:13 40:8 51:4 60:13 66:7 78:23 98:9,23

objections 11:6

obligated 11:14

observation 38:12,21 56:1 58:16 83:13

observations 38:15,25 39:2

observed 38:15

observing 39:6

occurred 28:7, 12

occurs 65:17

offered 9:1 10:2 83:20 84:4

offering 8:12 9:24

office 7:1 48:25 73:24,25 74:3,21 92:20 98:4,14

officer 8:13 9:25 17:1 24:7

25:10,16 29:15 30:18 31:3 42:7 43:15 74:7,15 89:25 94:13

officer's 89:24

officers 20:2,7, 13 57:17 73:21

on-call 24:11, 13

oncoming 60:18

ondansetron 41:13 91:19,21

online 6:3

open 20:12 69:1 71:22 95:18

opened 93:25

opening 20:14

operate 27:1

operates 26:9

order 49:3

overseeing 61:12

overtime 27:19

oxycodone 41:8 42:3 52:13 89:11

### P

p.m. 24:19 39:3 62:21,25 66:5 83:5 93:3

packaging 52:2

packet 82:22, 25

pad 32:17

pages 14:5

pain 44:9

pairs 17:24

paper 46:16, 22,24 48:10

paragraph 68:20

Parker 57:14 67:15,21,22 77:6 78:1,15 87:15 93:4

part 9:24 24:16 41:20,23 42:6,7 52:4 54:1,17 63:2 64:10,14 66:9 69:20 94:9

part-time 24:14 25:10

part-timer 66:13

parties 7:9

parts 24:25 25:14 69:17

pass 59:20 60:14,15,19 61:2,6,13,18,21 62:1,7 63:18 65:12 66:16,18, 19,20,25 67:2 83:5,8

pass-on 65:17

passed 59:25 62:11

passes 15:23

passing 83:6

past 14:24 56:8,19,22,25 57:6

patient 95:25

pending 6:12 11:21

people 9:16 10:18,22 13:3 20:15 24:22 25:12,23 57:8, 17 63:18,23 68:25 98:19

perform 61:1 89:15

performed 61:21 62:1 73:11 74:7 98:15

performing 62:7

person 9:17,18 25:18,21 26:24 27:9 34:2,7 58:25 59:9 69:21 81:10,11 82:23,24 83:3

person's 34:12,17

personal 29:9

personally 47:9 53:20 58:8 98:19

persons 23:22 35:8 81:21

pharmacy 90:23

pharmacy's 95:18

phone 45:10 70:23 71:4,5, 11,15,19 77:19, 20 79:3,7 90:23

phonetic 13:4 29:3 33:15 47:25

photo 29:25

pick 71:11

picked 71:14

piece 46:14,16, 22,24

pill 90:16,17

pills 40:21 42:4 51:6,8,9,17,20 52:2,8,10 53:10,14,18 54:11,17,23 55:1,7,14 89:12,16 91:4 96:1,7,11,14, 17,20,23 97:1, 4,6,8,16,20



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

98:3,5,12

**Pisney** 6:25
44:3,13,19
59:13 84:16
90:9

**place** 47:13
66:17 82:10
97:21

**placing** 52:20
98:3,12

**plaintiff** 6:19
7:11,25 87:10

**plaintiff's** 6:17

**plan** 22:20,23

**point** 19:7
21:13 33:13
63:6 64:17,18
65:13 69:24
71:6 77:7

**pointing** 91:21

**portion** 33:12

**portions** 41:25
54:20

**position** 16:24
86:11,15

**possibly** 20:2
63:10

**practice** 42:25
64:10 83:22
85:6 88:3

**practitioner**
37:20 87:5,20

**precise** 76:18

**preparation**
22:11 28:24
35:17 38:8
39:11 68:11
80:14

**prepare** 12:20
13:10 14:18
15:6,17 17:9,16
68:19

**prepared** 29:4
34:1

**preparing**
76:19

**prescription**
44:21,23 51:8
52:11,14 54:11
89:11,17

**prescriptions**
58:3

**present** 9:2,16
10:11 18:15
85:23

**prevent** 12:11

**previous** 65:7

**primary** 81:13,
17,19,22

**print** 29:11

**printed** 30:7
32:19 35:10

**prior** 89:20

**problem** 45:8

**procedure**
50:19 65:5
98:15

**PROCEEDING
S** 6:1

**process** 10:8
19:3 32:22
34:3,14,16
35:10 36:23
37:2,15 42:8
46:15 48:15,19
51:1,2,12 52:4,
22 54:1,17
55:7,12 57:20
59:25 64:15
65:17 81:16
85:24,25

**program**
15:21,25 29:8
30:9

**Progress** 36:8

**property** 54:4,
9 97:25 98:1

**provide** 76:20

**provided**
23:21 32:19

**provider** 42:20
43:1 88:3,13

89:22 90:1,7,10

**providing**
12:11

**PT** 95:24

**public** 32:2
93:19 94:1,10

**pull** 46:18

**purported**
23:21

**purpose** 38:14

**purposes**
38:16

**purse** 17:25
51:5,21 52:6,8
53:5,19 54:2,5,
8 85:3,5 96:1,8,
11 97:5

**push** 72:10

**put** 47:9 48:22
49:16 82:22
89:5 90:24
92:13,15,16

**putting** 82:15,
24

---

## Q

**question** 11:1,
2,13,20,21 21:2
26:17 33:2 37:7
47:24 51:13
77:16 82:3
86:14,23 94:7
97:17

**questions** 9:6,
18,19 10:12,13
12:5,15 17:7
36:18,20 62:13
80:2 84:9 94:21
95:7,8,10

**quick** 45:3,23
62:13 84:11

**quickly** 16:11
23:8 28:16 33:2
37:12 68:5
79:7,13 80:5
86:20

---

## R

**radiation**
41:14 43:10

**radio** 73:9

**radioed** 73:4

**raise** 7:13

**rang** 93:18

**reach** 77:16

**reached** 69:24

**reacted** 78:15,
22

**read** 23:24
36:10,11,14,17
37:9 81:22,25
82:13 86:21
88:18

**reading** 68:17

**real** 16:11 23:8
33:2 37:12
45:22 62:13
68:5 80:5

**reason** 59:9
69:3 92:10

**recall** 8:2 14:12
16:7 17:17,20
18:2,3,4,5,7
19:6,19,22
20:17,20,23
21:4,8 26:2
27:14,20 28:12
37:1,14 41:20,
23 43:22 50:18
51:1,15,16,25
52:5,8,10,19,23
53:4,6,7,18
54:16,18,20
55:9,17 56:8,
19,22,25 57:10,
12 58:6,8 59:2,
4,12,14,15,18
61:4,25 62:7,9
64:1,3 67:6,11,
15,21,22 70:18
77:5,6,9,11
78:6,9,11,14,
17,20,21 83:7
85:15,20,22

86:25 93:13
95:21 96:4,6,
10,16,19,21,22,
25 97:7,9,10
98:24

**recalled** 28:2
36:1

**receive** 66:16

**received** 44:4

**recipient** 64:9

**reciting** 87:1

**recognize**
15:12 21:20
23:9 24:9
28:17,21 33:7
35:19,21 39:16,
25 40:11,24
43:17,20 68:6,8
80:16,18,23

**recognized**
40:5

**recognizing**
14:25

**recollection**
12:17 17:4,8
18:18,22,25
22:5 26:19
27:12 44:2
51:12,19 52:16,
25 54:16 57:18
69:7 86:16 87:6
89:21 93:4,10
97:23

**recollections**
19:4

**record** 7:7
15:4,11 17:8
38:14 44:22
45:5,12,14,15
79:18,20,22,23
83:22,25 99:9

**recorded**
38:20

**recording**
38:19 45:20

**records** 39:1

**REDIRECT**
95:12



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

referring 14:4,
5 33:6,22 34:13
35:24 40:25
42:14 58:15
90:7

refresh 69:7

relay 60:20

relayed 76:15

released 32:4

relevant 61:11

remember
13:20,25 14:8,9
17:21 19:16
20:3,4,10 22:16
23:16 24:3,4
25:2,25 37:19,
23 38:2 39:5
42:1,3 52:1,16
53:21,23 55:6
61:21 62:24
63:1 65:21
66:11 70:20
78:1,7 83:10
85:1,2,14,18
93:7 97:13,14,
19 98:4,7,10,
11,12

remote 10:9

repeat 60:25
66:1 85:4 86:14
94:7 97:17

report 14:10
33:25 34:1
35:9,23 48:6,9
49:10,19 50:20
55:19 73:5
80:20 81:5,12,
13,17,19,22,25
82:1,5,14 83:4

reported 70:13
74:16

reporter 6:2,3
7:6,9,13,19
8:17 9:2 10:10,
12,22 11:4
37:9,10 45:5,
12,15 56:14
79:20,23 87:8,
11 99:6,8

reporter's
10:15

Reporters 6:4

reporting 72:4

reports 81:17,
18,22,23

represent 6:19
7:4,25 84:15

represented
11:7

representing
6:4

reserve 12:6

respect 91:18
92:3

respond
72:18,22

restroom 45:3

retrievable
92:16

retrieve 74:17
92:23

returning
61:20

review 13:10
14:13

reviewed
13:14 14:6
15:6,17,19
17:9,15 28:23
35:6 38:8 39:10
68:11 69:6
80:13 95:15

reviewing 14:9
16:4 17:11
22:10

Reynolds 7:3

RN 36:24 86:24
95:17 96:13

role 25:22

room 7:3 8:16
9:15 10:9 14:23

routine 85:6
87:20 88:12

row 44:8

rub 74:7

rude 10:19

rule 56:13
59:19

rules 9:8 10:5
12:3 61:5

run 10:6

Runice 6:8 7:6,
8,10,22 15:2,13
21:17 23:25
27:22 28:16
33:2,16 35:24
36:12,19 37:15
38:6 39:9 45:2,
18 46:20 68:1,
5,15 79:16
80:1,5,21,25
81:6 82:6 83:12
84:7,15 90:13
93:3 95:14
99:1,4

RX 40:20

_____

S

sat 10:8

scan 82:22

scheduled
30:24 31:10

school 16:15

Schwanz 24:8
27:13 94:13,14,
15

screen 15:1
21:25 58:18
72:5 82:5 86:21
88:18

screening
18:10 33:25
35:9,23 48:6,9
49:9,19 50:20
55:19 82:14
83:3 86:1,8,12,
17

scroll 28:15
33:1 68:4 80:5

scrolled 33:15

seconds 71:12

secure 47:11
50:13

secured 48:25
51:10

sense 10:13,23
11:4,14,22
12:8,18 78:25
79:9

sentence
73:22 74:6,19
76:13

separate 50:17

separated
50:11,22

separates
23:1

sequence 34:8

Sergeant 24:6
70:11 72:16,22
73:4 74:16

service 20:20

set 32:3 92:20

sets 84:24

sex 30:3

share 33:12
86:21

Shasta 67:15,
21 77:6

she'd 44:4

sheet 13:21
29:3,12,21
30:17 31:14,15
34:20 35:5,10
47:3,10,14,19
48:11,22 49:7,
19 50:19 55:18
82:10,15

sheets 47:21

sheriff's 16:12,
20,21,25 20:13
73:24,25 74:3

shift 13:22 14:2
15:19,21 19:13,

17 20:17 22:7
24:5,10,12,16,
19,23 25:8
26:20 27:20
42:23 43:23
56:2,8,20,22,25
57:7,21 58:7
59:21 60:1,5,
18,23 61:2,6,
10,13 62:14,20,
24 63:2,6,18,24
64:5,10,11,15,
17,18,22 65:6,
8,21,22 66:3,4
67:5,7 77:7
83:5,6,7,8

shifts 22:6
57:16

shock 75:1

shocks 75:13

Shoppe 90:8

short 20:4

shortly 42:24

show 14:22
21:14 23:8,19
36:7 55:25

showed 93:15

showing 15:4,
10 28:14 32:25
38:5 83:11 93:1
95:14

shut 45:22

side 11:2 20:13
91:17

sight 71:8

signature
32:9,12,13

signed 32:17

signify 88:21
90:14

signing 32:16

signs 32:18

simple 58:24
62:14

sir 7:14 51:11
86:23 92:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

94:22 99:3

sit 65:10

sits 32:1

sitting 9:15
22:19 71:1
82:21

situation 36:25
70:12,16 81:11
86:25 87:5

situation's
61:17

sleep 12:11
62:17

slid 75:5

slot 92:22

smaller 51:20

smoothly 10:6

solemnly 7:14

someone's
58:21

sooner 88:11

sort 9:5 14:9
30:4 40:19,20
42:10 52:2
61:16 65:5
66:20 76:22
90:17

sounded 78:24
79:1

sounds 51:16
52:5

Sparta 7:4

speak 12:4,6
78:3

speaking 21:8
58:6 79:10,13

special 57:22

specific 28:11
33:6 62:9 98:21

specifically
27:17 42:15

spend 14:17

spoke 12:1,7,

25 18:12,14,15,
19,21 47:12,18
54:21

spoken 11:24

staff 36:25 73:5
75:5 86:24 87:4
92:16,21

staffed 20:4

standard 51:2,
12 52:22 55:12

standing 97:24

stands 95:25

stapled 34:20
35:5,11 48:10

start 68:17

started 20:8
74:12 79:10,12

starting 6:16
16:14 89:7,10

state 6:15 7:7

statement
96:4

statements
9:20

States 6:12

station 34:24
35:12 47:22

stationed
22:22 23:17
24:23,24 25:2
71:7

stations 71:2

stay 19:7 23:23
27:21 57:6

stayed 27:21
56:16,25 57:10
93:22

staying 27:19
56:8,19,22

Stephen 6:18

sternum 74:7

Steve 7:24
20:25 45:7

Street 6:5

stretch 11:19

strike 19:13

Suite 6:5

summary
36:23 76:19,20

Sunday 93:2
95:18

supplement
81:19

supplemental
80:20 81:5,6,
18,21,23 82:1

supposed
93:9

surrounding
21:9

suspend 10:20

swear 7:15

symbol 91:9

___ T ___

tab 44:8

taking 11:22
25:23

talk 10:18 22:6
64:2 78:13 79:3
88:3 94:11

talked 82:8

talking 10:22
14:17 37:19
46:7 49:5 53:25
55:18 67:6
90:7,9

talks 10:20
95:17

technician 6:3

telephone
20:16 70:19

teletypes
66:23

telling 60:18
78:11

term 42:10

terms 9:14
17:11 38:18
42:25 44:6,23

test 12:16

testified 8:7,16
9:9 36:22 37:23
66:2 82:9

testify 8:11

testifying 8:15
9:14 52:5

testimony
7:15 8:12,19,20
9:1 48:8 49:15,
18 87:1 89:21

thereabouts
63:11

thing 11:19
30:12 80:2 86:3

things 10:6
27:1 65:12
66:20,24 68:24
76:13,14,21
77:1 88:17

thinking 82:20

thought 9:1

thousands
85:19

three-page
33:17

time 6:7 9:9,12
10:2,23 16:24
17:2 18:11 25:8
31:4,8 39:23
45:16 57:5
77:11 79:21,24
84:8,23 88:20,
21,24 89:5,9
90:22 97:4,12,
15,20,22 98:2
99:5

timeline 76:23

times 8:9,11,25
9:21,23 66:22
76:18

today 6:3,6
10:7,8 11:6,8,

17 12:12 13:11
14:19 15:17
28:24 35:17
38:9 39:11
68:12 80:14
84:8 86:15 87:6

told 10:7 37:23
38:2 39:5 47:20
78:14 93:20
94:19

top 39:18 80:20
81:13 88:24

total 25:8 75:13

transferred
58:24 63:14
66:5,12

transfers
66:24

transported
20:24 21:5

trial 12:15

trouble 14:25

true 38:23
88:13

truth 7:16,17

Tucker 24:11

turn 62:12

turning 35:15
40:4 41:5 52:15
54:13 55:17

TW 90:15

TW8 90:14

typed 9:19
80:25 81:3

typically 25:7,
9,12 31:20
32:1,4,23 34:6
50:6 52:24
57:21 59:2,25
61:15 65:11,20
66:25 67:2 89:4
92:20

typing 10:16
15:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## U

**ultimately**
42:17

**unable** 95:18

**unavailable**
78:13

**understand**
11:7 17:10 26:5
34:15 42:14,15
48:14 49:17
51:15 53:17
54:15 55:16
70:7 81:6,16
84:15 87:25

**understanding**
26:8,22,24 32:6
34:5,14,22
47:20 49:15,18
53:12 57:13,15
86:7 90:11

**understood**
48:8 73:15

**unique** 17:21

**unit** 59:17

**United** 6:12

**Unknown**
45:20 92:3

**unusual** 86:3

## V

**verbal** 60:14,
15,17,19 61:2,
6,13,18,21
62:1,7 65:20

**verification**
13:21 15:5
45:19 46:7
48:16,20,21,24
49:12 50:2,4,
10,13,22 52:17,
21 53:8,10
54:14 55:20
59:16 88:2,17
89:5 90:24
92:14 98:13

**verified** 46:10

**verify** 87:21

**versus** 6:11
17:11

**video** 6:3,7,21
72:5,14,19 73:1
76:20,22,24

**VOICE** 45:20

## W

**W-E-I-L** 6:19

**wait** 93:20,25

**waited** 93:24

**walked** 71:20

**walking** 98:14

**wall** 22:25 23:4

**wanted** 19:25
42:4 84:22
86:20 88:16

**Warren** 24:6
26:4,21 57:14
70:12,16,20
71:7 72:17,23
73:4,9 74:16,21
81:14 82:1
87:16 93:3
97:3,7,14,19

**watch** 13:22
14:2 18:24
37:25 38:3
58:10,12,14,21,
25 59:7,9 60:7,
8 70:4,7

**watched** 76:3

**watching**
75:10,16,22

**weight** 29:10

**Weil** 6:18,19
7:11,21,24 21:3
22:3 33:14
37:8,11,13
45:2,8,11,17,21
46:3,5 48:4
79:16,25 84:7
86:5,9 87:7,10,
22 88:5,14,22,

25 89:13 90:2,6
91:2 95:3,5,7,9,
13 98:6,25
99:4,7

**West** 6:5

**Westby** 16:16

**Western** 6:13

**whomever**
61:22

**wife** 94:3

**window** 67:19

**wire** 34:24,25
35:12 47:3
55:20 82:11,16

**Wisconsin**
6:13 7:1,4
16:17

**witnesses**
34:6

**words** 49:16

**work** 6:19
16:11 65:19

**worked** 16:18

**working** 14:24
19:19,23 20:7,
11 22:15,18
23:22 24:4,10,
23 25:10 60:17
88:1 96:16,19,
25

**works** 38:18

**would've**
24:16 26:19
27:11,19,21,23
28:12 31:2,17
43:7 59:6,8
69:14 76:3,14
97:21

**write** 9:20 14:8
90:13 91:12,23
92:7

**writing** 76:17
91:20,21

**written** 33:23
81:18

**wrote** 36:23
86:24 91:25

## Y

**years** 9:12

## Z

**Ziploc** 47:9,13
48:22 52:21

**Zuercher**
15:21

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com