```
                                                            1
  1            IN THE UNITED STATES DISTRICT COURT
  2            FOR THE WESTERN DISTRICT OF WISCONSIN
  3    -------------------------------------------------
  4    GREGORY BOYER, as administrator of the
       Estate of Christine Boyer,
  5    and on his own behalf,
  6             Plaintiff,
  7         vs.              Case No. 20-CV-1123-jdp
  8    ADVANCED CORRECTIONAL HEALTHCARE, INC.,
       LISA PISNEY, AMBER FENNIGKOH,
  9    STAN HENDRICKSON, DANIELLE WARREN,
       SHASTA PARKER and MONROE COUNTY, WISCONSIN,
 10
            Defendants.
 11
       -------------------------------------------------
 12
       GREGORY BOYER, as Administrator of the
 13    Estate of Christine Boyer,
       and on his own behalf,
 14
             Plaintiff,
 15
             vs.             Case No. 22-CV-723-jdp
 16
       USA MEDICAL & PSYCHOLOGICAL STAFFING,
 17    NORMAN JOHNSON, TRAVIS SCHAMBER,
       WESLEY HARMSTON and JILLIAN BRESNAHN,
 18
             Defendants.
 19
       -------------------------------------------------
 20
              Deposition of JEFFREY SCHWANZ, a witness in
 21    the above-entitled action, taken at the instance of
       the Plaintiff, pursuant to notice of the
 22    examination and service of subpoena on November 3,
       2023, commencing at 12:38 p.m. at 112 South Court
 23    Street, Sparta, Wisconsin, pursuant to applicable
       Wisconsin Statutes, before and reported by Nancy
 24    Johnson, Registered Professional Reporter.
 25                        * * * * *
```

```
                                                            2
  1                      A P P E A R A N C E S
  2       STEPHEN H. WEIL
            LOEVY & LOEVY, 311 North Aberdeen
  3       Street, 3rd Floor, Chicago, Illinois, 60607,
          appeared as counsel for and on behalf of
  4       Gregory Boyer, as Administrator of the Estate
          of Christine Boyer and on is own behalf,
  5       Plaintiff.
  6       DOUGLAS S. KNOTT
            LEIB KNOTT GAYNOR, LLC, 219 North
  7       Milwaukee Street, Suite 710, Milwaukee,
          Wisconsin, 53202, appeared as counsel for and
  8       on behalf of Advanced Correctional Healthcare,
          Inc., Lisa Pisney and Amber Fennigkoh,
  9       Defendants.
 10       ANDREW A. JONES
            HANSEN REYNOLDS, LLC, 301 North
 11       Broadway Street, Suite 400, Milwaukee,
          Wisconsin, 53202, appeared, as counsel for and
 12       on behalf of Stan Hendrickson, Shasta Parker,
          Danielle Warren and Monroe County, Defendants.
 13
          MARK W. HARDY
 14         GERAGHTY, O'LOUGHLIN & KENNEDY, P.A.,
          Wells Fargo Place, 27th Floor, 30 East Seventh
 15       Street, St. Paul, Minnesota, 55101, appeared by
          Zoom as counsel for and on behalf of USA
 16       Medical & Psychological Staffing, S.C., Norman
          Johnson, Tavis Schamber, Wesley Harmston and
 17       Jillian Bresnahan, Defendants.
 18       DANIEL KAFKA
            LEIB KNOTT GAYNOR, LLC, 219 North
 19       Milwaukee Street, Suite 710, Milwaukee,
          Wisconsin, 53202, appeared by Zoom as counsel
 20       for and on behalf of Advanced Correctional
          Healthcare, Inc., Lisa Pisney and Amber
 21       Fennigkoh, Defendants.
 22
 23                        * * * * *
 24
 25
```

```
                                                            3
  1                        I N D E X
  2
       Examination of JEFFREY SCHWANZ
  3
  4    By ATTORNEY WEIL
       Examination . . . . . . . . . . . .  4
  5
       By ATTORNEY KNOTT
  6    Examination . . . . . . . . . . . . 48
  7
  8                        * * * * *
  9
 10    There were no exhibits marked.
 11
 12
 13                        * * * * *
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

```
                                                            4
  1    WHEREUPON,
  2                      JEFFREY SCHWANZ,
  3         was duly sworn by the Notary Public and
  4            testified under oath as follows:
  5    BY MR. WEIL:
  6    Q   So Mr. Schwanz, you and I just met.  My name is
  7        Steve Weil.  I represent the Plaintiff in this
  8        case.  There are two lawyers here and a few on
  9        the screen, and that's why you're on Zoom and
 10        here.
 11    A   Okay.
 12    Q   And live.  Have you been deposed before, Mr.
 13        Schwanz?
 14    A   What's that?
 15    Q   Have you been deposed before?
 16    A   No.
 17    Q   Have you ever testified in Court?
 18    A   No.
 19    Q   I will go over a few rules.  This is -- I'm
 20        going to try to make this as normal a
 21        conversation as possible.  I have some
 22        questions.  The idea is you provide some
 23        answers and we'll try to make it flow smoothly.
 24        The one big rule here is we have a court
 25        reporter taking down everything you and I say.
```

**5**

1  That changes our conversation a little in two
2  specific ways. First, it's normal to talk over
3  each other a little bit. You anticipate my
4  question, I anticipate your answer and we
5  overlap a little. With the court reporter, we
6  can't do that. We have to try to avoid as much
7  as we can, because the court reporter can't
8  take two people talking at the same time.
9  **A** Okay.
10 **Q** The other rule is, it's common to say uh-huh,
11 uh-uh, nod your head, shake your head, that
12 kind of thing. Hard for the court reporter to
13 take down. So in the place of that, I would
14 ask for a yes or a no and you can go ahead and
15 say whatever you like. But just that those
16 answers are clear so the court reporter can
17 take down something that's sensible for the
18 record. Does that make sense?
19 **A** Yes.
20 **Q** I am here to get your best recollection, your
21 best estimate. I don't want you to speculate,
22 but I am entitled to what you recall, and if
23 I'm asking you to estimate something, I would
24 ask you to do that. Is that fair?
25 **A** Yes.

**6**

1  **Q** I will try to be as clear as I possibly can in
2  asking questions and have them make sense. If
3  something doesn't make sense to you, you don't
4  know what I'm talking about, let me know. I
5  will do my best to explain myself. Is that
6  clear?
7  **A** Yes.
8  **Q** Okay. If you answer a question, I'm going to
9  assume you understand what I'm asking, is that
10 fair?
11 **A** Yes.
12 **Q** The lawyers may object from time to time.
13 That's just a normal part of these depositions.
14 Unless you're instructed not to answer the
15 question, you're still obligated to answer.
16 Does that make sense?
17 **A** Yes.
18 **Q** Your lawyer here today is Mr. Jones?
19 **A** Correct.
20 **Q** What did you do to prepare for this deposition
21 today, Mr. Schwanz?
22 **A** Nothing, really. I mean, I was just called by
23 my attorney and he just told me --
24       MR. JONES: No, no. Don't talk about
25 what you and I discussed.

**7**

1       MR. WEIL: I'll help him out.
2  BY MR. WEIL:
3  **Q** I'm not interested in the substance of what you
4  talked about with Mr. Jones. That's
5  privileged. But it sounds like you had a
6  conversation with him to prepare for this
7  deposition?
8  **A** Yes.
9  **Q** Did you review any documents to prepare for the
10 deposition?
11 **A** I did not.
12 **Q** Did you write a report in this case?
13 **A** I believe I did not.
14 **Q** You don't remember reviewing anything, even a
15 report that you might have written?
16 **A** I do not.
17 **Q** You had a conversation with Mr. Jones. Was it
18 on Zoom? On the telephone?
19 **A** Telephone.
20 **Q** Were you looking at any documents at the time?
21 **A** I was not.
22 **Q** Any document ever been sent to you? Emailed to
23 you? Anything like that?
24 **A** No.
25 **Q** How long was your conversation with Mr. Jones?

**8**

1  Again, I don't want to get into the substance.
2  I just want to know how long it went.
3  **A** Half an hour, 40 minutes.
4  **Q** When was that?
5  **A** Today is Friday. I believe it was Tuesday.
6  **Q** I want to go over the very brief and high level
7  of your employment history. I don't want
8  details. Just kind of from high school on out
9  with some rough dates. Can be estimates,
10 that's fine. Just kind of what you did with
11 your career?
12 **A** Okay. Served during the Vietnam War.
13 Honorable discharge. 1977, 1977 I started at
14 the Veterans Hospital in Tomah, Wisconsin.
15 Worked there for 40 years on the psychiatric
16 unit. Retired from there. Took a year off and
17 applied at the Sheriff's office and worked
18 there for a little over eight years until I
19 retired.
20 **Q** I'm trying to catch up with you here. So you
21 started at the Sheriff's office in 2018?
22 **A** No. It was more like 2016, I believe.
23 **Q** You retired from the VA?
24 **A** 2014 I retired from the Veterans Hospital.
25 **Q** I was doing math in my head. You said you

**Page 9**

1  started at the VA in '77?
2  A  Yes.
3  Q  You worked there for approximately 40 years.
4     You retired?
5  A  With my service time it was 40 years.
6  Q  Gotcha.
7  A  Yes.
8  Q  So you retired in '14 from the VA. And you
9     were not working for a year?
10 A  Correct.
11 Q  And so in, roughly in 2016 you got a job with
12    the Sheriff's office?
13 A  Yes.
14 Q  Just to go back to your work at the VA
15    hospital. You said you worked in the psych
16    ward?
17 A  Yes.
18 Q  Did you graduate from high school?
19 A  In the service, got my diploma, GED.
20 Q  You went into the service and got a GED?
21 A  Correct.
22 Q  Did you have education after that?
23 A  No.
24 Q  Okay.
25 A  Just my service. Everything I had had to be

**Page 10**

1  updated.
2  Q  You said you worked in the psych ward at the VA
3     hospital?
4  A  Correct.
5  Q  What was your job there?
6  A  I was a certified nursing assistant, CPR
7     instructor, and I responded to all medical and
8     psych emergencies. I was on the team.
9  Q  The CNA, what sort of training did you go
10    through for that?
11 A  Oh, I believe it was two months of training,
12    blood pressures. It's been a long time. Just
13    things to help take care of the Veterans.
14    Medication reviews and things like that, and,
15    you know, care for the Veterans.
16 Q  What do you mean by medication review?
17 A  Well, just make sure they get their meds on
18    time and, you know, if they need any extra
19    medications, like a shot or something. Being
20    on the psych unit, sometimes we had to assist
21    the nurses in doing that.
22 Q  You wouldn't be deciding which medications
23    anybody needed?
24 A  No, no.
25 Q  Just making sure that the medications

**Page 11**

1  prescribed got to where they were supposed to
2  go?
3  A  Correct.
4  Q  In terms of giving shots, you would be, not
5     maybe administering the shots, but helping out
6     a nurse --
7  A  Yes.
8  Q  -- to administer them?
9  A  Yes.
10 Q  You said you learned CPR, correct?
11 A  Yes. I taught CPR for 35 years.
12 Q  Blood pressure measuring?
13 A  Yes. Temp, whatever.
14 Q  And you said you started at -- well, let me
15    back up real quick. Referring to the VA
16    hospital, you received periodic training there
17    in those, in the CNA role?
18 A  Yes. Every year, annually.
19 Q  Okay. And that was sort of to re-up your, your
20    education, the medical education that you had?
21 A  Yes.
22 Q  And it sounds like you retired in '14 and then
23    began working at the jail in '16, is that
24    right?
25 A  Yes. I took a year off. I drove bus for the

**Page 12**

1  County for senior citizens. And then I applied
2  in the jail and they hired me.
3  Q  So you were driving a bus 2014 - 2015?
4  A  Approximately, yes.
5  Q  Then you take on the job at the Monroe County
6     Jail in 2016?
7  A  Approximately, yes.
8  Q  What's your title at the jail when you take
9     that on?
10 A  Just a correction officer.
11 Q  And how long were you at the jail?
12 A  Eight years.
13 Q  So you would have retired -- you've retired
14    since then?
15 A  April.
16 Q  April?
17 A  This year.
18 Q  April of this year. April of '23?
19 A  Yes.
20 Q  Correctional officer the whole time?
21 A  I was promoted to Sergeant, I want to say,
22    beginning of 2022.
23 Q  You left as soon as you got the promotion, more
24    or less?
25 A  Well, it was a whole year.

## Page 13

1  Q  Got to be boss for a year?
2  A  Yeah. Kind of, I guess.
3  Q  In terms of your work at the jail, were you on
4     a particular shift over that time or did it
5     vary?
6  A  It varied. I worked a lot of 16-hour shifts.
7  Q  This incident, this deposition is about the
8     medical incident with Christine Boyer. And, as
9     I understand it, you were on the night shift
10    for -- during that incident, is that right?
11 A  I believe I came in at ten p.m. that night to
12    work overnight, because they had a call-in, so
13    I came in at ten p.m. to work until six a.m.
14 Q  You were covering for someone?
15 A  Yes.
16 Q  What was your typical shift, do you remember,
17    during that time?
18 A  I do not recall. I believe I was on the day
19    shift, which was six a.m. to six p.m.
20 Q  Did you have a number, a shield number, that
21    you would enter in, say, for Cell Check Logs
22    and whatnot?
23 A  Yes.
24 Q  What was it?
25 A  1296.

## Page 14

1  Q  Ninety-six. Do you have any recollection of
2     Christine Boyer?
3  A  Some.
4  Q  Can you tell me about that?
5  A  The incident you're asking, or?
6  Q  Let's back up. Do you have -- if Christine
7     Boyer walked through the door today, would you
8     recognize her?
9  A  I would not.
10 Q  What's your memory of Christine Boyer?
11 A  Really, none. I never had no contact with
12    Christine until the night of the incident.
13 Q  All right. Why don't you describe what you
14    recall about the incident. Well, let's back
15    up. You mentioned that, you talked about the
16    shift that you were on. Do you recall coming
17    in to cover for someone else at ten p.m.?
18 A  I believe so.
19 Q  And how do you remember that? Is it -- did you
20    look at a document to refresh yourself?
21 A  No. I just, if I was there that night, it was
22    probably for coverage.
23 Q  Got it. So you would not normally be there on
24    such a late shift, so that indicates you were
25    covering for someone else? Am I understanding

## Page 15

1     right?
2  A  Yes.
3  Q  So, go ahead. How do you remember coming in
4     around ten that night?
5  A  A lot of times I came in at ten to work, ten to
6     two, or on my days off I would come in, cover a
7     shift.
8  Q  The night shift is six to six right? Six p.m.
9     to six a.m.?
10 A  Six p.m. to six a.m., yes.
11 Q  Do you know why you would be getting called in
12    at ten p.m., sort of after the shift is well
13    underway?
14 A  I believe somebody stayed from six p.m. until
15    ten p.m. We could only stay for four hours
16    over your regular shift, so it would have been
17    16 hours. Somebody went home at ten p.m. and I
18    came in at ten p.m.
19 Q  So the two of you sort of shared that shift?
20 A  Yes.
21 Q  Do you know who that other person was, the
22    person that worked up to ten p.m.?
23 A  I want to say it was Shasta.
24 Q  Why do you think it was Shasta?
25 A  Well, I believe she stayed from six p.m. to ten

## Page 16

1     p.m.
2  Q  Okay. From the documents we've gathered in
3     this case, Shasta Parker was, at least for part
4     of the time, in the booking area --
5  A  Correct.
6  Q  -- of the jail. Does that sound right to you,
7     from your recollection?
8  A  I believe so.
9  Q  Do you recall that you were -- where do you
10    remember being that night?
11 A  Housing.
12 Q  And if Shasta was in booking and you replaced
13    her, do you know why you ended up in housing
14    that night?
15 A  I believe Danielle came to booking when I came
16    in at ten.
17 Q  Okay. And so she took over booking and you
18    went into housing?
19 A  I believe so.
20 Q  Okay. Do you have any -- I don't want you,
21    again, I don't want you to speculate. I'm just
22    asking for your best estimate. Is that
23    something you recall, or?
24        MR. JONES: Okay. Go ahead.
25 A  Not really. I guess.

**17**

1  Q  Let me ask it this way. Let's go to the
2     incident with Ms. Boyer. Do you remember where
3     you were when you first learned that there was
4     a medical emergency with Ms. Boyer?
5  A  Yes. I was in housing.
6  Q  Who were you there with?
7  A  I believe it was Kyle.
8  Q  Kyle Moga?
9  A  Yes.
10 Q  What were your duties in housing, typically?
11 A  Charting, doing our hourly checks. That was
12    basically it.
13 Q  Hourly cell checks where you were walking
14    around and checking on detainees?
15 A  Yes.
16 Q  At ten p.m., they are in their cells at that
17    point, is that right?
18 A  Yes.
19 Q  What do you remember happening after -- how did
20    you learn about the medical event with Ms.
21    Boyer?
22 A  I believe it came over the radio.
23 Q  And did you have a radio on you?
24 A  Yes.
25 Q  And that was a standard thing to have when

**18**

1     you're in housing?
2  A  Yes.
3  Q  And what did you -- do you remember, was there
4     a special call sign? Was it just a normal
5     conversational speech, or?
6  A  I don't recall.
7  Q  Were there codes that were used to describe a
8     medical emergency?
9  A  No.
10 Q  What do you remember hearing from Ms. Warren,
11    if anything?
12 A  That there was a medical emergency or she
13    needed somebody in booking.
14 Q  Anything else?
15 A  No.
16 Q  And what did you do when you heard that?
17 A  I immediately went to booking to assist.
18 Q  What did you see there when you got there?
19 A  I seen Warren and Moga, Kyle, doing CPR, trying
20    to get Christine to respond. I started
21    covering the windows in booking. Curtains, we
22    have magnetic curtains. So I wanted to make
23    sure she had her privacy. And everybody
24    performed what they were supposed to perform,
25    CPR, and, you know.

**19**

1  Q  So, go ahead. I'm sorry.
2  A  EMTs were called, you know. AED was applied.
3  Q  You and Mr. Moga are in housing together when
4     the call comes in?
5  A  Yes.
6  Q  It sounds like he got to Ms. Boyer first?
7  A  He did, because I couldn't run that fast
8     because of my age.
9  Q  We all get there, right?
10 A  Right.
11 Q  So Mr. Moga is there first. By the time you
12    get there, he's already administering CPR?
13 A  Yes. They were trying to get Christine to
14    respond.
15 Q  And is that the first time you remember laying
16    eyes on Christine Boyer?
17 A  Yes.
18 Q  Did you have any -- I just spoke with Mr. Moga.
19    Deposed him like I'm deposing you. He had a
20    chance interaction where he, while he was
21    assigned to housing, he had ended up in booking
22    a couple times. Did that happen with you too,
23    or?
24 A  Yeah. If everything was quiet in housing, we
25    would go down and see if anything needed to be

**20**

1     done in booking.
2  Q  Do you remember that happening in this case
3     with Ms. Boyer on that shift?
4  A  I don't recall.
5  Q  Well, do you remember anything, again about Ms.
6     Boyer or the situation or any calls to doctors
7     or anything like that before the medical
8     emergency?
9         MR. JONES: Objection to form. Go
10    ahead and answer.
11 A  No.
12 Q  You said that when you got there, Mr. Moga and
13    others are rendering aid to Ms. Boyer. And you
14    went and put something on the cell windows for
15    the other cells?
16 A  Correct.
17 Q  And you did that to preserve her privacy?
18 A  Yes.
19 Q  Could other detainees see into Ms. Boyer's cell
20    when her emergency was occurring?
21 A  Possibly.
22 Q  And that's why you put the coverings on the
23    windows?
24 A  Yes.
25 Q  Okay. Do you recall any detainees looking out

**Page 21**

1  onto the scene?
2  A  I do not recall.
3  Q  So you put the coverings on the windows. What
4     do you do after that?
5  A  I just waited for the EMTs to show up, because
6     the rest of the staff was doing what they were
7     supposed to be doing with Christine.
8  Q  So the other folks are helping Christine. Are
9     you involved in that at all?
10 A  No.
11 Q  I'm going to have you take a look. This has
12    been marked before as Exhibit 41.
13       MR. WEIL: Andrew, do you mind if I
14    use your copy here? That's the universal copy
15    there.
16       MR. JONES: Yep.
17 BY MR. WEIL:
18 Q  I'll just have you take a look at that, Mr.
19    Schwanz. Give it a read and then I have some
20    questions for you.
21 A  Okay.
22 Q  Okay. You've read it?
23 A  Yes.
24       MR. JONES: You can hang onto it until
25    he's done.

**Page 22**

1  BY MR. WEIL:
2  Q  Do you recall writing this report?
3  A  Yes. Yeah. We always have to write a report
4     on any incident.
5  Q  How was this report written? Literally, is it
6     -- are you in a special form on the computer or
7     are you typing this out on a Word document?
8     How does that work?
9  A  Just a Word document.
10 Q  Microsoft Word document. You're typing this
11    up?
12 A  Yes.
13 Q  And then how does --- what happens when you
14    type it up? What do you do with it?
15 A  My supervisors receive it.
16 Q  Do you email it to your supervisor?
17 A  I did not. I printed off copies and gave it to
18    them.
19 Q  So you've printed off a hard copy and handed it
20    to your supervisor?
21 A  Yes. Yes.
22 Q  Do you know what happens with the report after
23    that?
24 A  I do not know.
25 Q  If this were in a computer system, do you know

**Page 23**

1  how it would have gotten there if you printed
2  off a hard copy and handed it to somebody?
3  A  No.
4  Q  Do you know if there's any sort of system for
5     storing reports like this in the Monroe County
6     Jail?
7  A  No.
8  Q  This report has a case caption SO-CR192109. Do
9     you see that?
10 A  Yes.
11 Q  Do you know what that refers to?
12 A  I believe that case number goes up to the DA's
13    office or somewheres. I don't know where it
14    goes.
15 Q  What is a case number?
16 A  That would be the report number for the
17    incident.
18 Q  Okay.
19 A  This would be the case number.
20 Q  So does every incident get a case? Is that how
21    it works? A case number?
22 A  Yes.
23 Q  And how do you know which case number to assign
24    it to?
25 A  We have to call dispatch and they give us a

**Page 24**

1  case number.
2  Q  Dispatch would be the Sheriff's office?
3  A  Yes.
4  Q  Does everybody call dispatch or does one person
5     call and say, okay, for the Boyer incident,
6     here's the number?
7  A  One person.
8  Q  And do you know who at dispatch is on the other
9     end?
10 A  I do not.
11 Q  Do you know how, how it is decided that
12    something is a case versus not?
13 A  No.
14 Q  Did anybody -- did you receive instruction
15    about -- were you told to write a report at
16    some point?
17 A  Yes.
18 Q  Do you remember who told you?
19 A  Probably, I believe it was Danielle.
20 Q  Danielle Warren?
21 A  Yes.
22 Q  Do you remember when she would have told you to
23    write the report?
24 A  Shortly after the incident before I went home
25    that morning.

**Page 25**

1 Q All right. The incident takes place around,
2 shortly before one a.m. Is that consistent
3 with your recollection?
4 A I believe so.
5 Q You can look down here at the report.
6 A Okay.
7 Q Does the report accurately -- the report in
8 Exhibit 41, does it accurately reflect what you
9 recall from the incident?
10 A Pretty much.
11 Q What would you add or subtract?
12 A I guess I don't remember running to get the
13 scissors. I guess that would be about it.
14 Q You mentioned, when we were talking before, we
15 looked at this, that you also put covers on the
16 windows. I don't see that in the report. Do
17 you?
18 A No. It's not in the report.
19 Q That's something you would add if you were
20 editing?
21 A Yep.
22 Q Any reason to think you didn't run and get the
23 scissors? Or you just don't remember?
24 A I don't remember.
25 Q No reason to think that this report is wrong,

**Page 26**

1 though, right?
2 A No. It looks right.
3 Q After the -- well, the EMS arrived at some
4 point, correct?
5 A Yes.
6 Q And they took Ms. Boyer out, correct?
7 A Yes. We put her on the gurney.
8 Q Do you know what happened to her after that?
9 A She was going across the street to Mayo
10 hospital.
11 Q Okay. Do you know what happened after that?
12 A I do not know.
13 Q It says in this third from the bottom line of
14 your report, the scene was then secured by jail
15 staff. Do you see that?
16 A Yes.
17 Q What does that mean?
18 A That means we locked down the cell until
19 administrative, which would be Captain
20 Hendrickson, can check the scene out and make
21 sure it would be cleared before we could use
22 the cell again.
23 Q The next line says, inmate's husband was
24 waiting in the lobby during the incident. Do
25 you see that?

**Page 27**

1 A Yes.
2 Q Do you remember how you learned that Mr. Boyer
3 was in the lobby?
4 A I believe Master Control said that he was out
5 there with some medications for Christine.
6 Q They told you that?
7 A I think we all were aware of it, but before we
8 could go out to see him, we had her medical
9 emergency.
10 Q Are you saying you were aware of that before
11 the medical emergency even occurred?
12 A I don't recall.
13 Q Do you remember when Mr. Boyer showed up at the
14 jail?
15 A I don't recall. I was in housing.
16 Q And so when did you learn Mr. Boyer was out
17 waiting to provide some medications for Ms.
18 Boyer?
19 A After we put her in the ambulance.
20 Q So after the medical emergency, that's when you
21 learned that Mr. Boyer was out in the hallway?
22 A Yes.
23 Q Do you know why -- how did you learn he was
24 dropping medications off for Ms. Boyer?
25 A He had a bag of medications when I went out to

**Page 28**

1 see him.
2 Q Did someone -- how were you assigned or how did
3 it come to be that you were the one who went
4 out to see him?
5 A It shouldn't have been me, but Captain
6 Hendrickson was there and he asked me if I
7 would go out and talk to him, so, he is my
8 Captain, so I told him I would.
9 Q So you went out to see Mr. Boyer after Captain
10 Hendrickson instructed you to do that?
11 A Yes.
12 Q Is that right?
13 A Yes.
14 Q Do you know why Captain Hendrickson -- well,
15 you said it shouldn't have been you. Why do
16 you say that?
17 A Well, usually it's the supervisor that's on
18 duty. At the time I was not a Sergeant. So,
19 you know, I just -- my supervisor told me to
20 and I did what I was ordered to do.
21 Q Did I understand you correctly to say you think
22 it should have been the supervisor who went
23 out?
24 A That's usually the practice, yes.
25 Q Did Captain Hendrickson explain why he was

### Page 29

1 asking you to do it instead?
2 A  He went into Master Control to review the
3    videos of the incident, so he was busy.
4 Q  How long after Captain Hendrickson arrived did
5    he instruct you to go out and see Mr. Boyer?
6 A  Right away.
7 Q  Okay. And when did Captain Hendrickson arrive?
8 A  Oh.
9 Q  Let me back up. When did the -- to go out here
10   to look at your report again. Let's say Ms.
11   Boyer is placed on the gurney and taken to the
12   jail hospital. What's your estimate of how
13   long that took from -- when you first learned
14   of the medical emergency to her being wheeled
15   out?
16 A  Not very long at all. The EMT, the ambulance
17   was there pretty fast.
18 Q  And they got her out pretty fast?
19 A  Yes. They started an IV and they got a pulse.
20   We put her on the gurney, took her out in the
21   sally port, loaded her up in the ambulance.
22 Q  Okay.
23 A  So it was quite fast.
24 Q  All right. From the time she gets wheeled out
25   to when Captain Hendrickson arrives, how long

### Page 30

1    is that?
2 A  I don't recall.
3 Q  Best estimate. Again --
4 A  Half an hour.
5 Q  Half an hour?
6 A  Thirty minutes.
7 Q  Half an hour to 40 minutes?
8 A  I would say 30 minutes. I'm sure he was called
9    right away.
10 Q  Thirty minutes he arrives. Do you know how
11   Captain Hendrickson learned that Mr. Boyer was
12   out in the hallway?
13 A  I believe whoever was in Master told him.
14 Q  Was there any discussion of telling Mr. Boyer
15   what had happened in the time before Captain
16   Hendrickson arrived?
17 A  No.
18 Q  Someone in Master, you believe, told Captain
19   Hendrickson that Ms. Boyer's husband was out in
20   the hallway?
21 A  Yes.
22 Q  And Mr. Hendrickson then tells you, why don't
23   you go out and talk to him. Or what does Mr.
24   Hendrickson say to you?
25 A  He just asked me to go out, explain the

### Page 31

1    situation to her husband, and I said, okay, I
2    will.
3 Q  And what Mr. Hendrickson was doing instead of
4    talking to Mr. Boyer was looking at videos of
5    the incident?
6        MR. JONES: Objection to form. You
7    can answer.
8 A  He was just trying to get the facts together.
9    What happened.
10 Q  Okay. What do you mean by that? What was he
11   doing?
12 A  Video and talking to us and whatever, whatever
13   it took for him to figure out what happened.
14 Q  Okay. So he was looking at video and he's in
15   Master Control looking at video?
16 A  Yes.
17 Q  He's talking to us. Who is he talking to?
18 A  I don't recall who was in Master Control that
19   night, but he was talking to whoever was in
20   Master Control.
21 Q  Okay. And Master Control is inside of a, kind
22   of a bubble with windows?
23 A  Yes.
24 Q  And that's where you recall Mr. Hendrickson
25   standing when you went out to go speak with Mr.

### Page 32

1    Boyer?
2 A  Yes.
3 Q  When you went out to speak with Mr. Boyer, do
4    you remember what you said?
5 A  Yes.
6 Q  What did you tell him?
7 A  I told him there was an incident with his wife.
8    We loaded her on the gurney, took her across.
9    Put her in the ambulance and they were taking
10   her across the street to the hospital and get
11   her stabilized and they were going to
12   helicopter to La Crosse. And for him to go
13   across the street and find out where she was
14   going.
15 Q  Where she was going in the helicopter?
16 A  Yes.
17 Q  How did Mr. Boyer react?
18 A  He stood up with the bag of pills and went out
19   the door. He didn't seem too upset. My
20   recollection was he just got up and went across
21   the street.
22 Q  Did he say anything to you?
23 A  No. I don't recall him saying anything to me,
24   or, if he did, it was, okay, and out the door
25   he went.

**Page 33**

**Q** Did you ever see Mr. Boyer again after that?
**A** No.
**Q** What can you tell me about anything you had to do professionally with Ms. Boyer's -- this event after the event occurred and you sent Mr. Boyer out. I know you wrote this report. Did anything else happen?
   MR. JONES: Object to form. Go ahead.
**A** That was basically it. Sometimes we use our reports for a learning tool, you know. We look back and see how CPR is done, make sure everything was done correct, so we can use it in the future if things were done wrong.
**Q** Did that happen here?
**A** No.
**Q** Did anybody talk to you about what had happened? Anybody in the Sheriff's office talk to you about what had happened with Ms. Boyer?
   MR. JONES: Objection to form. Go ahead.
**A** No. We had a little debriefing afterwards, which is policy. I talked to the staff that was involved, just to make sure everybody was okay, because I just feel like that's part of my job, and everybody was fine with the way

**Page 34**

things went.
**Q** Debriefing, when did this debriefing occur?
**A** Within a half an hour to an hour after the incident.
**Q** Okay. So about the time Captain Hendrickson arrives?
**A** Yes.
**Q** Did Captain Hendrickson conduct a debriefing with everybody?
**A** No.
**Q** How does the debriefing work? Are you all standing together in a circle? Are you talking to people individually?
**A** Probably both individually and as a group.
**Q** I don't want you to speculate. Do you remember how the debriefing went here?
**A** No, I do not.
**Q** You said one occurred. Just give me what you do remember about it in terms of how it occurred. The mechanics?
**A** Basically we ask everybody if, you know, if they are okay with it or if they've got to see the pastor or whatever the case may be. Like I say, I've been involved in several over the years at the Veterans Hospital, so I was fine

**Page 35**

with it. And I just wanted to make sure everybody else was too.
**Q** What do you mean, you were fine with it?
**A** Well, you know, I still think about it now and then, but, like I say, I've been there a few times, so I know how it affects people. And we've got a lot of young people, and I just wanted to make sure that they were all right or if they needed to talk to somebody.
**Q** Was everybody all right?
**A** Seemed to be, yes.
**Q** How was Danielle Warren?
**A** She was a little shaken, but she was fine. I talked to her. She was okay.
**Q** How was Kyle Moga?
**A** Kyle was fine.
**Q** Anybody else? Anybody report any distress to you at all about what had just happened?
   MR. JONES: Objection to the form. You can answer.
**A** No.
**Q** Do you recall having any discussions after that night -- well, let me back up. Was Captain Hendrickson part of those conversations at all?
**A** No.

**Page 36**

**Q** Did you see Captain Hendrickson doing any similar debriefing that you might have not been within earshot of?
**A** I did not.
   MR. JONES: Objection to form.
BY MR. WEIL:
**Q** After that debriefing, you wrote this report, correct?
**A** Yes.
**Q** Did you ever speak with anybody about the incident, besides writing this report?
**A** No.
**Q** It was never a topic of conversation at all with any guard at the jail?
   MR. JONES: Objection to form. Go ahead.
**A** Not with me, no.
**Q** Did you ever learn that Ms. Boyer died?
**A** Not, no, not for awhile. It might have been a week or so later, because I had a few days off there, so I don't -- somebody might have mentioned that she passed.
**Q** Okay.
**A** I don't recall when it was.
**Q** You recall learning about, that Ms. Boyer died.

**37**

1 Q You don't recall exactly when?
2 A Yes.
3 Q Do you recall that being a topic of
4 conversation at all?
5 A No.
6 Q Do you live nearby?
7 A Tomah.
8 Q In Tomah, okay. That's right. So there
9 wouldn't have been a topic of conversation of a
10 helicopter landing in Sparta?
11 MR. JONES: Objection to form.
12 BY MR. WEIL:
13 Q That you're aware of?
14 A No.
15 Q And that wasn't a topic of conversation with
16 anybody at the jail?
17 A No, not me, no.
18 Q Other than writing this report, were you ever
19 approached by any investigator or any
20 supervisor to talk about what had happened?
21 A No. I don't recall.
22 Q Ever interviewed by anybody in any sort of
23 debrief, beyond the short emotional debrief you
24 talked about earlier?
25 MR. JONES: Objection to form. Go

**38**

1 ahead.
2 A No.
3 Q Did Captain Hendrickson ever talk to you about
4 what you saw?
5 A I don't recall.
6 Q You don't recall one way or the other?
7 A Right.
8 Q Did anybody talk to you about this report at
9 all?
10 A No. I don't recall.
11 Q You weren't typically on the night shift,
12 correct?
13 A I believe so.
14 Q Did people on the day shift have questions for
15 you about what happened?
16 A No.
17 Q Was this an out-of-the-ordinary incident at the
18 jail?
19 A I don't know.
20 Q You were there for several years. Did this
21 strike you as an out-of-the-ordinary incident
22 at the jail?
23 A No. No.
24 Q Why do you say that?
25 A We take all the people that come in seriously,

**39**

1 medical or suicidal incidents, so we take
2 precautions.
3 Q Were medical emergencies like this common at
4 the jail?
5 A Yes.
6 Q How so?
7 A If an inmate has been drinking for three days,
8 they come into the jail, and we monitor them
9 for 24, 48 hours to make sure they are okay.
10 Q Was it frequent that the jail would, in your
11 experience, that the jail would be calling
12 paramedics in like it did in this circumstance?
13 A Yes.
14 Q How often would that occur?
15 A Maybe once a month, I suppose. Twice a month
16 at the most.
17 Q Again, I'm just trying to get your best
18 recollection. What medical emergencies do you
19 recall inducing those, those call-ins by
20 paramedics?
21 MR. JONES: Objection to form. You
22 can answer.
23 A Mostly people with heart problems. Or
24 unresponsive people. We always take
25 precautions and call EMTs if we are in any

**40**

1 doubt at all.
2 Q So you recall heart problems being a frequent
3 issue for EMTs getting called in?
4 MR. JONES: Objection to form.
5 A Yep. Maybe diabetics, blood sugars, blood
6 pressures, whatever the case may be, we take
7 precautions on all that.
8 Q Okay. There is a hospital across the street
9 from the jail, right?
10 A Yes.
11 Q Did you have a feeling about why paramedics
12 would be getting called in if there was a
13 hospital across the street from the jail?
14 MR. JONES: Objection, form. Go
15 ahead.
16 A That's just the way we do things. Especially
17 when we're short of help. We can't just give a
18 correction officer -- take somebody across the
19 street, because we do not -- then we would be
20 under our numbers and we can't do that.
21 Q When an EMT comes in and takes somebody away,
22 does a correctional officer need to go with
23 them?
24 A Usually.
25 Q So if an EMT comes in and takes a person from

## Page 41

```
 1     the jail across the street to the hospital, a
 2     guard has to go with them to the hospital,
 3     right?
 4   A Correct.
 5   Q So I didn't understand what you were saying
 6     about being short of staff.
 7   A Unless we call transport officers in.  We have
 8     transport officers on call that come in and do
 9     that kind of stuff for us.
10   Q Could a transport officer transport someone to
11     the emergency room?
12   A Yes.
13   Q So I'm still not following you.  What's the
14     difference?
15   A I do not believe that we sent anyone across the
16     street that night.  I don't recall.
17   Q I wasn't talking about that night.  I'm just
18     talking generally in your experience.  You said
19     that EMTs would be called in about once a
20     month, and I'm just trying to get your
21     recollection about the circumstances
22     surrounding that?
23   A Well, we --
24        MR. JONES:  Objection to form.  You
25     can go ahead and answer.
```

## Page 42

```
 1   A If we know --
 2        MR. JONES:  What's the question
 3     pending?
 4   BY MR. WEIL:
 5   Q So I was trying to understand.  The question I
 6     had was, I'm just trying to understand.  Again,
 7     you're there.  You're seeing things I'm not, so
 8     I'm just trying to understand.  When EMTs are
 9     getting called in about once a month, did you
10     have a feeling about why they would be getting
11     called in versus taking the person across the
12     street beforehand?
13        MR. JONES:  Objection to form.  Go
14     ahead.
15   A Usually if we know an inmate is going across
16     the street, we will call transport officers in
17     to take them across the street.
18   Q Okay.
19   A We have vans that take them across the street.
20     We have transport officers that live right in
21     Sparta that are there within ten minutes.
22   Q Okay.  And the question is, why not just take
23     them across the street as opposed to having
24     EMTs come in?  Do you know?
25        MR. JONES:  Objection.  Go ahead.
```

## Page 43

```
 1   BY MR. WEIL:
 2   Q I'll back up.  My question had to do with, you
 3     said EMTs comes into the jail.  The question
 4     was, we started with, was Ms. Boyer's event
 5     extraordinary?  I'm not trying to put words in
 6     your mouth, but you indicated it wasn't.  About
 7     once a month we have an event like this where
 8     EMTs come into the jail.  Did I understand you
 9     correctly there?
10   A Yes.
11   Q So I was asking what sort of conditions you
12     would see EMTs coming into the jail for.  Do
13     you remember me asking that?  I can ask this
14     question.
15   A So what is your question?
16   Q I had asked you, do you remember -- you told
17     me, I asked what sort of conditions people come
18     into the jail -- induce these EMTs to come into
19     the jail for.  I think you mentioned heart
20     problems, diabetics, blood pressure was the
21     three things I wrote down.  Is that right?
22   A Yes.  I mean, they would be overdoses, whatever
23     the case may be.
24   Q And my question is, did you have a sense of why
25     EMTs would be getting called in as opposed to
```

## Page 44

```
 1     just walking the person across the street to
 2     the hospital?
 3   A No.
 4   Q Can you recall any particular events where
 5     someone was -- an EMT came in for a heart
 6     problem?
 7   A No.
 8   Q But you do recall that occurring?
 9   A Yes.
10   Q About how many times, would you say?
11        MR. JONES:  Over the course of his
12     employment?
13   BY MR. WEIL:
14   Q Yes.
15   A Four, five times, maybe.
16   Q How about blood pressure?  Do you have any
17     estimate?
18        MR. JONES:  Of how many times an EMT
19     came into the jail for that sort of situation?
20   BY MR. WEIL:
21   Q Yeah, on your shift?
22   A In my eight years there, you're asking?
23   Q Yeah.
24   A Five or six times, maybe.
25   Q What other events do you remember EMTs coming
```

                                                                45
1    in for?
2  A I can't recall of any other ones.
3  Q Are you familiar with Protocols or Illness
4    Reports that are filled out?
5  A Yes.
6  Q And in those Protocols, I'll take the chest
7    pain Protocol.  That's the one I'm familiar
8    with, because of this case.  Someone will
9    report chest pain, by way of example.  That's
10   one of the conditions that you're aware of that
11   you need to fill out a Protocol for, and then
12   you would call the provider or the practitioner
13   to report what's on the Protocol and then
14   follow the practitioner's instructions.  Is
15   that generally how the Protocols work?
16 A It is.
17 Q Did you recall filling out any of those
18   Protocols for chest pain?
19 A I did not.
20 Q Were there Protocols where -- well, do you
21   recall a practitioner instructing you -- let me
22   strike that.  Do you recall EMTs, if you know,
23   being called into the jail as a result of
24   filling out a Protocol?  Or typically with a
25   protocol, if the Protocol called for medical

                                                                46
1    attention, that would result in someone just
2    taking a person across the street?
3         MR. JONES:  Objection to form.  You
4    may answer.
5  A The question again, please.
6  Q Sure.  It was bad a one.  I apologize.  I'm
7    trying to understand.  As I understand the
8    Protocol, it's, you know, where you might be in
9    a situation where, it's, like, maybe I should
10   call 911.  The Protocol provides an avenue for
11   getting the medical attention of folks at ACH
12   to make some decisions, right?
13 A All right.
14 Q When you call an EMT, when EMTs are coming in,
15   is that typically the result of a 911 call as
16   opposed to going through the Protocol?
17        MR. JONES:  Objection to form,
18   foundation.  You can answer.
19 A Not always, no.
20 Q Is it often the case?
21 A No.
22 Q There are some situations that are so emergent
23   that you're just calling 911, right?  You're
24   not filling out the Protocol?
25 A Correct.

                                                                47
1  Q And in those situations, that's when the EMTs
2    are coming in and you're not, you know, waiting
3    around trying to figure out whether or not to
4    send the person to the hospital, right?
5  A Correct.
6  Q Are you aware of situations where the
7    practitioner would say, call EMTs as opposed to
8    send the person to the ER, which is across the
9    street?
10 A I am not aware of that.  No, I'm not.
11 Q Is it your understanding that most of those
12   times that we're talking about here then with
13   EMTs coming in would be from a guard just
14   saying, I've got to call 911.  I can't wait for
15   the Protocol?
16        MR. JONES:  Objection to form,
17   foundation.  You can answer.
18 A Sometimes.
19 Q How often would you say?
20 A I guess it's our discretion, you know.
21        MR. JONES:  He's asking you how often
22   that happened.
23 A Not very often.
24 Q When you say it's your discretion, what do you
25   mean?

                                                                48
1  A I guess it comes with experience again.
2  Q Did you receive any instruction about when to
3    fill out an Illness Report or a Protocol as
4    opposed to just calling 911?
5  A We always do that, Protocols.
6  Q Why is that?
7  A We fill out our Protocols.  We call the nurse
8    practitioner and she tells us what we should
9    do -- if they should be taken across the street
10   or get some meds for that person or whatever
11   the case may be.
12        MR. WEIL:  Okay.  Mr. Schwanz, thank
13   you.  That's all I have at this time.
14        MR. KNOTT:  Sir, I have just one topic
15   I want to follow up on.  My name is Doug Knott
16   and I represent Advanced Correctional, Amber
17   Fennigkoh and Lisa Pisney.
18 BY MR. KNOTT:
19 Q You said that, that when you went to see Mr.
20   Boyer, he had a bag of medications?
21 A Yes.
22 Q Can you describe what the bag was like?  Was it
23   a grocery bag?
24 A It was a big-sized Baggie, like a zip-top.
25 Q You're gesturing with your hands?

49

1  A  One of the bigger bag you can purchase.
2  Q  You're gesturing like about a square foot wide?
3  A  Yeah, probably like a --
4         MR. JONES:  Just like before.  You
5     have to wait for him to finish his question.
6  BY MR. KNOTT:
7  Q  Yes, just so we can record what you're showing
8     with your hands.  I was just saying, are you --
9     you're kind of describing with your hands a
10    square, like a foot wide?  Is that fair?
11 A  Yes.
12 Q  Okay.  So it was clear, correct?
13 A  Yes.
14 Q  And do you remember, were there loose pills in
15    there or do you remember if there were pill
16    bottles?
17 A  I recall several pill bottles in there.
18 Q  Okay.  But you didn't have a conversation with
19    him about what those were or anything?
20 A  I did not.
21        MR. KNOTT:  Okay.  Fair enough.  Thank
22    you, sir.
23        MR. JONES:  Anything, Mark?
24        MR. HARDY:  No questions.
25        MR. JONES:  Any follow-up?

50

1         MR. WEIL:  No follow-up.
2         MR. JONES:  No questions.  He'll read
3     and sign.
4         MR. WEIL:  Thanks very much, Mr.
5     Schwanz.
6         THE WITNESS:  You're welcome.
7     (Deposition concluded at 1:32 p.m.)

51

1  STATE OF WISCONSIN   )
                        : ss  CERTIFICATE
2  COUNTY OF LACROSSE   )

4      I hereby certify that I reported the
   deposition of JEFFREY SCHWANZ on the 3rd day of
   November, 2023, in Sparta, Wisconsin, and that
   the witness was by me first duly sworn to tell
   the whole truth; that the testimony was
   transcribed under my direction and is a true
   and complete record, to the best of my ability,
   of the testimony of the witness;

       That the cost of the original has been
   charged to the party who noticed the
   deposition, and that all parties who ordered
   such copies have been charged at the same rate
   for such copies;

       That I am not a relative or employee or
   attorney or counsel of the parties or a
   relative or employee of such attorney or
   counsel; that I am not financially interested
   in the action and have no contract with the
   parties, attorneys or persons with an interest
   in the action that affects or has a substantial
   tendency to affect my impartiality.

       WITNESS MY HAND AND SEAL THIS 7TH DAY
   OF NOVEMBER, 2023.


                    _____
                    Nancy Johnson
                    Registered Professional Reporter
                    P.O. Box 21
                    La Crosse, Wisconsin, 54601-0021

   My Commission Expires
   July 15, 2025

| | **5** | 41:25, 42:14, 42:25<br>**aid** [1] - 20:13 | **B** | 37:12, 42:4, 43:1,<br>44:13, 44:20, 48:18,<br>49:6 |
|---|---|---|---|---|
| **'14** [2] - 9:8, 11:22<br>**'16** [1] - 11:23<br>**'23** [1] - 12:18<br>**'77** [1] - 9:1 | **53202** [3] - 2:7, 2:11, 2:19<br>**54601-0021** [1] - 51:21<br>**55101** [1] - 2:15 | **AMBER** [1] - 1:8<br>**Amber** [3] - 2:8, 2:20, 48:16<br>**ambulance** [4] - 27:19, 29:16, 29:21, 32:9 | **bad** [1] - 46:6<br>**bag** [6] - 27:25, 32:18, 48:20, 48:22, 48:23, 49:1<br>**Baggie** [1] - 48:24 | **C** |
| **1** | **6** | **AND** [1] - 51:16<br>**Andrew** [1] - 21:13 | **beforehand** [1] - 42:12 | **call-in** [1] - 13:12<br>**call-ins** [1] - 39:19 |
| **112** [1] - 1:22<br>**1296** [1] - 13:25<br>**12:38** [1] - 1:22<br>**15** [1] - 51:23<br>**16** [1] - 15:17<br>**16-hour** [1] - 13:6<br>**1977** [2] - 8:13<br>**1:32** [1] - 50:7 | **60607** [1] - 2:3<br>**7**<br>**710** [2] - 2:7, 2:19<br>**7TH** [1] - 51:16 | **ANDREW** [1] - 2:10<br>**annually** [1] - 11:18<br>**answer** [12] - 5:4, 6:8, 6:14, 6:15, 20:10, 31:7, 35:20, 39:22, 41:25, 46:4, 46:18, 47:17<br>**answers** [2] - 4:23, 5:16 | **began** [1] - 11:23<br>**beginning** [1] - 12:22<br>**behalf** [8] - 1:5, 1:13, 2:3, 2:4, 2:8, 2:12, 2:15, 2:20<br>**best** [7] - 5:20, 5:21, 6:5, 16:22, 30:3, 39:17, 51:6<br>**beyond** [1] - 37:23 | **Captain** [17] - 26:19, 28:5, 28:8, 28:9, 28:14, 28:25, 29:4, 29:7, 29:25, 30:11, 30:15, 30:18, 34:5, 34:8, 35:23, 36:1, 38:3<br>**caption** [1] - 23:8<br>**care** [2] - 10:13, 10:15<br>**career** [1] - 8:11 |
| **2** | **9** | **anticipate** [2] - 5:3, 5:4<br>**apologize** [1] - 46:6 | **big** [2] - 4:24, 48:24<br>**big-sized** [1] - 48:24<br>**bigger** [1] - 49:1 | **case** [20] - 1:7, 4:8, 7:12, 16:3, 20:2, 23:8, 23:12, 23:15, 23:19, 23:20, 23:21, |
| **20-CV-1123-jdp** [1] - 1:7<br>**2014** [2] - 8:24, 12:3<br>**2015** [1] - 12:3<br>**2016** [3] - 8:22, 9:11, 12:6<br>**2018** [1] - 8:21<br>**2022** [1] - 12:22<br>**2023** [3] - 1:22, 51:4, 51:16<br>**2025** [1] - 51:23<br>**21** [1] - 51:20<br>**219** [2] - 2:6, 2:18<br>**22-CV-723-jdp** [1] - 1:15<br>**24** [1] - 39:9<br>**27th** [1] - 2:14 | **911** [5] - 46:10, 46:15, 46:23, 47:14, 48:4<br>**A**<br>**a.m** [5] - 13:13, 13:19, 15:9, 15:10, 25:2<br>**Aberdeen** [1] - 2:2<br>**ability** [1] - 51:6<br>**above-entitled** [1] - 1:21<br>**accurately** [2] - 25:7, 25:8<br>**ACH** [1] - 46:11<br>**action** [3] - 1:21, 51:13, 51:14<br>**add** [2] - 25:11, 25:19<br>**administer** [1] - 11:8<br>**administering** [2] - 11:5, 19:12<br>**administrative** [1] - 26:19<br>**administrator** [1] - 1:4<br>**Administrator** [2] - 1:12, 2:4 | **appeared** [5] - 2:3, 2:7, 2:11, 2:15, 2:19<br>**applicable** [1] - 1:23<br>**applied** [3] - 8:17, 12:1, 19:2<br>**approached** [1] - 37:19<br>**April** [4] - 12:15, 12:16, 12:18<br>**area** [1] - 16:4<br>**arrive** [1] - 29:7<br>**arrived** [3] - 26:3, 29:4, 30:16<br>**arrives** [3] - 29:25, 30:10, 34:6<br>**assign** [1] - 23:23<br>**assigned** [2] - 19:21, 28:2<br>**assist** [2] - 10:20, 18:17<br>**assistant** [1] - 10:6<br>**assume** [1] - 6:9<br>**attention** [2] - 46:1, 46:11<br>**ATTORNEY** [2] - 3:4, 3:5<br>**attorney** [3] - 6:23, 51:11, 51:12 | **bit** [1] - 5:3<br>**blood** [6] - 10:12, 11:12, 40:5, 43:20, 44:16<br>**booking** [9] - 16:4, 16:12, 16:15, 16:17, 18:13, 18:17, 18:21, 19:21, 20:1<br>**boss** [1] - 13:1<br>**bottles** [2] - 49:16, 49:17<br>**bottom** [1] - 26:13<br>**Box** [1] - 51:20<br>**BOYER** [2] - 1:4, 1:12<br>**Boyer** [39] - 1:4, 1:13, 2:4, 2:4, 13:8, 14:2, 14:7, 14:10, 17:2, 17:4, 17:21, 19:6, 19:16, 20:3, 20:6, 20:13, 24:5, 26:6, 27:2, 27:13, 27:16, 27:18, 27:21, 27:24, 28:9, 29:5, 29:11, 30:11, 30:14, 31:4, 32:1, 32:3, 32:17, 33:1, 33:6, 33:18, | 23:23, 24:1, 24:12, 34:23, 40:6, 43:23, 45:8, 46:20, 48:11<br>**Case** [1] - 1:15<br>**catch** [1] - 8:20<br>**cell** [5] - 17:13, 20:14, 20:19, 26:18, 26:22<br>**Cell** [1] - 13:21<br>**cells** [2] - 17:16, 20:15<br>**CERTIFICATE** [1] - 51:1<br>**certified** [1] - 10:6<br>**certify** [1] - 51:3<br>**chance** [1] - 19:20<br>**changes** [1] - 5:1<br>**charged** [2] - 51:8, 51:9<br>**charting** [1] - 17:11<br>**check** [1] - 26:20<br>**Check** [1] - 13:21<br>**checking** [1] - 17:14<br>**checks** [2] - 17:11, 17:13 |
| **3** | **administrator** [1] - 1:4<br>**Administrator** [2] - 1:12, 2:4<br>**Advanced** [3] - 2:8, 2:20, 48:16<br>**ADVANCED** [1] - 1:8<br>**AED** [1] - 19:2<br>**affect** [1] - 51:14<br>**affects** [2] - 35:6, 51:14<br>**afterwards** [1] - 33:21<br>**age** [1] - 19:8<br>**ahead** [13] - 5:14, 15:3, 16:24, 19:1, 20:10, 33:8, 33:20, 36:16, 38:1, 40:15, | **attorneys** [1] - 51:13<br>**avenue** [1] - 46:10<br>**avoid** [1] - 5:6<br>**aware** [6] - 27:7, 27:10, 37:13, 45:10, 47:6, 47:10<br>**awhile** [1] - 36:19 | 36:18, 36:25, 48:20<br>**Boyer's** [4] - 20:19, 30:19, 33:4, 43:4<br>**Bresnahan** [1] - 2:17<br>**BRESNHAN** [1] - 1:17<br>**brief** [1] - 8:6<br>**Broadway** [1] - 2:11<br>**bubble** [1] - 31:22<br>**bus** [2] - 11:25, 12:3<br>**busy** [1] - 29:3<br>**BY** [12] - 4:5, 7:2, 21:17, 22:1, 36:6, | **chest** [3] - 45:6, 45:9, 45:18<br>**Chicago** [1] - 2:3<br>**Christine** [14] - 1:4, 1:13, 2:4, 13:8, 14:2, 14:6, 14:10, 14:12, 18:20, 19:13, 19:16, 21:7, 21:8, 27:5<br>**circle** [1] - 34:12<br>**circumstance** [1] - 39:12<br>**circumstances** [1] - 41:21<br>**citizens** [1] - 12:1 |
| **3** [1] - 1:22<br>**30** [2] - 2:14, 30:8<br>**301** [1] - 2:10<br>**311** [1] - 2:2<br>**35** [1] - 11:11<br>**3rd** [2] - 2:3, 51:4 | | | | |
| **4** | | | | |
| **4** [1] - 3:4<br>**40** [5] - 8:3, 8:15, 9:3, 9:5, 30:7<br>**400** [1] - 2:11<br>**41** [2] - 21:12, 25:8<br>**48** [2] - 3:6, 39:9 | | | | |

| | | | | **F** |
|---|---|---|---|---|
| **clear** [4] - 5:16, 6:1, 6:6, 49:12<br>**cleared** [1] - 26:21<br>**CNA** [2] - 10:9, 11:17<br>**codes** [1] - 18:7<br>**coming** [7] - 14:16, 15:3, 43:12, 44:25, 46:14, 47:2, 47:13<br>**commencing** [1] - 1:22<br>**Commission** [1] - 51:22<br>**common** [2] - 5:10, 39:3<br>**complete** [1] - 51:6<br>**computer** [2] - 22:6, 22:25<br>**concluded** [1] - 50:7<br>**conditions** [3] - 43:11, 43:17, 45:10<br>**conduct** [1] - 34:8<br>**consistent** [1] - 25:2<br>**contact** [1] - 14:11<br>**contract** [1] - 51:13<br>**Control** [6] - 27:4, 29:2, 31:15, 31:18, 31:20, 31:21<br>**conversation** [10] - 4:21, 5:1, 7:6, 7:17, 7:25, 36:13, 37:4, 37:9, 37:15, 49:18<br>**conversational** [1] - 18:5<br>**conversations** [1] - 35:24<br>**copies** [3] - 22:17, 51:9, 51:10<br>**copy** [4] - 21:14, 22:19, 23:2<br>**correct** [17] - 6:19, 9:10, 9:21, 10:4, 11:3, 11:10, 16:5, 20:16, 26:4, 26:6, 33:12, 36:8, 38:12, 41:4, 46:25, 47:5, 49:12<br>**correction** [2] - 12:10, 40:18<br>**CORRECTIONAL** [1] - 1:8<br>**Correctional** [3] - 2:8, 2:20, 48:16<br>**correctional** [2] - 12:20, 40:22<br>**correctly** [2] - 28:21, 43:9<br>**cost** [1] - 51:8<br>**counsel** [7] - 2:3, 2:7, 2:11, 2:15, 2:19, 51:11, 51:12 | **COUNTY** [2] - 1:9, 51:2<br>**County** [4] - 2:12, 12:1, 12:5, 23:5<br>**couple** [1] - 19:22<br>**course** [1] - 44:11<br>**court** [5] - 4:24, 5:5, 5:7, 5:12, 5:16<br>**Court** [2] - 1:22, 4:17<br>**COURT** [1] - 1:1<br>**cover** [2] - 14:17, 15:6<br>**coverage** [1] - 14:22<br>**covering** [3] - 13:14, 14:25, 18:21<br>**coverings** [2] - 20:22, 21:3<br>**covers** [1] - 25:15<br>**CPR** [7] - 10:6, 11:10, 11:11, 18:19, 18:25, 19:12, 33:11<br>**CR192109** [1] - 23:8<br>**Crosse** [2] - 32:12, 51:21<br>**curtains** [2] - 18:21, 18:22<br><br>**D**<br><br>**DA's** [1] - 23:12<br>**DANIEL** [1] - 2:18<br>**DANIELLE** [1] - 1:9<br>**Danielle** [5] - 2:12, 16:15, 24:19, 24:20, 35:12<br>**dates** [1] - 8:9<br>**DAY** [1] - 51:16<br>**days** [3] - 15:6, 36:20, 39:7<br>**debrief** [2] - 37:23<br>**debriefing** [8] - 33:21, 34:2, 34:8, 34:11, 34:16, 36:2, 36:7<br>**decided** [1] - 24:11<br>**deciding** [1] - 10:22<br>**decisions** [1] - 46:12<br>**Defendants** [5] - 1:10, 2:9, 2:12, 2:17, 2:21<br>**defendants** [1] - 1:18<br>**deposed** [3] - 4:12, 4:15, 19:19<br>**deposing** [1] - 19:19<br>**deposition** [6] - 6:20, 7:7, 7:10, 13:7, 51:4, 51:9<br>**Deposition** [2] - 1:20, 50:7<br>**depositions** [1] - 6:13<br>**describe** [3] - 14:13, 18:7, 48:22 | **describing** [1] - 49:9<br>**details** [1] - 8:8<br>**detainees** [3] - 17:14, 20:19, 20:25<br>**diabetics** [2] - 40:5, 43:20<br>**died** [2] - 36:18, 36:25<br>**difference** [1] - 41:14<br>**diploma** [1] - 9:19<br>**direction** [1] - 51:6<br>**discharge** [1] - 8:13<br>**discretion** [2] - 47:20, 47:24<br>**discussed** [1] - 6:25<br>**discussion** [1] - 30:14<br>**discussions** [1] - 35:22<br>**dispatch** [4] - 23:25, 24:2, 24:4, 24:8<br>**distress** [1] - 35:17<br>**DISTRICT** [2] - 1:1, 1:2<br>**doctors** [1] - 20:6<br>**document** [5] - 7:22, 14:20, 22:7, 22:9, 22:10<br>**documents** [3] - 7:9, 7:20, 16:2<br>**done** [5] - 20:1, 21:25, 33:11, 33:12, 33:13<br>**door** [3] - 14:7, 32:19, 32:24<br>**doubt** [1] - 40:1<br>**Doug** [1] - 48:15<br>**DOUGLAS** [1] - 2:6<br>**down** [7] - 4:25, 5:13, 5:17, 19:25, 25:5, 26:18, 43:21<br>**drinking** [1] - 39:7<br>**driving** [1] - 12:3<br>**dropping** [1] - 27:24<br>**drove** [1] - 11:25<br>**duly** [2] - 4:3, 51:5<br>**during** [4] - 8:12, 13:10, 13:17, 26:24<br>**duties** [1] - 17:10<br>**duty** [1] - 28:18<br><br>**E**<br><br>**earshot** [1] - 36:3<br>**East** [1] - 2:14<br>**editing** [1] - 25:20<br>**education** [3] - 9:22, 11:20<br>**eight** [3] - 8:18, 12:12, 44:22<br>**email** [1] - 22:16<br>**emailed** [1] - 7:22<br>**emergencies** [3] - | 10:8, 39:3, 39:18<br>**emergency** [10] - 17:4, 18:8, 18:12, 20:8, 20:20, 27:9, 27:11, 27:20, 29:14, 41:11<br>**emergent** [1] - 46:22<br>**emotional** [1] - 37:23<br>**employee** [2] - 51:11, 51:12<br>**employment** [2] - 8:7, 44:12<br>**EMS** [1] - 26:3<br>**EMT** [6] - 29:16, 40:21, 40:25, 44:5, 44:18, 46:14<br>**EMTs** [18] - 19:2, 21:5, 39:25, 40:3, 41:19, 42:8, 42:24, 43:3, 43:8, 43:12, 43:18, 43:25, 44:25, 45:22, 46:14, 47:1, 47:7, 47:13<br>**end** [1] - 24:9<br>**ended** [2] - 16:13, 19:21<br>**enter** [1] - 13:21<br>**entitled** [2] - 1:21, 5:22<br>**ER** [1] - 47:8<br>**especially** [1] - 40:16<br>**Estate** [3] - 1:4, 1:13, 2:4<br>**estimate** [6] - 5:21, 5:23, 16:22, 29:12, 30:3, 44:17<br>**estimates** [1] - 8:9<br>**event** [5] - 17:20, 33:5, 43:4, 43:7<br>**events** [2] - 44:4, 44:25<br>**exactly** [1] - 37:1<br>**examination** [1] - 1:22<br>**Examination** [3] - 3:2, 3:4, 3:6<br>**example** [1] - 45:9<br>**Exhibit** [2] - 21:12, 25:8<br>**exhibits** [1] - 3:10<br>**experience** [3] - 39:11, 41:18, 48:1<br>**Expires** [1] - 51:22<br>**explain** [3] - 6:5, 28:25, 30:25<br>**extra** [1] - 10:18<br>**extraordinary** [1] - 43:5<br>**eyes** [1] - 19:16 | **facts** [1] - 31:8<br>**fair** [4] - 5:24, 6:10, 49:10, 49:21<br>**familiar** [2] - 45:3, 45:7<br>**Fargo** [1] - 2:14<br>**fast** [4] - 19:7, 29:17, 29:18, 29:23<br>**FENNIGKOH** [1] - 1:8<br>**Fennigkoh** [3] - 2:8, 2:21, 48:17<br>**few** [4] - 4:8, 4:19, 35:5, 36:20<br>**figure** [2] - 31:13, 47:3<br>**fill** [3] - 45:11, 48:3, 48:7<br>**filled** [1] - 45:4<br>**filling** [3] - 45:17, 45:24, 46:24<br>**financially** [1] - 51:12<br>**fine** [6] - 8:10, 33:25, 34:25, 35:3, 35:13, 35:16<br>**finish** [1] - 49:5<br>**first** [7] - 5:2, 17:3, 19:6, 19:11, 19:15, 29:13, 51:5<br>**five** [2] - 44:15, 44:24<br>**Floor** [2] - 2:3, 2:14<br>**flow** [1] - 4:23<br>**folks** [2] - 21:8, 46:11<br>**follow** [4] - 45:14, 48:15, 49:25, 50:1<br>**follow-up** [2] - 49:25, 50:1<br>**following** [1] - 41:13<br>**follows** [1] - 4:4<br>**foot** [2] - 49:2, 49:10<br>**FOR** [1] - 1:2<br>**form** [18] - 20:9, 22:6, 31:6, 33:8, 33:19, 35:19, 36:5, 36:15, 37:11, 37:25, 39:21, 40:4, 40:14, 41:24, 42:13, 46:3, 46:17, 47:16<br>**foundation** [2] - 46:18, 47:17<br>**four** [2] - 15:15, 44:15<br>**frequent** [2] - 39:10, 40:2<br>**Friday** [1] - 8:5<br>**future** [1] - 33:13 |

**G**

gathered [1] - 16:2
GAYNOR [2] - 2:6, 2:18
GED [2] - 9:19, 9:20
generally [2] - 41:18, 45:15
GERAGHTY [1] - 2:14
gesturing [2] - 48:25, 49:2
gotcha [1] - 9:6
graduate [1] - 9:18
GREGORY [2] - 1:4, 1:12
Gregory [1] - 2:4
grocery [1] - 48:23
group [1] - 34:14
guard [3] - 36:14, 41:2, 47:13
guess [6] - 13:2, 16:25, 25:12, 25:13, 47:20, 48:1
gurney [4] - 26:7, 29:11, 29:20, 32:8

**H**

half [5] - 8:3, 30:4, 30:5, 30:7, 34:3
hallway [3] - 27:21, 30:12, 30:20
HAND [1] - 51:16
handed [2] - 22:19, 23:2
hands [3] - 48:25, 49:8, 49:9
hang [1] - 21:24
HANSEN [1] - 2:10
hard [3] - 5:12, 22:19, 23:2
HARDY [2] - 2:13, 49:24
HARMSTON [1] - 1:17
Harmston [1] - 2:16
head [3] - 5:11, 8:25
Healthcare [2] - 2:8, 2:20
HEALTHCARE [1] - 1:8
heard [1] - 18:16
hearing [1] - 18:10
heart [4] - 39:23, 40:2, 43:19, 44:5
helicopter [3] - 32:12, 32:15, 37:10
help [3] - 7:1, 10:13, 40:17

helping [2] - 11:5, 21:8
HENDRICKSON [1] - 1:9
Hendrickson [21] - 2:12, 26:20, 28:6, 28:10, 28:14, 28:25, 29:4, 29:7, 29:25, 30:11, 30:16, 30:19, 30:22, 30:24, 31:3, 31:24, 34:5, 34:8, 35:24, 36:1, 38:3
hereby [1] - 51:3
high [3] - 8:6, 8:8, 9:18
hired [1] - 12:2
history [1] - 8:7
home [2] - 15:17, 24:24
honorable [1] - 8:13
hospital [12] - 9:15, 10:3, 11:16, 26:10, 29:12, 32:10, 40:8, 40:13, 41:1, 41:2, 44:2, 47:4
Hospital [3] - 8:14, 8:24, 34:25
hour [6] - 8:3, 30:4, 30:5, 30:7, 34:3
hourly [2] - 17:11, 17:13
hours [3] - 15:15, 15:17, 39:9
housing [10] - 16:11, 16:13, 16:18, 17:5, 17:10, 18:1, 19:3, 19:21, 19:24, 27:15
husband [3] - 26:23, 30:19, 31:1

**I**

idea [1] - 4:22
Illinois [1] - 2:3
Illness [2] - 45:3, 48:3
immediately [1] - 18:17
impartiality [1] - 51:14
IN [1] - 1:1
Inc [2] - 2:8, 2:20
INC [1] - 1:8
incident [22] - 13:7, 13:8, 13:10, 14:5, 14:12, 14:14, 17:2, 22:4, 23:17, 23:20, 24:5, 24:24, 25:1, 25:9, 26:24, 29:3, 31:5, 32:7, 34:4, 36:11, 38:17, 38:21

incidents [1] - 39:1
indicated [1] - 43:6
indicates [1] - 14:24
individually [2] - 34:13, 34:14
induce [1] - 43:18
inducing [1] - 39:19
inmate [2] - 39:7, 42:15
inmate 's [1] - 26:23
inside [1] - 31:21
instance [1] - 1:21
instead [2] - 29:1, 31:3
instruct [1] - 29:5
instructed [2] - 6:14, 28:10
instructing [1] - 45:21
instruction [2] - 24:14, 48:2
instructions [1] - 45:14
instructor [1] - 10:7
interaction [1] - 19:20
interest [1] - 51:13
interested [2] - 7:3, 51:12
interviewed [1] - 37:22
investigator [1] - 37:19
involved [3] - 21:9, 33:23, 34:24
issue [1] - 40:3
IV [1] - 29:19

**J**

jail [27] - 11:23, 12:2, 12:8, 12:11, 13:3, 16:6, 26:14, 27:14, 29:12, 36:14, 37:16, 38:18, 38:22, 39:4, 39:8, 39:10, 39:11, 40:9, 40:13, 41:1, 43:3, 43:8, 43:12, 43:18, 43:19, 44:19, 45:23
Jail [2] - 12:6, 23:6
JEFFREY [4] - 1:20, 3:2, 4:2, 51:4
Jillian [1] - 2:17
JILLIAN [1] - 1:17
job [4] - 9:11, 10:5, 12:5, 33:25
Johnson [3] - 1:24, 2:16, 51:19
JOHNSON [1] - 1:17
JONES [31] - 2:10,

6:24, 16:24, 20:9, 21:16, 21:24, 31:6, 33:8, 33:19, 35:19, 36:5, 36:15, 37:11, 37:25, 39:21, 40:4, 40:14, 41:24, 42:2, 42:13, 42:25, 44:11, 44:18, 46:3, 46:17, 47:16, 47:21, 49:4, 49:23, 49:25, 50:2
Jones [4] - 6:18, 7:4, 7:17, 7:25
july [1] - 51:23

**K**

KAFKA [1] - 2:18
KENNEDY [1] - 2:14
kind [7] - 5:12, 8:8, 8:10, 13:2, 31:21, 41:9, 49:9
Knott [1] - 48:15
KNOTT [8] - 2:6, 2:6, 2:18, 3:5, 48:14, 48:18, 49:6, 49:21
Kyle [5] - 17:7, 17:8, 18:19, 35:15, 35:16

**L**

LACROSSE [1] - 51:2
landing [1] - 37:10
late [1] - 14:24
lawyer [1] - 6:18
lawyers [2] - 4:8, 6:12
laying [1] - 19:15
learn [4] - 17:20, 27:16, 27:23, 36:18
learned [6] - 11:10, 17:3, 27:2, 27:21, 29:13, 30:11
learning [2] - 33:10, 36:25
least [1] - 16:3
left [1] - 12:23
LEIB [2] - 2:6, 2:18
less [1] - 12:24
level [1] - 8:6
line [2] - 26:13, 26:23
LISA [1] - 1:8
Lisa [3] - 2:8, 2:20, 48:17
literally [1] - 22:5
live [3] - 4:12, 37:6, 42:20
LLC [3] - 2:6, 2:10, 2:18
loaded [2] - 29:21,

32:8
lobby [2] - 26:24, 27:3
locked [1] - 26:18
LOEVY [2] - 2:2
Logs [1] - 13:21
look [6] - 14:20, 21:11, 21:18, 25:5, 29:10, 33:10
looked [1] - 25:15
looking [5] - 7:20, 20:25, 31:4, 31:14, 31:15
looks [1] - 26:2
loose [1] - 49:14

**M**

magnetic [1] - 18:22
Mark [1] - 49:23
MARK [1] - 2:13
marked [2] - 3:10, 21:12
Master [8] - 27:4, 29:2, 30:13, 30:18, 31:15, 31:18, 31:20, 31:21
math [1] - 8:25
Mayo [1] - 26:9
mean [7] - 6:22, 10:16, 26:17, 31:10, 35:3, 43:22, 47:25
means [1] - 26:18
measuring [1] - 11:12
mechanics [1] - 34:20
MEDICAL [1] - 1:16
medical [17] - 10:7, 11:20, 13:8, 17:4, 17:20, 18:8, 18:12, 20:7, 27:8, 27:11, 27:20, 29:14, 39:1, 39:3, 39:18, 45:25, 46:11
Medical [1] - 2:16
medication [2] - 10:14, 10:16
medications [8] - 10:19, 10:22, 10:25, 27:5, 27:17, 27:24, 27:25, 48:20
meds [2] - 10:17, 48:10
memory [1] - 14:10
mentioned [4] - 14:15, 25:14, 36:22, 43:19
met [1] - 4:6
Microsoft [1] - 22:10
might [5] - 7:15, 36:2, 36:19, 36:21, 46:8
Milwaukee [5] - 2:7, 2:11, 2:19

**mind** [1] - 21:13
**Minnesota** [1] - 2:15
**minutes** [6] - 8:3, 30:6, 30:7, 30:8, 30:10, 42:21
**Moga** [7] - 17:8, 18:19, 19:3, 19:11, 19:18, 20:12, 35:15
**monitor** [1] - 39:8
**MONROE** [1] - 1:9
**Monroe** [3] - 2:12, 12:5, 23:5
**month** [5] - 39:15, 41:20, 42:9, 43:7
**months** [1] - 10:11
**morning** [1] - 24:25
**most** [2] - 39:16, 47:11
**mostly** [1] - 39:23
**mouth** [1] - 43:6
**MR** [50] - 4:5, 6:24, 7:1, 7:2, 16:24, 20:9, 21:13, 21:16, 21:17, 21:24, 22:1, 31:6, 33:8, 33:19, 35:19, 36:5, 36:6, 36:15, 37:11, 37:12, 37:25, 39:21, 40:4, 40:14, 41:24, 42:2, 42:4, 42:13, 42:25, 43:1, 44:11, 44:13, 44:18, 44:20, 46:3, 46:17, 47:16, 47:21, 48:12, 48:14, 48:18, 49:4, 49:6, 49:21, 49:23, 49:24, 49:25, 50:1, 50:2, 50:4
**MY** [1] - 51:16

### N

**name** [2] - 4:6, 48:15
**Nancy** [2] - 1:23, 51:19
**nearby** [1] - 37:6
**need** [3] - 10:18, 40:22, 45:11
**needed** [4] - 10:23, 18:13, 19:25, 35:9
**never** [2] - 14:11, 36:13
**next** [1] - 26:23
**night** [13] - 13:9, 13:11, 14:12, 14:21, 15:4, 15:8, 16:10, 16:14, 31:19, 35:23, 38:11, 41:16, 41:17
**ninety** [1] - 14:1
**ninety-six** [1] - 14:1

**none** [1] - 14:11
**normal** [4] - 4:20, 5:2, 6:13, 18:4
**normally** [1] - 14:23
**NORMAN** [1] - 1:17
**Norman** [1] - 2:16
**North** [4] - 2:2, 2:6, 2:10, 2:18
**Notary** [1] - 4:3
**nothing** [1] - 6:22
**notice** [1] - 1:21
**noticed** [1] - 51:8
**November** [2] - 1:22, 51:4
**NOVEMBER** [1] - 51:16
**number** [10] - 13:20, 23:12, 23:15, 23:16, 23:19, 23:21, 23:23, 24:1, 24:6
**numbers** [1] - 40:20
**nurse** [2] - 11:6, 48:7
**nurses** [1] - 10:21
**nursing** [1] - 10:6

### O

**O'LOUGHLIN** [1] - 2:14
**oath** [1] - 4:4
**object** [2] - 6:12, 33:8
**objection** [17] - 20:9, 31:6, 33:19, 35:19, 36:5, 36:15, 37:11, 37:25, 39:21, 40:4, 40:14, 41:24, 42:13, 42:25, 46:3, 46:17, 47:16
**obligated** [1] - 6:15
**occur** [2] - 34:2, 39:14
**occurred** [4] - 27:11, 33:5, 34:18, 34:20
**occurring** [2] - 20:20, 44:8
**OF** [4] - 1:2, 51:1, 51:2, 51:16
**office** [6] - 8:17, 8:21, 9:12, 23:13, 24:2, 33:17
**officer** [5] - 12:10, 12:20, 40:18, 40:22, 41:10
**officers** [4] - 41:7, 41:8, 42:16, 42:20
**often** [5] - 39:14, 46:20, 47:19, 47:21, 47:23
**once** [4] - 39:15, 41:19, 42:9, 43:7

**one** [12] - 4:24, 24:4, 24:7, 25:2, 28:3, 34:18, 38:6, 45:7, 45:10, 46:6, 48:14, 49:1
**ones** [1] - 45:2
**opposed** [5] - 42:23, 43:25, 46:16, 47:7, 48:4
**ordered** [2] - 28:20, 51:9
**ordinary** [2] - 38:17, 38:21
**original** [1] - 51:8
**out-of-the-ordinary** [2] - 38:17, 38:21
**overdoses** [1] - 43:22
**overlap** [1] - 5:5
**overnight** [1] - 13:12
**own** [3] - 1:5, 1:13, 2:4

### P

**P.A** [1] - 2:14
**p.m** [17] - 1:22, 13:11, 13:13, 13:19, 14:17, 15:8, 15:10, 15:12, 15:14, 15:15, 15:17, 15:18, 15:22, 15:25, 16:1, 17:16, 50:7
**P.O** [1] - 51:20
**pain** [3] - 45:7, 45:9, 45:18
**paramedics** [3] - 39:12, 39:20, 40:11
**Parker** [2] - 2:12, 16:3
**PARKER** [1] - 1:9
**part** [4] - 6:13, 16:3, 33:24, 35:24
**particular** [2] - 13:4, 44:4
**parties** [3] - 51:9, 51:11, 51:13
**party** [1] - 51:8
**passed** [1] - 36:22
**pastor** [1] - 34:23
**Paul** [1] - 2:15
**pending** [1] - 42:3
**people** [9] - 5:8, 34:13, 35:6, 35:7, 38:14, 38:25, 39:23, 39:24, 43:17
**perform** [1] - 18:24
**performed** [1] - 18:24
**periodic** [1] - 11:16
**person** [11] - 15:21, 15:22, 24:4, 24:7, 40:25, 42:11, 44:1, 46:2, 47:4, 47:8,

48:10
**persons** [1] - 51:13
**pill** [2] - 49:15, 49:17
**pills** [2] - 32:18, 49:14
**Pisney** [3] - 2:8, 2:20, 48:17
**PISNEY** [1] - 1:8
**Place** [1] - 2:14
**place** [2] - 5:13, 25:1
**placed** [1] - 29:11
**Plaintiff** [5] - 1:6, 1:14, 1:21, 2:5, 4:7
**point** [3] - 17:17, 24:16, 26:4
**policy** [1] - 33:22
**port** [1] - 29:21
**possible** [1] - 4:21
**possibly** [2] - 6:1, 20:21
**practice** [1] - 28:24
**practitioner** [4] - 45:12, 45:21, 47:7, 48:8
**practitioner 's** [1] - 45:14
**precautions** [3] - 39:2, 39:25, 40:7
**prepare** [3] - 6:20, 7:6, 7:9
**prescribed** [1] - 11:1
**preserve** [1] - 20:17
**pressure** [3] - 11:12, 43:20, 44:16
**pressures** [2] - 10:12, 40:6
**pretty** [3] - 25:10, 29:17, 29:18
**printed** [3] - 22:17, 22:19, 23:1
**privacy** [2] - 18:23, 20:17
**privileged** [1] - 7:5
**problem** [1] - 44:6
**problems** [3] - 39:23, 40:2, 43:20
**Professional** [2] - 1:24, 51:20
**professionally** [1] - 33:4
**promoted** [1] - 12:21
**promotion** [1] - 12:23
**Protocol** [11] - 45:7, 45:11, 45:13, 45:24, 45:25, 46:8, 46:10, 46:16, 46:24, 47:15, 48:3
**protocol** [1] - 45:25
**Protocols** [7] - 45:3, 45:6, 45:15, 45:18, 45:20, 48:5, 48:7

**provide** [2] - 4:22, 27:17
**provider** [1] - 45:12
**provides** [1] - 46:10
**psych** [4] - 9:15, 10:2, 10:8, 10:20
**psychiatric** [1] - 8:15
**PSYCHOLOGICAL** [1] - 1:16
**Psychological** [1] - 2:16
**Public** [1] - 4:3
**pulse** [1] - 29:19
**purchase** [1] - 49:1
**pursuant** [2] - 1:21, 1:23
**put** [9] - 20:14, 20:22, 21:3, 25:15, 26:7, 27:19, 29:20, 32:9, 43:5

### Q

**questions** [6] - 4:22, 6:2, 21:20, 38:14, 49:24, 50:2
**quick** [1] - 11:15
**quiet** [1] - 19:24
**quite** [1] - 29:23

### R

**radio** [2] - 17:22, 17:23
**rate** [1] - 51:9
**re** [1] - 11:19
**re-up** [1] - 11:19
**react** [1] - 32:17
**read** [3] - 21:19, 21:22, 50:2
**real** [1] - 11:15
**really** [3] - 6:22, 14:11, 16:25
**reason** [2] - 25:22, 25:25
**receive** [3] - 22:15, 24:14, 48:2
**received** [1] - 11:16
**recognize** [1] - 14:8
**recollection** [7] - 5:20, 14:1, 16:7, 25:3, 32:20, 39:18, 41:21
**record** [3] - 5:18, 49:7, 51:6
**referring** [1] - 11:15
**refers** [1] - 23:11
**reflect** [1] - 25:8
**refresh** [1] - 14:20

| | | | | |
|---|---|---|---|---|
| **Registered** [2] - 1:24, 51:20<br>**regular** [1] - 15:16<br>**relative** [2] - 51:11, 51:12<br>**remember** [27] - 7:14, 13:16, 14:19, 15:3, 16:10, 17:2, 17:19, 18:3, 18:10, 19:15, 20:2, 20:5, 24:18, 24:22, 25:12, 25:23, 25:24, 27:2, 27:13, 32:4, 34:15, 34:19, 43:13, 43:16, 44:25, 49:14, 49:15<br>**rendering** [1] - 20:13<br>**replaced** [1] - 16:12<br>**report** [26] - 7:12, 7:15, 22:2, 22:3, 22:5, 22:22, 23:8, 23:16, 24:15, 24:23, 25:5, 25:7, 25:16, 25:18, 25:25, 26:14, 29:10, 33:6, 35:17, 36:7, 36:11, 37:18, 38:8, 45:9, 45:13<br>**Report** [1] - 48:3<br>**reported** [2] - 1:23, 51:3<br>**reporter** [5] - 4:25, 5:5, 5:7, 5:12, 5:16<br>**Reporter** [2] - 1:24, 51:20<br>**Reports** [1] - 45:4<br>**reports** [2] - 23:5, 33:10<br>**represent** [2] - 4:7, 48:16<br>**respond** [2] - 18:20, 19:14<br>**responded** [1] - 10:7<br>**rest** [1] - 21:6<br>**result** [3] - 45:23, 46:1, 46:15<br>**retired** [9] - 8:16, 8:19, 8:23, 8:24, 9:4, 9:8, 11:22, 12:13<br>**review** [3] - 7:9, 10:16, 29:2<br>**reviewing** [1] - 7:14<br>**reviews** [1] - 10:14<br>**REYNOLDS** [1] - 2:10<br>**role** [1] - 11:17<br>**room** [1] - 41:11<br>**rough** [1] - 8:9<br>**roughly** [1] - 9:11<br>**rule** [2] - 4:24, 5:10<br>**rules** [1] - 4:19<br>**run** [2] - 19:7, 25:22<br>**running** [1] - 25:12 | **S**<br><br>**S.C** [1] - 2:16<br>**sally** [1] - 29:21<br>**saw** [1] - 38:4<br>**scene** [3] - 21:1, 26:14, 26:20<br>**SCHAMBER** [1] - 1:17<br>**Schamber** [1] - 2:16<br>**school** [2] - 8:8, 9:18<br>**SCHWANZ** [4] - 1:20, 3:2, 4:2, 51:4<br>**schwanz** [1] - 4:6<br>**Schwanz** [5] - 4:13, 6:21, 21:19, 48:12, 50:5<br>**scissors** [2] - 25:13, 25:23<br>**screen** [1] - 4:9<br>**SEAL** [1] - 51:16<br>**secured** [1] - 26:14<br>**see** [18] - 18:18, 19:25, 20:19, 23:9, 25:16, 26:15, 26:25, 27:8, 28:1, 28:4, 28:9, 29:5, 33:1, 33:11, 34:22, 36:1, 43:12, 48:19<br>**seeing** [1] - 42:7<br>**seem** [1] - 32:19<br>**send** [2] - 47:4, 47:8<br>**senior** [1] - 12:1<br>**sense** [5] - 5:18, 6:2, 6:3, 6:16, 43:24<br>**sensible** [1] - 5:17<br>**sent** [3] - 7:22, 33:5, 41:15<br>**Sergeant** [2] - 12:21, 28:18<br>**seriously** [1] - 38:25<br>**served** [1] - 8:12<br>**service** [5] - 1:22, 9:5, 9:19, 9:20, 9:25<br>**Seventh** [1] - 2:14<br>**several** [3] - 34:24, 38:20, 49:17<br>**shake** [1] - 5:11<br>**shaken** [1] - 35:13<br>**shared** [1] - 15:19<br>**SHASTA** [1] - 1:9<br>**Shasta** [5] - 2:12, 15:23, 15:24, 16:3, 16:12<br>**Sheriff's** [5] - 8:17, 8:21, 9:12, 24:2, 33:17<br>**shield** [1] - 13:20<br>**shift** [15] - 13:4, 13:9, 13:16, 13:19, 14:16, 14:24, 15:7, 15:8, 15:12, 15:16, 15:19, 20:3, 38:11, 38:14, 44:21<br>**shifts** [1] - 13:6<br>**short** [3] - 37:23, 40:17, 41:6<br>**shortly** [2] - 24:24, 25:2<br>**shot** [1] - 10:19<br>**shots** [2] - 11:4, 11:5<br>**show** [1] - 21:5<br>**showed** [1] - 27:13<br>**showing** [1] - 49:7<br>**sign** [2] - 18:4, 50:3<br>**similar** [1] - 36:2<br>**situation** [4] - 20:6, 31:1, 44:19, 46:9<br>**situations** [3] - 46:22, 47:1, 47:6<br>**six** [13] - 13:13, 13:19, 14:1, 15:8, 15:9, 15:10, 15:14, 15:25, 44:24<br>**sized** [1] - 48:24<br>**smoothly** [1] - 4:23<br>**SO** [1] - 23:8<br>**SO-CR192109** [1] - 23:8<br>**someone** [9] - 13:14, 14:17, 14:25, 28:2, 30:18, 41:10, 44:5, 45:8, 46:1<br>**sometimes** [3] - 10:20, 33:9, 47:18<br>**somewheres** [1] - 23:13<br>**soon** [1] - 12:23<br>**sorry** [1] - 19:1<br>**sort** [9] - 10:9, 11:19, 15:12, 15:19, 23:4, 37:22, 43:11, 43:17, 44:19<br>**sound** [1] - 16:6<br>**sounds** [3] - 7:5, 11:22, 19:6<br>**South** [1] - 1:22<br>**Sparta** [4] - 1:23, 37:10, 42:21, 51:4<br>**special** [2] - 18:4, 22:6<br>**specific** [1] - 5:2<br>**speculate** [3] - 5:21, 16:21, 34:15<br>**speech** [1] - 18:5<br>**square** [2] - 49:2, 49:10<br>**ss** [1] - 51:1<br>**St** [1] - 2:15<br>**stabilized** [1] - 32:11<br>**staff** [4] - 21:6, 26:15, 33:22, 41:6<br>**Staffing** [1] - 2:16<br>**STAFFING** [1] - 1:16<br>**Stan** [1] - 2:12<br>**STAN** [1] - 1:9<br>**standard** [1] - 17:25<br>**standing** [2] - 31:25, 34:12<br>**started** [7] - 8:13, 8:21, 9:1, 11:14, 18:20, 29:19, 43:4<br>**STATE** [1] - 51:1<br>**STATES** [1] - 1:1<br>**Statutes** [1] - 1:23<br>**stay** [1] - 15:15<br>**stayed** [2] - 15:14, 15:25<br>**STEPHEN** [1] - 2:2<br>**Steve** [1] - 4:7<br>**still** [3] - 6:15, 35:4, 41:13<br>**stood** [1] - 32:18<br>**storing** [1] - 23:5<br>**street** [18] - 26:9, 32:10, 32:13, 32:21, 40:8, 40:13, 40:19, 41:1, 41:16, 42:12, 42:16, 42:17, 42:19, 42:23, 44:1, 46:2, 47:9, 48:9<br>**Street** [6] - 1:23, 2:3, 2:7, 2:11, 2:15, 2:19<br>**strike** [2] - 38:21, 45:22<br>**stuff** [1] - 41:9<br>**subpoena** [1] - 1:22<br>**substance** [2] - 7:3, 8:1<br>**substantial** [1] - 51:14<br>**subtract** [1] - 25:11<br>**sugars** [1] - 40:5<br>**suicidal** [1] - 39:1<br>**Suite** [3] - 2:7, 2:11, 2:19<br>**supervisor** [6] - 22:16, 22:20, 28:17, 28:19, 28:22, 37:20<br>**supervisors** [1] - 22:15<br>**suppose** [1] - 39:15<br>**supposed** [3] - 11:1, 18:24, 21:7<br>**surrounding** [1] - 41:22<br>**sworn** [2] - 4:3, 51:5<br>**system** [2] - 22:25, 23:4 | **T**<br><br>**taught** [1] - 11:11<br>**Tavis** [1] - 2:16<br>**team** [1] - 10:8<br>**telephone** [2] - 7:18, 7:19<br>**temp** [1] - 11:13<br>**ten** [15] - 13:11, 13:13, 14:17, 15:4, 15:5, 15:12, 15:15, 15:17, 15:18, 15:22, 15:25, 16:16, 17:16, 42:21<br>**tendency** [1] - 51:14<br>**terms** [3] - 11:4, 13:3, 34:19<br>**testified** [2] - 4:4, 4:17<br>**testimony** [2] - 51:5, 51:7<br>**THE** [3] - 1:1, 1:2, 50:6<br>**they've** [1] - 34:22<br>**third** [1] - 26:13<br>**thirty** [2] - 30:6, 30:10<br>**THIS** [1] - 51:16<br>**three** [2] - 39:7, 43:21<br>**title** [1] - 12:8<br>**today** [4] - 6:18, 6:21, 8:5, 14:7<br>**together** [3] - 19:3, 31:8, 34:12<br>**Tomah** [3] - 8:14, 37:7, 37:8<br>**took** [8] - 8:16, 11:25, 16:17, 26:6, 29:13, 29:20, 31:13, 32:8<br>**tool** [1] - 33:10<br>**top** [1] - 48:24<br>**topic** [5] - 36:13, 37:3, 37:9, 37:15, 48:14<br>**training** [3] - 10:9, 10:11, 11:16<br>**transcribed** [1] - 51:6<br>**transport** [6] - 41:7, 41:8, 41:10, 42:16, 42:20<br>**TRAVIS** [1] - 1:17<br>**true** [1] - 51:6<br>**truth** [1] - 51:5<br>**try** [4] - 4:20, 4:23, 5:6, 6:1<br>**trying** [12] - 8:20, 18:19, 19:13, 31:8, 39:17, 41:20, 42:5, 42:6, 42:8, 43:5, 46:7, 47:3<br>**Tuesday** [1] - 8:5<br>**twice** [1] - 39:15<br>**two** [6] - 4:8, 5:1, 5:8, 10:11, 15:6, 15:19 |

**type** [1] - 22:14
**typical** [1] - 13:16
**typically** [4] - 17:10, 38:11, 45:24, 46:15
**typing** [2] - 22:7, 22:10

## U

**under** [3] - 4:4, 40:20, 51:6
**underway** [1] - 15:13
**unit** [2] - 8:16, 10:20
**UNITED** [1] - 1:1
**universal** [1] - 21:14
**unless** [2] - 6:14, 41:7
**unresponsive** [1] - 39:24
**up** [22] - 8:20, 11:15, 11:19, 14:6, 14:15, 15:22, 16:13, 19:21, 21:5, 22:11, 22:14, 23:12, 27:13, 29:9, 29:21, 32:18, 32:20, 35:23, 43:2, 48:15, 49:25, 50:1
**updated** [1] - 10:1
**upset** [1] - 32:19
**USA** [2] - 1:16, 2:15

## V

**VA** [6] - 8:23, 9:1, 9:8, 9:14, 10:2, 11:15
**vans** [1] - 42:19
**varied** [1] - 13:6
**vary** [1] - 13:5
**versus** [2] - 24:12, 42:11
**Veterans** [5] - 8:14, 8:24, 10:13, 10:15, 34:25
**video** [3] - 31:12, 31:14, 31:15
**videos** [2] - 29:3, 31:4
**Vietnam** [1] - 8:12
**vs** [2] - 1:7, 1:15

## W

**wait** [2] - 47:14, 49:5
**waited** [1] - 21:5
**waiting** [3] - 26:24, 27:17, 47:2
**walked** [1] - 14:7
**walking** [2] - 17:13, 44:1
**War** [1] - 8:12

**ward** [2] - 9:16, 10:2
**WARREN** [1] - 1:9
**warren** [1] - 18:10
**Warren** [4] - 2:12, 18:19, 24:20, 35:12
**ways** [1] - 5:2
**week** [1] - 36:20
**WEIL** [17] - 2:2, 3:4, 4:5, 7:1, 7:2, 21:13, 21:17, 22:1, 36:6, 37:12, 42:4, 43:1, 44:13, 44:20, 48:12, 50:1, 50:4
**Weil** [1] - 4:7
**welcome** [1] - 50:6
**Wells** [1] - 2:14
**WESLEY** [1] - 1:17
**Wesley** [1] - 2:16
**WESTERN** [1] - 1:2
**whatnot** [1] - 13:22
**wheeled** [2] - 29:14, 29:24
**WHEREUPON** [1] - 4:1
**whole** [3] - 12:20, 12:25, 51:5
**wide** [2] - 49:2, 49:10
**wife** [1] - 32:7
**windows** [6] - 18:21, 20:14, 20:23, 21:3, 25:16, 31:22
**WISCONSIN** [3] - 1:2, 1:9, 51:1
**Wisconsin** [8] - 1:23, 1:23, 2:7, 2:11, 2:19, 8:14, 51:4, 51:21
**WITNESS** [2] - 50:6, 51:16
**witness** [3] - 1:20, 51:5, 51:7
**Word** [3] - 22:7, 22:9, 22:10
**words** [1] - 43:5
**works** [1] - 23:21
**write** [4] - 7:12, 22:3, 24:15, 24:23
**writing** [3] - 22:2, 36:11, 37:18
**written** [2] - 7:15, 22:5
**wrote** [3] - 33:6, 36:7, 43:21

## Y

**year** [8] - 8:16, 9:9, 11:18, 11:25, 12:17, 12:18, 12:25, 13:1
**years** [9] - 8:15, 8:18, 9:3, 9:5, 11:11,

12:12, 34:25, 38:20, 44:22
**young** [1] - 35:7
**yourself** [1] - 14:20

## Z

**zip** [1] - 48:24
**zip-top** [1] - 48:24
**Zoom** [4] - 2:15, 2:19, 4:9, 7:18