

# KENTUCKIANA
## —— COURT REPORTERS ——

**CASE NO. 20-cv-1123**

**GREGORY BOYER, AS ADMINISTRATOR OF THE ESTATE OF**

**CHRISTINE BOYER, AND ON HIS OWN BEHALF**

**V.**

**ADVANCED CORRECTIONAL HEALTHCARE, INC., ET AL.**

**DEPONENT:**

**JEFFREY SPENCER**

**DATE:**

**October 12, 2023**



✉ schedule@kentuckianareporters.com

☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF WISCONSIN
 2
   ------------------------------------------------------------
 3
   Gregory Boyer, as Administrator
 4 of the Estate of Christine Boyer,
   and on his own behalf,
 5
           Plaintiff,                    Case No. 20-cv-1123
 6
   - vs -
 7
   Advanced Correctional
 8 Healthcare, Inc., et al.
 9         Defendants.

10 ------------------------------------------------------------

11
              *       *       *       *       *       *
12
           VIDEOTAPED DEPOSITION OF JEFFREY SPENCER
13
           TAKEN ON THE 12TH DAY OF OCTOBER, 2023
14
                        12:47 P.M.
15
                   REMOTELY VIA ZOOM
16
              *       *       *       *       *       *
17

18

19
           Taken before Michelle A. Manni, RPR
20

21

22

23

24

25
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 2

APPEARANCES

1
2      STEPHEN WEIL, ESQUIRE, MEGAN PORTER, ESQUIRE, and
3    MARIA MAKAR, ESQUIRE, of the firm of Loevy & Loevy, 311
4    North Aberdeen Street, Third Floor, Chicago, Illinois
5    60607, appeared remotely via Zoom on behalf of the
6    Plaintiff.
7
8      DOUGLAS S. KNOTT, ESQUIRE, and DANIEL A. KAFKA,
9    ESQUIRE, of the firm of Lieb Knott Gaynor, LLC, 219 North
10   Milwaukee Street, Suite 710, Milwaukee, Wisconsin 53202,
11   appeared remotely via Zoom on behalf of the Defendants
12   Advanced Correctional Healthcare, Inc., Amber Fennigkoh,
13   and Lisa Pisney.
14
15     ANDREW A. JONES, ESQUIRE, of the firm of Hansen
16   Reynolds, LLC, 301 North Broadway Street, Suite 400,
17   Milwaukee, Wisconsin 53202, appeared remotely via Zoom
18   on behalf of the Defendants Monroe County, Wisconsin,
19   Stan Hendrickson, Danielle Warren, Shasta Parker, and
20   Jeffrey Spencer.
21
22     MARK W. HARDY, ESQUIRE, and JOHN B. CASSERLY,
23   ESQUIRE, of the firm of Geraghty, O'Loughlin & Kenney,
24   Wells Fargo Place, 30 Seventh Street, Suite 2750, St.
25   Paul, Minnesota 55101, appeared remotely via Zoom on

Page 3

1    behalf of the Defendants USA Medical & Psychological
2    Staffing, S.C., Norman Johnson, Travis Schamber, Wesley
3    Harmston, and Jillian Bresnahan.
4
5      ALSO PRESENT REMOTELY:
6      Sheila Jones, videographer
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                        INDEX
2    EXAMINATION                                        PAGE
3    OF JEFFREY SPENCER
4    By Ms. Porter.....................................9
5    By Mr. Knott.....................................82
6    By Ms. Porter....................................83
7
8                      OBJECTIONS
9    PAGE        LINE
10    15          23
11    17          10
12    17          25
13    19          18
14    20          4
15    20          20
16    22          7
17    23          25
18    24          15
19    25          20
20    27          11
21    28          4
22    31          18
23    40          16
24    40          25
25    41          22

5

Page 5

1    50          10
2    54          12
3    56          21
4    58          23
5    59          8
6    63          22
7    64          25
8    66          18
9    67          21
10    69          7
11    69          19
12    71          12
13    72          10
14    75          21
15    76          6
16    77          11
17    77          20
18    78          20
19    79          12
20    81          4
21    83          20
22    84          8
23    84          13
24    84          19
25    85          17

6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**Page 6**

1    85          17
2
3            EXHIBITS PREVIOUSLY MARKED FOR IDENTIFICATION
4    Exhibit 47........................................7
         [Handwritten Notes]
5
     Exhibit 48........................................7
6         [Text Messages]
7    Exhibit 49........................................7
         [Supplemental Report By Jeffrey Spencer]
8
9
             EXHIBITS MARKED FOR IDENTIFICATION
10
     Exhibit 51.......................................43
11        [Email Chain]
12   Exhibit 52.......................................47
         [Email]
13
     Exhibit 53.......................................60
14        [Email Chain]
15
     (Exhibit Nos. 51 - 53 were attached to the original
16   transcript; copies to transcript copies.)
17
18
19
20
21
22
23
24
25

**Page 7**

1              PROCEEDINGS
2       (Exhibit 47 [Handwritten Notes], Exhibit 48
3    [Text Messages], Exhibit 49 [Supplemental Report By
4    Jeffrey Spencer] was previously marked for
5    identification.)
6       THE VIDEOGRAPHER:  We are now on the record.  My
7    name is Sheila Jones.  I'm the online video
8    technician, and Michelle Manni is the court reporter.
9    We represent Kentuckiana Court Reporters located at
10   730 West Main Street, Suite 11, Louisville, Kentucky.
11      Today is the 12th day of October 2023.  The time
12   12:47 p.m. Central time.  We are convened by
13   videoconference to take the deposition of Jeffrey
14   Spencer in the matter of Greg Boyer as administrator
15   of the estate of Christine Boyer, and on his own
16   behalf, vs. Advanced Correctional Healthcare, Inc.,
17   et al., pending in the United States District for the
18   Western District of Wisconsin, Case No. 20-cv-1123.
19      Will everyone, except for the witness, please
20   state your appearance, how you're attending, and the
21   location you are attending from, starting with
22   plaintiff's counsel.
23      MS. PORTER:  Megan Porter for the plaintiff,
24   appearing via Zoom from Chicago, Illinois.
25      MR. WEIL:  Stephen Weil appearing via Zoom from

**Page 8**

1    Chicago, Illinois.
2       MS. JONES:  Andrew Jones on behalf of defendants
3    Monroe County, Shasta Moga, Danielle Warren, and
4    Monroe County, Stan Hendrickson, appearing by Zoom
5    from Sparta, Wisconsin.
6       MR. KNOTT:  Doug Knott and Daniel Kafka appear
7    for Advanced Correctional Healthcare, Defendant
8    Fennigkoh, and Pisney, from Milwaukee, Wisconsin.
9       MR. HARDY:  Mark Hardy appearing on behalf USA
10   Medical & Psychological Staffing, S.C., Defendants
11   Johnson, Schamber, Harmston, and Bresnahan by Zoom
12   from Minneapolis.
13      THE VIDEOGRAPHER:  Thank you.
14      Will the witness state your full name for the
15   record.
16      THE WITNESS:  Jeffrey Spencer.
17      THE VIDEOGRAPHER:  Thank you.
18      And the parties agreed that you will stipulate
19   to the identify of Mr. Spencer today.  Everyone in
20   agreement?
21      MR. JONES:  Yes.
22      MS. PORTER:  Yes.
23      MR. KNOTT:  Yes.
24      MR. HARDY:  Yes.
25      THE VIDEOGRAPHER:  Thank you.

**Page 9**

1       Mr. Spencer, will you raise your right hand for
2    the court reporter.
3       (The deponent was duly sworn by the court
4    reporter.)
5       MS. PORTER:  Is everybody all ready to proceed?
6       THE VIDEOGRAPHER:  Yes, ma'am.
7       MR. JONES:  I think so, yes.
8       MS. PORTER:  Okay.  I wanted to check.
9       MR. JONES:  Megan -- Megan, before you do begin,
10   can we have an agreement, as we had in the last
11   deposition, that an objection by one attorney for his
12   clients is an objection for all defendants?
13      MS. PORTER:  Yes.  That's fine.
14      MR. JONES:  Thank you.
15      MS. PORTER:  Great.
16             JEFFREY SPENCER,
17   having been first duly sworn, was examined and testified
18   as follows:
19             EXAMINATION
20   BY MS. PORTER:
21      Q.   Starting out, what is your rank, Mr. Spencer?
22   Is it captain or lieutenant?  I want to make sure I get it
23   right first.
24      A.   Captain.
25      Q.   All right.  So, Captain Spencer, my name is



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1 Megan Porter. I am one of the plaintiff's counsel in this
2 case. Have you ever been deposed in another case before?
3    A. No.
4    Q. Okay. So first, I'm going to lay out some
5 protocols for you, just some ground rules to help you
6 understand how depositions work. I'm going to be asking
7 you questions. You are going to be giving answers under
8 oath, just like if you were in a courtroom with a judge
9 and jury.
10       It can be a little bit strange because we're on
11 Zoom, so the conversation can feel a little bit informal,
12 but the answers that you give here in the deposition have
13 the same force as if you were giving them in a courtroom
14 before a judge.
15       The court reporter, who is present today, is
16 going to be recording our conversation, as well as the
17 videographer who is our filming the conversation. Because
18 we are on Zoom and sometimes there can be a lag or a delay
19 in the video feed on either end, all I ask for you, for
20 the sake of the court reporter while they're transcribing,
21 is that you wait until I'm done asking a question until
22 you start your answer. It just helps the court reporter
23 make sure that they can transcribe everything correctly.
24       If you don't understand a question that I ask,
25 please tell me. I'm happy to repeat myself. I'm happy to

1 clarify. I'm happy to rephrase, if that's what you need.
2 But if you do respond to my questions, I'm going to
3 presume that you understood it.
4       You know, please give verbal answers when
5 responding rather than nodding your head or shaking your
6 head. Please try to give verbal answers that are at least
7 a word rather than ums or um-hmms, because it can be a
8 little difficult for that to be transcribed on screen for
9 the court reporter.
10       It also feels a little bit strange, but during
11 the course of our conversation, while you're testifying,
12 your lawyer will be periodically objecting to questions
13 that I ask you. And you still continue to respond to my
14 question, even if there's an objection, unless your lawyer
15 asks you or directs you not to respond. Do you understand
16 the rules that I laid out thus far?
17    A. Yes.
18    Q. Great. You can take a break at any time, as
19 long as there isn't a question pending. All you got to do
20 is ask me. Do you have any questions to any of the rules
21 I laid out?
22    A. No.
23    Q. Okay. First of all, are you -- remind me, where
24 are you currently located?
25    A. Sparta, Wisconsin.

1    Q. Great. And are you currently alone in the room
2 that you're in, or are you with anybody else?
3    A. Just Attorney Jones.
4    Q. Okay. Great. And do you have any documents
5 laid out in front of you?
6    A. No.
7    Q. Great. And Attorney Jones, is that your
8 counsel? Are you being represented by Attorney Jones?
9      MR. JONES: He is.
10 BY MS. PORTER:
11    Q. Great. Okay. So first, I want to spend a
12 little bit of talking about how you prepared for your
13 deposition. So without revealing the substance of your
14 conversations with your counsel, did you meet with your
15 attorneys before today's conver- -- before today's
16 deposition?
17    A. Yes.
18    Q. Okay. Who did you meet with?
19    A. Attorney Jones.
20    Q. Great. And how many times did you meet?
21    A. We spoke over the phone, I think, twice.
22    Q. And about how long were each of those
23 meetings?
24    A. First one was relatively short, less than half
25 an hour. The other one, a little more than an hour.

1    Q. Okay. And was Attorney Jones the only other
2 person present at those meetings?
3    A. Yes.
4    Q. Great. And did you review any documents to
5 prepare for today's deposition?
6    A. Yes.
7    Q. What did you review?
8    A. A report that I completed, some medical
9 documents, and some photos that I took.
10    Q. Okay. Do you remember the medical documents
11 that you reviewed? What were those?
12    A. There's some from Gundersen and then a single
13 page from UW-Madison from an autopsy report.
14    Q. Okay. Great. And then the photos that you
15 reviewed, what were those?
16    A. The photos that I took during my investigation.
17    Q. Okay. And photos of what?
18    A. The cell that Ms. Boyer had been in prior to her
19 death.
20    Q. Okay. And -- okay. Did you look at any
21 transcripts of testimony from any deposition in this case?
22    A. No.
23    Q. Okay. And the documents that you reviewed, how
24 did you receive those? How did they come into your
25 possession?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1    A.   I've had them since the investigation.
2    Q.   Okay.  Did you search for those documents and
3  review them yourself, or were you sent those documents by,
4  say, your attorney?
5    A.   Can you ask that again?
6    Q.   Yeah.  Absolutely.  Did you, on your own, select
7  the documents that you reviewed, you know, go search for
8  the documents, select them, review them yourself; or were
9  you sent specific documents from your attorney?
10    A.   They were documents that I had, that I sent to
11  him, that, my understanding, he sent them.
12    Q.   Okay.  And so just for my clarification, you
13  sent the documents that you reviewed to him.  He did not
14  sent to you any documents to review?
15    A.   Correct.
16    Q.   Okay.  Thank you.  Okay.  Beyond your attorney,
17  did you speak with anybody else to prepare for your
18  deposition today?
19    A.   No.
20    Q.   Okay.  And did you know Christine Boyer before
21  you became involved in this case?
22    A.   No.
23    Q.   Did you know Greg Boyer?
24    A.   No.
25    Q.   Okay.  So first, I want to talk a little bit

Page 15

1  about your background.  What is your education?
2    A.   I have a bachelor's degree.
3    Q.   Okay.  In what?
4    A.   Criminal justice.
5    Q.   Okay.  And what did that degree entail, what
6  kind of course of study?
7    A.   It was a bachelor's degree from Winona State
8  University in Minnesota.  It entailed four years of
9  college-level classes, a mix of general education, as well
10  as specific to criminal justice, law enforcement.
11    Q.   Okay.  Do you have any certifications or
12  training?
13    A.   Continued training from being on the job.  Some
14  specifically, I guess, right out of college, would have
15  been the law enforcement academy for the State of
16  Wisconsin certification.
17    Q.   Okay.  I'm sorry I interrupted you.
18    A.   No.  That's fine.  If you had further -- and,
19  again, just continuing education from the job.
20    Q.   Okay.  What -- I'm sorry I interrupted you
21  again.  What -- what topics did the certifications in
22  continuing education cover?
23         MR. JONES:  Objection to form.
24         You can go ahead and answer, if you can.
25         THE WITNESS:  A wide range of things from -- I

Page 16

1  mean, I'm not going to be able to list all of them
2  off the top of my head.  I need at least 24 hours
3  every single year of ongoing training for the
4  position.  And it's ranged -- everything from
5  firearms, emergency vehicle operations, law,
6  instructor development, investigations, a wide, wide
7  range of investigations --
8    Q.   Okay.  And I apologize.  I think there's a lag
9  on my screen.  You can finish your response.
10    A.   Yeah -- as well as number of management courses
11  that I've attended.
12    Q.   Okay.  And what is your current employment?
13    A.   I'm a captain with the Monroe County Sheriff's
14  Office in Wisconsin.
15    Q.   Okay.  Have you held other positions with Monroe
16  County in the past?
17    A.   No.
18    Q.   No?  Okay.  When were you hired as a captain?
19    A.   I'm sorry.  I think -- can you repeat your last
20  question?  I may have answered that wrong.
21    Q.   That's okay.  When were you hired by Monroe
22  County?
23    A.   Two thousand -- January of 2008.  And I've held
24  a number of positions within Monroe County since then.
25    Q.   Okay.  Can you just quickly walk me through what

Page 17

1  those positions were?
2    A.   I started as a patrol deputy for about two and a
3  half years.  I then became an investigator for another
4  number of years.  I then was promoted to lieutenant and
5  then promoted -- or my position title changed from
6  lieutenant to captain.
7    Q.   Okay.  And in the course of your employment with
8  Monroe County, have you ever had any civilian complaints
9  filed against you?
10         MR. JONES:  Objection to form.
11         Go ahead.
12         THE WITNESS:  Yes.
13  BY MS. PORTER:
14    Q.   Okay.  What were those?
15    A.   The one that I can think of off the top of my
16  head was a driving complaint.  A local business -- I drove
17  through their parking lot responding to a call when they
18  were open, didn't realize they were open.  They complained
19  that I drove through the parking lot is lights and sirens.
20    Q.   Okay.  What was the disposition of that
21  complaint?
22    A.   Just a verbal counseling.
23    Q.   Okay.  And did you have any other civilian
24  complaints during your time with Monroe County?
25         MR. JONES:  Objection to form.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1    Go ahead.
2    THE WITNESS: Not that I recall.
3    BY MS. PORTER:
4    Q.  Okay.  Great.  So you listed a couple of
5    different positions, including investigator --
6    investigator, lieutenant, and captain.  Did any of
7    those -- well, actually, scratch that.
8    What were your responsibilities as an
9    investigator for Monroe County?
10    A.  Investigated -- usually, followed up complaints
11    that our deputies on the road initially would take.  It
12    was general investigations, so a mix of number of crimes,
13    yeah, just more in-depth than what our patrol deputies do.
14    Q.  Okay.  And what -- what dates were you an
15    investigator for Monroe County?
16    A.  I don't have them in front of me.  It would have
17    been the end of -- end of 2010 until the latter part of
18    2017, '16 or '17.
19    Q.  Okay.  And what position were you in at the time
20    of Christine Boyer's incident?
21    A.  I would have been a lieutenant at that time.
22    Q.  Okay.  And what were your responsibilities as
23    lieutenant?
24    A.  I oversaw the investigative bureau, the other
25    investigators within that.  I would respond to assist in

Page 19

1    cases.  I would assign cases to the investigators.  There
2    are a number of other administrative-type duties that --
3    that I would do as well during that time, reviewing open
4    records, coordinating training.
5    Q.  Okay.  How long have you been doing
6    investigation work?
7    A.  Since January of 2008, when I started at the
8    sheriff's office, our deputies do investigations.  So I
9    wasn't specifically an investigator, but I've been
10    investigative work since I started working here.
11    Q.  So -- and you said 2008.  Am I correct?
12    A.  Correct.
13    Q.  Okay.  So you have been doing investigations for
14    approximately 15 years; is that correct?
15    A.  Yes.  Yes.
16    Q.  And what is your -- can you walk me through,
17    like, what your standard approach to an investigation is?
18    MR. JONES:  Objection to form.
19    You can answer.
20    THE WITNESS:  Depends on the type of
21    investigation.
22    BY MS. PORTER:
23    Q.  Okay.  But for investigation, you know, just
24    generally, there are, typically -- I would imagine between
25    different investigations, there's common steps that

Page 20

1    typically take in order to initiate investigations?  What
2    were some of the -- what does that look like?  How do you
3    initiate an investigation?
4    MR. JONES:  Objection to form.
5    THE WITNESS:  I mean, the first step -- thing
6    would be receiving the complaint either by somebody
7    reporting it or observing some violation of law.
8    Some of the basic steps then are interviewing victims
9    and witnesses, interviewing suspects --
10    MS. PORTER:  Okay.
11    THE WITNESS:  -- collecting evidence --
12    MS. PORTER:  Okay.
13    THE WITNESS:  -- preparing reports.
14    BY MS. PORTER:
15    Q.  Okay.  During your time with Monroe County, have
16    you ever reviewed or seen any written policies governing
17    investigations?
18    A.  Yes.
19    Q.  Okay.  What do those policies say?
20    MR. JONES:  Objection to form.
21    Go ahead.
22    THE WITNESS:  I won't be able to say verbatim
23    what any of them say, especially over the time I've
24    worked here.  I mean, policies change over time as
25    well, so I -- I don't believe I can accurately answer

Page 21

1    what the policies themselves say.
2    BY MS. PORTER:
3    Q.  Okay.  Are -- have you received any training on
4    investigations while you've been employed by Monroe
5    County?
6    A.  Yes.
7    Q.  Okay.  What training have you received?
8    A.  Again, I mean, this is not going to be all
9    inclusive, because I've received hundreds, if not
10    thousands of hours in training, investigations, specific
11    courses in investigating deaths.  I have taken specific
12    courses in computer crimes, investigating those.  I've
13    taken specific courses investigating domestic violence.
14    Q.  Okay.  So you said earlier that when -- some
15    general things that you do when you begin an investigation
16    are, you know, interviewing victims, interviewing
17    witnesses, collecting evidence, preparing reports.  How
18    would you decide what evidence to look at in an
19    investigation?
20    A.  I guess I look at any evidence that's collected.
21    And I mean, depending on what's located, what's --
22    what's -- you look at all the evidence in cases, I guess,
23    that I'm presented with and then decide on the value for
24    that particular case.
25    Q.  Okay.  So for example, if you are conducting an

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1 investigation into an incident that occurred at the Monroe
2 County Jail, how do you decide what evidence to look at?
3     A.   I look at the evidence that I believe exists or
4 is available.
5     Q.   Okay.  And how do you acquire or access that
6 evidence?
7         MR. JONES:  Objection to form.
8         Go ahead.
9         THE WITNESS:  It depends on the evidence.
10 BY MS. PORTER:
11     Q.   It depends on the evidence.  Okay.  What are
12 some of the ways that you acquire evidence?
13     A.   Having somebody (inaudible).
14         THE COURT REPORTER:  I'm sorry.  He's breaking
15  up.
16         THE WITNESS:  It depends on the type of
17  evidence.
18 BY MS. PORTER:
19     Q.   Okay.  Do you -- are you ever sent evidence by
20 other members of Monroe County or the sheriff's
21 department?
22     A.   Yes.
23     Q.   Do you collect your own evidence?
24     A.   Yes.
25     Q.   Do you seek out and identify evidence that you

Page 23

1 think might be relevant in an investigation?
2     A.   Yes.
3     Q.   Okay.  How do you decide who to talk to in an
4 investigation?
5     A.   It depends on their involvement.  I mean, I seek
6 out potential witnesses.  And depending on where the
7 investigation leads, I decide on who might need to be
8 talked to.
9     Q.   Okay.  And you said you decide who might need to
10 be talked to.  Do you identify witnesses by speaking with
11 folks who were involved in a specific incident?
12     A.   Can you -- can you say that again?
13     Q.   Yeah.  Absolutely.  Do you ever identify
14 witnesses in an investigation by, say, speaking to other
15 folks who were involved in the incident?
16     A.   Yes.
17     Q.   Do you identify witnesses based off of
18 collecting and reviewing evidence?
19     A.   Yes.
20     Q.   Okay.  So correct me if I'm wrong, but my
21 understanding is that it seems like you, for an
22 investigation -- well, actually, scratch that.
23         For an investigation, do you try to start broad
24 with what you look at and who you speak to?
25         MR. JONES:  Objection to form.

Page 24

1         Go ahead.
2         THE WITNESS:  Yes.
3 BY MS. PORTER:
4     Q.   I'm sorry.  I didn't hear that.
5     A.   Yes.  I would -- I generally start broad and
6 then, depending on where that leads, narrow the scope from
7 there.
8     Q.   Okay.  Okay.  I understand that.  So start
9 broad, narrow the scope.  So would it be accurate to say
10 that you start from a full universe of relevant evidence
11 and witnesses, and you narrow as your investigation goes?
12     A.   Generally, yes.
13     Q.   Okay.  And when you're reviewing investigations,
14 what is your general goal for an investigation?
15         MR. JONES:  Objection to form.
16         Go ahead.
17         THE WITNESS:  To find out what occurred and to
18  find out if any laws -- if any laws were violated.
19 BY MS. PORTER:
20     Q.   Okay.  To find out what occurred and to find out
21 if any laws were violated.  Okay.  When you say "to find
22 out if any laws are violated," what laws are you referring
23 to?
24     A.   The laws of the State of Wisconsin, generally,
25 criminal laws of the State of Wisconsin.

Page 25

1     Q.   Okay.  Do you -- do you try to be thorough in
2 your investigations?
3     A.   Yes.
4     Q.   Okay.  And what does it mean for you to be
5 thorough in an investigation?
6     A.   To gather enough evidence to reasonably
7 understand what occurred.
8     Q.   Okay.  Great.  Okay.  So as I understand it, you
9 have been working investigations for quite some time, so
10 for about 15 years.  And you can correct anything I'm
11 repeating back to you is wrong.  You've been working about
12 15 years.  You've done many different hours of training on
13 how to do different investigations.
14         And it seems as though, when you're doing
15 investigation work, you're trying to ensure that your
16 approach to the investigation is as thorough as possible,
17 be able to find out what occurred, and then figure out if
18 any criminal laws have been violated?  Does that sound
19 correct?
20         MR. JONES:  Objection to form.
21         Go ahead.
22         THE WITNESS:  Yes.
23 BY MS. PORTER:
24     Q.   Okay.  When did you first hear about the --
25 about the incident related to Christine Boyer's death?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1    A.   I don't recall the exact date right now, but I
2  know it was while she was in the hospital after her
3  emergency.
4    Q.   Okay.  Okay.  So it was while she was in the
5  hospital.  Can you kind of just, you know, walk me
6  through, from the beginning, what you recall about when
7  you first heard about the incident related to her death,
8  that -- up through, you know, the beginning of your
9  investigation?
10   A.   I have very little direct recollection of -- of
11 the conversations I had, the things that I did.  Most of
12 my recollection comes from the report that I completed.
13   Q.   Okay.  Do you -- without looking at the report,
14 do you recall anything about how you became involved in
15 Christine Boyer's case?
16   A.   I recall, from reviewing my report, that
17 Lieutenant Hallman had reached out to me to let me know
18 that there had been this incident.
19   Q.   Okay.  Lieutenant Hallman reached out to you to
20 let you know that there had been an incident.  What did
21 Lieutenant Hallman tell you had occurred?
22   A.   As I remember, again, from reviewing my report,
23 not directly from the conversation that we had three years
24 ago, was that there was a female inmate who had a medical
25 issue, CPR had been done, and she had been taken by

Page 27

1  ambulance and then -- then flighted to a hospital.
2    Q.   Okay.  And at the time you and Lieutenant
3  Hallman had -- actually, you know, to back up for a
4  second, you know, at this point I -- I understand that you
5  do not have the report in front of you, and I understand
6  you previously reviewed the report.  But what I would like
7  to know right now is, what is your independent
8  recollection of these events?  So what do you remember,
9  sitting here today, about what you spoke to Lieutenant
10 Hallman about?
11      MR. JONES:  Objection to form.
12      I mean, as I understand it she's asking you to
13   distinguish your independent recollection from what
14   you may know from having reviewed the report.  And if
15   you can do that, go ahead.
16      THE WITNESS:  I don't have an independent
17   recollection of that conversation with him.
18 BY MS. PORTER:
19   Q.   Okay.  Do you have an independent recollection
20 of anything related to Christine Boyer's case, generally?
21   A.   Generally, no.
22   Q.   Okay.  Do you have independent recollection of
23 anything related to just the Boyer case at all?
24   A.   I have -- I can remember independently being in
25 Lieutenant Hendrickson's office, talking to Greg Boyer at

Page 28

1  some point during the investigation.
2    Q.   Okay.  So you recall a conversation with
3  Hendrickson and Greg Boyer.  When did that occur?
4      MR. JONES:  Objection to form.
5      You can answer.
6      THE WITNESS:  During the investigation, it
7   occurred.  And I don't remember the conversation
8   itself.  I just independently remember being in his
9   office for that conversation.
10 BY MS. PORTER:
11   Q.   Okay.  Was Greg Boyer in that office as well?
12   A.   He was not.  It was a phone call.
13   Q.   Okay.  It was a phone call between you,
14 Hendrickson, and Greg Boyer; is that right?
15   A.   Correct.  Hendrickson and I were both in the
16 room together.  Mr. Boyer, I mean, we had him on speaker
17 phone so we could both talk to him.
18   Q.   Okay.  Were you speaking to him before
19 Christine's death or after Christine's death?
20   A.   I don't independently recall.
21   Q.   Okay.  What was the purpose of your phone call
22 with Greg Boyer?
23   A.   I don't have an independent recollection of
24 that.
25   Q.   Do you remember anything said -- Hendrickson

Page 29

1  said to Greg Boyer?
2    A.   I do not.
3    Q.   Do you remember anything that you said to Greg
4  Boyer?
5    A.   I do not.
6    Q.   Do you remember anything that Greg Boyer said to
7  you both?
8    A.   Again, no, not independently.
9    Q.   Okay.  So you remember the phone call, but you
10 don't remember the purpose of the phone call?
11   A.   Not independently.
12      MS. PORTER:  Okay.  Why don't we -- let's take a
13   break for five minutes, and let's, say, come back
14   at -- I think we're all hopefully Central Time, but
15   1:26, it looks like, around about that time.
16      MR. JONES:  Okay.
17      MS. PORTER:  Great.
18      THE VIDEOGRAPHER:  Okay.  The time is 1:21 p.m.
19   We're going off the record.
20      (Pause in the proceedings.)
21      THE VIDEOGRAPHER:  We're back on the record for
22   the deposition of Jeff Spencer being conducted by
23   videoconference.  My name is Sheila Jones.  Today
24   October 12th, 2023.  The time is 1:28 p.m.  You may
25   proceed.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1 BY MS. PORTER:
2    Q.   Okay.  Captain Spencer, based on your own
3 recollection, what was the purpose of your investigation
4 into the circumstances surrounding Christine Boyer's
5 death?
6    A.   It was a criminal investigation, so to make sure
7 that there wasn't something criminal related to her death.
8    Q.   Okay.  So when you say "there wasn't criminal
9 related to your death" -- "her death," what do you mean?
10    A.   That it wasn't a homicide or something like
11 that.
12    Q.   Okay.  So it was -- actually, strike that.
13         And based on your own independent recollection,
14 how did your investigation get initiated?  How did it
15 start?
16    A.   I -- I don't have that independent recollection.
17    Q.   Okay.  And based on your own independent
18 recollection, how -- how would you determine if something
19 criminal had occurred resulting in her death?
20    A.   Can you ask that again or in a different way?
21    Q.   Yeah.  You said the purpose of the information
22 was a criminal investigation to determine if there were
23 any criminal acts involved in Christine Boyer's death.
24 How do you go about determining if there were any criminal
25 acts involved in her death?

Page 31

1    A.   By looking at the evidence surrounding how and
2 why she died.
3    Q.   Okay.  What evidence?
4    A.   Witness statements, videos, autopsy reports are
5 all things I take into consideration just to determine
6 what happened.
7    Q.   Okay.  You mention autopsy reports.  Did you
8 take into account medical records?
9    A.   Yes.
10    Q.   Okay.  What does -- what would be the purpose of
11 reviewing medical records in this investigation?
12    A.   Helping to determine, again, why she died,
13 because -- yeah.
14    Q.   Okay.  Were you trying to identify any medical
15 errors that -- were you looking for any medical errors in
16 her death?
17    A.   No.
18         MR. JONES:  Objection to form.
19 BY MS. PORTER:
20    Q.   I'm sorry.  You can repeat your answer?
21    A.   No.
22    Q.   No.  Okay.  So first -- let's see.  The first
23 thing that I want to do is -- oh, actually, strike that.
24         Going back to the last question, you said no,
25 you were not trying to identify medical errors involved in

Page 32

1 her -- strike that.
2         You said you were not trying to identify any
3 medical errors in her death.  Why?
4    A.   Because, generally, medical errors aren't a
5 criminal act.
6    Q.   Medical errors aren't, typically, a criminal
7 act.  Okay.  So what I want to do first is, I'm going to
8 share my screen.  I believe this is previously entered as
9 Exhibit 49.  This should be -- okay -- Exhibit 49.  Are
10 you seeing the incident report on the screen?
11    A.   Yes.
12    Q.   Okay.  And do you recognize this document?
13    A.   Yes.
14    Q.   Okay.  And what is it?
15    A.   I mean, from the first page there, it appears to
16 be my report that I completed related to this case.
17    Q.   Okay.  And so you said the report that you
18 completed related to this case.  Did you author this
19 document?
20    A.   Yes.
21    Q.   Okay.  And if you look at this highlight, this
22 portion I'm highlighting right now at the top, it says,
23 for the record, "On December 23rd, 2019, I was advised by
24 Lieutenant Hallman a female subject, identified as
25 Christine Boyer, who had been hospitalized out of the jail

Page 33

1 during the early mourning hours."
2         Is December 23rd, 2019, your earliest
3 involvement with the incident at issue in this case?
4    A.   Yes.
5    Q.   Okay.  And then continuing on, it says, "I was
6 advised that Christine possibly had a heart attack and may
7 not survive.  Lieutenant Hallman advised Christine had
8 been in booking cell on medical watch and that cell had
9 since been locked down."  Does that encompass the full
10 scope of your conversation with Lieutenant Hallman on
11 December 23d, 2019?
12    A.   I can't say that it was the full scope of that
13 conversation, being that I can't remember the
14 conversation.  But from the report there, that appears to
15 be the important parts of the conversation.
16    Q.   Okay.
17         MR. JONES:  If you -- it's too small for me to
18 see on the screen.  If you need her to zoom in at any
19 point, you're welcome to ask her to do that.
20 BY MS. PORTER:
21    Q.   Do you need me to zoom in, Captain Spencer?
22    A.   I can see it.
23    Q.   Okay.
24         MR. JONES:  He's younger than me.
25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1 BY MS. PORTER:
2     Q.  Okay.  So continuing on, it says, "I advised
3 Lieutenant Hallman that we would keep it locked down until
4 further information was gathered as to how we would be
5 proceeding with the investigation."
6         So when you said "keep it locked down," what did
7 you mean?
8     A.  That we would keep the cell that she had been in
9 locked, secured, that we wouldn't -- that jail staff
10 shouldn't clean it out and let other people stay in there.
11     Q.  Okay.  And why would you do that for an
12 investigation?
13     A.  I mean, at that point, because she hadn't -- she
14 was still alive at that point, we weren't sure that there
15 was going to be an investigation.  Generally, we would do
16 that to preserve the scene, which was our attempt there.
17     Q.  Okay.  So the purpose of locking down the cell
18 was to preserve the scene; is that right?
19     A.  Correct.
20     Q.  Okay.  And then continuing on, it says, "On
21 December 26, 2019, I was advised that Christine was still
22 on life support but expected to be removed from life
23 support later that day."  Who advised you that she was on
24 life support?
25     A.  I don't recall.

Page 35

1     Q.  Okay.  And continuing on, it says, "I spoke with
2 Sheriff Revels, and we agreed that I would complete an
3 investigation."  What did you remember about your
4 conversation with Sheriff Revels?
5     A.  That Sheriff Revels -- and independently, I
6 don't recall the conversation.  I mean, from the report
7 there, just that it -- that an investigation would have
8 needed to be completed, so I was assigned to do so.
9     Q.  Okay.  And who assigned you to complete an
10 investigation?
11     A.  I guess it was agreement between Sheriff Revels
12 and I.
13     Q.  Okay.  And how would an investigation at Monroe
14 County typically be started?  Would it just be the verbal
15 conversation with the sheriff?  Would it be in writing
16 somewhere?  How did it actually -- how did it get started?
17     A.  An investigation like this, I mean, under these
18 circumstances, generally, it would -- he would just tell
19 me an investigation would need to be completed.  We would
20 talk about who would do it, whether it be me or one of my
21 investigators.  That sort of thing is generally how it
22 would happen.
23     Q.  Okay.  And do you remember where this
24 conversation occurred?
25     A.  I do not.

Page 36

1     Q.  Okay.  And what was the purpose?  Did you -- did
2 you and the sheriff discuss a purpose for the
3 investigation during this conversation?
4     A.  I -- I can't recall.
5     Q.  Did the sheriff give you any sort of scope for
6 the investigation?
7     A.  I can't independently recall.
8     Q.  Okay.  Can you recall based off of your review
9 of your report?
10     A.  Yeah.  It would have been agreed upon that it
11 was a criminal investigation, what is -- is what I would
12 be completing as opposed to an internal investigation or
13 something else.
14     Q.  Okay.  What is the difference between a criminal
15 investigation versus an internal investigation?
16     A.  An internal investigation would be an
17 investigation to find out if any policy, procedure, that
18 sort of thing was violated as opposed to, again, a matter
19 of criminal law.
20     Q.  Okay.  And now based on your review of your
21 report in preparation for this deposition, do you recall
22 receiving any instructions from the sheriff on what
23 evidence to look at?
24     A.  I don't believe I received instruction from him
25 on what evidence I needed to look at.

Page 37

1     Q.  Did you receive any suggestions from him on what
2 evidence to look at?
3     A.  I don't believe so.
4     Q.  Okay.  Did you receive any instruction or
5 suggestion on what witnesses to talk to?
6     A.  I don't believe so.
7     Q.  Okay.  Did you receive any instruction or
8 suggestion to look at medical records?
9     A.  From Sheriff Revels?
10     Q.  Um-hmm.  Yes.
11     A.  No.
12     Q.  Okay.  Did you -- actually, strike that.  Let me
13 see.
14         Did the sheriff place any limitations on your
15 investigation?
16     A.  No.  I don't believe so.
17     Q.  Did you have any conversations with anyone in
18 Monroe County, in the sheriff's department, that placed
19 limitations on your investigation?
20     A.  Not that I recall.
21     Q.  Did you have any conversations with anybody in
22 Monroe County Sheriff's Department that place any
23 limitations on your investigation?
24     A.  Sorry.  I think the last two questions, in my
25 head, they sounded the same.  But what was --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1    Q.   That's okay.  The distinction is, the first one,
2  I was asking you if the sheriff gave you any limitations.
3  The second one, I'm asking if anybody gave you or
4  suggested limitations on your investigation?
5    A.   No.  Not that I recall.
6    Q.   Okay.  Let's see.  And then -- so at this point,
7  where you have spoken with the sheriff and agreed that you
8  would complete an investigation, what would be your next
9  step from there?
10    A.   From what I recall, I gathered documentation
11  from Lieutenant Hendrickson, being his -- Christine's jail
12  file, that sort of thing.  That, I believe, was my first
13  step, was gathering that information that they had.
14    Q.   Okay.  And it says you collected her jail file
15  and other paperwork.  What was in her jail file?
16    A.   Booking information.  Again, I couldn't tell you
17  completely what was in that jail file right now.
18    Q.   What do you -- I apologize for interrupting.
19         What do you recall was in the jail file?
20    A.   Her booking, like, face sheet.  They have some
21  other, like, booking documents that they -- are in there.
22  Exactly what those are, I don't recall or know.  Yeah.  I
23  don't recall all of the documents that were in there.
24  That booking sheet with her basic demographic information,
25  that sort of thing, is what I recall off the top of my

Page 39

1  head right now.
2    Q.   Okay.  Did you review -- were there any medical
3  records in her jail file?
4    A.   I don't recall.
5    Q.   Okay.  All right.  And it also references other
6  paperwork concerning the incident.  What does "other
7  paperwork" mean?
8    A.   The way I have that sentence structured, I mean,
9  I can't say for sure what the other paperwork would have
10  been.  I mean, paperwork that Lieutenant Hendrickson had
11  that may not have been jail file paperwork or may have
12  been and it was just poorly worded sentence.  I can't say
13  for sure.
14    Q.   Did you review any medical records?
15    A.   At some point I know I -- I did.
16    Q.   Did you receive any medical records from
17  Lieutenant Hendrickson?
18    A.   I don't recall if he gave me those or I got them
19  from another source.
20    Q.   Okay.  And so this latter portion, it says, "I
21  also reviewed reports of Jail Sergeant Danielle Warren,
22  Corrections Officer Lucas Runice, Corrections Officer Jeff
23  Schwanz, Corrections Officer Kyle Moga, Patrol Sergeant
24  Fritz Degner, and Deputy Alex Maas."
25         Are those all of the incident reports that you

Page 40

1  reviewed for your investigation?
2    A.   Yes.  I believe so.
3    Q.   Okay.  Did you speak with any of these
4  individuals in your investigation?
5    A.   Not that I recall.
6    Q.   Why?
7    A.   I felt like, especially initially, that the
8  reports spoke to what it is that they knew, which
9  information that they would have.  So I felt like there
10  was enough to move forward with the investigation from
11  what was in the reports.
12    Q.   Would it have been -- or strike that.
13         If you review a report written by an individual,
14  would it be prudent to speak to that individual about what
15  was in their report during the course of investigation?
16         MR. JONES:  Objection to form.
17         THE WITNESS:  I think I answered that, that it
18    would depend.  In this particular case, I felt like
19    that information -- there was enough that I didn't
20    need to speak with them.
21  BY MS. PORTER:
22    Q.   Could there possibly be relevant information
23  that you had obtained by speaking to those individuals
24  that might not be in their report?
25         MR. JONES:  Objection to form.

Page 41

1         THE WITNESS:  Coupled with the other evidence
2    that I found throughout the investigation, I did not
3    believe that there would be any other relevant
4    information that I would gather from speaking to
5    them.
6  BY MS. PORTER:
7    Q.   Okay.  So that is based off of your
8  determination that you did not believe speaking to them
9  would yield relevant information; is that correct?
10    A.   Correct.
11    Q.   Okay.  Did you have a lot of discretion, during
12  your investigation, for what to look at and who to speak
13  to?
14    A.   Yes.  I believe so.
15    Q.   I apologize.  There's something in my throat
16  briefly.
17         Okay.  So you had discretion about who to speak
18  to and what evidence to review, and you determined that it
19  would not be relevant to the investigation to speak to
20  these individuals after reading their reports; is that
21  correct?
22         MR. JONES:  Objection to form.
23         Go ahead.
24         THE WITNESS:  Not that it would be irrelevant.
25    I just felt it was unnecessary, again, with the other



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1     evidence I found.
2  BY MS. PORTER:
3     Q.   I apologize.  The first portion of you answer
4  came out a little muddled to me.  Could you repeat?
5     A.   Not that it wasn't -- I didn't believe it was
6  relevant with the other evidence that I had found.
7     Q.   Okay.  When you are -- I want to jump back for a
8  second.  You said that the purpose of your
9  investigation -- it was a criminal investigation, and so
10 that would determine if any criminal acts had occurred
11 that resulted in Christine Boyer's death.  Am I
12 remembering that correctly?
13    A.   Yes.
14    Q.   Okay.  Does a criminal investigation involve you
15 making a determination about cause of death?
16    A.   It's helpful, certainly.
17    Q.   What do you mean by, "It's helpful"?
18    A.   To know the cause of death is helpful in an
19 investigation.
20    Q.   Okay.  How would you typically -- when you say
21 it's helpful to know, where would you get that information
22 from?  Would you be making the determination of the cause
23 of death?
24    A.   No.
25    Q.   Okay.  I want to stop sharing for a moment.  And

Page 43

1  I apologize.  Give me just one moment while I work with my
2  exhibits.
3       Okay.  I am going to share my screen.  I believe
4  this is a new exhibit for us, and so this will be -- I
5  believe this is Exhibit 51, if I'm remembering correctly.
6  I would hope the court reporter can help me, where we left
7  off on the last one, if that's okay.
8       THE COURT REPORTER:  Yes.  It will be 51.
9       MS. PORTER:  Great.  Thank you so much.
10      (Exhibit 51 [Email Chain] was marked for
11 identification.)
12 BY MS. PORTER:
13    Q.   Do you recognize this document, Captain Spencer?
14    A.   I mean, I can see what the document is, yes.
15    Q.   Okay.  And so you see the portion that is
16 saying, from Jeffrey Spencer to Wes Revels, the sheriff,
17 and Robert Conroy; subject matter, jail death
18 investigation?  Do you see that portion?
19    A.   Yes.
20    Q.   Okay.  And so it says on here, "I have completed
21 my investigation into Boyer's death, and all appears to be
22 natural causes."  Did you make a determination about
23 that?  Did you make a determination that her cause of
24 death was natural causes?
25    A.   I don't know if natural causes is the best

Page 44

1  terminology, but in the -- as it relates to my
2  investigation, natural causes being noncriminal act as
3  opposed to somebody didn't cause it, is what I meant by
4  "natural causes" in that email.
5     Q.   So somebody didn't cause it, is what you mean by
6  "natural causes," is what I'm understanding?
7     A.   Yes.
8     Q.   Okay.  So back to my previous question.  Were
9  you making a determination about her cause of death here?
10    A.   As it relates to my criminal investigation, I
11 mean, I think the -- in an email to the sheriff and chief
12 deputy being different than potentially an autopsy report,
13 where it gets more specific as to what may have caused the
14 death.
15    Q.   Okay.  How did you determine that she died from
16 natural causes?
17    A.   Again, I mean, behind that being that there
18 wasn't -- the cause of her death wasn't from some criminal
19 act.  That's what I meant by that.
20    Q.   Okay.  But that does not answer my question.
21 How did you determine that her cause of death was natural
22 causes?
23    A.   I'm guessing, again, I didn't make that
24 determination.  Her cause of death would have been listed
25 in the autopsy report.

Page 45

1     Q.   Okay.  So I'm going to stop sharing for a
2  moment, and we can jump back to the incident report.  Give
3  me one moment.
4       Okay.  I'm sharing my screen again.  This is
5  back to Exhibit 49.  I jumped down the page a little bit.
6  But do you see this portion I just highlighted with my
7  cursor that says, "On December 30th, 2019, I met with
8  Detective Walensky, who had attended the autopsy, which
9  occurred on 12/28/2019 by Dr. Michael Stier.  I was
10 advised from the initial autopsy they were unable to
11 determine a cause of death, other than they were able to
12 determine that it was not caused by any physical trauma"?
13      Did you ever review anything beyond an initial
14 autopsy report in your investigation?
15    A.   Did I review anything beyond that?
16    Q.   Yeah.  Did you review anything beyond the
17 initial autopsy report that's noted here at the bottom of
18 your report?
19    A.   I did not review any other autopsy reports, if
20 there were any.
21    Q.   Okay.  Did you review any other document that
22 was produced by an medical expert that determined her
23 cause of death?
24    A.   No.
25    Q.   Okay.  I know we're jumping around with you a



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 46

1  little bit. I would like to go -- I would like to go to
2  this portion I'm highlighting here. It says, "On December
3  27th, 2019, approximately 9:40 p.m., I was informed that
4  Boyer had passed away."
5       Q.  Do you recall this interaction?
6       A.  Not independently of the report.
7       Q.  Okay. With the recollection of the report, do
8  you recall who told you this?
9       A.  No. Not with the recollection of the report.
10      Q.  Okay. You don't recall at all who told you or
11 how you were informed that Christine Boyer had passed
12 away?
13      A.  I recall a text message. And I believe I was
14 informed by the medical examiner. That's, generally, who
15 I would, but I can't recall specifically.
16      Q.  Okay. I'm going to stop sharing my screen for a
17 moment and put up what, I believe, is a new exhibit.
18 Correct me if I'm wrong.
19      Okay. Do you see the document being shared on
20 the screen?
21      A.  Yes.
22      Q.  Okay. And this is Bates-stamped ACH 19154.
23      MR. JONES: Is this a new exhibit, 52?
24      MS. PORTER: I believe this is a new exhibit,
25      52, yes.

Page 47

1       MS. JONES: And what was the Bates stamp, again?
2       MS. PORTER: It is ACH 19154.
3       MR. JONES: Thank you.
4       (Exhibit 52 [Email] was marked for
5       identification.)
6  BY MS. PORTER:
7       Q.  Okay. Do you recognize this document?
8       A.  No.
9       Q.  Okay. So what I have in front of us on screen
10 right now is -- you can read it from the top. Well,
11 actually, strike that.
12      Why don't you take a moment to read this
13 document? Let me know if you need me to make it larger on
14 the screen.
15      MR. JONES: He's ready when you are, Megan.
16 BY MS. PORTER:
17      Q.  Okay. Does reviewing this document refresh your
18 correction of it?
19      A.  I mean, I can see what it is. I don't recall
20 it, though.
21      Q.  Okay. Do you see your name, Jeffery Spencer, in
22 the cc line --
23      A.  I do.
24      Q.  -- that I just highlighted?
25      Okay. This document says, "There will be a

Page 48

1  critical incident debrief held in the sheriff's office
2  training room in the basement of the Justice Center from
3  0900 to" -- "from 9:00 a.m. to 10:00 a.m. on
4  December 27th, 2019.
5       "The debrief is for the incident that occurred
6  in the jail the morning of December 23rd, 2019. This is
7  not a mandatory meeting, but anyone involved in the
8  incident and anyone that feels they need to attend are
9  encouraged to do so."
10      Did you attend this meeting?
11      A.  No.
12      Q.  You did not attend this meeting?
13      A.  I did not.
14      Q.  Why?
15      A.  It's not something I would normally attend. A
16 critical incident debriefing, especially if I wasn't
17 there, having people under my supervisor, it's just not
18 the type of meeting that I would attend.
19      Q.  Were you already involved? Had your
20 investigation -- had you already spoken to the sheriff and
21 started your investigation at this point?
22      A.  Again, I don't recall the -- I know we talked
23 about the time frame I started the investigation. I --
24 right now looking at this, I believe I had, but I can't
25 say that for sure.

Page 49

1       Q.  So previously we've spoken about how you spoke
2  to the sheriff on the 26th, and you agreed with the
3  sheriff that you would complete an investigation into this
4  incident and that this meeting was held the following day,
5  on the 27th, which would be one day after you started your
6  investigation. Are you following?
7       A.  Yes.
8       Q.  Okay. Wouldn't this meeting, potentially,
9  contain relevant information to your investigation, if
10 they're debriefing the incident that is the subject of
11 your investigation?
12      A.  If there was, specifically, those types of
13 meetings, it would not be appropriate for me to attend to
14 further an investigation. I'll leave it at that.
15      Q.  Why would it not be appropriate?
16      A.  Those -- a critical incident debrief is
17 specifically for the mental health and well-being of those
18 who were involved so they can openly talk about what
19 happened. They're not held for any investigative
20 purposes.
21      Q.  Okay. Okay. I'll stop sharing my screen for a
22 moment, and I'm going to go back to Exhibit 49. Okay.
23 Are you seeing Exhibit 49 up on your screen again --
24      A.  Yes.
25      Q.  -- the report? Okay. Great.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1    I'm going to jump back for a second to talk,
2  again, about the purpose of your investigation.  So to
3  recap what we have discussed so far, the purpose of your
4  investigation was not to determine the -- you were not
5  making an independent determination of what Christine
6  Boyer's cause of death was; is that correct?
7    A.   Correct.
8    Q.   Okay.  And this is not, say, a mortality review;
9  is that correct?
10    MR. JONES:  Objection to form.
11    You can answer.
12    THE WITNESS:  I'm not sure exactly what you mean
13    by a "mortality review."
14  BY MS. PORTER:
15    Q.   I'm sorry.  I didn't hear your answer.
16    A.   I don't know what you mean by "mortality
17  review."  I'm not familiar.
18    Q.   Oh.  Oh, okay.  You were not determining,
19  like -- strike that.
20    The purpose of your investigation was not to
21  determine if she received an appropriate standard of
22  medical care while at the jail; is that correct?
23    MS. JONES:  Objection to form and asked and
24    answered.
25    Go ahead and answer again.

Page 51

1    THE WITNESS:  That is correct.
2  BY MS. PORTER:
3    Q.   Okay.  Great.  All right.  One moment.
4    So I want to move down to this portion of the
5  report I'm highlighting here.  Do you see the portion I
6  just highlighted?
7    A.   Yes.
8    Q.   Okay.  So it says, "On December 28, 2019, I
9  contacted Gundersen Hospital and requested that any blood
10  that was drawn be held.  I was advised they had blood from
11  December 25th, 2019, and December 26th, 2019, but all
12  other samples from before that had been destroyed."
13    Why did you request that blood be drawn -- that
14  any blood that was drawn be held?
15    A.   I -- I'm aware that -- that they don't hold
16  blood all that long, in general, and I didn't want to lose
17  any potential evidence that may be in the blood.
18    Q.   Okay.  What would the -- what would have been
19  the value of a blood sample to your investigation?
20    A.   I believe it would -- could have helped
21  determine a cause of death and what have certainly helped
22  a pathologist do that to know exactly what was in the
23  blood at the time of death.
24    Q.   And so in consulting with the ME -- pardon me.
25  So consulting with the ME, which I believe stands for

Page 52

1  "medical examiner," and pathologist, it was determined
2  this blood would not have any value due to medical
3  intervention that had been in place for at least two days
4  prior to those samples being drawn.  Do you -- do you know
5  what was done with the blood samples that they did have?
6    A.   No.
7    Q.   Okay.  All right.  I'm going to stop sharing for
8  a moment, and I'm going to share a prior Exhibit I believe
9  was Exhibit 47, our previous deposition.
10    Okay.  Are you seeing the exhibit up on the
11  screen?
12    A.   Yes.
13    Q.   Okay.  And are you able to read it?  Do you need
14  me to zoom in or anything?
15    A.   I can read it.
16    Q.   Okay.  Do you recognize this document?
17    A.   Yes.
18    Q.   Okay.  What is it?
19    A.   A copy of my notes.
20    Q.   Okay.  And so this -- is this your handwriting?
21    A.   Yes.
22    Q.   Okay.  And you mentioned that is your notes.
23  I'm scrolling through briefly.  So it looks like we have
24  three pages of notes.  Is that all the notes that you took
25  during the course of your investigation?

Page 53

1    A.   Yes.  I believe so.
2    Q.   Okay.  Beginning at the top, it says -- you
3  know, you can see the portion that says, "10:03 Greg Boyer
4  phone call."  Do you recall this conversation with Greg
5  Boyer?
6    A.   Again, not independently.  I remember being in
7  the room when we made that phone call.
8    Q.   Okay.  Okay.  I apologize for interrupting.  You
9  remember being in the room for this phone call based off
10  of your review of this document?
11    A.   Because of my independent recollection, I
12  remember being in the -- in the room when we talked, when
13  we made that phone call.  This document gives, obviously,
14  more information from that phone call and what was talked.
15    Q.   Okay.  Okay.  I'm now moving to the second page.
16  Do you see the portion that I just highlighted?
17    A.   Yes.
18    Q.   Okay.  It says, "Need for civil case," with a
19  question mark.  Why did you write that?
20    A.   Again, looking at the blood at that time, if --
21  it was a note to find out if the blood needed to be held
22  for a civil case beyond the criminal case.
23    Q.   Okay.  Did you anticipate litigation related to
24  this event?
25    A.   I don't know that I anticipated it as much, I



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 54

1  mean, from conversations. I guess I'm not sure exactly
2  how to answer that.
3     Q.  Well, the text from your note says, "Need for
4  civil case," question mark. Why would you have written
5  this note to yourself?
6     A.  I knew that a civil case from a jail death
7  wouldn't be a surprise.
8     Q.  So based off of your answer, you had
9  written this to yourself because it would not be
10 surprising that there to be litigation following this
11 incident of Christine Boyer's death; is that correct?
12    MR. JONES:  Objection to form.
13    Go ahead.
14    THE WITNESS:  Correct.
15 BY MS. PORTER:
16    Q.  Okay. Let's see. I'm going to stop sharing
17 this for a moment and go back to -- I believe this is
18 previously marked as Exhibit 48.
19    Okay. Do you -- I'm sharing the wrong screen I
20 apologize.
21    Okay. Do you see the document that I am sharing
22 on the screen?
23    A.  Yes.
24    Q.  Okay. Do you recognize this?
25    A.  Yes.

Page 55

1     Q.  Okay. And what is it?
2     A.  It's a group text message that was sent
3  regarding Ms. Boyer's death.
4     Q.  Okay. And you said that was sent regarding
5  Ms. Boyer's death. What was your -- did you have any
6  involvement in this text, this group message?
7     A.  I'm the one who sent the initial text message
8  advising that she had passed away.
9     Q.  Okay. Got it. So you -- so you're the blue
10 circle on this, like the blue messages?
11    A.  Correct.
12    Q.  Got it. Okay. And so just reading this very
13 quickly into the record, you say, "FYI, I just got word
14 that Boyer passed away about ten minutes ago. I think we
15 have everything squared away, as we have been expecting
16 it."
17    What did you mean by that?
18    A.  Just that we knew her prognosis wasn't good.
19    Q.  When you say you knew her prognosis
20 wasn't good, what were you expecting to happen at this
21 point?
22    A.  Before the text message was sent, we knew she
23 was going to be taken off of life support. So usually
24 when that happens, somebody dies shortly after that.
25    Q.  Okay. How long had you been anticipating her

Page 56

1  passing away?
2     A.  I can't recall exactly how long I was aware of
3  that.
4     Q.  Okay. You say that everything -- "We have
5  everything squared away." What was squared away?
6     A.  Just that we had taken steps to preserve the
7  scene. That's what I believe I meant by that, I mean,
8  just that we were somewhat prepared, that we had discussed
9  that she may be dying.
10    Q.  Okay. So you had preserved what, exactly?
11    A.  That cell she had been in, we talked about
12 earlier.
13    Q.  Okay. Did you take steps to preserve anything
14 else?
15    A.  I'm sorry. What was the question?
16    Q.  Did you take steps to preserve any other
17 evidence?
18    A.  At that point, I don't believe so.
19    Q.  Okay. Why didn't you take steps to preserve
20 that evidence?
21    MR. JOHNSON:  Objection to form. What evidence?
22    You can answer.
23    THE WITNESS:  Yeah. I mean, looking at the --
24    the date stamp, I guess the -- I had, prior that text
25    message, seen about preserving that blood as well.

Page 57

1     But beyond that, I don't know what, specifically --
2     what specific evidence you're referring to.
3  BY MS. PORTER:
4     Q.  Well, if -- you know, we previously looked at
5  your notes from December 26th, the day prior to her
6  passing, where you had said that there's at least a
7  possibility of civil litigation. I would imagine that
8  there's other evidence that can be preserved for civil
9  litigation, such as, say, video footage in the jail.
10    Did you take steps to preserve any video footage
11 that may have been captured during her stay at the jail?
12    A.  Not that I independently recall.
13    Q.  But do you recall yourself -- you don't recall
14 taking any steps to preserve evidence, such as video
15 evidence?
16    A.  Correct. I don't recall.
17    Q.  Okay. Do you recall anyone at Monroe County
18 taking steps to preserve video evidence by this date,
19 December 27th?
20    A.  I don't recall.
21    Q.  Okay. It also says on here --
22    MS. PORTER:  Well, actually, I'm going stop
23    sharing for a second. I think it's been an hour.
24    Why don't we take a break for another five minutes.
25    THE VIDEOGRAPHER:  The time --

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1      MS. PORTER:  And we can come back at, I guess,
2  2:20.
3      THE VIDEOGRAPHER:  Okay.  The time is 2:14 p.m.
4  We're going off the record.
5      (Pause in the proceedings.)
6      THE VIDEOGRAPHER:  We're back on the record for
7  the deposition of Jeffrey Spencer being conducted by
8  videoconference.  My name is Sheila Jones.  Today is
9  October 12th, 2023.  The time is 2:22 p.m.  You may
10  continue.
11  BY MS. PORTER:
12      Q.  Okay.  Captain Spencer, I want to jump back for
13  a second real quick to the purpose of your investigation.
14  You had said previously that this was a criminal
15  investigation.  You were not evaluating whether Christine
16  Boyer received the appropriate standard of care; is that
17  correct?
18      A.  That's correct.
19      Q.  Okay.  And did the other members of the Monroe
20  County Sheriff's Department know that you were conducting
21  a criminal investigation, not evaluating whether she
22  received the appropriate standard of care?
23      MR. JONES:  Objection to form.
24      Go ahead.
25      THE WITNESS:  Those that were aware of

Page 59

1  investigation, I believe, knew that.  But I guess I
2  can't say what they believed or not.
3  BY MS. PORTER:
4      Q.  Generally, if you're doing a criminal
5  investigation, do the other members of sheriff's
6  department know what that means, what the purpose of it
7  is, what it does and does not include?
8      MS. JONES:  Objection to form.
9      Go ahead objection.
10      THE WITNESS:  You would have to ask them that.
11  I believe they would.  That's what my understanding
12  would be if somebody else was conducting a criminal
13  investigation.
14  BY MS. PORTER:
15      Q.  Okay.  So I want to go back to -- let's see --
16  Exhibit 47.  I'm going to share my screen.  And so I'm
17  looking at the second page of your investigation notes,
18  and you see this portion where you're -- it appears to be
19  recording different potassium levels.  Do you see that?
20      A.  Yes.
21      Q.  Okay.  Why were you making this note?
22      A.  As I recall, I was -- there was something in the
23  medical record that talked about potassium levels and how
24  it may contribute to something.  Exactly what, I don't
25  recall.  So I was writing down, it appears, date and times

Page 60

1  that they had checked potassium levels.
2      Q.  That who had checked potassium levels?
3      A.  Something from the medical record -- I
4  couldn't -- the hospital.
5      Q.  Okay.  So you were checking the medical record?
6  Sorry.  Scratch that.
7      So you were recording potassium levels that had
8  been checked at the hospital that Christine Boyer had been
9  sent to; is that correct?
10      A.  Yes.  Yeah.
11      Q.  Okay.  And so how would checking potassium
12  levels be relevant to your criminal investigation?
13      A.  Again, in just reviewing them, trying to
14  understand, because there was some note, I believe, in
15  there that talked about them being weird, being off, so me
16  jotting down numbers, trying to -- to see if there was
17  anything that appeared to pop out as it related to it.
18      Q.  Did you -- did you research the effects
19  of potassium levels on someone in Christine Boyer's
20  condition?
21      A.  I can't say for sure.
22      (Exhibit 53 [Email Chain] was marked for
23   identification.)
24  BY MS. PORTER:
25      Q.  Okay.  I'm going to stop sharing for a moment,

Page 61

1  and now I'm going to share -- I believe this is a new
2  exhibit, so this would be Exhibit 53, if I remember
3  correctly.  One moment to share.
4      Okay.  Do you see the document on the screen in
5  front of you?
6      A.  Yes.
7      Q.  Okay.  And this document, for reference, is
8  Bates-stamped as ACH 19157.  Do you recognize this
9  document?
10      A.  Yes.
11      Q.  Okay.  What is it?
12      A.  It looks like it's an email that I sent to Amber
13  on December 31st.
14      Q.  Okay.  And so it is an email chain conversation
15  between you and Defendant Fennigkoh in this case.
16  Ms. Fennigkoh emailed you, says, "I pulled out the pill."
17  And, also, the subject of the email is "Unidentified
18  Pill."  Ms. Fennigkoh goes, "I pulled out the pill.  The
19  officers cannot identify.  After using a magnifying glass
20  and some searching, I believe it reads 'TEVA' on one on
21  side and '352' on the back top.  According to the
22  identification site, it is diazepam 2 milligrams."
23      You respond, "That is really interesting related
24  to some of the medical records and the fact that she
25  tested positive for Benzo.  It appears that it may not be

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 62

1 good to mix that with opioids or alcohol."
2      Why did you look into the effects of diazepam?
3    A.  Because she had that pill that identified as
4 diazepam in her possession.
5    Q.  Okay.  And how would that be relevant to your
6 criminal investigation?
7    A.  Helps us understand further, perhaps, how she
8 died or what was in her system at that time.
9    Q.  Okay.  Great.  Now, I'll -- one second.
10      Okay.  Were you looking at -- is it accurate to
11 say that you were trying to understand, by looking at
12 diazepam and its effects, whether a crime had been
13 committed?
14    A.  To understand how she died, to help understand
15 if a crime was committed.
16    Q.  Okay.  Great.  I'll stop sharing.  And now I
17 think I would like to -- okay.  I'm going to go back to
18 your incident report.  So that's Exhibit 49.  Great.
19      Do you see the incident report back up on the
20 screen?
21    A.  Yes.
22    Q.  Okay.  And so I am looking at -- and if you need
23 me to make the screen larger, just let me know, or move it
24 or anything.  So I'm looking at this highlighted portion
25 that I have at the bottom of the screen.  Do you see that?

Page 63

1    A.  Yes.
2    Q.  Okay.  So it says, "I reviewed medical
3 information for Christine and was able to confirm what
4 Greg had advised and found that Christine had significant
5 and long-term health issues, including high blood
6 pressure, cardiomyopathy, total abdomen and pelvis
7 reconstruction, and cancer removal with radiation.
8      "I also found that her lab results from blood
9 drawn at December 23rd, 2019, at 8:00 a.m., showed she
10 tested positive for benzodiazepines.  In further research
11 I found that she was not prescribed benzodiazepines and
12 that diazepines should not be taken with opioid medicine
13 or alcohol."
14      So why did you include this sentence in your
15 report?
16    A.  I think it pointed to, again, some of her
17 medical history and, potentially, some of things that may
18 have led to her death.
19    Q.  Okay.  So you did further research to look into
20 the potential effects that diazepine could have on someone
21 in her condition; is that correct?
22      MR. JONES:  Objection.  Asked and answered.
23      Go ahead.
24      THE WITNESS:  Yes.
25

Page 64

1 BY MS. PORTER:
2    Q.  Okay.  Stop sharing for a second, and I'm going
3 the put on the screen.  I believe this was previously
4 Exhibit 19.  Okay.  Do you see the document up on the
5 screen?
6    A.  Yes.
7    Q.  Okay.  And so do you recognize this document?
8    A.  No.  Not particularly.
9    Q.  Okay.  So have you seen it before?
10    A.  Not that I recall.
11    Q.  Okay.  So this is Bates-stamped Monroe County
12 001098 through 1099, and what I have up on the screen is a
13 chest pain protocol.  Are you familiar with chest pain
14 protocols in Monroe County?
15    A.  No.
16    Q.  Okay.  So I guess for your reference, the chest
17 pain protocols are documents that help assist guards in
18 Monroe County to understand -- be able to document when a
19 prisoner is experiencing chest pain.  And so do you see
20 this portion that I'm highlighting right here that says,
21 "Currently on any heart medications, lisinopril,
22 amlodipine and Coreg."
23      Do you see that portion?
24    A.  Yes.
25      MR. JONES:  Objection to form.

Page 65

1      THE WITNESS:  Yes.
2 BY MS. PORTER:
3    Q.  Okay.
4    A.  Yes.  I see that.
5    Q.  Okay.  So in your investigation into
6 Christine -- circumstances surrounding Christine Boyer's
7 death, did you look at any medical records that was
8 discussed, what medications she currently took?
9    A.  I remember looking at medical records.  I don't
10 recall if that was in there or not.
11    Q.  Okay.  So do you recall looking into whether she
12 was receiving any of the medications which she was
13 prescribed during her time at Monroe County Jail?
14    A.  Can you ask that question again?
15    Q.  Yeah.  Do you recall looking at any documents or
16 trying to determine if she was receiving the medication
17 she was prescribed in the Monroe County Jail?
18    A.  I know that there was discussion that there
19 medications that she was on and that they were attempting
20 to get them or that she had attempted to get them.  But
21 where that information -- exactly, how that works, I --
22 that's about all I can speak to on.
23    Q.  Okay.  I'm going to jump back to Exhibit 49
24 quickly, and do you see the portion that I'm highlighting
25 here?



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1    A.   Yes.

2    Q.   It says, "In further review of the medical
3  information, I saw that Christine was supposed to be on a
4  number of medications.  The jail allowed her to make phone
5  calls in an attempt to have someone bring those
6  medications.  I reviewed Christine's jail phone record" --
7  "calls and did find that she called Greg in the evening of
8  December 22nd, 2019, and they discussed him trying to
9  locate and bring the medications in."

10        Skipping ahead a little bit, "However, I was
11  advised by Captain Hendrickson that Greg did bring
12  property to the jail.  However, it was not until Christine
13  had suffered her medical emergency."

14        So according to your report, you were aware that
15  Christine was supposed to be on a number of medications,
16  but she was not receiving those medications; is that
17  correct?

18        MS. JONES:  Objection to form.

19        Go ahead.

20        THE WITNESS:  Yes.  That appears to be correct.

21  BY MS. PORTER:

22    Q.   Okay.  Did you -- you had looked into the
23  potential effects of diazepam on Christine, someone in her
24  condition, as we established earlier, correct?

25    A.   Yes.

Page 67

1    Q.   Did you look into the effects of -- did you --
2  scratch that.

3        Did you look into what the potential effects
4  would be on someone in Christine's condition to not have
5  the medications she was prescribed for blood pressure?

6    A.   Not that I recall.

7    Q.   Okay.  Why did you not look into that?

8    A.   Again, I think from the -- the paragraph that
9  you have highlighted there, it indicates she was supposed
10  to have something.  She didn't have them with.  She was
11  given something else.  And the -- there were arrangements
12  to attempt to get her actual medications.

13        I -- I don't know if that answers the question.

14    Q.   No, it does not.

15        So for diazepam, as we discussed earlier, from
16  your email, you looked into the potential effects, and you
17  found that it's something someone should not take if
18  they're also ingesting alcohol.  Did you look into how it
19  would affect someone like Christine if she did not have
20  her blood pressure medication and was not receiving it?

21        MR. JONES:  Asked and answered.  Objection.

22        THE WITNESS:  Not that I recall.

23  BY MS. PORTER:

24    Q.   Okay.  Did you, in your investigation, do any
25  research into this period of -- before December 23rd to

Page 68

1  look into what medical care she was receiving in the time
2  preceding her death?

3    A.   Not that I recall.

4    Q.   Why not?

5    A.   I -- I don't recall doing it.  I couldn't tell
6  you why, I guess, I didn't, if I didn't, because, again, I
7  don't recall one way or the other if I did or didn't.

8    Q.   Okay.  If the effects of diazepam on someone who
9  ingested alcohol would be relevant to your investigation,
10  would the effects of not taking prescribed blood pressure
11  medications on an individual be relevant to your
12  investigation?

13    A.   Can you re-ask that question?

14    Q.   Yeah.  If -- if you -- from my understanding,
15  when reading your email to Ms. Fennigkoh, when she was
16  identifying the pill diazepam, you deemed it relevant for
17  your investigation to look into what the effects would be.
18  Well, actually, scratch that.

19        MS. PORTER:  Ms. Manni, would you be able to
20  actually read back the question that I just asked to
21  Mr. Spencer, starting with "if it's relevant," like
22  diazepam -- if diazepam is relevant.

23        (The question on 68 page, line 8, was read by
24  the court reporter.)

25        THE WITNESS:  I think the effects of not taking

Page 69

1  it, the fact that she didn't take it, was put in
2  there.  Exactly what those effects were, I suppose,
3  would have some relevance.

4  BY MS. PORTER:

5    Q.   Okay.  And why would they have some relevance?

6    A.   I mean, I guess it depends on --

7        MR. KNOTT:  Sorry, sir.  I objected to form and
8  foundation.  Go ahead.

9        THE WITNESS:  It --

10        MR. JONES:  Do you have a question in front of
11  you?

12  BY MS. PORTER:

13    Q.   So you investigated the effects of diazepam on
14  someone in Ms. Boyer's condition.  You did not investigate
15  the effects of not taking any prescribed blood pressure
16  medication in someone in Ms. Boyer's position.  Why did
17  you investigate the potential effects of her not taking
18  her prescribed medication at the jail?

19        MR. JONES:  Asked and answered.

20        You can answer again.

21        THE WITNESS:  For her not taking her medication
22  wouldn't be relevant to whether or not this was
23  criminal.

24  BY MS. PORTER:

25    Q.   Her not taking her prescribed medication would

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1 not be relevant to your investigation into whether or not
2 this was criminal, but diazepam would be relevant to
3 whether or not this is criminal. Why?
4    A.   It was information I received.
5        MR. KNOTT: I need to object to the form of the
6    question on that grounds that it assumes facts not in
7    evidence, but go ahead.
8        THE WITNESS: The diazepam, as we kind found
9    out, there was information that I received, felt like
10   it was relevant. So that's why that ended up in the
11   report. Specifically whether or not it would make it
12   criminal, probably not, but I felt like it was
13   information important to be in report since I
14   received it.
15 BY MS. PORTER:
16   Q.   Okay. And you deemed it important enough to put
17 into your report that Christine was supposed to be on a
18 number of medications, but she was not receiving those
19 medications. Why would you not follow up about the
20 affects of those medications if you followed up about
21 diazepam?
22       MR. CASSERLY: Asked and answered.
23       MR. JONES: Asked and answered I think for the
24   third time, but go ahead.
25       THE WITNESS: The final part of your question

Page 71

1    was, why did I not?
2 BY MS. PORTER:
3    Q.   Yes. Why did you look into the effects of one
4 drug and not the effects of lack of drugs on another?
5    A.   Again, I would have to look at exactly what all
6 those drugs were. I didn't believe it was relevant enough
7 to take the time to look into what all those drugs were
8 and what the effects would be enough to put into my
9 report.
10   Q.   Going on, were you qualified to decide which
11 drugs were relevant in your investigation?
12       MR. JONES: Objection to form.
13       You can answer.
14       THE WITNESS: I think I'm qualified to put the
15   information I -- I got related to the drugs. I'm,
16   certainly, no pharmacist or anything like that.
17 BY MS. PORTER:
18   Q.   That's not my question, sir. Are you qualified
19 to determine which drugs are relevant to someone --
20 scratch that.
21       Are you -- do you have any medical training?
22   A.   No.
23   Q.   Okay. Do you have any -- you don't have any,
24 like, medical degrees or certifications?
25   A.   Correct. Yeah. In like basic first aid. I

Page 72

1 don't have any medal degrees --
2    Q.   Okay.
3    A.   -- medical degrees.
4    Q.   Okay. So you can't make any determinations
5 about whether one drug is more impactful on one's
6 condition than other drugs?
7    A.   That would be correct.
8    Q.   Okay. And so are you qualified to decide which
9 drugs are relevant to Ms. Boyer's cause of death?
10       MR. JONES: Asked and answered and
11   argumentative.
12       You can go ahead and answer.
13       THE WITNESS: No. I -- again, that would be up
14   to the pathologist to determine the drugs --
15       MS. PORTER: Okay.
16       THE WITNESS: -- of her death.
17 BY MS. PORTER:
18   Q.   Okay. Did you review any medical records
19 related to Ms. Boyer's condition before she -- well,
20 actually, I want to back up for a second and go back to
21 diazepam for a moment. Ms. Boyer taking prescription
22 drugs, it makes her look bad, doesn't it?
23   A.   (Inaudible.)
24   Q.   I'm sorry. Can you speak up a bit? I can't get
25 your answer.

Page 73

1    A.   I think that would look different to different
2 people, that fact --
3    Q.   Okay.
4    A.   -- whether or not somebody taking drugs that
5 weren't prescribed to them.
6    Q.   Okay. But you deemed it relevant to look into
7 the fact that he was taking a drug that didn't mix well
8 with alcohol and to point out she had alcohol in her
9 system when she came into the jail? From what I'm
10 reading, based off of what I'm reading, I read that --
11 well, scratch that.
12       Were you trying to find a reason to blame
13 Mrs. Boyer for her death?
14   A.   No.
15   Q.   Is that why you looked into diazepam?
16   A.   No.
17   Q.   In reading this portion that I still have
18 highlighted, you say that the jail allowed her to make
19 phone calls in attempt to have someone bring those
20 medications. And you later state that Mr. Boyer was not
21 able to bring her medications until after she suffered her
22 medical emergency. Did you look into whether anybody at
23 the jail had tried to give her other medications in lieu
24 of the ones prescribed?
25   A.   I don't recall.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1    Q.    Okay.  You don't recall seeing or reading any
2  documents related to whether other folks at the jail had
3  tried to give her other medications in lieu of the ones
4  that she was prescribed?
5    A.    Other than the -- that's noted there, that
6  somebody had given her something to lower her blood
7  pressure as it related to that chest pain.  But I don't
8  know if that was in lieu of her other medications or not.
9    Q.    Okay.  What medical records of hers did you
10 actually review?
11   A.    I know there's some medical records, stated
12 earlier, from Gundersen that I reviewed from after this
13 incident, the UW pathology report.
14   Q.    Okay.  I want to go back up a little bit to --
15 so back up to the beginning of your report, you say, "On
16 December 23rd, 2019, I was advised by Lieutenant Hallman
17 of a female subject, identified as Christine Boyer, who
18 had been hospitalized out of the jail during the early
19 morning hours.  I was advised that Christine possibly had
20 a heart attack and may not survive."
21        During the course of your investigation, did you
22 do any research into what symptoms a heart attack are?
23   A.    Not that I recall.
24   Q.    Okay.  Did you review any medical record that
25 listed any symptoms related to a heart attack?

Page 75

1    A.    Not that I recall.
2    Q.    Okay.  If you were advised that Christine
3  possibly had a heart attack, why didn't you look into what
4  the symptoms of a heart attack would be?
5    A.    I -- I can't tell you why I did or didn't.  I
6  mean, I'm aware of some symptoms of a heart attack.  I
7  can't tell you why I didn't look into them.
8    Q.    Okay.  Would it be -- for someone conducting an
9  investigation like yours, if you know that Christine
10 possibly died of a heart attack, would be relevant to your
11 investigation to know what are the symptoms of a heart
12 attack so when you're reviewing medical records, you're
13 able to identify potential symptoms?
14   A.    No.  I, ultimately, rely on what the pathologist
15 came up with at the end.
16   Q.    If you knew that Ms. Bower possibly had a heart
17 attack, would -- well, actually, strike that.
18        Did you ever do any online research about
19 whether someone in Ms. Boyer's condition, prior to exiting
20 the Monroe County Jail, should receive emergency care?
21        MR. JONES:  Objection to the form of the
22 question.
23        You can answer.
24        THE WITNESS:  I'm going to need the -- what the
25 question on that was.

Page 76

1  BY MS. PORTER:
2    Q.    Okay.  Did you do any research in the course of
3  your investigation about whether some one in Ms. Boyer's
4  condition, before she was taken to Gundersen, should
5  receive emergency care?
6        MR. JONES:  Same objection.
7        THE WITNESS:  No.  I don't believe I did.
8        MS. PORTER:  Okay.  Why don't we -- let me take
9  one last break, and I can see if I have any more
10 questions.  Maybe we can come back, let's say, in
11 five minutes.
12        MR. JONES:  Okay.
13        MS. PORTER:  Okay.
14        THE VIDEOGRAPHER:  Okay.  The time is 2:51 p.m.
15 We're going off the record.
16        (Pause in the proceedings.)
17        THE VIDEOGRAPHER:  We're back on the record for
18 the deposition of Jeff Spencer being conducted by
19 videoconference.  My name is Sheila Jones.  Today is
20 October 12th, 2023.  The time is 2:58 p.m.  You may
21 proceed.
22 BY MS. PORTER:
23   Q.    And, Captain Spencer, I have just a couple other
24 questions for you before turning it over to your counsel.
25        Did you ever try to figure out whether Christine

Page 77

1  Boyer -- or scratch that.
2        During the course of your investigation, did you
3  ever try to determine whether Christine Boyer should have
4  been sent to the emergency room earlier than she was?
5    A.    No.  I don't believe so.
6    Q.    Okay.  Are you familiar with the crime reckless
7  endangerment?
8    A.    Yes.
9    Q.    Okay.  Can not providing medical care to someone
10 who needs it be considered reckless?
11        MR. KNOTT:  Object to the form of the question.
12 It's vague.  Object to the extent that it calls for a
13 legal conclusion without specification.
14        THE WITNESS:  Yeah.  I don't know I can answer
15 that.
16 BY MS. PORTER:
17   Q.    Well, I'm not asking you to make a legal
18 conclusion, but can it be considered reckless to not
19 provide medical care?
20        MR. KNOTT:  Object to the form.  It's vague as
21 to circumstance in this hypothetical and calls for
22 speculation.
23 BY MS. PORTER:
24   Q.    I'm not calling for speculation, Captain
25 Spencer.  To be specific, you mentioned earlier in our



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1  deposition that in the course of your training as a law
2  enforcement officer, you received training on laws, and,
3  also, in your degree in criminal justice, you received
4  training on legal provisions.  Am I correctly remembering
5  that?
6      A.   Yes.
7      Q.   Okay.  And so a part of your job as a law
8  enforcement officer is to enforce the law correctly,
9  correct?  Am I right in that?
10     A.   Yes.
11     Q.   Okay.  And when you are enforcing the law, you
12 are making a determination about whether, in your
13 professional opinion, someone committed a crime; is that
14 correct?
15     A.   Yes.
16     Q.   Okay.  And so you can make a determination here
17 about whether someone not providing medical care could be
18 considered reckless, as is defined by a criminal law in
19 Wisconsin, correct?
20          MR. JONES:  Objection to the form.
21 BY MS. PORTER:
22     Q.   Okay.  So I'm looking at --
23          THE COURT REPORTER:  I didn't hear an answer.  I
24     didn't hear an answer.
25          MS. PORTER:  Okay.  I apologize, Ms. Manni.

Page 79

1          THE WITNESS:  Yeah.  I -- in that circumstances
2      you described in the question, I would refer to the
3      state statutes and look through it for specifics to
4      give me guidance.  I don't have that off the top of
5      my head.
6  BY MS. PORTER:
7      Q.   Okay.  If recklessness is defined as endangering
8  another's safety under circumstances which show utter
9  disregard for human life, could not sending someone to the
10 emergency room and not providing them medical care when
11 needed be considered reckless?
12          MR. JONES:  Objection to form and to the extent
13     it calls for a legal conclusion.
14          MR. KNOTT:  Object to form.  It's a vague
15     hypothetical.  And object to the form.  It calls for
16     a legal conclusion.
17          THE WITNESS:  Yeah.  To that, my answer being
18     the same, I would look at the specific facts of a
19     case, refer back to the legal definitions and legal
20     things within the statute to determine whether or not
21     I felt like it met that burden.
22 BY MS. PORTER:
23     Q.   Okay.  And in this investigation, did you look
24 at any Wisconsin state statutes, criminal statutes, to
25 determine whether the specifics of this case and the

Page 80

1  provision of medical care in this case violated any
2  Wisconsin criminal statute?
3      A.   Yes.  From the facts that I was presented, I
4  didn't feel like it met the burden of any of the statutes.
5      Q.   What statute did you look at?
6      A.   I can't tell you specifically if I went through
7  which ones.  Certainly, the homicide statutes, I didn't
8  believe it met those.
9      Q.   Okay.  So did you try to figure out whether
10 anybody in this case could have been guilty of reckless
11 endangerment?
12     A.   From the conclusions that I drew from the case
13 and what I know of that statute, again, off the top of my
14 head, I don't believe that it reached that level.
15     Q.   Okay.  One moment.  Make sure I got everything.
16          Okay.  In this investigation, did you consult
17 with any medical expert to get their expertise to help you
18 determine whether any of the medical practices in this
19 case committed reckless endangerment?
20     A.   No.
21     Q.   Okay.
22     A.   I didn't believe it was relevant to do so.
23     Q.   You stated earlier that you do not have any
24 medical training.  Am I remembering that correctly?
25     A.   Yes.

Page 81

1      Q.   Are you qualified to determine whether a medical
2  practitioner acted recklessly in the course of their
3  employment?
4          MS. JONES:  Objection to the form of the
5      question, but you can answer.
6          THE WITNESS:  I think I'm qualified to determine
7      a level of criminal reckless, yes.
8  BY MS. PORTER:
9      Q.   Okay.  How are you qualified to make that
10 determination if you're not a -- if you don't have any
11 medical experience?
12     A.   Recklessness, as I remember it -- I may be
13 speculating, so I probably shouldn't do that.
14          MR. JONES:  I think Ms. Porter would tell you
15     that she's not asking you to speculate, but if you
16     can answer the question, you should.
17          THE WITNESS:  Can you re-ask the question?
18          MS. PORTER:  Yeah.  Ms. Manni, would you be able
19     to read back the question?
20          THE COURT REPORTER:  Sure.
21          (The last question was read by the court
22     reporter.)
23          THE WITNESS:  Because I can -- I believe I can
24     apply the statute to specific circumstances to
25     feel -- to know if there's enough probable cause to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1    send that charge forward.
2    BY MS. PORTER:
3        Q.   But did you do any research into what the
4    standard of care would be for a medical practitioner?
5        A.   No.
6        Q.   Okay.  Why did you not do any research into the
7    standard of care for a medical practitioner, but you were
8    doing research into the effects of drugs like diazepam?
9        A.   That level of standard of care, I don't --
10   didn't think it mattered in the criminal investigation.
11       MS. PORTER:  I think that's all my questions.
12       MR. JONES:  Doug, any questions?
13                   EXAMINATION
14   BY MR. KNOTT:
15       Q.   Captain Spencer, is it your conclusion that
16   these facts did not constitute reckless endangerment a
17   conclusion you reached based upon your training and
18   experience in law enforcement and investigation?
19       A.   Yes.
20       Q.   Is that an opinion you hold to a reasonable
21   certainty with criminal state codes?
22       A.   Yes.
23       MR. KNOTT:  Thank you.
24       MR. JONES:  John, any questions.
25       MR. CASSERLY:  I have no questions.  Thank you.

Page 83

1        MR. JONES:  I do not have any questions.
2        MS. PORTER:  I have one last question.  I
3    apologize.  Would you be able to read back
4    Mr. Knott's last line of questioning I think starting
5    with the conclusion he reached about reckless
6    endangerment?
7        THE COURT REPORTER:  I will need a moment to
8    find it.
9        MR. JONES:  We're reading back a line of
10   questioning?
11       MS. PORTER:  That's all right, Ms. Manni.  I can
12   go back to it.
13                   EXAMINATION
14   BY MS. PORTER:
15       Q.   I believe my understanding from Ms. Knott's
16   questioning was, in your professional opinion, you, like,
17   did not reach a conclusion that reckless endangerment had
18   occurred in this case with respect to the provision of
19   medical care.  Am I understanding that correctly?
20       MR. KNOTT:  Object to the form of the question.
21       MR. JONES:  Yeah.  I don't think that captures
22   Doug's question.
23   BY MS. PORTER:
24       Q.   Okay.  I guess, for my last question would be,
25   then, did you ever investigation whether any medical

Page 84

1    practitioner committed reckless endangerment in your
2    investigation in this case?
3        A.   State that question one more time.
4        Q.   Okay.  To rephrase it, did you -- in the course
5    of your investigation, your criminal investigation to
6    determine whether any criminal acts occurred in this case,
7    did you determine whether reckless endangerment occurred?
8        MR. KNOTT:  Asked and answered.
9        THE WITNESS:  Correct.  Which I believe I
10   considered it.
11   BY MS. PORTER:
12       Q.   Did you consider it?
13       MR. KNOTT:  Asked and answered.
14   BY MS. PORTER:
15       Q.   Did you look at the statute and look at the
16   facts of this case and make any sort of conclusion about
17   whether reckless endangerment occurred with the provision
18   of medical care?
19       MR. KNOTT:  Objection to form.
20       MS. PORTER:  Captain Spencer, I think you're on
21   mute.
22       MR. JONES:  Oh, we've been.  Sorry.
23       THE WITNESS:  Sorry about that.
24       MS. PORTER:  That's all right.
25       MS. JONES:  Go ahead with your answer.

Page 85

1        THE WITNESS:  I considered the statutes that I
2    could think of that would be relevant to this case.
3    To say, specifically, I thought about that reckless
4    one and dove into it, from I know of that statute, I
5    didn't feel like it met that burden.
6    BY MS. PORTER:
7        Q.   Why didn't you include that in your report, the
8    criminal statutes you reviewed when you were doing your
9    criminal investigation?
10       A.   I didn't feel like it was relevant to do so.
11       Q.   Why not?
12       A.   Because it didn't meet the burden for that
13   statute.
14       Q.   So if something did not meet the burden, in your
15   opinion, you would omit it from your report instead of
16   explaining your investigative process?
17       MR. JONES:  Object to the form of the question.
18   Go ahead.
19       THE WITNESS:  I didn't feel it was relevant to
20   put in my report.
21       MS. PORTER:  I think that's all the question I
22   have.
23       MR. KNOTT:  Nothing further.
24       MR. CASSERLY:  Nothing further.
25       MR. JONES:  I don't have any.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1    THE VIDEOGRAPHER:  Okay.  The time is 3:12 p.m.
2  We're going off the record.
3    (The deposition was concluded at 3:12 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

1  STATE OF WISCONSIN )
2  COUNTY OF POLK     )
3
4    Be it known that I reported the remote deposition of
5  JEFFREY SPENCER on the 12th day of October, 2023;
6    that I was then and there a Notary Public in and for
7  the County of Polk, State of Wisconsin, and by the virtue
8  thereof, I was authorized to administer an oath;
9    that the witness, before testifying, was by me first
10  duly sworn to testify to the whole truth and nothing but
11  the truth relative to said cause;
12    that the testimony of said witness was recorded in
13  stenotype by myself and reduced to print by means of
14  computer-assisted transcription under my direction, and
15  that the deposition is a true record of the testimony
16  given by the witness to the best of my ability;
17    that I am not related to any parties hereto nor
18  interested in the outcome of the action.
19    Dated this 31st day of October, 2023.
20    
21    _____
     Michelle A. Manni, RPR, Notary Public
22    State of Wisconsin At Large
     My Commission Expires June 28, 2025
23
24
25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 47_
Spencer** 6:4
7:2 52:9 59:16

**Exhibit 48_
Spencer** 6:5
7:2 54:18

**Exhibit 49_
Spencer** 6:7
7:3 32:9 45:5
49:22,23 62:18
65:23

**Exhibit 51_
Spencer** 6:10
43:5,10

**Exhibit 52_
Spencer** 6:12
47:4

**Exhibit 53_
Spencer** 6:13
60:22 61:2

**0**

**001098** 64:12

**0900** 48:3

**1**

**1099** 64:12

**10:00** 48:3

**10:03** 53:3

**11** 7:10

**12/28/2019**
45:9

**12:47** 7:12

**12th** 7:11 29:24
58:9 76:20

**15** 19:14 25:10,
12

**16** 18:18

**17** 18:18

**19** 64:4

**19154** 46:22
47:2

**19157** 61:8

**1:21** 29:18

**1:26** 29:15

**1:28** 29:24

**2**

**2** 61:22

**20-cv-1123**
7:18

**2008** 16:23
19:7,11

**2010** 18:17

**2017** 18:18

**2019** 32:23
33:2,11 34:21
45:7 46:3 48:4,
6 51:8,11 63:9
66:8 74:16

**2023** 7:11
29:24 58:9
76:20

**22nd** 66:8

**23d** 33:11

**23rd** 32:23 33:2
48:6 63:9 67:25
74:16

**24** 16:2

**25th** 51:11

**26** 34:21

**26th** 49:2 51:11
57:5

**27th** 46:3 48:4
49:5 57:19

**28** 51:8

**2:14** 58:3

**2:20** 58:2

**2:22** 58:9

**2:51** 76:14

**2:58** 76:20

**3**

**30th** 45:7

**31st** 61:13

**352** 61:21

**3:12** 86:1,3

**4**

**47** 7:2 52:9
59:16

**48** 7:2 54:18

**49** 7:3 32:9 45:5
49:22,23 62:18
65:23

**5**

**51** 43:5,8,10

**52** 46:23,25
47:4

**53** 60:22 61:2

**6**

**68** 68:23

**7**

**730** 7:10

**8**

**8** 68:23

**8:00** 63:9

**9**

**9:00** 48:3

**9:40** 46:3

**A**

**a.m.** 48:3 63:9

**abdomen** 63:6

**Absolutely**
14:6 23:13

**academy**
15:15

**access** 22:5

**account** 31:8

**accurate** 24:9
62:10

**accurately**
20:25

**ACH** 46:22 47:2
61:8

**acquire** 22:5,
12

**act** 32:5,7 44:2,
19

**acted** 81:2

**acts** 30:23,25
42:10 84:6

**actual** 67:12

**administrative
-type** 19:2

**administrator**
7:14

**Advanced**
7:16 8:7

**advised** 32:23
33:6,7 34:2,21,
23 45:10 51:10
63:4 66:11
74:16,19 75:2

**advising** 55:8

**affect** 67:19

**affects** 70:20

**agreed** 8:18
35:2 36:10 38:7
49:2

**agreement**
8:20 9:10 35:11

**ahead** 15:24
17:11 18:1
20:21 22:8
24:1,16 25:21

**aid** 71:25

**alcohol** 62:1
63:13 67:18
68:9 73:8

**Alex** 39:24

**alive** 34:14

**allowed** 66:4
73:18

**Amber** 61:12

**ambulance**
27:1

**amlodipine**
64:22

**Andrew** 8:2

**another's** 79:8

**answers** 10:7,
12 11:4,6 67:13

**anticipate**
53:23

**anticipated**
53:25

**anticipating**
55:25

**apologize** 16:8
38:18 41:15
42:3 43:1 53:8
54:20 78:25
83:3

**appearance**
7:20

**appeared**
60:17

**appearing**
7:24,25 8:4,9

**appears** 32:15
33:14 43:21
59:18,25 61:25
66:20

**27:15** 41:23
50:25 54:13
58:24 59:9
63:23 66:10,19
69:8 70:7,24
72:12 84:25
85:18



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

apply 81:24

approach 19:17 25:16

approximately 19:14 46:3

argumentative 72:11

arrangements 67:11

asks 11:15

assign 19:1

assigned 35:8, 9

assist 18:25 64:17

assumes 70:6

attack 33:6 74:20,22,25 75:3,4,6,10,12, 17

attempt 34:16 66:5 67:12 73:19

attempted 65:20

attempting 65:19

attend 48:8,10, 12,15,18 49:13

attended 16:11 45:8

attending 7:20,21

attorney 9:11 12:3,7,8,19 13:1 14:4,9,16

attorneys 12:15

author 32:18

autopsy 13:13 31:4,7 44:12,25 45:8,10,14,17, 19

aware 51:15 56:2 58:25

66:14 75:6

_____

**B**

bachelor's 15:2,7

back 25:11 27:3 29:13,21 31:24 42:7 44:8 45:2,5 49:22 50:1 54:17 58:1,6,12 59:15 61:21 62:17,19 65:23 68:20 72:20 74:14,15 76:10,17 79:19 81:19 83:3,9,12

background 15:1

bad 72:22

based 23:17 30:2,13,17 36:8,20 41:7 53:9 54:8 73:10 82:17

basement 48:2

basic 20:8 38:24 71:25

Bates 47:1

Bates-stamped 46:22 61:8 64:11

begin 9:9 21:15

beginning 26:6,8 53:2 74:15

behalf 7:16 8:2,9

believed 59:2

Benzo 61:25

benzodiazepines 63:10,11

bit 10:10,11 11:10 12:12 14:25 45:5 46:1 66:10 72:24

74:14

blame 73:12

blood 51:9,10, 13,14,16,17,19, 23 52:2,5 53:20,21 56:25 63:5,8 67:5,20 68:10 69:15 74:6

blue 55:9,10

booking 33:8 38:16,20,21,24

bottom 45:17 62:25

Bower 75:16

Boyer 7:14,15 13:18 14:20,23 27:23,25 28:3, 11,14,16,22 29:1,4,6 32:25 46:4,11 53:3,5 55:14 58:16 60:8 72:21 73:13,20 74:17 77:1,3

Boyer's 18:20 25:25 26:15 27:20 30:4,23 42:11 43:21 50:6 54:11 55:3,5 60:19 65:6 69:14,16 72:9,19 75:19 76:3

break 11:18 29:13 57:24 76:9

breaking 22:14

Bresnahan 8:11

briefly 41:16 52:23

bring 66:5,9,11 73:19,21

broad 23:23 24:5,9

burden 79:21 80:4 85:5,12,14

bureau 18:24

business 17:16

_____

**C**

call 17:17 28:12,13,21 29:9,10 53:4,7, 9,13,14

called 66:7

calling 77:24

calls 66:5,7 73:19 77:12,21 79:13,15

cancer 63:7

captain 9:22, 24,25 16:13,18 17:6 18:6 30:2 33:21 43:13 58:12 66:11 76:23 77:24 82:15 84:20

captured 57:11

captures 83:21

cardiomyopathy 63:6

care 50:22 58:16,22 68:1 75:20 76:5 77:9,19 78:17 79:10 80:1 82:4,7,9 83:19 84:18

case 7:18 10:2 13:21 14:21 21:24 26:15 27:20,23 32:16, 18 33:3 40:18 53:18,22 54:4,6 61:15 79:19,25 80:1,10,12,19 83:18 84:2,6,16 85:2

cases 19:1 21:22

CASSERLY 70:22 82:25 85:24

caused 44:13 45:12

cell 13:18 33:8 34:8,17 56:11

Center 48:2

Central 7:12 29:14

certainty 82:21

certification 15:16

certifications 15:11,21 71:24

chain 43:10 60:22 61:14

change 20:24

changed 17:5

charge 82:1

check 9:8

checked 60:1, 2,8

checking 60:5, 11

chest 64:13,16, 19 74:7

Chicago 7:24 8:1

chief 44:11

Christine 7:15 14:20 18:20 25:25 26:15 27:20 30:4,23 32:25 33:6,7 34:21 42:11 46:11 50:5 54:11 58:15 60:8,19 63:3,4 65:6 66:3,12, 15,23 67:19 70:17 74:17,19 75:2,9 76:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

77:3

**Christine's** 28:19 38:11 66:6 67:4

**circle** 55:10

**circumstance** 77:21

**circumstances** 30:4 35:18 65:6 79:1,8 81:24

**civil** 53:18,22 54:4,6 57:7,8

**civilian** 17:8,23

**clarification** 14:12

**clarify** 11:1

**classes** 15:9

**clean** 34:10

**clients** 9:12

**codes** 82:21

**collect** 22:23

**collected** 21:20 38:14

**collecting** 20:11 21:17 23:18

**college** 15:14

**college-level** 15:9

**committed** 62:13,15 78:13 80:19 84:1

**common** 19:25

**complained** 17:18

**complaint** 17:16,21 20:6

**complaints** 17:8,24 18:10

**complete** 35:2, 9 38:8 49:3

**completed**

13:8 26:12 32:16,18 35:8, 19 43:20

**completely** 38:17

**completing** 36:12

**computer** 21:12

**concluded** 86:3

**conclusion** 77:13,18 79:13, 16 82:15,17 83:5,17 84:16

**conclusions** 80:12

**condition** 60:20 63:21 66:24 67:4 69:14 72:6,19 75:19 76:4

**conducted** 29:22 58:7 76:18

**conducting** 21:25 58:20 59:12 75:8

**confirm** 63:3

**Conroy** 43:17

**consideration** 31:5

**considered** 77:10,18 78:18 79:11 84:10 85:1

**constitute** 82:16

**consult** 80:16

**consulting** 51:24,25

**contacted** 51:9

**continue** 11:13 58:10

**Continued** 15:13

**continuing** 15:19,22 33:5 34:2,20 35:1

**contribute** 59:24

**convened** 7:12

**conver-** 12:15

**conversation** 10:11,16,17 11:11 26:23 27:17 28:2,7,9 33:10,13,14,15 35:4,6,15,24 36:3 53:4 61:14

**conversations** 12:14 26:11 37:17,21 54:1

**coordinating** 19:4

**copy** 52:19

**Coreg** 64:22

**correct** 14:15 19:11,12,14 23:20 25:10,19 28:15 34:19 41:9,10,21 46:18 50:6,7,9, 22 51:1 54:11, 14 55:11 57:16 58:17,18 60:9 63:21 66:17,20, 24 71:25 72:7 78:9,14,19 84:9

**correction** 47:18

**Correctional** 7:16 8:7

**Corrections** 39:22,23

**correctly** 10:23 42:12 43:5 61:3 78:4, 8 80:24 83:19

**counsel** 7:22 10:1 12:8,14 76:24

**counseling** 17:22

**County** 8:3,4 16:13,16,22,24 17:8,24 18:9,15 20:15 21:5 22:2,20 35:14 37:18,22 57:17 58:20 64:11,14, 18 65:13,17 75:20

**couple** 18:4 76:23

**Coupled** 41:1

**courses** 16:10 21:11,12,13

**court** 7:8,9 9:2, 3 10:15,20,22 11:9 22:14 43:6,8 68:24 78:23 81:20,21 83:7

**courtroom** 10:8,13

**cover** 15:22

**CPR** 26:25

**crime** 62:12,15 77:6 78:13

**crimes** 18:12 21:12

**criminal** 15:4, 10 24:25 25:18 30:6,7,8,19,22, 23,24 32:5,6 36:11,14,19 42:9,10,14 44:10,18 53:22 58:14,21 59:4, 12 60:12 62:6 69:23 70:2,3,12 78:3,18 79:24 80:2 81:7 82:10,21 84:5,6 85:8,9

**critical** 48:1,16 49:16

**current** 16:12

**cursor** 45:7

**D**

**Daniel** 8:6

**Danielle** 8:3 39:21

**date** 26:1 56:24 57:18 59:25

**dates** 18:14

**day** 7:11 34:23 49:4,5 57:5

**days** 52:3

**death** 13:19 25:25 26:7 28:19 30:5,7,9, 19,23,25 31:16 32:3 42:11,15, 18,23 43:17,21, 24 44:9,14,18, 21,24 45:11,23 50:6 51:21,23 54:6,11 55:3,5 63:18 65:7 68:2 72:9,16 73:13

**deaths** 21:11

**debrief** 48:1,5 49:16

**debriefing** 48:16 49:10

**December** 32:23 33:2,11 34:21 45:7 46:2 48:4,6 51:8,11 57:5,19 61:13 63:9 66:8 67:25 74:16

**decide** 21:18, 23 22:2 23:3,7, 9 71:10 72:8

**deemed** 68:16 70:16 73:6

**Defendant** 8:7 61:15

**defendants** 8:2,10 9:12

**defined** 78:18 79:7

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

definitions
79:19

Degner 39:24

degree 15:2,5,
7 78:3

degrees 71:24
72:1,3

delay 10:18

demographic
38:24

department
22:21 37:18,22
58:20 59:6

depend 40:18

depending
21:21 23:6 24:6

depends 19:20
22:9,11,16 23:5
69:6

deponent 9:3

deposed 10:2

deposition
7:13 9:11 10:12
12:13,16 13:5,
21 14:18 29:22
36:21 52:9 58:7
76:18 78:1 86:3

depositions
10:6

deputies
18:11,13 19:8

deputy 17:2
39:24 44:12

destroyed
51:12

Detective 45:8

determination
41:8 42:15,22
43:22,23 44:9,
24 50:5 78:12,
16 81:10

determinations 72:4

determine
30:18,22 31:5,

12 42:10 44:15,
21 45:11,12
50:4,21 51:21
65:16 71:19
72:14 77:3
79:20,25 80:18
81:1,6 84:6,7

determined
41:18 45:22
52:1

determining
30:24 50:18

development
16:6

diazepam
61:22 62:2,4,12
66:23 67:15
68:8,16,22
69:13 70:2,8,21
72:21 73:15
82:8

diazepine
63:20

diazepines
63:12

died 31:2,12
44:15 62:8,14
75:10

dies 55:24

difference
36:14

difficult 11:8

direct 26:10

directly 26:23

directs 11:15

discretion
41:11,17

discuss 36:2

discussed
50:3 56:8 65:8
66:8 67:15

discussion
65:18

disposition
17:20

disregard 79:9

distinction
38:1

distinguish
27:13

District 7:17,
18

document
32:12,19 43:13,
14 45:21 46:19
47:7,13,17,25
52:16 53:10,13
54:21 61:4,7,9
64:4,7,18

documentation 38:10

documents
12:4 13:4,9,10,
23 14:2,3,7,8,9,
10,13,14 38:21,
23 64:17 65:15
74:2

domestic
21:13

Doug 8:6 82:12

Doug's 83:22

dove 85:4

drawn 51:10,
13,14 52:4 63:9

drew 80:12

driving 17:16

drove 17:16,19

drug 71:4 72:5
73:7

drugs 71:4,6,7,
11,15,19 72:6,
9,14,22 73:4
82:8

due 52:2

duly 9:3,17

duties 19:2

dying 56:9

disregard 79:9

_____

E

_____

earlier 21:14
56:12 66:24
67:15 74:12
77:4,25 80:23

earliest 33:2

early 33:1
74:18

education
15:1,9,19,22

effects 60:18
62:2,12 63:20
66:23 67:1,3,16
68:8,10,17,25
69:2,13,15,17
71:3,4,8 82:8

email 43:10
44:4,11 47:4
60:22 61:12,14,
17 67:16 68:15

emailed 61:16

emergency
16:5 26:3 66:13
73:22 75:20
76:5 77:4 79:10

employed 21:4

employment
16:12 17:7 81:3

encompass
33:9

encouraged
48:9

end 10:19
18:17 75:15

endangering
79:7

endangerment
77:7 80:11,19
82:16 83:6,17
84:1,7,17

ended 70:10

enforce 78:8

enforcement
15:10,15 78:2,8
82:18

enforcing
78:11

ensure 25:15

entail 15:5

entailed 15:8

entered 32:8

errors 31:15,25
32:3,4,6

established
66:24

estate 7:15

et al 7:17

evaluating
58:15,21

evening 66:7

event 53:24

events 27:8

evidence
20:11 21:17,18,
20,22 22:2,3,6,
9,11,12,17,19,
23,25 23:18
24:10 25:6
31:1,3 36:23,25
37:2 41:1,18
42:1,6 51:17
56:17,20,21
57:2,8,14,15,18
70:7

exact 26:1

EXAMINATION 9:19 82:13
83:13

examined 9:17

examiner
46:14 52:1

exhibit 7:2,3
32:9 43:4,5,10
45:5 46:17,23,
24 47:4 49:22,
23 52:8,9,10
54:18 59:16
60:22 61:2
62:18 64:4
65:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

exhibits 43:2

exists 22:3

exiting 75:19

expected 34:22

expecting 55:15,20

experience 81:11 82:18

experiencing 64:19

expert 45:22 80:17

expertise 80:17

explaining 85:16

extent 77:12 79:12

_____

**F**

face 38:20

fact 61:24 69:1 73:2,7

facts 70:6 79:18 80:3 82:16 84:16

familiar 50:17 64:13 77:6

feed 10:19

feel 10:11 80:4 81:25 85:5,10, 19

feels 11:10 48:8

felt 40:7,9,18 41:25 70:9,12 79:21

female 26:24 32:24 74:17

Fennigkoh 8:8 61:15,16,18 68:15

figure 25:17 76:25 80:9

file 38:12,14, 15,17,19 39:3, 11

filed 17:9

filming 10:17

final 70:25

find 24:17,18, 20,21 25:17 36:17 53:21 66:7 73:12 83:8

fine 9:13 15:18

finish 16:9

firearms 16:5

flighted 27:1

folks 23:11,15 74:2

follow 70:19

footage 57:9, 10

force 10:13

form 15:23 17:10,25 19:18 20:4,20 22:7 23:25 24:15 25:20 27:11 28:4 31:18 40:16,25 41:22 50:10,23 54:12 56:21 58:23 59:8 64:25 66:18 69:7 70:5 71:12 75:21 77:11,20 78:20 79:12,14,15 81:4 83:20 84:19 85:17

forward 40:10 82:1

found 41:2 42:1,6 63:4,8, 11 67:17 70:8

foundation 69:8

frame 48:23

Fritz 39:24

front 12:5 18:16 27:5 47:9 61:5 69:10

full 8:14 24:10 33:9,12

FYI 55:13

_____

**G**

gather 25:6 41:4

gathered 34:4 38:10

gathering 38:13

gave 38:2,3 39:18

general 15:9 18:12 21:15 24:14 51:16

generally 19:24 24:5,12, 24 27:20,21 32:4 34:15 35:18,21 46:14 59:4

give 10:12 11:4,6 36:5 43:1 45:2 73:23 74:3 79:4

giving 10:7,13

glass 61:19

goal 24:14

good 55:18,20 62:1

governing 20:16

Great 9:15 11:18 12:1,4,7, 11,20 13:4,14 18:4 25:8 29:17 43:9 49:25 51:3 62:9,16,18

Greg 7:14 14:23 27:25 28:3,11,14,22

29:1,3,6 53:3,4 63:4 66:7,11

ground 10:5

grounds 70:6

group 55:2,6

guards 64:17

guess 15:14 21:20,22 35:11 54:1 56:24 58:1 59:1 64:16 68:6 69:6 83:24

guessing 44:23

guidance 79:4

guilty 80:10

Gundersen 13:12 51:9 74:12 76:4

_____

**H**

half 12:24 17:3

Hallman 26:17, 19,21 27:3,10 32:24 33:7,10 34:3 74:16

hand 9:1

handwriting 52:20

Handwritten 7:2

happen 35:22 55:20

happened 31:6 49:19

happy 10:25 11:1

Hardy 8:9,24

Harmston 8:11

head 11:5,6 16:2 17:16 37:25 39:1 79:5 80:14

health 49:17

63:5

Healthcare 7:16 8:7

hear 24:4 25:24 50:15 78:23,24

heard 26:7

heart 33:6 64:21 74:20,22, 25 75:3,4,6,10, 11,16

held 16:15,23 48:1 49:4,19 51:10,14 53:21

helped 51:20, 21

helpful 42:16, 17,18,21

Helping 31:12

helps 10:22 62:7

Hendrickson 8:4 28:3,14,15, 25 38:11 39:10, 17 66:11

Hendrickson's 27:25

high 63:5

highlight 32:21

highlighted 45:6 47:24 51:6 53:16 62:24 67:9 73:18

highlighting 32:22 46:2 51:5 64:20 65:24

hired 16:18,21

history 63:17

hold 51:15 82:20

homicide 30:10 80:7

hope 43:6

hospital 26:2,5 27:1 51:9 60:4,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

8

**hospitalized**
32:25 74:18

**hour** 12:25
57:23

**hours** 16:2
21:10 25:12
33:1 74:19

**human** 79:9

**hundreds** 21:9

**hypothetical**
77:21 79:15

_____

**I**

_____

**identification**
7:5 43:11 47:5
60:23 61:22

**identified**
32:24 62:3
74:17

**identify** 8:19
22:25 23:10,13,
17 31:14,25
32:2 61:19
75:13

**identifying**
68:16

**Illinois** 7:24
8:1

**imagine** 19:24
57:7

**impactful** 72:5

**important**
33:15 70:13,16

**in-depth** 18:13

**inaudible**
22:13 72:23

**incident** 18:20
22:1 23:11,15
25:25 26:7,18,
20 32:10 33:3
39:6,25 45:2
48:1,5,8,16
49:4,10,16
54:11 62:18,19
74:13

**include** 59:7
63:14 85:7

**including** 18:5
63:5

**inclusive** 21:9

**independent**
27:7,13,16,19,
22 28:23 30:13,
16,17 50:5
53:11

**independently**
27:24 28:8,20
29:8,11 35:5
36:7 46:6 53:6
57:12

**individual**
40:13,14 68:11

**individuals**
40:4,23 41:20

**informal** 10:11

**information**
30:21 34:4
38:13,16,24
40:9,19,22
41:4,9 42:21
49:9 53:14 63:3
65:21 66:3
70:4,9,13 71:15

**informed** 46:3,
11,14

**ingested** 68:9

**ingesting**
67:18

**initial** 45:10,13,
17 55:7

**initially** 18:11
40:7

**initiate** 20:1,3

**initiated** 30:14

**inmate** 26:24

**instruction**
36:24 37:4,7

**instructions**
36:22

**instructor** 16:6

**interaction**
46:5

**interesting**
61:23

**internal** 36:12,
15,16

**interrupted**
15:17,20

**interrupting**
38:18 53:8

**intervention**
52:3

**interviewing**
20:8,9 21:16

**investigate**
69:14,17

**investigated**
18:10 69:13

**investigating**
21:11,12,13

**investigation**
13:16 14:1
19:6,17,21,23
20:3 21:15,19
22:1 23:1,4,7,
14,22,23 24:11,
14 25:5,15,16
26:9 28:1,6
30:3,6,14,22
31:11 34:5,12,
15 35:3,7,10,
13,17,19 36:3,
6,11,12,15,16,
17 37:15,19,23
38:4,8 40:1,4,
10,15 41:2,12,
19 42:9,14,19
43:18,21 44:2,
10 45:14 48:20,
21,23 49:3,6,9,
11,14 50:2,4,20
51:19 52:25
58:13,15,21
59:1,5,13,17
60:12 62:6 65:5
67:24 68:9,12,
17 70:1 71:11
74:21 75:9,11
76:3 77:2 79:23
80:16 82:10,18

83:25 84:2,5
85:9

**investigations**
16:6,7 18:12
19:8,13,25
20:1,17 21:4,10
24:13 25:2,9,13

**investigative**
18:24 19:10
49:19 85:16

**investigator**
17:3 18:5,6,9,
15 19:9

**investigators**
18:25 19:1
35:21

**involve** 42:14

**involved** 14:21
23:11,15 26:14
30:23,25 31:25
48:7,19 49:18

**involvement**
23:5 33:3 55:6

**irrelevant**
41:24

**issue** 26:25
33:3

**issues** 63:5

_____

**J**

_____

**jail** 22:2 32:25
34:9 38:11,14,
15,17,19 39:3,
11,21 43:17
48:6 50:22 54:6
57:9,11 65:13,
17 66:4,6,12
69:18 73:9,18,
23 74:2,18
75:20

**January** 16:23
19:7

**Jeff** 29:22
39:22 76:18

**Jeffery** 47:21

**Jeffrey** 7:4,13
8:16 9:16 43:16

58:7

**job** 15:13,19
78:7

**John** 82:24

**Johnson** 8:11
56:21

**Jones** 7:7 8:2,
21 9:7,9,14
12:3,7,8,9,19
13:1 15:23
17:10,25 19:18
20:4,20 22:7
23:25 24:15
25:20 27:11
28:4 29:16,23
31:18 33:17,24
40:16,25 41:22
46:23 47:1,3,15
50:10,23 54:12
58:8,23 59:8
63:22 64:25
66:18 67:21
69:10,19 70:23
71:12 72:10
75:21 76:6,12,
19 78:20 79:12
81:4,14 82:12,
24 83:1,9,21
84:22,25 85:17,
25

**jotting** 60:16

**judge** 10:8,14

**jump** 42:7 45:2
50:1 58:12
65:23

**jumped** 45:5

**jumping** 45:25

**jury** 10:9

**justice** 15:4,10
48:2 78:3

_____

**K**

_____

**Kafka** 8:6

**Kentuckiana**
7:9

**Kentucky** 7:10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**kind** 15:6 26:5 70:8

**knew** 40:8 54:6 55:18,19,22 59:1 75:16

**Knott** 8:6,23 69:7 70:5 77:11,20 79:14 82:14,23 83:20 84:8,13,19 85:23

**Knott's** 83:4, 15

**Kyle** 39:23

——————

**L**

**lab** 63:8

**lack** 71:4

**lag** 10:18 16:8

**laid** 11:16,21 12:5

**larger** 47:13 62:23

**law** 15:10,15 16:5 20:7 36:19 78:1,7,8,11,18 82:18

**laws** 24:18,21, 22,24,25 25:18 78:2

**lawyer** 11:12, 14

**lay** 10:4

**leads** 23:7 24:6

**leave** 49:14

**led** 63:18

**left** 43:6

**legal** 77:13,17 78:4 79:13,16, 19

**level** 80:14 81:7 82:9

**levels** 59:19,23 60:1,2,7,12,19

**lieu** 73:23 74:3, 8

**lieutenant** 9:22 17:4,6 18:6,21,23 26:17,19,21 27:2,9,25 32:24 33:7,10 34:3 38:11 39:10,17 74:16

**life** 34:22,24 55:23 79:9

**lights** 17:19

**limitations** 37:14,19,23 38:2,4

**lisinopril** 64:21

**list** 16:1

**listed** 18:4 44:24 74:25

**litigation** 53:23 54:10 57:7,9

**local** 17:16

**locate** 66:9

**located** 7:9 11:24 21:21

**location** 7:21

**locked** 33:9 34:3,6,9

**locking** 34:17

**long** 11:19 12:22 19:5 51:16 55:25 56:2

**long-term** 63:5

**looked** 57:4 66:22 67:16 73:15

**lose** 51:16

**lot** 17:17,19 41:11

**Louisville** 7:10

**lower** 74:6

**Lucas** 39:22

——————

**M**

**Maas** 39:24

**made** 53:7,13

**magnifying** 61:19

**Main** 7:10

**make** 9:22 10:23 30:6 43:22,23 44:23 47:13 62:23 66:4 70:11 72:4 73:18 77:17 78:16 80:15 81:9 84:16

**makes** 72:22

**making** 42:15, 22 44:9 50:5 59:21 78:12

**management** 16:10

**mandatory** 48:7

**Manni** 7:8 68:19 78:25 81:18 83:11

**mark** 8:9 53:19 54:4

**marked** 7:4 43:10 47:4 54:18 60:22

**matter** 7:14 36:18 43:17

**mattered** 82:10

**means** 59:6

**meant** 44:3,19 56:7

**medal** 72:1

**medical** 8:10 13:8,10 26:24 31:8,11,14,15, 25 32:3,4,6 33:8 37:8 39:2,

14,16 45:22 46:14 50:22 52:1,2 59:23 60:3,5 61:24 63:2,17 65:7,9 66:2,13 68:1 71:21,24 72:3, 18 73:22 74:9, 11,24 75:12 77:9,19 78:17 79:10 80:1,17, 18,24 81:1,11 82:4,7 83:19,25 84:18

**medication** 65:16 67:20 69:16,18,21,25

**medications** 64:21 65:8,12, 19 66:4,6,9,15, 16 67:5,12 68:11 70:18,19, 20 73:20,21,23 74:3,8

**medicine** 63:12

**meet** 12:14,18, 20 85:12,14

**meeting** 48:7, 10,12,18 49:4,8

**meetings** 12:23 13:2 49:13

**Megan** 7:23 9:9 10:1 47:15

**members** 22:20 58:19 59:5

**mental** 49:17

**mention** 31:7

**mentioned** 52:22 77:25

**message** 46:13 55:2,6,7, 22 56:25

**messages** 7:3 55:10

**met** 45:7 79:21

**80:4,8 85:5**

**Michael** 45:9

**Michelle** 7:8

**milligrams** 61:22

**Milwaukee** 8:8

**Minneapolis** 8:12

**Minnesota** 15:8

**minutes** 29:13 55:14 57:24 76:11

**mix** 15:9 18:12 62:1 73:7

**Moga** 8:3 39:23

**moment** 42:25 43:1 45:2,3 46:17 47:12 49:22 51:3 52:8 54:17 60:25 61:3 72:21 80:15 83:7

**Monroe** 8:3,4 16:13,15,21,24 17:8,24 18:9,15 20:15 21:4 22:1,20 35:13 37:18,22 57:17 58:19 64:11,14, 18 65:13,17 75:20

**morning** 48:6 74:19

**mortality** 50:8, 13,16

**mourning** 33:1

**move** 40:10 51:4 62:23

**moving** 53:15

**muddled** 42:4

**mute** 84:21

——————

**N**

**narrow** 24:6,9,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

11

**natural** 43:22, 24,25 44:2,4,6, 16,21

**needed** 35:8 36:25 53:21 79:11

**nodding** 11:5

**noncriminal** 44:2

**note** 53:21 54:3,5 59:21 60:14

**noted** 45:17 74:5

**notes** 7:2 52:19,22,24 57:5 59:17

**number** 16:10, 24 17:4 18:12 19:2 66:4,15 70:18

**numbers** 60:16

---

**O**

**oath** 10:8

**object** 70:5 77:11,12,20 79:14,15 83:20 85:17

**objected** 69:7

**objecting** 11:12

**objection** 9:11,12 11:14 15:23 17:10,25 19:18 20:4,20 22:7 23:25 24:15 25:20 27:11 28:4 31:18 40:16,25 41:22 50:10,23 54:12 56:21 58:23 59:8,9 63:22 64:25 66:18 67:21

71:12 75:21 76:6 78:20 79:12 81:4 84:19

**observing** 20:7

**obtained** 40:23

**occur** 28:3

**occurred** 22:1 24:17,20 25:7, 17 26:21 28:7 30:19 35:24 42:10 45:9 48:5 83:18 84:6,7,17

**October** 7:11 29:24 58:9 76:20

**office** 16:14 19:8 27:25 28:9,11 48:1

**officer** 39:22, 23 78:2,8

**officers** 61:19

**omit** 85:15

**one's** 72:5

**ongoing** 16:3

**online** 7:7 75:18

**open** 17:18 19:3

**openly** 49:18

**operations** 16:5

**opinion** 78:13 82:20 83:16 85:15

**opioid** 63:12

**opioids** 62:1

**opposed** 36:12,18 44:3

**order** 20:1

**oversaw** 18:24

---

**P**

**p.m.** 7:12 29:18,24 46:3 58:3,9 76:14,20 86:1,3

**pages** 52:24

**pain** 64:13,17, 19 74:7

**paperwork** 38:15 39:6,7,9, 10,11

**paragraph** 67:8

**pardon** 51:24

**parking** 17:17, 19

**part** 18:17 70:25 78:7

**parties** 8:18

**parts** 33:15

**passed** 46:4, 11 55:8,14

**passing** 56:1 57:6

**past** 16:16

**pathologist** 51:22 52:1 72:14 75:14

**pathology** 74:13

**patrol** 17:2 18:13 39:23

**pause** 29:20 58:5 76:16

**pelvis** 63:6

**pending** 7:17 11:19

**people** 34:10 48:17 73:2

**period** 67:25

**periodically** 11:12

**person** 13:2

**pharmacist** 71:16

**phone** 12:21 28:12,13,17,21 29:9,10 53:4,7, 9,13,14 66:4,6 73:19

**photos** 13:9, 14,16,17

**physical** 45:12

**pill** 61:16,18 62:3 68:16

**Pisney** 8:8

**place** 37:14,22 52:3

**plaintiff** 7:23

**plaintiff's** 7:22 10:1

**point** 27:4 28:1 33:19 34:13,14 38:6 39:15 48:21 55:21 56:18 73:8

**pointed** 63:16

**policies** 20:16, 19,24 21:1

**policy** 36:17

**poorly** 39:12

**pop** 60:17

**Porter** 7:23 8:22 9:5,8,13, 15,20 10:1 12:10 17:13 18:3 19:22 20:10,12,14 21:2 22:10,18 24:3,19 25:23 27:18 28:10 29:12,17 30:1 31:19 33:20 34:1 40:21 41:6 42:2 43:9,12 46:24 47:2,6,16 50:14 51:2 54:15 57:3,22 58:1,11 59:3,14

60:24 64:1 65:2 66:21 67:23 68:19 69:4,12, 24 70:15 71:2, 17 72:15,17 76:1,8,13,22 77:16,23 78:21, 25 79:6,22 81:8,14,18 82:2,11 83:2, 11,14,23 84:11, 14,20,24 85:6, 21

**portion** 32:22 39:20 42:3 43:15,18 45:6 46:2 51:4,5 53:3,16 59:18 62:24 64:20,23 65:24 73:17

**position** 16:4 17:5 18:19 69:16

**positions** 16:15,24 17:1 18:5

**positive** 61:25 63:10

**possession** 13:25 62:4

**possibility** 57:7

**possibly** 33:6 40:22 74:19 75:3,10,16

**potassium** 59:19,23 60:1, 2,7,11,19

**potential** 23:6 51:17 63:20 66:23 67:3,16 69:17 75:13

**potentially** 44:12 49:8 63:17

**practices** 80:18

**practitioner** 81:2 82:4,7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

84:1

**preceding**
68:2

**preparation**
36:21

**prepare** 13:5
14:17

**prepared**
12:12 56:8

**preparing**
20:13 21:17

**prescribed**
63:11 65:13,17
67:5 68:10
69:15,18,25
73:5,24 74:4

**prescription**
72:21

**present** 10:15
13:2

**presented**
21:23 80:3

**preserve**
34:16,18 56:6,
13,16,19 57:10,
14,18

**preserved**
56:10 57:8

**preserving**
56:25

**pressure** 63:6
67:5,20 68:10
69:15 74:7

**presume** 11:3

**previous** 44:8
52:9

**previously** 7:4
27:6 32:8 49:1
54:18 57:4
58:14 64:3

**prior** 13:18
52:4,8 56:24
57:5 75:19

**prisoner** 64:19

**probable**
81:25

**procedure**
36:17

**proceed** 9:5
29:25 76:21

**proceeding**
34:5

**proceedings**
7:1 29:20 58:5
76:16

**process** 85:16

**produced**
45:22

**professional**
78:13 83:16

**prognosis**
55:18,19

**promoted**
17:4,5

**property** 66:12

**protocol** 64:13

**protocols** 10:5
64:14,17

**provide** 77:19

**providing** 77:9
78:17 79:10

**provision** 80:1
83:18 84:17

**provisions**
78:4

**prudent** 40:14

**Psychological**
8:10

**pulled** 61:16,
18

**purpose** 28:21
29:10 30:3,21
31:10 34:17
36:1,2 42:8
50:2,3,20 58:13
59:6

**purposes**
49:20

**put** 46:17 64:3
69:1 70:16
71:8,14 85:20

---
**Q**
---

**qualified**
71:10,14,18
72:8 81:1,6,9

**question**
10:21,24 11:14,
19 16:20 31:24
44:8,20 53:19
54:4 56:15
65:14 67:13
68:13,20,23
69:10 70:6,25
71:18 75:22,25
77:11 79:2
81:5,16,17,19,
21 83:2,20,22,
24 84:3 85:17,
21

**questioning**
83:4,10,16

**questions**
10:7 11:2,12,20
37:24 76:10,24
82:11,12,24,25
83:1

**quick** 58:13

**quickly** 16:25
55:13 65:24

---
**R**
---

**radiation** 63:7

**raise** 9:1

**range** 15:25
16:7

**ranged** 16:4

**rank** 9:21

**re-ask** 68:13
81:17

**reach** 83:17

**reached** 26:17,
19 80:14 82:17
83:5

**read** 47:10,12
52:13,15 68:20,
23 73:10 81:19,

21 83:3

**reading** 41:20
55:12 68:15
73:10,17 74:1
83:9

**reads** 61:20

**ready** 9:5
47:15

**real** 58:13

**realize** 17:18

**reason** 73:12

**reasonable**
82:20

**recall** 18:2
26:1,6,14,16
28:2,20 34:25
35:6 36:4,7,8,
21 37:20 38:5,
10,19,22,23,25
39:4,18 40:5
46:5,8,10,13,15
47:19 48:22
53:4 56:2
57:12,13,16,17,
20 59:22,25
64:10 65:10,11,
15 67:6,22
68:3,5,7 73:25
74:1,23 75:1

**recap** 50:3

**receive** 13:24
37:1,4,7 39:16
75:20 76:5

**received** 21:3,
7,9 36:24 50:21
58:16,22 70:4,
9,14 78:2,3

**receiving** 20:6
36:22 65:12,16
66:16 67:20
68:1 70:18

**reckless** 77:6,
10,18 78:18
79:11 80:10,19
81:7 82:16
83:5,17 84:1,7,
17 85:3

**recklessly**

21 83:3

**81:2**

**recklessness**
79:7 81:12

**recognize**
32:12 43:13
47:7 52:16
54:24 61:8 64:7

**recollection**
26:10,12 27:8,
13,17,19,22
28:23 30:3,13,
16,18 46:7,9
53:11

**reconstructio
n** 63:7

**record** 7:6 8:15
29:19,21 32:23
55:13 58:4,6
59:23 60:3,5
66:6 74:24
76:15,17 86:2

**recording**
10:16 59:19
60:7

**records** 19:4
31:8,11 37:8
39:3,14,16
61:24 65:7,9
72:18 74:9,11
75:12

**refer** 79:2,19

**reference** 61:7
64:16

**references**
39:5

**referring** 24:22
57:2

**refresh** 47:17

**related** 25:25
26:7 27:20,23
30:7,9 32:16,18
53:23 60:17
61:23 71:15
72:19 74:2,7,25

**relates** 44:1,10

**relevance**
69:3,5



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

relevant 23:1 24:10 40:22 41:3,9,19 42:6 49:9 60:12 62:5 68:9,11,16,21, 22 69:22 70:1, 2,10 71:6,11,19 72:9 73:6 75:10 80:22 85:2,10, 19

rely 75:14

remember 13:10 26:22 27:8,24 28:7,8, 25 29:3,6,9,10 33:13 35:3,23 53:6,9,12 61:2 65:9 81:12

remembering 42:12 43:5 78:4 80:24

remind 11:23

removal 63:7

removed 34:22

repeat 10:25 16:19 31:20 42:4

repeating 25:11

rephrase 11:1 84:4

report 7:3 13:8, 13 26:12,13,16, 22 27:5,6,14 32:10,16,17 33:14 35:6 36:9,21 40:13, 15,24 44:12,25 45:2,14,17,18 46:6,7,9 49:25 51:5 62:18,19 63:15 66:14 70:11,13,17 71:9 74:13,15 85:7,15,20

reporter 7:8 9:2,4 10:15,20, 22 11:9 22:14 43:6,8 68:24

78:23 81:20,22 83:7

Reporters 7:9

reporting 20:7

reports 20:13 21:17 31:4,7 39:21,25 40:8, 11 41:20 45:19

represent 7:9

represented 12:8

request 51:13

requested 51:9

research 60:18 63:10,19 67:25 74:22 75:18 76:2 82:3,6,8

respect 83:18

respond 11:2, 13,15 18:25 61:23

responding 11:5 17:17

response 16:9

responsibilities 18:8,22

resulted 42:11

resulting 30:19

results 63:8

revealing 12:13

Revels 35:2,4, 5,11 37:9 43:16

review 13:4,7 14:3,8,14 36:8, 20 39:2,14 40:13 41:18 45:13,15,16,19, 21 50:8,13,17 53:10 66:2 72:18 74:10,24

reviewed

13:11,15,23 14:7,13 20:16 27:6,14 39:21 40:1 63:2 66:6 74:12 85:8

reviewing 19:3 23:18 24:13 26:16,22 31:11 47:17 60:13 75:12

road 18:11

Robert 43:17

room 12:1 28:16 48:2 53:7,9,12 77:4 79:10

rules 10:5 11:16,20

Runice 39:22

___

**S**

S.C. 8:10

safety 79:8

sake 10:20

sample 51:19

samples 51:12 52:4,5

scene 34:16,18 56:7

Schamber 8:11

Schwanz 39:23

scope 24:6,9 33:10,12 36:5

scratch 18:7 23:22 60:6 67:2 68:18 71:20 73:11 77:1

screen 11:8 16:9 32:8,10 33:18 43:3 45:4 46:16,20 47:9, 14 49:21,23 52:11 54:19,22 59:16 61:4

62:20,23,25 64:3,5,12

scrolling 52:23

search 14:2,7

searching 61:20

secured 34:9

seek 22:25 23:5

select 14:6,8

send 82:1

sending 79:9

sentence 39:8, 12 63:14

Sergeant 39:21,23

shaking 11:5

share 32:8 43:3 52:8 59:16 61:1,3

shared 46:19

sharing 42:25 45:1,4 46:16 49:21 52:7 54:16,19,21 57:23 60:25 62:16 64:2

Shasta 8:3

sheet 38:20,24

Sheila 7:7 29:23 58:8 76:19

sheriff 35:2,4, 5,11,15 36:2,5, 22 37:9,14 38:2,7 43:16 44:11 48:20 49:2,3

sheriff's 16:13 19:8 22:20 37:18,22 48:1 58:20 59:5

short 12:24

shortly 55:24

show 79:8

showed 63:9

side 61:21

significant 63:4

single 13:12 16:3

sir 69:7 71:18

sirens 17:19

site 61:22

sitting 27:9

Skipping 66:10

small 33:17

sort 35:21 36:5, 18 38:12,25 84:16

sound 25:18

sounded 37:25

source 39:19

Sparta 8:5 11:25

speak 14:17 23:24 40:3,14, 20 41:12,17,19 65:22 72:24

speaker 28:16

speaking 23:10,14 28:18 40:23 41:4,8

specific 14:9 15:10 21:10,11, 13 23:11 44:13 57:2 77:25 79:18 81:24

specifically 15:14 19:9 46:15 49:12,17 57:1 70:11 80:6 85:3

specification 77:13



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

specifics 79:3, 25

speculate 81:15

speculating 81:13

speculation 77:22,24

Spencer 7:4, 14 8:16,19 9:1, 16,21,25 29:22 30:2 33:21 43:13,16 47:21 58:7,12 68:21 76:18,23 77:25 82:15 84:20

spend 12:11

spoke 12:21 27:9 35:1 40:8 49:1

spoken 38:7 48:20 49:1

squared 55:15 56:5

staff 34:9

Staffing 8:10

stamp 47:1 56:24

Stan 8:4

standard 19:17 50:21 58:16,22 82:4, 7,9

stands 51:25

start 10:22 23:23 24:5,8,10 30:15

started 17:2 19:7,10 35:14, 16 48:21,23 49:5

starting 7:21 9:21 68:21 83:4

state 7:20 8:14 15:7,15 24:24, 25 73:20 79:3,

24 82:21 84:3

stated 74:11 80:23

statements 31:4

States 7:17

statute 79:20 80:2,5,13 81:24 84:15 85:4,13

statutes 79:3, 24 80:4,7 85:1, 8

stay 34:10 57:11

step 20:5 38:9, 13

Stephen 7:25

steps 19:25 20:8 56:6,13, 16,19 57:10,14, 18

Stier 45:9

stipulate 8:18

stop 42:25 45:1 46:16 49:21 52:7 54:16 57:22 60:25 62:16 64:2

strange 10:10 11:10

Street 7:10

strike 30:12 31:23 32:1 37:12 40:12 47:11 50:19 75:17

structured 39:8

study 15:6

subject 32:24 43:17 49:10 61:17 74:17

substance 12:13

suffered 66:13

73:21

suggested 38:4

suggestion 37:5,8

suggestions 37:1

Suite 7:10

supervisor 48:17

Supplemental 7:3

support 34:22, 23,24 55:23

suppose 69:2

supposed 66:3,15 67:9 70:17

surprise 54:7

surprising 54:10

surrounding 30:4 31:1 65:6

survive 33:7 74:20

suspects 20:9

sworn 9:3,17

symptoms 74:22,25 75:4, 6,11,13

system 62:8 73:9

———— T ————

taking 57:14, 18 68:10,25 69:15,17,21,25 72:21 73:4,7

talk 14:25 23:3 28:17 35:20 37:5 49:18 50:1

talked 23:8,10 48:22 53:12,14 56:11 59:23

60:15

talking 12:12 27:25

technician 7:8

ten 55:14

terminology 44:1

tested 61:25 63:10

testified 9:17

testifying 11:11

testimony 13:21

TEVA 61:20

text 7:3 46:13 54:3 55:2,6,7, 22 56:24

thing 20:5 31:23 35:21 36:18 38:12,25

things 15:25 21:15 26:11 31:5 63:17 79:20

thought 85:3

thousand 16:23

thousands 21:10

throat 41:15

time 7:11,12 11:18 17:24 18:19,21 19:3 20:15,23,24 25:9 27:2 29:14,15,18,24 48:23 51:23 53:20 57:25 58:3,9 62:8 65:13 68:1 70:24 71:7 76:14,20 84:3 86:1

times 12:20 59:25

title 17:5

today 7:11 8:19 10:15 14:18 27:9 29:23 58:8 76:19

today's 12:15 13:5

told 46:8,10

top 16:2 17:15 32:22 38:25 47:10 53:2 61:21 79:4 80:13

topics 15:21

total 63:6

training 15:12, 13 16:3 19:4 21:3,7,10 25:12 48:2 71:21 78:1,2,4 80:24 82:17

transcribe 10:23

transcribed 11:8

transcribing 10:20

transcripts 13:21

trauma 45:12

turning 76:24

type 19:20 22:16 48:18

types 49:12

typically 19:24 20:1 32:6 35:14 42:20

———— U ————

ultimately 75:14

Um-hmm 37:10

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

um-hmms 11:7

ums 11:7

unable 45:10

understand 10:6,24 11:15 24:8 25:7,8 27:4,5,12 60:14 62:7,11,14 64:18

understanding 14:11 23:21 44:6 59:11 68:14 83:15,19

understood 11:3

Unidentified 61:17

United 7:17

universe 24:10

University 15:8

unnecessary 41:25

USA 8:9

utter 79:8

UW 74:13

UW-MADISON 13:13

---

**V**

vague 77:12,20 79:14

vehicle 16:5

verbal 11:4,6 17:22 35:14

verbatim 20:22

versus 36:15

victims 20:8 21:16

video 7:7 10:19 57:9,10,14,18

videoconference 7:13 29:23 58:8 76:19

videos 31:4

violated 24:18, 21,22 25:18 36:18 80:1

violation 20:7

violence 21:13

---

**W**

wait 10:21

Walensky 45:8

walk 16:25 19:16 26:5

wanted 9:8

Warren 8:3 39:21

watch 33:8

ways 22:12

Weil 7:25

weird 60:15

well-being 49:17

Wes 43:16

West 7:10

Western 7:18

wide 15:25 16:6

Winona 15:7

Wisconsin 7:18 8:5,8 11:25 15:16 16:14 24:24,25 78:19 79:24 80:2

witnesses 20:9 21:17 23:6,10,14,17 24:11 37:5

word 11:7 55:13

worded 39:12

work 10:6 19:6, 10 25:15 43:1

worked 20:24

working 19:10 25:9,11

works 65:21

write 53:19

writing 35:15 59:25

written 20:16 40:13 54:4,9

wrong 16:20 23:20 25:11 46:18 54:19

---

**Y**

year 16:3

years 15:8 17:3,4 19:14 25:10,12 26:23

yield 41:9

younger 33:24

---

**Z**

zoom 7:24,25 8:4,11 10:11,18 33:18,21 52:14



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com