Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN
--------------------------------------------------------

GREGORY BOYER, as Administrator
of the Estate of Christine Boyer,
and on his own behalf,

        Plaintiff,

      vs.          Lead Case No. 20-CV-1123

ADVANCED CORRECTIONAL
HEALTHCARE, INC., et al.,

        Defendants.

--------------------------------------------------------

GREGORY BOYER, as Administrator
of the Estate of Christine Boyer,
and on his own behalf,

        Plaintiff,

      vs.          Case No. 22-CV-723

USA MEDICAL & PSYCHOLOGICAL
STAFFING, et al.,

        Defendants.

--------------------------------------------------------

Remote Zoom Deposition of HOMER D. VENTERS, M.D.

Witness Location:  Port Washington, New York

Thursday, January 9, 2025

9:02 a.m. to 3:52 p.m.

with all parties appearing via Zoom Videoconference

Job No. 179598
Stenographically Reported by
Julie A. Poenitsch, RPR/RDR/CRC/CRR

## Page 2

1      Remote Zoom Deposition of
2  HOMER D. VENTERS, M.D., a witness in the
3  above-entitled action, was taken at the instance of
4  the Defendants, under and pursuant to the Federal
5  Rules of Civil Procedure, and pursuant to Notice,
6  before me, JULIE A. POENITSCH, RPR/RDR/CRC,
7  Certified Realtime Reporter, and Notary Public in
8  and for the State of Wisconsin, with all parties
9  appearing via Zoom Videoconference, on the 9th day
10 of January, 2025, commencing at 9:02 a.m. and
11 concluding at 3:52 p.m.
12
13
14      A P P E A R A N C E S
15 LOEVY & LOEVY, by
    Ms. Maria Makar
16 311 North Aberdeen Street, Suite 3
    Chicago, Illinois 60607
17 makar@loevy.com
    312-243-5900
18 appeared via videoconference on behalf of the
    Plaintiff.
19
20 LEIB KNOTT GAYNOR LLC, by
    Messrs. Douglas S. Knott and
    Daniel Kafka
21 219 North Milwaukee Street, Suite 710
    Milwaukee, Wisconsin 53202
22 dknott@lkglaw.net
    dkafka@lkglaw.net
23 414-276-2108
    appeared via videoconference on behalf of the
24 Defendants ACH, Lisa Pisney, and Amber Fennigkoh.
25

## Page 3

1      A P P E A R A N C E S  C O N T I N U E D
2  GERAGHTY, O'LOUGHLIN & KENNEY, P.A., by
    Mr. John Casserly
3  30 East 7th Street, Suite 2750
    St. Paul, Minnesota 55101-1812
4  casserly@goklawfirm.com
    651-291-1177
5  appeared via videoconference on behalf of the
    Defendants USA Medical & Psychological Staffing,
6  Jillian Bresnahan, Norman Johnson, Travis Schamber,
    and Wesley Harmston.
7
8  HANSEN REYNOLDS LLC, by
    Mr. Andrew A. Jones
    301 North Broadway, Suite 400
9  Milwaukee, Wisconsin 53202
    ajones@hansenreynolds.com
10 414-455-7676
    appeared via videoconference on behalf of the
11 Defendants Monroe County Sheriff's Office, Stan
    Hendrickson, Danielle Warren, and Shasta Parker.
12
13
14      I N D E X
15 EXAMINATION                    PAGE
16 By Mr. Knott                     5
17 By Ms. Makar                   149
18 By Mr. Jones                   152
19 By Mr. Casserly                202
20 By Mr. Knott                   206
21 By Ms. Makar                   215
22
23
24
25

## Page 4

1      E X H I B I T S
2  NUMBER                    PAGE IDENTIFIED
3  Exhibit 109  Curriculum vitae        77
   Exhibit 110  Intake Medical Screening Report   94
4      of Christine Boyer
   Exhibit 111  Monroe County Jail Healthcare    78
5      Policies and Procedures
   Exhibit 112  12/21/19 and 12/22/19 Narrative  111
6      Progress Note of Nurse Fennigkoh
   Exhibit 113  Medication Verification Form    118
7  Exhibit 114  Intake Medical Screening Report  123
       of Larry Schmieder
8  Exhibit 115  List of 14-day health and        133
       physicals from July 2016,
9      listing Larry Schmieder,
       Bates 002853
10 Exhibit 116  List of inmate medical files    210
       reviewed by Dr. Venters
11
12    (The original exhibits were attached to original
       transcript; electronic copies provided with
13         transcript copies.)
14
15
16      R E Q U E S T S
17 ITEM REQUESTED                    PAGE
18 1. Invoice for hours spent and compensation   13
    received
19 2. Find source for the information that       130
    Mr. Schmieder deteriorated over the final
20   week of his life
   3. Review Mr. Xiong's record and report back  140
21   if he had suffered a significant medical
    event or mortality
22 4. Confirm that the list of records in         214
    Exhibit 116 are the records that were
23   reviewed by Dr. Venters
24
25

## Page 5

1      TRANSCRIPT OF PROCEEDINGS
2      HOMER D. VENTERS, M.D., called as a
3  witness herein by the Defendants, after having
4  been first duly sworn, was examined and
5  testified as follows:
6      EXAMINATION
7  BY MR. KNOTT:
8  Q   Good morning, sir.  Could you please state your
9      full name for the record?
10 A   **Homer Venters.**
11 Q   And you're a medical doctor; is that true?
12 A   **Yes.**
13 Q   And my understanding is you've given
14     depositions in the past.
15 A   **Yes.**
16 Q   Approximately how many depositions, where
17     you're sworn and have a court reporter in the
18     room, do you think you've given?
19 A   **I would guess between 20 and 30, but I'm not**
20     **positive.**
21 Q   And I was trying to exclude from that testimony
22     in hearings or proceedings other than sort of
23     litigation.  Did I stumble on the right
24     question there for you to answer that?
25 A   **Yes.  Most of my work now is -- doesn't involve**

## Page 6

1  depositions, it involves hearings as a monitor,
2  so that 20 to 30 is my estimate of the
3  depositions.
4  Q   And that would be in legal proceedings, like a
5      courtroom, personal injury proceedings?
6  A   I don't know about the personal injury
7      component of it, but all my work is
8      correctional health, so both the individual
9      case litigation and now most of my work as a
10     medical monitor, which involves testimony in
11     front of courts, it's all correctional health,
12     one way or the other.
13 Q   And at the end of your -- at the end of your
14     curriculum vitae, there is a list of prior
15     testimony and depositions.  The first entry is
16     in 2015.
17         Were there -- I think you testified
18     in legal cases before then?
19 A   No, I don't believe so.
20 Q   Okay.  And all of that was to get to the point
21     that you're familiar with the process and kind
22     of understand that we shouldn't speak over one
23     another.  I'll try to do my best on that.  If
24     you could do your best as well, I'd appreciate
25     it.

## Page 7

1  A   Yes.
2  Q   And you're entitled to have a question that you
3      heard and understand, and if you would like
4      clarification or me to rephrase the question in
5      any way, please speak up, and I'll do so, okay?
6  A   Okay.
7  Q   If you proceed to answer the question, I, and
8      anybody who reads the transcript, is going to
9      assume that you understood the question.  Is
10     that fair?
11 A   Yes.
12 Q   We're here to discuss your opinions in the
13     matter involving Christine Boyer and the Monroe
14     County Jail.  You understand that?
15 A   Yes.
16 Q   And I've received a transcript -- or excuse me,
17     I've received your report.  Does that
18     accurately and completely summarize your
19     opinions in the matter?
20 A   Yes, based on the information I've reviewed up
21     to this point.
22 Q   And the report, I think, is dated November 26
23     of 2024.  Do you know if you've reviewed
24     anything since that time relevant to the case?
25 A   No, I don't believe so.

## Page 8

1  Q   So the report is a summary of your final
2      opinions, and you're prepared to discuss them
3      today.
4  A   Yes.  Just with a qualification I said that if
5      there was different information or other
6      information, it could change my opinions, but
7      certainly the report reflects my opinions as I
8      sit here today.
9          MR. KNOTT:  Ms. -- I think it's --
10     Maria, how do you pronounce your name?  Makar?
11         MS. MAKAR:  Makar.
12         MR. KNOTT:  Say it again.
13         MS. MAKAR:  Makar, like driving in my
14     car.
15 BY MR. KNOTT:
16 Q   Dr. Venters, you met with Ms. Makar to prepare
17     for the deposition, I assume.
18 A   Yes.
19 Q   Can you tell me when you met with her to
20     discuss the deposition?
21 A   Yesterday.
22 Q   And was that via Zoom?
23 A   Yes.
24 Q   Did any other people other than you and
25     Ms. Makar participate in the Zoom conference?

## Page 9

1  A   I don't believe so.
2  Q   Were you shown anything during your conference
3      with Ms. Makar yesterday?
4  A   No.
5  Q   In your report you state that your role is to
6      assess the adequacy of the care provided to
7      Ms. Boyer in the time she was detained and
8      leading up to the time of her death.
9          Is that what you understand your role
10     in the matter to be?
11 A   Yes.
12 Q   Were you assessed to -- were you asked to
13     assess the adequacy of anyone else's care other
14     than Ms. Boyer?
15 A   I was provided with additional records.  There
16     are other people referenced in the report, and
17     so I did review other people's records to see
18     if any of the deficiencies or problems I found
19     with Ms. Boyer's care were present for those
20     other people.
21 Q   Is it your understanding that you received
22     complete medical files for inmates other
23     than -- excuse me, detainees other than
24     Ms. Boyer?
25 A   No.  I think I explicitly say in my report that

3 (Pages 6 to 9)

Page 10

1    the additional patients, the information I
2    reviewed, was quite varied and incomplete.
3    Sometimes it involved medical records;
4    sometimes it didn't. So I think, as I say in
5    my report, it's not my position or
6    understanding that I have all the possible
7    records for those people.
8  Q  Are all of the detainee patients about whom you
9    have formed opinions named in your report?
10 A  I don't think I have any opinions about anybody
11   that's not in the report. So I think that's --
12   I'm answering yes to your question, I believe.
13   There's no person that I've formed opinions
14   about besides the people whose records I was
15   provided.
16 Q  And were you provided records for detainee
17   patients other than those that you've named in
18   the report?
19 A  Yes. I believe I -- it would be helpful for me
20   to look at this section of the report, because
21   I'm quite clear with the language I use, but I
22   believe I was presented with maybe 25 or 26
23   files, but some of them were quite incomplete
24   or didn't involve, for instance, anything
25   except an autopsy report, or something like

Page 11

1    that.
2        And so I looked at all of those 26
3    files, and based on what was in those files, I
4    assessed whether or not any of the core
5    problems or findings that were present in
6    Ms. Boyer's case were apparent in these other
7    cases.
8        And so as I say in my report, many of
9    these files were just incomplete or I couldn't
10   form an opinion.
11 Q  Were there any files that you looked at and
12   concluded that the care was adequate?
13       MS. MAKAR: Objection. Form.
14       THE WITNESS: I don't recall. I
15   think I was going through with these, really,
16   three things in mind and -- I don't recall as I
17   sit here today.
18 BY MR. KNOTT:
19 Q  Were you -- well, were you provided any lists
20   of detainees whose files you would be
21   reviewing?
22 A  No. I received a large collection of files.
23   So it was a big collection of 25 or 26 people's
24   names, and each one had an individual file.
25   And so I opened each of those up to look and

Page 12

1    see what was available. And as I say in the
2    report, and I just said here, in some of those
3    cases, I was able to discern some of the
4    problems that I saw in Ms. Boyer's case.
5  Q  In any of those matters that you looked at, did
6    you locate a COWS or CIWA standardized
7    withdrawal monitoring tool?
8  A  I --
9        MS. MAKAR: Objection. Outside the
10   scope. Work product privilege.
11       THE WITNESS: I don't recall.
12 BY MR. KNOTT:
13 Q  And so you were -- sent out a Notice Duces
14   Tecum asking you to bring certain things to the
15   deposition. Have you had an opportunity to
16   review that?
17 A  Yes.
18 Q  And is there anything that you brought with you
19   to the deposition responsive to the duces
20   tecum?
21 A  No.
22 Q  And why is that?
23 A  I believe everything that's requested either is
24   in my report, or my practice is also, with
25   counsel, to have them send, for instance, an

Page 13

1    invoice to you, since they have that.
2        But I didn't see anything listed that
3    was additional that wasn't either information
4    that counsel provided to me or I had already
5    sent to counsel so that they could provide that
6    to you.
7        MR. KNOTT: Maria, do you have an
8    invoice for Dr. Venters?
9        MS. MAKAR: I'll check. I believe
10   so.
11 BY MR. KNOTT:
12 Q  The request in the duces tecum was for an
13   itemization of the hours spent and compensation
14   to be paid for the witness's review and
15   testimony in the case.
16       Dr. Venters, does your invoice
17   itemize the hours spent and compensation you've
18   been paid?
19 A  Yes.
20 Q  I'd like that to be provided, please.
21       Dr. Venters, do you, in the course of
22   your preparation of your report, take notes on
23   the files that you review?
24 A  The notes that I take are in a Word document
25   that ultimately becomes the report itself, and

4 (Pages 10 to 13)

Page 14

1  so my approach is to create a timeline of
2  medical events and then build the report from
3  there. I don't have a separate set of notes, a
4  separate set of recordings or notes other than
5  the report.
6  Q  So your testimony is that as you sit here
7  today, the only thing you could put your hands
8  on, in terms of work product for the work that
9  you've done on this matter, is the report dated
10 November 26, 2024?
11 A  Yes.
12 Q  You said that you -- your process is to build a
13 timeline. Did you do that in this case?
14 A  Yes. There's a report -- part of the report
15 where I review the medical records of the
16 patient, in this case Ms. Boyer, and that would
17 have been the first thing I would write in this
18 document, and then I would go from there.
19 Q  So there's a narrative description of the care.
20 There is nothing I would describe as a
21 timeline. Are you saying that you did not do a
22 timeline in this case?
23 A  Since you're asking me about my report, can I
24 look at it?
25 Q  Absolutely.

Page 15

1  A  Okay. At the bottom of page 4, Section III is
2  entitled "Timeline of Events."
3  Q  And that's the reference to the timeline that
4  you just made.
5  A  Yes.
6  Q  Okay. And I want to ask you more about how you
7  received patient files.
8      In referencing page 4, your list of
9  materials reviewed includes as the fourth
10 bullet point on page 4 patient files from the
11 subpoena, and it says, for 26 ACH patients
12 outside Monroe County Jail. And that's 4,228
13 pages.
14     Did you receive all 4,228 pages?
15 A  I don't actually know as I sit here today. I
16 received for each patient a file with their
17 name on it, and I opened it up to look at
18 medical records or to see what was there, with
19 this lens that I already referenced, but I
20 couldn't tell you right now as I sit here how
21 many pages are in each of those.
22 Q  And other than the -- so you received 26
23 individual files for those detainees, if I
24 understand correctly.
25 A  Yes.

Page 16

1  Q  And did you receive any other kind of index or
2  identifier for those 26 patients?
3  A  Not that I recall.
4  Q  Is your practice to highlight electronically or
5  flag in any way the files that you receive?
6  A  No.
7  Q  Doctor, I think that the Bates number range --
8  and the reason I'm asking this question -- this
9  Bates number range actually refers to more than
10 40 patient files. And my question is whether
11 you reviewed 4,000 pages of records for more
12 than 40 patients or whether the records that
13 you reviewed were actually selected for you to
14 review.
15 A  My best answer is that -- and I just counted
16 this the other day -- there's a file of
17 additional cases. And I just looked at that
18 file, and it had 26 names in it, 25 or 26
19 names, and so those are the files I opened.
20     I don't -- if there are -- I don't
21 know if there are other cases, but those are
22 the 26 that I received and that I looked at.
23 Q  And how did you receive those records? Was it
24 in a Dropbox-type link, or was it physically
25 sent to you on a flash drive or something of

Page 17

1  that nature?
2  A  No. I think everything I received in this case
3  was through some sort of link, like a Dropbox
4  or Box link.
5  Q  I'm going to ask that you work with Ms. Makar
6  to provide to us, via the same process, the
7  materials that you reviewed in this case.
8  Okay?
9  A  Yes. That's not a problem, to work with her,
10 since I would have received them from her, so
11 yes.
12     MS. MAKAR: Doug, sorry to interrupt,
13 but I just sent you the invoice. And you
14 received the materials that we sent you along
15 with Dr. Venters' report, correct?
16     MR. KNOTT: I'm sorry?
17     MS. MAKAR: You received the
18 materials that we sent you along with
19 Dr. Venters' report back in November, correct?
20     MR. KNOTT: I'm not sure what you're
21 referring to. I have the CV and the report.
22     MS. MAKAR: There was also a Hightail
23 link with all of the materials.
24     MR. KNOTT: Okay. Well, it's been a
25 bit, so if that's there, I appreciate it; and

Homer D. Venters, M.D.                                           January 09, 2025

Page 18

1    if not, I'll work with you to try to make sure
2    that I have those.
3           MS. MAKAR:  That should have the
4    invoice, too, but just in case it doesn't, I
5    just re-sent it.
6    BY MR. KNOTT:
7    Q    And, Dr. Venters, from our discussion so far,
8    my understanding is that with respect to those
9    other patient files, you do not receive any
10   sort of abstract or summary or even a few word
11   description of the issue of those cases; is
12   that true?
13   A    **Not that I'm aware of.  My process in this case**
14   **was to look at this large file that had 26**
15   **names, to open each of those, and then to**
16   **proceed as I have outlined in my report.**
17   Q    And appreciating that I may have received this
18   information in November, but your report
19   references medical records for Kenneth Wilson,
20   Jennifer Lehman, and Larry Schmieder.
21          Do you know if you received and
22   reviewed records for patients other than Boyer,
23   the 26 patients referenced at bullet point
24   four, and records for those three patients?
25   A    **I'm just consulting my -- page 4 of my report.**

Page 19

1           **No, I believe that that's the sum**
2    **total of records that I reviewed, with the**
3    **qualification that some of the 26 people, I**
4    **think, might not have had actual medical**
5    **records.**
6    Q    In that case, you received some jail-generated
7    document pertaining to that patient, but you
8    didn't receive medical records; is that fair?
9           MS. MAKAR:  Objection.  Form.
10          THE WITNESS:  I think I even
11   reference in my report, there was a patient for
12   whom there was an autopsy report, but I don't
13   think I saw any medical records.
14          So it was -- I was very careful in my
15   report to say the type of information that I
16   received for each person was quite variable,
17   and so -- but in each case, there was a file
18   with a person's name.  I opened it up and
19   reviewed what was there.
20   BY MR. KNOTT:
21   Q    You are licensed in the state of New York,
22   correct?
23   A    **Yes.**
24   Q    Do you hold a medical license in any other
25   states?

Page 20

1    A    **No.**
2    Q    Do you currently have privileges at any health
3    care facility?
4    A    **No.**
5    Q    How do you describe your current professional
6    obligations?
7    A    **I work primarily as a federal monitor of health**
8    **care in jail and prison settings, but I'm a**
9    **correctional health physician.**
10   Q    Do you work through any kind of professional
11   entity or corporation?  Do you have a business
12   that you -- that you contract through?
13   A    **No.  I work as an independent contractor.**
14   Q    And so in addition to -- well, strike that.
15          You are not currently providing
16   direct patient care in any capacity; is that
17   true?
18   A    **That is true.**
19   Q    And your income is derived from being a monitor
20   in certain cases, correct?
21   A    **Yes.  It would be in some form of working in**
22   **correctional health, either as a monitor, or**
23   **I'm also retained by law enforcement agencies**
24   **to investigate, so not as a monitor, but to**
25   **help law enforcement investigate health care**

Page 21

1    **issues behind bars, but all of that is -- and**
2    **then this type of litigation work, but that's**
3    **all as a correctional health, I guess you could**
4    **call it, consultant.**
5    Q    Are the instances in which you've been
6    appointed as a monitor, an independent monitor
7    for a correctional facility, are those all
8    described in your curriculum vitae?
9    A    **I believe so, yes.**
10   Q    And then you said there are -- you consult with
11   correctional facilities.
12          Do you have any current projects that
13   you're working on, where you're consulting for
14   correctional facilities?
15   A    **No.  And I maybe wasn't clear.  It's usually**
16   **for a law enforcement agency.  So the U.S.**
17   **Department of Justice has retained me as an**
18   **expert in their investigations of jail and**
19   **prison health care for a number of years, and**
20   **several state attorneys general have also**
21   **retained me in the same manner.**
22   Q    And to the extent you've been retained by
23   states' attorneys general, are those
24   California, New York, and Illinois?
25   A    **Yes.**

6  (Pages 18 to 21)

Homer D. Venters, M.D.                                                January 09, 2025

Page 22

1    Q   Are those single projects for each of those
2        states?
3    A   In Illinois and California, yes, those were --
4        those are each single projects. And I'm not
5        sure they're done, but I haven't done much
6        recently.
7            In New York, I'm not currently
8        working, but I have worked on, I think, maybe
9        two jail investigations there.
10   Q   And are those -- and I'm generalizing with
11       respect to your retention by attorneys
12       general -- are those investigations of
13       incidents? Are they more broad investigations?
14       Can you -- I'm trying to walk a line between
15       not being too specific, but also wanting to
16       know what you're doing.
17   A   I would say for all of the law enforcement
18       work, it's generally -- my role is generally to
19       look at the adequacy of the health care, and
20       sometimes that involves looking at a specific
21       event, but it usually involves looking a little
22       more broadly at some of the major elements of
23       care, not just one incident.
24   Q   Have the projects that you did for the states
25       resulted in written reports that are publicly

Page 23

1        available?
2    A   I don't believe so.
3    Q   None of them have?
4    A   Not that I'm aware of.
5    Q   Can you tell me approximately what percentage
6        of your income in the year 2023 was derived
7        from consulting on legal cases for private
8        litigants versus your work as a monitor and
9        consultant?
10   A   I don't know. I would guess 50/50, but I
11       really don't know. I've never tallied that up.
12   Q   And how about in 2024?
13   A   Again, this is just a very gross estimate, but
14       I would -- my estimate is that the monitoring
15       would have been much more. Would have been
16       probably 75 or 80 percent in 2024.
17   Q   Was there a monitoring project in 2024 that
18       absorbed more of your time?
19   A   Well, I've added monitoring roles and decreased
20       the amount of private litigation over the last
21       several years. So one of the cases, I've been
22       working on for maybe three or four years, but
23       I've added subsequently other cases. So the
24       monitoring has grown to take up most of my
25       time.

Page 24

1    Q   Do you know how the Loevy firm came to find you
2        to ask that you consult on this case?
3    A   I had worked with them on another case earlier
4        in the year, but as to the question of how they
5        came to contact me for that case, I don't know.
6    Q   Do you recall the attorney you were working
7        with at the Loevy firm on the other case?
8    A   I worked both with Maria Makar, who's here
9        on this case, and with another attorney,
10       Steve Weil, I believe. And that's true for
11       both -- that's true for the case in the prior
12       engagement.
13   Q   And do you know where that -- where the
14       relevant care took place in the other matter on
15       which you're consulting with the Loevy firm?
16   A   State prison.
17   Q   Which state?
18   A   Illinois.
19   Q   Have you issued a written report in that case?
20   A   Yes.
21   Q   And was your conclusion that the care did not
22       meet standards?
23           MS. MAKAR: Objection. That's under
24       protective order.
25           MR. KNOTT: I find that hard to

Page 25

1        believe, Maria.
2            MS. MAKAR: Why?
3            MR. KNOTT: His report, his
4        conclusions are under a protective order?
5            MS. MAKAR: It hasn't been -- it's
6        not on the docket yet. We haven't reached that
7        point yet.
8            MR. KNOTT: Well, I wasn't really
9        asking for the paper. I was asking whether
10       he --
11   BY MR. KNOTT:
12   Q   Well, Doctor, to the extent that you formed
13       opinions in that matter, my understanding is
14       they've been reduced to a report, right?
15   A   Yes.
16   Q   And as you sit here today, is it your
17       recollection of that case that you believe that
18       certain standards were not met with respect to
19       the care of the Loevy client?
20   A   As I sit here today, my report, to the best of
21       my recollection, did include findings or
22       opinions about deficiencies in care; but to
23       specifically say what they were or which
24       specific standards I was concerned with, I
25       would need to consult a report.

7 (Pages 22 to 25)

Homer D. Venters, M.D.                                      January 09, 2025

Page 26

```
 1   Q   Do you recall the inmate's name in that case?
 2   A   No.
 3   Q   Have you given a deposition?
 4   A   Yes.
 5   Q   When did you give a deposition?
 6   A   Sometime last year.  I don't -- it would have
 7       been in the second half of 2024 sometime.
 8   Q   And your report hasn't been filed?
 9   A   I don't know.
10   Q   Do you remember the attorney who was in my role
11       and was asking you questions in that matter?
12   A   No.
13   Q   Doctor, can you tell me how many matters in
14       litigation or pre-litigation you have reviewed
15       this year or worked on this year?  I mean 2024.
16   A   I -- no, I don't know.
17   Q   Is there a typical caseload that you carry, in
18       terms of matters in litigation?
19   A   No.
20   Q   You testified that you cut down on your -- on
21       your litigation caseload.  Do you know what the
22       peak number of cases was before you cut down?
23   A   If I said that -- I don't believe that's what I
24       said.  I said most of my work, the work I do
25       now, is currently as a monitor.  Many of the
```

Page 27

```
 1       litigation cases might go on for years without
 2       me doing any work.  So I don't keep track.  I'm
 3       not sure if I would know how to keep track of
 4       when the cases resolve or are done.
 5           The thing I am aware of is how much
 6       work do I do.  And so the amount of work I do
 7       on the litigation side shrunk -- has shrunk
 8       over the last couple of years.
 9   Q   Doctor, do you have your CV with you, or do you
10       have access to it?
11   A   Yes, I can pull it up.
12           Okay.  I think I have my most recent
13       CV.
14   Q   Is there some way, Doctor, for us to determine
15       the date of the CV?
16   A   I -- the CV I have is -- I think the file
17       itself has a date of 5/2025.  I'm just looking
18       at the -- I'm trying to look at the actual
19       document itself.
20           But May of 2025 is when I -- or of
21       2024, I apologize, is when I believe I last
22       updated it.
23   Q   And in the CV that you're looking at, is there
24       a reference to the Illinois matter that you
25       were retained by the Loevy firm?
```

Page 28

```
 1   A   No, I don't believe so.
 2   Q   And you've given a deposition like this one in
 3       that matter.
 4   A   Yes.
 5   Q   Is there a reason why it was not included in
 6       your prior testimony and deposition testimony
 7       that you provided to us?
 8   A   I don't think I've updated my CV since the
 9       first few months of 2024.  So the hearings --
10       the court hearings as a monitor, and if
11       there -- I think there might be one or two
12       depositions, those wouldn't be on there yet.
13       So I plan to update my CV in the coming month
14       or two.
15   Q   Can you give me all the information you can
16       about the Illinois matter in which you've given
17       a deposition that's not on your disclosure?
18   A   Sorry.  What do you -- what type of information
19       are you -- you know.
20   Q   You don't remember the patient -- the
21       detainee/patient/plaintiff's name, correct?
22   A   Yes, not as I sit here today.
23   Q   Do you remember the defendant entity?
24   A   I believe it was a for-profit prison vendor,
25       and I think it may have been Wexford.
```

Page 29

```
 1   Q   And when did you give a deposition in that
 2       matter?
 3   A   Sometime in the --
 4           MS. MAKAR:  Object to form.
 5           THE WITNESS:  As I just said a couple
 6       minutes ago, I think in the second half of
 7       2024.
 8   BY MR. KNOTT:
 9   Q   Can you look on a calendar that's on the
10       computer in front of you to tell us when you
11       gave a deposition in that matter?
12   A   I don't know if I would find it in my calendar
13       as well as -- I could search through my email,
14       if you want, while we're sitting here, to look
15       and see.
16   Q   Maybe we'll do that when we take a break.  I'm
17       going to make a note of it.
18           And can you tell me -- you said there
19       were one or two cases that you've given
20       depositions in that were not included on
21       your list of prior testimony on your
22       curriculum vitae.
23           Can you tell me anything about the
24       other one or two cases, if there are two cases,
25       in which you've given testimony that are not on
```

888-893-3767     Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                California Firm Registration #179

Page 30

1   your CV?
2   A   No.  I would need to go back and review my
3       records to see what depositions have happened
4       in the last eight months or so.
5   Q   And there's been a single matter in which
6       you've worked with attorneys from the Loevy
7       firm, correct?
8   A   Aside from this one, I believe that's correct.
9   Q   Are you familiar with any of the attorneys
10      other than Mr. Weil and Ms. Makar from the
11      Loevy firm?
12  A   Not that I'm aware of.  It doesn't mean we
13      couldn't have crossed paths, just not that I'm
14      aware of.
15  Q   From the list we were given, it looks to me
16      like you've given approaching 30 depositions in
17      matters in civil litigation.  Does that many
18      sound about right?
19  A   As I said at the outset, my guess would be 20
20      to 30.  But I haven't added them up, so I
21      certainly wouldn't dispute that.
22  Q   Have you ever given a deposition in a matter in
23      which you testified on behalf of a defendant?
24  A   I believe one of the first depositions listed,
25      I wrote on my CV that I was representing the

Page 31

1       defendant, Benjamin v. Horn.  I'm actually not
2       sure legally what my title in the court was,
3       but I was the medical director for the jail and
4       was testifying about the adequacy of certain
5       elements of care.
6   Q   I've seen in prior testimony, you described
7       that as acting as a fact witness.  Is that
8       what you were doing, to the best of your
9       recollection?
10  A   Well, that sounds like something a lawyer would
11      say.  I don't know if I ever -- but as I said,
12      my -- I'll just repeat what I just told you,
13      which is that I was the medical director at the
14      time, testifying about the adequacy of the
15      care.  So however that's interpreted legally,
16      I'm not going to dispute it.  I'm just not --
17      that's kind of the end of my, like,
18      understanding of the classification.
19  Q   You were not a defendant in that case is my
20      understanding.
21  A   Correct.
22  Q   But people that worked underneath you were
23      defendants in that case; is that correct?
24  A   No.  I think it was that there was a court --
25      some legal process about whether previously

Page 32

1       agreed to or settled conditions were being met.
2       And so I think Benjamin v. Horn, the
3       case, was probably settled years before I
4       became the medical director.
5   Q   And other than that reference in your CV,
6       you've never given testimony on behalf of a
7       correctional facility or individual health care
8       provider who is accused of providing inadequate
9       care.  Is that true?
10          MS. MAKAR:  Objection.  Form.
11          THE WITNESS:  I think that's correct.
12      I think -- yes, I think that's correct.
13  BY MR. KNOTT:
14  Q   Have you told attorneys on the defense side
15      that you don't want to do that type of work on
16      the defense side?
17  A   No.
18  Q   Have you ever been retained to review a case on
19      behalf of a facility or individual health care
20      provider who is a defendant or potential
21      defendant in litigation?
22  A   Not that I'm aware of.
23  Q   But you were never asked to review on behalf of
24      the defendant?
25  A   I've been asked by a correctional system to

Page 33

1       help them assess the adequacy of their care,
2       but I don't think that was in relation to a
3       specific case or a specific litigation area.
4   Q   When were you last in a role where you were
5       providing direct patient care?
6   A   It would have been in -- when I was at Rikers.
7       So I think I left in 2017, maybe.  I would have
8       to consult my CV.  But my last direct patient
9       care was there.
10  Q   Are you board certified in any field?
11  A   Yes.  I have -- my internal medicine
12      certification is through the NBPAS, the
13      National Board of Physicians and Surgeons.
14  Q   At one point you were certified by the American
15      Board of Medical Specialties; is that true?
16  A   No.  I think I started with the ABIM, the
17      American Board of Internal Medicine, and then I
18      switched over to the NBPAS, probably with some
19      overlap.
20  Q   Is there a reason why you transitioned to that
21      other -- the second organization?
22  A   Yes.  It seemed like people in medical
23      administration, public health, it was a little
24      bit better fit.  So there was a couple-year
25      period where I had both, and then I just stuck

9 (Pages 30 to 33)

Homer D. Venters, M.D.                                          January 09, 2025

Page 34

1    with the NBPAS since then.
2    Q    The NBPAS does not require you to take exams in
3         order to maintain your certification; is that
4         true?
5    A    That's right.  It's continuing medical
6         education.
7    Q    And do you know how many hours per year you're
8         required to take of continuing medical
9         education to maintain your board certification
10        with the NBPAS?
11   A    I don't.
12   Q    Do you know if the NBPAS requires a residency
13        in internal medicine in order to obtain a
14        certification in internal medicine?
15   A    I assume so.  I have a residency in internal
16        medicine.  I guess I assumed that, but I don't
17        actually know as I sit here today.
18   Q    Referencing your CV, Doctor, and the positions
19        described under Independent Correctional Health
20        Monitor, are each of the six positions listed
21        under "Monitor" paid positions?
22   A    Let's see.  I am looking at them.  Yes,
23        although some of these were short term.  Like,
24        I think there's a date range in them.  But I
25        was paid for each of those and am paid for

Page 35

1         those in the cases that are ongoing.
2    Q    And if I understand correctly, when you act as
3         a monitor, you do not provide direct patient
4         care.
5    A    That's correct.
6    Q    If I understand, a -- well, let me ask it
7         fresh.
8              Do you have any ongoing projects with
9         the United States Department of Justice?
10   A    I believe so, yes.
11   Q    And what generally are you doing for the U.S.
12        DOJ?
13   A    Helping them with assessing the adequacy of
14        health care in a jail setting.
15   Q    Are there particular jails you're looking at?
16   A    I'm -- I believe I have an agreement of
17        confidentiality with the Department of Justice,
18        so I'm happy to consult with them after this
19        and see if it's permissible, with that
20        protective order, to disclose that to you.
21   Q    Can I ask you, is it an investigation of an
22        incident, or is it consulting on policy?
23   A    I would say -- I don't -- all of the work I do
24        with law enforcement involves adequacy of
25        different types of care.  And so usually that

Page 36

1         would involve more than just one incident.
2    Q    Have you ever been asked to review care at a
3         jail or prison in the state of Wisconsin?
4    A    I -- not that I recall, as I sit here today.
5    Q    And earlier you said that your last direct
6         patient care was while you were at Rikers.
7         Were you assigned to the infirmary at Rikers?
8    A    No.  My role at Rikers was to see patients.
9         The only time I had a regular place that I
10        provided care was when I first started, where
11        there was one jail I would -- of the 15 jails,
12        where I would see patients with residents; but
13        then over time, I came to see patients for
14        specific reasons, but I never had, besides that
15        first year or so, an assigned place or time
16        where I saw patients.
17   Q    And that first year or so is when you were
18        acting as Deputy Medical Director for
19        Correctional Health Services, New York
20        Department of Health and Mental Hygiene?
21   A    Yes.
22   Q    And what was the facility that you were
23        assigned to?
24   A    Well, I wasn't really assigned to it, but I had
25        a regular time where I would try and at least

Page 37

1         have two days a week where I saw patients in
2         what's known as the prison barge, but it's the
3         letters VCBC, Vernon C. Baines, B-A-I-N-E-S.
4         It's the floating jail off the -- in the Bronx.
5    Q    And even as deputy medical director, you had
6         just two clinical days a week?
7    A    Yes.
8    Q    So there was never a time when you were hired
9         to staff a single facility full time, true?
10   A    True.
11   Q    Were you ever in a role as an on-call physician
12        for a correctional facility?
13   A    As a deputy medical director and medical
14        director, I took calls.  We did not have --
15        because we had a large system, we had people --
16        I didn't have an assigned duty as an on-call
17        doctor, but I would regularly receive calls,
18        while I wasn't working, about patient care.
19   Q    And you said that you saw individual patients
20        through your time as chief medical officer.
21        What was the context in which you would see
22        individual patients if you were not assigned a
23        clinical day?
24   A    It increasingly became patients that were
25        either very sick or patients where there was

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                        California Firm Registration #179

Homer D. Venters, M.D.                                    January 09, 2025

Page 38

1    use of force or there was some circumstance
2    that required -- where the line staff required
3    help.
4    Q    And were you responsible in 2015 through 2017
5         for the supervision of the health care that was
6         being provided at the Rikers facility?
7    A    Yes.  Rikers is an island that had most of the
8         jails for New York City, but then in my role as
9         medical director and then chief medical
10        officer, that system is bigger than Rikers.  It
11        includes jails that are on Rikers Island and
12        then three or four, depending on the year,
13        jails in the boroughs off of the island.
14   Q    And was there a hospital facility that was run
15        by New York City for the jails?
16   A    Not a hospital.  We had an urgent care, which
17        was a very limited place, on Rikers Island,
18        where we could do basic emergency response if a
19        patient was brought to us.  But we never had a
20        hospital in our system.  We would send our
21        patients to local hospitals, depending on the
22        clinical status and other things.
23   Q    And is it fair to say that the New York City
24        jail facilities generally had infirmaries with
25        inpatient or -- yeah, inpatient beds?

Page 39

1    A    No.  The use of the term "inpatient" has a very
2         specific clinical threshold.  And so I would
3         say, in general, jail infirmaries are not
4         inpatient beds by state definitions or Medicaid
5         definitions.  That was also -- that's true for
6         the jail facility in New York City.  There were
7         two infirmaries, where patients who were below
8         the level of needing an inpatient
9         hospitalization might be, but we never had or I
10        don't think would seek to have an inpatient
11        level of care for patients.  That's what the
12        hospitals are for.
13   Q    I understand.  It was a misuse of the term.
14            Let me just talk about the two jails
15        that are referenced in your CV when you were
16        deputy medical director.
17            One of those was the Baines Center,
18        that you described?
19   A    That's one of the jails in the New York City
20        system.  It had no infirmary, though.
21   Q    But in your CV, you say you directed and
22        delivered health services in two jails.
23            One of those was the Baines Center;
24        is that correct?
25   A    Yes.

Page 40

1    Q    And the other was what?
2    A    There were several times where, for a short
3         period of time, I would be providing care in
4         one specific place.
5            So we had a circumstance in our
6         infirmary where, for a short period of time, we
7         in correctional health services became
8         directly -- more directly involved in providing
9         care.  So during that time I worked in that
10        facility.
11            I think there are other -- there are
12        other jails where, for a short period of time,
13        I would have been involved more directly than I
14        was normally.
15   Q    So can you identify the second jail that is
16        referenced in your CV, or are you saying there
17        was not two designated jails where you directed
18        and delivered health services?
19   A    What I'm saying is, I think there would have
20        been more than two, but -- and this maybe is a
21        point of clarity that I need to fix in my CV --
22        I was never only assigned -- like, since I was
23        the deputy medical director, I would spend time
24        in facilities providing and directing care, but
25        nobody was making that -- putting my name, for

Page 41

1         instance, onto the medical director, I don't
2         know, organizational chart.
3    Q    Well, let me approach it this way.  What is the
4         smallest correctional facility at which you
5         provided direct patient care?
6    A    I think that the west facility in Rikers Island
7         had about 30 or 40 people.  I think that the --
8         it's a little -- I'm struggling because there
9         are -- I provided direct patient care in every
10        one of the jails, just not consistently.
11            So I, for instance, would respond to
12        cases where a patient was injured in a use of
13        force.  I would provide care.  That probably
14        happened in every one of the jails.
15            And so the smallest, by number,
16        facilities were the west facility and the
17        infirmary, which could have had 30 to 50
18        patients in the west facility and maybe 100
19        patients in the infirmary.
20   Q    And how many detainees are held in the west
21        facility?
22   A    I think it's just, as I said, 30 or 50.
23   Q    And what's the role of the west facility in the
24        system?
25   A    People may be there getting screened for

11  (Pages 38 to 41)

Page 42

1  communicable diseases, or they could be
2  there -- I think it's primarily people who are
3  awaiting or getting screened for communicable
4  diseases.
5  Q   Is the infirmary that you referenced referred
6  to as the northern infirmary command?
7  A   Yes and no.  My recollection is there were two
8  pieces to the northern infirmary.  Command One
9  is a building.  It's a regular, very old jail
10  structure, and I guess I should have included
11  that.  That could have 30 to 100, maybe, people
12  who are just incarcerated in old-style cells.
13      And then next to it is the part of it
14  that's the infirmary, which had, I don't recall
15  as I sit here, but maybe about 100 patients.
16  Q   I read testimony in which you were asked about
17  the smallest facilities at which you rendered
18  patient care.  And your answer was the NIC and
19  the BCBC [sic].  Is that accurate?
20  A   I think what I just said kind of comports with
21  that.  I don't actually know the numbers of
22  these places, but certainly VC, Vernon C.
23  Baines Center, is a place where I consistently
24  saw patients, and so that's a bigger -- or
25  medium-size jail.  And then the NIC infirmary

Page 43

1  is smaller, and I also would have seen patients
2  there.
3  Q   So during this time that you were deputy
4  medical director, were you assigned to a
5  particular jail primarily on those two clinic
6  days?
7  A   No.  I set that up on my own.  The role didn't
8  require dedicated clinical time.
9  Q   And the NIC infirmary had 100 beds in the
10  infirmary itself; is that correct?
11  A   I think there might have been 100 people.
12  There were all sorts of -- some of them, as I
13  recall, were general population, beds for
14  people with disability accommodation.  And then
15  a smaller number were for people with specific
16  health problems.
17  Q   The Baines Center had about 800 detainees; is
18  that accurate?  Is that a good guess?
19  A   I don't actually recall.  That doesn't sound
20  far off, I just don't recall.
21  Q   And did it have a designated infirmary?
22  A   No.
23  Q   And the NIC, N-I-C, did have a designated
24  infirmary; is that correct?
25  A   Basically, part of the NIC functioned as an

Page 44

1  infirmary for the jails that were on -- for men
2  that were detained on Rikers Island.
3  Q   And is it true that there was 24/7 staffing by
4  physicians available at each of the Rikers
5  Island facilities?
6  A   Not always.  For -- some of the jails handled
7  new admissions, and some did not, and so for
8  jails where new admissions were coming in, we
9  generally had 24/7 providers.  And when I say
10  "provider," I mean, as a technical term, a
11  physician, a physician assistant, or a nurse
12  practitioner, but there could have been times
13  where jails that didn't do new admissions might
14  not have a provider for a shift overnight.
15  Q   And the urgent care facility on the island was
16  staffed, I assume, by providers 24/7?
17  A   Yes.
18  Q   And did the infirmaries have x-ray
19  capabilities?
20  A   Plain x-ray was available on Rikers Island, not
21  necessarily in the infirmary.  There were a
22  couple of ways, depending if it was a male or
23  female patient, to obtain x-rays, but -- and
24  for a while we did have some mobile x-ray
25  units, but not physically inside the infirmary.

Page 45

1  Q   Did each of the facilities have EKG machines?
2  A   Yes.  That's a basic requirement of a jail
3  treatment room.
4  Q   And was there a pharmacy dedicated to the needs
5  of the correctional facilities at Rikers?
6  A   Yes.
7  Q   And was that available 24/7?
8  A   I'm not sure.  It depends what you mean by
9  "pharmacy."  People could get medications they
10  needed 24 hours a day, seven days a week.  The
11  method by which they got those didn't always
12  involve going to a separate place, a pharmacy.
13  But people certainly had access to the
14  medications they needed every day of the week,
15  24 hours a day, or we would send them to the
16  hospital if they didn't.
17  Q   Dr. Venters, were you ever terminated or let go
18  from any of your positions?
19  A   No.
20      MS. MAKAR:  Doug, I need a break
21  soon.
22      MR. KNOTT:  Okay.  Just let me finish
23  up a couple of topics, and I will -- it'll be
24  within five minutes.  Is that all right?
25      MS. MAKAR:  Sure.  Thanks.

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                California Firm Registration #179

Page 46

1    MR. KNOTT: Okay.
2  BY MR. KNOTT:
3  Q  Community Oriented Correctional Health
4    Services, it looks like you were president for
5    three months. Is that accurate?
6  A  **I don't actually know how long I was president.**
7    **There was a time where I worked with COCHS, and**
8    **that was probably a year and a half, and part**
9    **of it I had a title, I can't remember, as a**
10   **fellow, and part of it it was the president.**
11   **And then when COVID hit, I moved on.**
12       **But it wasn't -- it didn't last as**
13   **long as either of us thought, the organization**
14   **or myself, because of COVID, really.**
15  Q  Does the organization continue to exist?
16  A  **Yes, although they're mostly Medicare policy**
17   **now.**
18  Q  At the time that you were affiliated with that
19    organization, was it advocating certain
20    policies related to correctional health care?
21  A  **Yes, primarily relating to oversight and use of**
22   **federal funds for people who are in jails and**
23   **how records are stored. And, yes, I think that**
24   **continues to be their kind of main area of**
25   **focus is the Medicaid waivers for use of**

Page 47

1    **federal funds in correctional settings.**
2  Q  Just kind of extracting from what you just
3    said, my guess is that it was advocating for
4    use of federal funds to implement electronic
5    medical records in correctional facilities. Is
6    that accurate?
7  A  **No. Actually, the electronic medical record**
8    **work they did is old. It's kind of, I don't**
9    **know, probably 10 or 15 years old. But most of**
10   **their work in the last decade has been -- and**
11   **this has now come to fruition -- advocating for**
12   **states to be able to seek a waiver, because**
13   **it's prohibited, to seek a waiver so that they**
14   **can use funds to provide care to people in a**
15   **jail or a prison, all types of care, especially**
16   **as they're getting ready to go home.**
17  Q  Did the U.S. Department of Justice or federal
18    government take legal action against New York
19    City for management of the health care in jails
20    while you were working there?
21  A  **Not as relates to provision of care. There was**
22   **a civil rights investigation, which we provided**
23   **quite a bit of data for, on brutality, on**
24   **physical abuse of our patients.**
25  Q  I understand.

Page 48

1    MR. KNOTT: Okay. We can take a
2  break. It's 10:22. You want to come back at
3  10:30?
4    MS. MAKAR: Perfect. Thanks.
5    (A recess was taken from 10:22 a.m.
6  to 10:33 a.m.)
7    MR. KNOTT: Okay. We can go back on
8  the record.
9    I just want to put on the record that
10  during the break, I had an opportunity to talk
11  with my paralegal, and the materials we
12  received do not include any of the records that
13  Dr. Venters reviewed.
14    So I'm going to repeat and ask that
15  you comply with the duces tecum, which was for
16  the complete file and all the materials you
17  reviewed. And in particular --
18    MS. MAKAR: Doug, are you asking for
19  us to, in addition to the list with all the
20  Bates numbers, to give you the actual
21  production that everyone has? Okay. That's
22  just not our usual practice, to redistribute
23  the production. Because the list has the
24  production. So it was actually me who told my
25  paralegal, you don't need to upload the entire

Page 49

1  production as long as you have the Bates
2  numbers listed. And then everything that
3  wasn't listed by Bates number, she uploaded to
4  the Hightail link that came along with the
5  report.
6    But if you want -- if you want
7  everything that has a Bates number, you know,
8  physically emailed to you as well, we can do
9  that.
10    MR. KNOTT: I don't want to -- if
11  that's your practice and that's what you
12  thought you were doing, I don't know why you
13  told me a few minutes ago that you had sent
14  those earlier but --
15    MS. MAKAR: Well, I didn't understand
16  that you meant you wanted everything that had a
17  Bates number re-sent to you. I meant that
18  we -- we were just talking past each other.
19    MR. KNOTT: Okay. It's actually
20  broader than that. I want -- I want the files
21  in the format that he received them, and I want
22  any kind of correspondence that discusses these
23  patients or lists them or anything like that.
24  If there's a spreadsheet that lists these
25  inmates and their Bates numbers, I need to

888-893-3767    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                California Firm Registration #179

Homer D. Venters, M.D.                                January 09, 2025

Page 50

1  know.
2        MS. MAKAR:  Yeah.
3        MR. KNOTT:  If there's records that
4  he sent to him, but he doesn't think they're
5  pertinent, weren't referenced in the report, I
6  need to know that.
7        MS. MAKAR:  Right.  He just
8  received -- he did not receive anything within
9  the body of the email, didn't receive any
10  discussion, any spreadsheet.  He just received
11  blank emails with attachments with the subpoena
12  response.  So we can forward those to you.
13  That's fine.  It just -- you know, I thought it
14  would be duplicate work, and it's usually not
15  my practice, but I'm happy to do that.
16        MR. KNOTT:  Well, in the context of,
17  you know, him saying that he received it by
18  Dropbox or something like that, it seems like
19  it would be pretty simple to send the
20  materials that were provided to him in the
21  format that they were provided to him.
22        MS. MAKAR:  That's fine.  I
23  misinterpreted your rider, and I will do
24  exactly what you just described.
25        MR. KNOTT:  For instance, Maria, he

Page 51

1  describes -- the report describes 4,000 pages
2  of Gallagher Bassett materials and 26 patients,
3  and the 4,000 pages are more than 26 patients.
4  So I just need to know how those were conveyed
5  to him.
6        So I think we understand each other
7  there.
8  BY MR. KNOTT:
9  Q  Dr. Venters, I'm trying to get a handle on the
10  nature of your practice in providing direct
11  care in a correctional facility, and maybe I'll
12  just approach it this way.
13        Are you able to identify the jail or
14  prison you've worked at that most closely
15  approximates, in your opinion, the Monroe
16  County Jail?  Is that something you could do?
17  A  No.  I haven't undertaken a review of the scope
18  of practice or the clinical presentations of
19  patients.  I haven't examined the physical
20  layout.  So, no, the short answer is no.  I
21  have provided care to a wide range of people
22  and patients, but I haven't undertaken an
23  assessment of the scope of practice or services
24  in the Monroe County Jail so that I could
25  compare that to a specific jail that I've

Page 52

1  provided care.
2  Q  Do you know how many detainees are held at the
3  Monroe County Jail, the capacity for that
4  facility?
5  A  No.
6  Q  Do you know what the health care budget was for
7  the New York City jails when you were the chief
8  medical officer?
9  A  I do not.
10  Q  Would you agree with me that the -- well,
11  strike that.
12        So I've heard you reference a phrase
13  "jail-attributable deaths."  Is that a metric
14  that you've coined for some of your work in
15  assessing health care and mortality in jails
16  and prisons?
17  A  Yes.
18  Q  And my understanding is that you -- the
19  reference to jail-attributable deaths is a
20  reference to deaths in jail that you believe
21  are the result of some preventable systemic or
22  individual decision making?
23  A  I don't know about decision making, but
24  certainly if a person dies behind bars and the
25  mortality review reveals information that

Page 53

1  includes information that indicates that the
2  patient did not receive the standard of care
3  and that something that happened, some
4  occurrence behind bars significantly led to
5  their death or made a significant contribution,
6  then those are cases that we would consider a
7  jail-attributable death.
8  Q  And there were jail-attributable deaths at the
9  New York City jails while you were chief
10  medical officer there, correct?
11  A  Yes.
12  Q  And you've stated publicly that the number of
13  jail-attributable deaths in the New York City
14  jails while you were a medical director got as
15  high as 50 percent of the deaths in the jail.
16  Is that fair?
17  A  I think there might have been a year where it
18  was very high, I think it was usually lower,
19  like 15 or 20 percent, but there was one -- at
20  least one year where we had quite a bit of
21  violence and lots of solitary confinement,
22  where we identified a large number, or a larger
23  percentage.
24  Q  So just so I understand that, taking all deaths
25  of people in custody in the New York City

14  (Pages 50 to 53)

Homer D. Venters, M.D.                                    January 09, 2025

Page 54

1    jails, it was typically -- did you say 10 to
2    15 percent of the deaths?
3  A  **That's my recollection.  I don't -- I haven't**
4    **kept those data, so -- but most years it was**
5    **much lower.**
6          **When we looked -- it doesn't mean**
7    **that there weren't areas that we needed to**
8    **improve, but the actual outcome of death being**
9    **attributable to something in the jail was**
10   **usually 15 or 20 percent is my best**
11   **recollection, maybe lower.**
12 Q  And in your use of the phrase, that those
13   deaths were, in your opinion, preventable
14   deaths, correct?
15 A  **Yes.**
16 Q  And in certain years, the number of
17   jail-attributable deaths while you were acting
18   as medical director got as high as 50 percent;
19   is that true?
20        MS. MAKAR:  Objection.  Form.
21        THE WITNESS:  I think it was one
22   year, and I -- and I was either the chief
23   medical officer or the medical director.  I
24   don't recall.
25

Page 55

1  BY MR. KNOTT:
2  Q  And do you feel like you have any personal
3    responsibility for those preventable deaths?
4        MS. MAKAR:  Objection.  Form.
5        THE WITNESS:  I felt and continue to
6    feel like it was my responsibility to find
7    those problems and fix them.
8  BY MR. KNOTT:
9  Q  There's a period of time between your
10   completion of undergrad and your start of
11   medical school.
12        Let me just ask, did you work in a
13   correctional setting in any regard during those
14   years?
15 A  **No.**
16 Q  And do you currently have any academic
17   positions?
18 A  **I'm not sure what you mean.  I have what's**
19   **essentially an adjunct position at the New York**
20   **University School of Global Public Health, but**
21   **that's a -- you know, adjunct means it's not a**
22   **paid position.  I'm not a paid employee.  I**
23   **provide little day-to-day role there.**
24 Q  And you don't have an office there, for
25   instance?

Page 56

1  A  **Correct.**
2  Q  And you don't have regular teaching
3    responsibilities there, correct?
4  A  **Correct.**
5  Q  And is the College of Global Public Health a
6    medical school?
7  A  **No.**
8  Q  And your CV refers to you as an award-winning
9    epidemiologist.  So what awards is that a
10   reference to?
11 A  **I think one of them was in 2014.  We conducted**
12   **an analysis of the link between solitary**
13   **confinement and self-harm.  And that paper,**
14   **which was from records at Rikers Island, was**
15   **identified by the American Journal of Public**
16   **Health as the outstanding paper or publication**
17   **for the year.**
18 Q  I represent a company called Advanced
19   Correctional Healthcare.
20        Have you encountered Advanced
21   Correctional Healthcare prior to this case?
22 A  **Not that I recall.**
23 Q  Are you familiar with anybody that works for or
24   has worked for Advanced Correctional
25   Healthcare?

Page 57

1  A  **Not that I know of.**
2  Q  Prior to your being named as an expert in the
3    case, there was a physician named Dr. Jeffrey
4    Keller, who testified on behalf of the
5    plaintiffs.
6          Are you familiar with Dr. Keller?
7  A  **I'm not sure, actually, if we've met or if I**
8    **know him or not.**
9  Q  Were you told why you were made a part of the
10   case?
11 A  **No.  I was told that somebody had been involved**
12   **in the case before me and was no longer part of**
13   **the case.**
14 Q  Were you told why?
15 A  **I don't -- no, I don't think so.**
16 Q  And were you provided his deposition transcript
17   or any portions of the transcript?
18 A  **No, I don't believe so.  I certainly haven't**
19   **looked at anything that that physician did or**
20   **said.**
21 Q  Were you told what he said in his report or in
22   his deposition?
23 A  **No, I don't think so.**
24 Q  There's a co-author on some of your papers by
25   the name of Keller.  I assume that's not the

15  (Pages 54 to 57)

Homer D. Venters, M.D.                                    January 09, 2025

Page 58

1    same person.
2    A   No.  That would be Alan Keller, who's a
3        physician who works at the Bellevue Program for
4        Survivors of Torture at Bellevue Hospital in
5        New York.  So I assume that's not the same
6        person.
7    Q   When you identify deficiencies in your report,
8        what standard are you applying?
9            MS. MAKAR:  Objection.  Form.
10           THE WITNESS:  I would apply my own
11       opinion about the standard of care in a jail
12       setting.  And when it's relevant or applicable,
13       I would also apply the standards of the
14       National Commission on Correctional Health Care
15       for some of the areas where it's relevant.
16   BY MR. KNOTT:
17   Q   Is it your opinion that the National Commission
18       on Correctional Health Care establishes the
19       standard of care on the topics it addresses?
20   A   I believe it's one source of standards.  Many
21       of the parts of correctional health care that
22       are relevant to, say, a disease, for instance,
23       they wouldn't have any input on those
24       standards.  So there it might be the
25       professional organizations or clinical

Page 59

1        standards of care that are more relevant.
2    Q   Have you -- strike that.
3            There is certification available for
4        correctional health care.  You understand that.
5    A   I'm not sure what you mean by that.  Do you
6        mean the accreditation that a facility can
7        seek?
8    Q   I think there's certifications for individual
9        health care providers, if we're not
10       communicating on it.
11           Anyway, you have not sought any
12       particular certification personally
13       specifically with respect to correctional
14       health care; is that true?
15   A   That's true.
16   Q   And there is accreditation of facilities
17       available through the NCCHC, correct?
18   A   Yes.
19   Q   Have you ever -- strike that.
20           Did any of the facilities for which
21       you were medical director or assistant medical
22       director or deputy medical director have NCCHC
23       accreditation?
24   A   I think we went through the process for one of
25       the facilities when I was at Rikers.  Or when I

Page 60

1        was in the New York City jails.
2    Q   Which facility was that?
3    A   I think it was the Manhattan Detention Center,
4        if I recall correctly.
5    Q   And did you succeed in obtaining NCCHC
6        accreditation?
7    A   I believe so, yes.
8    Q   And did you attempt to obtain NCCHC
9        accreditation for any other facilities?
10   A   I don't think so.
11   Q   You have not taught courses for the NCCHC; is
12       that true?
13   A   I've provided talks at their request.  I don't
14       know that they -- but that's all I can say, is
15       that they've invited me to give talks, but I'm
16       not sure how that compares to what you asked me
17       about.
18   Q   Okay.  You referenced earlier that the -- that
19       you would apply the standard of care.  What do
20       you mean by that?
21           MS. MAKAR:  Objection.  Calls for a
22       legal conclusion.
23           THE WITNESS:  It means what I view as
24       the appropriate course of action for a specific
25       clinical scenario or clinical case.

Page 61

1    BY MR. KNOTT:
2    Q   And if you assume the standard of care is what
3        a reasonably trained nurse would do under the
4        same or similar circumstances, do you feel
5        you're capable of speaking to the standard of
6        care of a nurse in general?
7            MS. MAKAR:  Objection.  Form.
8            THE WITNESS:  Yes.
9    BY MR. KNOTT:
10   Q   And what is the basis for your expertise in
11       nursing, such that you could speak to the
12       standard of care of a reasonable nurse?
13   A   In my role as a federal monitor, I am charged
14       by multiple federal courts with assessing the
15       adequacy of nursing care.
16           Also, in my prior role in the
17       New York City jails, I am -- I was in oversight
18       of adequacy of nursing policies and practices
19       and care, obviously in coordination with nurse
20       managers and other staff.
21           But that has been a core part of my
22       work in the jails and as a core part of the
23       responsibility that is currently asked of me or
24       given to me by federal courts.
25   Q   And to the extent that you supervise nurses at

16  (Pages 58 to 61)

Homer D. Venters, M.D.                                    January 09, 2025

Page 62

1  any time, you had directors of nursing that
2  reported to you, correct?
3  A  Certainly for quality assurance and policies,
4    yes, and for most day-to-day operations. But
5    in working in a clinic, there might have been
6    more direct interaction.
7  Q  In terms of chain of command, you did not have
8    direct responsibility for supervising frontline
9    mobile nursing, true?
10 A  I think that's largely true, yes.
11 Q  And if you assume that the standard of care is
12   what a reasonable, similarly trained nurse
13   practitioner would do under the same or similar
14   circumstances, do you believe you're qualified
15   to speak to the standard of care of a nurse
16   practitioner?
17 A  Yes.
18 Q  And what provides the basis for you to speak to
19   the standard of care of a nurse practitioner?
20 A  It would be very similar to what I just said
21   regarding nursing. It's been my responsibility
22   directly overseeing care, and also now as given
23   to me by federal courts, to assess the adequacy
24   of care provided by providers, which would
25   include physicians, nurse practitioners, and

Page 63

1  physician assistants.
2  Q  You obviously have not received any formal
3    education in nursing, correct?
4  A  That's correct.
5  Q  You've not gone through the training that a
6    nurse practitioner goes through, correct?
7  A  That's correct.
8  Q  Both have licenses to practice that you do not
9    have, right?
10 A  That is correct.
11 Q  There are professional organizations for both
12   nurse practitioners and nurses. You're not a
13   member of any of those organizations, correct?
14 A  That's correct.
15 Q  You don't -- well, strike that.
16     You did not consult any treatise or
17   publication specific to nursing with respect to
18   your opinions in the case, true?
19 A  Other than what I've referenced in my report,
20   there's nothing else I referred to as a
21   reference material for this case.
22 Q  If I asked you to identify, like, a leading
23   treatise on basic nursing, you wouldn't be able
24   to do that, right?
25 A  I don't know. As I sit here today, I'm not

Page 64

1  sure what you're asking, but I don't have any,
2  for instance, basics of nursing or what part
3  you're referring to. But, no, I don't have any
4  nursing textbooks or the names or titles of
5  them identified in my head.
6  Q  If I were to ask you whether there's a standard
7    textbook that's followed in instruction of
8    nurse practitioners, you would not be able to
9    identify that, correct?
10 A  No.
11 Q  Have you ever testified in a case that an
12   individual nurse breached a standard of care?
13 A  I believe so, yes.
14 Q  Have you ever testified in a case that an
15   individual nurse practitioner breached a
16   standard of care?
17 A  I believe so, yes.
18 Q  Have you ever been excluded or precluded from
19   giving testimony in a case by ruling of a
20   Court?
21 A  Not that I'm aware of. I don't -- I think
22   there might have been a case where a Court said
23   I should not provide security advice, if I
24   opined on, like, something a security staffer
25   did, but I'm not aware of any instance where a

Page 65

1  Court excluded medical opinions or assessment
2  of health care opinions.
3  Q  There was a challenge to your qualifications to
4    give opinions about security staff?
5  A  I don't actually know that there was a
6    challenge. I think a judge might have said,
7    Dr. Venters can opine on the health response,
8    but not what the security officers did, but I
9    don't actually recall.
10 Q  And do you remember what state it was where
11   that lawsuit was venued?
12 A  No. It was an immigration detention facility.
13   It was -- I don't recall. It must have been
14   five or six years ago, a few years ago.
15 Q  I think I asked you whether there were ever --
16   whether there was any case in which your
17   testimony was actually excluded or precluded.
18     To your knowledge, has there ever
19   been a challenge by the other side to your
20   competency to testify to the standard of care
21   of a nurse?
22 A  I don't know.
23 Q  Same question with respect to a nurse
24   practitioner.
25 A  Similarly, I don't know.

17  (Pages 62 to 65)

Homer D. Venters, M.D.                                                January 09, 2025

Page 66

1    Q   You reference in your report some training
2        slides from ACH.
3            Do you have specific criticisms of
4        the manner in which Nurse Fennigkoh or
5        Nurse Pisney were trained by ACH?
6    A   **The criticisms I have are the ones that are in**
7        **the report, and so as I sit here today, I don't**
8        **recall critique of the approach to training,**
9        **but I would -- for any question, I would say if**
10       **it's in -- the report includes the totality of**
11       **my opinions as I have -- you know, as of today.**
12   Q   I need to know more specifically what your
13       criticisms are.  And is it fair to say that you
14       don't know, substantively, what was taught to
15       Nurse Fennigkoh in regard to her performance of
16       duties at the Monroe County Jail?
17           MS. MAKAR: Objection. Form.
18           THE WITNESS: I've reviewed training
19       slides.  I'm not sure -- and I believe I've
20       referenced in at least one area of the report
21       training slides, but I'm not -- I don't recall
22       reviewing other information about the approach
23       to training.
24           And so I'm happy to, for instance, do
25       a word search of "training" in my report, if

Page 67

1        you want, but that's -- what's in my report
2        reflects my opinions.
3    BY MR. KNOTT:
4    Q   I'm trying to -- I understand you have
5        criticisms of the practices.  What I'm trying
6        to understand is whether you have the basis for
7        giving an opinion about the substance of the
8        training that was provided --
9            MS. MAKAR: Objection.
10   BY MR. KNOTT:
11   Q   -- on that basis?
12   A   **And, again, the criticisms I have, which**
13       **include at least one reference to slides that**
14       **may be used in training, but other documents,**
15       **which I don't know if they were used in**
16       **training, such as policies or forms, those are**
17       **the substance of my critique.  And other -- I**
18       **don't have other opinions that I haven't shared**
19       **relating to training or the adequacy of**
20       **training.**
21   Q   And my understanding from review of your
22       report, is that to the extent you reference
23       those slides, you are not critical of the
24       content of those slides; is that fair?
25           MS. MAKAR: Objection. Form.

Page 68

1            THE WITNESS: I would like to review
2        my report, with your allowance.
3    BY MR. KNOTT:
4    Q   Sure.
5    A   **I really see just two places where I reference**
6        **training slides, and neither of them appears to**
7        **be critical of the content.**
8    Q   I apologize, Doctor, but I'm getting a signal
9        on my computer that it's going to log me off,
10       so I have to send in a code or something here.
11           With respect to the NCCHC,
12       Dr. Venters, the NCCHC accredits -- it performs
13       audits and accredits jails and prisons; is that
14       correct?
15   A   **Yes.**
16   Q   Are you aware of whether a private correctional
17       health care provider company can be subject to
18       NCCHC accreditation?
19   A   **I am not.**
20   Q   Doctor, do you have a recollection of reviewing
21       the contract between Advanced Correctional and
22       Monroe County?  And I'll say that I -- it's not
23       specifically referenced in your materials
24       reviewed list, but I have a recollection of
25       seeing it in a larger group of the materials.

Page 69

1        But tell me if you --
2    A   **I don't recall.  For this case, I was mostly**
3        **focused on the clinical documents.  So as I sit**
4        **here today, I just don't recall.**
5    Q   Do you know how many nursing hours were
6        contracted for in December of 2019?
7    A   **No.**
8    Q   Do you know how many medical staff hours were
9        contracted for in 2019?
10   A   **No.**
11   Q   And I asked you whether you had served as a
12       provider on call for any facility.  And you
13       said there were certain circumstances where you
14       were; is that correct?
15   A   **Yes.**
16   Q   Was there ever a circumstance in where the
17       conduit to the information that you received
18       was the security staff?
19   A   **It could be somebody on the security side.**
20       **Probably not the frontline security staff, but**
21       **a security -- somebody on -- a senior person on**
22       **the security side, like a warden or a**
23       **supervising warden or commissioner might call**
24       **me.**
25   Q   You understand that it's common practice in

18  (Pages 66 to 69)

Page 70

1      small jails in states like Wisconsin that there
2      is not 24/7 staffing by nursing or physicians?
3    **A   Yes.**
4    Q   And you understand that there are jails in
5      which the direct contact with the physician,
6      when the nurses are not available, is the
7      security staff?  You understand that's a common
8      practice, true?
9            MS. MAKAR:  Objection.  Form.
10            THE WITNESS:  That is a practice I've
11      encountered.  I couldn't say how common or
12      uncommon it is, but it's certainly something
13      I'm familiar with it.
14    BY MR. KNOTT:
15    Q   Are you critical of any jail that doesn't staff
16      nursing 24/7?
17    **A   No.  Many of the places on the monitor are very**
18      **small, and it's not a -- on its own, it's not**
19      **something that I would be critical of.**
20    Q   You reference certain emails in your report as
21      evidence that financial considerations may
22      enter into the medical decision making at the
23      jail or may have entered into the decision
24      making with respect to Ms. Boyer.  Am I
25      correct?

Page 71

1    **A   I'm not sure you are.  I referred to email**
2      **communications, but I'd be happy to -- if you**
3      **have a specific area, I'd like to look at it.**
4    Q   Well, what I'm getting at is what basis you
5      have, if any, to suggest that financial
6      considerations entered into the care provided
7      to Ms. Boyer.
8    **A   Is there -- can you lead me to a point in my**
9      **report that says what you just said I said?**
10    Q   Well, I guess I'm trying to understand whether
11      that is your opinion and whether the -- whether
12      you have a basis for it, if you had that
13      opinion.
14            So we can look through your report,
15      but before we do so, is it part of your opinion
16      that somebody was cost cutting, and that was a
17      reason why Ms. Boyer allegedly did not receive
18      adequate care?
19            MS. MAKAR:  Objection.  Form.
20            THE WITNESS:  All right.  So I
21      will -- because you've used some very broad and
22      definitive terms that I didn't use, and so I
23      would like to refer to my report as the source
24      of my opinions, as opposed to you assuming
25      what's in my report.

Page 72

1    BY MR. KNOTT:
2    Q   Okay.
3    **A   And I see a sentence on page 24 at the top.**
4      **I'm not sure if this is what you're referring**
5      **to, but the sentence says, "Whether from cost**
6      **concerns, or simply from lack of attention to**
7      **the standard of care in correctional health,**
8      **ACH did not ensure that patients who needed**
9      **provider-level assessment, including during**
10      **potential medical emergencies, received the**
11      **standard of care."**
12            **So that is an area where I had**
13      **reviewed the emails, I think that you just**
14      **referenced, and that is certainly very**
15      **different than what you just postulated to be**
16      **my opinion, which is evidence of the financial**
17      **concerns being the cause or sole cause.**
18            **But that sentence in my report, I**
19      **think, is a good approximate -- that's my**
20      **opinion.**
21    Q   And can you take me there again?  What page are
22      you referring to?  I think you said page 24.
23    **A   Yes.  The report I have at the top of page 24,**
24      **the paragraph starts halfway down, maybe,**
25      **page 23, but the concluding sentence, which is**

Page 73

1      **near the top of page 24, says, "Whether from**
2      **cost concerns, or simply from lack of attention**
3      **to the standard of care in correctional**
4      **health."**
5            **And then my conclusion there is that**
6      **patients weren't receiving the standard of**
7      **care.  I didn't say there that it was**
8      **definitive or I had evidence that it was simply**
9      **because of financial concerns.**
10    Q   So the question I have, Doctor, is whether
11      there's any basis, other than the emails you
12      cite there, for an opinion that cost concerns
13      may have impacted Ms. Boyer's care.
14            MS. MAKAR:  Objection.  Form.
15            THE WITNESS:  The information that
16      I've relied upon for the opinions that are in
17      the report are cited there, and so I think that
18      the report speaks for itself.  And the emails,
19      I believe, are the only area where cost or
20      financial costs were being specifically
21      mentioned.
22    BY MR. KNOTT:
23    Q   So with all respect, your report -- I have your
24      report, I've read your report, and I'm entitled
25      to ask questions about the basis for the

19 (Pages 70 to 73)

Homer D. Venters, M.D.                                    January 09, 2025

Page 74

1    opinions expressed in the report, and saying
2    that your opinions are in the report is not
3    sufficient.
4            So what I want to know is whether
5    there is any basis, other than the emails you
6    cite in that paragraph, for the statement that
7    cost concerns may have entered into Ms. Boyer's
8    care.
9            MS. MAKAR:  Objection.  Form.
10   Leading.
11           THE WITNESS:  I don't see in my
12   report any reference to or reliance on
13   information other than the emails.
14   BY MR. KNOTT:
15   Q   And I'll represent to you that there were
16   thousands of pages of email communications
17   exchanged in this case.
18           Were you provided any email exchanges
19   other than those referenced in that paragraph?
20   A   I don't recall.
21   Q   Did you ask to review any additional
22   correspondence between Ms. Fennigkoh and
23   Mr. Hendrickson?
24   A   Not that I recall.
25   Q   You have no information about Advanced

Page 75

1    Correctional Healthcare's financial condition;
2    is that true?
3    A   I don't believe I'm aware of that or have
4    reviewed anything -- any information like that.
5    Q   Well, my understanding is there is no written
6    document, other than those emails, that you're
7    referring to when you postulate the possibility
8    that cost concerns entered into the care that
9    Ms. Boyer was given.
10           Am I correct in that understanding?
11   A   I believe that is true.  I'm just reviewing
12   those paragraphs.  I'm not sure I can do that
13   all at this moment, to see whether or not
14   there's any reference to deposition testimony,
15   but it looks like in these paragraphs, the
16   quotations are just from the emails.
17   Q   Do you agree with me that saving the detainees
18   from unnecessary charges is a valid concern for
19   a correctional health care provider?
20   A   Yes, it could be.
21   Q   Do you know -- strike that.
22           Do you know whether Ms. Pisney was
23   ever made aware of Ms. Fennigkoh's concerns, as
24   expressed in those emails?
25   A   I would need to review these paragraphs to see

Page 76

1    if there's any reference to -- it's not clear
2    from my review of these paragraphs if or how
3    that communication occurred.
4    Q   So you don't have any information to suggest
5    that Ms. Pisney was ever advised of
6    Ms. Fennigkoh's concerns, true?
7            MS. MAKAR:  Objection.  Form.
8            THE WITNESS:  I don't believe I have
9    any information that shows that that occurred.
10   BY MR. KNOTT:
11   Q   And referring to the materials you reviewed, on
12   page 4 there's a reference to ACH corporate
13   policies and procedures.  Do you see that?
14   A   Yes.
15   Q   And was it your understanding that the document
16   referenced there was a policy authored by
17   Advanced Correctional and that it constitutes
18   the entirety of their policies and procedures?
19   A   I don't -- it was my understanding that these
20   are -- those are ACH policies.  I don't know
21   and I didn't form an opinion about if they have
22   some other policies of a different scope, but
23   it was my understanding that those reflect ACH
24   policies.
25   Q   I'm going to put a document on the screen, but

Page 77

1    let's just, for kind of housekeeping, I've been
2    referencing your curriculum vitae, and I want
3    to mark that as an exhibit for the deposition.
4            MR. KNOTT:  Pursuant to the
5    conversation we had before the deposition
6    started, what I'm going to do is provide those
7    to the court reporter, along with the number of
8    the next exhibit, and we'll make sure those are
9    designated.
10           Is that okay to everybody?
11           MS. MAKAR:  Yes.
12           MR. KNOTT:  Okay.  And the reason we
13   can't just -- I think that we have a continuous
14   exhibit plan here, and I'm not sure what the
15   next number is.
16   BY MR. KNOTT:
17   Q   But at any rate, your CV that was provided to
18   us and which we've been referencing, will be
19   marked as an exhibit.
20           Doctor, do you have -- well, do you
21   have access to the document that was provided
22   to you and described as ACH corporate policies
23   and procedures?
24   A   It may take me some time to find, because as I
25   recall, it's a very long -- there's, like,

Homer D. Venters, M.D.                                    January 09, 2025

Page 78

1    **50 -- there's quite a few PDFs, and they don't**
2    **have titles. So do you have a Bates number?**
3    Q   Hold on. I think I can share it with you.
4        And I'm putting up on the screen the
5        document. Am I sharing here?
6    A   **Yes.**
7    Q   Okay. I'm putting up on the screen a document
8        Bates numbered Monroe County 010071 and -72.
9        And that's the Bates referenced in
10       your list of materials reviewed, correct?
11   A   **I'm not disputing that. I'm just not sure.**
12       **Yeah, I'm not disputing that. I just don't --**
13       **I'm not sure where to see that.**
14   Q   Oh, the Bates?
15   A   **I see that, that that is the Monroe County**
16       **policy.**
17   Q   So in your materials reviewed, these pages are
18       described as ACH corporate policies and
19       procedures.
20       Did you write that description, or
21       was the file titled that?
22   A   **I don't recall. I recall that there was a file**
23       **that had the -- one PDF had the ACH policies,**
24       **and one had the Monroe County policies, and I**
25       **think I'm -- and that they're differently --**

Page 79

1    **they're also differently titled. Like, the**
2    **county policy is like this, has like a -- these**
3    **are basically copy-and-paste to the NCCHC**
4    **policies at J, and then that the ACH corporate**
5    **policies had like a -- just two numbers, like**
6    **0-1 or 1-2, but I don't recall the titles of**
7    **the files.**
8    Q   Okay. Well, can you tell me where you obtained
9        the information that's put in your report under
10       materials reviewed? Was that your conclusion,
11       or was it somebody else's conclusion?
12   A   **Is there a specific citation in the report,**
13       **like where I cite -- say something about a**
14       **policy that you're referring to?**
15   Q   Well, that's what I'm trying to dig into. So
16       what I'd like to know is whether you have any
17       criticism of an ACH written policy or practice.
18       And this is the only reference I have in terms
19       of materials reviewed. And so let's kind of
20       work through the process here.
21       I think you recognize that the
22       document on the screen is not an ACH corporate
23       policy or procedure, true?
24   A   **Yes.**
25   Q   And can you tell me -- and you can take your

Page 80

1    time to look through your report, I guess --
2    whether you have any criticism of an ACH
3    corporate policy or procedure, in terms of a
4    written document?
5    A   **Yes. I just pulled up on page 12 -- I recall**
6        **this also, the chest pain -- there's an ACH**
7        **chest pain protocol, which has these two --**
8        **the 01-01, I think. It's not a Monroe County.**
9        **It's a -- my recollection is it's an ACH**
10       **policy. And that it's deficient in the same**
11       **way that the form in Ms. Boyer's medical**
12       **records is deficient. And I explained that in**
13       **the report there, that the kind of lack of**
14       **guidance on EKG, oxygen, acute coronary**
15       **syndrome that's present in standard jail chest**
16       **pain protocols, which I reference both small**
17       **and large jail examples in my report, is**
18       **missing both from Ms. Boyer's records and also**
19       **from the ACH corporate policy that I reviewed,**
20       **which is, I think, labeled 01-01.**
21   Q   Well, again, I think this is the reason why we
22       need to have the files that were sent to you in
23       the native form, because the thing described as
24       ACH corporate policies, you'd agree with me
25       that the exhibit on your screen is not a --

Page 81

1    it's not what is being referenced on page 12,
2    correct?
3    A   **Yes, that's true. That's obviously -- and I do**
4        **elsewhere in the report reference the Monroe**
5        **County policies. But there, just on that**
6        **page 12, I see, you know, three different ACH**
7        **policies, which I think are identifiable by**
8        **their numbers, 01-01, 13-01, 17-01.**
9    Q   And what are you referencing to? Something not
10       up on the screen? Oh, you're referencing
11       page 12 of your report.
12   A   **Yes, page 12 of my report, where I say -- I**
13       **have a whole paragraph -- I have reviewed ACH**
14       **corporate policies. And then this paragraph**
15       **lists several policies and then has critique of**
16       **a couple of them and then also has the number**
17       **of the policy, as included in the policy**
18       **document.**
19   Q   Okay. So referencing, again, page 4, you agree
20       with me that the alleged corporate policies
21       that you're referencing on page 12 is not the
22       document that is described in your materials
23       reviewed, right?
24   A   **Yeah. That looks like a mistake, that that is**
25       **a reference to the Monroe County policy.**

21 (Pages 78 to 81)

Homer D. Venters, M.D.                                              January 09, 2025

Page 82

1    Q    And I don't see any other itemization in the
2         materials you reviewed that would include
3         either Monroe County policies or ACH corporate
4         policies.
5              Do you see some source of those
6         records?
7    A    Again, that just may -- that may be a mistake
8         on my part, that I didn't list out the correct
9         Bates numbers and maybe conflated -- it's very
10        clear in the report. I say, distinctly, I
11        reviewed county policies and I reviewed ACH
12        policies, but I may have made a -- it sounds
13        like -- it looks like I made a mistake in
14        listing those, the details of listing those.
15   Q    Did you see reference in any of the deposition
16        testimony to illness reports, jail illness
17        reports?
18   A    Maybe, maybe, but I'm not sure what you
19        specifically are asking me.
20   Q    Well, I'm asking you what do you understand the
21        document you reference as chest pain protocol
22        01-01 to be?
23   A    Well, in my report, I say, "The corporate
24        policies have a chest pain protocol, 01-01."
25        If you're asking for more information about the

Page 83

1         form, I'm happy to consult it, or you could
2         show it to me, but my understanding is if a
3         patient has an acute problem that involves
4         chest pain, ACH has a protocolized form and
5         policy for this specific issue.
6    Q    Is it your understanding that the Policy 01-01
7         is directions to the physician or nurse
8         practitioner on what to do in an instance of
9         chest pain?
10   A    My understanding is that the nurse
11        practitioners or physicians are usually not
12        present. And so if they do see a patient, they
13        may do a whole separate assessment and plan for
14        the patient, but that this would be a protocol
15        that's used by the nursing staff.
16   Q    Are you familiar with any circumstance in which
17        a jail uses a form for the security staff to
18        gather information in order to make a call to
19        the provider?
20   A    Yes.
21   Q    What do you call those forms?
22   A    Well, it could be the same as this. The
23        form -- when a patient has an acute complaint,
24        a chest pain protocol could involve -- could be
25        used by nursing or security staff in calling --

Page 84

1         gathering information and calling. It's no
2         different than, let's say, a receiving
3         screening that could be done by security staff
4         or nursing staff, but that that happens before
5         the providers are alerted.
6    Q    So your understanding of that type of form is
7         that it is not directions on how the licensed
8         provider will deal with the situation, correct?
9    A    Well, it could be. It certainly -- these chest
10        pain protocols or acute illness protocols can
11        be used by nursing or by security staff.
12   Q    So I think we have a common understanding.
13        These protocols are used by security staff to
14        gather information, or you believe by nursing
15        staff to gather information, so that they can
16        place a call to the physician, right?
17             MS. MAKAR: Objection. Form.
18             THE WITNESS: Or they can do very
19        basic things, like call 911 or prevent a --
20        basic lifesaving care, things like that.
21   BY MR. KNOTT:
22   Q    And the form does not restrict the provider in
23        their determinations on the next steps in
24        response to the situation, true?
25   A    Yes.

Page 85

1    Q    Doctor, can any facility meet the standard of
2         care, in your opinion, if it does not use the
3         designated CIWA or COWS form?
4    A    There should be a standard -- I'm not sure.
5         That's a very broad question. So if you are
6         asking specifically for patients with potential
7         alcohol or opiate or other types of withdrawal,
8         the standard of care is to use either -- these
9         two are the most common tool, but a
10        standardized tool to track symptom severity.
11             And so that's the standard of care.
12        Without that -- this type of tool, the standard
13        of care is not met.
14   Q    But you could envision a circumstance in which
15        the monitoring is adequate, even though the
16        facility doesn't employ one of those
17        standardized forms.
18             MS. MAKAR: Objection. Form.
19             THE WITNESS: Only if the elements
20        from those tools are included. And the most
21        crucial part of these tools is that -- and this
22        is why ASAM, the American Society of Addiction
23        Medicine, and the NCCHC has endorsed these
24        specific tools for a long time.
25             It's because these tools yield a

22  (Pages 82 to 85)

Homer D. Venters, M.D.                                January 09, 2025

Page 86

1   score. And when that score -- and this is
2   absolutely required for facilities that don't
3   have providers on site -- when that score goes
4   up, security staff, nursing staff, they need to
5   know when an elevation in the score is a
6   problem, when it should resolve.
7           So I've never seen an assessment
8   tool, symptom severity tool, besides these
9   tools, that does that; but in theory, if you
10  took, you know, the ten things from the CIWA,
11  C-I-W-A, or the ten or 11 things from the COWS,
12  C-O-W-S, and you somehow use them differently,
13  but you came up with a score, and then you
14  showed your staff this is the score for mild,
15  moderate, severe, and told them what to do with
16  those numbers, then that could be adequate. I
17  just have never seen that.
18  BY MR. KNOTT:
19  Q   You were given four depositions to review,
20      right?
21  **A   I believe so. I'm not disputing that. I just**
22  **don't recall, as I sit here, if it was three or**
23  **four, but I reviewed several depositions, yes.**
24  Q   And you didn't make any notes or summarize
25      those in any way, other than in your report?

Page 87

1   **A   Correct.**
2   Q   And given some confusion about what you were
3       provided, I want to ask and make sure I have an
4       understanding.
5           Were you provided a spreadsheet of
6       any type in reference to your work on this
7       case?
8   **A   No. And I don't recall ever seeing a**
9   **spreadsheet of depositions or cases or anything**
10  **like that.**
11          THE WITNESS: And just a housekeeping
12      issue. If it's okay, in about a half hour, 45
13      minutes, I'd like to take a quick lunch break
14      of 15 or so minutes, if that's allowable.
15          If we're going to -- basically, if we
16      were going to go just another hour or two, then
17      I wouldn't need it; but if we're going to go
18      another three or four hours, then I guess I
19      would like to take a lunch break.
20          MR. KNOTT: We're going to go a
21      while, Doctor, so --
22          THE WITNESS: And, sorry, I have a
23      hard stop of five o'clock my time, four o'clock
24      Central.
25          MR. KNOTT: I understand that.

Page 88

1   BY MR. KNOTT:
2   Q   So I think this is the final topic about what
3       you were given and what you reviewed, but at
4       page 26 of your report, you reference "Review
5       of Additional Cases Among Patients Under the
6       Care of ACH."
7   **A   Yes.**
8   Q   I just want to make sure that I understand,
9       that other than Ms. Boyer and those 26
10      additional cases that you reference there,
11      the only records you received are for Kenneth
12      Wilson, Jennifer Lehman, and Larry Schmieder;
13      is that correct?
14          MS. MAKAR: Objection. Form.
15          THE WITNESS: I believe that's
16      correct.
17  BY MR. KNOTT:
18  Q   If there's some other set of records, then I'd
19      like to know it. I'm getting a little
20      concerned about knowing what the scope of --
21          MS. MAKAR: Okay. I don't know what
22      the confusion is. I'm going to send you
23      everything that's listed there, and we'll make
24      sure that it's all correct. I think he's
25      already answered these questions, but we will

Page 89

1   clear this up.
2           MR. KNOTT: Sorry about that. Well,
3       the problem is that I'm not sure that I have
4       complete information. So if -- and I'm
5       concerned about the list. So just if we could
6       get some clarification of that, I'd appreciate
7       it.
8   BY MR. KNOTT:
9   Q   So, Dr. Venters, do you have an opinion on the
10      medical cause of Ms. Boyer's death, other than
11      what is reported in the autopsy report?
12  **A   No.**
13  Q   You reference in your report that she was
14      treated for an electrolyte imbalance. That's
15      something that you gained from looking at the
16      Gundersen health care records, correct?
17  **A   That's my recollection, yes.**
18  Q   Do you have any reason to disagree that her
19      cardiac arrest was likely secondary to an
20      electrolyte imbalance?
21  **A   I would not offer an opinion. She had multiple**
22  **potential causes for cardiac stress, and so I**
23  **would -- electrolyte imbalance could be one of**
24  **them. There are multiple others. I simply**
25  **wouldn't provide an opinion about what I think**

23  (Pages 86 to 89)

Homer D. Venters, M.D.                                    January 09, 2025

Page 90

1  caused her heart strain or stress in her
2  terminal period.
3  Q  Do you have an opinion that she entered the
4  jail with some sort of disease process in her
5  lungs?
6  A  I believe she reported, and I'd like to refer
7  to my report --
8  Q  Could you tell us what page?
9  A  Yes. I'm just scrolling up. I'm looking -- I
10  have a summary chart from page 14, where I just
11  put in what was present on the medical
12  screening and then what was in the medical
13  note. And one of the things that was mentioned
14  in the medical screening was asthma. Two other
15  items that are relevant to the lungs involved
16  cancer with chemo and radiotherapy, both of
17  which can cause pulmonary changes and damage,
18  and congestive heart failure, which causes
19  often serious pulmonary congestion.
20        And so those are -- and then,
21  obviously, alcohol intoxication. If withdrawal
22  ensues, that can have pulmonary consequences,
23  too; but the primary pulmonary issues that
24  would have been relevant, based on what was
25  reported, involved the asthma, the cancer

Page 91

1  treatment, and the congestive heart failure.
2  Q  There was no active cancer treatment, right?
3  A  Not that I'm aware of.
4  Q  She did not have active cancer that you're
5  aware of, correct?
6  A  I don't know. Based on the records I reviewed,
7  I feel confident saying she wasn't actively
8  under treatment.
9  Q  And you don't have any basis for an opinion
10  that she had an acute exacerbation of her
11  asthma condition on her entry to the jail on
12  the 21st, true?
13  A  I don't know. I don't recall her getting a
14  peak flow, so I would say I don't have an
15  opinion one way or the other.
16  Q  I understand your criticism of the intake
17  assessment and timeliness of the intake
18  assessment. My question is whether you have an
19  opinion that an acute condition was present on
20  December 21, when she was being assessed.
21  A  I don't know.
22  Q  Ms. Boyer was intoxicated when she was brought
23  to the jail?
24  A  That's my understanding.
25  Q  Do you have reason to think she was alcohol

Page 92

1  dependent?
2  A  I have no idea.
3  Q  You do not hold an opinion that Ms. Boyer
4  experienced alcoholic withdrawal during the
5  time that she was at the Monroe County Jail,
6  true?
7  A  Not true. We have no idea. She wasn't
8  monitored for withdrawal.
9  Q  So I understand that you have criticisms about
10  the monitoring. My question is whether you
11  have a basis for believing that she actually
12  experienced withdrawal while she was at the
13  jail.
14  A  I think it's possible. I can't conclude
15  definitively, but as I reference in my report,
16  she had elevated blood pressures, which while
17  that could simply be from high blood pressure
18  or other health problems, it certainly is part
19  of withdrawal in its more severe stages.
20        I also reference in my report that
21  the mental health staff noted several -- they
22  circled several things, I think that she had a
23  labile mood, I can't remember what else, but
24  certainly some of those things would have been
25  consistent with withdrawal.

Page 93

1        They could be consistent with other
2  things, so I can't definitively say, but it's
3  certainly, based on the information I have
4  reviewed, it is not possible to say that she
5  didn't experience some withdrawal. And it
6  could have been from benzodiazepines or alcohol
7  or opiates, three different things, or that
8  those could have been from one or all of those
9  withdrawals.
10  Q  So if I understand your response, you're not
11  able to say to a reasonable degree of medical
12  probability that Ms. Boyer experienced actual
13  alcohol withdrawal during the time she was at
14  the jail.
15  A  Correct.
16  Q  And you're not able to say to a reasonable
17  degree of medical probability that she
18  experienced withdrawal from benzodiazepines
19  during the time she was at the jail.
20  A  Correct.
21  Q  And you're not able to say to a reasonable
22  degree of medical probability that she
23  experienced opiate withdrawal during the time
24  she was at the jail.
25  A  Correct.

24  (Pages 90 to 93)

Page 94

1  Q  Ms. Boyer denied being dependent on alcohol at
2     the time of her intake, correct?
3  A  I believe so. I'm not disputing that. I just
4     don't recall that specifically.
5  Q  One of the questions that was asked was whether
6     she had any concern for withdrawal, and she
7     said no.
8        MS. MAKAR: Objection. Form.
9        THE WITNESS: Again, I'm not
10    disputing that. I just don't recall it.
11 BY MR. KNOTT:
12 Q  I'm going to share with you at this time the
13    Intake Medical Screening Report, which we'll
14    also mark as the third exhibit to the
15    deposition.
16       Can you see that, Doctor?
17 A  Yes.
18 Q  And is it legible to you?
19 A  As legible as it is to you.
20 Q  Okay. But the size is large enough that you
21    can -- on your screen that you can read the
22    page.
23 A  Yes. I may have to -- yes, that's fine.
24 Q  I'm offering, Doctor, to try to blow it up if
25    you need it, but --

Page 95

1  A  I think it's okay.
2  Q  Okay. Question 3 is, "Are you or will you be
3     experiencing alcohol or drug withdrawal?"
4        And the answer Ms. Boyer provided was
5     "no," correct?
6  A  Yes, I see that.
7  Q  In your experience, are most alcohol or drug
8     dependent arrestees truthful when they respond
9     to that question?
10 A  I don't -- this is asked in a way that strikes
11    me as not very helpful. Most jail intake forms
12    ask a different question, which is, have you
13    ever experienced withdrawal before, and then go
14    through various -- you know, whether it's
15    security or nursing staff ask that.
16       People who are intoxicated, by
17    definition, aren't experiencing withdrawal.
18    They're intoxicated. So this conflates two
19    very different things.
20       But I don't think I've ever asked
21    people, are you -- you know, who aren't past
22    the intoxication stage, are you experiencing
23    withdrawal. So I don't know how to answer your
24    question about this issue. But sometimes
25    people report that they are using substances;

Page 96

1     sometimes they don't.
2  Q  So the question wasn't -- I understand you have
3     a criticism about the question that was asked.
4     My question to you is whether, in your
5     experience, people who suspect they may have
6     withdrawals are motivated to be truthful in
7     responding to this type of question.
8        MS. MAKAR: Objection. Form.
9        THE WITNESS: I think it's variable.
10    That's my experience.
11 BY MR. KNOTT:
12 Q  And are you aware that Ms. Boyer's husband
13    testified that she's a social drinker and that
14    he had never seen her drunk?
15 A  I don't recall that, but I'm not disputing it.
16 Q  And you agree that it is unlikely that she
17    would experience alcoholic withdrawal if she,
18    in fact, had never been intoxicated?
19 A  I would agree that it's unlikely, if a person
20    used alcohol for the first time, they
21    wouldn't -- they'd be much less likely to
22    experience withdrawal. However, there are
23    people who are social drinkers who experience
24    very serious withdrawal.
25 Q  And by "social drinker," I mean he testified

Page 97

1     that she had a drink or more two to three
2     nights per week.
3        Is that type of person likely to
4     experience alcohol withdrawal?
5  A  I don't know. I think that if a person had
6     serious health problems aside from withdrawal,
7     then it could be; but when people drink
8     alcohol, if they also have some other substance
9     in their body are they have -- that precipitates
10    similar withdrawal physiology, or if they have
11    serious health problems, then certainly they
12    could, as a social drinker, drinking a few
13    drinks a few times a week, could experience
14    withdrawal.
15 Q  And Ms. Boyer never expressed concern of
16    withdrawal to anyone at any time she was at the
17    jail, true?
18       MS. MAKAR: Objection. Form.
19       THE WITNESS: I don't -- I didn't see
20    any information where she said affirmatively,
21    I'm experiencing withdrawal.
22 BY MR. KNOTT:
23 Q  And she never told anyone that she was
24    concerned that she may experience withdrawal.
25 A  Correct.

25  (Pages 94 to 97)

Homer D. Venters, M.D.                                                    January 09, 2025

Page 98

1  Q   Do you know whether Ms. Boyer was prescribed
2      benzodiazepines in December of 2019?
3  A   I don't know.
4  Q   With the intake screening report back up on the
5      screen, I want to ask you this question, and
6      you can ask me to scroll through.
7          You agree with me that Ms. Boyer did
8      not report that she was taking benzodiazepines
9      to the people doing the intake assessment on
10     the 21st.
11 A   I didn't see that on the intake assessment
12     form.
13 Q   You agree that if Ms. Boyer did not report to
14     Nurse Fennigkoh that she was -- had taken or
15     was taking benzodiazepines, that Ms. Fennigkoh
16     had no reason to suspect that she would have
17     benzodiazepine withdrawal.
18 A   I agree with that.
19 Q   Do you know whether Ms. Boyer was prescribed
20     opioids in December of 2019?
21 A   I don't.  There's a reference to oxycodone use
22     in a nursing note, but I don't recall
23     specifically if she was prescribed anything.
24 Q   Is it important to you whether the drug, the
25     opioid, is prescribed or whether it's being

Page 99

1      obtained off the street?
2  A   Well, in both circumstances, the patient needs
3      to be monitored for withdrawal.  The withdrawal
4      could kill the patient, whether it's a
5      prescribed or illicit use.
6          So from the standpoint of a jail
7      health care service, we just want to start
8      monitoring the patient for withdrawal.
9  Q   And do you have any information about whether
10     opioids were found in Ms. Boyer's system when
11     she was taken to the hospital?
12 A   I don't recall.  I don't recall.  I recall
13     something besides alcohol being found, but I
14     can't remember if it was benzodiazepines or
15     opiates.
16         MR. KNOTT:  Okay.  I think this would
17     be a decent time to take that break that you
18     requested.
19         MS. MAKAR:  And, Doug, my paralegal
20     is, you know, in the process of transferring
21     everything and adding it to that Hightail link
22     that you received in November.
23         MR. KNOTT:  Okay.  And I have 12:08.
24     You want to reconvene at 12:30?
25         THE WITNESS:  Yeah, that sounds good

Page 100

1  to me.
2          MR. KNOTT:  All right.
3          THE WITNESS:  Thank you.
4          (A recess was taken from 12:08 p.m.
5  to 12:33 p.m.)
6          MR. KNOTT:  We're back on the record,
7  and we were just trying to discuss Dr. Venters'
8  access to the files for the individual
9  detainees that are referenced in his report.
10         And I'd just note for the record, and
11 I understand it's on the way, but, Maria, we
12 have not, as of now, received the email that
13 you referenced your paralegal sending, so I
14 haven't had a chance to access the actual files
15 but --
16         MS. MAKAR:  Yes.  You have the Bates
17 numbers for them, but if you aren't able to
18 locate them yourself that way, she's about to
19 send them via ShareFile.  She is working as
20 fast as she can.
21         MR. KNOTT:  Okay.  Well --
22         MS. MAKAR:  We just usually don't do
23 it that way with items that are Bates stamped,
24 but now that we know that's how you want it,
25 she's going as fast as she can.

Page 101

1          MR. KNOTT:  Yeah.  So I don't want to
2  repeat myself, but I also don't want there to
3  be an inaccurate record.
4          So, Maria, this report says that he
5  reviewed -- that he was given 4,228 pages of
6  patient files, and I know that those Bates
7  numbers are from more than 26 patients.  So
8  either he found those 26 within that larger
9  group, which I think he denied having done, or
10 he was provided less than that set.
11         And we've also, I think, identified
12 some other things that were -- that he obtained
13 that aren't listed in the report.  Which, I
14 understand, it happens, but I just want to be
15 clear in terms of my ability to know what he
16 reviewed.
17         MS. MAKAR:  I understand.  That's why
18 we're going to just make sure we send
19 everything and, you know, do it that way,
20 because it seems there might be a mistake on
21 the list.  I understand that.
22         And she's going to send it.  I mean,
23 we're not -- we're not disagreeing.  So let's
24 just move on to something where you don't need
25 it, and she's about to send it.

26  (Pages 98 to 101)

Homer D. Venters, M.D.                                    January 09, 2025

Page 102

1          MR. KNOTT:  Okay.
2    BY MR. KNOTT:
3    Q    Dr. Venters, would you describe yourself as an
4         advocate for change in practices with respect
5         to correctional health care?
6    A    I would say I'm an advocate for patient care,
7         improving patient care.  That's certainly my
8         role as a federal monitor, is improving patient
9         care.  I'm not sure -- sometimes that involves
10        changing things.  Sometimes it involves
11        highlighting things that are, you know, going
12        well.
13   Q    And I'm not being critical or trying to suggest
14        you're not independent.  I'm just trying to --
15        I think you have a unique curriculum vitae, and
16        I'm wondering how you describe yourself in
17        terms of your goals -- your professional goals.
18   A    It's to, honestly, assess and improve the
19        health care and health of people who are
20        incarcerated or detained.
21   Q    And you have, since at least 2017, left the
22        practice of providing direct care, right?
23   A    Yes.
24   Q    And you were with a couple of organizations
25        that were -- that advocated for certain

Page 103

1         policies, right?
2    A    Well, I think I've always -- I mean, when I was
3         with the Health and Hospitals Corporation or
4         the New York City Health Department, they
5         strongly advocated for policies.  And when I
6         trained at Albert Einstein, they advocated for
7         health policies.  I'm not sure I've ever been
8         part of an organization that doesn't promote,
9         you know, access to health or high-quality
10        health.
11   Q    So you were Director of Programs for Physicians
12        for Human Rights.
13   A    Yes.
14   Q    That's certainly an advocacy group; would you
15        agree with that?
16   A    There is -- a part of their role is advocating
17        for survivors of torture, but probably the
18        biggest part of the work is documenting.  So
19        it's doing forensic examination, training
20        doctors and nurses, and training law
21        enforcement to document.
22             So my work in Iraq, my work with
23        people in Bangladesh who survived the, you
24        know, Myanmar experiences, revolved around
25        training doctors and nurses and law enforcement

Page 104

1         staff, how they can document physical injuries,
2         need for care among people.
3    Q    So the process of monitoring a detainee for
4         drug or alcohol withdrawal involves initially
5         screening for that potential, correct?
6    A    Yes.
7    Q    And then it involves identifying the actual
8         withdrawal, right?
9    A    Well, yes, there's an initial screening for the
10        potential for withdrawal, and then usually at
11        that time, time zero, there's an initial
12        withdrawal assessment done, and then that's
13        repeated every four to eight hours over time to
14        see if the score changes at all.
15   Q    But you would not expect implementation of the
16        severity standard in someone who has not been
17        screened as having the potential for
18        withdrawal, correct?
19   A    If there's no concern about withdrawal, so
20        there's no intoxication, there's no history of
21        withdrawal, nothing raises the concern about
22        withdrawal, then you wouldn't generally
23        initiate monitoring.
24   Q    Is every detainee who comes into the jail
25        intoxicated considered as having the potential

Page 105

1         for withdrawal?
2    A    I think generally, unless there's -- yes,
3         generally.  So the guidelines from the
4         Department of Justice, from ASAM generally
5         teach us that when a person comes in, and
6         they're very intoxicated, certainly if they're
7         so intoxicated, they're impaired, we should
8         monitor them as if they might potentially enter
9         into withdrawal, especially for alcohol.
10        That's, I think, especially dangerous.
11             And then we can stop it when -- you
12        know, the next day or later on, when we're not
13        worried anymore.  So generally, when a person
14        comes in and they're intoxicated, especially
15        with alcohol, we start monitoring, and then we
16        can stop it the next day or, you know, a couple
17        days later, if we're not worried.
18   Q    But the actual COWS or CIWA device is not a
19        screening tool, correct?
20   A    It actually, I think in a technical manner, you
21        are -- you know, it's kind of semantics,
22        because sometimes it is referred to as a
23        screening tool, because the actual diagnosis of
24        withdrawal, diagnosis of anything, is done by a
25        provider.

27  (Pages 102 to 105)

Page 106

1    So an NP, a PA, or a physician has to
2  give a diagnosis.  That can't be done by
3  nursing or security staff.  But most jail
4  protocols have people identified -- and
5  initially, they've received this tool, this
6  screening tool, the monitoring tool, it's kind
7  of an overlap, but that has to happen right
8  away so you get a baseline score.
9        And it's a tool that's used -- you
10  know, lots of small jails have correctional
11  officers use this tool, not nurses.  But I'm
12  not -- I think it's a little bit semantic as to
13  whether or not it's technically a screening or
14  monitoring tool.  The diagnosis comes from a
15  provider, though.
16  Q  So the mere fact that someone uses alcohol or
17    reports using alcohol does not mandate that the
18    COWS/CIWA monitoring tool be implemented, true?
19        MS. MAKAR:  Objection.  Form.
20        THE WITNESS:  I guess it depends on
21  how they answer questions like have they ever
22  experienced withdrawal in the past, are there
23  any concerns about withdrawal that are raised,
24  but there are -- if a person is not intoxicated
25  and they haven't had a drink in a long time and

Page 107

1    there's no concern that they're impaired, then
2    those are circumstances where you credibly
3    could say the patient doesn't really need to
4    have monitoring started.
5  BY MR. KNOTT:
6  Q  I'm concerned about the word -- the use of the
7    word "impaired" there.
8        So there are detainees who come into
9    the facility who are intoxicated at the time
10    who can be screened out, in terms of potential
11    for withdrawal; is that true?
12  A  No.  I think --
13        MS. MAKAR:  Sorry.  Objection.  Form.
14    Incomplete hypothetical.
15        THE WITNESS:  I think people who come
16    into a facility and are intoxicated and are
17    thought to be intoxicated from alcohol, need
18    initiation of monitoring, and then that
19    initiation can be stopped.
20        You know, there are all sorts of
21    guidelines for how to stop this and, you know,
22    when to stop it, but certainly you need to
23    start monitoring, because you have no idea,
24    when a person is intoxicated with alcohol, what
25    their real risks are for withdrawal.

Page 108

1  BY MR. KNOTT:
2  Q  So regardless of how that person may answer the
3    screening questions, the monitoring tool needs
4    to be implemented, the CIWA/COWS monitoring
5    tool.
6  A  Well, for alcohol, it would be CIWA.  And, yes,
7    it should start and then can be discontinued
8    once you have enough information to say you're
9    not worried about withdrawal.  Because the
10    opposite way leads to preventable deaths.
11  Q  Can you tell me what facts you've assumed with
12    respect to the role of Nurse Fennigkoh?
13  A  I'm not sure what the meaning of your question
14    is.  The nurse and nurse practitioner I've
15    understood to be employees who worked in this
16    facility.  I'm not sure what specific other
17    questions you have about the role.
18  Q  Well, I'm asking about what you understand to
19    be Nurse Fennigkoh's role with respect to her
20    interactions with Ms. Boyer.
21  A  Well, I will -- if it's okay -- I'm not -- I'm
22    still not exactly clear, so I'm going to look
23    in my report to see where I've referenced her,
24    if that's acceptable.
25        So I first refer to her in my report

Page 109

1  on page 5, referring to a progress note that
2  Nurse Fennigkoh put -- that's present from the
3  medical records for Ms. Boyer.  And so my
4  understanding from that is that -- and my
5  assumption is she's a nurse that's employed in
6  the jail to provide care, and then -- and
7  there's discussion in my report about the
8  information she received and documented.
9        And then I reference another report,
10  also by Nurse Fennigkoh, on page 6, which was a
11  little bit later, on the 22nd of December, at
12  four o'clock in the afternoon.
13        And so both of those references in my
14  report assume that her role was as a nurse who
15  was working in some form of patient care in the
16  jail.
17  Q  And if I ask you to discuss with me what you
18    understand to be her interaction with Ms. Boyer
19    on the 21st, are you able to do so?
20  A  I'm looking at that reference there on page 5,
21    leading into page 6, and it doesn't appear that
22    she had a physical assessment or encounter with
23    the patient, that this is information that was
24    reported to her as she was leaving the
25    facility, when a Tomah police officer related

28 (Pages 106 to 109)

Page 110

1    information to her.
2  Q  So tell me what you mean by that.  Are you
3     saying that the note that she entered that day
4     was related to her by the Tomah police officer?
5  A  My report says a progress note by Registered
6     Nurse Fennigkoh is present with a timestamp of
7     2240 on December 21st, and the note reads.  And
8     then there's a quote that, from the note, says,
9     "Leaving facility when Tomah PD officer stated,
10    'I hope you're ready for a medical mess.'"
11           And so this part of my report
12    includes both that information, and then also,
13    later on, that the nurse found some loose pills
14    in the patient's purse.  And it says -- it
15    concludes with, "RN fully explained the
16    difficulty, as her pharmacy is not open
17    Sundays."  And so that explanation back to the
18    patient.
19  Q  What you were just doing there was reading and
20    characterizing what you wrote in your report,
21    correct?
22  A  Yes.
23  Q  And just tell me, you're not able to have a
24    discussion with me based on a recollection of
25    the role of Ms. Fennigkoh, right?

Page 111

1  A  Correct.  My recollection -- I'm able to
2     represent and discuss what's in the report, but
3     I don't have an independent recollection, for
4     instance, of her assignment that day or what
5     she was -- you know, what her overall
6     assignment or role was.
7  Q  And when we get to Nurse Pisney, would that be
8     the same response, that you're able to recite
9     what appears in your report with respect to her
10    involvement, but you're not in a position to
11    discuss, based on your own recollection of the
12    records, what her role was?
13  A  Well, I haven't -- I can't recite my report, to
14    the extent I haven't memorized it, but it is
15    true that my understanding of and impression of
16    the interaction or role of these two staff in
17    Ms. Boyer's care is in my report.  I don't have
18    a separate additional understanding.
19  Q  I've put up on the screen the narrative
20    progress note completed by Nurse Fennigkoh on
21    the 21st and 22nd.
22           This is what you referenced in your
23    report, correct?
24  A  Yes, I see that.
25  Q  And in the second line of the first note,

Page 112

1     Ms. Fennigkoh questioned Sergeant Warren if she
2     felt the patient needed medical clearance, and
3     Sergeant Warren indicated no, the patient has a
4     long history of past medical concerns and is
5     intoxicated.
6            Do you agree with me that that
7     statement demonstrates that the possibility of
8     obtaining medical clearance at a hospital was
9     available?
10  A  Yes.
11  Q  It means that there was not -- there was not a
12    policy against obtaining medical clearance.
13    You agree with that?
14  A  I don't know.  I don't think it speaks to
15    policy.  I think that it references the
16    potential for medical clearance to occur in
17    some circumstance.
18  Q  And Nurse Fennigkoh, along with Sergeant
19    Warren, were engaged in a process of
20    interviewing Ms. Boyer to determine whether she
21    was appropriate for admission to the jail.  Do
22    you agree with that?
23           MS. MAKAR:  Objection.  Form.
24           THE WITNESS:  I would agree that they
25    were interviewing her.  It's not really clear

Page 113

1     what the scope of the interview was.  But I
2     agree that they had both spoken with her or
3     were speaking with her.
4  BY MR. KNOTT:
5  Q  And Nurse Fennigkoh at least considered, during
6     her interaction with Ms. Boyer, the possibility
7     of sending her for medical clearance, true?
8  A  I'm not sure that's true.  I mean, what's in
9     this note is that a law enforcement officer,
10    who is not a health care professional at all,
11    said this patient doesn't need medical
12    clearance.
13           And then I don't see a review of
14    whether or not medical clearance was really
15    needed later on in the note.  Normally, it
16    would look much different than this, where a
17    nurse does an objective collection of signs,
18    symptoms.  And then there's some sort of review
19    near the end about is medical clearance needed
20    or not, and what are the criteria?
21  Q  You disagree with the decision and you disagree
22    with the process, but you agree that
23    Ms. Fennigkoh was exercising her judgment in
24    determining whether she should obtain clearance
25    versus admission to the jail.  Do you agree

29 (Pages 110 to 113)

Homer D. Venters, M.D.                                                    January 09, 2025

Page 114

1    with that?
2    A  No.
3           MS. MAKAR:  Objection.  Form.
4    BY MR. KNOTT:
5    Q  Did you answer?
6    A  I disagree.
7    Q  And tell me why you disagree.
8    A  Well, what you've postulated is that she
9       reasoned on her own or evaluated somehow if
10      this patient needs medical clearance.
11           What's actually in this note is very
12      different.  It's that a law enforcement officer
13      said no clearance is needed.
14           And then there's a review of lots of
15      things that really don't have much to do with
16      medical clearance, some with medications.
17      There's nowhere in here where -- what you just
18      referenced, which was the independent
19      decision-making assessment, you know, whether
20      or not the patient needs medical clearance from
21      the nurse's standpoint.  I don't see that
22      documented here.  I simply see the nurse
23      starting the note with a police officer says
24      this patient doesn't need medical clearance.
25    Q  Do you know what the plan was at the conclusion

Page 115

1    of this interaction?
2           MS. MAKAR:  Objection.  Form.
3           THE WITNESS:  I'm just reading the
4    last part of this note.
5           I'm sorry.  My experience as a doctor
6    is that the nurse would put what they are going
7    to do at the end of your note.  So if you want
8    me to respond to your question, I would like to
9    look at the note.  Is that okay?
10    BY MR. KNOTT:
11    Q  Sure.
12    A  Okay.  It looks like RN instructed jail staff
13      to alert NP of situation when able.
14    Q  Was a decision made to admit Ms. Boyer to the
15      jail?
16    A  She entered the jail.  I'm not sure about the
17      decision, but I assume it was made, since she
18      continued into the jail.
19    Q  And do you have any understanding as to how
20      she -- or where she was housed?
21    A  I don't recall.
22    Q  Is it your opinion that there was some urgent
23      medical emergency that Ms. Boyer was
24      experiencing on the night of the 21st that
25      required immediate attention?

Page 116

1    A  I don't know.  I think she required assessment
2       by a provider, an in-person assessment, and
3       it's unclear from the -- you know, as I
4       mentioned before, some of the important fact
5       information just wasn't gathered on the way in.
6           So I wouldn't definitively say I know
7       she was having this type of medical emergency
8       or that type, but as I say in my report, she
9       needed, as an absolute requirement, to be
10      assessed by a provider, given all of the
11      serious health problems she reported.
12    Q  But you're not able to state to a reasonable
13      degree of medical probability that she was
14      experiencing a medical emergency at the time of
15      her admission on December 21, true?
16    A  That's true.
17    Q  Was it reasonable to develop a plan to have the
18      husband bring in her medications and diagnosis
19      list?
20    A  That is not an acceptable plan as the only
21      plan.  Certainly getting a medication list from
22      family is important, but it's another reason
23      why the patient needed a provider level of
24      assessment, because it's not a nurse's job to
25      figure out which health problems or which

Page 117

1       medications could be life sustaining or missing
2       the medications could be life threatening.
3    Q  Hold on for a second here.
4           At page 5 of your report, you
5       reference medications referred to in the
6       medication verification form, and you list
7       them.  Are you with me?
8    A  I am scrolling.  Yes, I see that.
9    Q  And one of the things you list there is
10      diazepam, which is a benzodiazepine, correct?
11    A  Yes.
12    Q  And what's your understanding as to the source
13      of information about diazepam?
14    A  I can't recall.  As I recall, a pill of
15      benzodiazepine was found in her purse, and then
16      I can't recall if also a review of some -- a
17      called pharmacy yielded some information.  I
18      don't actually know, as I sit here today, other
19      than that I recall that they found some sort of
20      benzodiazepine in her purse.
21    Q  Anything else you recall about the
22      benzodiazepine found in her purse?
23    A  No, not as I sit here.
24    Q  I'm going to share on the screen the medication
25      verification form that I think you're

30  (Pages 114 to 117)

Page 118

1    referencing in page 5.
2        You agree that it looks -- it looks
3    like that's what you were referencing?
4    A   Yes, I think so.
5    Q   And you agree that, actually, diazepam was not
6    identified on the medication verification form.
7    A   I see that.
8    Q   What is peak flow, Doctor?
9    A   **It's a standard measurement patients use -- and**
10   **health care staff -- that patients use to**
11   **monitor how their asthma is doing.  You just**
12   **breathe into a little plastic device, and it**
13   **gives you the strength of your, like, breath,**
14   **exhalation, moves a small plastic piece up, and**
15   **it gives you a number.**
16   Q   Is it standard, used in every intake assessment
17   of a detainee?
18   A   **For somebody with asthma, yes, absolutely.**
19   Q   And did Ms. Boyer report on the 21st any
20   concern about her breathing?
21   A   **No, but I have asthma noted on the form.**
22   **That's what would have triggered it, not**
23   **shortness of breath.**
24   Q   Can you tell me when Nurse Pisney was initially
25   contacted about this patient?  And tell me if

Page 119

1    it's just not something that you're familiar
2    with at this time.
3    A   **I have not memorized that level of detail, but**
4    **I'm happy to consult my report to see.  I have**
5    **her involvement detailed in the report.**
6    Q   Is it important for you, in the formation of
7    your opinions, to know when Ms. Boyer initially
8    reported chest pain?
9    A   **I think it's important in terms of whether or**
10   **not staff responded.  So it's part of the**
11   **information I've reviewed.**
12   Q   So the question was whether it's important for
13   you to know when she first reported chest pain.
14   A   **Yes.  And so I would say it's certainly**
15   **important for me to know when staff were**
16   **informed.  She might have reported it to lots**
17   **of people, but when the health staff became**
18   **aware and the security staff became aware,**
19   **that's kind of where my focus starts.**
20   Q   Okay.  So when did Nurse Pisney become aware of
21   her reported chest pain?
22   A   **I have in my report -- I just looked up Nurse**
23   **Practitioner Pisney -- on the 22nd, late on the**
24   **22nd, as the first time.**
25   Q   What page are you referring to?

Page 120

1    A   **Page 7.  And it's where the jail illness report**
2    **is mentioned.**
3    Q   And is it your understanding that her chest
4    pain persisted?
5    A   **I'm just reading my report.**
6    Q   Let me take you through it.
7        On page 7 -- and you can read it, if
8    you'd like -- but page 7, you say that the jail
9    illness report at 8:09 references chest pain,
10   correct?
11   A   **Yes.**
12   Q   And in the paragraph under the bulleted points
13   on page 7, the last sentence is, "No mention of
14   chest pain," in the -- in the note recorded at
15   8:52, correct?
16   A   **Yes, I see that.**
17   Q   Is it your understanding that she reported
18   chest pain at any time after 8:52?
19   A   **I don't have a -- there's no documentation of**
20   **that.**
21   Q   And you have no basis to believe that she was
22   continuing to experience chest pain after 8:52,
23   true?
24       MS. MAKAR:  Objection.  Form.
25       THE WITNESS:  I would say I don't --

Page 121

1    I don't know how long it persisted after -- I
2    assume it didn't stop the second that first
3    note was entered, and so I don't know whether
4    it recurred or whether it continued after that.
5    BY MR. KNOTT:
6    Q   Bear with me.
7        Do you know if the NCCHC standard on
8    intake assessment references vitals?
9    A   **I don't recall as I sit here today.**
10   Q   Do you know if it references peak flow?
11   A   **Well, it wouldn't, because it doesn't -- I**
12   **don't think it contemplates that every person**
13   **has asthma, but -- so, yeah, I would say no,**
14   **it's for -- not that I recall.**
15   Q   Do you know if it references getting a
16   pregnancy test?
17   A   **I think that pregnancy status is referenced in**
18   **the jail standards, I don't recall where, but**
19   **everybody coming into a jail should have -- all**
20   **women should have their pregnancy status**
21   **checked.**
22       **I've actually never encountered a**
23   **jail that doesn't do that for everybody.**
24   **That's really a shocking finding.**
25   Q   Do you agree with me that it's moot in this

Homer D. Venters, M.D.                                    January 09, 2025

Page 122

1    case, because Ms. Boyer was not pregnant?
2         MS. MAKAR:  Objection.  Form.
3         THE WITNESS:  I don't have an opinion
4    about -- and I don't have any evidence to think
5    that the failure to check her pregnancy status
6    had anything to do with her death.  I think
7    that's fair.
8    BY MR. KNOTT:
9    Q   Okay.  I want to talk to you for a minute about
10       Mr. Schmieder, who you reference on page 17 of
11       your report.
12            Do you have access to those records?
13   A   Just a moment.  I can -- I'm first going to
14       page 17 of my report.
15            Okay.  I see the reference to him in
16       the report, and I will look for the medical
17       records.
18            Oh, I see.  You know, I'm having
19       trouble looking at the medical records while
20       this camera is on because of the limit to the
21       number of USB ports, because I keep the medical
22       records on a secure drive.
23            So I can -- so I guess the short
24       answer is no, but I can -- if you show me
25       something, I'm happy to look at it; but

Page 123

1    otherwise, I have to either unplug my mouse,
2    which would kind of make it hard, or unplug the
3    camera, which, obviously, I don't want to do.
4    Q   Well, it's hard, because I don't want it to be
5        a memory test, but --
6    A   You have his medical records.  You have access
7        to them.  Can you show them to me, like you did
8        the other thing?
9    Q   I have immediate access to a few pages, but let
10       me try to lead you through those.
11            MS. MAKAR:  Jessie should have just
12       sent you everything.  So it should be in your
13       in-box in a second, if it's not already.
14   BY MR. KNOTT:
15   Q   So I've shared on the screen Mr. Schmieder's
16       intake medical screening report from June 30,
17       2016.
18   A   I see that, yeah.
19   Q   It's Monroe County Bates No. 002850 through
20       -52.
21   A   Yes, I see that.
22   Q   And I can scroll through it, if you'd like, but
23       you're critical of the facility and nursing
24       staff or the health care staff with respect to
25       this intake assessment.

Page 124

1         I have a difficult time talking to
2    you about this without having a common
3    understanding, but is it your opinion that he
4    had some acute condition?
5    A   It's a little unclear.  He has serious lung
6        disease, and I have written in my report that
7        he came in with lung disease requiring
8        supplemental oxygen, so pretty serious.  And it
9        says there, actually, COPD, emphysema.  That's
10       the, you know, red flag.  And then down below,
11       in the medications, it just says a lot.
12            So this is really -- potentially, a
13       very complicated patient that, you know, if he
14       really needs oxygen, the level of his, like,
15       lung function should be figured out by a
16       provider to determine that he's, you know,
17       going to go to the right place or he's going to
18       get the right care.
19   Q   And my question is whether you, reviewing this
20       document, have a basis for believing that he
21       had some acute, rather than chronic, condition.
22   A   Well, he certainly -- just what you have right
23       there.  His pulse is elevated, and his
24       breathing is fast, and his oxygen is, you know,
25       low, normal low.

Page 125

1         So just those things right there
2    should trigger an assessment by a provider.
3    It's not a nurse's or a security officer's job
4    to say a fast heart rate or a fast breathing
5    rate or that oxygen of 95 percent is okay.
6    It's not clear.
7         So I would say there's indication
8    that he had abnormal signs and symptoms and
9    that he had very serious lung disease, and
10   based on that, he needed to be seen by a
11   provider.
12   Q   The reference range with respect to pulse
13       oximetry, O2 saturation, is what, Doctor?
14   A   Well, it's very person-specific.  So I would
15       say 94, 95 is probably the lower limit of
16       normal, but for patients with emphysema, COPD,
17       it's important to know what's their baseline.
18       So when a provider did an adequate assessment
19       of a patient, that's one thing they'd probably
20       ask, is, you know, what's your peak flow
21       normally, what's your O2 sat. normally, and how
22       are you on room air versus supplemental oxygen?
23   Q   So what's the reference range for pulse?
24   A   It is usually 60 to 100.  I think that, you
25       know, when we think about -- again, for

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                    California Firm Registration #179

Homer D. Venters, M.D.                                    January 09, 2025

Page 126

1    instance, when we look at withdrawal, patients
2    in withdrawal, we sometimes think about an 80
3    to 100, giving us a point if we're doing
4    withdrawal monitoring. And the respiratory
5    rate, again, is mildly elevated. So all of
6    these are mildly off.
7    Q   What's the reference -- I apologize if I
8    interrupted.
9           What's the reference range for the
10   respiratory rate?
11   A   Usually 16 to 20.
12   Q   So this gentleman with COPD and emphysema has a
13   respiratory rate of 22 versus a normal of 20;
14   he has an O2 at 95, and you describe 94 or 95
15   as normal; and he has pulse of 101, with a
16   reference range of pulse of 80 to 100 being
17   normal. Am I understanding that correctly?
18   A   Yes.
19   Q   And, again, I understand that you have an
20   opinion that Mr. Schmieder was a complicated
21   patient with chronic conditions.
22          Do you have a basis for believing
23   that he had an acute condition requiring
24   emergent medical attention on June 30, 2016?
25   A   I don't have an opinion that he was having a

Page 127

1    medical emergency.
2    Q   And do you have enough recollection of this
3    patient to tell me what you mean when you say
4    he deteriorated over the final week of his
5    life?
6    A   I'm reviewing my report, which says his records
7    show multiple phone contacts between custodial
8    staff and an off-site provider, that he
9    deteriorated over the final week of his life,
10   and that he was refusing medications, so -- but
11   I'm happy to look at any of those records. But
12   I don't have an independent recollection of the
13   records.
14   Q   Are you familiar with any standards in the
15   state of Wisconsin for inmate health in jails?
16   A   No.
17   Q   Was it something you looked at?
18   A   I don't -- no, I don't think so. I did review
19   a report by a state agency or investigator, but
20   I don't think I've reviewed any jail standards.
21   Q   And the state report did not identify any flaws
22   in policies at the jail, true?
23   A   My recollection is it had to do with medication
24   documentation. I don't -- as I sit here today,
25   I don't recall how it was phrased or framed.

Page 128

1    Q   You wrote about Mr. Schmieder that he was
2    refusing his medications due to concerns over
3    being charged for them.
4    A   I believe --
5    Q   How do I find the source of that?
6    A   I don't recall, as I sit here now, if it was in
7    the notes from a refusal form or in his
8    clinical encounter notes.
9    Q   And this -- no one other than you looked at
10   Schmieder's records in order to reach that
11   conclusion; is that correct?
12   A   I haven't relied on anybody else's opinions or
13   information, so this is my own assessment.
14          And if you want to take a quick
15   break, I can, like, log out, plug in my hard
16   drive, look at this, or I can review this at a
17   later time. Whatever works best.
18   Q   I would like to know the source of some of this
19   factual information you put in your report, so
20   if that's what it takes, I think we should do
21   that. So why don't we take five minutes.
22   A   Okay. And I'll be back in five minutes.
23          MR. KNOTT: Thank you.
24          (A recess was taken from 1:25 p.m. to
25   1:35 p.m.)

Page 129

1    BY MR. KNOTT:
2    Q   So, Dr. Venters, while we were off the record,
3    you were able to replug in, and as I understand
4    it, you were able to obtain access to the
5    patient files, but you don't have time to get
6    through them to respond to questions that are
7    asked, right?
8    A   Yeah. I was able to get into my hard drive.
9    There's, you know, numerous, numerous PDFs in
10   there, and so I wasn't, in the few minutes we
11   were off, I wasn't able to answer your
12   question.
13          So as I sit here today, I can't tell
14   you the specific note or citation for the --
15   what's in that sentence, that he had concerns
16   about being charged for medications.
17   Q   Let me -- I need to be able to talk to you
18   about the factual basis for your opinions, and
19   you didn't flag these records in any way with
20   reference to the facts that you're putting in
21   your report about them, correct?
22   A   Correct.
23   Q   So if I asked you the source of the information
24   that he deteriorated over the final week of his
25   life, can you tell me that?

33 (Pages 126 to 129)

Homer D. Venters, M.D.                                    January 09, 2025

Page 130

1   A   Not as I sit here today.  Again, I'm happy to
2       review the medical records, if you want to show
3       them to me, or -- yeah, I'm certainly happy to
4       do that, just as we just did with his intake.
5   Q   And with respect to -- well, as I suspect you
6       know, because Mr. Schmieder's records are
7       available to you, there's 192 pages.  So we're
8       not really able to look through that, and I
9       can't find a source for the facts that you're
10      putting in your report.
11          So if I ask you the source of the
12      information that he deteriorated over the final
13      week of his life, you're not in a position to
14      converse about that at this time, correct?
15  A   I certainly have not memorized those 200 or so
16      pages, but I would be happy to, if there's a
17      specific question, find a page citation and
18      send it across later on.
19  Q   I think I'd ask you to do that, with respect to
20      deteriorated over the final week of his life
21      and medications -- that he refused medications
22      due to concerns over being charged for them.
23      Let me -- maybe we could eliminate the latter.
24          Do you believe that Mr. Schmieder did
25      not have access to medications because he would

Page 131

1       be able -- because he would be asked to pay for
2       them?
3   A   I actually don't know.
4   Q   Do you know what the policy at the jail is in
5       that respect?
6   A   I understand there's a policy that if people
7       can't pay for their medications, then they
8       would be provided to them.
9   Q   And that is fairly widespread across the
10      country, is it not?
11  A   I'm not sure I would say widespread.  Jails --
12      it's different in prisons, but jails, more
13      often than not, in my experience, do not charge
14      people for their medications, because even
15      though there may be a policy to let people get
16      their medicines if they can't pay for it, those
17      extra steps lead some people to just simply not
18      get the medicine or stop taking it.
19          So it's my personal experience that
20      it's much more common that people not pay for
21      medicines in jail than it is that they do pay.
22  Q   And you can't speculate about Mr. Schmieder's
23      motivation for refusing his medications that
24      were offered to him.
25  A   I don't know anything other than what I've

Page 132

1       reported from his records, so I have no
2       independent knowledge of his motivations or
3       fears.
4   Q   And I think I asked you whether he was
5       experiencing an emergency at the time of
6       intake.  Do you believe he had an urgent
7       medical need at the time of intake?
8   A   Absolutely.  He was a patient who, it had been
9       written, was on a lot of medicine, with no
10      effort to say what all those medicines are.  He
11      had -- his vitals, as we discussed, were
12      borderline abnormal, so a patient who could be
13      tipping into an emergency.
14          But COPD and emphysema are leading
15      causes of death.  And particularly when
16      patients all of a sudden stop their medications
17      or there's confusion about their medications,
18      an urgent situation with a patient like this
19      can quickly become an emergency.  So, yes, it
20      was urgent, absolutely urgent, that he be seen
21      by a provider based on his clinical
22      presentation.
23  Q   And of course you can't talk about when his
24      medications were verified and started in
25      relation to his intake, correct?

Page 133

1           MS. MAKAR:  Objection.  Form.
2           THE WITNESS:  I'm happy to review the
3       medical records, if you want me to.
4   BY MR. KNOTT:
5   Q   There's no evidence that Mr. Schmieder felt his
6       care was inadequate, true?
7           MS. MAKAR:  Objection.  Form.
8           THE WITNESS:  I don't have an opinion
9       one way or the other.  I don't recall seeing a
10      grievance, for example, that he submitted.
11  BY MR. KNOTT:
12  Q   I'm going to share with you a document Bates
13      labeled Monroe County 002853 from
14      Mr. Schmieder's record and point out to you
15      that this is a list of 14-day health and
16      physicals.  And the only inmate not blocked out
17      on that page is Mr. Schmieder, and this
18      document indicates that he refused his
19      physical.
20          Does that impact your opinions in any
21      way?
22  A   No.
23  Q   Is it your opinion that his death could have
24      been prevented, or do you not have adequate
25      information to render that opinion?

34  (Pages 130 to 133)

Page 134

1  A  I do not have adequate information to give an
2     opinion on that.
3  Q  I assume that if you believed his death was
4     preventable, you would have -- on your review
5     of these records, you would have entered that
6     into your report. Is that fair?
7  A  Certainly if I had reviewed adequate
8     information to make and come to that
9     conclusion, I would have put it in.
10 Q  Doctor, page 24 of your report, if you can turn
11    there.
12 A  Yes, I'm on page 24.
13 Q  And you wrote there that -- under -- in the
14    middle paragraph, the fourth line says, "I have
15    also asked for mortality reviews in other cases
16    of death among patients at Monroe County Jail
17    in the past decade and have not received any
18    such reports."
19       Can you tell me, did you -- who did
20    you ask?
21 A  Counsel at the beginning of the case, I asked,
22    are there mortality -- clinical mortality
23    reviews that I can review and was told there
24    weren't any that I could review.
25 Q  And were there any deaths at the jail that you

Page 135

1     could identify in the past decade that you
2     expected there to be mortality reviews?
3  A  Well, certainly the clinical mortality review
4     in this case, and then I don't recall if there
5     were other cases preceding or how many there
6     were.
7  Q  Can you identify any cases of medical-related
8     deaths at the jail in the decade prior to
9     Ms. Boyer's?
10 A  As I sit here today, I don't know what -- how
11    many people died beforehand. I think I
12    reference a couple of cases here in my report,
13    but I don't actually, as I sit here now, know
14    the names or the exact dates of when those
15    people died.
16 Q  Can you tell us what would have been learned in
17    a prior mortality review of a death at the jail
18    that would have impacted Ms. Boyer's care?
19 A  There are -- I mean, it's hard for me to
20    summarize in one response. I think that the
21    prior deaths -- a mortality review looks at the
22    patient's care, looks at the standard of care,
23    whether or not it's met, and it finds areas
24    that need to be addressed. And these are often
25    systemic problems.

Page 136

1        And so to the extent that prior cases
2     involved any of the kind of core deficiencies
3     in her case, so failure to do an adequate
4     intake assessment or get medical clearance,
5     failure to institute monitoring for withdrawal,
6     failure to respond to a medical emergency, if
7     those three things were present in prior cases,
8     then what should have happened is that the
9     clinical mortality review would pick that up,
10    use it as a fulcrum for improving workflows and
11    standards of care.
12       So that's the way this -- that's why
13    there's a requirement in almost every -- I just
14    haven't seen too many correctional centers that
15    don't do these clinical mortality reviews, but
16    my lens would be the deficiencies I see in her
17    case, were those present in the prior cases
18    where people died?
19 Q  And are you aware that under Wisconsin law,
20    deaths in jails are reported to the Department
21    of Corrections?
22 A  I'm not disputing that. I'm not sure I was
23    aware of that.
24 Q  And you're not aware of any -- you're not able
25    to converse with us today about any death at

Page 137

1     the Monroe County Jail that you feel is
2     factually similar to Ms. Boyer's circumstance.
3        MS. MAKAR: Objection. Form.
4        THE WITNESS: That's not at all what
5     I said. I'm happy to look at my report,
6     because I've referenced several prior deaths, I
7     think, in the Monroe County Jail. I just want
8     to -- and why the failure to provide -- to do
9     these mortality reviews is really relevant.
10       I'm just looking through -- so in
11    order to answer your question, I need to look
12    at the cases that I've referenced of prior
13    deaths.
14       Yeah, so there are two cases where
15    people died from suicide, Mr. Kenneth Wilson
16    and Ms. Jennifer Lehman. They're both on
17    page 34 of my report. And one of the really
18    important features of their cases that is also
19    part of my assessment in Ms. Boyer's case is
20    the lack of adequate withdrawal monitoring.
21    And that is something that should have been
22    picked up in a very basic mortality review, and
23    if it had been addressed, would have resulted
24    in increased medical monitoring for Ms. Boyer.
25

35 (Pages 134 to 137)

Homer D. Venters, M.D.                                    January 09, 2025

Page 138

BY MR. KNOTT:
Q   We'll get to them.
        In this discussion of mortality
reviews, you reference on page 25, Mr. Xiong,
X-I-O-N-G.
        Are you capable of discussing
Mr. Xiong's circumstance with a --
A   I have his part of the report in front of me.
Q   You agree with me that the standard that you're
referencing with respect to mortality review is
procedure in the event of an inmate death?
A   Well, these are morbidity and mortality
reviews, so M&M, which is the standard term,
involves review of deaths and other serious
outcomes.
        So, for instance -- so there are many
circumstances when somebody doesn't die, but
there's a serious problem.  That kind of
medical term for this, M&M, is morbidity and
mortality for that reason.
Q   So the NCCHC standard on mortality reviews does
not reference reviews in the event of morbidity
short of mortality, true?
A   I would need to look -- they certainly
affirmatively say every death needs to be

Page 139

investigated.  I would need to review as to
where and how they reference morbidity, like
sentinel events in critical cases.
Q   So if the standard JA10 is procedure in the
event of inmate death, then you would agree
that does not speak to some event short of
death, true?
A   True.  It may be that critical incidents and
other events that are short of death, that
don't involve death, are referenced elsewhere.
Q   So is there some other source that you can cite
me to that says there's a standard that
requires review of the nature you're talking
about, of events short of mortality?
A   Well, I think that, first of all, my own
clinical practice and understanding of the
standard of care in jails is that when we have
a near miss, when there's a serious health
outcome, which would include any kind of delay
in emergency care, that that should trigger a
clinical review, and that could be under
quality assurance or quality improvement.  It
also could be under M&M.
Q   You know from this discussion, Mr. Xiong didn't
die.

Page 140

A   Yes.
Q   Did you know that when you wrote the report?
A   I believe so, yes.
Q   And Mr. Xiong did not have any chronic medical
conditions at intake, true?
A   I don't recall his records off the top of my
head, but I'm certainly happy to review.
Q   His case did not involve any concern for
withdrawal.
A   Again, I don't recall his medical records as I
sit here today, but I'm not disputing that.
Q   And if you could do that review and let us know
any evidence that he suffered a significant
medical event or mortality, I'd appreciate you
doing so.
A   Well, just hold on there for a second.  My
position in the report is that when a patient
has chest pain, and there's a delay in
response, there's no EKG done, that's a
significant medical event.  I'm not looking at
the patient -- the reason these cases are so
important for improving our care, it's not that
the -- the patient may not die.  They may in
fact have, you know, a relatively benign
problem.  But in his case, and the reason it's

Page 141

referenced here, is this is an example of
learning that should have occurred that doesn't
appear to have triggered a different approach.
But the medical event was not did he die or
not, it was that he had a delay in assessment
when he reported chest pain and had normal
vital signs on December 20th, 2016.
Q   Ms. Lehman and Mr. Wilson did not report chest
pain, true?
A   Not that I recall as I sit here today.  I'm
just going up to the section of the report that
discusses them.
        Yes, I referenced both of those cases
because of a lack of withdrawal assessment and
monitoring.
Q   And do you have any evidence from the records
that Mr. Wilson actually experienced
withdrawal?
A   No.  As I just said, it was never -- it didn't
look like it was ever assessed.  So it would
be -- I don't have an opinion that either of
them had it.  My concern is that they needed it
and didn't get it.
Q   You had that concern, but you don't have any
evidence that actual withdrawal was missed,

36 (Pages 138 to 141)

Page 142

1  right?
2  A  That's right.  If health staff don't do their
3     job, it's impossible to know what happened in
4     that void or that black box.  So I don't have
5     any evidence that they were in withdrawal,
6     that's true.
7  Q   And so you -- and you have no evidence that
8     their -- that any abuse disorder contributed to
9     their suicide attempt or suicide.
10       MS. MAKAR:  Objection.  Form.
11       THE WITNESS:  Yes.  Again, I didn't
12     see -- this would have been an important
13     feature of a mortality review, is to dig into
14     the contribution of either substance use
15     disorder or withdrawal, but the withdrawal
16     wasn't assessed during their incarceration, and
17     then there wasn't a mortality review for me to
18     look at to see if this had been contemplated.
19  BY MR. KNOTT:
20  Q   But you're a forensic correctional health
21     expert, right?
22  A  I don't know what you mean by the term
23     "forensic," but I'm a correctional health
24     expert.
25  Q   And you have conducted mortality/morbidity

Page 143

1     reviews, right?
2  A  Yes.
3  Q   And you looked at the records for Mr. Wilson,
4     right?
5  A  Yes.
6  Q   And you have no basis in those records for
7     saying that withdrawal contributed to his
8     suicide attempt.
9  A  There's no information for me to say either
10     way.  So I know we're going in circles, but if
11     health staff don't measure something, then
12     later on, it's true, we don't know if the thing
13     happened or not.  And so the gross deficiency
14     in this care is these patients never got
15     monitored for potential withdrawal.
16  Q   And the fact that Mr. Wilson's event occurred
17     in 2020 means that nothing would have been
18     learned from that that would have impacted
19     Ms. Boyer's care.  Do you agree?
20  A  Yes.
21  Q   And Ms. Lehman, L-E-H-M-A-N, you have no basis
22     to offer an opinion that she experienced actual
23     withdrawal, correct?
24  A  I would say, again, I have no information
25     either way.

Page 144

1  Q   And you have no basis to offer an opinion that
2     a failure to address her withdrawal contributed
3     to her suicide.
4  A  I have no information either way.
5  Q   Would it be important to you, as a scientist,
6     to know that you've reviewed the entire
7     available medical record before you offer
8     opinions?
9  A  Well, I think it's important to reflect the
10     opinions -- that the opinions I give are based
11     on a clear set of information.  It's often the
12     case that, for instance, family members have
13     important information or other sources of
14     clinical background would -- might inform my
15     opinion.  So the most important thing, from my
16     standpoint, is to say, you know, which -- the
17     scope of types of records that I reviewed.
18  Q   Doctor, do you have any basis to suggest that
19     ACH uses a business model that underbids rivals
20     by cutting back on referrals of sick detainees
21     to outside care providers?
22  A  I don't have an opinion about that.
23  Q   Do you have an opinion that ACH trains all of
24     its new employees to discount the medical
25     concerns of jail detainees?

Page 145

1  A  I also do not have an opinion about that.
2  Q   Do you have any evidence to suggest that ACH
3     pressures its practitioners to reduce or delay
4     care?
5  A  The only evidence or indication I have about
6     financial concerns is included in the report,
7     and I think we've already talked about that,
8     where I reference emails and say it could raise
9     a concern or it could raise a potential
10     concern, but I don't make the conclusion
11     definitively about what I know is happening.
12  Q   I'm about to wrap up and let these other folks
13     ask their questions.
14       Doctor, have you ever been accused of
15     professional malpractice?
16  A  No.  I was a defendant in a jail case where I
17     was named, but it wasn't a patient I saw or
18     provided care to.  It was in my role as the --
19     I think the medical director or the chief
20     medical officer.
21  Q   To your knowledge, how many times have you been
22     named as a defendant in a case?
23  A  I think one or two.
24  Q   Do you know whether any of those cases were
25     settled?

37  (Pages 142 to 145)

Homer D. Venters, M.D.                                        January 09, 2025

Page 146

1    A   I don't know.  I assume they must have been
2        settled, because I think I listed the
3        deposition of one of them at the end of my CV,
4        and after the deposition, I never heard from
5        the law department again.
6    Q   And just because I read this in another
7        transcript, I just need to make it a record in
8        this case.
9            Doctor, you were required to withdraw
10       a paper because of inaccurate reporting of data
11       on a research project; is that true?
12   A   Yes.
13   Q   The, I think it's U.S. Department of Health,
14       Office of Research Integrity --
15   A   Yes.
16   Q   -- concluded that you had falsified data, true?
17   A   Yes.
18   Q   And you agreed to that.
19   A   Yes.
20   Q   And the paper was withdrawn from publication?
21   A   I think two figures were withdrawn, but I'm not
22       going to -- I'm not disputing it.  That's just
23       my recollection.
24   Q   And it was research associated with your Ph.D.
25       dissertation?

Page 147

1    A   Yes.
2    Q   Was it published in a peer-reviewed journal?
3    A   Yes.
4    Q   And were there any other consequences to you
5        other than the withdrawal of the paper?
6    A   I underwent a period of monitoring, which meant
7        subsequent to that, I agreed with the Office of
8        Research Integrity that when I did research
9        subsequently, I would have an extra adviser
10       review my data.
11           And so during that period, I think it
12       was two or three years, I went and did a
13       research fellowship at New York University and
14       had this extra layer of review and then
15       finished that time period in good standing, and
16       it concluded.
17   Q   Were you required to leave your Ph.D. program?
18   A   I had left the Ph.D. program prior to this.  So
19       the university had concluded -- basically gave
20       me an option to redo the research and undergo a
21       different approach, change labs maybe.
22           I elected to finish with a master's.
23       So I finished with a master's in biology and
24       moved on to medical school, but after -- this
25       agreement with the ORI happened after I had

Page 148

1        already left the research program.
2    Q   And do you remember generally what the topic
3        was of the paper?
4    A   Something with cytokines, which are kind of --
5        is a basic bench research project.  That's
6        about what I remember.
7    Q   Just one other topic.  You published on
8        feasibility of treating hepatitis in jails,
9        right?
10   A   Yes.
11   Q   Do you agree there are valid concerns about
12       whether starting hepatitis C treatment in a
13       jail population is efficacious?
14   A   No.  And the professional societies that guide
15       us on hepatitis treatment, both of them, have
16       made clear in the last several years that
17       everybody with hep C, unless there's some
18       clinical reason, everybody should be treated.
19           They've also moved hep C treatment
20       into a primary care space, and so -- and they
21       have specifically said people in jail and
22       prison should be treated with hep C.
23           So I agree with those professional
24       societies and the people who know hep C
25       treatment, which is that being in jail

Page 149

1        shouldn't preclude you from being treated.
2        It's a lifesaving treatment.
3    Q   Its concern is that it needs to be continued,
4        right?  It needs to -- you need to complete the
5        treatment, right?
6            MS. MAKAR:  Objection to form.
7            THE WITNESS:  I would say you could
8        make the same argument about many other very
9        serious problems.  But, again, the professional
10       societies that guide us on hep C treatment have
11       said specifically, being in jail and prison
12       shouldn't preclude you from getting treated.
13           So there are concerns with all sorts
14       of treatment, but it is an anachronistic and
15       bigoted perception that people with hep C in
16       jail shouldn't be treated.
17           MR. KNOTT:  Okay.  I'm going to let
18       these other folks ask questions.
19           EXAMINATION
20   BY MS. MAKAR:
21   Q   Hi, Dr. Venters.  Were there any materials you
22       asked me for that I told you I had available to
23       me but that I didn't make available to you?
24   A   I don't really recall.  I just recall that you
25       shared these 26 patients with me, and I asked

                              38 (Pages 146 to 149)

Page 150

1  for the mortality reviews, and that's kind of
2  all I remember.
3  Q   Do you recall asking me for any other materials
4      that you needed for your forming of your
5      opinions?
6  A   No. I think the only thing I asked for that
7      I -- the only thing I recall asking for that
8      wasn't available involved mortality reviews.
9  Q   Did you notice any errors in your report while
10     preparing for your deposition or during today's
11     deposition?
12 A   I think there are two. I think we already went
13     over that I incorrectly attributed the ACH
14     corporate policies in my list of information
15     reviewed to a Bates number that -- so in the
16     information review, I think there are a couple
17     of errors, like in terms of the numbers I use,
18     either for the ACH policies or the records for
19     those 26 patients. I think those are Bates
20     number errors.
21         And then I think there was a typo
22     near the end of the report, where I think I
23     used the word tracks, T-R-A-C-K-S, instead of
24     the word lacks, L-A-C-K-S. And we already kind
25     of discussed the -- I'm just looking it up

Page 151

1      right now to tell you where it is specifically.
2      Because we already talked about this area of
3      the report.
4          On page 12, there is a sentence that
5      the second paragraph starts, "I have reviewed
6      the ACH corporate policies, and this" -- then
7      it says, "and this form also tracks the basic
8      guidance." And what I meant to say -- meant to
9      write was "lacks." And so I think I explained
10     that when we talked about it, but that's a
11     typo, also. I think those three are kind of
12     the only ones I'm aware of.
13 Q   Have you changed any of your opinions in your
14     report?
15 A   No.
16         MS. MAKAR: I don't have any further
17     questions right now. Thank you, Doctor.
18         You're on mute, Andrew.
19         MR. JONES: The important first step
20     in any Zoom call.
21         John, okay if I go next, or do you
22     want to?
23         MR. CASSERLY: What's that important
24     step you were talking about? That's fine. Go
25     ahead.

Page 152

1          MR. KNOTT: I think he was saying
2      it's important to turn on his microphone in a
3      Zoom call.
4              EXAMINATION
5  BY MR. JONES:
6  Q   Dr. Venters, we didn't really meet when we
7      started. My name is Andrew Jones. I am the
8      attorney for Monroe County and several
9      individual Monroe County defendants.
10         We've been at this for a while. If
11     you want to -- anytime you want to take a
12     break, just let me know, okay?
13 A   Yeah. And we have -- I think since we have,
14     what, an hour and 20 minutes left, if we use
15     all that time, maybe in, like, 20, 30 minutes
16     we could take a quick break, if that's okay.
17 Q   We've got till five o'clock your time, right?
18 A   Right.
19 Q   Okay. Just speak up whenever you're ready for
20     a break.
21         You talked about this with Mr. Knott,
22     but I just want to ask a few follow-up
23     questions. And I don't intend to reask
24     anything that he already asked -- and forgive
25     me if I do -- but if you could take a look at

Page 153

1      the materials you reviewed for the purposes of
2      your work on this file on page 4 of your
3      report. I assume you still have that handy.
4  A   Yes.
5  Q   Is there anything that at this point, having
6      answered Mr. Knott's questions, that you think
7      that you reviewed for the purposes of your work
8      on the file that isn't listed on page 4?
9  A   I think that what I reference in the report,
10     and this error I just mentioned, was that I
11     reviewed and discussed in the report both ACH
12     corporate policies and Monroe County policies.
13         And so I've cited them, you know,
14     later on in the report, but I think that I
15     should have put two separate headings, one for
16     ACH corporate policies, one for Monroe County
17     policies, and then given the correct Bates
18     numbers for those. And I think that's an error
19     I made. And that's the only one, I think, that
20     I'm aware of.
21 Q   And in terms of the medical records for
22     Ms. Boyer, if I'm understanding this part of
23     your report correctly, what you had available
24     to you were medical records from the jail, the
25     autopsy report, and her medical records from

39 (Pages 150 to 153)

Homer D. Venters, M.D.                                    January 09, 2025

Page 154

1    Gundersen Hospital after her medical event on
2    January 23rd, correct?
3  A  I believe so.  I don't -- as I sit here, I
4    can't recall.  There's one PDF that has, like,
5    Boyer jail records, and I think that -- and
6    then there's another one for Gundersen, and I
7    believe that's all I've reviewed for her.
8  Q  And the Gundersen records were for her care at
9    the hospital after she suffered the medical
10   emergency in the jail, correct?
11 A  That's my recollection.  I don't recall if
12   there was anything -- if she ever went to that
13   hospital before, I don't recall seeing
14   anything.  I couldn't preclude it, for sure,
15   but the records I looked at, certainly that I
16   was concerned about, were the ones when she got
17   to the hospital.
18 Q  To the best of your knowledge, you did not have
19   any medical records for Ms. Boyer from before
20   she was booked into the Monroe County Jail in
21   December 2019, correct?
22 A  Not that I recall.  The only qualification
23   would be whether the ME's report referenced any
24   prior care or care before.  Sometimes the ME
25   will do a medical history, where they put in

Page 155

1    some amount of, like, medical information, but
2    I don't recall looking at medical records
3    besides what we've just discussed.
4  Q  And if you had looked at medical records from
5    before her booking into the Monroe County Jail,
6    you would have listed those on page 4 of your
7    report, correct?
8  A  Yeah, that would be my practice and my intent.
9  Q  And you did not review a deposition transcript
10   for Ms. Boyer's husband, Greg, correct?
11 A  Not that I recall.
12 Q  Well, there's none listed on your report.  Does
13   that indicate to you that you didn't review
14   such a transcript?
15 A  I don't recall reviewing such a transcript.
16 Q  And did you review any transcripts from
17   depositions taken of jail staff, that is
18   security staff, other than Brooke Dempsey?
19 A  Not that I recall, no.
20 Q  And if you had, you would have listed them,
21   correct?
22 A  Yes.
23 Q  And the patient files you list in the fourth
24   bullet point, those are the records that had
25   the Bates numbering starting with the prefix

Page 156

1    GB, GB1 through 4228.  Do you see that
2    reference?
3  A  Yes.  I think that there's a -- I have an error
4    there, because based on the discussion earlier,
5    I know for a fact I got a folder with 26 people
6    in it.  And so I looked at those.  And so I
7    think that I may have had an error in the
8    number I put there, but that reflects the 26
9    people who I think were non-Monroe, basically,
10   patients.
11 Q  And that's my question to you.  Those records,
12   to your knowledge at least, were from
13   individuals who were incarcerated in jails
14   other than Monroe County, correct?
15 A  Yes.  I think I make that clear in the section
16   on additional patients reviewed, or something
17   to that effect.
18 Q  And then am I correct in understanding, based
19   on what's here on page 4 of your report, that
20   you did not review any medical records for
21   individuals incarcerated or imprisoned at the
22   Monroe County Jail, other than Christine
23   Boyer, Kenneth Wilson, Jennifer Lehman, and
24   Larry Schmieder?
25 A  And then there's another patient --

Page 157

1  Q  Is that Mr. Xiong?
2  A  Yes, that's right, that's right.  I think
3    that's the total -- I think that's the total
4    number of people for whom I reviewed records.
5  Q  That's the total number of individuals for whom
6    you reviewed medical records who were
7    incarcerated in the Monroe County Jail,
8    correct?
9  A  Yes.  Or at least at the time their records --
10   I reviewed the records.
11 Q  And Mr. Schmieder, Mr. Wilson, Ms. Lehman, and
12   Mr. Xiong, do you know why you were provided
13   their medical records, out of all the people
14   who were imprisoned in the Monroe County Jail
15   between 2015 and 2020?
16 A  I believe I would have asked if we had access
17   to records for people who died or mortality
18   reviews for people who died, and so I think
19   that would be part of it.
20 Q  Well, what would the other part of it be?  If
21   there was any other reason.
22 A  I don't recall any other reason.  I don't --
23   yeah, as I sit here, I don't recall how I came
24   to get access to those records, besides the
25   patients who died.

40 (Pages 154 to 157)

Page 158

1  Q   So in response to a request for records of
2      individuals who died, you were given the
3      records for Mr. Wilson, Ms. Lehman,
4      Mr. Schmieder, and Mr. Xiong?
5  A   **No. I think that -- my understanding is**
6      **Ms. Lehman and Mr. Wilson died. I don't think**
7      **Mr. Xiong died. I can't recall if he died or**
8      **not as I sit here today.**
9  Q   And if he didn't die, do you have any
10     understanding as to why you got his record?
11 A   **I don't recall, no.**
12 Q   But having reviewed the records for the other
13     three, your understanding is that they were
14     individuals who died in the jail?
15 A   **My understanding is for Mr. Wilson and**
16     **Ms. Lehman -- and I kind of -- as I sit here**
17     **today, I've kind of forgotten about**
18     **Mr. Schmieder's case, so I don't really recall**
19     **what his outcome was.**
20 Q   And do you have any other information at all
21     about individuals other than Ms. Boyer and
22     those four who were in the Monroe County Jail
23     in those six years, 2015 to 2020?
24     MS. MAKAR: Objection. Form.
25     THE WITNESS: I don't believe I've

Page 159

1      looked at any other medical records for anybody
2      else.
3  BY MR. JONES:
4  Q   And so, for instance, do you know how many
5      individuals were booked into the jail in those
6      six years?
7  A   No.
8  Q   Have you reviewed the intake screening records
9      for any individuals other than those five?
10 A   No, I don't believe so.
11 Q   Do you know how many individuals received
12     medical care in the Monroe County Jail in those
13     six years?
14 A   No.
15 Q   Do you have any idea or do you have any
16     knowledge as to how many prisoners in the jail
17     were suffering from withdrawal from drugs or
18     alcohol in those six years?
19 A   No.
20 Q   Do you have any knowledge as to how many of
21     those were placed on withdrawal protocols, such
22     as CIWA or COWS?
23 A   No.
24 Q   Do you have any knowledge as to how many
25     prisoners in the Monroe County Jail suffered

Page 160

1      medical emergencies in those six years?
2  A   No.
3  Q   Do you have any knowledge as to how many
4      prisoners in the jail were referred to outside
5      medical care during those six years?
6  A   No.
7  Q   So if we look at -- if we could turn to page 12
8      of your report. Are you there? Or let me know
9      when you are.
10 A   Yes.
11 Q   So in this section of your report about your
12     findings and opinions with respect to
13     Ms. Boyer's death, there are several opinions
14     you offer, each one under a separate heading,
15     correct?
16 A   Yes.
17 Q   And the first one, starting on page 12, has to
18     do with your opinion with respect to the
19     adequacy of the intake screening or medical
20     clearance, correct?
21 A   Yes.
22 Q   And if we just identify the individuals who
23     were jailed at the Monroe County Jail for whom
24     you reviewed records, that fall -- strike that.
25     My understanding on reviewing your

Page 161

1      report is that there were two patients, two
2      individuals who were in the jail for whom you
3      reviewed their records, that form the basis for
4      this opinion. Is that correct? That is
5      Ms. Boyer and Mr. Schmieder.
6      MS. MAKAR: Objection. Form.
7      THE WITNESS: I would -- looking at
8  this section here, it references the individual
9  records for people, but it also references, for
10 instance, the deposition testimony of staff.
11     So, for instance, there's a paragraph
12 that starts on page 13, "Nurse Practitioner
13 Pisney testified that she had never seen one of
14 the intake sheets before the death of
15 Ms. Boyer."
16 BY MR. JONES:
17 Q   So let me rephrase the question, just so we're
18     talking about the same thing.
19     If we were to identify the
20 individuals who were imprisoned at the Monroe
21 County Jail whose records you reviewed and
22 formed at least part of the basis for this
23 opinion, it's two individuals, Christine Boyer
24 and Larry Schmieder, correct?
25 A   **Yes. Those are the two people that I cite for**

41 (Pages 158 to 161)

Page 162

1    medical records.
2    Q   And then on page 17 of your report, you move on
3        to discuss an opinion with respect to
4        monitoring of individuals for substance
5        withdrawal, correct?
6    A   Yes.
7    Q   And if we create a list of the individuals
8        imprisoned in the Monroe County Jail for whom
9        you reviewed their records that fall within
10       this opinion, that's three individuals,
11       correct?  Ms. Boyer, Jennifer Lehman, and
12       Kenneth Wilson?
13   A   Yes.
14   Q   No others, correct?
15   A   Correct.
16   Q   And if we look at page 20, you move there to a
17       discussion of an opinion you hold with respect
18       to the response to medical emergencies,
19       correct?
20   A   Yes.
21   Q   And so for that section of your report, that
22       opinion, in terms of the individual --
23       individuals who were imprisoned in the Monroe
24       County Jail whose records you reviewed that
25       form a part or a basis for that opinion, it's

Page 163

1        Ms. Boyer and Mr. Xiong, correct?
2    A   Yes.
3    Q   No others, correct?
4    A   Correct.
5    Q   And then finally, starting on page 24, pages 24
6        through 26, you're offering an opinion about
7        failure of ACH to conduct mortality reviews,
8        correct?
9    A   Yes.
10   Q   And same question.  The individuals who were
11       imprisoned in the Monroe County Jail for whom
12       you reviewed records that form the basis for
13       that opinion, it's two, Ms. Boyer and
14       Mr. Xiong, correct?
15       MS. MAKAR:  Objection.  Form.
16       THE WITNESS:  Well, my understanding
17   is nobody got mortality reviews.  So the
18   patients who committed suicide, my
19   understanding is they didn't get a mortality
20   review.  But I think that, essentially, the
21   denominator is everybody who died, and the
22   numerator is zero, because I didn't -- I didn't
23   see any mortality reviews.
24   BY MR. JONES:
25   Q   And you don't know how many people died in the

Page 164

1        Monroe County Jail in the five years prior to
2        Ms. Boyer's death, do you?
3    A   Not as I sit here today, no.
4    Q   Well, do you believe you have any information
5        in your report that would answer that question?
6    A   Well, I referenced a couple of deaths -- I
7        don't know if it was five or seven years
8        before -- but to answer your initial question,
9        I've seen zero mortality reviews.
10       So for Ms. Boyer, for Ms. Lehman, for
11   the other person that committed suicide, that's
12   three, I don't know what the time span is, but
13   I haven't seen any mortality reviews.
14   Q   And the individuals that you cite in your
15       report as a basis for your opinion about
16       mortality reviews who were incarcerated in the
17       Monroe County Jail, that's Ms. Boyer and
18       Mr. Xiong, correct?
19   A   Well, I think that Mr. Xiong is an example of a
20       problem that would have been fixed with
21       mortality reviews.  He didn't die, but I think
22       he's a good example of either morbidity or
23       critical case review.
24       But my understanding is there are
25   three people who died, Ms. Boyer, Mr. -- sorry,

Page 165

1    I'm blanking on the other two names, the two
2    people who died by suicide.
3        So those are, at a minimum, three
4    people that should have had mortality reviews
5    that I didn't see any for.
6    Q   And in that answer, you're talking about
7        Ms. Boyer, Ms. Lehman, and Mr. Wilson, yes?
8    A   I think so, yes.
9    Q   Would you look at page 13 of your report?
10   A   I'm sorry, did you say 13, one three?
11   Q   Yes.  Bottom of 13 onto 14.  You have a
12       discussion there of elements missing from the
13       intake medical screen form that you saw --
14   A   Yes.
15   Q   -- and used in Ms. Boyer's case?
16   A   Yes.
17   Q   And you indicate that the form was missing many
18       of the basic elements that the NCCHC standard
19       indicates should be part of the form, yes?
20   A   Yes.
21   Q   And that's NCCHC J-E-02, is it not?
22   A   It may be, as I sit here.  I'm not disputing
23       it.  I just don't recall or have the standard
24       in front of me.
25   Q   And you were quoting there at the bottom of 13

42  (Pages 162 to 165)

Homer D. Venters, M.D.                                January 09, 2025

---

Page 166

1  to the top of 14 your -- what you were doing
2  there was repeating portions of that standard
3  that should be in the intake screening form,
4  correct?
5  A   Yes.  Or, like, very -- it doesn't have to -- I
6      don't take the position that it has to be
7      exactly those words, but, you know, disability
8      accommodation, history of withdrawal, these
9      broad areas should be part of every receiving
10     screening.
11 Q   And just looking at that block quote from the
12     bottom of 13 onto the top of 14, what
13     specifically was missing from the form used
14     with Ms. Boyer?
15 A   Well, we've already talked about one of the
16     areas that I think is relevant to the case,
17     which is the history of withdrawal.  It's not
18     even clinically useful to ask a patient who's
19     intoxicated are you withdrawing.
20         There are very specific and standard
21     questions about the history of withdrawal the
22     jails everywhere I've been asked.  So have you
23     ever experienced -- what happens when you stop
24     drinking?  Well, a lot of patients don't even
25     know what withdrawal is, so you're asking them

Page 167

1  a question that's impossible or hard for them
2  to answer.
3      So the standard approach that I've
4  seen in jails all over the country is, what
5  happens when you stop drinking?  How do you
6  feel?  And then affirmatively they ask, do you
7  ever get the shakes?  Do you ever get dizzy?
8  Do you ever see things?  All these things that
9  go into a history of withdrawal.  So that's an
10 example that it's relevant to my second finding
11 in this case.
12     By the way, you also see, you know, I
13 think that asking about -- getting a good set
14 of vitals, asking about some of these other
15 problems, like dental problems or accommodation
16 for -- or need for disability accommodation,
17 that's important, but the one that's most
18 directly relevant that seems to be missing from
19 the intake screening form that I looked at is
20 the withdrawal history.
21 Q   Okay.  In addition to that element, what else
22     were you referring to when you said the form
23     was missing many of the basic elements?
24 A   Well, pregnancy history, recent pregnancy.  I
25     mean, that's -- as I said before, I have never

Page 168

1  encountered a jail that doesn't ask about or
2  test for, through a urine dip or some -- you
3  know, doesn't try and figure out if a woman
4  coming into the jail is pregnant.  It's just
5  really unheard of.
6  Q   So other than history of withdrawal and
7      pregnancy, what other basic elements were
8      missing from the form?
9  A   Well, I mentioned various -- there's several
10     types of disability and accommodation for
11     disability.  And I haven't -- I didn't create a
12     side-by-side list, but it would be easy to pull
13     up -- because there are quite a few missing
14     things, it would be easy to pull up that form
15     and then compare it right now to this.
16 Q   Well, whatever you need to do to answer the
17     question, but you offered the opinion that the
18     form was missing many of the basic elements,
19     and I just want to know from you what the basic
20     elements are that were missing.
21         MS. MAKAR:  Objection.  Form.
22         THE WITNESS:  I've just offered
23     multiple examples.
24 BY MR. JONES:
25 Q   I'm asking for a complete list.

Page 169

1          MS. MAKAR:  Objection.  Form.
2          THE WITNESS:  As I sit here today,
3      I'm not in a position to create a spreadsheet
4      or a list, but if you'd like me to provide it
5      and cross-reference what's on that form with
6      what's in this list, I'd be happy to.
7  BY MR. JONES:
8  Q   Really, all I'm asking for, Doctor, is if you
9      can tell me what you meant when you wrote in
10     your report that the form was missing many of
11     the basic elements.
12         If you're able to, please do; if
13     you're not, please tell me.
14         MS. MAKAR:  Objection.  Form.
15         THE WITNESS:  Okay.  I don't have
16     your intake screening form memorized.  So if
17     you'd like to bring it up, and I'll tell you
18     specifically.
19 BY MR. JONES:
20 Q   Are you able to answer the question in any
21     other way?
22 A   Not without -- I've given you multiple examples
23     of what you just asked for.  To give you more
24     definitive examples or the complete list of the
25     examples, I simply need to compare the intake

43 (Pages 166 to 169)

Page 170

1    screening to this piece of paper.  And we could
2    have accomplished this in a tenth of the time
3    we're talking about it if you just put it up on
4    the screen.
5          MS. MAKAR:  I need a break in the
6    next couple minutes, Andrew.
7          MR. JONES:  We can take a break now,
8    if you'd like.
9          MS. MAKAR:  Thanks.
10         MR. JONES:  How long do you want,
11   Maria?
12         MS. MAKAR:  Ten minutes.
13         MR. JONES:  Okay.  2:50.
14         (A recess was taken from 2:40 p.m. to
15   2:50 p.m.)
16         MR. JONES:  Okay.  Back on the
17   record.
18   BY MR. JONES:
19   Q   Doctor, I think this might be one thing that
20       Mr. Knott asked you, so forgive me in advance,
21       but the NCCHC standard relating to intake
22       screening, does it speak to taking vital signs
23       or not?  Do you know?
24   A   I don't recall -- I don't recall as I sit here
25       today.

Page 171

1    Q   If it doesn't, is there another NCCHC standard
2        that you're aware of that speaks to the
3        requirement to take vitals at intake?
4    A   Usually -- I would have to review, but I think
5        there's -- in the stand -- in the approach
6        where custody staff do the -- just ask a few
7        questions or ask a bunch of questions, then
8        there's usually an approach that involves a
9        nurse assessment after that.
10             And so I think in that two-step, when
11       it's not a nurse seeing the patient first, when
12       it's custody staff, then a nurse, I think that
13       would -- either way, the patient should have
14       their vitals on the way in.  I just don't
15       recall if that's -- where that's in, this
16       standard or the one that follows.
17   Q   And, again, sticking with NCCHC standards, are
18       you aware of what NCCHC standard, if there is
19       one, that requires that a pregnancy test be
20       done on a female prisoner of childbearing age?
21   A   I don't recall.  I think there's mention of
22       pregnancy history has to be collected, which
23       obviously was not done in this case.  And I
24       don't recall where the pregnancy test is.  It
25       may be like the vital signs is done by nursing

Page 172

1    staff right after the custody staff, but I
2    don't -- as I sit here today, the J-E-02
3    specifically mentions pregnancy history, which
4    was not collected.  The test itself, I don't
5    recall where it's referenced in the standards.
6    Q   You're not able to tell us what standard would
7        include that requirement; is that correct?
8    A   No, not as I sit here today.
9    Q   And what does the standard of care in
10       correctional health, in your opinion, require
11       if a patient or inmate declines assessment by a
12       health care provider?
13   A   Well, if it's the initial assessment, the
14       standard of care involves -- it depends on
15       whether or not they're going to answer
16       questions, and you can rule out communicable
17       disease concerns.
18             So, for instance, some of the
19       questions that are lacking from this form that
20       you all used and this NCCHC specifically
21       references involved the concern for potentially
22       having tuberculosis.  So asking things like are
23       you spitting up blood at night?  Have you had
24       weight loss?
25             Every correctional setting worries

Page 173

1    about tuberculosis, other communicable diseases
2    coming in and causing an outbreak.  So when a
3    patient won't answer any of those questions and
4    the health staff and the security staff can't
5    figure it out, then often those patients will
6    go into a medical isolation cell.  And there
7    are various approaches to figuring that out.
8          That's separate from if the patient
9    has a potentially life-threatening emergency.
10   If the patient won't agree to an assessment,
11   but it looks like they're in distress, then
12   they would be sent to the hospital.
13   Q   Well, what about -- what about a patient or a
14       detainee who does not appear to be in any sort
15       of medically emergent state, but declines a
16       medical assessment by health care staff?  What
17       does the standard of care require in that
18       instance, if anything?
19   A   Well, it kind of comes down to the clinical
20       risk.  If a patient, for instance, is
21       severely -- is intoxicated, where they're --
22       this is pretty common in jail settings --
23       patients come in, they're intoxicated, they
24       either can't or won't engage with health staff,
25       then those patients go out for medical

Page 174

1    clearance, where they go to a hospital, the
2    hospital makes an assessment, and then they
3    come back.
4         The same could be true for a patient
5    with a, you know, psychiatric problem.  When
6    they're not engaging with health staff, it's
7    not actually clear to custodial or health staff
8    what the problem is.  The patients often don't
9    engage.
10        And so what we don't want is for them
11   to say, we'll see you in 24 hours, or we're
12   just going to peek in the cell every, you know,
13   half hour.  We want to know if there's any
14   concern about withdrawal, psychosis,
15   suicidality, those patients to get assessed and
16   medically cleared.
17   Q   So let's take it out of the intake context.
18       And so if it's just a detainee who's already in
19       custody and has been in custody for some period
20       of time and is not presenting with withdrawal
21       or any concern of a risk for contagious disease
22       and is not presenting with any sort of emergent
23       condition and that individual declines, say, an
24       H&P, that sort of assessment, what, if
25       anything, does the standard of care require for

Page 175

1    staff in that instance, in your opinion?
2         MS. MAKAR:  Objection.  Form.
3    Incomplete hypothetical.
4         THE WITNESS:  So there's two kind of
5    interests at play.  One is patients who are
6    incarcerated or detained, they retain
7    decisional capacity.  So this is a core element
8    of -- there's a basic medical ethic principle
9    that says people have the right to make
10   decisions about their health care.
11        So if a person is refusing something
12   about an assessment or care, a provider, which
13   is, you know, an M.D., a P.A., or a nurse
14   practitioner, needs to assess their decisional
15   capacity.
16        There is another interest at play,
17   though, which is that if any of this assessment
18   relates to the safety or health of people
19   around the person.
20        So I mentioned communicable disease.
21   An example I've run into is, you know, if
22   there's an outbreak of MRSA, methicillin
23   resistant -- or you know what, I'll just say if
24   there's a -- if there's an outbreak of a skin
25   infection, it could spread to other people.

Page 176

1         If a patient refuses to be assessed
2    by that, they may retain the decisional
3    capacity to refuse that assessment, but it may
4    be that there's an important response that
5    involves physically separating them from other
6    people so that doesn't spread.
7         So those are my two practices and I
8    think won't reflect the standard of care for
9    refusal of different elements of assessment.
10   BY MR. JONES:
11   Q   So if a detainee or a prisoner declines an H&P,
12       and there isn't a concern about that prisoner's
13       capacity to make that decision, and there isn't
14       a concern about the sort of health risk to
15       others that you described in your example, what
16       does the standard of care require in that
17       instance?
18   A   Well, I'm not really familiar with patients who
19       persistently refuse their initial history and
20       physical.  I think that my experience in doing
21       history and physicals is that a patient may
22       refuse it on day one or two, and, you know,
23       it's the job of the health staff, the doctor or
24       the nurse practitioner or the physician
25       assistant, to try and engage with them to get

Page 177

1    it done.
2         And sometimes it might mean
3    negotiating, getting the most critical parts of
4    the medical history or the physical exam, but
5    certainly engaging with a patient to try and
6    get the essential parts of the history and
7    physical done, that's the obligation of the
8    health staff.
9    Q   And ultimately, does the individual who's
10       detained retain the authority, the ability to
11       say no, I decline for that sort of assessment,
12       as long as they're considered to be capable of
13       making that decision?
14        MS. MAKAR:  Objection.  Form.
15        THE WITNESS:  And as long as there's
16   no concern about a communicable disease.  I
17   think -- I actually have not encountered that
18   ever in my career.  Sometimes people refuse
19   things, but they generally will agree, you
20   know, on day two or three or four.
21   BY MR. JONES:
22   Q   I don't mean to ask you based solely on your
23       experience.  My question is, as someone who's
24       practiced in this field, in your opinion, do
25       individuals retain the right to decline

45 (Pages 174 to 177)

Page 178

1    assessment by medical staff, as long as they're
2    capable of making that decision and don't
3    present a risk of the sort of contagious
4    disease that you've described in your prior
5    responses?
6            MS. MAKAR:  Objection.  Incomplete
7    hypothetical.
8            THE WITNESS:  I think if you check
9    off the box of doing a decisional capacity
10   assessment, and you've tried to engage with a
11   patient, and there's no concern with any
12   communicable diseases, then it is foreseeable,
13   but depending on the type of facility, it is
14   often the case that those patients will be in a
15   medical isolation cell.  Because I just have
16   never -- it's such a rare, in my experience,
17   impossible -- or I haven't encountered it --
18   hypothetical, that once a patient is in medical
19   isolation and staff are engaging with them,
20   they're able to get the information they need
21   and do the assessment they need within a few
22   days.
23   BY MR. JONES:
24   Q   In terms of Ms. Boyer, do you know anything
25       about her use or abuse of alcohol, opiates,

Page 179

1    and/or benzodiazepines before she was booked
2    into the jail?
3    A   No, I don't think so.
4    Q   And to your knowledge, was she documented as a
5        daily alcohol drinker?
6    A   I would have to review the intake assessment.
7        I don't recall -- I don't recall that.
8    Q   You don't know one way or the other?
9    A   As I sit here today, I don't recall.
10   Q   And I know you discussed this in part with
11       Mr. Knott, but just to be sure I understand
12       your opinion, all else being equal, would you
13       expect an individual who consumes alcohol, on
14       average, three times a week, but not to excess,
15       to experience alcohol withdrawal symptoms if
16       they don't have a drink for 24 to 36 hours?
17           MS. MAKAR:  Objection to form.
18   Improper hypothetical.
19           THE WITNESS:  I would -- that's a
20   little bit more precise question, and I think
21   that when people drink two or three times a
22   week consistently, when they stop drinking,
23   they'll have withdrawal symptoms.  They may be
24   mild, but they may not, and it depends a little
25   bit on them, a little bit on their other health

Page 180

1    problems.
2            But, you know, we have to look for
3    withdrawal, otherwise we miss it, and
4    withdrawal can be missed and can be very
5    serious in patients who we don't think drink
6    as -- you know, to excess, or get drunk falling
7    down.
8            So, yes, in that scenario you just
9    postulated, that patient certainly, I would
10   suspect, will feel some symptoms of withdrawal.
11   It depends if there's other withdrawal or other
12   health problems, but yes, I would predict some
13   symptoms.
14   BY MR. JONES:
15   Q   To be sure that I understand, your medical
16       opinion is that someone who has a drink or two
17       three times a week, but not to excess, will
18       experience withdrawal if they don't have a
19       drink for 24 to 36 hours?
20   **A   I think it's very possible that a person who**
21       **has multiple drinks multiple times a week will**
22       **experience some sort of withdrawal.  And I**
23       **think, as I said, if they have heart problems,**
24       **lung problems, if they're also taking anything**
25       **else that they could withdraw from, then the**

Page 181

1    **likelihood of those would be exacerbated.**
2            **But it is not the -- we don't know**
3    **when a person comes through the door the truth**
4    **of how much they drink, and one of the problems**
5    **with this form you have and the facility is it**
6    **asks specifically do you abuse drugs or**
7    **alcohol.  And that is such an antiquated,**
8    **harmful way to ask the question, because**
9    **patients don't respond to that.  Patients --**
10   **the standard of care in corrections for a long**
11   **time has been to simply ask do you use alcohol,**
12   **do you use drugs.  So when you start with this**
13   **question do you abuse, it makes a moral**
14   **judgment on the patient, and it really sets you**
15   **up to not find out if it's one drink or five**
16   **drinks a few times a week.**
17   Q   So it's possible that someone who drinks three
18       times a week but not to excess would experience
19       withdrawal symptoms if they don't have a drink
20       for 24 to 36 hours?  Is that your testimony?
21           MS. MAKAR:  Objection.  Form.
22           THE WITNESS:  Yes.  And, you know,
23   alcohol withdrawal symptoms can occur over a
24   period of days.  And as I said, also, one of
25   the important modifiers about that would be if

46 (Pages 178 to 181)

Homer D. Venters, M.D.                                January 09, 2025

Page 182

1    there's any withdrawal from other substances or
2    other health problems.
3    BY MR. JONES:
4    Q   On page 20 of your report, you indicate that
5        the Gundersen Health -- or excuse me, Gundersen
6        Hospital records for Ms. Boyer confirmed the
7        presence of benzodiazepines in her system on
8        the day of her admission, so January 23rd.
9            Do you see that reference, end of the
10       paragraph that carries on to page 20?
11   A   I'm looking. Sorry, I'm having trouble finding
12       it.
13   Q   On page 20 of your report.
14   A   Okay. Sorry. From 19 to 20. I was looking at
15       20 to 21.
16   Q   Sorry. The last sentence of the paragraph that
17       carries on to page 20.
18   A   Yes, I see that.
19   Q   Okay. So what's the significance for your
20       opinion with respect to Ms. Boyer and the
21       possibility of her experiencing withdrawal
22       symptoms of the fact that she had
23       benzodiazepines in her system when she first
24       got to Gundersen?
25   A   I'm not sure. I think that the most important

Page 183

1        thing is that, as I recall, she had a
2        benzodiazepine pill in her purse, that that
3        should have triggered the withdrawal
4        monitoring. That she had benzodiazepines in
5        her system later, either when she died or when
6        she was at the hospital, as I said earlier, I
7        don't have a definitive opinion that she was
8        for sure in one type of withdrawal or another.
9        So I would say that is just kind of a
10       recitation of -- that she had benzos in her
11       system.
12           The most -- in terms of the
13       deficiency in the care, that second finding is
14       that there was a concern that she had some
15       benzodiazepine on her person, and that should
16       have triggered, although it would have been
17       probably the same tool, monitoring for
18       withdrawal symptoms.
19   Q   And does the fact that she had benzodiazepines
20       in her system when she was admitted to
21       Gundersen on January -- excuse me,
22       December 23rd, does that say anything about
23       whether or not she was in withdrawal?
24   A   Well, no. We don't know anything about if she
25       was in withdrawal, because it was never

Page 184

1        measured.
2            That's the point I keep coming back
3        to. If you don't look for it, then you get to
4        say it never happened, because you never found
5        it. But she needed withdrawal monitoring. I
6        don't have an opinion that she was definitely
7        in this type of withdrawal or that type of
8        withdrawal.
9    Q   Are there short-term versus long-term
10       diazepines -- benzodiazepines?
11   A   Sure.
12   Q   And what's the distinction there?
13   A   Well, clinically, the difference is the
14       mechanism of action, how long it lasts. From a
15       jail health standpoint, when you do a
16       withdrawal assessment, when you start the
17       CIWA -- you usually would use a CIWA for
18       alcohol and benzodiazepine -- if you learn that
19       a person was on a long-acting benzodiazepine,
20       then you may want to extend out your period of
21       monitoring. But in terms of the initial days
22       in the jail, it's not -- you would just start
23       the withdrawal monitoring right away.
24   Q   In your experience, does whether someone is
25       using a long-acting benzodiazepine versus a

Page 185

1        short-acting benzodiazepine have any impact on
2        how quickly they'll begin to feel withdrawal
3        symptoms?
4    A   Sure. The American Society of Addiction
5        Medicine has all sorts of tables that lay this
6        out, but basically, we think of most withdrawal
7        symptoms happening in the first few days in a
8        jail. There are people that have been taking
9        long-acting benzodiazepines that could show up
10       with their most serious symptoms, let's say a
11       week or even up to ten days into incarceration.
12           And so those assessments and
13       decisions are really important later on, not so
14       much in the first couple of days you would
15       start, you know, the CIWA monitoring, but it
16       could be relevant, let's say, a week into or
17       five or six days into detention, where, you
18       know, the concern about alcohol or short-acting
19       benzo withdrawal has waned, but if you knew
20       that they were on a long-acting benzodiazepine,
21       you might continue monitoring.
22   Q   If Ms. Boyer had been abusing opiates, would
23       you have expected -- or would you expect
24       opiates to have been found in her system at
25       Gundersen?

47 (Pages 182 to 185)

Homer D. Venters, M.D.                                    January 09, 2025

Page 186

1    A  I think -- well, I would think if she had -- if
2       she had a tox. screen done, the opiates would
3       have been found, so yes.  And I don't recall
4       seeing that she had any opiates in her system.
5       But, yes, generally, whether it's prescribed or
6       illicit opiates, whether it's pills or other
7       forms, they would show up in most tox. screens.
8    Q  If she had been using them regularly or abusing
9       them, they would have shown up in a tox. screen
10      done at Gundersen when she first got there.
11   A  I think so, yes.
12   Q  Is there -- on this subject of withdrawal
13      assessment, I don't think I saw in your report
14      a specific cite, such as to an NCCHC standard
15      with respect to your opinion that the basic
16      standard of care required that Ms. Boyer had
17      been assessed and monitored for withdrawal.
18          Is there a specific standard that you
19      can point us to?
20          MS. MAKAR:  Objection to form.
21          THE WITNESS:  Yeah.  I think there's
22      a -- NCCHC jail standards have a withdrawal --
23      medical management and withdrawal standard, I
24      can't remember what the number is, and I think
25      since at least 2014, they've referenced one --

Page 187

1       using one of the accepted tools, meaning CIWA
2       or COWS.  And I'm happy to go look at what that
3       standard is, but I'm pretty sure it's
4       management or medical management of withdrawal.
5    BY MR. JONES:
6    Q  The policy -- the policy that you describe --
7       the jail policy that you describe on page 18 of
8       your report, with respect to intoxication and
9       withdrawal, that written policy -- let me know
10      when you're there.
11   A  Yes, I see that.
12   Q  Do you have any concern with respect to the
13      policy as it's written?
14   A  I don't recall as I sit here today.  I think
15      that's the policy I was just thinking of when
16      you asked me the prior question.  As I sit
17      here, I don't recall whether or not the Monroe
18      County policy has what I believe is in the
19      NCCHC standard, which is to mandate that people
20      are monitored on a regular basis for
21      withdrawal.  And so I think that that's
22      probably the most important element of medical
23      management and withdrawal is the monitoring via
24      these tools.
25          And so if that was not in the policy

Page 188

1       that Monroe County had or they had not worked
2       to ensure that their vendor had that approach,
3       that would be a critique.
4    Q  Are you expressing an opinion in your report
5       that the written policy, as you quoted it on
6       page 18 of your report, is deficient in some
7       way?
8    A  I'm -- no, because I think that it is my
9       experience that sometimes counties may have a
10      medical policy that doesn't spell out every
11      element of care that should be provided.  And
12      so I think it's important to ensure for this
13      exam -- because this is a common cause of
14      preventable deaths in jails, the county should
15      have a way to ensure that this part of the
16      clinical standard of care is followed.  Often
17      they copy and paste the whole NCCHC standard
18      in, but certainly some counties also take the
19      approach of having a more minimal set of
20      clinical standards, but then making sure
21      through oversight or quality assurance that the
22      vendor does meet the clinical standard of care.
23      So there are different ways to do that.
24   Q  Well, again, I'm just trying to understand if
25      you're expressing an opinion one way or the

Page 189

1       other as to whether the written policy that the
2       county had in place was deficient.
3    A  And I'm saying I don't recall as I sit here
4       today, and so I'm not making an opinion today
5       about this area where I have identified what I
6       think is a clinical deficiency in the ACH
7       approach as to whether or not that reflected a
8       deficiency on the county's side.
9          Because I would allow for the fact
10      that counties can use written policies, but
11      they can also use other means to ensure that a
12      vendor meets clinical standards of care.
13   Q  In terms of mortality reviews, I think Mr. --
14      when Mr. Knott was asking you questions, you
15      talked about the fact that NCCHC has a standard
16      relating to the procedure in the event of an
17      inmate death.
18          And so setting that aside, is there
19      an NCCHC standard that requires the sort of
20      after-the-fact review by the medical care
21      provider in the event of serious events that
22      don't lead to death?
23   A  I think there are two places where the NCCHC
24      talks about it.  One is in the clinical quality
25      committee, and one is in suicide prevention.

888-893-3767     Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                    California Firm Registration #179

Homer D. Venters, M.D.                    January 09, 2025

Page 190

1   Those are two areas where patients think they
2   happen, where the patient doesn't die or worry
3   about the adequacy of care.
4   Q   And so if we look for the NCCHC standards about
5       CQI and suicide prevention, that's where we'd
6       find reference to that kind of after-the-fact
7       review?
8   A   That's my recollection as I sit here today.
9   Q   Okay.  Is there any other -- or are there any
10      other standards that you would point us to on
11      that requirement?
12  A   Well, the standard of care in corrections,
13      based on my experience, is that the M&M process
14      is just that, it's morbidity and mortality.  So
15      the NCCHC limits -- has a very limited scope,
16      but my experience in jail and prison settings,
17      as a federal monitor, for instance, is that
18      these reviews, these types of reviews, often
19      occur after a critical incident that doesn't
20      involve death.
21  Q   And what would the parameters be for deciding
22      what sort of events require that kind of review
23      outside of a death?
24  A   Well, it requires that the clinical leadership,
25      the medical director of the facility or the

Page 191

1   nursing director, somebody identify a case
2   where there was a deficiency that needs
3   addressing or that could happen again.
4       So on the mental health side, it's
5   often self-harm or, you know, suicide attempt,
6   which are two different things.  Missed
7   medications or wrong medications are examples.
8       So there are -- it's fairly broad,
9   and it requires that the clinical staff have
10  some instruction on when and how to do this.
11  Q   Do you recall in your review of the records
12      from Mr. Schmieder's death that there was an
13      investigation into that death done by the
14      Monroe County Sheriff's Office?
15  A   I don't -- as I sit here, I don't recall that.
16      But what I'm talking about is a clinical review
17      by clinical staff.
18  Q   I understand the distinction.  I just wanted to
19      confirm if you know whether or not the records
20      that you reviewed relating to Mr. Schmieder did
21      incorporate an investigation done by the
22      county.
23  A   I'm not disputing it.  I just don't happen to
24      recall that fact.
25  Q   And same question as to Ms. Lehman.

Page 192

1   A   Yes, again, same.  My -- I don't -- I testified
2       considerably up to this point about the lack of
3       clinical mortality reviews, but I'm not
4       disputing the existence of other types of
5       either critical incident reviews or
6       administrative reviews.
7   Q   You talked quite a bit today about -- well,
8       strike that.
9           There are places in your report with
10      respect to your opinions that you refer to
11      various NCCHC standards set out in their
12      standards for health services in jails.
13          I understood from Mr. Knott's
14      questions of you this morning that in addition
15      to those NCCHC standards, there are instances
16      where your opinions are based on your general
17      view of the standard of care based on your
18      experience in the field.  Is that a fair
19      statement?
20  A   Yes.
21  Q   And so in those instances where in your report
22      for your opinions, you don't cite to a
23      particular NCCHC standard, are those instances
24      where you're offering opinion about the
25      standard of care based on your experience

Page 193

1   generally in the field?
2   A   Yes.
3   Q   And so in those instances, what you're telling
4       us is based on your general training,
5       experience, and knowledge, you have an opinion
6       about the standard of care.  Is that a fair
7       statement?
8           MS. MAKAR:  Objection.  Form.
9           THE WITNESS:  Yes.
10  BY MR. JONES:
11  Q   But in those instances, you're not -- where you
12      don't cite to the NCCHC standards, you're not
13      pointing to anything more specific than just
14      your general experience and knowledge and
15      training, correct?
16  A   I think so.  I mean, I was just asked about
17      hepatitis C.  So it wasn't in my report, but
18      there are clear recommendations by professional
19      societies that are clinical about the need to
20      treat hepatitis C in jails and prisons.
21          And so I think I also mentioned
22      earlier in this discussion about standards that
23      there are lots of clinical standards, in fact
24      most clinical standards, of care that the NCCHC
25      does not reference or get into.

49 (Pages 190 to 193)

Homer D. Venters, M.D.                                                    January 09, 2025

Page 194

1        And so the discussion about peak
2    flows, I didn't put it in my report.  It's my
3    longstanding interpretation of the clinical
4    standard of care that when a patient is seen
5    who has asthma, their peak flow should be
6    checked.  That's a clinical standard of care.
7    That also happens to be supported by the CDC
8    and the professional societies that treat
9    asthma, but the difference is that the clinical
10   standards of care are often not dealt with by
11   the NCCHC, which is dealing more with the jail
12   process standards.
13   Q    Really what I'm getting at is those instances
14        in your report where you don't cite to a
15        specific NCCHC standard for a particular
16        opinion about standard of care, are those
17        instances where we can understand that what
18        you're relying on is your general experience,
19        knowledge, and training as a physician in the
20        field?
21           MS. MAKAR:  Objection.  Form.
22           THE WITNESS:  Yes, I think that
23        that's fair.
24   BY MR. JONES:
25   Q    The invoice that you supplied to Ms. Makar for

Page 195

1        your work, that invoice was current as of the
2        day you signed this report, correct?
3    A    Or when I sent the invoice, which might have
4        been the same.  I don't -- there would be a
5        date that the invoice was sent.  So, I mean, my
6        practice would normally be to send an invoice a
7        day or two after the report, so probably that's
8        true.
9    Q    So the invoice would reflect all of the time
10        you spent on the file up through and including
11        the date of the invoice, correct?
12   A    Yes.
13   Q    And do you keep track separately of the time
14        you spend on a file?
15   A    I usually will have an invoice open.  And so I
16        think I have an invoice number two open, where
17        I just jot in a Word document the number of
18        hours that I've put in.  And then I'll close
19        that out and send that whenever I'm ready for a
20        subsequent invoice.  So I guess that is kind of
21        a separate approach.
22   Q    But for the time you spent that was reflected
23        in the first invoice, the only invoice, as I
24        understand it, that you sent to Ms. Makar,
25        there wouldn't be any separate record of the

Page 196

1        time you spent on the file and how you spent
2        that time, or would there?
3    A    No, you're correct.
4    Q    Do you recall when you were retained to work on
5        this file?
6    A    No.  I think it would have been in the latter
7        part of 2024, but I don't recall when.
8    Q    Can you give us anything more specific beyond
9        latter part of 2024?
10   A    I think the last four months, maybe.
11   Q    The fall of 2024?
12   A    Sometime in the last four months.  I just don't
13        recall.
14   Q    And other than speaking with Ms. Makar, was
15        there anything else you did to prepare for the
16        deposition today?
17   A    I reviewed my report, so I reread my report,
18        and I re -- I believe I reread Ms. Boyer's
19        medical records.  And so aside from just
20        looking at records, I didn't speak with anybody
21        else or do anything else.
22   Q    How much time did you spend preparing for the
23        deposition outside of your meeting with
24        Ms. Makar?
25   A    I think three or four hours.

Page 197

1    Q    And how long was the meeting with Ms. Makar?
2    A    I believe it was one hour.
3    Q    Is there anything else you recall
4        reviewing other than your report and
5        Ms. Boyer's medical records in the three to
6        four hours you spent preparing outside of the
7        meeting with Ms. Makar?
8    A    Not that I recall.
9    Q    I understand that Ms. Makar or her office sent
10        you various records to review, correct?
11   A    Yes.
12   Q    And my understanding, based on your testimony
13        thus far is you would get an email that
14        wouldn't have any substantive text, and it
15        would contain a link to whatever additional
16        records you were being provided.  Is that
17        correct?
18   A    As I sit here today, I actually don't know if
19        it was a Box link.  That's most commonly how I
20        get records.  It could be that they were just
21        sent as email attachments, which would be
22        pretty burdensome with this case.  But either
23        way -- as I sit here today, I don't recall
24        that, because either way, what I would be doing
25        is downloading a file, either from an email or

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                       California Firm Registration #179

Page 198

1    from a Box link that came with a report -- or
2    came from counsel.
3  Q   Were there any communications in writing from
4    Ms. Makar or her office that in the
5    communication identified any facts or data
6    provided by her or her office that you relied
7    on in forming your opinions?
8  A   No.
9  Q   Were there any communications from Ms. Makar or
10   her office that provided assumptions for you to
11   rely on in forming your opinions?
12  A   No.
13  Q   And were there any communications to and from
14   Ms. Makar or her office relating to your
15   compensation for your work on the file other
16   than the one invoice you've provided to date?
17  A   No.
18  Q   And the hourly rate that you're charging for
19   your work in this file, is it your standard
20   rate, or is it higher or lower than your
21   standard rate?
22  A   That's my standard rate.
23  Q   You are not a cardiologist, correct?
24  A   Correct.
25  Q   You are not an emergency room physician,

Page 199

1    correct?
2  A   Correct.
3  Q   You are not an addiction medicine specialist;
4    is that correct?
5  A   Correct.
6  Q   Are you a fellow or member of the American
7    College of Correctional Physicians?
8  A   No.
9  Q   Have you ever been?
10  A   No.
11  Q   Have you ever worked in a jail setting in a
12   capacity other than as a medical professional?
13  A   Other than as a monitor or -- so including
14   monitoring a jail and also working directly as
15   a medical professional, no, no other roles.
16  Q   And your monitoring role, that's as a
17   physician, correct?
18  A   Yes.
19  Q   So you haven't been a corrections officer,
20   sergeant, lieutenant, any sort of security role
21   in a jail.
22  A   Correct.
23  Q   Have you ever received any training as a
24   security officer in a jail or other confinement
25   setting?

Page 200

1  A   No.
2  Q   You are not an expert on the security aspects
3    of corrections, correct?
4  A   No.  With the narrow carve-out that there is a
5    part of security training that is generally
6    referred to as health training for correctional
7    staff.  And so both in my role in the New York
8    City jails and my role as a monitor, I have
9    expressed expertise and authority in
10   contributing to and reviewing those policies.
11       So as a monitor, I look at what
12   health training is given the security staff,
13   for instance, and what they're advised or
14   trained to do.  But with that very narrow
15   carve-out, which would include suicide
16   prevention, I have no other expertise in
17   security matters.
18  Q   What did you do between 1989 and when you began
19   medical school, which, if I'm interpreting your
20   CV correctly, was 1999?
21  A   I was in the Peace Corps in West Africa.  Then
22   I came back and took several years to take
23   basic science classes to apply to medical
24   school.  I worked as an EMT while I was doing
25   that.  And then I went to Illinois and started

Page 201

1    working in a lab and then transitioned to
2    medical school.
3  Q   So when was the Ph.D. work that Mr. Knott was
4    asking you about?
5  A   I think that was maybe 1999 or 2000.  It was
6    right at the time when I was starting to become
7    a medical student.
8  Q   Are all of the specific sources that you relied
9    on in forming your opinions cited in your
10   report?
11  A   Yes, with the caveat that I identified, I
12   think, two errors in the information reviewed
13   regarding the Bates numbers in reference to ACH
14   corporate policies and Monroe County policies.
15   But with that exception, I believe everything I
16   reviewed upon -- everything I've relied upon
17   for my opinions is included in the report.
18  Q   And it's a problem with the wording of the
19   question, but what I was meaning to ask you
20   about was, you know, for instance, various
21   NCCHC standards, sources like that.
22       Are all of the sources in your field
23   of work that you relied on in forming your
24   opinions, are those referenced or cited in your
25   report?

Page 202

1  **A  I believe so, yes.**
2         MR. JONES:  Okay.  I think that's all
3  I have, but I'll turn it over to Mr. Casserly,
4  and if I think of anything else, I'll ask it at
5  the very end.  Thank you, Doctor.
6         THE WITNESS:  Thank you.
7              EXAMINATION
8  BY MR. CASSERLY:
9  Q   Good afternoon, Doctor.  My name is John --
10 excuse me -- my name is John Casserly, and I
11 represent a corporation called USA Medical and
12 Psychological Staffing, as well as some past
13 and one current shareholder of that
14 corporation.  Their names are Drs. Johnson,
15 Schamber, Harmston, and Bresnahan.
16        Have you reviewed the -- I don't
17 expect to take a lot of time with you unless
18 you surprise me with some opinions that aren't
19 in your report or documents that aren't listed
20 as having been reviewed.  I just need to dot my
21 I's and cross my T's.  So I hope to be done
22 with you in 10 or 15 minutes here.
23        Depositions were taken of founder and
24 shareholder Dr. Johnson, CEO of ACH; Jessica
25 Young; and CFO of ACH, Jaime Lynch.

Page 203

1         Have you reviewed those deposition
2  transcripts?
3  **A   Not that I recall.**
4  Q   Okay.  Have you reviewed the deposition
5  transcript of plaintiff's previously disclosed
6  expert, Jeffrey Keller?
7  **A   No.**
8  Q   Have you discussed with Ms. Makar whether you
9  would be providing opinions about whether there
10 was any inappropriate conduct by the
11 shareholders or corporate governing bodies, not
12 regarding health policies, but regarding
13 corporate operations?  Was that topic discussed
14 between you and Ms. Makar?
15 **A   I think it's safe to say no.  I'm not even sure**
16 **what that means, but I don't recall any**
17 **discussions in that area.**
18 Q   Okay.  I'll walk you through a bunch of
19 examples of things that I'm referring to, and
20 then I'll come back at the end and follow up on
21 that question, because that was a fair
22 criticism of it.
23        In your review and preparation of
24 opinions in this matter, have you evaluated and
25 come to an expert opinion about whether ACH has

Page 204

1  engaged in inadequate capitalization of the
2  business?
3  **A   No.**
4  Q   Have you -- the same question, have you
5  developed an opinion about whether or not ACH
6  has ever failed to observe corporate
7  formalities?
8  **A   No.**
9  Q   Have you developed an opinion about whether ACH
10 has failed to issue stock?
11 **A   No.**
12 Q   Have you developed an opinion about whether ACH
13 has failed to make dividend payments?
14 **A   No.**
15 Q   Have you developed an opinion about whether ACH
16 has overlooked and permitted nonfunctioning of
17 any corporate officers or directors?
18 **A   No.**
19 Q   Do you have the opinion that ACH has engaged in
20 not creating or losing corporate records?
21 **A   No.**
22 Q   Have you developed an opinion that ACH has been
23 engaged in permitting the insolvency of any
24 debtor corporations?
25 **A   No.**

Page 205

1  Q   Have you come to the opinion that ACH has
2  engaged in inappropriate commingling of funds?
3  **A   No.**
4  Q   Have you come to the opinion that ACH has
5  engaged in diversion of assets from the
6  corporation to a shareholder or other person,
7  to the detriment of creditors?
8  **A   No.**
9  Q   Have you got the opinion that ACH has failed to
10 maintain arm's-length relationships among its
11 related entities?
12 **A   No.**
13 Q   Do you have the opinion about whether ACH is a
14 mere facade for the operation of dominant
15 shareholders?
16 **A   No.  And I don't believe I understand what that**
17 **means, but I have no opinions that even come**
18 **close to that.**
19 Q   Okay.  There is a separate corporation from ACH
20 that I mentioned I represent, and that is USA
21 Medical and Psychological Staffing, S.C.
22 That's a Wisconsin corporation.  And so I'm
23 also going to ask you only three questions, but
24 they're a little wordier under Wisconsin law.
25        Do you have an opinion that any

52  (Pages 202 to 205)

Homer D. Venters, M.D.                                                          January 09, 2025

Page 206

1    shareholders of USA Medical -- I'm going to
2    shorten it to USA Medical -- is engaging in
3    complete domination of finances, policies, and
4    business practice in relation to the provision
5    of medical care?
6    A   No.
7    Q   Do you have an opinion that -- well, actually,
8        these are series -- these are series elements,
9        so because you don't have that opinion about
10       the first element, I can relinquish the rest of
11       my time. I have no other questions, Doctor.
12       Thank you.
13   A   Thank you.
14           MR. KNOTT: Doctor, I'm sorry, but I
15       have a couple more topics to follow up. I
16       understand we're running out of time. I'll try
17       to be brief.
18               EXAMINATION
19   BY MR. KNOTT:
20   Q   Is it fair to say that chest pain is frequently
21       reported by patients who do not have a cardiac
22       issue?
23           MS. MAKAR: Objection. Form.
24       Improper hypothetical.
25           THE WITNESS: Yes, that occurs.

Page 207

1    BY MR. KNOTT:
2    Q   It's a very difficult thing for providers
3        working in jails to deal with, isn't it?
4            MS. MAKAR: Objection. Form.
5            THE WITNESS: I'm not sure what you
6        mean by "difficult." I think it's a common
7        presentation or complaint by patients, and it
8        can be difficult if we go through all the steps
9        that we should and then the patient comes back.
10       But it's one of the more easily protocolized
11       potential medical emergencies in jails.
12   BY MR. KNOTT:
13   Q   Have you ever seen any statistics about what
14       percentage of chest pain presenting in
15       emergency rooms and urgent cares is of
16       noncardiac origin?
17   A   Not that I recall sitting here today.
18   Q   And I want to ask you about the source of your
19       standard of care with respect to some of this.
20           You testified that testing of women
21       of childbearing years is absolutely fundamental
22       and part of the standard of care.
23           Is that a fair characterization of
24       your belief about this?
25   A   Yes.

Page 208

1    Q   And you believe it's a breach of the standard
2        of care of a reasonable jail medical provider
3        and jail if they do not test women for
4        pregnancy, right?
5    A   Yes. They -- the fact is, there may be people
6        that are pregnant or report being pregnant, but
7        pregnancy status and pregnancy history should
8        be assessed for every female patient of
9        childbearing age.
10   Q   And I think you said it was unheard of that a
11       jail would not test. Is that your opinion?
12   A   Well, I'm not saying I've never seen it missed.
13       I just haven't encountered jails that don't do
14       this, that don't get pregnancy history and
15       pregnancy status for women coming in the front
16       door.
17   Q   You feel very strongly that it is a widespread
18       protocol to test for pregnancy in women coming
19       into jails.
20   A   Well, as I just said --
21           MS. MAKAR: Objection. Form.
22           THE WITNESS: -- assessing pregnancy
23       status and pregnancy history I believe is a
24       standard of care. I don't -- I'm not sure
25       I've --

Page 209

1    BY MR. KNOTT:
2    Q   No. I'm talking about pregnancy tests. I'm
3        trying to make this short. I don't -- I'm
4        talking about not treatment of pregnancy. I'm
5        talking about just getting a pregnancy test in
6        people who don't know whether they're pregnant
7        or not, and that's what I --
8    A   I think that's a standard of care.
9    Q   And what would you -- what would you estimate
10       is the percentage of jails nationwide that have
11       protocol for testing every woman of
12       childbearing years?
13   A   I don't know.
14   Q   And the reason I'm asking this is because what
15       can we refer to as the source of your standard
16       of care in regard to that opinion?
17   A   I would give my opinion as a medical expert
18       based on my experience in correctional health.
19       I just haven't -- this is the first discussion
20       I think I've ever had where people are
21       questioning the need to identify who's pregnant
22       and who's not for women -- it's like a
23       tuberculosis test. I've just never encountered
24       people say or put forward the opinion that's
25       not something we have to know.

53 (Pages 206 to 209)

Page 210

1    Q   Do you review or regularly receive the American
2        Journal of Public Health?
3    A   It's been some time since I've received it.
4    Q   Am I correct in understanding that the standard
5        of care does not require a mortality review of
6        a death in a jail if the death is assumed to be
7        of natural causes?
8    A   No.  Absolutely not.
9    Q   So every death should be considered and go
10       through the mortality review process.
11   A   Yes.
12           MS. MAKAR:  Objection.  Form.
13           THE WITNESS:  That's a shocking
14       question.
15   BY MR. KNOTT:
16   Q   And you agree that -- well, strike that.
17           I'm going to share the screen and try
18       to -- we prepared a document based on the
19       materials that we received sometime in the
20       afternoon, and I just want to make sure that we
21       have this correct.
22           And, Doctor, do you have something
23       there that you can look at to tell us that
24       these are, in fact, the records that you
25       received?

Page 211

1    A   No.  I would -- like I did before, I mean, I
2        could figure this out in short order, but
3        not -- I would need to turn off my camera or
4        somehow disconnect.
5    Q   You can't open a folder and tell us whether the
6        list is the list that you -- if files that you
7        reviewed?
8           MS. MAKAR:  Objection.
9           THE WITNESS:  No.  I mean, the way I
10       can -- one way I can do it is I'm going to try
11       and count to see if there's 26 names there,
12       because I know, just from memory, that I got 26
13       names.
14   BY MR. KNOTT:
15   Q   Well, I'm --
16   A   I have no way of just sitting here and
17       instantly doing that, no.
18   Q   Okay.  And I'll tell you, there are 26 names
19       there and --
20   A   You know what?  Some names have been dropped or
21       replaced.  I recall affirmatively from my
22       memory, and I'm confident in this, that I
23       received a file that I opened -- or a folder
24       that I opened, whatever term you want to use,
25       and there were 26 files in there, and each were

Page 212

1        kind of alphabetical, and so this looks very
2        much like those 26 to me.
3    Q   And can we assume that you paid careful
4        attention and reviewed very carefully each file
5        that was sent to you?
6           MS. MAKAR:  Objection.  Form.
7           THE WITNESS:  Well, some -- as I say,
8        I think, in my report, I go into detail about
9        my process, but some of these files were
10       incomplete or didn't seem to have information
11       that was going to be -- my lens in opening -- I
12       opened every one of these -- was does the
13       information in any of these files reflect the
14       three core findings -- because the fourth is
15       the mortality review -- the three core findings
16       for Ms. Boyer's case.
17           So my process was to open each of
18       these and then look to see is there anything
19       that indicates the presence of one of these
20       three things.
21   BY MR. KNOTT:
22   Q   But you would have looked at each file,
23       correct?
24   A   Yes.
25   Q   And there's a few different categories there

Page 213

1        from a different production.  There are five
2        files from the Monroe County production.  And
3        are you able to confirm that you reviewed the
4        records for each of these patients?
5           MS. MAKAR:  Do you want to mark this
6        as an exhibit, Doug?
7           MR. KNOTT:  I will.
8           MS. MAKAR:  Okay.
9           THE WITNESS:  I don't know.  I have
10       to -- I'm looking up that name Rebeles.  I
11       don't know if that's -- that doesn't -- I don't
12       see it in the report.  So I guess I can.  I
13       would certainly be able to take this list that
14       you've just presented me at the end of the
15       deposition and compare it to the files I have
16       on my hard drive, but as I sit here today, I'm
17       not sure I can do that.
18   BY MR. KNOTT:
19   Q   And do you recognize the names that are listed
20       below under Plaintiff Production?
21   A   I don't really -- I'm not sure I recognize
22       those names.  Just the Monroe County I
23       recognize.
24   Q   And my understanding is this came from --
25       directly from the email we received sometime

54  (Pages 210 to 213)

Homer D. Venters, M.D.                                      January 09, 2025

Page 214

1    this afternoon of the listing of files reviewed
2    by you.
3            MR. KNOTT:  And so I guess could I
4    ask, Ms. Makar, that you confirm that this
5    list -- I'll mark it -- is in fact the records
6    that were reviewed by Dr. Venters?
7            MS. MAKAR:  Yes.
8            MR. KNOTT:  Okay.
9    BY MR. KNOTT:
10   Q   And, Dr. Venters, do you have -- if I highlight
11       this Brandon Lessman for an example, do you
12       have the capacity, as you sit there today, to
13       open that file?
14   A   No.  It's the same problem when we talked about
15       another patient.  I'm pretty confident I
16       recognize that name, I think from the report,
17       but I can't open the medical records as I sit
18       here.
19   Q   And I guess tell me, again, why that is again.
20   A   I have to -- I mean, I could disconnect my
21       camera, and then it's just a US -- the number
22       of USB ports but --
23   Q   I got it.  Okay.
24           I've located the -- I want to work
25       with the exhibit numbers, but I think we can do

Page 215

1    that off the record and have a stipulation that
2    the exhibits that we've reviewed will be marked
3    according to a sequence.
4            That's all I have for now, Doctor.
5            THE WITNESS:  Thank you.
6            MR. JONES:  I do not have anything
7    more.
8            MR. CASSERLY:  I have no follow-up.
9            MS. MAKAR:  I have one follow-up
10   question, Doctor.
11           EXAMINATION
12   BY MS. MAKAR:
13   Q   So now having been asked another set of
14       questions, have any of your opinions in your
15       report changed?
16   A   No.
17           MS. MAKAR:  Thank you.
18           MR. KNOTT:  Okay.  Let's go off the
19   record, and if we need to add to the record
20   about the exhibits, we can do that, but --
21           THE WITNESS:  Am I able to leave?
22           MR. KNOTT:  I think we can cut you
23   free.
24           THE WITNESS:  All right.  Thank you.
25           MR. KNOTT:  Thanks for your time.

Page 216

1            (Concluded at 3:52 p.m.)
2            (Exhibits 109 through 116 were
3    submitted electronically to the reporter
4    following the conclusion of the deposition and
5    marked for identification.  The original
6    exhibits were attached to original transcript;
7    electronic copies provided with transcript
8    copies.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 217

1    STATE OF WISCONSIN )
                        ) SS
2    MILWAUKEE COUNTY  )
3            I, JULIE A. POENITSCH, RPR/RDR/CRC,
4    Certified Realtime Reporter, and Notary Public in
5    and for the State of Wisconsin, do hereby certify
6    that the preceding remote Zoom deposition was
7    stenographically reported by me and reduced to
8    writing under my personal direction.
9            I further certify that said deposition was
10   taken before me, with all parties appearing via Zoom
11   Videoconference, on the 9th day of January, 2025,
12   commencing at 9:02 a.m. and concluding at 3:52 p.m.
13           I further certify that I am not a relative
14   or employee or attorney or counsel of any of the
15   parties, or a relative or employee of such attorney
16   or counsel, or financially interested directly or
17   indirectly in this action.
18           In witness whereof, I have hereunto set my
19   hand and affixed my seal of office at Milwaukee,
20   Wisconsin, on this 27th day of January, 2025.
21
   _____
22           JULIE A. POENITSCH - Notary Public
             In and for the State of Wisconsin
23
   My commission expires January 25, 2027.
24
25

55  (Pages 214 to 217)

Homer D. Venters, M.D.    January 09, 2025

Page 218

**A**

**a.m** 1:22 2:10
48:5,6 217:12
**Aberdeen** 2:16
**ability** 101:15
177:10
**ABIM** 33:16
**able** 12:3 47:12
51:13 63:23
64:8 93:11,16
93:21 100:17
109:19 110:23
111:1,8 115:13
116:12 129:3,4
129:8,11,17
130:8 131:1
136:24 169:12
169:20 172:6
178:20 213:3
213:13 215:21
**abnormal** 125:8
132:12
**above-entitled**
2:3
**absolute** 116:9
**absolutely** 14:25
86:2 118:18
132:8,20
207:21 210:8
**absorbed** 23:18
**abstract** 18:10
**abuse** 47:24
142:8 178:25
181:6,13
**abusing** 185:22
186:8
**academic** 55:16
**acceptable**
108:24 116:20
**accepted** 187:1
**access** 27:10
45:13 77:21
100:8,14 103:9
122:12 123:6,9
129:4 130:25
157:16,24
**accommodation**

43:14 166:8
167:15,16
168:10
**accomplished**
170:2
**accreditation**
59:6,16,23
60:6,9 68:18
**accredits** 68:12
68:13
**accurate** 42:19
43:18 46:5
47:6
**accurately** 7:18
**accused** 32:8
145:14
**ACH** 2:24 15:11
66:2,5 72:8
76:12,20,23
77:22 78:18,23
79:4,17,22
80:2,6,9,19,24
81:6,13 82:3
82:11 83:4
88:6 144:19,23
145:2 150:13
150:18 151:6
153:11,16
163:7 189:6
201:13 202:24
202:25 203:25
204:5,9,12,15
204:19,22
205:1,4,9,13
205:19
**act** 35:2
**acting** 31:7
36:18 54:17
**action** 2:3 47:18
60:24 184:14
217:17
**active** 91:2,4
**actively** 91:7
**actual** 19:4
27:18 48:20
54:8 93:12
100:14 104:7
105:18,23

141:25 143:22
**acute** 80:14 83:3
83:23 84:10
91:10,19 124:4
124:21 126:23
**add** 215:19
**added** 23:19,23
30:20
**addiction** 85:22
185:4 199:3
**adding** 99:21
**addition** 20:14
48:19 167:21
192:14
**additional** 9:15
10:1 13:3
16:17 74:21
88:5,10 111:18
156:16 197:15
**address** 144:2
**addressed**
135:24 137:23
**addresses** 58:19
**addressing**
191:3
**adequacy** 9:6,13
22:19 31:4,14
33:1 35:13,24
61:15,18 62:23
67:19 160:19
190:3
**adequate** 11:12
71:18 85:15
86:16 125:18
133:24 134:1,7
136:3 137:20
**adjunct** 55:19
55:21
**administration**
33:23
**administrative**
192:6
**Administrator**
1:3,11
**admission**
112:21 113:25
116:15 182:8
**admissions** 44:7

44:8,13
**admit** 115:14
**admitted** 183:20
**advance** 170:20
**Advanced** 1:7
56:18,20,24
68:21 74:25
76:17
**advice** 64:23
**advised** 76:5
200:13
**adviser** 147:9
**advocacy** 103:14
**advocate** 102:4
102:6
**advocated**
102:25 103:5,6
**advocating**
46:19 47:3,11
103:16
**affiliated** 46:18
**affirmatively**
97:20 138:25
167:6 211:21
**affixed** 217:19
**Africa** 200:21
**after-the-fact**
189:20 190:6
**afternoon**
109:12 202:9
210:20 214:1
**age** 171:20 208:9
**agencies** 20:23
**agency** 21:16
127:19
**ago** 29:6 49:13
65:14,14
**agree** 52:10
75:17 80:24
81:19 96:16,19
98:7,13,18
103:15 112:6
112:13,22,24
113:2,22,25
118:2,5 121:25
138:9 139:5
143:19 148:11
148:23 173:10

177:19 210:16
**agreed** 32:1
146:18 147:7
**agreement**
35:16 147:25
**ahead** 151:25
**air** 125:22
**ajones@hanse...**
3:9
**al** 1:8,15
**Alan** 58:2
**Albert** 103:6
**alcohol** 85:7
90:21 91:25
93:6,13 94:1
95:3,7 96:20
97:4,8 99:13
104:4 105:9,15
106:16,17
107:17,24
108:6 159:18
178:25 179:5
179:13,15
181:7,11,23
184:18 185:18
**alcoholic** 92:4
96:17
**alert** 115:13
**alerted** 84:5
**alleged** 81:20
**allegedly** 71:17
**allow** 189:9
**allowable** 87:14
**allowance** 68:2
**alphabetical**
212:1
**Amber** 2:24
**American** 33:14
33:17 56:15
85:22 185:4
199:6 210:1
**amount** 23:20
27:6 155:1
**anachronistic**
149:14
**analysis** 56:12
**and/or** 179:1
**Andrew** 3:8

Homer D. Venters, M.D.

January 09, 2025

Page 219

151:18 152:7
170:6
answer 5:24 7:7
16:15 42:18
51:20 95:4,23
106:21 108:2
114:5 122:24
129:11 137:11
164:5,8 165:6
167:2 168:16
169:20 172:15
173:3
answered 88:25
153:6
answering 10:12
antiquated
181:7
anybody 7:8
10:10 56:23
128:12 159:1
196:20
anymore 105:13
anytime 152:11
Anyway 59:11
apologize 27:21
68:8 126:7
apparent 11:6
appear 109:21
141:3 173:14
appeared 2:18
2:23 3:5,10
appearing 1:23
2:9 217:10
appears 68:6
111:9
applicable 58:12
apply 58:10,13
60:19 200:23
applying 58:8
appointed 21:6
appreciate 6:24
17:25 89:6
140:14
appreciating
18:17
approach 14:1
41:3 51:12
66:8,22 141:3

147:21 167:3
171:5,8 188:2
188:19 189:7
195:21
approaches
173:7
approaching
30:16
appropriate
60:24 112:21
approximate
72:19
approximately
5:16 23:5
approximates
51:15
area 33:3 46:24
66:20 71:3
72:12 73:19
151:2 189:5
203:17
areas 54:7 58:15
135:23 166:9
166:16 190:1
argument 149:8
arm's-length
205:10
arrest 89:19
arrestees 95:8
ASAM 85:22
105:4
aside 30:8 97:6
189:18 196:19
asked 9:12 32:23
32:25 36:2
42:16 60:16
61:23 63:22
65:15 69:11
94:5 95:10,20
96:3 129:7,23
131:1 132:4
134:15,21
149:22,25
150:6 152:24
157:16 166:22
169:23 170:20
187:16 193:16
215:13

asking 12:14
14:23 16:8
25:9,9 26:11
48:18 64:1
82:19,20,25
85:6 108:18
150:3,7 166:25
167:13,14
168:25 169:8
172:22 189:14
201:4 209:14
asks 181:6
aspects 200:2
assess 9:6,13
33:1 62:23
102:18 175:14
assessed 9:12
11:4 91:20
116:10 141:20
142:16 174:15
176:1 186:17
208:8
assessing 35:13
52:15 61:14
208:22
assessment
51:23 65:1
72:9 83:13
86:7 91:17,18
98:9,11 104:12
109:22 114:19
116:1,2,24
118:16 121:8
123:25 125:2
125:18 128:13
136:4 137:19
141:5,14 171:9
172:11,13
173:10,16
174:2,24
175:12,17
176:3,9 177:11
178:1,10,21
179:6 184:16
186:13
assessments
185:12
assets 205:5

assigned 36:7,15
36:23,24 37:16
37:22 40:22
43:4
assignment
111:4,6
assistant 44:11
59:21 176:25
assistants 63:1
associated
146:24
assume 7:9 8:17
34:15 44:16
57:25 58:5
61:2 62:11
109:14 115:17
121:2 134:3
146:1 153:3
212:3
assumed 34:16
108:11 210:6
assuming 71:24
assumption
109:5
assumptions
198:10
assurance 62:3
139:22 188:21
asthma 90:14,25
91:11 118:11
118:18,21
121:13 194:5,9
attached 4:11
216:6
attachments
50:11 197:21
attempt 60:8
142:9 143:8
191:5
attention 72:6
73:2 115:25
126:24 212:4
attorney 24:6,9
26:10 152:8
217:14,15
attorneys 21:20
21:23 22:11
30:6,9 32:14

attributable
54:9
attributed
150:13
audits 68:13
authored 76:16
authority
177:10 200:9
autopsy 10:25
19:12 89:11
153:25
available 12:1
23:1 44:4,20
45:7 59:3,17
70:6 112:9
130:7 144:7
149:22,23
150:8 153:23
average 179:14
awaiting 42:3
award-winning
56:8
awards 56:9
aware 18:13
23:4 27:5
30:12,14 32:22
64:21,25 68:16
75:3,23 91:3,5
96:12 119:18
119:18,20
136:19,23,24
151:12 153:20
171:2,18

**B**

B 4:1
B-A-I-N-E-S
37:3
back 4:20 17:19
30:2 48:2,7
98:4 100:6
110:17 128:22
144:20 170:16
174:3 184:2
200:22 203:20
207:9
background
144:14

**Baines** 37:3
 39:17,23 42:23
 43:17
**Bangladesh**
 103:23
**barge** 37:2
**bars** 21:1 52:24
 53:4
**based** 7:20 11:3
 90:24 91:6
 93:3 110:24
 111:11 125:10
 132:21 144:10
 156:4,18
 177:22 190:13
 192:16,17,25
 193:4 197:12
 209:18 210:18
**baseline** 106:8
 125:17
**basic** 38:18 45:2
 63:23 84:19,20
 137:22 148:5
 151:7 165:18
 167:23 168:7
 168:18,19
 169:11 175:8
 186:15 200:23
**basically** 43:25
 79:3 87:15
 147:19 156:9
 185:6
**basics** 64:2
**basis** 61:10
 62:18 67:6,11
 71:4,12 73:11
 73:25 74:5
 91:9 92:11
 120:21 124:20
 126:22 129:18
 143:6,21 144:1
 144:18 161:3
 161:22 162:25
 163:12 164:15
 187:20
**Bassett** 51:2
**Bates** 4:9 16:7,9
 48:20 49:1,3,7

49:17,25 78:2
 78:8,9,14 82:9
 100:16,23
 101:6 123:19
 133:12 150:15
 150:19 153:17
 155:25 201:13
**BCBC** 42:19
**Bear** 121:6
**beds** 38:25 39:4
 43:9,13
**began** 200:18
**beginning**
 134:21
**behalf** 1:4,12
 2:18,23 3:5,10
 30:23 32:6,19
 32:23 57:4
**belief** 207:24
**believe** 6:19 7:25
 9:1 10:12,19
 10:22 12:23
 13:9 19:1 21:9
 23:2 24:10
 25:1,17 26:23
 27:21 28:1,24
 30:8,24 35:10
 35:16 52:20
 57:18 58:20
 60:7 62:14
 64:13,17 66:19
 73:19 75:3,11
 76:8 84:14
 86:21 88:15
 90:6 94:3
 120:21 128:4
 130:24 132:6
 140:3 154:3,7
 157:16 158:25
 159:10 164:4
 187:18 196:18
 197:2 201:15
 202:1 205:16
 208:1,23
**believed** 134:3
**believing** 92:11
 124:20 126:22
**Bellevue** 58:3,4

**bench** 148:5
**benign** 140:24
**Benjamin** 31:1
 32:2
**benzo** 185:19
**benzodiazepine**
 98:17 117:10
 117:15,20,22
 183:2,15
 184:18,19,25
 185:1,20
**benzodiazepines**
 93:6,18 98:2,8
 98:15 99:14
 179:1 182:7,23
 183:4,19
 184:10 185:9
**benzos** 183:10
**best** 6:23,24
 16:15 25:20
 31:8 54:10
 128:17 154:18
**better** 33:24
**beyond** 196:8
**big** 11:23
**bigger** 38:10
 42:24
**biggest** 103:18
**bigoted** 149:15
**biology** 147:23
**bit** 17:25 33:24
 47:23 53:20
 106:12 109:11
 179:20,25,25
 192:7
**black** 142:4
**blank** 50:11
**blanking** 165:1
**block** 166:11
**blocked** 133:16
**blood** 92:16,17
 172:23
**blow** 94:24
**board** 33:10,13
 33:15,17 34:9
**bodies** 203:11
**body** 50:9 97:9
**booked** 154:20

159:5 179:1
**booking** 155:5
**borderline**
 132:12
**boroughs** 38:13
**bottom** 15:1
 165:11,25
 166:12
**box** 17:4 142:4
 178:9 197:19
 198:1
**Boyer** 1:3,4,11
 1:11 4:4 7:13
 9:7,14,24
 14:16 18:22
 70:24 71:7,17
 75:9 88:9
 91:22 92:3
 93:12 94:1
 95:4 97:15
 98:1,7,13,19
 108:20 109:3
 109:18 112:20
 113:6 115:14
 115:23 118:19
 119:7 122:1
 137:24 153:22
 154:5,19
 156:23 158:21
 161:5,15,23
 162:11 163:1
 163:13 164:10
 164:17,25
 165:7 166:14
 178:24 182:6
 182:20 185:22
 186:16
**Boyer's** 9:19
 11:6 12:4
 73:13 74:7
 80:11,18 89:10
 96:12 99:10
 111:17 135:9
 135:18 137:2
 137:19 143:19
 155:10 160:13
 164:2 165:15
 196:18 197:5

212:16
**Brandon** 214:11
**breach** 208:1
**breached** 64:12
 64:15
**break** 29:16
 45:20 48:2,10
 87:13,19 99:17
 128:15 152:12
 152:16,20
 170:5,7
**breath** 118:13
 118:23
**breathe** 118:12
**breathing**
 118:20 124:24
 125:4
**Bresnahan** 3:6
 202:15
**brief** 206:17
**bring** 12:14
 116:18 169:17
**broad** 22:13
 71:21 85:5
 166:9 191:8
**broader** 49:22
**broadly** 22:22
**Broadway** 3:8
**Bronx** 37:4
**Brooke** 155:18
**brought** 12:18
 38:19 91:22
**brutality** 47:23
**budget** 52:6
**build** 14:2,12
**building** 42:9
**bullet** 15:10
 18:23 155:24
**bulleted** 120:12
**bunch** 171:7
 203:18
**burdensome**
 197:22
**business** 20:11
 144:19 204:2
 206:4

───────────

**C**

Homer D. Venters, M.D.

January 09, 2025

**C** 2:14 3:1,1
  37:3 42:22
  148:12,17,19
  148:22,24
  149:10,15
  193:17,20
**C-I-W-A** 86:11
**C-O-W-S** 86:12
**calendar** 29:9,12
**California** 21:24
  22:3
**call** 21:4 69:12
  69:23 83:18,21
  84:16,19
  151:20 152:3
**called** 5:2 56:18
  117:17 202:11
**calling** 83:25
  84:1
**calls** 37:14,17
  60:21
**camera** 122:20
  123:3 211:3
  214:21
**cancer** 90:16,25
  91:2,4
**capabilities**
  44:19
**capable** 61:5
  138:6 177:12
  178:2
**capacity** 20:16
  52:3 175:7,15
  176:3,13 178:9
  199:12 214:12
**capitalization**
  204:1
**car** 8:14
**cardiac** 89:19,22
  206:21
**cardiologist**
  198:23
**care** 9:6,13,19
  11:12 14:19
  20:3,8,16,25
  21:19 22:19,23
  24:14,21 25:19
  25:22 31:5,15

32:7,9,19 33:1
33:5,9 35:4,14
35:25 36:2,6
36:10 37:18
38:5,16 39:11
40:3,9,24 41:5
41:9,13 42:18
44:15 46:20
47:14,15,19,21
51:11,21 52:1
52:6,15 53:2
58:11,14,18,19
58:21 59:1,4,9
59:14 60:19
61:2,6,12,15
61:19 62:11,15
62:19,22,24
64:12,16 65:2
65:20 68:17
71:6,18 72:7
72:11 73:3,7
73:13 74:8
75:8,19 84:20
85:2,8,11,13
88:6 89:16
99:7 102:5,6,7
102:9,19,22
104:2 109:6,15
111:17 113:10
118:10 123:24
124:18 133:6
135:18,22,22
136:11 139:17
139:20 140:22
143:14,19
144:21 145:4
145:18 148:20
154:8,24,24
159:12 160:5
172:9,12,14
173:16,17
174:25 175:10
175:12 176:8
176:16 181:10
183:13 186:16
188:11,16,22
189:12,20
190:3,12

192:17,25
193:6,24 194:4
194:6,10,16
206:5 207:19
207:22 208:2
208:24 209:8
209:16 210:5
**career** 177:18
**careful** 19:14
  212:3
**carefully** 212:4
**cares** 207:15
**carries** 182:10
  182:17
**carry** 26:17
**carve-out** 200:4
  200:15
**case** 1:6,14 6:9
  7:24 11:6 12:4
  13:15 14:13,16
  14:22 17:2,7
  18:4,13 19:6
  19:17 24:2,3,5
  24:7,9,11,19
  25:17 26:1
  31:19,23 32:3
  32:18 33:3
  56:21 57:3,10
  57:12,13 60:25
  63:18,21 64:11
  64:14,19,22
  65:16 69:2
  74:17 87:7
  122:1 134:21
  135:4 136:3,17
  137:19 140:8
  140:25 144:12
  145:16,22
  146:8 158:18
  164:23 165:15
  166:16 167:11
  171:23 178:14
  191:1 197:22
  212:16
**caseload** 26:17
  26:21
**cases** 6:18 11:7
  12:3 16:17,21

18:11 20:20
23:7,21,23
26:22 27:1,4
29:19,24,24
35:1 41:12
53:6 87:9 88:5
88:10 134:15
135:5,7,12
136:1,7,17
137:12,14,18
139:3 140:21
141:13 145:24
**Casserly** 3:2,19
  151:23 202:3,8
  202:10 215:8
**casserly@gokl...**
  3:4
**categories**
  212:25
**cause** 72:17,17
  89:10 90:17
  188:13
**caused** 90:1
**causes** 89:22
  90:18 132:15
  210:7
**causing** 173:2
**caveat** 201:11
**CDC** 194:7
**cell** 173:6 174:12
  178:15
**cells** 42:12
**Center** 39:17,23
  42:23 43:17
  60:3
**centers** 136:14
**Central** 87:24
**CEO** 202:24
**certain** 12:14
  20:20 25:18
  31:4 46:19
  54:16 69:13
  70:20 102:25
**certainly** 8:7
  30:21 42:22
  45:13 52:24
  57:18 62:3
  70:12 72:14

84:9 92:18,24
93:3 97:11
102:7 103:14
105:6 107:22
116:21 119:14
124:22 130:3
130:15 134:7
135:3 138:24
140:7 154:15
177:5 180:9
188:18 213:13
**certification**
  33:12 34:3,9
  34:14 59:3,12
**certifications**
  59:8
**certified** 2:7
  33:10,14 217:4
**certify** 217:5,9
  217:13
**CFO** 202:25
**chain** 62:7
**challenge** 65:3,6
  65:19
**chance** 100:14
**change** 8:6
  102:4 147:21
**changed** 151:13
  215:15
**changes** 90:17
  104:14
**changing** 102:10
**characterizati...**
  207:23
**characterizing**
  110:20
**charge** 131:13
**charged** 61:13
  128:3 129:16
  130:22
**charges** 75:18
**charging** 198:18
**chart** 41:2 90:10
**check** 13:9 122:5
  178:8
**checked** 121:21
  194:6
**chemo** 90:16

Homer D. Venters, M.D.

January 09, 2025

Page 222

chest 80:6,7,15
82:21,24 83:4
83:9,24 84:9
119:8,13,21
120:3,9,14,18
120:22 140:18
141:6,8 206:20
207:14
Chicago 2:16
chief 37:20 38:9
52:7 53:9
54:22 145:19
childbearing
171:20 207:21
208:9 209:12
Christine 1:4,11
4:4 7:13
156:22 161:23
chronic 124:21
126:21 140:4
circled 92:22
circles 143:10
circumstance
38:1 40:5
69:16 83:16
85:14 112:17
137:2 138:17
circumstances
61:4 62:14
69:13 99:2
107:2 138:17
citation 79:12
129:14 130:17
cite 73:12 74:6
79:13 139:11
161:25 164:14
186:14 192:22
193:12 194:14
cited 73:17
153:13 201:9
201:24
City 38:8,15,23
39:6,19 47:19
52:7 53:9,13
53:25 60:1
61:17 103:4
200:8
civil 2:5 30:17

47:22
CIWA 12:6 85:3
86:10 105:18
108:6 159:22
184:17,17
185:15 187:1
CIWA/COWS
108:4
clarification 7:4
89:6
clarity 40:21
classes 200:23
classification
31:18
clear 10:21
21:15 76:1
82:10 89:1
101:15 108:22
112:25 125:6
144:11 148:16
156:15 174:7
193:18
clearance 112:2
112:8,12,16
113:7,12,14,19
113:24 114:10
114:13,16,20
114:24 136:4
160:20 174:1
cleared 174:16
client 25:19
clinic 43:5 62:5
clinical 37:6,23
38:22 39:2
43:8 51:18
58:25 60:25,25
69:3 128:8
132:21 134:22
135:3 136:9,15
139:16,21
144:14 148:18
173:19 188:16
188:20,22
189:6,12,24
190:24 191:9
191:16,17
192:3 193:19
193:23,24

194:3,6,9
clinically 166:18
184:13
close 195:18
205:18
closely 51:14
co-author 57:24
COCHS 46:7
code 68:10
coined 52:14
collected 171:22
172:4
collection 11:22
11:23 113:17
College 56:5
199:7
come 47:11 48:2
107:8,15 134:8
173:23 174:3
203:20,25
205:1,4,17
comes 104:24
105:5,14
106:14 173:19
181:3 207:9
coming 28:13
44:8 121:19
168:4 173:2
184:2 208:15
208:18
command 42:6,8
62:7
commencing
2:10 217:12
commingling
205:2
commission
58:14,17
217:23
commissioner
69:23
committed
163:18 164:11
committee
189:25
common 69:25
70:7,11 84:12
85:9 124:2

131:20 173:22
188:13 207:6
commonly
197:19
communicable
42:1,3 172:16
173:1 175:20
177:16 178:12
communicating
59:10
communication
76:3 198:5
communicatio...
71:2 74:16
198:3,9,13
Community
46:3
company 56:18
68:17
compare 51:25
168:15 169:25
213:15
compares 60:16
compensation
4:18 13:13,17
198:15
competency
65:20
complaint 83:23
207:7
complete 9:22
48:16 89:4
149:4 168:25
169:24 206:3
completed
111:20
completely 7:18
completion
55:10
complicated
124:13 126:20
comply 48:15
component 6:7
comports 42:20
computer 29:10
68:9
concern 75:18
94:6 97:15

104:19,21
107:1 118:20
140:8 141:22
141:24 145:9
145:10 149:3
172:21 174:14
174:21 176:12
176:14 177:16
178:11 183:14
185:18 187:12
concerned 25:24
88:20 89:5
97:24 107:6
154:16
concerns 72:6
72:17 73:2,9
73:12 74:7
75:8,23 76:6
106:23 112:4
128:2 129:15
130:22 144:25
145:6 148:11
149:13 172:17
conclude 92:14
concluded 11:12
146:16 147:16
147:19 216:1
concludes
110:15
concluding 2:11
72:25 217:12
conclusion
24:21 60:22
73:5 79:10,11
114:25 128:11
134:9 145:10
216:4
conclusions 25:4
condition 75:1
91:11,19 124:4
124:21 126:23
174:23
conditions 32:1
126:21 140:5
conduct 163:7
203:10
conducted 56:11
142:25

Homer D. Venters, M.D.                                                              January 09, 2025

conduit 69:17
conference 8:25
  9:2
confident 91:7
  211:22 214:15
confidentiality
  35:17
confinement
  53:21 56:13
  199:24
confirm 4:22
  191:19 213:3
  214:4
confirmed 182:6
conflated 82:9
conflates 95:18
confusion 87:2
  88:22 132:17
congestion
  90:19
congestive 90:18
  91:1
consequences
  90:22 147:4
consider 53:6
considerably
  192:2
considerations
  70:21 71:6
considered
  104:25 113:5
  177:12 210:9
consistent 92:25
  93:1
consistently
  41:10 42:23
  179:22
constitutes
  76:17
consult 21:10
  24:2 25:25
  33:8 35:18
  63:16 83:1
  119:4
consultant 21:4
  23:9
consulting 18:25
  21:13 23:7

24:15 35:22
consumes
  179:13
contact 24:5
  70:5
contacted
  118:25
contacts 127:7
contagious
  174:21 178:3
contain 197:15
contemplated
  142:18
contemplates
  121:12
content 67:24
  68:7
context 37:21
  50:16 174:17
continue 46:15
  55:5 185:21
continued
  115:18 121:4
  149:3
continues 46:24
continuing 34:5
  34:8 120:22
continuous
  77:13
contract 20:12
  68:21
contracted 69:6
  69:9
contractor
  20:13
contributed
  142:8 143:7
  144:2
contributing
  200:10
contribution
  53:5 142:14
conversation
  77:5
converse 130:14
  136:25
conveyed 51:4
coordination

61:19
COPD 124:9
  125:16 126:12
  132:14
copies 4:12,12
  216:7,8
copy 188:17
copy-and-paste
  79:3
core 11:4 61:21
  61:22 136:2
  175:7 212:14
  212:15
coronary 80:14
corporate 76:12
  77:22 78:18
  79:4,22 80:3
  80:19,24 81:14
  81:20 82:3,23
  150:14 151:6
  153:12,16
  201:14 203:11
  203:13 204:6
  204:17,20
corporation
  20:11 103:3
  202:11,14
  205:6,19,22
corporations
  204:24
Corps 200:21
correct 17:15,19
  19:22 20:20
  28:21 30:7,8
  31:21,23 32:11
  32:12 35:5
  39:24 43:10,24
  53:10 54:14
  56:1,3,4 59:17
  62:2 63:3,4,6,7
  63:10,13,14
  64:9 68:14
  69:14 70:25
  75:10 78:10
  81:2 82:8 84:8
  87:1 88:13,16
  88:24 89:16
  91:5 93:15,20

93:25 94:2
  95:5 97:25
  104:5,18
  105:19 110:21
  111:1,23
  117:10 120:10
  120:15 128:11
  129:21,22
  130:14 132:25
  143:23 153:17
  154:2,10,21
  155:7,10,21
  156:14,18
  157:8 160:15
  160:20 161:4
  161:24 162:5
  162:11,14,15
  162:19 163:1,3
  163:4,8,14
  164:18 166:4
  172:7 193:15
  195:2,11 196:3
  197:10,17
  198:23,24
  199:1,2,4,5,17
  199:22 200:3
  210:4,21
  212:23
correctional 1:7
  6:8,11 20:9,22
  21:3,7,11,14
  32:7,25 34:19
  36:19 37:12
  40:7 41:4 45:5
  46:3,20 47:1,5
  51:11 55:13
  56:19,21,24
  58:14,18,21
  59:4,13 68:16
  68:21 72:7
  73:3 75:1,19
  76:17 102:5
  106:10 136:14
  142:20,23
  172:10,25
  199:7 200:6
  209:18
corrections

136:21 181:10
  190:12 199:19
  200:3
correctly 15:24
  35:2 60:4
  126:17 153:23
  200:20
correspondence
  49:22 74:22
cost 71:16 72:5
  73:2,12,19
  74:7 75:8
costs 73:20
counsel 12:25
  13:4,5 134:21
  198:2 217:14
  217:16
count 211:11
counted 16:15
counties 188:9
  188:18 189:10
country 131:10
  167:4
county 3:11 4:4
  7:14 15:12
  51:16,24 52:3
  66:16 68:22
  78:8,15,24
  79:2 80:8 81:5
  81:25 82:3,11
  92:5 123:19
  133:13 134:16
  137:1,7 152:8
  152:9 153:12
  153:16 154:20
  155:5 156:14
  156:22 157:7
  157:14 158:22
  159:12,25
  160:23 161:21
  162:8,24
  163:11 164:1
  164:17 187:18
  188:1,14 189:2
  191:14,22
  201:14 213:2
  213:22 217:2
county's 189:8

Homer D. Venters, M.D.

January 09, 2025

**couple** 27:8 29:5
  44:22 45:23
  81:16 102:24
  105:16 135:12
  150:16 164:6
  170:6 185:14
  206:15
**couple-year**
  33:24
**course** 13:21
  60:24 132:23
**courses** 60:11
**court** 1:1 5:17
  28:10 31:2,24
  64:20,22 65:1
  77:7
**courtroom** 6:5
**courts** 6:11
  61:14,24 62:23
**COVID** 46:11
  46:14
**COWS** 12:6
  85:3 86:11
  105:18 159:22
  187:2
**COWS/CIWA**
  106:18
**CQI** 190:5
**create** 14:1
  162:7 168:11
  169:3
**creating** 204:20
**credibly** 107:2
**creditors** 205:7
**criteria** 113:20
**critical** 67:23
  68:7 70:15,19
  102:13 123:23
  139:3,8 164:23
  177:3 190:19
  192:5
**criticism** 79:17
  80:2 91:16
  96:3 203:22
**criticisms** 66:3,6
  66:13 67:5,12
  92:9
**critique** 66:8

67:17 81:15
  188:3
**cross** 202:21
**cross-reference**
  169:5
**crossed** 30:13
**crucial** 85:21
**current** 20:5
  21:12 195:1
  202:13
**currently** 20:2
  20:15 22:7
  26:25 55:16
  61:23
**curriculum** 4:3
  6:14 21:8
  29:22 77:2
  102:15
**custodial** 127:7
  174:7
**custody** 53:25
  171:6,12 172:1
  174:19,19
**cut** 26:20,22
  215:22
**cutting** 71:16
  144:20
**CV** 17:21 27:9
  27:13,15,16,23
  28:8,13 30:1
  30:25 32:5
  33:8 34:18
  39:15,21 40:16
  40:21 56:8
  77:17 146:3
  200:20
**cytokines** 148:4

———————
**D**
———————
**D** 1:19 2:2 3:1
  3:14 5:2
**daily** 179:5
**damage** 90:17
**dangerous**
  105:10
**Daniel** 2:20
**Danielle** 3:11
**data** 47:23 54:4

146:10,16
  147:10 198:5
**date** 27:15,17
  34:24 195:5,11
  198:16
**dated** 7:22 14:9
**dates** 135:14
**day** 2:9 16:16
  37:23 45:10,14
  45:15 105:12
  105:16 110:3
  111:4 176:22
  177:20 182:8
  195:2,7 217:11
  217:20
**day-to-day**
  55:23 62:4
**days** 37:1,6 43:6
  45:10 105:17
  178:22 181:24
  184:21 185:7
  185:11,14,17
**deal** 84:8 207:3
**dealing** 194:11
**dealt** 194:10
**death** 9:8 53:5,7
  54:8 89:10
  122:6 132:15
  133:23 134:3
  134:16 135:17
  136:25 138:11
  138:25 139:5,7
  139:9,10
  160:13 161:14
  164:2 189:17
  189:22 190:20
  190:23 191:12
  191:13 210:6,6
  210:9
**deaths** 52:13,19
  52:20 53:8,13
  53:15,24 54:2
  54:13,14,17
  55:3 108:10
  134:25 135:8
  135:21 136:20
  137:6,13
  138:14 164:6

188:14
**debtor** 204:24
**decade** 47:10
  134:17 135:1,8
**December** 69:6
  91:20 98:2,20
  109:11 110:7
  116:15 141:7
  154:21 183:22
**decent** 99:17
**deciding** 190:21
**decision** 52:22
  52:23 70:22,23
  113:21 115:14
  115:17 176:13
  177:13 178:2
**decision-maki...**
  114:19
**decisional** 175:7
  175:14 176:2
  178:9
**decisions** 175:10
  185:13
**decline** 177:11
  177:25
**declines** 172:11
  173:15 174:23
  176:11
**decreased** 23:19
**dedicated** 43:8
  45:4
**defendant** 28:23
  30:23 31:1,19
  32:20,21,24
  145:16,22
**defendants** 1:9
  1:16 2:4,24 3:5
  3:11 5:3 31:23
  152:9
**defense** 32:14,16
**deficiencies** 9:18
  25:22 58:7
  136:2,16
**deficiency**
  143:13 183:13
  189:6,8 191:2
**deficient** 80:10
  80:12 188:6

189:2
**definitely** 184:6
**definition** 95:17
**definitions** 39:4
  39:5
**definitive** 71:22
  73:8 169:24
  183:7
**definitively**
  92:15 93:2
  116:6 145:11
**degree** 93:11,17
  93:22 116:13
**delay** 139:19
  140:18 141:5
  145:3
**delivered** 39:22
  40:18
**demonstrates**
  112:7
**Dempsey** 155:18
**denied** 94:1
  101:9
**denominator**
  163:21
**dental** 167:15
**department**
  21:17 35:9,17
  36:20 47:17
  103:4 105:4
  136:20 146:5
  146:13
**dependent** 92:1
  94:1 95:8
**depending** 38:12
  38:21 44:22
  178:13
**depends** 45:8
  106:20 172:14
  179:24 180:11
**deposition** 1:19
  2:1 8:17,20
  12:15,19 26:3
  26:5 28:2,6,17
  29:1,11 30:22
  57:16,22 75:14
  77:3,5 82:15
  94:15 146:3,4

Homer D. Venters, M.D.

January 09, 2025

Page 225

150:10,11
155:9 161:10
196:16,23
203:1,4 213:15
216:4 217:6,9
**depositions** 5:14
5:16 6:1,3,15
28:12 29:20
30:3,16,24
86:19,23 87:9
155:17 202:23
**deputy** 36:18
37:5,13 39:16
40:23 43:3
59:22
**derived** 20:19
23:6
**describe** 14:20
20:5 102:3,16
126:14 187:6,7
**described** 21:8
31:6 34:19
39:18 50:24
77:22 78:18
80:23 81:22
176:15 178:4
**describes** 51:1,1
**description**
14:19 18:11
78:20
**designated**
40:17 43:21,23
77:9 85:3
**detail** 119:3
212:8
**detailed** 119:5
**details** 82:14
**detained** 9:7
44:2 102:20
175:6 177:10
**detainee** 10:8,16
104:3,24
118:17 173:14
174:18 176:11
**detainee/patie...**
28:21
**detainees** 9:23
11:20 15:23

41:20 43:17
52:2 75:17
100:9 107:8
144:20,25
**detention** 60:3
65:12 185:17
**deteriorated**
4:19 127:4,9
129:24 130:12
130:20
**determinations**
84:23
**determine** 27:14
112:20 124:16
**determining**
113:24
**detriment** 205:7
**develop** 116:17
**developed** 204:5
204:9,12,15,22
**device** 105:18
118:12
**diagnosis** 105:23
105:24 106:2
106:14 116:18
**diazepam**
117:10,13
118:5
**diazepines**
184:10
**die** 138:17
139:25 140:23
141:4 158:9
164:21 190:2
**died** 135:11,15
136:18 137:15
157:17,18,25
158:2,6,7,7,14
163:21,25
164:25 165:2
183:5
**dies** 52:24
**difference**
184:13 194:9
**different** 8:5
35:25 72:15
76:22 81:6
84:2 93:7

95:12,19
113:16 114:12
131:12 141:3
147:21 176:9
188:23 191:6
212:25 213:1
**differently**
78:25 79:1
86:12
**difficult** 124:1
207:2,6,8
**difficulty** 110:16
**dig** 79:15 142:13
**dip** 168:2
**direct** 20:16
33:5,8 35:3
36:5 41:5,9
51:10 62:6,8
70:5 102:22
**directed** 39:21
40:17
**directing** 40:24
**direction** 217:8
**directions** 83:7
84:7
**directly** 40:8,8
40:13 62:22
167:18 199:14
213:25 217:16
**director** 31:3,13
32:4 36:18
37:5,13,14
38:9 39:16
40:23 41:1
43:4 53:14
54:18,23 59:21
59:22,22
103:11 145:19
190:25 191:1
**directors** 62:1
204:17
**disability** 43:14
166:7 167:16
168:10,11
**disagree** 89:18
113:21,21
114:6,7
**disagreeing**

101:23
**discern** 12:3
**disclose** 35:20
**disclosed** 203:5
**disclosure** 28:17
**disconnect**
211:4 214:20
**discontinued**
108:7
**discount** 144:24
**discuss** 7:12 8:2
8:20 100:7
109:17 111:2
111:11 162:3
**discussed**
132:11 150:25
153:11 155:3
179:10 203:8
203:13
**discusses** 49:22
141:12
**discussing** 138:6
**discussion** 18:7
50:10 109:7
110:24 138:3
139:24 156:4
162:17 165:12
193:22 194:1
209:19
**discussions**
203:17
**disease** 58:22
90:4 124:6,7
125:9 172:17
174:21 175:20
177:16 178:4
**diseases** 42:1,4
173:1 178:12
**disorder** 142:8
142:15
**dispute** 30:21
31:16
**disputing** 78:11
78:12 86:21
94:3,10 96:15
136:22 140:11
146:22 165:22
191:23 192:4

**dissertation**
146:25
**distinction**
184:12 191:18
**distinctly** 82:10
**distress** 173:11
**DISTRICT** 1:1
1:2
**diversion** 205:5
**dividend** 204:13
**dizzy** 167:7
**dkafka@lkgla...**
2:22
**dknott@lkgla...**
2:22
**docket** 25:6
**doctor** 5:11 16:7
25:12 26:13
27:9,14 34:18
37:17 68:8,20
73:10 77:20
85:1 87:21
94:16,24 115:5
118:8 125:13
134:10 144:18
145:14 146:9
151:17 169:8
170:19 176:23
202:5,9 206:11
206:14 210:22
215:4,10
**doctors** 103:20
103:25
**document** 13:24
14:18 19:7
27:19 75:6
76:15,25 77:21
78:5,7 79:22
80:4 81:18,22
82:21 103:21
104:1 124:20
133:12,18
195:17 210:18
**documentation**
120:19 127:24
**documented**
109:8 114:22
179:4

Homer D. Venters, M.D.

January 09, 2025

Page 226

documenting
103:18
documents
67:14 69:3
202:19
doing 22:16 27:2
31:8 35:11
49:12 98:9
103:19 110:19
118:11 126:3
140:15 166:1
176:20 178:9
197:24 200:24
211:17
DOJ 35:12
dominant
205:14
domination
206:3
door 181:3
208:16
dot 202:20
Doug 17:12
45:20 48:18
99:19 213:6
Douglas 2:20
downloading
197:25
Dr 4:10,23 8:16
13:8,16,21
17:15,19 18:7
45:17 48:13
51:9 57:3,6
65:7 68:12
89:9 100:7
102:3 129:2
149:21 152:6
202:24 214:6
214:10
drink 97:1,7
106:25 179:16
179:21 180:5
180:16,19
181:4,15,19
drinker 96:13
96:25 97:12
179:5
drinkers 96:23

drinking 97:12
166:24 167:5
179:22
drinks 97:13
180:21 181:16
181:17
drive 16:25
122:22 128:16
129:8 213:16
driving 8:13
Dropbox 17:3
50:18
Dropbox-type
16:24
dropped 211:20
Drs 202:14
drug 95:3,7
98:24 104:4
drugs 159:17
181:6,12
drunk 96:14
180:6
duces 12:13,19
13:12 48:15
due 128:2
130:22
duly 5:4
duplicate 50:14
duties 66:16
duty 37:16

E

E 2:14,14 3:1,1,1
3:14 4:1,16,16
earlier 24:3 36:5
49:14 60:18
156:4 183:6
193:22
easily 207:10
East 3:3
easy 168:12,14
education 34:6,9
63:3
effect 156:17
efficacious
148:13
effort 132:10
eight 30:4

104:13
Einstein 103:6
either 12:23
13:3 20:22
37:25 46:13
54:22 82:3
85:8 101:8
123:1 141:21
142:14 143:9
143:25 144:4
150:18 164:22
171:13 173:24
183:5 192:5
197:22,24,25
EKG 45:1 80:14
140:19
elected 147:22
electrolyte 89:14
89:20,23
electronic 4:12
47:4,7 216:7
electronically
16:4 216:3
element 167:21
175:7 187:22
188:11 206:10
elements 22:22
31:5 85:19
165:12,18
167:23 168:7
168:18,20
169:11 176:9
206:8
elevated 92:16
124:23 126:5
elevation 86:5
eliminate 130:23
else's 9:13 79:11
128:12
email 29:13 50:9
71:1 74:16,18
100:12 197:13
197:21,25
213:25
emailed 49:8
emails 50:11
70:20 72:13
73:11,18 74:5

74:13 75:6,16
75:24 145:8
emergencies
72:10 160:1
162:18 207:11
emergency
38:18 115:23
116:7,14 127:1
132:5,13,19
136:6 139:20
154:10 173:9
198:25 207:15
emergent
126:24 173:15
174:22
emphysema
124:9 125:16
126:12 132:14
employ 85:16
employed 109:5
employee 55:22
217:14,15
employees
108:15 144:24
EMT 200:24
encounter
109:22 128:8
encountered
56:20 70:11
121:22 168:1
177:17 178:17
208:13 209:23
endorsed 85:23
enforcement
20:23,25 21:16
22:17 35:24
103:21,25
113:9 114:12
engage 173:24
174:9 176:25
178:10
engaged 112:19
204:1,19,23
205:2,5
engagement
24:12
engaging 174:6
177:5 178:19

206:2
ensues 90:22
ensure 72:8
188:2,12,15
189:11
enter 70:22
105:8
entered 70:23
71:6 74:7 75:8
90:3 110:3
115:16 121:3
134:5
entire 48:25
144:6
entirety 76:18
entities 205:11
entitled 7:2 15:2
73:24
entity 20:11
28:23
entry 6:15 91:11
envision 85:14
epidemiologist
56:9
equal 179:12
error 153:10,18
156:3,7
errors 150:9,17
150:20 201:12
especially 47:15
105:9,10,14
essential 177:6
essentially 55:19
163:20
establishes
58:18
Estate 1:4,11
estimate 6:2
23:13,14 209:9
et 1:8,15
ethic 175:8
evaluated 114:9
203:24
event 4:21 22:21
138:11,22
139:5,6 140:14
140:20 141:4
143:16 154:1

Homer D. Venters, M.D.

January 09, 2025

189:16,21
**events** 14:2 15:2
139:3,9,14
189:21 190:22
**everybody** 77:10
121:19,23
148:17,18
163:21
**evidence** 70:21
72:16 73:8
122:4 133:5
140:13 141:16
141:25 142:5,7
145:2,5
**exacerbated**
181:1
**exacerbation**
91:10
**exact** 135:14
**exactly** 50:24
108:22 166:7
**exam** 177:4
188:13
**examination**
3:15 5:6
103:19 149:19
152:4 202:7
206:18 215:11
**examined** 5:4
51:19
**example** 133:10
141:1 164:19
164:22 167:10
175:21 176:15
214:11
**examples** 80:17
168:23 169:22
169:24,25
191:7 203:19
**exams** 34:2
**exception**
201:15
**excess** 179:14
180:6,17
181:18
**exchanged**
74:17
**exchanges** 74:18

**exclude** 5:21
**excluded** 64:18
65:1,17
**excuse** 7:16 9:23
182:5 183:21
202:10
**exercising**
113:23
**exhalation**
118:14
**exhibit** 4:3,3,4,5
4:6,7,8,10,22
77:3,8,14,19
80:25 94:14
213:6 214:25
**exhibits** 4:11
215:2,20 216:2
216:6
**exist** 46:15
**existence** 192:4
**expect** 104:15
179:13 185:23
202:17
**expected** 135:2
185:23
**experience** 93:5
95:7 96:5,10
96:17,22,23
97:4,13,24
115:5 120:22
131:13,19
176:20 177:23
178:16 179:15
180:18,22
181:18 184:24
188:9 190:13
190:16 192:18
192:25 193:5
193:14 194:18
209:18
**experienced**
92:4,12 93:12
93:18,23 95:13
106:22 141:17
143:22 166:23
**experiences**
103:24
**experiencing**

95:3,17,22
97:21 115:24
116:14 132:5
182:21
**expert** 21:18
57:2 142:21,24
200:2 203:6,25
209:17
**expertise** 61:10
200:9,16
**expires** 217:23
**explained** 80:12
110:15 151:9
**explanation**
110:17
**explicitly** 9:25
**expressed** 74:1
75:24 97:15
200:9
**expressing**
188:4,25
**extend** 184:20
**extent** 21:22
25:12 61:25
67:22 111:14
136:1
**extra** 131:17
147:9,14
**extracting** 47:2

———————
**F**
**facade** 205:14
**facilities** 21:11
21:14 38:24
40:24 41:16
42:17 44:5
45:1,5 47:5
59:16,20,25
60:9 86:2
**facility** 20:3 21:7
32:7,19 36:22
37:9,12 38:6
38:14 39:6
40:10 41:4,6
41:16,18,21,23
44:15 51:11
52:4 59:6 60:2
65:12 69:12

85:1,16 107:9
107:16 108:16
109:25 110:9
123:23 178:13
181:5 190:25
**fact** 31:7 96:18
106:16 116:4
140:24 143:16
156:5 182:22
183:19 189:9
189:15 191:24
193:23 208:5
210:24 214:5
**facts** 108:11
129:20 130:9
198:5
**factual** 128:19
129:18
**factually** 137:2
**failed** 204:6,10
204:13 205:9
**failure** 90:18
91:1 122:5
136:3,5,6
137:8 144:2
163:7
**fair** 7:10 19:8
38:23 53:16
66:13 67:24
122:7 134:6
192:18 193:6
194:23 203:21
206:20 207:23
**fairly** 131:9
191:8
**fall** 160:24 162:9
196:11
**falling** 180:6
**falsified** 146:16
**familiar** 6:21
30:9 56:23
57:6 70:13
83:16 119:1
127:14 176:18
**family** 116:22
144:12
**far** 18:7 43:20
197:13

**fast** 100:20,25
124:24 125:4,4
**fears** 132:3
**feasibility** 148:8
**feature** 142:13
**features** 137:18
**federal** 2:4 20:7
46:22 47:1,4
47:17 61:13,14
61:24 62:23
102:8 190:17
**feel** 55:2,6 61:4
91:7 137:1
167:6 180:10
185:2 208:17
**fellow** 46:10
199:6
**fellowship**
147:13
**felt** 55:5 112:2
133:5
**female** 44:23
171:20 208:8
**Fennigkoh** 2:24
4:6 66:4,15
74:22 98:14,15
108:12 109:2
109:10 110:6
110:25 111:20
112:1,18 113:5
113:23
**Fennigkoh's**
75:23 76:6
108:19
**field** 33:10
177:24 192:18
193:1 194:20
201:22
**figure** 116:25
168:3 173:5
211:2
**figured** 124:15
**figures** 146:21
**figuring** 173:7
**file** 11:24 15:16
16:16,18 18:14
19:17 27:16
48:16 78:21,22

Homer D. Venters, M.D.

January 09, 2025

153:2,8 195:10
195:14 196:1,5
197:25 198:15
198:19 211:23
212:4,22
214:13
**filed** 26:8
**files** 4:10 9:22
10:23 11:3,3,9
11:11,20,22
13:23 15:7,10
15:23 16:5,10
16:19 18:9
49:20 79:7
80:22 100:8,14
101:6 129:5
155:23 211:6
211:25 212:9
212:13 213:2
213:15 214:1
**final** 4:19 8:1
88:2 127:4,9
129:24 130:12
130:20
**finally** 163:5
**finances** 206:3
**financial** 70:21
71:5 72:16
73:9,20 75:1
145:6
**financially**
217:16
**find** 4:19 24:1
24:25 29:12
55:6 77:24
128:5 130:9,17
181:15 190:6
**finding** 121:24
167:10 182:11
183:13
**findings** 11:5
25:21 160:12
212:14,15
**finds** 135:23
**fine** 50:13,22
94:23 151:24
**finish** 45:22
147:22

**finished** 147:15
147:23
**firm** 24:1,7,15
27:25 30:7,11
**first** 5:4 6:15
14:17 28:9
30:24 36:10,15
36:17 96:20
108:25 111:25
119:13,24
121:2 122:13
139:15 151:19
160:17 171:11
182:23 185:7
185:14 186:10
195:23 206:10
209:19
**fit** 33:24
**five** 45:24 65:14
87:23 128:21
128:22 152:17
159:9 164:1,7
181:15 185:17
213:1
**fix** 40:21 55:7
**fixed** 164:20
**flag** 16:5 124:10
129:19
**flash** 16:25
**flaws** 127:21
**floating** 37:4
**flow** 91:14 118:8
121:10 125:20
194:5
**flows** 194:2
**focus** 46:25
119:19
**focused** 69:3
**folder** 156:5
211:5,23
**folks** 145:12
149:18
**follow** 203:20
206:15
**follow-up**
152:22 215:8,9
**followed** 64:7
188:16

**following** 216:4
**follows** 5:5
171:16
**for-profit** 28:24
**force** 38:1 41:13
**forensic** 103:19
142:20,23
**foreseeable**
178:12
**forgive** 152:24
170:20
**forgotten** 158:17
**form** 4:6 11:10
11:13 19:9
20:21 29:4
32:10 54:20
55:4 58:9 61:7
66:17 67:25
70:9 71:19
73:14 74:9
76:7,21 80:11
80:23 83:1,4
83:17,23 84:6
84:17,22 85:3
85:18 88:14
94:8 96:8
97:18 98:12
106:19 107:13
109:15 112:23
114:3 115:2
117:6,25 118:6
118:21 120:24
122:2 128:7
133:1,7 137:3
142:10 149:6
151:7 158:24
161:3,6 162:25
163:12,15
165:13,17,19
166:3,13
167:19,22
168:8,14,18,21
169:1,5,10,14
169:16 172:19
175:2 177:14
179:17 181:5
181:21 186:20
193:8 194:21

206:23 207:4
208:21 210:12
212:6
**formal** 63:2
**formalities**
204:7
**format** 49:21
50:21
**formation** 119:6
**formed** 10:9,13
25:12 161:22
**forming** 150:4
198:7,11 201:9
201:23
**forms** 67:16
83:21 85:17
95:11 186:7
**forward** 50:12
209:24
**found** 9:18
99:10,13 101:8
110:13 117:15
117:19,22
184:4 185:24
186:3
**founder** 202:23
**four** 18:24 23:22
38:12 86:19,23
87:18,23
104:13 109:12
158:22 177:20
196:10,12,25
197:6
**fourth** 15:9
134:14 155:23
212:14
**framed** 127:25
**free** 215:23
**frequently**
206:20
**fresh** 35:7
**front** 6:11 29:10
138:8 165:24
208:15
**frontline** 62:8
69:20
**fruition** 47:11
**fulcrum** 136:10

**full** 5:9 37:9
**fully** 110:15
**function** 124:15
**functioned**
43:25
**fundamental**
207:21
**funds** 46:22 47:1
47:4,14 205:2
**further** 151:16
217:9,13

_____

**G**

**gained** 89:15
**Gallagher** 51:2
**gather** 83:18
84:14,15
**gathered** 116:5
**gathering** 84:1
**GAYNOR** 2:19
**GB** 156:1
**GB1** 156:1
**general** 21:20,23
22:12 39:3
43:13 61:6
192:16 193:4
193:14 194:18
**generalizing**
22:10
**generally** 22:18
22:18 35:11
38:24 44:9
104:22 105:2,3
105:4,13 148:2
177:19 186:5
193:1 200:5
**gentleman**
126:12
**GERAGHTY**
3:2
**getting** 41:25
42:3 47:16
68:8 71:4
88:19 91:13
116:21 121:15
149:12 167:13
177:3 194:13
209:5

Homer D. Venters, M.D.

January 09, 2025

**give** 26:5 28:15
29:1 48:20
60:15 65:4
106:2 134:1
144:10 169:23
196:8 209:17
**given** 5:13,18
26:3 28:2,16
29:19,25 30:15
30:16,22 32:6
61:24 62:22
75:9 86:19
87:2 88:3
101:5 116:10
153:17 158:2
169:22 200:12
**gives** 118:13,15
**giving** 64:19
67:7 126:3
**Global** 55:20
56:5
**go** 14:18 27:1
30:2 45:17
47:16 48:7
87:16,17,20
95:13 124:17
151:21,24
167:9 173:6,25
174:1 187:2
207:8 210:9
212:8 215:18
**goals** 102:17,17
**goes** 63:6 86:3
**going** 7:8 11:15
17:5 29:17
31:16 45:12
48:14 68:9
76:25 77:6
87:15,16,17,20
88:22 94:12
100:25 101:18
101:22 102:11
108:22 115:6
117:24 122:13
124:17,17
133:12 141:11
143:10 146:22
149:17 172:15

174:12 205:23
206:1 210:17
211:10 212:11
**good** 5:8 43:18
72:19 99:25
147:15 164:22
167:13 202:9
**governing**
203:11
**government**
47:18
**Greg** 155:10
**GREGORY** 1:3
1:11
**grievance**
133:10
**gross** 23:13
143:13
**group** 68:25
101:9 103:14
**grown** 23:24
**guess** 5:19 21:3
23:10 30:19
34:16 42:10
43:18 47:3
71:10 80:1
87:18 106:20
122:23 195:20
213:12 214:3
214:19
**guidance** 80:14
151:8
**guide** 148:14
149:10
**guidelines** 105:3
107:21
**Gundersen**
89:16 154:1,6
154:8 182:5,5
182:24 183:21
185:25 186:10

——— **H** ———

**H** 4:1
**H&P** 174:24
176:11
**half** 26:7 29:6
46:8 87:12

174:13
**halfway** 72:24
**hand** 217:19
**handle** 51:9
**handled** 44:6
**hands** 14:7
**handy** 153:3
**HANSEN** 3:7
**happen** 106:7
190:2 191:3,23
**happened** 30:3
41:14 53:3
136:8 142:3
143:13 147:25
184:4
**happening**
145:11 185:7
**happens** 84:4
101:14 166:23
167:5 194:7
**happy** 35:18
50:15 66:24
71:2 83:1
119:4 122:25
127:11 130:1,3
130:16 133:2
137:5 140:7
169:6 187:2
**hard** 24:25
87:23 123:2,4
128:15 129:8
135:19 167:1
213:16
**harmful** 181:8
**Harmston** 3:6
202:15
**head** 64:5 140:7
**heading** 160:14
**headings** 153:15
**health** 4:8 6:8,11
20:2,7,9,22,25
21:3,19 22:19
32:7,19 33:23
34:19 35:14
36:19,20 38:5
39:22 40:7,18
43:16 46:3,20
47:19 52:6,15

55:20 56:5,16
58:14,18,21
59:4,9,14 65:2
65:7 68:17
72:7 73:4
75:19 89:16
92:18,21 97:6
97:11 99:7
102:5,19,19
103:3,4,7,9,10
113:10 116:11
116:25 118:10
119:17 123:24
127:15 133:15
139:18 142:2
142:20,23
143:11 146:13
172:10,12
173:4,16,24
174:6,7 175:10
175:18 176:14
176:23 177:8
179:25 180:12
182:2,5 184:15
191:4 192:12
200:6,12
203:12 209:18
210:2
**Healthcare** 1:8
4:4 56:19,21
56:25
**Healthcare's**
75:1
**heard** 7:3 52:12
146:4
**hearings** 5:22
6:1 28:9,10
**heart** 90:1,18
91:1 125:4
180:23
**held** 41:20 52:2
**help** 20:25 33:1
38:3
**helpful** 10:19
95:11
**Helping** 35:13
**Hendrickson**
3:11 74:23

**hep** 148:17,19
148:22,24
149:10,15
**hepatitis** 148:8
148:12,15
193:17,20
**hereunto** 217:18
**Hi** 149:21
**high** 53:15,18
54:18 92:17
**high-quality**
103:9
**higher** 198:20
**highlight** 16:4
214:10
**highlighting**
102:11
**Hightail** 17:22
49:4 99:21
**hired** 37:8
**history** 104:20
112:4 154:25
166:8,17,21
167:9,20,24
168:6 171:22
172:3 176:19
176:21 177:4,6
208:7,14,23
**hit** 46:11
**hold** 19:24 78:3
92:3 117:3
140:16 162:17
**home** 47:16
**Homer** 1:19 2:2
5:2,10
**honestly** 102:18
**hope** 110:10
202:21
**Horn** 31:1 32:2
**hospital** 38:14
38:16,20 45:16
58:4 99:11
112:8 154:1,9
154:13,17
173:12 174:1,2
182:6 183:6
**hospitalization**
39:9

Homer D. Venters, M.D.                    January 09, 2025

hospitals 38:21
  39:12 103:3
hour 87:12,16
  152:14 174:13
  197:2
hourly 198:18
hours 4:18 13:13
  13:17 34:7
  45:10,15 69:5
  69:8 87:18
  104:13 174:11
  179:16 180:19
  181:20 195:18
  196:25 197:6
housed 115:20
housekeeping
  77:1 87:11
Human 103:12
husband 96:12
  116:18 155:10
Hygiene 36:20
hypothetical
  107:14 175:3
  178:7,18
  179:18 206:24

――――― I ―――――
I's 202:21
idea 92:2,7
  107:23 159:15
identifiable 81:7
identification
  216:5
identified 4:2
  53:22 56:15
  64:5 101:11
  106:4 118:6
  189:5 198:5
  201:11
identifier 16:2
identify 40:15
  51:13 58:7
  63:22 64:9
  127:21 135:1,7
  160:22 161:19
  191:1 209:21
identifying
  104:7

III 15:1
illicit 99:5 186:6
Illinois 2:16
  21:24 22:3
  24:18 27:24
  28:16 200:25
illness 82:16,16
  84:10 120:1,9
imbalance 89:14
  89:20,23
immediate
  115:25 123:9
immigration
  65:12
impact 133:20
  185:1
impacted 73:13
  135:18 143:18
impaired 105:7
  107:1,7
implement 47:4
implementation
  104:15
implemented
  106:18 108:4
important 98:24
  116:4,22 119:6
  119:9,12,15
  125:17 137:18
  140:22 142:12
  144:5,9,13,15
  151:19,23
  152:2 167:17
  176:4 181:25
  182:25 185:13
  187:22 188:12
impossible
  142:3 167:1
  178:17
impression
  111:15
imprisoned
  156:21 157:14
  161:20 162:8
  162:23 163:11
Improper
  179:18 206:24
improve 54:8

102:18
improvement
  139:22
improving 102:7
  102:8 136:10
  140:22
in-box 123:13
in-person 116:2
inaccurate
  101:3 146:10
inadequate 32:8
  133:6 204:1
inappropriate
  203:10 205:2
incarcerated
  42:12 102:20
  156:13,21
  157:7 164:16
  175:6
incarceration
  142:16 185:11
incident 22:23
  35:22 36:1
  190:19 192:5
incidents 22:13
  139:8
include 25:21
  48:12 62:25
  67:13 82:2
  139:19 172:7
  200:15
included 28:5
  29:20 42:10
  81:17 85:20
  145:6 201:17
includes 15:9
  38:11 53:1
  66:10 110:12
including 72:9
  195:10 199:13
income 20:19
  23:6
incomplete 10:2
  10:23 11:9
  107:14 175:3
  178:6 212:10
incorporate
  191:21

incorrectly
  150:13
increased
  137:24
increasingly
  37:24
independent
  20:13 21:6
  34:19 102:14
  111:3 114:18
  127:12 132:2
index 16:1
indicate 155:13
  165:17 182:4
indicated 112:3
indicates 53:1
  133:18 165:19
  212:19
indication 125:7
  145:5
indirectly
  217:17
individual 6:8
  11:24 15:23
  32:7,19 37:19
  37:22 52:22
  59:8 64:12,15
  100:8 152:9
  161:8 162:22
  174:23 177:9
  179:13
individuals
  156:13,21
  157:5 158:2,14
  158:21 159:5,9
  159:11 160:22
  161:2,20,23
  162:4,7,10,23
  163:10 164:14
  177:25
infection 175:25
infirmaries
  38:24 39:3,7
  44:18
infirmary 36:7
  39:20 40:6
  41:17,19 42:5
  42:6,8,14,25

43:9,10,21,24
  44:1,21,25
inform 144:14
information
  4:19 7:20 8:5,6
  10:1 13:3
  18:18 19:15
  28:15,18 52:25
  53:1 66:22
  69:17 73:15
  74:13,25 75:4
  76:4,9 79:9
  82:25 83:18
  84:1,14,15
  89:4 93:3
  97:20 99:9
  108:8 109:8,23
  110:1,12 116:5
  117:13,17
  119:11 128:13
  128:19 129:23
  130:12 133:25
  134:1,8 143:9
  143:24 144:4
  144:11,13
  150:14,16
  155:1 158:20
  164:4 178:20
  201:12 212:10
  212:13
informed 119:16
initial 104:9,11
  164:8 172:13
  176:19 184:21
initially 104:4
  106:5 118:24
  119:7
initiate 104:23
initiation 107:18
  107:19
injured 41:12
injuries 104:1
injury 6:5,6
inmate 4:10
  127:15 133:16
  138:11 139:5
  172:11 189:17
inmate's 26:1

inmates 9:22
  49:25
inpatient 38:25
  38:25 39:1,4,8
  39:10
input 58:23
inside 44:25
insolvency
  204:23
instance 2:3
  10:24 12:25
  41:1,11 50:25
  55:25 58:22
  64:2,25 66:24
  83:8 111:4
  126:1 138:16
  144:12 159:4
  161:10,11
  172:18 173:18
  173:20 175:1
  176:17 190:17
  200:13 201:20
instances 21:5
  192:15,21,23
  193:3,11
  194:13,17
instantly 211:17
institute 136:5
instructed
  115:12
instruction 64:7
  191:10
intake 4:3,7
  91:16,17 94:2
  94:13 95:11
  98:4,9,11
  118:16 121:8
  123:16,25
  130:4 132:6,7
  132:25 136:4
  140:5 159:8
  160:19 161:14
  165:13 166:3
  167:19 169:16
  169:25 170:21
  171:3 174:17
  179:6
Integrity 146:14

  147:8
intend 152:23
intent 155:8
interaction 62:6
  109:18 111:16
  113:6 115:1
interactions
  108:20
interest 175:16
interested
  217:16
interests 175:5
internal 33:11
  33:17 34:13,14
  34:15
interpretation
  194:3
interpreted
  31:15
interpreting
  200:19
interrupt 17:12
interrupted
  126:8
interview 113:1
interviewing
  112:20,25
intoxicated
  91:22 95:16,18
  96:18 104:25
  105:6,7,14
  106:24 107:9
  107:16,17,24
  112:5 166:19
  173:21,23
intoxication
  90:21 95:22
  104:20 187:8
investigate
  20:24,25
investigated
  139:1
investigation
  35:21 47:22
  191:13,21
investigations
  21:18 22:9,12
  22:13

investigator
  127:19
invited 60:15
invoice 4:18
  13:1,8,16
  17:13 18:4
  194:25 195:1,3
  195:5,6,9,11
  195:15,16,20
  195:23,23
  198:16
involve 5:25
  10:24 36:1
  45:12 83:24
  139:10 140:8
  190:20
involved 10:3
  40:8,13 57:11
  90:15,25 136:22
  150:8 172:21
involvement
  111:10 119:5
involves 6:1,10
  22:20,21 35:24
  83:3 102:9,10
  104:4,7 138:14
  171:8 172:14
  176:5
involving 7:13
Iraq 103:22
island 38:7,11
  38:13,17 41:6
  44:2,5,15,20
  56:14
isolation 173:6
  178:15,19
issue 18:11 83:5
  87:12 95:24
  204:10 206:22
issued 24:19
issues 21:1 90:23
it'll 45:23
ITEM 4:17
itemization
  13:13 82:1
itemize 13:17
items 90:15
  100:23

J

J 79:4
J-E-02 165:21
  172:2
JA10 139:4
jail 4:4 7:14
  15:12 20:8
  21:18 22:9
  31:3 35:14
  36:3,11 37:4
  38:24 39:3,6
  40:15 42:9,25
  43:5 45:2
  47:15 51:13,16
  51:24,25 52:3
  52:20 53:15
  54:9 58:11
  66:16 70:15,23
  80:15,17 82:16
  83:17 90:4
  91:11,23 92:5
  92:13 93:14,19
  93:24 95:11
  97:17 99:6
  104:24 106:3
  109:6,16
  112:21 113:25
  115:12,15,16
  115:18 120:1,8
  121:18,19,23
  127:20,22
  131:4,21
  134:16,25
  135:8,17 137:1
  137:7 144:25
  145:16 148:13
  148:21,25
  149:11,16
  153:24 154:5
  154:10,20
  155:5,17
  156:22 157:7
  157:14 158:14
  158:22 159:5
  159:12,16,25
  160:4,23 161:2
  161:21 162:8

  162:24 163:11
  164:1,17 168:1
  168:4 173:22
  179:2 184:15
  184:22 185:8
  186:22 187:7
  190:16 194:11
  199:11,14,21
  199:24 208:2,3
  208:11 210:6
jail-attributable
  52:13,19 53:7
  53:8,13 54:17
jail-generated
  19:6
jailed 160:23
jails 35:15 36:11
  38:8,11,13,15
  39:14,19,22
  40:12,17 41:10
  41:14 44:1,6,8
  44:13 46:22
  47:19 52:7,15
  53:9,14 54:1
  60:1 61:17,22
  68:13 70:1,4
  106:10 127:15
  131:11,12
  136:20 139:17
  148:8 156:13
  166:22 167:4
  188:14 192:12
  193:20 200:8
  207:3,11
  208:13,19
  209:10
Jaime 202:25
January 1:21
  2:10 154:2
  182:8 183:21
  217:11,20,23
Jeffrey 57:3
  203:6
Jennifer 18:20
  88:12 137:16
  156:23 162:11
Jessica 202:24
Jessie 123:11

Homer D. Venters, M.D.

January 09, 2025

Page 232

**Jillian** 3:6
**job** 1:24 116:24
  125:3 142:3
  176:23
**John** 3:2 151:21
  202:9,10
**Johnson** 3:6
  202:14,24
**Jones** 3:8,18
  151:19 152:5,7
  159:3 161:16
  163:24 168:24
  169:7,19 170:7
  170:10,13,16
  170:18 176:10
  177:21 178:23
  180:14 182:3
  187:5 193:10
  194:24 202:2
  215:6
**jot** 195:17
**journal** 56:15
  147:2 210:2
**judge** 65:6
**judgment**
  113:23 181:14
**Julie** 1:25 2:6
  217:3,22
**July** 4:8
**June** 123:16
  126:24
**Justice** 21:17
  35:9,17 47:17
  105:4

**K**

**Kafka** 2:20
**keep** 27:2,3
  122:21 184:2
  195:13
**Keller** 57:4,6,25
  58:2 203:6
**Kenneth** 18:19
  88:11 137:15
  156:23 162:12
**KENNEY** 3:2
**kept** 54:4
**kill** 99:4

**kind** 6:21 16:1
  20:10 31:17
  42:20 46:24
  47:2,8 49:22
  77:1 79:19
  80:13 105:21
  106:6 119:19
  123:2 136:2
  138:18 139:19
  148:4 150:1,24
  151:11 158:16
  158:17 173:19
  175:4 183:9
  190:6,22
  195:20 212:1
**knew** 185:19
**Knott** 2:19,20
  3:16,20 5:7 8:9
  8:12,15 11:18
  12:12 13:7,11
  17:16,20,24
  18:6 19:20
  24:25 25:3,8
  25:11 29:8
  32:13 45:22
  46:1,2 48:1,7
  49:10,19 50:3
  50:16,25 51:8
  55:1,8 58:16
  61:1,9 67:3,10
  68:3 70:14
  72:1 73:22
  74:14 76:10
  77:4,12,16
  84:21 86:18
  87:20,25 88:1
  88:17 89:2,8
  94:11 96:11
  97:22 99:16,23
  100:2,6,21
  101:1 102:1,2
  107:5 108:1
  113:4 114:4
  115:10 121:5
  122:8 123:14
  128:23 129:1
  133:4,11 138:1
  142:19 149:17

  152:1,21
  170:20 179:11
  189:14 201:3
  206:14,19
  207:1,12 209:1
  210:15 211:14
  212:21 213:7
  213:18 214:3,8
  214:9 215:18
  215:22,25
**Knott's** 153:6
  192:13
**know** 6:6 7:23
  15:15 16:21
  18:21 22:16
  23:10,11 24:1
  24:5,13 26:9
  26:16,21 27:3
  28:19 29:12
  31:11 34:7,12
  34:17 41:2
  42:21 46:6
  47:9 49:7,12
  50:1,6,13,17
  51:4 52:2,6,23
  55:21 57:1,8
  60:14 63:25
  65:5,22,25
  66:11,12,14
  67:15 69:5,8
  74:4 75:21,22
  76:20 79:16
  81:6 86:5,10
  88:19,21 91:6
  91:13,21 95:14
  95:21,23 97:5
  98:1,3,19
  99:20 100:24
  101:6,15,19
  102:11 103:9
  103:24 105:12
  105:16,21
  106:10 107:20
  107:21 111:5
  112:14 114:19
  114:25 116:1,3
  116:6 117:18
  119:7,13,15

  121:1,3,7,10
  121:15 122:18
  124:10,13,16
  124:24 125:17
  125:20,25
  128:18 129:9
  130:6 131:3,4
  131:25 135:10
  135:13 139:24
  140:2,12,24
  142:3,22
  143:10,12
  144:6,16
  145:11,24
  146:1 148:24
  152:12 153:13
  156:5 157:12
  159:4,11 160:8
  163:25 164:7
  164:12 166:7
  166:25 167:12
  168:3,19
  170:23 174:5
  174:12,13
  175:13,21,23
  176:22 177:20
  178:24 179:8
  179:10 180:2,6
  181:2,22
  183:24 185:15
  185:18 187:9
  191:5,19
  197:18 201:20
  209:6,13,25
  211:12,20
  213:9,11
**knowing** 88:20
**knowledge**
  65:18 132:2
  145:21 154:18
  156:12 159:16
  159:20,24
  160:3 179:4
  193:5,14
  194:19
**known** 37:2

**L**

**L-A-C-K-S**
  150:24
**L-E-H-M-A-N**
  143:21
**lab** 201:1
**labeled** 80:20
  133:13
**labile** 92:23
**labs** 147:21
**lack** 72:6 73:2
  80:13 137:20
  141:14 192:2
**lacking** 172:19
**lacks** 150:24
  151:9
**language** 10:21
**large** 11:22
  18:14 37:15
  53:22 80:17
  94:20
**largely** 62:10
**larger** 53:22
  68:25 101:8
**Larry** 4:7,9
  18:20 88:12
  156:24 161:24
**lasts** 184:14
**late** 119:23
**law** 20:23,25
  21:16 22:17
  35:24 103:20
  103:25 113:9
  114:12 136:19
  146:5 205:24
**lawsuit** 65:11
**lawyer** 31:10
**lay** 185:5
**layer** 147:14
**layout** 51:20
**lead** 1:6 71:8
  123:10 131:17
  189:22
**leadership**
  190:24
**leading** 9:8
  63:22 74:10
  109:21 132:14
**leads** 108:10

Homer D. Venters, M.D.

January 09, 2025

Page 233

**learn** 184:18
**learned** 135:16
   143:18
**learning** 141:2
**leave** 147:17
   215:21
**leaving** 109:24
   110:9
**led** 53:4
**left** 33:7 102:21
   147:18 148:1
   152:14
**legal** 6:4,18 23:7
   31:25 47:18
   60:22
**legally** 31:2,15
**legible** 94:18,19
**Lehman** 18:20
   88:12 137:16
   141:8 143:21
   156:23 157:11
   158:3,6,16
   162:11 164:10
   165:7 191:25
**LEIB** 2:19
**lens** 15:19
   136:16 212:11
**Lessman** 214:11
**let's** 34:22 77:1
   79:19 84:2
   101:23 174:17
   185:10,16
   215:18
**letters** 37:3
**level** 39:8,11
   116:23 119:3
   124:14
**license** 19:24
**licensed** 19:21
   84:7
**licenses** 63:8
**lieutenant**
   199:20
**life** 4:20 117:1,2
   127:5,9 129:25
   130:13,20
**life-threatening**
   173:9

**lifesaving** 84:20
   149:2
**likelihood** 181:1
**limit** 122:20
   125:15
**limited** 38:17
   190:15
**limits** 190:15
**line** 22:14 38:2
   111:25 134:14
**link** 16:24 17:3,4
   17:23 49:4
   56:12 99:21
   197:15,19
   198:1
**Lisa** 2:24
**list** 4:8,10,22
   6:14 15:8
   29:21 30:15
   48:19,23 68:24
   78:10 82:8
   89:5 101:21
   116:19,21
   117:6,9 133:15
   150:14 155:23
   162:7 168:12
   168:25 169:4,6
   169:24 211:6,6
   213:13 214:5
**listed** 13:2 30:24
   34:20 49:2,3
   88:23 101:13
   146:2 153:8
   155:6,12,20
   202:19 213:19
**listing** 4:9 82:14
   82:14 214:1
**lists** 11:19 49:23
   49:24 81:15
**litigants** 23:8
**litigation** 5:23
   6:9 21:2 23:20
   26:14,18,21
   27:1,7 30:17
   32:21 33:3
**little** 22:21 33:23
   41:8 55:23
   88:19 106:12

109:11 118:12
   124:5 179:20
   179:24,25
   205:24
**LLC** 2:19 3:7
**local** 38:21
**locate** 12:6
   100:18
**located** 214:24
**Location** 1:20
**Loevy** 2:15,15
   24:1,7,15
   25:19 27:25
   30:6,11
**log** 68:9 128:15
**long** 46:6,13
   49:1 77:25
   85:24 106:25
   112:4 121:1
   170:10 177:12
   177:15 178:1
   181:10 184:14
   197:1
**long-acting**
   184:19,25
   185:9,20
**long-term** 184:9
**longer** 57:12
**longstanding**
   194:3
**look** 10:20 11:25
   14:24 15:17
   18:14 22:19
   27:18 29:9,14
   71:3,14 80:1
   108:22 113:16
   115:9 122:16
   122:25 126:1
   127:11 128:16
   130:8 137:5,11
   138:24 141:20
   142:18 152:25
   160:7 162:16
   165:9 180:2
   184:3 187:2
   190:4 200:11
   210:23 212:18
**looked** 11:2,11

12:5 16:17,22
   54:6 57:19
   119:22 127:17
   128:9 143:3
   154:15 155:4
   156:6 159:1
   167:19 212:22
**looking** 22:20,21
   27:17,23 34:22
   35:15 89:15
   90:9 109:20
   122:19 137:10
   140:20 150:25
   155:2 161:7
   166:11 182:11
   182:14 196:20
   213:10
**looks** 30:15 46:4
   75:15 81:24
   82:13 115:12
   118:2,2 135:21
   135:22 173:11
   212:1
**loose** 110:13
**losing** 204:20
**loss** 172:24
**lot** 124:11 132:9
   166:24 202:17
**lots** 53:21
   106:10 114:14
   119:16 193:23
**low** 124:25,25
**lower** 53:18 54:5
   54:11 125:15
   198:20
**lunch** 87:13,19
**lung** 124:5,7,15
   125:9 180:24
**lungs** 90:5,15
**Lynch** 202:25

_____
**M**
**M&M** 138:13,19
   139:23 190:13
**M.D** 1:19 2:2 5:2
   175:13
**machines** 45:1
**main** 46:24

**maintain** 34:3,9
   205:10
**major** 22:22
**Makar** 2:15 3:17
   3:21 8:10,11
   8:11,13,13,16
   8:25 9:3 11:13
   12:9 13:9 17:5
   17:12,17,22
   18:3 19:9 24:8
   24:23 25:2,5
   29:4 30:10
   32:10 45:20,25
   48:4,18 49:15
   50:2,7,22
   54:20 55:4
   58:9 60:21
   61:7 66:17
   67:9,25 70:9
   71:19 73:14
   74:9 76:7
   77:11 84:17
   85:18 88:14,21
   94:8 96:8
   97:18 99:19
   100:16,22
   101:17 106:19
   107:13 112:23
   114:3 115:2
   120:24 122:2
   123:11 133:1,7
   137:3 142:10
   149:6,20
   151:16 158:24
   161:6 163:15
   168:21 169:1
   169:14 170:5,9
   170:12 175:2
   177:14 178:6
   179:17 181:21
   186:20 193:8
   194:21,25
   195:24 196:14
   196:24 197:1,7
   197:9 198:4,9
   198:14 203:8
   203:14 206:23
   207:4 208:21

Homer D. Venters, M.D.

January 09, 2025

210:12 211:8
212:6 213:5,8
214:4,7 215:9
215:12,17
makar@loevy...
2:17
making 40:25
52:22,23 70:22
70:24 177:13
178:2 188:20
189:4
male 44:22
malpractice
145:15
management
47:19 186:23
187:4,4,23
managers 61:20
mandate 106:17
187:19
Manhattan 60:3
manner 21:21
66:4 105:20
Maria 2:15 8:10
13:7 24:8 25:1
50:25 100:11
101:4 170:11
mark 77:3 94:14
213:5 214:5
marked 77:19
215:2 216:5
master's 147:22
147:23
material 63:21
materials 15:9
17:7,14,18,23
48:11,16 50:20
51:2 68:23,25
76:11 78:10,17
79:10,19 81:22
82:2 149:21
150:3 153:1
210:19
matter 7:13,19
9:10 14:9
24:14 25:13
26:11 27:24
28:3,16 29:2

29:11 30:5,22
203:24
matters 12:5
26:13,18 30:17
200:17
ME's 154:23
mean 26:15
30:12 44:10
45:8 54:6
55:18 59:5,6
60:20 96:25
101:22 103:2
110:2 113:8
127:3 135:19
142:22 167:25
177:2,2
193:16 195:5
207:6 211:1,9
214:20
meaning 108:13
187:1 201:19
means 55:21
60:23 112:11
143:17 189:11
203:16 205:17
meant 49:16,17
147:6 151:8,8
169:9
measure 143:11
measured 184:1
measurement
118:9
mechanism
184:14
Medicaid 39:4
46:25
medical 1:15 3:5
4:3,7,10,21
5:11 6:10 9:22
10:3 14:2,15
15:18 18:19
19:4,8,13,24
31:3,13 32:4
33:15,22 34:5
34:8 36:18
37:5,13,13,20
38:9,9 39:16
40:23 41:1

43:4 47:5,7
52:8 53:10,14
54:18,23,23
55:11 56:6
59:21,21,22
65:1 69:8
70:22 72:10
80:11 89:10
90:11,12,14
93:11,17,22
94:13 109:3
110:10 112:2,4
112:8,12,16
113:7,11,14,19
114:10,16,20
114:24 115:23
116:7,13,14
122:16,19,21
123:6,16
126:24 127:1
130:2 132:7
133:3 136:4,6
137:24 138:19
140:4,10,14,20
141:4 144:7,24
145:19,20
147:24 153:21
153:24,25
154:1,9,19,25
155:1,2,4
156:20 157:6
157:13 159:1
159:12 160:1,5
160:19 162:1
162:18 165:13
173:6,16,25
175:8 177:4
178:1,15,18
180:15 186:23
187:4,22
188:10 189:20
190:25 196:19
197:5 199:12
199:15 200:19
200:23 201:2,7
202:11 205:21
206:1,2,5
207:11 208:2

209:17 214:17
medical-related
135:7
medically
173:15 174:16
Medicare 46:16
medication 4:6
116:21 117:6
117:24 118:6
127:23
medications
45:9,14 114:16
116:18 117:1,2
117:5 124:11
127:10 128:2
129:16 130:21
130:21,25
131:7,14,23
132:16,17,24
191:7,7
medicine 33:11
33:17 34:13,14
34:16 85:23
131:18 132:9
185:5 199:3
medicines
131:16,21
132:10
medium-size
42:25
meet 24:22 85:1
152:6 188:22
meeting 196:23
197:1,7
meets 189:12
member 63:13
199:6
members 144:12
memorized
111:14 119:3
130:15 169:16
memory 123:5
211:12,22
men 44:1
mental 36:20
92:21 191:4
mention 120:13
171:21

mentioned
73:21 90:13
116:4 120:2
153:10 168:9
175:20 193:21
205:20
mentions 172:3
mere 106:16
205:14
mess.' 110:10
Messrs 2:20
met 8:16,19
25:18 32:1
57:7 85:13
135:23
methicillin
175:22
method 45:11
metric 52:13
microphone
152:2
middle 134:14
mild 86:14
179:24
mildly 126:5,6
Milwaukee 2:21
2:21 3:9 217:2
217:19
mind 11:16
minimal 188:19
minimum 165:3
Minnesota 3:3
minute 122:9
minutes 29:6
45:24 49:13
87:13,14
128:21,22
129:10 152:14
152:15 170:6
170:12 202:22
misinterpreted
50:23
missed 141:25
180:4 191:6
208:12
missing 80:18
117:1 165:12
165:17 166:13

167:18,23
168:8,13,18,20
169:10
**mistake** 81:24
82:7,13 101:20
**misuse** 39:13
**mobile** 44:24
62:9
**model** 144:19
**moderate** 86:15
**modifiers**
181:25
**moment** 75:13
122:13
**monitor** 6:1,10
20:7,19,22,24
21:6,6 23:8
26:25 28:10
34:20,21 35:3
61:13 70:17
102:8 105:8
118:11 190:17
199:13 200:8
200:11
**monitored** 92:8
99:3 143:15
186:17 187:20
**monitoring** 12:7
23:14,17,19,24
85:15 92:10
99:8 104:3,23
105:15 106:6
106:14,18
107:4,18,23
108:3,4 126:4
136:5 137:20
137:24 141:15
147:6 162:4
183:4,17 184:5
184:21,23
185:15,21
187:23 199:14
199:16
**Monroe** 3:11 4:4
7:13 15:12
51:15,24 52:3
66:16 68:22
78:8,15,24

80:8 81:4,25
82:3 92:5
123:19 133:13
134:16 137:1,7
152:8,9 153:12
153:16 154:20
155:5 156:14
156:22 157:7
157:14 158:22
159:12,25
160:23 161:20
162:8,23
163:11 164:1
164:17 187:17
188:1 191:14
201:14 213:2
213:22
**month** 28:13
**months** 28:9
30:4 46:5
196:10,12
**mood** 92:23
**moot** 121:25
**moral** 181:13
**morbidity**
138:12,19,22
139:2 164:22
190:14
**morning** 5:8
192:14
**mortality** 4:21
52:15,25
134:15,22,22
135:2,3,17,21
136:9,15 137:9
137:22 138:3
138:10,12,20
138:21,23
139:14 140:14
142:13,17
150:1,8 157:17
163:7,17,19,23
164:9,13,16,21
165:4 189:13
190:14 192:3
210:5,10
212:15
**mortality/mor...**

142:25
**motivated** 96:6
**motivation**
131:23
**motivations**
132:2
**mouse** 123:1
**move** 101:24
162:2,16
**moved** 46:11
147:24 148:19
**moves** 118:14
**MRSA** 175:22
**multiple** 61:14
89:21,24 127:7
168:23 169:22
180:21,21
**mute** 151:18
**Myanmar**
103:24

———————
**N**
**N** 2:14 3:1,1,1
3:14
**N-I-C** 43:23
**name** 5:9 8:10
15:17 19:18
26:1 28:21
40:25 57:25
152:7 202:9,10
213:10 214:16
**named** 10:9,17
57:2,3 145:17
145:22
**names** 11:24
16:18,19 18:15
64:4 135:14
165:1 202:14
211:11,13,18
211:20 213:19
213:22
**narrative** 4:5
14:19 111:19
**narrow** 200:4,14
**National** 33:13
58:14,17
**nationwide**
209:10

**native** 80:23
**natural** 210:7
**nature** 17:1
51:10 139:13
**NBPAS** 33:12
33:18 34:1,2
34:10,12
**NCCHC** 59:17
59:22 60:5,8
60:11 68:11,12
68:18 79:3
85:23 121:7
138:21 165:18
165:21 170:21
171:1,17,18
172:20 186:14
186:22 187:19
188:17 189:15
189:19,23
190:4,15
192:11,15,23
193:12,24
194:11,15
201:21
**near** 73:1 113:19
139:18 150:22
**necessarily**
44:21
**need** 25:25 30:2
40:21 45:20
48:25 49:25
50:6 51:4
66:12 75:25
80:22 86:4
87:17 94:25
101:24 104:2
107:3,17,22
113:11 114:24
129:17 132:7
135:24 137:11
138:24 139:1
146:7 149:4
167:16 168:16
169:25 170:5
178:20,21
193:19 202:20
209:21 211:3
215:19

**needed** 45:10,14
54:7 72:8
112:2 113:15
113:19 114:13
116:9,23
125:10 141:22
150:4 184:5
**needing** 39:8
**needs** 45:4 99:2
108:3 114:10
114:20 124:14
138:25 149:3,4
175:14 191:2
**negotiating**
177:3
**neither** 68:6
**never** 23:11 32:6
32:23 36:14
37:8 38:19
39:9 40:22
86:7,17 96:14
96:18 97:15,23
121:22 141:19
143:14 146:4
161:13 167:25
178:16 183:25
184:4,4 208:12
209:23
**new** 1:20 19:21
21:24 22:7
36:19 38:8,15
38:23 39:6,19
44:7,8,13
47:18 52:7
53:9,13,25
55:19 58:5
60:1 61:17
103:4 144:24
147:13 200:7
**NIC** 42:18,25
43:9,23,25
**night** 115:24
172:23
**nights** 97:2
**non-Monroe**
156:9
**noncardiac**
207:16

Homer D. Venters, M.D.

January 09, 2025

Page 236

**nonfunctioning**
204:16
**normal** 124:25
125:16 126:13
126:15,17
141:6
**normally** 40:14
113:15 125:21
125:21 195:6
**Norman** 3:6
**North** 2:16,21
3:8
**northern** 42:6,8
**Notary** 2:7
217:4,22
**note** 4:6 29:17
90:13 98:22
100:10 109:1
110:3,5,7,8
111:20,25
113:9,15
114:11,23
115:4,7,9
120:14 121:3
129:14
**noted** 92:21
118:21
**notes** 13:22,24
14:3,4 86:24
128:7,8
**notice** 2:5 12:13
150:9
**November** 7:22
14:10 17:19
18:18 99:22
**NP** 106:1 115:13
**number** 4:2 16:7
16:9 21:19
26:22 41:15
43:15 49:3,7
49:17 53:12,22
54:16 77:7,15
78:2 81:16
118:15 122:21
150:15,20
156:8 157:4,5
186:24 195:16
195:17 214:21

**numbered** 78:8
**numbering**
155:25
**numbers** 42:21
48:20 49:2,25
79:5 81:8 82:9
86:16 100:17
101:7 150:17
153:18 201:13
214:25
**numerator**
163:22
**numerous** 129:9
129:9
**nurse** 4:6 44:11
61:3,6,12,19
62:12,15,19,25
63:6,12 64:8
64:12,15 65:21
65:23 66:4,5
66:15 83:7,10
98:14 108:12
108:14,14,19
109:2,5,10,14
110:6,13 111:7
111:20 112:18
113:5,17
114:22 115:6
118:24 119:20
119:22 161:12
171:9,11,12
175:13 176:24
**nurse's** 114:21
116:24 125:3
**nurses** 61:25
63:12 70:6
103:20,25
106:11
**nursing** 61:11
61:15,18 62:1
62:9,21 63:3
63:17,23 64:2
64:4 69:5 70:2
70:16 83:15,25
84:4,11,14
86:4 95:15
98:22 106:3
123:23 171:25

191:1

## O

**O** 3:1
**o'clock** 87:23,23
109:12 152:17
**O'LOUGHLIN**
3:2
**O2** 125:13,21
126:14
**Object** 29:4
**Objection** 11:13
12:9 19:9
24:23 32:10
54:20 55:4
58:9 60:21
61:7 66:17
67:9,25 70:9
71:19 73:14
74:9 76:7
84:17 85:18
88:14 94:8
96:8 97:18
106:19 107:13
112:23 114:3
115:2 120:24
122:2 133:1,7
137:3 142:10
149:6 158:24
161:6 163:15
168:21 169:1
169:14 175:2
177:14 178:6
179:17 181:21
186:20 193:8
194:21 206:23
207:4 208:21
210:12 211:8
212:6
**objective** 113:17
**obligation** 177:7
**obligations** 20:6
**observe** 204:6
**obtain** 34:13
44:23 60:8
113:24 129:4
**obtained** 79:8
99:1 101:12

**obtaining** 60:5
112:8,12
**obviously** 61:19
63:2 81:3
90:21 123:3
171:23
**occur** 112:16
181:23 190:19
**occurred** 76:3,9
141:2 143:16
**occurrence** 53:4
**occurs** 206:25
**off-site** 127:8
**offer** 89:21
143:22 144:1,7
160:14
**offered** 131:24
168:17,22
**offering** 94:24
163:6 192:24
**office** 3:11 55:24
146:14 147:7
191:14 197:9
198:4,6,10,14
217:19
**officer** 37:20
38:10 52:8
53:10 54:23
109:25 110:4,9
113:9 114:12
114:23 145:20
199:19,24
**officer's** 125:3
**officers** 65:8
106:11 204:17
**Oh** 78:14 81:10
122:18
**okay** 6:20 7:5,6
15:1,6 17:8,24
27:12 45:22
46:1 48:1,7,21
49:19 60:18
72:2 77:10,12
78:7 79:8
81:19 87:12
88:21 94:20
95:1,2 99:16
99:23 100:21

102:1 108:21
115:9,12
119:20 122:9
122:15 125:5
128:22 149:17
151:21 152:12
152:16,19
167:21 169:15
170:13,16
182:14,19
190:9 202:2
203:4,18
205:19 211:18
213:8 214:8,23
215:18
**old** 42:9 47:8,9
**old-style** 42:12
**on-call** 37:11,16
**once** 108:8
178:18
**ones** 66:6 151:12
154:16
**ongoing** 35:1,8
**open** 18:15
110:16 195:15
195:16 211:5
212:17 214:13
214:17
**opened** 11:25
15:17 16:19
19:18 211:23
211:24 212:12
**opening** 212:11
**operation**
205:14
**operations** 62:4
203:13
**opiate** 85:7
93:23
**opiates** 93:7
99:15 178:25
185:22,24
186:2,4,6
**opine** 65:7
**opined** 64:24
**opinion** 11:10
51:15 54:13
58:11,17 67:7

Homer D. Venters, M.D.

January 09, 2025

Page 237

71:11,13,15
72:16,20 73:12
76:21 85:2
89:9,21,25
90:3 91:9,15
91:19 92:3
115:22 122:3
124:3 126:20
126:25 133:8
133:23,25
134:2 141:21
143:22 144:1
144:15,22,23
145:1 160:18
161:4,23 162:3
162:10,17,22
162:25 163:6
163:13 164:15
168:17 172:10
175:1 177:24
179:12 180:16
182:20 183:7
184:6 186:15
188:4,25 189:4
192:24 193:5
194:16 203:25
204:5,9,12,15
204:19,22
205:1,4,9,13
205:25 206:7,9
208:11 209:16
209:17,24
**opinions** 7:12,19
  8:2,6,7 10:9,10
  10:13 25:13,22
  63:18 65:1,2,4
  66:11 67:2,18
  71:24 73:16
  74:1,2 119:7
  128:12 129:18
  133:20 144:8
  144:10,10
  150:5 151:13
  160:12,13
  192:10,16,22
  198:7,11 201:9
  201:17,24
  202:18 203:9

203:24 205:17
  215:14
**opioid** 98:25
**opioids** 98:20
  99:10
**opportunity**
  12:15 48:10
**opposed** 71:24
**opposite** 108:10
**option** 147:20
**order** 24:24 25:4
  34:3,13 35:20
  83:18 128:10
  137:11 211:2
**organization**
  33:21 46:13,15
  46:19 103:8
**organizational**
  41:2
**organizations**
  58:25 63:11,13
  102:24
**ORI** 147:25
**Oriented** 46:3
**origin** 207:16
**original** 4:11,11
  216:5,6
**outbreak** 173:2
  175:22,24
**outcome** 54:8
  139:19 158:19
**outcomes**
  138:15
**outlined** 18:16
**outset** 30:19
**outside** 12:9
  15:12 144:21
  160:4 190:23
  196:23 197:6
**outstanding**
  56:16
**overall** 111:5
**overlap** 33:19
  106:7
**overlooked**
  204:16
**overnight** 44:14
**overseeing**

62:22
**oversight** 46:21
  61:17 188:21
**oximetry** 125:13
**oxycodone**
  98:21
**oxygen** 80:14
  124:8,14,24
  125:5,22

_____
**P**
**P** 2:14,14 3:1,1
**P.A** 3:2 175:13
**p.m** 1:22 2:11
  100:4,5 128:24
  128:25 170:14
  170:15 216:1
  217:12
**PA** 106:1
**page** 3:15 4:2,17
  15:1,8,10
  18:25 72:3,21
  72:22,23,25
  73:1 76:12
  80:5 81:1,6,11
  81:12,19,21
  88:4 90:8,10
  94:22 109:1,10
  109:20,21
  117:4 118:1
  119:25 120:1,7
  120:8,13
  122:10,14
  130:17 133:17
  134:10,12
  137:17 138:4
  151:4 153:2,8
  155:6 156:19
  160:7,17
  161:12 162:2
  162:16 163:5
  165:9 182:4,10
  182:13,17
  187:7 188:6
**pages** 15:13,14
  15:21 16:11
  51:1,3 74:16
  78:17 101:5

123:9 130:7,16
  163:5
**paid** 13:14,18
  34:21,25,25
  55:22,22 212:3
**pain** 80:6,7,16
  82:21,24 83:4
  83:9,24 84:10
  119:8,13,21
  120:4,9,14,18
  120:22 140:18
  141:6,9 206:20
  207:14
**paper** 25:9
  56:13,16
  146:10,20
  147:5 148:3
  170:1
**papers** 57:24
**paragraph**
  72:24 74:6,19
  81:13,14
  120:12 134:14
  151:5 161:11
  182:10,16
**paragraphs**
  75:12,15,25
  76:2
**paralegal** 48:11
  48:25 99:19
  100:13
**parameters**
  190:21
**Parker** 3:11
**part** 14:14 42:13
  43:25 46:8,10
  57:9,12 61:21
  61:22 64:2
  71:15 82:8
  85:21 92:18
  103:8,16,18
  110:11 115:4
  119:10 137:19
  138:8 153:22
  157:19,20
  161:22 162:25
  165:19 166:9
  179:10 188:15

196:7,9 200:5
  207:22
**participate** 8:25
**particular** 35:15
  43:5 48:17
  59:12 192:23
  194:15
**particularly**
  132:15
**parties** 1:23 2:8
  217:10,15
**parts** 58:21
  177:3,6
**paste** 188:17
**paths** 30:13
**patient** 14:16
  15:7,10,16
  16:10 18:9
  19:7,11 20:16
  28:20 33:5,8
  35:3 36:6
  37:18 38:19
  41:5,9,12
  42:18 44:23
  53:2 83:3,12
  83:14,23 99:2
  99:4,8 101:6
  102:6,7,8
  107:3 109:15
  109:23 110:18
  112:2,3 113:11
  114:10,20,24
  116:23 118:25
  124:13 125:19
  126:21 127:3
  129:5 132:8,12
  132:18 140:17
  140:21,23
  145:17 155:23
  156:25 166:18
  171:11,13
  172:11 173:3,8
  173:10,13,20
  174:4 176:1,21
  177:5 178:11
  178:18 180:9
  181:14 190:2
  194:4 207:9

Homer D. Venters, M.D.

January 09, 2025

Page 238

208:8 214:15
**patient's** 110:14
135:22
**patients** 10:1,8
10:17 15:11
16:2,12 18:22
18:23,24 36:8
36:12,13,16
37:1,19,22,24
37:25 38:21
39:7,11 41:18
41:19 42:15,24
43:1 47:24
49:23 51:2,3
51:19,22 72:8
73:6 85:6 88:5
101:7 118:9,10
125:16 126:1
132:16 134:16
143:14 149:25
150:19 156:10
156:16 157:25
161:1 163:18
166:24 173:5
173:23,25
174:8,15 175:5
176:18 178:14
180:5 181:9,9
190:1 206:21
207:7 213:4
**Paul** 3:3
**pay** 131:1,7,16
131:20,21
**payments**
204:13
**PD** 110:9
**PDF** 78:23 154:4
**PDFs** 78:1 129:9
**Peace** 200:21
**peak** 26:22
91:14 118:8
121:10 125:20
194:1,5
**peek** 174:12
**peer-reviewed**
147:2
**people** 8:24 9:16
9:20 10:7,14

19:3 31:22
33:22 37:15
41:7,25 42:2
42:11 43:11,14
43:15 45:9,13
46:22 47:14
51:21 53:25
95:16,21,25
96:5,23 97:7
98:9 102:19
103:23 104:2
106:4 107:15
119:17 131:6
131:14,15,17
131:20 135:11
135:15 136:18
137:15 148:21
148:24 149:15
156:5,9 157:4
157:13,17,18
161:9,25
163:25 164:25
165:2,4 175:9
175:18,25
176:6 177:18
179:21 185:8
187:19 208:5
209:6,20,24
**people's** 9:17
11:23
**percent** 23:16
53:15,19 54:2
54:10,18 125:5
**percentage** 23:5
53:23 207:14
209:10
**perception**
149:15
**Perfect** 48:4
**performance**
66:15
**performs** 68:12
**period** 33:25
40:3,6,12 55:9
90:2 147:6,11
147:15 174:19
181:24 184:20
**permissible**

35:19
**permitted**
204:16
**permitting**
204:23
**persisted** 120:4
121:1
**persistently**
176:19
**person** 10:13
19:16 52:24
58:1,6 69:21
96:19 97:3,5
105:5,13
106:24 107:24
108:2 121:12
164:11 175:11
175:19 180:20
181:3 183:15
184:19 205:6
**person's** 19:18
**person-specific**
125:14
**personal** 6:5,6
55:2 131:19
217:8
**personally** 59:12
**pertaining** 19:7
**pertinent** 50:5
**Ph.D** 146:24
147:17,18
201:3
**pharmacy** 45:4
45:9,12 110:16
117:17
**phone** 127:7
**phrase** 52:12
54:12
**phrased** 127:25
**physical** 47:24
51:19 104:1
109:22 133:19
176:20 177:4,7
**physically** 16:24
44:25 49:8
176:5
**physicals** 4:8
133:16 176:21

**physician** 20:9
37:11 44:11,11
57:3,19 58:3
63:1 70:5 83:7
84:16 106:1
176:24 194:19
198:25 199:17
**physicians** 33:13
44:4 62:25
70:2 83:11
103:11 199:7
**physiology**
97:10
**pick** 136:9
**picked** 137:22
**piece** 118:14
170:1
**pieces** 42:8
**pill** 117:14 183:2
**pills** 110:13
186:6
**Pisney** 2:24 66:5
75:22 76:5
111:7 118:24
119:20,23
161:13
**place** 24:14 36:9
36:15 38:17
40:4 42:23
45:12 84:16
124:17 189:2
**placed** 159:21
**places** 42:22
68:5 70:17
189:23 192:9
**Plain** 44:20
**Plaintiff** 1:5,13
2:18 213:20
**plaintiff's** 203:5
**plaintiffs** 57:5
**plan** 28:13 77:14
83:13 114:25
116:17,20,21
**plastic** 118:12
118:14
**play** 175:5,16
**please** 5:8 7:5
13:20 169:12

169:13
**plug** 128:15
**Poenitsch** 1:25
2:6 217:3,22
**point** 6:20 7:21
15:10 18:23
25:7 33:14
40:21 71:8
126:3 133:14
153:5 155:24
184:2 186:19
190:10 192:2
**pointing** 193:13
**points** 120:12
**police** 109:25
110:4 114:23
**policies** 4:5
46:20 61:18
62:3 67:16
76:13,18,20,22
76:24 77:22
78:18,23,24
79:4,5 80:24
81:5,7,14,15
81:20 82:3,4
82:11,12,24
103:1,5,7
127:22 150:14
150:18 151:6
153:12,12,16
153:17 189:10
200:10 201:14
201:14 203:12
206:3
**policy** 35:22
46:16 76:16
78:16 79:2,14
79:17,23 80:3
80:10,19 81:17
81:17,25 83:5
83:6 112:12,15
131:4,6,15
187:6,6,7,9,13
187:15,18,25
188:5,10 189:1
**population**
43:13 148:13
**Port** 1:20

Homer D. Venters, M.D.                                    January 09, 2025

**portions** 57:17 166:2
**ports** 122:21 214:22
**position** 10:5 55:19,22 111:10 130:13 140:17 166:6 169:3
**positions** 34:18 34:20,21 45:18 55:17
**positive** 5:20
**possibility** 75:7 112:7 113:6 182:21
**possible** 10:6 92:14 93:4 180:20 181:17
**postulate** 75:7
**postulated** 72:15 114:8 180:9
**potential** 32:20 72:10 85:6 89:22 104:5,10 104:17,25 107:10 112:16 143:15 145:9 207:11
**potentially** 105:8 124:12 172:21 173:9
**practice** 12:24 16:4 48:22 49:11 50:15 51:10,18,23 63:8 69:25 70:8,10 79:17 102:22 139:16 155:8 195:6 206:4
**practiced** 177:24
**practices** 61:18 67:5 102:4 176:7
**practitioner** 44:12 62:13,16

62:19 63:6 64:15 65:24 83:8 108:14 119:23 161:12 175:14 176:24
**practitioners** 62:25 63:12 64:8 83:11 145:3
**pre-litigation** 26:14
**preceding** 135:5 217:6
**precipitates** 97:9
**precise** 179:20
**preclude** 149:1 149:12 154:14
**precluded** 64:18 65:17
**predict** 180:12
**prefix** 155:25
**pregnancy** 121:16,17,20 122:5 167:24 167:24 168:7 171:19,22,24 172:3 208:4,7 208:7,14,15,18 208:22,23 209:2,4,5
**pregnant** 122:1 168:4 208:6,6 209:6,21
**preparation** 13:22 203:23
**prepare** 8:16 196:15
**prepared** 8:2 210:18
**preparing** 150:10 196:22 197:6
**prescribed** 98:1 98:19,23,25 99:5 186:5
**presence** 182:7 212:19

**present** 9:19 11:5 80:15 83:12 90:11 91:19 109:2 110:6 136:7,17 178:3
**presentation** 132:22 207:7
**presentations** 51:18
**presented** 10:22 213:14
**presenting** 174:20,22 207:14
**president** 46:4,6 46:10
**pressure** 92:17
**pressures** 92:16 145:3
**pretty** 50:19 124:8 173:22 187:3 197:22 214:15
**prevent** 84:19
**preventable** 52:21 54:13 55:3 108:10 134:4 188:14
**prevented** 133:24
**prevention** 189:25 190:5 200:16
**previously** 31:25 203:5
**primarily** 20:7 42:2 43:5 46:21
**primary** 90:23 148:20
**principle** 175:8
**prior** 6:14 24:11 28:6 29:21 31:6 56:21 57:2 61:16 135:8,17,21 136:1,7,17

137:6,12 147:18 154:24 164:1 178:4 187:16
**prison** 20:8 21:19 24:16 28:24 36:3 37:2 47:15 51:14 148:22 149:11 190:16
**prisoner** 171:20 176:11
**prisoner's** 176:12
**prisoners** 159:16,25 160:4
**prisons** 52:16 68:13 131:12 193:20
**private** 23:7,20 68:16
**privilege** 12:10
**privileges** 20:2
**probability** 93:12,17,22 116:13
**probably** 23:16 32:3 33:18 41:13 46:8 47:9 69:20 103:17 125:15 125:19 183:17 187:22 195:7
**problem** 17:9 83:3 86:6 89:3 138:18 140:25 164:20 174:5,8 201:18 214:14
**problems** 9:18 11:5 12:4 43:16 55:7 92:18 97:6,11 116:11,25 135:25 149:9 167:15,15 180:1,12,23,24 181:4 182:2

**procedure** 2:5 79:23 80:3 138:11 139:4 189:16
**procedures** 4:5 76:13,18 77:23 78:19
**proceed** 7:7 18:16
**proceedings** 5:1 5:22 6:4,5
**process** 6:21 14:12 17:6 18:13 31:25 59:24 79:20 90:4 99:20 104:3 112:19 113:22 190:13 194:12 210:10 212:9,17
**product** 12:10 14:8
**production** 48:21,23,24 49:1 213:1,2 213:20
**professional** 20:5,10 58:25 63:11 102:17 113:10 145:15 148:14,23 149:9 193:18 194:8 199:12 199:15
**program** 58:3 147:17,18 148:1
**Programs** 103:11
**progress** 4:6 109:1 110:5 111:20
**prohibited** 47:13
**project** 23:17 146:11 148:5
**projects** 21:12 22:1,4,24 35:8

Homer D. Venters, M.D.

January 09, 2025

Page 240

**promote** 103:8
**pronounce** 8:10
**protective** 24:24
  25:4 35:20
**protocol** 80:7
  82:21,24 83:14
  83:24 208:18
  209:11
**protocolized**
  83:4 207:10
**protocols** 80:16
  84:10,10,13
  106:4 159:21
**provide** 13:5
  17:6 35:3
  41:13 47:14
  55:23 64:23
  77:6 89:25
  109:6 137:8
  169:4
**provided** 4:12
  9:6,15 10:15
  10:16 11:19
  13:4,20 28:7
  36:10 38:6
  41:5,9 47:22
  50:20,21 51:21
  52:1 57:16
  60:13 62:24
  67:8 71:6
  74:18 77:17,21
  87:3,5 95:4
  101:10 131:8
  145:18 157:12
  188:11 197:16
  198:6,10,16
  216:7
**provider** 32:8,20
  44:10,14 68:17
  69:12 75:19
  83:19 84:8,22
  105:25 106:15
  116:2,10,23
  124:16 125:2
  125:11,18
  127:8 132:21
  172:12 175:12
  189:21 208:2

**provider-level**
  72:9
**providers** 44:9
  44:16 59:9
  62:24 84:5
  86:3 144:21
  207:2
**provides** 62:18
**providing** 20:15
  32:8 33:5 40:3
  40:8,24 51:10
  102:22 203:9
**provision** 47:21
  206:4
**psychiatric**
  174:5
**Psychological**
  1:15 3:5
  202:12 205:21
**psychosis**
  174:14
**public** 2:7 33:23
  55:20 56:5,15
  210:2 217:4,22
**publication**
  56:16 63:17
  146:20
**publicly** 22:25
  53:12
**published** 147:2
  148:7
**pull** 27:11
  168:12,14
**pulled** 80:5
**pulmonary**
  90:17,19,22,23
**pulse** 124:23
  125:12,23
  126:15,16
**purposes** 153:1
  153:7
**purse** 110:14
  117:15,20,22
  183:2
**pursuant** 2:4,5
  77:4
**put** 14:7 48:9
  76:25 79:9

  90:11 109:2
  111:19 115:6
  128:19 134:9
  153:15 154:25
  156:8 170:3
  194:2 195:18
  209:24
**putting** 40:25
  78:4,7 129:20
  130:10

———————
          **Q**
**qualification** 8:4
  19:3 154:22
**qualifications**
  65:3
**qualified** 62:14
**quality** 62:3
  139:22,22
  188:21 189:24
**question** 5:24
  7:2,4,7,9 10:12
  16:8,10 24:4
  65:23 66:9
  73:10 85:5
  91:18 92:10
  95:2,9,12,24
  96:2,3,4,7 98:5
  108:13 115:8
  119:12 124:19
  129:12 130:17
  137:11 156:11
  161:17 163:10
  164:5,8 167:1
  168:17 169:20
  177:23 179:20
  181:8,13
  187:16 191:25
  201:19 203:21
  204:4 210:14
  215:10
**questioned**
  112:1
**questioning**
  209:21
**questions** 26:11
  73:25 88:25
  94:5 106:21

  108:3,17 129:6
  145:13 149:18
  151:17 152:23
  153:6 166:21
  171:7,7 172:16
  172:19 173:3
  189:14 192:14
  205:23 206:11
  215:14
**quick** 87:13
  128:14 152:16
**quickly** 132:19
  185:2
**quite** 10:2,21,23
  19:16 47:23
  53:20 78:1
  168:13 192:7
**quotations**
  75:16
**quote** 110:8
  166:11
**quoted** 188:5
**quoting** 165:25

———————
          **R**
**R** 2:14 3:1 4:16
**radiotherapy**
  90:16
**raise** 145:8,9
**raised** 106:23
**raises** 104:21
**range** 16:7,9
  34:24 51:21
  125:12,23
  126:9,16
**rare** 178:16
**rate** 77:17 125:4
  125:5 126:5,10
  126:13 198:18
  198:20,21,22
**re-sent** 18:5
  49:17
**reach** 128:10
**reached** 25:6
**read** 42:16 73:24
  94:21 120:7
  146:6
**reading** 110:19

  115:3 120:5
**reads** 7:8 110:7
**ready** 47:16
  110:10 152:19
  195:19
**real** 107:25
**really** 11:15
  23:11 25:8
  36:24 46:14
  68:5 107:3
  112:25 113:14
  114:15 121:24
  124:12,14
  130:8 137:9,17
  149:24 152:6
  158:18 168:5
  169:8 176:18
  181:14 185:13
  194:13 213:21
**Realtime** 2:7
  217:4
**reask** 152:23
**reason** 16:8 28:5
  33:20 71:17
  77:12 80:21
  89:18 91:25
  98:16 116:22
  138:20 140:21
  140:25 148:18
  157:21,22
  209:14
**reasonable**
  61:12 62:12
  93:11,16,21
  116:12,17
  208:2
**reasonably** 61:3
**reasoned** 114:9
**reasons** 36:14
**Rebeles** 213:10
**recall** 11:14,16
  12:11 16:3
  24:6 26:1 36:4
  42:14 43:13,19
  43:20 54:24
  56:22 60:4
  65:9,13 66:8
  66:21 69:2,4

Homer D. Venters, M.D.

January 09, 2025

74:20,24 77:25
78:22,22 79:6
80:5 86:22
87:8 91:13
94:4,10 96:15
98:22 99:12,12
99:12 115:21
117:14,14,16
117:19,21
121:9,14,18
127:25 128:6
133:9 135:4
140:6,10
141:10 149:24
149:24 150:3,7
154:4,11,13,22
155:2,11,15,19
157:22,23
158:7,11,18
165:23 170:24
170:24 171:15
171:21,24
172:5 179:7,7
179:9 183:1
186:3 187:14
187:17 189:3
191:11,15,24
196:4,7,13
197:3,8,23
203:3,16
207:17 211:21
**receive** 15:14
16:1,5,23 18:9
19:8 37:17
50:8,9 53:2
71:17 210:1
**received** 4:18
7:16,17 9:21
11:22 15:7,16
15:22 16:22
17:2,10,14,17
18:17,21 19:6
19:16 48:12
49:21 50:8,10
50:17 63:2
69:17 72:10
88:11 99:22
100:12 106:5

109:8 134:17
159:11 199:23
210:3,19,25
211:23 213:25
**receiving** 73:6
84:2 166:9
**recess** 48:5
100:4 128:24
170:14
**recitation**
183:10
**recite** 111:8,13
**recognize** 79:21
213:19,21,23
214:16
**recollection**
25:17,21 31:9
42:7 54:3,11
68:20,24 80:9
89:17 110:24
111:1,3,11
127:2,12,23
146:23 154:11
190:8
**recommendati...**
193:18
**reconvene** 99:24
**record** 4:20 5:9
47:7 48:8,9
100:6,10 101:3
129:2 133:14
144:7 146:7
158:10 170:17
195:25 215:1
215:19,19
**recorded** 120:14
**recordings** 14:4
**records** 4:22,22
9:15,17 10:3,7
10:14,16 14:15
15:18 16:11,12
16:23 18:19,22
18:24 19:2,5,8
19:13 30:3
46:23 47:5
48:12 50:3
56:14 80:12,18
82:6 88:11,18

89:16 91:6
109:3 111:12
122:12,17,19
122:22 123:6
127:6,11,13
128:10 129:19
130:2,6 132:1
133:3 134:5
140:6,10
141:16 143:3,6
144:17 150:18
153:21,24,25
154:5,8,15,19
155:2,4,24
156:11,20
157:4,6,9,10
157:13,17,24
158:1,3,12
159:1,8 160:24
161:3,9,21
162:1,9,24
163:12 182:6
191:11,19
196:19,20
197:5,10,16,20
204:20 210:24
213:4 214:5,17
**recurred** 121:4
**red** 124:10
**redistribute**
48:22
**redo** 147:20
**reduce** 145:3
**reduced** 25:14
217:7
**refer** 71:23 90:6
108:25 192:10
209:15
**reference** 15:3
19:11 27:24
32:5 52:12,19
52:20 56:10
63:21 66:1
67:13,22 68:5
70:20 74:12
75:14 76:1,12
79:18 80:16
81:4,25 82:15

82:21 87:6
88:4,10 89:13
92:15,20 98:21
109:9,20 117:5
122:10,15
125:12,23
126:7,9,16
129:20 135:12
138:4,22 139:2
145:8 153:9
156:2 182:9
190:6 193:25
201:13
**referenced** 9:16
15:19 18:23
39:15 40:16
42:5 50:5
60:18 63:19
66:20 68:23
72:14 74:19
76:16 78:9
81:1 100:9,13
108:23 111:22
114:18 121:17
137:6,12
139:10 141:1
141:13 154:23
164:6 172:5
186:25 201:24
**references** 18:19
109:13 112:15
120:9 121:8,10
121:15 161:8,9
172:21
**referencing** 15:8
34:18 77:2,18
81:9,10,19,21
118:1,3 138:10
**referrals** 144:20
**referred** 42:5
63:20 71:1
105:22 117:5
160:4 200:6
**referring** 17:21
64:3 72:4,22
75:7 76:11
79:14 109:1
119:25 167:22

203:19
**refers** 16:9 56:8
**reflect** 76:23
144:9 176:8
195:9 212:13
**reflected** 189:7
195:22
**reflects** 8:7 67:2
156:8
**refusal** 128:7
176:9
**refuse** 176:3,19
176:22 177:18
**refused** 130:21
133:18
**refuses** 176:1
**refusing** 127:10
128:2 131:23
175:11
**regard** 55:13
66:15 209:16
**regarding** 62:21
201:13 203:12
203:12
**regardless** 108:2
**Registered**
110:5
**regular** 36:9,25
42:9 56:2
187:20
**regularly** 37:17
186:8 210:1
**related** 46:20
109:25 110:4
205:11
**relates** 47:21
175:18
**relating** 46:21
67:19 170:21
189:16 191:20
198:14
**relation** 33:2
132:25 206:4
**relationships**
205:10
**relative** 217:13
217:15
**relatively**

Homer D. Venters, M.D.

140:24
**relevant** 7:24
   24:14 58:12,15
   58:22 59:1
   90:15,24 137:9
   166:16 167:10
   167:18 185:16
**reliance** 74:12
**relied** 73:16
   128:12 198:6
   201:8,16,23
**relinquish**
   206:10
**rely** 198:11
**relying** 194:18
**remember** 26:10
   28:20,23 46:9
   65:10 92:23
   99:14 148:2,6
   150:2 186:24
**remote** 1:19 2:1
   217:6
**render** 133:25
**rendered** 42:17
**repeat** 31:12
   48:14 101:2
**repeated** 104:13
**repeating** 166:2
**rephrase** 7:4
   161:17
**replaced** 211:21
**replug** 129:3
**report** 4:3,7,20
   7:17,22 8:1,7
   9:5,16,25 10:5
   10:9,11,18,20
   10:25 11:8
   12:2,24 13:22
   13:25 14:2,5,9
   14:14,14,23
   17:15,19,21
   18:16,18,25
   19:11,12,15
   24:19 25:3,14
   25:20,25 26:8
   49:5 50:5 51:1
   57:21 58:7
   63:19 66:1,7

66:10,20,25
67:1,22 68:2
70:20 71:9,14
71:23,25 72:18
72:23 73:17,18
73:23,24,24
74:1,2,12 79:9
79:12 80:1,13
80:17 81:4,11
81:12 82:10,23
86:25 88:4
89:11,13 90:7
92:15,20 94:13
95:25 98:4,8
98:13 100:9
101:4,13
108:23,25
109:7,9,14
110:5,11,20
111:2,9,13,17
111:23 116:8
117:4 118:19
119:4,5,22
120:1,5,9
122:11,14,16
123:16 124:6
127:6,19,21
128:19 129:21
130:10 134:6
134:10 135:12
137:5,17 138:8
140:2,17 141:8
141:11 145:6
150:9,22 151:3
151:14 153:3,9
153:11,14,23
153:25 154:23
155:7,12
156:19 160:8
160:11 161:1
162:2,21 164:5
164:15 165:9
169:10 182:4
182:13 186:13
187:8 188:4,6
192:9,21
193:17 194:2
194:14 195:2,7

196:17,17
197:4 198:1
201:10,17,25
202:19 208:6
212:8 213:12
214:16 215:15
**reported** 1:24
   62:2 89:11
   90:6,25 109:24
   116:11 119:8
   119:13,16,21
   120:17 132:1
   136:20 141:6
   206:21 217:7
**reporter** 2:7
   5:17 77:7
   216:3 217:4
**reporting**
   146:10
**reports** 22:25
   82:16,17
   106:17 134:18
**represent** 56:18
   74:15 111:2
   202:11 205:20
**representing**
   30:25
**request** 13:12
   60:13 158:1
**requested** 4:17
   12:23 99:18
**require** 34:2
   43:8 172:10
   173:17 174:25
   176:16 190:22
   210:5
**required** 34:8
   38:2,2 86:2
   115:25 116:1
   146:9 147:17
   186:16
**requirement**
   45:2 116:9
   136:13 171:3
   172:7 190:11
**requires** 34:12
   139:13 171:19
   189:19 190:24

191:9
**requiring** 124:7
   126:23
**reread** 196:17
   196:18
**research** 146:11
   146:14,24
   147:8,8,13,20
   148:1,5
**residency** 34:12
   34:15
**residents** 36:12
**resistant** 175:23
**resolve** 27:4
   86:6
**respect** 18:8
   22:11 25:18
   59:13 63:17
   65:23 68:11
   70:24 73:23
   102:4 108:12
   108:19 111:9
   123:24 125:12
   130:5,19 131:5
   138:10 160:12
   160:18 162:3
   162:17 182:20
   186:15 187:8
   187:12 192:10
   207:19
**respiratory**
   126:4,10,13
**respond** 41:11
   95:8 115:8
   129:6 136:6
   181:9
**responded**
   119:10
**responding** 96:7
**response** 38:18
   50:12 65:7
   84:24 93:10
   111:8 135:20
   140:19 158:1
   162:18 176:4
**responses** 178:5
**responsibilities**
   56:3

**responsibility**
   55:3,6 61:23
   62:8,21
**responsible** 38:4
**responsive**
   12:19
**rest** 206:10
**restrict** 84:22
**result** 52:21
**resulted** 22:25
   137:23
**retain** 175:6
   176:2 177:10
   177:25
**retained** 20:23
   21:17,21,22
   27:25 32:18
   196:4
**retention** 22:11
**reveals** 52:25
**review** 4:20 9:17
   12:16 13:14,23
   14:15 16:14
   30:2 32:18,23
   36:2 51:17
   52:25 67:21
   68:1 74:21
   75:25 76:2
   86:19 88:4
   113:13,18
   114:14 117:16
   127:18 128:16
   130:2 133:2
   134:4,23,24
   135:3,17,21
   136:9 137:22
   138:10,14
   139:1,13,21
   140:7,12
   142:13,17
   147:10,14
   150:16 155:9
   155:13,16
   156:20 163:20
   164:23 171:4
   179:6 189:20
   190:7,22
   191:11,16

197:10 203:23
210:1,5,10
212:15
**reviewed** 4:10
4:23 7:20,23
10:2 15:9
16:11,13 17:7
18:22 19:2,19
26:14 48:13,17
66:18 68:24
72:13 75:4
76:11 78:10,17
79:10,19 80:19
81:13,23 82:2
82:11,11 86:23
88:3 91:6 93:4
101:5,16
119:11 127:20
134:7 144:6,17
150:15 151:5
153:1,7,11
154:7 156:16
157:4,6,10
158:12 159:8
160:24 161:3
161:21 162:9
162:24 163:12
191:20 196:17
201:12,16
202:16,20
203:1,4 211:7
212:4 213:3
214:1,6 215:2
**reviewing** 11:21
66:22 68:20
75:11 124:19
127:6 155:15
160:25 197:4
200:10
**reviews** 134:15
134:23 135:2
136:15 137:9
138:4,13,21,22
143:1 150:1,8
157:18 163:7
163:17,23
164:9,13,16,21
165:4 189:13

190:18,18
192:3,5,6
**revolved** 103:24
**REYNOLDS**
3:7
**rider** 50:23
**right** 5:23 15:20
25:14 30:18
34:5 45:24
50:7 63:9,24
71:20 81:23
84:16 86:20
91:2 100:2
102:22 103:1
104:8 106:7
110:25 124:17
124:18,22
125:1 129:7
142:1,2,21
143:1,4 148:9
149:4,5 151:1
151:17 152:17
152:18 157:2,2
168:15 172:1
175:9 177:25
184:23 201:6
208:4 215:24
**rights** 47:22
103:12
**Rikers** 33:6 36:6
36:7,8 38:6,7
38:10,11,17
41:6 44:2,4,20
45:5 56:14
59:25
**risk** 173:20
174:21 176:14
178:3
**risks** 107:25
**rivals** 144:19
**RN** 110:15
115:12
**role** 9:5,9 22:18
26:10 33:4
36:8 37:11
38:8 41:23
43:7 55:23
61:13,16 102:8

103:16 108:12
108:17,19
109:14 110:25
111:6,12,16
145:18 199:16
199:20 200:7,8
**roles** 23:19
199:15
**room** 5:18 45:3
125:22 198:25
**rooms** 207:15
**RPR/RDR/CRC**
2:6 217:3
**RPR/RDR/C...**
1:25
**rule** 172:16
**Rules** 2:5
**ruling** 64:19
**run** 38:14
175:21
**running** 206:16

---
**S**

**S** 2:14,20 3:1 4:1
4:16,16
**S.C** 205:21
**safe** 203:15
**safety** 175:18
**sat** 125:21
**saturation**
125:13
**saving** 75:17
**saw** 12:4 19:13
36:16 37:1,19
42:24 145:17
165:13 186:13
**saying** 14:21
40:16,19 50:17
74:1 91:7
110:3 143:7
152:1 189:3
208:12
**says** 15:11 71:9
72:5 73:1
101:4 110:5,8
110:14 114:23
124:9,11 127:6
134:14 139:12

151:7 175:9
**scenario** 60:25
180:8
**Schamber** 3:6
202:15
**Schmieder** 4:7,9
4:19 18:20
88:12 122:10
126:20 128:1
130:24 133:5
133:17 156:24
157:11 158:4
161:5,24
191:20
**Schmieder's**
123:15 128:10
130:6 131:22
133:14 158:18
191:12
**school** 55:11,20
56:6 147:24
200:19,24
201:2
**science** 200:23
**scientist** 144:5
**scope** 12:10
51:17,23 76:22
88:20 113:1
144:17 190:15
**score** 86:1,1,3,5
86:13,14
104:14 106:8
**screen** 76:25
78:4,7 79:22
80:25 81:10
94:21 98:5
111:19 117:24
123:15 165:13
170:4 186:2,9
210:17
**screened** 41:25
42:3 104:17
107:10
**screening** 4:3,7
84:3 90:12,14
94:13 98:4
104:5,9 105:19
105:23 106:6

106:13 108:3
123:16 159:8
160:19 166:3
166:10 167:19
169:16 170:1
170:22
**screens** 186:7
**scroll** 98:6
123:22
**scrolling** 90:9
117:8
**seal** 217:19
**search** 29:13
66:25
**second** 26:7 29:6
33:21 40:15
111:25 117:3
121:2 123:13
140:16 151:5
167:10 183:13
**secondary** 89:19
**section** 10:20
15:1 141:11
156:15 160:11
161:8 162:21
**secure** 122:22
**security** 64:23
64:24 65:4,8
69:18,19,20,21
69:22 70:7
83:17,25 84:3
84:11,13 86:4
95:15 106:3
119:18 125:3
155:18 173:4
199:20,24
200:2,5,12,17
**see** 9:17 12:1
13:2 15:18
29:15 30:3
34:22 35:19
36:8,12,13
37:21 68:5
72:3 74:11
75:13,25 76:13
78:13,15 81:6
82:1,5,15
83:12 94:16

95:6 97:19
98:11 104:14
108:23 111:24
113:13 114:21
114:22 117:8
118:7 119:4
120:16 122:15
122:18 123:18
123:21 136:16
142:12,18
156:1 163:23
165:5 167:8,12
174:11 182:9
182:18 187:11
211:11 212:18
213:12
**seeing** 68:25
87:8 133:9
154:13 171:11
186:4
**seek** 39:10 47:12
47:13 59:7
**seen** 31:6 43:1
86:7,17 96:14
125:10 132:20
136:14 161:13
164:9,13 167:4
194:4 207:13
208:12
**selected** 16:13
**self-harm** 56:13
191:5
**semantic** 106:12
**semantics**
105:21
**send** 12:25 38:20
45:15 50:19
68:10 88:22
100:19 101:18
101:22,25
130:18 195:6
195:19
**sending** 100:13
113:7
**senior** 69:21
**sent** 12:13 13:5
16:25 17:13,14
17:18 49:13

50:4 80:22
123:12 173:12
195:3,5,24
197:9,21 212:5
**sentence** 72:3,5
72:18,25
120:13 129:15
151:4 182:16
**sentinel** 139:3
**separate** 14:3,4
45:12 83:13
111:18 153:15
160:14 173:8
195:21,25
205:19
**separately**
195:13
**separating**
176:5
**sequence** 215:3
**sergeant** 112:1,3
112:18 199:20
**series** 206:8,8
**serious** 90:19
96:24 97:6,11
116:11 124:5,8
125:9 138:14
138:18 139:18
149:9 180:5
185:10 189:21
**served** 69:11
**service** 99:7
**services** 36:19
39:22 40:7,18
46:4 51:23
192:12
**set** 14:3,4 43:7
88:18 101:10
144:11 167:13
188:19 192:11
215:13 217:18
**sets** 181:14
**setting** 35:14
55:13 58:12
172:25 189:18
199:11,25
**settings** 20:8
47:1 173:22

190:16
**settled** 32:1,3
145:25 146:2
**seven** 45:10
164:7
**severe** 86:15
92:19
**severely** 173:21
**severity** 85:10
86:8 104:16
**shakes** 167:7
**share** 78:3 94:12
117:24 133:12
210:17
**shared** 67:18
123:15 149:25
**ShareFile**
100:19
**shareholder**
202:13,24
205:6
**shareholders**
203:11 205:15
206:1
**sharing** 78:5
**Shasta** 3:11
**sheets** 161:14
**Sheriff's** 3:11
191:14
**shift** 44:14
**shocking** 121:24
210:13
**short** 34:23 40:2
40:6,12 51:20
122:23 138:23
139:6,9,14
209:3 211:2
**short-acting**
185:1,18
**short-term**
184:9
**shorten** 206:2
**shortness**
118:23
**show** 83:2
122:24 123:7
127:7 130:2
185:9 186:7

**showed** 86:14
**shown** 9:2 186:9
**shows** 76:9
**shrunk** 27:7,7
**sic** 42:19
**sick** 37:25
144:20
**side** 27:7 32:14
32:16 65:19
69:19,22 189:8
191:4
**side-by-side**
168:12
**signal** 68:8
**signed** 195:2
**significance**
182:19
**significant** 4:21
53:5 140:13,20
**significantly**
53:4
**signs** 113:17
125:8 141:7
170:22 171:25
**similar** 61:4
62:13,20 97:10
137:2
**similarly** 62:12
65:25
**simple** 50:19
**simply** 72:6 73:2
73:8 89:24
92:17 114:22
131:17 169:25
181:11
**single** 22:1,4
30:5 37:9
34:17 36:4
42:15 63:25
66:7 69:3
86:22 117:18
117:23 121:9
127:24 128:6
129:13 130:1

135:10,13
140:11 141:10
154:3 157:23
158:8,16 164:3
165:22 169:2
170:24 172:2,8
179:9 187:14
187:16 189:3
190:8 191:15
197:18,23
213:16 214:12
214:17
**site** 86:3
**sitting** 29:14
207:17 211:16
**situation** 84:8,24
115:13 132:18
**six** 34:20 65:14
158:23 159:6
159:13,18
160:1,5 185:17
**size** 94:20
**skin** 175:24
**slides** 66:2,19,21
67:13,23,24
68:6
**small** 70:1,18
80:16 106:10
118:14
**smaller** 43:1,15
**smallest** 41:4,15
42:17
**social** 96:13,23
96:25 97:12
**societies** 148:14
148:24 149:10
193:19 194:8
**Society** 85:22
185:4
**sole** 72:17
**solely** 177:22
**solitary** 53:21
56:12
**somebody** 57:11
69:19,21 71:16
79:11 118:18
138:17 191:1
**soon** 45:21

Homer D. Venters, M.D.

January 09, 2025

Page 245

**sorry** 17:12,16
28:18 87:22
89:2 107:13
115:5 164:25
165:10 182:11
182:14,16
206:14
**sort** 5:22 17:3
18:10 90:4
113:18 117:19
173:14 174:22
174:24 176:14
177:11 178:3
180:22 189:19
190:22 199:20
**sorts** 43:12
107:20 149:13
185:5
**sought** 59:11
**sound** 30:18
43:19
**sounds** 31:10
82:12 99:25
**source** 4:19
58:20 71:23
82:5 117:12
128:5,18
129:23 130:9
130:11 139:11
207:18 209:15
**sources** 144:13
201:8,21,22
**space** 148:20
**span** 164:12
**speak** 6:22 7:5
61:11 62:15,18
139:6 152:19
170:22 196:20
**speaking** 61:5
113:3 196:14
**speaks** 73:18
112:14 171:2
**specialist** 199:3
**Specialties**
33:15
**specific** 22:15,20
25:24 33:3,3
36:14 39:2

40:4 43:15
51:25 60:24
63:17 66:3
71:3 79:12
83:5 85:24
108:16 129:14
130:17 166:20
186:14,18
193:13 194:15
196:8 197:3
201:8
**specifically**
25:23 59:13
66:12 68:23
73:20 82:19
85:6 94:4
98:23 148:21
149:11 151:1
166:13 169:18
172:3,20 181:6
**speculate** 131:22
**spell** 188:10
**spend** 40:23
195:14 196:22
**spent** 4:18 13:13
13:17 195:10
195:22 196:1,1
197:6
**spitting** 172:23
**spoken** 113:2
**spread** 175:25
176:6
**spreadsheet**
49:24 50:10
87:5,9 169:3
**SS** 217:1
**St** 3:3
**staff** 37:9 38:2
61:20 65:4
69:8,18,20
70:7,15 83:15
83:17,25 84:3
84:4,11,13,15
86:4,4,14
92:21 95:15
104:1 106:3
111:16 115:12
118:10 119:10

119:15,17,18
123:24,24
127:8 142:2
143:11 155:17
155:18 161:10
171:6,12 172:1
172:1 173:4,4
173:16,24
174:6,7 175:1
176:23 177:8
178:1,19 191:9
191:17 200:7
200:12
**staffed** 44:16
**staffer** 64:24
**staffing** 1:15 3:5
44:3 70:2
202:12 205:21
**stage** 95:22
**stages** 92:19
**stamped** 100:23
**Stan** 3:11
**stand** 171:5
**standard** 53:2
58:8,11,19
60:19 61:2,5
61:12 62:11,15
62:19 64:6,12
64:16 65:20
72:7,11 73:3,6
80:15 85:1,4,8
85:11,12
104:16 118:9
118:16 121:7
135:22 138:9
138:13,21
139:4,12,17
165:18,23
166:2,20 167:3
170:21 171:1
171:16,18
172:6,9,14
173:17 174:25
176:8,16
181:10 186:14
186:16,18,23
187:3,19
188:16,17,22

189:15,19
190:12 192:17
192:23,25
193:6 194:4,6
194:15,16
198:19,21,22
207:19,22
208:1,24 209:8
209:15 210:4
**standardized**
12:6 85:10,17
**standards** 24:22
25:18,24 58:13
58:20,24 59:1
121:18 127:14
127:20 136:11
171:17 172:5
186:22 188:20
189:12 190:4
190:10 192:11
192:12,15
193:12,22,23
193:24 194:10
194:12 201:21
**standing** 147:15
**standpoint** 99:6
114:21 144:16
184:15
**start** 55:10 99:7
105:15 107:23
108:7 181:12
184:16,22
185:15
**started** 33:16
36:10 77:6
107:4 132:24
152:7 200:25
**starting** 114:23
148:12 155:25
160:17 163:5
201:6
**starts** 72:24
119:19 151:5
161:12
**state** 2:8 5:8 9:5
19:21 21:20
24:16,17 36:3
39:4 65:10

116:12 127:15
127:19,21
173:15 217:1,5
217:22
**stated** 53:12
110:9
**statement** 74:6
112:7 192:19
193:7
**states** 1:1 19:25
22:2,24 35:9
47:12 70:1
**states'** 21:23
**statistics** 207:13
**status** 38:22
121:17,20
122:5 208:7,15
208:23
**stenographica...**
1:24 217:7
**step** 151:19,24
**steps** 84:23
131:17 207:8
**Steve** 24:10
**sticking** 171:17
**stipulation**
215:1
**stock** 204:10
**stop** 87:23
105:11,16
107:21,22
121:2 131:18
132:16 166:23
167:5 179:22
**stopped** 107:19
**stored** 46:23
**strain** 90:1
**street** 2:16,21
3:3 99:1
**strength** 118:13
**stress** 89:22 90:1
**strike** 20:14
52:11 59:2,19
63:15 75:21
160:24 192:8
210:16
**strikes** 95:10
**strongly** 103:5

208:17
**structure** 42:10
**struggling** 41:8
**stuck** 33:25
**student** 201:7
**stumble** 5:23
**subject** 68:17
186:12
**submitted**
133:10 216:3
**subpoena** 15:11
50:11
**subsequent**
147:7 195:20
**subsequently**
23:23 147:9
**substance** 67:7
67:17 97:8
142:14 162:4
**substances**
95:25 182:1
**substantive**
197:14
**substantively**
66:14
**succeed** 60:5
**sudden** 132:16
**suffered** 4:21
140:13 154:9
159:25
**suffering** 159:17
**sufficient** 74:3
**suggest** 71:5
76:4 102:13
144:18 145:2
**suicidality**
174:15
**suicide** 137:15
142:9,9 143:8
144:3 163:18
164:11 165:2
189:25 190:5
191:5 200:15
**Suite** 2:16,21 3:3
3:8
**sum** 19:1
**summarize** 7:18
86:24 135:20

**summary** 8:1
18:10 90:10
**Sundays** 110:17
**supervise** 61:25
**supervising** 62:8
69:23
**supervision** 38:5
**supplemental**
124:8 125:22
**supplied** 194:25
**supported** 194:7
**sure** 17:20 18:1
22:5 27:3 31:2
45:8,25 55:18
57:7 59:5
60:16 64:1
66:19 68:4
71:1 72:4
75:12 77:8,14
78:11,13 82:18
85:4 87:3 88:8
88:24 89:3
101:18 102:9
103:7 108:13
108:16 113:8
115:11,16
131:11 136:22
154:14 179:11
180:15 182:25
183:8 184:11
185:4 187:3
188:20 203:15
207:5 208:24
210:20 213:17
213:21
**Surgeons** 33:13
**surprise** 202:18
**survived** 103:23
**survivors** 58:4
103:17
**suspect** 96:5
98:16 130:5
180:10
**sustaining** 117:1
**switched** 33:18
**sworn** 5:4,17
**symptom** 85:10
86:8

**symptoms**
113:18 125:8
179:15,23
180:10,13
181:19,23
182:22 183:18
185:3,7,10
**syndrome** 80:15
**system** 32:25
37:15 38:10,20
39:20 41:24
99:10 182:7,23
183:5,11,20
185:24 186:4
**systemic** 52:21
135:25

---

**T**

**T** 3:1 4:1,16
**T's** 202:21
**T-R-A-C-K-S**
150:23
**tables** 185:5
**take** 13:22,24
23:24 29:16
34:2,8 47:18
48:1 72:21
77:24 79:25
87:13,19 99:17
120:6 128:14
128:21 152:11
152:16,25
166:6 170:7
171:3 174:17
188:18 200:22
202:17 213:13
**taken** 2:3 48:5
98:14 99:11
100:4 128:24
155:17 170:14
202:23 217:10
**takes** 128:20
**talk** 39:14 48:10
122:9 129:17
132:23
**talked** 145:7
151:2,10
152:21 166:15

189:15 192:7
214:14
**talking** 49:18
124:1 139:13
151:24 161:18
165:6 170:3
191:16 209:2,4
209:5
**talks** 60:13,15
189:24
**tallied** 23:11
**taught** 60:11
66:14
**teach** 105:5
**teaching** 56:2
**technical** 44:10
105:20
**technically**
106:13
**tecum** 12:14,20
13:12 48:15
**tell** 8:19 15:20
23:5 26:13
29:10,18,23
69:1 79:8,25
90:8 108:11
110:2,23 114:7
118:24,25
127:3 129:13
129:25 134:19
135:16 151:1
169:9,13,17
172:6 210:23
211:5,18
214:19
**telling** 193:3
**ten** 86:10,11
170:12 185:11
**tenth** 170:2
**term** 34:23 39:1
39:13 44:10
138:13,19
142:22 211:24
**terminal** 90:2
**terminated**
45:17
**terms** 14:8 26:18
62:7 71:22

79:18 80:3
101:15 102:17
107:10 119:9
150:17 153:21
162:22 178:24
183:12 184:21
189:13
**test** 121:16
123:5 168:2
171:19,24
172:4 208:3,11
208:18 209:5
209:23
**testified** 5:5 6:17
26:20 30:23
57:4 64:11,14
96:13,25
161:13 192:1
207:20
**testify** 65:20
**testifying** 31:4
31:14
**testimony** 5:21
6:10,15 13:15
14:6 28:6,6
29:21,25 31:6
32:6 42:16
64:19 65:17
75:14 82:16
161:10 181:20
197:12
**testing** 207:20
209:11
**tests** 209:2
**text** 197:14
**textbook** 64:7
**textbooks** 64:4
**Thank** 100:3
128:23 151:17
202:5,6 206:12
206:13 215:5
215:17,24
**Thanks** 45:25
48:4 170:9
215:25
**theory** 86:9
**they'd** 96:21
125:19

Homer D. Venters, M.D.

January 09, 2025

Page 247

| | | | | |
|---|---|---|---|---|
| **thing** 14:7,17 | 95:20 96:9 | 201:5,12 202:2 | 119:24 120:18 | **today's** 150:10 |
| 27:5 80:23 | 97:5 99:16 | 202:4 203:15 | 124:1 128:17 | **told** 31:12 32:14 |
| 123:8 125:19 | 101:9,11 | 207:6 208:10 | 129:5 130:14 | 48:24 49:13 |
| 143:12 144:15 | 102:15 103:2 | 209:8,20 212:8 | 132:5,7 147:15 | 57:9,11,14,21 |
| 150:6,7 161:18 | 105:2,10,20 | 214:16,25 | 152:15,17 | 86:15 97:23 |
| 170:19 183:1 | 106:12 107:12 | 215:22 | 157:9 164:12 | 134:23 149:22 |
| 207:2 | 107:15 112:14 | **thinking** 187:15 | 170:2 174:20 | **Tomah** 109:25 |
| **things** 11:16 | 112:15 116:1 | **third** 94:14 | 181:11 195:9 | 110:4,9 |
| 12:14 38:22 | 117:25 118:4 | **thought** 46:13 | 195:13,22 | **tool** 12:7 85:9,10 |
| 84:19,20 86:10 | 119:9 121:12 | 49:12 50:13 | 196:1,2,22 | 85:12 86:8,8 |
| 86:11 90:13 | 121:17 122:4,6 | 107:17 | 201:6 202:17 | 105:19,23 |
| 92:22,24 93:2 | 125:24,25 | **thousands** 74:16 | 206:11,16 | 106:5,6,6,9,11 |
| 93:7 95:19 | 126:2 127:18 | **threatening** | 210:3 215:25 | 106:14,18 |
| 101:12 102:10 | 127:20 128:20 | 117:2 | **timeline** 14:1,13 | 108:3,5 183:17 |
| 102:11 114:15 | 130:19 132:4 | **three** 11:16 | 14:21,22 15:2 | **tools** 85:20,21 |
| 117:9 125:1 | 135:11,20 | 18:24 23:22 | 15:3 | 85:24,25 86:9 |
| 136:7 167:8,8 | 137:7 139:15 | 38:12 46:5 | **timeliness** 91:17 | 187:1,24 |
| 168:14 172:22 | 144:9 145:7,19 | 81:6 86:22 | **times** 40:2 44:12 | **top** 72:3,23 73:1 |
| 177:19 191:6 | 145:23 146:2 | 87:18 93:7 | 97:13 145:21 | 140:6 166:1,12 |
| 203:19 212:20 | 146:13,21 | 97:1 136:7 | 179:14,21 | **topic** 88:2 148:2 |
| **think** 5:18 6:17 | 147:11 150:6 | 147:12 151:11 | 180:17,21 | 148:7 203:13 |
| 7:22 8:9 9:25 | 150:12,12,16 | 158:13 162:10 | 181:16,18 | **topics** 45:23 |
| 10:4,10,11 | 150:19,21,22 | 164:12,25 | **timestamp** | 58:19 206:15 |
| 11:15 16:7 | 151:9,11 152:1 | 165:3,10 | 110:6 | **torture** 58:4 |
| 17:2 19:4,10 | 152:13 153:6,9 | 177:20 179:14 | **tipping** 132:13 | 103:17 |
| 19:13 22:8 | 153:14,18,19 | 179:21 180:17 | **title** 31:2 46:9 | **total** 19:2 157:3 |
| 27:12,16 28:8 | 154:5 156:3,7 | 181:17 196:25 | **titled** 78:21 79:1 | 157:3,5 |
| 28:11,25 29:6 | 156:9,15 157:2 | 197:5 205:23 | **titles** 64:4 78:2 | **totality** 66:10 |
| 31:24 32:2,11 | 157:3,18 158:5 | 212:14,15,20 | 79:6 | **tox** 186:2,7,9 |
| 32:12,12 33:2 | 158:6 163:20 | **threshold** 39:2 | **today** 8:3,8 | **track** 27:2,3 |
| 33:7,16 34:24 | 164:19,21 | **Thursday** 1:21 | 11:17 14:7 | 85:10 195:13 |
| 39:10 40:11,19 | 165:8 166:16 | **till** 152:17 | 15:15 25:16,20 | **tracks** 150:23 |
| 41:6,7,22 42:2 | 167:13 170:19 | **time** 7:24 9:7,8 | 28:22 34:17 | 151:7 |
| 42:20 43:11 | 171:4,10,12,21 | 23:18,25 31:14 | 36:4 63:25 | **trained** 61:3 |
| 46:23 50:4 | 176:8,20 | 36:9,13,15,25 | 66:7,11 69:4 | 62:12 66:5 |
| 51:6 53:17,18 | 177:17 178:8 | 37:8,9,20 40:3 | 117:18 121:9 | 103:6 200:14 |
| 54:21 56:11 | 179:3,20 180:5 | 40:6,9,12,23 | 127:24 129:13 | **training** 63:5 |
| 57:15,23 59:8 | 180:20,23 | 43:3,8 46:7,18 | 130:1 135:10 | 66:1,8,18,21 |
| 59:24 60:3,10 | 182:25 185:6 | 55:9 62:1 | 136:25 140:11 | 66:23,25 67:8 |
| 62:10 64:21 | 186:1,1,11,13 | 77:24 80:1 | 141:10 158:8 | 67:14,16,19,20 |
| 65:6,15 72:13 | 186:21,24 | 85:24 87:23 | 158:17 164:3 | 68:6 103:19,20 |
| 72:19,22 73:17 | 187:14,21 | 92:5 93:13,19 | 169:2 170:25 | 103:25 193:4 |
| 77:13 78:3,25 | 188:8,12 189:6 | 93:23 94:2,12 | 172:2,8 179:9 | 193:15 194:19 |
| 79:21 80:8,20 | 189:13,23 | 96:20 97:16 | 187:14 189:4,4 | 199:23 200:5,6 |
| 80:21 81:7 | 190:1 193:16 | 99:17 104:11 | 190:8 192:7 | 200:12 |
| 84:12 88:2,24 | 193:21 194:22 | 104:11,13 | 196:16 197:18 | **trains** 144:23 |
| 89:25 91:25 | 195:16 196:6 | 106:25 107:9 | 197:23 207:17 | **transcript** 4:12 |
| 92:14,22 95:1 | 196:10,25 | 116:14 119:2 | 213:16 214:12 | 4:12 5:1 7:8,16 |

57:16,17 146:7
155:9,14,15
203:5 216:6,7
**transcripts**
155:16 203:2
**transferring**
99:20
**transitioned**
33:20 201:1
**Travis** 3:6
**treat** 193:20
194:8
**treated** 89:14
148:18,22
149:1,12,16
**treating** 148:8
**treatise** 63:16,23
**treatment** 45:3
91:1,2,8
148:12,15,19
148:25 149:2,5
149:10,14
209:4
**tried** 178:10
**trigger** 125:2
139:20
**triggered** 118:22
141:3 183:3,16
**trouble** 122:19
182:11
**true** 5:11 18:12
20:17,18 24:10
24:11 32:9
33:15 34:4
37:9,10 39:5
44:3 54:19
59:14,15 60:12
62:9,10 63:18
70:8 75:2,11
76:6 79:23
81:3 84:24
91:12 92:6,7
97:17 106:18
107:11 111:15
113:7,8 116:15
116:16 120:23
127:22 133:6
138:23 139:7,8

140:5 141:9
142:6 143:12
146:11,16
174:4 195:8
**truth** 181:3
**truthful** 95:8
96:6
**try** 6:23 18:1
36:25 94:24
123:10 168:3
176:25 177:5
206:16 210:17
211:10
**trying** 5:21
22:14 27:18
51:9 67:4,5
71:10 79:15
100:7 102:13
102:14 188:24
209:3
**tuberculosis**
172:22 173:1
209:23
**turn** 134:10
152:2 160:7
202:3 211:3
**two** 22:9 28:11
28:14 29:19,24
29:24 37:1,6
39:7,14,22
40:17,20 42:7
43:5 68:5 79:5
80:7 85:9
87:16 90:14
95:18 97:1
111:16 137:14
145:23 146:21
147:12 150:12
153:15 161:1,1
161:23,25
163:13 165:1,1
175:4 176:7,22
177:20 179:21
180:16 189:23
190:1 191:6
195:7,16
201:12
**two-step** 171:10

**type** 19:15 21:2
28:18 32:15
84:6 85:12
87:6 96:7 97:3
116:7,8 178:13
183:8 184:7,7
**types** 35:25
47:15 85:7
144:17 168:10
190:18 192:4
**typical** 26:17
**typically** 54:1
**typo** 150:21
151:11

_____

**U**

**U** 3:1 4:16
**U.S** 21:16 35:11
47:17 146:13
**ultimately** 13:25
177:9
**unclear** 116:3
124:5
**uncommon**
70:12
**underbids**
144:19
**undergo** 147:20
**undergrad**
55:10
**underneath**
31:22
**understand** 6:22
7:3,14 9:9
15:24 35:2,6
39:13 47:25
49:15 51:6
53:24 59:4
67:4,6 69:25
70:4,7 71:10
82:20 87:25
88:8 91:16
92:9 93:10
96:2 100:11
101:14,17,21
108:18 109:18
126:19 129:3
131:6 179:11

180:15 188:24
191:18 194:17
195:24 197:9
205:16 206:16
**understanding**
5:13 9:21 10:6
18:8 25:13
31:18,20 52:18
67:21 75:5,10
76:15,19,23
83:2,6,10 84:6
84:12 87:4
91:24 109:4
111:15,18
115:19 117:12
120:3,17 124:3
126:17 139:16
153:22 156:18
158:5,10,13,15
160:25 163:16
163:19 164:24
197:12 210:4
213:24
**understood** 7:9
108:15 192:13
**undertaken**
51:17,22
**underwent**
147:6
**unheard** 168:5
208:10
**unique** 102:15
**United** 1:1 35:9
**units** 44:25
**university** 55:20
147:13,19
**unnecessary**
75:18
**unplug** 123:1,2
**update** 28:13
**updated** 27:22
28:8
**upload** 48:25
**uploaded** 49:3
**urgent** 38:16
44:15 115:22
132:6,18,20,20
207:15

**urine** 168:2
**USA** 1:15 3:5
202:11 205:20
206:1,2
**USB** 122:21
214:22
**use** 10:21 38:1
39:1 41:12
46:21,25 47:4
47:14 54:12
71:22 85:2,8
86:12 98:21
99:5 106:11
107:6 118:9,10
136:10 142:14
150:17 152:14
178:25 181:11
181:12 184:17
189:10,11
211:24
**useful** 166:18
**uses** 83:17
106:16 144:19
**usual** 48:22
**usually** 21:15
22:21 35:25
50:14 53:18
54:10 83:11
100:22 104:10
125:24 126:11
171:4,8 184:17
195:15

_____

**V**

**v** 31:1 32:2
**valid** 75:18
148:11
**variable** 19:16
96:9
**varied** 10:2
**various** 95:14
168:9 173:7
192:11 197:10
201:20
**VC** 42:22
**VCBC** 37:3
**vendor** 28:24
188:2,22

Homer D. Venters, M.D.

January 09, 2025

189:12
**Venters** 1:19 2:2
4:10,23 5:2,10
8:16 13:8,16
13:21 18:7
45:17 48:13
51:9 65:7
68:12 89:9
102:3 129:2
149:21 152:6
214:6,10
**Venters'** 17:15
17:19 100:7
**venued** 65:11
**verification** 4:6
117:6,25 118:6
**verified** 132:24
**Vernon** 37:3
42:22
**versus** 23:8
113:25 125:22
126:13 184:9
184:25
**videoconference**
1:23 2:9,18,23
3:5,10 217:11
**view** 60:23
192:17
**violence** 53:21
**vitae** 4:3 6:14
21:8 29:22
77:2 102:15
**vital** 141:7
170:22 171:25
**vitals** 121:8
132:11 167:14
171:3,14
**void** 142:4
**vs** 1:6,14

———
**W**
**waiver** 47:12,13
**waivers** 46:25
**walk** 22:14
203:18
**waned** 185:19
**want** 15:6 29:14
32:15 48:2,9

49:6,6,10,20
49:20,21 67:1
74:4 77:2 87:3
88:8 98:5 99:7
99:24 100:24
101:1,2,14
115:7 122:9
123:3,4 128:14
130:2 133:3
137:7 151:22
152:11,11,22
168:19 170:10
174:10,13
184:20 207:18
210:20 211:24
213:5 214:24
**wanted** 49:16
191:18
**wanting** 22:15
**warden** 69:22,23
**Warren** 3:11
112:1,3,19
**Washington**
1:20
**wasn't** 13:3
21:15 25:8
36:24 37:18
46:12 49:3
91:7 92:7 96:2
116:5 129:10
129:11 142:16
142:17 145:17
150:8 193:17
**way** 6:12 7:5
16:5 27:14
41:3 51:12
80:11 86:25
91:15 95:10
100:11,18,23
101:19 108:10
116:5 129:19
133:9,21
136:12 143:10
143:25 144:4
167:12 169:21
171:13,14
179:8 181:8
188:7,15,25

197:23,24
211:9,10,16
**ways** 44:22
188:23
**we'll** 29:16 77:8
88:23 94:13
138:2 174:11
**we're** 7:12 29:14
59:9 87:15,17
87:20 100:6
101:18,23,23
105:12,17
126:3 130:7
143:10 161:17
170:3 174:11
206:16
**we've** 57:7 77:18
101:11 145:7
152:10,17
155:3 166:15
215:2
**week** 4:20 37:1,6
45:10,14 97:2
97:13 127:4,9
129:24 130:13
130:20 179:14
179:22 180:17
180:21 181:16
181:18 185:11
185:16
**weight** 172:24
**Weil** 24:10
30:10
**went** 59:24
147:12 150:12
154:12 200:25
**weren't** 50:5
54:7 73:6
134:24
**Wesley** 3:6
**west** 41:6,16,18
41:20,23
200:21
**WESTERN** 1:2
**Wexford** 28:25
**whereof** 217:18
**wide** 51:21
**widespread**

131:9,11
208:17
**Wilson** 18:19
88:12 137:15
141:8,17 143:3
156:23 157:11
158:3,6,15
162:12 165:7
**Wilson's** 143:16
**Wisconsin** 1:2
2:8,21 3:9 36:3
70:1 127:15
136:19 205:22
205:24 217:1,5
217:20,22
**withdraw** 146:9
180:25
**withdrawal** 12:7
85:7 90:21
92:4,8,12,19
92:25 93:5,13
93:18,23 94:6
95:3,13,17,23
96:17,22,24
97:4,6,10,14
97:16,21,24
98:17 99:3,3,8
104:4,8,10,12
104:18,19,21
104:22 105:1,9
105:24 106:22
106:23 107:11
107:25 108:9
126:1,2,4
136:5 137:20
140:9 141:14
141:18,25
142:5,15,15
143:7,15,23
144:2 147:5
159:17,21
162:5 166:8,17
166:21,25
167:9,20 168:6
174:14,20
179:15,23
180:3,4,10,11
180:18,22

181:19,23
182:1,21 183:3
183:8,18,23,25
184:5,7,8,16
184:23 185:2,6
185:19 186:12
186:17,22,23
187:4,9,21,23
**withdrawals**
93:9 96:6
**withdrawing**
166:19
**withdrawn**
146:20,21
**witness** 1:20 2:2
5:3 11:14
12:11 19:10
29:5 31:7
32:11 54:21
55:5 58:10
60:23 61:8
66:18 68:1
70:10 71:20
73:15 74:11
76:8 84:18
85:19 87:11,22
88:15 94:9
96:9 97:19
99:25 100:3
106:20 107:15
112:24 115:3
120:25 122:3
133:2,8 137:4
142:11 149:7
158:25 161:7
163:16 168:22
169:2,15 175:4
177:15 178:8
179:19 181:22
186:21 193:9
194:22 202:6
206:25 207:5
208:22 210:13
211:9 212:7
213:9 215:5,21
215:24 217:18
**witness's** 13:14
**woman** 168:3

Homer D. Venters, M.D.

January 09, 2025

Page 250

209:11
**women** 121:20
207:20 208:3
208:15,18
209:22
**wondering**
102:16
**word** 13:24
18:10 66:25
107:6,7 150:23
150:24 195:17
**wordier** 205:24
**wording** 201:18
**words** 166:7
**work** 5:25 6:7,9
12:10 14:8,8
17:5,9 18:1
20:7,10,13
21:2 22:18
23:8 26:24,24
27:2,6,6 32:15
35:23 47:8,10
50:14 52:14
55:12 61:22
79:20 87:6
103:18,22,22
153:2,7 195:1
196:4 198:15
198:19 201:3
201:23 214:24
**worked** 22:8
24:3,8 26:15
30:6 31:22
40:9 46:7
51:14 56:24
108:15 188:1
199:11 200:24
**workflows**
136:10
**working** 20:21
21:13 22:8
23:22 24:6
37:18 47:20
62:5 100:19
109:15 199:14
201:1 207:3
**works** 56:23
58:3 128:17

**worried** 105:13
105:17 108:9
**worries** 172:25
**worry** 190:2
**wouldn't** 28:12
30:21 58:23
63:23 87:17
89:25 96:21
104:22 116:6
121:11 195:25
197:14
**wrap** 145:12
**write** 14:17
78:20 151:9
**writing** 198:3
217:8
**written** 22:25
24:19 75:5
79:17 80:4
124:6 132:9
187:9,13 188:5
189:1,10
**wrong** 191:7
**wrote** 30:25
110:20 128:1
134:13 140:2
169:9

**X**

**X** 3:14 4:1
**X-I-O-N-G**
138:5
**x-ray** 44:18,20
44:24
**x-rays** 44:23
**Xiong** 138:4
139:24 140:4
157:1,12 158:4
158:7 163:1,14
164:18,19
**Xiong's** 4:20
138:7

**Y**

**yeah** 38:25 50:2
78:12 81:24
99:25 101:1
121:13 123:18

129:8 130:3
137:14 152:13
155:8 157:23
186:21
**year** 23:6 24:4
26:6,15,15
34:7 36:15,17
38:12 46:8
53:17,20 54:22
56:17
**years** 21:19
23:21,22 27:1
27:8 32:3 47:9
54:4,16 55:14
65:14,14
147:12 148:16
158:23 159:6
159:13,18
160:1,5 164:1
164:7 200:22
207:21 209:12
**yesterday** 8:21
9:3
**yield** 85:25
**yielded** 117:17
**York** 1:20 19:21
21:24 22:7
36:19 38:8,15
38:23 39:6,19
47:18 52:7
53:9,13,25
55:19 58:5
60:1 61:17
103:4 147:13
200:7
**Young** 202:25

**Z**

**zero** 104:11
163:22 164:9
**Zoom** 1:19,23
2:1,9 8:22,25
151:20 152:3
217:6,10

**0**

**0-1** 79:6
**002850** 123:19

**002853** 4:9
133:13
**01-01** 80:8,20
81:8 82:22,24
83:6
**010071** 78:8

**1**

**1** 4:18
**1-2** 79:6
**1:25** 128:24
**1:35** 128:25
**10** 47:9 54:1
202:22
**10:22** 48:2,5
**10:30** 48:3
**10:33** 48:6
**100** 41:18 42:11
42:15 43:9,11
125:24 126:3
126:16
**101** 126:15
**109** 4:3 216:2
**11** 86:11
**110** 4:3
**111** 4:4,5
**112** 4:5
**113** 4:6
**114** 4:7
**115** 4:8
**116** 4:10,22
216:2
**118** 4:6
**12** 80:5 81:1,6
81:11,12,21
151:4 160:7,17
**12/21/19** 4:5
**12/22/19** 4:5
**12:08** 99:23
100:4
**12:30** 99:24
**12:33** 100:5
**123** 4:7
**13** 4:18 161:12
165:9,10,11,25
166:12
**13-01** 81:8
**130** 4:19

**133** 4:8
**14** 90:10 165:11
166:1,12
**14-day** 4:8
133:15
**140** 4:20
**149** 3:17
**15** 36:11 47:9
53:19 54:2,10
87:14 202:22
**152** 3:18
**16** 126:11
**17** 122:10,14
162:2
**17-01** 81:8
**179598** 1:24
**18** 187:7 188:6
**19** 182:14
**192** 130:7
**1989** 200:18
**1999** 200:20
201:5

**2**

**2** 4:19
**2:40** 170:14
**2:50** 170:13,15
**20** 5:19 6:2
30:19 53:19
54:10 126:11
126:13 152:14
152:15 162:16
182:4,10,13,14
182:15,17
**20-CV-1123** 1:6
**200** 130:15
**2000** 201:5
**2014** 56:11
186:25
**2015** 6:16 38:4
157:15 158:23
**2016** 4:8 123:17
126:24 141:7
**2017** 33:7 38:4
102:21
**2019** 69:6,9 98:2
98:20 154:21
**202** 3:19

Homer D. Venters, M.D.

January 09, 2025

Page 251

**2020** 143:17
157:15 158:23
**2023** 23:6
**2024** 7:23 14:10
23:12,16,17
26:7,15 27:21
28:9 29:7
196:7,9,11
**2025** 1:21 2:10
27:20 217:11
217:20
**2027** 217:23
**206** 3:20
**20th** 141:7
**21** 91:20 116:15
182:15
**210** 4:10
**214** 4:22
**215** 3:21
**219** 2:21
**21st** 91:12 98:10
109:19 110:7
111:21 115:24
118:19
**22** 126:13
**22-CV-723** 1:14
**2240** 110:7
**22nd** 109:11
111:21 119:23
119:24
**23** 72:25
**23rd** 154:2
182:8 183:22
**24** 45:10,15 72:3
72:22,23 73:1
134:10,12
163:5,5 174:11
179:16 180:19
181:20
**24/7** 44:3,9,16
45:7 70:2,16
**25** 10:22 11:23
16:18 138:4
217:23
**26** 7:22 10:22
11:2,23 14:10
15:11,22 16:2
16:18,18,22

18:14,23 19:3
51:2,3 88:4,9
101:7,8 149:25
150:19 156:5,8
163:6 211:11
211:12,18,25
212:2
**2750** 3:3
**27th** 217:20

**3**

**3** 2:16 4:20 95:2
**3:52** 1:22 2:11
216:1 217:12
**30** 3:3 5:19 6:2
30:16,20 41:7
41:17,22 42:11
123:16 126:24
152:15
**301** 3:8
**311** 2:16
**312-243-5900**
2:17
**34** 137:17
**36** 179:16
180:19 181:20

**4**

**4** 4:22 15:1,8,10
18:25 76:12
81:19 153:2,8
155:6 156:19
**4,000** 16:11 51:1
51:3
**4,228** 15:12,14
101:5
**40** 16:10,12 41:7
**400** 3:8
**414-276-2108**
2:23
**414-455-7676**
3:10
**4228** 156:1
**45** 87:12

**5**

**5** 3:16 109:1,20
117:4 118:1

**5/2025** 27:17
**50** 41:17,22
53:15 54:18
78:1
**50/50** 23:10
**52** 123:20
**53202** 2:21 3:9
**55101-1812** 3:3

**6**

**6** 109:10,21
**60** 125:24
**60607** 2:16
**651-291-1177**
3:4

**7**

**7** 120:1,7,8,13
**710** 2:21
**72** 78:8
**75** 23:16
**77** 4:3
**78** 4:4
**7th** 3:3

**8**

**8:09** 120:9
**8:52** 120:15,18
120:22
**80** 23:16 126:2
126:16
**800** 43:17

**9**

**9** 1:21
**9:02** 1:22 2:10
217:12
**911** 84:19
**94** 4:3 125:15
126:14
**95** 125:5,15
126:14,14
**9th** 2:9 217:11