Page 1

```
1              UNITED STATES DISTRICT COURT
2              WESTERN DISTRICT OF WISCONSIN
3                    * * * * *
4   GREGORY BOYER, as Administrator  )
    of the Estate of Christine Boyer,)
5   and on his own behalf,           )
                                     )
6              Plaintiff,            )
                                     )
7    vs.                            )  Lead Case No.:
                                     )   20-CV-1123
8   ADVANCED CORRECTIONAL HEALTHCARE,)
    INC., et al.,                    )
9                                    )
               Defendants.           )
10  _____  )
    GREGORY BOYER, as Administrator  )
11  of the Estate of Christine Boyer,)
    and on his own behalf,           )
12                                   )
               Plaintiff,            )
13                                   )
     vs.                            )  Case No.:
14                                   )  22-CV-723
    USA MEDICAL & PSYCHOLOGICAL      )
15  STAFFING, et al.,                )
                                     )
16             Defendants.           )
    _____  )
17
18  VIDEOCONFERENCE DEPOSITION OF JEFFREY KELLER, M.D.,
                   FACEP, FACCP
19
       Tuesday, March 19, 2024; 10:00 o'clock a.m.
20
       BE IT REMEMBERED that the videoconference
21  deposition of JEFFREY KELLER, M.D., FACEP, FACCP,
    was taken by the attorney for the defendants at the
22  office of T&T Reporting, 477 Shoup Avenue, Suite
    105, Idaho Falls, Idaho, before DiAnn Erdman Prock,
23  CSR SRL 963, CCR, Court Reporter and Notary Public,
    in and for the State of Idaho, in the above-entitled
24  matter.
25
```

Page 2

```
1              A P P E A R A N C E S
2   For the Plaintiff:
       LOEVY & LOEVY
3      BY:  STEPHEN H. WEIL
       311 North Aberdeen Street
4      3rd Floor
       Chicago, Illinois  60607
5      (312)  243-5900
       E-mail:  intake@loevy.com
6
    For the Defendants (Monroe County, Hendrickson,
7   Shasta Parker, and Danielle Warren):
       HANSEN REYNOLDS, LLC
8      BY:  ANDREW JONES
       301 N. Broadway
9      Suite 400
       Milwaukee, Wisconsin  53202
10     (414) 326-4952
       E-mail:  ajones@Hansenreynolds.com
11
    For the Defendant (USA Medical & Psychological
12  Staffing Inc, Norman Johnson, Travis Schamber,
    Gillian Bresnahan, Westley Harmston):
13     GERAGHTY O'LOUGHLIN & KENNEY, P.A.
       BY:  JOHN B. CASSERLY
14     Wells Fargo Place
       30 East Seventh Street
15     Suite 2750
       St. Paul, Minnesota 55101
16     (651) 291-6437
       E-mail:  jcasserly@goklawfirm.com
17
    For the Defendants (ACH, Lisa Pisney, Amber
18  Fennigkoh):
       LEIB KNOTT GAYNOR LLC
19     BY:  DOUGLAS KNOTT
          -and-
20     DANIEL A. KAFKA
       219 N. Milwaukee Street
21     Suite 710
       Milwaukee, Wisconsin  53202
22     (414) 276-2102
       E-mail:  dkafka@lkglaw.net
23
24
25
```

Page 3

```
1                  I N D E X
2                E X A M I N A T I O N
3   WITNESS                          PAGE
4   JEFFREY KELLER, M.D., FACEP, FACCP
5   Examination by Mr. Knott. . . . . . . . .    4
6   Examination by Mr. Jones. . . . . . . . .  136
7   Examination by Mr. Casserly . . . . . . .  231
8   Examination by Mr. Weil . . . . . . . . .  242
9   Further Examination by Mr. Jones. . . . .  253
10
11                 I N D E X
12               E X H I B I T S
13  NUMBER                           PAGE
14  Exhibit 88 Invoice . . . . . . . . . . . .   15
15  Exhibit 89 CQI Notes . . . . . . . . . . .   90
16  Exhibit 90 Report by Dr. Keller. . . . . .  230
17
18
19
20  ***EXHIBITS 88 & 90 RETAINED BY COUNSEL***
21
22
23
24
25
```

Page 4

```
1        (The deposition proceeded at 10:00 a.m.
2        as follows:)
3
4   WHEREUPON,
5        JEFFREY KELLER, M.D., FACEP, FACCP, having
6   been first duly sworn to tell the truth, the whole
7   truth, and nothing but the truth, testified as
8   follows:
9             * * * * * *
10            EXAMINATION
11  BY MR. KNOTT:
12      Q.   Good morning, sir.  Could you please
13  state your name for the record?
14      A.   Jeffrey Ernest Keller.
15      Q.   And you're a medical doctor?
16      A.   Yes.
17      Q.   And you're board certified in emergency
18  medicine; is that true?
19      A.   Yes.
20      Q.   And my understanding is that you have no
21  other board certifications, correct?
22      A.   Correct.
23      Q.   And, sir, my name is Doug Knott, and I
24  represent Advanced Correctional Health Care and
25  Nurse Practitioner Pisney and Nurse Fennigkoh.
```



Page 5

1          Do you understand that?

2     **A.   Yes.**

3     Q.     And do you understand that I'm here to

4  take your deposition and talk to you about the

5  opinions that you've rendered that bear on my

6  clients?

7     **A.   Yes.**

8     Q.   Do you understand that?

9     **A.   Yes.**

10    Q.     And I received a report dated

11 February 7, 2024, that I'm told contains your

12 opinions relevant to the matter; is that true?

13    **A.   Yes.**

14    Q.     Is that your complete and final

15 statement of opinions?

16    **A.   Yes.**

17    Q.     Can we rely on your written report as

18 introducing and explaining your opinions relevant to

19 the matter?

20    **A.   Yes.**

21    Q.     And we were given your curriculum vitae

22 as well, and I think that's dated June 20, 2023.

23         Are there any significant changes to

24 your curriculum vitae since June 2023?

25    **A.   The only significant change is that I am**

Page 6

1  **now the president of the American College of**

2  **Correctional Physicians rather than the president**

3  **elect.**

4     Q.   Thank you.

5         And when did your term start, and when

6  does your term end?

7     **A.   My term started the first week of**

8  **September, and it will end in two years from then.**

9     Q.   And how long have you been a member of

10 the Board of the American College of Correctional

11 Physicians?

12    **A.   I've been the member of the board for**

13 **approximately eight years.**

14    Q.   Are there any physicians employed by

15 Advance Correctional Health Care on the board of the

16 American College of Correctional Physicians?  Do you

17 know?  Do you know?

18    **A.   No.  There are not.**

19    Q.   Are you familiar with any physicians

20 that are employed by Advance Correctional Health

21 Care?

22    **A.   No.  I may be, but I can't think of any**

23 **off the top of my head.**

24    Q.   Right.  Fair enough.

25         So far we can hear each other, and we're

Page 7

1  communicating okay.  Just because of the technology

2  and because of the way I ask questions, sometimes I

3  trail off.  Please recognize that, and try to wait

4  for the end of my question.

5         I recognize that the way I ask questions

6  can be difficult because I change direction in the

7  middle, but let's try not to speak over one another.

8  And if we do, we'll try to make it clear for the

9  record.

10        Okay?

11    **A.   Okay.**

12    Q.   So you're located where at the moment,

13 sir?

14    **A.   I am in Idaho Falls, Idaho.**

15    Q.   And you're located in the court

16 reporter's office there, correct?

17    **A.   Yes.**

18    Q.     And the court reporter is located with

19 you, correct?

20    **A.   Yes.**

21    Q.   And there's no one else in the room?

22    **A.   No.**

23    Q.   And did you meet with anybody by Zoom,

24 in person, or telephone to prepare for the

25 deposition?

Page 8

1     **A.   I met with Mr. Weil yesterday.**

2     Q.   And how long did you meet with him?

3     **A.   About six hours.**

4     Q.   And was that by Zoom?

5     **A.   Yes.**

6     Q.   And have you had previous Zoom meetings

7  with Mr. Weil?

8     **A.   Relevant to this case, yes.**

9     Q.   How many?

10    **A.   I'm not sure.  Most of our**

11 **communications have been by phone, but we've had a**

12 **couple of Zoom meetings, so maybe two.**

13    Q.     And approximately how many phone calls

14 have you had with Mr. Weil about the case to date?

15    **A.   Five-ish.**

16    Q.     And, sir, you were asked to bring

17 certain things to the deposition, correct?

18    **A.   Yes.**

19    Q.     And were you shown a Notice of

20 Deposition that had a duces tecum or list of things

21 that we asked you to bring to the deposition?

22    **A.   Yes.**

23    Q.     And we asked you to bring your entire

24 file on which you formed the basis for your

25 opinions, correct?

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                       California Firm Registration #179

LEXITAS

Page 9

1    A.    Yes.

2    Q.    And you didn't do that, correct?

3    A.    I went over -- we went over that list of

4    documents to bring to the -- to the deposition, and

5    Mr. Weil said he would handle some things, and I

6    said I would -- and asked me to bring other things,

7    and I brought everything I thought I was assigned to

8    bring.

9    Q.    Obviously, you reviewed a lot of medical

10   records?

11   A.    Yes.

12   Q.    And you -- did you review those medical

13   records on PDF?

14   A.    Yes.

15   Q.    Did you print at any time medical

16   records that you reviewed in the case?

17   A.    No.  Not that I recall.

18   Q.    And so do you work off a laptop when you

19   review medical records for this type of work?

20   A.    I have a laptop and a desk top, and I

21   use both.

22   Q.    And you're capable of reviewing the

23   records that you reviewed in this case on the laptop

24   if necessary, right?

25   A.    Yes.

Page 10

1    Q.    Did you bring the laptop to the

2    deposition?

3    A.    No.

4    Q.    Were you told not to bring the laptop to

5    the deposition?

6    A.    No.  I was not told not to bring the

7    laptop.

8    Q.    So you know that we're going to be

9    talking about more than twenty inmates today.  If I

10   ask you questions about particular facts and

11   circumstances of those inmates, you would not be

12   able to reference the record and identify by page

13   number, or any other way, the source of the facts

14   that you're asserting, true?

15         MR. WEIL: Object to form.

16         THE WITNESS:  No.  I do not have the

17   original medical records with me.  I have only my

18   report.

19   Q.    (BY MR. KNOTT:) Is it fair to say, as

20   you sit here today, you don't have a sufficient

21   recollection of the facts on each and every case

22   such that you could testify to a reasonable degree

23   of medical probability about those facts?

24         MR. WEIL: Object to form.

25         THE WITNESS:  I have my report, and that

Page 11

1    is -- that is my -- that's my report after reviewing

2    the records.

3    Q.    (BY MR. KNOTT:)  And your report doesn't

4    cite to Bates numbers for the facts that you assert,

5    correct?

6    A.    Yes.

7    Q.    So if I ask you the source of a fact

8    that you've asserted in your report, you would not

9    be able to locate it in order to explain your

10   opinion, true?

11         MR. WEIL: Object to form.

12         THE WITNESS:  I would not be able to

13   show the source of particular statements, correct.

14         MR. KNOTT:  Well, I object to proceeding

15   with a deposition where the witness has not brought

16   the materials requested and is unable to have a

17   dialogue about the source of facts with respect to

18   these more than twenty witnesses that he's -- are

19   inmates that he's going to discuss, so --

20         MR. WEIL:  Doug, do you want to discuss

21   that right now, Doug, or -- the documents that were

22   provided to Dr. Keller are predominantly drop boxes

23   so on my Dropbox.  We can provide those -- the

24   documents we sent you have links to those drop

25   boxes, and so they're all accessible to you now, and

Page 12

1    that's the method by which we're providing the

2    documents you're requesting.

3          So if Dr. Keller has a screen, he could

4    look up any document that you're asking about in the

5    records we've provided.

6          MR. KELLER:  But he's not able to locate

7    a record if I ask him to in his file, which is the

8    purpose of the request, you know.

9          Dr. Bentley sat there with the report in

10   front of her and couldn't speak to the facts of the

11   case in order to give us sources, and I think that

12   was an unfair situation for us, and I think you've

13   put us in the same situation.

14         The Notice of Deposition doesn't ask

15   that he bring -- that you provide it to me.  It asks

16   that the witness have it with him at the deposition.

17         MR. WEIL:  And I think in the context of

18   an online deposition like that that's a little --

19   that's fairly unclear in the situation.  I mean, we

20   could go off the record and figure out if there's a

21   computer that we can send the link to Dr. Keller,

22   and he can just look at the pages there on the

23   Dropbox.

24         As you know, there are thousands of

25   pages of records.  I don't know if you expected



Jeffrey Keller, M.D., FACEP, FACCP                                    March 19, 2024

Page 13

1  Dr. Keller to print every single page out and come
2  down with boxes of documents or what --
3        MR. KNOTT:  I expected Dr. Keller to
4  have some facility in locating, in identifying the
5  factual basis for some of his statements, so --
6        MR. WEIL:  In an online situation like
7  that, that's a little unclear here.  I think -- I'll
8  let you finish, Doug.
9        MR. KNOTT:  Is there a laptop that the
10  doctor can locate, or should we adjourn this and
11  continue when he's got access to the records that
12  he's going to be citing.
13        THE COURT REPORTER:  Counsel, can we go
14  off the record?
15        (A brief recess was had.)
16        MR. KNOTT:  Let's go back on the record.
17        Well, we took a break while the court
18  reporter located a laptop, and we have been working
19  through the process of Dr. Keller getting access to
20  the Dropbox links with the medical records relevant
21  to the case.
22     Q.    (BY MR. KNOTT:)  By the way, Doctor,
23  what time is it there?
24     A.    It is 10:34 a.m.
25     Q.    And my understanding is that your

Page 14

1  deposition was noticed for 10:00 a.m. Central.
2        Did you receive a notice that said it
3  was scheduled for --
4     A.    Well, I -- whether I made a mistake or
5  not, I thought it was scheduled for 10:00 a.m. my
6  time.
7     Q.    Gotcha.
8        All right.  I just want to make sure
9  that we note that in case there's an issue down the
10  road.
11        So, Doctor, my understanding from our
12  brief conversation before the deposition started was
13  that you brought your report into the room, right?
14     A.    Yes.
15     Q.    And you brought Dr. Bentley's report?
16     A.    Yes.
17     Q.    And can you tell me the date of
18  Dr. Bentley's report?
19     A.    Dr. Bentley's report is dated
20  February 2nd, 2024.
21     Q.    And you brought with you to the room an
22  invoice for your services?
23     A.    Yes.
24     Q.    Is that the only invoice you've issued
25  to date?

Page 15

1     A.    Yes.
2        MR. KNOTT:  And we'll have that marked.
3  I think we're up to Exhibit 88.
4        (Exhibit 88 was marked for
5        identification.)
6     Q.    (BY MR. KNOTT:)  Can you tell me when
7  you first started work on the matter, Doctor?
8     A.    About a year ago.
9     Q.    Does it have a date on your invoice?
10     A.    The first date on the invoice is
11  2-11-23.
12     Q.    And can you tell me the amount of your
13  charges so far?
14     A.    Nineteen thousand, two hundred and fifty
15  dollars.
16     Q.    And what is the date of your invoice?
17     A.    February 12th, 2024.
18     Q.    And has the invoice that you've been
19  issued been paid?
20     A.    No.
21     Q.    Do you have some agreement with
22  plaintiff's counsel on the timing of payment?
23     A.    I received an e-mail a couple of days
24  ago saying that they -- it had been approved for
25  payment, but that I had -- they didn't have my W-9,

Page 16

1  so I sent them a W-9.
2     Q.    And this is a very recent
3  communication?
4     A.    Yes.
5     Q.    All right.  Any other documents you
6  brought in the room?
7     A.    I have a list of my depositions for the
8  last five years.
9     Q.    And that consists of six cases; is that
10  right?
11     A.    Yes.
12     Q.    How many depositions have you given in
13  your lifetime, sir?
14     A.    Maybe eight.  A couple more in addition
15  to these.
16     Q.    All right.  Do you continue to practice
17  medicine, sir?
18     A.    I do clinical shifts in local jails
19  occasionally, maybe once every three to six months
20  when I'm asked to do so by the -- to help out.
21     Q.    And what jail is that?
22     A.    When I do clinical shifts they are at
23  the Bonneville County Jail in Idaho Falls, the
24  Jefferson County Jail, and the Madison County
25  Jail.



1    Q.    And when you are working there, are you
2    working for a private company, or are you working
3    for the government entities?
4    **A.    When I do those shifts, I'm working for**
5    **Ivy Medical.**
6    Q.    And do you have an ownership interest in
7    Ivy Medical?
8    **A.    No.**
9    Q.    And is that Ivy like the plant?
10   **A.    Yes.**
11   Q.    You're a fellow in the American College
12   of Correctional Physicians --
13   **A.    Yes.**
14   Q.    -- correct?
15   **A.    Yes.**
16   Q.    And what does it require to become a
17   fellow in the American College of Correctional
18   Physicians?
19   **A.    One has to be a member of the college**
20   **for four years, have been active participant in**
21   **college activities such as committees, board,**
22   **education, and have board certification in some**
23   **other specialty.**
24   Q.    Do you know how many fellows there are
25   in the American College of Correctional

1    Physicians?
2    **A.    Not exactly.  I believe there are about**
3    **twenty-five or thirty.**
4    Q.    And does it require actual experience in
5    the practice of correctional medicine?
6    **A.    Yes.  I didn't mention that, but it**
7    **does.**
8    Q.    How much experience?
9    **A.    Primary -- a lot.  I would have to look**
10   **at the exact -- I think it's termed significant in**
11   **the fellowship criteria.**
12   Q.    Do you agree that the practice of
13   correctional medicine presents unique challenges in
14   terms of the patient population when considered in
15   comparison to community practice?
16   **A.    Yes.**
17   Q.    And do you agree that the practice of
18   correctional medicine presents unique challenges in
19   terms of the patient population, in comparison to
20   the outside community practice in terms of the
21   population's mental health concerns?
22          MR. WEIL:  Object to form.
23          THE COURT REPORTER:  Excuse me, what was
24   that?
25          MR. WEIL:  Objection to form.

1          Can you hear me okay?
2          THE COURT REPORTER:  Not really.  You're
3    quiet.
4          MR. WEIL:  Okay.
5          THE COURT REPORTER:  Still quiet.
6          MR. WEIL:  How about this?
7          THE COURT REPORTER:  Still quiet.
8          MR. WEIL:  I'll make sure I speak up.
9          THE COURT REPORTER:  Thank you.
10         **THE WITNESS:  Would you repeat the**
11   **question, please.**
12   Q.    (BY MR. KNOTT:)  It's all right.  I'm
13   going to move on.
14         Can you tell me how you spend your
15   professional time currently?
16   **A.    Most of the time I spend currently is**
17   **working as the president of the American College of**
18   **Correctional Physicians.  I also do some expert**
19   **legal consulting on a few cases, this being one of**
20   **them.**
21   Q.    So approximately how many hours a week
22   are you devoting to professional activities?
23   **A.    Somewhere in the neighborhood of ten to**
24   **twenty.**
25   Q.    And how long has it been since you had a

1    regular scheduled clinical practice?
2    **A.    Two-and-a-half years.**
3    Q.    And how old are you, sir?
4    **A.    I am sixty-eight.**
5    Q.    And of the ten to twenty hours that you
6    spend currently in professional activities, what
7    percentage of that is devoted to legal -- review of
8    legal cases like this one?
9          MR. WEIL:  Object to form.
10         Go ahead.
11         **THE WITNESS:  Half, approximately.**
12   Q.    (BY MR. KNOTT:)  And is the other half
13   devoted to your work with the American College of
14   Correctional Physicians?
15   **A.    Yes.**
16   Q.    Do you do business either of those
17   activities through a separate entity, business
18   entity, of your own?
19   **A.    Yes.  I have a business entity called**
20   **TFS Correctional Consultants.**
21   Q.    And what does that TFS stand for?
22   **A.    Two Flying Swans.**
23   Q.    And so the work you're doing is billed
24   through TFS Corporation; is that correct?
25   **A.    Yes.**

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Page 21

1    Q.   And is the activity of TFS Corporation
2    exclusively medical/legal consulting?
3        A.   Yes.
4        Q.   And other than medical/legal consulting
5    and the shifts that you handle on an irregular basis
6    for Ivy, do you have any other sources of
7    professional income currently?
8        A.   I published a book, and I get a little
9    bit of money from sales of the book.
10       Q.   And how many copies of your book have
11   you sold?
12       A.   Approximately one thousand.
13       Q.   It's published directly to Kindle; is
14   that correct?
15       A.   Well, it's directly published both to
16   Kindle and hard -- hard paperback copy.
17       Q.   Okay.  So the publisher is Amazon Kindle
18   direct publishing, and it is available in a hard
19   back?
20       A.   Well, paperback, yes.
21       Q.   I'm sorry.  Paperback?
22       A.   Yes.
23       Q.   Yes?
24       A.   Yes.
25       Q.   You're -- what is the activity you

Page 22

1    perform for the American Medical Association Guides
2    Panel?  What is that?
3        A.   Well, I've retired from that.  That's
4    another change in my resume, I guess.  But the
5    guides panel published the AMA Disability Guides,
6    Guides to Disability, and the panel met monthly to
7    discuss changes in the guides, and I was --
8        Q.   Guides being some kind of publication?
9        A.   Pardon?
10       Q.   Guides being some type of publication?
11       A.   Yes.  There are several publications;
12   but, basically, they have to do with guides to
13   disability determinations, how to do a disability
14   determination.
15       Q.   Was that, at some point in your career,
16   a significant part of your professional
17   activities?
18       A.   No.
19       Q.   The -- your CV lists the Editorial Board
20   of Med Page today.
21            Is that still active?
22       A.   Yes.  I believe I'm still on the
23   editorial board, but it requires very little work.
24       Q.   You're not sure?
25       A.   No.  I'm on the editorial board.  It

Page 23

1    just requires very little work.
2        Q.   And is Med Page today devoted
3    exclusively to correctional health care?
4        A.   No.
5        Q.   Is your participation focus on
6    correctional health care?
7        A.   Yes.
8        Q.   You have a personal blog at
9    jailmedicine.com; is that correct?
10       A.   I had, in the past, that blog.  It no
11   longer exists.
12       Q.   It's no longer active?
13       A.   Correct.
14       Q.   And that when I tried to visit that
15   domain, it was not available.  Is that -- is that --
16   was your domain taken down?
17       A.   Yes.
18       Q.   And you published two hundred forty
19   articles on jailmedicine.com?
20       A.   Approximately, yes.
21       Q.   Is there a reason why you no longer hold
22   the domain?
23       A.   When I retired two and a half years ago,
24   I decided to retire from writing the blog.  So I
25   gave the blog to the -- and the domain to the

Page 24

1    American College of Correctional Physicians.  They
2    published maybe three or four articles, and then
3    they basically let it die, and didn't pay the bills.
4    And I considered trying to resurrect it, but I
5    decided not to.
6        Q.   Do you have access to the two hundred
7    and forty articles that you published?
8        A.   No.  I have access to about one hundred
9    of them.
10       Q.   Do you know if you've ever written a
11   blog post or article or a book chapter or any other
12   form of writing on diagnosis of chest pain in a
13   correctional setting?
14       A.   Yes.
15       Q.   And where did you address that?
16       A.   I've addressed that in lectures, and I
17   don't know if I've written a blog post or an article
18   in a book about it.  I can't remember off the top of
19   my head whether I have.
20       Q.   What lectures come to mind that you
21   addressed diagnosis of chest pain in a correctional
22   setting?
23       A.   I believe I gave a lecture at the
24   National Commission on Correctional Health Care.  I
25   don't know, ten, fifteen, years ago.

Jeffrey Keller, M.D., FACEP, FACCP                                    March 19, 2024

Page 25

1    Q.    Do you believe the standard of care for
2  dealing with chest pain in a correctional sitting
3  has changed over the last ten to fifteen years?
4    **A.    No, I don't.**
5    Q.    You were the CEO of an entity called
6  Badger Correctional Medicine, 1997 to 2021.
7        What was the nature of that business?
8    **A.    It was a company that provided medical**
9  **care to incarcerated people in jails and juvenile**
10 **centers in Idaho.**
11   Q.    I'm sorry, I missed the end of that, and
12 that's my own fault because I was shuffling the
13 paper.
14   **A.    It was a company that provided medical**
15 **care to jails and juvenile centers in Idaho.**
16   Q.    And at its peak, can you tell me how
17 many employees Badger Correctional Medicine had?
18   **A.    At its peak, maybe fifty.**
19   Q.    And did you employ nurses?
20   **A.    Yes.**
21   Q.    R.N.s?
22   **A.    Yes.**
23   Q.    LPNs?
24   **A.    Yes.**
25   Q.    Nurse practitioners?

Page 26

1    **A.    Yes.**
2    Q.    Physician assistants?
3    **A.    Yes.**
4    Q.    Physicians other than yourself?
5    **A.    No.**
6    Q.    And at its peak, how many contracts did
7  Badger Correctional Medicine hold at a single
8  time?
9    **A.    Seventeen.**
10   Q.    And that when was that, sir, if you
11 remember?
12   **A.    Approximately fifteen years ago.**
13   Q.    So at that time were you the only
14 physician covering seventeen facilities?
15   **A.    Yes.**
16   Q.    All right.  And were there weeks when
17 you as a physician did not visit those facilities,
18 each of those facilities?
19   **A.    Yes.**
20   Q.    Can you tell me the largest number of
21 beds at a facility where Badger Correctional
22 provided the services?
23   **A.    Five hundred.**
24   Q.    And what county was that, sir?
25   **A.    Bonneville County.**

Page 27

1    Q.    And can you tell me how many beds were
2  in the smallest facility that you held the contract
3  for?
4    **A.    Ten.**
5    Q.    And what county was that, sir?
6    **A.    Fremont County.**
7    Q.    Can you tell me, as best you are
8  able, the counties where Badger Correctional
9  Medicine held a contract to provide health care
10 services in the jail?
11   **A.    Okay. So not juvenile centers, I'm**
12 **hearing you say.**
13   Q.    True.
14   **A.    Okay.  Jails.  Fremont County, Madison**
15 **County, Jefferson County, Bonneville County, Bingham**
16 **County, Jerome County, Elmore County, Owyhee County,**
17 **Gem County, Letah County, and Nez Perce County.**
18   Q.    And did you contract with other entities
19 in order to provide services in jails on behalf of
20 Badger Correctional?
21   **A.    I don't understand the question.**
22   Q.    Did you employ another service to help
23 you with, say, human resources or billing?
24   **A.    No.**
25   Q.    Did you perform the orientations of new

Page 28

1  employees yourself, sir?
2    **A.    I myself did the orientation for all of**
3  **the practitioners and mental health professionals.**
4    Q.    And did you have an agenda for what you
5  would cover?
6    **A.    Well, a check sheet, but most of it was**
7  **them observing me in a clinic, and then me observing**
8  **them in a clinic making sure that they were familiar**
9  **with the policies and procedures and that they knew**
10 **all the -- everything that they were supposed to do**
11 **as part of their job.**
12   Q.    Did you provide them any training on
13 aspects of the jail population that might be unique
14 to the jail practice in medicine as opposed to the
15 practice of medicine outside?
16   **A.    Yes.**
17   Q.    And what did you provide them in that
18 regard?
19   **A.    One, jail patient -- you cannot fire**
20 **jail patients, and jail patients can't fire you.**
21   **So I taught them techniques of what I**
22 **call verbal Jujitsu which is how to defuse**
23 **confrontations and maintain a physician/patient**
24 **relationship.**
25   **Two, I taught them that you have to be**



Page 29

1  fair.  Outside medicine is not fair, but in a jail
2  you have to be fair.
3       Three, I taught them that patients in a
4  jail were -- often had not had medical care before
5  they came to jail, and so especially at the
6  beginning of their incarceration, they needed --
7  many of them needed extra attention.
8       I taught them that -- that they needed
9  to be careful of the disease processes that were
10  most likely to result in patient deaths such as
11  suicide, withdrawal, diabetic problems, chest pain.
12       I taught them that -- I taught them how
13  to -- what was expected of them when they got calls
14  from nurses, and how and when to call me.
15       I taught them how to interact with
16  security staff deputies.
17       That's probably not all of it.
18       Q.   When you say you taught them how to
19  interact with you, it's an acceptable process in
20  correctional medicine for a nurse to do an interview
21  and assessment of a patient and for the doctor to
22  give orders based on the information relayed by the
23  nurse; is that true?
24       MR. WEIL:  Object to form.
25       Go ahead and answer.

Page 30

1       THE WITNESS:  Yes.  That is true, just
2  as it is in outside medicine.
3       Q.   (BY MR. KNOTT:)  And are you aware of
4  the facilities other than Monroe County jail where
5  the correctional officers are engaged in the process
6  of gathering information from the inmate in an
7  organized way so that they can report it to the
8  on-call physician in circumstances there's not a
9  nurse or a doctor in the facility?
10       A.   No.  That was something new to me that I
11  had not encountered before.
12       Q.   Did you work for Badger Correctional --
13  did you work at facilities that did not staff
14  nursing 24/7?
15       A.   Yes.
16       Q.   And they didn't have practitioners
17  available 24/7?
18       A.   They always had practitioners available
19  24/7 on an on-call basis.  They had nurses and
20  practitioners that were available to all facilities
21  24/7 on a call-back basis.
22       Q.   So in a facility in which there's not a
23  nurse available, say in the evening hours, and a
24  patient reports a new symptom, say, a severe
25  dizziness, how is the doctor alerted in your

Page 31

1  practice?
2       A.   Would you rephrase that?  I think I hear
3  you asking how would that be handled, and would that
4  have been handled in one of my jails.
5       Is that correct?
6       Q.   That's correct.
7       What I'm trying to get at is if the
8  inmate reports a symptom and there's not a nurse
9  available, how is that new event relayed to the
10  physician?
11       A.   Well, the first call usually would be
12  from the security staff to the nurse who would then
13  go to the jail and do a patient assessment.  And
14  then the nurse would always, there was no option not
15  to, would always call the practitioner on call, and
16  then a decision would be made.
17       A patient could be sent to the ER at any
18  time before the nurse came or when the nurse got
19  there, but once the nurse did the assessment and
20  called the practitioner, a decision would be made
21  whether to send the patient to the ER.
22       Or the practitioner goes into the jail
23  and sees the patient personally, or this can wait
24  until reassessment tomorrow, a secondary assessment
25  tomorrow by the nurse, and the practitioner would

Page 32

1  always see that patient, always, always, but at the
2  latest would be at the next scheduled clinic.
3       Q.   So in your practice, there's never
4  direct communication between the security staff and
5  you the physician?
6       A.   They could call me, but would not give
7  them orders over the phone.  I would just say:  You
8  have a choice to make whether to send the patient to
9  the ER or to wait for the nurse to get there, which
10  is usually about twenty minutes, and it's a call you
11  have to make.
12       I mean, that's the training I would give
13  them.  I gave officers training, too.
14       Q.   And the training was that they should
15  contact the nurse first with any report of new
16  symptoms?
17       A.   They could call me -- they could call
18  the practitioner as well, and they could call me.
19       And I did receive calls from jail
20  security staff over the years, and most of the time
21  if they were so concerned about a patient that they
22  called -- that they bypassed the nurse, bypassed the
23  petitioner, and called me directly, I would say send
24  them to an ER.
25       Q.   But the practice and protocol that you



Page 33

1  trained on, was that the security staff would
2  contact the nurse, and the nurse would physically
3  report to the jail and do an assessment before any
4  decisions were made?
5      **A.   In most cases, yes.**
6      Q.   And you referenced you trained your
7  staff on the art of verbal Jujitsu in order to
8  interact with inmates.
9          Did I get that correct?
10     **A.   Well, it's not just inmates.  This is a**
11  **practice that actually I learned in an emergency**
12  **department.  If a patient, as some patients do in**
13  **any practice, gets aggressive, then you need to know**
14  **how to deal with that in an effective way.  An**
15  **ineffective way is to yell back; for example, don't**
16  **do that.  So, yes, I taught that.**
17     Q.   And your initial response said that you
18  taught them that it's a no-fire situation.  They
19  can't fire you and you can't fire them.
20          And then I think you said so we teach
21  them the art of verbal Jujitsu.
22          Did I have that correct?
23     **A.   Yes.**
24     Q.   And does the manner in which you are
25  required to interact with a patient vary for an

Page 34

1  inmate in a jail versus a patient in the ER?
2      **A.   I didn't get that question.  Would you**
3  **restate it, please.**
4      Q.   Actually, could DiAnn read it back?
5          THE COURT REPORTER:  Yes.
6          Question, And does the manner in which
7  you are required to interact with a patient vary for
8  an inmate in a jail versus a patient in the ER?
9          **THE WITNESS:  No.  The proper way to**
10  **interact with any patient in any practice setting**
11  **should be about the same.**
12     Q.   (BY MR. KNOTT:)  And you said that you
13  trained your employees that they need to be fair in
14  that, I think you said, health care outside is not
15  fair but it needs to be fair inside?
16     **A.   Yes.**
17     Q.   Did I understand that correctly?
18     **A.   Yes.**
19     Q.   And what did you mean by that, sir?
20     **A.   Well, as to give one example, some**
21  **patients on the outside don't have insurance, and**
22  **they have lesser access to medical care than people**
23  **who are well insured.**
24          **In a jail, everybody has the same access**
25  **to medical care, and you need to do the same thing**

Page 35

1  **for all patients in similar situations.**
2      Q.   Do you agree with me that a proper
3  orientation for health staff to work in a
4  correctional facility, should, among other things,
5  focus on the similarities and differences between
6  providing health care in the community and in a
7  correctional setting?
8          MR. WEIL:  Objection.
9          Go ahead and answer.
10         **THE WITNESS:  There are differences**
11  **practicing medicine in a correctional facility**
12  **versus the outside, important differences, and those**
13  **do need to be addressed in orientation.**
14     Q.   (BY MR. KNOTT:)  Did you say the
15  important differences need to be addressed in
16  orientation?
17     **A.   I said there are differences.  There are**
18  **important differences that do need to be addressed**
19  **in orientation.**
20     Q.   So do you agree with me that it is
21  appropriate for an orientation for health care staff
22  to focus on the similarities and differences between
23  providing health care in the community and in a
24  correctional setting?
25         MR. WEIL:  Object to form.

Page 36

1          Go ahead and answer.
2      **THE WITNESS:  Well, that's a general**
3  **question, but yes.  Practitioners in a jail need to**
4  **know what the differences are and why they're**
5  **important.**
6      Q.   (BY MR. KNOTT:)  And one of the things
7  you train on are the disease processes that might be
8  likely to lead to death in a jail, correct?
9      **A.   Yes.**
10     Q.   And did you review any training by ACH
11  for its employees on that topic?
12     **A.   Yes.**
13     Q.   And was that training on that topic
14  appropriate?
15     **A.   So training for the -- that was provided**
16  **about chest pain, and other topics that are reviewed**
17  **was, for the most part, appropriate.**
18     Q.   So you've included in your report a
19  single slide from a presentation called Introduction
20  to Correctional Health Care, just so we can exclude
21  discussion of the other training, is it fair to say
22  you have no criticism of the training provided other
23  than that particular topic?
24     **A.   Yes.**
25     Q.   And your concern about that topic is it



Jeffrey Keller, M.D., FACEP, FACCP                                    March 19, 2024

Page 37

1  creates -- well, strike -- strike that.
2         Your concern about that topic is based
3  on the four or five slides that Susan Bentley
4  included in her report?
5         MR. WEIL:  Object to the form.
6         THE WITNESS:  Well, it's based on my own
7  review of that.  I reviewed the slides, and I've
8  listened to the lecture two or three times.
9  And I -- as I said in my report, I think that the
10  training is wrong, and that that will lead people,
11  whether subtly or overtly, to practice bad
12  medicine.
13     Q.   (BY MR. KNOTT:)  And is there a
14  published standard on the training of that topic
15  that you can cite to by which you judged that
16  training that you reviewed?
17         MR. WEIL:  Object to form.
18         Go ahead and answer.
19         THE WITNESS:  So I'm not aware of any
20  published training materials.  My opinions about
21  that are based on my own experience.  Yes, based on
22  my own experience.
23         I'm not aware of any published --
24  broadly published training materials for
25  correctional medicine.

Page 38

1     Q.   (BY MR. KNOTT:)  Any other source in
2  medical literature and correctional literature, in
3  presentations that you've seen, or books that you
4  can cite as the source of the standard by which you
5  judge that introduction to correctional health care
6  training?
7     A.   Yes.  Not that I can cite specifically,
8  but yes.  I've been to many lectures, and seminars,
9  where this topic has been discussed, and those --
10  those also figured into my opinion about this
11  training.
12     Q.   Those topics have been discussed meaning
13  what?
14     A.   Meaning I've heard other people lecture
15  about this topic about whether incarcerated people
16  are different in how they frame complaints than
17  people on the outside, and should they be approached
18  differently by medical people as far as judging the
19  veracity of their complaints.  I have heard lectures
20  about that.
21     Q.   And when did you hear lectures about
22  that?
23     A.   I don't know.  I've been going to
24  lectures at the National Commission on Correctional
25  Health Care, the -- my organization, the ACCP, the

Page 39

1  American Correctional Association, Idaho Sheriffs
2  Association, other -- many places.
3         This topic has been discussed, I can't
4  give you an exact time and date, but it's been
5  discussed.  It's a topic of discussion.
6     Q.   And so when you say that training is
7  wrong, you're saying it's not consistent with your
8  experience.
9         Is that fair?
10     A.   It is not.
11         MR. WEIL:  Object to form.
12         Go ahead and answer.
13         THE WITNESS:  Well, amongst other
14  things, I think it is not consistent with my
15  experience and the experience of other people with
16  whom I've -- that I've listed to and discussed the
17  topic with.
18     Q.   (BY MR. KNOTT:)  Have you yourself
19  presented orientation for health care staff for any
20  entities other than Badger Correctional?
21     A.   I taught Introduction to Correctional
22  Medicine at the Idaho POST Academy, the Police
23  Officer Standards Training, for all new hires for
24  detention for jail positions, for a couple of years.
25  Of course, that's not correctional staff.

Page 40

1         I've taught some training for my other
2  job, which was when I was the chief medical officer
3  for Centurion.  I did some training there.
4         I did some -- I have done some training
5  for other entities that did include -- at
6  conferences that did include correctional staff.
7  I've never --
8     Q.   Have you --
9     A.   I'm sorry.
10     Q.   I'm sorry, did I interrupt you?
11     A.   No.  I think I'm done.
12     Q.   When you taught Introduction to
13  Correctional Health Care for Badger Correctional,
14  did you use a recorded video?
15     A.   No.
16     Q.   Did you reference any written materials
17  as your source?
18     A.   No, other than that they needed to be
19  familiar with the policies and the -- the written
20  policies and procedures of Badger, and also the --
21  they needed to be -- understand the guidelines of
22  the National Commission on Correctional Health
23  Care.
24     Q.   If an entity in correctional health care
25  complies with National Commission on Correctional

Page 41

1  Health Care standards, you agree they are generally
2  within the standard of care?
3          MR. WEIL:  Object to form.
4          You can answer.
5          THE WITNESS:  I think it is a good thing
6  to comply with the National Commission on Health
7  Care Standards, but just being accredited by the
8  National Commission of Correctional Health Care does
9  not mean that every single bit of health care that
10  is done within that facility meets the standard of
11  care.
12      Q.   (BY MR. KNOTT:)  Did you reference the
13  National Committee on Correctional Health Care's
14  standard on orientation of health care staff when
15  assessing the adequacy of the training by Advance
16  Correctional?
17      A.   No.
18      Q.   Do you believe generally that the
19  privatization of health care in jails leads to
20  diminished quality of care?
21      A.   No.  Not necessarily.
22      Q.   Did you, in marketing yourself to
23  counties, suggest to the counties that you could
24  provide better services and save them money?
25      A.   Well, my -- I never -- none of the

Page 42

1  contracts that I got, the seventeen contracts that I
2  got, were a result of a response to an RFP.  They
3  were all -- they were all direct, you know, can you
4  provide medical care to our county and how much
5  would it cost, and that sort of thing.
6          But I didn't -- I didn't respond to
7  RFPs, so I didn't actually market in the way that
8  you're saying.
9      Q.   Okay.  So taking the marketing out of
10  it, were you able to provide adequate health care
11  while saving the government entity money?
12      A.   Yes.  I did save some of -- some of my
13  contracts quite a bit of money.
14      Q.   And do you believe you did that by
15  cutting and diminishing the quality of care?
16      A.   No.  I did that by increasing the
17  quality of care.
18      Q.   While cutting the cost?
19          MR. WEIL:  Object to form.
20          THE WITNESS:  Well, good medicine is
21  cost effective.  Bad medicine is expensive, so by
22  eliminating bad medicine, you save money overall.
23      Q.   (BY MR. KNOTT:)  So you admit that
24  private health care entities can save a government
25  entity money while at the same time improving the

Page 43

1  quality of care.  That's possible.
2      A.   That is possible.
3          MR. WEIL:  Object to form.
4      Q.   (BY MR. KNOTT:)  When you took a
5  contract for a county correctional facility for
6  Badger Correctional, did the county specify the
7  staffing, or did you?
8      A.   Both.  I recommended staffing and
9  county's -- county commissioners and sheriffs
10  sometimes said no, we don't think it should be
11  staffed that much.  So sometimes there was a
12  compromise on staffing.
13      Q.   Were there times when the commissioners
14  and administrators did not want to adopt your
15  recommendation for staffing?
16      A.   Yes.
17      Q.   And did you proceed forward with some
18  sort of compromise that allowed you to work at that
19  facility?
20      A.   Yes.
21      Q.   Badger Correctional remained in business
22  in 2019 through 2021?
23      A.   Yes.  I believe we ceased operations in
24  2021, so from 2019 to 2021, yes.
25      Q.   Can you tell me how many contracts you

Page 44

1  had for county jails in 2019?
2      A.   One, two, three, four, five -- I think
3  five.
4      Q.   You counted up to five there, Doctor?
5      A.   I believe five.
6      Q.   Okay.  And did that increase or decrease
7  in 2020?
8      A.   I'm not sure what you're asking.
9      Q.   Did the number of contracts you had for
10  county jails increase or decrease in 2020?
11      A.   Well, the number -- I didn't add any
12  contracts for about the last ten years maybe, so
13  they all decreased.  So it was always a decrease.
14  Why there was a decrease that happened in 2020, I'm
15  not sure.
16      Q.   And did you carry professional liability
17  insurance for your entity?
18      A.   Did I have professional liability
19  insurance?
20      Q.   Yes.
21      A.   Yes.
22      Q.   And how did you determine how much
23  professional liability insurance you would carry?
24      A.   In conversation with my agent.
25      Q.   Did the government entities ever specify



Page 45

1 the amount of professional liability insurance they
2 required for you to have the contract?
3   **A.   Some of them did, but most of the time**
4 **they required less than what I -- what I had.**
5   Q.   And when you say that some of them
6 required less than what you had, can you tell me
7 what -- how much professional liability insurance
8 you carried in 2020?  I'm sorry, 2019.
9   **A.   2019.  I'm not exactly sure how much I**
10 **carried in 2019.  It might have been one -- one**
11 **million, three million, but I don't know.  It might**
12 **have gone up, so I'm not sure exactly.  But that's**
13 **probably what it was.**
14   Q.   So you understood that to be insurance
15 coverage against claims by patients, including
16 inmates, up to one million per single claim, and
17 three million aggregate for a year?
18   **A.   Yeah.  We're talking, just to make sure**
19 **we're talking about the same thing, I'm talking**
20 **about malpractice coverage.**
21   Q.   Correct.
22   **A.   Yes.**
23   Q.   That's what I mean when I say
24 professional liability.
25   **A.   I believe that that is correct.**

Page 46

1   Q.   And did your professional liability
2 insurance cover you against claims for violation of
3 civil rights that might be asserted in federal
4 court?
5   **A.   Well, I assume so because I was fully**
6 **covered, according to my agents.**
7   Q.   Do you know who your insurer was?
8   **A.   UMIA, Utah Medical Insurance -- it**
9 **changed names, but I believe the last entity -- it**
10 **was the same insurance all the time, but it changed**
11 **names.  The last one was UMIA.**
12   Q.   And in your opinion as the administrator
13 of a jail correctional health entity, did you
14 believe you were adequately insured?
15   **A.   Yes.**
16   Q.   Did you ever seek to get additional
17 liability coverage?
18   **A.   No.**
19   Q.   Did you consciously choose to obtain
20 limited liability insurance in order to shift the
21 cost of correctional health care off the government
22 and onto you?
23   **A.   I don't understand.**
24     MR. WEIL:  Object to form.
25     **THE WITNESS:  I don't understand that**

Page 47

1 question.
2   Q.   (BY MR. KNOTT:)  Did you limit your
3 liability coverage to a million dollars so that you
4 could make yourself judgment proof?
5     MR. WEIL:  Object to form.
6     **THE WITNESS:  No.**
7   Q.   (BY MR. KNOTT:)  At the peak of your
8 work for Badger Correctional, do you know how many
9 patient interactions your staff had daily?
10   **A.   Off the top of my head, no.**
11   Q.   Was that a statistic that was monitored
12 from year to year?
13   **A.   It was monitored in each facility.  I**
14 **don't know if we ever added them all up as one -- as**
15 **a group.**
16   Q.   And was it monitored in each facility as
17 part of the CQI process?
18   **A.   Well, statistics aren't CQI, so it was**
19 **something that we did, but it wasn't labeled as part**
20 **of the CQI.  But it was something that we did.  We**
21 **kept statistic.**
22   Q.   And did you discuss those statistics
23 with the jail administration?
24   **A.   Yes.**
25   Q.   Doctor, were you ever sued personally in

Page 48

1 any context?
2   **A.   So one of my employees sued -- I don't**
3 **know if I was sued personally, but one of my**
4 **employees sued Badger Medical, and I guess me,**
5 **personally, alleging that we violated her Americans**
6 **with Disability Association rights.**
7   Q.   Were you ever -- you or your entity ever
8 sued by an inmate over health care issues?
9   **A.   In Idaho, before you -- before it**
10 **becomes a formal malpractice suit, claims --**
11 **malpractice claims have to go to an arbitration**
12 **board.  It's not an arbitration board, but they have**
13 **to be heard by a board from the Board of Medicine**
14 **first.**
15     **And I had a couple that went to that and**
16 **were found to be -- have no merit.  The patient**
17 **could still file a malpractice suit, but none of**
18 **them did.  So no, I never had a malpractice claim**
19 **that actually made it as far as a formal malpractice**
20 **claim.**
21   Q.   And when you say that there were a
22 couple of claims filed about the Board of Medicine,
23 is that two?
24   **A.   I don't remember.  Two or three.**
25   Q.   And did an inmate ever file a lawsuit or



Page 49

1  a claim of negligence against any employee of Badger
2  Correctional?
3      A.   Not that I remember.
4      Q.   Have you ever settled a claim involving
5  an inmate?
6      A.   No.
7      Q.   Have you ever admitted to an inmate that
8  you made a mistake?
9      A.   Yes.
10     Q.   Have you ever taken discipline against
11 an inmate or against an employee for what you
12 thought was mistaken judgment?
13     A.   Yes.
14     Q.   And with respect to your disclosure
15 cases, I apologize, I think there's six disclosed,
16 and you think you've given eight depositions in your
17 career.
18     A.   Yeah.  The ones I've disclosed are the
19 ones in the last five years, and I've done a couple
20 before that.  I could find out the exact number, but
21 I'm not sure.  I think it's two or three.
22     Q.   And did you give a deposition in any
23 context other than as a retained expert witness?
24     A.   Yes.  I've given a deposition in a
25 divorce case, and I've given a deposition in the ADA

Page 50

1  case that I referenced earlier.
2      Q.   Were those included in your mental count
3  of --
4      A.   No.
5      Q.   -- eight or nine?
6      A.   No.
7      Q.   So you think there may be eight or nine
8  cases that you testified as a retained expert
9  witness?
10     A.   Yes.
11     Q.   And have you ever testified in court,
12 sir?
13     A.   Once.
14     Q.   Where was that?
15     A.   In Pennsylvania.
16     Q.   Can you tell me the number of cases you
17 have reviewed in your career?
18     A.   Not exactly.
19          MR. WEIL:  Object to form.
20          THE WITNESS:  Approximately twenty-five
21 or thirty.
22     Q.   (BY MR. KNOTT:)  And how did you first
23 enter into the business of being an expert
24 witness?
25          MR. WEIL:  Object to form.

Page 51

1          Go ahead and answer.
2          THE WITNESS:  I was contacted by and
3  asked to do it.
4      Q.   (BY MR. KNOTT:)  And do you know the
5  percentage of cases that you've reviewed where you
6  were reviewing it on behalf of the plaintiff's side
7  or the inmate's side versus the defense side, the
8  health care provider's side?
9      A.   Not exactly, but I'm going to estimate
10 ten to fifteen percent defense and the rest
11 plaintiffs.
12     Q.   Are your services as a litigation
13 consultant advertised anywhere, sir?
14     A.   No.
15     Q.   Or listed on any list of expert
16 witnesses, if you know?
17     A.   No.  Not that I know of.
18     Q.   Have you reviewed other cases for the
19 Loevy & Loevy firm?
20     A.   Yes.
21     Q.   When did you first review a case for the
22 Loevy and Loevy firm?
23     A.   Four years ago, five years ago.
24     Q.   And how many cases, other than this one,
25 have you reviewed for the Loevy firm?

Page 52

1      A.   One.
2      Q.   And where does that case arise out of?
3  Where does it arise out of?
4      A.   I don't -- you know what?  I don't know
5  the answer to that.  In my mind it was the Bosche
6  case.  I don't know where it arose out of.
7      Q.   You kind of leaned back there, sir, and
8  I lost you.  I couldn't hear you.
9      A.   In my mind it's the Bosche case.  I
10 don't remember where it arose from.
11     Q.   Did you issue a written report in that
12 case?
13     A.   Yes.
14     Q.   And can you tell me what the medical
15 issue was in that case?
16     A.   The medical issue was that the company
17 that was providing medical care had a corporate-wide
18 push to reduce emergency room referrals,
19 corporate-wide, so the practitioners were told stop
20 sending so many people to the emergency department.
21     Q.   All right.  And what was that company?
22     A.   Was it Wexford?  I think it was
23 Wexford.
24     Q.   Did you say Wexford?
25     A.   I believe it was Wexford.



Page 53

1    Q.   And what was the evidence of their
2    corporate-wide push to reduce trips to the ER?
3         MR. WEIL:  Object to the form.
4         Go ahead and answer.
5         **THE WITNESS:  It wasn't a secret.  They**
6    **published it.  It was something that they -- that**
7    **they put out as a corporate-wide push.  This is**
8    **something that we're going to try to do is reduce**
9    **emergency department referrals.**
10   Q.   (BY MR. KNOTT:)  And that that was to
11   save costs?
12        MR. WEIL:  Object to form.
13        Go ahead.
14        **THE WITNESS:  My opinion was yes, that**
15   **was to save costs.**
16   Q.   (BY MR. KNOTT:)  And, sir, you have not
17   seen in this case, the Boyer case, any evidence of a
18   corporate-wide push to reduce trips to the emergency
19   room, have you?
20        MR. WEIL:  Object to form.  Go ahead and
21   answer.
22        **THE WITNESS:  I have not seen an overt**
23   **program to reduce emergency room department**
24   **referrals.**
25   Q.   (BY MR. KNOTT:)  Have you testified in

Page 54

1    cases involving diagnosis of chest pain?
2    **A.   I can't think of another case involving**
3    **chest pain that I've been an expert witness on.**
4    Q.   So do you have any explanation for why
5    ten to fifteen percent of the cases you review are
6    for the defense and the majority are for the
7    plaintiff?
8    **A.   Because I mostly get contacted by**
9    **plaintiffs' attorneys.**
10   Q.   Have you ever had your qualifications to
11   testify in court challenged?
12   **A.   No.**
13        MR. WEIL:  Object to form.
14        MR. KNOTT:  We've been at it for a
15   little bit here, and I could use a break.  If we
16   could take a few minutes, I think it would be an
17   appropriate time to do that.
18        MR. WEIL:  When do you want to come
19   back, Doug?
20        MR. KNOTT:  Realistically, five minutes
21   to 1:00.
22        MR. WEIL:  Five to 1:00?  Okay.
23        (A brief recess was had.)
24        MR. KNOTT:  Back on the record.
25   Q.   (BY MR. KNOTT:)  Doctor, if we

Page 55

1    weren't -- Doctor, I learned during the break, but
2    didn't get a chance to look at, an e-mail from
3    Mr. Weil sending us what I believe are the materials
4    you reviewed.
5         Did you create notes or some other type
6    of file for the review of the inmate cases?
7    **A.   For the preparation of my report, I did**
8    **drafts.**
9    Q.   So my question is:  When you reviewed
10   the records, did you create any type of work product
11   or synthesis or abstract or chronology or anything
12   other than work on a draft report?
13   **A.   I created -- I did snips, which is if I**
14   **saw something in a record that I wanted to include**
15   **in my draft, I snipped it as a -- basically a**
16   **picture, and then I organized those and used those**
17   **to create the draft.**
18   Q.   And was that in a separate document
19   other than your draft?
20   **A.   Well --**
21        MR. WEIL:  Object to form.
22        **THE WITNESS:  I used them to create the**
23   **draft, and then -- so, no.  There's no separate**
24   **document.**
25   Q.   (BY MR. KNOTT:)  So you took snippets,

Page 56

1    screen snaps, from the PDFs and put them in your
2    draft report directly.
3         Is that what you're saying?
4    **A.   No.  I -- well, I didn't paste them in,**
5    **but I used them to write into my -- because they're**
6    **more convenient to write from, so I used them to**
7    **write from.**
8    Q.   So I guess bottom line, on your review
9    of these hundreds of thousands of pages of material,
10   you didn't create any notes of your own other than
11   your report?
12   **A.   Correct.**
13   Q.   And were the materials provided to you
14   in a format that was -- that directed you to certain
15   pages?
16        MR. WEIL:  Object to form.  Go ahead and
17   answer.
18        **THE WITNESS:  I was provided with**
19   **material that said look at particular cases.  I**
20   **don't remember that I was given actual pages to look**
21   **at.**
22   Q.   (BY MR. KNOTT:)  And is that
23   correspondence that you have received from Weil's
24   firm, Attorney Weil's firm?
25        MR. WEIL:  So I think we're treading



Page 57

1  into a privileged area here. I'm going to object.
2       And if I can have a minute with the
3  Doctor, we can resolve the privilege. Otherwise I'm
4  going to instruct him not to answer as the question
5  is currently posed.
6       MR. KNOTT: Completely inappropriate.
7       MR. WEIL: Well, I'm instructing him --
8  I'm going to let you take your deposition. This is
9  similar to a -- I want to just preserve the
10  privilege while letting you take your deposition on
11  discovery materials. The question that you're
12  asking covers privileged and nonprivileged
13  communications, so I want to --
14       MR. KNOTT: So you're directing him not
15  to answer that question.
16       MR. WEIL: As it's phrased, yes.
17       Again, I think we can clear it up pretty
18  easily, but as a straight, yes, I would direct him
19  not to answer.
20   Q.   (BY MR. KNOTT:) Doctor, did I hear you
21  correctly that you received from Attorney Weil's
22  office correspondence saying you should look at
23  particular cases?
24       MR. WEIL: Object to form and instruct
25  the witness not to answer because of privilege.

Page 58

1  Again, we can resolve this by properly narrowing the
2  question or have a side bar with the doctor. As
3  phrased, I instruct him not to answer.
4       MR. KNOTT: Mr. Weil, can you tell me
5  what I received after the deposition started?
6  Because I'm not in a position to study it now.
7       MR. WEIL: So I believe what you're
8  referring to is what I sent before the deposition
9  began, which are the series of summaries and a -- of
10  different cases, and then a table of a bunch of
11  cases for Monroe County.
12       I don't have a problem asking Dr. Keller
13  about that. The privilege would be any discussions
14  beyond the materials we provided him where we're
15  talking about -- you know, talking about various
16  cases or the different medical situations that are
17  in the record. So that's the distinction I'm
18  drawing.
19       MR. KNOTT: I don't want to take the
20  time to delve into the e-mail that you sent me, so
21  could you tell me that again? You sent summaries?
22       MR. WEIL: There is an e-mail that we
23  sent before the deposition that contains various
24  summaries of different cases of medical care outside
25  of Monroe County.

Page 59

1       There is also a table that I would say
2  contains more truncated summaries of care within
3  Monroe County, and those were provided to Dr. Keller
4  in the course of preparing this report.
5   Q.   (BY MR. KNOTT:) Is that your
6  understanding as well, Dr. Keller?
7   A.   Yes.
8   Q.   And did you add to the summaries or the
9  truncated summaries that Mr. Weil described, any of
10  your own notes?
11       MR. WEIL: Object to form. Go ahead and
12  answer.
13       THE WITNESS: Well, my -- what I've --
14  what I have written in my report is based on my own
15  review of the charts.
16   Q.   (BY MR. KNOTT:) I'm really looking for
17  your notetaking of any kind independent of the
18  report. And trying to see -- it just strikes me as
19  a difficult task, Doctor, to review hundreds of
20  thousands of pages without taking notes.
21       MR. WEIL: Object to form. Asked and
22  answered.
23       THE WITNESS: I used snips. So in the
24  past, yeah, I took -- I would take handwritten notes
25  or whatever, but snips works quite a bit better

Page 60

1  because for one thing in the snip I can -- it
2  includes exactly where it is; whereas, if I take a
3  handwritten note, in the past, I've forgotten where
4  it came from, and I can't find it again. So snips
5  works better, and that's how I do it.
6   Q.   And a snip is the application within
7  Windows that allows you to capture a section of the
8  screen?
9   A.   Yes.
10   Q.   And does your -- does a document with
11  the snips that you selected exist anywhere?
12       MR. WEIL: Object to form.
13       Go ahead and answer.
14       THE WITNESS: Well, early -- early
15  drafts of my report didn't include the snips
16  themselves, but they included the verbiage that I
17  transcribed from the snips.
18   Q.   (BY MR. KNOTT:) And did you highlight
19  or put Post-Its or anything like that on any of the
20  PDFs that you reviewed?
21   A.   Probably. As a matter of fact, yes, I
22  did.
23   Q.   And what did you -- what kind of note
24  did you take? Highlight? It was a double question.
25  I asked if you highlighted or took notes.



Page 61

1          Can you tell me which of those two you
2    did?
3        A.   I highlighted.
4        Q.   And did you save your highlighting?
5        A.   Probably.
6        Q.   And is that in a -- on PDFs maintained
7    by you?
8        A.   Yes.
9             MR. KNOTT:  And were those provided to
10   me, Mr. Weil?
11            MR. WEIL:  I don't believe they were.
12   Unless Dr. Keller sent them over, I don't believe
13   they were.
14       Q.   (BY MR. KNOTT:)  Did the -- your report
15   references minutes of the Davis or Davis County
16   Commission in 2004.  Does that have any bearing on
17   your opinions in the matter?
18       A.   Do you mean where I said it's -- I
19   reviewed it, it's in the documents that I reviewed?
20       Q.   Yes.
21       A.   No, it doesn't.
22       Q.   So I understand from review of your
23   report that your opinions endorse and apply
24   Dr. Bentley's opinions in the context of
25   correctional medicine.

Page 62

1          Is that a fair characterization?
2        A.   Could you rephrase the question?  I
3    guess I'm not exactly understanding what you're
4    saying.
5        Q.   (BY MR. KNOTT:)  Yeah.  I'm trying to
6    understand.  Well, your report covers a discussion
7    of other inmates, and setting that aside for a
8    second, your report comments on the care provided to
9    Christine Boyer.
10            True?
11       A.   So Mr. Weil did not ask me to directly
12   address the care given to Christine Boyer, so I
13   don't have a separate section in my report directly
14   dealing with her case.
15            I endorse Dr. Bentley's summary of that
16   case.  There's nothing that she said that I disagree
17   with.
18       Q.   And I just want to focus our discussion.
19   Your opinions with respect to the care provided to
20   Ms. Boyer follow the contours exactly of what
21   Dr. Bentley has testified to, correct?
22       A.   Yes.
23       Q.   Put in her report more fairly.
24            You haven't seen Dr. Bentley's
25   testimony, have you?

Page 63

1        A.   You mean her deposition?  No, I have
2    not.
3        Q.   And you haven't talked to Dr. Bentley,
4    have you?
5        A.   No.
6        Q.   And I guess I'm kind of having a hard
7    time dealing with this conceptually, but if I look
8    at your report at page 2, carrying over to 3, the
9    medical standard of care in the case of Christine
10   Boyer, is there any opinion you intend to offer at
11   the time of trial that's set forth in that section
12   other than you agree with the opinion of
13   Dr. Bentley?
14            MR. WEIL:  Object to form.
15            THE WITNESS:  So if you're referring to
16   the -- the sentence says:  The medical standard of
17   care in the jail is no different than the medical --
18   excuse me, standard of care in the community, that
19   incarcerated patients are entitled to the same level
20   of medical care as unincarcerated patients, I stand
21   by that.
22            I believe that's what Dr. Bentley said
23   as well, but that's -- independently that's my
24   opinion as well.
25       Q.   So my question was actually about that

Page 64

1    section from the bolded statement, the medical
2    standard of care on page 2 down to training provided
3    by ACAH.
4            And what I'm trying to get at is:  You
5    were not asked to independently review the facts and
6    circumstances of Ms. Boyer's care, fair?
7        A.   Not exactly.  I was -- I reviewed them.
8    I was not asked to write a report about them.  But I
9    did review the circumstances revolving the care
10   given to Ms. Boyer.
11            And I believe that Dr. Bentley
12   summarized it well, and I agree with everything
13   that -- with all of her conclusions.
14       Q.   You agree you're qualified to speak to
15   the care of a registered nurse?
16       A.   I am qualified to speak -- well, in a
17   word, yes.
18       Q.   Okay.  And your report includes no
19   discussion of the particular interactions of the
20   staff and Ms. Boyer on December 21 or 22, correct?
21       A.   No.
22       Q.   Not correct or correct?
23       A.   No.  My report does not include a
24   discussion of the care given to Ms. Boyer.  I was
25   not asked to do that.  But I do agree with



Page 65

1  Dr. Bentley's summary.  There is nothing in her
2  report that I disagree with, with regard to the care
3  of Christine Boyer.
4       Q.   My understanding is that you're not
5  offering opinions on the standard of care of the
6  correctional staff, true?
7       A.   Other than to say I agree with
8  Dr. Bentley's assessment, I didn't directly address
9  that in my own report.
10      Q.   Do you have in mind at this time any
11 opinions that Ms. Bentley rendered with regard to
12 the corrections staff?
13      A.   I guess I don't understand the
14 question.
15      Q.   You're saying that you don't have any
16 opinions regarding the correctional staff other than
17 to agree with those stated by Dr. Bentley.
18           And my question is whether you have in
19 mind here today any particular opinions concerning
20 the correctional staff.
21      A.   Well, I didn't address this in my report
22 other than to say I agreed with Dr. Bentley's
23 assessment.
24      Q.   Okay.  I'll leave that there.
25           In your report, you referred to the

Page 66

1  standard of care.  Can you tell me what's meant by
2  the phrase standard of care, as it's used in this
3  report?
4       A.   What I meant when I said the standard of
5  care is basically the care that would occur in
6  outside medical setting, and I also mean the -- what
7  is commonly believed and taught in medical textbooks
8  as being appropriate care for certain conditions.
9       Q.   And when you're talking about the
10 standard of care of a physician practicing
11 correctional medicine, is there a textbook that you
12 could cite for the standard of care?
13           MR. WEIL:  Object to form.
14           Go ahead and answer.
15           THE WITNESS:  Well, the medical
16 textbooks are no different for correctional
17 physicians as they are for noncorrectional
18 physicians.  There's not a different medical
19 textbook for corrections as noncorrections.  That's
20 kind of the point as being a uniform standard.
21      Q.   (BY MR. KNOTT:)  So if I understand your
22 prior answer, you define the standard of care as one
23 care that would occur in an outside facility and
24 care as it's taught in textbooks, if I remember that
25 correctly?

Page 67

1           MR. WEIL:  Object to form.  Go ahead and
2  answer.
3           THE WITNESS:  That is an okay summary.
4       Q.   (BY MR. KNOTT:)  I'm sorry, I didn't
5  hear that.
6       A.   That is an okay summary.
7       Q.   Okay summary?
8       A.   I agree with that summary.
9       Q.   Thank you.
10           Are you familiar with the Constitutional
11 standards governing health care providers in a jail
12 or prison setting?
13      A.   Yes.
14           MR. WEIL:  Object to form.
15           Go ahead and answer.
16      Q.   (BY MR. KNOTT:)  You've heard the term
17 deliberate indifference under the 8th Amendment?
18      A.   Yes.
19      Q.   And you've heard the term objectively
20 unreasonable under the 14th Amendment?  Have you
21 heard that phrase?
22           MR. WEIL:  Object to form.
23           Go ahead and answer.
24           THE WITNESS:  Yes.
25      Q.   (BY MR. KNOTT:)  Are you intending, when

Page 68

1  you refer to the standard of care in your report, to
2  be referring to a constitutional standard?
3           MR. WEIL:  Object to form.
4           Go ahead and answer.
5           THE WITNESS:  No.  I had no intention of
6  addressing legal issues or constitutional issues.  I
7  am addressing medical issues.
8       Q.   (BY MR. KNOTT:)  Is a violation of the
9  standard of care, as you phrase it, negligence?
10          MR. WEIL:  Object to form.
11          Go ahead and answer.
12          THE WITNESS:  It can be.
13      Q.   (BY MR. KNOTT:)  Do you agree that
14 different practitioners can approach the same
15 patient differently and still be within the standard
16 of care?
17          MR. WEIL:  Object to form.
18          You can answer.
19          THE WITNESS:  That depends on the case
20 they're approaching.  There are some cases where if
21 you do two different things, one can be right and
22 one can be wrong.
23          There are other cases where, yes, you
24 can -- two different practitioners can approach it
25 different ways, and both be okay, but it depends on



Page 69

1 the case.

2     Q.   (BY MR. KNOTT:)  The standard of care

3 for a primary care practitioner is different than

4 the standard of care for a neurologist, isn't it?

5         MR. WEIL:  Object to the form.

6         Go ahead and answer.

7         **THE WITNESS:  So I'm not sure exactly**

8 **where you're going with that.**

9         **A neurologist is trained to do different**

10 **things than a -- than a primary care physician.  The**

11 **expectation of a neurologist is based on his**

12 **training.**

13         **So I'm -- I don't know exactly where**

14 **that is going.  A primary care physician is not**

15 **trained to do neurosurgery, and so that is not what**

16 **the standard is for them.**

17     Q.   What I was getting at is there's not a

18 single standard of care for all classes of medical

19 providers, is there?

20         MR. WEIL:  Object to form.

21         Go ahead and answer.

22         **THE WITNESS:  I'm not sure if I agree**

23 **with that.  There are -- people have different**

24 **specialties and different areas of expertise, but**

25 **the overall medical care that's provided to a**

Page 70

1 **patient, everybody has their role, and probably**

2 **should stay in their lane, but the overall care is**

3 **no different for one physician than -- I mean, the**

4 **care depends on the patient.  So what a primary care**

5 **physician does would be different than what a**

6 **specialty care physician does, but they both are in**

7 **pursuit of the overall medical standard.**

8     Q.   (BY MR. KNOTT:)  You, as a medical

9 doctor and board certified emergency room physician,

10 are not in the same licensing class as a nurse

11 practitioner.

12         Agree?

13     **A.   Correct.**

14     Q.   Same with respect to a registered nurse.

15     **A.   Correct.**

16     Q.   And do you have any idea of the

17 requirements to practice as a nurse practitioner in

18 the state of Wisconsin?

19     **A.   Yes.**

20         MR. WEIL:  Object to form.

21         Go ahead.

22     Q.   (BY MR. KNOTT:)  And what do you know

23 about that?

24     **A.   Well, that's a broad question.  It's**

25 **similar all over the country.  There are some states**

Page 71

1 **that allow nurse practitioners to practice**

2 **independently.  I don't believe Wisconsin is one.**

3     Q.   Have you ever been -- have you ever been

4 a collaborating physician for a nurse

5 practitioner?

6     **A.   Yes.**

7     Q.   I want you to consider a hypothetical,

8 Doctor.

9         **A gentleman walks into a hospital**

10 **emergency room and says:  I want Tums, antacid.**

11         **Is the standard of care for the response**

12 **to that the same in the emergency room as it is in a**

13 **jail?**

14         MR. WEIL:  Object to form.

15         Go ahead and answer.

16         **THE WITNESS:  Yes.**

17     Q.   (BY MR. KNOTT:)  Doctor, if you assume

18 that the standard of care, as defined by the courts

19 in the state of Wisconsin, is what a reasonable

20 provider in the same class of providers would do

21 under the same or similar circumstances, if that's

22 the definition of standard of care in Wisconsin,

23 would you agree that you're not qualified to speak

24 to the standard of care of a nurse practitioner?

25     **A.   No.**

Page 72

1         MR. WEIL:  Object to form.

2         Go ahead and answer.

3         THE WITNESS:  No.

4     Q.   (BY MR. KNOTT:)  You would not agree?

5     **A.   I would not agree.**

6     Q.   Because you know what a reasonable

7 provider in the same class of providers would do

8 under the same or similar circumstances?

9         MR. WEIL:  Object to form.

10         Go ahead and answer.

11         **THE WITNESS:  So it might be that what**

12 **we're talking about is scope of practice.  So going**

13 **back to the neurosurgeon and the family practice**

14 **doctor, I think that they're -- the standard of**

15 **medical care is the same, but they have different**

16 **scope of practices, so it would be inappropriate for**

17 **the family doctor to try to do neurosurgery.  That's**

18 **beyond her scope of practice.**

19         **The scope of practice of nurse**

20 **practitioners and physicians and a primary care**

21 **physician differ a little bit, but for the most**

22 **part, they overlap, like two circles that overlap in**

23 **the middle.  There's a little bit on either side.**

24         **But for the most part, they're both**

25 **practicing primary care medicine, and it's the same**

Page 73

1 for -- the expectations are the same for both.

2    Q.    Doctor, when you contracted to provide

3 health care services in jail, did your company bear

4 the costs of medications that were prescribed?

5    **A.    In one contract, yes.**

6    Q.    And in other contracts no?

7    **A.    Correct.**

8    Q.    And did your practice differ based on

9 whether you -- your company bore the costs of the

10 medication?

11    **A.    No.**

12    Q.    And did your company bear the costs of

13 sending inmates out for specialty care?

14    **A.    No.**

15    Q.    Or for emergency room visits?

16    **A.    No.**

17    Q.    Do you know whether Advanced

18 Correctional Health Care, under their contract with

19 Monroe County Jail, bore the costs of sending

20 inmates to the emergency room?

21    **A.    I believe the answer to that is no.**

22 **They do not bear the costs.**

23    Q.    And I understand that you are critical

24 of the training that was provided by ACH as

25 potentially fostering bias.

Page 74

1       I don't see in your report any opinion

2 that you're critical of the training for encouraging

3 providers to limit services in the interest of

4 profit.

5       Did I read your report correctly?

6       MR. WEIL:  Object to form.

7       Go ahead and answer.

8    **THE WITNESS:  So you might need to**

9 **restate that question, because I'm not sure exactly**

10 **what I'm being asked here.**

11    Q.    (BY MR. KNOTT)  Maybe I'll try it a

12 different way.  I'm talking about training.

13       You did not see any evidence in the

14 training that ACH was encouraging providers to limit

15 the services they provide in the interest of profit,

16 did you?

17       MR. WEIL:  Object on form.

18       Go ahead and answer.

19    **THE WITNESS:  No, not in the training.**

20 **I think Nurse Fennigkoh sent some**

21 **e-mails that referenced -- referenced that, but I**

22 **didn't quote that in my report.**

23    Q.    (BY MR. KNOTT)  Nurse Fennigkoh's

24 concern was the cost to the inmate, wasn't it?

25       MR. WEIL:  Object to the form.

Page 75

1    THE WITNESS:  Not the way I read it, but

2 I didn't put it in my report so -- and I don't

3 remember reading that in her deposition, so I can't

4 comment.  I can't answer that.

5    Q.    (BY MR. KNOTT)  And my understanding

6 from reading this report is that there's no written

7 policy by ACH that you think is deficient.

8    **A.    Well, whether it's written or not, I**

9 **think the policy of allowing people to practice**

10 **outside their scope of practice is wrong even if**

11 **it's not written as such.  The general practice is**

12 **that that's what happens.**

13       **And the general practice is that**

14 **practitioners are allowed to practice medicine over**

15 **the phone without ever seeing the patient, and**

16 **nurses are allowed to practice outside their scope**

17 **of practice by making diagnoses and prescriptions of**

18 **legacy drugs, which is outside their scope of**

19 **practice.**

20       **All of that is tolerated, whether or not**

21 **it's written.**

22    Q.    And the question was whether you're

23 aware of any written policy that you believe is

24 deficient.

25       So I understand from your answer you

Page 76

1 don't believe there's a written policy that's

2 deficient.

3    **A.    No.**

4       MR. WEIL:  Object to form.

5    **THE WITNESS:  Not that I recall.**

6    Q.    (BY MR. KNOTT)  So of the cases that

7 you reference in your report for the Monroe County

8 Jail and other cases, those were cases that were

9 selected for you by Mr. Weil's firm for you to

10 review, true?

11       MR. WEIL:  Object to form.

12       Go ahead and answer, if you know.

13    **THE WITNESS:  Well, they are all cases**

14 **from the complaint, so in that sense they were**

15 **chosen.  I think every case --**

16    Q.    (BY MR. KNOTT)  And did you review --

17 I'm sorry, were you done?

18    **A.    I was going to say every case in my**

19 **report out of Monroe County was in the original**

20 **complaint.  So in that case, in that way they were**

21 **chosen because those are the cases that I focused**

22 **on.**

23    Q.    And did you review medical records

24 before the Fourth Amended Complaint was filed?

25       MR. WEIL:  Object to form.



Page 77

1        Go ahead and answer.

2        THE WITNESS:  I don't remember.  I don't

3    remember reviewing charts before I knew -- before I

4    knew exactly which charts I was looking at.

5        Q.    (BY MR. KNOTT:)  Do you know who

6    reviewed the charts in order to select the cases

7    that were included in the amended complaints?

8        A.    The exact person, no.

9        Q.    You know that it was someone with

10   Mr. Weil's firm, right?

11       A.    Yes.

12       Q.    And so you have not reviewed the medical

13   records for any inmate that Mr. Weil has not

14   selected for you to review, true?

15       MR. WEIL:  Object to form.

16       Go ahead and answer.

17       THE WITNESS:  No.

18       Q.    (BY MR. KNOTT:)  So you understand that

19   Mr. Weil has access to around thirteen hundred

20   Monroe County inmate files?

21       A.    Yes.

22       Q.    And he's had access to those for more

23   than a year.  You know that, right?

24       A.    I don't know when he originally obtained

25   access to them.

Page 78

1        Q.    And my understanding is you didn't

2    review the county medical records and tell him which

3    records are significant.  You didn't review the

4    thirteen hundred to determine which are significant,

5    true?

6        A.    True.

7        MR. WEIL:  Object to form.

8        Q.    (BY MR. KNOTT:)  Do you know if eleven

9    cases out of thirteen hundred cases is statistically

10   significant, Doctor?

11       MR. WEIL:  Object to form.

12       Go ahead and answer.

13       THE WITNESS:  No.

14       Q.    (BY MR. KNOTT:)  Do you agree that to

15   offer -- agree as a scientist that to offer a valid

16   opinion about the quality of ACH services at the

17   Monroe County Jail, that you should look at a random

18   selection of files rather than those selected by the

19   plaintiff's firm?

20       A.    I wasn't doing --

21       MR. WEIL:  Object to form.

22       THE WITNESS:  -- a scientific study.

23   Instead, I was looking at the way that the contract

24   was set up, and what I found is confirmation of

25   things that originally came out of Christine Boyer's

Page 79

1    case, that is that correctional officers were

2    functioning in the role of nurses and, in fact, were

3    provided with a long list of -- a long -- a big

4    group of files that they were supposed to use when

5    communicating as in the form of nurses to

6    practitioners, that practitioners were

7    prescribing -- diagnosing and prescribing without

8    seeing a patient based on phone interviews and never

9    seeing the patient.

10       And that nurses were prescribing outside

11   their scope of practice without ever escalating care

12   to appropriate levels, and that patients were not --

13   were not being escalated to appropriate levels.

14       I think I saw enough cases to think that

15   that is a robust statement, and I don't even know if

16   ACH would disagree with that, that they do ask

17   correctional officers to fill out forms and call in,

18   and that practitioners then give orders back to them

19   about giving drugs to inmates, et cetera, et cetera.

20       So I thought I had enough data from

21   those eleven cases that there was no reason to go

22   through thirteen hundred.  I suspect if I did go

23   through thirteen hundred, it wouldn't be that there

24   were no correctional officers calling in about

25   patients on the other thirteen hundred.  I think

Page 80

1    they were.

2        And I think I saw enough cases to

3    ascertain that that was, in fact, the practice at

4    Monroe County.  That's the way the contract was set

5    up.

6        Q.    So that the question is:  Do you think

7    it's fair to give general opinions about the quality

8    of medical care at the jail based solely on your

9    review of cases selected by an attorney who has sued

10   the facility?

11       MR. WEIL:  Object to form.

12       Go ahead and answer.

13       THE WITNESS:  I wasn't giving an overall

14   assessment of medical care at the jail.  I was

15   assessing the way that the contract was set up, and

16   that not all of the -- and not all of the cases that

17   I reviewed were handled inappropriately.

18       My -- I had enough cases to show that

19   the way that the -- the way that medical care was

20   delivered was different than it was -- than it would

21   be on the outside, and that people were allowed to

22   practice outside their scope of practice, and in

23   fact, encouraged to do so.

24       In my mind, that's inevitably going to

25   lead to bad medical outcomes, not in every patient,



Page 81

1  but to some, and I was able to find evidence of --
2  in these eleven cases of people that should have
3  been -- the care should have been escalated to a
4  higher level that were not.
5          I think to do a rigorous scientific
6  evaluation of all the cases, I don't think would
7  change what I knew about the basic way that the care
8  was set up.
9      Q.   Doctor, is it appropriate for a
10  correctional facility to have correctional staff do
11  intake screening?
12     A.   Yes.  It is appropriate to have
13  correctional staff do booking screening.
14     Q.   And they're trained to ask those
15  questions, get information, so that they can
16  communicate that to the provider if there's an
17  immediate need, right?
18     A.   They should be.  They should have a
19  policy in place of exactly which patients need a
20  medical clearance at booking.
21          So they should know exactly if this
22  question is answered yes, or if this happens, they
23  don't even have to call a provider.  They just tell
24  the arresting officer take this person to the
25  emergency room and get a medical clearance.

Page 82

1          So all jails, in my opinion, should have
2  a policy and procedure in place for correctional
3  officers to refer to when accepting medical
4  patients, and they should have a policy and
5  procedure in place for what questions are asked and
6  what happens when yes or no questions -- when
7  questions are answered yes or no.
8      Q.   I think if you focus on the question, we
9  can move along a little better, but so I understood
10  your answer to be that it is appropriate in the
11  context of booking screening for the correctional
12  officers to take information from the inmate and
13  communicate with the practitioner about that inmate,
14  correct?
15     A.   Yes.
16     Q.   And you're not testifying that it's
17  never appropriate for a physician or practitioner to
18  give a voice order in the context of correctional
19  medicine?
20     A.   No.
21          MR. WEIL:  Objection to form.
22          Go ahead and answer.
23          THE WITNESS:  It's appropriate for that
24  to happen in correctional medicine just as it
25  happens anywhere else in outside medicine.

Page 83

1  Physicians in hospitals give voice orders all the
2  time.
3      Q.   (BY MR. KNOTT:)  And if -- if a
4  physician receives information and assesses a
5  patient as having hypertension, chronic
6  hypertension, it's appropriate to order
7  administration of a blood pressure medication, and
8  to plan to see that patient later, isn't it?
9          MR. WEIL:  Object to form.
10          THE WITNESS:  Yes, the critical area
11  there is to see that patient later.  That's one of
12  the things that was not happening in Monroe County
13  in the cases that I reviewed.
14     Q.   (BY MR. KNOTT:)  Right.
15          And to see that patient later could be
16  to see that patient at the next clinic visit by the
17  practitioner?
18     A.   It could be.
19     Q.   Doctor, is there a phenomenon known as
20  hypertensive crisis?
21     A.   Yes.
22     Q.   And you've written that hypertensive
23  crisis is not an emergency, right?
24     A.   No.  So I have written about the idea of
25  a hypertensive urgency is a myth.  That's different

Page 84

1  than a hypertensive crisis.
2          And I was not asked to opine on the
3  practice in Monroe County of giving clonidine for an
4  elevated blood pressures, but I don't agree with
5  that.  But hypertensive urgency and hypertensive
6  emergency are two different things, or a
7  hypertensive crisis.
8      Q.   Did you determine whether Advance
9  Correctional Health Care is sued more than or less
10  than other providers?
11     A.   I know that they're sued way more than
12  my company was, even taking into perspective being
13  much larger than my company, and I believe they're
14  sued more than my other company, Centurion, was,
15  even though Centurion is much, much larger.
16          But I have not done a rigorous
17  evaluation, because I don't know how often they've
18  been sued.  I don't know the actual number, so I
19  don't know.
20     Q.   You're unaware of any actual monitoring
21  of that --
22     A.   Monitoring of lawsuits you mean?  Where
23  they're counted --
24     Q.   Yeah.
25     A.   -- where a company -- I'm unaware of any



Page 85

1 way to ascertain how many times any one company, say
2 Wellpath, has been sued compared to any other
3 company, say ACH or NavCare. I don't know where to
4 look that up.
5     Q. And Centurion provided care in prisons,
6 right?
7     A. Yes.
8     Q. And you have no knowledge of whether
9 there is data available on the national average for
10 lawsuits against correctional health care
11 providers?
12     A. I am unaware of that.
13     Q. And you didn't investigate to determine
14 how many cases filed against Advance Correctional
15 Health Care were deemed meritless, right?
16     A. I have no way of knowing that. I have
17 no way of knowing that.
18     Q. Some random thoughts here, Doctor, from
19 my notes, but I think I read an index of your book,
20 and it referenced comfort items.
21     What is that reference to?
22     A. Extra mattresses, special shoes, bottom
23 bunks, pillows, things like that that are not really
24 medical items.
25     Q. They are accommodations that an inmate

Page 86

1 may seek from the medical staff to make them
2 comfortable, right?
3     A. Yes.
4     Q. Dr. Keller, do you know if there's a
5 provision in the Advance Correctional contract with
6 Monroe County for CQI services?
7     A. No.
8     Q. And you know from review of the
9 statistics that were discussed at CQI meetings that
10 ACH practitioners would ship inmates to the
11 emergency room for care, right?
12     A. Yes.
13     MR. WEIL: Objection, form.
14     Go ahead and answer.
15     Q. (BY MR. KNOTT:) And do you have any
16 basis to judge whether the number of times that they
17 were sent to the emergency room in 2019 or 2018 was
18 appropriate for the population?
19     MR. WEIL: Object to form.
20     Go ahead and answer.
21     THE WITNESS: Well, I don't think that
22 that's a question that's possible to answer. As a
23 matter of fact, I don't think there's any published
24 correct number. It depends on how many emergencies
25 one gets, or how many things that should be sent to

Page 87

1 an emergency department, and that depends on a lot
2 of factors.
3     So I don't think I can answer that
4 question.
5     Q. (BY MR. KNOTT:) Are you aware of any
6 basis to believe that Advance Correctional staff
7 were admonished or coached not to send patients out
8 to an emergency room?
9     A. Not overtly, but in the training where
10 they were trained to -- that incarcerated people
11 complain more than other patients, and are trying to
12 basically game the system to get comfortable, I
13 think if someone believed that, that they would
14 inevitably tend to think that a complaint of chest
15 pains, say, hasn't -- would be due to anxiety rather
16 than a heart attack, and that is going to lead you
17 to send people -- not send people out who should be
18 sent out, if you believe that training.
19     Q. So to answer my question, there is no
20 evidence that ACH administration admonishes the
21 staff and tells them not to send patients to the
22 emergency room?
23     A. Not that I have seen.
24     MR. WEIL: Object to form.
25     Q. (BY MR. KNOTT:) And what you believe is

Page 88

1 that the training has the potential to create a
2 culture where the practitioners may base their
3 clinical decisions on -- on some sort of unconscious
4 bias, right?
5     MR. WEIL: Object to form.
6     THE WITNESS: Not just the
7 practitioners, but also the nurses who will
8 interpret someone with chest pain and shortness of
9 breath as having anxiety and give them Hydroxyzine
10 without ever calling a practitioner.
11     MR. KNOTT: Is everybody doing okay?
12     THE WITNESS: I would like to take a
13 five-minute break, not a long one, but I want to go
14 back to the bathroom, if I may.
15     MR. KNOTT: Okay. We'll do that.
16     (A brief recess was had.)
17     Q. (BY MR. KNOTT:) Dr. Keller, I just
18 wanted to follow up on that -- the end of that
19 discussion we were just having.
20     I understand that you believe that the
21 training that ACH provides about the difference
22 between inmates and patients in the community
23 violate the standard of care, right?
24     A. I don't mean -- no. That doesn't --
25 that isn't exactly right. I think it's wrong, and



Page 89

1  that it will inevitably lead people who believe it,
2  I don't know that everybody was taught it actually
3  believes it, for people who believe it, it will
4  result in a tendency to discount the medical
5  complaints of incarcerated people and to ascribe
6  those medical complaints to benign conditions which
7  maybe in most cases it's not going to cause a
8  problem, but in some cases it's going to have them
9  miscount -- misdiagnose, misconstrue, and avoid
10 sending people out.  And it's that act that is a
11 violation of the standard of care.
12     Q.   Okay.  So the training is factually
13 wrong, you believe, right?
14     A.   I believe the training is factually
15 wrong.
16     Q.   And you believe that it has the
17 potential to create bias that would impact the
18 practitioner's exercise of their clinical judgment,
19 correct?
20     A.   Yes.  I think it can impact medical
21 judgment in a detrimental way.
22     Q.   I'm sharing my screen, Doctor.  Are you
23 able to read it?
24     A.   Yes.
25     Q.   This is Monroe County 2617, and we can

Page 90

1  mark this as Exhibit 89, CQI notes for --
2        (Exhibit 89 was marked for
3        identification.)
4        MR. WEIL:  Doug, was Exhibit 88 the
5  report?
6        MR. KNOTT:  It was the invoice.  I
7  didn't mark the report or the CV.
8        MR. WEIL:  It's MC2618 through what?
9        MR. KNOTT:  Well, I guess it's
10 seventy-five pages, so I only mean to talk about a
11 couple of pages here.  So it's through 2691.  And we
12 can treat it as a single exhibit.
13     Q.   (BY MR. KNOTT:)  So, Doctor, you agree
14 with me that your knowledge of the ACH CQI process
15 is limited to what you learned from Monroe County,
16 correct?
17     A.   Yes.  And also the fact that I saw no
18 evidence of anything different being done in the
19 other counties, but mainly the Monroe County.
20     Q.   Well, you weren't given any CQI
21 documentation from any other counties, were you?
22     A.   No.  There was no indication of any -- I
23 received no other CQI documents.
24     Q.   And your characterization of the CQI
25 program is just a discussion of statistics only,

Page 91

1  correct?
2        A.   Overall, yes.  It's a discussion of
3  statistics.  I didn't see any evidence of formal CQI
4  process studies or outcome studies or sentinel event
5  evaluations or stuff that I would expect at a CQI
6  meeting.
7     Q.   So I just want to get you to look at an
8  example on page 2617.  One of the action items is
9  jail administration has received and approved new
10 medical intake questions.
11       That's not a discussion of statistics,
12 correct?
13       A.   No, that's not a discussion of
14 statistics, but it's also not a CQI unless it came
15 out of a CQI study.
16     Q.   And are you referring to CQI that
17 arises -- can only arise out of patient outcomes?
18       A.   No.  There are -- they are NCCHC
19 defines -- well, there's many aspects to CQI, but as
20 far as studies go, they define outcome studies and
21 process studies, two different kinds of CQI studies.
22       And if you want to be NCCA certified,
23 you have to do both quarterly.
24     Q.   And are you aware of any sentinel event
25 at Monroe County Jail that would have changed the

Page 92

1  outcome for Ms. Boyer if there was CQI conformed to
2  your standard?
3        MR. WEIL:  Object to form.
4        Go ahead and answer.
5        THE WITNESS:  A specific patient?  Are
6  you asking me about if there is a specific patient
7  where since a CQI sentinel event study wasn't done,
8  that directly led to Ms. Boyer's death?  Is that
9  what you're asking?  I didn't understand, I guess.
10 No, I didn't.  I'm not aware of any specific patient
11 like that.
12     Q.   (BY MR. KNOTT:)  And are you aware of
13 any sentinel events at the Monroe County Jail other
14 than the Schmieder case and the Boyer case?
15       MR. WEIL:  Object to form.
16       You can answer.
17       THE WITNESS:  The Xiong case should
18 have -- is a sentinel event, should have been a
19 sentinel event.  The Aaron Oliver case should have
20 been a sentinel event.
21     Q.   We'll talk about those in a second.
22       So you reference the Xiong case.  Can
23 you tell me the source of your records for the Xiong
24 case?  Can you tell me the Bates range?
25       A.   No.  I cannot tell you the Bates stamps



Page 93

1  on the Xiong charts off the top of my head.

2      Q.   So I just want to make sure you looked

3  at the same records that we looked at.

4           How would I do that?

5           Steve, is it in the spreadsheet that you

6  sent?

7           MR. WEIL:  I believe --

8           THE COURT REPORTER:  Counsel, I can't

9  hear you.

10          MR. WEIL:  -- not on the spreadsheet.

11  It's among the documents that we provided to

12  Dr. Keller in the medical records.

13          MR. KNOTT:  I didn't hear you.

14          MR. WEIL:  It's not in the spreadsheet,

15  the Monroe County Medical Review spreadsheet.  It's

16  in documents we sent to Dr. Keller.

17          THE WITNESS:  So I've got it pulled up

18  on my computer, the records that I had; and, let's

19  see, it looks like the first Bates stamp says

20  0003047.  And then it goes on for -- I can't

21  remember how many pages it is.

22      Q.   (BY MR. KNOTT)  It's important, Doctor,

23  could you scroll to the bottom of that?

24      A.   Okay.  All the way to the bottom, it's

25  still loading, downloading.  The last one I have is

Page 94

1  003145.

2      Q.   So you make the statement in your report

3  that at the hospital it was important that Mr. Xiong

4  was experiencing a heart attack.

5           Can you tell me the basis for that fact?

6      A.   Well, I -- I did not review the hospital

7  records, so that is something that I obtained maybe

8  from the spreadsheet I got, I guess, from counsel.

9  Or maybe --

10      Q.   Were you provided records other than the

11  Monroe County Jail for Mr. Xiong?

12      A.   Records from the Monroe County Jail?

13  Yes.  That's what I'm looking at.

14      Q.   Other than --

15      A.   That's what I'm looking at right here,

16  and there might have been -- yeah.  I don't remember

17  already specifically where I learned that he had

18  been diagnosed with a myocardial infarction at the

19  hospital.  I don't remember now.

20      Q.   And what are you looking at now, Doctor?

21      A.   I'm just finding Mr. Xiong on my -- in

22  my report that's on page 11, and then I'm in the

23  middle of Mr. Xiong's chart, so I'm ready for

24  wherever you want to reference me.

25      Q.   And what I'm looking for, Doctor, is the

Page 95

1  source for your knowledge or belief that he was --

2  experienced a heart attack?

3      A.   I don't remember specifically where that

4  knowledge came from.  I believe -- yeah.  I don't

5  remember exactly where that knowledge came from.

6      Q.   Okay.  Would it be important to your

7  analysis of the case if there was no evidence that

8  he did have a heart attack?

9      A.   No.  No.  It doesn't matter if he had a

10  heart attack or not at the hospital.

11          A lot of people -- that's actually a

12  mistake to say:  Well, we didn't find a heart attack

13  so we should never have sent him to the ER in the

14  first place.  That's one of the things that I train

15  on.  If you don't get to do retrospective analysis,

16  Mr. Xiong should have gone to the ER the day -- at

17  least the day before he went whether or not he had a

18  heart attack or not.

19      Q.   Okay.  Let's look at what you wrote

20  about Mr. Xiong on page 11.  You said he was booked

21  into the jail on December 6th, 2019.

22          So that would be a couple weeks before

23  Boyer occurred, right?

24      A.   Yes.

25      Q.   And looking at the records on your

Page 96

1  screen, Doctor, in fact, he was booked into the jail

2  in 2016, not 2019, correct?

3      A.   Well, he was booked several times; but

4  yes, you're correct.  That is a mistake I made in my

5  charting.

6      Q.   That was an incorrect statement of fact

7  in your charting, right?

8      A.   I wrote 2019, when it should have been

9  2016.

10      Q.   And he had elevated blood pressure at

11  booking and the practitioner asked that his blood

12  pressure be monitored for three days, and he refused

13  to have it monitored, correct?

14      A.   I don't remember that he refused to have

15  it monitored.  I don't recall seeing a -- seeing a

16  refusal form.

17      Q.   And when Mr. Xiong presented on the 30th

18  of December, he reported that he believed his pain

19  was related to spicy noodles, correct?

20      A.   Yes.

21      Q.   And your testimony is that if an inmate

22  eats spicy noodles and comes to the staff saying

23  that he is having pain related to spicy noodles, he

24  would require transport to the emergency room?

25          MR. WEIL:  Object to the form.



Page 97

1          THE WITNESS:  Well, no.  That's -- I
2   would not -- I would not frame it in that way.
3          So patients often say, you know, in my
4   emergency room career, patients would come in often
5   saying I'm having chest pain, and I think it's
6   something I ate.  Boy, that is really common.
7          And so you don't immediately say:  Oh,
8   yeah, it was something you ate, so we don't need to
9   do anything, go home.
10         So I think the main thing is that he
11  sought out medical care, or he sought medical care
12  based on chest pain, and when asked, What do you
13  think?
14         Well, maybe it was the spicy noodles.
15         Well, that doesn't matter.  He had chest
16  pain.
17  Q.    (BY MR. KNOTT:)  Is the patient's
18  description and belief about the source of the pain
19  relevant to the analysis?
20  A.    Maybe.  Maybe not.  You certainly don't
21  stop there.
22  Q.    So your testimony is that Mr. Xiong
23  should have been transported to the emergency room
24  on December 30th?
25  A.    Yes.  So he had abnormal vital signs, a

Page 98

1   heart rate of a hundred fourteen, elevated blood
2   pressure.
3          On the differential diagnosis, he's --
4   he's -- he's at high risk based on his age, and you
5   can't just ignore his abnormal vital signs or the
6   fact that he thinks that his chest pain was due to
7   spicy noodles.
8          I don't think -- if he was any other
9   place in the medical spectrum, if he went to an
10  urgent care center or his family physician or an ER
11  and said, I'm having chain pain, his blood
12  pressure's elevated, and he's of -- he's of the age
13  he is, they would -- even though he says I ate spicy
14  noodles, they would not turn around and say:  You're
15  okay, and send him home.  They do a workup, and the
16  workup starts with doing a differential diagnosis
17  that is based on a history and a physical exam.
18         So no.  Only a cursory history was done.
19  No physical exam was done.  No attention was paid to
20  the vital signs.  And just to ascribe it as, okay,
21  you've got indigestion, well, that's going down to
22  the very bottom of the differential diagnosis.
23  That's ignoring the things that could be causing
24  this that could kill him.
25         Matter fact, he could have just died the

Page 99

1   next day instead of just having chest pain and being
2   sent to the ER.
3   Q.    So your testimony is that a
4   forty-eight-year-old who comes to the staff and says
5   he's got pain related to spicy noodles and points at
6   the pain in his bicep, that GERD or acid reflux
7   would be the likely explanations?
8   A.    I would say that --
9          MR. WEIL:  Object to form.
10         THE WITNESS:  I would say that the
11  appropriate response to that complaint is for him to
12  get -- to see a medical provider who would do a
13  detailed history like:  When exactly did the pain
14  start?  Does it come or go?  Is it anywhere else?
15  Have you ever had it before?  Does it burn in your
16  chest?  Is it heavy in your chest?  On and on and on
17  and on, and the appropriate questions to ask.
18         And then an examination, which includes
19  palpating the belly, for example, to see if he has
20  pain in the -- where you would get pain from
21  indigestion versus listening to his lungs and heart,
22  and then if you get abnormal vitals saying, Why are
23  they abnormal, and repeating them or evaluating them
24  in some way.
25         If I was evaluating this guy in an

Page 100

1   urgent care center as a physician, I would say he
2   needs a workup.  And the workup would be -- well,
3   that history and a physical, but he would go beyond
4   that in needing some sort of testing.
5          So yes, he should have gone to the
6   emergency department.
7          But even before the emergency
8   department, it certainly would have been appropriate
9   for the practitioner on duty to come to the jail at
10  this time and see him.  That would have been an
11  appropriate response.
12         It was not elevated to the appropriate
13  levels, and there were two places it could have
14  gone.  It could have gone to the -- practitioner
15  goes to the jail and sees him, and then does
16  whatever, does the evaluation, or it could have been
17  send him to the ER.
18  Q.    Now, you're opening a different topic
19  here, Doctor.  You're not saying that you, as a
20  contracted physician for your company, were required
21  to come to the jail every time you got a call,
22  right?
23  A.    No.  But a call like this, we would have
24  gone to the jail.  I've got a patient with abnormal
25  vital signs and pain in his late forties and --



Jeffrey Keller, M.D., FACEP, FACCP                    March 19, 2024

Page 101

1    Q.   And based on what you're able to see
2  there, you don't have any evidence that it was
3  anything other than indigestion or acid reflux,
4  true?
5    A.   Sure. I mean, why would indigestion or
6  acid reflux give you a heart rate of a hundred and
7  fourteen? It wouldn't.
8    Q.   So are you ready to testify, Doctor, to
9  a reasonable degree of medical probability within
10  your field that Mr. Xiong actually experienced a
11  heart attack?
12    A.   At that moment in time, no. I think
13  that Mr. Xiong needed to see a medical practitioner
14  at that point in time. And I'll say that very
15  strongly. He should have gone to see a medical
16  practitioner at that point in time. Medical
17  practitioner could have gone to the jail to see him,
18  or he could have been sent out to see a medical
19  practitioner.
20    Q.   And he was sent out in the morning and
21  you don't know the outcome.
22    A.   He was sent out in the morning, and it
23  doesn't matter what the outcome was. He was sent
24  out in the morning when he continued to complain and
25  it got worse.

Page 102

1    Q.   Mr. Schmieder passed away in 2016,
2  right?
3    A.   Yes.
4    Q.   And you're unaware of any deaths at the
5  Monroe County Jail other than Boyer and Schmieder
6  that you attribute to ACH practices, correct?
7    A.   I didn't look at the three suicides, and
8  I don't know if ACH was responsible for mental
9  health care or if any of those suicides -- I didn't
10  look at them, so I don't know if any of them had any
11  other medical overlay to them. But there were three
12  other deaths, but I'm not aware of any beyond those
13  five.
14    Q.   So between 2016 and 2024, you're aware
15  of two deaths at the jail that you believe may be
16  related to ACH practices.
17    A.   That's two too many.
18    Q.   Can you answer the question, Doctor?
19    A.   I'm aware of -- I evaluated these two
20  deaths, and I'm not aware of any others.
21    Q.   And you're not able to determine a cause
22  of death of Mr. Schmieder, are you?
23    A.   Well, I believe the autopsy, the medical
24  examiner attributed it to respiratory failure.
25    Q.   Actually, I think the cause was

Page 103

1  undetermined, but your assumption is that it was
2  attributable to respiratory distress, correct?
3    A.   He did have respiratory distress before
4  he died.
5    Q.   At any rate, you're not able to give an
6  opinion about what was his cause of death, true?
7    A.   I would -- I would defer to his autopsy.
8    Q.   And you wrote that his -- that many of
9  the medications he brought to the jail were denied,
10  including his steroid inhaler and pain medication.
11        I read that correctly on page 10 of your
12  report?
13    A.   Yes.
14    Q.   Albuterol inhaler is a steroid inhaler,
15  isn't it?
16    A.   No.
17    Q.   What is it?
18    A.   It's an alpha agonist. It's a rescue
19  inhaler. It's a bronchodialator. It's a different
20  class of drugs.
21    Q.   He was taking -- he was using an
22  Albuterol inhaler, correct?
23    A.   Yes. He had an Albuterol inhaler that
24  he was allowed access to.
25    Q.   And he was allowed access to Combivent

Page 104

1  Respimat, right?
2    A.   I don't remember the exact ones, but the
3  exact ones -- the exact meds. Let's see, yeah. He
4  was not allowed access to his mometasol flouride
5  inhaler.
6    Q.   And how is that different than
7  Proventil, mometasone, Combivent, and Albuterol,
8  which he was allowed?
9    A.   It is a long-acting steroid in a bigger
10  dose. It's something that is kind of the mainstay
11  of therapy for people with COPD and asthma. It's an
12  important drug.
13    Q.   Which was -- which drug was that?
14    A.   The mometasol, the steroid inhaler that
15  he wasn't allowed to have. I don't understand why
16  he wasn't allowed to have it, but he wasn't allowed
17  to have it.
18    Q.   Okay.
19    A.   The issue there, actually, is also not
20  coming to see him and actually interviewing and
21  seeing him and asking: Why are you on these meds?
22  But he never saw a practitioner.
23        So if you're going to screw around with
24  his meds, you probably should see him in the flesh
25  and do an exam.



Page 105

1  Q.  And Mr. Schmieder refused a medical
2  evaluation, according to your report?
3  A.  Well, nobody went and asked him why he
4  was refusing, and nobody went back and asked him a
5  second time if I can do it on a different day.
6      So it isn't enough to just -- he's there
7  for a month. It isn't enough to say: Well, he
8  doesn't need -- he's refused, so he's refused
9  forever. That's not appropriate. He's still your
10 patient. Even though he's refused, he's still your
11 patient. You go back and check on him again.
12     He didn't refuse wellness checks. He
13 didn't refuse anybody coming and saying: Can I take
14 your vitals and see how you're doing.
15 Q.  Doctor, you have no reason to believe he
16 was incompetent, right?
17 A.  No.
18 Q.  And he never asked for the medications
19 that he was denied, right?
20 A.  No. There are a lot of people that --
21 that don't --
22 Q.  Can I get an answer?
23 A.  I said no.
24 Q.  He never asked for --
25 A.  I said no, and I was going to add a

Page 106

1  little bit.
2  Q.  And do you think that the nursing staff
3  didn't have a conversation with him when he was
4  refusing and signing refusal?
5  A.  I don't see any -- I didn't see any
6  notes of their conversations with him. If the
7  nurses had a conversation, you know, one of the
8  things I taught, and I believe is the medical
9  standard of care that would happen in a hospital, is
10 every interaction between a medical professional and
11 a patient generates a note of what happened of some
12 kind. So if the nurses --
13 Q.  Like a refusal form?
14 A.  If the nurses went up and talked to him
15 and said, How are you doing -- I'm talking about
16 later. I believe that you meant later. If the
17 nurses went up and saw him later and said, How are
18 you doing, I would expect that would have generated
19 a note.
20     And besides the refusal form, I don't
21 see that they made any investigation of why he was
22 refusing.
23 Q.  And he refused -- strike that.
24     I need to know, in page 11, the basis
25 for you to say that the medical staff were aware of

Page 107

1  his, quote, troubled breathing the night of his
2  death, the night before his death.
3  A.  Okay. So if I remember correctly, the
4  investigator conducted interviews with the inmates
5  who stated that before his death he was having
6  trouble breathing, and medical staff were aware of
7  this problem.
8      Where that came from exactly, I think it
9  came from -- I'm not sure -- I think it came from
10 the in-custody death summary, so I'm looking for
11 it.
12 Q.  You faded there on me. It came from
13 where?
14 A.  I believe it came from the death
15 summary, but I'm looking for it.
16     By the way, when -- the refusal forms
17 weren't signed by Mr. Schmieder, which I think was
18 odd, but why wouldn't he sign?
19     But be that as it may, I'm not seeing
20 where the in -- his fellow inmates notified medical
21 staff.
22 Q.  You're not seeing that.
23 A.  No. I can't find it at this point in
24 time.
25 Q.  Okay. I shared the screen of the

Page 108

1  medication verification form from the day
2  Mr. Schmieder was booked.
3      Which of his vitals were abnormal?
4  A.  His heart rate is a hundred and one,
5  that's abnormal. His respiratory rate is
6  twenty-two, that's abnormal. His blood pressure is
7  okay. He doesn't have a fever.
8  Q.  Okay. Pull up your records for
9  Mr. Mendoza.
10 A.  I lost it. Oh, they're not in deaths.
11 That's why.
12 Q.  Are you with me, Doctor?
13 A.  I'm looking for Mendoza. I've seen some
14 of the other patients go by, but I haven't seen
15 Mendoza yet.
16     MR. WEIL: Dr. Keller, I'm not sure how
17 to help you find it. I pulled it up from the e-mail
18 I sent you.
19     THE WITNESS: I've seen lots of other
20 ones: Coleman, Date, Hodgkins, Luthke, Mask,
21 Xiong.
22     MR. WEIL: You're getting there. You're
23 getting there on that list.
24     THE WITNESS: And then a bunch of them,
25 it isn't clear to see. It isn't clear exactly who



Jeffrey Keller, M.D., FACEP, FACCP                                    March 19, 2024

Page 109

1  it is, Eli Brush, without opening it.

2          So I need to open them all, I guess.

3      MR. WEIL:  You should be able to click

4  right at the top and just scroll through them.

5      THE WITNESS:  Hanson.  Well, if you

6  found it, where is it in the list?

7      MR. WEIL:  Yeah.  I'm going to -- let me

8  see here, can we go off the record real quick?  I

9  think I can get it to him pretty quickly.

10         Is that okay, Doug?

11     MR. KNOTT:  Sure.

12     MR. WEIL:  Okay.  Thanks.

13     (Pause in the proceedings.)

14     MR. WEIL:  Are you ready to go back on,

15  Doug?

16     MR. KNOTT:  Yeah.

17     MR. WEIL:  Okay.

18     Q.   (BY MR. KNOTT:)  So, Doctor, I'm sharing

19  the screen for an event from August 25, 2012.  If

20  you take a look at that, it's -- do you agree that

21  this is the event that you described in your report

22  at page 11?

23     A.   Uh-huh, yes.  It was -- actually, it was

24  the one earlier is the one I'm really talking about

25  where it says -- this is one -- the second one.  He

Page 110

1  was complaining the second time.

2      Q.   Okay.  And actually, Doctor, you wrote

3  in your report that it was August 25, 2019.  In

4  fact, per MC39943, this is an event that occurred in

5  2012.

6          Okay?

7      A.   Okay.

8      Q.   So you made a mistake of fact as to the

9  year that this occurred, right?

10     A.   Yes.

11     Q.   And then with respect to the 2019

12  incident, August 16, 2019, page MC Medical 40219,

13  it's a nursing note.

14         Is this the source of your information

15  for the second half of your note?

16     A.   I believe so.

17     Q.   Paragraph 3, page 11, Doctor?

18     A.   I believe so.

19     Q.   And you wrote that the LPN diagnosed him

20  with anxiety.

21         First of all, she's an R.N., right?

22     A.   Okay.

23     Q.   Correct?

24     A.   This note is signed by an R.N., yes.

25     Q.   And is the difference in training

Page 111

1  between an R.N. and LPN significant to you,

2  Doctor?

3      A.   Yes.

4      Q.   You repeatedly refer to the Monroe

5  County Jail R.N.s as LPNs.

6          Is there a reason for that?

7      A.   Well, are they all R.N.s?  When I used

8  LPN, I based it on what I was seeing in the --

9  seeing on their signatures.

10     Q.   Okay.  So, Doctor, there's no report of

11  chest pain in this note, correct?

12     A.   I am not sure if that is the one that I

13  was referring to, but there -- yes.  This is not the

14  right one.  It was the event that happened earlier

15  where the anxiety he had mentioned earlier, he did

16  not want to take his PRN Hydroxyzine.  It's the

17  interaction where the PRN Hydroxyzine was

18  prescribed.

19     Q.   What are you reading, Doctor?

20     A.   I'm reading right in the middle where it

21  says:  I asked patient about the anxiety he

22  mentioned to me he had been feeling earlier today.

23  He agreed he was feeling anxious.  He did not want

24  to take his PRN Hydroxyzine.

25         So it was already prescribed.  So it was

Page 112

1  earlier than that.  It was an earlier interaction

2  than this one.

3      Q.   Well, you don't -- you don't reference

4  Hydroxyzine in your report.

5      A.   No.  I don't mention Hydroxyzine in my

6  report.

7      Q.   And so are you saying there's another

8  significant event on August 16th, 2019, where the

9  care was mismanaged?

10     A.   There is an incident, and I'll find it

11  if I look -- if I continue to look, but there was an

12  incident where Mr. Mendoza wasn't -- here he's

13  complaining of repeating reporting his claim.  It

14  was -- well, maybe it was this one.  I don't know.

15         The one I remember seeing was the nurse

16  had a diagnosis of anxiety.  I don't think this is

17  the same one.  And the one where the Hydroxyzine

18  started.  So I don't believe that's the same one

19  that I referenced.

20     Q.   So if there's another note on August 16,

21  2019, referencing the starting of Hydroxyzine, then

22  that's what you're referring to.  Otherwise you're

23  mistaken about there being a note describing a

24  diagnosis.

25     A.   I don't believe I am mistaken, and I



Page 113

1  don't believe -- no. I don't believe I'm mistaken
2  about there being another note, and I don't believe
3  I'm mistaken about having a diagnosis of anxiety,
4  and the beginning of Hydroxyzine.
5      Q.   Okay. So there's no reference in the
6  note that's in front of you 040219 to a nurse making
7  a diagnosis.
8          Do you agree?
9      A.   There's no reference there as to the
10  nurse making a diagnosis in that note.
11     Q.   And what she describes as the inmate had
12  mentioned anxiety to her earlier in the day. I'm
13  putting my highlighter on it, my mouse on it.
14  Right?
15     A.   Yes. That note mentions that. I don't
16  believe that's the note I was referring to.
17     Q.   Okay. And he reported drinking a lot of
18  coffee, at least in the note that I'm referring to,
19  right?
20     A.   Yes.
21     Q.   And he reported that he agreed he is
22  feeling anxious, right?
23     A.   Yes. Even that being the case -- even
24  that being the case, though, this is something that
25  should have been elevated to a practitioner, maybe

Page 114

1  not immediately, but a practitioner should have seen
2  him.
3      Q.   On his report of anxiety that resolved
4  in ten minutes?
5      A.   With a prescription of Hydroxyzine,
6  which is a medicine that needs to have a
7  practitioner prescribe it.
8      Q.   You don't have any evidence of a cardiac
9  condition for Mr. Mendoza, true?
10     A.   No.
11     Q.   And no evidence that he complained about
12  his care, right?
13     A.   No.
14     Q.   And no evidence that this report on
15  August 16, 2019, was anything other than anxiety,
16  true?
17     A.   No. I have no evidence -- I don't know
18  whether that is true or not. I do think, though,
19  that there are other things in the differential
20  diagnosis that would cause rapid heart rate and not
21  being able to breathe that are not anxiety, and
22  proper management is to rule them out first.
23     Q.   As far as you know, it was anxiety and
24  the nurse was correct.
25     A.   I don't -- I don't know. Neither does

Page 115

1  she.
2      Q.   I want to talk to you about Elizabeth
3  Coleman.
4      A.   Okay.
5      Q.   Okay.
6      A.   I've got Elizabeth Coleman open.
7      Q.   And your criticism of the staff is that
8  she was not properly worked up for seizures; is that
9  correct?
10     A.   Correct.
11     Q.   She was not seen by a practitioner. In
12  fact, I'm showing you page MC Medical 011710.
13  Ms. Coleman was sent to the emergency room the night
14  she fell, right?
15     A.   Yes.
16     Q.   And do you know what recommendations the
17  emergency room had for her?
18     A.   Well, let's pull it up. So I've got --
19  if you're looking at the med list that they sent
20  back, the after-visit summary, that's where I'm
21  at.
22     Q.   Me, too, Doctor. So in the after-visit
23  summary, she was seen for a head injury. She was
24  given a CT and the recommendation was acetaminophen,
25  correct?

Page 116

1      A.   No. I got the medication list as being
2  copaxone, metoclopramide, Albuterol, and
3  topiramate.
4      Q.   Right. And the topiramate was restarted
5  at the recommendation of the R.N. in communication
6  with the nurse practitioner after this workup at the
7  hospital, right, Doctor?
8      A.   Right. And the nurse practitioner at
9  the jail never saw her. This is another reason why
10  the nurse practitioner should have seen her.
11         She went to the hospital with a head
12  injury. Those patients who have an injury bad
13  enough that they need to go to the ER, you can't
14  just blindly assume they're going to get better.
15  Some don't. And that should have generated a visit
16  with the nurse practitioner. It did not.
17         Someone that had just started a new
18  prescription for topiramate, she would have been on,
19  what, seizure chronic care and should have been seen
20  by a practitioner, and she was not.
21     Q.   So she had fallen on the 8th and had
22  been to the emergency room, right?
23     A.   Yes.
24     Q.   And she had a CT, and was sent back to
25  the emergency room -- or sent back to the jail,



Page 117

1  right?
2      A.   Yes.
3      Q.   The hospital listed her medications as
4  including topiramate --
5      A.   Yes.
6      Q.   -- right?
7           And you're critical of the continuation
8  of the topiramate?
9      A.   No.
10          MR. WEIL:  Object to form.
11          THE WITNESS:  I'm critical of the fact
12  that she had never seen a practitioner.  So, for
13  example, here on page -- let's see, I don't see a
14  Bates number on it, but I'm looking at a narrative
15  progress note 9-13-19.  Nurse was called to pod by
16  jail staff because patient was having a seizure.
17  She was able to stand and walk back to her -- she
18  was not visibly shaking.  She saw flashing lights.
19  She calmed down, asked questions, never referred to
20  a practitioner.
21     Q.   Can I share on the screen with you,
22  Doctor?  This is MC Medical 011711.
23          Can you see this?
24     A.   Yes.
25     Q.   And it's a medical progress note, MPPA.

Page 118

1  Do you see that at the top?
2      A.   Uh-huh.
3      Q.   January 27, '20, and signed by a nurse
4  practitioner.
5           So do you agree that your criticism that
6  this patient was never seen by the nurse
7  practitioner in person is baseless criticism?
8           MR. WEIL:  Object to form.
9           THE WITNESS:  The criticism I have with
10  that -- okay.  I guess I'll have to -- I'll admit
11  that she was seen by --
12     Q.   (BY MR. KNOTT:)  Can we start with --
13  can we start with if you're critical with the nurse
14  practitioner for never seeing her, then you're
15  wrong?  Can we start with that?
16          MR. WEIL:  Object to form.
17          THE WITNESS:  It appears that the nurse
18  practitioner saw her.
19     Q.   (BY MR. KNOTT:)  So the criticism you
20  articulated in paragraph four is inaccurate.
21          Do you agree with that?
22     A.   Yes.
23     Q.   And, Doctor, did you receive information
24  from Mr. Weil's firm that Ms. Coleman was never seen
25  by a practitioner?

Page 119

1      A.   No.  That was -- that was me.  I
2  evidently missed that -- that form.  That mistake
3  was my mistake, not Mr. Weil's mistake.
4      Q.   I want to try to move along through
5  these.  I generally -- I know you don't think it's
6  important, but I want to ask you whether you're
7  aware of the outcome for these patients.  So I just
8  want to get that factually in the record.
9           So Troy Maske, you describe his report
10  of heartburn, and he was given Tums in 2019, and you
11  say he should have had a cardiac workup.
12          Is that your criticism?
13     A.   Well, my criticism starts before that on
14  6-14-19, where he was given an emergency dose of
15  clonidine, and if he's sick enough to get an
16  emergency dose of clonidine, he needed to have -- he
17  should have had -- he should have had a workup.
18          I mean, he should have been seen
19  face-to-face by a practitioner, and if he really
20  needs an emergency dose of clonidine, he's that
21  sick, he needs face-to-face workup with a
22  practitioner, so he should have been sent to the
23  hospital for a cardiac workup, I guess, at that
24  point.
25          And then again, he's -- the nurse

Page 120

1  practitioner never saw him, as far as I could see
2  on -- after he -- after he complained of chest pain
3  and was given -- had abnormal vital signs and was
4  given Tums.
5      Q.   And you have no evidence that Mr. Maske
6  actually had a cardiac condition, right?
7      A.   No.
8      Q.   And you have no evidence that Mr. Maske
9  asked for or felt the need for more treatment,
10  right?
11     A.   No.  That's irrelevant.  The nurse
12  practitioner --
13     Q.   I understand that.  I'm trying to get
14  the facts --
15     A.   On 6-14, the nurse practitioner thought
16  he was so sick that he needed an emergency dose of a
17  cardiac medication, and yet never saw him later and
18  never sent him to the ER.
19          So then he complains again on a second
20  time of chest pain, and this time he got Tums, which
21  is not an emergency medication, but nevertheless, he
22  needed to have a face-to-face with a nurse
23  practitioner --
24     Q.   So --
25     A.   -- or go to the ER.

888-893-3767                Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                        California Firm Registration #179

LEXITAS

Page 121

1    Q.   I'm just trying to get these facts of
2    record, and there's no evidence that Mr. Maske had
3    actually had a cardiac condition, right?
4    A.   Right.
5    Q.   And there's no evidence that he had an
6    untoward outcome from his complaints of chest pain
7    in 2019, correct?
8    A.   Correct.
9    Q.   And you described -- well, strike that.
10        Mr. Hanson was sent to the emergency
11   room for medical clearance before he was booked into
12   the jail, right?
13   A.   Okay.  So let's go to Mr. Hanson.
14   Q.   It's in your report.
15   A.   Right.
16   Q.   Take your time.
17   A.   Right.  He went to the emergency
18   department for hemoptysis just right before he was
19   booked into jail.
20   Q.   I'm trying to find the document where
21   you say that the nurse diagnosed him with acid
22   reflux.
23        At any rate --
24   A.   I was on the wrong page.
25   Q.   -- there's no evidence that you're aware

Page 122

1    of, Doctor, that Mr. Hanson had a cardiac disorder,
2    true?
3    A.   No.
4        MR. WEIL:  Object to form.
5        Go ahead and answer.
6        MR. KNOTT:  Excuse me.
7        THE WITNESS:  I have no evidence that he
8    had a cardiac abnormality.
9    Q.   (BY MR. KNOTT:)  And no evidence that
10   Mr. Hanson felt that he needed more treatment or to
11   go to the hospital, right?
12   A.   No.
13   Q.   And no evidence that Mr. Hanson had an
14   untoward outcome, true?
15   A.   No.
16   Q.   Not true?
17   A.   No.  I have no evidence that he had an
18   untoward outcome.  But the fact that his care was
19   not elevated to a nurse practitioner of some kind,
20   that LPN didn't even call the practitioner,
21   didn't put him on the schedule to see a
22   practitioner, that was inappropriate medical care.
23   The fact that he had no bad outcome doesn't make it
24   okay.
25   Q.   Sometimes, Doctor, the inmates are put

Page 123

1    on the schedule to be seen at a clinic, and they're
2    discharged before that clinic date comes around,
3    true?
4    A.   That is true.
5    Q.   I'm going to share a screen for Eli
6    Brush, and your comments on Mr. Brush are in reverse
7    order, I think.  With respect to the 2019 event,
8    12-21-2019, you say:  Mr. Brush was seen by an LPN
9    who diagnosed anxiety and prescribed Hydroxyzine
10   without calling a practitioner.
11        So that would be reflected in this
12   narrative note, wouldn't it, Doctor?
13   A.   I can't -- can you enlarge that?  I
14   can't read it.  Okay.
15   Q.   And I don't -- first of all, this was
16   an R.N., not an LPN as you've described her.
17   A.   Right.
18   Q.   And I don't see anywhere in her language
19   that she diagnosed him with anxiety, do you?
20   A.   Okay.  I'm not sure if that is the one
21   that I saw, but it must have been.  That's the date.
22   So no, I don't see where she diagnosed anxiety
23   there.
24   Q.   And your criticism is that the R.N.
25   diagnosed anxiety and prescribed Hydroxyzine without

Page 124

1    calling a practitioner, and that's not true either
2    is it, Doctor?  This is a telephoned voice order
3    from the nurse practitioner, right?
4    A.   I don't think that that is the -- that
5    that is the right note that I looked at.  Doesn't
6    look like the right note.  I would have to find the
7    right note.
8    Q.   Do you agree that Hydroxyzine was
9    ordered as a result of a telephone order with the
10   nurse practitioner --
11   A.   Yes.
12   Q.   -- on December 21 of 2019?
13   A.   Yes.
14   Q.   And there's no evidence that Mr. Brush
15   had a cardiac disorder, true?
16   A.   No.
17   Q.   No evidence that Mr. Brush felt the need
18   for more treatment or to go to the hospital, true?
19   A.   True.
20   Q.   And no evidence that Mr. Brush had an
21   untoward outcome, true?
22   A.   True.
23   Q.   Do you have another criticism about the
24   treatment of Mr. Brush on February 20, 2020?  I'll
25   tell you, I couldn't find any treatment on



1 February 20, 2020, but this is February '22.

2     And assuming this is what you're

3 referring to, there's no reference in this document

4 to Mr. Brush reporting chest pain.

5     **A.   Well, the quick, dull cramp, I guess.**

6 **That's the one I'm looking at.**

7     Q.   It doesn't say where that is.

8     **A.   Well, let's go down.  If that's the one,**

9 **yeah, no major medical concern.  So I assume that**

10 **that was chest pain.**

11     Q.   Okay.  His vitals are normal?

12     **A.   Yes.**

13     Q.   Sitting comfortably in the chair with no

14 physical distress?

15     **A.   It should have been elevated to either**

16 **go to the hospital or to see Ms. Pisney later, which**

17 **I don't believe he did.**

18     Q.   All right.  Again, well --

19     I'm going to share with you a record for

20 Mr. Hage, and your criticism is he was seen by

21 an LPN who diagnosed withdrawal and prescribed

22 Hydroxyzine without calling a practitioner?

23     Do you agree with me, Doctor?

24     **A.   Yup, yes.**

25     Q.   It wasn't an LPN, it was an R.N. that

1 interacted with him that day, right?

2     **A.   Yes.**

3     Q.   She didn't diagnose withdrawal.  Her

4 assessment was possible withdrawal, right?

5     **A.   That's shaving a point, but she thought**

6 **he was having withdrawal.**

7     Q.   And your criticism that it was

8 prescribed without calling a practitioner is

9 erroneous because it says telephone order of

10 Dr. Schamber, right?

11     **A.   Yes, that's correct.**

12     Q.   And Dr. Schamber signed it the next day.

13     **A.   But didn't see the patient.**

14     Q.   With respect to Mr. Hage, there's no

15 evidence of an actual cardiac disorder; is that

16 true?

17     **A.   No.  I think the question on Mr. Hage**

18 **was one of withdrawal.**

19     Q.   So that is a true statement by me?

20     **A.   Yes.**

21     Q.   And there's no evidence that Mr. Hage

22 thought that he needed more treatment or to go to

23 the hospital, right?

24     **A.   No.**

25     Q.   And no evidence of a bad outcome,

1 right?

2     **A.   No.**

3     Q.   And with respect to the lump on

4 Mr. Hage's back, you don't have any evidence that,

5 in fact, it was a malignancy, correct?

6     **A.   No.**

7     Q.   And isn't it a true statement that it's

8 unlikely malignant if it's movable?

9     **A.   Well, that might be true.  It's just**

10 **that an R.N. or an LPN, a nurse, shouldn't be the**

11 **one making that determination.  It should be a**

12 **practitioner making that determination.**

13     **The nurse might have been right, but**

14 **she's not the right person to be making that**

15 **determination.  She should have elevated that to a**

16 **practitioner.**

17     Q.   Doctor, if you look at the note of that,

18 it's MC Medical 22552, it's actually Dr. Schamber

19 who's relating that it's most likely not malignant

20 if moveable, true?

21     **A.   Dr. Schamber needed to examine the**

22 **patient himself.  His -- that comment may or may not**

23 **be right, but he needs to examine the patient.**

24     Q.   I want to ask you about Erin Oliver.

25     Sir, with respect to this Erin Oliver,

1 if I understand your narrative correctly, she

2 reported a decaying tooth.  Nurse Pisney saw her,

3 and identified it as a cavity in the middle of the

4 tooth space on November 29, and she was seen at the

5 dentist on January 2, 2020.

6     **A.   Right.**

7     Q.   And I assume that you're not qualified

8 to give an opinion that the four teeth extraction

9 could have been avoided if she had been seen

10 earlier?

11     **A.   No, I am not, but I am -- but I can say**

12 **that it should have been elevated to see a dentist**

13 **far sooner and that her pain and suffering during**

14 **that month could have been lessened if it had been**

15 **elevated to a dentist sooner.**

16     Q.   Doctor, do you have trouble getting

17 dentists to treat prisoners in Idaho?

18     **A.   No.**

19     Q.   Do you ever have delays in getting

20 prisoners out for the dental care they thought they

21 needed?

22     **A.   No, I haven't.  I would expect if that**

23 **was the case in -- on Erin Oliver, that a nurse or**

24 **somebody would have written a note that said I**

25 **called a dentist, and earliest we can get Ms. Oliver**



Page 129

1  in is such-and-such, and I've informed Ms. Oliver of
2  this.  I didn't see any such note.  It might be that
3  what you say is the case, but I didn't see any
4  evidence of it.
5      Q.   I'll share with you MC Medical 42706.
6  It is a report from Ms. Oliver, sick call request,
7  December 31.  And the response is made the same day
8  saying: Erin, an appointment has been made for you
9  to be seen at the dentist.  Due to jail policy,
10  medical cannot tell you the date.  And then it says:
11  Patient seen by the nurse practitioner?
12      A.   Yeah.  My criticism isn't that she
13  eventually got to the dentist.  My criticism is she
14  should have been elevated to the dentist far
15  earlier.
16          If she could not have been elevated --
17  you know, if they couldn't have made an appointment
18  on December 7th, December 9th, November 29th, then I
19  would -- if they had written a note, then that would
20  have been one thing.  I did not see a note to that
21  effect.
22      Q.   In your discussion of the cases at
23  facilities serviced by ACH --
24          MR. WEIL:  Can we take a quick bathroom
25  break if you're shifting gear?

Page 130

1          MR. KNOTT:  Yeah.  Yeah, but I'm going
2  to try to wrap up soon here.
3          MR. WEIL:  Okay.  Well, your call.  I
4  could use one, if you wouldn't mind.
5          MR. KNOTT:  Yes.
6          MR. WEIL:  Thank you.
7          (A brief recess was had.)
8          MR. KNOTT:  Back on the record.
9      Q.   (BY MR. KNOTT:) Doctor, with respect to
10  the eleven cases at other facilities serviced by
11  ACH, the extent of your knowledge is contained in
12  papers or the records you received from Mr. Weil's
13  office, right?
14      A.   Yes.
15      Q.   And those eleven cases were selected by
16  Mr. Weil, I think some of them were included in the
17  complaint.  They were not selected by you, right?
18      A.   Yes.
19      Q.   And, well, with respect to the Monroe
20  County Jail cases, there were, I think, seven of
21  them that you said you had technical difficulties
22  and couldn't open the file.
23          I assume you are not able to open the
24  file today.
25      A.   Probably not.  I haven't looked, but

Page 131

1  probably not.
2      Q.   You don't have any opinions on those?
3      A.   No.
4      Q.   And did you rely -- with respect to the
5  eleven cases from those other facilities, did you
6  rely on the plaintiff's expert or their evaluation
7  of the case?
8      A.   I looked at all the -- all their records
9  myself that I was sent.  I also looked at some, but
10  not all of the plaintiff's experts.
11      Q.   Did you look at some of the defense
12  expert reports?
13      A.   No.  I don't think I was sent any
14  defense expert reports, so I did not look at any
15  defense expert reports.
16      Q.   Are the records that you received for
17  those eleven cases summarized in some correspondence
18  from Mr. Weil's office?
19      A.   Would you repeat the question?
20      Q.   Yeah.  I don't want to repeat the
21  question.  It was a bad question.
22          Were the records from the eleven cases
23  that you reviewed for other facilities, were those
24  abstracted or summarized in some way by Mr. Weil's
25  office?

Page 132

1      A.   Mr. Weil's office did do a summary on
2  them, but the records I reviewed were the actual
3  records from the facilities that I was sent plus
4  some autopsy reports and autopsy files.
5      Q.   And I'm sorry if I asked you this, but
6  you didn't read any depositions, right?
7      A.   I read some plaintiffs' depositions, but
8  I didn't -- but I didn't read all of them, and I
9  didn't read any defense depositions.
10      Q.   Why would you choose to do that?
11          MR. WEIL:  Object to form.
12          THE WITNESS:  On the depositions, I
13  relied on the summaries that were provided to me by
14  Mr. Weil's office.
15          MR. KNOTT:  And, Mr. Weil, have those
16  summaries been provided to us?
17          MR. WEIL:  We provided you the
18  documents --
19          THE COURT REPORTER:  Wait.  Speak up a
20  little bit.  I couldn't hear you.
21          MR. WEIL:  We have provided the
22  summaries that we provided to Dr. Keller.
23      Q.   (BY MR. KNOTT:)  Dr. Keller, a
24  differential diagnosis is not simply the process of
25  ordering the most serious potential cause of



Page 133

1  symptoms at the top, no matter how unlikely, is
2  it?
3          MR. WEIL:  Object to form.
4          Go ahead and answer.
5          THE WITNESS:  Differential diagnosis
6  takes into account likelihood as well as -- as well
7  as lethality and ability to cause morbidity.
8          So the whole process of developing a
9  differential diagnosis takes into account the most
10  likely things, but also ranks those; so, yes, there
11  is that, but it also ranks them according to which
12  ones are most important to rule out first.
13     Q.   (BY MR. KNOTT:)  And the clinician is
14  required to evaluate the report of symptoms in each
15  case to weigh the likelihood of each diagnosis as
16  explaining the symptoms, right?
17          MR. WEIL:  Object to form.
18          THE WITNESS:  The first step in
19  formulating a differential diagnosis is to get a
20  complete history and do a physical exam.  It's
21  inappropriate to start speculating beforehand.
22  After you do --
23     Q.   So it's a --
24          MR. WEIL:  Let Dr. Keller finish.
25          THE WITNESS:  After you get your -- do

Page 134

1  the history and do the physical, then is the time to
2  formulate a differential diagnosis based on, yes,
3  the complaints the patient has, but also based on
4  the history that you got and the physical exam that
5  you did that.
6     Q.   (BY MR. KNOTT:)  And do you agree that
7  the ordering of the potential diagnosis on a
8  differential diagnosis involves the application of
9  clinical judgment to the facts and circumstances of
10  the case?
11          MR. WEIL:  Object to form.  Go ahead and
12  answer.
13          THE WITNESS:  Yes.
14     Q.   (BY MR. KNOTT:)  And the manner that you
15  approach the workup to attempt to investigate and
16  find the cause of the symptoms, that involves
17  clinical judgment, doesn't it?
18          MR. WEIL:  Object to form.
19          Go ahead and answer.
20          THE WITNESS:  Would you repeat that
21  question, please.
22     Q.   (BY MR. KNOTT:)  The manner in which the
23  clinician proceeds through the workup to address and
24  investigate the symptoms is a matter of clinical
25  judgment, too, isn't it?

Page 135

1          MR. WEIL:  Object to form.
2          THE WITNESS:  Well, to some degree it
3  is, although it has common ground no matter what the
4  patient and what the complaint, and that is that you
5  have gather a history and you do a physical exam.
6          And then where you go from that depends
7  on what you've learned from the -- from the history
8  and the physical exam.
9     Q.   (BY MR. KNOTT:)  Do you agree that
10  anxiety is a cause of Ms. Boyer's elevated blood
11  pressure, shortness of breath, and diaphoresis on
12  Sunday the 22nd, that anxiety would be on the
13  differential diagnosis, at least a potential
14  explanation?
15          MR. WEIL:  Object to form.
16          THE WITNESS:  It would not have been on
17  my differential diagnosis at that point.
18     Q.   (BY MR. KNOTT:)  Nowhere on the
19  differential?
20     A.   Maybe low down.  But I mean, the idea
21  that anxiety alone in a patient with a high
22  problem -- high risk factor for heart disease, and a
23  related history of cancer and chemotherapy, that
24  that person's diaphoresis, sweatiness, and blood
25  pressure elevation, and all of the elevations, would

Page 136

1  have been due to anxiety, is so low that it wouldn't
2  have even been on my list.  It's possible, yes; but
3  it certainly not probable.
4          MR. KNOTT:  All right.  I'm going to
5  wrap it up there and let others ask questions while
6  I check my notes.
7          MR. JONES:  I'm happy to go next, John,
8  unless you want to start.
9          MR. CASSERLY.  That's fine.  I'll only
10  have about fifteen or twenty minutes when you're
11  done.
12          MR. JONES:  Okay.
13
14          EXAMINATION
15  BY MR. JONES:
16     Q.   Doctor, I'm Andrew Jones.  I'm the
17  attorney who represents the Monroe County, and the
18  individual Monroe County defendants.
19          I'm going to try and move as quickly as
20  I can.  I know we've been at this a while.  But I do
21  want to ask some follow-up questions in particular
22  about the Monroe County patients whose records you
23  reviewed.
24          Fair enough?
25     A.   Yes.



Page 137

1   Q.   And tell me, how is it easiest for you?
2  I notice when Mr. Knott had pages up that he was
3  sharing on his screen that you more often than not
4  were looking at the laptop that's in front of you at
5  the medical record on the laptop.
6        Is it easier if I just refer to a Bates
7  number for a particular patient, or do you want me
8  to share on the screen?
9   **A.   Why don't you share on the screen**
10  **because oftentimes I could not find what I was**
11  **looking for.**
12   Q.   Okay.  So for Mr. Xiong -- I'm sorry.
13       So we talked about the episode of chest
14  pain he had on December 30th.  And I want to go back
15  to when he was screened into the jail on
16  December 9th.  Okay?  And I'm sharing on the screen
17  Monroe County 3127 through 31.
18       You recognize this as I'm moving
19  about --
20   **A.   Yes.**
21   Q.   -- as the medical screening report for
22  Mr. Xiong?
23   **A.   Yes.**
24   Q.   It would have been completed at the time
25  he was booked into the jail?

Page 138

1   **A.   Yes.**
2   Q.   And you noted in your report that his
3  blood pressure was high when he was booked, yes?
4   **A.   Yes.**
5   Q.   One fifty-four over ninety-three?
6   **A.   Yes.**
7   Q.   And the direction at the time was to
8  administer a dose of clonidine and then recheck his
9  blood pressure over the next several days,
10  correct?
11   **A.   Yes.**
12   Q.   And I'm showing you now what's been
13  marked as 3083 through 85.
14       Do you recognize having seen these
15  refusal of treatment forms before just now?
16       And they indicate that he refused to
17  have his blood pressure checked on the 11th of
18  December and the 10th of December, correct?
19   **A.   Yes.**
20   Q.   He did have a medical history completed
21  while he was in the jail, correct?
22   **A.   Yes.**
23   Q.   I'm showing you Monroe County 3087.
24  It's a little hard to tell the date on this, but I
25  understood this was from December 21st of 2016.

Page 139

1        Is that your understanding?
2   **A.   Yes.**
3   Q.   And his vitals were taken as part of
4  that medical history, correct?
5   **A.   Yes.**
6   Q.   And was there anything abnormal in those
7  vital signs as of December 21st?
8   **A.   No.**
9   Q.   And was there any indication of any sort
10  of cardiac or heart problem or abnormality as a
11  result of that medical history completed on the
12  21st?
13   **A.   No.**
14   Q.   And then, if we look to -- if we go then
15  to the evening of December 30th, when he first
16  complained of chest pain, I'm showing you Monroe
17  County 3073 through 75, this is the document filled
18  out by the officer as a result of his complaint,
19  yes?
20   **A.   Yes.**
21   Q.   All right.  And Mr. Xiong indicated he
22  had no history of heart disease, elevated blood
23  pressure, or other medical conditions, correct?
24   **A.   Yes.**
25   Q.   And he indicated to the officer he

Page 140

1  wasn't on any heart medication, yes?
2   **A.   Yes.**
3   Q.   No history of cocaine usage, correct?
4   **A.   Yes.**
5   Q.   And he evidently was then asked by the
6  officer how long he had been having the pain,
7  correct?
8   **A.   Yes.**
9   Q.   And his response was it had just started
10  five minutes ago, correct?
11   **A.   Yes.**
12   Q.   And he was asked by the officer for his
13  subjective assessment or understanding of what was
14  causing the pain, yes?
15   **A.   Yes.**
16   Q.   And he indicated that he had eaten spicy
17  noodles, yes?
18   **A.   Yes.**
19   Q.   And he told the officer he had not had
20  similar symptoms before this, correct?
21   **A.   Correct.**
22   Q.   And he told the officer the pain came
23  and went, correct?
24   **A.   Yes.  Which is -- which, by the way, is**
25  **important.**



Page 141

1    Q.    That's one of the things you want
2  Mr. Xiong to have been asked, correct?
3    A.    Yes.
4    Q.    And he indicated he described the pain
5  as hot, aching, yes?
6    A.    Yes.
7    Q.    He did not have nausea or vomiting?
8    A.    Yes.
9    Q.    No shortness of breath, correct?
10    A.    Yes.
11    Q.    And there was no pain in his neck,
12  shoulder, or arm, correct?
13        MR. WEIL:  Object to form.
14        THE WITNESS:  Well, he -- except he
15  pointed to his left bicep when asked where he felt
16  the pain.
17    Q.    (BY MR. JONES:)  Well, let me ask a
18  better question.  When asked if the pain was in his
19  neck, shoulder, or arm, he responded no, correct?
20    A.    Yes.
21    Q.    And when he was asked to show or
22  pinpoint the area of the pain, he put his hand on
23  his left bicep, correct?
24    A.    Yes.
25    Q.    The vitals were measured as shown on the

Page 142

1  form, correct?
2    A.    Yes.
3    Q.    And he had, to the officer's
4  observation, no shortness of breath and no abnormal
5  sweating, correct?
6    A.    Yes.
7    Q.    And when you -- when you testified, I
8  believe -- well, let me put it differently.  When
9  you said in your report that his symptoms were
10  consistent with a heart attack, what specifically
11  are you pointing to?
12    A.    Well, first of all, he's -- he's in a
13  high risk category based on his age, near fifty, and
14  the fact that he has high blood pressure, as a
15  matter of fact, his blood pressure was so high he
16  needed an emergency dose of clonidine to bring it
17  down.
18        He's having -- he's having pain, cardiac
19  pain is felt in the chest, but commonly radiates to
20  the left arm.  He's having pain in the left arm.
21  Cardiac pain typically, or very commonly, comes and
22  goes.  You get it and it goes away, you get it back.
23  And then he has abnormal vital signs.
24        So all of that in an emergency room, he
25  would not -- or an urgent care center, for example,

Page 143

1  or doctor's office, he would not just be given Tums
2  for this, he would get a workup.  At the very
3  minimum, he should have been in front of a
4  practitioner.  He needed to be seen by a
5  practitioner.  It should have been elevated to a
6  practitioner.
7        So the doctor they called, or the
8  practitioner they called, could have come to the
9  jail, or he could have gone out.  But either way, he
10  should have been seen by a practitioner based on his
11  presentation.
12    Q.    And is it -- is it acceptable or not
13  acceptable if someone complains of chest pain that
14  started five minutes ago, and the person
15  subjectively attributes to having eaten spicy food
16  to suggest they take Tums or an antacid, and then
17  see if that resolves the symptoms?
18        MR. WEIL:  Object to form.
19        THE WITNESS:  Well, seeing if that
20  resolved the symptoms I don't believe occurred.  One
21  of the things what I'd be interested in as a
22  practitioner would be, even more than that, I'd be
23  interested in whether -- if his vital sign
24  abnormalities, how they changed with time.
25        So if he gets rechecked, and says:  Hey,

Page 144

1  did the Tums help?  I would want to check his vital
2  signs, too.  And it doesn't matter whether the Tums
3  worked or not, if he's still in an emergency room or
4  an urgent care center would get a workup based on
5  the fact that he was high -- that he's in a high
6  risk category.
7    Q.    (BY MR. JONES:)  So again, my question
8  was, would it be acceptable or not acceptable with
9  an individual who complained of chest pain that
10  started five minutes ago, who subjectively
11  attributed it to having eaten spicy food, to direct
12  them to take Tums or an antacid, and see if that
13  resolved the issue?
14        MR. WEIL:  Object to form.
15        THE WITNESS:  It would have been
16  perfectly acceptable to give the patient Tums while
17  the doctor was on the way in to see him.
18        And then when the doctor got there could
19  say:  How did the Tums do?  Let's see what your
20  vital signs are now, and let me get a more complete
21  history.
22    Q.    (BY MR. JONES:)  So do you know whether
23  or not Mr. Xiong complained of any ongoing symptoms
24  before he complained at 7:00 a.m. the next
25  morning?



Page 145

1    A.   No.  All I have to go on are the
2  documents.  I don't have anything indicating
3  anything in between.
4       Q.   And when he complained at 7:00 a.m., he
5  was sent to the hospital, correct?
6    A.   Yes.
7       Q.   And this was discussed a little bit, but
8  I want to be clear, I want the record to be clear.
9  In your report you indicate that at the hospital it
10 was determined that he had been experiencing a heart
11 attack.
12       Do you have any source for that
13 statement in your report?
14   A.   I got that from somewhere.  I don't
15 remember where.  And I -- so I can't answer that
16 right now.  But I will say it doesn't matter.
17 Sending him to the hospital --
18       Q.   That's not -- we've been at this for
19 quite a while, Doctor, and my question is:  Do you
20 have a source for that assertion in your report?
21   A.   I have a source -- I had a source.  I
22 didn't just make it up.  I'm not -- I can't remember
23 what that source is right now.
24       Q.   And your report doesn't tell us what the
25 source is.

Page 146

1    A.   Correct.
2       Q.   And if there's no indication or
3  statement in the medical records that you reviewed
4  that were provided to you, where would you have
5  gotten that?  Are you able to enlighten us at all as
6  to where you got that factual assertion?
7    A.   As I sit here I do not remember where I
8  got it.
9       Q.   On the screen is an Excel spreadsheet
10 that Mr. Weil provided to counsel about sixteen
11 minutes before we began this morning.
12       MR. WEIL:  It's not on the screen,
13 Andrew.
14       MR. JONES:  Oh, it isn't?
15       MR. WEIL:  No.
16       MR. JONES:  Oh, I'm sorry.  Hang on.
17 Thanks, Steve.
18       Q.   (BY MR. JONES:)  Okay.  Do you see it at
19 this point, Doctor?
20   A.   Yes.
21       Q.   Do you recognize this spreadsheet?
22   A.   Yes.
23       Q.   And what do you understand it to be?
24   A.   It's a spreadsheet of patients from the
25 Monroe County Jail.

Page 147

1       Q.   And who created this spreadsheet, if you
2  know?
3    A.   I don't know specifically who created
4  this spreadsheet.
5       Q.   Do you have a copy of this spreadsheet
6  that identifies what each of the columns in the
7  spreadsheet represents?
8    A.   I have a copy of the spreadsheet.  I'm
9  not sure -- I don't remember what each of the
10 columns represents.  I'm not sure exactly what
11 you're asking.
12       Q.   Well, what I'm asking you is, what
13 information is shared in column A of the
14 spreadsheet?
15   A.   I don't know.
16       Q.   What information is shared in
17 column B?
18   A.   I don't know the answer to that right
19 now.
20       Q.   Do you understand or know how the
21 individuals who were listed on this page of the
22 spreadsheet are organized?
23   A.   Do I know how the person who prepared
24 this organized it and why it was organized in that
25 way?  I don't know.  I think it was organized

Page 148

1  alphabetically, but a spreadsheet like that you can
2  change, of course.
3       Q.   Do you know what the information in
4  column F means?
5    A.   I think the information in column F is
6  how significant the person who did the evaluation
7  thought the care was.
8       Q.   And, again, you don't know who did the
9  evaluation for that?
10   A.   No.
11       Q.   And how, if at all, did you use or rely
12 on this spreadsheet in your work?
13   A.   Well, I thought the ones that this
14 person said were appropriate care, I assumed were
15 appropriate care, and I didn't review them.
16       I reviewed a couple of -- I mainly
17 reviewed the cases that were in the complaint.  I
18 think I reviewed a couple that were -- that this
19 person thought were problematic, but that's how I
20 used it.
21       Q.   So for the individuals -- the eleven or
22 twelve individuals who are discussed in your report
23 who were patients or inmates in the Monroe County
24 Jail, did you look to this spreadsheet and rely on
25 the description -- descriptions given in columns G



Page 149

1   and H in your work in this case?
2         MR. WEIL:  Object to the form.
3         **THE WITNESS:  I read them.  I don't**
4   **believe that I -- I relied on them.  I relied on the**
5   **medical records.**
6      Q.   (BY MR. JONES:)  But did you review the
7   descriptions in this spreadsheet for the patients
8   that are discussed in your report?
9      **A.   Yes.**
10     Q.   And I'm showing you a second page of the
11  same spreadsheet.
12         Have you seen this page before, or did
13  you look at this page as part of your work?
14     **A.   No, I didn't look at the second page.**
15     Q.   And do you know who Essence and Jessie
16  are?
17     **A.   No.**
18     Q.   So I want to shift gears to Mr. Mendoza.
19  Jose Mendoza.
20         Sharing my screen again.
21         Do you see the screen?
22     **A.   Yes.**
23     Q.   So in your report -- and Mr. Knott asked
24  you some questions about this -- but in your report,
25  you talk about incidents that occurred on

Page 150

1   August 16th of '29 (sic), correct?
2      **A.   Yes.**
3      Q.   Where Mr. Mendoza complained that his
4   heart was beating too fast and that he could not
5   breathe, yes?
6      **A.   Yes.**
7      Q.   And your description in your report is
8   about an LPN diagnosing him with anxiety, correct?
9      **A.   Yes.**
10     Q.   So what I've got on the screen, that's a
11  medication administration record for Mr. Mendoza,
12  yes?
13     **A.   Yes.**
14     Q.   And it's pretty faint or pretty small,
15  but at the bottom right above the Bates number, it
16  indicates this is from July of that year, yes?
17     **A.   Yes.**
18     Q.   So before the situation on August 16th,
19  correct?
20     **A.   Yes.**
21     Q.   And it shows Mr. Mendoza being on an
22  anti-anxiety medication in July of 2019, correct?
23     **A.   Yes.**
24     Q.   And that would be the Hydroxyzine?
25     **A.   Yes.**

Page 151

1      Q.   Were there other medications on this
2   list that relate to anxiety?
3      **A.   Well, all of them can relate to anxiety**
4   **except for the one on top.  That's an allergy med.**
5      Q.   And then to return to the note from
6   August 16th -- a little bit cumbersome, so bear with
7   me.
8         So this is the progress note that you
9   were looking at earlier from August 16th of 2019,
10  correct?
11     **A.   That was the one that was shown to me**
12  **earlier, yes.**
13     Q.   And I want to be clear, this is the note
14  that you were referring to in your report when you
15  talk about this incident on August 16th, correct?
16     **A.   I believe it is, yes.**
17     Q.   And I mean, the complaint that's stated
18  in the first two lines is almost word for word your
19  description of Mr. Mendoza's complaint on that date,
20  correct?
21     **A.   Yes.**
22     Q.   So this note is what you were talking
23  about in your report for this date, correct?
24     **A.   I believe so, yes.**
25     Q.   And, again, this is -- this was an R.N.,

Page 152

1   not an LPN, responding to Mr. Mendoza's complaint,
2   correct?
3      **A.   Yes.**
4      Q.   And other than -- other than the pulse,
5   his vitals were normal, correct?
6      **A.   Well, his respiratory rate is a little**
7   **high, too.**
8      Q.   Well, how high?
9      **A.   Oh, I think top normal is sixteen.**
10     Q.   And this is somebody who was already on
11  medication for anxiety, correct?
12     **A.   Well, you showed me -- you showed me the**
13  **month previously.  I don't know if he was on -- I**
14  **would assume he was, but I haven't seen the**
15  **spreadsheet for that month.**
16     Q.   Well, take a look at the page on the
17  screen.  This is from August of that year,
18  correct?
19     **A.   Yes, all right.  That's August, yes, he**
20  **was.**
21     Q.   And he's on the Hydroxyzine in August of
22  that year, correct?
23     **A.   Yes.**
24     Q.   So this was somebody who was already on
25  medication prescribed by a provider for anxiety

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179
LEXITAS

Page 153

1  medications, correct?
2  **A.  Yes.**
3  Q.  So the R.N. didn't, quote, unquote,
4  diagnose him with anxiety, correct?
5  **A.  Does not look like it.**
6  Q.  He had already been diagnosed with
7  anxiety, correct?
8  MR. WEIL:  Object to form.
9  **THE WITNESS:  I have not seen anything**
10  **that showed where he had been diagnosed with**
11  **anxiety.  You haven't showed me anything like**
12  **that.**
13  Q.  (BY MR. JONES:)  Well, let me put it
14  differently.  He had already been prescribed an
15  anti-anxiety medication, correct?
16  **A.  Yes.**
17  Q.  And those -- and you don't have any
18  reason to believe that the anti-anxiety medication
19  that he had already been taking in July and August
20  hadn't been prescribed or authorized by a
21  practitioner, do you?
22  **A.  No.**
23  Q.  And when Mr. Mendoza came to the nurse
24  on the evening of August 16th, he reported to her
25  that he had refused or declined to take the

Page 154

1  anti-anxiety medication earlier that day, correct?
2  **A.  Yes.**
3  Q.  And that he had been drinking a lot of
4  coffee.
5  Do you see that?
6  **A.  Yes.**
7  Q.  I'm showing you a progress note from
8  August 30th, correct?
9  **A.  Yes.**
10  Q.  And this is something you would have
11  reviewed in your work on the case, correct?
12  **A.  Yes.**
13  Q.  And his vitals were fine on that day,
14  correct?
15  **A.  Yes.**
16  Q.  No indication there that any sort of
17  problem had developed because of the care he was
18  given on August 16th, correct?
19  **A.  No.**
20  Q.  My statement was a correct one; is that
21  true?
22  **A.  Your statement was a correct one.**
23  Q.  Okay.  There's no evidence that you're
24  aware of that there was an adverse outcome for
25  Mr. Mendoza because of the care he was provided in

Page 155

1  the jail, correct?
2  **A.  Correct.**
3  Q.  Or that there was any treatment that he
4  was seeking that he did not receive, correct?
5  **A.  Correct.**
6  Q.  I'm sorry, I didn't hear your answer.
7  **A.  Correct.**
8  Q.  If we could shift gears, and I'd like to
9  ask you about Elizabeth Coleman.
10  You talked about with Mr. Knott the fact
11  that she had had an incident on January 8th of 2020,
12  that resulted in her being sent to the hospital,
13  correct?
14  **A.  Yes.**
15  Q.  And she had fallen and hit her head,
16  correct?
17  **A.  Yes.**
18  Q.  And there was a question on January 8th
19  as to whether that had been caused by a seizure,
20  correct?
21  **A.  Yes.**
22  Q.  And she did, in fact, go to the
23  hospital, correct?
24  **A.  Yes.**
25  Q.  That was on the 8th?

Page 156

1  **A.  Yes.**
2  Q.  And the hospital, in discharging her,
3  indicated that -- well, let me ask you:  What does
4  it mean in this set what I'm calling discharge
5  paperwork from the hospital, that it describes,
6  quote, unquote, your medication list?
7  What does that mean?
8  **A.  Well, I don't know if that means that**
9  **it's medications that the patient came in on.  I**
10  **don't believe that she went to the hospital on those**
11  **medications, but she might have, I guess.**
12  Q.  Well, let me ask you, do you know or do
13  you not know whether -- when she went to the
14  hospital, she was already on those medications?
15  **A.  Well, let's take the first one,**
16  **copaxone.  I don't believe she was on the medication**
17  **copaxone when she went to the hospital.**
18  Q.  What's copaxone for?
19  **A.  It's a medicine for -- I believe it's a**
20  **medicine for muscular (sic) sclerosis.**
21  Q.  What about the other ones?
22  **A.  I don't know what she was on when she**
23  **went to the hospital.  It might have been**
24  **medications that they identified from their records**
25  **from previous admissions to the hospital or from the**

Page 157

1  **pharmacy, from records they had.**

2  Q.  I'm sharing my screen again showing you

3  MC Medical 11723 to 74.  This is a medical history

4  and health appraisal completed on January 8th,

5  correct?

6  **A.  Yes.**

7  Q.  And under subjective data it indicates

8  she's got MS, correct?

9  **A.  Yes.**

10  Q.  And that she has a history of seizures,

11  yes?

12  **A.  Yes.**

13  Q.  And that she usually takes copaxone for

14  her MS and seizures, correct?

15  **A.  Yes.**

16  Q.  So going back to the hospital discharge

17  summary, or after-visit summary, those medications

18  listed under her medication list, do you have any

19  reason to believe those weren't medications that she

20  had regularly been taking at that point?

21  **A.  No.**

22  Q.  And that's in particular given the

23  medical history form, correct?

24  **A.  Yes.**

25  Q.  So then if we look at the progress note

Page 158

1  from January 10th, this is two days later in the

2  jail, correct?

3  **A.  Yes.**

4  Q.  And so in your report you indicate that

5  on January 10th Miss Coleman reported to the jail

6  nurse that she had had a seizure, yes?

7  **A.  Yes.**

8  Q.  And, in fact, the progress note

9  indicates that on January 10th that she stated to

10  the nurse at the evening med pass, quote, did you

11  hear what happened?  I had a seizure.  Couldn't feel

12  my legs and fell and hit my head.  See?  End quote.

13  Do you see that?

14  **A.  Yes.**

15  Q.  Given everything we've talked about,

16  that is what had happened on the 8th, and your

17  understanding of what happened on the 8th, isn't

18  this, in fact, a note indicating that the patient

19  was talking to the nurse about what had happened

20  on -- two days earlier on January 8th?

21  **A.  Yes.**

22  Q.  And as a result of what happened on the

23  8th, she went to the hospital, yes?

24  **A.  Yes.**

25  Q.  So when you say in your report no workup

Page 159

1  was done, that's not correct, is it?

2  **A.  No workup was done at the hospital.**

3  Q.  And when you say the nurse practitioner

4  didn't see Coleman either then or later for this

5  complaint, in fact, Ms. Coleman had been seen at the

6  hospital for that complaint, yes?

7  **A.  Yes.**

8  Q.  And we already talked about the fact

9  that later on that month, Ms. Coleman was, in fact,

10  seen by the nurse practitioner at the jail,

11  correct?

12  **A.  Yes.**

13  Q.  And when you said that the nurse

14  practitioner prescribed anti-seizure medication

15  topiramate over the telephone, that prescription or

16  direction to start that medication was consistent

17  with what the hospital had indicated, correct?

18  **A.  Yes.**

19  Q.  And it was consistent based on reviewing

20  all of these records with what Ms. Coleman had

21  previously been taking, correct?

22  **A.  Yes.**

23  Q.  If we could take a look at Mr. Maske.

24  So in your report, you talk about the

25  situation on June 14th of 2019, correct, involving

Page 160

1  chest pain?

2  **A.  Yes.**

3  Q.  And what you say in your report is that

4  the nurse practitioner ordered the nurse to give

5  Mr. Maske the blood pressure medication clonidine.

6  Do you see that?

7  **A.  Yes.**

8  Q.  What's lisinopril?

9  **A.  Lisinopril is a blood pressure**

10  **medicine.**

11  Q.  Is it the same thing as clonidine?

12  **A.  No.**

13  Q.  Can you -- well, what's clonidine?

14  **A.  Clonidine is a medicine that is -- in**

15  **the past was sometimes used for blood pressure.  It**

16  **is not used for blood pressure in the modern era**

17  **because it doesn't last long enough.  It's also**

18  **sedating, so it's sometimes used as a sedative.**

19  Q.  What did you mean in your report when

20  you referred to an emergency dose of clonidine?

21  **A.  Well, there is -- there is an old belief**

22  **that if your blood pressure numbers got too high**

23  **that you should be -- that patients would benefit by**

24  **getting an emergency dose of clonidine to bring the**

25  **blood pressure down emergently before it caused a**

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


Jeffrey Keller, M.D., FACEP, FACCP                    March 19, 2024

Page 161

1 stroke or heart attack or something like that. That
2 is actually --
3    Q.   So --
4    A.   That is -- let me finish, please.
5    Q.   I'm sorry.
6    A.   That has actually been disproven, and it
7 is not done much anymore. It is being done in this
8 case. I've seen a couple of cases of it. But it is
9 an -- when it is administered that way, as for a
10 hypertensive urgency, it is an urgent or emergent
11 medication. That's why you're giving it.
12    Q.   So it's a one-time dose or a short-term
13 dosage prescribed to see if it will reduce the blood
14 pressure.
15        Is that what you're describing in your
16 report described by an emergency dose of
17 clonidine?
18    A.   That is correct. It was given because
19 Mr. Maske or Maske's blood pressure was felt to be
20 too high so they gave a dose of clonidine in order
21 to reduce it emergently on an emergency basis or an
22 urgent basis.
23    Q.   So I'm showing my screen again. Are you
24 able to see it?
25    A.   Yes.

Page 162

1    Q.   Ms. Monroe, or MC Medical 37679, this is
2 the progress note or series of notes from June 13th
3 and 14th of 2019, correct?
4    A.   Correct.
5    Q.   And the notes from the 14th, those are
6 what you were referring to when you were talking in
7 your report about Mr. Maske having been seen for
8 complaints of chest pain on the 14th, correct?
9    A.   Right.
10    Q.   And forgive me, you may have probably
11 heard this, but it was a nurse, not an LPN, that saw
12 him on the 14th for his complaint, correct?
13    A.   Correct.
14        MR. WEIL: Object to form.
15        Go ahead.
16    Q.   (BY MR. JONES:) So you were wrong in
17 your report when you said that an LPN saw him,
18 correct?
19    A.   Correct.
20    Q.   And the nurse took his vitals, looks
21 like she listened to his heart, made her notes, and
22 indicated that she would discuss with the nurse
23 practitioner, correct?
24    A.   Yes.
25    Q.   And the nurse practitioner prescribed

Page 163

1 lisinopril, a course of lisinopril for a course of a
2 hundred twenty days, correct?
3    A.   Yes.
4    Q.   And further checks of his blood
5 pressure, correct?
6    A.   Yes.
7    Q.   There's no indication of an order for
8 clonidine, is there?
9    A.   No. I don't see an order for
10 clonidine.
11    Q.   So what were you referring to in your
12 report when the basis for your opinion relating to
13 this June 14th incident was that the nurse
14 practitioner prescribed clonidine?
15    A.   I don't know. It appears I made a
16 mistake.
17    Q.   So that portion of your report
18 indicating that the nurse practitioner ordered the
19 nurse to give clonidine is incorrect, yes?
20    A.   It appears so.
21    Q.   And if we look at the MAR for June of
22 2019 at 3767273, there's no indication that he was
23 prescribed or given clonidine in June of 2019,
24 correct?
25    A.   Correct.

Page 164

1    Q.   The other portion of your report
2 relating to Mr. Maske refers to an incident on
3 July 4th, correct?
4    A.   Yes.
5    Q.   And I'm showing you MC Medical 37765 and
6 66.
7        Do you see that on the screen?
8    A.   Yes.
9    Q.   And is this a -- is this the form or
10 portion of the medical record referring to when --
11 with respect to until July 4th incident?
12    A.   I believe so. He has abnormal vital
13 signs.
14    Q.   Okay. And so the officer, in
15 interacting with Mr. Maske about his complaint,
16 noted that Mr. Maske said the pain had been there a
17 couple of hours since supper, correct?
18    A.   Yes.
19    Q.   And when asked what he subjectively
20 believed was causing the pain, he indicated
21 heartburn, yes?
22    A.   Yes.
23    Q.   And when asked if he had had similar
24 symptoms before, he said all his life. It gets
25 worse as he gets older referring presumably to what



Page 165

1  he had attributed to being heartburn, correct?

2  **A.    Correct.**

3     Q.    And the other symptoms he reported or

4  indicated he didn't have are documented on the

5  report, correct?

6  **A.    Yes.**

7     Q.    And including the officer's observation

8  that Mr. Maske was burping?

9  **A.    Yes.**

10     Q.    And the directions here were to give --

11  to start a course of -- well, how do you say the

12  medication, Doctor?

13  **A.    I can't -- I can't read -- I can't read**

14  **it.  You'll have to make it bigger.**

15           **Omeprazole.**

16     Q.    That's a heartburn medication, yes?

17  **A.    Yes.**

18     Q.    Essentially Prilosec?

19  **A.    Yes.**

20     Q.    And I'm showing you a progress note from

21  the next day, July 5th, correct?

22  **A.    Yes.**

23     Q.    37664 is the Bates number.

24           And this is the nurse talking to

25  Mr. Maske, yes?

Page 166

1  **A.    Yes.**

2     Q.    And she was following up with him after

3  his report of chest pain the night prior, yes?

4  **A.    I can't read it.  You'll have to make it**

5  **bigger.**

6     Q.    Is that better?

7  **A.    Yes.**

8     Q.    So she was following up with him about

9  his report of chest pain, yes?

10  **A.    Yes.**

11     Q.    And he indicated to her that he had

12  taken the Tums which had helped, yes?

13  **A.    Yes.**

14     Q.    And he reported to her that this usually

15  occurs after he eats at night, yes?

16  **A.    Yes.**

17     Q.    And his request to her was simply that

18  he get Tums in addition to the Omeprazole that he

19  was already on, yes?

20  **A.    Yes.**

21     Q.    Any indication there of an ongoing

22  problem as a result of what happened on July 4th?

23  **A.    No.**

24     Q.    And he was seen on July 6th, correct?

25  **A.    Yes.**

Page 167

1     Q.    And that subjectively he reported he was

2  having increased acid reflux, yes?

3  **A.    Yes.**

4     Q.    And any problem with the vital signs

5  that the nurse was indicating there?

6  **A.    No.**

7     Q.    So what he was reporting was that he was

8  having acid reflux, yes?

9  **A.    Yes.**

10     Q.    Any sign of an ongoing problem that was

11  cardiac in nature at this point?

12  **A.    No.  There's no indication of cardiac at**

13  **this point.**

14     Q.    And this is a progress note from

15  July 19th, correct?

16  **A.    Yes.**

17     Q.    MC Medical 37653, and this is another

18  follow up by the nurse relating to his earlier

19  complaints from the 3rd, 4th, 5th, and 6th of

20  heartburn?

21  **A.    Yes.**

22     Q.    And he's not reporting any further

23  heartburn at this point, correct?

24  **A.    Yes.**

25     Q.    Any problems with the vitals on

Page 168

1  July 19th?

2  **A.    No.**

3     Q.    So from the records I've shown you from

4  the 4th through the 19th, does it appear that

5  Mr. Maske, during that period of time, was suffering

6  from heartburn that resolved over time with the use

7  of the equivalent of Prilosec?

8  **A.    Yes.**

9     Q.    Is there any indication from your review

10  of those records, as we sit here now, that Mr. Maske

11  had any sort of cardiac problem?

12  **A.    No.**

13     Q.    Let me ask you about Jessie Hanson.

14           This was an individual who reported on

15  March 17th that he was having abdominal pain,

16  vomiting, and in some way blood in his sputum,

17  correct?

18  **A.    Yes.**

19     Q.    And the directions by the provider at

20  the jail was that he should be taken to the

21  hospital, yes?

22  **A.    Yes.**

23     Q.    And that happened.  He was sent to the

24  hospital, correct?

25  **A.    Yes.**

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Page 169

1    Q.    And I'm showing you, I've got up on the
2    screen, the records from his time at the hospital.
3         Do you recognize those?
4    A.    Yes.
5    Q.    These are MC 20 -- Medical 23681 to 690.
6         You reviewed those in the course of your
7    review of Mr. Hanson's situation, yes?
8    A.    Yes.
9    Q.    And on the second page of the document,
10   and again, the symptoms were abdominal pain,
11   vomiting, or coughing blood, yes?
12   A.    Yes.
13   Q.    And the note indicates that he should
14   return to the emergency department if those symptoms
15   worsen, correct?
16   A.    Regarding your reported hemoptysis --
17   you'll have to raise it up -- if you find yourself
18   incarcerated for longer than two weeks, ask for the
19   jail medical staff to have you further evaluated
20   with the jail physician and/or pulmonology.
21        There is -- there's another -- there's
22   another form where it said to come back if you get
23   worse.  I'm in the sure where that was.
24   Q.    What I'm actually referring to is just
25   above there where it says:  Follow-up instructions.

Page 170

1    Return to emergency department, and then under
2    comments, if symptoms worsen, yes?
3    A.    Yes.  There's another page up there or,
4    I believe, it adds more, but yes, that's what that
5    one says.
6    Q.    And later on it says this is in
7    reference to hemoptysis.  Get prompt medical
8    attention.  So when they say get prompt medical
9    attention, that would be seek medical attention,
10   yes?
11   A.    Yes.  Get prompt medical attention for
12   coughing, fever, trouble breathing, chest pain,
13   chest pressure, feeling weak, or fainting.  Any of
14   those.
15   Q.    And so then on March 31st, you
16   indicate -- you indicate in your report that he was
17   suffering or complaining of chest pain, yes?
18   A.    Yes.
19   Q.    And those are the wrong documents sorry.
20   So seek medical attention, if you have any complaint
21   of chest discomfort or pain, yes?
22   A.    Yes.
23   Q.    And so then on the 31st, we're looking
24   at the medical progress note of MC Medical 23616.
25   He has a subjective complaint of chest pain, yes?

Page 171

1    A.    Yes.
2    Q.    And he's seen by the nurse, yes?
3    A.    Yes.
4    Q.    Not an LPN, as you indicate in your
5    report, yes?
6    A.    Yes.
7    Q.    And she takes his vitals, yes, which are
8    reported on the form?
9    A.    Yes.
10   Q.    Anything unusual or abnormal in those
11   vitals?
12   A.    His heart rate's low.
13   Q.    Otherwise?
14   A.    His blood pressure is a little high.
15   Q.    Anything alarming in those vital
16   signs?
17   A.    No.
18   Q.    And she indicates that -- well, I'm not
19   sure what the first word is, but that his breathing
20   is unlabored?
21   A.    Yes.
22   Q.    Got complaints of chest pain midsternum
23   and no radiation and pulse is regular and strong,
24   yes?
25   A.    Yes.

Page 172

1    Q.    And that he's nondiaphoretic?
2    A.    Yes.
3    Q.    Which means what?
4    A.    He's not sweating.
5    Q.    And she assesses it is possibly acid
6    reflux, correct?
7    A.    Yes.
8    Q.    And the plan is to give him Tums and
9    recheck later that day, yes?
10   A.    Yes.
11   Q.    And, I mean, prescribing Tums if you
12   suspect acid reflex, that's a reasonable response,
13   yes?
14   A.    In this, yes.  Although in this case,
15   for a patient who had been to the ER, recently,
16   comes in with complaints as referenced in the ER,
17   seek medical attention if you have these, that
18   patient should have been elevated to see a
19   practitioner.
20   Q.    And what is about the fact that he had
21   had abdominal pain, vomiting, and coughing blood
22   that means in particular he should go to the ER for
23   chest pain over any other patient?
24        MR. WEIL:  Object to form.
25        THE WITNESS:  I don't understand that

LEXITAS

Page 173

1  question.

2      Q.   (BY MR. JONES:)  Well, I guess what I'm

3  asking about is his symptom on this date is some

4  form of chest pain which was not his symptom that

5  led him to go to the hospital two weeks earlier,

6  correct?

7      A.   Yes.  Well, you're misunderstanding me.

8  He needs to see a practitioner.  So a practitioner

9  could have gone to see him or he could have been

10  sent out, but it would have been perfectly

11  appropriate for a practitioner to see him --

12      Q.   And again --

13      A.   -- at the jail.

14      Q.   It would be reasonable to give someone

15  Tums if you suspected acid reflux, yes?

16      A.   Yeah.  I'm not criticizing that he got

17  Tums.  I'm criticizing the fact that he was not seen

18  by a practitioner.

19      Q.   And the nurse followed through and did

20  recheck his vitals that afternoon, yes?

21      A.   Yes.

22      Q.   And the vitals were normal, yes?

23      A.   Well, the heart rate is still a little

24  low, but not significantly.

25      Q.   Is there anything about the vitals that

Page 174

1  suggest a need for further follow-up care at that

2  point when they were rechecked?

3      A.   The vitals don't indicate a need for

4  follow-up care, but the overall presentation of a

5  patient that had been sick enough to go to the

6  hospital recently was having similar symptoms that

7  should have been elevated to see a practitioner.

8      Q.   And to go back to my question, is there

9  anything about the vitals as they were measured that

10  afternoon that would have indicated the need for

11  further follow-up care?

12      A.   Well, they're not normal.  So any time

13  vital signs are not normal, they need to be checked

14  again.  So she rechecked them, that's great, because

15  they weren't normal.  These aren't normal.  They

16  need to be rechecked.

17      Q.   Tell me what's not normal about the

18  afternoon vital signs?

19      A.   The heart rate is low.

20      Q.   How low?

21      A.   Normal goes down to sixty.  So it's not

22  very low, but it's still abnormal.  So it should

23  have been rechecked.

24      Q.   And there were no other complaints by

25  the patient when he was seen that afternoon, yes?

Page 175

1      A.   I don't know.  There's none recorded.

2      Q.   Well, where it says no other

3  complaints -- no other complaints by patient, yes?

4      A.   I'm not seeing where you're pointing.

5      Q.   Directly below the vital signs that

6  afternoon.

7      A.   I can't read it.

8      Q.   Does that help?

9      A.   No other complaints by patient.  That's

10  right.

11          So that to me indicates no other

12  complaints other than the ones that she had

13  documented above.  I don't read that as meaning the

14  complaints he had above are gone.

15      Q.   Do you have any indication from your

16  review of Mr. Hanson's six hundred and sixty-seven

17  pages of medical records that there was any cardiac

18  issue that he suffered from?

19      A.   No.

20      Q.   Any evidence from your review of these

21  six hundred and sixty-six pages of medical records

22  that there was any ongoing symptoms beyond the

23  afternoon recheck on March 31st of 2017?

24      A.   Not that I recall.

25      Q.   And that any information that you have

Page 176

1  from your review of the chart that was any sort of

2  adverse outcome for Mr. Hanson?

3      A.   No.

4      Q.   I'd like to ask you about Mr. Brush.

5          In particular, the interaction on

6  February 22nd, 2020.  I have up on the screen MC

7  Medical 8396.

8          As far as you know, is this the

9  interaction you were referring to in your report as

10  being on February 20th?

11      A.   Would you make it larger, please.

12      Q.   Yup.  Sorry.

13          Is that better?

14      A.   I believe so, yes.

15      Q.   This subjective complaint in terms of a

16  skipping heartbeat or that he felt a skipping

17  heartbeat, that's part of what was noted on this

18  February 2nd, 2020, note, yes?

19      A.   Yes.

20      Q.   And there's no explicit mention by

21  Mr. Brush of chest pain, right?

22      A.   No.  Just a quick, dull cramping.

23      Q.   And the nurse did an objective

24  assessment, yes?

25      A.   Yes.



Page 177

1    Q.   And there were no signs or symptoms of
2  physical distress that she noted, yes?
3    A.   Yes.
4    Q.   And she listened to his heart?
5    A.   Yes.
6    Q.   And there were no skips, clicks, or
7  murmurs that she could observe on listening to his
8  heart, yes?
9    A.   Yes.
10   Q.   And he was educated or told by the nurse
11  to follow if he had any worsening symptoms,
12  correct?
13   A.   Yes.
14   Q.   And am I correct in understanding that
15  you're not aware of any adverse outcome that
16  resulted from Mr. Brush or rather for Mr. Brush from
17  this intersection of Nurse Fennigkoh?
18   A.   No.
19   Q.   And are you aware, from your review of
20  his entire medical record, whether or not he had any
21  cardiac condition?
22   A.   I'm not aware of any cardiac
23  condition.
24   Q.   And is there any indication in the
25  medical records that he came back to the medical

Page 178

1  personnel to indicate that what he was feeling when
2  he first made the complaint on the 22nd that he
3  continued to feel those symptoms or that they got
4  worse?
5    A.   No.
6    Q.   And Mr. Knott asked you about an
7  incident on December 21st or the situation on
8  December 21st. I believe you discussed this set of
9  narrative notes with Mr. Knott, yes?
10   A.   Yes.
11   Q.   As being an MC Medical 8426.
12       And I want to be sure. I think he went
13  over the details with you, but this page from
14  Mr. Brush's medical records, that's the portion of
15  the medical records you were referring to in your
16  report when you discussed the interaction on
17  December 21st, correct?
18   A.   I believe so.
19   Q.   Nicholas Hage, quickly.
20       MR. KNOTT:  Hey, guys, I got to jump in
21  here and say I've got to take off for the airport,
22  so Daniel's going to cover for the end of the
23  deposition for the record.
24       MR. JONES:  Okay.  Thanks, Doug.
25   Q.   (BY MR. JONES:)  Doctor, I've got up on

Page 179

1  the screen 22552, a progress note from March 19 of
2  2019.
3        I want to be certain, this is the
4  progress note you were referring to in your report
5  when you talked about an interaction on March 1st of
6  that year, correct?
7    A.   Yes.
8    Q.   And, again, it wasn't an LPN, it was a
9  nurse, correct?
10   A.   Yes.
11   Q.   And she did talk to the practitioner
12  Dr. Schamber, correct?
13   A.   Yes.
14   Q.   And you're not aware of any information
15  in Mr. Hage's medical record that indicates there
16  was any sort of adverse outcome from this situation,
17  correct?
18   A.   Correct.
19   Q.   You're not aware that he continued to
20  complain of anything relating to this lump,
21  correct?
22   A.   Correct.
23   Q.   I want to ask you about Jeremy Hodgkins.
24  In your report you note that Mr. Hodgkins was booked
25  to the jail on May 14th with a prescription for

Page 180

1  suboxone, a medicine used to treat dependents on
2  opioids, correct?
3    A.   Yes.
4    Q.   And from your time in correctional
5  medicine, are there any limits on which jails or
6  which correctional facilities can prescribe or
7  provide suboxone or is that something that any jail
8  can provide?
9    A.   Well, jails don't provide them.
10  Practitioners provide them.  And no, there's no --
11  there's no limit to who can prescribe suboxone.
12       At this point in time, you would have
13  needed what's called -- you would have had to ask
14  for permission to prescribe suboxone, but there's
15  two ways to continue suboxone on someone who's been
16  on it, and one way is to ask the outside provider
17  who had been prescribing it to continue it and bring
18  it to the jail and give it.
19       The second way is for the practitioner,
20  which has since been removed, but in 2019 needed to
21  have special training, and to give it in that -- to
22  get that so you could prescribe it.
23       So the short answer is there were ways
24  to continue suboxone in the jail, and it should have
25  been continued in the jail.  It was inappropriate to



Jeffrey Keller, M.D., FACEP, FACCP                                    March 19, 2024

Page 181

1  stop it.

2     Q.   And you indicate in your report that in
3  your opinion there was no treatment or care provided
4  for opioid withdrawal or addiction, right?

5     A.   That is correct.

6     Q.   So I'm showing you the progress note
7  from -- now I am.

8          Do you see my screen?

9     A.   Yes.

10    Q.   The progress note from May 14th,
11 correct?

12    A.   Could you increase it, please.

13    Q.   Yup.  Are you able to read it?

14    A.   Yes.

15    Q.   So there is an order signed off by --
16 well, I'm going to represent to you it was signed
17 off by Lisa Pisney starting certain medications.

18         Do you see that, the handwriting
19 portion?

20    A.   Yes.  Starting Hydroxyzine and
21 dicyclomine.  Neither of those are treatments for
22 opiate withdrawal or oipioid dependency.

23         If you look at -- if you look at
24 guidelines written by the American Addiction Society
25 or the guidelines published by the Department of

Page 182

1  Justice, neither Hydroxyzine or dicyclomine are on
2  there for treatments of opioid withdrawal or
3  addiction?

4     Q.   And what's your understanding from your
5  review of the medical records as to why those were
6  being prescribed at this point?

7     A.   Well, I assume that they are being
8  prescribed as a substitution for suboxone, but if
9  that's the case, they are not treatments.  They're
10 not treatments for opioid withdrawal.

11    Q.   Would they counteract any symptoms from
12 oipioid withdrawal?

13    A.   They might.  But there -- but once
14 again, if you look at the guidelines of opioid
15 withdrawal, those are not listed.  Hydroxyzine is
16 not listed.

17    Q.   I want to ask you about the patient you
18 identify as Allen Dalton in your report on page 13.
19 Am I -- this is not important, but just so we're
20 talking about the right person, his name was
21 actually Dalton Allen, correct?

22    A.   Okay.  Yes.

23    Q.   And what you're talking about in your
24 report is an interaction on June 12th of '21, about
25 tooth pain, correct?

Page 183

1     A.   Yes.

2     Q.   And is this the -- I'm showing you a
3  dental progress note.

4          Is this the record you were referring

5  to?

6     A.   It doesn't look familiar, and that is
7  not -- no.  I don't believe so.  That took place on
8  8-21-18 not 6-12-21.

9     Q.   I have the wrong one.  Sorry.  I've got
10 the wrong number.  Sorry.  All right.

11         I'm going to set him aside for the
12 moment.  Mr. Crispin, Chase Crispin.  There's two
13 separate situations you're talking about with
14 respect to Mr. Crispin, right?  One on February 9th
15 and one on September 15, 2019?

16    A.   Yup.

17    Q.   So taking the earlier one before,
18 September 15 of 2017.  Okay.  Do you see my screen
19 ends Monroe County 35869?

20    A.   Yes.

21    Q.   And this is the evaluation for dental
22 pain on September 15 of 2017, correct?

23    A.   Yes.

24    Q.   And this is a complaint about three
25 teeth on the lower right-hand side of his jaw

Page 184

1  correct?

2          Numbers 3031 and 32, yes?

3     A.   Yes.

4     Q.   And the -- the direction is to prescribe
5  an antibiotic along with an oral rinse, right?

6     A.   Yes.

7     Q.   And then he had -- he was seen again on
8  October 4th of 2017, and that's this progress note
9  at Monroe County 36867, right?

10    A.   Yes.

11    Q.   And he's being seen here again for tooth
12 pain?

13    A.   Yes.

14    Q.   He's seen -- being seen for different
15 teeth on this day, correct?

16    A.   Yes.

17    Q.   Two teeth on the lower left-hand side of
18 his jaw, seventeen and eighteen, correct?

19    A.   Yes.

20    Q.   So the visit or the evaluation on the
21 5th of September was teeth on the lower right-hand
22 side, and the evaluation on October 4th was teeth on
23 the lower left-hand side, correct?

24    A.   Yes.

25    Q.   Different teeth on those two occasions,

1  yes?

2      A.   Yes.  But it doesn't change the fact

3  that one, it's inappropriate to prescribe

4  antibiotics without personally examining the

5  patient.  The practitioner should have seen the

6  patient.  And it's inappropriate to prescribe

7  antibiotics for a dental abscess or a dental

8  complication without sending the patient to see a

9  dentist.

10     Q.   Is there any indication in your review

11  of the records, now that we see that these visits

12  were for different teeth, that the antibiotics

13  prescribed as a result of the September 5th of 2017,

14  interaction doesn't resolve any infection that

15  existed at that time?

16     A.   I'm not sure what the question is.  The

17  fact that he had two -- that he had two dental

18  infections within a month, one required that -- and

19  especially when the second one is causing less --

20     Q.   Doctor, if you're not sure what the

21  question is, let me ask you a question so you

22  understand what I'm asking.

23          Is there any indication in the medical

24  record that the antibiotic prescribed as of

25  September 5th didn't resolve any infection that

1  existed for those teeth on the lower right side of

2  his jaw at that time?

3      A.   The nurse makes no mention of the teeth

4  on the right side in this -- in this note.

5      Q.   Do you have any other evidence from the

6  file based on your review of this chart that any

7  infection that existed on the lower right-hand side

8  of his jaw as of September 5th of 2017, wasn't

9  resolved by the antibiotics that were prescribed?

10     A.   No.

11     Q.   And do you have any indication, based on

12  your review of his chart, that any infection that

13  existed on the lower left-hand side of his jar as of

14  October 4th of 2017, didn't resolve as a result of

15  the antibiotics prescribed at that time?

16     A.   No.  There should have been a follow-up

17  note if they weren't -- if the patient was not going

18  to be referred to a dentist and was not going to be

19  seen by a practitioner, would you think there would

20  at least be a follow-up by somebody to see if the

21  swollen jaw, the swollen left-sided facial swelling

22  had resolved, but there is no note.

23     Q.   Is there any indication in the chart

24  that any infection that existed as of October 4th

25  wasn't resolved by the antibiotic?

1      A.   No.  There's no other -- the patient did

2  not see a practitioner.  I have seen no other charts

3  from the nurse and was not sent to a dentist, so I

4  have no documentation either way.

5      Q.   Is there any indication in the chart

6  that Mr. Crispin continued to complain of lower

7  left-hand side jaw pain after being prescribed the

8  antibiotic on October 4th?

9      A.   No.

10     Q.   Do you know whether or not Mr. Crispin

11  had a history of ear infections?

12     A.   No.

13     Q.   If the chart indicates that he did,

14  would you have any reason -- well, strike that.

15          From your review of the chart, you don't

16  know whether or not he had a history of ear

17  infections; is that correct?

18     A.   I don't remember if he had a history of

19  ear infections.

20     Q.   Well, you didn't note it in your report,

21  did you?

22     A.   I didn't note it in my report.

23     Q.   And as you sit here now, having prepared

24  for the deposition and done all the work that you've

25  done in the case, do you have any knowledge as to

1  whether or not he had a history of ear infections?

2      A.   No.  I don't remember if he did or

3  not.

4      Q.   If we look at the chart from

5  February 9th, which is one of the dates you refer to

6  in your report, this is a situation where

7  Mr. Crispin is seen by an LPN who then called the

8  provider, correct?

9      A.   Yes.

10     Q.   And the provider identified the plan

11  that would be followed, correct, not the LPN?

12     A.   Yes.  That's what I said.  She called

13  the practitioner who prescribed an antibiotic.

14     Q.   But in this case, it would not be

15  correct to say that the LPN identified the plan of

16  treatment, correct?

17     A.   No.  But the LPN wrote a diagnosis right

18  otitis media.

19     Q.   She wrote assessment, correct?

20     A.   That's a diagnosis.

21     Q.   Okay.  And she discussed that with the

22  provider, and the provider directed or ordered a

23  plan of treatment, correct?

24     A.   Correct.

25     Q.   If one antibiotic fails to resolve a



Page 189

1  possible infection, how common or uncommon is it for
2  the practitioner to order a new or different
3  antibiotic?
4      A.   Without ever seeing the patient in the
5  free world -- I mean, the outside of the jail, that
6  doesn't happen.  So it is not uncommon to order two
7  courses of antibiotics.
8          What is uncommon is not to have seen the
9  patient that you're ordering them for either time.
10     Q.   And Mr. Crispin was seen again on
11 February 19th and prescribed a new antibiotic.
12         Did you have any information as to
13 whether or not that new antibiotic resolved the
14 infection?
15     A.   No, I have no follow-up documentation of
16 any kind.
17     Q.   You're not able -- you're not opining
18 that Mr. Crispin had an adverse outcome, correct?
19     A.   Correct.
20     Q.   And with respect to Ms. Oliver, Erin
21 Oliver, am I correct in understanding that you don't
22 know when the first time was that medical staff at
23 the jail contacted the dentist relating to
24 Ms. Oliver, correct?
25     A.   No.

Page 190

1      Q.   And you don't know how long it took
2  medical staff at the jail to obtain an appointment
3  for Ms. Oliver to be seen, correct?
4      A.   No.  And I don't know how hard they
5  tried either.
6      Q.   You just don't --
7      A.   No.  When I work with dentists and I say
8  it's an urgent situation and I need them to be seen
9  now, they get seen now.
10     Q.   And you don't have any knowledge about
11 the availability of dentists in the Sparta area at
12 the point in time that Oliver was in the jail, do
13 you?
14     A.   No.
15         MR. WEIL:  Object to form.
16     Q.   (BY MR. JONES:)  I'm sorry, I didn't
17 hear your answer.
18     A.   No.
19     Q.   With respect to Mr. Schmieder, if I
20 understand correctly, you, as part of your review,
21 looked at the report or investigation materials that
22 were prepared by the Monroe County Sheriff's
23 Department after Mr. Schmieder died, correct?
24     A.   Yes.
25     Q.   Did you also review the report prepared

Page 191

1  by the Lacrosse County Sheriff's Department
2  regarding Mr. Schmieder's death?
3      A.   That is not something I recall seeing.
4      Q.   Well, it was among the materials that
5  you received or indicate that you reviewed as part
6  of preparing your report.
7      A.   Well, that probably -- I probably did.
8  I'd have to pull it up.
9          Do you want me to --
10     Q.   Okay.  So if Monroe County referred
11 Mr. Schmieder's death to the Lacrosse County
12 Sheriff's Department to conduct a follow-on
13 investigation, it's not accurate to say that the
14 county didn't do any further investigation, is it?
15     A.   Well, I would -- I believe that I meant
16 by that any further investigation than that that
17 was -- that I had reviewed.  But I reviewed
18 everything in the file that was sent to me, and I
19 guess I lumped them both together.  No review was
20 done after that.
21     Q.   Well, you refer specifically in your
22 report to a county investigator having conducted
23 interviews.  But you don't refer to an outside
24 investigator, that is, the Lacrosse County Sheriff's
25 Department.

Page 192

1          So let me ask again to be clear, when
2  you said in your report that it doesn't appear that
3  the county did any further investigation, were you
4  referring to the county not going on its own
5  investigation, or are you actually saying that the
6  county didn't do an investigation other than the two
7  that were conducted?
8      A.   Other than the two that were
9  conducted.
10     Q.   And so in reviewing the records of the
11 Lacrosse County investigation, did you make any note
12 of what the health care provider or nurse who was
13 interviewed said about what had happened that
14 evening?
15     A.   I don't recall reading that, no.
16     Q.   And it's not in your report, is it?
17     A.   No.
18     Q.   And so as you sit here now, having
19 prepared for your deposition, are you in a position
20 to say what it is that the nurse said happened that
21 evening?
22     A.   I don't recall reading what the nurse
23 said happened that evening.
24     Q.   And if the nurse had indicated that --
25 I'm sorry.  Hold on.



Jeffrey Keller, M.D., FACEP, FACCP                                    March 19, 2024

1      By the way, what's a Combivent
2  inhaler?
3      A.   A Combivent inhaler is a combination of
4  a low-dose steroid and a long-acting
5  bronchodilater.
6      Q.   So if that Mr. Schmieder had been using
7  in the jail a Combivent inhaler, would that indicate
8  that he was not refused the steroid inhaler?
9      A.   That's different than a mometisone
10  inhaler.  A mometisone inhaler is high dose.  So
11  it's different.
12      Q.   It's different, but it is still, in
13  part, a steroid inhaler?
14      A.   It is a low-dose steroid inhaler, yes.
15      Q.   And that would have to be prescribed by
16  a provider?
17      A.   Yes.
18      Q.   So if Mr. Schmieder had been using a
19  Combivent inhaler in the jail, that would be him
20  using a low-dose steroid inhaler prescribed by a
21  provider, yes?
22      A.   Right.  That isn't the issue.  I had no
23  problem with him continuing the Combivent inhaler.
24  That was a good call.  I don't -- I don't understand
25  why the mometisone inhaler was discontinued, and I

1  don't understand why if you're going to discontinue
2  the mometisone inhaler, why you didn't -- why no
3  practitioner came in and talked to him or did an
4  evaluation.  That's -- that's what I don't
5  understand, and I don't agree with.
6      So a practitioner at a jail can do
7  anything he or she wants with the medications.
8  They're the practitioners of the patient.  That's
9  their patient.  But usually you make changes in a
10  medication regimen after you've examined the
11  patient.
12      Q.   If the nurse indicated that on the
13  evening before he died Mr. Schmieder had refused his
14  Combivent inhaler, you don't have any reason to
15  dispute that's, in fact, what occurred, do you?
16      A.   No.
17      Q.   So someone going to see if he would take
18  his Combivent inhaler and him refusing, would you
19  characterize that as nursing staff being aware of a
20  problem and doing nothing to intervene?
21      A.   Well, you make a good point that if a --
22  I don't believe that going and saying do you want
23  your -- if you get a report that someone is in a
24  serious medical problem, and you go and say do you
25  want your medication and they say no or don't

1  answer, and that's the only intervention, then that
2  isn't enough, no.
3      Q.   Okay.  But let's --
4      A.   An appropriate intervention would be
5  actually go and see the patient, listen to their
6  lungs, get a set of vital signs.
7      Q.   You don't have any reason to dispute
8  that Mr. Schmieder refused that inhaler the night
9  before he passed away, correct?
10      A.   I don't have any reason to dispute that.
11  It sounds like a med pass encounter.  The nurse came
12  by with med pass, and he said:  I don't want my
13  meds.  That's not the same as doing an evaluation of
14  a patient that you have heard is having a lot of
15  problems.
16      Q.   When you said -- and you said it a
17  couple times now -- that, quote, unquote, the nurse
18  heard he was having a problem, am I right in
19  understanding that's based entirely on the
20  investigator's conversations with other inmates in
21  the cell block or housing unit?
22      A.   Yes.
23      Q.   And so you're only going off of what
24  those inmates were reported to have said to the
25  investigator, correct?

1      A.   Yes.
2      Q.   Outside of that, do you have any
3  information from the records you reviewed relating
4  to Mr. Schmieder that, one, he had trouble breathing
5  that evening; or, two, that medical staff were
6  informed of that?
7      A.   That is the source of my statement that
8  medical staff were informed.  I have no other
9  sources other than that.
10      Q.   And if a patient that has been
11  prescribed this inhaler declines to take it or use
12  the inhaler, and indicates that he's fine without it
13  that evening, is it your testimony that the medical
14  practitioner should still insist on some sort of
15  follow up with the patient?
16      A.   We're talking about the patient had been
17  there a month, Mr. Schmieder had been there a month,
18  I believe, before he died.
19      Q.   We're talking about Mr. Schmieder.
20      A.   Yeah.  I think he had been there a
21  month, and the practitioner had never seen him.
22      Q.   Let me focus in on the specific
23  question.
24      If Mr. Schmieder indicated to medical
25  personnel that he was refusing his inhaler that



Page 197

1  evening, and that he was fine that evening without
2  it, is it your testimony that medical staff should
3  have insisted on follow-up -- further follow-up at
4  that point?
5      A.   So you've described a scenario that
6  hasn't -- that wasn't described in the documents I
7  reviewed.  I read no statements by the nurse that
8  said Mr. Schmieder said:  I'm fine.  And, in fact, a
9  lot of times when patients quote, unquote, refuse
10  their medications, it's because they're asleep and
11  they didn't hear the call, or they're on the phone,
12  or they're on the -- they're in the bathroom, or
13  they're just cranky, or whatever.
14          So I don't know any circumstances.  I
15  don't know if the nurse actually talked to him or if
16  they have announced med pass and he didn't get up to
17  go or any of that.  So I don't know the
18  circumstances.
19          I certainly don't know that he said I
20  feel great and I don't think I need my meds
21  tonight.
22      Q.   So if the nurse stated to an
23  investigator that Mr. Schmieder refused the
24  Combivent inhaler saying he had his Albuterol with
25  him and was fine, is it your testimony that the

Page 198

1  nurse should have insisted on further follow-up?
2      A.   No.
3      Q.   And you have no reason to dispute that
4  was, in fact, what occurred, am I correct?
5      A.   Correct.
6      Q.   And in your report, when you say that he
7  was not sent to the hospital despite other inmates
8  reporting that his medical condition was, quote,
9  unquote, deteriorating, again, that's based on the
10  investigator's notes of what those other inmates
11  said to him, correct?
12      A.   Correct.
13      Q.   There's no other source for that
14  statement in your report, correct?
15      A.   Yes.
16      Q.   The patients you reviewed from the
17  Monroe County Jail, those patients for the health
18  care spans the six-year period, correct?  2016 to
19  2021, yes?
20      A.   Yes.
21      Q.   And those, again, those were all
22  patients --
23          MR. WEIL:  Object to form.
24      Q.   (BY MR. JONES:)  Those were patients'
25  charts that were selected for you to review by

Page 199

1  plaintiff's counsel, correct?
2      A.   Well, not entirely, but some.
3      Q.   Well, which of the eleven or twelve
4  patients that we discussed today that you discussed
5  with Mr. Knott were not chosen for you to review by
6  Mr. Weil or his firm?
7      A.   The patients were all chosen.  Some of
8  the incidents that I came up with were not flagged
9  or anything like that.
10      Q.   So Mr. Weil chose the patients that you
11  would review, or his firm did, correct?
12      A.   They chose -- they flagged the files
13  that I -- that I should review the charts.  The
14  files that were in the Fourth Amended Complaint were
15  ones that I reviewed, and then I had the spreadsheet
16  that they sent me, and I picked them out of that.
17      Q.   Mr. Weil gave you a group of patient
18  charts to review that he or his firm had selected,
19  correct?
20      A.   Yes.
21      Q.   And then of those, you decided to
22  discuss a certain subset in your report, correct?
23      A.   Yes.
24      Q.   And the ones you didn't discuss are ones
25  either that you felt the care was appropriate or you

Page 200

1  couldn't assess one way or the other because of
2  technical issues, yes?
3      A.   Yes.
4      Q.   And you don't know the criteria used to
5  select the patient charts that were given to you, do
6  you?
7      A.   No.  I do.  They -- they came from the
8  spreadsheet and evaluation -- of which ones
9  potentially had problematic care.
10      Q.   You don't know how those patients were
11  chosen among the patient population, correct?
12      A.   I'm not sure what you're asking.  I
13  think I understand how they were chosen.  The
14  patient charts were reviewed.  A bunch of patients
15  were eliminated because the care was appropriate.  A
16  subset of those who were left were given to me to
17  review.
18      Q.   But you don't know who or how those
19  patients -- who identified those patients as being
20  potentially inappropriate in terms of the care or
21  who did that selection, do you?
22      A.   I don't know the person who did that.
23      Q.   Or how they decided that those were the
24  patients with inappropriate care that you should
25  review, correct?



Jeffrey Keller, M.D., FACEP, FACCP                    March 19, 2024

Page 201

1    A.   Well, I assume that they -- actually, I
2    know -- I think that the person did look through the
3    charts and the ones that that person thought
4    potentially inappropriate care were referred to
5    me.
6    Q.   And you do not know the number of
7    bookings in the Monroe County Jail during those six
8    years, do you?
9    A.   No.
10   Q.   You do agree, though, that no matter the
11   number of bookings, the number of charts you
12   reviewed is not a statistically significant
13   percentage of those bookings, correct?
14       MR. WEIL:  Object to form.
15       Go ahead.
16       THE WITNESS:  I was not -- I'm sorry.
17       I was not trying to do a significantly
18   significant sampling.  That wasn't what I was
19   attempting to do.
20   Q.   (BY MR. JONES:)  And you believe you saw
21   a certain pattern in the eleven or twelve patient
22   charts that you reviewed from the Monroe County
23   Jail, yes?
24   A.   Yes.
25   Q.   In terms of the care that was being

Page 202

1    provided, yes?
2    A.   I was looking at the way that medical
3    was set up, and the way that medical is set up in
4    Monroe County Jail was something that is different
5    than most of the jails that I have ever seen, and
6    I've seen a lot of them, where correctional officers
7    were being asked to function essentially as nurses,
8    where practitioners were doing assessments and
9    prescriptions by telephone without ever seeing the
10   patient.  And that's -- that's the pattern that I
11   saw.
12   Q.   So you saw a pattern among those patient
13   charts, correct?
14   A.   Yes.
15   Q.   But you would agree with me that it's
16   not scientifically valid to draw conclusions about
17   the care being provided to the entire patient
18   population for those six years based on your review
19   of those eleven or twelve charts, wouldn't you?
20       MR. WEIL:  Object to form.
21       THE WITNESS:  I am not saying that all
22   the medical care in the Monroe County Jail was
23   inappropriate and wrong.  I'm not saying that.  And
24   I'm not saying that the practitioners were
25   incompetent or uncaring.

Page 203

1        What I am saying is that Monroe County
2    has an unusual system that is used by ACH which is
3    incongruent with the standard of care which is how
4    medical is standardly done outside of jails.
5        So in other words, I'm in a medical
6    clinic or an urgent care center, I don't send a
7    security guard in to take a patient's history and
8    vital signs and then call me on the phone while I'm
9    at home and tell me what's going on with this
10   patient that showed up at the urgent care center.
11   That never happens on the outside.
12       So that is an unusual thing.  It's an
13   unusual thing that practitioners are doing their
14   entire evaluation, not that they're giving voice
15   orders, but they're doing their whole
16   evaluation, prescribing, and then never following
17   up, never seeing the patient.  That is unusual, and
18   that's different than is done on the outside, and
19   it's different, frankly, than is done in most of the
20   other jails that I'm familiar with, including my
21   own.
22   Q.   I guess what I'm trying to understand,
23   Doctor, is whether, based on reviewing, I should
24   have counted -- I'm not sure as I'm sitting here
25   whether it's eleven or twelve, say twelve -- what

Page 204

1    I'm trying to understand is from reviewing twelve
2    charts, whether you feel you have a medically sound
3    or scientific basis to draw conclusions about all of
4    the other charts that you didn't review from those
5    six years.
6        MR. WEIL:  Object to norm.
7        THE WITNESS:  I think what I did learn
8    from the charts that I did review is that the system
9    that's set up by ACH in Monroe County is certainly
10   different than is done on the outside.  No medical
11   care in any medical clinic on the outside is done
12   that way in the ways that I've described.  It's not
13   done that way in most jails that I'm familiar with.
14       And I believe that if I reviewed every
15   single chart, hundreds of charts, I would find the
16   same system.
17       I also think I went in with the
18   prejudice that -- that a -- just as one example,
19   that a practitioner who doesn't see the patient that
20   just practices on the phone, that gets a call, makes
21   a diagnosis, makes a prescription, and then never
22   follows up, never sees the patient, would be not as
23   good, would be more likely to make mistakes than a
24   practitioner who practiced in the way that is
25   commonly done on the outside.



Page 205

1        I myself would not be as good if I just
2    handled everything by phone and never actually
3    talked to a patient, to the patients I was
4    prescribing to.
5        So I identified that as being outside of
6    the medical norm, outside of medical standard for
7    medical practice. I believe that there's a pattern
8    of not -- not accelerating appropriately. And so, I
9    didn't intend to do a statistical analysis. I had
10   with those eleven charts. I think I know how
11   medical is run at the jail. And I identified how
12   that was different than how it was run in --
13   normally run in medical settings.
14   Q.   You're not in a position to say, are
15   you, whether there were mistakes made in the care of
16   any of the patients for whom you didn't review their
17   charts, are you?
18   A.   No.
19   Q.   You're not in a position to say whether
20   or not there were bad outcomes for patients other
21   than those whose charts you reviewed, are you?
22   A.   No.
23   Q.   Just a couple of other things I want to
24   follow up with you on, Doctor. I know we're getting
25   late in the day.

Page 206

1        When you talk about the CQI program at
2    the jail in your report, you talk about, quote,
3    unquote, true CQI systems, and where we would go to
4    know or understand what a true CQI system is?
5    What's your source?
6    A.   The best -- well, maybe the best source,
7    but there are others, but the National Commission on
8    Correctional Health Care Standards for Jails. The
9    American Correctional Association Standards for
10   Jails, both of those, either of them.
11   Q.   And CQI, a good CQI system does look at
12   data, correct?
13   A.   Yes.
14   Q.   I mean, it's a -- CQI does include the
15   review and analysis of data, yes?
16   A.   Broadly, yes.
17   Q.   On a monthly or quarterly basis, yes?
18   A.   Well, as I said, CQI isn't just
19   statistics, so reviewing statistics, this is how
20   many patients were seen in clinic, this is how many
21   patients put in medical requests, that is not CQI.
22   Not to say it's not important, it is, but it's not
23   CQI.
24   Q.   Does a component of true CQI incorporate
25   activities to monitor quality of the health care

Page 207

1    service delivery including the review and analysis
2    of monthly data?
3    A.   Well, sure. Are you -- you analyze
4    monthly data, but let's -- let's -- we're using
5    terms. Let's say continuous -- CQI stands for
6    continuous quality improvement.
7        So analyzing data does not -- does
8    not -- is no -- is not continuous quality
9    improvement. To get continuous quality improvement,
10   you have to identify areas that need to be improved,
11   so you can't improve an area that you haven't
12   identified.
13       So you have to identify areas that need
14   to be improved, and you can use statistics to do
15   that. Then you have to make a plan to improve the
16   place that you think needs to be improved, so you
17   have to first find areas of deficiency or things
18   that you could do better, and then you have to make
19   a plan to improve it, and then you need to implement
20   the plan, and then you need to at some point in the
21   future evaluate the plan and see how it was doing.
22       That's CQI, those four steps. Having --
23   just looking at statistics, is none of those unless
24   it's part of identifying a problem we have. I've
25   looked at these statistics and we have --

Page 208

1    Q.   What's the shorthand --
2    A.   I've looked at these statistics and we
3    have this problem, so that's the first step of CQI
4    is identifying the problem and then developing a
5    plan to fix it. Just looking at statistics without
6    using it to develop -- to improve, is not part of
7    CQI.
8    Q.   What's the shorthand, the four elements
9    or steps of CQI that you just referred to, or what
10   are those four steps?
11   A.   You mean identify a problem, make a plan
12   to improve, implement the plan, and then evaluate
13   how the plan works?
14   Q.   Yes. That's what I was asking.
15   A.   And then a fifth step would be change
16   your operating procedure to implement the
17   improvement that you've just made continuously, so
18   there's the continuous quality improvement, and then
19   do another one, start another one.
20   Q.   Mr. Knott asked you which of the
21   patients you reviewed for Monroe County were
22   sentinel events, and I believe you identified Xiong
23   and Oliver; is that correct?
24   A.   Xiong.
25   Q.   And Schmieder?



Page 209

1    A.   Xiong and Mrs. Boyer.  That would have
2  been another one.
3    Q.   Okay.  Setting aside Mrs. Boyer, of the
4  patient charts from Monroe County that you reviewed,
5  were there any others that constituted sentinel
6  events, as you used the term in your report, other
7  than Mr. Schmieder, Mr. Xiong, and Ms. Oliver?
8    A.   Of the charts that I reviewed, no
9  others.  But I know, just based on the size of the
10  jail, that there were others.  So anybody that went
11  to the hospital unexpectedly, and I'm sure that
12  there are patients who were -- and I know that there
13  have been patients that were sent to the hospital --
14  many patients that were sent to the hospital
15  appropriately.  If any of those were unexpected,
16  that's a sentinel event.
17       So there are other sentinel events, so
18  of all the patients that were sent to the hospital,
19  if those were unexpected and there was something
20  that could have been done to prevent that, that's a
21  sentinel event.  So there are other sentinel
22  events.
23    Q.   I think my question to you, Doctor, was:
24  Of the patients you reviewed, other than Ms. Boyer,
25  which of them were sentinel events as you use the

Page 210

1  term?  Are there any others besides Mr. Schmieder,
2  Mr. Xiong, and Ms. Oliver?
3    A.   Ms. Coleman falling off a bunk and
4  hitting her head could be a sentinel event.  That's
5  on the borderline.  Of the others, no, I don't
6  believe so.
7    Q.   And so Mr. Xiong, what made him or his
8  situation a sentinel event?
9    A.   The fact that he went unexpectedly to
10  the hospital with cardiac disease.  I'm going to
11  assume that I'm right and that he did have a heart
12  attack, but let's say even if he didn't, patient
13  that was sent unexpectedly to the hospital because
14  of fear of a heart attack, that would be -- that
15  could be a sentinel event.
16    Q.   And Ms. Oliver, what made her situation
17  a sentinel event?
18    A.   The fact that she had a whole bunch of
19  teeth extracted.  And it might be that nothing could
20  have been done at the jail to have improved that,
21  but the fact that she had -- she was sent out, and
22  had unexpected surgery, I don't think that the jail
23  expected her to have four teeth pulled; but the fact
24  that that was done, that's a sentinel event.
25    Q.   And so from the patients that you

Page 211

1  reviewed, the charts you reviewed that were not
2  sentinel events, how would a proper or true CQI
3  system, to use your terminology, have identified
4  those patients as needing some sort of review or
5  evaluation?
6    A.   That's something for the jail to
7  determine.  So the jail and the jail medical staff,
8  they are the ones that make that determination.
9       So the first thing is identifying that
10  we have a problem in this regard.  And no jail
11  program is perfect.  None.  So all jail programs can
12  be improved.  So the Monroe County Jail is the one
13  to identify what is our problem -- what is the
14  problem that we have, or potential problem?  How can
15  we improve it?
16       So the jail would be in a much better
17  situation than I am to identify their own
18  problems.
19    Q.   Well, so if the CQI program properly set
20  up and administered would have flagged Mr. Xiong's
21  case and Ms. Oliver's case or after-the-fact review,
22  that's what you're saying, right?
23    A.   Well, sentinel events is part of CQI,
24  but that isn't what -- I didn't think what we were
25  talking about.  I thought we were talking about

Page 212

1  outcome studies where you identify that you have a
2  problem, you evaluate the problem, you make a plan
3  to improve the problem, and then you follow up with
4  the plan.
5       So something that I would identify is
6  the whole thing of practitioners practicing -- let's
7  say prescribing medications over the phone and never
8  following up.  So is that a problem?  I think it is.
9  So a CQI would look into that.  How often does that
10  happen?  Then you would sit around a table and say:
11  Is it a problem?  Can we improve it?  What are we
12  going to do to improve it, make a plan.
13       After you've done it for three months,
14  say you evaluate the plan, and say:  Are we better
15  or are we not?  Should we go back to the way it was
16  before?  So that would be one.  There are others.  I
17  mean, I didn't really look at diabetics.
18    Q.   So, Doctor, my question, as I had
19  phrased it, was simply if Schmieder, Xiong, and
20  Oliver were sentinel events, then my understanding
21  of your opinion is that those would have been called
22  out for after-the-fact review by a proper CQI
23  program.
24       So far so good.
25    A.   Evaluation of deaths and sentinel events



Page 213

1    is a proper event of CQI.

2        Q.    So what I want to ask you about is:  The

3    other patients that you reviewed that were not

4    sentinel events did not occur, are you saying that

5    those other cases would have been called out or had

6    fallen out for further after-the-fact review by a

7    proper CQI program?

8        A.    Sure.  Yes.  So --

9        Q.    Let me ask you that.  Let me ask you how

10   is it that those cases would have fallen out for

11   after-the-fact review by virtue of a true CQI

12   program?

13       A.    Okay.  Well, I think we're talking about

14   sentinel events.  So, one, we have --

15       Q.    No, no, no.  We are not talking about

16   sentinel events.  I'm asking about the patients who

17   were not sentinel events.

18           How would they have fallen out for

19   further after-the-fact review by virtue of a CQI

20   program?

21       A.    Because the jail would have looked into

22   it beforehand and identified problems.  So one

23   problem that you yourself identified, we have a

24   problem getting patients in to a dentist.  That's

25   our problem.  So I've identified a problem.  Why are

Page 214

1    we --

2        Q.    You're talking about Ms. Oliver now,

3    correct?

4        A.    Ms. Oliver's not the only one.

5           But you asked me to identify something

6    that you could use -- that you could use as a

7    trigger for CQI out of these patients that I've

8    identified.  That's one.

9           We have a problem getting patients in to

10   dentists.  That's our problem.  So one, how often --

11   how often -- what is the scope of the problem?  How

12   many patients do we refer to dentists?  What's the

13   average length of time from the time of the referral

14   until they get in to a dentist?  What's the reason

15   why we -- dentists give for not wanting to work with

16   us, or whatever?

17           You define the problem.  How do we fix

18   the problem?  Do we hire a dentist to come to the

19   jail?  That's what a lot of jails do.  They hire a

20   dentist come to the jail once in a week.  Do we sign

21   a contract with an outside dentist that gives us,

22   say, five dental slots a week?  How do we fix the

23   problem?  You try to fix it so that if you're asking

24   about one thing that can -- that this could pop up,

25   there's one.

Page 215

1        Q.    Would a CQI program have flagged those

2    other cases, the non-sentinel events for

3    follow-up?

4        A.    Maybe.  It depends on what CQI you had

5    done beforehand.  I mean, it depends on what you're

6    studying, so if you were studying -- we talked about

7    people who are complaining of chest pain and are

8    being given Tums, that would be -- that would be an

9    appropriate topic for CQI.  What is our Tums policy?

10   What's our policy for people who complain of chest

11   pain and gastric reflux?  How do we handle those?

12   Are we handling it appropriate?

13           It might be that your CQI program says

14   yes, everything is hunky dory and appropriate with

15   how we distribute Tums.  Most of the time you can

16   say we can make this better, and you do.

17       Q.    So it's possible if the CQI program was

18   looking at a particular problem or scenario, that

19   one or more of those patients that fell under that

20   scenario would fall out through the CQI program.

21           So far so good?

22       A.    Right.  You can pick anybody you want.

23   You can pick any problem you want.

24       Q.    But it's not necessarily true that those

25   patients would have fallen out just by virtue of

Page 216

1    there being a, quote, unquote, true CQI program in

2    the jail, correct?

3        A.    No.  You could have a true CQI program,

4    and you chose to study other stuff that had nothing

5    to do with any of these patients.  You looked at

6    diabetes.  You looked at foot care.  You looked at

7    people who injured their ankles playing basketball.

8    And you just never looked at anything related to the

9    patients here.

10           But that's something that the jail and

11   the medical staff choose.  If you choose not to look

12   at something, then it doesn't get looked at.  But

13   you could choose to look at something relating to

14   these patients.

15       Q.    Let me shift gears quickly to ask you

16   about the portion of your report relating to

17   staffing on pages 6 through 7.

18           You talk there about individuals with

19   nontrivial complaints needing to be evaluated and

20   examined by a practitioner, correct?

21       A.    Yes.

22       Q.    And so can you define for me any more

23   specifically the line between trivial and

24   nontrivial?

25       A.    No.  That's a common sense -- I guess

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Page 217

1 common sensical thing. So you can pick examples
2 that are definitely trivial. I have a hangnail. I
3 have a minor rash on my foot.
4        You can pick examples that are clearly
5 nontrivial. I'm throwing up blood.
6        And then there's a bunch of things that
7 are kind of in the middle.
8    Q.   And for the stuff that's in the middle,
9 does that involve some degree of medical
10 professional judgment as to whether it's trivial or
11 not trivial?
12       MR. WEIL: Object to form.
13       THE WITNESS: Sure. But in a jail,
14 almost everybody should be seen by a practitioner.
15    Q.   (BY MR. JONES:) Well, you use the
16 dividing line in your report between trivial and
17 nontrivial, which is why I'm asking you if you could
18 define it?
19    A.   No. I'm not saying that nontrivial
20 things should never been seen by a practitioner.
21 And to a shorter answer, no, I can't actually define
22 what trivial and nontrivial is. You are right that
23 it requires judgment and protocols --
24    Q.   And so when you -- when you talk on
25 page --

Page 218

1        MR. WEIL: Can you let Dr. Keller finish
2 his answer?
3    Q.   (BY MR. JONES:) Oh, I'm sorry, Doctor.
4 Were you finished? I didn't meant to cut you off.
5    A.   I want to say that patients make that
6 determination when you put in medical requests.
7 They're saying when a patient comes to an urgent
8 care clinic and walks in the door and says I'm here,
9 they themselves have elevated their complaint to
10 nontrivial.
11       And that's the same thing in a jail when
12 a patient puts in a request for medical care, those
13 pretty much all should be seen by a practitioner.
14 The patient has requested medical care and the only
15 way that it's not going to be seen by a practitioner
16 is that if there's a well-developed process for
17 specific items that are -- that can be -- that can
18 be solved in some other way.
19    Q.   Well, I'm sorry, I'm interrupting you
20 again.
21    A.   Well, for example, dandruff. I have
22 dandruff, and all I want is a dandruff shampoo. So
23 if there is a mechanism for that patient to get an
24 over-the-counter dandruff shampoo without a
25 practitioner, that's fine. And there are lots of

Page 219

1 such things.
2        But most people that -- most patients
3 who put in a request, I want to be seen for
4 whatever, back pain, heartburn, knee pain,
5 headaches, I have a history of seizures, all of
6 those should be seen by a practitioner just as they
7 would in a community.
8    Q.   Well, in your report you talk about at
9 the bottom of page 6 that when a patient complains
10 of a nontrivial complaint such as chest pain in a
11 correctional facility, they should be evaluated in
12 the same way, meaning by a practitioner.
13       And you go on to say all such patients,
14 in other words, those who complain of a nontrivial
15 complaint, should be evaluated and examined by a
16 medical practitioner. That's your opinion, yes?
17    A.   Yes.
18    Q.   Am I fair in understanding that in
19 making that point you were saying that patients in a
20 jail with nontrivial complaints should be evaluated
21 and examined by a practitioner?
22    A.   What I -- yeah. What I am saying is
23 that patients who request to see -- request medical
24 care in a jail should be seen by a practitioner just
25 like they would in a community.

Page 220

1        Could we -- could we continue this in a
2 second? Could we take a short break?
3        MR. JONES: That's fine with me. I
4 don't have but a couple minutes more, but I'm happy
5 to take a break.
6        Why don't we take two or three minutes,
7 take five minutes, and then I'll wrap up.
8        (A brief recess was had.)
9    Q.   (BY MR. JONES:) Doctor, is it your
10 opinion that any inmate or patient in a county jail
11 who makes a medical complaint needs to be evaluated
12 by a practitioner?
13    A.   Most of them, and if they're not seen by
14 a practitioner, there has to be defined guidelines
15 for why not and what -- what -- exactly how that
16 happens if they're not. The default should be that
17 they're all seeing a practitioner.
18    Q.   And is the dividing line the line that
19 you identify in your report that is between those
20 with trivial complaints and those with nontrivial
21 complaints?
22    A.   There's no good way to define that, and
23 I think patients define it themselves so any patient
24 that says I want to see -- I want medical care, the
25 default should be they see a practitioner just



Page 221

1  like --
2      Q.   So --
3      A.   -- just like they would in a
4  community.
5      Q.   So your opinion is, in fact, that if an
6  inmate complains of some sort of medical symptom or
7  problem, seeking medical attention, that that
8  individual has to be seen by a practitioner in order
9  to satisfy the standard of care.
10         MR. WEIL:  Object to form.
11     THE WITNESS:  In most cases, yes.  What
12  should happen in a jail is the same as what happens
13  in a community.
14     Q.   (BY MR. JONES:)  And what category of
15  cases is it that an individual in custody in a jail
16  asking for medical attention for some problem
17  doesn't need to be seen by a practitioner?
18     A.   Okay.  Any case in which there is a
19  prescription of a legacy drug, and a legacy is just
20  something that needs to be prescribed by a
21  practitioner.  It cannot be -- it's illegal to --
22  you have to get it from a pharmacy.
23         Any encounter that involves a legacy
24  drug, the patient needs to be seen by a
25  practitioner.  That's one.

Page 222

1          Any encounter that can be handled with
2  over-the-counter medications, so that in the
3  community a patient would not need to see a
4  practitioner but just go to the corner drugstore and
5  get it, in a jail you can't go to the corner
6  drugstore and get it so sometimes you have to go to
7  medical to get over-the-counter medications.
8          Many of those do not have to see a
9  practitioner.  Those cases need to be well defined.
10  Who doesn't need to see a practitioner, what happens
11  when they make a complaint, how it's handled, but
12  those don't necessarily have to see a
13  practitioner.
14     Q.   I'm sorry, for the legacy prescriptions
15  those do or don't have to see a practitioner?
16     A.   You do.  Just like if you want to get a
17  blood pressure medication in the community, you have
18  to see a practitioner.
19     Q.   So if it's not a situation where the
20  individual's complaint can be treated or resolved by
21  an over-the-counter medication, the individual in a
22  jail has to be seen by a practitioner in order to
23  satisfy the standard of care.
24         Is that your opinion?
25     A.   Just as it is in the community.

Page 223

1      Q.   So is that a yes, Doctor?
2      A.   Yes.  In the community you cannot get a
3  legacy drug without being seen by a practitioner,
4  and that's the way it should be in a jail as well.
5      Q.   Okay.  So but what I'm trying to define
6  with you is the categories where it's not necessary
7  for an inmate in the jail complaining of a medical
8  problem to be seen physically by a practitioner.
9  And so far, I believe what you've identified for me
10  is in certain circumstances where the situation can
11  be resolved by an over-the-counter medication.
12         So far so good?
13     A.   Right.
14     Q.   Are there any other circumstances where
15  an inmate's making a complaint seeking medical care,
16  that the inmate does not have to be seen by a
17  practitioner in order to satisfy the standard of
18  care as you see it?
19     A.   Well, if the patient doesn't want to see
20  a practitioner, if the patient doesn't need a legacy
21  drug and is happy getting -- their problem can be
22  answered via -- via nursing protocols where a nurse
23  can take care of it, or deputies for that matter,
24  then no, they don't have to see a practitioner just
25  like they don't in the community.

Page 224

1      Q.   So the instances where an individual in
2  a jail seeking medical care would not need to be
3  seen by a practitioner in order to satisfy the
4  standard of care, includes circumstances where the
5  problem can be resolved with an over-the-counter
6  medication, if the inmate refuses further medical
7  care, and if the situation can be resolved by a
8  nurse.
9          So far so good?
10     A.   Well, no.  I mean, I wouldn't really
11  agree with that summary.  I mean, this is -- this
12  is -- if an inmate refuses medical care, that's a
13  whole -- another subject.  Inmates have the right to
14  refuse medical care, but there's a lot of potholes
15  that you can sprain your ankle in in that road, and
16  we don't have to go through that.  But if they're
17  refusing medical care, then they're not seeking
18  medical care.
19         If there are some instances where some
20  patients still need to be seen by a medical
21  practitioner, it depends on why they're refusing
22  medical care.  If an -- if the patient wants
23  something that a nurse can give them, for example,
24  will you -- I'm having -- because of mobility issues
25  I'm having trouble clipping my toenails, if there's



Page 225

1  a service that a nurse can do that doesn't involve a
2  prescription drug, that would be an example of
3  something that can be handled by a nurse without
4  recourse to a practitioner.
5      Q.   So other than where the medical issue at
6  question can be resolved with an over-the-counter
7  drug or is something that a nurse can resolve, are
8  there any other circumstances in your opinion where
9  an inmate complaining of a medical problem seeking
10  medical attention does not have to be seen by a
11  practitioner in order to satisfy the standard of
12  care?
13     A.   Well, I can't think of any at this
14  time.
15     Q.   And ultimately, it's an issue of medical
16  judgment as to whether an inmate who's complaining
17  of a medical problem needs to be seen by a
18  practitioner; is that correct?
19     A.   To some degree it is.  Any time there's
20  a prescription of a legacy drug, and that includes
21  reauthorizing medicines that they came in with, any
22  time that that practitioner prescribes medications,
23  they have to be -- the patient should be seen by the
24  practitioner.
25     Q.   In terms of your opinions about the

Page 226

1  training, orientation training provided by ACH, am I
2  correct that any training that you're basing that
3  opinion upon is listed among the materials that you
4  reviewed on pages 2 and 3 of your report?
5      A.   I don't understand that question.
6      Q.   So in your report you list the materials
7  that you considered in forming your opinions in this
8  case, correct?
9      A.   Yes.
10     Q.   And is that a complete list of the
11  materials you reviewed and considered in forming
12  your opinions in this case?
13     A.   I believe so.
14     Q.   And so if you have opinions about
15  orientation training provided by ACH, the basis --
16  the evidentiary basis for those opinions, that's
17  found among the documents listed in those you
18  considered in your report, correct?
19     A.   Yes.  There may -- ACH may have other
20  training materials that I have not reviewed, and if
21  I have not reviewed them, then I did consider
22  them.
23     Q.   The only ones you reviewed you've listed
24  in your report?
25     A.   Yes.

Page 227

1      Q.   Your invoice in the case shows that you
2  have about forty hours in on the file up until the
3  date of your report, February 7th.
4          Do you recall that?
5      A.   Yes.
6      Q.   And roughly, are you able to portion
7  those forty hours between the time you spent
8  reviewing records and other materials to form your
9  opinions and the portion of the forty hours that you
10  spent drafting your report?
11     A.   I don't think so, no.
12     Q.   Do you have any records that would help
13  you divide the forty hours among record review
14  versus report writing?
15     A.   I don't think so.
16     Q.   Do you know when you started writing the
17  report in this case?
18     A.   I don't know, off the top of my head.  I
19  have would have to -- I'd have to go back and
20  look.
21     Q.   What would you look at?
22     A.   I would look at my computer and see when
23  the first -- when I started working on the
24  document.
25     Q.   Very quickly, under Dalton Allen -- I'm

Page 228

1  sharing my screen.
2          Can you see it?
3      A.   You have to make it bigger.
4      Q.   Sorry.  Better?
5      A.   Yes.
6      Q.   I'm showing you what's marked as Monroe
7  County 36380 through 36384, which is titled medical
8  history and health appraisal.
9          Do you see that?
10     A.   Yes.
11     Q.   From March 19th of 2021, correct?
12     A.   Yes.
13     Q.   Do you recognize this as a document you
14  reviewed in considering the care given to
15  Mr. Allen?
16     A.   I believe so, yes.
17     Q.   And this looks like some sort of history
18  and physical, right?
19     A.   Yes.
20     Q.   And it notes on page 4 of 5, so 36383,
21  it includes notes about his -- a dental screening,
22  correct?
23     A.   Yes.
24     Q.   And it -- it refers to the fact that he
25  had upper dentures, his own teeth, and his lower jaw



Page 229

1  with two broken teeth, correct?
2  **A.   Yes.**
3  Q.   And this is as of March of 2021, yes?
4  **A.   Yes.**
5  Q.   And it goes on to say that what he
6  wanted was denture glue, but he did not want to be
7  referred to anyone, correct?
8  **A.   Yes.**
9  Q.   Is it fair to read that as saying he
10  didn't want to be referred out for dental care?
11  **A.   As of that day, he did not.**
12  Q.   And do you -- do you know of anything in
13  the file or chart that indicates that he changed his
14  mind about not wanting to be referred out for dental
15  care?
16  **A.   No.**
17  Q.   And then lastly, because I don't think
18  we got up until this point, I'm showing you what
19  I've got on the screen and I understand to be a copy
20  of your written report in this case.
21      Do you see that?
22  **A.   Yes.**
23      MR. JONES:  Do you -- Steve, do you know
24  what number we left off on?  I think maybe 89?
25      MR. WEIL:  Hold on one second.  89 is

Page 230

1  the last one.
2      MR. JONES:  So we'll mark this as
3  Exhibit 90.
4      (Exhibit 90 was marked for
5      identification.)
6  Q.   (BY MR. JONES:)  Doctor, is this, in
7  fact, and I can scroll through it if you'd like, but
8  is this a complete copy of your report in this
9  case?
10  **A.   That's what it looks like.**
11  Q.   And at the back end of it is your CV,
12  correct?
13  **A.   Yes.**
14  Q.   And this is actually a CV from January
15  of this year, correct?
16  **A.   Yes.**
17  Q.   And your January 2024 CV, is that a
18  complete and current copy of your CV?
19  **A.   (No audible response.)**
20  Q.   I'm sorry, did you answer?
21  **A.   What was the question?**
22  Q.   The CV that's at the back of your
23  report, Exhibit 90, is that a complete and current
24  copy of your curriculum vitae?
25  **A.   It looks like it, yes.**

Page 231

1      MR. JONES:  Thank you, Doctor.
2  I don't have any other questions.
3      MR. CASSERLY:  Can you stop sharing?
4      MR. JONES:  Yes.
5
6          EXAMINATION
7  BY MR. CASSERLY:
8  Q.   Good afternoon, Doctor.  My name is John
9  Casserly.  I'm the attorney for USA Medical.  My
10  plane leaves in less than ninety minutes, so I have
11  a couple of questions to start out.
12      I will not be asking you for examples
13  unless I ask you for examples.  Okay?  Do you
14  appreciate the -- I'm going to start over.  And I'm
15  also not going to ask you for reasons for the
16  answers to my questions unless I say why.
17      Are those fair requests that I can make
18  of you at this point?
19  **A.   Sure.**
20      MR. WEIL:  Objection.
21      MR. CASSERLY:  Okay.
22  Q.   (BY MR. CASSERLY:)  You have a business
23  that you own called TFS Correctional Consultants; is
24  that correct?
25  **A.   Yes.**

Page 232

1  Q.   And you used to own a company with
2  Badger in the name?
3  **A.   Yes.**
4  Q.   Is that right?
5  **A.   Yes.**
6  Q.   Can you give me the full name of the
7  Badger business once more, please?
8  **A.   Badger Medical, PA.**
9  Q.   PA?
10  **A.   Yeah.  Professional association.**
11  Q.   Okay.  What kind of business
12  organization was Badger Medical, PA?
13  **A.   It was a professional association.  It**
14  **was a corporation.**
15  Q.   Okay.  I'm going to start asking, have
16  you ever owned any other businesses besides those
17  two?
18  **A.   No.**
19  Q.   Okay.  Were you the sole owner of
20  Badger?  I'm going to use the shortened version,
21  just Badger.
22      Were you the sole owner of Badger?
23  **A.   For most of its life I was because Idaho**
24  **law required that a -- that such a company be owned**
25  **only by a physician.**



Jeffrey Keller, M.D., FACEP, FACCP                                                                  March 19, 2024

Page 233

1    Q.   Okay.

2    **A.   Later when Idaho changed its law, my**

3    **wife -- the short answer, my wife was a co-owner at**

4    **the time of the sale.**

5    Q.   Not to be pedantic, your Honor --

6    Doctor, although I think that's what I do for a

7    living, I would have said that the answer to that --

8    short answer to that question would have been no

9    because I asked you if you were always the sole

10   owner.

11   **A.   Okay.**

12   Q.   I didn't want to know why or under what

13   circumstances you weren't the sole owner.

14        Would you agree that one of the main

15   reasons for forming a corporation rather than

16   running a business as a sole proprietorship is to

17   obtain the liability limitations inherent in

18   corporate ownership, right?

19   **A.   That's probably a little over my head.**

20   **That isn't why I set up my corporation, but not**

21   **something --**

22   Q.   Why -- why -- I'm sorry.  I did not mean

23   to speak over you.

24        Please finish.

25   **A.   I think I'm done.**

Page 234

1    Q.   Okay.  Why did you set up a corporation

2    rather than proceed as a sole proprietorship --

3    **A.   On the advice --**

4    Q.   -- for Badger?

5    **A.   On the advice of my attorney.**

6    Q.   Do you remember why your attorney told

7    you that it was a good idea to form Badger as a

8    corporation rather than run it as a sole

9    proprietorship?

10        MR. WEIL:  Okay.  Hold on.

11        That's a privileged question.

12   Privileged legal advice, so I'm going to instruct

13   Dr. Keller not to answer.

14        MR. CASSERLY:  I think my question was

15   whether he remembered why, which wouldn't be

16   privileged.

17        Wouldn't you agree?

18        MR. WEIL:  Okay.  Well, on that limited

19   answer, that's fine.

20        **THE WITNESS:  Yes.**

21   Q.   (BY MR. CASSERLY:)  Do you remember,

22   Doctor?

23   **A.   Yes.**

24   Q.   Okay.  Badger had a professional

25   liability insurance policy with a limit of one

Page 235

1    million dollars for each claim.

2        Is that your best recollection?

3    **A.   Yes.**

4    Q.   Thinking back to the years that you

5    owned Badger, do you remember, as you sit here,

6    whether you kept retained earnings in the accounts

7    of Badger year over year?

8    **A.   Yes.**

9    Q.   And do you have a memory of how much you

10   left in Badger -- and a generalization or your best

11   estimate of average at this point would be great --

12   year over year, when you owned Badger how much you

13   would leave in there as profit?

14   **A.   Yes.**

15   Q.   How much would that be on average, your

16   best estimate of average?

17   **A.   Zero.**

18   Q.   And that's because at the end of each

19   year you would take the profits in order to avoid

20   income tax on that; is that right?  Corporate income

21   tax?

22   **A.   Well, I assume that's the reason.  We**

23   **did it on the advice of our accountant, but I**

24   **believe that the main reason was to avoid income**

25   **tax.**

Page 236

1    Q.   Okay.  I apologize for these gaps when

2    I'm the one who's been whining about time, but I'm

3    skipping over parts of my outline that I don't need,

4    so....

5        I'd like to pose to you a hypothetical

6    question about something that could have happened

7    when you owned Badger.

8        If Badger had been sued by a patient

9    inmate, and that inmate had received a verdict and

10   judgment against Badger for millions of dollars more

11   than your insurance policy, you'd agree that Badger,

12   under that circumstance, would not have had

13   sufficient capital to pay that judgment, would

14   they?

15   **A.   Well, in this hypothetical, that is**

16   **correct.**

17   Q.   Okay.  Did Badger observe all the

18   appropriate corporate formalities that you're aware

19   of?

20   **A.   Yes.**

21   Q.   Okay.  Do you have copies of meeting

22   minutes from each year's shareholder meetings?

23   **A.   Yes.**

24   Q.   And meeting minutes of each year's board

25   meetings?



Page 237

1    A.   Yes.

2    Q.   Okay.  Have you continually insured that

3  Badger's filing requirements with the State of Idaho

4  have been met?

5    A.   They were -- well, Badger doesn't exist

6  anymore, but until it was dissolved, yes.

7    Q.   Okay.  Did Badger hold -- did Badger

8  issue shares of stock?

9    A.   One.  One share.

10   Q.   Okay.  And who held that share of

11  stock?

12   A.   Me.

13   Q.   Okay.  Did Badger pay any money to you,

14  the shareholder, in the form of dividends or did you

15  take all proceeds as payroll?

16   A.   No dividends, if I remember correctly.

17   Q.   Okay.  Did Badger have any officers or

18  directors besides yourself?

19   A.   No.

20   Q.   Do you still have records in your

21  possession that discuss the corporate formalities of

22  the existence of Badger?

23   A.   I don't believe so.  I think that they

24  went with the company that purchased Badger.  I

25  think all of that went with them.

Page 238

1    Q.   Okay.  Looking back on your ownership of

2  Badger, even though there could have been a

3  circumstance where a judgment against Badger would

4  have left it unable to satisfy that judgment

5  creditor, a theoretical possibility that we

6  discussed, you don't believe that Badger was a mere

7  facade of a corporation, do you?

8        MR. WEIL:  Object to form.

9        THE WITNESS:  I don't understand the

10  question.

11   Q.   (BY MR. CASSERLY:)  Sure.

12        You believe that Badger was at all times

13  in good faith operating as a corporate business,

14  right?

15   A.   Yes.

16   Q.   You don't -- you wouldn't agree if

17  someone accused you of sanctioning a fraud upon

18  creditors with your ownership of Badger, right?

19   A.   Well, it never happened, so I never had

20  that -- never had to cross that bridge.

21   Q.   Okay.  Are you currently the sole owner

22  of TFS Correctional Consultants?

23   A.   Yes.

24   Q.   And TFS is also a corporation, right?

25   A.   Yes.  I believe so.

Page 239

1    Q.   And does TFS have a policy of

2  professional liability insurance?

3    A.   No.  I don't believe so.

4    Q.   Okay.  Does TFS have more than a nominal

5  amount of financial corporate assets, say more than

6  ten thousand dollars maintained in its accounts?

7    A.   No.

8    Q.   But you do keep enough money in TFS to

9  pay your debts, right?

10   A.   Yes.

11   Q.   Do you have any -- okay.

12        Does TFS observe all appropriate

13  corporate formalities?

14   A.   Yes.

15   Q.   Do you have meeting minutes of each

16  year's shareholder meeting?

17   A.   I'm not sure what the corporate

18  formalities are for TFS because I'm not sure exactly

19  how it's structured.  That's not my department, so

20  I'm not sure.  I don't -- I'm not sure even that it

21  is a corporation.  It might not be.  I don't know.

22   Q.   One second here.  If the Idaho Secretary

23  of State's website says that TFS Correctional

24  Consultants is a general business corporation, would

25  you have any reason to disagree with that?

Page 240

1    A.   No.  But, yes, I don't have any reason

2  to disagree with that.

3    Q.   Thank you.

4        Do you have meeting minutes of each

5  year's board meetings?

6    A.   I don't know.

7    Q.   Okay.  I don't think I got an answer to

8  my previous question about whether you had copies of

9  meeting minutes of each year's shareholder meetings.

10   A.   I don't know.

11   Q.   Okay.  Have you made sure that TFS's

12  filing requirements with the State of Idaho have

13  been met?

14   A.   Well, between my accountant and my

15  attorney, I believe that all that's taken care of.

16   Q.   Okay.  If that same website at the Idaho

17  Secretary of State's office indicates that TFS

18  Correctional is inactive, dash, dissolved

19  administrative, would you have any reason to

20  disagree with that?

21   A.   No, I don't.  I don't know.

22   Q.   Okay.  You would disagree if someone

23  accused you and TFS of -- of sanctioning a fraud,

24  wouldn't you?

25   A.   Yes.  I would disagree with that.



Page 241

1    Q.    Okay.  You don't believe that your
2  operation of TFS promotes any injustice?
3    A.    No.
4          MR. CASSERLY:  Okay.  Doctor, you have
5  been very understanding of my anxiety about catching
6  my plane and asking sharply worded and sounding
7  questions.  I apologize for that, and I have no
8  further questions.
9          MR. WEIL:  Okay.  I think that's it for
10  all the defendants, right?
11         MR. CASSERLY:  Yes.
12         MR. KAFKA:  Take a quick break if we
13  could go off the record.
14         (Discussion off the record.)
15         THE COURT REPORTER:  Mr. Casserly, what
16  do you need with your transcript order?
17         MR. WEIL:  Okay.
18         MR. CASSERLY:  Okay.
19         MR. WEIL:  Thanks.
20         MR. CASSERLY:  I know we're not done.
21  I'm going to listen by phone, but I would like just
22  a searchable PDF with scanned PDF exhibits.
23         MR. WEIL:  Okay.  So Dr. Keller, you can
24  turn off the mike and the camera real quick, and I'm
25  going to do the same, and let's just take a break

Page 242

1  and we'll reconvene for any questions.
2          (A brief recess was had.)
3
4                EXAMINATION
5  BY MR. WEIL:
6    Q.    Okay.  Dr. Keller, would you pull up
7  your report, please, and turn to pages -- page 19
8  and 20?
9    A.    Okay.  I'm ready.
10   Q.    Okay.  You were asked -- you talked
11  about medical care.  I'm just reading from the first
12  time -- the medical case I reviewed in this report,
13  both within the Monroe County Jail and at other
14  facilities, bear a striking resemblance to
15  Ms. Boyer's case.
16         Is that -- I'm sorry, there's some sort
17  of alarm going off.  I'll be right back, I
18  apologize.
19         (Pause in the proceedings.)
20   Q.    (BY MR. WEIL:)  Dr. Keller, I apologize
21  for the interruption there.
22         The discussion you have of the outside
23  cases, does that form a basis for the opinions you
24  offer regarding the pattern of care?
25   A.    Yes.

Page 243

1    Q.    Was that independent of your review --
2  well, describe the relationship between that and the
3  review of the Monroe County cases in terms of the
4  basis of your description or pattern of care?
5          THE COURT REPORTER:  Counsel, you're
6  going to have to speak up.
7    Q.    (BY MR. WEIL:)  Sure.  I'll ask it --
8  did you hear the question, Dr. Keller?
9    A.    I didn't hear the question all the way.
10  I'm sorry.
11   Q.    Okay.  Let me -- I've got to turn
12  something up here.
13         Did the cases involving outside medical
14  care outside of Monroe County form a basis for your
15  opinion about there being a pattern of improper
16  medical care?
17   A.    Yes.
18   Q.    Was that the case whether or not
19  regardless of who -- did that depend or was it
20  independent of the Monroe County cases to be
21  reviewed?
22         MR. JONES:  Objection to form.
23         MR. WEIL:  What's the objection?
24         MR. JONES:  I don't understand what
25  you're asking him.

Page 244

1          MR. WEIL:  Okay.
2    Q.    (BY MR. WEIL:)  Dr. Keller, can you try
3  to answer the question?
4    A.    It was an independent verification of my
5  opinions, and it was probably in some way stronger
6  because they were all deaths.  So they were all
7  mortality reviews rather than morbidity reviews,
8  which were the majority of the Monroe County
9  cases.
10   Q.    If we just set aside all of the Monroe
11  County cases and you looked -- if we're considering
12  just the outside cases, is your conclusion about the
13  pattern, the observations you made here, would that
14  apply?
15   A.    Yes.
16   Q.    Okay.  You were asked about statistical
17  significance of your -- well, let me -- would you
18  turn to page 9, please, Dr. Keller, of your report?
19   A.    Sure.
20   Q.    And turn -- if you'd read, there's
21  review of records, care of other patients, and the
22  second paragraph beginning:  I have conducted.
23         Do you see that?
24   A.    I have conducted this review in the
25  manner of mortality and morbidity in signal event

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                          California Firm Registration #179

LEXITAS

Page 245

1  reviews.

2      Q.   That's the one.  If you read that

3  paragraph real quick and I have a question.

4      **A.   Do you want me to read it out loud?**

5      Q.   You don't have to, no.

6      **A.   Yes, I've read it.**

7      Q.   Okay.  Did this review -- did the review

8  you conducted here depend on statistical measures of

9  care provided among the other care provided at

10 either ECH more broadly or the Monroe County Jail?

11     **A.   No.  As I said before, I never intended**

12 **to do a statistical analysis.  I was doing an**

13 **analysis more along the lines of a mortality and**

14 **morbidity review where the goal is to identify**

15 **problems that were amenable to correction.**

16     Q.   You were asked several times -- I think

17 that you were asked several times about calling a

18 medical staff person an LPN versus an R.N.

19        Do you remember that?

20     **A.   Yes.**

21     Q.   For your purposes in conducting your

22 analysis in this for your report, did the

23 distinction between LPN and R.N. matter for the

24 cases you reviewed?

25     **A.   No.**

Page 246

1      Q.   Why not?

2      **A.   Because I wasn't looking at the**

3  **difference of scope of practice between an LPN and**

4  **an R.N.  I was looking at the scope of practice of a**

5  **nurse versus an advance practice nurse or other kind**

6  **of practitioner.**

7      Q.   Do you remember being asked about six

8  years of medical records?

9      **A.   Yes.**

10     Q.   Referring to the overall universe?

11     **A.   Yes.**

12     Q.   What's your understanding of the

13 universe of medical records that were gathered at

14 the Monroe County Jail for your review?

15     **A.   We had one year of review, one year of**

16 **medical records.  Some -- we had a few -- there were**

17 **a few cases beyond that, and some of the records**

18 **that I got included that bookings from before.  So a**

19 **patient that had been booked in the year that we got**

20 **them had also been booked in previous years.**

21     Q.   Was there a -- did you have an

22 understanding or were you provided with a full six

23 years of medical records for the jail?

24     **A.   No.  As I understand it, there was one**

25 **year of medical records provided.**

Page 247

1      MR. JONES:  Do you recall -- I believe

2  you referred to the spreadsheet that you had and

3  the -- well, let me ask you this:  In your

4  experience with the jail, is it your -- about what

5  portion of folks have medical issues requiring

6  sustained medical attention at all?

7      MR. WEIL:  Objection to form.

8      **THE WITNESS:  I don't know what the**

9  **percentage is.  Jail -- people incarcerated in jail**

10 **tend to be younger and healthier than the population**

11 **at large.**

12     **As a group, there are a lot of healthy**

13 **young men who have no medical problems and never**

14 **have medical complaints.  What percentage that is,**

15 **I'm not sure.**

16     Q.   (BY MR. WEIL:)  Is it the case -- would

17 you expect a lot of people to require medical care

18 going in -- well, strike that.

19        How many of those people just never --

20 of the group you described, is it a large percentage

21 who don't ever get medical care at all in jail, or

22 do all of them end up getting medical care?

23     MR. JONES:  Objection to form.

24     MR. KAFKA:  Join.

25     MR. WEIL:  What's the objection?

Page 248

1      MR. JONES:  I'm not sure.  I think the

2  question was vague as to what group of incarcerated

3  people you're asking him about.

4      MR. WEIL:  Okay.

5      **THE WITNESS:  Are you waiting for me to**

6  **answer?**

7      MR. WEIL:  No.  I'm trying to address

8  the objection so we can get out of here.

9      Q.   (BY MR. WEIL:)  I'm showing you the

10 spreadsheet, Dr. Keller, that has been referred to a

11 few times.  Do you see column F with the number

12 designation there?

13     **A.   Yes.**

14     Q.   Okay.  And after -- there's a hundred

15 and twenty that get four or higher, right?

16     **A.   Yes.**

17     Q.   Okay.  And then the rest, just scrolling

18 down here, are twos or ones, and then there's some

19 change at the bottom.

20        Do you see that?

21     **A.   Yes.**

22     Q.   Okay.  Do you have an understanding of

23 what those lower numbers mean?

24     **A.   There are a lot of people who come to**

25 **jail who have no medical problems and never make a**

Jeffrey Keller, M.D., FACEP, FACCP                                    March 19, 2024

Page 249

1  medical request.  So the only time they see medical
2  is at intake, and then if they're there long enough
3  at a year, regularly scheduled medical exams, and
4  then any time they put in a request to see medical,
5  but many never put in a request to see medical.
6      Q.   Is that consistent with your experience
7  as a correctional health care provider in terms of
8  there being a large percentage of people who don't
9  request medical care at all?
10     A.   Yes.
11     Q.   And so would it be -- well, strike that.
12         Dr. Keller, if you turn to page 6 of
13  your report.  Let me know when you're there.
14     A.   Yes, I'm there.
15     Q.   Okay.  So I'm looking at the second
16  paragraph in staffing because when a patient
17  complains of chest pain, abdominal pain, or any
18  other nontrivial complaint.
19         Do you see that?
20     A.   Yes.
21     Q.   And you and Mr. Jones had an extended
22  conversation about that.
23         And abdominal pain is nontrivial why?
24     A.   Abdominal pain is nontrivial because it
25  has potential serious consequences of death or

Page 250

1  morbidity, and people with abdominal pain can get
2  really sick.
3      Q.   Would that be etiology of abdominal
4  pain?  Is that a serious etiology?  Is that what
5  you're describing?
6      A.   What I'm describing is that the broad
7  category of abdominal pain contains a large
8  number -- the broad category of abdominal pain
9  contains a large --
10         MR. WEIL:  John, I don't think you're on
11  mute.  Let's just go ahead, Dr. Keller.  Sorry about
12  that.
13         THE WITNESS:  The large category of
14  abdominal pain contains a lot of things on the
15  differential diagnosis that can cause serious harm;
16  appendicitis, bowel obstructions, many, many things
17  like that, so more than other types of complaints,
18  there's a higher likelihood of someone having a
19  serious outcome.
20     Q.   (BY MR. WEIL:)  Is that -- is that
21  generally the reason you would include chest pain
22  there as well?
23     A.   Yes.
24     Q.   Okay.  And so those both have --
25         MR. CASSERLY:  I'm sorry, I just see

Page 251

1  that I was not on mute, but I have to send you all
2  through a metal detector, if you'll give me less
3  than one minute without asking a question.
4          MR. WEIL:  Sure.
5          MR. CASSERLY:  Thank you.
6          (Pause in the proceedings.)
7          MR. CASSERLY:  Thank you.  You've all
8  been X-rayed.
9          Go ahead.
10     Q.   (BY MR. WEIL:)  I think the question
11  that I had while you were describing abdominal pain
12  as having a number of serious etiologies -- and
13  that's etiology for the court reporter.
14         The same would be true of chest pain; is
15  that correct?
16     A.   Yes.
17     Q.   And is it potentially serious etiology
18  that makes a complaint nontrivial?
19     A.   Well, that's one of the things that
20  makes a complaint nontrivial.  Another that makes it
21  nontrivial is that the patient asks to be -- for an
22  evaluation.  And another thing is that the -- the
23  encounter ends up with a prescription of a legacy
24  medication.
25         But of those, probably the most

Page 252

1  important is this one, the complaints that there
2  are -- complaints that have a higher possibility of
3  serious or negative outcomes.
4      Q.   When we were -- if you turn to page 18
5  and 19 of your report, paragraphs 9, 10, and 11, did
6  you see those three cases there, Dr. Keller?
7      A.   Yes.
8      Q.   Okay.  I think when we were going over
9  this yesterday, you identified those as cases that
10  you reviewed, but they weren't in the documents
11  listed on page 2 of your report; is that right?
12     A.   That is correct.
13         The list of cases that I reviewed did
14  not include those, and I did review them obviously
15  since they are in the report.
16     Q.   So did you review documents underlying
17  those three cases Listale (phonetic), Riggin, and
18  Hinkle?
19     A.   Yes.
20         MR. WEIL:  Okay.  Doctor, that's all I
21  have.
22         Thank you.
23         MR. JONES:  Doctor, there's really just
24  one thing I want to follow up on, and that's in
25  reference to this Excel spreadsheet again that

Page 253

1  Mr. Weil asked you about briefly.

2

3           FURTHER EXAMINATION

4  BY MR. JONES:

5      Q.   Do you know what the difference between

6  a five and a four in column F is?

7      **A.   As I understand it, the -- it's a**

8  **difference in possibility of a medical -- bad**

9  **medical event.**

10     Q.   And how did you gain that?

11     **A.   Five would be the highest possibility,**

12 **four would be next, all the way down to one being**

13 **zero.**

14     Q.   And how did you gain that

15 understanding?

16     **A.   Mr. Weil or one of his team told me.**

17     Q.   And when was that?

18     **A.   When I got the -- when I got this when**

19 **they sent it to me.**

20     Q.   Because I understood you when I was

21 asking you questions before to not know what column

22 F described.

23     **A.   Oh, no, no, no.  I don't know what**

24 **column A, B, and D -- well or -- but F, yes, I did.**

25 **I don't think that's true.  We'll have to go back to**

Page 254

1  **the transcript, but I knew what F described.**

2      Q.   Fair enough.  Fair enough.

3           And do you know what the dividing line

4  between a four and a five is or between a four and a

5  three is?

6      **A.   No.**

7      Q.   And is that true of the lines between

8  each of the categories, one through five?

9      **A.   Yes.**

10     MR. JONES:  That's all I had.

11 Thank you.

12     MR. WEIL:  Anyone else?

13     MR. KAFKA:  One second, please.

14     MR. CASSERLY:  Casserly has no follow

15 up.

16     MR. KAFKA:  No.  That's it.

17     THE COURT REPORTER:  Counsel, I need to

18 know -- Mr. Casserly, what do you want with your

19 transcript order?

20     MR. CASSERLY:  Just a searchable PDF

21 with PDF exhibits attached.

22     THE COURT REPORTER:  Mr. Kafka?

23     MR. KAFKA:  I'll take the same.

24     THE COURT REPORTER:  Mr. Jones?

25     MR. JONES:  Same.

Page 255

1      THE COURT REPORTER:  Mr. Weil?

2      MR. WEIL:  No copy at this time -- no,

3  we'll take a copy.  What am I saying?  Just a

4  searchable PDF, no index, and exhibits.  Same

5  thing.

6      THE COURT REPORTER:  And Mr. Kafka,

7  you're e-mailing the exhibits to me, correct?

8      MR. KAFKA:  I will, yes.

9      THE COURT REPORTER:  Do you want me to

10 give you the e-mail address real quick?

11     MR. KAFKA:  No, I actually copied it

12 already.  Thank you, though.

13     THE COURT REPORTER:  Perfect.

14     And did you want to read and sign your

15 transcript or waive signature?

16     **THE WITNESS:  Yes.  Read and sign.**

17     (Whereupon, the videoconference

18     deposition concluded at 6:21 p.m.)

19     * * * * * *

20

21

22

23

24

25

Page 256

1           REPORTER'S CERTIFICATE

2  STATE OF IDAHO      )
                       ) ss.
3  COUNTY OF BONNEVILLE )

4

5

6      I, DiAnn Erdman Prock, CSR, CCR, a duly
   commissioned Notary Public in and for the State of
7  Idaho, do hereby certify:

8      That prior to being examined, JEFFREY
   KELLER, M.D., FACEP, FACCP, the witness named in the
9  foregoing videoconference deposition, was by me duly
   sworn to testify to the truth, the whole truth, and
10 nothing but the truth;

       That said videoconference deposition was
11 taken down by me in shorthand at the time and place
   therein named and thereafter reduced to typewriting
12 under my direction, and that the foregoing
   transcript contains a full, true, and verbatim
13 record of said videoconference deposition spoken in
   my direct presence or received by me via electronic
14 transmission.

       I further certify that I have no interest
15 in the event of the action.

       WITNESS my hand and seal this 28th day of
16 March, 2024.

17

18

19

20

21

22 _____
   DiAnn Erdman Prock
23 Idaho CSR SRL 963, CCR
   Notary Public in and for
24 the State of Idaho

   My commission expires November 26, 2025.

25

*[Notary seal: DiAnn Erdman Prock, COMMISSION NO. 51352, NOTARY PUBLIC, STATE OF IDAHO]*



Page 257

1           LEXITAS LEGAL

2    April 8, 2024

3    STEPHEN H. WEIL, ESQUIRE

4    LOEVY & LOEVY

5    311 North Aberdeen Street, 3rd Floor

6    Chicago, Illinois  60607

8    IN RE: Gregory Boyer et al v Advanced Correctional Healthcare Inc et al

9

10   Dear Mr. Weil,

11   Please find enclosed a copy of the deposition of

12   JEFFREY KELLER, M.D., taken on MARCH 19, 2024

13   in the above-referenced case. Also enclosed is the

14   original signature page and errata sheets.

15

16   Please have the witness read your copy of the

17   transcript, indicate any changes and/or corrections

18   desired on the errata sheets, and sign the signature

19   page before a notary public.

20   Please return the errata sheets and notarized

21   signature page to our office at 711 N 11th Street, St.

22   Louis, MO 63101 for filing prior to trial date.

23   Sincerely,

24

25   DiAnn Erdman Prock

Page 258

1    Enclosures

2              ERRATA SHEET

3    Witness Name: JEFFREY KELLER, M.D.

4    RE: Gregory Boyer et al v Advanced Correctional Healthcare Inc et al

5

6    Date Taken: MARCH 19, 2024

7    Page #_____  Line #_____

8    Should read: _____

9    Reason for change: _____

10   Page #_____  Line #_____

11   Should read: _____

12   Reason for change: _____

13   Page #_____  Line #_____

14   Should read: _____

15   Reason for change: _____

16   Page #_____  Line #_____

17   Should read: _____

18   Reason for change: _____

19   Page #_____  Line #_____

20   Should read: _____

21   Reason for change: _____

22

23

24   Witness Signature: _____

25

Page 259

1    STATE OF _____)

2    COUNTY OF _____)

3    I, JEFFREY KELLER, M.D., do hereby certify:

4         That I have read the foregoing deposition;

5         That I have made such changes in form

6    and/or substance to the within deposition as might

7    be necessary to render the same true and correct;

8         That having made such changes thereon, I

9    hereby subscribe my name to the deposition.

10        I declare under penalty of perjury that the

11   foregoing is true and correct.

12        Executed this _____ day of _____,

13   20____, at _____.

14

15        _____

16             JEFFREY KELLER, M.D.

17

18        _____

19             NOTARY PUBLIC

20   My Commission Expires:

21

22

23

24

25

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.

www.lexitaslegal.com                      California Firm Registration #179



**Exhibits**

**162311 Keller MD, Jeffrey 03.29. 24 EX 89** 3:15 90:1,2

**0**

**0003047** 93:20

**003145** 94:1

**011710** 115:12

**011711** 117:22

**040219** 113:6

**1**

**10** 103:11 252:5

**10:00** 4:1 14:1,5

**10:34** 13:24

**10th** 138:18 158:1, 5,9

**11** 94:22 95:20 106:24 109:22 110:17 252:5

**11723** 157:3

**11th** 138:17

**12-21-2019** 123:8

**12th** 15:17 182:24

**13** 182:18

**136** 3:6

**13th** 162:2

**14th** 67:20 159:25 162:3,5,8,12 163:13 179:25 181:10

**15** 3:14 183:15,18, 22

**16** 110:12 112:20 114:15

**16th** 112:8 150:1, 18 151:6,9,15 153:24 154:18

**17th** 168:15

**18** 252:4

**19** 179:1 242:7 252:5

**1997** 25:6

**19th** 167:15 168:1, 4 189:11 228:11

**1:00** 54:21,22

**1st** 179:5

**2**

**2** 63:8 64:2 128:5 226:4 252:11

**2-11-23** 15:11

**20** 5:22 118:3 124:24 125:1 169:5 242:8

**2004** 61:16

**2012** 109:19 110:5

**2016** 96:2,9 102:1, 14 138:25 198:18

**2017** 175:23 183:18,22 184:8 185:13 186:8,14

**2018** 86:17

**2019** 43:22,24 44:1 45:8,9,10 86:17 95:21 96:2, 8 110:3,11,12 112:8,21 114:15 119:10 121:7 123:7 124:12 150:22 151:9 159:25 162:3

**163**:22,23 179:2 180:20 183:15

**2020** 44:7,10,14 45:8 124:24 125:1 128:5 155:11 176:6,18

**2021** 25:6 43:22, 24 198:19 228:11 229:3

**2023** 5:22,24

**2024** 5:11 14:20 15:17 102:14 230:17

**20th** 176:10

**21** 64:20 124:12 182:24

**21st** 138:25 139:7, 12 178:7,8,17

**22** 64:20 125:1

**22552** 127:18 179:1

**22nd** 135:12 176:6 178:2

**230** 3:16

**231** 3:7

**23616** 170:24

**23681** 169:5

**24/7** 30:14,17,19, 21

**242** 3:8

**25** 109:19 110:3

**253** 3:9

**2617** 89:25 91:8

**2691** 90:11

**27** 118:3

**29** 128:4 150:1

**29th** 129:18

**2nd** 14:20 176:18

**3**

**3** 63:8 110:17 226:4

**3031** 184:2

**3073** 139:17

**3083** 138:13

**3087** 138:23

**30th** 96:17 97:24 137:14 139:15 154:8

**31** 129:7 137:17

**3127** 137:17

**31st** 170:15,23 175:23

**32** 184:2

**35869** 183:19

**36380** 228:7

**36383** 228:20

**36384** 228:7

**36867** 184:9

**37653** 167:17

**37664** 165:23

**3767273** 163:22

**37679** 162:1

**37765** 164:5

**3rd** 167:19

**4**

**4** 3:5 228:20

**40219** 110:12

**42706** 129:5

**4th** 164:3,11 166:22 167:19

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



168:4 184:8,22
186:14,24 187:8

**5**

**5** 228:20

**5th** 165:21 167:19
184:21 185:13,25
186:8

**6**

**6** 216:17 219:9
249:12

**6-12-21** 183:8

**6-14** 120:15

**6-14-19** 119:14

**66** 164:6

**690** 169:5

**6:21** 255:18

**6th** 95:21 166:24
167:19

**7**

**7** 5:11 216:17

**74** 157:3

**75** 139:17

**7:00** 144:24 145:4

**7th** 129:18 227:3

**8**

**8-21-18** 183:8

**8396** 176:7

**8426** 178:11

**85** 138:13

**88** 3:14,20 15:3,4
90:4

**89** 3:15 90:1,2
229:24,25

**8th** 67:17 116:21
155:11,18,25
157:4 158:16,17,
20,23

**9**

**9** 244:18 252:5

**9-13-19** 117:15

**90** 3:15,16,20
230:3,4,23

**9th** 129:18 137:16
183:14 188:5

**A**

**a.m.** 4:1 13:24
14:1,5 144:24
145:4

**Aaron** 92:19

**abdominal** 168:15
169:10 172:21
249:17,23,24
250:1,3,7,8,14
251:11

**ability** 133:7

**abnormal** 97:25
98:5 99:22,23
100:24 108:3,5,6
120:3 139:6
142:4,23 164:12
171:10 174:22

**abnormalities**
143:24

**abnormality** 122:8
139:10

**abscess** 185:7

**abstract** 55:11

**abstracted** 131:24

**Academy** 39:22

**ACAH** 64:3

**accelerating**
205:8

**acceptable** 29:19
143:12,13 144:8,
16

**accepting** 82:3

**access** 13:11,19
24:6,8 34:22,24
77:19,22,25
103:24,25 104:4

**accessible** 11:25

**accommodations**
85:25

**account** 133:6,9

**accountant**
235:23 240:14

**accounts** 235:6
239:6

**ACCP** 38:25

**accredited** 41:7

**accurate** 191:13

**accused** 238:17
240:23

**acetaminophen**
115:24

**ACH** 36:10 73:24
74:14 75:7 78:16
79:16 85:3 86:10
87:20 88:21 90:14
102:6,8,16 129:23
130:11 203:2
204:9 226:1,15,19

**aching** 141:5

**acid** 99:6 101:3,6
121:21 167:2,8
172:5,12 173:15

**act** 89:10

**action** 91:8

**active** 17:20 22:21
23:12

**activities** 17:21
19:22 20:6,17
22:17 206:25

**activity** 21:1,25

**actual** 18:4 56:20
84:18,20 126:15
132:2

**ADA** 49:25

**add** 44:11 59:8
105:25

**added** 47:14

**addiction** 181:4,
24 182:3

**addition** 16:14
166:18

**additional** 46:16

**address** 24:15
62:12 65:8,21
134:23 248:7
255:10

**addressed** 24:16,
21 35:13,15,18

**addressing** 68:6,7

**adds** 170:4

**adequacy** 41:15

**adequate** 42:10

**adequately** 46:14

**adjourn** 13:10

**administer** 138:8

**administered**
161:9 211:20

**administration**
47:23 83:7 87:20
91:9 150:11

**administrative**

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


240:19

**administrator**
46:12

**administrators**
43:14

**admissions**
156:25

**admit** 42:23
118:10

**admitted** 49:7

**admonished** 87:7

**admonishes**
87:20

**adopt** 43:14

**advance** 6:15,20
41:15 84:8 85:14
86:5 87:6 246:5

**Advanced** 4:24
73:17

**adverse** 154:24
176:2 177:15
179:16 189:18

**advertised** 51:13

**advice** 234:3,5,12
235:23

**after-the-fact**
211:21 212:22
213:6,11,19

**after-visit** 115:20,
22 157:17

**afternoon** 173:20
174:10,18,25
175:6,23 231:8

**age** 98:4,12
142:13

**agenda** 28:4

**agent** 44:24

**agents** 46:6

**aggregate** 45:17

**aggressive** 33:13

**agonist** 103:18

**agree** 18:12,17
35:2,20 41:1
63:12 64:12,14,25
65:7,17 67:8
68:13 69:22 70:12
71:23 72:4,5
78:14,15 84:4
90:13 109:20
113:8 118:5,21
124:8 125:23
134:6 135:9 194:5
201:10 202:15
224:11 233:14
234:17 236:11
238:16

**agreed** 65:22
111:23 113:21

**agreement** 15:21

**ahead** 20:10 29:25
35:9 36:1 37:18
39:12 51:1 53:4,
13,20 56:16 59:11
60:13 66:14 67:1,
15,23 68:4,11
69:6,21 70:21
71:15 72:2,10
74:7,18 76:12
77:1,16 78:12
80:12 82:22
86:14,20 92:4
122:5 133:4
134:11,19 162:15
201:15 250:11
251:9

**airport** 178:21

**alarm** 242:17

**alarming** 171:15

**Albuterol** 103:14,
22,23 104:7 116:2
197:24

**alerted** 30:25

**alleging** 48:5

**Allen** 182:18,21
227:25 228:15

**allergy** 151:4

**allowed** 43:18
75:14,16 80:21
103:24,25 104:4,
8,15,16

**allowing** 75:9

**alpha** 103:18

**alphabetically**
148:1

**AMA** 22:5

**Amazon** 21:17

**amenable** 245:15

**amended** 76:24
77:7 199:14

**Amendment**
67:17,20

**American** 6:1,10,
16 17:11,17,25
19:17 20:13 22:1
24:1 39:1 181:24
206:9

**Americans** 48:5

**amount** 15:12
45:1 239:5

**analysis** 95:7,15
97:19 205:9
206:15 207:1
245:12,13,22

**analyze** 207:3

**analyzing** 207:7

**and/or** 169:20

**Andrew** 136:16
146:13

**ankle** 224:15

**ankles** 216:7

**announced**
197:16

**answers** 231:16

**antacid** 71:10
143:16 144:12

**anti-anxiety**
150:22 153:15,18
154:1

**anti-seizure**
159:14

**antibiotic** 184:5
185:24 186:25
187:8 188:13,25
189:3,11,13

**antibiotics** 185:4,
7,12 186:9,15
189:7

**anxiety** 87:15 88:9
110:20 111:15,21
112:16 113:3,12
114:3,15,21,23
123:9,19,22,25
135:10,12,21
136:1 150:8
151:2,3 152:11,25
153:4,7,11 241:5

**anxious** 111:23
113:22

**anymore** 161:7
237:6

**apologize** 49:15
236:1 241:7
242:18,20

**appears** 118:17
163:15,20

**appendicitis**
250:16

**application** 60:6
134:8

**apply** 61:23

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Case: 3:22-cv-00723-jdp    Document #: 109    Filed: 02/12/25    Page 69 of 105
Jeffrey Keller, M.D., FACEP, FACCP
March 19, 2024

Index: appointment..Badger

244:14

**appointment** 129:8,17 190:2

**appraisal** 157:4 228:8

**approach** 68:14, 24 134:15

**approached** 38:17

**approaching** 68:20

**appropriately** 205:8 209:15

**approved** 15:24 91:9

**approximately** 6:13 8:13 19:21 20:11 21:12 23:20 26:12 50:20

**arbitration** 48:11, 12

**area** 57:1 83:10 141:22 190:11 207:11

**areas** 69:24 207:10,13,17

**arise** 52:2,3 91:17

**arises** 91:17

**arm** 141:12,19 142:20

**arose** 52:6,10

**arresting** 81:24

**art** 33:7,21

**article** 24:11,17

**articles** 23:19 24:2,7

**articulated** 118:20

**ascertain** 80:3 85:1

**ascribe** 89:5 98:20

**asks** 12:15 251:21

**asleep** 197:10

**aspects** 28:13 91:19

**assert** 11:4

**asserted** 11:8 46:3

**asserting** 10:14

**assertion** 145:20 146:6

**assess** 200:1

**assesses** 83:4 172:5

**assessing** 41:15 80:15

**assessment** 29:21 31:13,19,24 33:3 65:8,23 80:14 126:4 140:13 176:24 188:19

**assessments** 202:8

**assets** 239:5

**assigned** 9:7

**assistants** 26:2

**association** 22:1 39:1,2 48:6 206:9 232:10,13

**assume** 46:5 71:17 116:14 125:9 128:7 130:23 152:14 182:7 201:1 210:11 235:22

**assumed** 148:14

**assuming** 125:2

**assumption** 103:1

**asthma** 104:11

**ate** 97:6,8 98:13

**attached** 254:21

**attack** 87:16 94:4 95:2,8,10,12,18 101:11 142:10 145:11 161:1 210:12,14

**attempt** 134:15

**attempting** 201:19

**attention** 29:7 98:19 170:8,9,11, 20 172:17 221:7, 16 225:10 247:6

**attorney** 56:24 57:21 80:9 136:17 231:9 234:5,6 240:15

**attorneys** 54:9

**attributable** 103:2

**attribute** 102:6

**attributed** 102:24 144:11 165:1

**attributes** 143:15

**audible** 230:19

**August** 109:19 110:3,12 112:8,20 114:15 150:1,18 151:6,9,15 152:17,19,21 153:19,24 154:8, 18

**authorized** 153:20

**autopsy** 102:23 103:7 132:4

**availability** 190:11

**average** 85:9 214:13 235:11,15, 16

**avoid** 89:9 235:19, 24

**avoided** 128:9

**aware** 30:3 37:19, 23 75:23 87:5 91:24 92:10,12 102:12,14,19,20 106:25 107:6 119:7 121:25 154:24 177:15,19, 22 179:14,19 194:19 236:18

**B**

**back** 13:16 21:19 33:15 34:4 52:7 54:19,24 72:13 79:18 88:14 105:4,11 109:14 115:20 116:24,25 117:17 127:4 130:8 137:14 142:22 157:16 169:22 174:8 177:25 212:15 219:4 227:19 230:11,22 235:4 238:1 242:17 253:25

**bad** 37:11 42:21, 22 80:25 116:12 122:23 126:25 131:21 205:20 253:8

**Badger** 25:6,17 26:7,21 27:8,20 30:12 39:20 40:13,20 43:6,21 47:8 48:4 49:1 232:2,7,8,12,20, 21,22 234:4,7,24 235:5,7,10,12 236:7,8,10,11,17 237:5,7,13,17,22, 24 238:2,3,6,12, 18

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

LEXITAS

**Badger's** 237:3

**bar** 58:2

**base** 88:2

**based** 29:22 37:2, 6,21 59:14 69:11 73:8 79:8 80:8 97:12 98:4,17 101:1 111:8 134:2,3 142:13 143:10 144:4 159:19 186:6,11 195:19 198:9 202:18 203:23 209:9

**baseless** 118:7

**basic** 81:7

**basically** 22:12 24:3 55:15 66:5 87:12

**basing** 226:2

**basis** 8:24 13:5 21:5 30:19,21 86:16 87:6 94:5 106:24 161:21,22 163:12 204:3 206:17 226:15,16 242:23 243:4,14

**basketball** 216:7

**Bates** 11:4 92:24, 25 93:19 117:14 137:6 150:15 165:23

**bathroom** 88:14 129:24 197:12

**bear** 5:5 73:3,12, 22 151:6 242:14

**bearing** 61:16

**beating** 150:4

**beds** 26:21 27:1

**began** 58:9 146:11

**beginning** 29:6 113:4 244:22

**behalf** 27:19 51:6

**belief** 95:1 97:18 160:21

**believed** 66:7 87:13 96:18 164:20

**believes** 89:3

**belly** 99:19

**benefit** 160:23

**benign** 89:6

**Bentley** 12:9 37:3 62:21 63:3,13,22 64:11 65:11,17

**Bentley's** 14:15, 18,19 61:24 62:15,24 65:1,8, 22

**bias** 73:25 88:4 89:17

**bicep** 99:6 141:15, 23

**big** 79:3

**bigger** 104:9 165:14 166:5 228:3

**billed** 20:23

**billing** 27:23

**bills** 24:3

**Bingham** 27:15

**bit** 21:9 41:9 42:13 54:15 59:25 72:21,23 106:1 132:20 145:7 151:6

**blindly** 116:14

**block** 195:21

**blog** 23:8,10,24,25 24:11,17

**blood** 83:7 84:4 96:10,11 98:1,11 108:6 135:10,24 138:3,9,17 139:22 142:14,15 160:5, 9,15,16,22,25 161:13,19 163:4 168:16 169:11 171:14 172:21 217:5 222:17

**board** 4:17,21 6:10,12,15 17:21, 22 22:19,23,25 48:12,13,22 70:9 236:24 240:5

**bolded** 64:1

**Bonneville** 16:23 26:25 27:15

**book** 21:8,9,10 24:11,18 85:19

**booked** 95:20 96:1,3 108:2 121:11,19 137:25 138:3 179:24 246:19,20

**booking** 81:13,20 82:11 96:11

**bookings** 201:7, 11,13 246:18

**books** 38:3

**borderline** 210:5

**bore** 73:9,19

**Bosche** 52:5,9

**bottom** 56:8 85:22 93:23,24 98:22 99:7 150:15 219:9 248:19

**bowel** 250:16

**boxes** 11:22,25

13:2

**Boy** 97:6

**Boyer** 53:17 62:9, 12,20 63:10 64:10,20,24 65:3 92:1,14 95:23 102:5 209:1,3,24

**Boyer's** 64:6 78:25 92:8 135:10 242:15

**break** 13:17 54:15 55:1 88:13 129:25 220:2,5 241:12,25

**breath** 88:9 135:11 141:9 142:4

**breathe** 114:21 150:5

**breathing** 107:1,6 170:12 171:19 196:4

**bridge** 238:20

**briefly** 253:1

**bring** 8:16,21,23 9:4,6,8 10:1,4,6 12:15 142:16 160:24 180:17

**broad** 70:24 250:6,8

**broadly** 37:24 206:16 245:10

**broken** 229:1

**bronchodialator** 103:19

**bronchodilater** 193:5

**brought** 9:7 11:15 14:13,15,21 16:6 103:9

**Brush** 109:1

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F. California Firm Registration #179



123:6,8 124:14,
17,20,24 125:4
176:4,21 177:16

**Brush's** 178:14

**bunch** 58:10
108:24 200:14
210:18 217:6

**bunk** 210:3

**bunks** 85:23

**burn** 99:15

**burping** 165:8

**business** 20:16,
17,19 25:7 43:21
50:23 231:22
232:7,11 233:16
238:13 239:24

**businesses**
232:16

**bypassed** 32:22

---

**C**

**call** 28:22 29:14
31:11,15 32:6,10,
17,18 79:17 81:23
100:21,23 122:20
129:6 130:3
193:24 197:11
203:8 204:20

**call-back** 30:21

**called** 20:19 25:5
31:20 32:22,23
36:19 117:15
128:25 143:7,8
180:13 188:7,12
212:21 213:5
231:23

**calling** 79:24
88:10 123:10
124:1 125:22
126:8 156:4
245:17

**calls** 8:13 29:13
32:19

**calmed** 117:19

**camera** 241:24

**cancer** 135:23

**capable** 9:22

**capital** 236:13

**capture** 60:7

**cardiac** 114:8
119:11,23 120:6,
17 121:3 122:1,8
124:15 126:15
139:10 142:18,21
167:11,12 168:11
175:17 177:21,22
210:10

**care** 4:24 6:15,21
23:3,6 24:24 25:1,
9,15 27:9 29:4
34:14,22,25 35:6,
21,23 36:20 38:5,
25 39:19 40:13,
23,24 41:1,2,7,8,
9,11,14,19,20
42:4,10,15,17,24
43:1 46:21 48:8
51:8 52:17 58:24
59:2 62:8,12,19
63:9,17,18,20
64:2,6,9,15,24
65:2,5 66:1,2,5,8,
10,12,22,23,24
67:11 68:1,9,16
69:2,3,4,10,14,18,
25 70:2,4,6 71:11,
18,22,24 72:15,
20,25 73:3,13,18
79:11 80:8,14,19
81:3,7 84:9 85:5,
10,15 86:11 88:23
89:11 97:11 98:10
100:1 102:9 106:9
112:9 114:12
116:19 122:18,22

128:20 142:25
144:4 148:7,14,15
154:17,25 174:1,
4,11 181:3 192:12
198:18 199:25
200:9,15,20,24
201:4,25 202:17,
22 203:3,6,10
204:11 205:15
206:8,25 216:6
218:8,12,14
219:24 220:24
221:9 222:23
223:15,18,23
224:2,4,7,12,14,
17,18,22 225:12
228:14 229:10,15
240:15 242:11,24
243:4,14,16
244:21 245:9
247:17,21,22
249:7,9

**Care's** 41:13

**career** 22:15 49:17
50:17 97:4

**careful** 29:9

**carried** 45:8,10

**carry** 44:16,23

**carrying** 63:8

**case** 8:8,14 9:16,
23 10:21 12:11
13:21 14:9 49:25
50:1 51:21 52:2,6,
9,12,15 53:17
54:2 62:14,16
63:9 68:19 69:1
76:15,18,20 79:1
92:14,17,19,22,24
95:7 113:23,24
128:23 129:3
131:7 133:15
134:10 149:1
154:11 161:8
172:14 182:9

187:25 188:14
211:21 221:18
226:8,12 227:1,17
229:20 230:9
242:12,15 243:18
247:16

**cases** 16:9 19:19
20:8 33:5 49:15
50:8,16 51:5,18,
24 54:1,5 55:6
56:19 57:23
58:10,11,16,24
68:20,23 76:6,8,
13,21 77:6 78:9
79:14,21 80:2,9,
16,18 81:2,6
83:13 85:14 89:7,
8 129:22 130:10,
15,20 131:5,17,22
148:17 161:8
213:5,10 215:2
221:11,15 222:9
242:23 243:3,13,
20 244:9,11,12
245:24 246:17
252:6,9,13,17

**Casserly** 3:7
136:9 231:3,7,9,
21,22 234:14,21
238:11 241:4,11,
15,18,20 250:25
251:5,7 254:14,
18,20

**catching** 241:5

**categories** 223:6
254:8

**category** 142:13
144:6 221:14
250:7,8,13

**caused** 155:19
160:25

**causing** 98:23
140:14 164:20
185:19



cavity 128:3

ceased 43:23

cell 195:21

center 98:10 100:1 142:25 144:4 203:6,10

centers 25:10,15 27:11

Central 14:1

Centurion 40:3 84:14,15 85:5

CEO 25:5

certification 17:22

certifications 4:21

certified 4:17 70:9 91:22

cetera 79:19

chain 98:11

chair 125:13

challenged 54:11

challenges 18:13, 18

chance 55:2

change 5:25 7:6 22:4 81:7 148:2 185:2 208:15 248:19

changed 25:3 46:9,10 91:25 143:24 229:13 233:2

chapter 24:11

characterization 62:1 90:24

characterize 194:19

charges 15:13

chart 94:23 176:1 186:6,12,23 187:5,13,15 188:4 204:15 229:13

charting 96:5,7

charts 59:15 77:3, 4,6 93:1 187:2 198:25 199:13,18 200:5,14 201:3, 11,22 202:13,19 204:2,4,8,15 205:10,17,21 209:4,8 211:1

Chase 183:12

check 28:6 105:11 136:6 144:1

checked 138:17 174:13

checks 105:12 163:4

chemotherapy 135:23

chest 24:12,21 25:2 29:11 36:16 54:1,3 87:14 88:8 97:5,12,15 98:6 99:1,16 111:11 120:2,20 121:6 125:4,10 137:13 139:16 142:19 143:13 144:9 160:1 162:8 166:3,9 170:12, 13,17,21,25 171:22 172:23 173:4 176:21 215:7,10 219:10 249:17 250:21 251:14

chief 40:2

choice 32:8

choose 46:19 132:10 216:11,13

chose 199:10,12 216:4

chosen 76:15,21 199:5,7 200:11,13

Christine 62:9,12 63:9 65:3 78:25

chronic 83:5 116:19

chronology 55:11

circles 72:22

circumstance 236:12 238:3

circumstances 10:11 30:8 64:6,9 71:21 72:8 134:9 197:14,18 223:10, 14 224:4 225:8 233:13

cite 11:4 37:15 38:4,7 66:12

citing 13:12

civil 46:3

claim 45:16 48:18, 20 49:1,4 112:13 235:1

claims 45:15 46:2 48:10,11,22

class 70:10 71:20 72:7 103:20

classes 69:18

clear 7:8 57:17 108:25 145:8 151:13 192:1

clearance 81:20, 25 121:11

click 109:3

clicks 177:6

clients 5:6

clinic 28:7,8 32:2 83:16 123:1,2 203:6 204:11 206:20 218:8

clinical 16:18,22 20:1 88:3 89:18 134:9,17,24

clinician 133:13 134:23

clipping 224:25

clonidine 84:3 119:15,16,20 138:8 142:16 160:5,11,13,14, 20,24 161:17,20 163:8,10,14,19,23

co-owner 233:3

coached 87:7

cocaine 140:3

coffee 113:18 154:4

Coleman 108:20 115:3,6,13 118:24 155:9 158:5 159:4,5,9,20 210:3

collaborating 71:4

college 6:1,10,16 17:11,17,19,21,25 19:17 20:13 24:1

column 147:13,17 148:4,5 248:11 253:6,21,24

columns 147:6,10 148:25

combination 193:3

Combivent 103:25 104:7 193:1,3,7, 19,23 194:14,18 197:24

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

72



**comfort** 85:20

**comfortable** 86:2
87:12

**comfortably**
125:13

**comment** 75:4
127:22

**comments** 62:8
123:6 170:2

**Commission**
24:24 38:24
40:22,25 41:6,8
61:16 206:7

**commissioners**
43:9,13

**Committee** 41:13

**committees** 17:21

**common** 97:6
135:3 189:1
216:25 217:1

**commonly** 66:7
142:19,21 204:25

**communicate**
81:16 82:13

**communicating**
7:1 79:5

**communication**
16:3 32:4 116:5

**communications**
8:11 57:13

**community** 18:15,
20 35:6,23 63:18
88:22 219:7,25
221:4,13 222:3,
17,25 223:2,25

**company** 17:2
25:8,14 52:16,21
73:3,9,12 84:12,
13,14,25 85:1,3
100:20 232:1,24
237:24

**compared** 85:2

**comparison**
18:15,19

**complain** 87:11
101:24 179:20
187:6 215:10
219:14

**complained**
114:11 120:2
139:16 144:9,23,
24 145:4 150:3

**complaining**
110:1 112:13
170:17 215:7
223:7 225:9,16

**complains** 120:19
143:13 219:9
221:6 249:17

**complaint** 76:14,
20,24 87:14 99:11
130:17 135:4
139:18 148:17
151:17,19 152:1
159:5,6 162:12
164:15 170:20,25
176:15 178:2
183:24 199:14
218:9 219:10,15
220:11 222:11,20
223:15 249:18
251:18,20

**complaints** 38:16,
19 77:7 89:5,6
121:6 134:3 162:8
167:19 171:22
172:16 174:24
175:3,9,12,14
216:19 219:20
220:20,21 247:14
250:17 252:1,2

**complete** 5:14
133:20 144:20
226:10 230:8,18,
23

**completed** 137:24
138:20 139:11
157:4

**Completely** 57:6

**complication**
185:8

**complies** 40:25

**comply** 41:6

**component**
206:24

**compromise**
43:12,18

**computer** 12:21
93:18 227:22

**conceptually** 63:7

**concern** 36:25
37:2 74:24 125:9

**concerned** 32:21

**concerns** 18:21

**concluded** 255:18

**conclusion**
244:12

**conclusions**
64:13 202:16
204:3

**condition** 114:9
120:6 121:3
177:21,23 198:8

**conditions** 66:8
89:6 139:23

**conduct** 191:12

**conducted** 107:4
191:22 192:7,9
244:22,24 245:8

**conducting**
245:21

**conferences** 40:6

**confirmation**
78:24

**conformed** 92:1

**confrontations**
28:23

**consciously** 46:19

**consequences**
249:25

**considered** 18:14
24:4 226:7,11,18

**consistent** 39:7,
14 142:10 159:16,
19 249:6

**consists** 16:9

**constituted** 209:5

**constitutional**
67:10 68:2,6

**consultant** 51:13

**Consultants** 20:20
231:23 238:22
239:24

**consulting** 19:19
21:2,4

**contact** 32:15 33:2

**contacted** 51:2
54:8 189:23

**contained** 130:11

**context** 12:17 48:1
49:23 61:24
82:11,18

**continually** 237:2

**continuation**
117:7

**continue** 13:11
16:16 112:11
180:15,17,24
220:1

**continued** 101:24
178:3 179:19
180:25 187:6



**continuing** 193:23

**continuous** 207:5, 6,8,9 208:18

**continuously** 208:17

**contours** 62:20

**contract** 27:2,9,18 43:5 45:2 73:5,18 78:23 80:4,15 86:5 214:21

**contracted** 73:2 100:20

**contracts** 26:6 42:1,13 43:25 44:9,12 73:6

**convenient** 56:6

**conversation** 14:12 44:24 106:3,7 249:22

**conversations** 106:6 195:20

**copaxone** 116:2 156:16,17,18 157:13

**COPD** 104:11

**copied** 255:11

**copies** 21:10 236:21 240:8

**copy** 21:16 147:5, 8 229:19 230:8, 18,24 255:2,3

**corner** 222:4,5

**corporate** 233:18 235:20 236:18 237:21 238:13 239:5,13,17

**corporate-wide** 52:17,19 53:2,7, 18

**corporation** 20:24 21:1 232:14 233:15,20 234:1,8 238:7,24 239:21, 24

**correct** 4:21,22 7:16,19 8:17,25 9:2 11:5,13 17:14 20:24 21:14 23:9, 13 31:5,6 33:9,22 36:8 45:21,25 56:12 62:21 64:20,22 70:13,15 73:7 82:14 86:24 89:19 90:16 91:1, 12 96:4,13,19 102:6 103:2,22 110:23 111:11 114:24 115:9,10, 25 121:7,8 126:11 127:5 138:10,18, 21 139:4,23 140:3,7,10,20,21, 23 141:2,9,12,19, 23 142:1,5 145:5 146:1 150:1,8,19, 22 151:10,15,20, 23 152:2,5,11,18, 22 153:1,4,7,15 154:1,8,11,14,18, 20,22 155:1,2,4,5, 7,13,16,20,23 157:5,8,14,23 158:2 159:1,11, 17,21,25 161:18 162:3,4,8,12,13, 18,19,23 163:2,5, 24,25 164:3,17 165:1,2,5,21 166:24 167:15,23 168:17,24 169:15 172:6 173:6 177:12,14 178:17 179:6,9,12,17,18, 21,22 180:2 181:5,11 182:21, 25 183:22 184:1,

15,18,23 187:17 188:8,11,15,16, 19,23,24 189:18, 19,21,24 190:3,23 195:9,25 198:4,5, 11,12,14,18 199:1,11,19,22 200:11,25 201:13 202:13 206:12 208:23 214:3 216:2,20 225:18 226:2,8,18 228:11,22 229:1,7 230:12,15 231:24 236:16 251:15 252:12 255:7

**correction** 245:15

**correctional** 4:24 6:2,10,15,16,20 17:12,17,25 18:5, 13,18 19:18 20:14,20 23:3,6 24:1,13,21,24 25:2,6,17 26:7,21 27:8,20 29:20 30:5,12 35:4,7,11, 24 36:20 37:25 38:2,5,24 39:1,20, 21,25 40:6,13,22, 24,25 41:8,13,16 43:5,6,21 46:13, 21 47:8 49:2 61:25 65:6,16,20 66:11,16 73:18 79:1,17,24 81:10, 13 82:2,11,18,24 84:9 85:10,14 86:5 87:6 180:4,6 202:6 206:8,9 219:11 231:23 238:22 239:23 240:18 249:7

**corrections** 65:12 66:19

**correctly** 34:17 57:21 66:25 74:5

103:11 107:3 128:1 190:20 237:16

**correspondence** 56:23 57:22 131:17

**cost** 42:5,18,21 46:21 74:24

**costs** 53:11,15 73:4,9,12,19,22

**coughing** 169:11 170:12 172:21

**counsel** 3:20 13:13 15:22 93:8 94:8 146:10 199:1 243:5 254:17

**count** 50:2

**counted** 44:4 84:23 203:24

**counteract** 182:11

**counties** 27:8 41:23 90:19,21

**country** 70:25

**county** 16:23,24 26:24,25 27:5,6, 14,15,16,17 30:4 42:4 43:5,6,9 44:1,10 58:11,25 59:3 61:15 73:19 76:7,19 77:20 78:2,17 80:4 83:12 84:3 86:6 89:25 90:15,19 91:25 92:13 93:15 94:11,12 102:5 111:5 130:20 136:17,18,22 137:17 138:23 139:17 146:25 148:23 183:19 184:9 190:22 191:1,10,11,14, 22,24 192:3,4,6,

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



11 198:17 201:7,
22 202:4,22 203:1
204:9 208:21
209:4 211:12
220:10 228:7
242:13 243:3,14,
20 244:8,11
245:10 246:14

**county's** 43:9

**couple** 8:12 15:23
16:14 39:24
48:15,22 49:19
90:11 95:22
148:16,18 161:8
164:17 195:17
205:23 220:4
231:11

**courses** 189:7

**court** 7:15,18
13:13,17 18:23
19:2,5,7,9 34:5
46:4 50:11 54:11
93:8 132:19
241:15 243:5
251:13 254:17,22,
24 255:1,6,9,13

**courts** 71:18

**cover** 28:5 46:2
178:22

**coverage** 45:15,20
46:17 47:3

**covered** 46:6

**covering** 26:14

**covers** 57:12 62:6

**CQI** 3:15 47:17,18,
20 86:6,9 90:1,14,
20,23,24 91:3,5,
14,15,16,19,21
92:1,7 206:1,3,4,
11,14,18,21,23,24
207:5,22 208:3,7,
9 211:2,19,23
212:9,22 213:1,7,

11,19 214:7
215:1,4,9,13,17,
20 216:1,3

**cramp** 125:5

**cramping** 176:22

**cranky** 197:13

**create** 55:5,10,17,
22 56:10 88:1
89:17

**created** 55:13
147:1,3

**creates** 37:1

**creditor** 238:5

**creditors** 238:18

**crisis** 83:20,23
84:1,7

**Crispin** 183:12,14
187:6,10 188:7
189:10,18

**criteria** 18:11
200:4

**critical** 73:23 74:2
83:10 117:7,11
118:13

**criticism** 36:22
115:7 118:5,7,9,
19 119:12,13
123:24 124:23
125:20 126:7
129:12,13

**criticizing** 173:16,
17

**cross** 238:20

**CT** 115:24 116:24

**culture** 88:2

**cumbersome**
151:6

**current** 230:18,23

**curriculum** 5:21,
24 230:24

**cursory** 98:18

**custody** 221:15

**cut** 218:4

**cutting** 42:15,18

**CV** 22:19 90:7
230:11,14,17,18,
22

---

**D**

**daily** 47:9

**Dalton** 182:18,21
227:25

**dandruff** 218:21,
22,24

**Daniel's** 178:22

**dash** 240:18

**data** 79:20 85:9
157:7 206:12,15
207:2,4,7

**date** 8:14 14:17,25
15:9,10,16 39:4
108:20 123:2,21
129:10 138:24
151:19,23 173:3
227:3

**dated** 5:10,22
14:19

**dates** 188:5

**Davis** 61:15

**day** 95:16,17 99:1
105:5 108:1
113:12 126:1,12
129:7 154:1,13
165:21 172:9
184:15 205:25
229:11

**days** 15:23 96:12

**138:9 158:1,20
163:2

**deal** 33:14

**dealing** 25:2 62:14
63:7

**death** 36:8 92:8
102:22 103:6
107:2,5,10,14
191:2,11 249:25

**deaths** 29:10
102:4,12,15,20
108:10 212:25
244:6

**debts** 239:9

**decaying** 128:2

**December** 64:20
95:21 96:18 97:24
124:12 129:7,18
137:14,16 138:18,
25 139:7,15
178:7,8,17

**decided** 23:24
24:5 199:21
200:23

**decision** 31:16,20

**decisions** 33:4
88:3

**declined** 153:25

**declines** 196:11

**decrease** 44:6,10,
13,14

**decreased** 44:13

**deemed** 85:15

**default** 220:16,25

**defendants**
136:18 241:10

**defense** 51:7,10
54:6 131:11,14,15
132:9



**defer** 103:7

**deficiency** 207:17

**deficient** 75:7,24
76:2

**define** 66:22 91:20
214:17 216:22
217:18,21 220:22,
23 223:5

**defined** 71:18
220:14 222:9

**defines** 91:19

**definition** 71:22

**defuse** 28:22

**degree** 10:22
101:9 135:2 217:9
225:19

**delays** 128:19

**deliberate** 67:17

**delivered** 80:20

**delivery** 207:1

**delve** 58:20

**denied** 103:9
105:19

**dental** 128:20
183:3,21 185:7,17
214:22 228:21
229:10,14

**dentist** 128:5,12,
15,25 129:9,13,14
185:9 186:18
187:3 189:23
213:24 214:14,18,
20,21

**dentists** 128:17
190:7,11 214:10,
12,15

**denture** 229:6

**dentures** 228:25

**department** 33:12
52:20 53:9,23
87:1 100:6,8
121:18 169:14
170:1 181:25
190:23 191:1,12,
25 239:19

**depend** 243:19
245:8

**dependency**
181:22

**dependents** 180:1

**depends** 68:19,25
70:4 86:24 87:1
135:6 215:4,5
224:21

**deposition** 4:1 5:4
7:25 8:17,20,21
9:4 10:2,5 11:15
12:14,16,18 14:1,
12 49:22,24,25
57:8,10 58:5,8,23
63:1 75:3 178:23
187:24 192:19
255:18

**depositions** 16:7,
12 49:16 132:6,7,
9,12

**deputies** 29:16
223:23

**describe** 119:9
243:2

**describes** 113:11
156:5

**describing** 112:23
161:15 250:5,6
251:11

**description** 97:18
148:25 150:7
151:19 243:4

**descriptions**
148:25 149:7

**designation**
248:12

**desk** 9:20

**detailed** 99:13

**details** 178:13

**detector** 251:2

**detention** 39:24

**deteriorating**
198:9

**determination**
22:14 127:11,12,
15 211:8 218:6

**determinations**
22:13

**determine** 44:22
78:4 84:8 85:13
102:21 211:7

**determined**
145:10

**detrimental** 89:21

**develop** 208:6

**developed** 154:17

**developing** 133:8
208:4

**devoted** 20:7,13
23:2

**devoting** 19:22

**diabetes** 216:6

**diabetic** 29:11

**diabetics** 212:17

**diagnose** 126:3
153:4

**diagnosed** 94:18
110:19 121:21
123:9,19,22,25
125:21 153:6,10

**diagnoses** 75:17

**diagnosing** 79:7
150:8

**diagnosis** 24:12,
21 54:1 98:3,16,
22 112:16,24
113:3,7,10 114:20
132:24 133:5,9,
15,19 134:2,7,8
135:13,17 188:17,
20 204:21 250:15

**dialogue** 11:17

**Diann** 34:4

**diaphoresis**
135:11,24

**dicyclomine**
181:21 182:1

**die** 24:3

**died** 98:25 103:4
190:23 194:13
196:18

**differ** 72:21 73:8

**difference** 88:21
110:25 246:3
253:5,8

**differences** 35:5,
10,12,15,17,18,22
36:4

**differential** 98:3,
16,22 114:19
132:24 133:5,9,19
134:2,8 135:13,
17,19 250:15

**differently** 38:18
68:15 142:8
153:14

**difficult** 7:6 59:19

**difficulties** 130:21

**diminished** 41:20

**diminishing** 42:15

**direct** 21:18 32:4



42:3 57:18 144:11

**directed** 56:14
188:22

**directing** 57:14

**direction** 7:6
138:7 159:16
184:4

**directions** 165:10
168:19

**directly** 21:13,15
32:23 56:2 62:11,
13 65:8 92:8
175:5

**directors** 237:18

**disability** 22:5,6,
13 48:6

**disagree** 62:16
65:2 79:16 239:25
240:2,20,22,25

**discharge** 156:4
157:16

**discharged** 123:2

**discharging** 156:2

**discipline** 49:10

**disclosed** 49:15,
18

**disclosure** 49:14

**discomfort** 170:21

**discontinue** 194:1

**discontinued**
193:25

**discount** 89:4

**discovery** 57:11

**discuss** 11:19,20
22:7 47:22 162:22
199:22,24 237:21

**discussed** 38:9,12
39:3,5,16 86:9
145:7 148:22

149:8 178:8,16
188:21 199:4
238:6

**discussion** 36:21
39:5 62:6,18
64:19,24 88:19
90:25 91:2,11,13
129:22 241:14
242:22

**discussions** 58:13

**disease** 29:9 36:7
135:22 139:22
210:10

**disorder** 122:1
124:15 126:15

**disproven** 161:6

**dispute** 194:15
195:7,10 198:3

**dissolved** 237:6
240:18

**distinction** 58:17
245:23

**distress** 103:2,3
125:14 177:2

**distribute** 215:15

**divide** 227:13

**dividends** 237:14,
16

**dividing** 217:16
220:18 254:3

**divorce** 49:25

**dizziness** 30:25

**doctor** 4:15 13:10,
22 14:11 15:7
29:21 30:9,25
44:4 47:25 54:25
55:1 57:3,20 58:2
59:19 70:9 71:8,
17 72:14,17 73:2
78:10 81:9 83:19
85:18 89:22 90:13

93:22 94:20,25
96:1 100:19 101:8
102:18 105:15
108:12 109:18
110:2,17 111:2,
10,19 115:22
116:7 117:22
118:23 122:1,25
123:12 124:2
125:23 127:17
128:16 130:9
136:16 143:7
144:17,18 145:19
146:19 165:12
178:25 185:20
203:23 205:24
209:23 212:18
218:3 220:9 223:1
230:6 231:1,8
233:6 234:22
241:4 252:20,23

**doctor's** 143:1

**document** 12:4
55:18,24 60:10
121:20 125:3
139:17 169:9
227:24 228:13

**documentation**
90:21 187:4
189:15

**documented**
165:4 175:13

**documents** 9:4
11:21,24 12:2
13:2 16:5 61:19
90:23 93:11,16
132:18 145:2
170:19 197:6
226:17 252:10,16

**dollars** 15:15 47:3
235:1 236:10
239:6

**domain** 23:15,16,
22,25

**door** 218:8

**dory** 215:14

**dosage** 161:13

**dose** 104:10
119:14,16,20
120:16 138:8
142:16 160:20,24
161:12,16,20
193:10

**double** 60:24

**Doug** 4:23 11:20,
21 13:8 54:19
90:4 109:10,15
178:24

**downloading**
93:25

**draft** 55:12,15,17,
19,23 56:2

**drafting** 227:10

**drafts** 55:8 60:15

**draw** 202:16 204:3

**drawing** 58:18

**drinking** 113:17
154:3

**drop** 11:22,24

**Dropbox** 11:23
12:23 13:20

**drug** 104:12,13
221:19,24 223:3,
21 225:2,7,20

**drugs** 75:18 79:19
103:20

**drugstore** 222:4,6

**duces** 8:20

**due** 87:15 98:6
129:9 136:1

**dull** 125:5 176:22

**duly** 4:6

888-893-3767
www.lexislegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**duty** 100:9

---

**E**

---

**e-mail** 15:23 55:2 58:20,22 108:17 255:10

**e-mailing** 255:7

**e-mails** 74:21

**ear** 187:11,16,19 188:1

**earlier** 50:1 109:24 111:14,15,22 112:1 113:12 128:10 129:15 151:9,12 154:1 158:20 167:18 173:5 183:17

**earliest** 128:25

**early** 60:14

**earnings** 235:6

**easier** 137:6

**easiest** 137:1

**easily** 57:18

**eaten** 140:16 143:15 144:11

**eats** 96:22 166:15

**ECH** 245:10

**editorial** 22:19,23, 25

**educated** 177:10

**education** 17:22

**effect** 129:21

**effective** 33:14 42:21

**eighteen** 184:18

**elect** 6:3

**elements** 208:8

**elevated** 84:4 96:10 98:1,12 100:12 113:25 122:19 125:15 127:15 128:12,15 129:14,16 135:10 139:22 143:5 172:18 174:7 218:9

**elevation** 135:25

**elevations** 135:25

**eleven** 78:8 79:21 81:2 130:10,15 131:5,17,22 148:21 199:3 201:21 202:19 203:25 205:10

**Eli** 109:1 123:5

**eliminated** 200:15

**eliminating** 42:22

**Elizabeth** 115:2,6 155:9

**Elmore** 27:16

**emergencies** 86:24

**emergency** 4:17 33:11 52:18,20 53:9,18,23 70:9 71:10,12 73:15,20 81:25 83:23 84:6 86:11,17 87:1,8, 22 96:24 97:4,23 100:6,7 115:13,17 116:22,25 119:14, 16,20 120:16,21 121:10,17 142:16, 24 144:3 160:20, 24 161:16,21 169:14 170:1

**emergent** 161:10

**emergently** 160:25 161:21

**employ** 25:19 27:22

**employed** 6:14,20

**employee** 49:1,11

**employees** 25:17 28:1 34:13 36:11 48:2,4

**encounter** 195:11 221:23 222:1 251:23

**encountered** 30:11

**encouraged** 80:23

**encouraging** 74:2, 14

**end** 6:6,8 7:4 25:11 88:18 158:12 178:22 230:11 235:18 247:22

**endorse** 61:23 62:15

**ends** 183:19 251:23

**engaged** 30:5

**enlarge** 123:13

**enlighten** 146:5

**enter** 50:23

**entire** 8:23 177:20 202:17 203:14

**entities** 17:3 27:18 39:20 40:5 42:24 44:25

**entitled** 63:19

**entity** 20:17,18,19 25:5 40:24 42:11, 25 44:17 46:9,13 48:7

**episode** 137:13

**equivalent** 168:7

**ER** 31:17,21 32:9, 24 34:1,8 53:2 95:13,16 98:10 99:2 100:17 116:13 120:18,25 172:15,16,22

**era** 160:16

**Erin** 127:24,25 128:23 129:8 189:20

**Ernest** 4:14

**erroneous** 126:9

**escalated** 79:13 81:3

**escalating** 79:11

**Essence** 149:15

**essentially** 165:18 202:7

**estimate** 51:9 235:11,16

**etiologies** 251:12

**etiology** 250:3,4 251:13,17

**evaluate** 133:14 207:21 208:12 212:2,14

**evaluated** 102:19 169:19 216:19 219:11,15,20 220:11

**evaluating** 99:23, 25

**evaluation** 81:6 84:17 100:16 105:2 131:6 148:6,9 183:21 184:20,22 194:4 195:13 200:8 203:14,16 211:5 212:25 251:22



**evaluations** 91:5

**evening** 30:23 139:15 153:24 158:10 192:14,21, 23 194:13 196:5, 13 197:1

**event** 31:9 91:4,24 92:7,18,19,20 109:19,21 110:4 111:14 112:8 123:7 209:16,21 210:4,8,15,17,24 213:1 244:25 253:9

**events** 92:13 208:22 209:6,17, 22,25 211:2,23 212:20,25 213:4, 14,16,17 215:2

**eventually** 129:13

**evidence** 53:1,17 74:13 81:1 87:20 90:18 91:3 95:7 101:2 114:8,11, 14,17 120:5,8 121:2,5,25 122:7, 9,13,17 124:14, 17,20 126:15,21, 25 127:4 129:4 154:23 175:20 186:5

**evidentiary** 226:16

**evidently** 119:2 140:5

**exact** 18:10 39:4 49:20 77:8 104:2, 3

**exam** 98:17,19 104:25 133:20 134:4 135:5,8

**examination** 3:5, 6,7,8,9 4:10 99:18

136:14 231:6 242:4 253:3

**examine** 127:21, 23

**examined** 194:10 216:20 219:15,21

**examiner** 102:24

**examining** 185:4

**examples** 217:1,4 231:12,13

**exams** 249:3

**Excel** 146:9 252:25

**exclude** 36:20

**exclusively** 21:2 23:3

**excuse** 18:23 63:18 122:6

**exercise** 89:18

**exhibit** 3:14,15,16 15:3,4 90:1,2,4,12 230:3,4,23

**exhibits** 3:20 241:22 254:21 255:4,7

**exist** 60:11 237:5

**existed** 185:15 186:1,7,13,24

**existence** 237:22

**exists** 23:11

**expect** 91:5 106:18 128:22 247:17

**expectation** 69:11

**expectations** 73:1

**expected** 12:25 13:3 29:13 210:23

**expensive** 42:21

**experience** 18:4,8 37:21,22 39:8,15 247:4 249:6

**experienced** 95:2 101:10

**experiencing** 94:4 145:10

**expert** 19:18 49:23 50:8,23 51:15 54:3 131:6,12,14, 15

**expertise** 69:24

**experts** 131:10

**explain** 11:9

**explaining** 5:18 133:16

**explanation** 54:4 135:14

**explanations** 99:7

**explicit** 176:20

**extended** 249:21

**extent** 130:11

**extra** 29:7 85:22

**extracted** 210:19

**extraction** 128:8

**F**

**facade** 238:7

**FACCP** 3:4 4:5

**face-to-face** 119:19,21 120:22

**FACEP** 3:4 4:5

**facial** 186:21

**facilities** 26:14,17, 18 30:4,13,20 129:23 130:10 131:5,23 132:3 180:6 242:14

**facility** 13:4 26:21 27:2 30:9,22 35:4, 11 41:10 43:5,19 47:13,16 66:23 80:10 81:10 219:11

**fact** 11:7 60:21 79:2 80:3,23 86:23 90:17 94:5 96:1,6 98:6,25 110:4,8 115:12 117:11 122:18,23 127:5 142:14,15 144:5 155:10,22 158:8,18 159:5,8, 9 172:20 173:17 185:2,17 194:15 197:8 198:4 210:9,18,21,23 221:5 228:24 230:7

**factor** 135:22

**factors** 87:2

**facts** 10:10,13,21, 23 11:4,17 12:10 64:5 120:14 121:1 134:9

**factual** 13:5 146:6

**factually** 89:12,14 119:8

**faded** 107:12

**fails** 188:25

**failure** 102:24

**faint** 150:14

**fainting** 170:13

**fair** 6:24 10:19 29:1,2 34:13,15 36:21 39:9 62:1 64:6 80:7 136:24 219:18 229:9 231:17 254:2



**fairly** 12:19 62:23

**faith** 238:13

**fall** 215:20

**fallen** 116:21 155:15 213:6,10, 18 215:25

**falling** 210:3

**Falls** 7:14 16:23

**familiar** 6:19 28:8 40:19 67:10 183:6 203:20 204:13

**family** 72:13,17 98:10

**fast** 150:4

**fault** 25:12

**fear** 210:14

**February** 5:11 14:20 15:17 124:24 125:1 176:6,10,18 183:14 188:5 189:11 227:3

**federal** 46:3

**feel** 158:11 178:3 197:20 204:2

**feeling** 111:22,23 113:22 170:13 178:1

**fell** 115:14 158:12 215:19

**fellow** 17:11,17 107:20

**fellows** 17:24

**fellowship** 18:11

**felt** 120:9 122:10 124:17 141:15 142:19 161:19 176:16 199:25

**Fennigkoh** 4:25 74:20 177:17

**Fennigkoh's** 74:23

**fever** 108:7 170:12

**field** 101:10

**fifteen** 24:25 25:3 26:12 51:10 54:5 136:10

**fifty** 15:14 25:18 142:13

**fifty-four** 138:5

**figure** 12:20

**figured** 38:10

**file** 8:24 12:7 48:17,25 55:6 130:22,24 186:6 191:18 227:2 229:13

**filed** 48:22 76:24 85:14

**files** 77:20 78:18 79:4 132:4 199:12,14

**filing** 237:3 240:12

**fill** 79:17

**filled** 139:17

**final** 5:14

**financial** 239:5

**find** 49:20 60:4 81:1 95:12 107:23 108:17 112:10 121:20 124:6,25 134:16 137:10 169:17 204:15 207:17

**finding** 94:21

**fine** 136:9 154:13 196:12 197:1,8,25

**218:25 220:3 234:19**

**finish** 13:8 133:24 161:4 218:1 233:24

**finished** 218:4

**fire** 28:19,20 33:19

**firm** 51:19,22,25 56:24 76:9 77:10 78:19 118:24 199:6,11,18

**Five-ish** 8:15

**five-minute** 88:13

**fix** 208:5 214:17, 22,23

**flagged** 199:8,12 211:20 215:1

**flashing** 117:18

**flesh** 104:24

**flouride** 104:4

**Flying** 20:22

**focus** 23:5 35:5,22 62:18 82:8 196:22

**focused** 76:21

**folks** 247:5

**follow** 62:20 88:18 167:18 177:11 196:15 205:24 212:3 252:24 254:14

**follow-on** 191:12

**follow-up** 136:21 169:25 174:1,4,11 186:16,20 189:15 197:3 198:1 215:3

**food** 143:15 144:11

**foot** 216:6 217:3

**forever** 105:9

**forgive** 162:10

**forgotten** 60:3

**form** 10:15,24 11:11 18:22,25 20:9 24:12 29:24 35:25 37:5,17 39:11 41:3 42:19 43:3 46:24 47:5 50:19,25 53:3,12, 20 54:13 55:21 56:16 57:24 59:11,21 60:12 63:14 66:13 67:1, 14,22 68:3,10,17 69:5,20 70:20 71:14 72:1,9 74:6, 17,25 76:4,11,25 77:15 78:7,11,21 79:5 80:11 82:21 83:9 86:13,19 87:24 88:5 92:3, 15 96:16,25 99:9 106:13,20 108:1 117:10 118:8,16 119:2 122:4 132:11 133:3,17 134:11,18 135:1, 15 141:13 142:1 143:18 144:14 149:2 153:8 157:23 162:14 164:9 169:22 171:8 172:24 173:4 190:15 198:23 201:14 202:20 217:12 221:10 227:8 234:7 237:14 238:8 242:23 243:14,22 247:7, 23

**formal** 48:10,19 91:3

**formalities** 236:18

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



237:21 239:13,18

**format** 56:14

**formed** 8:24

**forming** 226:7,11
233:15

**forms** 79:17
107:16 138:15

**formulate** 134:2

**formulating**
133:19

**forties** 100:25

**forty** 23:18 24:7
227:2,7,9,13

**forty-eight-year-
old** 99:4

**forward** 43:17

**fostering** 73:25

**found** 48:16 78:24
109:6 226:17

**fourteen** 98:1
101:7

**Fourth** 76:24
199:14

**frame** 38:16 97:2

**frankly** 203:19

**fraud** 238:17
240:23

**free** 189:5

**Fremont** 27:6,14

**front** 12:10 113:6
137:4 143:3

**full** 232:6 246:22

**fully** 46:5

**function** 202:7

**functioning** 79:2

**future** 207:21

---

**G**

**gain** 253:10,14

**game** 87:12

**gaps** 236:1

**gastric** 215:11

**gather** 135:5

**gathered** 246:13

**gathering** 30:6

**gave** 23:25 24:23
32:13 161:20
199:17

**gear** 129:25

**gears** 149:18
155:8 216:15

**Gem** 27:17

**general** 36:2
75:11,13 80:7
239:24

**generalization**
235:10

**generally** 41:1,18
119:5 250:21

**generated** 106:18
116:15

**generates** 106:11

**gentleman** 71:9

**GERD** 99:6

**give** 12:11 29:22
32:6,12 34:20
39:4 49:22 79:18
80:7 82:18 83:1
88:9 101:6 103:5
128:8 144:16
160:4 163:19
165:10 172:8
173:14 180:18,21
214:15 224:23
232:6 251:2

---

255:10

**giving** 79:19 80:13
84:3 161:11
203:14

**glue** 229:6

**goal** 245:14

**good** 4:12 41:5
42:20 193:24
194:21 204:23
205:1 206:11
212:24 215:21
220:22 223:12
224:9 231:8 234:7
238:13

**Gotcha** 14:7

**governing** 67:11

**government** 17:3
42:11,24 44:25
46:21

**great** 174:14
197:20 235:11

**ground** 135:3

**group** 47:15 79:4
199:17 247:12,20
248:2

**guard** 203:7

**guess** 22:4 48:4
56:8 62:3 63:6
65:13 90:9 92:9
94:8 109:2 118:10
119:23 125:5
156:11 173:2
191:19 203:22
216:25

**guidelines** 40:21
181:24,25 182:14
220:14

**guides** 22:1,5,6,7,
8,10,12

**guy** 99:25

---

**guys** 178:20

---

**H**

**Hage** 125:20
126:14,17,21
178:19

**Hage's** 127:4
179:15

**half** 20:11,12
23:23 110:15

**hand** 141:22

**handle** 9:5 21:5
215:11

**handled** 31:3,4
80:17 205:2
222:1,11 225:3

**handling** 215:12

**handwriting**
181:18

**handwritten** 59:24
60:3

**Hang** 146:16

**hangnail** 217:2

**Hanson** 109:5
121:10,13 122:1,
10,13 168:13
176:2

**Hanson's** 169:7
175:16

**happen** 82:24
106:9 189:6
212:10 221:12

**happened** 44:14
106:11 111:14
158:11,16,17,19,
22 166:22 168:23
192:13,20,23
236:6 238:19

**happening** 83:12

---



**happy** 136:7 220:4 223:21

**hard** 21:16,18 63:6 138:24 190:4

**harm** 250:15

**head** 6:23 24:19 47:10 93:1 115:23 116:11 155:15 158:12 210:4 227:18 233:19

**headaches** 219:5

**health** 4:24 6:15, 20 18:21 23:3,6 24:24 27:9 28:3 34:14 35:3,6,21, 23 36:20 38:5,25 39:19 40:13,22,24 41:1,6,8,9,13,14, 19 42:10,24 46:13,21 48:8 51:8 67:11 73:3, 18 84:9 85:10,15 102:9 157:4 192:12 198:17 206:8,25 228:8 249:7

**healthier** 247:10

**healthy** 247:12

**hear** 6:25 19:1 31:2 38:21 52:8 57:20 67:5 93:9, 13 132:20 155:6 158:11 190:17 197:11 243:8,9

**heard** 38:14,19 48:13 67:16,19,21 162:11 195:14,18

**hearing** 27:12

**heart** 87:16 94:4 95:2,8,10,12,18 98:1 99:21 101:6, 11 108:4 114:20 135:22 139:10,22

140:1 142:10 145:10 150:4 161:1 162:21 171:12 173:23 174:19 177:4,8 210:11,14

**heartbeat** 176:16, 17

**heartburn** 119:10 164:21 165:1,16 167:20,23 168:6 219:4

**heavy** 99:16

**held** 27:2,9 237:10

**helped** 166:12

**hemoptysis** 121:18 169:16 170:7

**Hey** 143:25 178:20

**high** 98:4 135:21, 22 138:3 142:13, 14,15 144:5 152:7,8 160:22 161:20 171:14 193:10

**higher** 81:4 248:15 250:18 252:2

**highest** 253:11

**highlight** 60:18,24

**highlighted** 60:25 61:3

**highlighter** 113:13

**highlighting** 61:4

**Hinkle** 252:18

**hire** 214:18,19

**hires** 39:23

**history** 98:17,18 99:13 100:3 133:20 134:1,4

135:5,7,23 138:20 139:4,11,22 140:3 144:21 157:3,10, 23 187:11,16,18 188:1 203:7 219:5 228:8,17

**hit** 155:15 158:12

**hitting** 210:4

**Hodgkins** 108:20 179:23,24

**hold** 23:21 26:7 192:25 229:25 234:10 237:7

**home** 97:9 98:15 203:9

**Honor** 233:5

**hospital** 71:9 94:3, 6,19 95:10 106:9 116:7,11 117:3 119:23 122:11 124:18 125:16 126:23 145:5,9,17 155:12,23 156:2, 5,10,14,17,23,25 157:16 158:23 159:2,6,17 168:21,24 169:2 173:5 174:6 198:7 209:11,13,14,18 210:10,13

**hospitals** 83:1

**hot** 141:5

**hours** 8:3 19:21 20:5 30:23 164:17 227:2,7,9,13

**housing** 195:21

**human** 27:23

**hundred** 15:14 23:18 24:6,8 26:23 77:19 78:4, 9 79:22,23,25 98:1 101:6 108:4

163:2 175:16,21 248:14

**hundreds** 56:9 59:19 204:15

**hunky** 215:14

**Hydroxyzine** 88:9 111:16,17,24 112:4,5,17,21 113:4 114:5 123:9,25 124:8 125:22 150:24 152:21 181:20 182:1,15

**hypertension** 83:5,6

**hypertensive** 83:20,22,25 84:1, 5,7 161:10

**hypothetical** 71:7 236:5,15

---

**I**

**Idaho** 7:14 16:23 25:10,15 39:1,22 48:9 128:17 232:23 233:2 237:3 239:22 240:12,16

**idea** 70:16 83:24 135:20 234:7

**identification** 15:5 90:3 230:5

**identified** 128:3 156:24 188:10,15 200:19 205:5,11 207:12 208:22 211:3 213:22,23, 25 214:8 223:9 252:9

**identifies** 147:6

**identify** 10:12

888-893-3767
www.lexislegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



182:18 207:10,13 208:11 211:13,17 212:1,5 214:5 220:19 245:14

**identifying** 13:4 207:24 208:4 211:9

**ignore** 98:5

**ignoring** 98:23

**illegal** 221:21

**immediately** 97:7 114:1

**impact** 89:17,20

**implement** 207:19 208:12,16

**important** 35:12, 15,18 36:5 93:22 94:3 95:6 104:12 119:6 133:12 140:25 182:19 206:22 252:1

**improper** 243:15

**improve** 207:11, 15,19 208:6,12 211:15 212:3,11, 12

**improved** 207:10, 14,16 210:20 211:12

**improvement** 207:6,9 208:17,18

**improving** 42:25

**in-custody** 107:10

**inaccurate** 118:20

**inactive** 240:18

**inappropriate** 57:6 72:16 122:22 133:21 180:25 185:3,6 200:20,24 201:4 202:23

**inappropriately** 80:17

**incarcerated** 25:9 38:15 63:19 87:10 89:5 169:18 247:9 248:2

**incarceration** 29:6

**incident** 110:12 112:10,12 151:15 155:11 163:13 164:2,11 178:7

**incidents** 149:25 199:8

**include** 40:5,6 55:14 60:15 64:23 206:14 250:21 252:14

**included** 36:18 37:4 50:2 60:16 77:7 130:16 246:18

**includes** 60:2 64:18 99:18 224:4 225:20 228:21

**including** 45:15 103:10 117:4 165:7 203:20 207:1

**income** 21:7 235:20,24

**incompetent** 105:16 202:25

**incongruent** 203:3

**incorporate** 206:24

**incorrect** 96:6 163:19

**increase** 44:6,10 181:12

**increased** 167:2

**increasing** 42:16

**independent** 59:17 243:1,20 244:4

**independently** 63:23 64:5 71:2

**index** 85:19 255:4

**indicating** 145:2 158:18 163:18 167:5

**indication** 90:22 139:9 146:2 154:16 163:7,22 166:21 167:12 168:9 175:15 177:24 185:10,23 186:11,23 187:5

**indifference** 67:17

**indigestion** 98:21 99:21 101:3,5

**individual** 136:18 144:9 168:14 221:8,15 222:21 224:1

**individual's** 222:20

**individuals** 147:21 148:21,22 216:18

**ineffective** 33:15

**inevitably** 80:24 87:14 89:1

**infarction** 94:18

**infection** 185:14, 25 186:7,12,24 189:1,14

**infections** 185:18 187:11,17,19 188:1

**information** 29:22 30:6 81:15 82:12 83:4 110:14

118:23 147:13,16 148:3,5 175:25 179:14 189:12 196:3

**informed** 129:1 196:6,8

**inhaler** 103:10,14, 19,22,23 104:5,14 193:2,3,7,8,10,13, 14,19,20,23,25 194:2,14,18 195:8 196:11,12,25 197:24

**inherent** 233:17

**initial** 33:17

**injured** 216:7

**injury** 115:23 116:12

**injustice** 241:2

**inmate** 30:6 31:8 34:1,8 48:8,25 49:5,7,11 55:6 74:24 77:13,20 82:12,13 85:25 96:21 113:11 220:10 221:6 223:7,16 224:6,12 225:9,16 236:9

**inmate's** 51:7 223:15

**inmates** 10:9,11 11:19 33:8,10 45:16 62:7 73:13, 20 79:19 86:10 88:22 107:4,20 122:25 148:23 195:20,24 198:7, 10 224:13

**inside** 34:15

**insist** 196:14

**insisted** 197:3 198:1

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**instances** 224:1, 19

**instruct** 57:4,24 58:3 234:12

**instructing** 57:7

**instructions** 169:25

**insurance** 34:21 44:17,19,23 45:1, 7,14 46:2,8,10,20 234:25 236:11 239:2

**insured** 34:23 46:14 237:2

**insurer** 46:7

**intake** 81:11 91:10 249:2

**intend** 63:10 205:9

**intended** 245:11

**intending** 67:25

**intention** 68:5

**interact** 29:15,19 33:8,25 34:7,10

**interacted** 126:1

**interacting** 164:15

**interaction** 106:10 111:17 112:1 176:5,9 178:16 179:5 182:24 185:14

**interactions** 47:9 64:19

**interest** 17:6 74:3, 15

**interested** 143:21, 23

**interpret** 88:8

**interrupt** 40:10

**interrupting** 218:19

**interruption** 242:21

**intersection** 177:17

**intervene** 194:20

**intervention** 195:1,4

**interview** 29:20

**interviewed** 192:13

**interviewing** 104:20

**interviews** 79:8 107:4 191:23

**introducing** 5:18

**introduction** 36:19 38:5 39:21 40:12

**investigate** 85:13 134:15,24

**investigation** 106:21 190:21 191:13,14,16 192:3,5,6,11

**investigator** 107:4 191:22,24 195:25 197:23

**investigator's** 195:20 198:10

**invoice** 3:14 14:22,24 15:9,10, 16,18 90:6 227:1

**involve** 217:9 225:1

**involves** 134:8,16 221:23

**involving** 49:4 54:1,2 159:25

243:13

**irregular** 21:5

**irrelevant** 120:11

**issue** 14:9 52:11, 15,16 104:19 144:13 175:18 193:22 225:5,15 237:8

**issued** 14:24 15:19

**issues** 48:8 68:6,7 200:2 224:24 247:5

**items** 85:20,24 91:8 218:17

**Ivy** 17:5,7,9 21:6

**J**

**jail** 16:21,23,24,25 27:10 28:13,14, 19,20 29:1,4,5 30:4 31:13,22 32:19 33:3 34:1,8, 24 36:3,8 39:24 46:13 47:23 63:17 67:11 71:13 73:3, 19 76:8 78:17 80:8,14 91:9,25 92:13 94:11,12 95:21 96:1 100:9, 15,21,24 101:17 102:5,15 103:9 111:5 116:9,25 117:16 121:12,19 129:9 130:20 137:15,25 138:21 143:9 146:25 148:24 155:1 158:2,5 159:10 168:20 169:19,20 173:13 179:25 180:7,18,24,25 189:5,23 190:2,12

193:7,19 194:6 198:17 201:7,23 202:4,22 205:11 206:2 209:10 210:20,22 211:6, 7,10,11,12,16 213:21 214:19,20 216:2,10 217:13 218:11 219:20,24 220:10 221:12,15 222:5,22 223:4,7 224:2 242:13 245:10 246:14,23 247:4,9,21 248:25

**jailmedicine.com** 23:9,19

**jails** 16:18 25:9,15 27:14,19 31:4 41:19 44:1,10 82:1 180:5,9 202:5 203:4,20 204:13 206:8,10 214:19

**January** 118:3 128:5 155:11,18 157:4 158:1,5,9, 20 230:14,17

**jar** 186:13

**jaw** 183:25 184:18 186:2,8,21 187:7 228:25

**Jefferson** 16:24 27:15

**Jeffrey** 3:4 4:5,14

**Jeremy** 179:23

**Jerome** 27:16

**Jessie** 149:15 168:13

**job** 28:11 40:2

**John** 136:7 231:8 250:10

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**Join** 247:24

**Jones** 3:6,9 136:7, 12,15,16 141:17 144:7,22 146:14, 16,18 149:6 153:13 162:16 173:2 178:24,25 190:16 198:24 201:20 217:15 218:3 220:3,9 221:14 229:23 230:2,6 231:1,4 243:22,24 247:1, 23 248:1 249:21 252:23 253:4 254:10,24,25

**Jose** 149:19

**judge** 38:5 86:16

**judged** 37:15

**judging** 38:18

**judgment** 47:4 49:12 89:18,21 134:9,17,25 217:10,23 225:16 236:10,13 238:3,4

**Jujitsu** 28:22 33:7, 21

**July** 150:16,22 153:19 164:3,11 165:21 166:22,24 167:15 168:1

**jump** 178:20

**June** 5:22,24 159:25 162:2 163:13,21,23 182:24

**Justice** 182:1

**juvenile** 25:9,15 27:11

## K

**Kafka** 241:12 247:24 254:13,16, 22,23 255:6,8,11

**Keller** 3:4,16 4:5, 14 11:22 12:3,6, 21 13:1,3,19 58:12 59:3,6 61:12 86:4 88:17 93:12,16 108:16 132:22,23 133:24 218:1 234:13 241:23 242:6,20 243:8 244:2,18 248:10 249:12 250:11 252:6

**kill** 98:24

**kind** 22:8 52:7 59:17 60:23 63:6 66:20 104:10 106:12 122:19 189:16 217:7 232:11 246:5

**Kindle** 21:13,16, 17

**kinds** 91:21

**knee** 219:4

**knew** 28:9 77:3,4 81:7 254:1

**Knott** 3:5 4:11,23 10:19 11:3,14 13:3,9,16,22 15:2, 6 19:12 20:12 30:3 34:12 35:14 36:6 37:13 38:1 39:18 41:12 42:23 43:4 47:2,7 50:22 51:4 53:10,16,25 54:14,20,24,25 55:25 56:22 57:6, 14,20 58:4,19 59:5,16 60:18

61:9,14 62:5 66:21 67:4,16,25 68:8,13 69:2 70:8, 22 71:17 72:4 74:11,23 75:5 76:6,16 77:5,18 78:8,14 83:3,14 86:15 87:5,25 88:11,15,17 90:6, 9,13 92:12 93:13, 22 97:17 109:11, 16,18 118:12,19 122:6,9 130:1,5,8, 9 132:15,23 133:13 134:6,14, 22 135:9,18 136:4 137:2 149:23 155:10 178:6,9,20 199:5 208:20

**knowing** 85:16,17

**knowledge** 85:8 90:14 95:1,4,5 130:11 187:25 190:10

## L

**labeled** 47:19

**Lacrosse** 191:1, 11,24 192:11

**lane** 70:2

**language** 123:18

**laptop** 9:18,20,23 10:1,4,7 13:9,18 137:4,5

**large** 247:11,20 249:8 250:7,9,13

**larger** 84:13,15 176:11

**largest** 26:20

**lastly** 229:17

**late** 100:25 205:25

**latest** 32:2

**law** 232:24 233:2

**lawsuit** 48:25

**lawsuits** 84:22 85:10

**lead** 36:8 37:10 80:25 87:16 89:1

**leads** 41:19

**leaned** 52:7

**learn** 204:7

**learned** 33:11 55:1 90:15 94:17 135:7

**leave** 65:24 235:13

**leaves** 231:10

**lecture** 24:23 37:8 38:14

**lectures** 24:16,20 38:8,19,21,24

**led** 92:8 173:5

**left** 141:15,23 142:20 200:16 229:24 235:10 238:4

**left-hand** 184:17, 23 186:13 187:7

**left-sided** 186:21

**legacy** 75:18 221:19,23 222:14 223:3,20 225:20 251:23

**legal** 19:19 20:7,8 68:6 234:12

**legs** 158:12

**length** 214:13

**lessened** 128:14

**lesser** 34:22



**Letah** 27:17

**lethality** 133:7

**letting** 57:10

**level** 63:19 81:4

**levels** 79:12,13 100:13

**liability** 44:16,18, 23 45:1,7,24 46:1, 17,20 47:3 233:17 234:25 239:2

**licensing** 70:10

**life** 164:24 232:23

**lifetime** 16:13

**lights** 117:18

**likelihood** 133:6, 15 250:18

**limit** 47:2 74:3,14 180:11 234:25

**limitations** 233:17

**limited** 46:20 90:15 234:18

**limits** 180:5

**lines** 151:18 245:13 254:7

**link** 12:21

**links** 11:24 13:20

**Lisa** 181:17

**lisinopril** 160:8,9 163:1

**list** 8:20 9:3 16:7 27:7 51:15 79:3 108:23 109:6 115:19 116:1 136:2 151:2 156:6 157:18 226:6,10 252:13

**Listale** 252:17

**listed** 39:16 51:15

117:3 147:21 157:18 182:15,16 226:3,17,23 252:11

**listen** 195:5 241:21

**listened** 37:8 162:21 177:4

**listening** 99:21 177:7

**lists** 22:19

**literature** 38:2

**litigation** 51:12

**living** 233:7

**loading** 93:25

**local** 16:18

**locate** 11:9 12:6 13:10

**located** 7:12,15,18 13:18

**locating** 13:4

**Loevy** 51:19,22,25

**long** 6:9 8:2 19:25 79:3 88:13 140:6 160:17 190:1 249:2

**long-acting** 104:9 193:4

**longer** 23:11,12, 21 169:18

**looked** 93:2,3 124:5 130:25 131:8,9 190:21 207:25 208:2 213:21 216:5,6,8, 12 244:11

**lost** 52:8 108:10

**lot** 9:9 18:9 87:1 95:11 105:20

113:17 154:3 195:14 197:9 202:6 214:19 224:14 247:12,17 248:24 250:14

**lots** 108:19 218:25

**loud** 245:4

**low** 135:20 136:1 171:12 173:24 174:19,20,22

**low-dose** 193:4, 14,20

**lower** 183:25 184:17,21,23 186:1,7,13 187:6 228:25 248:23

**LPN** 110:19 111:1, 8 122:20 123:8,16 125:21,25 127:10 150:8 152:1 162:11,17 171:4 179:8 188:7,11, 15,17 245:18,23 246:3

**LPNS** 25:23 111:5

**lump** 127:3 179:20

**lumped** 191:19

**lungs** 99:21 195:6

**Luthke** 108:20

---

## M

**M.D.** 3:4 4:5

**made** 14:4 31:16, 20 33:4 48:19 49:8 96:4 106:21 110:8 129:7,8,17 162:21 163:15 178:2 205:15 208:17 210:7,16 240:11 244:13

**Madison** 16:24 27:14

**main** 97:10 233:14 235:24

**mainstay** 104:10

**maintain** 28:23

**maintained** 61:6 239:6

**major** 125:9

**majority** 54:6 244:8

**make** 7:8 14:8 19:8 32:8,11 45:18 47:4 86:1 93:2 94:2 122:23 145:22 165:14 166:4 176:11 192:11 194:9,21 204:23 207:15,18 208:11 211:8 212:2,12 215:16 218:5 222:11 228:3 231:17 248:25

**makes** 186:3 204:20,21 220:11 251:18,20

**making** 28:8 75:17 113:6,10 127:11, 12,14 219:19 223:15

**malignancy** 127:5

**malignant** 127:8, 19

**malpractice** 45:20 48:10,11,17,18,19

**management** 114:22

**manner** 33:24 34:6 134:14,22 244:25

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**MAR** 163:21

**March** 168:15 170:15 175:23 179:1,5 228:11 229:3

**mark** 90:1,7 230:2

**marked** 15:2,4 90:2 138:13 228:6 230:4

**market** 42:7

**marketing** 41:22 42:9

**Mask** 108:20

**Maske** 119:9 120:5,8 121:2 159:23 160:5 161:19 162:7 164:2,15,16 165:8,25 168:5,10

**Maske's** 161:19

**material** 56:9,19

**materials** 11:16 37:20,24 40:16 55:3 56:13 57:11 58:14 190:21 191:4 226:3,6,11, 20 227:8

**matter** 5:12,19 15:7 60:21 61:17 86:23 95:9 97:15 98:25 101:23 133:1 134:24 135:3 142:15 144:2 145:16 201:10 223:23 245:23

**mattresses** 85:22

**MC** 110:12 115:12 117:22 127:18 129:5 157:3 162:1 164:5 167:17 169:5 170:24

176:6 178:11

**MC2618** 90:8

**MC39943** 110:4

**meaning** 38:12,14 175:13 219:12

**means** 148:4 156:8 172:3,22

**meant** 66:1,4 106:16 191:15 218:4

**measured** 141:25 174:9

**measures** 245:8

**mechanism** 218:23

**med** 22:20 23:2 115:19 151:4 158:10 195:11,12 197:16

**media** 188:18

**medical** 4:15 9:9, 12,15,19 10:17,23 13:20 17:5,7 22:1 25:8,14 29:4 34:22,25 38:2,18 40:2 42:4 46:8 48:4 52:14,16,17 58:16,24 63:9,16, 17,20 64:1 66:6,7, 15,18 68:7 69:18, 25 70:7,8 72:15 76:23 77:12 78:2 80:8,14,19,25 81:20,25 82:3 85:24 86:1 89:4,6, 20 91:10 93:12,15 97:11 98:9 99:12 101:9,13,15,16,18 102:11,23 105:1 106:8,10,25 107:6,20 110:12 115:12 117:22,25 121:11 122:22

125:9 127:18 129:5,10 137:5,21 138:20 139:4,11, 23 146:3 149:5 157:3,23 162:1 164:5,10 167:17 169:5,19 170:7,8, 9,11,20,24 172:17 175:17,21 176:7 177:20,25 178:11, 14,15 179:15 182:5 185:23 189:22 190:2 194:24 196:5,8, 13,24 197:2 198:8 202:2,3,22 203:4, 5 204:10,11 205:6,7,11,13 206:21 211:7 216:11 217:9 218:6,12,14 219:16,23 220:11, 24 221:6,7,16 222:7 223:7,15 224:2,6,12,14,17, 18,20,22 225:5,9, 10,15,17 228:7 231:9 232:8,12 242:11,12 243:13, 16 245:18 246:8, 13,16,23,25 247:5,6,13,14,17, 21,22 248:25 249:1,3,4,5,9 253:8,9

**medical/legal** 21:2,4

**medically** 204:2

**medication** 73:10 83:7 103:10 108:1 116:1 120:17,21 140:1 150:11,22 152:11,25 153:15, 18 154:1 156:6,16 157:18 159:14,16 160:5 161:11

165:12,16 194:10, 25 222:17,21 223:11 224:6 251:24

**medications** 73:4 103:9 105:18 117:3 151:1 153:1 156:9,11,14,24 157:17,19 181:17 194:7 197:10 212:7 222:2,7 225:22

**medicine** 4:18 16:17 18:5,13,18 25:6,17 26:7 27:9 28:14,15 29:1,20 30:2 35:11 37:12, 25 39:22 42:20, 21,22 48:13,22 61:25 66:11 72:25 75:14 82:19,24,25 114:6 156:19,20 160:10,14 180:1,5

**medicines** 225:21

**meds** 104:3,21,24 195:13 197:20

**meet** 7:23 8:2

**meeting** 91:6 236:21,24 239:15, 16 240:4,9

**meetings** 8:6,12 86:9 236:22,25 240:5,9

**meets** 41:10

**member** 6:9,12 17:19

**memory** 235:9

**men** 247:13

**Mendoza** 108:9, 13,15 112:12 114:9 149:18,19 150:3,11,21

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

LEXITAS

153:23 154:25

**Mendoza's** 151:19 152:1

**mental** 18:21 28:3 50:2 102:8

**mention** 18:6 112:5 176:20 186:3

**mentioned** 111:15,22 113:12

**mentions** 113:15

**mere** 238:6

**merit** 48:16

**meritless** 85:15

**met** 8:1 22:6 237:4 240:13

**metal** 251:2

**method** 12:1

**metoclopramide** 116:2

**middle** 7:7 72:23 94:23 111:20 128:3 217:7,8

**midsternum** 171:22

**mike** 241:24

**million** 45:11,16, 17 47:3 235:1

**millions** 236:10

**mind** 24:20 52:5,9 65:10,19 80:24 130:4 229:14

**minimum** 143:3

**minor** 217:3

**minute** 57:2 251:3

**minutes** 32:10 54:16,20 61:15 114:4 136:10

140:10 143:14 144:10 146:11 220:4,6,7 231:10 236:22,24 239:15 240:4,9

**misconstrue** 89:9

**miscount** 89:9

**misdiagnose** 89:9

**mismanaged** 112:9

**missed** 25:11 119:2

**mistake** 14:4 49:8 95:12 96:4 110:8 119:2,3 163:16

**mistaken** 49:12 112:23,25 113:1,3

**mistakes** 204:23 205:15

**misunderstanding** 173:7

**mobility** 224:24

**modern** 160:16

**moment** 7:12 101:12 183:12

**mometasol** 104:4, 14

**mometasone** 104:7

**mometisone** 193:9,10,25 194:2

**money** 21:9 41:24 42:11,13,22,25 237:13 239:8

**monitor** 206:25

**monitored** 47:11, 13,16 96:12,13,15

**monitoring** 84:20, 22

**Monroe** 30:4 58:11,25 59:3 73:19 76:7,19 77:20 78:17 80:4 83:12 84:3 86:6 89:25 90:15,19 91:25 92:13 93:15 94:11,12 102:5 111:4 130:19 136:17,18,22 137:17 138:23 139:16 146:25 148:23 162:1 183:19 184:9 190:22 191:10 198:17 201:7,22 202:4,22 203:1 204:9 208:21 209:4 211:12 228:6 242:13 243:3,14,20 244:8,10 245:10 246:14

**month** 105:7 128:14 152:13,15 159:9 185:18 196:17,21

**monthly** 22:6 206:17 207:2,4

**months** 16:19 212:13

**morbidity** 133:7 244:7,25 245:14 250:1

**morning** 4:12 101:20,22,24 144:25 146:11

**mortality** 244:7,25 245:13

**mouse** 113:13

**movable** 127:8

**move** 19:13 82:9 119:4 136:19

**moveable** 127:20

**moving** 137:18

**MPPA** 117:25

**murmurs** 177:7

**muscular** 156:20

**mute** 250:11 251:1

**myocardial** 94:18

**myth** 83:25

---

**N**

**names** 46:9,11

**narrative** 117:14 123:12 128:1 178:9

**narrowing** 58:1

**national** 24:24 38:24 40:22,25 41:6,8,13 85:9 206:7

**nature** 25:7 167:11

**nausea** 141:7

**Navcare** 85:3

**NCCA** 91:22

**NCCHC** 91:18

**necessarily** 41:21 215:24 222:12

**neck** 141:11,19

**needed** 29:6,7,8 40:18,21 101:13 119:16 120:16,22 122:10 126:22 127:21 128:21 142:16 143:4 180:13,20

**needing** 100:4 211:4 216:19



negative 252:3

negligence 49:1 68:9

neighborhood 19:23

neurologist 69:4, 9,11

neurosurgeon 72:13

neurosurgery 69:15 72:17

Nez 27:17

Nicholas 178:19

night 107:1,2 115:13 166:3,15 195:8

Nineteen 15:14

ninety 231:10

ninety-three 138:5

no-fire 33:18

nominal 239:4

non-sentinel 215:2

noncorrectional 66:17

noncorrections 66:19

nondiaphoretic 172:1

nonprivileged 57:12

nontrivial 216:19, 24 217:5,17,19,22 218:10 219:10,14, 20 220:20 249:18, 23,24 251:18,20, 21

noodles 96:19,22, 23 97:14 98:7,14

99:5 140:17

norm 204:6 205:6

normal 125:11 152:5,9 173:22 174:12,13,15,17, 21

note 14:9 60:3,23 106:11,19 110:13, 15,24 111:11 112:20,23 113:2, 6,10,15,16,18 117:15,25 123:12 124:5,6,7 127:17 128:24 129:2,19, 20 151:5,8,13,22 154:7 157:25 158:8,18 162:2 165:20 167:14 169:13 170:24 176:18 179:1,4,24 181:6,10 183:3 184:8 186:4,17,22 187:20,22 192:11

noted 138:2 164:16 176:17 177:2

notes 3:15 55:5 56:10 59:10,20,24 60:25 85:19 90:1 106:6 136:6 162:2,5,21 178:9 198:10 228:20,21

notetaking 59:17

notice 8:19 12:14 14:2 137:2

noticed 14:1

notified 107:20

November 128:4 129:18

number 3:13 10:13 26:20 44:9, 11 49:20 50:16 84:18 86:16,24

117:14 137:7 150:15 165:23 183:10 201:6,11 229:24 248:11 250:8 251:12

numbers 11:4 160:22 184:2 248:23

nurse 4:25 25:25 29:20,23 30:9,23 31:8,12,14,18,19, 25 32:9,15,22 33:2 64:15 70:10, 14,17 71:1,4,24 72:19 74:20,23 112:15 113:6,10 114:24 116:6,8, 10,16 117:15 118:3,6,13,17 119:25 120:11,15, 22 121:21 122:19 124:3,10 127:10, 13 128:2,23 129:11 153:23 158:6,10,19 159:3,10,13 160:4 162:11,20,22,25 163:13,18,19 165:24 167:5,18 171:2 173:19 176:23 177:10,17 179:9 186:3 187:3 192:12,20,22,24 194:12 195:11,17 197:7,15,22 198:1 223:22 224:8,23 225:1,3,7 246:5

nurses 25:19 29:14 30:19 75:16 79:2,5,10 88:7 106:7,12,14,17 202:7

nursing 30:14 106:2 110:13 194:19 223:22

## O

object 10:15,24 11:11,14 18:22 20:9 29:24 35:25 37:5,17 39:11 41:3 42:19 43:3 46:24 47:5 50:19, 25 53:3,12,20 54:13 55:21 56:16 57:1,24 59:11,21 60:12 63:14 66:13 67:1,14,22 68:3, 10,17 69:5,20 70:20 71:14 72:1, 9 74:6,17,25 76:4, 11,25 77:15 78:7, 11,21 80:11 83:9 86:19 87:24 88:5 92:3,15 96:25 99:9 117:10 118:8,16 122:4 132:11 133:3,17 134:11,18 135:1, 15 141:13 143:18 144:14 149:2 153:8 162:14 172:24 190:15 198:23 201:14 202:20 204:6 217:12 221:10 238:8

objection 18:25 35:8 82:21 86:13 231:20 243:22,23 247:7,23,25 248:8

objective 176:23

objectively 67:19

observation 142:4 165:7

observations 244:13

observe 177:7 236:17 239:12

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



observing 28:7

obstructions 250:16

obtain 46:19 190:2 233:17

obtained 77:24 94:7

occasionally 16:19

occasions 184:25

occur 66:5,23 213:4

occurred 95:23 110:4,9 143:20 149:25 194:15 198:4

occurs 166:15

October 184:8,22 186:14,24 187:8

odd 107:18

offer 63:10 78:15 242:24

offering 65:5

office 7:16 57:22 130:13 131:18,25 132:1,14 143:1 240:17

officer 39:23 40:2 81:24 139:18,25 140:6,12,19,22 164:14

officer's 142:3 165:7

officers 30:5 32:13 79:1,17,24 82:3,12 202:6 237:17

oftentimes 137:10

oipioid 181:22 182:12

older 164:25

Oliver 92:19 127:24,25 128:23, 25 129:1,6 189:20,21,24 190:3,12 208:23 209:7 210:2,16 212:20 214:2

Oliver's 211:21 214:4

Omeprazole 165:15 166:18

on-call 30:8,19

one-time 161:12

ongoing 144:23 166:21 167:10 175:22

online 12:18 13:6

open 109:2 115:6 130:22,23

opening 100:18 109:1

operating 208:16 238:13

operation 241:2

operations 43:23

opiate 181:22

opine 84:2

opining 189:17

opinion 11:10 38:10 46:12 53:14 63:10,12,24 74:1 78:16 82:1 103:6 128:8 163:12 181:3 212:21 219:16 220:10 221:5 222:24 225:8 226:3 243:15

opinions 5:5,12,

15,18 8:25 37:20 61:17,23,24 62:19 65:5,11,16,19 80:7 131:2 225:25 226:7,12,14,16 227:9 242:23 244:5

opioid 181:4 182:2,10,14

opioids 180:2

opposed 28:14

option 31:14

oral 184:5

order 11:9 12:11 27:19 33:7 46:20 77:6 82:18 83:6 123:7 124:2,9 126:9 161:20 163:7,9 181:15 189:2,6 221:8 222:22 223:17 224:3 225:11 235:19 241:16 254:19

ordered 124:9 160:4 163:18 188:22

ordering 132:25 134:7 189:9

orders 29:22 32:7 79:18 83:1 203:15

organization 38:25 232:12

organized 30:7 55:16 147:22,24, 25

orientation 28:2 35:3,13,16,19,21 39:19 41:14 226:1,15

orientations 27:25

original 10:17 76:19

originally 77:24 78:25

otitis 188:18

outcome 91:4,20 92:1 101:21,23 119:7 121:6 122:14,18,23 124:21 126:25 154:24 176:2 177:15 179:16 189:18 212:1 250:19

outcomes 80:25 91:17 205:20 252:3

outline 236:3

over-the-counter 218:24 222:2,7,21 223:11 224:5 225:6

overlap 72:22

overlay 102:11

overt 53:22

overtly 37:11 87:9

owned 232:16,24 235:5,12 236:7

owner 232:19,22 233:10,13 238:21

ownership 17:6 233:18 238:1,18

Owyhee 27:16

---

**P**

p.m. 255:18

PA 232:8,9,12

pages 12:22,25 56:9,15,20 59:20

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



90:10,11 93:21
137:2 175:17,21
216:17 226:4
242:7

**paid** 15:19 98:19

**pain** 24:12,21 25:2
29:11 36:16 54:1,
3 88:8 96:18,23
97:5,12,16,18
98:6,11 99:1,5,6,
13,20 100:25
103:10 111:11
120:2,20 121:6
125:4,10 128:13
137:14 139:16
140:6,14,22
141:4,11,16,18,22
142:18,19,20,21
143:13 144:9
160:1 162:8
164:16,20 166:3,9
168:15 169:10
170:12,17,21,25
171:22 172:21,23
173:4 176:21
182:25 183:22
184:12 187:7
215:7,11 219:4,10
249:17,23,24
250:1,4,7,8,14,21
251:11,14

**pains** 87:15

**palpating** 99:19

**panel** 22:2,5,6

**paper** 25:13

**paperback** 21:16,
20,21

**papers** 130:12

**paperwork** 156:5

**paragraph** 110:17
118:20 244:22
245:3 249:16

**paragraphs** 252:5

**Pardon** 22:9

**part** 22:16 28:11
36:17 47:17,19
72:22,24 139:3
149:13 176:17
190:20 191:5
193:13 207:24
208:6 211:23

**participant** 17:20

**participation** 23:5

**parts** 236:3

**pass** 158:10
195:11,12 197:16

**passed** 102:1
195:9

**past** 23:10 59:24
60:3 160:15

**paste** 56:4

**patient** 18:14,19
28:19 29:10,21
30:24 31:13,17,
21,23 32:1,8,21
33:12,25 34:1,7,8,
10 47:9 48:16
68:15 70:1,4
75:15 79:8,9
80:25 83:5,8,11,
15,16 91:17 92:5,
6,10 100:24
105:10,11 106:11
111:21 117:16
118:6 126:13
127:22,23 129:11
134:3 135:4,21
137:7 144:16
156:9 158:18
172:15,18,23
174:5,25 175:3,9
182:17 185:5,6,8
186:17 187:1
189:4,9 194:8,9,
11 195:5,14

196:10,15,16
199:17 200:5,11,
14 201:21 202:10,
12,17 203:10,17
204:19,22 205:3
209:4 210:12
218:7,12,14,23
219:9 220:10,23
221:24 222:3
223:19,20 224:22
225:23 236:8
246:19 249:16
251:21

**patient's** 97:17
203:7

**patients** 28:20
29:3 33:12 34:21
35:1 45:15 63:19,
20 79:12,25 81:19
82:4 87:7,11,21
88:22 97:3,4
108:14 116:12
119:7 136:22
146:24 148:23
149:7 160:23
197:9 198:16,17,
22 199:4,7,10
200:10,14,19,24
205:3,16,20
206:20,21 208:21
209:12,13,14,18,
24 210:25 211:4
213:3,16,24
214:7,9,12
215:19,25 216:5,
9,14 218:5 219:2,
13,19,23 220:23
224:20 244:21

**patients'** 198:24

**pattern** 201:21
202:10,12 205:7
242:24 243:4,15
244:13

**pause** 109:13
242:19 251:6

**pay** 24:3 236:13
237:13 239:9

**payment** 15:22,25

**payroll** 237:15

**PDF** 9:13 241:22
254:20,21 255:4

**PDFS** 56:1 60:20
61:6

**peak** 25:16,18
26:6 47:7

**pedantic** 233:5

**Pennsylvania**
50:15

**people** 25:9 34:22
37:10 38:14,15,
17,18 39:15 52:20
69:23 75:9 80:21
81:2 87:10,17
89:1,3,5,10 95:11
104:11 105:20
215:7,10 216:7
219:2 247:9,17,19
248:3,24 249:8
250:1

**Perce** 27:17

**percent** 51:10
54:5

**percentage** 20:7
51:5 201:13
247:9,14,20 249:8

**perfect** 211:11
255:13

**perfectly** 144:16
173:10

**perform** 22:1
27:25

**period** 168:5
198:18

**permission**
180:14

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**person** 7:24 77:8
81:24 118:7
127:14 143:14
147:23 148:6,14,
19 182:20 200:22
201:2,3 245:18

**person's** 135:24

**personal** 23:8

**personally** 31:23
47:25 48:3,5
185:4

**personnel** 178:1
196:25

**perspective** 84:12

**petitioner** 32:23

**pharmacy** 157:1
221:22

**phenomenon**
83:19

**phone** 8:11,13
32:7 75:15 79:8
197:11 203:8
204:20 205:2
212:7 241:21

**phonetic** 252:17

**phrase** 66:2 67:21
68:9

**phrased** 57:16
58:3 212:19

**physical** 98:17,19
100:3 125:14
133:20 134:1,4
135:5,8 177:2
228:18

**physically** 33:2
223:8

**physician** 26:2,14,
17 30:8 31:10
32:5 66:10 69:10,
14 70:3,5,6,9 71:4
72:21 82:17 83:4

98:10 100:1,20
169:20 232:25

**physician/patient**
28:23

**physicians** 6:2,11,
14,16,19 17:12,18
18:1 19:18 20:14
24:1 26:4 66:17,
18 72:20 83:1

**pick** 215:22,23
217:1,4

**picked** 199:16

**picture** 55:16

**pillows** 85:23

**pinpoint** 141:22

**Pisney** 4:25
125:16 128:2
181:17

**place** 81:19 82:2,5
95:14 98:9 183:7
207:16

**places** 39:2
100:13

**plaintiff** 54:7

**plaintiff's** 15:22
51:6 78:19 131:6,
10 199:1

**plaintiffs** 51:11

**plaintiffs'** 54:9
132:7

**plan** 83:8 172:8
188:10,15,23
207:15,19,20,21
208:5,11,12,13
212:2,4,12,14

**plane** 231:10
241:6

**plant** 17:9

**playing** 216:7

**pod** 117:15

**point** 22:15 66:20
101:14,16 107:23
119:24 126:5
135:17 146:19
157:20 167:11,13,
23 174:2 180:12
182:6 190:12
194:21 197:4
207:20 219:19
229:18 231:18
235:11

**pointed** 141:15

**pointing** 142:11
175:4

**points** 99:5

**Police** 39:22

**policies** 28:9
40:19,20

**policy** 75:7,9,23
76:1 81:19 82:2,4
129:9 215:9,10
234:25 236:11
239:1

**pop** 214:24

**population** 18:14,
19 28:13 86:18
200:11 202:18
247:10

**population's**
18:21

**portion** 163:17
164:1,10 178:14
181:19 216:16
227:6,9 247:5

**pose** 236:5

**posed** 57:5

**position** 58:6
192:19 205:14,19

**positions** 39:24

**possession**
237:21

**possibility** 238:5
252:2 253:8,11

**possibly** 172:5

**post** 24:11,17
39:22

**Post-its** 60:19

**potential** 88:1
89:17 132:25
134:7 135:13
211:14 249:25

**potentially** 73:25
200:9,20 201:4
251:17

**potholes** 224:14

**practice** 16:16
18:5,12,15,17,20
20:1 28:14,15
31:1 32:3,25
33:11,13 34:10
37:11 70:17 71:1
72:12,13,18,19
73:8 75:9,10,11,
13,14,16,17,19
79:11 80:3,22
84:3 205:7 246:3,
4,5

**practiced** 204:24

**practices** 72:16
102:6,16 204:20

**practicing** 35:11
66:10 72:25 212:6

**practitioner** 4:25
31:15,20,22,25
32:18 69:3 70:11,
17 71:5,24 82:13,
17 83:17 88:10
96:11 100:9,14
101:13,16,17,19
104:22 113:25
114:1,7 115:11



116:6,8,10,16,20
117:12,20 118:4,
7,14,18,25
119:19,22 120:1,
12,15,23 122:19,
20,22 123:10
124:1,3,10 125:22
126:8 127:12,16
129:11 143:4,5,6,
8,10,22 153:21
159:3,10,14 160:4
162:23,25 163:14,
18 172:19 173:8,
11,18 174:7
179:11 180:19
185:5 186:19
187:2 188:13
189:2 194:3,6
196:14,21 204:19,
24 216:20 217:14,
20 218:13,15,25
219:6,12,16,21,24
220:12,14,17,25
221:8,17,21,25
222:4,9,10,13,15,
18,22 223:3,8,17,
20,24 224:3,21
225:4,11,18,22,24
246:6

**practitioner's**
89:18

**practitioners**
25:25 28:3 30:16,
18,20 36:3 52:19
68:14,24 71:1
72:20 75:14 79:6,
18 86:10 88:2,7
180:10 194:8
202:8,24 203:13
212:6

**predominantly**
11:22

**prejudice** 204:18

**preparation** 55:7

**prepare** 7:24

**prepared** 147:23
187:23 190:22,25
192:19

**preparing** 59:4
191:6

**prescribe** 114:7
180:6,11,14,22
184:4 185:3,6

**prescribed** 73:4
111:18,25 123:9,
25 125:21 126:8
152:25 153:14,20
159:14 161:13
162:25 163:14,23
182:6,8 185:13,24
186:9,15 187:7
188:13 189:11
193:15,20 196:11
221:20

**prescribes** 225:22

**prescribing** 79:7,
10 172:11 180:17
203:16 205:4
212:7

**prescription** 114:5
116:18 159:15
179:25 204:21
221:19 225:2,20
251:23

**prescriptions**
75:17 202:9
222:14

**presentation**
36:19 143:11
174:4

**presentations**
38:3

**presented** 39:19
96:17

**presents** 18:13,18

**preserve** 57:9

**president** 6:1,2
19:17

**pressure** 83:7
96:10,12 98:2
108:6 135:11,25
138:3,9,17 139:23
142:14,15 160:5,
9,15,16,22,25
161:14,19 163:5
170:13 171:14
222:17

**pressure's** 98:12

**pressures** 84:4

**pretty** 57:17 109:9
150:14 218:13

**prevent** 209:20

**previous** 8:6
156:25 240:8
246:20

**previously** 152:13
159:21

**Prilosec** 165:18
168:7

**primary** 18:9 69:3,
10,14 70:4 72:20,
25

**print** 9:15 13:1

**prior** 66:22 166:3

**prison** 67:12

**prisoners** 128:17,
20

**prisons** 85:5

**private** 17:2 42:24

**privatization**
41:19

**privilege** 57:3,10,
25 58:13

**privileged** 57:1,12

234:11,12,16

**PRN** 111:16,17,24

**probability** 10:23
101:9

**probable** 136:3

**problem** 58:12
89:8 107:7 135:22
139:10 154:17
166:22 167:4,10
168:11 193:23
194:20,24 195:18
207:24 208:3,4,11
211:10,13,14
212:2,3,8,11
213:23,24,25
214:9,10,11,17,
18,23 215:18,23
221:7,16 223:8,21
224:5 225:9,17

**problematic**
148:19 200:9

**problems** 29:11
167:25 195:15
211:18 213:22
245:15 247:13
248:25

**procedure** 82:2,5
208:16

**procedures** 28:9
40:20

**proceed** 43:17
234:2

**proceeded** 4:1

**proceeding** 11:14

**proceedings**
109:13 242:19
251:6

**proceeds** 134:23
237:15

**process** 13:19
29:19 30:5 47:17

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



90:14 91:4,21 132:24 133:8 218:16

**processes** 29:9 36:7

**product** 55:10

**professional** 19:15,22 20:6 21:7 22:16 44:16, 18,23 45:1,7,24 46:1 106:10 217:10 232:10,13 234:24 239:2

**professionals** 28:3

**profit** 74:4,15 235:13

**profits** 235:19

**program** 53:23 90:25 206:1 211:11,19 212:23 213:7,12,20 215:1,13,17,20 216:1,3

**programs** 211:11

**progress** 117:15, 25 151:8 154:7 157:25 158:8 162:2 165:20 167:14 170:24 179:1,4 181:6,10 183:3 184:8

**promotes** 241:2

**prompt** 170:7,8,11

**proof** 47:4

**proper** 34:9 35:2 114:22 211:2 212:22 213:1,7

**properly** 58:1 115:8 211:19

**proprietorship**

233:16 234:2,9

**protocol** 32:25

**protocols** 217:23 223:22

**Proventil** 104:7

**provide** 11:23 12:15 27:9,19 28:12,17 41:24 42:4,10 73:2 74:15 180:7,8,9, 10

**provided** 11:22 12:5 25:8,14 26:22 36:15,22 56:13,18 58:14 59:3 61:9 62:8,19 64:2 69:25 73:24 79:3 85:5 93:11 94:10 132:13,16, 17,21,22 146:4,10 154:25 181:3 202:1,17 226:1,15 245:9 246:22,25

**provider** 71:20 72:7 81:16,23 99:12 152:25 168:19 180:16 188:8,10,22 192:12 193:16,21 249:7

**provider's** 51:8

**providers** 67:11 69:19 71:20 72:7 74:3,14 84:10 85:11

**providing** 12:1 35:6,23 52:17

**provision** 86:5

**publication** 22:8, 10

**publications** 22:11

**published** 21:8, 13,15 22:5 23:18 24:2,7 37:14,20, 23,24 53:6 86:23 181:25

**publisher** 21:17

**publishing** 21:18

**pull** 108:8 115:18 191:8 242:6

**pulled** 93:17 108:17 210:23

**pulmonology** 169:20

**pulse** 152:4 171:23

**purchased** 237:24

**purpose** 12:8

**purposes** 245:21

**pursuit** 70:7

**push** 52:18 53:2,7, 18

**put** 12:13 53:7 56:1 60:19 62:23 75:2 122:21,25 141:22 142:8 153:13 206:21 218:6 219:3 249:4,5

**puts** 218:12

**putting** 113:13

---

**Q**

**qualifications** 54:10

**qualified** 64:14,16 71:23 128:7

**quality** 41:20 42:15,17 43:1 78:16 80:7 206:25

207:6,8,9 208:18

**quarterly** 91:23 206:17

**question** 7:4 19:11 27:21 34:2, 6 36:3 47:1 55:9 57:4,11,15 58:2 60:24 62:2 63:25 65:14,18 70:24 74:9 75:22 80:6 81:22 82:8 86:22 87:4,19 102:18 126:17 131:19,21 134:21 141:18 144:7 145:19 155:18 173:1 174:8 185:16,21 196:23 209:23 212:18 225:6 226:5 230:21 233:8 234:11,14 236:6 238:10 240:8 243:8,9 244:3 245:3 248:2 251:3,10

**questions** 7:2,5 10:10 81:15 82:5, 6,7 91:10 99:17 117:19 136:5,21 149:24 231:2,11, 16 241:7,8 242:1 253:21

**quick** 109:8 125:5 129:24 176:22 241:12,24 245:3 255:10

**quickly** 109:9 136:19 178:19 216:15 227:25

**quiet** 19:3,5,7

**quote** 74:22 107:1 153:3 156:6 158:10,12 195:17 197:9 198:8 206:2

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



216:1

## R

**R.N.** 110:21,24 111:1 116:5 123:16,24 125:25 127:10 151:25 153:3 245:18,23 246:4

**R.n.s** 25:21 111:5, 7

**radiates** 142:19

**radiation** 171:23

**raise** 169:17

**random** 78:17 85:18

**range** 92:24

**ranks** 133:10,11

**rapid** 114:20

**rash** 217:3

**rate** 98:1 101:6 103:5 108:4,5 114:20 121:23 152:6 173:23 174:19

**rate's** 171:12

**read** 34:4 74:5 75:1 85:19 89:23 103:11 123:14 132:6,7,8,9 149:3 165:13 166:4 175:7,13 181:13 197:7 229:9 244:20 245:2,4,6 255:14,16

**reading** 75:3,6 111:19,20 192:15, 22 242:11

**ready** 94:23 101:8 109:14 242:9

**real** 109:8 241:24 245:3 255:10

**Realistically** 54:20

**reason** 23:21 79:21 105:15 111:6 116:9 153:18 157:19 187:14 194:14 195:7,10 198:3 214:14 235:22,24 239:25 240:1,19 250:21

**reasonable** 10:22 71:19 72:6 101:9 172:12 173:14

**reasons** 231:15 233:15

**reassessment** 31:24

**reauthorizing** 225:21

**recall** 9:17 76:5 96:15 175:24 191:3 192:15,22 227:4 247:1

**receive** 14:2 32:19 118:23 155:4

**received** 5:10 15:23 56:23 57:21 58:5 90:23 91:9 130:12 131:16 191:5 236:9

**receives** 83:4

**recent** 16:2

**recently** 172:15 174:6

**recess** 13:15 54:23 88:16 130:7 220:8 242:2

**recheck** 138:8 172:9 173:20

175:23

**rechecked** 143:25 174:2,14,16,23

**recognize** 7:3,5 137:18 138:14 146:21 169:3 228:13

**recollection** 10:21 235:2

**recommendation** 43:15 115:24 116:5

**recommendations** 115:16

**recommended** 43:8

**reconvene** 242:1

**record** 4:13 7:9 10:12 12:7,20 13:14,16 54:24 55:14 58:17 109:8 119:8 121:2 125:19 130:8 137:5 145:8 150:11 164:10 177:20 178:23 179:15 183:4 185:24 227:13 241:13,14

**recorded** 40:14 175:1

**records** 9:10,13, 16,19,23 10:17 11:2 12:5,25 13:11,20 55:10 76:23 77:13 78:2, 3 92:23 93:3,12, 18 94:7,10,12 95:25 108:8 130:12 131:8,16, 22 132:2,3 136:22 146:3 149:5 156:24 157:1

**referring** 58:8 63:15 68:2 91:16 111:13 112:22 113:16,18 125:3 151:14 162:6 163:11 164:10,25 169:24 176:9 178:15 179:4

159:20 168:3,10 169:2 175:17,21 177:25 178:14,15 182:5 185:11 192:10 196:3 227:8,12 237:20 244:21 246:8,13, 16,17,23,25

**recourse** 225:4

**reduce** 52:18 53:2, 8,18,23 161:13,21

**refer** 68:1 82:3 111:4 137:6 188:5 191:21,23 214:12

**reference** 10:12 40:16 41:12 76:7 85:21 92:22 94:24 112:3 113:5,9 125:3 170:7 252:25

**referenced** 33:6 50:1 74:21 85:20 112:19 172:16

**references** 61:15

**referencing** 112:21

**referral** 214:13

**referrals** 52:18 53:9,24

**referred** 65:25 117:19 160:20 186:18 191:10 201:4 208:9 229:7,10,14 247:2 248:10

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F. California Firm Registration #179

 LEXITAS

183:4 192:4
246:10

**refers** 164:2
228:24

**reflected** 123:11

**reflex** 172:12

**reflux** 99:6 101:3,6
121:22 167:2,8
172:6 173:15
215:11

**refusal** 96:16
106:4,13,20
107:16 138:15

**refuse** 105:12,13
197:9 224:14

**refused** 96:12,14
105:1,8,10 106:23
138:16 153:25
193:8 194:13
195:8 197:23

**refuses** 224:6,12

**refusing** 105:4
106:4,22 194:18
196:25 224:17,21

**regard** 28:18 65:2,
11 211:10

**regimen** 194:10

**registered** 64:15
70:14

**regular** 20:1
171:23

**regularly** 157:20
249:3

**relate** 151:2,3

**related** 96:19,23
99:5 102:16
135:23 216:8

**relating** 127:19
163:12 164:2
167:18 179:20

189:23 196:3
216:13,16

**relationship** 28:24
243:2

**relayed** 29:22 31:9

**relevant** 5:12,18
8:8 13:20 97:19

**relied** 132:13
149:4

**rely** 5:17 131:4,6
148:11,24

**remained** 43:21

**remember** 24:18
26:11 48:24 49:3
52:10 56:20 66:24
75:3 77:2,3 93:21
94:16,19 95:3,5
96:14 104:2 107:3
112:15 145:15,22
146:7 147:9
187:18 188:2
234:6,21 235:5
237:16 245:19
246:7

**remembered**
234:15

**removed** 180:20

**rendered** 5:5
65:11

**repeat** 19:10
131:19,20 134:20

**repeatedly** 111:4

**repeating** 99:23
112:13

**rephrase** 31:2
62:2

**report** 3:16 5:10,
17 10:18,25 11:1,
3,8 12:9 14:13,15,
18,19 30:7 32:15
33:3 36:18 37:4,9

52:11 55:7,12
56:2,11 59:4,14,
18 60:15 61:14,23
62:6,8,13,23 63:8
64:8,18,23 65:2,9,
21,25 66:3 68:1
74:1,5,22 75:2,6
76:7,19 90:5,7
94:2,22 103:12
105:2 109:21
110:3 111:10
112:4,6 114:3,14
119:9 121:14
129:6 133:14
137:21 138:2
142:9 145:9,13,
20,24 148:22
149:8,23,24 150:7
151:14,23 158:4,
25 159:24 160:3,
19 161:16 162:7,
17 163:12,17
164:1 165:5
166:3,9 170:16
171:5 176:9
178:16 179:4,24
181:2 182:18,24
187:20,22 188:6
190:21,25 191:6,
22 192:2,16
194:23 198:6,14
199:22 206:2
209:6 216:16
217:16 219:8
220:19 226:4,6,
18,24 227:3,10,
14,17 229:20
230:8,23 242:7,12
244:18 245:22
249:13 252:5,11,
15

**reported** 96:18
113:17,21 128:2
153:24 158:5
165:3 166:14
167:1 168:14
169:16 171:8

195:24

**reporter** 7:18
13:13,18 18:23
19:2,5,7,9 34:5
93:8 132:19
241:15 243:5
251:13 254:17,22,
24 255:1,6,9,13

**reporter's** 7:16

**reporting** 112:13
125:4 167:7,22
198:8

**reports** 30:24 31:8
131:12,14,15
132:4

**represent** 4:24
181:16

**represents** 136:17
147:7,10

**request** 12:8
129:6 166:17
218:12 219:3,23
249:1,4,5,9

**requested** 11:16
218:14

**requesting** 12:2

**requests** 206:21
218:6 231:17

**require** 17:16 18:4
96:24 247:17

**required** 33:25
34:7 45:2,4,6
100:20 133:14
185:18 232:24

**requirements**
70:17 237:3
240:12

**requires** 22:23
23:1 217:23

**requiring** 247:5

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


rescue 103:18

resemblance 242:14

resolve 57:3 58:1 185:14,25 186:14 188:25 225:7

resolved 114:3 143:20 144:13 168:6 186:9,22,25 189:13 222:20 223:11 224:5,7 225:6

resolves 143:17

resources 27:23

respect 11:17 49:14 62:19 70:14 110:11 123:7 126:14 127:3,25 130:9,19 131:4 164:11 183:14 189:20 190:19

Respimat 104:1

respiratory 102:24 103:2,3 108:5 152:6

respond 42:6

responded 141:19

responding 152:1

response 33:17 42:2 71:11 99:11 100:11 129:7 140:9 172:12 230:19

responsible 102:8

rest 51:10 248:17

restarted 116:4

restate 34:3 74:9

result 29:10 42:2 89:4 124:9 139:11,18 158:22

166:22 185:13 186:14

resulted 155:12 177:16

resume 22:4

resurrect 24:4

retained 3:20 49:23 50:8 235:6

retire 23:24

retired 22:3 23:23

retrospective 95:15

return 151:5 169:14 170:1

reverse 123:6

review 9:12,19 20:7 36:10 37:7 51:21 54:5 55:6 56:8 59:15,19 61:22 64:5,9 76:10,16,23 77:14 78:2,3 80:9 86:8 93:15 94:6 148:15 149:6 168:9 169:7 175:16,20 176:1 177:19 182:5 185:10 186:6,12 187:15 190:20,25 191:19 198:25 199:5,11,13,18 200:17,25 202:18 204:4,8 205:16 206:15 207:1 211:4,21 212:22 213:6,11,19 227:13 243:1,3 244:21,24 245:7, 14 246:14,15 252:14,16

reviewed 9:9,16, 23 36:16 37:7,16 50:17 51:5,18,25 55:4,9 60:20

61:19 64:7 77:6, 12 80:17 83:13 131:23 132:2 136:23 146:3 148:16,17,18 154:11 169:6 191:5,17 196:3 197:7 198:16 199:15 200:14 201:12,22 204:14 205:21 208:21 209:4,8,24 211:1 213:3 226:4,11, 20,21,23 228:14 242:12 243:21 245:24 252:10,13

reviewing 9:22 11:1 51:6 77:3 159:19 192:10 203:23 204:1 206:19 227:8

reviews 244:7 245:1

revolving 64:9

RFP 42:2

RFPS 42:7

Riggin 252:17

right-hand 183:25 184:21 186:7

rights 46:3 48:6

rigorous 81:5 84:16

rinse 184:5

risk 98:4 135:22 142:13 144:6

road 14:10 224:15

robust 79:15

role 70:1 79:2

room 7:21 14:13, 21 16:6 52:18 53:19,23 70:9

71:10,12 73:15,20 81:25 86:11,17 87:8,22 96:24 97:4,23 115:13,17 116:22,25 121:11 142:24 144:3

roughly 227:6

rule 114:22 133:12

run 205:11,12,13 234:8

running 233:16

___

**S**

sale 233:4

sales 21:9

sampling 201:18

sanctioning 238:17 240:23

sat 12:9

satisfy 221:9 222:23 223:17 224:3 225:11 238:4

save 41:24 42:12, 22,24 53:11,15 61:4

saving 42:11

scanned 241:22

scenario 197:5 215:18,20

Schamber 126:10, 12 127:18,21 179:12

schedule 122:21 123:1

scheduled 14:3,5 20:1 32:2 249:3

Schmieder 92:14 102:1,5,22 105:1

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



107:17 108:2
190:19,23 193:6,
18 194:13 195:8
196:4,17,19,24
197:8,23 208:25
209:7 210:1
212:19

**Schmieder's**
191:2,11

**scientific** 78:22
81:5 204:3

**scientifically**
202:16

**scientist** 78:15

**sclerosis** 156:20

**scope** 72:12,16,
18,19 75:10,16,18
79:11 80:22
214:11 246:3,4

**screen** 12:3 56:1
60:8 89:22 96:1
107:25 109:19
117:21 123:5
137:3,8,9,16
146:9,12 149:20,
21 150:10 152:17
157:2 161:23
164:7 169:2 176:6
179:1 181:8
183:18 228:1
229:19

**screened** 137:15

**screening** 81:11,
13 82:11 137:21
228:21

**screw** 104:23

**scroll** 93:23 109:4
230:7

**scrolling** 248:17

**searchable** 241:22
254:20 255:4

**secondary** 31:24

**secret** 53:5

**Secretary** 239:22
240:17

**section** 60:7 62:13
63:11 64:1

**security** 29:16
31:12 32:4,20
33:1 203:7

**sedating** 160:18

**sedative** 160:18

**seek** 46:16 86:1
170:9,20 172:17

**seeking** 155:4
221:7 223:15
224:2,17 225:9

**sees** 31:23 100:15
204:22

**seizure** 116:19
117:16 155:19
158:6,11

**seizures** 115:8
157:10,14 219:5

**select** 77:6 200:5

**selected** 60:11
76:9 77:14 78:18
80:9 130:15,17
198:25 199:18

**selection** 78:18
200:21

**seminars** 38:8

**send** 12:21 31:21
32:8,23 87:7,17,
21 98:15 100:17
203:6 251:1

**sending** 52:20
55:3 73:13,19
89:10 145:17
185:8

**sense** 76:14
216:25

**sensical** 217:1

**sentence** 63:16

**sentinel** 91:4,24
92:7,13,18,19,20
208:22 209:5,16,
17,21,25 210:4,8,
15,17,24 211:2,23
212:20,25 213:4,
14,16,17

**separate** 20:17
55:18,23 62:13
183:13

**September** 6:8
183:15,18,22
184:21 185:13,25
186:8

**series** 58:9 162:2

**service** 27:22
207:1 225:1

**serviced** 129:23
130:10

**services** 14:22
26:22 27:10,19
41:24 51:12 73:3
74:3,15 78:16
86:6

**set** 63:11 78:24
80:4,15 81:8
156:4 178:8
183:11 195:6
202:3 204:9
211:19 233:20
234:1 244:10

**setting** 24:13,22
34:10 35:7,24
62:7 66:6 67:12
209:3

**settings** 205:13

**settled** 49:4

**seventeen** 26:9,14
42:1 184:18

**seventy-five** 90:10

**severe** 30:24

**shaking** 117:18

**shampoo** 218:22,
24

**share** 117:21
123:5 125:19
129:5 137:8,9
237:9,10

**shared** 107:25
147:13,16

**shareholder**
236:22 237:14
239:16 240:9

**shares** 237:8

**sharing** 89:22
109:18 137:3,16
149:20 157:2
228:1 231:3

**sharply** 241:6

**shaving** 126:5

**sheet** 28:6

**Sheriff's** 190:22
191:1,12,24

**sheriffs** 39:1 43:9

**shift** 46:20 149:18
155:8 216:15

**shifting** 129:25

**shifts** 16:18,22
17:4 21:5

**ship** 86:10

**shoes** 85:22

**short** 180:23
220:2 233:3,8

**short-term** 161:12

**shortened** 232:20



**shorter** 217:21

**shorthand** 208:1,8

**shortness** 88:8 135:11 141:9 142:4

**shoulder** 141:12, 19

**show** 11:13 80:18 141:21

**showed** 152:12 153:10,11 203:10

**showing** 115:12 138:12,23 139:16 149:10 154:7 157:2 161:23 164:5 165:20 169:1 181:6 183:2 228:6 229:18 248:9

**shown** 8:19 141:25 151:11 168:3

**shows** 150:21 227:1

**shuffling** 25:12

**sic** 150:1 156:20

**sick** 119:15,21 120:16 129:6 174:5 250:2

**side** 51:6,7,8 58:2 72:23 183:25 184:17,22,23 186:1,4,7,13 187:7

**sign** 107:18 143:23 167:10 214:20 255:14,16

**signal** 244:25

**signature** 255:15

**signatures** 111:9

**signed** 107:17 110:24 118:3 126:12 181:15,16

**significance** 244:17

**significant** 5:23, 25 18:10 22:16 78:3,4,10 111:1 112:8 148:6 201:12,18

**significantly** 173:24 201:17

**signing** 106:4

**signs** 97:25 98:5, 20 100:25 120:3 139:7 142:23 144:2,20 164:13 167:4 171:16 174:13,18 175:5 177:1 195:6 203:8

**similar** 35:1 57:9 70:25 71:21 72:8 140:20 164:23 174:6

**similarities** 35:5, 22

**simply** 132:24 166:17 212:19

**single** 13:1 26:7 36:19 41:9 45:16 69:18 90:12 204:15

**sir** 4:12,23 7:13 8:16 16:13,17 20:3 26:10,24 27:5 28:1 34:19 50:12 51:13 52:7 53:16 127:25

**sit** 10:20 146:7 168:10 187:23 192:18 212:10 235:5

**sitting** 25:2 125:13 203:24

**situation** 12:12, 13,19 13:6 33:18 150:18 159:25 169:7 178:7 179:16 188:6 190:8 210:8,16 211:17 222:19 223:10 224:7

**situations** 35:1 58:16 183:13

**six-year** 198:18

**sixteen** 146:10 152:9

**sixty** 174:21

**sixty-eight** 20:4

**sixty-seven** 175:16

**sixty-six** 175:21

**size** 209:9

**skipping** 176:16 236:3

**skips** 177:6

**slide** 36:19

**slides** 37:3,7

**slots** 214:22

**small** 150:14

**smallest** 27:2

**snaps** 56:1

**snip** 60:1,6

**snipped** 55:15

**snippets** 55:25

**snips** 55:13 59:23, 25 60:4,11,15,17

**Society** 181:24

**sold** 21:11

**sole** 232:19,22 233:9,13,16 234:2,8 238:21

**solely** 80:8

**solved** 218:18

**sooner** 128:13,15

**sort** 42:5 43:18 88:3 100:4 139:9 154:16 168:11 176:1 179:16 196:14 211:4 221:6 228:17 242:16

**sought** 97:11

**sound** 204:2

**sounding** 241:6

**sounds** 195:11

**source** 10:13 11:7, 13,17 38:1,4 40:17 92:23 95:1 97:18 110:14 145:12,20,21,23, 25 196:7 198:13 206:5,6

**sources** 12:11 21:6 196:9

**space** 128:4

**spans** 198:18

**Sparta** 190:11

**speak** 7:7 12:10 19:8 64:14,16 71:23 132:19 233:23 243:6

**special** 85:22 180:21

**specialties** 69:24

**specialty** 17:23 70:6 73:13

**specific** 92:5,6,10 196:22 218:17

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**specifically** 38:7
94:17 95:3 142:10
147:3 191:21
216:23

**spectrum** 98:9

**speculating**
133:21

**spend** 19:14,16
20:6

**spent** 227:7,10

**spicy** 96:19,22,23
97:14 98:7,13
99:5 140:16
143:15 144:11

**sprain** 224:15

**spreadsheet** 93:5,
10,14,15 94:8
146:9,21,24
147:1,4,5,7,8,14,
22 148:1,12,24
149:7,11 152:15
199:15 200:8
247:2 248:10
252:25

**sputum** 168:16

**staff** 29:16 30:13
31:12 32:4,20
33:1,7 35:3,21
39:19,25 40:6
41:14 47:9 64:20
65:6,12,16,20
81:10,13 86:1
87:6,21 96:22
99:4 106:2,25
107:6,21 115:7
117:16 169:19
189:22 190:2
194:19 196:5,8
197:2 211:7
216:11 245:18

**staffed** 43:11

**staffing** 43:7,8,12,
15 216:17 249:16

**stamp** 93:19

**stamps** 92:25

**stand** 20:21 63:20
117:17

**standard** 25:1
37:14 38:4 41:2,
10,14 63:9,16,18
64:2 65:5 66:1,2,
4,10,12,20,22
68:1,2,9,15 69:2,
4,16,18 70:7
71:11,18,22,24
72:14 88:23 89:11
92:2 106:9 203:3
205:6 221:9
222:23 223:17
224:4 225:11

**standardly** 203:4

**standards** 39:23
41:1,7 67:11
206:8,9

**stands** 207:5

**start** 6:5 99:14
118:12,13,15
133:21 136:8
159:16 165:11
208:19 231:11,14
232:15

**started** 6:7 14:12
15:7 58:5 112:18
116:17 140:9
143:14 144:10
227:16,23

**starting** 112:21
181:17,20

**starts** 98:16
119:13

**state** 4:13 70:18
71:19 237:3
240:12

**State's** 239:23
240:17

**stated** 65:17 107:5
151:17 158:9
197:22

**statement** 5:15
64:1 79:15 94:2
96:6 126:19 127:7
145:13 146:3
154:20,22 196:7
198:14

**statements** 11:13
13:5 197:7

**states** 70:25

**statistic** 47:11,21

**statistical** 205:9
244:16 245:8,12

**statistically** 78:9
201:12

**statistics** 47:18,22
86:9 90:25 91:3,
11,14 206:19
207:14,23,25
208:2,5

**stay** 70:2

**step** 133:18 208:3,
15

**steps** 207:22
208:9,10

**steroid** 103:10,14
104:9,14 193:4,8,
13,14,20

**Steve** 93:5 146:17
229:23

**stock** 237:8,11

**stop** 52:19 97:21
181:1 231:3

**straight** 57:18

**strike** 37:1 106:23
121:9 187:14
247:18 249:11

**strikes** 59:18

**striking** 242:14

**stroke** 161:1

**strong** 171:23

**stronger** 244:5

**strongly** 101:15

**structured** 239:19

**studies** 91:4,20,21
212:1

**study** 58:6 78:22
91:15 92:7 216:4

**studying** 215:6

**stuff** 91:5 216:4
217:8

**subject** 224:13

**subjective** 140:13
157:7 170:25
176:15

**subjectively**
143:15 144:10
164:19 167:1

**suboxone** 180:1,
7,11,14,15,24
182:8

**subset** 199:22
200:16

**substitution** 182:8

**subtly** 37:11

**such-and-such**
129:1

**sued** 47:25 48:2,3,
4,8 80:9 84:9,11,
14,18 85:2 236:8

**suffered** 175:18

**suffering** 128:13
168:5 170:17

**sufficient** 10:20
236:13

**suggest** 41:23



143:16 174:1

**suicide**  29:11

**suicides**  102:7,9

**suit**  48:10,17

**summaries**  58:9,
21,24 59:2,8,9
132:13,16,22

**summarized**
64:12 131:17,24

**summary**  62:15
65:1 67:3,6,7,8
107:10,15 115:20,
23 132:1 157:17
224:11

**Sunday**  135:12

**supper**  164:17

**supposed**  28:10
79:4

**surgery**  210:22

**Susan**  37:3

**suspect**  79:22
172:12

**suspected**  173:15

**sustained**  247:6

**Swans**  20:22

**sweatiness**
135:24

**sweating**  142:5
172:4

**swelling**  186:21

**swollen**  186:21

**sworn**  4:6

**symptom**  30:24
31:8 173:3,4
221:6

**symptoms**  32:16
133:1,14,16
134:16,24 140:20

142:9 143:17,20
144:23 164:24
165:3 169:10,14
170:2 174:6
175:22 177:1,11
178:3 182:11

**synthesis**  55:11

**system**  87:12
203:2 204:8,16
206:4,11 211:3

**systems**  206:3

---

**T**

**table**  58:10 59:1
212:10

**takes**  133:6,9
157:13 171:7

**taking**  42:9 59:20
84:12 103:21
153:19 157:20
159:21 183:17

**talk**  5:4 90:10
92:21 115:2
149:25 151:15
159:24 179:11
206:1,2 216:18
217:24 219:8

**talked**  63:3 106:14
137:13 155:10
158:15 159:8
179:5 194:3
197:15 205:3
215:6 242:10

**talking**  10:9 45:18,
19 58:15 66:9
72:12 74:12
106:15 109:24
151:22 158:19
162:6 165:24
182:20,23 183:13
196:16,19 211:25
213:13,15 214:2

**task**  59:19

**taught**  28:21,25
29:3,8,12,15,18
33:16,18 39:21
40:1,12 66:7,24
89:2 106:8

**tax**  235:20,21,25

**teach**  33:20

**team**  253:16

**technical**  130:21
200:2

**techniques**  28:21

**technology**  7:1

**tecum**  8:20

**teeth**  128:8 183:25
184:15,17,21,22,
25 185:12 186:1,3
210:19,23 228:25
229:1

**telephone**  7:24
124:9 126:9
159:15 202:9

**telephoned**  124:2

**tells**  87:21

**ten**  19:23 20:5
24:25 25:3 27:4
44:12 51:10 54:5
114:4 239:6

**tend**  87:14 247:10

**tendency**  89:4

**term**  6:5,6,7 67:16,
19 209:6 210:1

**termed**  18:10

**terminology**  211:3

**terms**  18:14,19,20
176:15 200:20
201:25 207:5
225:25 243:3
249:7

**testified**  4:7 50:8,
11 53:25 62:21
142:7

**testify**  10:22 54:11
101:8

**testifying**  82:16

**testimony**  62:25
96:21 97:22 99:3
196:13 197:2,25

**testing**  100:4

**textbook**  66:11,19

**textbooks**  66:7,
16,24

**TFS**  20:20,21,24
21:1 231:23
238:22,24 239:1,
4,8,12,18,23
240:17,23 241:2

**TFS's**  240:11

**theoretical**  238:5

**therapy**  104:11

**thing**  34:25 41:5
42:5 45:19 60:1
97:10 129:20
160:11 203:12,13
211:9 212:6
214:24 217:1
218:11 251:22
252:24 255:5

**things**  8:17,20 9:5,
6 35:4 36:6 39:14
68:21 69:10 78:25
83:12 84:6 85:23
86:25 95:14 98:23
106:8 114:19
133:10 141:1
143:21 205:23
207:17 217:6,20
219:1 250:14,16
251:19

**Thinking**  235:4

888-893-3767
www.lexislegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**thinks** 98:6

**thirteen** 77:19 78:4,9 79:22,23, 25

**thirty** 18:3 50:21

**thought** 9:7 14:5 49:12 79:20 120:15 126:5,22 128:20 148:7,13, 19 201:3 211:25

**thoughts** 85:18

**thousand** 15:14 21:12 239:6

**thousands** 12:24 56:9 59:20

**throwing** 217:5

**time** 9:15 13:23 14:6 19:15,16 26:8,13 31:18 32:20 39:4 42:25 45:3 46:10 54:17 58:20 63:7,11 65:10 83:2 100:10,21 101:12, 14,16 105:5 107:24 110:1 120:20 121:16 134:1 137:24 138:7 143:24 168:5,6 169:2 174:12 180:4,12 185:15 186:2,15 189:9,22 190:12 214:13 215:15 225:14,19,22 227:7 233:4 236:2 242:12 249:1,4 255:2

**times** 37:8 43:13 85:1 86:16 96:3 195:17 197:9 238:12 245:16,17 248:11

**timing** 15:22

**titled** 228:7

**today** 10:9,20 22:20 23:2 65:19 111:22 130:24 199:4

**toenails** 224:25

**told** 5:11 10:4,6 52:19 140:19,22 177:10 234:6 253:16

**tolerated** 75:20

**tomorrow** 31:24, 25

**tonight** 197:21

**tooth** 128:2,4 182:25 184:11

**top** 6:23 9:20 24:18 47:10 93:1 109:4 118:1 133:1 151:4 152:9 227:18

**topic** 36:11,13,23, 25 37:2,14 38:9, 15 39:3,5,17 100:18 215:9

**topics** 36:16 38:12

**topiramate** 116:3, 4,18 117:4,8 159:15

**trail** 7:3

**train** 36:7 95:14

**trained** 33:1,6 34:13 69:9,15 81:14 87:10

**training** 28:12 32:12,13,14 36:10,13,15,21,22 37:10,14,16,20,24 38:6,11 39:6,23 40:1,3,4 41:15

64:2 69:12 73:24 74:2,12,14,19 87:9,18 88:1,21 89:12,14 110:25 180:21 226:1,2, 15,20

**transcribed** 60:17

**transcript** 241:16 254:1,19 255:15

**transport** 96:24

**transported** 97:23

**treading** 56:25

**treat** 90:12 128:17 180:1

**treated** 222:20

**treatment** 120:9 122:10 124:18,24, 25 126:22 138:15 155:3 181:3 188:16,23

**treatments** 181:21 182:2,9,10

**trial** 63:11

**trigger** 214:7

**trips** 53:2,18

**trivial** 216:23 217:2,10,11,16,22 220:20

**trouble** 107:6 128:16 170:12 196:4 224:25

**troubled** 107:1

**Troy** 119:9

**true** 4:18 5:12 10:14 11:10 27:13 29:23 30:1 62:10 65:6 75:7 76:10 77:14 78:5,6 101:4 103:6 114:9,16,18

122:2,14,16 123:3,4 124:1,15, 18,19,21,22 126:16,19 127:7, 9,20 154:21 206:3,4,24 211:2 213:11 215:24 216:1,3 251:14 253:25 254:7

**truncated** 59:2,9

**truth** 4:6,7

**Tums** 71:10 119:10 120:4,20 143:1,16 144:1,2, 12,16,19 166:12, 18 172:8,11 173:15,17 215:8, 9,15

**turn** 98:14 241:24 242:7 243:11 244:18,20 249:12 252:4

**twelve** 148:22 199:3 201:21 202:19 203:25 204:1

**twenty** 10:9 11:18 19:24 20:5 32:10 136:10 163:2 248:15

**twenty-five** 18:3 50:20

**twenty-two** 108:6

**Two-and-a-half** 20:2

**twos** 248:18

**type** 9:19 22:10 55:5,10

**types** 250:17

**typically** 142:21



**U**

**Uh-huh** 109:23
118:2

**ultimately** 225:15

**UMIA** 46:8,11

**unable** 11:16
238:4

**unaware** 84:20,25
85:12 102:4

**uncaring** 202:25

**unclear** 12:19 13:7

**uncommon** 189:1,
6,8

**unconscious** 88:3

**underlying** 252:16

**understand** 5:1,3,
8 27:21 34:17
40:21 46:23,25
61:22 62:6 65:13
66:21 73:23 75:25
77:18 88:20 92:9
104:15 120:13
128:1 146:23
147:20 172:25
185:22 190:20
193:24 194:1,5
200:13 203:22
204:1 206:4 226:5
229:19 238:9
243:24 246:24
253:7

**understanding**
4:20 13:25 14:11
59:6 62:3 65:4
75:5 78:1 139:1
140:13 158:17
177:14 182:4
189:21 195:19
212:20 219:18
241:5 246:12,22
248:22 253:15

**understood** 45:14
82:9 138:25
253:20

**undetermined**
103:1

**unexpected**
209:15,19 210:22

**unexpectedly**
209:11 210:9,13

**unfair** 12:12

**uniform** 66:20

**unincarcerated**
63:20

**unique** 18:13,18
28:13

**unit** 195:21

**universe** 246:10,
13

**unlabored** 171:20

**unquote** 153:3
156:6 195:17
197:9 198:9 206:3
216:1

**unreasonable**
67:20

**untoward** 121:6
122:14,18 124:21

**unusual** 171:10
203:2,12,13,17

**upper** 228:25

**urgency** 83:25
84:5 161:10

**urgent** 98:10
100:1 142:25
144:4 161:10,22
190:8 203:6,10
218:7

**USA** 231:9

**usage** 140:3

**Utah** 46:8

---

**V**

**vague** 248:2

**valid** 78:15 202:16

**vary** 33:25 34:7

**veracity** 38:19

**verbal** 28:22 33:7,
21

**verbiage** 60:16

**verdict** 236:9

**verification** 108:1
244:4

**version** 232:20

**versus** 34:1,8
35:12 51:7 99:21
227:14 245:18
246:5

**video** 40:14

**videoconference**
255:17

**violate** 88:23

**violated** 48:5

**violation** 46:2 68:8
89:11

**virtue** 213:11,19
215:25

**visibly** 117:18

**visit** 23:14 26:17
83:16 116:15
184:20

**visits** 73:15
185:11

**vitae** 5:21,24
230:24

**vital** 97:25 98:5,20
100:25 120:3
139:7 142:23

143:23 144:1,20
164:12 167:4
171:15 174:13,18
175:5 195:6 203:8

**vitals** 99:22
105:14 108:3
125:11 139:3
141:25 152:5
154:13 162:20
167:25 171:7,11
173:20,22,25
174:3,9

**voice** 82:18 83:1
124:2 203:14

**vomiting** 141:7
168:16 169:11
172:21

---

**W**

**W-9** 15:25 16:1

**wait** 7:3 31:23
32:9 132:19

**waiting** 248:5

**waive** 255:15

**walk** 117:17

**walks** 71:9 218:8

**wanted** 55:14
88:18 229:6

**wanting** 214:15
229:14

**ways** 68:25
180:15,23 204:12

**weak** 170:13

**website** 239:23
240:16

**week** 6:7 19:21
214:20,22

**weeks** 26:16 95:22
169:18 173:5

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**weigh** 133:15

**Weil** 3:8 8:1,7,14
9:5 10:15,24
11:11,20 12:17
13:6 18:22,25
19:4,6,8 20:9
29:24 35:8,25
37:5,17 39:11
41:3 42:19 43:3
46:24 47:5 50:19,
25 53:3,12,20
54:13,18,22 55:3,
21 56:16,25 57:7,
16,24 58:4,7,22
59:9,11,21 60:12
61:10,11 62:11
63:14 66:13 67:1,
14,22 68:3,10,17
69:5,20 70:20
71:14 72:1,9 74:6,
17,25 76:4,11,25
77:13,15,19 78:7,
11,21 80:11 82:21
83:9 86:13,19
87:24 88:5 90:4,8
92:3,15 93:7,10,
14 96:25 99:9
108:16,22 109:3,
7,12,14,17 117:10
118:8,16 122:4
129:24 130:3,6,16
132:11,15,17,21
133:3,17,24
134:11,18 135:1,
15 141:13 143:18
144:14 146:10,12,
15 149:2 153:8
162:14 172:24
190:15 198:23
199:6,10,17
201:14 202:20
204:6 217:12
218:1 221:10
229:25 231:20
234:10,18 238:8
241:9,17,19,23
242:5,20 243:7,23

244:1,2 247:7,16,
25 248:4,7,9
250:10,20 251:4,
10 252:20 253:1,
16 254:12 255:1,2

**Weil's** 56:23,24
57:21 76:9 77:10
118:24 119:3
130:12 131:18,24
132:1,14

**well-developed**
218:16

**wellness** 105:12

**Wellpath** 85:2

**Wexford** 52:22,23,
24,25

**whining** 236:2

**wife** 233:3

**Windows** 60:7

**Wisconsin** 70:18
71:2,19,22

**withdrawal** 29:11
125:21 126:3,4,6,
18 181:4,22
182:2,10,12,15

**witnesses** 11:18
51:16

**word** 64:17 151:18
171:19

**worded** 241:6

**words** 203:5
219:14

**work** 9:18,19 15:7
20:13,23 22:23
23:1 30:12,13
35:3 43:18 47:8
55:10,12 148:12
149:1,13 154:11
187:24 190:7
214:15

**worked** 115:8
144:3

**working** 13:18
17:1,2,4 19:17
227:23

**works** 59:25 60:5
208:13

**workup** 98:15,16
100:2 116:6
119:11,17,21,23
134:15,23 143:2
144:4 158:25
159:2

**world** 189:5

**worse** 101:25
164:25 169:23
178:4

**worsen** 169:15
170:2

**worsening** 177:11

**wrap** 130:2 136:5
220:7

**write** 56:5,6,7 64:8

**writing** 23:24
24:12 227:14,16

**written** 5:17 24:10,
17 40:16,19 52:11
59:14 75:6,8,11,
21,23 76:1 83:22,
24 128:24 129:19
181:24 229:20

**wrong** 37:10 39:7
68:22 75:10 88:25
89:13,15 118:15
121:24 162:16
170:19 183:9,10
202:23

**wrote** 95:19 96:8
103:8 110:2,19
188:17,19

**X**

**X-RAYED** 251:8

**Xiong** 92:17,22,23
93:1 94:3,11,21
95:16,20 96:17
97:22 101:10,13
108:21 137:12,22
139:21 141:2
144:23 208:22,24
209:1,7 210:2,7
212:19

**Xiong's** 94:23
211:20

**Y**

**year** 15:8 45:17
47:12 77:23 110:9
150:16 152:17,22
179:6 230:15
235:7,12,19
246:15,19,25
249:3

**year's** 236:22,24
239:16 240:5,9

**years** 6:8,13 16:8
17:20 20:2 23:23
24:25 25:3 26:12
32:20 39:24 44:12
49:19 51:23 201:8
202:18 204:5
235:4 246:8,20,23

**yell** 33:15

**yesterday** 8:1
252:9

**young** 247:13

**younger** 247:10

**Yup** 125:24 176:12
181:13 183:16

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



## Z

**Zoom**  7:23 8:4,6,
12

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                              California Firm Registration #179

LEXITAS