UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN

----------------------------------------------------------

GREGORY BOYER, as Administrator of the
Estate of Christine Boyer, and on his own behalf,

        Plaintiff,

          vs.           Lead Case No. 20-CV-1123

ADVANCED CORRECTIONAL
HEALTHCARE, INC., et al.,

        Defendants.

----------------------------------------------------------

GREGORY BOYER, as Administrator of the
Estate of Christine Boyer, and on his own behalf,

        Plaintiff,

          vs.          Case No. 22-CV-723

USA MEDICAL & PSYCHOLOGICAL
STAFFING, et al.,

        Defendants.

----------------------------------------------------------

ZOOM Deposition of BRUCE CHARASH, M.D.

Tuesday, January 28th, 2025

10:04 a.m. - 1:05 p.m.


appearing remotely from New York City, New York




Job No. 180758
Stenographically Reported by Rosanne E. Pezze, RPR/CRR
Certified Realtime Reporter

Page 2

1        Remote ZOOM Deposition of BRUCE CHARASH,
2  M.D., a witness in the above-entitled action,
3  taken at the instance of the Defendants, pursuant
4  to the Federal Rules of Civil Procedure, pursuant
5  to Notice, before Rosanne E. Pezze, RPR/CRR,
6  Certified Realtime Reporter and Notary Public,
7  State of Wisconsin, appearing remotely from New
8  York City, New York, on the 28th day of January,
9  2025, commencing at 10:04 a.m. and concluding at
10  1:05 p.m.
11
12  A P P E A R A N C E S :
13       LOEVY & LOEVY, by
          Ms. Maria Makar
14        311 North Aberdeen Street, 3rd Floor
          Chicago, Illinois 60607
15        312-243-5900
          makar@loevy.com
16        Appeared via Zoom on behalf of Plaintiffs.
17       LEIB KNOTT GAYNOR, LLC, by
          Mr. Douglas Knott
18        219 North Milwaukee Avenue, Suite 710
          Milwaukee, Wisconsin 53202
19        414-276-2108
          dknott@lkglaw.net
20        Appeared via Zoom on behalf of Defendants
          ACH, Lisa Pisney and Amber Fennigkoh.
21
22
23
24
25

Page 3

1  A P P E A R A N C E S (continued):
2       GERAGHTY, O'LOUGHLIN & KENNEY, P.A., by
          Mr. John B. Casserly
3        30 East 7th Street, Suite 2750
          St. Paul, Minnesota 55101-1812
4        651-291-1177
          jcasserly@goklawfirm.com
5        Appeared via Zoom on behalf of Defendants
          USA Medical & Psychological Staffing,
6        Jillian Bresnahan, Norman Johnson, Travis
          Schamber and Wesley Harmston.
7
       HANSEN REYNOLDS, LLC, by
8        Mr. Andrew A. Jones
          301 North Broadway Street, Suite 400
9        Milwaukee, Wisconsin 53202
          414-455-7676
10
       Appeared via Zoom on behalf of Defendants
11        Monroe County Sheriff's Office, Stan
          Hendrickson, Danielle Warren and Shasta
12        Parker.
13       ALSO PRESENT: Ms. Alecia Richards, Intern
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            I N D E X
2  EXAMINATION                  PAGE
3  By Mr. Knott. . . . . . . . . . . . 5, 108
4  By Mr. Jones. . . . . . . . . . . . 84
5  By Mr. Casserly. . . . . . . . . . .107
6
7
8
9           E X H I B I T S
10  EXHIBIT NO.            PAGE NUMBER
11  Exhibit 117  Curriculum Vitae. . . . . . .10
12  Exhibit 118  Bruce Charash, MD invoices. . . . 10
13  Exhibit 119  Deposition List of Bruce Charash, MD. 10
14  Exhibit 120  Trial List of Bruce Charash, MD. . .10
15  Exhibit 121  Gundersen ED Provider Notes
           (Bates GHS 1339). . . . . . 54
16
    Exhibit 122  Heart monitor strip (Bates GHS 1559). 55
17
18  (Original exhibits attached to Original transcript;
          copies of exhibits are attached.)
19
20
21
22        R E Q U E S T S
23
24       (None.)
25

Page 5

1       TRANSCRIPT OF PROCEEDINGS
2       BRUCE CHARASH, M.D., having been first
3  duly sworn remotely on oath, was examined and
4  testified as follows:
5       E X A M I N A T I O N
6  BY MR. KNOTT:
7  Q   Sir, could you please state your full name for the
8     record.
9  A   Bruce Charash, C-H-A-R-A-S-H.
10  Q   And you are a medical doctor?
11  A   Yes.
12  Q   And what is your area of specialty?
13  A   Cardiology and internal medicine.
14  Q   And are you at your home today, Dr. Charash?
15  A   Yes.  Pardon me.  Yes.
16  Q   You've given depositions before?
17  A   Yes.
18  Q   You understand that I'm trying to find out what
19     opinions you may have to offer in this matter if
20     it were to go to trial?
21  A   Yes.
22  Q   And that I am questioning you based on a report
23     that we were given dated February 2, 2024.
24        Is that a report that you prepared?
25  A   Yes, it is.

Bruce Charash, M.D.                                                    January 28, 2025

---

Page 6

1   Q   And are those your final opinions in the matter?
2   A   Yes, other than perhaps addressing any new defense
3       opinions if they're revealed that I haven't --
4       that have not yet been disclosed.  But in terms of
5       my opinion in the case, yes, it's all there.
6   Q   Okay.  Let's go back.
7           Your curriculum vitae discloses an
8       address on 63rd Street.  Is that your home or
9       professional address?
10  A   Both.
11  Q   So your home is your professional address?
12  A   Yes.
13  Q   You've given depositions in the past?  I think I
14      asked you that, right?
15  A   Correct.
16  Q   And approximately how many depositions have you
17      given, Doctor?
18  A   Well, I've been involved in these types of
19      litigations for 38 years, since 1987, and I've
20      probably been deposed 360-plus times in those same
21      years.
22  Q   360.  Do you have some kind of count, or is that
23      an estimate based on a certain number per year?
24  A   Well, it's an estimate based on -- it's an
25      estimate I've kept over the years, not a count.

Page 7

1       I'd say I average maybe 10 a year to 11 a year, so
2       maybe it's 370.  I don't know the exact number.
3       You know, in the first few years I did very few
4       testimony.
5   Q   Did you testify in the past that you've given more
6       than 900 depositions?
7   A   No.  I have testified multiple times that I have,
8       A, reviewed around 1,000 to 1,100 cases in 38
9       years, or back then 37 years.
10          Then I've also testified that I
11      have appeared in court on average seven times a
12      year in trial for 38 years, and have appeared in
13      deposition around 10 to 11 times a year.
14          Then I've testified, and people
15      have asked me if I add my depositions and trials,
16      does that reach a number like 6- or 700, and I
17      said yeah, if you add up all the trials and
18      depositions, even though there's overlap.  But
19      I've never done 900 depositions and I've never
20      testified to that.  If so, it's transcribed wrong,
21      because it's clear I'm very consistent in my
22      replies.
23  Q   Okay.  So have you ruled -- reviewed anything
24      since the time of your report from February of
25      2024?

Page 8

1   A   With regard to Christine Boyer and the case
2       involving her?
3   Q   Of course.
4   A   Yes, I reviewed the defense reports, multiple
5       defense reports.
6   Q   And can you tell me the names of the expert
7       reports that you've reviewed so that we know.
8       There's --
9   A   I'd have to look it up.  One was John Wolff,
10      Dr. Wolff.  I don't remember his first name.
11      Sorry.  Dr. Wolff.  I reviewed the report of
12      Kimberly Pearson, who's a nurse, I believe.
13      Dr. Murray Young, a New York doctor.  Matthew
14      Wolff is his name.  Sorry.  Matthew Wolff.  I
15      think there was another report, but I'm not sure.
16      Let me look.  I'm going to have to look it up, but
17      those for sure.
18  Q   Okay.  Do you have Dr. Wolff's report in front of
19      you, sir?
20  A   I do.
21  Q   And you have Ms. Pearson and Dr. Young's reports
22      in front of you as well?
23  A   I do not.
24  Q   Did you make any notes or do any highlighting of
25      Dr. Wolff's report?

Page 9

1   A   No.
2   Q   You met with Ms. Makar before the deposition?
3   A   Yesterday we had a video chat.
4   Q   Can you tell me approximately how long that chat
5       was?
6   A   Less than an hour, but probably close to an hour.
7   Q   Were there any other people on the chat?
8   A   No.
9   Q   Did you ask to see anything during the chat?
10  A   No.
11  Q   Were you shown anything during the chat?
12  A   No.
13  Q   You reviewed the duces tecum request for documents
14      that was sent to you for the deposition today?
15  A   Yes.
16  Q   And one of the things that it asked for is whether
17      you have any notes from your work on the matter.
18          Do you have any notes?
19  A   No, I don't.  My report are my notes.
20  Q   You have no notes other than the final report?
21  A   Correct.
22  Q   Dr. Charash, when you were preparing your report,
23      did you look up or reference any literature in
24      order to confirm your opinions?
25  A   No.

3  (Pages 6 to 9)

Bruce Charash, M.D.                                                January 28, 2025

Page 10

1    Q    And do you review a case, when you review cases,
2         do you review them via PDF, or do you review them
3         on paper?
4    A    PDF.
5    Q    And does your process include selecting documents
6         and putting them in a separate file if they're
7         particularly important or highlighting them?
8    A    No.
9    Q    Do you keep a separate note where you would write
10        down Bates numbers that are particularly
11        important?
12   A    No.
13   Q    So I'm going to mark your curriculum vitae as
14        Exhibit 117. I'll mark, when we take a break,
15        I'll mark your -- the invoices that we were
16        provided as 118, your deposition list 119, your
17        trial testimony 120.
18             So we were provided a list of your
19        testimony, two lists of your testimony in response
20        to the duces tecum or in your disclosure.
21             Do you maintain a list of the cases
22        in which you've testified?
23   A    I just keep a list of the last four years.
24   Q    And do you have the list that was provided in this
25        case?

Page 11

1    A    Yes. I don't have it printed, but it's in my -- I
2         can access it.
3    Q    Let me see if I can access it.
4    A    What happened?
5    Q    So I'm --
6    A    Oh, okay. Good.
7    Q    -- I'm sharing with you what's been marked as
8         Exhibit 119. It's a deposition list.
9             Was this the list that you
10        referenced of your deposition testimony?
11   A    Yes.
12   Q    And it doesn't include any testimony in 2021. Did
13        you testify at all in 2021?
14   A    Virtually no. It was COVID. I have one
15        deposition in January and that was it.
16   Q    Okay. So I counted, and you testified 17 times in
17        2022. You didn't testify at all in 2021 --
18   A    Correct.
19   Q    -- except for that one case during COVID?
20   A    Yeah, I don't think there was any more than that.
21        I'm not sure.
22   Q    Have you ever reviewed a case involving plaintiffs
23        or defendants in the state of Wisconsin?
24   A    Not that I'm aware of, no.
25   Q    Have you ever been retained by the Loevy firm, if

Page 12

1         you know?
2    A    Other than this matter, I don't remember. There's
3         maybe one other, but I'm not sure, actually.
4    Q    What is -- what clicks in your mind that you think
5         you may have been retained in one other?
6    A    I'm not sure. For me, I have a very powerful
7         passive memory in the sense that, for example, you
8         could read me these case names; I won't remember
9         anything about them, even if it was a month ago.
10        But if I'm given a small trigger of information,
11        I'll remember every detail of the case.
12             So the name, the Loevy firm's name
13        is familiar to me, and I'm not sure if it's just
14        because of this case I've been involved with, or
15        one other. But if I was given a small piece of
16        information, I would actively remember. So I
17        don't know.
18   Q    Well, your list includes a single word under the
19        case name. Is that the plaintiff or the
20        defendant, or do you know?
21   A    Always the plaintiff. It's always by plaintiff,
22        because I figure that's the easiest way to track
23        it down.
24   Q    Have you ever testified in federal court, sir?
25   A    A long, long time ago.

Page 13

1    Q    How long?
2    A    Five, ten years, I think. I'm not sure. I don't
3         really remember exactly when.
4    Q    So we can --
5    A    I think -- this is probably my only case with the
6         Loevy firm, but I'm not 100 percent sure.
7    Q    So we can assume that any testimony on this list
8         is in state court; is that correct?
9             MS. MAKAR: Objection. Form.
10   A    These would not be federal cases.
11   BY MR. KNOTT:
12   Q    And are the -- there's a single word for the most
13        part under the column "Lawyer." Is that the
14        individual lawyer that you worked with on the
15        case, or is it a firm?
16   A    It's the lead name of the letterhead of the firm.
17   Q    It looks like you've worked with two lawyers in
18        Illinois, Taxman and Loggins. There's one more.
19        Meyer Kiss, I guess.
20             Do you know what -- do you have a
21        recollection of any matters in which you testified
22        for the Loggins firm or Ms. Loggins or
23        Mr. Loggins?
24   A    I won't remember any details. I need something to
25        trigger that memory.

4 (Pages 10 to 13)

Bruce Charash, M.D.                                                                    January 28, 2025

Page 14

1  Q   As you look at this list, do you think that any of
2      these cases involved congestive heart failure?  Do
3      you have any --
4  A   **If you're saying generically, congestive heart**
5      **failure may have been a role in a number of cases.**
6      **I don't know if they did.  But, you know, I**
7      **wouldn't characterize this case as simple heart**
8      **failure.  But that said, I may have.  But I don't**
9      **think I've ever had a case, at least in recent**
10     **memory, that's similar to this case.  But I don't**
11     **know.**
12         **Are we waiting on something?  I'm**
13     **confused.**
14 Q   Yeah, I said bear with me, please.  I'm trying
15     to --
16 A   **Oh, sorry.  I couldn't hear that.  Remember, with**
17     **this cold, if I -- I'm not 100 percent sure I**
18     **didn't miss anything.**
19 Q   And I'm putting on the screen now Exhibit 120,
20     which is a list of trial testimony that we were
21     provided.
22         Do you recognize that?
23 A   I do.
24 Q   And these are the matters in which you went to
25     court and actually testified in a case?

Page 15

1  A   **Yes.**
2  Q   And it looks like you testified in the last four
3      years in a single matter in the state of Illinois;
4      is that correct?
5  A   **Yes.**
6  Q   Do you remember where that was?
7  A   **No.**
8  Q   And did you go to court at any time before October
9      of 2021 --
10 A   **No.**
11 Q   -- in the calendar year 2021?
12 A   **No.  That was -- again, I don't think so.  That's**
13     **at the tail end of COVID, but I'm not sure.**
14 Q   I read in previous testimony that you believed
15     that you had testified in matters pending in about
16     40 states.  Is that accurate?
17 A   **No.  I reviewed cases from lawyers in**
18     **approximately 40 states.  I've only testified in**
19     **maybe 15 of them, between depo and trial, and**
20     **probably only eight or nine in trial.  Most of the**
21     **cases are on the northeast, from the east coast.**
22     **East coast.  But I've not testified in most of**
23     **those states.**
24 Q   So it's accurate to say that you've -- you
25     reviewed matters from lawyers based in

Page 16

1      approximately 40 states; is that correct?
2  A   **Yes.**
3  Q   And, Doctor, do you continue to see patients at
4      this time?
5  A   **Yes.**
6  Q   And tell me about your current professional
7      responsibilities.
8  A   **Well, I see patients.  I'm the cardiologist for**
9      **half my practice.  For 25 percent they came to me**
10     **for cardiology but then asked if I would also be**
11     **their primary care doctor in addition to**
12     **cardiology.  And then another 25 percent came to**
13     **me just for primary care, but over time, at least**
14     **half of them have developed some form of cardiac**
15     **issue or concern.**
16         **I'm a noninvasive cardiologist.  I**
17     **do echocardiograms.  I used to do stress testing**
18     **in my office.  No more.  But I do echocardiograms**
19     **and physical exams.  I'm an attending at Lenox**
20     **Hill Hospital in New York.  And that's my**
21     **practice.  9:00 to 5:00 office hours.  About**
22     **85 percent of my time is in the office and about**
23     **15, 10 to 15 percent of the time is in the**
24     **hospital.**
25 Q   And do you have any employees in your practice

Page 17

1      other than yourself?
2  A   **No, not anymore.**
3  Q   And you have privileges at Lenox Hill?
4  A   **Yes.**
5  Q   You're not listed on the Lenox Hill website.
6  A   **Correct.**
7  Q   Do you have an understanding why not?
8  A   **It's voluntary, and I'm not looking to expand my**
9      **practice.  That's where people can find doctors.**
10     **It's only there to give people access to**
11     **practices, their information, match the insurance.**
12     **But I'm not open to new patients unless it's a**
13     **case by case through referral, but I'm not letting**
14     **my name be out in the public anymore.**
15 Q   Are most of the physicians at Lenox Hill employed
16     by a single entity?
17 A   **No.  The overwhelming majority are private**
18     **practice, and they're affiliated at Lenox Hill.**
19     **But there is a -- they have hospitalists now.**
20     **Things have changed.  So they have hospitalists in**
21     **the hospital.  But most cardiologists, most**
22     **primary care doctors don't get -- don't get paid**
23     **by the hospital or any medical school.**
24 Q   And can you tell me how many patients you see a
25     week on average?

                                          5  (Pages 14 to 17)

Bruce Charash, M.D.                                                January 28, 2025

Page 18

1   A   A week on average. Between 40 and 60.
2   Q   And do you -- I know that it's a big commitment to
3       be on the list of providers for health insurers.
4       Are you authorized to provide services and bill to
5       any health insurance companies?
6           MS. MAKAR: Objection. Form.
7   A   No, I am not.
8   BY MR. KNOTT:
9   Q   So all of your patients are private pay?
10  A   Well, half are. Half my patients pay me an annual
11      fee based on how much they're going to need me.
12      People call it concierge practice. But the other
13      half of my patients are military, Medicare, other
14      people who I don't charge at all. The wealthier
15      half of my practice pays for the other half of my
16      practice, and everyone gets my cell phone number
17      and everyone can contact me when they need to.
18      And I do house calls for everyone.
19  Q   I'm sorry that I'm wading into something I don't
20      understand very well, but do you bill Medicare?
21  A   No. My patients pay a flat fee to have me look
22      after them.
23  Q   Okay. So you're saying that half your patients,
24      and I know it's approximate, are private pay and
25      that their compensation to you covers the rest of

Page 19

1       the patients that you provide services to?
2   A   Correct.
3   Q   I want to go back to your testimonial history just
4       for a second here.
5           Doctor, among the cases in which
6       you testified at trial, do you know the
7       approximate percentage where you were retained by
8       the plaintiff?
9   A   I do. Of cases in which I've been retained,
10      85 percent have been for plaintiff cases and
11      15 percent for defense. But when it comes to
12      testifying, about 95 to 96 percent are for
13      plaintiff and 4 to 5 percent are for defense.
14  Q   Do you have any idea why that might be, Doctor,
15      that that's sort of tilted that way?
16          MS. MAKAR: Objection. Form.
17  A   I absolutely do have an idea why. 15 percent of
18      my cases come from defense firms. Now, I reject a
19      lot of plaintiff's cases just on a phone call
20      saying -- if someone said a patient had a stroke
21      during a catheterization, and I tell them that's a
22      normal -- a well-known side effect, I won't review
23      the case. If I don't think there's anything
24      there, I'm not going to waste anyone's time or
25      money.

Page 20

1           But defense lawyers have no choice
2       but to analyze their case, whether they can defend
3       a doctor legitimately or not.
4           So about 15 percent of the defense
5       cases that I review, I find that I cannot easily
6       defend the doctor, but the defense lawyers still
7       want me to review it and have me at least kind of
8       mitigate the damages or whatever can be done.
9       Those cases I'm never going to testify in. So
10      15 percent of my cases are defense cases.
11      About -- only 7 percent of them absolute -- of all
12      my cases, I'm willing to testify on the defense.
13      And of those, about half resolve before I'm even
14      asked to testify, whereas, very few plaintiff
15      cases resolve that way. That's why it's a much
16      smaller percentage of testifying in defense cases.
17  BY MR. KNOTT:
18  Q   Doctor, I put your trial list back up on the
19      screen, the list of your trial testimony in the
20      last four years.
21          And I'll scroll through it so you
22      can see it all. But do any of those stand out as
23      a case in which you testified for a defendant at
24      trial?
25  A   Actually, the first one on the list, Rakhit, I

Page 21

1       was -- was a doctor I was defending. But the rest
2       I'm unsure. It just stood out because it was a
3       lawyer named Margolis and I know he was defending
4       them. But I wouldn't be able to tell you which
5       other ones were defense.
6   Q   Do you know Margolis' first name?
7   A   Not anymore. I could probably dig it out, but I
8       don't remember it.
9   Q   Bear with me. And I put up on the screen once
10      again your deposition testimony list, which is
11      Exhibit 119.
12          Looking at that, do you recognize
13      any of those cases as being a case in which you
14      testified on behalf of the defendant?
15  A   There's too many. I don't know. I mean, I would
16      have to try and dig out -- I don't remember, so I
17      don't know.
18  Q   Okay. I'm scrolling through them, and your answer
19      is you don't know?
20  A   Correct.
21          MS. MAKAR: Objection.
22  A   I just don't know.
23  BY MR. KNOTT:
24  Q   Fair enough.
25          Doctor, do you know if you've ever

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                California Firm Registration #179

Bruce Charash, M.D.                                    January 28, 2025

---

Page 22

1    testified in a matter involving a detainee in a
2    jail or prison?
3    A   I have.  I have a number of them in New York
4        State.  I've probably testified in deposition in
5        about three or four cases, but I don't think I've
6        ever been called to court, at least not as of now,
7        except for this case.
8    Q   And in the three or four cases that you were asked
9        to review, at least, were all of those in the
10       state of New York?
11   A   Yes, I believe so.
12   Q   And do you know if those involved claims that
13       civil rights were infringed upon?
14   A   I believe some of them at least were, yes.
15   Q   And were you instructed or do you feel
16       knowledgeable of the Constitutional standard by
17       which a healthcare provider is judged in a civil
18       rights case?
19   A   No.  I had nothing to do with that aspect of the
20       case, determining civil rights violations.  I only
21       talked about the medicine.
22   Q   And my understanding is that you'll be called to
23       testify in this matter as to issues of causation
24       only; is that fair?
25           MS. MAKAR:  Objection.  Form.

---

Page 23

1    A   Yes.  My opinions in my report were all causation
2        opinions, and I have no intention of testifying
3        about standard of care.
4    BY MR. KNOTT:
5    Q   And I appreciate that answer, and I appreciate
6        that you understand the difference between
7        standard of care and causation, but let me just
8        ask these questions briefly and we'll get through
9        this.
10           You've never practiced in a
11       correctional facility, correct?
12   A   Correct.
13   Q   You've never held a contract to provide healthcare
14       services at a correctional facility, correct?
15   A   Correct.
16   Q   You're not trained as a nurse or a nurse
17       practitioner, correct?
18   A   Correct.
19   Q   And is it fair to say you don't have any opinions
20       on the care provided to -- strike that.
21           You don't have any opinions on the
22       adequacy of county or Advanced Correctional
23       Healthcare policies and procedures, correct?
24           MS. MAKAR:  Objection to form.
25   A   I will not be commenting on those things.

---

Page 24

1    BY MR. KNOTT:
2    Q   And, Doctor, you may have noted from your review
3        of Dr. Young's report that there are several other
4        inmates whose care has been put at issue in this
5        case.
6            Is it fair to say that you don't
7        have any opinion about the care provided by
8        Advanced Correctional or Monroe County Jail to
9        detainees other than Christine Boyer?
10   A   Correct.
11           MS. MAKAR:  Objection.  Form.
12   A   Yes, I have no opinions.
13   BY MR. KNOTT:
14   Q   Doctor, do you know whether your current earnings
15       in medical-legal cases exceed those earnings in
16       your professional practice?
17   A   They do not.  My earnings medical-legally have run
18       averaging 15 to 20 percent.  There were a handful
19       of years in the early 2000s where it was up to
20       25 percent, but it's averaging around 20 percent
21       of my income.
22   Q   Thank you.
23           Doctor, I'm trying to find a
24       document and I keep making the same mistake every
25       time I do this, so I apologize.

---

Page 25

1    A   By the way, I'm sorry, Mr. Knott.  This wasn't
2        clear when we started this deposition, but who is
3        your client in this case?
4    Q   I apologize.  I should have introduced myself.
5        Yeah, I represent Nurse Practitioner Pisney, Nurse
6        Fennigkoh, and Advanced Correctional Healthcare,
7        which is a private correctional healthcare
8        provider.
9    A   Okay.  Thank you.  Just wasn't sure.
10   Q   Okay.  You're welcome.
11           And, sir, I put up on the screen
12       your curriculum vitae, which was marked as
13       Exhibit 117.  Any significant changes or updates
14       to this in the last couple of years?  I guess
15       you've been involved in the case since 2022.
16       Maybe it could be that old.
17   A   Can you just scroll a little further down?  Keep
18       going.  No, this is updated.  This is -- it's
19       current.  Nothing's changed in the last couple of
20       years.
21   Q   Okay.  You currently don't have any academic
22       appointments, correct?
23   A   That I'm aware of.  That's the weird part.  Lenox
24       Hill joined a giant network called Northwell,
25       which is now the biggest medical entity in New

---

7 (Pages 22 to 25)

Bruce Charash, M.D.                                                    January 28, 2025

Page 26

1  York State, and they became affiliated with a new
2  medical school on Long Island named Hofstra.
3  Pretty much anyone who's a voluntary doctor at a
4  hospital is given the minimum credential of
5  clinical assistant professor of medicine.
6      But I've never heard back from
7  them, and it's been kind of weird, so I'm trying
8  to find out.  But I can't name -- I can't
9  guarantee I have it.  I teach medical students
10  regularly from Hofstra, and I give lectures to all
11  the doctors in training at Lenox Hill, but I'm not
12  100 percent sure if my title is formalized.  I
13  don't know.
14  Q  You are not assigned to represent any residents at
15     this time.  Fair?
16  A  No private doctor is assigned residents, no.
17  Q  In what context do you supervise residents, sir?
18  A  There are a few.  The first is, every time I go to
19     the hospital and I see one of my patients, I pull
20     together the clinical team which involves medical
21     students, interns, residents and sometimes
22     cardiology fellows.  And I not only go over the
23     instructions for my patient, but I actually go
24     over the medicine and teach them things on
25     physical exam or on clinical and academic interest

Page 27

1  of the case.
2      Secondly, about three times a year
3  I give big lectures to everyone on staff, all the
4  doctors in training from students to fellows, on
5  acute coronary issues like chest pain in the ER.
6  I used to run the cardiac arrest team, so I give a
7  lecture about new advances in cardiac arrest.  And
8  then a couple of -- several times a year I will be
9  called spontaneously by the residents the night
10  before to come in the next day at 6:00 to have a
11  conference with the residents who are on call the
12  night before, called resident report, where they
13  bring up what they think is the more challenging
14  admissions they want to discuss.
15      And finally, one month out of every
16  two years, because there's so many of us, I'm the
17  cardiology consult attending for the month where I
18  go over the service patients with the clinical
19  care team doctors in training.  So those are the
20  different venues by which I teach.
21  Q  Okay.  You have no affiliation with this Northwell
22     entity, correct?
23  A  With what?
24  Q  You have no affiliation with the Northwell entity?
25  A  No, no.  I'm affiliated with Northwell because I'm

Page 28

1  at Lenox Hill.  It's whether I have an affiliation
2  with Hofstra Medical School.  The academic
3  appointment would be Hofstra.  Lenox Hill is
4  Northwell.
5  Q  Okay.  Got it.  So you're on some sort of coverage
6     schedule at Lenox Hill; is that fair?
7  A  No.  I don't know what you mean by that.
8  Q  Well --
9  A  I don't --
10  Q  -- you don't cover -- then let me try to clarify.
11      You do not see patients at Lenox
12  Hill other than your own, the patients that you
13  admit; is that correct?
14  A  Yes, other than if I'm the consult attending,
15     which comes once every couple of years.  But yes,
16     I only see my patients.
17  Q  Okay.  And that was my question.  Something comes
18     up once every couple of years.  What is that?
19  A  It's the rotation for who's the cardiology
20     attending of the month for what's called the
21     cardiology consult service for patients who don't
22     have private doctors that rely on the consult
23     service.
24  Q  So once every couple of years you provide coverage
25     on call for Lenox Hill?

Page 29

1  A  No, it's -- the consult service is for patients
2     who don't have private doctors, and there's a
3     fellow and residents covering them, on call
4     covering them at night.
5  Q  How is what you're saying different than what I'm
6     saying?  I don't understand.
7  A  Well, it's not like I'm on call in general for the
8     hospital.  I'm just seeing what we call the
9     consult service.  I don't know how else to clarify
10     that.  I'm really sorry.  I'm not getting where
11     we're not communicating.  I apologize.
12  Q  Yeah.  Well, I wouldn't expect that any physician
13     would be generally on call for all issues.  But --
14     so you are on a call rotation for the cardiology
15     services at Lenox Hill; is that fair?
16      MS. MAKAR:  Objection.  Form.
17  A  I wouldn't phrase it that way.  Because there are
18     a lot of cardiologists, I get told that on a given
19     month I will be the consult attending.  Usually
20     every year, but there are too many cardiologists,
21     so we all rotate.  So I will say -- you know,
22     April 2026 I'll be the consult attending.
23      I don't know what -- what you're
24     saying doesn't seem to register the same to me,
25     but I think I'm being very clear about what that

888-893-3767     Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                    California Firm Registration #179

Page 30

1    is.
2    BY MR. KNOTT:
3    Q   And when you're on that service, do you see
4        patients in the ER?
5    A   Sometimes, but sometimes -- I see my patients in
6        the ER.  The consult service usually gets called
7        after the emergency room, but sometimes they're
8        called through the emergency room.  It's not very
9        common, but it can happen.
10   Q   And when was the last time you provided a lecture
11       in an academic setting?
12   A   Academic setting.  Well, again, these are lecture
13       hall, you know, resident lectures.  I think it was
14       last June.
15   Q   So is that June of 2024?
16   A   Yes, June of 2024.  I haven't given a lecture this
17       year yet.
18   Q   And do you prepare slides for your discussions?
19   A   No, I actually don't.  I like to use a whiteboard
20       to keep them engaged, and then it's mostly
21       didactics.
22   Q   And in that context, what was your -- how did you
23       get connected to provide that lecture?
24   A   Well, for 20 years I was the chief of the cardiac
25       care unit at Lenox Hill and I started giving those

Page 31

1        lectures when I was chief of the unit.  I was
2        chief -- well, less than 20 years, from 1991 to
3        2006.
4               Then when I went into private
5        practice, they still had me come in and give talks
6        to the residents about coronary management.  I was
7        also the director of the Chest Pain Center in the
8        emergency room, and I was the chief of the Cardiac
9        Arrest Team for the hospital.  So I had areas of
10       interest and I'd give talks.
11   Q   Yeah, and I apologize, I'm trying to find my way
12       through here.
13              But the people that you spoke to
14       are residents; they are not medical students of
15       Hofstra?
16   A   No, they are.  They include medical students at
17       Hofstra that are rotating at Lenox Hill.
18   Q   All right.  So this Doc2Dock, is that still
19       active?
20   A   Yes, but I turned over day-to-day operations to a
21       partner organization, because maintaining a
22       warehouse in New York was becoming too expensive.
23       But my infrastructure and the methodology still is
24       running.
25   Q   Does it have a website?

Page 32

1    A   Yes.
2    Q   What is it?
3    A   Doc2Dock.com.  Dot org, I mean.
4    Q   So it's the -- the organization name that I've
5        highlighted there on the screen, which is capital
6        D-O-C, number 2, capital D-O-C-K --
7    A   Dot org.
8    Q   Dot org?
9    A   Yes.
10   Q   Your CV includes some publications and abstracts.
11              Are there any publications that you
12       consider relevant to this matter?
13   A   I haven't published in over 30 years, and none of
14       them are relevant.
15   Q   And you published a book called "Heart Myths."
16       What was the -- what was your angle there, Doctor?
17       What were the heart myths?
18   A   That there are a lot of -- that when we digest
19       publicly health advice, we're often given an
20       overgeneralized view and sometimes gloss over
21       data.  For example, I considered it a myth that
22       salt is bad for everyone.  There are certain
23       people with hypertension that will get worse if
24       they avoid salt; that's 20 percent of them.  Or
25       that a leaky valve means something's leaking in

Page 33

1        your heart.
2               So some of it's a bunch of
3        misunderstandings, but in the book I explain how
4        the heart works and how pathology occurs, and I
5        explore misconceptions people have.
6    Q   You state in your report that you reviewed CCTV
7        footage from December 23, 2019.
8               Have you reviewed that recently?
9    A   I had reviewed it early when I got the case, but I
10       have not relooked at it in a long time.
11   Q   As you sit here today, is there any -- do you have
12       any recollection of the video and anything that
13       would be pertinent?  Can you identify anything
14       that would be pertinent from that video to your
15       opinions?
16   A   No.  Just what's in my report, the timeline of
17       events.
18   Q   You describe in your report at Page 3 what you saw
19       on the video as "what appeared to be a seizure."
20              Is there anything about the manner
21       in which Ms. Boyer collapsed that tells you --
22       that gives you clinical information?
23   A   No.  Just that she had a seizure, which Dr. Wolff
24       and I appear to agree that it was a seizure from
25       oxygen deprivation to her brain from some sort of

9  (Pages 30 to 33)

Bruce Charash, M.D.                                    January 28, 2025

Page 34

1    arrhythmia.
2  Q   Do you agree that in that video footage that prior
3      to the seizure she does not appear to be
4      experiencing any distress or discomfort?
5          MS. MAKAR:  Objection.  Form.
6      Foundation.
7  A   Well, there's no way to know if she's in distress
8      or discomfort.  She was not showing outward
9      indicators of duress, but that doesn't mean she
10     wasn't in pain.  Lots of people have pain and
11     don't show it.  So I wouldn't draw too much of a
12     conclusion other than she was not in apparent
13     acute distress.  But it doesn't mean she wasn't in
14     pain or in any form of -- it doesn't mean she was
15     comfortable breathing; it just means she didn't
16     look acutely distressed.
17  BY MR. KNOTT:
18  Q   Have you accepted as true the correctional
19     officer's testimony that she had a single report
20     of chest pain around 7:30 p.m.?
21  A   Well, first of all, if you look at the note, it's
22     not a single episode.  It says here that her chest
23     pain has been on and off all day long, so that is
24     no longer a single episode.
25          What we don't know is, which you

Page 35

1      have purported, when did it go away completely.
2      If it was episodic, it means it reoccurs.  So she
3      could go for any period of time, in theory, and
4      have no pain and then it could reoccur again.  So
5      she reported an episodic recurrent phenomenon that
6      was occurring all day long.  It was not one
7      episode that went away.  It was a recurrent
8      episode.  And we don't know, there was no specific
9      history taken of her symptoms.
10  Q   So it was recurrent prior to that report.
11          Do you accept the testimony that it
12      then resolved around 8:00 p.m. and was not
13      reported again that evening?
14          MS. MAKAR:  Objection.  Form.
15  A   The sentence has to be broken down to whether
16     anyone asked her or whether she volunteered it.
17     There's three possibilities.  If somebody asked
18     her, are you having pain, she said no.  And were
19     they doing that throughout the night.  Or did she
20     report pain.  Or if no one asked her, could she be
21     having recurrent symptoms.  But since she's
22     already been evaluated, it's conceivable she
23     doesn't continue to mention it.
24          All we know is that after
25     8:00-something, no one is documenting pain, but it

Page 36

1      doesn't exclude her from having pain.  Just
2      there's no evidence that she was in pain.  So if
3      she had episodic pain all day long, it could have
4      just managed, but I think that we don't have any
5      evidence.
6          But I don't want to get into
7      standard of care here, because that's kind of
8      getting close to that.  I'm only giving you a
9      causation opinion.
10  BY MR. KNOTT:
11  Q   I understand that.  And so, we agree there's no
12      evidence that she reported pain after
13      approximately 8:00 p.m.?
14  A   There's no evidence that -- there's no
15      documentation for having chest pain after
16      8:00 p.m.  That's all we can say.
17  Q   Doctor, I'm looking at your report at Page 2 under
18      Factual Background.  There is -- the first two
19      paragraphs.
20          Is that what you believe to be the
21      relevant past medical history?
22  A   Yes.  I mean, I didn't go into the details of her
23      having recurrent abdominal pelvic surgeries,
24      because those were all consequences of her cancer,
25      and none of them are life-threatening injuries,

Page 37

1      just major quality of life issues for her.  But
2      yeah, these are the major issues.
3  Q   I'm sorry.  I didn't hear you there.
4  A   These are the major issues.  These are the major
5      medical issues.
6  Q   But I didn't hear your response, and you said
7      something about quality of life?
8  A   Oh.  She had -- she was -- obviously had suffering
9      of abdominal pain and had multiple procedures and
10      surgeries on her abdomen and pelvis because of the
11      cancer she experienced when she was young.  But
12      that was not a life-threatening issue; that's a
13      quality of life issue.
14  Q   Okay.  And you disagree with her report that she
15      had less than one year to live?
16          MS. MAKAR:  Objection.
17  A   Well, first of all, it sounds like she was
18      intoxicated when she came in.  But there's no --
19      I've looked at her records at Gundersen where she
20      was cared for, and there was absolutely nothing
21      going on that would limit her life to one year.
22      There's nothing in there at all that discussed
23      that.
24          But apparently from the report of
25      when she was highly intoxicated, she obviously had

10  (Pages 34 to 37)

Bruce Charash, M.D.                                    January 28, 2025

---

Page 38

1    a very dark turn when I read the police report
2    about her taking a gun and wanting to --
3    putting -- whatever she was doing, she was in a
4    very dark place.
5              But if you look at her medical
6    records, there was nothing -- she didn't have
7    advanced cancer. She didn't have any end-organ
8    failure. She didn't have anything that would
9    predictably weaken her life in the next year.
10   That's out of thin air. There's no medical basis
11   for that. But she was in a very dark place. It's
12   more of a psychological assessment than it is
13   medical.
14   BY MR. KNOTT:
15   Q   Did you see that Ms. Boyer had any psychological
16       diagnoses?
17   A   Not that I'm aware of.
18             MS. MAKAR: Objection. Outside the
19       scope.
20   BY MR. KNOTT:
21   Q   Is it unusual in your practice that a patient
22       would report that they have one year left to live
23       without any basis in their medical condition?
24             MS. MAKAR: Objection. Form.
25   A   I'm not -- I haven't -- I have not discussed this

---

Page 39

1    in my report. It has nothing to do with my
2    opinions. She was drunk and dark. I know people
3    who get very dark when they're drunk, and she was
4    spewing things that were very dark, but they're
5    not true. There was nothing about her life that
6    limited her to a one-year life expectancy. It was
7    out of thin air. It was a reflection of what
8    alcohol did to her mind at that point in her
9    darkness at that moment.
10   BY MR. KNOTT:
11   Q   Is there a difference, Doctor, between difficulty
12       breathing and shortness of breath?
13   A   There could be. For most people they would relate
14       to them as being the same thing. For some people
15       difficulty breathing could be a mechanically
16       difficult time breathing. So if somebody has rib
17       pain and when they breathe in, they could say it's
18       hard to breathe but they don't feel short of
19       breath. But for the most part they're considered
20       equivalent.
21             May I take a quick bathroom break?
22       I'm sorry, this cold thing, I'm on these cold
23       medicines and I need a quick break.
24             MR. KNOTT: Absolutely. It's not an
25       endurance test.

---

Page 40

1              THE WITNESS: Fives minutes or less.
2    Okay, thanks.
3              (Brief recess taken from 11:00 a.m. to
4    11:07 a.m.)
5    BY MR. KNOTT:
6    Q   At any rate, Doctor, just if you need to cough, if
7        you need to step out of the screen here, if you
8        need anything, just let me know. I am going to
9        start kind of turning through the pages of your
10       report here, so I think we'll be moving along
11       pretty quickly.
12   A   Okay.
13   Q   So Mrs. Boyer was provided clonidine.
14             Do you agree that the
15       administration of clonidine was an appropriate
16       intervention as far as it went?
17   A   I'm not offering standard of care opinions. I'm
18       only offering causation opinions. I have not
19       weighed in on the appropriateness or the lack of
20       appropriateness of giving her clonidine.
21             I'm only here to answer that she
22       would have survived if she had been transferred to
23       a hospital. I'm not giving opinions about the
24       medication she received or the care she received.
25       Other people are doing that.

---

Page 41

1    Q   All right. Well, I don't think that's necessarily
2        a basis for objection, but I respect your -- I
3        respect your comment, Doctor, and I will -- I'll
4        move on.
5              I -- well, at any rate, in your
6        report, you cut and pasted a couple of sections
7        from a document that was created by a correctional
8        officer at the jail. That's Page 3 of your
9        report. Are you there?
10   A   Yes.
11   Q   And, Doctor, can you just tell me, how would you
12       characterize the vitals at 8:53, which is in that
13       second segment?
14   A   She had --
15             MS. MAKAR: Objection. Form.
16   A   Well, her blood pressure was elevated.
17   BY MR. KNOTT:
18   Q   Is there an objective scale of blood pressure to
19       measure whether it's mildly elevated, moderately
20       elevated, severely elevated?
21   A   No, because it's contextual, meaning, to begin
22       with, this is not a steady state blood pressure.
23       It's one with a person coming in with, you know,
24       being incarcerated, whatever her emotions are.
25       But if you're having symptoms of blood pressure of

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                  California Firm Registration #179

Bruce Charash, M.D.                                           January 28, 2025

Page 42

1  142 over 92, it might have more significance than
2  if you're not having symptoms and you have it
3  measured casually in a doctor's office.
4       So it really isn't just a simple --
5  you don't just compare it to an absolute curve.
6  It depends on the context.  If somebody's having
7  chest pain or shortness of breath, a blood
8  pressure of 142 over 92 could have more
9  significance than if someone is comfortable.
10 Q  How would you characterize 142 over 92 if it were
11    in a patient that was comfortable in your office?
12 A  Mild to moderately elevated.
13 Q  You agree, Doctor, that that standing alone is not
14    indicative of a hypertensive emergency?
15 A  Alone, of course it isn't.
16 Q  Do you know if you were provided EKG strips?
17 A  I was -- sorry.  Can you please repeat that?
18 Q  Do you know if you were provided EKG strips?
19 A  Yeah, I believe I was.  Well, I was -- I was
20    given -- I don't remember what EKG strips. I'm
21    sorry, I don't recall what EKG strips you're
22    referring to.  When she got admitted to the
23    hospital, I saw those EKG strips.
24 Q  And at the top of Page 4 you reference EKG strips.
25 A  At Gundersen.

Page 43

1  Q  Correct.
2  A  Yeah, I saw those.  I said at Gundersen when she
3     was admitted.
4  Q  Right.  And, Doctor, my question is --
5  A  Okay.
6  Q  -- is that your own interpretation of the strip,
7     or are you taking that from a report?
8  A  Well, it's my interpretation, but I don't know if
9     that's different -- I don't recall what the report
10    says anymore.  It could be identical.  I don't
11    recall.
12 Q  And is what you describe in the first paragraph of
13    Page 4 an acute ischemic change?
14 A  Yes.  Those would be acute ischemic changes.
15 Q  Can you explain that, Doctor, for a layperson?
16 A  Well, the EKG, there's a segment of it called the
17    ST segment.  It's the end of the QRS complex to
18    the beginning of the T-wave.  And that QRS segment
19    can be elevated, can be depressed or at baseline.
20       If you have more than a millimeter
21    of depression of that ST segment, it frequently is
22    an indicator of active ischemia to a section of
23    heart muscle.
24       Here, there were inverted -- there
25    was ST depression in what we call the inferior

Page 44

1  leads, all looking at the same part of the heart,
2  leads II, III and F, aVF, as well as lateral
3  leads, which would be V3 and V6, with the inverted
4  T-waves.
5       So these EKGs not only are showing
6  classic ischemic abnormalities, but they're also
7  localized into an anatomic territory.  So it's
8  highly suggestive.  But nothing is 100 percent
9  proof.  But this EKG is highly suggestive of an
10 acute moment of ischemia to the left ventricle.
11 Q  And is it your opinion to a reasonable degree of
12    medical probability that she was experiencing
13    ischemic injury throughout the afternoon?
14 A  No, I didn't say that.  I mean, she was showing
15    acute ischemia.  In part it could -- when you have
16    a cardiomyopathy, as was her diagnosis for
17    causation, you can have ischemia under certain
18    stress states.  And remember, that EKG was done
19    after she had her cardiac arrest, so that could
20    also be post arrest.  But I mean -- but there was
21    clearly, when she was admitted, EKG findings that
22    are very consistent with an acute ischemia.
23 Q  If you had an ischemic event sufficient to cause a
24    change in the EKG, such as you've described, would
25    you expect those to continue?

Page 45

1  A  I don't know what you mean.  Usually ischemia is
2     transient.  So you could have ST depression, which
3     will then recover, because ischemia tends to come
4     in waves.  So, yeah, you would expect there to be
5     recovery of those EKG changes.
6  Q  And I guess the question I have, Doctor, is
7     whether you're stating to a reasonable degree of
8     medical probability that Ms. Boyer was
9     experiencing ischemic -- experiencing ischemic
10    chest pain throughout the afternoon of
11    December 22nd?
12       MS. MAKAR:  Objection.  Form.
13 A  I'm sorry.  Can you please repeat that?  I missed
14    the first half.
15 BY MR. KNOTT:
16 Q  The question that I have is whether you believe to
17    a reasonable degree of medical probability that
18    Ms. Boyer was experiencing ischemic chest pain the
19    afternoon of December 22?
20       MS. MAKAR:  Objection.  Form.
21 A  We can't know with absolute certainty.  We do know
22    that she did not have identifiable obstructive
23    coronary disease, but that's not the only way you
24    can get ischemic.  Traditionally, you get ischemic
25    or have heart attacks by a clot in an artery

888-893-3767      Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                    California Firm Registration #179

Bruce Charash, M.D.                                                January 28, 2025

## Page 46

1  blocking the supply of blood.  That wasn't her
2  problem.
3          But under certain stress states,
4  the increase of demand of oxygen can lead to that.
5  In her case, she did have chest pain radiating to
6  her left arm with shortness of breath, which are
7  common coronary types of symptoms, and she had
8  ischemic abnormalities, albeit after the code.  So
9  she might have.  We don't know.
10 BY MR. KNOTT:
11 Q   Ischemic abnormalities after what, Doctor?
12 A   After her cardiac arrest when she was admitted to
13 the hospital.
14         So she had, you know -- she had
15 chest pain and she had EKG abnormalities looking
16 like ischemia, but again, that was after the code,
17 so we don't know.
18 Q   People with anxiety and elevated blood pressure
19 sometimes complain of chest pain and shortness of
20 breath; is that a fair statement?
21         MS. MAKAR:  Objection.  Form.
22 A   People with anxiety and what?  Chest pressure?
23 BY MR. KNOTT:
24 Q   Elevated blood pressure.
25 A   Yes, what about it?

## Page 47

1  Q   Sometimes complain of chest pain and shortness of
2  breath.
3  A   Oh, my gosh.  I mean, in theory, that could
4  happen, but I mean, that's just -- usually we
5  fight against that thinking because too many
6  people are dismissed from having coronary symptoms
7  by writing off symptoms of chest pain and
8  shortness of breath to anxiety.
9          But, in theory, yes, you can
10 have -- you can have chest pain and shortness of
11 breath without it being a cardiac issue.  It's
12 possible.
13 Q   Is it fair to say that many people present in
14 primary care settings with a complaint of chest
15 pain that has a noncardiac etiology?
16         MS. MAKAR:  Objection.  Form.
17 Foundation.  Outside the scope.
18 A   It's a bit of a vague question.  I think that
19 chest pain is the most common symptom that brings
20 people to medical attention in both an office as
21 well as an add-on visit or an ER.  But in those
22 cases, an evaluation must be performed to see if
23 it is coronary in most of those cases, and then
24 you find out whether it was coronary or not.  Some
25 of them need to be in the hospital; some don't.

## Page 48

1  So if somebody has acute onset of
2  chest pain, you don't know with the tools at hand
3  in your office whether it's coronary or not, so
4  you have to make decisions:  It is a cardiac
5  arrest?  Is it prolonged?  Is it episodic?  Those
6  details can make a big difference.  But again,
7  we're getting more into trying to diagnose her.
8  My causation opinion is simply if she were in the
9  hospital, she wouldn't have been dead.
10 BY MR. KNOTT:
11 Q   Yeah, yeah.  I'm trying to --
12 A   You want me to agree with you -- you're trying to
13 get me to say that she had things that were
14 stabilizing which leaned towards your standard of
15 care, and I'm not engaging in that.  You're asking
16 me about whether her chest pain --
17 Q   Doctor -- Doctor, just let it go.  Just stop.
18 A   You're asking me things that are not in my report,
19 and you're asking me things that are not involved
20 in my opinion.
21 Q   Yeah, I think you've been around the block,
22 Doctor, and you know how this works.  And I'm
23 entitled to ask questions, and the fact that it's
24 not in your report does not mean you get to
25 determine relevance.  So you're fine, we'll get

## Page 49

1  through this, and it will be fairly brief, but I'm
2  not going to have you lecture me or --
3  A   Sir, I don't mean to offend you.  I'm not trying
4  to lecture you.  It's just that my opinions are
5  very straightforward.  And quite frankly, I think
6  that Dr. Wolff and I have no difference in our
7  opinions in terms of -- no one challenged my
8  causation opinion.  No one.
9          Not one expert said -- my main
10 opinion is, had she been sent to the hospital
11 earlier, she would not have died.  And no one has
12 disagreed with that in any report.  So I'm really
13 confused why I'm even being deposed, because
14 everyone agrees with me.
15 Q   So just let me kind of break it down into what
16 you've actually talked about in your report.
17         Again, I think there is a
18 difference, and I'm trying to -- I'm trying to
19 hone in on it.  And I apologize, Doctor, I don't
20 have the understanding of these fine points in
21 medicine.
22         I guess I'm trying to understand
23 what you mean when you say that there was a
24 hypertensive event superimposed over a
25 cardiomyopathy.

13  (Pages 46 to 49)

Bruce Charash, M.D.                                                January 28, 2025

## Page 50

1      MS. MAKAR: Objection. Form.
2  BY MR. KNOTT:
3  Q   I hadn't asked a question yet. I'm trying to get
4      there.
5           And physiologically, Doctor, what
6      are you proposing occurred when you say that the
7      hypertensive event was superimposed on a
8      cardiomyopathy?
9  A   Well, what I'm trying to get at in that comment,
10     because her blood pressure had ups and downs, and
11     we don't really have a track through the night,
12     but the point is that because she has a
13     cardiomyopathy, the same blood pressures that she
14     might have formally tolerated become less
15     tolerable because your heart's weakened. So if
16     you have a normal ventricle and you have high
17     blood pressure, it may not impact cardiac
18     performance. But if you already have some damage
19     to it and you haven't established cardiomyopathy,
20     now the same blood pressures will lead to a higher
21     risk of congestive symptoms.
22          So what we do -- all we know -- the
23     problem is we don't have enough information.
24          She was having hypertensive
25     episodes to the point of getting p.r.n. pills.

## Page 51

1      She was not able to take her chronic medications.
2      She, you know, wasn't getting her narcotics, so
3      there could theoretically be some withdrawal from
4      it. But at that point all we know is she's having
5      chest discomfort to the left arm and she's having
6      hypertensive episodes and shortness of breath.
7      And then all we know there is that we don't have
8      any data about what happened to her, and the next
9      thing we know she's coding.
10          And to that degree, all I can say
11     is that had she been in the hospital, she never
12     would have coded, or if she did code, she would
13     have been saved immediately. Because whatever led
14     to her code didn't kill her. It caused her to
15     code in the -- in the jail, and the delay
16     intrinsic of an out-of-hospital cardiac arrest is
17     what caused her brain to die. But she didn't die
18     of any medical reason. It just caused her to
19     code.
20          And all I'm saying is had she been
21     in the hospital, she never would have coded. They
22     would have prevented it or they would have
23     resuscitated immediately. But I don't know what
24     caused her to code. We don't have enough data.
25     We just know a lot of things were going on.

## Page 52

1      But in any given person, if you're
2      having both chest pain, shortness of breath, high
3      blood pressures that you're giving p.r.n.
4      clonidine, we don't know what's going on, but it's
5      concerning.
6  Q   Right. And I think you'll agree with me -- and
7      I'll move to strike to the extent you're stating a
8      standard of care opinion --
9  A   I wasn't really.
10 Q   -- but I am trying to -- I am trying to understand
11     exactly what you believe was going on.
12          And I understand the kind of
13     general opinion that if she were in an ER, she
14     would not have coded.
15          My question to you is, and I think
16     I understand this: Is it fair to say that you do
17     not have enough data to give an opinion that she
18     was suffering chest pain due to cardiac ischemia
19     between 7:00 and 8:00 p.m. on December 22?
20          MS. MAKAR: Objection.
21     Mischaracterization of testimony. Form.
22     Foundation.
23 A   Well, we know that she reported having episodic
24     pain all day long, but if you're saying that same
25     pain reported between 7:00 and 8:00, whatever, we

## Page 53

1      don't know if it's ischemic.
2  BY MR. KNOTT:
3  Q   And --
4  A   In retrospect, we don't really know if it's
5      ischemic. It's just hard to know.
6  Q   And you don't hold an opinion that she was
7      experiencing an arrhythmia during the day on the
8      22nd. Fair?
9          MS. MAKAR: Objection.
10 A   We know she had a long enough arrhythmia to cause
11     her to have a hypoxic seizure, which was captured
12     on video, but we don't know whether or not she was
13     having shorter runs of arrhythmias like V-tach
14     earlier in the day. Between her potassium being
15     reduced and her different symptoms, it's possible
16     she was having non-sustained arrhythmias. What we
17     do know what happened is she arrested. And that's
18     documented.
19 BY MR. KNOTT:
20 Q   And you understand, Doctor, as a scientist and as
21     a experienced expert witness that being able to
22     say that something is more probable than not is an
23     important distinction.
24          You understand that, correct?
25          MS. MAKAR: Objection. Form.

14  (Pages 50 to 53)

Page 54

1    A   Of course I understand that.
2    BY MR. KNOTT:
3    Q   Yeah.  And you can't say that it is more probable
4        than not that she was experiencing arrhythmia
5        during the day on the 22nd?
6            MS. MAKAR:  Objection.
7    A   Correct.  Correct, I cannot say that.
8    BY MR. KNOTT:
9    Q   I have something cued up here, Doc, and I just
10       want your input on it.
11           We can mark this as Exhibit 121.
12       It's GHS1339.  Doctor, can you read that?  I can
13       blow it up a little.
14   A   Do you want me to read it out loud --
15   Q   Read it to yourself.
16   A   -- or are you asking me if I can read it?
17   Q   It's the note of the emergency room provider the
18       morning of December 23.
19   A   (Witness reads.)  Yeah, I see that.
20   Q   And I've highlighted the sentence that begins --
21       or the passage that begins, "Initial EKG," and it
22       ends with "begin with."
23           Can you interpret that for us,
24       Doctor, if you're able, as to what the emergency
25       room physician and cardiologist believe occurred

Page 55

1        in terms of the EKG?
2    A   Yes.  They're saying that the paramedic, which
3        often do 12-lead EKGs, found there to be ST
4        depression in the leads I discussed earlier, II,
5        III and aVF.  Those are inferior leads.  And there
6        was ST elevation in lead aVL, but that's not that
7        important.  But there was ST depression in the
8        inferior leads, but then that resolved.  Again,
9        ischemia does tend to resolve.  And they're not
10       100 percent sure if that ischemia was present to
11       provoke the arrest or if it was a consequence of
12       the arrest.  And I agree with that, too.
13           But there was no reason to take her
14       to the cath lab because it had resolved.
15   Q   Okay.  I've put on the screen GHS1559, which we'll
16       mark as Exhibit 122.
17           Have you seen that before, Doctor?
18       It's an EKG strip.
19   A   Yes, I have.
20   Q   And one of the providers wrote at the bottom,
21       "torsades de pointes."  I think that's how you
22       pronounce it.
23   A   Yes.  P-O-I-N-T-E-S.  So it would be "pointes,"
24       but you're pronouncing it with a French accent.
25   Q   Okay.  Thank you.  I'd rather pronounce it with my

Page 56

1        Iowan accent.
2            Doctor, do you agree that that
3        shows that the strip is accurately interpreted as
4        torsades pointes?
5    A   Just say torsades.  T-O-R-S-A-D-E-S.  Torsades.
6        Yes, it is torsades.
7    Q   And torsades is a non-ischemic pattern; is that
8        fair?
9    A   It's not ischemia.  It's a form of ventricular
10       tachycardia.  It can occur in patients.  It has no
11       comment on whether there's ischemia.  It's just a
12       form of V-tach.  It can be precipitated by
13       electrolyte, but it doesn't mean there isn't an
14       element of ischemia.  It's just neutral on that.
15   Q   So isn't it true, Doctor, that torsades is
16       pathognomonic of an electrolyte imbalance?
17           MS. MAKAR:  Objection.  Form.
18   A   It is not.  It is most common in patients with
19       prolonged QT intervals.  That can occur from
20       ischemia and heart attacks, that can occur from
21       medications with normal electrolytes, and it can
22       occur in abnormal electrolytes.
23           So, for example, I've seen patients
24       have torsades who received the drug Lidocaine, and
25       they get too much of it, their QT interval

Page 57

1        prolonged and they have torsades with normal
2        potassium.  Certainly this patient has low
3        potassium, which means their threshold to going
4        into torsades is lower.
5            So if a person who has a potassium
6        of two-three gets ischemic, it's more likely their
7        V-tach will be torsades.  It's just a form of
8        V-tach that's influenced by things that prolong
9        the QT interval.  And it's not -- it's not
10       diagnostic of an electrolyte problem.
11   BY MR. KNOTT:
12   Q   It's associated with an electrolyte problem?
13   A   Can be associated with certain electrolyte
14       problems, but that's not the only reason why it
15       occurs.
16   Q   And if I understood --
17   A   It's more common with medications than it is with
18       electrolytes.
19   Q   Okay.  If I understood your response correctly,
20       this pattern, torsades, presents in response to
21       ischemia, one; medication, two; torsades, three?
22       I mean electrolyte imbalance, three?
23   A   What did you say one was?
24   Q   Ischemia.
25   A   No, I didn't say ischemia.  What I'm saying is

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                    California Firm Registration #179

Bruce Charash, M.D.                                          January 28, 2025

Page 58

1    that this form of ventricular tachycardia, it's a
2    form of V-tach, it is more likely to occur if
3    someone's going to have ventricular tachycardia in
4    conditions that prolong the QT interval. Those
5    conditions can include low potassium,
6    electrolytes. Those conditions can include a lot
7    of different medications, which is actually the
8    most common form of torsades is medications that
9    prolong the QT interval.
10        Ischemia, especially in the setting
11   of cardiomyopathy, or dead or damaged muscle, also
12   is at risk for a long QT interval.
13        But the point is that if somebody
14   has an electrolyte abnormality and then they get
15   ischemic, if the ischemia is going to cause
16   V-tach, if they have a low potassium, it's going
17   to be torsades V-tach.
18        So you have no diagnostic utility
19   here. It just says that this patient had V-tach
20   and it was torsades. Unquestionably, the fact
21   that the potassium was low is a strong indicator
22   of that being the reason why the V-tach is
23   torsades, but it doesn't tell you that that's what
24   initiated the torsades.
25   Q   She had a second episode of V-tach the morning of

Page 59

1    December 24th?
2    A   Yes.
3    Q   Do you agree that that was likely precipitated by
4        the electrolyte imbalance?
5    A   Well, there were orders trying to correct it, so I
6        don't know if that's -- remember, when this
7        patient had a code, there's -- you know, even
8        though she recovered from the acute code, the
9        heart gets even further damaged because there was
10       a code and more irritable. So you might have more
11       V-tach just because you already survived a code.
12   Q   And anything, in terms of a potassium level,
13       anything below 3.0 is profoundly reduced.
14       Do you agree with that?
15       MS. MAKAR: Objection. Form.
16   A   A, I wouldn't have a cutoff for profound. People
17       with cardiomyopathies of any type, we try to keep
18       the potassium over 4. And we find under 3.5 to be
19       more unacceptable, and then as you drop, it
20       progressively has greater and greater instability.
21       But we don't have a single cutoff that says above
22       3, lower than 3. But the lower you get, the worse
23       it is in terms of risk.
24       But, on the other hand, she was not
25       in refractory torsades all day. It wasn't -- I've

Page 60

1    seen people who have Lidocaine toxicity go into
2    V-tach torsades and it doesn't stop. It will go
3    on for hours while being shocked, so you have to
4    put in a pacemaker and speed up the heart. The
5    point is she wasn't having it every five seconds.
6    She had periods of no torsades, which makes an
7    argument that it wasn't only electrolytes.
8    Q   When did she have periods of no torsades?
9    A   When she was admitted. She wasn't having every
10       five minutes getting shocked out of torsades.
11   Q   Do you agree that a potassium level of 2.3 puts a
12       person at substantial risk of arrhythmia?
13       MS. MAKAR: Objection. Form.
14   A   Yes. But the only qualification I'd have on that
15       is that in her cardiac arrest, she got multiple
16       doses of epinephrine. That's standard for all
17       ACLS protocols. And epinephrine injections will
18       drop your serum potassium.
19       So when her potassium went to 2.3,
20       although it came back to 2.6, it's not 100 percent
21       clear if it really was 2.3 before her arrest,
22       because she got a lot of epinephrine. But she did
23       have 2.6 before she was hospitalized and didn't
24       have an arrhythmia.
25

Page 61

1    BY MR. KNOTT:
2    Q   She had 2.6?
3    A   As an outpatient, yes.
4    Q   No one can know what her potassium level was on
5        the day of her admission to the jail. You'd agree
6        with that?
7    A   Correct.
8        THE STENOGRAPHER: I'm sorry? Did you
9        say "correct"?
10   A   Yes. Just stretching.
11   BY MR. KNOTT:
12   Q   Does pulmonary edema cause chest pain?
13   A   It could, but usually chest pain is part of the
14       reason why someone has pulmonary edema. But
15       developing pulmonary edema could independently
16       cause chest pain, yes, it's possible.
17   Q   Pulmonary edema could cause shortness of breath.
18       True?
19   A   Yeah, definitely causes shortness of breath, and
20       in theory can cause chest pain.
21       MR. KNOTT: Am I still sharing?
22       MS. MAKAR: No.
23   BY MR. KNOTT:
24   Q   I want to look at your report, Doctor, Page 5.
25   A   Okay.

16  (Pages 58 to 61)

Bruce Charash, M.D.                                                    January 28, 2025

---

Page 62

1    Q    In the third paragraph, second sentence, "Her
2         cardiac arrest was provoked by her hypertensive
3         episode" --
4    A    I'm sorry.  The third full paragraph?  I'm not
5         sure -- Page 5?
6    Q    Page 5, third full paragraph.
7    A    That begins with "It is my opinion"?
8    Q    Correct.
9    A    Okay.
10   Q    But I'm focused on the second sentence.
11   A    Yes.
12   Q    "Her cardiac arrest was provoked by her
13        hypertensive episodes recorded during the
14        afternoon and evening of 12/22/19" --
15   A    Yes.
16   Q    -- open paren, "(provoking congestive heart
17        failure and coronary artery ischemia)," closed
18        paren, period.
19             Do you have -- strike that.
20             What is the basis for your
21        statement there that she had coronary artery
22        ischemia?
23   A    Well, the EKG showed -- a lot of people have
24        cardiac arrest but they don't show focal ischemia
25        on a 12-lead.  She had ischemia on the EKG.  She

---

Page 63

1    had a ventricular tachycardia arrest.  She had
2    chest pain, shortness of breath, and high blood
3    pressure.
4         So all together, that would be my
5    most likely formulation of what occurred.  Oddly
6    enough, that has nothing to do with my causation
7    opinion, in that no matter what she had, she would
8    have survived if she were in the emergency room
9    before it happened.
10        But my best formulation, the one
11   that makes the most sense, so my opinion is with a
12   reasonable degree of medical certainty, not
13   absolute certainty, reasonable degree of medical
14   certainty something happened where her blood
15   pressure was going up.  We don't have any data as
16   to how high it went after the last check.  And,
17   that led -- and more likely than not, her blood
18   pressure going up would make chest pain and
19   shortness of breath happen in her case.
20        So I think the best formulation of
21   what happened is, since she had heart disease, was
22   that she had hypertension which led to congestion,
23   and in her case, because of the underlying
24   structural heart disease, transient ischemia that
25   led to V-tach and her arrest.  I think it's the

---

Page 64

1    most logical assessment based on the normal
2    methodology we use to evaluate a patient in the
3    real world.
4    Q    And I'm just trying to focus in on some individual
5         pillars of your opinion here, Doctor.  I
6         appreciate that.  I think I understand your
7         overall opinion.
8    A    It's not really a pillar of my opinion, of course,
9         because it doesn't matter what she coded from.  If
10        she were in a hospital, she would either have not
11        arrested or she would have been survived with a
12        normal brain, because she only died because her
13        brain was abnormal.
14   Q    I've been given a report, Doctor, and I'm trying
15        to understand it.  Okay?
16   A    Yes.
17   Q    There were no findings of pathology in her
18        coronary arteries on autopsy?
19   A    Yes.  We know she did not have coronary disease.
20        Right.
21   Q    And so what I'm trying to understand, Doctor, is
22        that reference in that particular paragraph to
23        coronary artery ischemia.  What are you
24        postulating occurred in her coronary arteries
25        that -- that contributed to her death?

---

Page 65

1    A    I'm sorry.  It's probably just the use of coronary
2         artery ischemia.  It's just the term we use for
3         ischemia.  Ischemia is any time the demand for
4         fuel in the heart is greater than the blood supply
5         delivered.
6             Now, traditionally when we think of
7         coronary ischemia, we think of an obstructed
8         coronary artery with atherosclerosis plus or minus
9         a clot that could be dynamic.
10            But the other ways you could have
11        coronary ischemia is an increase in demand due to
12        a profound stress on the heart.  And high blood
13        pressure cannot only increase demand, it can also
14        reduce supply by making the muscle tighten up, so
15        it would be at a microvascular bed level.  So you
16        can have ischemia without having obstructive
17        coronary disease.  So that's all I'm saying.
18   Q    Just want to make sure that I understand, Doctor.
19            She first reported symptoms at
20        3:00 p.m. on Sunday, December 22.  That's
21        referenced in your report?
22   A    She was first reported that she had been having
23        symptoms that day.  That's not when she first had
24        symptoms.  She reported that she was having
25        episodic symptoms all day.  Right?  I just want to

---

17  (Pages 62 to 65)

Bruce Charash, M.D.                                                    January 28, 2025

Page 66

1  be clear about that.
2  Q  Well, that's a fact question that will have to be
3     resolved.  But let's assume -- let's just pinpoint
4     3:00 p.m. when she first reported symptoms.
5          You do not have a basis to say that
6     she was experiencing ventricular tachycardia at
7     that time, correct?
8  A  Correct.  Of course.
9  Q  Of course not?
10 A  Of course I never said she had ventricular
11    tachycardia at that time.  There's no basis to
12    know if she did or didn't.
13 Q  You agree that she more likely than not did not
14    have an arrhythmia at that time?
15          MS. MAKAR:  Objection.  Form.
16 A  I don't know whether -- you can't determine
17    whether she was having non-sustained bursts of
18    V-tach.  There's no way to know.
19 BY MR. KNOTT:
20 Q  You state in your report that her hypokalemia was
21    a substantial contributing factor, correct?
22 A  Towards her having V-tach, yes.
23 Q  You're, of course, not able to state the relative
24    contribution of her hypokalemia versus her
25    congestive heart failure?

Page 67

1  A  There's no way to know the role of either one.  I
2     think her low potassium was a significant
3     contributing factor.
4  Q  Is a potassium level of 2.3 sufficiently depressed
5     to have triggered a ventricular arrhythmia and
6     arrest on its own?
7  A  In theory, yes.  But I figure it's very unlikely
8     because her arrest just didn't happen out of the
9     blue.  It happened in the setting of her needing
10    urgent drugs for blood pressure control and her
11    having chest pain that day.  I don't think you
12    could exclude those.
13          So I can't give you that with
14    absolute certainty, but I think with reasonable
15    certainty the low potassium lowered the trigger of
16    firing, but something else pulled the trigger.  It
17    was just a hairpin trigger.
18 Q  If I ask you to define major hypertension as you
19    use it on Page 5, I assume you'd tell me that it's
20    relative to the patient?
21          MS. MAKAR:  Objection.
22 A  Yes, relative to the patient.
23 BY MR. KNOTT:
24 Q  We looked previously at the particular cut and
25    paste on Page 3.  Do you agree with me that the

Page 68

1  vitals that are shown on Page 3 are inconsistent
2  with a sustained ventricular arrhythmia?
3          MS. MAKAR:  Objection.
4  A  There's no chance -- she could not have had a
5     sustained arrhythmia.  She would have coded.
6     So -- she could have AFib or other arrhythmias,
7     but in terms of ventricular arrhythmias, she could
8     not have had a sustained ventricular arrhythmia at
9     that point.
10 BY MR. KNOTT:
11 Q  You quote in your report Gundersen records that
12    had -- that identify the contribution of
13    electrolyte imbalance as a source of the arrest.
14    Her providers were identifying that as a likely
15    cause of her arrest, correct?
16 A  Yes.
17 Q  Are you aware of any report from Gundersen that
18    identifies episodic hypertension as a contributor
19    to her arrest?
20 A  I didn't see anything.  But on the other hand, I
21    don't know whether they were aware of what was
22    going on in the present -- in the jail.  I don't
23    know if they were aware she had episodic chest
24    pain on again/off again that day.  Because she
25    came in with cardiac arrest, she couldn't give a

Page 69

1  history.  So I don't know whether they were aware
2  she had the need for p.r.n. clonidine, so I don't
3  know what they knew.  But nor is it that
4  important.  It has nothing to do with my opinion,
5  but I don't know if they knew.
6  Q  Doctor, how is malignant hypertension defined?
7  A  It's defined by a person having end-organ damage
8     as a result of hypertension, usually with
9     diastolics that go over 100 or 110.  But again, it
10    depends on the context of the person.  But it
11    usually means high blood pressure that is
12    clinically believed to be causing heart failure or
13    chest pain.  Symptomatic hypertension on a
14    cardiovascular system.  Did I use the word
15    "malignant hypertension" in my report?  Because I
16    don't recall that.  I don't think I used the word
17    malignant hypertension, because she didn't have
18    malignant hypertension.  I never raised that as an
19    issue.
20 Q  Okay.  What I was getting at is, do you have any
21    understanding of what the source was of her
22    potassium wasting disorder?
23 A  No.  She was identified to have it as an
24    outpatient, and I don't know what caused the
25    disorder.  She was not really on a diuretic to

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                        California Firm Registration #179

Bruce Charash, M.D.                                                                January 28, 2025

## Page 70

1    explain it, but I don't know what was causing it.
2  Q    You agree that it's most likely some sort of
3    kidney disorder resulting from her childhood
4    cancer treatment?
5  A    Maybe. I'm not too sure that would cause -- I
6    don't know how long she had her potassium problem.
7  Q    Is it potentially related to her -- her chronic
8    hypertension?
9          MS. MAKAR: Objection. Form.
10   Foundation.
11  A    I'm not sure I understand what you're saying. You
12   don't get potassium wasting from being
13   hypertensive, but you do get it from medications.
14   But she's been on the drug Vasotec for a long
15   time, and that raises potassium. But despite
16   that, she still had low potassium. And I don't
17   recall her being on a potassium-wasting drug, so I
18   don't know what the basis is. I'm not sure.
19  BY MR. KNOTT:
20  Q    What was the drug you said, Vasotec?
21  A    Sorry. Lisinopril. Lisinopril. It's a cousin.
22   She was on lisinopril 40 milligrams forever.
23   Since at least 2011 I saw her on it, the same
24   dose, all those years.
25  Q    And with respect to your opinion on life

## Page 71

1    expectancy, you referenced the CDC tables,
2    correct?
3  A    Yes.
4  Q    And where did you locate those, Doctor?
5  A    Online. You can look up CDC life tables for the
6    year 2019, whatever the year.
7  Q    Did you do that in this case?
8  A    Yes.
9  Q    And obviously, they don't have a cohort for
10   individuals with congestive heart failure, right?
11         MS. MAKAR: Objection. Form.
12  A    They do in that what you get is the average life
13   expectancy for a population. For any given
14   population of people, let's take all 41-year-olds,
15   if they get 40 more years, that's 81. You could
16   break all 40-year-olds into three theoretic
17   groups. One group are the healthiest 41-year-olds
18   with zero medical problems in good shop. You know
19   they're going to live longer than the average of
20   81; these are the people that make it into their
21   late 80s or 90s or older.
22         Then you have a population of
23   people who are 41 who have horrible short-term
24   prognoses; they're on dialysis with no hope of
25   getting a transplant, or they have major organ

## Page 72

1    failure or malignant cancer, and they're not going
2    to make it five years. And then you have the
3    average 41-year-old who have medical problems.
4    That's baked into the average. It's not --
5    there's no such thing as a normal life expectancy.
6    There is an average life expectancy. Reduced her
7    from the average. But the average includes people
8    who have different problems.
9          And her heart failure, by the way,
10   was not much of an issue as an outpatient. She had
11   a cardiomyopathy, but she was reported on her last
12   visit prior to this admission of having no
13   shortness of breath. So she had Class I heart
14   failure, which means she had no known limit. So
15   she had disease but no major -- she wasn't in
16   sustained or chronic heart failure as a symptom.
17  BY MR. KNOTT:
18  Q    So even just -- Doctor, do you consult the CDC
19   tables in your day-to-day practice?
20  A    On rare occasions I do, but usually not. I think
21   through my practice of being in medicine for over
22   40 years, 45 years, actually, now, I think I begin
23   to, you know, understand the impact of disease
24   states on life expectancy. The tables just give a
25   more formal understanding of that, a quantitative

## Page 73

1    understanding.
2  Q    In this case, though, you started with the CDC
3    tables, right?
4  A    Right.
5  Q    And in your daily practice, if someone wanted to
6    know their prognosis and their outlook going
7    forward, you would use your knowledge of that
8    particular patient and you would not consult the
9    CDC table. Fair?
10  A    Yes and no, 'cause the table corresponds to what I
11   already know in medicine. And I usually don't
12   give people a life expectancy. I would just tell
13   them that they have a disease which has risk, and
14   I deal it from a prospective viewpoint with
15   telling them the steps they could do to optimize
16   it. But I usually don't say to a patient, you
17   have a 31.3 -- 31.3 year life expectancy. The
18   population --
19  Q    Can you answer my question? In speaking to your
20   patients, you're not likely to consult the CDC
21   table to talk about their prognosis?
22  A    Well, it's not a table for prognosis. It's an
23   average life expectancy for population, so it
24   wouldn't be part of day-to-day practice.
25  Q    I didn't hear the end of that, Doctor.

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                        California Firm Registration #179

Page 74

1    A   It would not be part of day-to-day practice to
2        quote a population survival curve.
3    Q   And in this case, even though you described how
4        the medical conditions are baked into the CDC
5        curve, you did factor in your assessment
6        congestive heart failure?
7    A   Yeah, but her heart failure was not a major factor
8        in her survival, in part, because she didn't have
9        clinical heart failure.  She had damage to the
10       left ventricle, which is different.  But she was
11       not being treated with diuretics.  She wasn't
12       admitted to the hospital with recurrent shortness
13       of breath.  So she didn't really have congestive
14       heart failure.  She was found to have a
15       cardiomyopathy at a very low burning level that
16       was not interfering with her day-to-day function.
17       She never had --
18   Q   Page 8 of your report, Doctor.  I don't -- I don't
19       want to argue about this.  I'm trying to get at
20       your methodology.  Her only serious long-term
21       medical problem was her underlying cardiomyopathy?
22   A   But that's not heart failure.  That's
23       cardiomyopathy.
24   Q   Okay.
25   A   There's a difference between cardiomyopathy and --

Page 75

1        you can have a cardiomyopathy and be totally
2        asymptomatic.
3    Q   Okay.  All right.  So your methodology, sir, was
4        to start with the CDC life table.  And the single
5        medical condition that you considered was her
6        underlying cardiomyopathy.  Fair?
7            MS. MAKAR:  Objection.  Form.
8    A   Those are things that potentially can jeopardize
9        life expectancy, yes.  Her other problems were
10       meaningful but they weren't threatening her --
11       (unintelligible) --
12           THE STENOGRAPHER:  I'm sorry, Doctor.  I
13       didn't hear you.  "Her other problems were
14       meaningful but they" --
15   A   Her other problems were meaningful to her, but
16       they were not jeopardizing her life expectancy.
17   BY MR. KNOTT:
18   Q   Mrs. Boyer was -- or Ms. Boyer was a smoker.
19           Does that have an impact on life
20       expectancy?
21   A   It certainly can.  Certainly would potentially add
22       to weighing down.  But of note, despite her
23       coronary risk factors, she had clean coronary
24       arteries at 41, which is good news.
25   Q   Her smoking is not a factor that you considered in

Page 76

1        your assessment of her life expectancy.  Fair?
2            MS. MAKAR:  Objection.  Form.
3        Foundation.
4    A   It's baked in there a little bit, yes, but it's
5        not a major factor in her life expectancy.  If she
6        had coronary disease or cancer it would be, but
7        she didn't have cancer on her autopsy, and she
8        didn't have coronary disease.  But of course, you
9        would have to weigh it.  And remember, cigarette
10       smokers 22 percent -- probably 20 percent of all
11       40-year-olds are smokers, so that's somewhat baked
12       into the average.  That's already part of the
13       average.
14   BY MR. KNOTT:
15   Q   So I want you to -- I want to tick through her
16       medical conditions and tell me whether you
17       considered them as a serious long-term medical
18       problem that impacted her life expectancy versus
19       something that was baked into the tables.
20           Hypertension; was that individually
21       considered for Ms. Boyer?
22   A   That's baked into the table.
23   Q   So you did not consider it independently?
24           MS. MAKAR:  Objection.
25   A   It's part of weighing everything all together.

Page 77

1    BY MR. KNOTT:
2    Q   Yeah, I understand that.
3            She was narcotic dependent.  Is
4        that a factor that you considered as impacting her
5        life expectancy?
6    A   No.  She --
7            MS. MAKAR:  Objection.
8    A   She wasn't taking an illegal drug or street drugs.
9        She was getting it prescribed.  They were trying
10       to deal with her chronic pain syndrome, so that
11       should not impact her life expectancy.  It's just
12       terrible that she had so much pain, but it's not a
13       life expectancy issue.
14   BY MR. KNOTT:
15   Q   Did you consider or dig into the source of her
16       abdominal pain when you're considering her life
17       expectancy?
18   A   It was obviously pain that was residual from the
19       cancer she had and the multiple complications of
20       bowel obstructions and issues she had in her
21       pelvis and abdomen.  But there's no delving into
22       it.  I mean I wasn't able to examine her.  But to
23       that degree she had -- it was a quality of life
24       issue.
25   Q   She had asthma.  That's not a factor that you

Bruce Charash, M.D.                                    January 28, 2025

Page 78

1    considered independently?
2            MS. MAKAR: Objection. Form.
3    Foundation.
4    A   It's one of those things that's baked into the
5        average of the life expectancy curve.
6    BY MR. KNOTT:
7    Q   Doctor, there's -- there's --
8    A   Her asthma was not horrible. It wasn't as if she
9        went to ERs and was getting intubated or being in
10       ICUs or even having recurrent ER visits. She had
11       mild asthma. That's not going to affect -- that's
12       baked into the average life expectancy curve.
13       There's a magnitude to these things. And I think
14       she's only been a smoker --
15   Q   Doctor, there's -- there's data available on the
16       impact of smoking on life expectancy, isn't there?
17   A   I think it depends on how much you smoke, because
18       I think she was a half a pack a day.
19   Q   And there's data available. You didn't consult
20       it. Fair?
21           MS. MAKAR: Objection. Form.
22   Foundation.
23   A   It's baked into her life expectancy.
24   BY MR. KNOTT:
25   Q   So you didn't consult any other -- any independent

Page 79

1    data on her -- the impact of tobacco abuse on life
2    expectancy?
3    A   I didn't --
4            MS. MAKAR: Form.
5    A   -- do research, because I know clinically the
6        impact of different abnormalities, including
7        cigarette smoking and how it has its impact on
8        both quality of life and survival. So I'm aware
9        of these things. I didn't have to do research.
10   BY MR. KNOTT:
11   Q   She had refractory, urinary and fecal
12       incontinence. Is that a factor that you
13       considered independently in her life expectancy?
14           MS. MAKAR: Objection. Form.
15   Foundation. Misstates the record.
16   A   It was considered as a quality of life issue, but
17       not one that impacted her life expectancy.
18   BY MR. KNOTT:
19   Q   So the answer is no?
20           MS. MAKAR: Objection. Form.
21   A   I did -- there's no impact it would have that
22       would significantly impact life expectancy. It's
23       a chronic manageable problem.
24   BY MR. KNOTT:
25   Q   She had some sort of potassium-wasting condition

Page 80

1    which you did not consider individually in
2    assessing her life expectancy?
3            MS. MAKAR: Objection. Form.
4    Foundation. Misstates the record.
5    A   I'm sorry. I missed something you said. What did
6        you say?
7    BY MR. KNOTT:
8    Q   She had a potassium-wasting condition which you
9        did not consider individually?
10   A   It would have been manageable. I don't know what
11       caused it, but they -- an endocrine workup would
12       be necessary, and whatever cause, it would be
13       treatable.
14           There was no cancer found on
15       autopsy, so she wasn't dealing with a tumor.
16   Q   And Ms. Boyer had a history of noncompliance with
17       her potassium supplement. You're aware of that?
18           MS. MAKAR: Same objection.
19   A   A lot of people don't like taking potassium
20       supplements. But her problem is way beyond
21       potassium supplements. It's a different issue.
22       It's physiologic.
23   BY MR. KNOTT:
24   Q   Do you think that walking around on the streets
25       with a potassium level below 3 creates a

Page 81

1    substantial risk of sudden death?
2            MS. MAKAR: Same objections.
3    A   I think it was an easily manageable problem, and I
4        think that this certainly -- had she had the
5        torsades and survived it in the ER, it would have
6        become the focus of a workup to find out what's
7        going on, as well as within reasonable certainty
8        implanting a defibrillator, because that is a risk
9        to her. And this arrest, if it occurred, would
10       have required her to get a defibrillator. That or
11       absolutely diagnose what's going on and then find
12       out how to treat it.
13   BY MR. KNOTT:
14   Q   She had three bowel obstruction surgeries
15       resulting in colostomies. You're aware of that?
16           MS. MAKAR: Same objections.
17   A   Yes.
18   BY MR. KNOTT:
19   Q   And that's -- the fact that she had three
20       colostomies is not a factor you considered in
21       assessing her life expectancy?
22           MS. MAKAR: Same objection.
23   A   Not a major one, no. It's baked in.
24   BY MR. KNOTT:
25   Q   Do you agree, Doctor, that if you went to other

21  (Pages 78 to 81)

Page 82

1    cardiologists to speak to them about their opinion
2    on her life expectancy that the approach to
3    assessing that would likely vary?
4         MS. MAKAR:  Objection.  Form.
5    Foundation.
6    **A    That's a very vague question, so I don't know what**
7    **you're asking.**
8    BY MR. KNOTT:
9    Q   If you went to talk to five cardiologists about
10    this issue of her life expectancy, do you agree
11    that there is likely to be multiple approaches to
12    how to estimate that?
13         MS. MAKAR:  Same objection.
14    **A   If I were to approach other cardiologists, I would**
15    **ask them what of her chronic medical conditions or**
16    **problems are an acute threat to her life and how**
17    **does that factor in, and I'd have a conversation.**
18    **I don't think we would have a vast difference, but**
19    **there may be some difference.**
20    BY MR. KNOTT:
21    Q   Your report makes no reference to withdrawal from
22    drugs or alcohol as contributing to the sequence
23    of events.  You don't hold an opinion that
24    Ms. Boyer was experiencing withdrawal from drugs
25    or alcohol, do you?

Page 83

1    **A   She might have been withdrawing from drugs or**
2    **alcohol.  I don't know.  But it doesn't change my**
3    **causation opinion that had she been sent to a**
4    **hospital in a timely manner she would have**
5    **survived.**
6    Q   Then just let me wrap up that point.
7    **A   I thought I mentioned her narcotics, but maybe I**
8    **didn't.  I thought I did.**
9    Q   Doctor, can you state to a reasonable degree of
10    medical probability that Ms. Boyer was
11    experiencing withdrawal from drugs or alcohol on
12    December 21st, 22nd or 23rd?
13    **A   I don't know.**
14    Q   And so you cannot state to a reasonable degree of
15    medical probability that she was experiencing
16    withdrawal from alcohol?
17         MS. MAKAR:  Objection.  Form.
18    **A   I don't know, and again, it doesn't affect my**
19    **causation opinion at all.  That's a standard of**
20    **care issue, not a causation issue.**
21         MR. KNOTT:  Doctor, I'm going to allow
22    some of these other attorneys to ask questions and
23    they'll introduce themselves.  I'm going to look
24    through my notes while they do that.
25         THE WITNESS:  Okay.

Page 84

1         MR. KNOTT:  Thank you.
2         MR. JONES:  I suggest we take a five- or
3    10-minute break.
4         MR. KNOTT:  Sure.  Okay by me.
5         MS. MAKAR:  Five or ten, Andrew?
6         MR. JONES:  Why don't we go for it.
7    We'll take a 10-minute break.  12:25.
8         MS. MAKAR:  Okay.
9         THE WITNESS:  It's now 1:15.
10         MR. JONES:  1:25, Doctor.
11         THE WITNESS:  Okay.  Thank you.
12         MR. JONES:  Sure.
13         (Brief recess taken from 12:15 p.m. to
14    12:25 p.m.)
15         E X A M I N A T I O N
16    BY MR. JONES:
17    Q   Doctor, I'm Andrew Jones.  I don't have all that
18    many questions for you, but I do want to follow up
19    on some things that you talked about with Mr.
20    Knott.
21         I am counsel for Monroe County and
22    several of its correctional staff.  Can you hear
23    me okay?
24    **A   Yes, I can.  Thank you.**
25    Q   I thought I understood you to say during your

Page 85

1    testimony that you don't know what caused
2    Mrs. Boyer to code in the early morning hours of
3    December 23rd; is that correct?
4    **A   Well, I don't know with enough -- I can say with**
5    **reasonable medical certainty that she developed a**
6    **spiral of high blood pressure, shortness of**
7    **breath, resulting in, and with her low potassium,**
8    **all conspiring to cause a cardiac arrest.  I think**
9    **that's the most reasonable explanation with all**
10    **the medical facts.**
11    **        So I can say with a reasonable**
12    **medical certainty, not absolute certainty, but**
13    **reasonable certainty that somewhere she developed**
14    **a spiral of chest pain -- I mean of high blood**
15    **pressure, which resulted in chest pain, shortness**
16    **of breath, and then because she had low potassium,**
17    **throwing her into an arrest.  That's the most**
18    **likely explanation with all the facts we know.**
19    Q   And are you offering that opinion in this case?
20    **A   Yes, but it's totally irrelevant to my main**
21    **opinion, which doesn't matter what she had.  She**
22    **didn't die of it.  She coded.  So my main opinion**
23    **is if she were in a hospital, she would not be**
24    **dead.**
25    Q   Okay.  And I understand that you also are offering

Bruce Charash, M.D.                                    January 28, 2025

Page 86

1    that opinion. I just want to be clear on whether
2    you're offering the opinion you just gave now in
3    your last answer as to what caused her to code?
4         MS. MAKAR: Objection. Form.
5    A   I'm saying that I think it's with reasonable
6    certainty the most likely explanation of what
7    occurred. But it doesn't matter to my main
8    causation opinion. It has nothing really to do
9    with causation, only to the degree that she didn't
10   die of something that was meant to kill her.
11        Because you can -- for example, if
12   someone said she had pneumonia, I think it's
13   highly unlikely, but pneumonia kills you two ways;
14   either major oxygen saturation drops, which never
15   occurred here, someone's on 100 percent oxygen,
16   you can't get any more in, they die, or they die
17   of sepsis with low blood pressure. She didn't die
18   of that. She didn't die of anything because her
19   body recovered. It's her brain that was
20   permanently damaged.
21        So no matter what triggered her
22   arrest, ultimately that got better. The only
23   thing we were left with was the brain damage,
24   which was only a consequence of having such an
25   event occur outside of a hospital. So that's my

Page 87

1    point.
2         So it really is not that important
3    as to what I believe was the sequence of events
4    that led to her arrest, but I think that is what
5    most likely, in terms of causation, to have led to
6    her arrest. I think it was related to her
7    cardiomyopathy.
8    BY MR. JONES:
9    Q   And if I understood the explanation you gave and
10   offered in your report, it's her elevated blood
11   pressure in combination with the underlying
12   cardiomyopathy, that is, the reduced function of
13   her left ventricle, and then with the low
14   potassium level that caused her to have ischemia?
15   A   The low potassium had nothing to do with anything
16   more than causing a torsades cardiac arrest.
17   That's the electrical event caused by clinical
18   events that triggered an electrical event.
19   Q   All right. Am I correct in understanding that
20   you're saying, though, that the elevated blood
21   pressure over the course of the afternoon in
22   combination with the condition of her left
23   ventricle caused her to have ischemia to some or
24   all of the heart?
25        MS. MAKAR: Objection. Form.

Page 88

1    A   With reasonable certainty, it caused local
2    ischemia in her inferior wall, because those are
3    the leads that were affected. And I think that
4    somehow the combination of all of that with the
5    low potassium triggered the cardiac arrest.
6    BY MR. JONES:
7    Q   As a layperson, I understand ischemia to mean
8    reduced blood flow to some portion of the heart;
9    is that correct?
10   A   No. Ischemia means insufficient oxygen delivery
11   for the work being demanded.
12        The most common cause of ischemia
13   is a blocked coronary artery with atherosclerosis
14   with or without an acute blood clot, which can be
15   an acute issue. But ischemia is any time there's
16   a mismatch of supply and demand.
17        In this case, the demand for fuel
18   goes up under stressed states, which would be
19   included in a hypertensive episode as well as
20   hypertension, and a low EF can lead to difficulty
21   of blood getting through the muscle because the
22   muscle is being stressed. So it's not the
23   arteries themselves. So you can have both a
24   reduction of supply and an increase in demand
25   during such episodes, which can lead to chest pain

Page 89

1    and EKG changes.
2    Q   So am I correct in understanding that the
3    increased demand, that would be a function of the
4    elevated blood pressure?
5         MS. MAKAR: Objection. Form.
6    A   Not that alone. The elevated blood pressure in
7    conjunction with the cardiomyopathy. Either.
8    BY MR. JONES:
9    Q   And the cardiomyopathy, am I correct in
10   understanding that that affects the ability of the
11   heart to supply? I'm trying to understand what
12   you say the mismatch between the supply and
13   demand --
14   A   No. It's -- somehow I'm not obviously being very
15   understandable, and I apologize for that. I don't
16   know what I'm saying wrong.
17   Q   Well, it may be the listener, too. So...
18   A   It has to be me, because I usually can make things
19   clear. Let me try one more time, and I apologize.
20        If you have a combination of
21   cardiomyopathy, some damage to someone's heart,
22   left ventricle, and high blood pressure, makes
23   them feel short of breath, they go into heart
24   failure, that can lead to ischemia in the heart
25   muscle through a number of mechanisms, one of

23  (Pages 86 to 89)

Page 90

1    which is the ventricle can stiffen under the
2    setting of some high blood pressure, shortness of
3    breath, which can in the muscle layer reduce blood
4    flow through the muscle, because these arteries
5    have to penetrate the muscle.  So even though the
6    big arteries are open, going through the muscle,
7    it can tighten down on the small blood vessels
8    leading to small vessel ischemia.
9            Also, the work demand of the
10   ventricle goes up when you have high blood
11   pressure on top of a cardiomyopathy.  So she had
12   both reasons for -- and if she was withdrawing
13   from drugs, it would certainly contribute to a
14   spiral, but I don't know how much that was a role
15   for her.  All I can tell you is there was a
16   spiral.  Here's a lady who comes in with known
17   heart disease.  That's her only major systemic
18   organ disease, who in the hospital has high blood
19   pressure, which is cardiovascular, has chest pain
20   which sounds cardiovascular, and she has an
21   arrhythmia, which is cardiovascular.  It's
22   difficult to believe those are not all unified by
23   the same cardiovascular process.
24   Q   Am I correct -- well, do you know the underlying
25       cause of the cardiomyopathy?

Page 91

1    A   It is unknown in her.
2    Q   I'm sorry?
3    A   It is unknown in her.
4    Q   Thank you.
5    A   It's called idiopathic, meaning they didn't know
6        the reason.
7    Q   And the cardiomyopathy that she had, is that -- is
8        there a way to characterize that in terms of being
9        mild, moderate or severe?
10   A   Well, you can use kind of blunt terms with three
11       categories, or you could just say she had an
12       ejection fraction of, what was it, 40 to
13       45 percent?  I'm sorry.  I forgot what her
14       ejection fraction was.  It was 35 to 40 percent.
15           So she had an ejection fraction --
16       normal ejection fractions range between 50 and 70.
17       Most people are 60 percent, which means 60 percent
18       of the blood gets squeezed out by the muscle when
19       the heart beats.  In her case only 35 to 40.  So
20       quantifying it is better than coming up with a
21       general descriptor.
22   Q   If you had to put a general descriptor on it, what
23       would it be?
24   A   Mild to moderate LV reduction.  On the other hand,
25       clinically, she was not in clinical heart failure,

Page 92

1        so that's another favorable.
2    Q   Well, that was my next question.  Am I correct in
3        understanding you to say that she did not have
4        congestive heart failure?
5    A   She did not have symptoms of congestive heart
6        failure as a chronic issue.  Her records show that
7        she had no other symptoms.  In November of 2019
8        she was seen at her outpatient cardiology and they
9        said no chest pain, no shortness of breath.  And
10       that's consistent with other visits.
11   Q   Well, do you understand her to have been diagnosed
12       with congestive heart failure?
13   A   Well, again, congestive heart failure, some people
14       just relate saying a low ejection fraction is
15       congestive heart failure.  But you really have to
16       have congestive heart failure.  She wasn't on a
17       diuretic.  She was on spirolactone, which is a
18       potassium sparing diuretic, but it wasn't like she
19       was on Lasix.  I didn't see evidence of that.  I
20       didn't see her needing to have fluid taken off,
21       having leg edema, I don't see any volume overload.
22       So I don't see any evidence of congestive heart
23       failure, just she had a damaged ventricle.
24   Q   On your review of her medical history, she did not
25       have any evidence of congestive heart failure; is

Page 93

1        that a correct statement?
2    A   I couldn't find any.  Certainly not as a chronic
3        issue, congestive heart failure.
4    Q   When -- what is the definition of coronary artery
5        ischemia?
6    A   Well, it was a poor use of terms when I said it.
7        Ischemia is ischemia, meaning not enough blood
8        supplied for the demand for fuel.  Usually when
9        you say coronary ischemia, you're talking about a
10       blocked coronary artery.  But it was just poor --
11       it was just sloppy language there.  I was just
12       using that as opposed to saying ischemia.  But
13       it's a poor term.  She didn't have technically
14       coronary artery ischemia.  She had ischemia.
15   Q   So normally coronary artery ischemia would refer
16       to a blockage, a reduced blood flow through the
17       coronary artery?
18   A   Yes, usually that's what it means.
19   Q   I understood you to say that in between Friday and
20       today you've reviewed the report of Dr. Wolff,
21       Matthew Wolff?
22   A   Between Friday and today?  I don't remember when I
23       got it.  It was recent, but I don't know if I got
24       it Friday.
25   Q   Fair enough.  That's my edition.  I'll rephrase

Bruce Charash, M.D.                                                  January 28, 2025

Page 94

1    it.
2            Am I correct in understanding that
3    you have reviewed the written report by Dr. Wolff?
4    A   Yes, I have.
5    Q   And I understand you have it with you right there?
6    A   I do.
7    Q   And just broadly speaking, are there any opinions
8    offered by Dr. Wolff that you take issue with or
9    disagreed with?
10   A   There's only one thing he said in his report that
11   I take some issue with, but I think if we go
12   through his opinions, they all agree with me.
13   There's nothing in his report that varies from
14   what I said.
15           But he described her blood pressure
16   in what I think is a strange term.  You can have
17   resistant hypertension, but he called her severe
18   multidrug resistant hypertension to make it sound
19   very severe.
20   Q   Can you -- I'm sorry.  Can I just stop you briefly
21   and have you point me to what -- what specifically
22   you're referring to or just give me a page and
23   line.
24   A   Page 3 on the second half of the page, the second
25   paragraph under Brief Medical Summary, and he said

Page 95

1    here, "Her medical history was also notable for
2    severe multidrug resistant hypertension."
3            Now, we use kind of multidrug
4    resistant for antibiotics resistance.  And there's
5    no evidence she had severe multidrug resistant
6    hypertension, because looking at her chart, she
7    was on the same drugs for hypertension for the
8    last eight years without even changing the doses.
9    And there were periods in 2017 where she had worse
10   high blood pressure, and it wasn't well
11   controlled, at least not perfectly controlled, but
12   there's no evidence of any drug resistance.  It
13   wasn't like they were putting her on a new drug
14   every month and it kept failing.  They never
15   changed her drugs.
16           So how do you say she is severe
17   multidrug resistant?  All we see is she continued
18   to have hypertension despite her current medical
19   regimen.  Doesn't mean she had any resistance.  So
20   there was no increase in her drugs.  There was no
21   addition.  So it's just a bizarre thing to throw
22   into a report saying she had severe
23   multi-resistant hypertension.  That's the only
24   small comment.
25           But otherwise, I think he agrees

Page 96

1    with everything I said, or we're not in variance.
2    His main opinions that I think I can agree with is
3    that she had a primary ventricular arrhythmia.
4    Yes, I agree, although something may have
5    triggered it.
6            Two, it was precipitated by severe
7    low potassium.  I agree, a significant
8    contributing factor.  Three --
9    Q   Doctor, Doctor, if I may save you some time --
10   A   Go ahead.
11   Q   -- other than his reference to her medical history
12   having been notable for what he phrased as a
13   severe multidrug resistant hypertension, is there
14   any other portion of Dr. Wolff's written report
15   that you disagree with?
16           MS. MAKAR:  Objection.  Form.
17   A   It's a little broad, because I haven't memorized
18   his report.  I did review it.  I don't remember
19   any major area of disagreement.  But that doesn't
20   mean I'm blanketly saying I agree with every
21   sentence.  I don't remember.  There's no major
22   point that he brought up that I think requires me
23   to rebut.  But somehow --
24   BY MR. JONES:
25   Q   Well, he offered -- hang on.  Bear with me.  He

Page 97

1    offered seven numbered opinions in his report.
2            Do you disagree with any of the
3    seven numbered opinions that Dr. Wolff sets out in
4    his report?
5            MS. MAKAR:  Objection.  Form.
6    A   Well, to begin with, he gave eight opinions
7    because he listed two different sixes.  On Page 7,
8    he has two different opinion sixes, so I think he
9    has eight opinions, because Opinion 7 is actually
10   Opinion 8.  Just --
11   BY MR. JONES:
12   Q   With that clarification --
13   A   With that clarification --
14   Q   -- let me --
15   A   I want to go through and make sure -- I want to go
16   through and make sure I have them.
17   Q   Let me make sure that the question is on the
18   record, though, Doctor, since we spoke over each
19   other, and I will try not to do that.
20   A   Sure.
21   Q   Of Dr. Wolff's eight numbered opinions, are there
22   any that you disagree with?
23   A   Well, I have to go through them to make sure.  One
24   of them I don't have a comment on.
25           So one, he gives the opinion that

888-893-3767        Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                     California Firm Registration #179

Page 98

1    her arrest, No. 1 opinion, was due to a primary
2    arrhythmia, V-tach or V-fib. I agree with that.
3              Two, the ultimate fatal ventricular
4    arrhythmic arrest was precipitated by severe
5    hypokalemia, low potassium. I agree with that to
6    the degree that it was a significant contributing
7    factor.
8              And by the way, the arrhythmia
9    wasn't fatal. The neurologic injury due to the
10   fact this was out of hospital is what was fatal.
11             Three, her severe low potassium
12   predated her coming into the jail. I agree.
13             Four, her dilated cardiomyopathy
14   increased her vulnerability to a malignant
15   arrhythmia. I agree with that.
16             Seven -- I mean that was Opinion
17   No. 4.
18             Opinion No. 5, her cardiac arrest
19   was not due to an acute myocardial infarction, and
20   her chest complaints prior to arrest were not
21   secondary to coronary artery disease or
22   ventricular arrhythmias.
23             Well, technically I agree with him.
24   I think the patient was ischemic but not due to
25   coronary disease. I think that's the most likely

Page 99

1    answer. And her chest pain was because of the
2    hypertension and underlying heart disease. And I
3    agree she didn't have an acute MI either, so in
4    principle we're not very far apart on Opinion 5.
5              Opinion 6, the cardiac arrest was
6    not due to malignant hypertension. I agree with
7    that. No one ever said she had malignant
8    hypertension. It was never suggested. I never
9    said she had malignant hypertension.
10             Opinion 6, which is actually
11   Opinion 7, the medical care provided to Ms. Boyer
12   was reasonable, consistent with accepted medical
13   standards. I'm not offering a standard of care
14   opinion.
15             And then his final opinion, the
16   initial care she received from jail personnel
17   following her cardiac arrest was timely -- yeah.
18   When she coded, they did the best they could. I'm
19   not -- and I'm not giving standard of care, but I
20   agree that at least the code -- I have -- it's a
21   standard of care opinion. I haven't seen
22   anyone -- I don't recall anyone raising a
23   criticism of the post-arrest, of the arrest
24   management, you know, but I'm not giving any
25   opinion about that. So I have no opinion on

Page 100

1    standard of care. He does, but I'm not offering
2    any.
3              And he didn't -- again, I just want
4    to make this clear. The main thrust of my opinion
5    is giving times by which if she had reached the
6    hospital the arrest would either have been
7    avoided, or if not avoided, would have been
8    resuscitated without brain damage. And from my
9    reading of every defense expert who's seen my
10   report, I presume, no one has disagreed with that
11   including Dr. Wolff. So --
12   Q    And in --
13   A    -- to that degree, I agree with him.
14   Q    And picking up on what you said in reference to
15        his -- what he labels as Opinion 7 on Page 8 of
16        his report. You made the observation in your
17        report on Page 3, "the correctional staff
18        responded aggressively and appropriately once
19        Ms. Boyer suffered her cardiac arrest."
20             Do you recall that observation in
21        your report?
22   A    Although -- yeah, I'm supportive of them, but I'm
23        still not going to be offering standard of care.
24   Q    I understand. But you made the observation in
25        your report, correct?

Page 101

1    A    Yes.
2              MS. MAKAR: Objection. Form.
3    BY MR. JONES:
4    Q    And do you stand by that observation in your
5        report?
6              MS. MAKAR: Objection. Form.
7    A    Yes. Of course I do.
8    BY MR. JONES:
9    Q    Were there any -- were there any pieces of
10       literature in your field or any other sources from
11       your field that you relied on in forming or
12       reaching your opinions?
13   A    No.
14   Q    I'm sorry. I didn't hear your answer.
15   A    No.
16   Q    And I assume the list of records that you provided
17       on Page 1 and 2 of your report and that you
18       reviewed, is that a complete list of all the
19       records you reviewed in forming your opinions?
20   A    Yes. Obviously they don't include the defense
21       reports, which came later, but yes.
22   Q    Understood. And were there any records that you
23       asked for but that you were not provided?
24   A    No.
25   Q    You've provided us with the invoices that you gave

888-893-3767    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com    California Firm Registration #179

Bruce Charash, M.D.                                                    January 28, 2025

Page 102

1    to the Loevy firm for your work in this case,
2    correct?
3    A    Yes.
4    Q    And were there any other written communications
5        between you and Ms. Makar or anybody else at the
6        Loevy firm relating to your compensation for your
7        work in this matter?
8    A    No.
9    Q    And were there any --
10   A    No.
11   Q    Were there any written communications coming from
12       Ms. Makar or anyone else at the Loevy firm to you
13       that identified specific facts or data that you've
14       relied on in forming your opinions?
15   A    No.  No.  Nothing.
16   Q    And were there any written communications from
17       Ms. Makar or anyone else at her firm to you
18       identifying assumptions that you relied on in
19       forming your opinions?
20   A    No.  No.  Absolutely not.
21   Q    And the invoices that you've provided Mr. Knott,
22       marked here as Exhibit 118, the last invoice is
23       dated January 22nd, 2025.  Do you recall that?
24   A    That's the final invoice.
25   Q    So as of last Wednesday, I believe that is, do

Page 103

1        those invoices account for all of the hours you've
2        spent in connection with your work on this matter
3        up through January 22nd of 2025?
4            THE STENOGRAPHER:  Yes?
5    A    I said "yes."
6    BY MR. JONES:
7    Q    I didn't -- thank you.
8            And if I can just ask you about the
9        last one from last Wednesday, January 22nd, the
10       narrative on the invoice reads that you were
11       billing for upcoming review of defense reports,
12       preparation for your deposition, and the
13       anticipated pre-deposition discussion with
14       counsel.
15   A    Yes.
16   Q    So am I correct in understanding this invoice was
17       sort of anticipatory of that work?
18   A    Yes.  I knew there'd be an hour discussion, that's
19       typical.  We were about an hour.  I was given the
20       understanding there'd be a handful of reports.  So
21       that's factored in, and my final prep, so yes.
22   Q    Okay.  And so does that invoice essentially
23       account for the time you spent in preparing for
24       the deposition?
25   A    Correct.

Page 104

1    Q    So in truth, these invoices account for all of the
2        time you spent on this file up until the moment we
3        began this deposition this morning; is that
4        correct?
5    A    Yes, that is correct.
6    Q    And is $550 an hour -- well, scratch that.
7    A    It went up to 600 an hour last year.
8    Q    Yeah, I just noticed that.
9    A    2023 it went up to 600 an hour.
10   Q    Okay.  So 600 an hour, is that your standard rate
11       for your work as an expert witness?
12   A    For review.  For deposition it's $700 an hour
13       because that cuts into my daytime, which I can
14       review at night.  And then for trial, if it's out
15       of town, I charge $6,000 for the day plus
16       reasonable expenses.  I don't charge for travel
17       time.  Just the day of being gone.
18   Q    And previously was the standard rate for review
19       and report writing 550, was that your standard
20       rate?
21   A    No.  Then it was 550 for review, 600 for
22       testimony, and 5,000 for day at trial.
23   Q    I'm not asking you very good questions.  Let me
24       try with a different question.
25           The rates that you've charged the

Page 105

1        Loevy firm for your work in this matter, have
2        those been your standard billing rates?
3    A    Well, since I've made the change, yes.  It's not
4        special for them.  Those are my rates.
5    Q    Were there any materials you reviewed to prepare
6        for the deposition, other than your report, the
7        reports by the other experts that you've been
8        provided or records that are identified on pages 1
9        and 2 of your report?
10   A    I'm sorry.  When did you ask?  I missed that, the
11       first part.  I couldn't hear it.
12   Q    Were there any records you reviewed to prepare for
13       your deposition, other than your own report, the
14       reports of the other experts that Ms. Makar
15       provided you?
16   A    No.  I relooked at the Gundersen records.
17   Q    So anything other than your report, the Gundersen
18       records and the other expert reports that you were
19       provided?
20   A    Well, the defense reports, of course, I spent a
21       fair amount of time with those, going over their
22       dissertations.  So those were the major things was
23       my report, defense reports, and the Gundersen
24       file.
25   Q    Was there anything else you reviewed to prepare

27  (Pages 102 to 105)

Bruce Charash, M.D.    January 28, 2025

Page 106

```
 1   for your deposition?
 2   A   I looked at some of the jail records again,
 3       although I mean, not extensively, but I did spend
 4       time looking at the narrative reports of the jail.
 5   Q   Anything else?
 6   A   No, not that I can think of.
 7   Q   You're licensed in New York, correct?
 8   A   Yes.
 9   Q   Have you ever been licensed in a state other than
10       New York?
11   A   No.
12   Q   Have you ever been subject to any sort of
13       discipline under your New York license or your
14       board certification?
15   A   I've had no discipline outside of marriage.  A
16       little levity into today's proceedings.  I'm
17       sorry.
18   Q   That's good.  That's good.
19           And your CV, it includes all of
20       your publications, correct?
21   A   Yes.
22   Q   I'm sorry.  I didn't hear an answer.
23   A   I said "yes."
24           MR. JONES:  Okay.  Thank you, Doctor.
25           THE WITNESS:  Certainly, sir.
```

Page 107

```
 1           E X A M I N A T I O N
 2   BY MR. CASSERLY:
 3   Q   Hi, Doctor.  I think I'm only going to be going
 4       about five minutes, so if you need a break, we can
 5       take one, otherwise I can just charge ahead.
 6   A   I think we should just charge ahead.
 7   Q   Great.  I hear no objection.  So I'll introduce
 8       myself.  My name's John Casserly.  I am an
 9       attorney for some defendants in this matter.  They
10       are USA Medical and Psychological Staffing, S.C.,
11       and four doctors, Drs. Harmston, Bresnahan,
12       Johnson and Schamber.
13           And I assure you, I was listening
14       when you told Mr. Knott that your opinions are in
15       your report and you're not intending to give any
16       other opinions, and because of that, I will
17       shorten these up.  But I do need to confirm,
18       because there are some allegations in this case
19       about my clients that are not explicitly medical,
20       but I need to make sure you're not going to have
21       an opinion on them.
22           So my first question is, you have
23       not reviewed the deposition transcripts of any of
24       the corporate officers or shareholders of the --
25       of USA Medical and ACH.  Those would be
```

Page 108

```
 1   Dr. Johnson, and CEO Jessica Young, and CFO Jaime
 2   Lynch, right?
 3   A   Correct.
 4   Q   And is it fair to say that you don't have an
 5       opinion about the corporate structure or the
 6       corporate financial status of USA Medical or
 7       Advanced Correctional Healthcare; is that right?
 8   A   That is correct.
 9   Q   Okay.  You don't have any criticisms that those
10       corporations are under -- underinsured or
11       undercapitalized; is that right?
12   A   No, I have no opinions about anything to do with
13       the corporate structure or finance or anything
14       like that.  I will not talk about them for a
15       millisecond.
16           MR. CASSERLY:  All right.  You have --
17       you have exhausted my questions.  I have no
18       others.
19           THE WITNESS:  Okay.  Mr. Knott, do you
20       have any further questions, or did you --
21           MR. KNOTT:  Yeah, I just need to follow
22       up.  Thank you, Doctor.
23           E X A M I N A T I O N
24   BY MR. KNOTT:
25   Q   You said that you had reviewed the report of
```

Page 109

```
 1   Pearson.  Ms. Pearson is a nurse.  I assume you
 2   have no commentary or debate with Ms. Pearson that
 3   you --
 4   A   I have no opinion about her standard of care
 5       opinions.
 6           MS. MAKAR:  I --
 7   BY MR. KNOTT:
 8   Q   Yeah.  And the same with respect to Dr. Young, do
 9       you have any -- did that alter your opinions or do
10       you wish to add to your opinions in this case
11       because of your review of Dr. Young's report?
12           MS. MAKAR:  Sorry.  Go ahead.  Finish.
13           MR. KNOTT:  I did.
14   A   I think --
15           MS. MAKAR:  Oh.  I would just object to
16       any questioning outside of the scope of John or
17       Andrew's questioning, as you've passed the
18       witness, and move to strike any question in
19       response, outside the scope of that questioning
20       under Rule 30.
21   A   Anyway, I have no comment on their opinions.  They
22       did not in any way address my causation opinion,
23       so we have no overlap.  I'm not agreeing or
24       disagreeing with anything they say.  We just don't
25       have any overlap.
```

28 (Pages 106 to 109)

Bruce Charash, M.D.                                    January 28, 2025

Page 110

1   BY MR. KNOTT:
2   Q   Okay.  Doctor, is it your opinion that Ms. Boyer's
3       experience of chest pain was due to ischemia, or
4       can you not know?
5   A   I think with medical certainty she was
6       experiencing some ischemia, because you have
7       underlying heart disease, you had her having chest
8       pain and shortness of breath going on to a cardiac
9       arrest and having ischemic abnormalities on her
10      first EKG after the arrest.  So I would say with a
11      reasonable medical certainty she was experiencing
12      some form of ischemia right before her arrest.
13  Q   And are you -- the question is a little different.
14          Are you testifying that her
15      experience of chest pain during the day or evening
16      was caused by heart ischemia?
17  A   I said it would likely be ischemia.  I've said
18      that.
19  Q   Okay.  I understand you to say there was likely
20      ischemia, but the question is whether at that
21      particular time you thought -- you think that the
22      pain she experienced was resulting from ischemia,
23      or can you not know with that specificity?
24          MS. MAKAR:  Objection.
25  A   I'm saying I think her chest pain was, within

Page 111

1       reasonable medical certainty, more likely than not
2       to be ischemic pain.  Am I not understanding what
3       you're asking me?  Am I answering you?  I really
4       don't want to be rude.  I thought that was my
5       answer.  I think with reasonable certainty she was
6       feeling chest pain from coronary -- from cardiac
7       ischemia.
8   BY MR. KNOTT:
9   Q   Your response ended with before her --
10  A   Okay.  Then take that back.  That's fine.  Her
11      chest pain was ischemia pain with reasonable
12      certainty.
13          MR. KNOTT:  Okay.  Okay.  Those are the
14      questions I have.  Thank you.
15          THE WITNESS:  Okay.
16          MS. MAKAR:  I don't have any questions.
17      Thank you, Doctor.
18          THE WITNESS:  You're welcome.  I will
19      send you an invoice for the three hours of this
20      deposition which you can forward to the defense,
21      Maria?
22          MS. MAKAR:  Yes.
23          THE WITNESS:  And a W9 as well.  Okay.
24          MS. MAKAR:  Yes.
25          THE WITNESS:  Are you in read or waive

Page 112

1       kind of thing?  Do you do that when you have
2       depositions in your state?  Some states I have to
3       read or waive.
4           MS. MAKAR:  Yes, I think you're about to
5       be asked that.
6           THE WITNESS:  Okay.  Then I'll read.
7       Thank you.  You all take care.
8           (Deposition concluded at 1:05 p.m.)
9           (Deposition Exhibit Nos. 117 through 122
10      electronically marked for identification.)
11          (Original exhibits attached to Original
12      transcript; copies of exhibits are attached.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 113

1   STATE OF WISCONSIN )
                        ) SS:
2   MILWAUKEE COUNTY  )
3
4       I, Rosanne E. Pezze, RPR/CSR/CRR
5   and Notary Public in and for the State of
6   Wisconsin, do hereby certify that the deposition
7   of BRUCE CHARASH, M.D. was recorded remotely by me
8   and reduced to writing under my personal
9   direction.
10      I further certify that said
11  deposition was taken remotely from New York City,
12  New York, on the 28th day of January, 2025,
13  commencing at 10:04 a.m.
14      I further certify that I am not a
15  relative or employee or attorney or counsel of any
16  of the parties, or a relative or employee of such
17  attorney or counsel, or financially interested
18  directly or indirectly in this action.
19      In witness whereof, I have hereunto
20  set my hand and affixed my seal of office on this
21  3rd day of February, 2025.
22
23
    _____
        ROSANNE E. PEZZE, RPR/CSR/CRR
24          Notary Public
        My commission expires January 10, 2026
25

29  (Pages 110 to 113)

Bruce Charash, M.D.                                    January 28, 2025

Page 114

```
 1      STATE OF WISCONSIN )
 2                        ) SS:
 3      MILWAUKEE COUNTY   )
 4
 5
 6
 7           I, BRUCE CHARASH, M.D., do hereby certify
 8      I have read the foregoing transcript of proceedings
 9      taken January 28th, 2025, remotely from New York
10      City, New York, and the same is true and
11      correct except for the list of corrections noted on
12      the annexed page.
13
14
15
16          Dated at _____
17          this _____ day of _____, 2025.
18
19
20                   _____
21                        BRUCE CHARASH, M.D.
22
23
24
25
```

888-893-3767    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                    California Firm Registration #179

Bruce Charash, M.D.

January 28, 2025

Page 115

| A | | | | |
|---|---|---|---|---|

**a.m** 1:19 2:9
40:3,4 113:13
**abdomen** 37:10
77:21
**abdominal**
36:23 37:9
77:16
**Aberdeen** 2:14
**ability** 89:10
**able** 21:4 51:1
53:21 54:24
66:23 77:22
**abnormal** 56:22
64:13
**abnormalities**
44:6 46:8,11
46:15 79:6
110:9
**abnormality**
58:14
**above-entitled**
2:2
**absolute** 20:11
42:5 45:21
63:13 67:14
85:12
**absolutely** 19:17
37:20 39:24
81:11 102:20
**abstracts** 32:10
**abuse** 79:1
**academic** 25:21
26:25 28:2
30:11,12
**accent** 55:24
56:1
**accept** 35:11
**accepted** 34:18
99:12
**access** 11:2,3
17:10
**account** 103:1
103:23 104:1
**accurate** 15:16
15:24
**accurately** 56:3

**ACH** 2:20
107:25
**ACLS** 60:17
**action** 2:2
113:18
**active** 31:19
43:22
**actively** 12:16
**acute** 27:5 34:13
43:13,14 44:10
44:15,22 48:1
59:8 82:16
88:14,15 98:19
99:3
**acutely** 34:16
**add** 7:15,17
75:21 109:10
**add-on** 47:21
**addition** 16:11
95:21
**address** 6:8,9,11
109:22
**addressing** 6:2
**adequacy** 23:22
**administration**
40:15
**Administrator**
1:3,10
**admission** 61:5
72:12
**admissions**
27:14
**admit** 28:13
**admitted** 42:22
43:3 44:21
46:12 60:9
74:12
**advanced** 1:7
23:22 24:8
25:6 38:7
108:7
**advances** 27:7
**advice** 32:19
**affect** 78:11
83:18
**affiliated** 17:18
26:1 27:25
**affiliation** 27:21

27:24 28:1
**affixed** 113:20
**AFib** 68:6
**afternoon** 44:13
45:10,19 62:14
87:21
**again/off** 68:24
**aggressively**
100:18
**ago** 12:9,25
**agree** 33:24 34:2
36:11 40:14
42:13 48:12
52:6 55:12
56:2 59:3,14
60:11 61:5
66:13 67:25
70:2 81:25
82:10 94:12
96:2,4,7,20
98:2,5,12,15
98:23 99:3,6
99:20 100:13
**agreeing** 109:23
**agrees** 49:14
95:25
**ahead** 96:10
107:5,6 109:12
**air** 38:10 39:7
**al** 1:7,14
**albeit** 46:8
**alcohol** 39:8
82:22,25 83:2
83:11,16
**Alecia** 3:13
**allegations**
107:18
**allow** 83:21
**alter** 109:9
**Amber** 2:20
**amount** 105:21
**analyze** 20:2
**anatomic** 44:7
**Andrew** 3:8 84:5
84:17
**Andrew's**
109:11
**angle** 32:16

**annexed** 114:12
**annual** 18:10
**answer** 21:18
23:5 40:21
73:19 79:19
86:3 99:1
101:14 106:22
111:5
**answering** 111:3
**antibiotics** 95:4
**anticipated**
103:13
**anticipatory**
103:17
**anxiety** 46:18,22
47:8
**anybody** 102:5
**anymore** 17:2
17:14 21:7
43:10
**anyone's** 19:24
**Anyway** 109:21
**apart** 99:4
**apologize** 24:21
25:4 29:11
31:11 49:19
89:15,19
**apparent** 34:12
**apparently**
37:24
**appear** 33:24
34:3
**appeared** 2:16
2:20 3:5,10
7:11,12 33:19
**appearing** 1:20
2:7
**appointment**
28:3
**appointments**
25:22
**appreciate** 23:5
23:5 64:6
**approach** 82:2
82:14
**approaches**
82:11
**appropriate**

40:15
**appropriately**
100:18
**appropriateness**
40:19,20
**approximate**
18:24 19:7
**approximately**
6:16 9:4 15:18
16:1 36:13
**April** 29:22
**area** 5:12 96:19
**areas** 31:9
**argue** 74:19
**argument** 60:7
**arm** 46:6 51:5
**arrest** 27:6,7
31:9 44:19,20
46:12 48:5
51:16 55:11,12
60:15,21 62:2
62:12,24 63:1
63:25 67:6,8
68:13,15,19,25
81:9 85:8,17
86:22 87:4,6
87:16 88:5
98:1,4,18,20
99:5,17,23
100:6,19 110:9
110:10,12
**arrested** 53:17
64:11
**arrhythmia** 34:1
53:7,10 54:4
60:12,24 66:14
67:5 68:2,5,8
90:21 96:3
98:2,8,15
**arrhythmias**
53:13,16 68:6
68:7 98:22
**arrhythmic** 98:4
**arteries** 64:18
64:24 75:24
88:23 90:4,6
**artery** 45:25
62:17,21 64:23

Bruce Charash, M.D.

January 28, 2025

65:2,8 88:13
93:4,10,14,15
93:17 98:21
**asked** 6:14 7:15
9:16 16:10
20:14 22:8
35:16,17,20
50:3 101:23
112:5
**asking** 48:15,18
48:19 54:16
82:7 104:23
111:3
**aspect** 22:19
**assessing** 80:2
81:21 82:3
**assessment**
38:12 64:1
74:5 76:1
**assigned** 26:14
26:16
**assistant** 26:5
**associated** 57:12
57:13
**assume** 13:7
66:3 67:19
101:16 109:1
**assumptions**
102:18
**assure** 107:13
**asthma** 77:25
78:8,11
**asymptomatic**
75:2
**atherosclerosis**
65:8 88:13
**attached** 4:18,18
112:11,12
**attacks** 45:25
56:20
**attending** 16:19
27:17 28:14,20
29:19,22
**attention** 47:20
**attorney** 107:9
113:15,17
**attorneys** 83:22
**authorized** 18:4

**autopsy** 64:18
76:7 80:15
**available** 78:15
78:19
**Avenue** 2:18
**average** 7:1,11
17:25 18:1
71:12,19 72:3
72:4,6,7,7
73:23 76:12,13
78:5,12
**averaging** 24:18
24:20
**aVF** 44:2 55:5
**aVL** 55:6
**avoid** 32:24
**avoided** 100:7,7
**aware** 11:24
25:23 38:17
68:17,21,23
69:1 79:8
80:17 81:15

---

**B**

**B** 3:2 4:9
**back** 6:6 7:9
19:3 20:18
26:6 60:20
111:10
**Background**
36:18
**bad** 32:22
**baked** 72:4 74:4
76:4,11,19,22
78:4,12,23
81:23
**based** 5:22 6:23
6:24 15:25
18:11 64:1
**baseline** 43:19
**basis** 38:10,23
41:2 62:20
66:5,11 70:18
**Bates** 4:15,16
10:10
**bathroom** 39:21
**bear** 14:14 21:9
96:25

**beats** 91:19
**becoming** 31:22
**bed** 65:15
**began** 104:3
**beginning** 43:18
**begins** 54:20,21
62:7
**behalf** 1:4,11
2:16,20 3:5,10
21:14
**believe** 8:12
22:11,14 36:20
42:19 45:16
52:11 54:25
87:3 90:22
102:25
**believed** 15:14
69:12
**best** 63:10,20
99:18
**better** 86:22
91:20
**beyond** 80:20
**big** 18:2 27:3
48:6 90:6
**biggest** 25:25
**bill** 18:4,20
**billing** 103:11
105:2
**bit** 47:18 76:4
**bizarre** 95:21
**blanketly** 96:20
**block** 48:21
**blockage** 93:16
**blocked** 88:13
93:10
**blocking** 46:1
**blood** 41:16,18
41:22,25 42:7
46:1,18,24
50:10,13,17,20
52:3 63:2,14
63:17 65:4,12
67:10 69:11
85:6,14 86:17
87:10,20 88:8
88:14,21 89:4
89:6,22 90:2,3

90:7,10,18
91:18 93:7,16
94:15 95:10
**blow** 54:13
**blue** 67:9
**blunt** 91:10
**board** 106:14
**body** 86:19
**book** 32:15 33:3
**bottom** 55:20
**bowel** 77:20
81:14
**Boyer** 1:3,4,10
1:11 8:1 24:9
33:21 38:15
40:13 45:8,18
75:18,18 76:21
80:16 82:24
83:10 85:2
99:11 100:19
**Boyer's** 110:2
**brain** 33:25
51:17 64:12,13
86:19,23 100:8
**break** 10:14
39:21,23 49:15
71:16 84:3,7
107:4
**breath** 39:12,19
42:7 46:6,20
47:2,8,11 51:6
52:2 61:17,19
63:2,19 72:13
74:13 85:7,16
89:23 90:3
92:9 110:8
**breathe** 39:17
39:18
**breathing** 34:15
39:12,15,16
**Bresnahan** 3:6
107:11
**brief** 40:3 49:1
84:13 94:25
**briefly** 23:8
94:20
**bring** 27:13
**brings** 47:19

**broad** 96:17
**broadly** 94:7
**Broadway** 3:8
**broken** 35:15
**brought** 96:22
**Bruce** 1:17 2:1
4:12,13,14 5:2
5:9 113:7
114:7,21
**bunch** 33:2
**burning** 74:15
**bursts** 66:17

---

**C**

**C** 2:12 3:1
**C-H-A-R-A-S...**
5:9
**calendar** 15:11
**call** 18:12 19:19
27:11 28:25
29:3,7,8,13,14
43:25
**called** 22:6,22
25:24 27:9,12
28:20 30:6,8
32:15 43:16
91:5 94:17
**calls** 18:18
**cancer** 36:24
37:11 38:7
70:4 72:1 76:6
76:7 77:19
80:14
**capital** 32:5,6
**captured** 53:11
**cardiac** 16:14
27:6,7 30:24
31:8 44:19
46:12 47:11
48:4 50:17
51:16 52:18
60:15 62:2,12
62:24 68:25
85:8 87:16
88:5 98:18
99:5,17 100:19
100:8 111:6
**cardiologist**

Bruce Charash, M.D.

January 28, 2025

16:8,16 54:25
**cardiologists**
17:21 29:18,20
82:1,9,14
**cardiology** 5:13
16:10,12 26:22
27:17 28:19,21
29:14 92:8
**cardiomyopat...**
59:17
**cardiomyopat...**
44:16 49:25
50:8,13,19
58:11 72:11
74:15,21,23,25
75:1,6 87:7,12
89:7,9,21
90:11,25 91:7
98:13
**cardiovascular**
69:14 90:19,20
90:21,23
**care** 16:11,13
17:22 23:3,7
23:20 24:4,7
27:19 30:25
36:7 40:17,24
47:14 48:15
52:8 83:20
99:11,13,16,19
99:21 100:1,23
109:4 112:7
**cared** 37:20
**case** 1:6,13 6:5
8:1 10:1,25
11:19,22 12:8
12:11,14,19
13:5,15 14:7,9
14:10,25 17:13
17:13 19:23
20:2,23 21:13
22:7,18,20
24:5 25:3,15
27:1 33:9 46:5
63:19,23 71:7
73:2 74:3
85:19 88:17
91:19 102:1

107:18 109:10
**cases** 7:8 10:1,21
13:10 14:2,5
15:17,21 19:5
19:9,10,18,19
20:5,9,10,10
20:12,15,16
21:13 22:5,8
24:15 47:22,23
**Casserly** 3:2 4:5
107:2,8 108:16
**casually** 42:3
**categories** 91:11
**cath** 55:14
**catheterization**
19:21
**causation** 22:23
23:1,7 36:9
40:18 44:17
48:8 49:8 63:6
83:3,19,20
86:8,9 87:5
109:22
**cause** 44:23
53:10 58:15
61:12,16,17,20
68:15 70:5
73:10 80:12
85:8 88:12
90:25
**caused** 51:14,17
51:18,24 69:24
80:11 85:1
86:3 87:14,17
87:23 88:1
110:16
**causes** 61:19
**causing** 69:12
70:1 87:16
**CCTV** 33:6
**CDC** 71:1,5
72:18 73:2,9
73:20 74:4
75:4
**cell** 18:16
**Center** 31:7
**CEO** 108:1
**certain** 6:23

32:22 44:17
46:3 57:13
**certainly** 57:2
75:21,21 81:4
90:13 93:2
106:25
**certainty** 45:21
63:12,13,14
67:14,15 81:7
85:5,12,12,13
86:6 88:1
110:5,11 111:1
111:5,12
**certification**
106:14
**Certified** 1:24
2:6
**certify** 113:6,10
113:14 114:7
**CFO** 108:1
**challenged** 49:7
**challenging**
27:13
**chance** 68:4
**change** 43:13
44:24 83:2
105:3
**changed** 17:20
25:19 95:15
**changes** 25:13
43:14 45:5
89:1
**changing** 95:8
**characterize**
14:7 41:12
42:10 91:8
**Charash** 1:17
2:1 4:12,13,14
5:2,9,14 9:22
113:7 114:7,21
**charge** 18:14
104:15,16
107:5,6
**charged** 104:25
**chart** 95:6
**chat** 9:3,4,7,9,11
**check** 51:1
**chest** 27:5 31:7

34:20,22 36:15
42:7 45:10,18
46:5,15,19,22
47:1,7,10,14
47:19 48:2,16
51:5 52:2,18
61:12,13,16,20
63:2,18 67:11
68:23 69:13
85:14,15 88:25
90:19 92:9
98:20 99:1
110:3,7,15,25
111:6,11
**Chicago** 2:14
**chief** 30:24 31:1
31:2,8
**childhood** 70:3
**choice** 20:1
**Christine** 1:4,11
8:1 24:9
**chronic** 51:1
70:7 72:16
77:10 79:23
82:15 92:6
93:2
**cigarette** 76:9
79:7
**City** 1:20 2:8
113:11 114:10
**civil** 2:4 22:13
22:17,20
**claims** 22:12
**clarification**
97:12,13
**clarify** 28:10
29:9
**Class** 72:13
**classic** 44:6
**clean** 75:23
**clear** 7:21 25:2
29:25 60:21
66:1 86:1
89:19 100:4
**clearly** 44:21
**clicks** 12:4
**client** 25:3
**clients** 107:19

**clinical** 26:5,20
26:25 27:18
33:22 74:9
87:17 91:25
**clinically** 69:12
79:5 91:25
**clonidine** 40:13
40:15,20 52:4
69:2
**close** 9:6 36:8
**closed** 62:17
**clot** 45:25 65:9
88:14
**coast** 15:21,22
**code** 46:8,16
51:12,14,15,19
51:24 59:7,8
59:10,11 85:2
86:3 99:20
**coded** 51:12,21
52:14 64:9
68:5 85:22
99:18
**coding** 51:9
**cohort** 71:9
**cold** 14:17 39:22
39:22
**collapsed** 33:21
**colostomies**
81:15,20
**column** 13:13
**combination**
87:11,22 88:4
89:20
**come** 19:18
27:10 31:5
45:3
**comes** 19:11
28:15,17 90:16
**comfortable**
34:15 42:9,11
**coming** 41:23
91:20 98:12
102:11
**commencing** 2:9
113:13
**comment** 41:3
50:9 56:11

Bruce Charash, M.D.

January 28, 2025

**Page 118**

109:21
**commentary**
109:2
**commenting**
23:25
**commission**
113:24
**commitment**
18:2
**common** 30:9
46:7 47:19
56:18 57:17
58:8 88:12
**communicating**
29:11
**communicatio...**
102:4,11,16
**companies** 18:5
**compare** 42:5
**compensation**
18:25 102:6
**complain** 46:19
47:1
**complaint** 47:14
**complaints**
98:20
**complete** 101:18
**completely** 35:1
**complex** 43:17
**complications**
77:19
**conceivable**
35:22
**concern** 16:15
**concerning** 52:5
**concierge** 18:12
**concluded** 112:8
**concluding** 2:9
**conclusion**
34:12
**condition** 38:23
75:5 79:25
80:8 87:22
**conditions** 58:4
58:5,6 74:4
76:16 82:15
**conference**
27:11

**confirm** 9:24
107:17
**confused** 14:13
49:13
**congestion**
63:22
**congestive** 14:2
14:4 50:21
62:16 66:25
71:10 74:6,13
92:4,5,12,13
92:15,16,22,25
93:3
**conjunction**
89:7
**connected** 30:23
**connection**
103:2
**consequence**
55:11 86:24
**consequences**
36:24
**consider** 32:12
76:23 77:15
80:1,9
**considered**
32:21 39:19
75:5,25 76:17
76:21 77:4
78:1 79:13,16
81:20
**considering**
77:16
**consistent** 7:21
44:22 92:10
99:12
**conspiring** 85:8
**Constitutional**
22:16
**consult** 27:17
28:14,21,22
29:1,9,19,22
30:6 72:18
73:8,20 78:19
78:25
**contact** 18:17
**context** 26:17
30:22 42:6

69:10
**contextual** 41:21
**continue** 16:3
35:23 44:25
**continued** 3:1
95:17
**contract** 23:13
**contribute** 90:13
**contributed**
64:25
**contributing**
66:21 67:3
82:22 96:8
98:6
**contribution**
66:24 68:12
**contributor**
68:18
**control** 67:10
**controlled** 95:11
95:11
**conversation**
82:17
**copies** 4:18
112:12
**coronary** 27:5
31:6 45:23
46:7 47:6,23
47:24 48:3
62:17,21 64:18
64:19,23,24
65:1,7,8,11,17
75:23,23 76:6
76:8 88:13
93:4,9,10,14
93:15,17 98:21
98:25 111:6
**corporate**
107:24 108:5,6
108:13
**corporations**
108:10
**correct** 6:15
9:21 11:18
13:8 15:4 16:1
17:6 19:2
21:20 23:11,12
23:14,15,17,18

23:23 24:10
25:22 27:22
28:13 43:1
53:24 54:7,7
59:5 61:7,9
62:8 66:7,8,21
68:15 71:2
85:3 87:19
88:9 89:2,9
90:24 92:2
93:1 94:2
100:25 102:2
103:16,25
104:4,5 106:7
106:20 108:3,8
114:11
**correctional** 1:7
23:11,14,22
24:8 25:6,7
34:18 41:7
84:22 100:17
108:7
**corrections**
114:11
**correctly** 57:19
**corresponds**
73:10
**cough** 40:6
**counsel** 84:21
103:14 113:15
113:17
**count** 6:22,25
**counted** 11:16
**county** 3:11
23:22 24:8
84:21 113:2
114:3
**couple** 25:14,19
27:8 28:15,18
28:24 41:6
**course** 8:3 42:15
54:1 64:8 66:8
66:9,10,23
76:8 87:21
101:7 105:20
**court** 1:1 7:11
12:24 13:8
14:25 15:8

22:6
**cousin** 70:21
**cover** 28:10
**coverage** 28:5
28:24
**covering** 29:3,4
**covers** 18:25
**COVID** 11:14
11:19 15:13
**created** 41:7
**creates** 80:25
**credential** 26:4
**criticism** 99:23
**criticisms** 108:9
**cued** 54:9
**current** 16:6
24:14 25:19
95:18
**currently** 25:21
**curriculum** 4:11
6:7 10:13
25:12
**curve** 42:5 74:2
74:5 78:5,12
**cut** 41:6 67:24
**cutoff** 59:16,21
**cuts** 104:13
**CV** 32:10 106:19

---
**D**
**D** 4:1
**D-O-C** 32:6
**D-O-C-K** 32:6
**daily** 73:5
**damage** 50:18
69:7 74:9
86:23 89:21
100:8
**damaged** 58:11
59:9 86:20
92:23
**damages** 20:8
**Danielle** 3:11
**dark** 38:1,4,11
39:2,3,4
**darkness** 39:9
**data** 32:21 51:8
51:24 52:17

Bruce Charash, M.D.

63:15 78:15,19
79:1 102:13
**dated** 5:23
102:23 114:16
**day** 2:8 27:10
34:23 35:6
36:3 52:24
53:7,14 54:5
59:25 61:5
65:23,25 67:11
68:24 78:18
104:15,17,22
110:15 113:12
113:21 114:17
**day-to-day**
31:20 72:19
73:24 74:1,16
**daytime** 104:13
**de** 55:21
**dead** 48:9 58:11
85:24
**deal** 73:14 77:10
**dealing** 80:15
**death** 64:25 81:1
**debate** 109:2
**December** 33:7
45:11,19 52:19
54:18 59:1
65:20 83:12
85:3
**decisions** 48:4
**defend** 20:2,6
**defendant** 12:20
20:23 21:14
**defendants** 1:8
1:15 2:3,20 3:5
3:10 11:23
107:9
**defending** 21:1,3
**defense** 6:2 8:4,5
19:11,13,18
20:1,4,6,10,12
20:16 21:5
100:9 101:20
103:11 105:20
105:23 111:20
**defibrillator**
81:8,10

**define** 67:18
**defined** 69:6,7
**definitely** 61:19
**definition** 93:4
**degree** 44:11
45:7,17 51:10
63:12,13 77:23
83:9,14 86:9
98:6 100:13
**delay** 51:15
**delivered** 65:5
**delivery** 88:10
**delving** 77:21
**demand** 46:4
65:3,11,13
88:16,17,24
89:3,13 90:9
93:8
**demanded** 88:11
**dependent** 77:3
**depends** 42:6
69:10 78:17
**depo** 15:19
**deposed** 6:20
49:13
**deposition** 1:17
2:1 4:13 7:13
9:2,14 10:16
11:8,10,15
21:10 22:4
25:2 103:12,24
104:3,12 105:6
105:13 106:1
107:23 111:20
112:8,9 113:6
113:11
**depositions** 5:16
6:13,16 7:6,15
7:18,19 112:2
**depressed** 43:19
67:4
**depression**
43:21,25 45:2
55:4,7
**deprivation**
33:25
**describe** 33:18
43:12

**described** 44:24
74:3 94:15
**descriptor** 91:21
91:22
**despite** 70:15
75:22 95:18
**detail** 12:11
**details** 13:24
36:22 48:6
**detainee** 22:1
**detainees** 24:9
**determine** 48:25
66:16
**determining**
22:20
**developed** 16:14
85:5,13
**developing**
61:15
**diagnose** 48:7
81:11
**diagnosed** 92:11
**diagnoses** 38:16
**diagnosis** 44:16
**diagnostic** 57:10
58:18
**dialysis** 71:24
**diastolics** 69:9
**didactics** 30:21
**die** 51:17,17
85:22 86:10,16
86:16,17,18
**died** 49:11 64:12
**difference** 23:6
39:11 48:6
49:6,18 74:25
82:18,19
**different** 27:20
29:5 43:9
53:15 58:7
72:8 74:10
79:6 80:21
97:7,8 104:24
110:13
**difficult** 39:16
90:22
**difficulty** 39:11
39:15 88:20

**dig** 21:7,16
77:15
**digest** 32:18
**dilated** 98:13
**direction** 113:9
**directly** 113:18
**director** 31:7
**disagree** 37:14
96:15 97:2,22
**disagreed** 49:12
94:9 100:10
**disagreeing**
109:24
**disagreement**
96:19
**discipline**
106:13,15
**disclosed** 6:4
**discloses** 6:7
**disclosure** 10:20
**discomfort** 34:4
34:8 51:5
**discuss** 27:14
**discussed** 37:22
38:25 55:4
**discussion**
103:13,18
**discussions**
30:18
**disease** 45:23
63:21,24 64:19
65:17 72:15,23
73:13 76:6,8
90:17,18 98:21
98:25 99:2
110:7
**dismissed** 47:6
**disorder** 69:22
69:25 70:3
**dissertations**
105:22
**distinction**
53:23
**distress** 34:4,7
34:13
**distressed** 34:16
**DISTRICT** 1:1
1:2

**diuretic** 69:25
92:17,18
**diuretics** 74:11
**dknott@lkgla...**
2:19
**Doc** 54:9
**Doc2Dock** 31:18
**Doc2Dock.com**
32:3
**doctor** 5:10 6:17
8:13 16:3,11
19:5,14 20:3,6
20:18 21:1,25
24:2,14,23
26:3,16 32:16
36:17 39:11
40:6 41:3,11
42:13 43:4,15
45:6 46:11
48:17,17,22
49:19 50:5
53:20 54:12,24
55:17 56:2,15
61:24 64:5,14
64:21 65:18
69:6 71:4
72:18 73:25
74:18 75:12
78:7,15 81:25
83:9,21 84:10
84:17 96:9,9
97:18 106:24
107:3 108:22
110:2 111:17
**doctor's** 42:3
**doctors** 17:9,22
26:11 27:4,19
28:22 29:2
107:11
**document** 24:24
41:7
**documentation**
36:15
**documented**
53:18
**documenting**
35:25
**documents** 9:13

Bruce Charash, M.D.

January 28, 2025

Page 120

10:5
**doing** 35:19 38:3
40:25
**dose** 70:24
**doses** 60:16 95:8
**Dot** 32:3,7,8
**Douglas** 2:17
**downs** 50:10
**Dr** 5:14 8:10,11
8:13,18,21,25
9:22 24:3
33:23 49:6
93:20 94:3,8
96:14 97:3,21
100:11 108:1
109:8,11
**draw** 34:11
**drop** 59:19
60:18
**drops** 86:14
**Drs** 107:11
**drug** 56:24
70:14,17,20
77:8 95:12,13
**drugs** 67:10 77:8
82:22,24 83:1
83:11 90:13
95:7,15,20
**drunk** 39:2,3
**duces** 9:13 10:20
**due** 52:18 65:11
98:1,9,19,24
99:6 110:3
**duly** 5:3
**duress** 34:9
**dynamic** 65:9

**E**
**E** 1:23 2:5,12,12
3:1,1 4:1,9,22
4:22 5:5 84:15
107:1 108:23
113:4,23
**earlier** 49:11
53:14 55:4
**early** 24:19 33:9
85:2
**earnings** 24:14

24:15,17
**easiest** 12:22
**easily** 20:5 81:3
**east** 3:3 15:21,22
**echocardiogra...**
16:17,18
**ED** 4:15
**edema** 61:12,14
61:15,17 92:21
**edition** 93:25
**EF** 88:20
**effect** 19:22
**eight** 15:20 95:8
97:6,9,21
**either** 64:10
67:1 86:14
89:7 99:3
100:6
**ejection** 91:12
91:14,15,16
92:14
**EKG** 42:16,18
42:20,21,23,24
43:16 44:9,18
44:21,24 45:5
46:15 54:21
55:1,18 62:23
62:25 89:1
110:10
**EKGs** 44:5 55:3
**electrical** 87:17
87:18
**electrolyte** 56:13
56:16 57:10,12
57:13,22 58:14
59:4 68:13
**electrolytes**
56:21,22 57:18
58:6 60:7
**electronically**
112:10
**element** 56:14
**elevated** 41:16
41:19,20,20
42:12 43:19
46:18,24 87:10
87:20 89:4,6
**elevation** 55:6

**emergency** 30:7
30:8 31:8
42:14 54:17,24
63:8
**emotions** 41:24
**employed** 17:15
**employee**
113:15,16
**employees** 16:25
**end-organ** 38:7
69:7
**ended** 111:9
**endocrine** 80:11
**ends** 54:22
**endurance**
39:25
**engaged** 30:20
**engaging** 48:15
**entitled** 48:23
**entity** 17:16
25:25 27:22,24
**epinephrine**
60:16,17,22
**episode** 34:22,24
35:7,8 58:25
62:3 88:19
**episodes** 50:25
51:6 62:13
88:25
**episodic** 35:2,5
36:3 48:5
52:23 65:25
68:18,23
**equivalent** 39:20
**ER** 27:5 30:4,6
47:21 52:13
78:10 81:5
**ERs** 78:9
**especially** 58:10
**essentially**
103:22
**established**
50:19
**Estate** 1:4,11
**estimate** 6:23,24
6:25 82:12
**et** 1:7,14
**etiology** 47:15

**evaluate** 64:2
**evaluated** 35:22
**evaluation** 47:22
**evening** 35:13
62:14 110:15
**event** 44:23
49:24 50:7
86:25 87:17,18
**events** 33:17
82:23 87:3,18
**evidence** 36:2,5
36:12,14 92:19
92:22,25 95:5
95:12
**exact** 7:2
**exactly** 13:3
52:11
**exam** 26:25
**EXAMINATI...**
4:2
**examine** 77:22
**examined** 5:3
**example** 12:7
32:21 56:23
86:11
**exams** 16:19
**exceed** 24:15
**exclude** 36:1
67:12
**exhausted**
108:17
**Exhibit** 4:10,11
4:12,13,14,15
4:16 10:14
11:8 14:19
21:11 25:13
54:11 55:16
102:22 112:9
**exhibits** 4:18,18
112:11,12
**expand** 17:8
**expect** 29:12
44:25 45:4
**expectancy** 39:6
71:1,13 72:5,6
72:24 73:12,17
73:23 75:9,16
75:20 76:1,5

76:18 77:5,11
77:13,17 78:5
78:12,16,23
79:2,13,17,22
80:2 81:21
82:2,10
**expenses** 104:16
**expensive** 31:22
**experience**
110:3,15
**experienced**
37:11 53:21
110:22
**experiencing**
34:4 44:12
45:9,9,18 53:7
54:4 66:6
82:24 83:11,15
110:6,11
**expert** 8:6 49:9
53:21 100:9
104:11 105:18
**experts** 105:7,14
**expires** 113:24
**explain** 33:3
43:15 70:1
**explanation**
85:9,18 86:6
87:9
**explicitly** 107:19
**explore** 33:5
**extensively**
106:3
**extent** 52:7

**F**
**F** 44:2
**facility** 23:11,14
**fact** 48:23 58:20
66:2 81:19
98:10
**factor** 66:21
67:3 74:5,7
75:25 76:5
77:4,25 79:12
81:20 82:17
96:8 98:7
**factored** 103:21

factors 75:23
facts 85:10,18
  102:13
Factual 36:18
failing 95:14
failure 14:2,5,8
  38:8 62:17
  66:25 69:12
  71:10 72:1,9
  72:14,16 74:6
  74:7,9,14,22
  89:24 91:25
  92:4,6,12,13
  92:15,16,23,25
  93:3
fair 21:24 22:24
  23:19 24:6
  26:15 28:6
  29:15 46:20
  47:13 52:16
  53:8 56:8 73:9
  75:6 76:1
  78:20 93:25
  105:21 108:4
fairly 49:1
familiar 12:13
far 40:16 99:4
fatal 98:3,9,10
favorable 92:1
February 5:23
  7:24 113:21
fecal 79:11
federal 2:4
  12:24 13:10
fee 18:11,21
feel 22:15 39:18
  89:23
feeling 111:6
fellow 29:3
fellows 26:22
  27:4
Fennigkoh 2:20
  25:6
field 101:10,11
fight 47:5
figure 12:22
  67:7
file 10:6 104:2

105:24
final 6:1 9:20
  99:15 102:24
  103:21
finally 27:15
finance 108:13
financial 108:6
financially
  113:17
find 5:18 17:9
  20:5 24:23
  26:8 31:11
  47:24 59:18
  81:6,11 93:2
  findings 44:21
  64:17
fine 48:25 49:20
  111:10
Finish 109:12
firing 67:16
firm 11:25 13:6
  13:15,16,22
  102:1,6,12,17
  105:1
firm's 12:12
firms 19:18
first 5:2 7:3 8:10
  20:25 21:6
  26:18 34:21
  36:18 37:17
  43:12 45:14
  65:19,22,23
  66:4 105:11
  107:22 110:10
five 13:2 60:5,10
  72:2 82:9 84:5
  107:4
five- 84:2
Fives 40:1
flat 18:21
Floor 2:14
flow 88:8 90:4
  93:16
fluid 92:20
focal 62:24
focus 64:4 81:6
focused 62:10
follow 84:18

108:21
following 99:17
follows 5:4
footage 33:7
  34:2
foregoing 114:8
forever 70:22
forgot 91:13
form 13:9 16:14
  18:6 19:16
  22:25 23:24
  24:11 29:16
  34:5,14 35:14
  38:24 41:15
  45:12,20 46:21
  47:16 50:1
  52:21 53:25
  56:9,12,17
  57:7 58:1,2,8
  59:15 60:13
  66:15 70:9
  71:11 75:7
  76:2 78:2,21
  79:4,14,20
  80:3 82:4
  83:17 86:4
  87:25 89:5
  96:16 97:5
  101:2,6 110:12
formal 72:25
formalized
  26:12
formally 50:14
forming 101:11
  101:19 102:14
  102:19
formulation
  63:5,10,20
forward 73:7
  111:20
found 55:3
  74:14 80:14
Foundation 34:6
  47:17 52:22
  70:10 76:3
  78:3,22 79:15
  80:4 82:5
four 10:23 15:2

20:20 22:5,8
98:13 107:11
fraction 91:12
  91:14,15 92:14
fractions 91:16
frankly 49:5
French 55:24
frequently 43:21
Friday 93:19,22
  93:24
front 8:18,22
fuel 65:4 88:17
  93:8
full 5:7 62:4,6
function 74:16
  87:12 89:3
further 25:17
  59:9 108:20
  113:10,14

_____
        G
GAYNOR 2:17
general 29:7
  52:13 91:21,22
generally 29:13
generically 14:4
GERAGHTY
  3:2
getting 29:10
  36:8 48:7
  50:25 51:2
  60:10 69:20
  71:25 77:9
  78:9 88:21
GHS 4:15,16
GHS1339 54:12
GHS1559 55:15
giant 25:24
give 17:10 26:10
  27:3,6 31:5,10
  52:17 67:13
  68:25 72:24
  73:12 94:22
  107:15
given 5:16,23
  6:13,17 7:5
  12:10,15 26:4
  29:18 30:16

32:19 42:20
52:1 64:14
71:13 103:19
gives 33:22
  97:25
giving 30:25
  36:8 40:20,23
  52:3 99:19,24
  100:5
gloss 32:20
go 5:20 6:6 15:8
  19:3 26:18,22
  26:23 27:18
  35:1,3 36:22
  48:17 60:1,2
  69:9 84:6
  89:23 94:11
  96:10 97:15,15
  97:23 109:12
goes 88:18 90:10
going 8:16 10:13
  18:11 19:24
  20:9 25:18
  37:21 40:8
  49:2 51:25
  52:4,11 57:3
  58:3,15,16
  63:15,18 68:22
  71:19 72:1
  73:6 78:11
  81:7,11 83:21
  83:23 90:6
  100:23 105:21
  107:3,3,20
  110:8
good 11:6 71:18
  75:24 104:23
  106:18,18
gosh 47:3
Great 107:7
greater 59:20,20
  65:4
GREGORY 1:3
  1:10
group 71:17
groups 71:17
guarantee 26:9
guess 13:19

25:14 45:6
49:22
**gun** 38:2
**Gundersen** 4:15
  37:19 42:25
  43:2 68:11,17
  105:16,17,23

**H**

**H** 4:9
**hairpin** 67:17
**half** 16:9,14
  18:10,10,13,15
  18:15,23 20:13
  45:14 78:18
  94:24
**hall** 30:13
**hand** 48:2 59:24
  68:20 91:24
  113:20
**handful** 24:18
  103:20
**hang** 96:25
**HANSEN** 3:7
**happen** 30:9
  47:4 63:19
  67:8
**happened** 11:4
  51:8 53:17
  63:9,14,21
  67:9
**hard** 39:18 53:5
**Harmston** 3:6
  107:11
**health** 18:3,5
  32:19
**healthcare** 1:7
  22:17 23:13,23
  25:6,7 108:7
**healthiest** 71:17
**hear** 14:16 37:3
  37:6 73:25
  75:13 84:22
  101:14 105:11
  106:22 107:7
**heard** 26:6
**heart** 4:16 14:2
  14:4,7 32:15

32:17 33:1,4
43:23 44:1
45:25 56:20
59:9 60:4
62:16 63:21,24
65:4,12 66:25
69:12 71:10
72:9,13,16
74:6,7,9,14,22
87:24 88:8
89:11,21,23,24
90:17 91:19,25
92:4,5,12,13
92:15,16,22,25
93:3 99:2
110:7,16
**heart's** 50:15
**held** 23:13
**Hendrickson**
  3:11
**hereunto** 113:19
**Hi** 107:3
**high** 50:16 52:2
  63:2,16 65:12
  69:11 85:6,14
  89:22 90:2,10
  90:18 95:10
**higher** 50:20
**highlighted** 32:5
  54:20
**highlighting**
  8:24 10:7
**highly** 37:25
  44:8,9 86:13
**Hill** 16:20 17:3,5
  17:15,18 25:24
  26:11 28:1,3,6
  28:12,25 29:15
  30:25 31:17
**history** 19:3
  35:9 36:21
  69:1 80:16
  92:24 95:1
  96:11
**Hofstra** 26:2,10
  28:2,3 31:15
  31:17
**hold** 53:6 82:23

**home** 5:14 6:8
  6:11
**hone** 49:19
**hope** 71:24
**horrible** 71:23
  78:8
**hospital** 16:20
  16:24 17:21,23
  26:4,19 29:8
  31:9 40:23
  42:23 46:13
  47:25 48:9
  49:10 51:11,21
  64:10 74:12
  83:4 85:23
  86:25 90:18
  98:10 100:6
**hospitalists**
  17:19,20
**hospitalized**
  60:23
**hour** 9:6,6
  103:18,19
  104:6,7,9,10
  104:12
**hours** 16:21 60:3
  85:2 103:1
  111:19
**house** 18:18
**hypertension**
  32:23 63:22
  67:18 68:18
  69:6,8,13,15
  69:17,18 70:8
  76:20 88:20
  94:17,18 95:2
  95:6,7,18,23
  96:13 99:2,6,8
  99:9
**hypertensive**
  42:14 49:24
  50:7,24 51:6
  62:2,13 70:13
  88:19
**hypokalemia**
  66:20,24 98:5
**hypoxic** 53:11

**I**

**ICUs** 78:10
**idea** 19:14,17
**identical** 43:10
**identifiable**
  45:22
**identification**
  112:10
**identified** 69:23
  102:13 105:8
**identifies** 68:18
**identify** 33:13
  68:12
**identifying**
  68:14 102:18
**idiopathic** 91:5
**II** 44:2 55:4
**III** 44:2 55:5
**illegal** 77:8
**Illinois** 2:14
  13:18 15:3
**imbalance** 56:16
  57:22 59:4
  68:13
**immediately**
  51:13,23
**impact** 50:17
  72:23 75:19
  77:11 78:16
  79:1,6,7,21,22
**impacted** 76:18
  79:17
**impacting** 77:4
**implanting** 81:8
**important** 10:7
  10:11 53:23
  55:7 69:4 87:2
**incarcerated**
  41:24
**include** 10:5
  11:12 31:16
  58:5,6 101:20
**included** 88:19
**includes** 12:18
  32:10 72:7
  106:19
**including** 79:6

100:11
**income** 24:21
**inconsistent**
  68:1
**incontinence**
  79:12
**increase** 46:4
  65:11,13 88:24
  95:20
**increased** 89:3
  98:14
**independent**
  78:25
**independently**
  61:15 76:23
  78:1 79:13
**indicative** 42:14
**indicator** 43:22
  58:21
**indicators** 34:9
**indirectly**
  113:18
**individual** 13:14
  64:4
**individually**
  76:20 80:1,9
**individuals**
  71:10
**infarction** 98:19
**inferior** 43:25
  55:5,8 88:2
**influenced** 57:8
**information**
  12:10,16 17:11
  33:22 50:23
**infrastructure**
  31:23
**infringed** 22:13
**initial** 54:21
  99:16
**initiated** 58:24
**injections** 60:17
**injuries** 36:25
**injury** 44:13
  98:9
**inmates** 24:4
**input** 54:10
**instability** 59:20

Bruce Charash, M.D.

instance 2:3
instructed 22:15
instructions
   26:23
insufficient
   88:10
insurance 17:11
   18:5
insurers 18:3
intending
   107:15
intention 23:2
interest 26:25
   31:10
interested
   113:17
interfering
   74:16
Intern 3:13
internal 5:13
interns 26:21
interpret 54:23
interpretation
   43:6,8
interpreted 56:3
interval 56:25
   57:9 58:4,9,12
intervals 56:19
intervention
   40:16
intoxicated
   37:18,25
intrinsic 51:16
introduce 83:23
   107:7
introduced 25:4
intubated 78:9
inverted 43:24
   44:3
invoice 102:22
   102:24 103:10
   103:16,22
   111:19
invoices 4:12
   10:15 101:25
   102:21 103:1
   104:1
involved 6:18

12:14 14:2
22:12 25:15
48:19
involves 26:20
involving 8:2
   11:22 22:1
Iowan 56:1
irrelevant 85:20
irritable 59:10
ischemia 43:22
   44:10,15,17,22
   45:1,3 46:16
   52:18 55:9,10
   56:9,10,11,14
   56:20 57:21,24
   57:25 58:10,15
   62:17,22,24,25
   63:24 64:23
   65:2,3,3,7,11
   65:16 87:14,23
   88:2,7,10,12
   88:15 89:24
   90:8 93:5,7,7,9
   93:12,14,14,15
   110:3,6,12,16
   110:17,20,22
   111:7,11
ischemic 43:13
   43:14 44:6,13
   44:23 45:9,9
   45:18,24,24
   46:8,11 53:1,5
   57:6 58:15
   98:24 110:9
   111:2
Island 26:2
issue 16:15 24:4
   37:12,13 47:11
   69:19 72:10
   77:13,24 79:16
   80:21 82:10
   83:20,20 88:15
   92:6 93:3 94:8
   94:11
issues 22:23 27:5
   29:13 37:1,2,4
   37:5 77:20

J

jail 22:2 24:8
   41:8 51:15
   61:5 68:22
   98:12 99:16
   106:2,4
Jaime 108:1
January 1:18
   2:8 11:15
   102:23 103:3,9
   113:12,24
   114:9
jcasserly@go...
   3:4
jeopardize 75:8
jeopardizing
   75:16
Jessica 108:1
Jillian 3:6
Job 1:23
John 3:2 8:9
   107:8 109:16
Johnson 3:6
   107:12 108:1
joined 25:24
Jones 3:8 4:4
   84:2,6,10,12
   84:16,17 87:8
   88:6 89:8
   96:24 97:11
   101:3,8 103:6
   106:24
judged 22:17
June 30:14,15
   30:16

K

keep 10:9,23
   24:24 25:17
   30:20 59:17
KENNEY 3:2
kept 6:25 95:14
kidney 70:3
kill 51:14 86:10
kills 86:13
Kimberly 8:12
kind 6:22 20:7

26:7 36:7 40:9
49:15 52:12
91:10 95:3
112:1
Kiss 13:19
knew 69:3,5
   103:18
Knott 2:17,17
   4:3 5:6 13:11
   18:8 20:17
   21:23 23:4
   24:1,13 25:1
   30:2 34:17
   36:10 38:14,20
   39:10,24 40:5
   41:17 45:15
   46:10,23 48:10
   50:2 53:2,19
   54:2,8 57:11
   61:1,11,21,23
   66:19 67:23
   68:10 70:19
   72:17 75:17
   76:14 77:1,14
   78:6,24 79:10
   79:18,24 80:7
   80:23 81:13,18
   81:24 82:8,20
   83:21 84:1,4
   84:20 102:21
   107:14 108:19
   108:21,24
   109:7,13 110:1
   111:8,13
know 7:2,3 8:7
   12:1,17,20
   13:20 14:6,6
   14:11 18:2,24
   19:6 21:3,6,15
   21:17,19,22,25
   22:12 24:14
   26:13 28:7
   29:9,21,23
   30:13 34:7,25
   35:8,24 39:2
   40:8 41:23
   42:16,18 43:8
   45:1,21,21

46:9,14,17
48:2,22 50:22
51:2,4,7,9,23
51:25 52:4,23
53:1,4,5,10,12
53:17 59:6,7
61:4 64:19
66:12,16,18
67:1 68:21,23
69:1,3,5,24
70:1,6,18
71:18 72:23
73:6,11 79:5
80:10 82:6
83:2,13,18
85:1,4,18
89:16 90:14,24
91:5 93:23
99:24 110:4,23
knowledge 73:7
knowledgeable
   22:16
known 72:14
   90:16

L

lab 55:14
labels 100:15
lack 40:19
lady 90:16
language 93:11
Lasix 92:19
late 71:21
lateral 44:2
lawyer 13:13,14
   21:3
lawyers 13:17
   15:17,25 20:1
   20:6
layer 90:3
layperson 43:15
   88:7
lead 1:6 13:16
   46:4 50:20
   55:6 88:20,25
   89:24
leading 90:8
leads 44:1,2,3

Bruce Charash, M.D.

January 28, 2025

**55:**4,5,8 **88:**3
**leaking 32:**25
**leaky 32:**25
**leaned 48:**14
**lecture 27:**7
  30:10,12,16,23
  49:2,4
**lectures 26:**10
  27:3 30:13
  31:1
**led 51:**13 **63:**17
  63:22,25 87:4
  87:5
**left 38:**22 **44:**10
  46:6 51:5
  74:10 86:23
  87:13,22 89:22
**leg 92:**21
**legitimately**
  20:3
**LEIB 2:**17
**Lenox 16:**19
  17:3,5,15,18
  25:23 26:11
  28:1,3,6,11,25
  29:15 30:25
  31:17
**let's 6:**6 **66:**3,3
  71:14
**letterhead 13:**16
**letting 17:**13
**level 59:**12 **60:**11
  61:4 65:15
  67:4 74:15
  80:25 87:14
**levity 106:**16
**license 106:**13
**licensed 106:**7,9
**Lidocaine 56:**24
  60:1
**life 37:**1,7,13,21
  38:9 39:5,6
  70:25 71:5,12
  72:5,6,24
  73:12,17,23
  75:4,9,16,19
  76:1,5,18 77:5
  77:11,13,16,23

**78:**5,12,16,23
  79:1,8,13,16
  79:17,22 80:2
  81:21 82:2,10
  82:16
**life-threatening**
  36:25 37:12
**limit 37:**21
  72:14
**limited 39:**6
**line 94:**23
**Lisa 2:**20
**lisinopril 70:**21
  70:21,22
**list 4:**13,14
  10:16,18,21,23
  10:24 11:8,9
  12:18 13:7
  14:1,20 18:3
  20:18,19,25
  21:10 101:16
  101:18 114:11
**listed 17:**5 **97:**7
**listener 89:**17
**listening 107:**13
**lists 10:**19
**literature 9:**23
  101:10
**litigations 6:**19
**little 25:**17 **54:**13
  76:4 96:17
  106:16 110:13
**live 37:**15 **38:**22
  71:19
**LLC 2:**17 **3:**7
**local 88:**1
**localized 44:**7
**locate 71:**4
**Loevy 2:**13,13
  11:25 12:12
  13:6 102:1,6
  102:12 105:1
**Loggins 13:**18
  13:22,22,23
**logical 64:**1
**long 9:**4 **12:**25
  12:25 13:1
  26:2 33:10

**34:**23 **35:**6
  36:3 52:24
  53:10 58:12
  70:6,14
**long-term 74:**20
  76:17
**longer 34:**24
  71:19
**look 8:**9,16,16
  9:23 14:1
  18:21 34:16,21
  38:5 61:24
  71:5 83:23
**looked 37:**19
  67:24 106:2
**looking 17:**8
  21:12 36:17
  44:1 46:15
  95:6 106:4
**looks 13:**17 **15:**2
**lot 19:**19 **29:**18
  32:18 51:25
  58:6 60:22
  62:23 80:19
**Lots 34:**10
**loud 54:**14
**low 57:**2 **58:**5,16
  58:21 67:2,15
  70:16 74:15
  85:7,16 86:17
  87:13,15 88:5
  88:20 92:14
  96:7 98:5,11
**lower 57:**4 **59:**22
  59:22
**lowered 67:**15
**LV 91:**24
**Lynch 108:**2

━━━━━━━━━━
**M**
**M 5:**5 **84:**15
  107:1 108:23
**M.D 1:**17 **2:**2 **5:**2
  113:7 114:7,21
**magnitude**
  78:13
**main 49:**9 **85:**20
  85:22 86:7

**96:**2 **100:**4
**maintain 10:**21
**maintaining**
  31:21
**major 37:**1,2,4,4
  67:18 71:25
  72:15 74:7
  76:5 81:23
  86:14 90:17
  96:19,21
  105:22
**majority 17:**17
**Makar 2:**13 **9:**2
  13:9 18:6
  19:16 21:21
  22:25 23:24
  24:11 29:16
  34:5 35:14
  37:16 38:18,24
  41:15 45:12,20
  46:21 47:16
  50:1 52:20
  53:9,25 54:6
  56:17 59:15
  60:13 61:22
  66:15 67:21
  68:3 70:9
  71:11 75:7
  76:2,24 77:7
  78:2,21 79:4
  79:14,20 80:3
  80:18 81:2,16
  81:22 82:4,13
  83:17 84:5,8
  86:4 87:25
  89:5 96:16
  97:5 101:2,6
  102:5,12,17
  105:14 109:6
  109:12,15
  110:24 111:16
  111:22,24
  112:4
**makar@loevy...**
  2:15
**making 24:**24
  65:14
**malignant 69:**6

**69:**15,17,18
  72:1 98:14
  99:6,7,9
**manageable**
  79:23 80:10
  81:3
**managed 36:**4
**management**
  31:6 99:24
**manner 33:**20
  83:4
**Margolis 21:**3
**Margolis' 21:**6
**Maria 2:**13
  111:21
**mark 10:**13,14
  10:15 54:11
  55:16
**marked 11:**7
  25:12 102:22
  112:10
**marriage 106:**15
**match 17:**11
**materials 105:**5
**matter 5:**19 **6:**1
  9:17 12:2 15:3
  22:1,23 32:12
  63:7 64:9
  85:21 86:7,21
  102:7 103:2
  105:1 107:9
**matters 13:**21
  14:24 15:15,25
**Matthew 8:**13
  8:14 93:21
**MD 4:**12,13,14
**mean 21:**15 **28:**7
  32:3 34:9,13
  34:14 36:22
  44:14,20 45:1
  47:3,4 48:24
  49:3,23 56:13
  57:22 77:22
  85:14 88:7
  95:19 96:20
  98:16 106:3
**meaning 41:**21
  91:5 93:7

Bruce Charash, M.D.

January 28, 2025

Page 125

meaningful
75:10,14,15
means 32:25
34:15 35:2
57:3 69:11
72:14 88:10
91:17 93:18
meant 86:10
measure 41:19
measured 42:3
mechanically
39:15
mechanisms
89:25
medical 1:14 3:5
5:10 17:23
25:25 26:2,9
26:20 28:2
31:14,16 36:21
37:5 38:5,10
38:13,23 44:12
45:8,17 47:20
51:18 63:12,13
71:18 72:3
74:4,21 75:5
76:16,17 82:15
83:10,15 85:5
85:10,12 92:24
94:25 95:1,18
96:11 99:11,12
107:10,19,25
108:6 110:5,11
111:1
medical-legal
24:15
medical-legally
24:17
Medicare 18:13
18:20
medication
40:24 57:21
medications
51:1 56:21
57:17 58:7,8
70:13
medicine 5:13
22:21 26:5,24
49:21 72:21

73:11
medicines 39:23
memorized
96:17
memory 12:7
13:25 14:10
mention 35:23
mentioned 83:7
met 9:2
methodology
31:23 64:2
74:20 75:3
Meyer 13:19
MI 99:3
microvascular
65:15
mild 42:12 78:11
91:9,24
mildly 41:19
military 18:13
milligrams
70:22
millimeter 43:20
millisecond
108:15
Milwaukee 2:18
2:18 3:9 113:2
114:3
mind 12:4 39:8
minimum 26:4
Minnesota 3:3
minus 65:8
minutes 40:1
60:10 107:4
Mischaracteri...
52:21
misconceptions
33:5
mismatch 88:16
89:12
missed 45:13
80:5 105:10
Misstates 79:15
80:4
mistake 24:24
misunderstan...
33:3
mitigate 20:8

moderate 91:9
91:24
moderately
41:19 42:12
moment 39:9
44:10 104:2
money 19:25
monitor 4:16
Monroe 3:11
24:8 84:21
month 12:9
27:15,17 28:20
29:19 95:14
morning 54:18
58:25 85:2
104:3
move 41:4 52:7
109:18
moving 40:10
multi-resistant
95:23
multidrug 94:18
95:2,3,5,17
96:13
multiple 7:7 8:4
37:9 60:15
77:19 82:11
Murray 8:13
muscle 43:23
58:11 65:14
88:21,22 89:25
90:3,4,5,6
91:18
myocardial
98:19
myth 32:21
myths 32:15,17

_____
N
_____
N 2:12 3:1 4:1
5:5,5 84:15,15
107:1,1 108:23
108:23
name 5:7 8:10
8:14 12:12,12
12:19 13:16
17:14 21:6
26:8 32:4

name's 107:8
named 21:3 26:2
names 8:6 12:8
narcotic 77:3
narcotics 51:2
83:7
narrative
103:10 106:4
necessarily 41:1
necessary 80:12
need 13:24
18:11,17 39:23
40:6,7,8 47:25
69:2 107:4,17
107:20 108:21
needing 67:9
92:20
network 25:24
neurologic 98:9
neutral 56:14
never 7:19,19
20:9 23:10,13
26:6 51:11,21
66:10 69:18
74:17 86:14
95:14 99:8,8
new 1:20,20 2:7
2:8 6:2 8:13
16:20 17:12
22:3,10 25:25
26:1 27:7
31:22 95:13
106:7,10,13
113:11,12
114:9,10
news 75:24
night 27:9,12
29:4 35:19
50:11 104:14
nine 15:20
non-ischemic
56:7
non-sustained
53:16 66:17
noncardiac
47:15
noncompliance
80:16

noninvasive
16:16
normal 19:22
50:16 56:21
57:1 64:1,12
72:5 91:16
normally 93:15
Norman 3:6
North 2:14,18
3:8
northeast 15:21
Northwell 25:24
27:21,24,25
28:4
Nos 112:9
notable 95:1
96:12
Notary 2:6
113:5,24
note 10:9 34:21
54:17 75:22
noted 24:2
114:11
notes 4:15 8:24
9:17,18,19,20
83:24
Nothing's 25:19
Notice 2:5
noticed 104:8
November 92:7
number 4:10
6:23 7:2,16
14:5 18:16
22:3 32:6
89:25
numbered 97:1
97:3,21
numbers 10:10
nurse 8:12 23:16
23:16 25:5,5
109:1

_____
O
_____
O 5:5 84:15
107:1 108:23
O'LOUGHLIN
3:2
oath 5:3

Bruce Charash, M.D.

January 28, 2025

Page 126

**object** 109:15
**objection** 13:9
  18:6 19:16
  21:21 22:25
  23:24 24:11
  29:16 34:5
  35:14 37:16
  38:18,24 41:2
  41:15 45:12,20
  46:21 47:16
  50:1 52:20
  53:9,25 54:6
  56:17 59:15
  60:13 66:15
  67:21 68:3
  70:9 71:11
  75:7 76:2,24
  77:7 78:2,21
  79:14,20 80:3
  80:18 81:22
  82:4,13 83:17
  86:4 87:25
  89:5 96:16
  97:5 101:2,6
  107:7 110:24
**objections** 81:2
  81:16
**objective** 41:18
**observation**
  100:16,20,24
  101:4
**obstructed** 65:7
**obstruction**
  81:14
**obstructions**
  77:20
**obstructive**
  45:22 65:16
**obviously** 37:8
  37:25 71:9
  77:18 89:14
  101:20
**occasions** 72:20
**occur** 56:10,19
  56:20,22 58:2
  86:25
**occurred** 50:6
  54:25 63:5

64:24 81:9
  86:7,15
**occurring** 35:6
**occurs** 33:4
  57:15
**October** 15:8
**Oddly** 63:5
**offend** 49:3
**offer** 5:19
**offered** 87:10
  94:8 96:25
  97:1
**offering** 40:17
  40:18 85:19,25
  86:2 99:13
  100:1,23
**office** 3:11 16:18
  16:21,22 42:3
  42:11 47:20
  48:3 113:20
**officer** 41:8
**officer's** 34:19
**officers** 107:25
**Oh** 11:6 14:16
  37:8 47:3
  109:15
**okay** 6:6 7:23
  8:18 11:6,16
  18:23 21:18
  25:9,10,21
  27:21 28:5,17
  37:14 40:2,12
  43:5 55:15,25
  57:19 61:25
  62:9 64:15
  69:20 74:24
  75:3 83:25
  84:4,8,11,23
  85:25 103:22
  104:10 106:24
  108:9,19 110:2
  110:19 111:10
  111:13,13,15
  111:23 112:6
**old** 25:16
**older** 71:21
**once** 21:9 28:15
  28:18,24

100:18
**one-year** 39:6
**ones** 21:5
**Online** 71:5
**onset** 48:1
**open** 17:12
  62:16 90:6
**operations**
  31:20
**opinion** 6:5 24:7
  36:9 44:11
  48:8,20 49:8
  49:10 52:8,13
  52:17 53:6
  62:7 63:7,11
  64:5,7,8 69:4
  70:25 82:1,23
  83:3,19 85:19
  85:21,22 86:1
  86:2,8 97:8,9
  97:10,25 98:1
  98:16,18 99:4
  99:5,10,11,14
  99:15,21,25,25
  100:4,15
  107:21 108:5
  109:4,22 110:2
**opinions** 5:19
  6:1,3 9:24 23:1
  23:2,19,21
  24:12 33:15
  39:2 40:17,18
  40:23 49:4,7
  94:7,12 96:2
  97:1,3,6,9,21
  101:12,19
  102:14,19
  107:14,16
  108:12 109:5,9
  109:10,21
**opposed** 93:12
**optimize** 73:15
**order** 9:24
**orders** 59:5
**org** 32:3,7,8
**organ** 71:25
  90:18
**organization**

31:21 32:4
**Original** 4:18,18
  112:11,11
**out-of-hospital**
  51:16
**outlook** 73:6
**outpatient** 61:3
  69:24 72:10
  92:8
**outside** 38:18
  47:17 86:25
  106:15 109:16
  109:19
**outward** 34:8
**overall** 64:7
**overgeneralized**
  32:20
**overlap** 7:18
  109:23,25
**overload** 92:21
**overwhelming**
  17:17
**oxygen** 33:25
  46:4 86:14,15
  88:10

---
**P**

**P** 2:12,12 3:1,1
**P-O-I-N-T-E-S**
  55:23
**P.A** 3:2
**p.m** 1:19 2:10
  34:20 35:12
  36:13,16 52:19
  65:20 66:4
  84:13,14 112:8
**p.r.n** 50:25 52:3
  69:2
**pacemaker** 60:4
**pack** 78:18
**page** 4:2,10
  33:18 36:17
  41:8 42:24
  43:13 61:24
  62:5,6 67:19
  67:25 68:1
  74:18 94:22,24
  94:24 97:7

100:15,17
  101:17 114:12
**pages** 40:9 105:8
**paid** 17:22
**pain** 27:5 31:7
  34:10,10,14,20
  34:23 35:4,18
  35:20,25 36:1
  36:2,3,12,15
  37:9 39:17
  42:7 45:10,18
  46:5,15,19
  47:1,7,10,15
  47:19 48:2,16
  52:2,18,24,25
  61:12,13,16,20
  63:2,18 67:11
  68:24 69:13
  77:10,12,16,18
  85:14,15 88:25
  90:19 92:9
  99:1 110:3,8
  110:15,22,25
  111:2,6,11,11
**paper** 10:3
**paragraph**
  43:12 62:1,4,6
  64:22 94:25
**paragraphs**
  36:19
**paramedic** 55:2
**Pardon** 5:15
**paren** 62:16,18
**Parker** 3:12
**part** 13:13 25:23
  39:19 44:1,15
  61:13 73:24
  74:1,8 76:12
  76:25 105:11
**particular** 64:22
  67:24 73:8
  110:21
**particularly**
  10:7,10
**parties** 113:16
**partner** 31:21
**passage** 54:21
**passed** 109:17

Bruce Charash, M.D.                                    January 28, 2025

passive 12:7
paste 67:25
pasted 41:6
pathognomonic
  56:16
pathology 33:4
  64:17
patient 19:20
  26:23 38:21
  42:11 57:2
  58:19 59:7
  64:2 67:20,22
  73:8,16 98:24
patients 16:3,8
  17:12,24 18:9
  18:10,13,21,23
  19:1 26:19
  27:18 28:11,12
  28:16,21 29:1
  30:4,5 56:18
  56:23 73:20
pattern 56:7
  57:20
Paul 3:3
pay 18:9,10,21
  18:24
pays 18:15
PDF 10:2,4
Pearson 8:12,21
  109:1,1,2
pelvic 36:23
pelvis 37:10
  77:21
pending 15:15
penetrate 90:5
people 7:14 9:7
  17:9,10 18:12
  18:14 31:13
  32:23 33:5
  34:10 39:2,13
  39:14 40:25
  46:18,22 47:6
  47:13,20 59:16
  60:1 62:23
  71:14,20,23
  72:7 73:12
  80:19 91:17
  92:13

percent 13:6
  14:17 16:9,12
  16:22,23 19:10
  19:11,12,13,17
  20:4,10,11
  24:18,20,20
  26:12 32:24
  44:8 55:10
  60:20 76:10,10
  86:15 91:13,14
  91:17,17
percentage 19:7
  20:16
perfectly 95:11
performance
  50:18
performed
  47:22
period 35:3
  62:18
periods 60:6,8
  95:9
permanently
  86:20
person 41:23
  52:1 57:5
  60:12 69:7,10
personal 113:8
personnel 99:16
pertinent 33:13
  33:14
Pezze 1:23 2:5
  113:4,23
phenomenon
  35:5
phone 18:16
  19:19
phrase 29:17
phrased 96:12
physical 16:19
  26:25
physician 29:12
  54:25
physicians 17:15
physiologic
  80:22
physiologically
  50:5

picking 100:14
piece 12:15
pieces 101:9
pillar 64:8
pillars 64:5
pills 50:25
pinpoint 66:3
Pisney 2:20 25:5
place 38:4,11
plaintiff 1:5,12
  12:19,21,21
  19:8,10,13
  20:14
plaintiff's 19:19
plaintiffs 2:16
  11:22
please 5:7 14:14
  42:17 45:13
plus 65:8 104:15
pneumonia
  86:12,13
point 39:8 50:12
  50:25 51:4
  58:13 60:5
  68:9 83:6 87:1
  94:21 96:22
pointes 55:21,23
  56:4
points 49:20
police 38:1
policies 23:23
poor 93:6,10,13
population
  71:13,14,22
  73:18,23 74:2
portion 88:8
  96:14
possibilities
  35:17
possible 47:12
  53:15 61:16
post 44:20
post-arrest
  99:23
postulating
  64:24
potassium 53:14
  57:2,3,5 58:5

58:16,21 59:12
  59:18 60:11,18
  60:19 61:4
  67:2,4,15
  69:22 70:6,12
  70:15,16 80:17
  80:19,21,25
  85:7,16 87:14
  87:15 88:5
  92:18 96:7
  98:5,11
potassium-wa...
  70:17 79:25
  80:8
potentially 70:7
  75:8,21
powerful 12:6
practice 16:9,21
  16:25 17:9,18
  18:12,15,16
  24:16 31:5
  38:21 72:19,21
  73:5,24 74:1
practiced 23:10
practices 17:11
practitioner
  23:17 25:5
pre-deposition
  103:13
precipitated
  56:12 59:3
  96:6 98:4
predated 98:12
predictably 38:9
prep 103:21
preparation
  103:12
prepare 30:18
  105:5,12,25
prepared 5:24
preparing 9:22
  103:23
prescribed 77:9
present 3:13
  47:13 55:10
  68:22
presents 57:20
pressure 41:16

41:18,22,25
  42:8 46:18,22
  46:24 50:10,17
  63:3,15,18
  65:13 67:10
  69:11 85:6,15
  86:17 87:11,21
  89:4,6,22 90:2
  90:11,19 94:15
  95:10
pressures 50:13
  50:20 52:3
presume 100:10
pretty 26:3
  40:11
prevented 51:22
previous 15:14
previously 67:24
  104:18
primary 16:11
  16:13 17:22
  47:14 96:3
  98:1
principle 99:4
printed 11:1
prior 34:2 35:10
  72:12 98:20
prison 22:2
private 17:17
  18:9,24 25:7
  26:16 28:22
  29:2 31:4
privileges 17:3
probability
  44:12 45:8,17
  83:10,15
probable 53:22
  54:3
probably 6:20
  9:6 13:5 15:20
  21:7 22:4 65:1
  76:10
problem 46:2
  50:23 57:10,12
  70:6 74:21
  76:18 79:23
  80:20 81:3
problems 57:14

Bruce Charash, M.D.

January 28, 2025

71:18 72:3,8
75:9,13,15
82:16
**Procedure** 2:4
**procedures**
23:23 37:9
**proceedings** 5:1
106:16 114:8
**process** 10:5
90:23
**professional** 6:9
6:11 16:6
24:16
**professor** 26:5
**profound** 59:16
65:12
**profoundly**
59:13
**prognoses** 71:24
**prognosis** 73:6
73:21,22
**progressively**
59:20
**prolong** 57:8
58:4,9
**prolonged** 48:5
56:19 57:1
**pronounce**
55:22,25
**pronouncing**
55:24
**proof** 44:9
**proposing** 50:6
**prospective**
73:14
**protocols** 60:17
**provide** 18:4
19:1 23:13
28:24 30:23
**provided** 10:16
10:18,24 14:21
23:20 24:7
30:10 40:13
42:16,18 99:11
101:16,23,25
102:21 105:8
105:15,19
**provider** 4:15

22:17 25:8
54:17
**providers** 18:3
55:20 68:14
**provoke** 55:11
**provoked** 62:2
62:12
**provoking** 62:16
**psychological**
1:14 3:5 38:12
38:15 107:10
**public** 2:6 17:14
113:5,24
**publications**
32:10,11
106:20
**publicly** 32:19
**published** 32:13
32:15
**pull** 26:19
**pulled** 67:16
**pulmonary**
61:12,14,15,17
**purported** 35:1
**pursuant** 2:3,4
**put** 20:18 21:9
24:4 25:11
55:15 60:4
91:22
**puts** 60:11
**putting** 10:6
14:19 38:3
95:13

_____

**Q**

**QRS** 43:17,18
**QT** 56:19,25
57:9 58:4,9,12
**qualification**
60:14
**quality** 37:1,7
37:13 77:23
79:8,16
**quantifying**
91:20
**quantitative**
72:25
**question** 28:17

43:4 45:6,16
47:18 50:3
52:15 66:2
73:19 82:6
92:2 97:17
104:24 107:22
109:18 110:13
110:20
**questioning** 5:22
109:16,17,19
**questions** 23:8
48:23 83:22
84:18 104:23
108:17,20
111:14,16
**quick** 39:21,23
**quickly** 40:11
**quite** 49:5
**quote** 68:11 74:2

_____

**R**

**R** 2:12 3:1 4:22
**radiating** 46:5
**raised** 69:18
**raises** 70:15
**raising** 99:22
**Rakhit** 20:25
**range** 91:16
**rare** 72:20
**rate** 40:6 41:5
104:10,18,20
**rates** 104:25
105:2,4
**reach** 7:16
**reached** 100:5
**reaching** 101:12
**read** 12:8 15:14
38:1 54:12,14
54:15,16
111:25 112:3,6
114:8
**reading** 100:9
**reads** 54:19
103:10
**real** 64:3
**really** 13:3 29:10
42:4 49:12
50:11 52:9

53:4 60:21
64:8 69:25
74:13 86:8
87:2 92:15
111:3
**Realtime** 1:24
2:6
**reason** 51:18
55:13 57:14
58:22 61:14
91:6
**reasonable**
44:11 45:7,17
63:12,13 67:14
81:7 83:9,14
85:5,9,11,13
86:5 88:1
99:12 104:16
110:11 111:1,5
111:11
**reasons** 90:12
**rebut** 96:23
**recall** 42:21 43:9
43:11 69:16
70:17 99:22
100:20 102:23
**received** 40:24
40:24 56:24
99:16
**recess** 40:3
84:13
**recognize** 14:22
21:12
**recollection**
13:21 33:12
**record** 5:8 79:15
80:4 97:18
**recorded** 62:13
113:7
**records** 37:19
38:6 68:11
92:6 101:16,19
101:22 105:8
105:12,16,18
106:2
**recover** 45:3
**recovered** 59:8
86:19

**recovery** 45:5
**recurrent** 35:5,7
35:10,21 36:23
74:12 78:10
**reduce** 65:14
90:3
**reduced** 53:15
59:13 72:6
87:12 88:8
93:16 113:8
**reduction** 88:24
91:24
**refer** 93:15
**reference** 9:23
42:24 64:22
82:21 96:11
100:14
**referenced**
11:10 65:21
71:1
**referral** 17:13
**referring** 42:22
94:22
**reflection** 39:7
**refractory** 59:25
79:11
**regard** 8:1
**regimen** 95:19
**register** 29:24
**regularly** 26:10
**reject** 19:18
**relate** 39:13
92:14
**related** 70:7
87:6
**relating** 102:6
**relative** 66:23
67:20,22
113:15,16
**relevance** 48:25
**relevant** 32:12
32:14 36:21
**relied** 101:11
102:14,18
**relooked** 33:10
105:16
**rely** 28:22
**remember** 8:10

Bruce Charash, M.D.

January 28, 2025

12:2,8,11,16
13:3,24 14:16
15:6 21:8,16
42:20 44:18
59:6 76:9
93:22 96:18,21
**Remote** 2:1
**remotely** 1:20
2:7 5:3 113:7
113:11 114:9
**reoccur** 35:4
**reoccurs** 35:2
**repeat** 42:17
45:13
**rephrase** 93:25
**replies** 7:22
**report** 5:22,24
7:24 8:11,15
8:18,25 9:19
9:20,22 23:1
24:3 27:12
33:6,16,18
34:19 35:10,20
36:17 37:14,24
38:1,22 39:1
40:10 41:6,9
43:7,9 48:18
48:24 49:12,16
61:24 64:14
65:21 66:20
68:11,17 69:15
74:18 82:21
87:10 93:20
94:3,10,13
95:22 96:14,18
97:1,4 100:10
100:16,17,21
100:25 101:5
101:17 104:19
105:6,9,13,17
105:23 107:15
108:25 109:11
**reported** 1:23
35:5,13 36:12
52:23,25 65:19
65:22,24 66:4
72:11
**Reporter** 1:24

2:6
**reports** 8:4,5,7
8:21 101:21
103:11,20
105:7,14,18,20
105:23 106:4
**represent** 25:5
26:14
**request** 9:13
**required** 81:10
**requires** 96:22
**research** 79:5,9
**resident** 27:12
30:13
**residents** 26:14
26:16,17,21
27:9,11 29:3
31:6,14
**residual** 77:18
**resistance** 95:4
95:12,19
**resistant** 94:17
94:18 95:2,4,5
95:17 96:13
**resolve** 20:13,15
55:9
**resolved** 35:12
55:8,14 66:3
**respect** 41:2,3
70:25 109:8
**responded**
100:18
**response** 10:19
37:6 57:19,20
109:19 111:9
**responsibilities**
16:7
**rest** 18:25 21:1
**result** 69:8
**resulted** 85:15
**resulting** 70:3
81:15 85:7
110:22
**resuscitated**
51:23 100:8
**retained** 11:25
12:5 19:7,9
**retrospect** 53:4

**revealed** 6:3
**review** 10:1,1,2
10:2 19:22
20:5,7 22:9
24:2 92:24
96:18 103:11
104:12,14,18
104:21 109:11
**reviewed** 7:8,23
8:4,7,11 9:13
11:22 15:17,25
33:6,8,9 93:20
94:3 101:18,19
105:5,12,25
107:23 108:25
**REYNOLDS**
3:7
**rib** 39:16
**Richards** 3:13
**right** 6:14 31:18
41:1 43:4 52:6
64:20 65:25
71:10 73:3,4
75:3 87:19
94:5 108:2,7
108:11,16
110:12
**rights** 22:13,18
22:20
**risk** 50:21 58:12
59:23 60:12
73:13 75:23
81:1,8
**role** 14:5 67:1
90:14
**room** 30:7,8
31:8 54:17,25
63:8
**Rosanne** 1:23
2:5 113:4,23
**rotate** 29:21
**rotating** 31:17
**rotation** 28:19
29:14
**RPR/CRR** 1:23
2:5
**RPR/CSR/CRR**
113:4,23

**rude** 111:4
**Rule** 109:20
**ruled** 7:23
**Rules** 2:4
**run** 24:17 27:6
**running** 31:24
**runs** 53:13

_____

**S**

**S** 2:12 3:1 4:9,22
4:22
**S.C** 107:10
**salt** 32:22,24
**saturation** 86:14
**save** 96:9
**saved** 51:13
**saw** 33:18 42:23
43:2 70:23
**saying** 14:4
18:23 19:20
29:5,6,24
51:20 52:24
55:2 57:25
65:17 70:11
86:5 87:20
89:16 92:14
93:12 95:22
96:20 110:25
**says** 34:22 43:10
58:19 59:21
**scale** 41:18
**Schamber** 3:6
107:12
**schedule** 28:6
**school** 17:23
26:2 28:2
**scientist** 53:20
**scope** 38:19
47:17 109:16
109:19
**scratch** 104:6
**screen** 14:19
20:19 21:9
25:11 32:5
40:7 55:15
**scroll** 20:21
25:17
**scrolling** 21:18

**seal** 113:20
**second** 19:4
41:13 58:25
62:1,10 94:24
94:24
**secondary** 98:21
**Secondly** 27:2
**seconds** 60:5
**section** 43:22
**sections** 41:6
**see** 9:9 11:3 16:3
16:8 17:24
20:22 26:19
28:11,16 30:3
30:5 38:15
47:22 54:19
68:20 92:19,20
92:21,22 95:17
**seeing** 29:8
**seen** 55:17 56:23
60:1 92:8
99:21 100:9
**segment** 41:13
43:16,17,18,21
**seizure** 33:19,23
33:24 34:3
53:11
**selecting** 10:5
**send** 111:19
**sense** 12:7 63:11
**sent** 9:14 49:10
83:3
**sentence** 35:15
54:20 62:1,10
96:21
**separate** 10:6,9
**sepsis** 86:17
**sequence** 82:22
87:3
**serious** 74:20
76:17
**serum** 60:18
**service** 27:18
28:21,23 29:1
29:9 30:3,6
**services** 18:4
19:1 23:14
29:15

Bruce Charash, M.D.

January 28, 2025

set 113:20
sets 97:3
setting 30:11,12
  58:10 67:9
  90:2
settings 47:14
seven 7:11 97:1
  97:3 98:16
severe 91:9
  94:17,19 95:2
  95:5,16,22
  96:6,13 98:4
  98:11
severely 41:20
shareholders
  107:24
sharing 11:7
  61:21
Shasta 3:11
Sheriff's 3:11
shocked 60:3,10
shop 71:18
short 39:18
  89:23
short-term
  71:23
shorten 107:17
shorter 53:13
shortness 39:12
  42:7 46:6,19
  47:1,8,10 51:6
  52:2 61:17,19
  63:2,19 72:13
  74:12 85:6,15
  90:2 92:9
  110:8
show 34:11
  62:24 92:6
showed 62:23
showing 34:8
  44:5,14
shown 9:11 68:1
shows 56:3
side 19:22
significance
  42:1,9
significant 25:13
  67:2 96:7 98:6

significantly
  79:22
similar 14:10
simple 14:7 42:4
simply 48:8
single 12:18
  13:12 15:3
  17:16 34:19,22
  34:24 59:21
  75:4
sir 5:7 8:19
  12:24 25:11
  26:17 49:3
  75:3 106:25
sit 33:11
sixes 97:7,8
slides 30:18
sloppy 93:11
small 12:10,15
  90:7,8 95:24
smaller 20:16
smoke 78:17
smoker 75:18
  78:14
smokers 76:10
  76:11
smoking 75:25
  78:16 79:7
somebody 35:17
  39:16 48:1
  58:13
somebody's 42:6
someone's 58:3
something's
  32:25
somewhat 76:11
sorry 8:11,14
  14:16 18:19
  25:1 29:10
  37:3 39:22
  42:17,21 45:13
  61:8 62:4 65:1
  70:21 75:12
  80:5 91:2,13
  94:20 101:14
  105:10 106:17
  106:22 109:12

sort 19:15 28:5
  33:25 70:2
  79:25 103:17
  106:12
sound 94:18
sounds 37:17
  90:20
source 68:13
  69:21 77:15
sources 101:10
sparing 92:18
speak 82:1
speaking 73:19
  94:7
special 105:4
specialty 5:12
specific 35:8
  102:13
specifically
  94:21
specificity
  110:23
speed 60:4
spend 106:3
spent 103:2,23
  104:2 105:20
spewing 39:4
spiral 85:6,14
  90:14,16
spirolactone
  92:17
spoke 31:13
  97:18
spontaneously
  27:9
squeezed 91:18
SS 113:1 114:2
St 3:3 43:17,21
  43:25 45:2
  55:3,6,7
stabilizing 48:14
staff 27:3 84:22
  100:17
Staffing 1:14 3:5
  107:10
Stan 3:11
stand 20:22
  101:4

standard 22:16
  23:3,7 36:7
  40:17 48:14
  52:8 60:16
  83:19 99:13,19
  99:21 100:1,23
  104:10,18,19
  105:2 109:4
standards 99:13
standing 42:13
start 40:9 75:4
started 25:2
  30:25 73:2
state 2:7 5:7
  11:23 13:8
  15:3 22:4,10
  26:1 33:6
  41:22 66:20,23
  83:9,14 106:9
  112:2 113:1,5
  114:1
statement 46:20
  62:21 93:1
states 1:1 15:16
  15:18,23 16:1
  44:18 46:3
  72:24 88:18
  112:2
stating 45:7 52:7
status 108:6
steady 41:22
STENOGRA...
  61:8 75:12
  103:4
Stenographica...
  1:23
step 40:7
steps 73:15
stiffen 90:1
stood 21:2
stop 48:17 60:2
  94:20
straightforward
  49:5
strange 94:16
street 2:14 3:3,8
  6:8 77:8
streets 80:24

stress 16:17
  44:18 46:3
  65:12
stressed 88:18
  88:22
stretching 61:10
strike 23:20 52:7
  62:19 109:18
strip 4:16 43:6
  55:18 56:3
strips 62:16,18
  42:20,21,23,24
stroke 19:20
strong 58:21
structural 63:24
structure 108:5
  108:13
students 26:9,21
  27:4 31:14,16
subject 106:12
substantial
  60:12 66:21
  81:1
sudden 81:1
suffered 100:19
suffering 37:8
  52:18
sufficient 44:23
sufficiently 67:4
suggest 84:2
suggested 99:8
suggestive 44:8
  44:9
Suite 2:18 3:3,8
Summary 94:25
Sunday 65:20
superimposed
  49:24 50:7
supervise 26:17
supplement
  80:17
supplements
  80:20,21
supplied 93:8
supply 46:1 65:4
  65:14 88:16,24
  89:11,12
supportive

Bruce Charash, M.D.

January 28, 2025

100:22
sure 8:15,17
  11:21 12:3,6
  12:13 13:2,6
  14:17 15:13
  25:9 26:12
  55:10 62:5
  65:18 70:5,11
  70:18 84:4,12
  97:15,16,17,20
  97:23 107:20
surgeries 36:23
  37:10 81:14
survival 74:2,8
  79:8
survived 40:22
  59:11 63:8
  64:11 81:5
  83:5
sustained 68:2,5
  68:8 72:16
sworn 5:3
symptom 47:19
  72:16
Symptomatic
  69:13
symptoms 35:9
  35:21 41:25
  42:2 46:7 47:6
  47:7 50:21
  53:15 65:19,23
  65:24,25 66:4
  92:5,7
syndrome 77:10
system 69:14
systemic 90:17

            T
T 4:9,22 5:5
  84:15 107:1
  108:23
T-O-R-S-A-D-...
  56:5
T-wave 43:18
T-waves 44:4
table 73:9,10,21
  73:22 75:4
  76:22

tables 71:1,5
  72:19,24 73:3
  76:19
tachycardia
  56:10 58:1,3
  63:1 66:6,11
tail 15:13
take 10:14 39:21
  51:1 55:13
  71:14 84:2,7
  94:8,11 107:5
  111:10 112:7
taken 2:3 35:9
  40:3 84:13
  92:20 113:11
  114:9
talk 73:21 82:9
  108:14
talked 22:21
  49:16 84:19
talking 93:9
talks 31:5,10
Taxman 13:18
teach 26:9,24
  27:20
team 26:20 27:6
  27:19 31:9
technically
  93:13 98:23
tecum 9:13
  10:20
tell 8:6 9:4 16:6
  17:24 19:21
  21:4 41:11
  58:23 67:19
  73:12 76:16
  90:15
telling 73:15
tells 33:21
ten 13:2 84:5
tend 55:9
tends 45:3
term 65:2 93:13
  94:16
terms 6:4 49:7
  55:1 59:12,23
  68:7 87:5 91:8
  91:10 93:6

terrible 77:12
territory 44:7
test 39:25
testified 5:4 7:7
  7:10,14,20
  10:22 11:16
  12:24 13:21
  14:25 15:2,15
  15:18,22 19:6
  20:23 21:14
  22:1,4
testify 7:5 11:13
  11:17 20:9,12
  20:14 22:23
testifying 19:12
  20:16 23:2
  110:14
testimonial 19:3
testimony 7:4
  10:17,19,19
  11:10,12 13:7
  14:20 15:14
  20:19 21:10
  34:19 35:11
  52:21 85:1
  104:22
testing 16:17
thank 24:22
  25:9 55:25
  84:1,11,24
  91:4 103:7
  106:24 108:22
  111:14,17
  112:7
thanks 40:2
theoretic 71:16
theoretically
  51:3
theory 35:3 47:3
  47:9 61:20
  67:7
thin 38:10 39:7
thing 39:14,22
  51:9 72:5
  86:23 94:10
  95:21 112:1
things 16:9
  17:20 23:25

26:24 39:4
  48:13,18,19
  51:25 57:8
  75:8 78:4,13
  79:9 84:19
  89:18 105:22
think 6:13 8:15
  11:20 12:4
  13:2,5 14:1,9
  15:12 19:23
  22:5 27:13
  29:25 30:13
  36:4 40:10
  41:1 47:18
  48:21 49:5,17
  52:6,15 55:21
  63:20,25 64:6
  65:6,7 67:2,11
  67:14 69:16
  72:20,22 78:13
  78:17,18 80:24
  81:3,4 82:18
  85:8 86:5,12
  87:4,6 88:3
  94:11,16 95:25
  96:2,22 97:8
  98:24,25 106:6
  107:3,6 109:14
  110:5,21,25
  111:5 112:4
thinking 47:5
third 62:1,4,6
thought 83:7,8
  84:25 110:21
  111:4
threat 82:16
threatening
  75:10
three 22:5,8
  27:2 35:17
  57:21,22 71:16
  81:14,19 91:10
  96:8 98:11
  111:19
threshold 57:3
throw 95:21
throwing 85:17
thrust 100:4

tick 76:15
tighten 65:14
  90:7
tilted 19:15
time 7:24 12:25
  15:8 16:4,13
  16:22,23 19:24
  24:25 26:15,18
  30:10 33:10
  35:3 39:16
  65:3 66:7,11
  66:14 70:15
  88:15 89:19
  96:9 103:23
  104:2,17
  105:21 106:4
  110:21
timeline 33:16
timely 83:4
  99:17
times 6:20 7:7
  7:11,13 11:16
  27:2,8 100:5
title 26:12
tobacco 79:1
today 5:14 9:14
  33:11 93:20,22
today's 106:16
told 29:18
  107:14
tolerable 50:15
tolerated 50:14
tools 48:2
top 42:24 90:11
torsades 55:21
  56:4,5,5,6,7,15
  56:24 57:1,4,7
  57:20,21 58:8
  58:17,20,23,24
  59:25 60:2,6,8
  60:10 81:5
  87:16
totally 75:1
  85:20
town 104:15
toxicity 60:1
track 12:22
  50:11

Bruce Charash, M.D.

January 28, 2025

Page 132

traditionally 45:24 65:6
trained 23:16
training 26:11 27:4,19
transcribed 7:20
transcript 4:18 5:1 112:12 114:8
transcripts 107:23
transferred 40:22
transient 45:2 63:24
transplant 71:25
travel 104:16
Travis 3:6
treat 81:12
treatable 80:13
treated 74:11
treatment 70:4
trial 4:14 5:20 7:12 10:17 14:20 15:19,20 19:6 20:18,19 20:24 104:14 104:22
trials 7:15,17
trigger 12:10 13:25 67:15,16 67:17
triggered 67:5 86:21 87:18 88:5 96:5
true 34:18 39:5 56:15 61:18 114:10
truth 104:1
try 21:16 28:10 59:17 89:19 97:19 104:24
trying 5:18 14:14 24:23 26:7 31:11 48:7,11,12 49:3,18,18,22 50:3,9 52:10

52:10 59:5 64:4,14,21 74:19 77:9 89:11
Tuesday 1:18
tumor 80:15
turn 38:1
turned 31:20
turning 40:9
two 10:19 13:17 27:16 36:18 57:21 86:13 96:6 97:7,8 98:3
two-three 57:6
type 59:17
types 6:18 46:7
typical 103:19

U

U 4:22
ultimate 98:3
ultimately 86:22
unacceptable 59:19
undercapitaliz... 108:11
underinsured 108:10
underlying 63:23 74:21 75:6 87:11 90:24 99:2 110:7
understand 5:18 18:20 23:6 29:6 36:11 49:22 52:10,12 52:16 53:20,24 54:1 64:6,15 64:21 65:18 70:11 72:23 77:2 85:25 88:7 89:11 92:11 94:5 100:24 110:19
understandable 89:15

understanding 17:7 22:22 49:20 69:21 72:25 73:1 87:19 89:2,10 92:3 94:2 103:16,20 111:2
understood 57:16,19 84:25 87:9 93:19 101:22
unified 90:22
unintelligible 75:11
unit 30:25 31:1
UNITED 1:1
unknown 91:1,3
Unquestionably 58:20
unsure 21:2
unusual 38:21
upcoming 103:11
updated 25:18
updates 25:13
ups 50:10
urgent 67:10
urinary 79:11
USA 1:14 3:5 107:10,25 108:6
use 30:19 64:2 65:1,2 67:19 69:14 73:7 91:10 93:6 95:3
usually 29:19 30:6 45:1 47:4 61:13 69:8,11 72:20 73:11,16 89:18 93:8,18
utility 58:18

V

V-fib 98:2
V-tach 53:13 56:12 57:7,8

58:2,16,17,19 58:22,25 59:11 60:2 63:25 66:18,22 98:2
V3 44:3
V6 44:3
vague 47:18 82:6
valve 32:25
variance 96:1
varies 94:13
vary 82:3
Vasotec 70:14 70:20
vast 82:18
ventricle 44:10 50:16 74:10 87:13,23 89:22 90:1,10 92:23
ventricular 56:9 58:1,3 63:1 66:6,10 67:5 68:2,7,8 96:3 98:3,22
venues 27:20
versus 66:24 76:18
vessel 90:8
vessels 90:7
video 9:3 33:12 33:14,19 34:2 53:12
view 32:20
viewpoint 73:14
violations 22:20
Virtually 11:14
visit 47:21 72:12
visits 78:10 92:10
vitae 4:11 6:7 10:13 25:12
vitals 41:12 68:1
volume 92:21
voluntary 17:8 26:3
volunteered 35:16
vs 1:6,13

vulnerability 98:14

W

W9 111:23
wading 18:19
waiting 14:12
waive 111:25 112:3
walking 80:24
wall 88:2
want 19:3 20:7 27:14 36:6 48:12 54:10,14 61:24 65:18,25 74:19 76:15,15 84:18 86:1 97:15,15 100:3 111:4
wanted 73:5
wanting 38:2
warehouse 31:22
Warren 3:11
wasn't 25:1,9 34:10,13 46:1 51:2 52:9 59:25 60:5,7,9 72:15 74:11 77:8,22 78:8 80:15 92:16,18 95:10,13 98:9
waste 19:24
wasting 69:22 70:12
waves 45:4
way 12:22 19:15 20:15 25:1 29:17 31:11 34:7 45:23 66:18 67:1 72:9 80:20 91:8 98:8 109:22
ways 65:10 86:13
we'll 23:8 40:10 48:25 55:15

Bruce Charash, M.D.

January 28, 2025

84:7
we're 29:11
  32:19 48:7
  96:1 99:4
weaken 38:9
weakened 50:15
wealthier 18:14
website 17:5
  31:25
Wednesday
  102:25 103:9
week 17:25 18:1
weigh 76:9
weighed 40:19
weighing 75:22
  76:25
weird 25:23 26:7
welcome 25:10
  111:18
well-known
  19:22
went 14:24 31:4
  35:7 40:16
  60:19 63:16
  78:9 81:25
  82:9 104:7,9
weren't 75:10
Wesley 3:6
WESTERN 1:2
whereof 113:19
whiteboard
  30:19
willing 20:12
Wisconsin 1:2
  2:7,18 3:9
  11:23 113:1,6
  114:1
wish 109:10
withdrawal 51:3
  82:21,24 83:11
  83:16
withdrawing
  83:1 90:12
witness 2:2 40:1
  53:21 54:19
  83:25 84:9,11
  104:11 106:25
  108:19 109:18

111:15,18,23
111:25 112:6
113:19
Wolff 8:9,10,11
  8:14,14 33:23
  49:6 93:20,21
  94:3,8 97:3
  100:11
Wolff's 8:18,25
  96:14 97:21
word 12:18
  13:12 69:14,16
work 9:17 88:11
  90:9 102:1,7
  103:2,17
  104:11 105:1
worked 13:14,17
works 33:4
  48:22
workup 80:11
  81:6
world 64:3
worse 32:23
  59:22 95:9
wouldn't 14:7
  21:4 29:12,17
  34:11 48:9
  59:16 73:24
wrap 83:6
write 10:9
writing 47:7
  104:19 113:8
written 94:3
  96:14 102:4,11
  102:16
wrong 7:20
  89:16
wrote 55:20

        X
X 4:1,9 5:5
  84:15 107:1
  108:23

        Y
yeah 7:17 11:20
  14:14 25:5
  29:12 31:11

37:2 42:19
43:2 45:4
48:11,11,21
54:3,19 61:19
74:7 77:2
99:17 100:22
104:8 108:21
109:8
year 6:23 7:1,1
  7:12,13 15:11
  27:2,8 29:20
  30:17 37:15,21
  38:9,22 71:6,6
  73:17 104:7
years 6:19,21,25
  7:3,9,9,12
  10:23 13:2
  15:3 20:20
  24:19 25:14,20
  27:16 28:15,18
  28:24 30:24
  31:2 32:13
  70:24 71:15
  72:2,22,22
  95:8
Yesterday 9:3
York 1:20,20
  2:8,8 8:13
  16:20 22:3,10
  26:1 31:22
  106:7,10,13
  113:11,12
  114:9,10
young 8:13
  37:11 108:1
  109:8
Young's 8:21
  24:3 109:11

        Z
zero 71:18
Zoom 1:17 2:1
  2:16,20 3:5,10

        0

        1
1 98:1 101:17

105:8
1,000 7:8
1,100 7:8
1:05 1:19 2:10
  112:8
1:15 84:9
1:25 84:10
10 4:11,12,13,14
  7:1,13 16:23
  113:24
10-minute 84:3
  84:7
10:04 1:19 2:9
  113:13
100 13:6 14:17
  26:12 44:8
  55:10 60:20
  69:9 86:15
107 4:5
108 4:3
11 7:1,13
11:00 40:3
11:07 40:4
110 69:9
117 4:11 10:14
  25:13 112:9
118 4:12 10:16
  102:22
119 4:13 10:16
  11:8 21:11
12-lead 55:3
  62:25
12/22/19 62:14
12:15 84:13
12:25 84:7,14
120 4:14 10:17
  14:19
121 4:15 54:11
122 4:16 55:16
  112:9
1339 4:15
142 42:1,8,10
15 15:19 16:23
  16:23 19:11,17
  20:4,10 24:18
1559 4:16
17 11:16
180758 1:23

1987 6:19
1991 31:2

        2
2 5:23 32:6
  36:17 101:17
  105:9
2.3 60:11,19,21
  67:4
2.6 60:20,23
  61:2
20 24:18,20
  30:24 31:2
  32:24 76:10
20-CV-1123 1:6
2000s 24:19
2006 31:3
2011 70:23
2017 95:9
2019 33:7 71:6
  92:7
2021 11:12,13
  11:17 15:9,11
2022 11:17
  25:15
2023 104:9
2024 5:23 7:25
  30:15,16
2025 1:18 2:9
  102:23 103:3
  113:12,21
  114:9,17
2026 29:22
  113:24
219 2:18
21st 83:12
22 45:19 52:19
  65:20 76:10
22-CV-723 1:13
22nd 45:11 53:8
  54:5 83:12
  102:23 103:3,9
23 33:7 54:18
23rd 83:12 85:3
24th 59:1
25 16:9,12 24:20
2750 3:3
28th 1:18 2:8

Bruce Charash, M.D.                    January 28, 2025

Page 134

113:12 114:9

---
**3**
---

**3** 33:18 41:8
59:22,22 67:25
68:1 80:25
94:24 100:17
**3.0** 59:13
**3.5** 59:18
**3:00** 65:20 66:4
**30** 3:3 32:13
109:20
**301** 3:8
**31.3** 73:17,17
**311** 2:14
**312-243-5900**
2:15
**35** 91:14,19
**360** 6:22
**360-plus** 6:20
**37** 7:9
**370** 7:2
**38** 6:19 7:8,12
**3rd** 2:14 113:21

---
**4**
---

**4** 19:13 42:24
43:13 59:18
98:17
**40** 15:16,18 16:1
18:1 70:22
71:15 72:22
91:12,14,19
**40-year-olds**
71:16 76:11
**400** 3:8
**41** 71:23 75:24
**41-year-old** 72:3
**41-year-olds**
71:14,17
**414-276-2108**
2:19
**414-455-7676**
3:9
**45** 72:22 91:13

---
**5**
---

**5** 4:3 19:13

61:24 62:5,6
67:19 98:18
99:4
**5,000** 104:22
**5:00** 16:21
**50** 91:16
**53202** 2:18 3:9
**54** 4:15
**55** 4:16
**550** 104:6,19,21
**55101-1812** 3:3

---
**6**
---

**6** 99:5,10
**6-** 7:16
**6,000** 104:15
**6:00** 27:10
**60** 18:1 91:17,17
**600** 104:7,9,10
104:21
**60607** 2:14
**63rd** 6:8
**651-291-1177**
3:4

---
**7**
---

**7** 20:11 97:7,9
99:11 100:15
**7:00** 52:19,25
**7:30** 34:20
**70** 91:16
**700** 7:16 104:12
**710** 2:18
**7th** 3:3

---
**8**
---

**8** 74:18 97:10
100:15
**8:00** 35:12 36:13
36:16 52:19,25
**8:00-something**
35:25
**8:53** 41:12
**80s** 71:21
**81** 71:15,20
**84** 4:4
**85** 16:22 19:10

---
**9**
---

**9:00** 16:21
**900** 7:6,19
**90s** 71:21
**92** 42:1,8,10
**95** 19:12
**96** 19:12