**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| GREGORY BOYER, as Administrator of the Estate of Christine Boyer, and on his own behalf,<br><br>    Plaintiff,<br><br>   v.<br><br>ADVANCED CORRECTIONAL HEALTHCARE, INC., LISA PISNEY, AMBER FENNIGKOH, MONROE COUNTY, WISCONSIN, STAN HENDRICKSON, DANIELLE WARREN, and SHASTA PARKER,<br><br>    Defendants. | No. 20-cv-1123-jdp |
| GREGORY BOYER, as Administrator of the Estate of Christine Boyer, and on his own behalf,<br><br>    Plaintiff,<br><br>   v.<br><br>USA MEDICAL & PSYCHOLOGICAL STAFFING, NORMAN JOHNSON, TRAVIS SCHAMBER,WESLEY HARMSTON, and JILLIAN BRESNAHAN,<br>    Defendants. | No. 22-cv-723-jdp |

**MEMORANDUM OF LAW IN SUPPORT OF MONROE COUNTY
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**<u>INTRODUCTION</u>**

  Plaintiff, Gregory Boyer ("plaintiff"), brings this action on his own behalf and as

administrator of the estate of Christine Boyer ("Boyer") seeking a remedy under 42 U.S.C.

§ 1983 and Wisconsin law for Boyer's death on December 27, 2019, following a brief stay

in the Monroe County Jail (the "Jail"). Boyer's death was undeniably tragic, but it does not provide a basis for relief under § 1983 or Wisconsin law, and this action should be dismissed in its entirety.

Boyer was booked into the Jail late on the evening of Saturday, December 21, 2019. Boyer was screened at booking by Danielle Nelson (formerly Warren) ("Nelson"), a sergeant in the Jail, and Amber Fennigkoh ("Fennigkoh"), a registered nurse with the Jail's contracted healthcare provider, Advanced Correctional Healthcare, Inc. ("ACH"). Boyer, who was intoxicated, reported that she had numerous chronic medical problems, but she either would not or could not provide much detail about her medical status to Nelson and Fennigkoh other than to say to Nelson that she had high blood pressure and congestive heart failure. Likewise, although she had certain medications and loose pills in her purse, Boyer did not provide a complete account of her medications. Fennigkoh, recognizing that she was not going to be able to obtain a complete account of Boyer's medical status from her, directed that Jail staff house her in a holding cell in the booking area of the Jail and place her on a heightened, thirty-minute medical watch until more information could be obtained about her medical status and medications. Nelson and the other Jail staff on duty at the time of Boyer's booking did just that, placing Boyer in a holding cell on a medical watch and monitoring her status every thirty minutes without incident for the remainder of the night.

The next afternoon, Sunday, December 22, Boyer complained of not feeling well to Shasta Moga (formerly Parker) ("Moga"), a sergeant in the Jail, and another member of the Jail staff, and asked to have her blood pressure checked. Based on Boyer's complaints and the results of a blood pressure check, Moga and her co-worker contacted Lisa Pisney ("Pisney"), an advanced practice nurse prescriber with ACH who was the on-call provider

for the Jail that day. Pisney directed that they give Boyer an antihypertensive medication and re-check her blood pressure within the hour. Moga did just that, and she contacted Pisney again with the second blood pressure reading. At that point, Pisney instructed Moga to re-check Boyer's blood pressure in another hour and, if her diastolic pressure was still above a certain level, to give Boyer another, smaller dose of the antihypertensive drug. Again, Moga did just as she was instructed. In addition, Moga informed Fennigkoh of what was occurring, and Fennigkoh told her staff was handling the situation correctly.

At approximately 8:00 p.m. that evening, Boyer complained for the first time to Moga that she was having chest pain. Moga completed a standard protocol for Boyer's complaint, gathering certain information and observations regarding Boyer's condition before again calling Pisney, as the on-call provider, for direction on how to handle the situation. Learning of Boyer's complaint from Moga, Pisney advised Moga to give Boyer a dose of aspirin and re-check her blood pressure again in thirty minutes. Moga did just that, and when she re-checked Boyer's blood pressure, her vitals had improved and she was no longer complaining of chest pain or otherwise asking for medical attention.

When Nelson took over for Moga in the booking area at 10:00 p.m. that evening, Moga informed Nelson of what had occurred, her contact with Pisney, and Pisney's advice. Nelson and one of her co-workers continued to check on Boyer at least once every thirty minutes from 10:00 p.m. on. Boyer did not complain to them of any ongoing chest pain or other discomfort, and they did not observe Boyer to be in any distress, either.

Just before 1:00 a.m. on Monday, December 23, an officer stationed at the Jail's master control desk saw that Boyer, who Nelson had observed to be fine only minutes before, was lying on the floor of her cell, unresponsive. Nelson and other staff responded immediately, summoned emergency medical responders, and began trying to resuscitate

Boyer until Boyer could be transferred to the hospital. Boyer, who had suffered a heart attack, died four days later at the hospital.

On these undisputed facts, and as described in greater detail below, plaintiff's § 1983 claims against Nelson, Moga, the Jail's administrator, Stan Hendrickson, and Monroe County (together, the "Monroe County defendants") must be dismissed on summary judgment. Plaintiff's primary claim against Nelson and Moga, properly treated as a claim for denial of adequate medical care to an arrestee under the Fourth Amendment, must fail because plaintiff cannot demonstrate that either Nelson or Moga responded to the circumstances involving Boyer in an objectively unreasonable manner, particularly considering the fact that both were following the advice of Fennigkoh and Pisney, as licensed medical professionals, in their actions with respect to Boyer. Further, plaintiff's claim against Nelson and Moga for a failure to intervene must also be dismissed because plaintiff cannot demonstrate that either had a sufficient opportunity to intervene to stop any alleged constitutional wrong on the part of the other. In turn, plaintiff's claim against Hendrickson, as a supervisor, must fail because he was not personally involved in the events surrounding Boyer's stay in the Jail. All three are entitled to qualified immunity in any event. Plaintiff's claim against the County is also subject to summary judgment, as plaintiff cannot meet his burden of proof under any of the three pathways to *Monell* liability on the part of the County: he cannot point to an express County policy, unconstitutional on its face, that caused Boyer's death; he cannot prove the existence of a widespread practice or *de facto* policy, of which the County had notice and to which it responded with deliberate indifference, that caused Boyer's death; and he cannot demonstrate that an official with final policy-making authority for the County took any action with respect to Boyer that caused her death. And, finally, plaintiff cannot succeed

4

under controlling Seventh Circuit precedent with a claim against the County defendants on his own behalf arising out of Boyer's death.

For these reasons, and as is discussed in greater detail below, the Monroe County defendants are entitled to summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and plaintiff's claims against them must be dismissed in their entirety.

## STATEMENT OF FACTS

The Monroe County defendants respectfully refer this Court to the Joint Proposed Findings of Fact in Support of the ACH and Monroe County Defendants' Motions for Summary Judgment ("DJPFOF") for a statement of the material undisputed facts of record. The Monroe County defendants refer below to these undisputed facts as they are relevant to their arguments in support of summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where, as here, there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Williams v. Ortiz*, 937 F.3d 936, 941 (7th Cir. 2019). A fact is "material" only if, under the governing law, it could affect the outcome of the lawsuit. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291-92 (7th Cir. 1997). A dispute over a material fact is "genuine" only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, the facts are construed in the light most favorable to the non-moving party. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). However, "[e]ven on summary judgment, district courts are not required to draw every requested inference; they must only draw reasonable ones that are supported by the record." *Id.* at 704 (citing *Omosegbon v. Wells*, 335 F.3d 668, 677 (7th Cir. 2003)).

Likewise, the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (internal quotation marks and citation omitted). Ultimately, to defeat a properly supported motion for summary judgment, the non-moving party must present "evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (internal quotation marks and citation omitted).

## ARGUMENT

I. **MOGA, NELSON, AND HENDRICKSON ARE ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S § 1983 CLAIMS.**

A. **Plaintiff's Claim Against Moga, Nelson, and Hendrickson for an Alleged Denial of Adequate Medical Care (Count I of the Complaint) is Subject to Summary Judgment.**

1. **Plaintiff's Claim for an Alleged Denial of Adequate Medical Care is Properly Considered Under the Fourth Amendment's Objective Reasonableness Standard.**

When she became unresponsive and was transported to the hospital in the early morning hours of Monday, December 23, Boyer was in custody at the Jail because she had been arrested on the evening of Saturday, December 21, by the Tomah Police Department. (DJPFOF ¶ 13.) As a detainee who had not yet had a judicial probable cause hearing, Boyer was subject to the protections of the Fourth Amendment. *See, e.g.*, *Jump v. Village of Shorewood*, 42 F.4th 782, 792-93 (7th Cir. 2022); *Braun v. Village of Palatine*, 56 F.4th 542, 551 (7th Cir. 2022).

Fourth Amendment claims based on an alleged denial of adequate medical care are governed by the objective reasonableness standard. *See, e.g.*, *Jump*, 42 F.4th at 793

(citing *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020)). As the Seventh Circuit has explained:

> Under this standard, the nonmoving plaintiff has the burden to provide evidence that the defendants' actions were objectively unreasonable and caused his injuries. [*Pulera*, 966 F.3d at 550.] We view this objective standard not mechanically but in light of the totality of the facts and circumstances of each particular case. *Id.*; *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S. Ct. 2466, 192 L.Ed.2d 416 (2015). Summary judgment is due defendants when no rational jury could find the official's actions objectively unreasonable under the circumstances. *Pulera*, 966 F.3d at 551, 555.

*Jump*, 42 F.4th at 793; *see also Braun*, 56 F.4th at 551 ("Accordingly, we ask whether the officer's conduct was objectively unreasonable under the circumstances.") (internal quotation marks and citations omitted).

Historically, the Seventh Circuit has identified four, non-exclusive factors as bearing on the objective reasonableness inquiry under the Fourth Amendment: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011) (citing *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)). At the same time, the Seventh Circuit has also emphasized that "[o]ne should not fixate on factors," *Florek v. Village of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011), as the "ultimate inquiry . . . is 'whether the conduct of each defendant was objectively reasonable under the circumstances,'" *Estate of Perry v. Wenzel*, 872 F.3d 439, 453-54 (7th Cir. 2017) (quoting *Ortiz*, 656 F.3d at 531).

More recently, in the context of denial of adequate medical care claims brought by pre-trial detainees under the Fourteenth Amendment, the Seventh Circuit has observed that the objective reasonableness standard incorporates two core questions: (1) did the

defendants act purposefully, knowingly, or recklessly; and (2) were the defendants' actions objectively reasonable. *Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018). Moreover, in addressing the objective reasonableness standard under the Fourteenth Amendment, the Seventh Circuit has emphasized the objective nature of the inquiry. *Pittman v. Madison County, Ill.*, 198 F.4th 561, 569-72 (7th Cir. 2024). Specifically, in *Pittman*, the Seventh Circuit held that "a pre-trial detainee in a medical care case need not prove a defendant's subjective awareness of the risk of harm" and, instead, that "the proper inquiry turns on whether a reasonable officer in the defendant's shoes would have recognized that the plaintiff was seriously ill or injured and thus needed medical care." *Id.* at 570; *see also id.* at 572 ("[T]o prevail, [a plaintiff] must prove that the defendants did not take reasonable available measures to abate the risk of serious harm to [the plaintiff], even though reasonable officers under the circumstances would have understood the high degree of risk involved, making the consequences of the defendants' conduct obvious. That is the essential objective inquiry.").

Notably, however, proof of negligence remains insufficient to establish constitutional liability under § 1983. *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 333 (1986); *Miranda*, 900 F.3d at 353. Moreover, the fact that the plaintiff suffered an adverse medical outcome is not necessarily evidence that a defendant jail official's actions were objectively unreasonable at the time they were taken. *See, e.g.*, *Florek*, 649 F.3d at 601-02 ("Just as the Fourth Amendment does not require a police officer to use the least intrusive method of arrest, neither does it require an officer to provide what hindsight reveals to be the most effective medical care for an arrested suspect") (internal quotations and citation omitted).

### 2. Plaintiff's Claim Against Moga, Nelson, and Hendrickson for Their Alleged Failure to Provide Adequate Medical Care Fails as a Matter of Law.

Under applicable Fourth Amendment standards, plaintiff cannot sustain his claim against Moga, Nelson, and Hendrickson for their alleged failure to provide adequate medical care to Boyer.

### a. Moga.

Moga was on duty in the Jail between 6:00 a.m. and 10:00 p.m. on Sunday, December 22. (DJPFOF ¶ 57.) Moga's interactions with Boyer centered on two periods of time during her shift that day: first, from mid- to late-afternoon, when Boyer complained that she thought her blood pressure might be elevated; and second, at approximately 8:00 p.m., when Boyer first complained of chest pain. (*Id.* ¶¶ 58-70 & 86-105.) During each set of interactions, Moga responded in an objectively reasonable manner to Boyer's complaints and symptoms. Specifically, she spoke with Boyer and gathered information about how she was feeling and her vital signs, she contacted the on-call medical provider, and she followed the medical advice given by the provider. Based on the undisputed facts material to Moga's interactions with Boyer, no reasonable jury could conclude that Moga responded to Boyer's medical concerns in an objectively unreasonable manner. As a result, Moga is entitled to summary judgment with respect to plaintiff's Fourth Amendment claim for failure to provide adequate medical care.

Moga's first interactions of note with Boyer on December 22 began when Boyer complained of feeling hot and sweaty and having difficulty breathing at approximately 3:00 p.m. that afternoon (*Id.* ¶ 58.) Based on Boyer's complaint, either Moga or her co-worker, Brooke Dempsey, took Boyer's blood pressure. (*Id.* ¶ 59.) Having taken Boyer's blood pressure, either Moga or Dempsey called Nurse Practitioner Pisney, who was the

on-call provider that day, to report what was happening and Boyer's blood pressure reading. (*Id.* ¶ 60.) Upon learning what was occurring, Pisney directed that staff give Boyer a dose of Clonidine, an antihypertensive drug that lowers blood pressure, and re-check Boyer's blood pressure roughly thirty minutes later. (*Id.* ¶ 61.) Boyer was given the medication as Pisney directed, and Moga re-checked her blood pressure at 3:45 p.m., also as directed as Pisney. (*Id.* ¶¶ 62 & 64.) At that point, Boyer did not convey any additional medical concerns to Moga. (*Id.* ¶ 63.) Moga then called Pisney with the new blood pressure reading, and Pisney directed her to again re-check Boyer's blood pressure one hour later. Pisney further directed that, if Boyer's diastolic pressure was then above 100, she was to receive another, smaller dose of Clonidine. (*Id.* ¶¶ 65-67.) Following Pisney's directions, Moga re-checked Boyer's blood pressure (for the third time in two hours) at approximately 5:00 p.m. Because the diastolic pressure reading (101) was above 100, Moga then gave Boyer the additional dose of Clonidine, as directed by Pisney. (*Id.* ¶¶ 68-70.) In addition to her contacts with Pisney that afternoon, Moga also informed Registered Nurse Fennigkoh what was occurring with Boyer by email, and she spoke directly with Fennigkoh, who happened to be in the Jail that afternoon to care for another inmate. (*Id.* ¶¶ 78-83.) In response to the information provided verbally by Moga, Fennigkoh told Moga Jail staff was handling the situation in the correct manner. (*Id.* ¶¶ 84-85.)

Moga's second set of interactions with Boyer began between 7:25 and 8:00 p.m. that evening, when Boyer complained to Moga that she was experiencing chest pain. (*Id.* ¶¶ 86-87.) This was the first time Boyer complained to Moga of chest pain. (*Id.* ¶ 87.) Moga responded to Boyer's complaint by gathering information from Boyer to complete an ACH "chest pain protocol," as she had been taught to do. (*Id.* ¶¶ 88 & 142.) Specifically,

Moga asked Boyer a series of questions about her medical history and her symptoms, including the nature of the pain, whether she was experiencing nausea, shortness of breath, or dizziness, and the specific location of the pain. (*Id.* ¶¶ 89-92.) Moga also took Boyer's vital signs as part of the chest pain protocol, and she made observations of Boyer's presentation and condition. (*Id.* ¶¶ 93-95.) Having completed the protocol, Moga again called Pisney, as the on-call provider. (*Id.* ¶ 96.) In response to being told that Boyer was experiencing chest pain, Pisney instructed Moga to give Boyer a dose of aspirin and to re-check her vital signs in thirty minutes. Pisney further instructed Moga to call her back again if Boyer's vital signs were again abnormal and she continued to complain of chest pain. (*Id.* ¶¶ 97-98.) Moga followed Pisney's instructions, giving Boyer a dose of aspirin and re-checking Boyer's blood pressure (for the fifth time that day) at roughly 8:53 p.m. (*Id.* ¶¶ 99-100.) At that point, Boyer was not complaining of continued chest pain or any other medical concerns, and she did not ask Moga for any additional medical assistance. (*Id.* ¶¶ 101-02.) In fact, Boyer did not complain again to Moga of chest pain or any other medical concerns before Moga went off duty at approximately 10:00 p.m. (*Id.* ¶ 103.) Further, Moga understood from Fennigkoh that Boyer's husband would be delivering her medications to the Jail that evening. (*Id.* ¶¶ 72-77.)

Based on these undisputed facts, no reasonable jury could conclude that Moga failed to respond in an objectively reasonable manner to Boyer's complaints and symptoms. Moga did not ignore Boyer or otherwise turn a blind eye to what was occurring. To the contrary, as the afternoon and evening unfolded, she interacted with Boyer about her medical concerns at least five separate times, each time gathering information about how she was feeling and taking her vital signs, she contacted the on-call medical provider three separate times, and she followed the medical advice given by

the provider during each of those calls. She also shared what was occurring that afternoon with the jail nurse. With the benefit of hindsight, Moga's actions did not prevent Boyer's ultimate medical emergency and her subsequent death, but, in the moment and as events unfolded, they were more than reasonable under the circumstances, particularly given that she was following the specific advice and direction given to her by the Jail's medical provider and confirmed by the Jail's nurse.

Indeed, security officials in a jail setting are entitled to rely on the judgments of medical personnel as to what is necessary for the care and treatment of a person in custody with medical needs. *See*, *e.g.*, *Miranda*, 900 F.3d at 343 ("When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention"); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("[I]f a prisoner is under the care of medical experts, a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands.") (citing *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)); *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021) ("A prison official . . . generally does not act with deliberate indifference if she reasonably relied on the judgment of medical personnel.") (internal quotation marks and citation omitted); *Stojanovic v. Bellile*, 19-cv-729-bbc, 2020 WL 7477765, at *5 (W.D. Wis. Dec. 18, 2020) (citing *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012), for proposition that "institution staff who are not responsible for administering medical care are entitled to defer to the judgment of health care professionals"). In such a circumstance, non-medical security personnel can be liable for inadequate medical care only if "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) (internal quotations and citation omitted). "As

*Hayes*, *Johnson*, *Greeno*, *Spruill*, and a host of other cases make clear, the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Hayes*, 546 F.3d at 527-28; *Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006); *Greeno*, 414 F.3d at 655-56; *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)).

These principles were recently reaffirmed by the Seventh Circuit. *See McGee v. Parsano*, 55 F.4th 563, 573 (7th Cir. 2022). In *McGee*, the administrator of the estate of a deceased jail detainee sued medical and corrections staff for their alleged failure to provide adequate medical care that led to the detainee's death. *Id.* at 565-66. Prior to his death, the detainee displayed symptoms such as confusion, lethargy, and labored breathing commonly associated with diabetic ketoacidosis. The defendant officers did not provide the detainee with any medical care, however, because the defendant jail nurse told them he was faking it. *Id.* Noting prior decisions on this issue, the Seventh Circuit summarized the law as follows:

> Simply put, [prior precedent] dictates that corrections officers are not constitutionally obligated to override the judgment of medical professionals unless they have reason to know that an inmate is receiving inadequate treatment. *This remains true even when an inmate is in obvious distress and even when the medical staff has misdiagnosed an inmate—or worse, accused him of faking a very real illness.*

*Id.* at 573 (emphasis added) (citing *King*, 680 F.3d at 1018; *Miranda*, 900 F.3d at 343; *Perry*, 827 F.3d at 450, 459).

Here, Moga repeatedly sought medical advice from the Jail's on-call medical provider and then followed that advice over the roughly seven hours between when Boyer

first complained to her that she felt hot and sweaty and when Moga went off duty. Only in hindsight, knowing what ultimately happened with Boyer, is it possible to question whether Moga failed to respond appropriately to the situation confronting her. But no reasonable jury could conclude that Moga had reason to know (or that a reasonable officer in her place would have had reason to know), in the moment and as events unfolded that afternoon and evening, that Boyer was receiving constitutionally inadequate care in response to her symptoms. To Moga's knowledge, Boyer's blood pressure was responding to the two doses of Clonidine that afternoon and the dose of aspirin that evening, the Jail nurse had affirmed that she was responding appropriately to the situation, and Boyer's blood pressure had fallen to 142/92 and she was no longer complaining of chest pain or other medical ailments by 8:53 p.m. Even if Boyer had *not* improved or had *continued* to complain of symptoms, Moga would have been justified in relying on Pisney and Fennigkoh's advice. *See*, *e.g.*, *McGee*, 55 F.4th at 575 (observing that "recognizing that someone is sick is not the same as knowing that he is receiving inadequate care from a trained medical professional"). Under the circumstances, Moga was entitled to defer to the medical advice given by Pisney (and affirmed by Fennigkoh), and she should not now be subject § 1983 liability for having done so.

### b. Nelson.

Nelson interacted with Boyer during two different periods of her stay in the Jail: first, when Boyer was initially booked into the Jail on the evening of Saturday, December 21, and, second, in the several hours leading up to when Boyer became unresponsive at roughly 1:00 a.m. on Monday, December 23. (DJPFOF ¶¶ 13-47 & 104-11.) During each of these two distinct periods, Nelson also responded reasonably to the circumstances confronting her. On the evening of December 21, Nelson worked with the Jail nurse to

14

gather as much information as possible from Boyer regarding her chronic medical conditions, and in the hours leading up to Boyer's medical emergency, Nelson monitored Boyer's well-being without incident. Based on the undisputed facts material to Nelson's interactions with Boyer, no reasonable jury could conclude that Nelson responded to Boyer's medical concerns in an objectively unreasonable manner. As such, Nelson is also entitled to summary judgment with respect to plaintiff's Fourth Amendment claim for failure to provide adequate medical care.

Nelson was on duty in the booking room when Boyer arrived at the Jail at approximately 10:40 p.m. on Saturday, December 21. (*Id*. ¶¶ 13 & 15.) As part of the booking process, Nelson completed an inmate medical screening report regarding Boyer. (*Id*. ¶¶ 16-17.) In completing this report, Nelson asked Boyer a series of questions regarding her medical status and history, and she recorded various observations regarding Boyer's condition. (*Id*. ¶¶ 18-24.) Boyer could not or would not tell Nelson specifically what all of her chronic medical problems were; she was intoxicated, and she kept stating to Nelson that she could not recall what they were and would not give a clear answer as to what kind of medical issues she had. (*Id*. ¶¶ 14 & 20.) Nelson recorded the information that Boyer did provide and her own observations on the screening form. (*Id*. ¶¶ 16-24.) Nelson also advised the Jail nurse of her inability to obtain a complete medical history from Boyer, and she was present as the nurse spoke to Boyer. (*Id*. ¶¶ 25-39.) Ultimately, the Jail nurse directed that Boyer be placed on a medical watch in one of the booking room cells with wellness checks every thirty minutes, and Nelson was one of the officers who implemented the watch for the rest of the shift. (*Id*. ¶¶ 39-41 & 44-46.) Boyer did not complain to Nelson of any specific medical concerns after she was booked into the Jail that night, and Nelson did not observe any medical problems with Boyer for the

remainder of her shift, either. (*Id.* ¶ 47.) The Jail nurse also advised Jail staff to alert the on-call medical provider of Boyer's presence in the Jail, and that occurred early the next morning. (*Id.* ¶¶ 41 & 49-51.)

Nelson's next interactions with Boyer occurred when she took over for Moga as the officer assigned to the booking room at approximately 10:00 p.m. on Sunday, December 22. (*Id.* ¶¶ 104-07.) When Nelson took over for Moga, Moga verbally explained to Nelson that she had completed a chest pain protocol for Boyer, that she had contacted Pisney, what Pisney's instructions to her had been, that she had re-checked Boyer's blood pressure, and that Boyer had not had any complaints the last time she had checked her blood pressure. (*Id.* ¶ 105.) After the shift change, Nelson checked on Boyer at least seven separate times. During those wellness checks, Nelson did not observe Boyer to be in any discomfort or distress, and Boyer did not complain to her of chest pain or any other ailments. (*Id.* ¶¶ 106-07.) Another officer, Lucas Runice, checked on Boyer at least six other times after the 10:00 p.m. shift change. During those wellness checks, Runice also did not observe Boyer to be in any discomfort or distress, and Boyer did not complain to him of chest pain or any other ailments. (*Id.* ¶¶ 108-09.) Nelson also understood from Fennigkoh that plaintiff would be coming later that evening with Boyer's medications. (*Id.* ¶¶ 72-77.)

Nelson's last wellness check on Boyer occurred at roughly 12:49 a.m. on Monday, December 23. (*Id.* ¶ 110.) During that check, Nelson observed Boyer to be alert and quiet; Boyer was sitting on the edge of the bed in her cell, preparing to lie down. (*Id.* ¶ 111.) At approximately 12:57 a.m., Runice noticed via closed circuit camera that Boyer was lying on the floor of her cell. Runice called for Nelson to respond to Boyer's cell, and Nelson immediately went to Boyer's cell and opened the door. (*Id.* ¶¶ 112-13.) Upon entering

Boyer's cell, Warren radioed for other Jail staff to respond and for emergency medical services to be called. Jail staff and Sheriff's Deputies Fritz Degner and Alex Maas began C.P.R. on Boyer and continued until emergency medical services personnel arrived at the Jail at approximately 1:07 a.m. (*Id.* ¶¶ 114-15.)

Based on these undisputed facts, no reasonable jury could conclude that Nelson failed to respond reasonably to Boyer's complaints and symptoms. When Boyer was booked into the Jail on December 21, Nelson appropriately completed the inmate screening, spoke to the Jail nurse given Boyer's inability to provide complete information regarding her medical status and history, and followed the nurse's instructions to initiate a medical watch with 30-minute wellness checks. Boyer did not present with any immediate medical concerns, and she did not manifest any such specific concerns despite close monitoring over the remainder of Nelson's shift that night. Nelson's conduct that evening was objectively reasonable, and no reasonable jury could conclude otherwise. And, in any event, there is no evidence that anything Nelson did on the night of Saturday, December 21, caused Boyer's medical emergency in the early morning hours of Monday, December 23.

In turn, Nelson cannot be said to have acted in an objectively unreasonable manner on the night of December 22, either. When Nelson took over for Moga in the booking room, she received a verbal de-brief from Moga during which she learned about Boyer's episode of chest pain, that the on-call medical provider had been involved, and that Moga had followed the provider's instructions without further incident. Nelson also knew from Fennigkoh that Boyer's husband would be delivering her medications to the Jail that evening. Nelson and another officer closely monitored Boyer beginning at 10:00 p.m. that evening, but Boyer did not display further discomfort or distress, and she did not

complain to Nelson or the other officer of ongoing chest pain or any other ailments from that point forward. And, ultimately, when Boyer collapsed, Nelson responded immediately, summoned help, and assisted in the officers' efforts to resuscitate Boyer before emergency medical personnel arrived at the Jail.

Viewed objectively, in light of the specific circumstances confronting her, Nelson did not act in an unreasonable manner. And, like Moga, she, too, was entitled to defer to the advice of the medical professionals involved in Boyer's stay in the Jail, both on the night Boyer was booked and when she took over for Moga in the booking room on the night Boyer became unresponsive. Nothing that occurred in Nelson's presence would have put her (or a reasonable officer in her place) on notice that the medical care being provided by the Jail nurse and the on-call provider was inadequate. In fact, nothing medically concerning happened in Nelson's presence until the moment she learned Boyer had collapsed in her cell. As a result, plaintiff cannot succeed on his failure to provide medical care claim against Nelson, and she is entitled to summary judgment on this claim.

### c. Hendrickson.

"To succeed on a claim for supervisory liability, a plaintiff must show that the supervisor was personally involved in the constitutional violation." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (citing *Matthews v. City of East St. Louis*, 675 F.3d 703, 707 (7th Cir. 2012)). "That means that the supervisor 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see.'" *Id.* (citing *Matthews*, 675 F.3d at 708). "If supervisory liability is predicated on a failure to act, the plaintiff must show an 'extremely high degree of culpability.'" *Odogba v. Wis. Dep't of Justice*, 22 F. Supp. 3d 895, 909 (E.D. Wis. 2014) (quoting *Lenard v. Argento*, 699 F.2d 874, 885 (7th Cir. 1983)). A supervisor's "[f]ailure to control

[his subordinates] is not actionable at all 'absent a showing that the official either encouraged the specific incident of misconduct or in some way directly participated in it.'" *Id.* at 909–910 (quoting *Lenard*, 699 F.2d at 885). Consistent with other, general principles of § 1983 liability, supervisors who are "merely negligent" or even grossly negligent are not constitutionally liable. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

Plaintiff has adduced no evidence to satisfy this burden with respect to Hendrickson. There is, in fact, no evidence that Hendrickson was personally involved in Boyer's incarceration in the Jail, let alone in a way that meets the parameters set forth by the Seventh Circuit with respect to supervisory liability under § 1983. For starters, there is no evidence he was on duty at the Jail at any point between when Boyer was booked on the night of Saturday, December 21, and when she collapsed in the early morning hours of Monday, December 23. Further, Hendrickson was not copied on Moga's December 22 email to the Jail nurse (DJPFOF ¶ 78), and there is no evidence that he was contacted about any other aspect of Boyer's stay in the Jail until after she had been transported to the hospital by emergency medical personnel. Absent *any* evidence of such personal involvement in the events involving Boyer, Hendrickson cannot be liable under the well-established standards for supervisory liability pursuant to § 1983, and he is entitled to summary judgment as a result.

Plaintiff seemingly attempts to sustain his § 1983 claim against Hendrickson by pointing to alleged deficiencies in the overall delivery of healthcare within the Jail. (*See* ECF No. 161, Case No. 20-cv-1123, ¶ 140.) In doing so, plaintiff evidently seeks to impose

§ 1983 liability on Hendrickson in his individual capacity[1] for alleged constitutional violations on the part of Monroe County as a municipal entity. Plaintiff's theory against Hendrickson thereby improperly ignores the distinction between individual liability and *Monell* liability under § 1983. *See*, *e.g.*, *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) ("A key part of § 1983's doctrinal structure is the difference between individual and governmental liability."). Regardless, as is discussed in Point III below, there is no basis to hold either the County *or* Hendrickson liable for any alleged policy or custom on the part of the County with respect to the delivery of healthcare in the Jail. For one, there was no policy – whether express or *de* facto – on the part of the County that was the moving force behind any violation of Boyer's constitutional rights. (*See* Points III(A) & (B) below.) Moreover, Hendrickson is not a final policy-maker for the County (*see* Point III(C) below), so there is no basis to hold him personally responsible for any such "systemic" constitutional violations. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1428-29 (7th Cir. 1996); *Sinn v. Lemmon*, 911 F.3d 412, 423 (7th Cir. 2018); *Heilman v. Burke*, No. 18-cv-3260, 2023 WL 3963817, at *10 (C.D. Ill. June 12, 2023). As a result, plaintiff's effort to avoid the fact that Hendrickson was not personally involved in the events relating to Boyer's stay in the Jail also must fail as a matter of law.

**B.    Plaintiff's Claim Against Moga and Nelson for Their Alleged Failure to Intervene (Count II of the Complaint) is Also Subject to Summary Judgment.**

An officer can be held liable under § 1983 for failing to intervene to prevent another officer from violating a plaintiff's constitutional rights only if the officer had time and the

---

[1] In fact, plaintiff expressly asserts that he sues Hendrickson only in his individual capacity. (*See* ECF No. 161, Case No. 20-cv-1123, ¶ 9.)

opportunity to prevent the constitutional wrong from occurring. More specifically, as the Seventh Circuit has held,

> An officer who is present and fails to prevent other law enforcement officers from infringing on the constitutional rights of citizens is liable under § 1983 if that officer had reason to know:  (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original); *see also Thompson v. Boggs*, 33 F.3d 847, 857 (7th Cir. 1994).

"A claim for failure to provide medical care concerns the defendant's knowledge of, and disregard for, a serious medical risk; whereas a claim for failure to intervene concerns the defendant's failure to prevent another from committing a constitutional violation." *Awalt v. Marketti*, Case No. 11-C-6142, 2012 WL 1161500, at *7 (N.D. Ill. Apr. 9, 2012). "To state a failure-to-intervene claim under § 1983, [a plaintiff] must allege that '[a] constitutional violation has been committed by a [state actor]; and the [defendant] had a realistic opportunity to intervene to prevent the harm from occurring.'" *Piercy v. Whiteside County, Illinois*, Case No. 14-CV-7398, 2016 WL 1719802, at *7 (N.D. Ill. Apr. 29, 2016) (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 744 (7th Cir. 2005)). A "realistic opportunity to intervene" only exists if the officer could have "called for a backup, called for help, or at least cautioned [the defendant] to stop." *Yang*, 37 F.3d at 285; *see also Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997). Of course, if no underlying constitutional violation occurred, there can be no liability for failure to intervene. *Abdullahi*, 423 F.3d at 767-68.

Under this standard, there is no basis to find liability for a failure to intervene on the part of either Moga or Nelson.[2] As an initial matter, as discussed above, neither violated Boyer's Fourth Amendment rights to begin with. Regardless, neither Moga nor Nelson was in a position to intervene to prevent the other from failing to provide adequate medical care to Boyer. Moga was not on duty on the evening of December 21, when Boyer was booked into the Jail, and she went off duty when Nelson took over for her in the booking room of the Jail at 10:00 p.m. on December 22. (DJPFOF ¶¶ 57 & 104.) In turn, Nelson was either not on duty at all (before 6:00 p.m.) or not on duty in the booking room (between 6:00 and 10:00 p.m.) when Moga was interacting with Boyer during the afternoon and early evening hours on December 22. (*Id.* ¶ 104.) In short, given the timing of their respective work shifts and assignments on the weekend of Boyer's stay in the Jail, neither was in a position to know of any constitutional violation committed by the other, and neither had a realistic opportunity to intervene to prevent any such constitutional harm from occurring in any event.

Plaintiff's failure to intervene claim is even more infirm to the extent it is premised on the proposition that Moga or Nelson somehow could have intervened to prevent Pisney or Fennigkoh from violating Boyer's right to adequate medical care. As discussed above, Moga and Nelson were both entitled as a matter of law to defer to the medical advice provided by Pisney and Fennigkoh. As the Seventh Circuit emphasized in *McGee*: "Simply put, [prior precedent] dictates that corrections officers are not constitutionally obligated to override the judgment of medical professionals unless they have reason to know that an inmate is receiving inadequate treatment." 55 F.4th at 573. For the reasons discussed

---

[2] Plaintiff does not pursue a failure to intervene claim against Hendrickson. (*See* ECF No. 161, Case No. 20-cv-1123, Count II, ¶¶ 170-73.)

above, Moga and Nelson lawfully relied on the medical advice of Pisney and Fennigkoh, and their decision to do so cannot, as a matter of law, constitute a basis to hold them liable for a failure to intervene.[3]

## II. REGARDLESS, HENDRICKSON, MOGA, AND NELSON ARE ENTITLED TO QUALIFIED IMMUNITY.

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have 'violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014)). For a right to be clearly established, relevant case law must have previously been developed in such a concrete and factually defined manner to make it obvious to all reasonable public officials presented with the same circumstances as the defendant that a particular course of conduct would be unconstitutional. *White v. Pauly*, 580 U.S. 73, 78-80 (2017) (per curiam). A prior case exactly on point is not necessarily required. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). However, "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it,' meaning that 'existing precedent [must have] placed the statutory or constitutional question beyond debate.'" *Sheehan*, 575 U.S. at 611 (quoting *Ashcroft*, 563 U.S.at 741); *see also District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Ashcroft* and describing standard as "demanding").

---

[3] Any argument by plaintiff that Moga or Nelson had reason to know Pisney and Fennigkoh were providing inadequate care to Boyer is, in truth, nothing more than an argument that Moga and Nelson are liable for failing to provide adequate medical care themselves. As a result, any additional claim of a failure to intervene based on this same argument would be wholly duplicative and would not provide a separate basis for liability on the part of Moga and Nelson.

The plaintiff always bears the burden of establishing the existence of a clearly established constitutional right violated by the defendant public official. *See*, *e.g.*, *Cibulka v. City of Madison*, 992 F.3d 633, 640 (7th Cir. 2021); *Clash v. Beatty*, 77 F.3d 1045, 1047 (7th Cir. 1996). "When reasonable minds could differ, in the typical summary judgment decision the balance tips in favor of the nonmovant while in the qualified immunity context the balance favors the movant." *Ellis v. Wynalda*, 999 F.2d 243, 246 n.2 (7th Cir. 1993).

"It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63. Moreover, the right in question must be clearly defined in light of the specific facts and circumstances confronting the defendant officials rather than at a high level of generality. *See*, *e.g.*, *McGee*, 55 F.4th at 572-73 ("[T]he Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.") (internal quotation marks and citation omitted); *Lopez v. Sheriff of Cook County*, 993 F.3d 981, 988 (7th Cir. 2021) ("The Supreme Court has time and again instructed lower courts not to define clearly established law at a high level of generality.") (internal quotation marks and citation omitted).

Even if the contours of the right in question are found to have been clearly delineated at the relevant time, a public official may still enjoy qualified immunity if it was objectively reasonable for her to believe that her actions did not violate the federal right. In fact, public officials are shielded from suit where officials "of reasonable competence could disagree" that such acts were objectively reasonable. *Malley v. Briggs*,

475 U.S. 335, 341 (1986) (reasoning that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *Lopez*, 993 F.3d at 988 ("That sounds like a high bar because it is.") (citing *Malley*).

Here, as discussed above, plaintiff cannot establish that Moga or Nelson responded to Boyer's medical needs in a manner that was objectively unreasonable, particularly in light of the medical advice given to Jail staff by Pisney and Fennigkoh. As further discussed above, plaintiff also cannot establish any personal involvement by Hendrickson in the events relating to Boyer's death, let alone the sort of personal involvement that would subject him to liability as a supervisor in the Jail. Regardless, even if plaintiff could do so, it cannot be said that the rights in question were so clearly established in December 2019 under the specific circumstances confronting the individual defendants that a reasonable officer in their place would have known she was violating the Fourth Amendment in connection with Boyer's time in custody. There is no Supreme Court precedent that would have put a reasonable officer on such notice. In turn, Seventh Circuit cases such as *Jump*, *Braun*, *McGee*, *King*, *Gill*, and *Yang* would have informed Moga, Nelson, and Hendrickson (who was not even involved) that their conduct with respect to Boyer was not unconstitutional.

At a minimum, given the available controlling case law, these issues are anything but "beyond debate," and officers of reasonable competence could well disagree whether Moga, Nelson, and Hendrickson's actions violated the Fourth Amendment. Because plaintiff cannot sustain his burden of demonstrating otherwise, the balance tips in favor of the individual Monroe County defendants, and they are entitled to summary judgment for this reason as well.

### III. MONROE COUNTY IS ALSO ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFF'S § 1983 CLAIMS.

Local governments are not vicariously liable under § 1983 for constitutional violations caused by their employees or agents. *Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 694 (1978). They are instead "responsible only for 'their *own* illegal acts.'" *Connick v. Thompson,* 563 U.S. 51, 60 (2011) (citation omitted); *Orozco v. Dart*, 64 F.4th 806, 823 (7th Cir. 2023). A plaintiff seeking to impose liability on a local government under § 1983 therefore must show that "action pursuant to official municipal policy," and not merely the actions of individual municipal employees, caused his injury. *Id.*

The Seventh Circuit has recognized three potential paths to make the required showing under *Monell. Rossi v. City of Chicago,* 790 F.3d 729, 737 (7th Cir. 2015). The constitutional injury must have been caused by: (1) an express policy of the municipality that is unconstitutional on its face; (2) a widespread practice so well-settled that it has the force of law and amounts to an implicit policy on the part of the municipality; or (3) a decision by a governmental agent with final policy-making authority for the municipality. *Id.; Orozco*, 64 F.4th at 823; *Calhoun v. Ramsey,* 408 F.3d 375, 379-80 (7th Cir. 2005).

Here, as is discussed above, plaintiff cannot establish that Moga, Nelson, Hendrickson, or some other agent of Monroe County actually violated Boyer's constitutional rights, so his *Monell* claim against the County necessarily fails right out of the gate. *See, e.g.*, *Sallenger v. City of Springfield, Illinois*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee."). Regardless, based on the undisputed material facts, and for the reasons set forth below, plaintiff cannot sustain his § 1983 claim against Monroe County under any of the three alternate paths to municipal liability

allowed under *Monell* and its progeny.

**A. Plaintiff Cannot Establish That an Express Policy, Unconstitutional on its Face, Caused the Violation of Boyer's Constitutional Rights.**

Here, plaintiff cannot sustain a claim that the alleged violation of Boyer's rights resulted from any express policy of Monroe County that "explicitly violates a constitutional right when enforced." *Calhoun,* 408 F.3d at 379; *see also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) ("That a constitutional injury was caused by a municipality may be shown directly by demonstrating that the policy itself is unconstitutional."). Plaintiff asserts in the complaint that the Jail does not employ medical staff in the Jail on weekends and does not provide for in-person medical evaluations of persons in custody on weekends, even for medical emergencies. (*See* ECF No. 161, Case No. 20-cv-1123, ¶ 163.) In addition, plaintiff asserts that a policy existed in the Jail that staff were not permitted to send inmates to the hospital for required medical care unless they first called an on-call ACH provider for permission. (*See id.*, ¶ 165.) However, the evidence of record does not support either theory, let alone that any such policies – assuming they existed – would on their face violate the constitution.

In fact, it is undisputed that, in December 2019, medical staff were on duty over the weekend, either at the Jail or on-call. Nursing staff contracted by ACH were on duty at the Jail twelve hours per day from Monday through Saturday. (DJPFOF ¶ 145.) The twelve hours of in-person nursing coverage ran from approximately 7:00 a.m. to approximately 7:00 p.m. each day from Monday through Saturday. (*Id.* ¶ 146.) In addition, a provider (such as a physician or nurse practitioner) was at the Jail one day per week and was otherwise on call and available by telephone, twenty-four hours per day and

seven days per week, including on Saturdays and Sundays. (*Id.* ¶¶ 147-48.) At all times, if the provider contracted by ACH was not available, a secondary provider was on call and available by telephone. (*Id.* ¶ 149.)

It is further undisputed that, in December 2019, all corrections staff in the Jail were instructed to take action to try to ensure an individual in custody with medical concerns received adequate medical care. (*Id.* ¶¶ 139-41.) Specifically, corrections staff were instructed to bring medical concerns raised by persons in custody or otherwise observed by staff to the attention of medical personnel in the Jail and to then follow the instructions provided by medical personnel. If medical personnel were not on duty in the Jail at the time of a medical concern (such as overnight or on a Sunday), corrections staff were instructed to contact the on-call provider and then follow the instructions provided by the on-call provider. (*Id.* ¶ 141.) When medical staff were not physically present in the Jail, corrections staff were trained in situations where someone in custody had a medical need to complete a protocol (or illness report) for the medical need in question and then call the on-call practitioner to obtain direction. (*Id.* ¶ 142.)

Moreover, it is also undisputed that, in December 2019, all corrections staff in the Jail were instructed in the case of a medical emergency involving an individual in custody to seek immediate in-person medical attention for the individual, whether from on-site medical personnel or by calling for emergency medical personnel to respond to the Jail, and to provide treatment to their level of training (such as by performing cardio-pulmonary resuscitation) until medical personnel took over providing care to the

individual. (*Id.* ¶ 143.)[4] In the case of a medical emergency involving someone in custody when medical personnel were not on duty in the Jail, corrections staff were *not* instructed that they were required to first seek advice from an on-call provider before calling for emergency medical personnel to respond to the Jail or otherwise seeking emergency medical care for the inmate. (*Id.*)

Plaintiff's assertions are thus, in large part, contrary to the undisputed factual record. Regardless, there is no support in relevant case law for the proposition that failing to employ on-site medical staff 24 hours a day, 7 days a week in small, rural county jail or that relying on a combination of in-person and on-call medical coverage in such a jail *per se* violates the constitution. *See*, *e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 386-87 (1989) ("There can be little doubt that on its face the city's policy regarding medical treatment for detainees is constitutional. The policy states that the city jailer "shall . . . have [a person needing medical care] taken to a hospital for medical treatment, with permission of his supervisor . . . .' It is difficult to see what constitutional guarantees are violated by such a policy."); *Story v. Dart*, Case No. 19-cv-2476, 2023 WL 2612622, at *7 (N.D. Ill. Mar. 23, 2023) (rejecting proposition that policy of referring inmates off-site for certain dental care was facially unconstitutional, reasoning that "the Constitution may require jails to provide medical care, but it says nothing about where that care must take place"); *Kudla v. City of Hammond*, No. 2:18 CV 419, 2022 WL 2171229, at *9 (N.D. Ind. June 16, 2022) (noting, in rejecting *Monell* claim that policy of relying on corrections and

---

[4] That is, in fact, exactly what occurred here when Nelson and other staff discovered shortly before 1:00 a.m. on Monday, December 23, that Boyer was unresponsive in her cell: staff responded to Boyer's cell, called for emergency medical personnel to be summoned to the Jail, began efforts to resuscitate Boyer, and continued those efforts until medical personnel arrived on scene, all without first seeking direction from the on-call provider. (DJPFOF ¶¶ 112-15.)

civilian employees to determine medical needs of arrestees and detainees violated Constitution, that "plaintiff does not cite, and this court is not aware, of any authority finding that a short-term holding facility such as the Jail is constitutionally required to have on-site medical staff"); *Harvey v. Dart*, Case No. 19-cv-2996, 2021 WL 4264312, at *8 (N.D. Ill. Sept. 20, 2021) ("But a policy of providing dental care off-site is facially constitutional. A policy to provide dental care off-site expressly provides for medical care. The policy involves where the detainee receives care, not whether the detainee receives care, or how soon the detainee receive it. It does not, facially, deprive a detainee of any constitutional rights."); *Vaught v. Qual. Corr. Care, LLC*, 323 F. Supp. 3d 997, 1011 (N.D. Ind. 2018) (rejecting on summary judgment claim that medical staffing model that relied on combination of on-site and on-call hours by nurse and nurse practitioner was unconstitutional); *Hunt v. Miller*, No. 2:07-CV-287RM, 2007 WL 2903195, at *4 (Sept. 28, 2007) (holding that fact "that a small jail has no full time medical staff, by itself, states no Eighth Amendment claim upon which relief can be granted-though failure to otherwise provide for inmates' medical care might") (amended on other grounds).

Because there is no basis for any assertion by plaintiff of an express, facially unconstitutional policy on the part of the County that was the moving force behind any violation of Boyer's constitutional rights, any *Monell* claim against the County premised on such a theory cannot succeed as a matter of law.

### B. Plaintiff Cannot Establish That a Widespread Practice, or *De Facto* Policy, Caused Any Violation of Boyer's Constitutional Rights.

#### 1. Plaintiff Cannot Establish a Widespread Practice in the Jail That Caused a Violation of Boyer's Rights.

To sustain a claim asserting that a municipality maintained a widespread custom

or practice that caused a constitutional injury, it is not enough to prove a "single isolated incident of wrongdoing" by a non-policymaker employee. *Cornfield v. Consol. High Sch. Dist. No. 230,* 991 F.2d 1316, 1326 (7th Cir. 1993). A plaintiff must instead point to "a series of bad acts" from which one could plausibly infer that the municipality "must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *Jackson v. Marion County,* 66 F.3d 151, 152 (7th Cir. 1995); *see also Palmer v. Marion County,* 327 F.3d 588, 596 (7th Cir. 2003) ("proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference"). As the Supreme Court held in *City of Oklahoma City v. Tuttle*:

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation.

471 U.S. 808, 823-24 (1985).

To prove a series of bad acts, the plaintiff ordinarily must identify more than three or four other incidents. *Wilson v. Cook County,* 742 F.3d 775, 780 (7th Cir. 2014) (holding that, while there are no "bright-line rules …, it is clear that a single incident – or even three incidents – do not suffice"); *Hildreth v. Butler*, 960 F.3d 420, 427 (7th Cir. 2020) (holding that three instances of delays in the plaintiff receiving his prescription medications over nineteen months "failed to qualify as a widespread unconstitutional practice so well-settled that it constitutes a custom or usage with the force of law"); *Grieveson v. Anderson*, 538 F.3d 763, 774-75 (7th Cir. 2008) (four instances of problems

with the way in which medications were distributed over eleven months were insufficient to prove a custom or practice); *Hamilton v. Oswego Cmty. Unit Sch. Dist. 308,* No. 20-cv-292, 2021 WL 767619, at *10 (N.D. Ill. Feb. 26, 2021) ("A practice is not widespread if it took place two, three, or four other times."). What is required is evidence that allows for "the reasonable inference that the practice is so widespread so as to constitute a governmental custom." *Gill v. City of Milwaukee,* 850 F.3d 335, 344 (7th Cir. 2017).

Moreover, the alleged pattern must consist of "*similar* constitutional violations." *Connick,* 563 U.S. at 60; *see also Gill,* 850 F.3d at 344 (affirming dismissal where plaintiff did not allege other bad acts "similar to those complained of here"). Put differently, a plaintiff may not "splatter-paint a picture of scattered violations" without common features. *Terry v. County of Milwaukee,* No. 17-cv-1112, 2018 WL 2567721, at *8 (E.D. Wis. Jun. 4, 2018) (citation omitted). As a corollary, broad assertions that the defendants violated a general duty to provide "adequate medical care" to detainees are impermissible. *Id.*

The same requirement to allege a series of similar constitutional violations applies to claims that a municipality failed to adopt a required policy or address a gap or deficiency in its existing policies. Whether the claim is for an implicit policy or a gap in expressed policies, *Monell* demands "a series of violations to lay the premise of deliberate indifference." *Thomas v. Cook Cty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2010). That is because a jail or other governmental entity is not constitutionally required to do everything in its power to foresee and prevent injuries to persons in its custody. *Palmer,* 327 F.3d at 593. In hindsight, it is always possible to claim that more could have been done. But that is not the standard for liability under *Monell. Id.* Instead, the government defendant must have had "actual or constructive notice of a problem" that needed to be

fixed, ordinarily through of a pattern of prior misconduct. *Miranda,* 900 F.3d at 345.

Finally, to prove that a municipal entity such as the County "is liable for a harmful custom or practice, the plaintiff must show that [the municipality was] deliberately indifferent as to the known or obvious consequences." *Thomas*, 604 F.3d at 303; *see also Canton*, 489 U.S. at 388 (requiring proof that the municipal entity acted with "deliberate indifference to the rights of person with whom [its officers] came into contact"). "In other words, [the municipality] must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas*, 604 F.3d at 303. As the Seventh Circuit recently noted:

> This is a high bar. As the Supreme Court explains, "'[d]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L.Ed.2d 417 (2011) (quoting [*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*], 520 U.S. at 410, 117 S. Ct. 1382).

*Orozco*, 64 F.4th at 824; *see also id.* (observing that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee") (internal quotation marks and citation omitted).

However, "it is not enough to demonstrate that [the municipality] could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006); *see also Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 4007 (1997) (deliberate indifference requires more than a "showing of simple or even heightened negligence"). To the contrary, there must be "evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of [the municipality] was apparent and amounted to a policy decision." *Phelan*, 463 F.3d at 790; *see also Calhoun*, 408 F.3d at 380 ("If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible

(though not necessary) to infer there is a policy at work.")

Here, there is no evidence of a series of similar constitutional violations sufficient to establish either the existence of a custom or that the County was deliberately indifferent to the consequences of such a *de facto* policy. Indeed, in the ten-year period before Boyer's death, only one other individual died in the Jail (or, as in Boyer's case, after having been transported from the Jail for emergency medical care) for medical reasons other than suicide. (DJPFOF ¶ 153.) In that same period, two individuals in the Jail died by suicide. (*Id.* ¶ 154.) There is no evidence that any of these deaths involved a pattern of constitutional violations with respect to the provision of medical care, let alone a pattern of constitutional violations similar to those alleged by plaintiff with respect to Boyer's care during her time in the Jail. Moreover, the unsupported *allegations* of the complaint aside, there is no admissible *evidence* to demonstrate a pattern of prior, similar constitutional violations with respect to the provision of medical care generally among other persons in custody in the Jail. And, to be sure, plaintiff must have proof of "similar constitutional violations" to meet her burden of proof. *See*, *e.g.*, *Connick*, 563 U.S. at 62-63 (although plaintiff presented evidence of multiple prior *Brady* violations by defendant prosecutor's office, prior violations were not similar to subject *Brady* violation because they did not involve failure to disclose same type of evidence); *Orozco*, 64 F.4th at 825 (holding that plaintiff could not demonstrate that county was on notice of risk that gap in policy would violate his rights, as "there is no record showing an actionable pattern of similar constitutional violations"); *Gill*, 850 F.3d at 344 (affirming dismissal of claims where plaintiff did not allege bad acts "similar to those complained of here"). Absent such proof, plaintiff cannot establish the deliberate indifference on the part of the County necessary to establish

liability on its part for any alleged custom or *de facto* policy. *See*, *e.g.*, *Thomas*, 604 F.3d at 303; *Phelan*, 463 F.3d at 790.

Plaintiff's allegations of "pressure" asserted on ACH staff to reduce the cost of care provided to persons in custody either by reducing referrals to outside care or reducing the use of medications likewise cannot sustain his *Monell* claim against the County. First, as the Seventh Circuit has recognized, there is nothing unconstitutional on its face about a government entity considering the cost of providing medical care to inmates, as the constitutional standard of care is "a function both of objective need and cost." *Knight v. Wiseman*, 590 F.3d 458, 467 (7th Cir. 2009); *see also Jordan v. Milwaukee County*, 680 F. Appx. 479, 483 (7th Cir. 2017) ("And the cost of care can be a permissible factor in choosing between acceptable treatments."); *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (noting that "the cost of treatment is a factor in determining what constitutes adequate, minimum-level care," even if medical personnel cannot resort to a course of treatment they know to be ineffective); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (same); *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011) (same); *Ralston v. McGovern*, 167 F.3d 1160, 1161 (7th Cir. 1999) (same). Second, plaintiff's allegations on this point amount to no more than assertions that Jail staff, including Hendrickson, were privy to discussions internal to ACH and its medical personnel about the need for certain care or treatment for persons with various medical conditions and were involved in continuous quality improvement ("CQI") discussions on the same subject. Knowledge of such discussions (or even disagreements) internal to ACH hardly can be said to amount to a *de facto* policy on the part of Monroe County, much less one of the County providing inadequate medical care *and* deliberate indifference to the known or obvious

consequences of such a custom.[5] Finally, the undisputed evidence demonstrates the absence of any discernable change in the frequency with which persons in custody in the Jail were referred for outside medical care, were sent out for emergency medical treatment, or were prescribed medications in the years in question. (DJPFOF ¶¶ 156-71.) Indeed, in just the three years surrounding Boyer's death (2018-2020), the percentage of persons in custody in the Jail on medications went up each year (from 34%, to 45%, to 54%), the number of persons in custody in the Jail sent to the emergency room for medical care stayed roughly flat (39 in 2018, 34 in 2019, and 37 in 2020), and the number of persons in custody in the Jail sent off-site for medical care increased from 2018 (47) to 2019 (52), before dropping in 2020 (18), the first year of the Covid pandemic, and rebounding thereafter. (*Id.* ¶¶ 162-71.)

Without proof of a series of prior, similar constitutional violations or that the County acted with deliberate indifference in the face thereof, plaintiff's *Monell* claim against the County also must fail as a matter of law to the extent it is premised on the existence of a custom or *de facto* policy.

### 2. Plaintiff Cannot Establish a Failure to Train That Caused a Violation of Boyer's Constitutional Rights.

The Supreme Court in *Connick* held that a local government's culpability for constitutional violations is "at its most tenuous where a claim turns on a failure to train." 563 U.S. at 61; *see also Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019). The law therefore imposes "a stringent standard of fault," requiring that government policymakers had "actual or constructive notice" of a deficiency, lest *Monell* collapse into

---

[5] This is particularly true if the alleged knowledge is on the part of municipal agents, such as Hendrickson, who are not final policymakers for the County. (*See* Point III(C) below.)

"de facto respondeat superior liability on municipalities." *Id.* at 61-62. Thus, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of a failure to train." *Id.* at 62.

In *Canton,* the Court hypothesized about a situation where the unconstitutional consequences of a failure to train might be so obvious that one could infer deliberate indifference on the part of the municipality even without a pattern of similar, prior violations. 489 U.S. at 390 n.10. This so-called "single-incident liability," however, is strictly limited to "a narrow range of circumstances." *Connick*, 563 U.S. at 63-64. Such "single-incident" cases are ones where "a violation of federal rights [is] a highly predictable consequence" of a municipality's failure to act. *Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 409; *see also J.K.J. v. Polk County*, 960 F.3d 367, 382 (7th Cir. 2020) (en banc).

Here, plaintiff cannot meet this rigorous burden of proof with respect to any claim of a failure to train. *First*, plaintiff cannot demonstrate any deficiencies in the training provided to corrections staff in the Jail, including Moga and Nelson. Where a state imposes minimum training standards on municipalities, adherence to those standards effectively bars a § 1983 claim of a failure to train. *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992); *Schnese v. County of Forest*, Case No. 19-C-1385, 2021 WL 3711035, at *13 (E.D. Wis. Aug. 20, 2021); *Harper v. City of Kenosha*, No. 09-CV-88, 2011 WL 2912741, at *6 (E.D. Wis. July 18, 2011); *Johnson v. City of Milwaukee*, 41 F. Supp. 2d 917, 931 (E.D. Wis. 1999). Such is the case here, as the minimum training standards for jail officer training in Wisconsin are set by the Wisconsin Department of Justice Law Enforcement Standards Board, and all corrections staff in the Jail, including Moga and Nelson, are trained in accordance with

those standards. (DJPFOF ¶¶ 136-38.) Plaintiff cannot identify any specific deficiencies in the state-mandated training, so his failure to train claim must fail for this reason.

*Second*, to the extent plaintiff's failure to train claim is based on an alleged failure to train corrections staff on the provision of medical care to persons held in the Jail, including in situations where persons in custody may need urgent or emergency medical care outside the Jail, the claim is factually unsupported. The undisputed facts demonstrate that all corrections staff in the Jail, including Moga and Nelson, are trained on the provision of medical care to arrestees and others being held in the Jail at the state-mandated academy training program, in field training, and through annual in-service training. (*Id.* ¶ 139.) As part of that training, all corrections staff in the Jail, including Nelson and Moga, are trained that they have a duty to ensure the provision of an adequate level of health care to persons being held in the Jail, including emergency health care when necessary. Specifically, corrections staff are trained to bring medical concerns raised by persons in custody or otherwise observed by staff to the attention of medical personnel in the Jail and to then follow the instructions provided by medical personnel. If medical personnel are not on duty in the Jail at the time of a medical concern, Jail staff are trained to contact the on-call provider and then follow the instructions provided by the on-call provider. Further, as part of that training, all corrections staff in the Jail, including Nelson and Moga, are trained in the case of a medical emergency involving a person in custody to seek immediate medical attention for the individual, whether from on-site medical personnel or by calling for emergency medical personnel to respond to the Jail. In the case of a medical emergency involving a person in custody when medical personnel are not on duty in the Jail, corrections staff are *not* trained that they must first seek advice from an on-call provider before calling

for emergency medical personnel to respond to the Jail or otherwise seeking emergency medical care for the individual. (*Id.* ¶¶ 140-43.)

*Third*, any hypothesis by plaintiff that more or better training specific to the provision of health care in the Jail might have been available for use by the County would be categorically insufficient to establish *Monell* liability. The *Canton* Court made this clear:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.

489 U.S. at 391; *see also Connick*, 563 U.S. at 68 ("But showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.")

Consistent with Supreme Court cases such as *Canton* and *Connick*, the Seventh Circuit has repeatedly reiterated that the failure to adopt "best practices" is not enough to constitute deliberate indifference. *See*, *e.g.*, *Del Raine v. Williford*, 32 F.3d 1024, 1042 (7th Cir. 1994); *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002) (abrogated on other grounds). Put differently, just because there is a better practice does not mean the existing one is unconstitutional. *Smith v. Sangamon Cty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013) ("The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent.") (quoting *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000)); *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997) ("The estate's argument boils down to 'no special training = deficient training.' We cannot accept this equation."); *Riccardo v. Rausch*, 375

F.3d 521, 528 (7th Cir. 2004) ("[T]he Constitution does not enforce all 'better practices.'")

*Fourth*, there is no evidence the County has been deliberately indifferent to any deficiencies in its training program. Again, to establish that a municipality maintained a widespread practice or custom that caused a constitutional injury, it is not enough to allege a "single isolated incident of wrongdoing," such as the plaintiff's own injury, by a non-policymaker employee. *Cornfield,* 991 F.2d at 1326. Instead, "a series of violations must be presented to lay the premise of deliberate indifference." *Palmer,* 327 F.3d at 596. There is no such proof here. There is no evidence of a series of prior constitutional violations involving inmate deaths due to insufficient medical care in the Jail, let alone a series of such violations sufficient in number and similar enough in nature to have put the County on notice that the training received by its officers, including Moga and Nelson, is constitutionally infirm.

And, to the extent plaintiff seeks to rely on the so-called "single-incident" exception identified in *Canton*, any such theory would necessarily fail. Again, unlike in *Canton*, the evidence establishes that *all* Monroe County corrections staff are trained in the role of security staff in providing medical care in the Jail, including in emergency situations at least at the academy, in field training, and in in-service training. (DJPFOF ¶¶ 139-43.) Reacting to a similar scenario in *Connick*, the Court rejected the possibility of *Monell* liability, reasoning as follows:

> The *Canton* hypothetical assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force. But it is undisputed here that the prosecutors in Connick's office were familiar with the general *Brady* rule. Thompson's complaint therefore cannot rely on the utter lack of an ability to cope with constitutional situations that underlies the *Canton* hypothetical, but rather must assert that prosecutors were not trained about particular *Brady* evidence or the specific scenario related to the violation in this case. That sort of nuance simply cannot support an inference of deliberate indifference here.

563 U.S. at 67.

The Seventh Circuit has expressly noted that the circumstances that might meet the high bar for "single-incident" *Monell* liability "are rare." *Orozco*, 64 F.4th at 825-26 (noting that ""[a] constitutional violation must be a 'blatantly obvious' consequence of inaction for single-incident liability" to apply) (citing *Bohanon v. City of Indianapolis*, 46 F.4th 669, 677 (7th Cir. 2022)). Moreover, the few examples in which the Seventh Circuit has arguably applied the single-incident theory to date bear no resemblance whatsoever to the record here. *See*, *e.g.*, *Flores v. City of South Bend*, 997 F.3d 725, 733-34 (7th Cir. 2021) (holding, in context of a motion to dismiss, that complaint stated a claim under single-incident theory insofar as it alleged that defendant municipality had actual knowledge that its officers, including the individual defendant, had a history of criminally reckless speeding and that the City had acted with deliberate indifference by failing to address the known problem); *J.K.J. v. Polk County*, 960 F.3d at 381-84 (upholding jury verdict based on single-incident theory where record at trial included actual evidence of notice to the defendant county that its policies and training were insufficient by way of prior sexual misconduct by its jail staff and evidence that there was a complete absence of any real training of staff sufficient to prevent and detect such misconduct); *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 382 (7th Cir. 2017) (holding that summary judgment was inappropriate when evidence demonstrated that jail healthcare provider had specific notice of the problems associated with having no polices providing for the coordinated care of complex, chronic illnesses and, despite that knowledge, did nothing to address the risk for more than seven years); *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 921 & 925-29 (7th Cir. 2004) (affirming jury verdict in favor of plaintiff when record

41

established that jail health care provider did not train its employees on its suicide prevention policies, did not monitor compliance with policies, and had long condoned widespread violations of policies). In short, there is nothing in prior precedent to suggest that the single-incident theory extends to a situation like this, where the County provided extensive, state-mandated training and there was no known need to alter that training, whether based on past, known problems or an obvious, known gap in the training.

*Fifth*, and finally, plaintiff cannot establish the required causal link between any alleged deficiency in the training offered by the County to its corrections staff and Boyer's death. As the Court noted in *Canton*, "for liability to attach . . . the identified deficiency in the [municipality's] training program must be closely related to the ultimate injury." 489 U.S. at 391. It is not enough to show that a municipality's policy was "a factor" in the constitutional violation; the policy "must have been the moving force." *Johnson v. Cook County*, 526 F. App'x 692, 696 (7th Cir. May 15, 2013). Stated differently, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Canton*, 489 U.S. at 391. Given the undisputed facts regarding what occurred during Boyer's time in custody in the Jail, plaintiff cannot demonstrate that any supposed shortcomings in the training provided Moga and Nelson caused them to provide her with inadequate medical care. As a result, plaintiff cannot establish cause, and his *Monell* claim based on an allege failure to train is subject to dismissal on summary judgment for this reason as well.

### C. Plaintiff Cannot Establish That a County Agent With Final Policymaking Authority Caused a Violation of Boyer's Constitutional Rights.

Plaintiff also evidently seeks to establish *Monell* liability on the part of the County on the theory that Hendrickson was an official with final policymaking authority for the County. This theory holds no merit based on either the facts or the law.

To have final policymaking authority, "an official must possess responsibility for making law or setting policy, that is, authority to adopt rules for the conduct of government." *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004). The official's authority must be final – that is, not constrained by or subordinate to another official or body. *See Helbachs Café, LLC v. Madison*, No. 20-cv-758, 2021 WL 5327946, at *7 (W.D. Wis. Nov. 16, 2021). The "mere authority to implement pre-existing rules" set by others is not the authority to make law or set policy. *Killinger*, 389 F.3d at 771. Nor does the fact that the official was in a "supervisory position" result in municipal liability. *Watt v. City of Highland Park*, Case No. 01-cv-6230, 2005 WL 2304790, at *3 (N.D. Ill. Sep. 20, 2005) (citing *Taylor v. Carmouche*, 214 F.3d 788, 791 (7th Cir. 2000)). "[S]imply because a municipal employee has decision making authority, even unreviewed authority, with respect to a particular matter does not render him a policymaker as to that matter." *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014); *see also Valentino v. City of South Chicago Heights*, 575 F.3d 664, 675 (7th Cir. 2009) ("The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.") (internal quotation marks and citation omitted). Rather, a "municipality must have delegated authority to the individual to make policy on its behalf." *Ball*, 760 F.3d at 643 (emphasis added).

Plaintiff alleges without elaboration that Hendrickson is a final policymaker for Monroe County. (*See* ECF No. 161, Case No. 20-cv-1123, ¶ 167.) At most, plaintiff claims Hendrickson, as a supervisor, has "oversight" of various aspects of aspects of the day-to-day operations of the Jail, including the delivery of healthcare to persons in custody. (*Id.*, ¶ 140.) The undisputed facts do not support plaintiff's assertions, however, and those same undisputed facts demonstrate that Hendrickson is not a final policymaker for the County as a matter of law.

Indeed, Hendrickson was not involved in the decision to hire ACH to provide medical care and services in the Jail, and he does not have the authority to determine whether to renew the County's contract with ACH. Instead, that authority lies with the Monroe County Sheriff and the Monroe County Board of Supervisors. (DJPFOF ¶¶ 144 & 173-74.) Hendrickson also does not have the authority to set the contract price for the health care services and personnel provided by ACH in the Jail. That authority lies with the Sheriff and the Monroe County Board of Supervisors. (*Id.* ¶ 175.) In turn, Hendrickson does not have the authority to oversee the overall performance of ACH in the Jail under its contract with the County. The Sheriff and the Board of Supervisors hold that authority. (*Id.* ¶ 176.) Finally, Hendrickson does not have the authority to oversee the professional performance of individual ACH medical staff in the Jail or to oversee the individual medical decisions about what health care to provide to a specific inmate in the Jail. That authority lies instead with ACH and its medical staff. (*Id.* ¶¶ 178-79.) All of this is fully consistent with Wisconsin law, which places the authority to "[t]ake the charge and custody of the jail maintained by the county and the persons in the jail, and keep the persons in the jail personally or by a deputy or jailer" with the Sheriff, not with any of his or her subordinate officers. *See* Wis. Stat. § 59.27(1); *see also Kocken v. Wisconsin Council*

*40, AFSCME*, 2007 WI 72, ¶ 44, 301 Wis. 2d 266, 732 N.W.2d 828 (noting that "the operation of the jail and the custody and care of jail inmates are part and parcel of the duties from time immemorial belonging to the office of sheriff and are distinctive to the office").

In short, while Hendrickson has authority over the day-to-day operations of the Jail and implementation of the policies and procedures relating to the Jail, his authority is not final and is instead subordinate to that of the Sheriff and the County Board and, as it relates to individual medical decisions, to ACH and its medical staff. (DJPFOF ¶¶ 172 & 178-79.) As a result, Hendrickson does not "possess responsibility for making law or setting policy, that is, authority to adopt rules for the conduct of government," *Killinger*, 389 F.3d at 771, and he is not a final policymaker for the County under *Monell* and its progeny.

## IV.  ANY CLAIMS BY PLAINTIFF UNDER § 1983 ON HIS OWN BEHALF ARE SUBJECT TO SUMMARY JUDGMENT.

Plaintiff, as Boyer's spouse and the administrator of her estate, brings this action on behalf of the estate and on his own behalf. (*See* ECF No. 161, Case No. 20-cv-1123, at Caption.) Although it appears from the face of the complaint that plaintiff asserts claims under § 1983 only on behalf of Boyer's estate and not also on his own behalf, the complaint does not expressly say so. (*See id.*, ¶¶ 149-73.) However, to the extent plaintiff purports to pursue § 1983 claims on his own behalf, any such claims are also subject to summary judgment.

As an initial matter, any § 1983 claim by plaintiff on his own behalf against the Monroe County defendants – as a claim derivative of those pursued by plaintiff on behalf of Boyer's estate – would fail for the same reasons set forth above. Regardless, any § 1983

claim by plaintiff on his own behalf would also fail because he has no standing to sue under § 1983 for the death of his spouse absent facts that would allow for the reasonable inference that Boyer died as a result of conduct intended to interfere with their spousal relationship.

As is well established, a litigant may only bring a § 1983 claim for the violation of his or her own constitutional rights. *See*, *e.g.*, *McGowan v. State of Maryland*, 366 U.S. 420, 429 (1961) (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)). Consistent with this general rule, in the Seventh Circuit, a plaintiff has no standing to pursue a claim under § 1983 for injury or death to their spouse absent evidence that the spouse was injured for the specific purpose of terminating their relationship. *Thompson v. City of Chicago*, 472 F.3d 444, 452 n.25 (7th Cir. 2006) (holding that decedent's "mother and wife do not have standing to pursue a § 1983 action against the City of Chicago or Officer Hespe, as they have not even alleged that [the decedent] was killed 'for the specific purpose of terminating [his] relationship with his family'") (quoting *Russ v. Watts*, 414 F.3d 783, 790 (7th Cir. 2005)); *see also Niehus v Liberio*, 973 F.2d 526, 534 (7th Cir. 1992) (declining to recognize loss of consortium claim by spouse under the Constitution); *Russ*, 414 F.3d at 790 (holding, in context of a § 1983 claim brought by parents arising from the death of an adult son, that a "constitutional violation based on official actions that were not directed at the parent-child relationship would stretch the concept of due process far beyond the guiding principles set forth by the Supreme Court" and "would create the risk of constitutionalizing all torts against individuals who happen to have families"); *Wand v. Lafayette Cty. Sheriff's Dep't*, 23-cv-297-jdp, 2024 WL 13258507, at *2 (W.D. Wis. Mar. 28, 2024) (holding that plaintiff "cannot directly bring claims for her own injuries caused by defendants for their actions or inactions toward [her deceased spouse]").

Here, there is no allegation, let alone evidence, that any conduct by the Monroe County defendants was in any way intended to interfere with the relationship between plaintiff and Boyer. Nor would any such allegation be reasonable under the circumstances of this case. As such, under controlling Seventh Circuit precedent, any § 1983 claim by plaintiff on his own behalf against the Monroe County defendants fails as a matter of law and must be dismissed on summary judgment.[6]

## CONCLUSION

For the reasons stated herein, the Monroe County defendants submit that this Court should enter an order granting them summary judgment, dismissing this action against them in its entirety, and awarding them their costs in defending this action, together with such other and further relief as this Court deems just and appropriate.

February 14, 2025

Respectfully submitted:

HANSEN REYNOLDS LLC

*/s/ Andrew A. Jones*
Andrew A. Jones
301 N. Broadway, Suite 400
Milwaukee, Wisconsin 53202
(414) 455-7676 (phone)
(414) 273-8476 (fax)
ajones@hansenreynolds.com

*Counsel for Defendants Monroe County,
Stan Hendrickson, Danielle Nelson, and
Shasta Moga*

---

[6] Plaintiff's only pendant claim under Wisconsin law against the Monroe County defendants is one asserting the County must indemnify Hendrickson, Moga, and Nelson for any judgment against them. (See ECF No. 161, Case No. 20-cv-1123, ¶¶ 174-98 (Counts III-VII) & 199-201 (Count VIII).) Because this claim is derivative of plaintiff's other claims against the Monroe County defendants, all of which fail as a matter of law, it too must be dismissed on summary judgment.