## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| Gregory Boyer, | |
| Plaintiff, | Case No: 3:20-cv-1123-JDP |
| v. | Judge James D. Peterson |
| Advanced Correctional Healthcare, Inc., *et al.*, | Magistrate Judge Anita M. Boor |
| Defendants. | |
| Gregory Boyer, | |
| Plaintiff, | Case No: 3:22-cv-00723-JDP |
| v. | Judge James D. Peterson |
| USA Medical & Psychological Staffing, Inc., *et al.*, | Magistrate Judge Anita M. Boor |
| Defendants. | |

## PLAINTIFF'S COMBINED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Gregory Boyer, as Administrator of the Estate of Christine Boyer and on his own behalf, submits this combined response to the motions for summary judgment and supporting memoranda filed by Defendants Advanced Correctional Healthcare, Lisa Pisney, and Amber Fennigkoh (ECF Nos. 250 and 251); by Defendants Monroe County, Danielle Warren, and Stasha Moga (ECF Nos. 239 and 245); and by Defendants USA Medical, Norman Johnson, and Travis Schamber (ECF Nos. 234 and 235).

## INTRODUCTION

Christine Boyer was a 41-year-old woman who had congestive heart failure and high blood pressure. Christine was booked into the Monroe County Jail in the evening of Saturday,

December 21, 2019. She told staff, including Sergeant Danielle Nelson and Registered Nurse Amber Fennigkoh, that she took a variety of medications to control these serious conditions, and that she did not have her medications with her. Yet the jail medical staff decided that she could go without those medications until after the weekend.

At that time, the arresting officer also told Fennigkoh that Christine had a long history of medical conditions. But Fennigkoh's shift was ending, so she told jail staff to call Defendant Nurse Practitioner Lisa Pisney, who was on-call and off-site. Nurse Pisney made no effort to identify or obtain Christine's medications. Instead, she instructed jail staff to wait until Monday to contact Christine's pharmacy.

On Sunday, Christine was experiencing shortness of breath and extremely high blood pressure: >180 systolic and diastolic >120. The jail did not have medical staff on-site on Sundays, but Fennigkoh was at the jail that afternoon on special assignment. Jail staff informed Fennigkoh of Christine's condition, but Fennigkoh did not contact Christine's pharmacist, did not contact her physician, and did not arrange for her to be taken to the emergency room, which was literally across the street. Instead, Fennigkoh directed jail staff to reach out to Pisney. Staff did not contact Pisney until four hours later.

At approximately 8:00 p.m. that evening, Christine reported to jail staff that she was suffering from persistent, stabbing chest pain, pain in her left shoulder, shortness of breath, nausea, and dizziness—classic symptoms of a heart attack. She reminded staff that she had congestive heart failure and high blood pressure and listed several medications she had been prescribed for those conditions, none of which she was receiving. Christine told staff that in the past, these symptoms had required emergency intervention because they indicated an imminent risk of a heart attack.

Still, jail staff did not take her to the emergency room. Instead, Defendant Shasta Moga completed a pre-printed "chest pain" report and contacted Pisney, who instructed her to administer aspirin. Christine suffered a fatal heart attack a few hours later.

Christine's husband, Plaintiff Gregory Boyer, seeks to hold the Defendants Advanced Correctional Healthcare, Monroe County, USA Medical & Psychological Staffing, Lisa Pisney, Amber Fennigkoh, Stan Hendrickson, Danielle Nelson (Warren), Stasha Moga (Parker), Norman Johnson, and Travis Schamber accountable for their failure to care for Christine and prevent her death. In *Boyer I* and *Boyer II*, which are now consolidated, Plaintiff brings the following claims:

1. 42 U.S.C. § 1983 claim for denial of medical care to a pretrial detainee against all Defendants

2. 42 U.S.C. § 1983 claim for failure to intervene against Pisney, Fennigkoh, Nelson, and Moga

3. Wisconsin medical practice claim against ACH, USA Medical, Pisney, Fennigkoh, Johnson, and Schamber

4. Wisconsin survival claim against ACH, USA Medical, Pisney, Fennigkoh, Johnson, and Schamber

5. Wisconsin wrongful death claim against ACH, USA Medical, Pisney, Fennigkoh, Johnson, and Schamber

6. Wisconsin intentional infliction of emotional distress claim against ACH, USA Medical, Pisney, Fennigkoh, Johnson, and Schamber

7. Wisconsin negligent infliction of emotional distress claim against ACH, USA Medical, Pisney, Fennigkoh, Johnson, and Schamber

8. State law indemnification against Monroe County

20-cv-1123 (*Boyer I*) ECF 102; 27-cv-723 (*Boyer II*) ECF 45. At the motion to dismiss stage, the Court dismissed Plaintiff's individual § 1983 claim against Hendrickson. All other claims remain. *Boyer II* ECF 22.

This is not a case that can be resolved at summary judgment. Substantial evidence in the record supports Plaintiff's claims that Defendants consciously disregarded Christine's serious medical needs by denying her the medical care she urgently needed, despite her persistent complaints. Viewing the evidence in the light most favorable to Plaintiff, as the Court must at this stage, the Court should deny Defendants' motions for summary judgment.

## THE SUMMARY JUDGMENT STANDARD

As the moving parties, Defendants must establish that this case presents no genuine issues of material fact that require a trial to resolve. *Ponsett v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010). When deciding whether a genuine factual dispute exists, the Court must view the evidence in the light most favorable to Plaintiff, resolving all evidentiary conflicts and drawing all reasonable inferences in his favor. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014). Circumstantial evidence is entitled to equal weight, especially in cases like this one that "turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

## ARGUMENT

This is a case about denial of medical care to an incarcerated person. To prevail, Plaintiff must prove that Christine suffered from an objectively serious medical condition, and that Defendants acted with deliberate indifference to the condition. *Petties*, 836 F.3d at 728 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A serious medical need is one that either a

physician has diagnosed as mandating treatment or is so obvious that even a lay person would know a doctor's attention is required. *See Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017). High blood pressure, congestive heart failure, and shortness of breath/chest pain are objectively serious medical conditions. *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir.1996) (objectively serious medical condition requires an "illness or injury . . . [which] is sufficiently serious or painful to make the refusal of assistance uncivilized"); *Gutierrez v. Peters*, 111 F.3d 1364, 1369–72 (7th Cir. 1997); *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

Deliberate indifference requires a factfinder to inquire into the Defendants' subjective state of mind, a topic particularly ill-suited for resolution at summary judgment. *Conley*, 796 F.3d at 747 ("[S]tate of mind is an 'inquiry that ordinarily cannot be concluded on summary judgment.'"). To establish deliberate indifference, a plaintiff must show that a defendant was aware of and disregarded a substantial risk of harm to the plaintiff. *Farmer*, 511 U.S. at 835; *Ortiz v. Webster*, 655 F.3d 731, 734 (7th Cir. 2011). Because prison officials "[r]arely if ever" admit that they acted with deliberate indifference, prisoners typically establish it through circumstantial evidence. *Petties*, 836 F.3d at 728. "[W]hile the "deliberate indifference standard does not permit claims for mere negligence or claims alleging that a reasonable medical judgment unfortunately led to a bad result, a prisoner is not required to show that he was literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611–12 (7th Cir. 2000).

The Seventh Circuit has identified multiple ways that a plaintiff can prove deliberate indifference through circumstantial evidence. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 842). A prisoner may also show deliberate indifference through evidence that "the defendant's chosen 'course of treatment'

5

departs radically from 'accepted professional practice,'" providing an inference that "no exercise of professional judgment actually occurred." *Diggs v. Ghosh*, 850 F.3d 905, 909 (7th Cir. 2017). And when medical staff persist in a course of treatment they know is ineffective, choose an "easier and less efficacious treatment[,]" or refuse to follow advice from a specialist, an inference of deliberate indifference at summary judgment is appropriate. *Petties*, 836 F.3d at 729–30; *Arnett v. Webster*, 658 F.3d 742, 753–54 (7th Cir. 2011).

Finally, an "inexplicable delay in treatment" which "exacerbate[s] the [plaintiff's] injury or unnecessarily prolong[s] [her] pain" warrants denial of summary judgment. *Petties*, 836 F.3d at 730-31; *see also Grieveson v. Anderson*, 538 F.3d 763, 779-80 (7th Cir. 2008) (delay in providing care actionable under the Eighth Amendment if evidence permits inference that plaintiff endured "many more hours of needless suffering for no reason").

Several of these situations indicating deliberate indifference are present here. There is evidence that Defendants knew Christine had serious medical needs and chose to ignore the risks to her health and life. Even if the Defendants do not admit to such knowledge, the risk was obvious, and circumstantial evidence establishes their knowledge. Namely, Plaintiff has presented factual and expert evidence that the Defendants departed radically from accepted professional practice, providing an inference that they did not exercise any professional judgment. Based on the record, Defendants were deliberately indifferent to Christine's emergent symptoms and serious medical conditions.

The Court should deny Defendants' motions for summary judgment. First, a reasonable jury could find that the Nurses Pisney and Fennigkoh denied Christine adequate care. A jury could also find ACH liable for failing to train jail and medical staff to consider patient complaints and reports, and instead prioritize cost-saving. Second, a reasonable jury could find

that Sergeant Warren and Office Moga were deliberately indifferent to Christine's pleas for care. A jury could also find Monroe County liable for its policies limiting patient care in the Jail, causing Christine's death. Third, USA Medical, Dr. Johnson, and Dr. Schamber are liable as alter egos of ACH and USA Medical. Fourth, the failure to intervene claims, claims brought on Plaintiff's own behalf, and state law claims should proceed to trial.

**I.  A Reasonable Jury Could Find that the ACH Defendants Denied Christine Adequate Medical Care.**

**A.  Plaintiff's claims against Nurse Pisney should proceed to trial.**

**i.  There is a genuine factual dispute regarding whether Nurse Pisney's care was reasonable, which must be decided by a jury.**

A reasonable jury could find that Nurse Pisney was deliberately indifferent to Christine's serious medical needs. Plaintiff's expert opines that Nurse Pisney sharply deviated from the standard of care at each point that jail staff called upon her to care for Christine: in the morning, in the afternoon, and in the evening on December 22. Marked deviations from the standard of care support the inference that Nurse Pisney was deliberately indifferent to Christine's medical needs. *Diggs*, 850 F.3d at 909. The Court must therefore deny Pisney's motion.

*1.  Morning of December 22*

Nurse Pisney knew on the morning of Sunday, December 22 that Christine had serious medical needs. ECF 249 (Bentley Rep.) at 11–12. Correctional Officer Brooke Dempsey called Nurse Pisney that morning to tell her about Christine's condition. ECF 217 (Nelson Dep.) at 148:1–147:11; 158:21–160:3. Officer Dempsey gave Nurse Pisney all of the information on the intake sheet, including information about the medications Christine took, that she took her blood pressure medication the previous day, that she had some of her medications on her person when

she entered the jail, that she reported having high blood pressure and asthma, and that she had congestive heart failure.  ECF 212 (Dempsey Dep.) at 40:1–48:8.

Nurse Pisney claimed not to remember being informed that Christine had congestive heart failure, testifying that the only information she remembers getting from Officer Dempsey during their phone call that morning was that Christine "had some sort of cancer, and that she was told she only had a month to live," ECF 218 (Pisney Dep.) at 127:25, 128:1, 22:16–17. But that self-serving testimony is in dispute. Contradicting her own testimony, Nurse Pisney admitted that she would have also known about the medications that Christine had on her person since she would have had to approve those. *Id.* 24:15–23. Christine had the following medications: oxycodone, Ondansetron, albuterol, and aspirin—all medications that are known to be "consistent with a person suffering from any number of serious medical conditions requiring consistent medication." ECF 249 (Bentley Rep.) at 11; *see also* ECF 246 (Venters Rep.) at 14. In addition, Nurse Pisney knew that, by her self-report, Christine had a history of cancer; did not have long to live; and had a significant medical history, though Christine's self-report was vague and unclear.

All of this information should have led Nurse Pisney to conclude that Christine was a high-risk patient who needed special attention and care.  According to Plaintiff's medical experts, the facts Nurse Pisney knew should have prompted her to take some action to make sure that Christine was not at risk of an imminent, acute medical crisis.  ECF 246 (Venters Rep.) at 14–15.  She should have followed up with Christine to get additional information about her medical history and medications, something that *Defendants'* medical expert Dr. Murray Young testified is standard practice when a patient appears intoxicated at intake—as Christine did. Ex. 2 (Young Dep). at 51:19–55:06 ("[I]f somebody is unable to answer questions or doesn't know, due to the fact that they've had an overabundance of alcohol, then it's better to wait and talk to them the next day").

Plaintiff's medical experts opined that Nurse Pisney should have asked the correctional officers to confirm the information on the intake form from the night before to prevent the transmission of imperfect information, a common practice in medicine. *See* ECF 249 (Bentley Rep.) at 11–12. Defendants' experts agree this is the standard of care. Ex. 2 (Young Dep.) at 52:02–53:10 ("[W]e say in the correctional setting trust but verify. So you're going to have to trust what [the patient] say[s], but you're going to have to verify again through the community, through the hospital, through the pharmacy of what medications they may be taking and what conditions they have. Usually you can tell what conditions a patient has by the medication they're taking.").

The standard of care required Pisney to ask for more information on Christine's medical history and for access to her medical records and a medication list. *Id.* Nurse Pisney should have called Christine's identified primary care physician, Dr. Erdman, or identified hospital system, Gundersen Health—where Nurse Pisney herself worked at the time. ECF 218 (Pisney Dep.) at 148:4–7. Nurse Pisney has not, and could not, present any sound, medical reason for these failures. Nor has Nurse Pisney explained why she did not follow standard practice of returning to the patient after intake for more information on their medical history and medications. Instead, the record shows that Nurse Pisney repeatedly and egregiously deviated from the standard of care, raising a material question of fact as to her deliberate indifference. *See Petties*, 836 F.3d at 730 ("If a prison doctor chooses an 'easier and less efficacious treatment' without exercising professional judgment, such a decision can also constitute deliberate indifference.").

Any one of these steps might have saved Christine's life. But instead of taking any of these steps, Nurse Pisney chose "the easier and less efficacious" approach, *Estelle*, 429 U.S. at 105 n.10 (1976), which ultimately cost Christine her life. ECF 248 (Charash Rep.) at 6. She instructed the correctional officers to obtain Christine's medical records and medication list from the pharmacy

when it opened on Monday but took no other steps to ensure Christine's health and safety. ECF 218 (Pisney Dep.) at 120:4–7, 120:15–20.

By failing to investigate Christine's medical history or obtain a medication list in a timely manner given what information she had about Christine from intake, including failing to ensure that Christine had access to all prescribed medications so that she would not miss any doses, Nurse Pisney purposefully disrupted the course of Christine's treatment. This evidence flatly precludes summary judgment. *See Est. of Crouch v. Madison Cnty.*, 682 F. Supp. 2d 862, 870 (S.D. Ind. 2010) (A jury may find deliberate indifference in cases where a provider is "intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment."); *see also Jones v. Natesha*, 151 F. Supp. 2d 938, 945 (N.D. Ill. 2001) (same).

### 2. Afternoon of December 22

Nurse Pisney again deviated from the standard of care on the afternoon of Sunday December 22 when she got a call from correctional staff telling her that Christine's blood pressure was dramatically high. ECF 249 (Bentley Rep.) at 12–13. At that time, Christine's systolic blood pressure was 177, and her diastolic blood pressure was over 100. According to Plaintiff's expert, "Christine's blood pressure readings bordered on hypertensive crisis (defined by readings of >180 systolic and/or diastolic >120), which would require emergent medical care on their own due to high risk of hypertensive crisis leading to heart attack, stroke, heart failure, or other life-threatening conditions." ECF 249 (Bentley Rep.) at 12; *see also* ECF 248 (Charash Rep.) at 4.

There is another factual dispute about the information that correctional officers conveyed to Nurse Pisney that afternoon. An email from Officer Moga (Parker) to jail personnel says that afternoon, Christine "started complaining of feeling hot and sweaty, not being able to breath etc." It continues: "She asked to have her blood pressure taken and it was . . . really high, and we called

Lisa." ECF 230-9. Nurse Pisney says that she remembers learning about Christine's high blood pressure but does not remember being told that Christine was hot, sweaty, and unable to breathe. ECF 218 (Pisney Dep.) at 141:9–11. Viewing the facts in Plaintiff's favor, a reasonable jury could find that Nurse Pisney knew Christine required emergent medical care.

Moreover, even if Nurse Pisney had not been told that Christine had congestive heart failure or that she was hot, sweaty, and unable to breathe, Nurse Pisney was aware of several other factors that put Christine at a particularly high risk of "severe, potentially fatal consequences from elevated blood pressure." ECF 249 (Bentley Rep.) at 12. Nurse Pisney knew that Christine had a history of cancer, reported that she was told she had one month to live, and had an unclear medical history, and did not have access to all her medications. ECF 218 (Pisney Dep.) at 24:15–23, 127:25, 128:1, 22:16–17.

Nurse Pisney should have gathered additional information about Christine's medical history and investigated what might be causing or exacerbating her high blood pressure. *See* ECF 249 (Bentley Rep.) at 12. She could have done so by asking Christine herself to describe her medical history and symptoms, or she could have accessed Christine's medical records. *Id.* But even if she did not investigate directly, she could have sent Christine to the emergency room for "end organ compromise, blood pressure monitoring, and intervention." *Id.* "At an absolute minimum," Plaintiff's expert Dr. Bentley concluded, "Christine needed an electrocardiogram to evaluate the functioning of her heart and screen for acute abnormalities, such as arrythmia or heart attack." ECF 249 (Bentley Rep.) at 12.

Instead, all Nurse Pisney did was tell the correctional officers to give Christine clonidine and check her blood pressure again in 30 minutes, then again an hour after that, and give her another dose of clonidine if it was still within a high range. ECF 218 (Pisney Dep.) at 142:1–3,

142:11–15.  She did not instruct the officers to check Christine again after that, ostensibly because she "assumed that the next dose [of clonidine] would drop [her blood pressure] even further and get . . . her into the normal zone." ECF 218 (Pisney Dep.) at 145:9–15.  So, the officers conducted two blood pressure checks, then stopped.  ECF 240-10 (Medical Administration Record).  Nurse Pisney made no attempt to rule out any of the severe health problems that Christine could have been experiencing.

When medical staff persist in a course of treatment they know is ineffective, or choose an "easier and less efficacious treatment[,]" an inference of deliberate indifference at summary judgment is appropriate. *Petties*, 836 F.3d at 729–30; *Arnett*, 658 F.3d at 753–54. A jury could determine that Nurse Pisney is liable for providing easier care known to be ineffective or less efficacious.

### 3.  Evening of December 22

Later that evening, Nurse Pisney's conduct deviated drastically from the standard of care yet again.  At approximately 7:30 p.m., Nurse Pisney was alerted by correctional officers that Christine was experiencing chest pain and shortness of breath, ECF 240-7; ECF 240-9, symptoms that indicate a medical emergency and are commonly associated with a heart attack, ECF 249 (Bentley Rep.) at 13; ECF 246 (Venters Rep.) at 21.  At this point, Nurse Pisney should have known that the lisinopril had not resolved Christine's symptoms. ECF 249 (Bentley Rep.) at 13; ECF 224 (Bentley Dep.) at 145:12–146:04; ECF 240-9; ECF 240-10. But Nurse Pisney made no attempt to rule out a heart attack, testifying after-the-fact (and based on nothing in particular) that Christine's symptoms were "more likely" caused by anxiety. ECF 218 (Pisney Dep.) at 187:13–14.  At this point, the standard of care required Nurse Pisney to rule out a heart attack.  ECF 249 (Bentley Rep.) at 13; ECF 246 (Venters Rep.) at 21–22; *see also* ECF 218 (Pisney Dep.) at 83:7–

13 ("you want to rule out the most serious diagnosis first" since "you don't want to kill the patient").  Doing so would have required an EKG, which was not available at the jail, so Nurse Pisney should have sent Christine out to the emergency room.  ECF 249 (Bentley Rep.) at 13; ECF 246 (Venters Rep.) at 21–23.

Nurse Pisney should have known that the need to send Christine to the hospital was particularly urgent since, from her calls that afternoon, she knew that Christine's blood pressure was elevated even after several doses of clonidine.  ECF 246 (Bentley Rep.) at 13.  This urgent need was exacerbated by the information that Nurse Pisney learned about Christine that morning: she had a history of cancer, an unclear medical history and medication regime, and was taking a variety of medications including one for blood pressure which she had not taken for over 24 hours.  ECF 218 (Pisney Dep.) at 24:15–23, 127:25, 128:1, 22:16–17.  Accepting Officer Dempsey's testimony that Nurse Pisney *did* know about Christine's congestive heart failure, ECF 212 (Dempsey Dep.) at 40:1–48:8, her obligation to send Christine to the emergency room as quickly as possible was even greater.  ECF 249 (Bentley Rep.) at 14.

Instead, Nurse Pisney instructed officers to give Christine 81mg of aspirin, check her blood pressure again in thirty minutes, and call back if it was elevated.  ECF 240-9; ECF 218 (Pisney Dep.) at 30:13–18.  In her deposition, she testified that she ordered the aspirin because she thought "it wouldn't hurt anything." ECF 218 (Pisney Dep.) at 30:13.  But in her answer to the complaint, she stated that she "instructed jail staff to administer aspirin, which is a common treatment used to prevent heart attack."  ECF 160 at ¶ 11.  As Plaintiff's expert Dr. Bentley pointed out, "[t]hese statements present different, conflicting scenarios."  ECF 249 (Bentley Rep.) at 16.

Viewing the record in Plaintiff's favor, Nurse Pisney knew Christine needed emergent medical care, and gave her only aspirin—a course of events that assuredly warrants the inference

of deliberate indifference. The *en banc* Seventh Circuit has found that "if knowing a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and sends him back to his cell, a jury could find deliberate indifference even though the prisoner received some treatment." *Petties*, 836 F.3d at 729–30. This reasoning in *Petties* applies with equal or greater force when the plaintiff, like Christine in this case, faces a serious risk of a heart attack, and when the provider knows that the patient has a host of other risk factors for a serious medical problem.

In other words, because Nurse Pisney did nothing but order aspirin because it "wouldn't hurt" in response to learning about the increasingly severe symptoms that Christine was experiencing, a jury may find her liable for knowingly prescribing ineffective treatment. According to the Seventh Circuit, "Doggedly persisting in an ineffective treatment can establish deliberate indifference." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022). The experts agree in this case that aspirin cannot prevent a heart attack and a patient at risk of a cardiac event must be sent to the ER. Ex. 2 (Young Dep.) at 1137:15–21 ("If you feel like the patient is at risk for having a cardiac event, then, yes, you send them out to the ER for further – for further evaluation."); ECF 248 (Charash Rep.) at 6 ("[A]spirin in such circumstances is not a substitute for emergency medical attention"). A jury could infer that Pisney ordered aspirin for Christine despite knowing that Christine was at risk of a heart attack and knowing as well that aspirin could not prevent it. *Petties*, 836 F.3d at 728; ECF 248 (Charash Rep.) at 6.

Defendant ACH's expert contends that Christine's chest pain "was the result of a cardiac arrhythmia, not ischemic blockage." (ECF 251 at 26). In other words, Defendant's expert argues that Christine was not experiencing the onset of a heart attack when she complained of chest pain

at the jail. *Id.* Plaintiff's expert disagrees, finding that Christine was most likely experiencing acute coronary ischemia, which led to cardiac arrest, ECF 248 (Charash Rep.) at 5, although he testified in his deposition that he cannot be certain, ECF 229 (Charash Dep.) at 44:11–46:9.

But this medical disagreement is a red herring—and, to the extent it is relevant, it reflects a *dispute* of fact, not grounds for summary judgment. Nurse Pisney did not need to know Christine's exact diagnosis, just facts indicating she needed medical intervention. "Under some circumstances when a nurse is aware of . . . the ineffectiveness of the medications, a delay in . . . initiating treatment may support a claim of deliberate indifference. Nurses, like physicians, may thus be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health." *Brown v. Osmundson*, 38 F.4th 545, 554–55 (7th Cir. 2022) (concurring) (citing *Lewis*, 864 F.3d at 564–65; *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (citation omitted); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010).

Regardless of the precise cause of Christine's chest pain and other symptoms, Nurse Pisney's failure to get Christine medical intervention despite signs that any nurse should know indicated she needed emergent medical care was a "substantial departure from accepted professional judgment, practice, or standards"—and evidence supporting an inference of deliberate indifference. *King v. Kramer*, 680 F.3d 1013, 1018–19 (7th Cir. 2012) (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). This "substantial departure" meant that Christine was not in the hospital when she went into cardiac arrest. *That* is what caused her death. ECF 248 (Charash Rep.) at 6. The specifics of how her body deteriorated after she went brain dead at the jail are immaterial to the issue of Nurse Pisney's deliberate indifference. *Id.* at 7.

### ii. A jury must assess the credibility of Pisney's hindsight justifications for not providing proper care.

Nurse Pisney's justifications for her decisions with respect to Christine have changed

throughout the course of this litigation.  For instance, as described above, Nurse Pisney said in her Answer that she ordered aspirin because it is "a common treatment used to prevent heart attack." ECF 160 (Def. Pisney Ans.) ¶ 11.  In her deposition, she testified that ordering aspirin was the officers' idea, and she agreed because "it wouldn't hurt anything."  ECF 218 (Pisney Dep.) at 30:13. The correctional officers have testified that Nurse Pisney ordered the aspirin because they lacked the authority to do so.  ECF 215 (Parker Dep.) at 249:19–23 ("Q: [I]t doesn't say [on the chest pain protocol], aspirin as ordered, right? A: It does not. But we are instructed that we cannot give medication without an order from a practitioner.").

Defendants' expert admitted, contrary to Pisney's claim, that correctional practitioners order aspirin out of habit even though there is widespread consensus that it does not do anything. Ex. 2 (Young Dep.) at 129:23–131:24. Combined with other evidence in the record, there is ample basis to infer that Nurse Pisney ordered a treatment known to her to be ineffective. Ex. 2 (Young Dep.) at 134:16–135:4 (Q: "[S]he wasn't trying to treat anything as far as blood pressure or any other symptoms with the aspirin."); ECF 218 (Pisney Dep.) at 30:13.

In sum, there is a factual dispute as to Nurse Pisney's knowledge that Christine was at risk of a heart attack or other serious harm or death requiring medical care and nonetheless ordered aspirin despite knowing it would not be effective. Resolving this dispute requires a credibility determination, which only a jury can make. So too with the other discrepancies between Nurse Pisney's testimony and that of the correctional officers: whether Nurse Pisney was informed that Christine had congestive heart failure, and whether Nurse Pisney was informed that Christine was hot, sweaty, and having trouble breathing on the afternoon of December 22.

### iii. Plaintiff's retained standard of care experts are qualified to opine on the nursing standard of care.

ACH attempts to defeat the opinions of Dr. Venters and Dr. Bentley by implying that Plaintiff's experts are unqualified to opine on the nursing standard of care, and thus unqualified to provide expert testimony on Nurse Pisney's care. *See* ECF 251 at 24 ("Defendants will demonstrate—with a qualified correctional nursing expert—that she met the standard of care of her profession."). This argument has been rejected by the Seventh Circuit, which has held that a physician may render an expert opinion on a nurse's standard of care. *Cooper v. Eagle River Mem'l Hosp., Inc*., 270 F.3d 456, 463 (7th Cir. 2001) (affirming district court decision that family physician could render an expert opinion of the standard of care that should be practiced by nurse practitioners, although family physician had only limited experience with nurse practitioners and her role was administrative in nature, and only 25 percent of her practice related to area of medicine at issue); *see also Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats").

Dr. Venters and Dr. Bentley have relevant expertise that qualifies them to opine on the standard of care for nurses and nurse practitioners. Dr. Venters oversaw "all aspects of medical care for 75,000 patients annually in 12 jails" in his role as Medical Director and Chief Medical Officer of the Correctional Health Services of New York City. ECF 246 (Venters Rep.) at 1–2. In that role, he "reviewed and approved all policies," including those related to nursing. *Id.* at 2. In addition, Dr. Venters has served as a federal court-appointed monitor for health services in four different jails and prisons, and "conducted dozens of court-ordered inspections of detention facilities to assess the adequacy of their COVID-19 responses." *Id.* These experiences make

him well-qualified to opine on the medical care that Christine received at the Monroe County

Jail, including the care provided by Nurse Pisney and Nurse Fennigkoh.

Dr. Bentley has robust experience in emergency and primary medicine that qualifies her

to offer an expert opinion on the care provided to Christine.  Dr. Bentley is a Professor of

Emergency Medicine and Medical Education at the Icahn School of Medicine at Mount Sinai in

New York, NY.  ECF 249 (Bentley Rep.) at 1.  Dr. Bentley is also the Director of Simulation

Innovation & Research for the New York City Health + Hospitals health system and Clinical

Director of the Elmhurst Simulation Center.  *Id.*  In those roles, Dr. Bentley is "responsible for

training all specialties of providers and staff," including nurses.  *Id.*  She teaches nurse

practitioners, physicians' assistants, residents, and nonclinical staff on emergency and primary

care. ECF 224 (Bentley Dep.) at 17:40–21. Dr. Bentley is also the President of the Society for

Academic Emergency Medicine Simulation Academy, where she serves "to establish best

practices . . . across US Emergency Medicine residencies."  *Id.*  This robust experience training

and teaching emergency medicine more than qualifies Dr. Bentley to opine on the care that

Nurse Pisney and Nurse Fennigkoh provided Christine.  To the extent that ACH has substantive

disagreements with Dr. Venters and Dr. Bentley's conclusions, those present at most "a factual

question for trial." *Cf. Jones v. Wexford Health Sources, Inc.*, 2021 WL 323792, at *7 (N.D. Ill.

Feb. 1, 2021).

Defendant ACH claims that "Plaintiff concede[d] in criticizing NP Pisney's management

of the differential diagnosis that she exercised professional judgment in responding to Christine's

symptoms."  (ECF 251 at 24).  Plaintiff has made no such concession.  ACH attempts to support

this claim with statements from Dr. Bentley and Dr. Keller in their depositions that the

formulation of a differential diagnosis involves judgment calls and reasonable practitioners may

disagree on how exactly to formulate the list of possible diagnoses and go about ruling them out. *Id.* But none of those statements pertain to Nurse Pisney's conduct; Plaintiff's experts were critical of Nurse Pisney's care. For example, throughout her deposition, Dr. Bentley was critical of Nurse Pisney's care and lack of differential diagnosis. ECF 224 (Bentley Dep.) at 17:35–36:01, 56:18–57:07, 69:20–72:01; 75:15–76:03; 71:19–72:01. Sometimes a practitioner will incorrectly diagnose a patient. That is inevitable. But a medical provider's care can only be reasonable if they have a medical rationale for their conduct. *Wade v. Castillo*, 658 F. Supp. 2d 906, 916 (W.D. Wis. 2009) ("[I]f a medical provider's actions are not based on medical judgment, a jury may infer unreasonableness and deliberate indifference"). This means that a provider must take "reasonable measures" when confronted with "serious risk of harm." *Id.* And Plaintiff's experts hold the view that Nurse Pisney failed to take reasonable measures. ECF 249 (Bentley Rep.) at 24–25 (describing Nurse Pisney's "stark departure from the process of differential diagnosis").

There is no plausible medical rationale for any of Nurse Pisney's medical decisions regarding Christine's care: her failure to obtain Christine's medical history, her failure to ensure that Christine was not missing doses of her proscribed medications, her failure to rule out a hypertensive crisis when Christine's blood pressure spiked, her failure to rule out a heart attack when Christine complained of chest pain later in the evening, and finally, her failure to send Christine out to the emergency room as her symptoms worsened and the likelihood she was having a severe health emergency grew.

### iv.  Plaintiff's punitive damages claim against Nurse Pisney should proceed to trial.

Plaintiff's punitive damages claim against Nurse Pisney should proceed to trial, since there is ample evidence for a jury to determine that Nurse Pisney demonstrated a "reckless or

callous disregard" to Christine's rights. *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 930 (7th Cir. 2004). Nurse Pisney repeatedly showed deliberate indifference to Christine's care, neglecting to investigate, question, or take proactive action in response to the information about Christine's history and condition that signaled Christine was a high-risk patient in need of special attention and intervention. A jury could find that Nurse Pisney's failures went beyond just deliberate indifference. Indeed, Dr. Bentley described Nurse Pisney's testimony that "anxiety was a more likely diagnosis than cardiac" as "dangerous, biased, and incorrect." ECF 249 (Bentley Rep) at 15.

A jury could find the correctional officers' version of events more credible than Nurse Pisney's and determine that she was on notice of Christine's congestive heart failure, shortness of breath and sweatiness in the afternoon of December 22. *See* ECF 249 (Bentley Rep.) at 17 (if the correctional officers' version of events is true, that "would make Nurse Pisney's departures from the standard of care even more stark"). If she had this information, according to Dr. Bentley, "Nurse Pisney needlessly placed Christine at extreme risk of decompensation or death." *Id.* Dr. Bentley continued: "Any person with medical training, and certainly any licensed advanced practice practitioner like Nurse Pisney, would have recognized that they were needlessly placing Christine at severe risk of death." *Id.* A jury could resolve the disputed facts in Plaintiff's favor and determine that Nurse Pisney acted with "reckless or callous disregard" for Christine's life. *Woodward*, 368 F.3d at 930. Accordingly, Plaintiff's punitive damages claim against Nurse Pisney should proceed to trial.

**B.    Plaintiff's claims against Nurse Fennigkoh should proceed to trial.**

There is evidence that Nurse Fennigkoh's care of Christine was unreasonable. The Court should also deny her motion for summary judgment. To succeed on his claim against Nurse

20

Fennigkoh, Plaintiff must prove that Christine suffered from an objectively serious medical condition, and that Nurse Fennigkoh acted with deliberate indifference to the condition. *Petties*, 836 F.3d at 728 (citing *Farmer*, 511 U.S. at 834).

Nurses and correctional officers acting under the supervision of a physician or nurse practitioner in jail may be held liable for deliberate indifference. *Reck*, 27 F.4th at 485–86 ("Under some circumstances when a nurse is aware of an inmate's pain and the ineffectiveness of the medications, a delay in advising the attending physician or in initiating treatment may support a claim of deliberate indifference."). Although nurses provide medical care under the supervision of physicians and nurse practitioners, the Seventh Circuit has made clear that nurses cannot just "unthinkingly defer to physicians and ignore obvious risks to an inmate's health." *See Rice v. Correctional Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012).

Nurses serve two key functions in providing medical care, according to Dr. Bentley. First, they "serve as the eyes and ears of doctors and practitioners, identifying signs and symptoms of dangerous conditions and reporting them to practitioners." ECF 246 (Bentley Rep.) at 18. Second, they "serve a triage function": "they decide how urgently a patient needs be seen by a practitioner to address particular signs and symptoms, bearing in mind the seriousness of the potential causes of a person's symptoms, the speed with which such a cause can harm or kill the patient, and what tools are necessary to rule out or treat the potentially serious cause before it harms or kills the patient." *Id.* at 19.

With the information Nurse Fennigkoh had about Christine's symptoms and medical history at the jail, Nurse Fennigkoh should have conducted a physical exam of Christine. *Id.* According to Defendant's expert Dr. Young, "*any* patient is going to get a physical exam eventually in a jail setting, unless they're gone early, like within hours." Ex. 2 (Young Dep.) at

56:9–12 (cleaned up) (emphasis added).  Nurse Fennigkoh knew that Christine had many more medical issues than the average patient—the arresting officers told her that Christine was a "medical mess," ECF 240-4; *see also* ECF 213 (Fennigkoh Dep.) at 61:22–24, and Nurse Fennigkoh knew that Christine had a history of cancer, congestive heart failure, and high blood pressure, ECF 240-2; *see also*  ECF 213 (Fennigkoh Dep.) at 81:10–12.  Additionally, Christine told Nurse Fennigkoh that she did not have long to live and all her organs were shutting down, ECF 240-4; *see also* ECF 213 (Fennigkoh Dep.) at 81:7–9.  Given that history, some of it reflected in Nurse Fennigkoh's own notes, "the appropriate triage in such a setting would have been to have Christine sent to the emergency department directly, or direct escalation to Nurse Pisney with the benefit of Nurse Fennigkoh's trained assessment" and her first-hand knowledge. ECF 249 (Bentley Rep.) at 19.  Nurse Fennigkoh did none of that.

Nurse Fennigkoh testified in her deposition that Christine told her that her husband did not know what medications she took or where she kept them.  ECF 240-4; ECF 213 (Fennigkoh Dep.) at 82:10–18. Instead of asking for more information about Christine's medications so that the jail could obtain them for Christine, Nurse Fennigkoh made it clear to Christine that the jail would not obtain her medications, since the pharmacy she used was closed on Sundays.  ECF 240-4; ECF 213 (Fennigkoh Dep.) at 82:19–25.  Nor did Nurse Fennigkoh call Christine's primary care physician, Dr. Erdman, whom Christine had listed by name during intake. ECF 240-2 at 2. In an attempt to get her medications somehow, Christine then said that there might be some loose pills in her purse, asked if that would help, and offered to call her husband.  ECF 240-4; ECF 213 (Fennigkoh Dep.) at 83:1–5.

Nurse Fennigkoh did not attempt to obtain Christine's medications through any mechanism other than contacting her husband (the one avenue Christine told her would be

ineffective), even though she testified that correctional officers "have the ability [to] contact the provider" when prescriptions are needed on a Sunday. ECF 213 (Fennigkoh Dep.) at 77:20–22. Nurse Fennigkoh knew from Christine that Plaintiff might not know which medicines Christine was taking, might not be able to locate them, and might not come to the jail. ECF 240-4; ECF 240-11. Instead of taking action to obtain Christine's medications through some other method, escalating to Nurse Pisney, or sending Christine out to the emergency room, Nurse Fennigkoh simply ordered that Christine be monitored (without instruction on what to monitor), and that her pharmacy be called on Monday. Nurse Fennigkoh did nothing further, even though Plaintiff informed Nurse Fennigkoh that he could not find the medications, could not get the medication list from the hospital, and told her, "We really need to get some medications in her. You know, this is – this is not going to be good." ECF 213 (Boyer Dep.) at 51:02–10.

Nurse Fennigkoh attempts to shift blame for her inaction to Christine because Christine was intoxicated when she arrived at the jail. The argument fails. Nurse Fennigkoh did not ask Christine pointed, follow-up questions during the initial screening and did not return to Christine to learn more about her medical history once her blood alcohol decreased. Moreover, Plaintiff testified that before her arrest and when he spoke to Christine on the phone after intake, she was not drunk, ECF 210 (Boyer Dep.) at 116:25–117:03, and on the phone she was forthcoming about her medical needs. *Id.* at 64:01–25 (testifying that Christine told him about her blood pressure medication and identified her other medications by name, and told him where to look for them).

But in any event, Christine's elevated blood alcohol content when she entered the jail makes Nurse Fennigkoh's failure to perform a physical exam upon intake, immediately call Nurse Pisney, take action to learn Christine's medical history and medications, or take Christine

to the ER all the more glaring. ECF 246 (Venters Rep.) at 15–16, 18–19 (explaining the importance of the intake exam to screen for health concerns and inform subsequent care); ECF 213 (Fennigkoh Dep.) at 73:14-17. When patients are intoxicated, it can be difficult and challenging to obtain a clear and accurate medical history from them. ECF 213 (Fennigkoh Dep.) at 75: 7-14. Nurse Fennigkoh herself admitted that she believed that Christine was not being forthcoming. ECF 213 (Fennigkoh Dep.) at 75-76: 20-6. This is a concern that Nurse Fennigkoh should have been familiar with and prepared to handle. ECF 246 (Venters Rep.) at 15–16 ("My experience in correctional health is that when facilities lack the capacity to adequately assess someone with serious health problems, the patients are simply sent to the closest emergency department for medical clearance. My experience is that this fallback is routinely utilized in small jail settings."). According to Defendants' own expert, Ms. Pearson, "[i]t's about 69 to 70 percent of the individuals coming in county jails have one or more substance use issues, and so this is a very prevalent population in the jails that we're accustomed to working with . . . it's difficult at times when someone's intoxicated to get those answers and you – you just have to keep that in mind." Ex. 17 (Pearson Dep.) at 76: 3-11.

Nurse Fennigkoh was aware that Christine had a serious and complicated medical history, and she was aware that Christine was likely having difficulty articulating that medical history because she was intoxicated. Yet instead of responding to Christine's intoxication and inability to consistently articulate her medical history with increased effort, Nurse Fennigkoh simply gave up. Nurse Fennigkoh left Christine in her distressed condition, knowing that there was no other medical care professional on-site at the jail. ECF 213 (Fennigkoh Dep.) at 85: 15-21.

Viewing the evidence in Plaintiff's favor and considering Nurse Fennigkoh's repeated failures to act in combination, a reasonable jury could infer Fennigkoh's deliberate indifference from her failure to perform a physical exam, her failure to alert Nurse Pisney upon intake of the concerning information she learned about Christine's medical history, and her failure to develop a viable plan to ensure Christine would have access to her medications (particularly after hearing Plaintiff's confirmation on Sunday that he could not bring Christine's medications). "Under some circumstances when a nurse is aware of an inmate's pain and the ineffectiveness of the medications, a delay in advising the attending physician or in initiating treatment may support a claim of deliberate indifference." *Brown*, 38 F.4th at 554–55 (Jackson-Akiwumi, J., concurring). Nurse Fennigkoh was aware of Christine's precarious condition but still failed to alert Nurse Pisney, failed to take any action to obtain Christine's medications, and failed to send her out to an external provider. All of this supports the reasonable inference that Fennigkoh was deliberately indifferent to Christine's medical needs.

i.     **Plaintiff's punitive damage claim against Nurse Fennigkoh should proceed to trial.**

Plaintiff's punitive damages claim against Nurse Fennigkoh should proceed to trial, since there is evidence to support a jury finding that Nurse Fennigkoh demonstrated a "reckless or callous disregard" of Christine's rights. *Woodward*, 368 F.3d at 930 (citing *Smith v. Wade*, 461 U.S. 30, 35 (1983)). "This is the same standard as for § 1983 liability, 'both require a determination that the defendants acted with deliberate indifference or reckless disregard.'". *Id.* (citing *Walsh v. Mellas*, 837 F.2d 789, 801 (7th Cir. 1988)). In Fourth Amendment cases where the plaintiff establishes deliberate indifference, the standard required to award punitive damages is also met. *Id.* (upholding punitive damages award where jury heard evidence of jail staff's deliberate indifference to pretrial detainee's health, resulting in his suicide).

25

Nurse Fennigkoh repeatedly showed deliberate indifference to Christine's care after she learned about Christine's medical history and the inaccessibility of her medications.  Nurse Fennigkoh acknowledged "that there would be no medical staff to provide care for Christine after she left the facility, and she left without obtaining vital signs or triggering a higher-level assessment for a patient who had reported serious heart, lung, and cancer problems, and who was also intoxicated."  ECF 246 (Venters Rep.) at 16.  Nurse Fennigkoh's failure to obtain more information about Christine, escalate her situation to Nurse Pisney, or send her out to the emergency room so that she could receive proper care represents exactly the kind of deliberate indifference that punitive damages are designed to "punish and deter."  *Calhoun v. DeTella*, 319 F.3d 936, 942 (7th Cir. 2003).

      C.      **The *Monell* claims against ACH should proceed to trial.**

Plaintiff is also entitled to a trial on his claim that the practices and express policies of ACH are to ignore and trivialize prisoners' complaints of illness and medical symptoms. ACH explicitly trains its medical practitioners that incarcerated patients are not to be believed when they report symptoms of illness. It would be reasonable for a jury to conclude that this policy reflects deliberate corporate indifference to the health and needs of the incarcerated people for whom ACH has assumed responsibility. *See City of Canton v. Harris,* 489 U.S. 378, 390 (1989) (deliberate indifference exists if the "need for more or different training" was "obvious"); *Sornberger v. Knoxville*, 434 F.3d 1006, 1029–30 (7th Cir. 2006) (deliberate indifference can be shown by a failure to provide adequate training in light of foreseeable consequences). Likewise, ACH's adoption of policies likely to result in inadequate medical care renders ACH liable for its practitioners' deficient care. *Calhoun v. Ramsey*, 408 F.3d 375, 379-80 (7th Cir. 2005) (application of a deficient express policy is enough to establish liability).

And it would be reasonable for the jury to infer that ACH's defective training and inadequate policies were, individually and in combination, a moving force behind the constitutional violations that Plaintiff contends Nurse Pisney and Nurse Fennigkoh committed, rendering ACH liable for those violations.[1]  *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 694–95 (1978).

### i. ACH trains its medical personnel to treat the symptoms and medical complaints of its incarcerated patients with skepticism and indifference.

ACH's trainings show that the company's key corporate officers deliberately engrain in ACH's medial staff systemic prejudice against the jail detainees as a population and indifference to any medical problems those patients may experience and attempt to report.  The ACH orientation training video presented by ACH's former CEO and founder Norman Johnson was shown to Nurse Pisney and many other ACH providers. Without basis it purveys and inculcates the assumption that incarcerated patients are dishonest malingerers in contrast to patients in the free community who seek out medical care for legitimate reasons. Screenshots from the video, which show this animus against ACH's patient population, are reproduced below:




---

[1] It is undisputed that private corporations like ACH are subject to the standard for section 1983 liability articulated in *Monell*. *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014).

 

Ex. 6 at 2–3, 14. Fennigkoh also received correctional staff training through ACH. Ex. 14 (Fennigkoh Training Slides).

In this video, Johnson informs ACH providers "inmates are known to exaggerate all their symptoms." *See* Ex. 19 (Video Transcript) at 12:12–15. Johnson tells new employees: "health is not the goal of inmates seeking care," and instead, "instant gratification and comfort" is their goal. ECF 226 (Johnson Dep.) at 5:06–10. He illustrates, "[If] they have to shoot up heroin with a dirty needle, that's perfectly okay because health is not the goal. Comfort is the goal. And it must be immediate. Consequently, this group of the – of the public . . . must be handled differently than patients in the free world." *Id.* at 5:07–15. According to Johnson's training, the complaints of jail detainees, such as pain, aches, and discomforts, are often a "perception of illness" that is not accurate and results from withdrawal from drugs. *Id.* at 6:20–7:08. Finally, Johnson says that ACH providers "have to kind of help [jail detainees] make decisions as opposed to including them in the decision process." *Id.* at 5:15–17. Johnson admitted in his deposition his view that "criminals" "perception of illness" is different from non-criminals. ECF 226 (Johnson Dep.) at 62:07–12.

Evaluating these materials, Dr. Bentley found that ACH's training encourages practitioners to use stereotypes about jail detainees and their reasons for seeking medical care.

ECF 249 (Bentley Rep.) at 21–24.  Dr. Bentley identified the following consequences of these materials:

- "actively introduces, reinforces, and exacerbates bias and misinformation about incarcerated patients";

- "encourages medical professionals to develop biases about patients in jails that, either consciously or unconsciously, replace the process of differential diagnosis with stereotypes that discount any reported symptoms and history";

- "invites healthcare professionals to assume that detainees are incapable even of providing useful information in the diagnostic process"; and

- "supports that ACH's unspoken expectation is to do less for people who are incarcerated."

ECF 249 (Bentley Rep.) at 23–24.

> **ii.    ACH's practices and express policies defeated proper medical screening at intake and prevented the transport of patients to off-site emergency rooms.**

Consistent with its training and culture of indifference to patient needs, ACH had policies and procedures that impeded and defeated the proper care of jail detainees. ACH's screening protocols were insufficient to identify and memorialize incoming detainees' problems and needs. ACH's policy for emergency transport was so restrictive as to make it impossible for medical staff to send a prisoner-patient experiencing chest pain to an emergency room.

> **a.    Screening policies and procedures were deficient.**

Plaintiff's correctional health expert opines that ACH's intake medical screening process failed to capture "basic information" about Christine and her health when she arrived.  ECF 246 (Venters Rep.) at 13.  The intake screening sheet lacked many of the 13 categories of information that the National Commission on Correctional Healthcare has identified as important to obtain during intake. *Id.* at 13–14.

Dr. Venters also noted "a serious and systemic deficiency" in the communication of information obtained at intake to medical staff. *Id.* at 13. According to Nurse Pisney's testimony, she had never seen one of the intake sheets prior to the death of Christine since intake sheets are not ordinarily included in a patient's medical file. ECF 218 (Pisney Dep.) at 59:2–3. The nurses or correctional officers working at the jail would communicate information obtained during intake to her, but that could lead to a problematic "game of telephone," where some information gets uncommunicated or miscommunicated. ECF 249 (Bentley Rep.) at 11. According to the experts, the failure of the intake process to capture important information about Christine's medical history reflected a flaw in the design of the process. ECF 249 (Bentley Rep.) at 24–25; ECF 246 (Venters Rep.) at 13–14.

Of particular pertinence in this case, ACH had no systematized practice of returning to obtain information from patients who were intoxicated during intake or otherwise unable to provide complete information about medications and medical history because of the stress of being in jail. Defendant's expert Dr. Young acknowledged that this is the proper practice. Ex. 2 (Young Dep.) at 54:3–7 ("[I]f somebody is unable to answer questions or doesn't know, due to the fact that they've had an overabundance of alcohol, then it's better to wait and talk to them the next day.").

These screening failures are no surprise in an environment where medical practitioners are taught at orientation that prisoners' accounts of their medical history and current condition lack all value, because "inmates are known to exaggerate all their symptoms" and "health is not the goal of inmates seeking care." ECF 226 (Johnson Dep.) at 5:06–10. Instead, as former ACH CEO and founder Norman Johnson taught in his training, the intake process was focused on speed over capturing accurate information about a jail detainee's medical history. Johnson

trained staff that when a jail detainee is describing their medical history, "at some point in time you can hurry them up because inmates frequently have nothing but time on their hands." *See* Ex. 19 (Video Transcript) at 22:15–17.

**b.  By policy, only "unresponsive" patients with chest pain went to the ER.**

Separately, ACH's express policy in its chest pain protocol effectively prohibited the transport of patients with indications of risk for heart attack from being transported to an emergency facility. In the words of Plaintiff's correctional healthcare expert Dr. Venters, ACH "did not ensure that patients who needed provider level assessment, including during potential medical emergencies, received the standard level of care." Venters Rep. at 24.  This problem was also "systemic" and likely caused either by "cost concerns, or simply from lack of attention to the standard of care in correctional health. *Id.* at 20, 24.  Either way, Dr. Venters found that unlike other small jails without full-time providers, ACH did not utilize transfer to the emergency department when it was necessary.  ECF 246 (Venters Rep.) at 15–16, 24. ACH's chest pain protocol epitomizes this: that form mandated EMS/911 response only if the patient was unresponsive, and had no clear information about obtaining an EKG, the only way to rule out a heart attack.  ECF 246 (Venters Rep.) at 21.

**iii.  Plaintiff has presented sufficient evidence of *Monell* liability based on a widespread practice.**

ACH takes Plaintiff to task for lacking sufficient evidence that its practices *resulted in other instances of death.* ACH Br. at 39–39. ACH misses the point. To succeed on a *Monell* claim, the plaintiff must show that, in the exercise of deliberate indifference, municipal policymakers chose a course of action from among alternatives that presented a known or obvious risk of constitutional harm. *Canton v. Harris*, 489 U.S. at 388. What matters is knowledge and disregard of a *risk of harm*, as many decisions reflect. *See, e.g.*, *Dixon v. Cook*

*Cty*, 819 F.3d 343, 348–49 (7th Cir. 2016) (notice of a systemic deficiency and inaction establishes liability); *Thomas v. Cook Cty.*, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom" of delayed responses to medical requests); *Davis v. Carter*, 452 F.3d 686, 694-95 (7th Cir. 2006); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760–61 (7th Cir. 2005) ("[T]he plaintiff need not show that the policy, practice, or custom resulted in past deprivations of rights."); *Woodward*, 368 F.3d at 929 (no "one free suicide" pass). A reasonable jury could certainly find that ACH's training practices, its screening procedures and its chest pain protocol, separately and collectively presented known or obvious risks and that ACH consciously disregarded those risks.

ACH is incorrect that a *Monell* violation must be supported with a substantial number of other incidents of injury. *See Thomas*, 604 F.3d at 303 (there are no "bright-line rules defining a 'widespread custom or practice'"). ACH "does not get a 'one free suicide'"—or here, a 'one free heart attack death'—"pass." *Woodward*, 368 F.3d at 929. Instead, "a single violation of federal rights can trigger municipal liability if the violation was a 'highly predictable consequence' of the [organization's] failure to act." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 398 (1997)); *see White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (citing *Jackson v. Marion County*, 66 F.3d 151, 152–53 (7th Cir. 1995) (holding that civil rights plaintiff's allegation of a widespread practice, together with allegation that the City of Chicago's standard printed form does not require specific factual support for an application for an arrest warrant, was sufficient to plead a *Monell* claim, and plaintiff was not required to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process). In sum, the Seventh Circuit has expressly rejected ACH's argument that there is some "magic number of injuries that must occur before its failure

to act can be considered deliberately indifferent." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017) (en banc).

Relying on these principles, district courts in this Circuit have denied summary judgment in cases like this one, where the plaintiff has provided evidence of a small number of other incidents where patients received constitutionally inadequate medical care. In *Awalt v. Marketti*, 74 F. Supp. 3d 909 (N.D. Ill. 2014), the district court denied summary judgment to HPL, a private medical care company, after the plaintiff provided evidence of six other detainees who were provided inadequate medical care. Similarly, in *Piercy v. Warkins*, 2017 WL 1477959 (N.D. Ill. Apr. 25, 2017), the district court denied summary judgment to ACH after the plaintiff provided evidence that seven other detainees were denied adequate medical care.

These cases, and many others, also establish that the evidence of notice is sufficient and summary judgment is unwarranted where the other examples of injury due to deficient care concern medical conditions not identical to the one at issue in the case. *See also Abreu v. City of Chicago*, 2022 WL 1487583, at *17 (N.D. Ill. May 10, 2022) (explaining that the Seventh Circuit has "warned against overstating Plaintiff's burden" and concluding that four complaints were sufficient to create a genuine issue in light of the record as a whole); *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 917 (N.D. Ill. 2016) (reiterating that there are no "bright-line rules" at summary judgment and explaining that a defendant's demand for statistical evidence of a widespread custom or practice "fails to persuade"); *Warfield v. City of Chicago*, 2009 WL 10739474, at *1 (N.D. Ill. Feb. 18, 2009) (holding that evidence of "up to nine witnesses who were allegedly mistreated" was sufficient to warrant trial and explaining that defendant's arguments that those incidents did not occur or were "isolated" and "outside of [their] control" are "not arguments amenable to summary judgment").

33

The obviousness of the risks posed by ACH's policy choices, without more, are sufficient for *Monell* liability. But even setting that point aside, the evidence in the summary judgment record as to other injurious outcomes is independently sufficient notice that the training approach and the screening procedures were deficient. Plaintiff's expert's record review identified six cases in which ACH failed to identify at screening that a detainee was suffering from drug withdrawal, causing those patients to experience acute and preventable symptoms of withdrawal.[2] ECF 246 (Venters Rep.) at 27–28. Two of those patients also had other emergent health symptoms, but were not evaluated or sent to the hospital. *Id.* He also identified four additional cases where patients had emergent health symptoms but were not sent to the emergency room. *Id.* Some of these cases resulted in the patients' death. *Id.*

These other instances, in combination with the obvious deficiencies of ACH's training and protocols is ample evidence to require a jury trial as to whether ACH was on notice that its training and policies were defective and could cause constitutional injury.

### iv.    A reasonable jury could determine that ACH's policies and practices caused Christine's death.

A reasonable jury could also determine that ACH's policies towards patients was a moving force behind the constitutional violations committed by Pisney and Fennigkoh that caused Christine's death.

---

[2] This is consistent with ACH's training protocols and generalized indifference to patient complaints reflected in those protocols. Johnson trained staff to the effect that withdrawal symptoms were of little concern: when "a crack cocaine addict, who really has never had a normal body sensation for the last five years" comes to jail and sleeps on an uncomfortable mattress, "they're going to have some pain," and will "feel achy all over." Ex. 19 (Training Video Transcript) at 7:21–8:05. Because they do not have access to drugs, "they have a perception of illness that may not be entirely accurate." *Id.* 8:05–06; *see also* ECF 226 (Johnson Dep.) at 62:07–12.

"[C]ausation is not a mechanical exercise like working a math problem and getting an answer, but instead requires jurors to view evidence in its totality, draw on their life experiences and common sense, and then reach reasonable conclusions about the effects of particular action and inaction." *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 384–85 (7th Cir. 2020) (en banc).  Courts have recognized that "a reasonable jury could find that pervasive systemic deficiencies in the detention center's healthcare system were the moving force behind" a plaintiff's injury in circumstances where that injury was foreseeable in light of a defendant's improper practices. *Dixon v. County of Cook*, 819 F.3d 343, 349 (7th Cir. 2016); *see also, e.g.*, *Daniel*, 833 F.3d at 740-42 (denying defendant's summary judgment motion where testimony from jail medical staff describing inadequate record-keeping practices and scheduling difficulties, "viewed in the light most favorable to Daniel, raise[d] a genuine issue medical care"); *Piercy*, 2017 WL 1477959, at *14 ("If a jail has a widespread practice of providing inadequate care, it is a highly predictable consequence that, faced with a possibly serious medical condition, medical personnel would fail to inquire further, provide necessary medications, or seek the assistance of a specialist."); *Roland v. Dart*, 2016 WL 4245524, at *7 (N.D. Ill. Aug. 11, 2016) (denying defendants' motion for summary judgment on prisoner's *Monell* claim and noting that even where the "causation chain is a long one, and it may be difficult for a jury to conclude that Defendants were a but-for cause of Plaintiff's injury . . . a jury, not the court, should make the determination whether Defendants' policies or practices—whether understaffing or generally allowing delayed processing of HSR forms—were the cause and 'moving force' behind Plaintiff's injury").

ACH's policies of treating the stated health problems of jail detainees with a high degree of skepticism and excluding patients from the diagnostic and treatment process were reflected in Nurse Pisney's conduct towards Christine, and Christine's death was a foreseeable result of those

policies.  Dr. Bentley concluded exactly that, finding that Nurse Pisney's dramatic departure

from the differential diagnosis process "was infected by [ACH's] training."  ECF 249 (Bentley

Rep.) at 24.  Bentley found that "Nurse Pisney repeated 'diagnostic' discussion is almost

verbatim from the ACH training video, stating that Christine was simply 'not happy to be in jail,

anxious about being in jail,' that she was probably having a 'panic attack.'"  *Id.*

ACH's policy of only gathering limited information from a patient to speed up the intake

process and treating the patient is an unreliable narrator of their own health history could

reasonably be viewed as causing Nurse Pisney not to follow up with Christine to gather

additional information.  Dr. Bentley adopted this view, finding:

> Nurse Pisney's statements that she saw no point in even attempting to gather
> additional medical information from Christine during the course of December 22
> (if her testimony that she did not know about the history heart history on the
> intake form is to be believed) correspond closely with ACH's training instruction
> that communicating with patients in a collaborative manner is disfavored in jail
> medicine and pointless since so many detainees are addicted.

ECF 249 (Bentley Rep.) at 24.

Nurse Pisney testified that, even if she had all the information about Christine's

symptoms and history, she *still* may not have sent her to the emergency room.  ECF 218 (Pisney

Dep.) at 239:8–10 ("The heart history may have changed my thinking, but I may have waited and

done the same thing as I did.").  Dr. Bentley found this statement to be "a stark departure from

the process of differential diagnosis in the case of a symptom like chest pain and shortness of

breath, for a woman who reported a history of congestive heart failure."  ECF 249 (Bentley Rep.)

at 25.  But, Dr. Bentley concluded, the statement "has a direct line to the approach encouraged in

Nurse Pisney's training."  *Id.*  In fact, Dr. Bentley determined, "it is hard to understand *except* in

a person who was trained in such thinking and adopted it in her clinical practice."  *Id.* (emphasis

added).

For all of these reasons, Plaintiff is entitled to a jury trial on his *Monell* claim against ACH.

## II. A Reasonable Jury Could Determine that the Monroe County Defendants Denied Christine Adequate Medical Care.

### A. Moga and Nelson are not entitled to qualified immunity.

#### i. Sergeant Shasta Moga failed to respond in an objectively reasonable manner to Christine's complaints and symptoms.

The claims against Shasta Moga should proceed because there is a dispute as to whether she responded in an objectively reasonable manner to Christine's complaints and symptoms. As a correctional officer, Moga could rely on the medical staff's expertise, but could not ignore Christine or her mistreatment. *See Arnett*, 658 F.3d at 755 ("nonmedical officials can be chargeable with deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner") (internal citations omitted); *Berry*, 604 F.3d at 440.

Like Nurse Pisney, Moga inadequately responded to Christine's repeated complaints about chest pain and needing to take her prescription medications. Moga completed a chest pain protocol with Christine in her cell after she complained to Moga of chest pain. ECF 215 (Moga-Parker Dep.) at 218:21–23, 223:14–17.

Despite Christine's complaints to Moga about her chest pain and other medical concerns, and Moga's knowledge about Christine's high blood pressure and heart problems, Moga decided not to get her emergency care. *Id.* at 103:18–104:03, 168:06–169:18, 230:20–231:5, 228:9–12. Moga knew a person should call 911 if they are with someone experiencing chest pain. ECF 215 (Moga-Parker Dep.) at 79:10–80:18. She observed Christine suffering from dizziness, shortness

of breath, and "achy, stabbing" chest pain. ECF 240-14 at 1. Christine reported to Moga, "I'm not right." *Id*.

Moga's decision not to call 911 or otherwise ensure Christine's transfer to the ER across the street resulted in her going into cardiac arrest at the Jail, causing her death. Had Moga called 911 or taken Christine to the ER before she went into cardiac arrest, she likely would have survived. Plaintiff's expert Dr. Charash opined:

> It is my opinion, within a reasonable degree of medical certainty, that had Ms. Boyer been sent to the emergency room at any point in time between 3:00 pm to 11:30 pm on 12/22/19, she would not have suffered from a cardiac arrest. Had Ms. Boyer been referred to an emergency room between 3:00 pm and 11:30 pm, she would have been placed on continuous cardiac monitoring. She would have had a 12-lead EKG taken, which would have shown the deep ischemic abnormalities that were noted later that evening. She also would have been given a chest x-ray, which would have resulted in a diagnosis of pulmonary edema.
> In the Emergency Room, Ms. Boyer would have been treated with supplemental oxygen, intravenous diuretics, ACE inhibitors, and bed rest.
>
> Blood testing would have diagnosed Ms. Boyer with severe hypokalemia, and Ms. Boyer would have been treated, in accordance with the standard of care, with intravenous supplemental doses of potassium. She would have had frequent potassium levels drawn. Standard care in an emergency department would have been to hold and treat Ms. Boyer until her cardiac emergency stabilized both through reduction of blood pressure and delivery of potassium therapy.
>
> With simple treatment outlined above, with the medications, supplements, and other care discussed above, Ms. Boyer would have avoided developing pulmonary edema, would have avoided going into congestive heart failure, and would have avoided suffering from a sustained cardiac arrest. She would have been successfully treated and would have survived this hospitalization.

ECF 248 (Charash Rep.) at 6.

There is evidence from which a jury could infer that Christine's chest pain, her report of achiness and shortness of breath, her statement that she was "not right" and her general appearance in combination were disturbing enough that, even as a lay person, Moga would have known that Christine required immediate treatment in the ER, creating a jury question as to whether her failure

to ensure that Christine was transported there was deliberately indifferent. Ex. 18 (MONROE COUNTY_2008) at 12:55:08 a.m.-12:57:35 a.m.; (jail video footage of Christine's emergent symptoms and cardiac arrest and staff's lack of urgency in responding and failure to help her).[3] *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) (plaintiff stated deliberate indifference claim against grievance officials where they did not intervene after receiving several grievances regarding plaintiff's medical care).

### B. Sergeant Danielle Nelson failed to respond in an objectively reasonable manner to Christine's complaints and symptoms.

There is also a jury question as to Nelson's deliberate indifference, evidenced by her failure upon Christine's intake (together with Fennigkoh) to document Christine's complaints and symptoms or get a complete medical history, ECF 215 (Moga-Parker Dep.) at 125:18–126:2; ECF 217 at 23:25, 24:14–15, and her failure to get Christine emergency care before she went into cardiac arrest, 160:8–11, 197:2–12, 197:25–198:2.

The standard for Nelson is the same. As a layperson, she could rely on the medical staff's expertise as long as she did not ignore Christine or her mistreatment. *See Arnett*, 658 F.3d at 755; *Berry*, 604 F.3d at 440. But Nelson took no action in response to Christine's repeated complaints about needing to take her prescription medications and chest pain. *Perez*, 792 F.3d at 782 (plaintiff

---

[3]     Plaintiff never received all surveillance video from Christine's detention, and notified defense counsel that he had access only to video footage starting at 12:55p.m. on Sunday. Defense counsel confirmed they had no other video than what had been produced, and produced ACH's retention policy that video footage automatically deletes after seven days. For a company like ACH that is frequently subject to litigation, such a policy can itself warrant a spoliation instruction. *See Lewy v. Remington Arms Co*.,836 F.2d 1104, 1112 (8th Cir. 1988) ("In cases where a document retention policy is instituted in order to limit damaging evidence available to potential plaintiffs, it may be proper to give a[] spoliation instruction."). Certainly here where a patient died, litigation could be anticipated and the improper auto-deletion should have been suspended.

stated deliberate indifference claim against grievance officials where they did not intervene after receiving several grievances regarding plaintiff's medical care).

Like Moga and Pisney, Nelson knew of Christine's complaints, symptoms, and history, but did not call 911 or try to secure Christine's transfer to the ER across the street. ECF 217 (Nelson Dep.) at 82:12–13. This resulted in Christine's death. ECF 248 (Charash Rep.) at 6. Nelson saw what Moga and Pisney saw and, like them, failed to get Christine the urgent care she obviously needed. Thus, there is likewise a jury question as to Nelson's liability for deliberate indifference.

**C. Moga and Nelson violated clearly established law.**

When a defendant invokes qualified immunity, the court assesses first whether the facts make out a violation of a constitutional right and then whether the right at issue was clearly established at the time of the defendant's misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Supreme Court recently emphasized, specifically in the qualified immunity context, the "importance of drawing inferences in favor of the nonmovant" at the summary judgment stage. *Tolan v. Cotton*, 134 S. Ct. 1866, 1866 (2014) (reversing grant of qualified immunity where lower court failed to do so); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004).

A jury could find that Moga and Nelson were deliberately indifferent to Christine's serious medical needs. The evidence, viewed favorably to Plaintiff, shows that Christine informed both Moga and Nelson of her heart complications and medical issues. *See* ECF 240-2; *see* ECF 240-14. Both also had the opportunity to observe Christine's condition and speak with her directly. *Id*. Both knew, because of their familiarity with the staffing schedule and Jail procedures, medical staff would not attend to concerns about Christine's medical state unless they intervened. These facts are sufficient to establish that Moga and Nelson had reason to believe that Christine's

complicated, incomplete medical history and later complaints of consistent chest pain required emergent care and created an imminent risk of harm.

Moga and Nelson's conduct violated clearly established law as it existed in 2019. In determining whether a right is clearly established, "it is unnecessary for the particular violation in question to have been previously held unlawful." *Lewis*, 864 F.3d 556 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Instead, the question is whether "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Anderson*, 483 U.S. at 640). Since at least 1994, the right to be free from deliberate indifference by non-medical staff regarding a medical need has been established. *See Farmer*, 511 U.S. at 825 ("A prison official may be held liable under the Eighth Amendment for acting with 'deliberate indifference' to inmate health or safety," and "[p]rison officials have a duty under the Eighth Amendment to provide humane conditions of confinement" including "medical care."); *see also Lewis*, 864 F.3d at 566 ("It has long been clear that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment."); *Walsh*, 837 F.2d at 801 (applying the deliberate indifference standard to jail staff in Fourth Amendment case).

Further, it is well established that if an official has reason to believe a prisoner is not receiving adequate treatment for a serious medical condition, a failure to take steps to ensure that medical care is provided satisfies the personal liability requirement of § 1983. *See Berry*, 604 F.3d at 440 (jail administrator not deliberately indifferent where he consulted with medical staff and responded to prisoner's complaints); *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (non-medical defendants not deliberately indifferent where "they investigated [plaintiff's complaints, sought reports from medical officials, and relied on the judgment of the prison physicians"); *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (prison official not deliberately

41

indifferent to prisoner's medical needs because he did not disregard the prisoner's complaints, but instead investigated the situation to ensure medical staff were addressing the problem); *Greeno*, 414 F.3d at 656 ("Perhaps it would be a different matter if [the non-medical defendant] had ignored plaintiff's complaints entirely, but we can see no deliberate indifference given that he investigated the complaints and referred them to the medical providers who could be expected to address plaintiff's concerns.").

Drawing all inferences in Plaintiff's favor, Moga and Nelson knew of Christine's serious medical need but inadequately responded. This violated clearly established law, and thus summary judgment on the basis of qualified immunity is inappropriate.

### C.  The Monell claims against Monroe County should proceed to trial.

Monroe County adopted ACH's deficient policies, as described above. Monroe County chose to provide medical care to its detainees via its contract with ACH, ECF 240-23, despite knowing that ACH had an express policy of systemic prejudice against the jail detainees and indifference to any medical problems those patients may experience and attempt to report. Monroe County knew of ACH's express policy in its chest pain protocol effectively prohibited the transport of patients with indications of risk for heart attack from being transported to an emergency facility. Yet Monroe County continued to contract with ACH to provide its detainee's care. Thus, for the same reasons that ACH is liable under *Monell,* Monroe County is also liable.

Monroe County correctional officers took Dr. Johnson's trainings: Introduction to Correctional Healthcare, Detox in Jails, and A Jail is Not a Health Spa. ECF 226 (Johnson Dep.) at 28:11–24, 45:3–07, 19:08–21:01 (Johnson testifying that his multiple trainings were for correctional and health staff, and his different approach to correctional medicine applied to all staff at the Jail). The County knew about these life-threatening practices at its Jail. Monroe

County correctional officers also used the chest pain protocol which allowed for emergency care for chest pain only if a patient is unresponsive. ECF 240-14.

If not for these policies, set by ACH and adopted and carried out by ACH and Monroe County, Christine likely would not have died. ECF 248 (Charash Rep.) at 6 (expert opinion that Christine would have survived had she been transferred to an ER before 11:30p.m.). Plaintiff's correctional healthcare expert points out in his opinion that it is common for small jails to send patients to the ER when they do not have a provider on-site, or otherwise "lack the capacity to adequately assess someone with serious health problems." ECF 246 (Venters Rep.) at 15–16. Yet Monroe County chose instead to implement ACH's protocols making emergency care impossible. Thus, Moga, who was trained in CPR from a prior job and knew to call 911 for chest pain, did not take these obvious and necessary steps as a Monroe County employee and pursuant to the County/ACH protocol. ECF 215 (Moga-Parker Dep) at 79:10–80:18. This was outside the norm for Jails like Monroe County's, and it created an obvious risk to its detainees' health. ECF 246 (Venters Dep) at 29–33.

For the same reasons discussed above, the need for more or different training and policies with respect to transporting detainees with emergent conditions to the hospital was or should have been plainly obvious to the county. *See* Harris, 489 U.S. at 390 ("City policy" may arise "if the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonable be said to have been deliberately indifferent to the need.").

Christine's death was a reasonably foreseeable consequence of Monroe County's contracting with ACH, a company known to have deficient healthcare practices, as evidenced by the trainings and protocols County employees utilized at the Jail. Monroe County's continued

contracting with ACH, despite these problems, caused the deficient care of Christine resulting in her death.

### i. Monroe County may be liable regardless of the individual defendants' liability.

Monroe County argues that it cannot be liable under *Monell* because Plaintiff has failed to establish Christine was deprived of a constitutional right by any individual defendant. ECF 245 at 26. As explained herein, however, a reasonable jury could find that the individual defendants were deliberately indifferent. But even if the jury were to find that if the individual defendants were not deliberately indifferent, a reasonable jury could nonetheless find Monroe County liable based on the actions of non-defendant Monroe County personnel who could be deemed to have violated Christine's constitutional rights. As Plaintiff's expert Dr. Venters explained, Christine presented with symptoms and a medical history that called for her transfer to the emergency room, which likely would have prevented her death. ECF 246 (Venters Rep.) at 15–16, 29–33. But no correctional officer on duty that weekend and no other Monroe County personnel who encountered Christine at the critical time, made any effort to secure her transfer to the emergency room. ECF 240-7.

Monroe County's argument also fails for a more fundamental reason. It is possible that Monroe County could be found liable under *Monell* even if no Monroe County employee is individually liable for a constitutional violation. The Seventh Circuit explained why *Monell* organizational liability does not rise and fall with individual liability, in *Glisson*:

> [T]his case well illustrates why an organization might be liable even if its individual agents are not. Without the full picture, each person might think that her decisions were an appropriate response to a problem; her failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent. But if institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible.

849 F.3d at 378. Accordingly, it is only where "the plaintiff's theory of *Monell* liability rests entirely on individual liability"—such as when a plaintiff alleges that the defendant is a final policymaker and offers no other *Monell* theory—that "negating individual liability will automatically preclude a finding of Monell liability." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). That is not the case here.

In sum, there are triable issues as to Warren and Moga. But even if a jury ultimately concludes that they acted reasonably given the facts known to them at the time, that jury could still reasonably conclude that Monroe County's unconstitutional training, practices, and procedures still created constitutional liability. *See Wiley v. Wexford*, 21-cv-599, ECF 145 at 7 (S.D. Ill. August 14, 2023) (Order Denying Defendants' Motion to Bifurcate Plaintiff's *Monell* Claim) ("Wexford may be liable under Monell, even where the Individual Defendants are not.") (citations omitted).

## III.    The claims against the USA Medical Defendants should proceed to trial.

### A.  The claims against USA Medical should proceed to trial.

Plaintiff includes a claim against USA Medical, shell company of ACH, because Plaintiff reasonably fears that Defendants Johnson and Schamber, the individual shareholders of both corporations, have deliberately undercapitalized ACH with a view to limiting ACH's ability to pay a substantial monetary judgment. This is a case in which, should Plaintiff prevail, a verdict against ACH could be substantial. A life has been lost. Should ACH claim that it lacks insurance or capital to satisfy a judgment based on such a verdict, Plaintiff should be permitted to pierce the corporate veil of ACH and seek recovery from USA Medical and

the two shareholders.[4]

"The doctrine of piercing the corporate veil may be used to hold individual shareholders, officers and related corporations liable for the acts of the corporation," and corporate form will be disregarded where "the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice."). *Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 265 (7th Cir. 1996). Veil-piercing and alter ego claims are governed by the law of the state of the corporation whose veil is sought to be pierced. *On Command Video Corp. v. Roti*, 705 F.3d 267, 272 (7th Cir. 2013); *see* Restatement (Second) of Conflict of Laws § 307 (regarding corporations); *see also Gann v. William Timblin Transit, Inc.,* 522 F.Supp.2d 1021, 1030 (N.D.Ill.2007).

USA Medical is incorporated in Wisconsin. ECF 238-2. Wisconsin courts apply the "alter ego" doctrine, requiring that the following three elements be present in order to pierce the corporate veil:

> 1. Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> 2. Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
>
> 3. The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

---

[4] Plaintiff does not believe that the veil piercing question is one for the jury to resolve or a matter that requires resolution at summary judgment. Whether the corporate veil can be pierced is only relevant if the jury should render a sizable verdict against ACH and/or its employees, or if ACH attempts to escape liability based on the ACH/USA Medical corporate form.

*Consumer's Co–op of Walworth County v. Olsen*, 419 N.W.2d 211, 217–18 (1988); *see Taurus IP*, 519 F.Supp.2d 905 (applying the alter ego doctrine from *Consumer's*, and stating that "a corporate veil may be pierced only if 'applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim.'"). Inadequate capitalization and disregard of corporate formalities are significant factors in determining whether the corporate veil should be pierced. *Consumer's Co–op*, 419 N.W.2d at 217.

In this case, the corporate forms of ACH and USA Medical should be disregarded. Plaintiff has presented evidence of both inadequate capitalization and disregard of corporate formalities. First, although ACH/USA Medical engages in correctional medicine, when asked if there was sufficient capital to pay a civil rights judgment, Dr. Johnson could not confirm that ACH had the funds even to pay a prior $8.5 million jury verdict that ultimately settled for half of that. ECF 226 (Johnson Dep.) at 258:19–25 ("Q: Do you think ACH would've been able to pay the full 8.5? A: I don't know."). Dr. Johnson offered that ACH has a line of credit, and guessed it was "3,000,000, something like that," *id.* at 258:19 –259:13, but even assuming his guess was accurate, ACH's settlement payment plus their total credit available would total $7.5 million. Yet ACH/USA Medical has *never* tried to secure insurance beyond $1 million. ECF 227 (Lynch Dep) at 86:09–87:22, 89:10–15, 95:17–22 ("Q: [H]as ACH attempted to obtain coverage above – of above one million? Q: Not directly, no, we've never asked for that."). Even when one state, Minnesota, required that ACH have insurance over $1.5 million, ACH asked their current broker but made no attempt to find another carrier to insure them above $1 million. *Id.* at 95:04–08.

Plaintiff has also presented evidence that ACH/USA Medical disregarded corporate

formalities. Johnson, Schamber, and ACH control USA Medical, and Johnson and Schamber control ACH. ACH's officers (president, vice president, secretary, and treasurer) are Dr. Johnson and his wife. ECF 238-7; ECF 238-8. ACH/USA Medical's board appear never to meet. ECF 238-3; ECF 238-4; ECF 238-9; ECF 239-10. Dr. Johnson and Schamber are owners, directors, and corporate executives of both ACH and USA Medical. ECF 238-3; ECF 238-4. Most of USA Medical's stock is owned by Norman Johnson and Travis Schamber. ECF 238-2.

USA Medical's only client is ACH, and ACH created it to outsources or subcontracts the performance of services that require licensure to practice medicine on all its jail contracts to USA Medical. ECF 226 at 23:02–12.  ACH, through Johnson and Schamber, exercises control over the manner of means by which USA Medical and its employees and officers (including Lisa Pisney and Amber Fennigkoh) perform their duties. Ex. 15 (Training Slides) at 1; ECF 226 (Johnson Dep.) at 26:15–17.

USA Medical makes two arguments against veil-piercing: (1) that there is not factual or expert evidence supporting veil-piercing, and (2) that Plaintiff did not answer discovery as to these claims.[5]

As to the first, Plaintiff has presented evidence supporting veil-piercing, and USA Medical has cited no authority for its position that expert evidence is needed to withstand summary judgment.

---

[5] USA Medical makes a third argument that Plaintiff's prior medical expert Jeff Keller had a healthcare company that was similarly insured and capitalized. USA Medical does not make an attempt to explain the relevance of this testimony, develop the facts, or cite to any caselaw stating that it should be considered. This argument is therefore waived. *See Berkowitz*, 927 F.2d at 1384 ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). Even if not waived, presenting piecemeal facts about how a non-party company operates does not absolve USA Medical of liability here.

As to the second, USA Medical's motion amounts to a motion for sanctions, asking the Court to disregard Plaintiff's veil-piercing evidence because Plaintiff failed to respond to interrogatories that USA Medical never enforced.[6] Courts do not resort to the sanction of barring evidence that was inadequately disclosed unless the omission was both unjustified and prejudicial. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Defendants were not prejudiced by Plaintiff's failure to respond to the discovery. Defendants understood the contours of Plaintiff's veil-piercing claims. *Boyer II* ECF 15; ECF 67. Indeed, Defendants never mentioned the discovery after serving it, even once Plaintiff missed the deadline, and Defendants proceeded with discovery without it (showing the lack of prejudice to them). *In re Sulfuric Acid Antitrust Litigation*, 231 F.R.D. 331, 340 (N.D.Ill.2005) (claim of severe prejudice by lack of responses to discovery requests was undermined by party taking the depositions in any event). The Court should deny their motion.

**B.  The claims against Schamber and Johnson as individuals should proceed to trial.**

Other than responding to the veil-piercing/alter ego arguments, Travis Schamber and Norman Johnson, the shareholders and founders of ACH, make no argument for why Plaintiff's Section 1983 and state-law claims against them should not proceed to trial. Any additional argument that those two Defendants might make in reply must therefore be deemed forfeited and rejected on that basis. *Berkowitz*, 927 F.2d at 1384 ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

---

[6] Although Plaintiff regrets the error, Defendants never alerted Plaintiff to the missed discovery responses. Defendants certainly never conferred prior to seeking this harsh sanction. From what Plaintiff's counsel can gather, the discovery deadline was not calendared. Defendants first alerted Plaintiff to the missed deadline in their motion for summary judgment.

But, in any event, there is a basis to find Johnson and Shamber liable for their
policymaking role in establishing the training and other policies that led to the constitutional
violations in this case. First, Dr. Schamber, in his capacity as the Corporate Medical Director,
controlled ACH/USA Medical's employees' provisions of care. Ex. 9 (Schamber Dep.) at 17:16–
21 (stating it was "[v]ery common" for Pisney and advanced practice providers to consult him in
his capacity as corporate medical director), 70:18–71:08, 120:19–121:05. Dr. Schamber
presented the flawed ACH trainings to new medical providers at the Jail, Ex. 14 (Training
Slides) at 1. He had the discretion to change Dr. Johnson's curriculum but chose not to. *Id.* at
107:3–18.

Dr. Johnson developed and controlled the training of all ACH/USA Medical personnel at
the Jail. ECF 226 (Johnson Dep.) at 26:15–17. His plan was to train providers to practice
medicine differently in a correctional environment than outside of it, and to expect different
motives from detainees than they themselves would have when seeking medical care. *Id.* at
26:21–27:03. He knew that correctional officers and medical staff received this training, and
often attended himself along with Dr. Schamber. *Id.* at 20:16–24, 29:10–12, 45:18–22; Ex. 9,
(Schamber Dep.) at 110:18-111:16.

He trained jail staff, "We must approach [detainees] in a far more parental method. We
have to kind of help them make decisions as opposed to including them in the decision process.
And so with this group, we actually have to tell them what we can do and what we cannot do in a
jail environment." ECF 226 (Johnson Dep.) at 37:2–9. In Christine's case, Pisney, Fennigkoh,
and jail staff followed Johnson's training almost to the letter. *Id.* at 28:14–25; 44:3–7 (training
staff to rush detainees through their description of their family medical history), 48:15 – 18
(training that its "not much different than dealing with pediatrics"), 86:2 –87:13 (training that

50

female detainees especially are addicted to drugs, want more medical care than they need, and are "going to be seeking health care immediately for any bodily sensation that they may have."

The record shows Dr. Johnson and Dr. Schamber were alter egos of ACH and USA Medical, and the individual claims against them should proceed to trial.

**IV.    Plaintiff's failure to intervene claims should proceed to trial.**

The jury must decide whether Defendants failed to intervene. In Count II, Plaintiff brings failure to intervene claims under section 1983 against Nurse Pisney, Nurse Fennigkoh, Sergeant Nelson, and Officer Moga. *Boyer I* ECF 102 ¶¶ 138–41.

The elements of a failure to intervene claim are that (1) a constitutional violation has been committed by a state actor; and (2) the defendant had a realistic opportunity to intervene to prevent the harm from occurring. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). "A failure to intervene claim generally presents questions of fact appropriate for the jury; a court should not decide it at summary judgment if the underlying [constitutional] claim remains unresolved." *Fleriage v. Village of Oswego*, 2017 WL 5903819, at *9 (N.D. Ill. Nov. 30, 2017).

Defendants did not move for summary judgment as to the failure to intervene claims, or present any arguments specific to those claims. There is ample evidence in the record that the Defendants failed to take action or provide the necessary information to enable effective lifesaving, medical care despite knowing of the serious risks of harm facing Christine (and knowing it was not being adequately addressed).

Summary judgment on this claim is therefore unwarranted.

**V.    Plaintiff's claims on his own behalf should proceed to trial.**

The Monroe County Defendants move for summary judgment on the claims brought on Plaintiff's own behalf, and inaccurately state that Plaintiff did make any allegation nor present

any evidence as to these claims. ECF 245 at 46–47. The Monroe County Defendants limit their arguments to criticizing any § 1983 claim brought on Plaintiff's own behalf. But as clearly stated in the operative complaint, claims for wrongful death, intentional infliction of emotional distress, and negligent infliction of emotional distress are brought on behalf of the Estate and Plaintiff's own behalf, not the § 1983 claims. Any argument that these claims should be dismissed is waived. *Berkowitz*, 927 F.2d at 1384.

The ACH Defendants moved for summary judgment as to the intentional infliction of emotional distress and negligent infliction of emotion distress claims brought on Plaintiff's own behalf. But the ACH Defendants misrepresent and oversimplify Wisconsin caselaw, and contend that a spouse may never bring a claim for emotional distress arising from medical malpractice. ECF 251 at 51–55 (conflating derivative and bystander claims, and parent/child cases and statutes).

Defendants contend that Plaintiff's claims for intentional and negligent infliction of emotional distress must be dismissed under *Pierce v. Physicians Ins. Co. of Wis., Inc.*, 692 N.W.2d 558, 563 (Wisc. 2005) and *Phelps v. Physicians Ins. Co. of Wis., Inc.*, 2009 N.W.2d 615, 635 (Wisc. 2009). But their reliance on these cases is misplaced. Neither decision forecloses Plaintiff's claims under the specific facts presented here, and both can be distinguished in material ways that preclude summary judgment.

In *Pierce*, the Wisconsin Supreme Court reaffirmed the bystander liability standard set out in *Bowen v. Lumbermens Mutual Casualty Co.*, 183 Wis. 2d 627 (1994), under which a plaintiff must demonstrate:

1. A close familial relationship with the victim;

2. Temporal and sensory observation of the negligent act or its immediate aftermath; and

3. Severe emotional distress.

Here, Plaintiff is Christine's surviving spouse and unquestionably satisfies the close relationship requirement. Unlike in *Pierce*, where the plaintiffs learned of the death after the fact and were not present at the hospital, Plaintiff was physically present in the jail on Sunday, was in phone communication with Christine, and directly heard her deteriorating condition in real time. ECF 210 (Boyer Dep.) at 44:15–18; 44:2–6, 63:14–16; 145:11–23. He knew something terrible could happen if Christine did not get her medications, and knew Defendants were refusing to help her. *Id.* at 51:2–10, 59:20–60:8, 140:16–22, 162:15–20. Then, Defendants asked Plaintiff to bring socks (not medicine) to the Jail for Christine, made him wait in fear when he got there, and then told him that she was in critical condition. *Id.* at 54:21–55:6; 57:25–58:11. At a minimum, there are genuine factual disputes regarding Plaintiff's proximity and sensory perception of the events leading to Christine's death that should be resolved by a jury—not on summary judgment. *See Bowen*, 183 Wis. 2d at 654–56.

In *Phelps*, the Court held that the wrongful death statute barred a duplicative IIED claim arising solely from the same alleged medical negligence. However, the Court made clear that IIED may still be actionable where there is distinct, outrageous conduct directed at the plaintiff, separate from the medical negligence at issue. *See Phelps*, 2009 WI 74, ¶ 67.

Here, Plaintiff's IIED claim is not duplicative of the wrongful death claim. It is based not merely on medical inattention, but on the callous disregard by jail and medical staff in the face of Christine and Greg's repeated pleas for help—conduct that Plaintiff himself experienced. This includes Plaintiff's knowledge of the jail's failure to administer Christine's prescribed medications, its hours-long delay in responding to clear signs of cardiac distress, and its refusal to transport her for emergency care. Throughout the weekend, Jail staff acted as though securing

Christine's medications was *his* responsibility, making him search throughout their home, garbage, and truck all night to find his wife's medications as she was dying. *Id.* at 66:04–68:05; Ex. 1 (MONROE_COUNTY_001518); These facts support a reasonable inference that Defendants engaged in outrageous conduct likely to cause emotional harm, a question that must be evaluated by a jury.

Moreover, whether Defendants acted with the reckless intent required for IIED is inherently a factual question. *See Alsteen v. Gehl*, 21 Wis. 2d 349, 358 (1963). The Court should deny Defendants' motions.

## VI.     The state law claims must proceed to trial.

In Counts IV and V of the Fourth Amended Complaint, Plaintiff brings wrongful death and survival claims against Defendants under Wisconsin state law. Because a reasonable jury could find that ACH/USA Medical, Monroe County, the Nurse Defendants, and the Correctional Officer Defendants violated Christine's Eighth Amendment rights, a jury necessarily could find that these Defendants liable under Wisconsin's wrongful death and survival statutes as well. Wis. Stat. § 895.01(1)(am); Wis. Stat. §§ 895.03; *Christ v. Exxon Mobil Corp*., 866 N.W.2d 602, 10–13 (describing history of claims and damages available).

Finally, the Estate may pursue IIED and NIED claims that Christine herself could have brought had she survived. Under Wis. Stat. § 895.01(1)(am), a cause of action for personal injury—including emotional distress—survives the death of the injured party and may be brought by their estate. If Christine had survived the conduct at issue, she would have had a viable cause of action for IIED or NIED based on the distress she endured while repeatedly begging for life-saving medical care and being ignored.

Christine repeatedly reported terrifying symptoms: stabbing chest pain, shortness of breath, dizziness, nausea, and shoulder pain. She identified the medications she had been prescribed and made clear that she had a history of congestive heart failure and was in imminent danger. Defendants were indifferent to her pleas, delayed contacting medical personnel, and failed to send her to the hospital. Christine remained conscious and aware throughout this period—acutely aware that she was dying and not being helped.

This is precisely the kind of "severe emotional distress" contemplated in *Alsteen*, 21 Wis. 2d 349 (IIED), and *Johnson v. Rogers Mem'l Hosp., Inc.*, 2001 WI 68, ¶ 96, 244 Wis. 2d 364 (NIED). In both torts, it is a jury question whether the conduct was extreme and outrageous (IIED) or whether the emotional harm was serious and foreseeable (NIED). The facts here satisfy the threshold to permit those issues to go to a jury.

## CONCLUSION

For the reasons set forth above, this Could should deny Defendants' motion for summary judgment.

Dated: March 28, 2025                     Respectfully submitted,

                                          **GREGORY BOYER**

                                          By:    /s/ Maria Makar
                                                 *One of Plaintiff's Attorneys*

                                          Jon Loevy
                                          Maria Makar
                                          LOEVY & LOEVY
                                          311 N. Aberdeen St. 3rd Floor
                                          Chicago, IL 60607
                                          (312) 243-5900